F I L E D
06/01/2020
*Shirley Faust*
CLERK
Missoula County District Court
STATE OF MONTANA
By: Latishia Atkins
DV-32-2020-0000604-OC
Deschamps, Robert L III
7.00

Quentin M. Rhoades
State Bar No. 3969
Robert Erickson
State Bar No. 9966
Rhoades, Siefert & Erickson PLLC
430 Ryman Street
Missoula, Montana 59802
Telephone: (406) 721-9700
qmr@montanalaywer.com
erickson@montanalawyer.com

*Pro Querente*

## IN THE FOURTH JUDICIAL DISTRICT COURT OF MONTANA
## MISSOULA COUNTY

| | |
|---|---|
| **STEVE NELSON, MICHAEL BOEHME and BONNER PROPERTY DEVELOPMENT, LLC,**<br><br>Plaintiffs,<br><br>**vs.**<br><br>**PROJECT SPOKANE, LLC, and SEAN WALSH,**<br><br>Defendants. | Cause No. **DV-32-2020-0000604-OC**<br>Dept. No. **1**<br><br><br>***DECLARATION OF STEPHEN NELSON*** |

## DECLARATION OF STEPHEN NELSON

Per MONT. CODE ANN. § 1-6-105, the undersigned declares under

oath as follows:

Exhibit G (1 of 3)

1.      I am over eighteen (18) years of age, and a resident of Missoula County, Montana. I am mentally sound and competent to attest to the matters set forth herein. The matters set forth in this Declaration are based upon my own personal knowledge, unless otherwise stated.

2.      I am a member and a Co-Manager of Bonner Property Development, LLC, a Montana limited liability company ("BPD"). Michael Boehme ("Boehme") is a member and Co-Manager of BPD. BPD is the owner of certain real property in Missoula County, Montana, commonly known as the "Planer Building at Bonner Mill Site" (the "Property").

3.      In 2015, I had multiple telephone conferences with Sean Walsh ("Walsh") and Yan Alwaiss regarding his interest in leasing space at the Property for the purposes of operating a cryptocurrency mining operation in the form of a data center with a very large number of high-tech computer servers specifically designed to "mine" cryptocurrency, including Bitcoin.

4.      After negotiations, I signed that certain Commercial Lease Agreement, effective March 1, 2016[1] (as amended to date, the "Lease"), on behalf of BPD, as landlord, with Project Spokane, LLC, a Colorado limited liability company ("Project Spokane"), as tenant. During the negotiations

---

[1] Ex. 1: Commercial Lease Agreement

related to the Lease, Walsh represented to me that he was acting in the capacity as an authorized agent of Project Spokane.

5.     BPD and Project Spokane subsequently amended the terms of the Lease arrangement, and I signed first and second amendments to the commercial lease agreement as a Co-Manager of BPD.[2]

6.     I was involved with and negotiated two loans from BPD to Project Spokane, specifically a loan in the original principal amount of $140,000.00, evidenced by a Promissory Note and a Security Agreement, each dated April 5, 2016, and a loan in the amount of $1,200,000.00, evidenced by a Promissory Note and a Security Agreement, each dated December 23, 2016.[3] These loans were later repaid by Project Spokane.

7.     In the summer of 2018, I had discussions with Walsh and Dan Stivers, who I understood to be the manager of the operations of Project Spokane, and then later of HyperBlock ("Stivers"), regarding the desire for Project Spokane to enter into a transaction whereby it would sell substantially all of its assets and assign its obligations under the Lease to HyperBlock LLC, a Delaware limited liability company ("HyperBlock").[4]

---

[2] Ex. 2:  (i) First Amendment to Commercial Lease Agreement dated December 2016, to be effective January 1, 2017,  *AND* (ii) Second Amendment to Commercial Lease Agreement dated July 13, 2017, and effective January 1, 2017

[3] Ex. 3:  (i) Promissory Note dated 04/05/2016; (ii) Security Agreement dated 04/05/2016; (iii) Promissory Note dated 12/23/2016; AND (iv) Security Agreement dated 12/23/2016

[4] Ex. 4: Emails among Rambod Peykar, Walsh, Stivers, Steve Nelson, Bjornson RE HyperBlock-Project Spokane transaction from 07/02/2018-07/09/2018

HyperBlock was formed in December 2017 as a Delaware limited liability company, and the sole member of HyperBlock was HyperBlock, Inc., an Ontario (Canada) corporation ("HBI").[5] Stivers was Sean Walsh's man on the ground for the Bonner data center. It was clear at the time that Walsh was actively involved with both Project Spokane and HyperBlock and Walsh would continue to be involved with the bitcoin mining operations at the Property, even after the transaction between HyperBlock and Project Spokane closed, in much the same manner as before.

8.     In a telephone conversation with Walsh in late June or early July of 2018, Walsh told me he would send me $100,000 worth of HyperBlock stock once the transaction with Project Spokane closed. I informed him that any stock would need to be not just to me personally but would also need to be shared with my partner. Neither I nor BPD ever received this stock.

9.     I met with Walsh at the Property in July of 2018 to discuss, among other things, the transaction between HyperBlock and Project Spokane.

---

[5] Ex. 5:  (i) Certificate of Formation of HyperBlock dated 12/29/2017; (ii) LLC Operating Agreement of HyperBlock dated 12/29/2017; (iii) Articles of Arrangement of HBI, filed with Ministry of Government and Consumer Services (Ontario), effective 7/10/2018;

10.     In connection with the HyperBlock-Project Spokane transaction, I executed consent letter on behalf of BPD, as Co-Manager, dated July 3, 2018,[6] and an Assignment, Assumption and Amendment of Lease effective July 10, 2018 (the "Assignment"),[7] under which HyperBlock assumed Project Spokane's obligations under the Lease. Walsh executed documents related to the acquisition of Project Spokane's assets by HyperBlock in the capacity of the Manager of PS Mgt LLC, a limited liability company which was the Manager of Project Spokane.[8]

11.     In connection with the acquisition of Project Spokane's assets by HyperBlock, all outstanding balances to BPD under the prior loans from BPD to Project Spokane were paid off.

12.     In the fall of 2018, I had discussions with Stivers and Walsh regarding HyperBlock's desire to expand its bitcoin mining operations by leasing additional space and constructing certain improvements on the Property, and we negotiated further modifications to the Lease. On November 2, 2018, I sent a term sheet[9] to David Bjornson, BPD's counsel ("Bjornson"), related to the lease modification and construction of the

---

[6] Ex. 6: Email from Kristen Martin (Walsh's executive assistant) to Nelson on 12/07/2018 at 1:46 PM with executed assignment and Project Spokane consent letter, dated 07/03/2018 (signed by Walsh on behalf of Project Spokane and by BPD)

[7] Ex. 7: Assignment and Assumption and Amendment of Lease, executed effective July 10, 2018

[8] *See* Ex. 5 and Ex. 6

[9] Ex. 8: Email from Nelson to Bjornson dated 11/02/2018 and attached term sheet

improvements at the Property. I had drafted and revised the term sheet based on my discussions with Walsh and Stivers. A provision included on the term sheet was "UCC filings & lien releases for each job & piece of equipment putting Bonner Property Development LLC in a first lien position." This term sheet was sent to Bowditch for his review and discussion with Walsh.[10] In addition, I had multiple correspondence with Walsh and on which Walsh was copied related to HyperBlock's desire to expand the leased space and construct improvements on the Property.[11]

13.    HyperBlock applied for a loan from Bank of Montana ("BOM") to finance the expansion through the construction of additional improvements and the acquisition of certain additional equipment. BOM was not willing to provide the loan to HyperBlock withoutcredit enhancements from BPD and its principals. To induce BOM to provide the loan to HyperBlock, BPD and its principals (specifically Boehme and I) agreed to provide certain credit enhancements, described in more detail below.

14.    In connection with HyperBlock's application to BOM for the loan, I was copied on email correspondence from representatives of HyperBlock, including Kristen Martin and Eric So, where they provided

---

[10] Ex. 8: (i) Term sheet provided from Nelson to Bjornson dated 11/02/2018; (ii) Bjornson emailing term sheet to Bowditch
[11] Ex. 9: Email chain with multiple corr. between Walsh, Nelson, and Jake Pelczar of BOM on 11/27/2018

certain governing documents and resolutions of HyperBlock and HBI. The resolutions and documents provided in connection with the BOM Loan indicated Walsh was designated as a party authorized to execute and deliver documents on behalf of HBI and HyperBlock, as the Chief Executive Officer of HBI, the sole member of HyperBlock.[12] [13]

15.    BOM ultimately provided HyperBlock a loan in the principal amount of up to $2,625,000 on or around December 14, 2018 (the "BOM Loan"). All documents related to the BOM Loan that required HyperBlock's signature were executed by Walsh on behalf of HyperBlock.[14]

16.    As part of the required credit enhancements for the BOM Loan, I personally, along with each of Boehme and BPD, each signed a Commercial Guaranty and pledged certain of our assets to guarantee and secure HyperBlock's obligations under the BOM Loan. I executed certain documents, both in my individual capacity and as a Co-Manager of BPD, including but not limited to a Commercial Guaranty from me personally, a Commercial Guaranty from BPD, and a Deed of Trust, an Assignment of

---

[12] Ex. 10:  Resolutions of HyperBlock and HBI: (i) Limited Liability Company Resolution to Borrow/Grant Collateral/Subordinate Debt of HyperBlock, signed by Walsh as CEO of HBI, sole member of HyperBlock on 12/14/2018; (ii) Resolution of Corporate LLC Member, signed by Walsh as CEO of HBI, on 12/14/2018; (iii) Resolution of Directors of HBI (including Walsh) dated 12/03/2018

[13] *See also* Ex. 5 (Formation and governing documents of HyperBlock and HBI)

[14] Ex. 11: Select BOM Loan documents executed by Walsh on behalf of HyperBlock: (i) Promissory Note, (ii) Business Loan Agreement, (iii) Landlord's Consent to Assignment, (iv) Subordination Agreement – Lease, (v) Disbursement Request and Authorization, (vi) Errors and Omissions Agreement, (vii) General Authorization, (viii) Consent to Disclosure of Income Tax Return Information, (ix) IRS Form W-9, (x) Beneficial Ownership Form

Rents, and a Landlord's Consent to Assignment, each by BPD related to the Property. Boehme also executed and delivered a Commercial Guaranty regarding his obligations as a personal guarantor of HyperBlock's obligations related to the BOM Loan.[15] Neither I nor Boehme personally received any consideration from HyperBlock in exchange for each of us providing a personal guaranty.

17.    Walsh negotiated and executed documents on behalf of HyperBlock related to BPD's credit enhancements for the BOM Loan, including a Credit Enhancement Agreement dated December 13, 2018 (the "Credit Enhancement Agt."),[16] and a Security Agreement, dated December 13, 2018 (the "Security Agt.").[17] Walsh also negotiated and executed a Third Amendment to Commercial Lease Agreement on behalf of HyperBlock, effective December 13, 2018 ("Third Amendment").[18] I signed each of the Credit Enhancement Agt., Security Agt., and Third Amendment as a Co-Manager of BPD.

18.    Walsh executed the Security Agt. and Credit Enhancement Agt. on behalf of HyperBlock and granted BPD a first lien security interest in the

---

[15] See Ex. 12: BOM Loan documents signed by BPD and its principals: (i) Commercial Guaranty from Nelson; (ii) Commercial Guaranty from BPD; (iii) Deed of Trust; (iv) Assignment of Rents; (v) Landlord's Consent to Assignment; (vi) Hazardous Substances Certificate and Indemnity Agreement; and (vii) Commercial Guaranty from Boehme
[16] Ex. 13: Credit Enhancement Agreement
[17] Ex. 14:  Security Agreement
[18] Ex. 15: Third Amendment to Lease

assets HyperBlock acquired with the BOM Loan for the purposes of securing HyperBlock's obligations to BPD under the Lease and the Credit Enhancement Agt..[19] I agreed to provide the credit enhancements and guarantee the BOM Loan because Sean, negotiating and signing documents, provided security interest in favor of BPD which was a first priority lien on the assets of HyperBlock to be acquired with BOM Loan. Had I known Walsh and Project Spokane had security interests or that they did not actually intend to provide BPD's first-priority lien as promised, I would not have provided the requested credit enhancements and the BOM Loan would not have been approved by BOM or closed. In other words, without the first lien security interest provided in the documents, there would not have been financing for Hyperblock to purchase new assets.

19.    Throughout November and December of 2018, Walsh and Jaymie Bowditch ("Bowditch"), of Boone Karlberg PC, as attorney for HyperBlock, had multiple correspondence and conversations with BPD's counsel related to BPD's security interests, various issues related to the contemplated financing and expansion, and the details regarding the intent of the parties if a default should occur. These negotiations included specific discussions about BPD's security interests and revisions to the Security

---

[19] *See* Security Agt. and Credit Enhancement Agt.

Agt., Credit Enhancement Agt. and the Third Amendment to Commercial Lease Agreement, to address, among other things, specific provisions related to BPD's first lien priority security interest in the assets acquired through the BOM Loan,[20] and HyperBlock's desire that the Security Agt. no longer secure HyperBlock's obligations under the Lease once the BOM Loan was paid off.[21] Bowditch made revisions to the Security Agt. and expressly acknowledged BPD's security interest in the following statement:

> "However, I do not want the security agreement to secure all obligations under the lease since the lease will be in effect well after the Bank of Montana loan is paid. I have therefore agreed to retain the language in Section 1 of the attached Security Agreement stating that said agreement secures obligation HB owes under the lease but have added language to clarify that the 40 MW substation only serves as collateral under the lease until the BoM loan is paid."[22]

Walsh was copied on most of the correspondence I reviewed from Bowditch and expressly weighed in on and consented to various revisions to the documents and terms through emails, as well as participating in the negotiation process through Bowditch.[23]

---

[20] Ex. 16: Emails with Bowditch, Walsh, Nelson, Bjornson, Stivers, regarding Credit Enhancement Agreement and Third Amendment, including Email from Bowditch dated 12/07/2018 at 4:06 PM with attached redline of Credit Enhancement Agt. and Third Amendment in which Bowditch revised language in the Credit Enhancement Agt., including specifically the provisions related to HyperBlock's obligation to maintain BPD's first lien position in Borrower's Pledged Assets at all times.

[21] Ex. 17: Emails from Bowditch dated 12/11/2018 at 5:46 PM and at 6:15 PM with attached Security Agt.

[22] Id.

[23] Ex. 18: Emails with Bowditch, Walsh, Nelson, Bjornson, Stivers, et. al., from December 2018 related to agreements, revisions, and Walsh's participation in negotiations process

20.     The Credit Enhancement Agt. specifically provided in Section 1.2 that BPD is provided a "first lien security interest" in the assets acquired with the BOM Loan.[24] There was an affirmative covenant in §1 of the Security Agt. and in §4.1.f. of the Credit Enhancement Agt. that [HyperBlock would] "Execute such financing statements and other documents as [BPD] may reasonably request to perfect and continue a first position security interest in Borrower's Pledged Assets in favor of [BPD]."

21.     During the course of these discussions, all indications from Walsh and Stivers indicated the intention to provide the contractually committed first-lien priority security interest to BPD, and there was no indication by Walsh, Stivers, or any other party on behalf of HyperBlock or Project Spokane that indicated an intention otherwise, or that Walsh or Project Spokane was intending to levy against any assets acquired by the BOM Loan.

22.     The first lien position on any assets acquired with the BOM Loan was a key term and material inducement for me to consent to the proposed transaction, without which I would not have agreed to personally

---

[24] *See* §1.2 of Credit Enhancement Agt.: "The reimbursement obligation [of HyperBlock to reimburse BPD and its principals] shall be secured by a first lien security interest in the new assets and other improvements that Borrower intends to acquire with the proceeds from the Bank Loan and the New Equity ("Borrower's Pledged Assets"). Borrower shall execute and deliver a security agreement contemporaneously with this Agreement in form and substance acceptable to Pledgor and its counsel ("Security Agreement"). Borrower covenants to obtain lien waivers and releases from contractors and suppliers and to maintain Pledgor's first lien position in Borrower's Pledged Assets at all times."

provide the credit enhancements which facilitated the financing for HyperBlock, and without which I would not have voted to approve BPD providing the credit enhancements which gave HyperBlock the ability to obtain the BOM Loan.

23.     In January 2019, I learned that it was taking HyperBlock longer than anticipated to raise the capital required for the construction of the improvements, and I had conversations with Stivers related to modifications to the terms of the BOM Loan and amendments to the Lease.

24.     On or about January 23, 2019, I signed on behalf of BPD and the following documents, each related to Walsh's request to modify the premises leased by HyperBlock and related to the parties' intent that all "fixtures" on the Property were to remain on the Property and be owned by BPD upon the termination or expiration of the Lease, in addition to certain other pieces of property that were agreed upon by the parties to belong to BPD at the termination of the Lease: the Side Agreement to the Third Amendment to the Lease (the "Side Agreement") and the Fourth Amendment to Commercial Lease Agreement (the "Fourth Amendment").[25] The Fourth Amendment included Exhibit E-2 to the Lease, which listed

---

[25] Ex. 19:  (i) Fourth Amendment to Commercial Lease Agreement, dated 01/23/2019; (ii) Side Agreement, dated 01/23/2019

certain items that were agreed to remain with the Property at the termination or expiration of the Lease (the "BPD Property"). Walsh executed the Fourth Amendment and the Side Agreement in the stated capacity as "Chief Executive Officer" of HyperBlock.[26]

25.     Also in January 2019, I was party to correspondence and discussions with Walsh, Stivers, Bowditch, and BPD's counsel regarding the intent of Project Spokane and HyperBlock to restructure a deferred obligation that HyperBlock owed to Project Spokane. In exchange for Project Spokane's agreement to so, HyperBlock agreed to a collateral assignment of the Lease, which required the consent of BPD.[27] I executed the collateral assignment of lease as a Co-Manager of BPD.[28] Walsh signed on behalf of Project Spokane.

26.     During these negotiations, Walsh acknowledged the promise of Project Spokane to subordinate its interests in the leased premises to those of BPD and the guarantors on the BOM Loan, agreeing that in the event of default under the BOM Loan, if Project Spokane did not step in as tenant under the assignment and continue to run the bitcoin mine, Project

---

[26] *See* Fourth Amendment and Side Agreement (Ex. 19)
[27] Ex. 20: Emails between Bowditch, Walsh, Bjornson, Nelson, etc., RE restructuring from January-February 2019
[28] Ex. 21: Collateral Assignment of Lease, dated February 1, 2019

Spokane's rights to HyperBlock's assets would be subject to those of BPD and its principals who were guarantors on the BOM Loan.[29]

27.    By December 2019, Hyperblock had still not drawn down the BOM Loan due to challenges in its expansion plans. In December of 2019, Walsh, Stivers, and I discussed changing plans for the proceeds of the BOM Loan to allow HyperBlock to be more profitable by upgrading the computer hardware used for the bitcoin mining operations, and I agreed on behalf of BPD to allow HyperBlock to use the funds from the BOM Loan for the acquisition of 1,493 Bitmain S17+ Servers, with PSU (the "Financed Equipment") instead of other equipment and improvements to the Property. BPD and its principals consented to HyperBlock's use of the BOM Loan to acquire the Financed Equipment.[30]

28.    In connection with this adjustment to the plans for the use of proceeds of the BOM Loan, Walsh negotiated with BPD a "Modification of Lease Agreement, Credit Enhancement Agt., Security Agt. and Side Letter to Third Amendment to Lease Agreement" (the "Modification"). The initial draft of this document was provided to Walsh by Stivers with a request that

---

[29] Ex. 22: Emails with Bowditch, Walsh, Nelson, to Bjornson regarding priority of BPD's interest and rights in event of default under BOM Loan from January-February 2019

[30] Ex. 23:  Emails with Nelson, Stivers, et. al. from December 2019 regarding HyperBlock's desire to use the funds for the acquisition of new servers, modification of lease, and request that BPD and its principals consent to HyperBlock's use of the BOM Loan to acquire the Financed Equipment, including changes to Modification Section 5.b. regarding negotiated language regarding equipment in place on 12/31/2019 not included in BPD's first-priority security interest

Walsh review and comment on the draft Modification, and Walsh was involved in subsequent correspondence related to the revisions to the Modification.[31]

29.    Pursuant to negotiations between and among the parties, including Walsh, the Modification was finalized and was signed by me on behalf of BPD, effective December 31, 2019.[32] Walsh executed the Modification on behalf of HyperBlock. The Modification provides in part that the Security Agt. was "*modified to include ALL personal property owned by Tenant which is located currently at the Property (and not just newly acquired New Servers), but specifically excluding all servers owned by Tenant and located on the Property as of the date of this Modification*." The Modification maintained in effect the first lien position to be held on any assets acquired through the BOM Loan as provided in the Credit Enhancement Agt., which now was clearly only the 1,493 servers comprising the Financed Equipment which was directly acquired by disbursement of the BOM Loan proceeds.

30.    Without BPD's continued first lien position on HyperBlock's assets acquired with the BOM Loan, and relying on representations and

---

[31] Ex. 24: Emails among Walsh, Stivers, Bowditch, Bjornson, Nelson, etc. regarding negotiations and revisions to Modification

[32] Ex. 25: Modification of Lease Agreement, Credit Enhancement Agreement, Security Agreement and Side Letter to Third Amendment to Lease Agreement, effective December 31, 2019

statements of Walsh, Stivers and Bowditch, as an agent and attorney of HyperBlock, related to BPD's interests and assurances that BPD's first lien security interest existed with respect to the Financed Equipment purchased with the BOM Loan, I would not have agreed (personally or as a member or Co-Manager of BPD) to the change in terms regarding the BOM Loan, or authorized disbursement to purchase the Financed Equipment. The continuation of BPD's first-lien priority security interest was a key term and material inducement to my consent to the change in terms.

31.    In January 2020, I had communications with Stivers and Walsh regarding HyperBlock's desire to execute a change in terms agreement related to the BOM Loan to increase the amount that could be advanced under the BOM Loan to $3,540,000.00.[33] BPD required supplemental security provisions, including the placement by HyperBlock of funds into a cash account as security an amount matching the amount drawn in excess of $2,625.000.

32.    On or about January 10, 2020, I executed on behalf of BPD and Walsh executed on behalf of HyperBlock certain documents related to the change in terms for the BOM Loan.[34] I again saw provided resolutions of

---

[33] Ex. 26: Email from Stivers to Nelson on 01/02/2020 at 12:45 PM and 3:26 PM regarding Modification
[34] Ex. 27: Documents related to change in terms, each dated 1/10/2020: (i) Change in Terms Agreement; (ii) Guarantor Addendum; (iii) Modification of Deed of Trust

HyperBlock and HBI that showed Walsh's authority to sign on behalf of HyperBlock.[35]

33.     Proceeds of the BOM Loan in the amount of $2,625,000 were used to acquire the Financed Equipment.[36] No amount was drawn down on the BOM Loan in excess of that amount.

34.     I am aware of certain UCC Financing Statements that were filed related to BPD's security interests in certain assets of HyperBlock.[37]

35.     On or around May 19, 2020, I received on behalf of BPD a Notice of Disposition of Collateral by Public Sale (the "Notice")[38] stating the intent of Project Spokane and Walsh to sell certain assets of HyperBlock's at a public sale scheduled for June 3, 2020 at 12:00 p.m. Eastern time (the "Sale") to satisfy obligations of HyperBlock to Walsh and Project Spokane. The items to be sold at the Sale include the Financed Equipment and certain items of the BPD Property which Hyperblock is not entitled to sell or

---

[35] Ex. 28: Resolutions of HyperBlock and HBI related to change in terms: (i) Certified Extract of Minutes of Meeting of Board of Directors of HBI held on 1/7/2020, dated 1/8/2020 (RE CIT) (Walsh reported to Board, authorized Walsh to sign on behalf of HBI and HyperBlock; Walsh signed extract as director of HBI); (ii) Limited Liability Company Resolution to Borrow/Grant Collateral/Subordinate Debt of HyperBlock, signed by Walsh as CEO of HBI, sole member of HyperBlock on 01/10/2020; (iii) Resolution of Corporate LLC Member, signed by Walsh as CEO of HBI, on 1/10/2020

[36] Ex. 29:  Evidence of use of BOM Loan proceeds

[37] Ex. 30:  BPD's UCC filings:  (i) UCC Financing Statement filed with the Montana Secretary of State on January 7, 2019, as File # 1901072389302, and amended by that certain UCC Amendment filed with the Montana Secretary of State on January 20, 2020, as File # 20200059663; (ii) that certain UCC Financing Statement recorded on January 22, 2019, in the office of the Clerk and Recorder of Missoula County, Montana, as Document No. 201900835, Book 1007, Page 1370, as a fixture filing against the Property; and (iii) that certain UCC Financing Statement filed with the Delaware Secretary of State on May 22, 2020, as File # 20203609866.

[38] Ex. 31: Notice of Disposition of Collateral by Public Sale, dated May 19, 2020

remove from the Property. It was my belief that if Project Spokane or Walsh had any security interest in the assets listed in the Notice, BPD's first lien position respecting the Financed Equipment would have had priority. Any security interest of Walsh or Project Spokane would be subordinate to BPD's security interests in the Financed Equipment and BPD's ownership interest in the BPD Property. The Notice does not include any mention of the Security Agt., the Credit Enhancement Agt. or the Modification respecting BPD's security interest in the assets to be sold. Walsh had just negotiated and executed the Modification on December 31, 2019, which specifically addressed modifications to the Security Agt., a mere 4 ½ months previously.

36.     Moreover, some of the assets listed in the Notice are fixtures and belong to BPD – not HyperBlock – and Project Spokane and Walsh have no interest in those assets whatsoever, and therefore no right to sell them or to encumber them. These include most critically 467 industrial fans, 58 power transformers, 445 electrical breaker panels, among other items. These are items that are permanently installed and have become so related to the building and property that, upon information and belief, any interest in them would arise under real property law, not under the UCC. If the roof fans are removed from the building, for example, there will be 467

gaping holes in the roof of the building, creating a substantial urgent problem and costing a large amount of money to repair. And, as noted above, HyperBlock, through Walsh, contractually committed very specifically and clearly in the Fourth Amendment that these items, and other items, would remain with the property. Now Project Spokane and Walsh state that they intend to illegally sell these fixtures as part of their sale even though Project Spokane and Walsh have no rights in them.

37.    Until I received the Notice of Sale on May 19, 2020, I did not receive any communication from Walsh or any other party on behalf of HyperBlock or Project Spokane that indicated there was an intention not to provide the contractually committed first-lien priority security interest to BPD, or that Walsh or Project Spokane was intending to levy against any assets acquired by the BOM Loan. In all of the conversations I had with Walsh and Stivers prior to May 19, 2020, and even in a conversation I had with Walsh and Stivers following May 19, 2020, Walsh and Stivers stated it was their intent to make the continuation of payments under the BOM Loan a priority. We discussed having Project Spokane (or another business entity with Walsh as a principal) take over the Lease and continue the bitcoin mining operations at the Property, with some potential modifications to the Lease. We also discussed BPD consenting to some temporary

accommodations regarding payment terms under the Lease to help facilitate the transfer of HyperBlock's energy contract from its previous energy provider to a new energy provider and to allow HyperBlock to continue its operations. This was necessary because HyperBlock's contract with its prior energy provider, Energy Keepers, Inc., was terminated due to HyperBlock's default in payment of an outstanding balance of over $800,000.00, which defaults I understand commenced in February 2020, and HyperBlock was requesting a temporary reduction in rent or ability to use reserve funds for rent payments. Stivers of HyperBlock represented in March 2020 that HyperBlock was negotiating with Talen Energy, of Colstrip, Montana for a new power supply contract. I subsequently learned that in May 2020 Energy Keepers filed a court action against HyperBlock, Walsh, and Project Spokane alleging that both Project Spokane and HyperBlock worked out of the same facility just outside of Missoula, Montana, and owe more than $3.7 million for their power use.[39]

38.   The Notice asserted that both Project Spokane and Walsh (personally) had a first-priority security interest in HyperBlock's personal

---

[39] Ex. 32: Article RE: Tribal Power Co. Says Cryptocurrency Miner Owes $3.7M; *See also* Case No. 9:20-cv-00076-DWM filed in UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MONTANA MISSOULA DIVISION: *Sx̌ʷnq̓ʔels l Suẃeč̓m / Ksukⱡiⱡmumaⱡ ʾA·k̓ⱡałmukwaʾits, Incorporated d/b/a Energy Keepers, Incorporated, A federal corporation wholly owned by the Confederated Salish and Kootenai Tribes v. HYPERBLOCK LLC, A Delaware limited liability company, PROJECT SPOKANE LLC, A Colorado limited liability company, and SEAN WALSH, Controlling Member of Hyperblock LLC and Project Spokane LLC*

property, including without limitation all equipment and fixtures of HyperBlock, and stated the property would be sold free and clear of BPD's lien. The Notice alleged that Walsh's rights in HyperBlock's assets arose under certain agreements between Walsh and HyperBlock, dated June 19, 2019, and Project Spokane's rights in HyperBlock's assets arose under certain agreements between Project Spokane and HyperBlock, dated July 10, 2018.

39.     When I spoke with Walsh and Stivers following my receipt of the Notice, they both continued to state that Project Spokane's, HyperBlock's, and Walsh's intentions were to work with BPD to arrange for Project Spokane's assumption of HyperBlock's obligations under the Lease and the BOM Loan. However, Walsh and Stivers were unwilling to commit these representations and assertions to writing. It is my belief, based upon their refusal to commit any of the statements in writing or sign any agreements and based upon their actions that demonstrate they are not attempting to work with me or BPD to resolve these issues, that Walsh made these statements in order to lull me into thinking Walsh and Project Spokane would cooperate until the Sale occurs, at which time it would be too late for me to stop it and protect myself and BPD from the negative consequences that would result.

40.     Bjornson, on behalf of BPD, sent a written response to Walsh and Peter Ito ("Ito"), attorney for Walsh and Project Spokane, on May 25, 2020, to notify them of the defects in the Notice including the failure to account for BPD's first lien priority security interests in certain of HyperBlock's assets, specifically the Financed Equipment, and BPD's nonpriority security interests in the remainder of the property subject to the Sale.[40] The response also points out that some of the property listed for sale are fixtures and personal property that remain with the Property under the terms of the Commercial Lease and are not subject to sale.

41.     Bjornson also sent correspondence Ito and Walsh on May 25, 2020, that included an offer made with the intent of resolving the dispute and making the most of a bad situation for everyone involved.

42.     In subsequent conversations, including in a telephone conference that I attended on May 26, 2020, Walsh and Ito informed me, Bjornson, Stivers, Boehme, and Mike Heisey (the general manager of the Property) that Walsh/Project Spokane were not planning to acknowledge the contractually committed first lien security interest, and they were not planning to work with BPD to negotiate agreements between Project

---

[40] Ex. 33: Email from Bjornson dated 05/25/2020 with attached notice regarding defects in notice of disposition of collateral by public sale

Spokane and BPD for a resolution that could have prevented this litigation. Walsh and Ito also stated in this telephone conference that they intended to go forward with the Sale and they did not intend to recognize BPD's claimed first lien security interest in the Financed Equipment or to exclude the BPD Property from the Sale, nor were they willing to revise the Notice to reflect BPD's security interests. Ito also sent written correspondence relaying these intentions of Project Spokane and Walsh to continue with the Sale and to disregard BPD's security interests.

43.    On May 26, 2020, BOM sent a notice of default to HyperBlock related to HyperBlock's defaults under the BOM Loan (I received the notice of default as a guarantor of HyperBlock's obligations related to the BOM Loan).[41]

44.    Pursuant to the documents related to the BOM Loan, upon a default under the BOM Loan, BOM is entitled to foreclose on the Property, proceed against the guarantors for collection, or exercise other remedies under the documents related to the BOM Loan.

45.    Based on the provisions in the Credit Enhancement Agt., Security Agt., and Modification related to the obligation to provide such documents as may be necessary to reference the priority of BPD's security

---

[41] Ex. 34: BOM Notice of Default

interests in certain assets of HyperBlock, Bjornson sent Ito and Walsh a draft subordination agreement with the request it be executed by Project Spokane and Walsh.[42] Ito communicated that Walsh and Project Spokane refused to execute the same or to acknowledge the contractually committed first lien security interest, even when presented with the specific various provisions and covenants in the agreements negotiated and executed by Walsh that obligated such documents be provided related to BPD's first-priority lien.[43]

46.    Due to HyperBlock's defaults under the Lease, Credit Enhancement Agt., and Security Agt., BPD sent HyperBlock a notice of default on May 31, 2020.[44]

47.    I have viewed advertisements on Twitter posted by Walsh related to the Sale and news articles referencing the Sale and Walsh's conduct related to Project Spokane and HyperBlock.[45] I also saw news articles related to Walsh's resignation as CEO of HyperBlock in April.[46]

---

[42] Ex. 35: Email from Bjornson on 05/26/2020 at 9:30 PM with draft subordination agreement
[43] Ex. 36: (i) Email from Ito to Bjornson on 05/27/2020 at 2:51 PM; (ii) Email from Ito to Bjornson on 05/26/2020 at 4:18 PM
[44] Ex. 37: BPD notice of default to HyperBlock
[45] Ex. 38: (i) bitcoinnews.com article regarding the Sale; (ii) Twitter posting regarding Sale; and (iii) Missoula Independent Article (accessed via
[46] Ex. 39: Press Release Published: April 24, 2020 at 10:15 a.m. ET: "Press Release: HyperBlock Provides April 2020 Status Update on Promissory Note Acceleration of Maturity Dates; Sean Walsh Resigns as Chairman and CEO of Hyperblock Inc." at https://www.marketwatch.com/press-release/hyperblock-provides-april-2020-status-update-on-promissory-note-acceleration-of-maturity-dates-2020-04-24?mod=mw_more_headlines&tesla=y

48.    If the Sale is allowed to proceed and the BPD Property and the Financed Equipment is sold, BPD will experience substantial financial harm, and it will also detrimentally impact me and Boehme personally in a substantial and material manner. It is my belief that if the Sale is allowed to occur, Walsh and Project Spokane will be allowed to benefit personally from their failure to follow through with and honor the contractual obligation made by Walsh as agent to provide a first lien security interest in the Financed Equipment, and from their misrepresentations that induced BPD and its principals to expose themselves to risk and extend credit on behalf of HyperBlock.

49.    I declare under penalty of perjury that the foregoing is true and correct.

## [REMAINDER OF PAGE INTENTIONALLY LEFT BLANK – SIGNATURE PAGE FOLLOWS]

I declare under penalty of perjury that the foregoing is true and correct.

Executed in Missoula, Montana, on this 31st day of May 2020.

Stephen Nelson

## CERTIFICATE OF SERVICE

I hereby certify that on this 1st day of June 2020, I served a true and correct copy of the foregoing on the following persons by depositing said copy by FedEx overnight delivery with exhibits, prepaid, and by email (without exhibits), addressed as follows:

Peter Ito
Ito Law Group
1550 Larimer Street, Suite 667
Denver, CO  80202
*peter@itolawgroup.com*

By: /s/ Quentin M. Rhoades___
    Quentin M. Rhoades

36

## Exhibits to Declaration of Stephen Nelson

**Exhibit 1.** *[Dec. #4]* Commercial Lease Agreement, effective March 1, 2016

**Exhibit 2.** *[Dec. #5]* Lease Amendments:
  (i)   First Amendment to Commercial Lease Agreement in December 2016, to be effective January 1, 2017
  (ii)  Second Amendment to Commercial Lease Agreement dated July 13, 2017, and effective January 1, 2017

**Exhibit 3.** *[Dec. #6]* BPD-PS Loan Documents:
  (i)   Promissory Note dated 04/05/2016;
  (ii)  Security Agreement dated 04/05/2016;
  (iii) Promissory Note dated 12/23/2016;
  (iv)  Security Agreement dated 12/23/2016

**Exhibit 4.** *[Dec. #7]* Emails among Rambod Peykar, Walsh, Stivers, Nelson, Bjornson from 07/02/2018-07/09/2018 RE Discussions about HyperBlock-Project Spokane transaction
  (i)    Email from Stivers to group (including Walsh) on 07/02/2018 at 10:16 PM (regarding revisions to consent letter);
  (ii)   Email from Rambod Peykar to group (including Walsh) on 07/02/2018 at 5:30 PM (regarding revisions to consent letter);
  (iii)  Email from Rambod Peykar to group (including Walsh) 07/03/2018 at 3:21 PM (RE revised consent);
  (iv)   Email from Nelson to group (including Walsh) 07/03/2018 at 3:19 PM (regarding BPD's signature to consent letter and requesting Assignment and Assumption Agreement);
  (v)    Email from Rambod Peykar to group (including Walsh) 07/03/2018 at 4:21 PM (with Assignment and Assumption Agreement);
  (vi)   Email from Jason Vaughan to group (including Walsh) on 07/03/2018 at 4:25 PM with BPD's signed Consent to Assignment of Contract and Payoff Letter;
  (vii)  Email from Rambod Peykar to group (including Walsh) on 07/03/2018 at 5:31 PM (Rambod requesting Sean sign the Consent to Assignment);
  (viii) Email from Steve Nelson to Rambod Peykar on 07/04/2018 6:58 AM (regarding Bjornson's request for Assignment and Assumption of Lease separate from general assignment);
  (ix)   Email from Zac Turke on 07/04/2018 at 8:29:37 AM MDT (asking if revising general assignment would be acceptable);
  (x)    Email from Bjornson to group (including Walsh) on 07/04/2018 at 12:43 PM (with draft Assignment and Assumption of Lease);
  (xi)   Email from Rambod to group (including Walsh) on 07/08/2018 at 5:18 PM (with revised Assignment and Assumption of Lease);
  (xii)  Email from Bjornson to group (including Walsh) on 07/08/2018 at 9:58 PM (revisions appear acceptable, will confirm with BPD);
  (xiii) Email from Rambod Peykar on 07/09/2018 at 8:48 AM requesting confirmation and Assignment signed by Nelson;
  (xiv)  Email from Bjornson to group (including Walsh) on 07/09/2018 at 10:09 AM regarding working to get Assignment signed by Nelson;
  (xv)   Email from Jason Vaughan to group (including Walsh) on 07/09/2018 at 10:35 AM with Assignment signed by Nelson;

       (xvi)    Email from Rambod Peykar to group (including Walsh) on 07/09/2018 at 12:11 PM (with revised Assignment and Assumption of Lease);

      (xvii)    Email from Bjornson to group (including Walsh) on 07/09/2018 at 11:38 AM approving revisions and authorizing change pages;

   (xviii)    Email from Rambod Peykar on 07/09/2018 at 12:40 PM

      (xix)    Email from Rambod Peykar to Bjornson on 07/09/2018 at 11:44 AM regarding additional change to Assignment and want to have telephone call;

      (xx)    Email from Bjornson to Rambod Peykar on 07/09/2018 regarding telephone call to discuss change;

      (xxi)    Email from Rambod Peykar to Bjornson on 07/09/2018 at 12:27 PM regarding change to approve revised Assignment;

**Exhibit 5.**  *[Dec. #7]* Formation and governing documents of HyperBlock and HBI:

      (i)    Certificate of Formation of HyperBlock dated 12/29/2017;

      (ii)    Operating Agreement of HyperBlock dated 12/29/2017;

      (iii)    Articles of Arrangement of HBI, filed with Ministry of Government and Consumer Services (Ontario), effective 7/10/2018

**Exhibit 6.**  *[Dec. #10]* Email from Kristen Martin (Walsh's executive assistant) to Nelson on 12/07/2018 at 1:46 PM with executed Project Spokane consent letter, dated 07/03/2018 (signed by Walsh on behalf of Project Spokane and by BPD)

**Exhibit 7.**  *[Dec. #10]* Assignment, Assumption and Amendment of Lease, executed effective July 10, 2018

**Exhibit 8.**  *[Dec. #12]* Term Sheet sent from Nelson to Bjornson on 11/02/2018 and Bjornson emailing term sheet to Bowditch

**Exhibit 9.**  *[Dec. #12]* Email chain with multiple correspondence between Nelson and Walsh on 11/27/2018

**Exhibit 10.** *[Dec. #14]* Resolutions of HyperBlock and HBI:

      (i)    Resolution of Directors of HBI (including Sean) dated 12/03/2018

      (ii)    Resolution of Corporate LLC Member, signed by Walsh as CEO of HBI, on 12/14/2018

      (iii)    Limited Liability Company Resolution to Borrow/Grant Collateral/Subordinate Debt of HyperBlock, signed by Walsh as CEO of HBI, sole member of HyperBlock on 12/14/2018

**Exhibit 11.** *[Dec. #15]* BOM Loan Docs signed by Walsh on behalf of HyperBlock:

      (i)    Promissory Note

      (ii)    Business Loan Agreement

      (iii)    Landlord's Consent to Assignment

      (iv)    Subordination Agreement – Lease

      (v)    Disbursement Request and Authorization

      (vi)    Errors and Omissions Agreement

      (vii)    General Authorization

     (viii)    Consent to Disclosure of Income Tax Return Information

      (ix)    IRS Form W-9

      (x)    Beneficial Ownership Form

**Exhibit 12.** *[Dec. #16]* BOM Loan Documents, signed by BPD and its principals, each dated December 14, 2018:

      (i)    Commercial Guaranty from Nelson

      (ii)    Commercial Guaranty from BPD

    (iii)    Deed of Trust

    (iv)    Assignment of Rents

    (v)    Landlord's Consent to Assignment

    (vi)    Hazardous Substances Certificate and Indemnity Agreement

    (vii)    Commercial Guaranty from Boehme

**Exhibit 13.** *[Dec. #17]* Credit Enhancement Agreement dated December 13, 2018

**Exhibit 14.** *[Dec. #17]* Security Agreement, dated December 13, 2018

**Exhibit 15.** *[Dec. #17]* Third Amendment to Commercial Lease Agreement, effective December 13, 2018

**Exhibit 16.** *[Dec. #19]* Emails with Bowditch, Walsh, Nelson, Bjornson, Stivers, regarding Credit Enhancement Agreement and Third Amendment

    (i)    Email from Bjornson to group (including Walsh) on 12/03/2018 at 4:44 PM (with draft Credit Enhancement Agt.), and earlier email chain including Walsh and Stivers regarding amendment to lease, draft Credit Enhancement Agt, and BOM Loan documents;

    (ii)    Email from Bjornson to group (including Walsh) on 12/04/2018 at 4:28 PM (with draft Security Agt.);

    (iii)    Email from Bowditch dated 12/07/2018 at 4:06 PM with attached redline of Credit Enhancement Agt. and Third Amendment in which Bowditch revised language in the Credit Enhancement Agt., including specifically the provisions related to HyperBlock's obligation to maintain BPD's first lien position in Borrower's Pledged Assets at all times.

    (iv)    Emails between Walsh and Bowditch (including Stivers) on 12/11/2018 (regarding approval to changed language in revised Third Amendment);

    (v)    Email from Bjornson to group (including Walsh) on 12/11/2018 at 10:09 PM with comments to draft Third Lease Amendment (with attached draft.);

**Exhibit 17.** *[Dec. #19]*

    (i)    Email from Bowditch dated 12/11/2018 at 5:46 PM with attached Security Agreement

    (ii)    Email from Bowditch dated 12/11/2018 at 6:15 PM with revised Security Agreement

**Exhibit 18.** *[Dec. #19]*: Emails with Bowditch, Walsh, Nelson, Bjornson, Stivers, et. al., from December 2018 related to agreements, revisions, and Walsh's participation in negotiations process:

    (i)    Emails between Bjornson and Bowditch on 12/7/2018-12/11/2018 with comments to revised drafts (attachments omitted for brevity);

    (ii)    Emails between Bjornson and Bowditch on 12/12/2018-12/13/2018 (CC Walsh) (Requesting final executed documents);

    (iii)    Email from Kristen Martin (Walsh's executive assistant) to group (including Bowditch and Walsh) on 12/13/2018 at 11:42 AM (with documents executed by Sean - attachments omitted for brevity);

    (iv)    Emails between Walsh and Bowditch (including Stivers) on 12/11/2018 (regarding approval to BPD's security interest and language for Security Amendment); 914 and 630 pm

**Exhibit 19.** *[Dec. #24]* Docs signed by BPD in Jan 2019:

    (i)    Fourth Amendment to Commercial Lease Agreement, dated 1/23/2019

    (ii)    Side Agreement, dated 1/23/2019

**Exhibit 20.** *[Dec. #25]* Emails RE restructuring:
      (i)     Email from Bowditch to DHB on 01/18/2019 at 2:51 PM (with statement by Jaymie regarding Walsh's approval of revisions: "I think Sean is okay with the revisions to Exhibit E that Steve has proposed.")
      (ii)    Email from Bowditch to DHB (CC to Walsh) on 01/31/2019 at 9:37 AM with attached "Collateral Lease Assignment that both HB and PS have approved";

**Exhibit 21.** *[Dec. #25]* Collateral Assignment of Lease, dated February 1, 2019

**Exhibit 22.** *[Dec. #26]* Emails between Bowditch, Walsh, Nelson, Bjornson, regarding Collateral Assignment
      (i)     Email from Bowditch to Bjornson on 01/31/2019 at 5:57 PM, regarding BPD's rights on default;
      (ii)    Emails between Bjornson and Bowditch on 01/31/2019 at 9:11-9:25 PM RE priority of BPD's interests
      (iii)   Email from Bowditch to Bjornson on 02/01/2019 at 11:10 AM regarding changes to Collateral Assignment with attached revised Collateral Assignment;
      (iv)   Email from Bowditch to Bjornson 02/07/2019 at 6:38 PM with Collateral Assignment executed by HyperBlock and Project Spokane and requesting Nelson execute on behalf of BPD
      (v)    Email from Bowditch to Bjornson 02/20/2019 at 12:36 PM regarding advising Walsh on status of Collateral Assignment

**Exhibit 23.** *[Dec. #27]* [Emails with Nelson, Stivers, et. al. from December 2019 regarding HyperBlock's desire to use the funds for the acquisition of new servers, modification of lease, and request that BPD and its principals consent to HyperBlock's use of the BOM Loan to acquire the Financed Equipment, including changes to Modification Section 5.b. regarding negotiated language regarding equipment in place on 12/31/2019 not included in BPD's first-priority security interest]:
      (i)     Email from Stivers on 12/30/2019 at 10:25 PM with revised draft modification of lease and prior emails in chain regarding BPD's security interest;
      (ii)    Email from Nelson to Stivers on 12/24/19 at 8:48 AM with revised Modification, including changes to Section 5.b. regarding negotiated language regarding equipment in place on 12/31/2019 not included in BPD's first-priority security interest

**Exhibit 24.** *[Dec. #28]* Emails among Walsh, Stivers, Bowditch, Bjornson, Nelson, etc. regarding negotiations and revisions to Modification
      (i)     Email from Stivers to Walsh on 12/29/19 at 7:13 PM with draft modification (attachment);
      (ii)    Email from Stivers on 12/30/2019 at 1:22 PM with "our comments" to revised draft modification; (attachment);
      (iii)   Email from Bjornson on 12/30/2019 at 11:49 EST PM with revised draft modification; (attachment);
      (iv)   Email from Stivers on 12/30/2019 at 10:25 PM with revised draft modification of lease;
      (v)    Emails between Stivers and Bjornson regarding revisions to Modification;
      (vi)   Emails between Stivers and Nelson on 12/30/2019 regarding revisions to Modification;

**Exhibit 25.** *[Dec. #29]* Modification of Lease Agreement, Credit Enhancement Agreement, Security Agreement and Side Letter to Third Amendment to Lease Agreement, effective December 31, 2019

**Exhibit 26.** *[Dec. #31]* Email from Stivers regarding Modification on 01/02/2020 at 12:45 PM and 3:26 PM

**Exhibit 27.** *[Dec. #32]* Documents related to change in terms, each dated 1/10/2020:
  (i)  Change in Terms Agreement;
  (ii)  Guarantor Addendum;
  (iii)  Modification of Deed of Trust

**Exhibit 28.** *[Dec. #32]* Resolutions of HyperBlock and HBI related to Change In Terms:
  (i)  Certified Extract of Minutes of Meeting of Board of Directors of HBI held on 1/7/2020, dated 1/8/2020
  (ii)  Limited Liability Company Resolution to Borrow/Grant Collateral/Subordinate Debt of HyperBlock, signed by Walsh as CEO of HBI, sole member of HyperBlock on 1/10/2020
  (iii)  Resolution of Corporate LLC Member of HyperBlock, signed by Walsh as CEO of HBI, on 1/10/2020

**Exhibit 29.** *[Dec. #33]* Evidence of use of BOM Loan proceeds

**Exhibit 30.** *[Dec. #34]* BPD's UCC filings:
  (i)  UCC Financing Statement filed with the Montana Secretary of State on January 7, 2019, as File # 1901072389302, and amended by that certain UCC Amendment filed with the Montana Secretary of State on January 20, 2020, as File # 20200059663;
  (ii)  UCC Financing Statement recorded on January 22, 2019, in the office of the Clerk and Recorder of Missoula County, Montana, as Document No. 201900835, Book 1007, Page 1370, as a fixture filing against the Property;
  (iii)  UCC Financing Statement filed with the Delaware Secretary of State on May 22, 2020, as File # 20203609866.

**Exhibit 31.** *[Dec. #35]* Notice of Disposition of Collateral by Public Sale, dated 05/19/2020

**Exhibit 32.** *[Dec. #37]* Article RE: Tribal Power Co. Says Cryptocurrency Miner Owes $3.7M; See also Case No. 9:20-cv-00076-DWM filed in UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MONTANA MISSOULA DIVISION: Sx^wnq̇ʔels l Suẇečm / Ksukⱡiⱡmumaⱡ ˀA·k□aⱡmukwaˀits, Incorporated d/b/a Energy Keepers, Incorporated, A federal corporation wholly owned by the Confederated Salish and Kootenai Tribes v. HYPERBLOCK LLC, A Delaware limited liability company, PROJECT SPOKANE LLC, A Colorado limited liability company, and SEAN WALSH, Controlling Member of Hyperblock LLC and Project Spokane LLC

**Exhibit 33.** *[Dec. #40]* Email from Bjornson on 05/25/2020 with attached notice regarding defects in notice of disposition of collateral by public sale

**Exhibit 34.** *[Dec. #43]* BOM Notice of Default

**Exhibit 35.** *[Dec. #45]* Email from Bjornson on 05/26/2020 at 9:320 PM with draft subordination agreement

**Exhibit 36.** *[Dec. #45]*
  (i)  Email from Ito to Bjornson on 05/26/2020 at 4:18 PM
  (ii)  Email from Ito to Bjornson on 05/27/2020 at 2:51 PM

**Exhibit 37.** *[Dec. #46]* BPD Notice of Default to HyperBlock

**Exhibit 38.** *[Dec. #47]*

      (i)      bitcoinnews.com article regarding the Sale

      (ii)     Twitter posting

      (iii)    Missoula Independent Article regarding Walsh and Project Spokane

**Exhibit 39.** *[Dec. #47]*: Press Release Published: April 24, 2020 at 10:15 a.m. ET: "Press Release: HyperBlock Provides April 2020 Status Update on Promissory Note Acceleration of Maturity Dates; Sean Walsh Resigns as Chairman and CEO of Hyperblock Inc." at https://www.marketwatch.com/press-release/hyperblock-provides-april-2020-status-update-on-promissory-note-acceleration-of-maturity-dates-2020-04-24?mod=mw_more_headlines&tesla=y

## COMMERCIAL LEASE AGREEMENT

THIS COMMERCIAL LEASE AGREEMENT (this "Lease") is entered into on
__MARCH    1__, 2016, to be effective, however as of March 1, 2016 (the "Effective
Date") by and between BONNER PROPERTY DEVELOPMENT, LLC, a Montana limited liability
company ("Bonner" or "Landlord"), and PROJECT SPOKANE, LLC, a Colorado limited liability
company (" "Tenant").  Either party may sometimes be referred to as a "Party" and both parties
together referred to as the "Parties".

### RECITAL

A. Tenant wishes to lease from Landlord certain real property described herein, which
property is part of a larger parcel of property located within the subdivision commonly known as
the Bonner Mill Site, located at Bonner, Montana between Highway 200 and the Blackfoot
River, and Landlord wishes to lease such property to Tenant.

### AGREEMENT

NOW THEREFORE, Landlord and Tenant agree as follows:

1.     **LEASE OF PROPERTY**.

       **a.     Lease of Property**.  Landlord leases to Tenant, and Tenant leases from
Landlord the following real property:

              A portion of the total square footage of the "Planer Building", located within the
              Bonner Mill Site in Missoula County, Montana commonly known as 9144 Bonner
              Mill Road, Bonner, MT 59823, for a total of 121,473 square feet as shown on the
              site plan attached as **Exhibit A** (the "Property").  The Planer Building in which
              the Property is located is approximately 300,715 square feet (the "Planer
              Building").  Any fixtures and personal property located on or about the Property
              as of the Lease Commencement Date (defined below) shall be considered part of
              the Property hereby leased and subject to all terms and conditions hereof.  The
              term "Fixture" shall refer to those items so permanently attached or embedded to
              as to be considered part of the premises, as defined in Section 70-15-103, MCA.
              The term "Fixture" shall not include unattached personal property, furniture, or
              trade fixtures of Lessee.

              This Lease is expressly subject to the Covenants and Master Association
              Documents described in Section 7.e.

       **b.     Acceptance of Property**.  Except as specifically stated in this Lease and the
items listed below in this Section 1.b., Landlord makes no representations or warranties to
Tenant regarding the Property, including but not limited to the structural condition of the
Property or the condition of mechanical, electrical, and other systems on the Property.
Notwithstanding the prior sentence, Landlord will perform the following items at its sole
expense (not to be passed through to Tenant as part of the Operating Costs); provided however
that thereafter Landlord shall have no further obligation in such regards unless specifically
stated herein:

EXHIBIT 1.
PAGE2

I.   <u>Landlord Improvements</u>.    Landlord  will  complete  the  following improvements in the Property:

    i)    Landlord will provide at least twenty (20) designated parking spaces (with signs) for use by Tenant's employees, guests and invitees.  Said parking areas shall be located near the office as depicted in **Exhibit A**.

    ii)    Landlord will obtain, on behalf of Tenant, verbal approval from Missoula County for Tenant to operate a Block Chain Data Center in the Property.

    iii)    Landlord will provide existing restrooms with water and septic in workable condition.  Tenant shall reimburse Landlord for this work in an amount not to exceed $10,000.00, the receipt of which Landlord acknowledges.

II.   <u>Tenant Improvements</u>.  Tenant shall be permitted, without obligation, to complete the following improvements at its sole cost, and to Landlord's reasonable approval, which shall not be unreasonably withheld:

    i)    Tenant shall be entitled to install all electrical equipment including the distribution breaker and voltage regulator at the Northwestern Energy substation.  Tenant is responsible for extending the powerlines to the Property.  Any additional electric improvements required in the office area, restrooms or warehouse shall be Tenant's responsibility.  Furthermore, all of Tenant's lighting and other electrical requirements shall be included in Tenant's separate electrical meter.  Landlord and Tenant agree that the electrical infrastructure installed and existing lines to complete the substation connection to the Property shall be deemed fixtures and, therefore, the property of Landlord at lease termination.

    ii)    Tenant shall be responsible for any additional lighting Tenant desires to install in or about the Property.

    iii)    All Tenant improvements deemed necessary by Tenant, in Tenant's sole discretion, for the operation of tenant's business, shall be provided by Tenant, including but not limited to wall openings for its cooling system and any rooftop units required.

    iv)    Tenant will be responsible to install and operate any security system Tenant desires for the Property.

    v)    Tenant will be responsible for the installation and connection costs for any gas lines or water lines required by Tenant.

    vi)    If so required, Tenant has or shall apply for a Missoula County Zoning Compliance Permit, the fee is $ 200.00.

vii)    If deemed necessary by Tenant, in Tenant's sole discretion, for the operation of tenant's business, Tenant will demolish and remove existing concrete equipment foundations, fill in trenches in the concrete floor and remove interior structures.

viii)    If deemed necessary by Tenant, in Tenant's sole discretion, for the operation of tenant's business, Tenant will pave or install concrete slab in the northwest corner of the Property where the floor is currently unfinished.

Excluding only the foregoing listed items, which Landlord and Tenant will complete only upon mutually approved plans and specifications, which approval shall not be unreasonably withheld, Tenant acknowledges that it has had adequate opportunity to investigate the Property and that, except as otherwise specifically set forth in this Lease, the Property in its present condition is suitable for Tenant's purposes; as such, the Tenant takes the Property "AS IS," "WHERE IS," and "WITH ALL FAULTS" and without any warranty of any kind unless expressly stated herein. Concerning any improvements Tenant desires to make to the Property, Landlord's consent for any of Tenant's proposed improvements to the Property shall be provided to Lessee within ten (10) days of Landlord receiving from Tenant the plans relating to said proposed improvements. Landlord's consent will be deemed granted if notice of Landlord's lack of consent is not received by Tenant within ten (10) days.

2.    **TERM; OCCUPANCY**

    **a.**    **Rent.** The term of this Lease shall commence on the earlier of the date of occupancy of the Property by Tenant or March 1, 2016 (the "Lease Commencement Date") and shall extend for ten (10) years. Tenant shall have an option to renew this Lease for two (2) additional periods of five (5) years each (each a "Renewal Period"). Tenant's right to renew this Lease for any Renewal Period shall be subject to the condition that there has been no default in the performance of any condition of this Lease by Tenant during the term hereof preceding the prospective effective date of such Renewal Period. Tenant shall provide Landlord written notice of Tenant's intent to exercise the options to renew the Lease, by certified mail return receipt requested, not later than ninety (90) days prior to the expiration of the initial term or the Renewal Term (as the case may be) of this Lease. The Lease rate shall increase by 2% each year during the initial term and the Renewal Periods starting at the Base Rent level for the first Lease year.

    **b.**    **Occupancy**. Landlord shall provide Tenant occupancy of the Property on the Lease Commencement Date, provided a fully executed Lease agreement has been executed and delivered, Landlord has received the advance Rent and Operating Costs outlined in Section 4. a. below and a copy of Tenant's Certificate of Insurance has been provided to Landlord.

    **c.**    **Termination Contingency.** On or before the deadlines set forth below, Tenant may terminate this Lease without liability based on the following:

    (i) Tenant does not receive written agreement and approval from Northwestern Energy to become a substation customer and to receive substation customer

EXHIBIT 1.
PAGE4

electric rates, as published by Northwestern Energy for substation customers in quantities of at least 8 megawatts of power and/or said electrical power is not actually delivered to the Property on behalf of Tenant at said substation customer electric rates. Deadline: 90 days from the Effective Date.

(ii) Tenant has not approved, in Tenant's sole discretion, the cost of installing sprinklers in the Property necessary to accommodate Tenant's business. Deadline: Thirty days from the Effective Date.

(iii) Tenant has been unable to verify, in Tenant's sole discretion, that the structural integrity of the building wherein the Property is located is suitable for Tenant's business. Deadline: Thirty days from the Effective Date.

(iv) Tenant has been unable to obtain a Missoula County Zoning Compliance Permit. Deadline: Thirty days from the Effective Date.

(v) Tenant has been unable to verify, in Tenant's sole discretion, that adequate Internet access is available to the Property and that is suitable for Tenant's business. Deadline: Thirty days from the Effective Date.

## 3.   OPTION TO LEASE PORTION OF REMAINDER OF PLANER BUILDING.

Tenant shall have the option to lease the portion of the Planer Building labeled as "Tenant 3" on attached **Exhibit A** consisting of approximately 117,474 square feet (the "Expansion Space") (the "Expansion Space Option"), which option is exercisable for a period expiring one (1) year from the Effective Date, with a minimum advance written notice provided by certified mail, return receipt requested, at least one hundred twenty (120) days prior to Tenant's intended occupancy date for such Expansion Premises. Tenant's option rights hereunder shall be subject to the condition that there has been no default in the performance of any condition of this Lease by Tenant during the entire term hereof preceding Tenant's exercise thereof. If Tenant exercises the Expansion Space Option, Rent and other terms applicable to the Expansion Space shall be calculated the same as Rent for the Property as provided in Section 4, except that Tenant's share of the Operating Costs shall remain the same and shall not be reduced as provided in Section 4.c. In other words, Tenant understand and agrees that for the first one (1) year of this Lease Tenant's share of Operating Costs shall be based on the assumption that Tenant is occupying the Property described herein and the Expansion Space. Therefore, Tenant's share of said Operating Costs shall be reduced in accordance with Section 4.c. only if Tenant does not exercise the Expansion Space Option. If the Expansion Space Option has not been exercised on or before the day which is one hundred twenty (120) days before the one (1) year anniversary of the Effective Date, the Expansion Space Option shall expire and be of no further force and effect.

## 4.   RENT, OPERATING COSTS, SECURITY DEPOSIT AND TAXES

a.   **Payment of Base Rent.** Commencing on the Lease Commencement Date (but see required initial advance Rent payment on or before the Effective Date set forth in Section 4.a.(ii)), Tenant shall pay Landlord, without prior notice, demand, deduction or offset, the following amounts as base rent ("Base Rent") in advance on or before the first day of each month during the term of this Lease and for any Renewal Periods duly exercised (Base Rent, together with Operating Costs as defined below, and other amounts provided herein, hereinafter

referred to as "Rent"). All amounts herein are in U.S. dollars. Rent for any partial month commencing on the Rent Commencement Date shall be computed on a pro rata, per diem basis.

> (i)     The Base Rent payable hereunder shall initially be $35,429.63 per month which is based on $3.50 per square foot per year multiplied by the square footage of the Property, 121,473, divided by 12 months, and shall continue at this rate for the first twelve (12) months of the term. On the date which is twelve months from the Effective Date hereof, hereinafter referred to as the "Lease Anniversary Date," and each Anniversary Date thereafter, the Base Rent will increase two percent (2%) per annum.

> (ii)    Upon Lease execution, Tenant shall pay Landlord advance Base Rent of $35,429.63 and estimated Operating Costs of $13,540.33 which shall be held as a nonrefundable Lease deposit prior to the Lease Commencement Date, and shall then be applied to Base Rent and Operating Costs on the Lease Commencement Date. The total amount due upon Lease execution including Base Rent and Operating Costs is $48,969.96.

> (iii)   If Tenant exercises the Expansion Space Option, the Base Rent payable shall be increased proportionally based on the increased square footage for the Property and the Expansion Space that will be leased by Tenant. Specifically, if Tenant exercises the Expansion Space Option the new square footage of space being leased by Tenant upon which rent will be based will be 121,473 square feet (the Property) plus 117,474 square feet (the Expansion Space) for total of 238,947 square feet. Including the two percent (2%) annual increase, Base Rent for the second year of this Lease if Tenant exercises the Expansion Space option will be $71,086.73 per month (3.57 per square foot per year multiplied by 238,947 square feet, divided by 12 months). As with the Base Rent for the Property, on each Lease Anniversary date beginning on the date which is twenty-four months from the Effective Date hereof, the Base Rent for the Property and the Expansion Space will increase two percent (2%) per annum.

**b.     Rent during Renewal Period**. If Tenant exercises its option to renew this Lease for any Renewal Period, the Base Rent shall increase at a rate of 2% per year during the renewal term on each Lease Anniversary Date, and all other terms and conditions of this Lease shall continue as provided herein and be reaffirmed.

**c.     Payment of Operating Costs**. As additional Rent, beginning on the Lease Commencement Date and at all times during this Lease (including during any Renewal Period), Tenant shall pay to Landlord, on or before the first day of each month Tenant's proportionate share of operating costs associated with the Property, initially established at $13,540.33, as "Operating Costs"). Tenant's proportionate share of Operating Costs shall initially be 79.46% which is the square footage of the Property and the Expansion Space (238,947 square feet) compared to the total square footage of the Planer Building in which the Property and Expansion Space are located (300,715 square feet). If Tenant does not exercise the Expansion Space Option, Tenant's proportionate share of Operating Costs shall be reduced as set forth below. Operating Costs for any partial month commencing on the Lease Commencement Date shall be computed on a pro rata, per diem basis. The total amount of the annual Operating Costs for the Planer Building is currently calculated according to the budget spreadsheet

reviewed and approved by the Parties at $204,486.20. The amount of the Operating Costs shall increase or decrease each year based upon actual and revised budgeted costs. Notwithstanding the foregoing, in no event shall Operating Costs be set at less than $0.68 per square foot. Landlord will produce an operating cost budget for each year, indicating the annual and monthly Operating Costs for the entire Planer Building. By May 1st of each calendar year, Landlord will reconcile the Operating Costs for the previous year, and provide Tenant an accounting of the costs. Landlord will pay Tenant any overpayment and charge Tenant for any underpayment during the year. At this same time a budget for the next year will be provided to the Tenant and the Tenant shall pay its proportionate share of the Operating Costs based on the budget. Landlord's books and records pertaining to Operating Costs shall be made available to Tenant for review purposes upon Tenant's request. If Tenant's review of Operating Costs reveals that Tenant has paid less than Tenant's share of Operating Costs for such reviewed year, then Tenant shall within thirty (30) days remit the balance thereof to Landlord. If, however, such review reveals that Tenant has paid more than Tenant's share of Operating Costs for the reviewed year, Landlord shall pay Tenant (in the form of a credit against rentals due, or if such review pertains to the final Lease year, upon the expiration of this Lease, in the form of Landlord's check) an amount equal to such excess.

Tenant's proportionate share of the Operating Costs shall be reduced in the event of the expiration of the Expansion Space Option. The reduction of Tenant's proportionate share of the Operating Costs shall occur on the date which is one (1) year from the Lease Commencement Date. The reduced amount of Tenant's proportionate share of the Operating Costs shall be 40.40% which is the square footage of the Property excluding the Expansion Space (121,473 square feet) compared to the total square footage of the Planer Building in which the Property is located (300,715 square feet).

      **d.**    **Definition of Operating Costs**. As used herein, "Operating Costs" shall mean all costs of operating, maintaining and repairing the Property (other than Tenants costs for individually maintaining and repairing the Property as provided in this Lease) and including without limitation the following: all taxes and assessments (including, but not limited to, all assessments from the Master Association (as defined below) and, whether included in assessments therefrom or separately, real and personal property taxes and assessments (except for corporate taxes, franchise taxes, and any late fees or other penalties for failure by Landlord to make timely tax payments), local improvement district assessments and other special purpose assessments); insurance premiums paid by Landlord and (to the extent used) deductibles for insurance applicable to the Property; water, sewer and all other utility charges (other than utilities separately metered and paid directly by Tenant or other tenants); supplies, materials, tools, and equipment used in the operation, repair, and maintenance of the Property; pest control; lighting systems, fire detection and security services; landscape maintenance; management (fees and/or personnel costs); and road and access maintenance. In those cases where this Lease states otherwise or an Operating Cost is solely for the benefit of Tenant, or measurable and billable directly to Tenant, such costs shall be paid solely by Tenant. Default in payment of any such direct charges shall constitute a default in payment of Rent hereunder. Landlord may, in its discretion, pay such charges in order to prevent a default relating to the Property, and such amount shall be invoiced to Tenant as additional Rent, and all provisions herein regarding overdue Rent shall apply to such charges (interest, remedies).

      **e.**    **Late Charges; Default Interest**. If any sums payable by Tenant to Landlord under this Lease are not received within five (5) Days after their due date, Tenant shall pay Landlord in addition to the amount due, for the cost of collecting and handling such late payment, an amount equal to five percent (5%) of the amounts overdue. In addition, all

delinquent sums payable by Tenant to Landlord and not paid within five (5) Days after their due date, at Landlord's option, bear interest at the rate of fifteen percent (15%) per annum, or the highest rate of interest allowable by law, whichever is less (the "Default Rate"). Interest on all delinquent amounts shall be calculated from the original due date to the date of payment.

**f.     Payments of Rent and Operating Expenses by EFT or ACH.**   All payments of Base Rent and Operating Costs subsequent to the first month following the Lease Commencement Date shall be made electronically and automatically by preauthorized ACH or EFT, with Tenant executing and delivering to its bank all documentation necessary to effectuate such electronic payments.

**g.     Less Than Full Payment.**   Landlord's acceptance of less than the full amount of any payment due from Tenant shall not be deemed an accord and satisfaction or compromise of such payment unless Landlord specifically consents in writing to payment of such lesser sum as an accord and satisfaction or compromise of the amount which Landlord claims.

**h.     Taxes.**   Tenant shall pay before delinquent all taxes, assessments, liens and license fees levied, assessed or imposed by any authority having the direct or indirect power to tax or assess any such liens, by reason of Tenant's use of the Property, and on Tenant's personal property located on the Property. Landlord shall pay all taxes and assessments with respect to the Property, and the Master Association shall pay all taxes and assessments on the common areas of the Mill Site, all of which shall be included in Operating Costs. In the event real or personal property taxes are not separately assessed against the Property, Tenant's liability shall be negotiated in good faith between the Tenant and Landlord. Landlord will use its best efforts to minimize the amount of real estate tax charged to Tenant during the Lease term and during any Renewal Period.

**5.     INTENTIONALLY OMITTED.**

**6.     UTILITIES AND SERVICES**. Tenant shall pay for the costs of electricity, gas, sewer, water, telephone and any other utilities, including trash removal services related to Tenant's use of the Property including, without limitation, snow removal and related services. Tenant shall pay any obligations related to such utilities when due such that the same shall not become a lien on the Property. Should any of these utilities be supplied and not capable of separate metering or billing, then Tenant and Landlord shall pay its pro rata share of such amounts as provided for under the same terms as Operating Costs. The electricity provided to the Property shall be paid by and in the name of Tenant. Tenant will be a direct Northwestern Energy Substation customer.

If Tenant has no other feasible access for desired utilities (excepting natural gas water, sewer, telephone, electricity and cable which are to be provided under Section 1.b.), Landlord agrees to provide Tenant reasonable access for utilities that do not currently serve the Property. Such easements shall be at no cost to Tenant although Tenant shall be solely responsible for developing the easement, extending the utility and restoring the property as closely as feasible to its original condition following installation.

**7.     PERMITTED USES, IMPROVEMENTS, AND COMPLIANCE WITH LAWS AND THE COVENANTS AND MASTER ASSOCIATION DOCUMENTS.**

**a.    Permitted Uses.** Subject to all other provision and terms herein, the Property shall be used for a blockchain data center, managed hosting services to clients, and related activities, including use of plant and machinery connected with the same, and management, office and administrative functions and or for any other legal purpose.

**b.    Improvements.** Except as provided in Section 1.b.I., Tenant is responsible for all improvements, including infrastructure, necessary or desired to conduct the permitted uses on the Property and shall obtain Landlord's written consent prior to making such improvements, which consent shall not be unreasonably withheld.    Concerning any improvements Tenant desires to make to the Property, Landlord's consent for any of Tenant's proposed improvements to the Property shall be provided to Lessee within ten (10) days of Landlord receiving from Tenant the plans relating to said proposed improvements.  Landlord's consent will be deemed granted if notice of Landlord's lack of consent is not received by Tenant within ten (10) days.   Tenant shall have the right to construct or place on the Property temporary or permanent buildings and equipment necessary to carry out its operations only upon Landlord's written consent which shall not be unreasonably withheld. In the performance of such work, Tenant agrees to comply with all laws, ordinances, rules and regulations of any public authority, and to save Landlord harmless from damage, loss or expense, and to perform such work and improvements in a good and workman like manner and to at least industry standards.   At Landlord's written request, Tenant, at Tenant's expense, shall remove any improvements Tenant places on the Property upon the expiration or earlier termination of the Lease.  Improvements of a permanent nature, or which by their nature are a part of the real estate property, useful and appropriate for use of the Property for the purpose for which Tenant has utilized the Property shall become a part of the real property and shall become and remain the property of Landlord upon expiration or termination of this Lease. Improvements not of such nature, or otherwise designated by Landlord in writing to Tenant shall be removed by Tenant prior to the expiration or termination of this Lease, with any damage, subject to normal wear and tear, or modification to the Property being caused by such improvements being repaired or remedied at Tenant's sole expense prior to the expiration or termination of this Lease.  Any improvements which should be removed under the terms hereof which are in fact not removed prior to the expiration or termination of this Lease shall become a part of the real property and shall become and remain the property of Landlord.  Should Landlord be required to remove any improvements as described and which Landlord does not designate to remain, said improvements may be removed by Landlord at Tenant's cost.

**c.    Prohibited Acts.** No act shall be done on or around the Property that is unlawful or that will increase the existing rate of insurance on the Property, or cause the cancellation of any insurance on the Property.   Tenant shall not commit or allow to be committed any waste upon the Property, or any public or private nuisance. Tenant shall not do or permit anything to be done in the Property or on the Property which will obstruct or interfere with the rights of other tenants or occupants of the Property, or their customers, clients and visitors, or to injure or annoy such persons.

**d.    Compliance with Laws.** Tenant shall not cause or permit the Property to be used in any way which violates any local, state or federal law, ordinance, or other governmental regulation or order.

**e.    Compliance with Covenants and Master Association Documents.** Tenant acknowledges that the Landlord and other owners and occupants of property around or adjoining the Property (referred to herein as the "Mill Site," which is further described as being located at Bonner, Montana between Highway 200 and the Blackfoot River and encompasses the Property) are subject to an overall Mill Site declaration that, among other things, creates road and utility easements through the Mill Site, creates easements for the monitoring wells on

the Mill Site, and pursuant to which a Mill Site owners' association was established which, among other things (a) owns the water rights which are appurtenant to the Mill Site, (b) owns the fire suppression system on Bonner Mountain and is or will be the tenant under the leases associated with that system, (c) is responsible for managing, operating, and repairing potable water, industrial water, and fire suppression water systems for the Mill Site, (d) is responsible for maintaining, repairing, and improving the main roads through the Mill Site, (e) is responsible for maintaining and operating the monitoring wells on the Mill Site, and (f) responsible for providing management, security, maintenance, repairs and such other services as may be approved by the lot and condominium unit owners in the Mill Site, with Tenant hereby acknowledging receipt of the following documents: (i) the Declaration of Protective Covenants, Conditions and Restrictions for Bonner Millsite-Missoula County Montana" recorded on June 12, 2012 as Document No. 201210783 in Book 895 of Micro Records, Page 460, in the property records of Missoula County, Montana (the "Declaration"), the First Amendment to Declaration of Protective Covenants, Conditions and Restrictions for Bonner Millsite-Missoula County, Montana, recorded on March 14, 2015 as Document No. 201403156 in Book 926 of Micro Records, Page 279, in the property records of Missoula County, Montana (the "First Amendment to Declaration"), Articles of Incorporation of the Bonner Mill Site Property Owners Association, Inc., filed with the Montana Secretary of State on May 31, 2012 (the "Association Articles"), the Bylaws of Bonner Mill Site Property Owners Association, Inc., dated June 11, 2012, and recorded on June 12, 2012 as Document No. 201210784 in Book 895 of Micro Records, Page 461, in the property records of Missoula County, Montana (the "Association Bylaws"). The Declaration, First Amendment to Declaration, Association Articles and Association Bylaws are collectively referred to as the "Covenants and Master Association Documents. Tenant hereby agrees to operate and occupy the Property in full compliance and subject to all provisions and restrictions of the Covenants and Master Association Documents as if it were an owner of property at the Mill Site and a party to the Covenants and Master Association Documents. Tenant shall execute and deliver such documents or take any such actions as requested by Landlord to evidence or obligate Tenant to the same. Tenant shall defend, indemnify, and hold Landlord harmless against all liabilities, damages, costs, and expenses, including attorneys' fees related to, arising from, or connected with Tenant's, or Tenant's employees, officers, contractors, licensees, agents, servants, employees, guests, invitees or visitors, failure to comply with the Covenants and Master Association Documents. This indemnification and hold harmless shall survive the termination of this Lease.

      **f.**    **Tenant's Access to Office**. Regardless of whether the area depicted as "Tenant 1" on **Exhibit A** is occupied by a tenant other than Tenant, Landlord shall ensure that Tenant at all times has interior access from the Property to the space designated as an office in **Exhibit A,** through the space designated in **Exhibit A** as "Tenant 1."

**8.**    **REPAIRS AND MAINTENANCE; SURRENDER**. Except for the maintenance, repair and replacement of the foundation, exterior walls, roof and all structural portions of the Property which are Landlord's responsibility under this Lease, Tenant shall, at its sole expense, maintain the Property in good condition and promptly make all repairs and replacements necessary to keep the Property safe and in good condition, including utilities and systems to the extent exclusively serving the portion of the Property being leased by Tenant pursuant to this Lease. This shall include but not be limited to the electrical system, which includes but is not limited to the electrical system from the substation to and within the Property. Use of any road located upon the Property by Landlord or third parties may not unreasonably interfere with Tenant's use of the Property and Tenant shall have the right, if necessary, to place reasonable limitations on the use of such access to ensure quiet enjoyment of the Property. Landlord (or

the Master Association or the Condominium Association, as applicable) shall maintain any common access roads serving more than the Property, with such costs to be included as part of the Operating Costs. Tenant shall not be responsible for any repairs to the Property made necessary by the negligence or willful misconduct of Landlord or its agents, employees, contractors or invitees therein.

If Tenant fails to perform Tenant's obligations under this Section 8 and the amount to cure Tenant's non-performance is greater than Ten Thousand Dollars ($10,000), Landlord may at Landlord's option enter upon the Property after thirty (30) days' prior written notice to Tenant and put the same in good order, condition and repair and the cost thereof together with interest thereon at the Default Rate shall be due and payable as additional Rent to Landlord. If Tenant fails to perform Tenant's obligations under this Section 8 and the amount to cure Tenant's non-performance is not greater than Ten Thousand Dollars ($10,000), Landlord may at Landlord's option enter upon the Property without notice to Tenant and put the same in good order, condition and repair and the cost thereof together with interest thereon at the Default Rate shall be due and payable as additional Rent to Landlord. Upon expiration of the Lease term (and any Renewal Period if duly exercised), whether by lapse of time or otherwise, Tenant shall promptly and peacefully surrender the Property to Landlord in a substantially similar and as good condition as when received by Tenant from Landlord or as thereafter improved (subject to Section 7.b. and otherwise as provided in this Lease), reasonable wear and tear and insured casualty and condemnation excepted.

If Landlord fails to make repairs that materially interfere with Tenant's use and enjoyment of the Property within a reasonable period after written notice (except in the case of an emergency), but not to exceed twenty (20) days (subject to events beyond Landlord's control), Tenant may make such repairs and offset the cost thereof against Rent and other amounts due under this Lease and may recover the amount thereof from Landlord, in addition to its other legal or equitable remedies.

9.    **ACCESS AND RIGHT OF ENTRY**.  Landlord, and Landlord's employees and agents have the right of access to the Property at all reasonable times (upon 24 hours prior written notice to Tenant, except in the case of an emergency during which no notice shall be required) to make repairs, inspections, alterations or improvements, or to show the property for sale or other lease, provided that Landlord shall use reasonable efforts to minimize interference with Tenant's use and enjoyment of the Property.  Nothing in this Section shall be construed as imposing any obligation on Landlord for repair or other purpose not expressly stated in this Lease.

10.    **SIGNAGE**.  Tenant shall have the right to install, at its own cost and expense, building façade signage on the exterior of the Building.  For any additional signage, Tenant shall obtain Landlord's written consent, which consent shall not be unreasonably withheld, as to size, location, materials, method of attachment, and appearance, before installing any signs upon the Property.  Tenant shall install such signage at Tenant's sole expense and in compliance with the Covenants and Master Association Documents and all applicable laws, rules and regulations. Tenant shall not damage or deface the Property in installing or removing signage and shall timely repair any injury or damage to the Property caused by such installation or removal.

11.    **DESTRUCTION OR CONDEMNATION**.

    a.    **Damage and Repair**.

EXHIBIT 1.
PAGE11

If less than seventy-five percent (75%) of the Property is destroyed, or partially damaged and rendered untenantable by fire or other casualty, and regardless of whether insurance proceeds are available to pay all or any portion of the cost of such restoration, Landlord shall restore the Property necessary for Tenant's occupancy with reasonable diligence to complete the work, and the monthly Base Rent shall be abated in the same proportion as the untenantable portion of the Property, provided, however, Tenant may terminate the Lease if Landlord is unable to restore the Property within six (6) months of the casualty event. Notwithstanding the foregoing, there shall be a rent abatement only if the damage or destruction of the Property did not result from negligence or willful misconduct on the part of Tenant, or Tenant's officers, contractors, licensees, subtenants, agents, servants, employees, guests, invitees or visitors. No damages, compensation or claim shall be payable by Landlord for inconvenience, loss of business or annoyance directly, incidentally or consequentially arising from any repair or restoration of any portion of the Property. Landlord will not carry insurance of any kind for the protection of Tenant or any improvements paid for by Tenant, or on Tenant's fixtures, equipment, improvements or appurtenances, and Landlord's restoration obligations hereunder shall not include any obligation to repair any damage thereto or replace the same.

If seventy five percent (75%) or more of the Property is destroyed, or partially damaged and rendered untenantable by fire or other casualty, Landlord may, at its option: (a) terminate this Lease as provided herein, or (b) restore the Property necessary for Tenant's occupancy. If Landlord restores Property, Landlord shall proceed with reasonable diligence to complete the work, and the monthly Base Rent shall be abated in the same proportion as the untenantable portion of the Property, provided, however, Tenant may terminate the Lease if Landlord is unable to restore the Property within twelve (12) months of the casualty event. Notwithstanding the foregoing, there shall be a rent abatement only if the damage or destruction of the Property did not result from negligence or willful misconduct on the part of Tenant, or Tenant's officers, contractors, licensees, subtenants, agents, servants, employees, guests, invitees or visitors. No damages, compensation or claim shall be payable by Landlord for inconvenience, loss of business or annoyance directly, incidentally or consequentially arising from any repair or restoration of any portion of the Property. Landlord will not carry insurance of any kind for the protection of Tenant or any improvements paid for by Tenant, or on Tenant's fixtures, equipment, improvements or appurtenances, and Landlord's restoration obligations hereunder shall not include any obligation to repair any damage thereto or replace the same.

**b.      Condemnation**. If the Property is made untenantable by eminent domain, or conveyed under a threat of condemnation (for this Section 11.b. each a "taking"), this Lease shall terminate at the option of either Landlord or Tenant as of the earlier of the date title vests in the condemning authority or the condemning authority first has possession of the Property and all Rents and other payments shall be paid to that date. In case of taking of a part of the Property necessary for Tenant's occupancy that does not render the Property untenantable, then this Lease shall continue in full force and effect and the base monthly Rent shall be equitably reduced based on the proportion by which the floor area of any structures is reduced, such reduction in Rent to be effective as of the earlier of the date the condemning authority first has possession of such portion or title vests in the condemning authority. Landlord shall be entitled to the entire award from the condemning authority attributable to the value of the Property and Tenant shall make no claim for the value of its leasehold. Tenant shall be permitted to make a separate claim against the condemning authority for moving expenses, provided that in no event shall Tenant's claim reduce Landlord's award.

**12.    INSURANCE**.

**a.      Tenant's Liability Insurance.**  During the Lease term, Tenant shall pay for and maintain commercial general liability insurance with broad form property damage and contractual liability endorsements.  This policy shall name Landlord, its property manager (if any), and other parties designated by Landlord as additional insureds using an endorsement form acceptable to Landlord,  and shall insure Tenant's activities and those of Tenant's employees, officers, contractors, licensees, agents, servants, employees, guests, invitees or visitors with respect to the Property and Landlord's adjacent property against loss, damage or liability for personal injury or bodily injury (including death) or loss or damage to property with a combined single limit of not less than $5,000,000, and a deductible of not more than $10,000.  Tenant's insurance will be primary and noncontributory with any liability insurance carried by Landlord.  Tenant's insurance coverage shall include all liability respecting Tenant's electrical system starting at the substation meter.

**b.      Fire and extended coverage.**  Tenant shall carry and maintain fire and extended coverage insurance sufficient to cover all of Tenant's signs, furniture, removable trade fixtures, equipment, electrical system from the substation to and including within the Property and other property of Tenant in an amount necessary to avoid co-insurance.   Landlord will carry and maintain fire and extended coverage insurance covering the Property of a minimum of $5,000,000.00 or replacement value, the cost of which will be included in Operating Costs.

**c.      Tenant's Property Insurance.**  During the Lease term, Tenant shall pay for and maintain special form causes of loss coverage property insurance for all of Tenant's personal property, fixtures and equipment in the amount of their full replacement value, with a deductible of not more than $10,000.  Tenant assumes the risk of loss to its property, furnishings, trade fixtures, equipment and supplies.

**d.      Additional Insureds.**  Both Parties agree to arrange for the other Party, and for the Master Association and the Condominium Association to be named as "additional insured" parties on all policies for liability, property and casualty insurance maintained hereunder.

**e.      Workers' Compensation.**  Tenant shall maintain Workers' Compensation insurance as detailed and required by the State of Montana.

**f.      Miscellaneous.**  The insurance required under this Section for both parties shall be placed with companies rated A-/VII or better in Best's Insurance Guide, and which are admitted in the State of Montana.  No insurance policy shall be cancelled or reduced in coverage and each such policy shall provide that it is not subject to cancellation or a reduction in coverage except after thirty (30) days prior written notice to the other party. Both parties shall deliver to the other upon commencement of the Lease and from time to time thereafter, copies of the insurance policies or evidence of insurance and copies of endorsements required by this Section. In no event shall the limits of such policies be considered as limiting the insured's liability.  If either party fails to acquire or maintain any insurance or provide any policy or evidence of insurance required by this Section, and such failure continues for three (3) days after written notice from a party, such party may, but shall not be required to, obtain such insurance for the other party's benefit and the costs of such insurance shall be reimbursed upon demand.  Such amounts, if owed by Tenant hereunder, shall be additional Rent payable by Tenant hereunder and in the event of non-payment thereof, Landlord shall have the same rights and remedies with respect to such non-payment as it has with respect to any other non-payment of Rent hereunder.

    **g.**    **Waiver of Subrogation**. Landlord and Tenant hereby release each other and any other tenant, their agents or employees, from responsibility for, and waive their entire claim of recovery for any loss or damage arising from any cause covered by property insurance required to be carried or otherwise carried by each of them. Each party shall provide notice to the property insurance carrier or carriers of this mutual waiver of subrogation, and shall cause its respective property insurance carriers to waive all rights of subrogation against the other. This waiver shall not apply to the extent of the deductible amounts to any such property policies or to the extent of liabilities exceeding the limits of such policies.

**13.**    **INDEMNIFICATION.**

    **a.**    **Indemnification by Tenant**. Tenant shall defend, indemnify, and hold Landlord harmless against all liabilities, damages, costs, and expenses, including reasonable attorneys' fees, for personal injury, bodily injury (including death) or property damage arising from any negligent or wrongful act or omission of Tenant or Tenant's officers, contractors, licensees, subtenants, agents, servants, employees, guests, invitees, or visitors on or around the Property, or arising from any breach of this Lease by Tenant, except such liabilities, claims, damages, costs and expenses arising from the negligence or intentional misconduct of Landlord.

    **b.**    **Indemnification by Landlord**. Landlord shall defend, indemnify, and hold tenant harmless against all liabilities, damages, costs, and expenses, including reasonable attorneys' fees, for personal injury, bodily injury (including death) or property damage arising from any negligent or wrongful act or omission of Landlord or Landlord's officers, contractors, licensees, subtenants, agents, servants, employees, guests, invitees, or visitors on or around the Property, or arising from any breach of this Lease by Landlord, except such liabilities, claims, damages, costs and expenses arising from the negligence or intentional misconduct of Tenant.

    **c.**    **Exemption of Landlord from Liability**. Except to the extent of claims arising out of Landlord's negligence, Landlord shall not be liable for injury to Tenant's business or assets or any loss of income therefrom or for damage to any property of Tenant or of its employees, invitees, customers, or any other person in or about the Property. In the event the claim is the result of the joint negligence of the Landlord and Tenant then liability shall be apportioned according to the proportionate share of each party's fault.

    **d.**    **Survival**. The provisions of this Indemnification Section shall survive expiration or termination of this Lease.

    **14.**    **ASSIGNMENT.**    Tenant shall not assign, sublet, mortgage, encumber or otherwise transfer any interest in this Lease or any part of the Property, without first obtaining Landlord's written consent which will not be unreasonably withheld, except that server hosting by Tenant shall under no circumstances be deemed subletting for purposes of this Section 14 and Tenant may assign the lease upon written notice to, but without the consent of, Landlord to (i) an entity in which Tenant owns a controlling interest (meaning 50% or more of the equitable and voting interests); (ii) to any corporation or other entity into or with which Tenant may be merged or consolidated; (iii) to any corporation or other entity to which all or substantially all of Tenant's assets may be transferred; or (iv) to any corporation or other entity that controls, is controlled by, or is under common control with Tenant; provided that the assignee must be of equal or greater financial strength than Tenant upon the date of assignment. A change in control of Tenant shall be deemed an assignment of this Lease. This Lease shall be assignable by Landlord without Tenant's consent.

**15.    LIENS**. Tenant shall keep the Property free from any liens created by or through Tenant.  Tenant shall indemnify and hold Landlord harmless from liability for any such liens including, without limitation, liens arising from any improvements.  If a lien is filed against the Property by any person claiming by, through or under Tenant, Tenant shall, within thirty (30) days after Landlord's demand, at Tenant's expense, either remove the lien or furnish to Landlord a bond in form and amount and issued by a surety satisfactory to Landlord, indemnifying Landlord and the Property against all liabilities, costs and expenses, including attorneys' fees, which Landlord could reasonably incur as a result of such lien(s).

**16.    DEFAULT**. The following occurrences shall each be deemed an Event of Default by Tenant.  Any notice periods granted herein shall be deemed to run concurrently with and not in addition to any default notice periods required by law.

**a.    Failure To Pay**.  Tenant fails to pay any sum due hereunder, including but not limited to Base Rent and Operating Costs, when due under the terms of this Lease and said non-payment continues for a period of fifteen (15) days after written notice by Landlord to Tenant of said failure to pay.

**b.    Insolvency**.  Tenant becomes insolvent, voluntarily or involuntarily bankrupt, or a receiver, assignee or other liquidating officer is appointed for Tenant's business, provided that in the event of any involuntary bankruptcy or other insolvency proceeding, the existence of such proceeding shall constitute an Event of Default only if such proceeding is not dismissed or vacated within 60 days after its institution or commencement.

**c.    Levy or Execution**.  Tenant's interest in this Lease or the Property, or any part thereof, is taken by execution or other process of law directed against Tenant, or is taken upon or subjected to any attachment by or pledge to any creditor of Tenant, if such attachment is not discharged within 15 days after being levied.

**d.    Other Non-Monetary Defaults**.  Tenant breaches any agreement, term or covenant of this Lease other than one requiring the payment of money and not otherwise enumerated in this Section or elsewhere in this Lease and the breach continues for a period of thirty (30) days after written notice by Landlord to Tenant of the breach; provided, however, that if the breach is not capable of being cured within such thirty (30) day period, then so long as Tenant commences the cure of such breach within the thirty (30) day period and prosecutes the cure with reasonable diligence thereafter such thirty (30) day period shall be extended by an additional thirty (30) days (for a total of 60 days for an uncured breach by Tenant).  For a breach which remains uncured after the initial thirty (30) day period, and such breach is curable through the expenditure by Landlord of funds for contracted services, repairs, materials or other items that would cure such breach, then Landlord shall have the right to cure such breach, and Tenant shall be liable to Landlord for the amounts incurred by Landlord, payable within thirty (30) days of invoicing to Tenant (with copies of all supporting documentation), as additional Rent hereunder.  Such right shall be exercisable by Landlord only with ten (10) days advance written notice to Tenant, with such breach remaining uncured at the end of such ten (10) day period.

**17.    REMEDIES**.

Landlord shall upon an Event of Default have available all remedies at law or in equity.  Landlord's rights and remedies under this Lease shall be cumulative, and shall include but note be limited to the following.

**a.** **Termination of Lease**. Upon termination of this Lease, Tenant will remain liable to Landlord for damages in an amount equal to the Rent and other sums that would have been owing by Tenant under this Lease for the balance of the Lease term, less the net proceeds, if any, of any reletting of the Property by Landlord subsequent to the termination, after deducting all Landlord's reletting expenses (as defined below).

**b.** **Nonpayment of Additional Rent.** All costs which Tenant is obligated to pay to Landlord pursuant to this Lease shall in the event of nonpayment be treated as if they were payments of Rent, and Landlord shall have all the rights herein provided for in case of nonpayment of Rent.

**c.** **Failure to Remove Property**. If Tenant fails to remove any of its property from the Property within fifteen (15) days of Landlord's written request following an uncured Event of Default, Landlord may, at its option, remove and store the property at Tenant's expense and risk. If Tenant does not pay the storage cost within fifteen (15) days of Landlord's request, Landlord may, at its option, have any or all of such property sold at public or private sale (and Landlord may become a purchaser at such sale), in such manner as Landlord deems proper, without notice to Tenant. Landlord shall apply the proceeds of such sale: (i) to the expense of such sale, including reasonable attorneys' fees actually incurred; (ii) to the payment of the costs or charges for storing such property; (iii) to the payment of any other sums of money which may then be or thereafter become due Landlord from Tenant under any of the terms hereof; and (iv) the balance, if any, to Tenant. Nothing in this Section shall limit Landlord's right to sell Tenant's personal property as permitted by law or to foreclose Landlord's lien for unpaid Rent.

**d**. **Mitigation.** In the event of default of this Lease by Tenant, Landlord shall use good faith efforts to mitigate its damages by marketing the Property for reletting to another tenant.

**e.** **Tenant Remedies**. In the event of a default by Landlord of its obligations under this Lease, Tenant shall, in addition to the remedies otherwise set forth in this Lease, have all applicable equitable and legal remedies. Notwithstanding anything to the contrary in the Lease, if Landlord's failure or inability to perform its obligations herein (including, but not limited to, a failure to provide any services) creates a condition that interferes substantially with the normal usage of the Property by Tenant as permitted herein, and as a consequence Tenant is compelled to discontinue business in the Property in whole or in part during the time that such interference persists for a period of thirty (30) consecutive days, then the rental payable hereunder shall be proportionately abated (based on the degree of interference) during the time of such discontinuance of business beyond such thirty (30) days but no abatement shall continue beyond the time that the interference no longer persists regardless of any delay by Tenant in resuming operation of business after that time. Such period shall be extended for periods of time during which the performance is prevented due to circumstances beyond Landlord's control, including without limitation, fires, floods, earthquakes, lockouts, strikes, embargoes, governmental regulations, acts of God, public enemy, terrorism, war or other strife.

If Tenant is unable to conduct its business for more than sixty (60) consecutive days after written notice to Landlord, Tenant shall have the right to terminate the Lease by delivering a second written notice to Landlord after such sixty (60) day period and the Lease shall terminate upon the expiration of fourteen (14) days after Landlord's receipt of such second notice unless the interruption or stoppage of such services, as set forth above, is cured during such fourteen (14) day period.

**18.    MORTGAGE SUBORDINATION AND ATTORNMENT.**  Subject to the condition set forth in the last sentence of this paragraph, this Lease shall automatically be subordinate to any mortgage or deed of trust created by Landlord which is now existing or hereafter placed upon the Property or Landlord's interest as lessee in the Property, including any advances, interest, modifications, renewals, replacements or extensions ("Landlord's Mortgage").  Tenant shall attorn to the holder of any Landlord's Mortgage or any person(s) acquiring the Property at any sale or other proceeding under any Landlord's Mortgage provided such person(s) assume the obligations of Landlord under this Lease.  Tenant shall promptly and in no event later than fifteen (15) days after request execute, acknowledge and deliver documents which the holder of any Landlord's Mortgage may reasonably require as further evidence of this subordination and attornment.  Notwithstanding the foregoing, Tenant's obligations under this Section to subordinate in the future are conditioned on the holder of each Landlord's Mortgage and each person acquiring the Property at any sale or other proceeding under any such Landlord's Mortgage not disturbing Tenant's occupancy and other rights under this Lease, so long as no uncured Event of Default exists.

**19.    NON-WAIVER.**  Landlord's waiver of any breach of any term contained in this Lease shall not be deemed to be a waiver of the same term for subsequent acts of Tenant.  The acceptance by Landlord of Rent or other amounts due by Tenant hereunder shall not be deemed to be a waiver of any breach by Tenant preceding such acceptance.

**20.    HOLDOVER.**  If Tenant shall hold over after the expiration or termination of the term (or the Renewal Term if so exercised), without the written consent of Landlord, such tenancy shall be deemed to be on a month-to-month basis and may be terminated according to Montana law.  During such tenancy, Tenant agrees to pay to Landlord 125% the rate of Base Rent last payable under this Lease, unless a different rate is agreed upon by Landlord.  All other terms of the Lease shall remain in effect.  Tenant acknowledges and agrees that this Section 20 does not grant any right to Tenant to holdover, and that Tenant may also be liable to Landlord for any and all damages or expenses which Landlord may have to incur as a result of Tenant's holdover.

**21.    NOTICES.** All notices under this Lease shall be in writing and effective (i) when delivered in person or via overnight courier, (ii) three (3) days after being sent by registered or certified mail to Landlord or Tenant, as the case may be; or (iii) upon confirmed transmission by facsimile or other electronic means to such persons at:

Landlord:

Bonner Property Development, LLC
224 North Higgins Ave
Missoula, MT 59802
Fax: (406) 542-1822

Tenant:

Project Spokane, LLC
Attn: Matt Carson, Managing Member
5619 DTC Parkway #475
Greenwood Village, CO  80111
Phone: (5641) 918-1446
Email: halo3rockm@gmail.com

With a copy to:

James A. Bowditch
Boone Karlberg P.C.
P.O. Box 9199
Missoula, MT  59807-9199
Phone: (406) 543-6646
Email: jbowditch@boonekarlberg.com

or such other addresses/facsimile numbers as may from time to time be designated by such parties in writing.

**22.    COSTS AND ATTORNEYS' FEES.** If Tenant or Landlord engage the services of an attorney to collect monies due or to bring any action for any relief against the other, declaratory or otherwise, arising out of this Lease, including any suit by Landlord for the recovery of Rent or other payments, or possession of the Property, the losing party shall pay the prevailing party a reasonable sum for attorneys' fees and costs in such suit in mediation or arbitration, at trial, on appeal and in any bankruptcy proceeding.

**23.    ESTOPPEL CERTIFICATES.** Tenant shall, from time to time, upon written request of Landlord, execute, acknowledge and deliver to Landlord or its designee a written statement specifying the following, subject to any modifications necessary to make such statements true and complete: (i) the date the Lease term commenced and the date it expires; (ii) the amount of minimum monthly Rent and the date to which such Rent has been paid; (iii) that this Lease is in full force and effect and has not been assigned, modified, supplemented or amended in any way; (iv) that this Lease represents the entire agreement between the parties; (v) that all conditions under this Lease to be performed by Landlord have been satisfied; (vi) that there are no existing claims, defenses or offsets which the Tenant has against the enforcement of this Lease by Landlord; (vii) that no Rent has been paid more than one month in advance; (viii) that no security has been deposited with Landlord (or, if so, the amount thereof);

and (ix) such other factual matters concerning the Lease or the Property as Landlord may reasonably request.

**24.   REPRESENTATIONS.** Except as specifically stated in this Lease, Landlord hereby disclaims any warranty, guaranty or representation of the nature and condition of the Property, including (but not by way of limitation) the soil and geology and suitability thereof for any and all activities and uses that Tenant may elect to conduct thereon at any time during the Lease term, the  manner of construction and the conditions and state of repair or lack of repair of all improvements  located thereon, and the nature and extent of the rights of others with respect to the Property, whether  by way of easement, right of way, lease, possession, lien, encumbrance, license, reservation, condition or  otherwise.  Notwithstanding the foregoing, Landlord represents that it has no knowledge of any latent defects with respect to the Property other than those disclosed in writing to Tenant prior to the execution hereof, and that, except as otherwise disclosed in writing to Tenant prior to the execution hereof, to the best of Landlord's knowledge the improvements on the Property do not violate any ordinance, rule, code or regulation of any governmental agency and has not received any notice of any such possible violations that is outstanding.

**25.   LANDLORD'S LIABILITY.**   Anything in this Lease to the contrary notwithstanding, covenants, undertakings and agreements herein made on the part of Landlord are made and intended not as personal covenants, undertakings and agreements for the purpose of binding Landlord personally or the assets of Landlord except Landlord's interest in the Property, but are made and intended for the purpose of binding only the Landlord's interest in the Property, as the same may from time to time be encumbered.  In no event shall Landlord or its partners, shareholders, or members, as the case may be, ever be personally liable hereunder.

**26.   RIGHT TO PERFORM.**  If Tenant shall fail to timely pay any sum or perform any other act on its part to be performed hereunder (after any applicable notice and cure periods have expired), Landlord may make any such payment or perform any such other act on Tenant's part to be made or performed as provided in this Lease.  Tenant shall, within thirty (30) days of demand, reimburse Landlord for its expenses incurred in making such payment or performance. Landlord shall (in addition to any other right or remedy of Landlord provided by law) have the same rights and remedies in the event of the nonpayment of sums due under this Section as in the case of default by Tenant in the payment of Rent. Any payment by Landlord due to Tenant's inaction or failure to perform in accordance with this Lease shall bear interest at the Default Rate.

**27.   HAZARDOUS MATERIAL.** On and after the Effective Date, Tenant shall not cause or permit any Hazardous Material to be brought upon, kept, or used in or about, or disposed of on the Property by Tenant, its agents, employees, contractors or invitees, or otherwise or in any way violate the Environmental Laws without Landlord's prior written consent which may be withheld for any reason. All Hazardous Materials which are so approved by Landlord to be on the Property shall be used in strict compliance with the Environmental Laws. If Tenant breaches the obligations stated in the preceding sentences, then, in addition to Landlord's other remedies under this Lease, Tenant shall indemnify, defend and hold Landlord harmless from any and all claims, judgments, damages, penalties, fines, costs, liabilities or losses including, without limitation, diminution in the value of the Property, damages for the loss or restriction on use of rentable or usable space or of any amenity of the Property, or elsewhere, damages arising from any adverse impact on marketing of space at the Property, and sums paid in settlement of claims, reasonable attorneys' fees, reasonable consultant fees and reasonable expert fees incurred or suffered by Landlord either during or after the Lease term

Test

arising out of or resulting from Tenant's breach. Tenant shall immediately notify Landlord of any inquiry, investigation or notice that Tenant may receive from any third party regarding the actual or suspected presence of Hazardous Material on the Property.

Without limiting the foregoing, if the presence of any Hazardous Material brought upon, kept or used in or about the Property by Tenant, its agents, employees, contractors or invitees, results in any unlawful release of Hazardous Materials or breach of an Environmental Law on the Property or any other property, Tenant shall promptly take all actions, at its sole expense, as are necessary to return the Property or any other property, to the condition existing prior to the release of any such Hazardous Material; provided that Landlord's approval of such actions shall first be obtained, which approval may be withheld at Landlord's sole discretion.

As used herein, the term "Hazardous Material" means any hazardous, dangerous, toxic or harmful substance, material or waste including biomedical waste which is or becomes regulated by any local governmental authority, any State or territory of the United States, or the United States Government, due to its potential harm to the health, safety or welfare of humans or the environment. As used herein "Environmental Law" means The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., or other applicable state or federal laws, rules, or regulations similar or related hereto.

Landlord hereby agrees to indemnify, defend and hold Tenant harmless from and against any claims, demands, actions, suits, damages, expenses, and costs incurred by Tenant directly resulting from (i) Hazardous Materials existing on the Property prior to the commencement of this Lease; (ii) Hazardous Materials that migrate from another location onto the Property during the term of this Lease; and (iii) Hazardous Materials that are introduced on to the Property by a party other than Tenant, provided that there shall be a rent abatement only if the damage or destruction of the Property did not result from, negligence or willful misconduct of Tenant, or Tenant's officers, contractors, licensees, subtenants, agents, servants, employees, guests, invitees or visitors. .

The provisions of this Section shall survive expiration or termination of this Lease.

**28.    QUIET ENJOYMENT**. So long as Tenant pays the Rent and performs all of its obligations in this Lease, Tenant's possession of the Property will not be disturbed by Landlord or anyone claiming by, through or under Landlord.

**29.    MERGER.** The voluntary or other surrender of this Lease by Tenant or a mutual cancellation thereof, shall not work a merger and shall, at the option of Landlord, terminate all or any existing sub tenancies or may, at the option of Landlord, operate as an assignment to Landlord of any or all of such sub tenancies.

**30.    GENERAL**.

**a.      Heirs and Assigns.** This Lease is binding upon Landlord and Tenant and their respective heirs, executors, administrators, successors and assigns.

**b.** **Entire Agreement.** This Lease contains all of the covenants and agreements between Landlord and Tenant relating to the Property. No prior or contemporaneous agreements or understanding pertaining to the Lease shall be valid or of any force or effect and the covenants and agreements of this Lease shall not be altered, modified or added to except in writing signed by Landlord and Tenant.

**c.** **Severability**. Any provision of this Lease which shall prove to be invalid, void or illegal shall in no way affect, impair or invalidate any other provision of this Lease.

**d.** **Force Majeure**. Time periods for either party's performance under any provisions of this Lease (excluding payment of Rent) shall be extended for periods of time during which the party's performance is prevented due to circumstances beyond such party's control, including without limitation, fires, floods, earthquakes, lockouts, strikes, embargoes, governmental regulations, acts of god, terrorism, public enemy, war or other strife.

**e.** **Governing Law.** This Lease shall be governed by and construed in accordance with the laws of the State of Montana.

**f.** **Submission of Lease Form Not an Offer**. One party's submission of this Lease to the other for review shall not constitute an offer to lease the Property. This Lease shall not become effective and binding upon Landlord and Tenant until it has been fully signed by both Landlord and Tenant.

**g.** **Authority of Parties.** Each party signing this Lease represents and warrants to the other that it has the authority to enter into this Lease, that the execution and delivery of this Lease has been duly authorized, and that upon such execution and delivery this Lease shall be binding upon and enforceable against the party on signing.

**h.** **Time**. "Day" as used herein means a calendar day and "business day" means any day on which commercial banks are generally open for business in the state where the Property is situated. Any period of time which would otherwise end on a non-business day shall be extended to the next following business day. Time is of the essence of this Lease.

**j.** **Fees**. Each party shall bear its own costs and fees (attorney, brokerage, or otherwise), unless specifically state in this Lease to the contrary, with regards to the preparation, negotiation, and execution of this Lease. Without limiting the foregoing or any other provision of this Lease, Tenant shall bear all costs and fees related, arising from, or connected to architects, engineers, associated with improvements made by it or on its behalf.

**k.** **Exhibits**. All exhibits attached to this Lease are incorporated herein by reference.

**l.** **Short-form lease**. Tenant and Landlord shall execute a memorandum or "short form" of this Lease. Such memorandum or "short form" shall be recorded, at Tenant's cost, with the Missoula County Clerk and Recorder.

*- Signatures Appear on Following Page -*

EXHIBIT 1.
PAGE21

IN WITNESS WHEREOF this Lease has been executed the date and year first above written.

**LANDLORD:**                                              **TENANT:**

BONNER PROPERTY DEVELOPMENT, LLC             PROJECT SPOKANE, LLC

By: _____                    By: _____ 2/29/2016
    Stephen Nelson, Co-Manager                        Matthew Carson
                                                      Its: Manager/Authorized Member

By: _____
    Michael Boehme, Co-Manager

EXHIBIT 1.
PAGE22

**Exhibit A**

**Site Plan**



EXHIBIT 1.
PAGE23

BONNER MILL SITE
BITCOIN DATA CENTER
PROJECT SPOKANE, LLC

G101



ELECTRICAL
ALAN SPICHKE



ARCHITECTURAL
KENT BAKI

PROJECT DESCRIPTION

SHEET INDEX

02/26/16

BONNER MILL SITE
BITCOIN DATA CENTER
PROJECT SPOKANE, LLC

OWNER:

ARCHITECT/ENGINEER:

PROJECT LOCATION:

VICINITY MAP:



EXHIBIT 1.
PAGE24





EXHIBIT 1.
PAGE25







EXHIBIT 1.
PAGE26





EXHIBIT 1. PAGE27



EXHIBIT 1.
PAGE28



EXHIBIT 1.
PAGE29



OVERALL ELECTRICAL PLAN

E101

EXHIBIT 1.
PAGE30



EXHIBIT 1.
PAGE31





Power Conduit Plan



EXHIBIT 1.
PAGE32



EXHIBIT 2.(i)
PAGE 1

# FIRST AMENDMENT
## TO
## COMMERCIAL LEASE AGREEMENT

THIS FIRST AMENDMENT TO LEASE AGREEMENT is entered into as of December ____, 2016, but effective January 1, 2017, by and between **Bonner Property Development, LLC**, a Montana limited liability company ("Landlord"), and **Project Spokane, LLC**, a Colorado limited liability company ("Tenant").

### Recitals

A.     Effective March 1, 2016, the parties entered into that certain Commercial Lease Agreement (the "Lease") for certain real property premises located in the Bonner Mill Site in Bonner, Montana as further described in the Lease.  Capitalized terms not otherwise defined herein shall be as defined in the Lease.

B.     Tenant wishes to expand its space within the Bonner Mill Site in Bonner, Montana, and to obtain the option to lease certain further additional space within the Bonner Mill Site, and Landlord has agreed to lease and provide an option on such additional space.

C.     The parties wish to amend the Lease to reflect the additional premises and option to further additional premises.

### Amendments

Landlord and Tenant agree as follows:

1.   Property.

   a.      Revised Description of "Property".  The first paragraph of **Section 1.a.** shall be amended and restated in its entirety to read as follows:

   The following premises located within various improvements located within the Bonner Mill Site in the City of Bonner Missoula County, Montana (collectively, the "Property"):

   i.   A portion of the total square footage of the "Planer Building" for a total of 234,949 square feet as shown on the site plan attached as **Exhibit A**.  The Planer Building in which the Property is located is approximately 300,715 square feet in total.

   ii.   A portion of the total square footage of the "Sorter Building" for a total of 9,000 square feet as shown on the site plan attached as **Exhibit B**.  The Sorter Building in which the Property is located is approximately 68,000 square feet in total.

   Any fixtures and personal property located on or about the Property as of the Lease Commencement Date (defined below) shall be considered part of the Property hereby

leased and subject to all terms and conditions hereof. The term "Fixture" shall refer to those items so permanently attached or embedded to as to be considered part of the premises, as defined in Section 70-15-103, MCA. The term "Fixture" shall not include unattached personal property, furniture, or trade fixtures of Lessee.

This Lease is expressly subject to the Covenants and Master Association Documents described in Section 7.e.

b. **Exhibit A** is hereby amended and restated as **Exhibit A** attached hereto. A new **Exhibit B** is hereby included in the Lease and is attached hereto.

c. **Section 1.b.I.** shall be amended and restated in its entirety to read as follows:

I. <u>Landlord Improvements</u>.     Landlord will complete the following improvements in the Property:

i)     Landlord will provide designated parking spaces for use by Tenant's employees, guests and invitees. Said parking areas shall be located next to the Planer Building and the Sorter Building, as reflected on **Exhibits C** and **D**.

ii)     Landlord will provide existing restrooms with water and septic in workable condition, in the Sorter Building.

d. The following new **subsections ix), x)** and **xi)** shall be added to **Section 1.b.II.**

ix)     The installation, maintenance and repair of a Pre-Action Fire System to be installed by Tenant in the Property and the Expansion Space shall be the sole obligation of the Tenant. Landlord shall be solely responsible for all repair and maintenance costs related to any existing sprinkler or other fire suppression systems that are within the Property or the Expansion Space.

x)     It is Tenant's plan to change its power from house power to substation power. Once this occurs, Tenant shall provide up to 1 megawatt of substation power to Landlord, at Tenant's cost, for use by other tenants leasing space in either the Planer Building or the Sorter Building. Tenant will bill Landlord for this substation power and Landlord shall be solely responsible for paying Tenant for this substation power and seeking reimbursement from Landlord's other tenants on the Property to whom Landlord provides said substation power. As an important inducement to Landlord to enter into this First Amendment, Tenant represents that it is its intent to complete Phase II 10 megawatt power and service by April 1, 2017. Other than the foregoing Landlord understands and acknowledges that Tenant makes no representations or guarantees as to the availability or quantity of

said substation power as delivered by the utility and Landlord agrees to indemnify and hold harmless Tenant against all liabilities, damages, costs, and expenses, including reasonable attorneys' fees, arising from any claims relating to the utility's failure to provide power to Tenant so that Tenant may provide said power to Landlord.

xi)   Should Tenant require tenant improvements or remodeling of the 9,000 sq. ft. in the Sorter Building, such activities will be with the consent of Landlord as provided hereunder and shall be all at Tenant's cost excepting the restrooms.

e.   New **Exhibits C** and **D** reflecting parking are hereby included in the Lease and are attached hereto.

2.   Term; Occupancy.

a.   Section 2.a.   **Section 2.a.** of the Lease shall be retitled as "Term" and shall be amended to provide that the term of the Lease, as amended and extended, shall commence on January 1, 2017 (the "Lease Commencement Date") and shall extend for nine (9) years two months (to February 28, 2026). The options to renew as provided in Section 2.a. shall remain in effect.

b.   Section 2.c.   The termination contingency contained in **Section 2.c.** shall be deleted from the Lease in its entirety and shall be of no further effect.

3.   Option for Expansion Space.  **Section 3** is amended to apply to an option to expand into 59,000 square feet in the Sorter Building. It will no longer reference or involve the Planer Building as Tenant has exercised the option to occupy that space and it has become part of the Property.  The section heading and first sentence of Section 3 shall be amended in their entirety to read as follows:

**OPTION TO LEASE PORTION OF REMAINDER OF SORTER BUILDING.**   Tenant shall have the option to lease the remainder of the Sorter Building not already being leased hereunder, which remainder is reflected on attached **Exhibit D-1** consisting of approximately 59,000 square feet (the "Expansion Space") (the "Expansion Space Option"), which option is exercisable for a period expiring thirty-six (36) months from the Effective Date (e.g., March 1, 2019), with a minimum advance written notice provided by certified mail, return receipt requested, at least one hundred twenty (120) days prior to Tenant's intended occupancy date for such Expansion Premises.  As consideration for Landlord granting this Expansion Space Option to Tenant, beginning on March 1, 2018 and continuing until the earlier of either (i) Tenant's exercise of the Expansion Space Option or (ii) the date of termination of the Expansion Space Option, Tenant shall pay to Landlord two times the amount of the Operating Costs for the Sorter Building that would otherwise be payable in accordance with Section 4.c. (the "Expansion Space Option Fee").  Landlord acknowledges and

agrees that if Tenant exercises the Expansion Space Option on or before March 1, 2018, Tenant shall not be obligated to pay the Expansion Space Option Fee.

The remainder of **Section 3** shall remain in full force and effect.

4. <u>Rent</u>.

    a. <u>Base Rent</u>. **Sections 4.a.i., ii. and iii.** shall be amended and restated in their entirety to read as follows:

        (i)     The Base Rent payable hereunder shall initially be $71,151.79 per month which is based on $3.50 per square foot per year multiplied by the square footage of the Property, 243,949, divided by 12 months, and shall continue at this rate for the first two (2) months of the term.  On March 1, 2017, and then again on March 1 of each year thereafter, hereinafter referred to as a "Lease Anniversary Date," the Base Rent will increase two percent (2%) per annum.

        (ii)    If Tenant exercises the Expansion Space Option, the Base Rent payable shall be increased proportionally based on the increased square footage for the Property and the Expansion Space that will be leased by Tenant. Specifically, if Tenant exercises the Expansion Space Option the new square footage of space being leased by Tenant upon which rent will be based will be 243,949 square feet (the Property) plus 59,000 square feet (the Expansion Space) for total of 302,949 square feet.  Including the two percent (2%) annual increase, Base Rent for the second year of this Lease if Tenant exercises the Expansion Space option will be $90,127.33 per month (3.57 per square foot per year multiplied by 302,949 square feet, divided by 12 months).  As with the Base Rent for the Property, on each Lease Anniversary Date beginning on March 1, 2017, the Base Rent for the Property and the Expansion Space will increase two percent (2%) per annum.

        (iii)   Beginning January 1, 2017, Tenant shall transfer two Bitcoins per month to the wallet(s) or other destination directed by Landlord from time to time for sixty (60) consecutive months; <u>provided that</u> should the value of a Bitcoin exceed $5,000.00 each at the time of any transfer, the number of Bitcoin required to be transferred shall be limited to a total value of $10,000.00 per month, with any partial Bitcoins not capable of being so transferred carrying over to be transferred in the next succeeding month in addition to any Bitcoin required to be transferred in such succeeding month.  Any fractional Bitcoin remaining untransferred after 60 months pursuant to this limitation shall be paid in cash in the month succeeding the 60th month.

    **b.** <u>Operating Costs</u>. **Section 4.c.** shall be amended and restated in its entirety, as follows:

    **Payment of Operating Costs.** As additional Rent, beginning on the Lease Commencement Date and at all times during this Lease (including during any Renewal Period), Tenant shall pay to Landlord, on or before the first day of each month Tenant's

proportionate share of operating costs associated with the Property, initially established at $17,167.11, ("Operating Costs"). Tenant's proportionate share of Operating Costs for the Planer Building shall be 78.13%, which is the square footage of the Property located within the Planer Building (234,949 square feet) compared to the total square footage of the Planer Building (300,715 square feet). Tenant's proportionate share of Operating Costs for the Sorter Building shall initially be 100.00%, as the total of the Property located within the Sorter Building and the Expansion Space constitutes 100.00% of that building (68,000 square feet). If Tenant does not exercise the Expansion Space Option and such option expires, Tenant's proportionate share of Operating Costs shall be reduced at the date of termination of the Expansion Space Option to 13.24% (9,000 / 68,000). Operating Costs for any partial month commencing on the Lease Commencement Date shall be computed on a pro rata, per diem basis. The amount of the Operating Costs shall increase or decrease each year based upon actual and revised budgeted costs. Notwithstanding the foregoing, in no event shall Operating Costs be set at less than $0.68 per square foot. Landlord will produce an operating cost budget for each year, indicating the annual and monthly Operating Costs for the entire Planer Building and the entire Sorter Building. By May 1st of each calendar year, Landlord will reconcile the Operating Costs for the previous year, and provide Tenant an accounting of the costs. Landlord will pay Tenant any overpayment and charge Tenant for any underpayment during the year. At this same time a budget for the next year will be provided to the Tenant and the Tenant shall pay its proportionate share of the Operating Costs based on the budget. Landlord's books and records pertaining to Operating Costs shall be made available to Tenant for review purposes upon Tenant's request. If Tenant's review of Operating Costs reveals that Tenant has paid less than Tenant's share of Operating Costs for such reviewed year, then Tenant shall within thirty (30) days remit the balance thereof to Landlord. If, however, such review reveals that Tenant has paid more than Tenant's share of Operating Costs for the reviewed year, Landlord shall pay Tenant (in the form of a credit against rentals due, or if such review pertains to the final Lease year, upon the expiration of this Lease, in the form of Landlord's check) an amount equal to such excess.

5.   Office Space Access – Planer Building. **Section 7.f.** is deleted in its entirety due to the relocation of the offices of Tenant to the Sorter Building.

6.   Remaining Provisions of Lease. To the extent not modified herein, all remaining provisions of the Lease shall remain in full force and effect, and are hereby reaffirmed.

7.   Counterparts. This Amendment may be signed in counterparts and the counterparts assembled into one or more originals. The counterparts shall be deemed delivered to the receiving party upon delivery of the signed counterparts to the receiving party's authorized representative.

-   SIGNATURES APPEAR ON FOLLOWING PAGE -

IN WITNESS WHEREOF this First Amendment to Lease has been executed effective the date and year first above written.

LANDLORD:                              TENANT:

Bonner Property Development, LLC      Project Spokane, LLC

By: _____          By:_____
Stephen Nelson, Co-Manager              Matthew Carson
                                        Its: Manager/Authorized Member

By: _____
Michael Boehme, Co-Manager

EXHIBIT 2.(I)
PAGE 7

     IN WITNESS WHEREOF this First Amendment to Lease has been executed effective the date and year first above written.

LANDLORD:                                                    TENANT:

Bonner Property Development, LLC                  Project Spokane, LLC


By: _____        By: _*Matthew Carson*_ 12/23/16
Stephen Nelson, Co-Manager                        Matthew Carson
                                                              Its: Manager/Authorized Member


By: _____
Michael Boehme, Co-Manager

EXHIBIT 2.(I)
PAGE 8

**Exhibit A**

**Site Plan – Planer Building**

EXHIBIT 2.(I)
PAGE 9

Exhibit A



EXHIBIT 2.(I)
PAGE 10

## Exhibit B

## Site Plan – Sorter Building

EXHIBIT 2 (I)
PAGE 11



EXHIBIT 2.(I)
PAGE 12

# Exhibit C

## Parking and Restrooms – Planer Building

EXHIBIT 2.(I)
PAGE 13



EXHIBIT 2.(I)
PAGE 14

# Exhibit D

## Parking – Sorter Building

EXHIBIT 2.(I)
PAGE 15



EXHIBIT 2.(I)
PAGE 16

## Exhibit D-1

## Expansion Space

EXHIBIT 2.(I)
PAGE 17



# SECOND AMENDMENT
## TO
## COMMERCIAL LEASE AGREEMENT

THIS SECOND AMENDMENT TO LEASE AGREEMENT ("Second Amendment") is entered into as of July  13  , 2017, but effective January 1, 2017, by and between **Bonner Property Development, LLC**, a Montana limited liability company ("Landlord"), and **Project Spokane, LLC**, a Colorado limited liability company ("Tenant").

## Recitals

A.      Effective March 1, 2016, the parties entered into that certain Commercial Lease Agreement (the "Lease") for certain real property premises located in the Bonner Mill Site in Bonner, Montana as further described in the Lease.  Capitalized terms not otherwise defined herein shall be as defined in the Lease.

B.      Effective January 1, 2017, the parties entered into that certain First Amendment to Commercial Lease Agreement (the "First Amendment") whereby Tenant expanded its space within the Bonner Mill Site in Bonner, Montana (the "Mill Site"), obtained an option to lease certain further additional space within the Bonner Mill Site, and whereby Landlord agreed to lend to Tenant $1,200,000.00 for the purposes of improvements, equipment acquisitions and operations of the business of Tenant conducted at the Mill Site.

C.      The parties wish to amend the Lease, as amended by the First Amendment, to clarify the obligation of Landlord to loan to Tenant $1,200,000.00 provided that Tenant satisfies certain conditions and to clarify what tenant improvements and other trade fixtures Tenant is entitled to retain upon and expiration or termination of this Lease, as amended.

## Amendments

Landlord and Tenant agree as follows:

1.    Property.

        a.        Revised Description of "Property".  The first paragraph of **Section 1.a.** shall be amended and restated in its entirety to read as follows:

            The following premises located within various improvements located within the Bonner Mill Site in the City of Bonner Missoula County, Montana (collectively, the "Property"):

                i.  A portion of the total square footage of the "Planer Building" for a total of 234,949 square feet as shown on the site plan attached as **Exhibit A**.  The Planer Building in which the Property is located is approximately 300,715 square feet in total.

                ii.  A portion of the total square footage of the "Sorter Building" for a total of 9,000 square feet as shown on the site plan attached as **Exhibit B** (the "Property").  The Sorter Building in which the Property is located is approximately 68,000 square feet in total.

Any fixtures and personal property located on or about the Property as of the Lease Commencement Date (defined below) shall be considered part of the Property hereby leased and subject to all terms and conditions hereof. The term "Fixture" shall refer to those items so permanently attached or embedded to as to be considered part of the premises, as defined in Section 70-15-103, MCA. Upon termination or expiration of this Lease for any reason, Tenant shall be entitled to remove from the Property any improvements that Tenant has made to the Property and that are not considered "Fixtures." As used herein the term "Fixture" shall not include unattached personal property, furniture, or trade fixtures of Tenant including those set forth in **Exhibit E**, attached hereto and incorporated herein by reference. Whether or not described as "Fixtures, the following nonexclusive list of items shall not be included in the items Tenant may remove from the Property: (i) the following items relating to the power supply to the Property: (A) power poles or other items involved in the transmission of power, excluding those incorporated into the racking of Tenant; (B) power lines, including those extended across the river; (C) switching gear; (D) leuvers; (E) transformers other than those described as Tenant's Trade Fixtures on Exhibit E; (ii) exhaust fans; (iii) sprinkler systems; and (iv) any other items installed or funded by Tenant which serve generally the buildings within which Tenant's premises are or will be located.

Landlord acknowledges and agrees that an important inducement to Tenant's agreement to expand the Property leased by Tenant is Landlord's agreement to lend to Tenant $1,200,000.00 pursuant to the terms of that certain Promissory Note between Landlord as lender and tenant as Borrower, dated December 23, 2016.

2. <u>Remaining Provisions of Lease</u>. To the extent not modified pursuant to the First Amendment and this Second Amendment, all remaining provisions of the Lease shall remain in full force and effect, and are hereby reaffirmed.

3. <u>Counterparts</u>. This Second Amendment may be signed in counterparts and the counterparts assembled into one or more originals. The counterparts shall be deemed delivered to the receiving party upon delivery of the signed counterparts to the receiving party's authorized representative.

EXHIBIT 2.(ii)
PAGE 3

IN WITNESS WHEREOF this Second Amendment to Lease has been executed effective the date and year first above written.

LANDLORD:                                              TENANT:

Bonner Property Development, LLC                       Project Spokane, LLC

By: _____                   Matthew Carson   Digitally signed by Matthew Carson
Stephen Nelson, Co-Manager                             By: _____   Date: 2017.07.13 14:53:15 -06'00'
                                                       Matthew Carson
                                                        Its: Manager/Authorized Member

By: _____
Michael Boehme, Co-Manager

EXHIBIT 2.(ii)
PAGE 4

**Exhibit E**

**Tenant's Trade Fixtures**

- 5,000 KVA substations with associated switch gear
- 225A distribution panels with main breaker
- 500 KVA transformers 480Vto 208V
- 36" Tubeaxial 3HP fans
- 60" Tubeaxial 20Hp fans
- 2500 feet of cable tray
- 2500 feet of pallet racking
- 150,000 feet of 10 gauge wire
- 5 section 15KV fuse disconnect (outdoor)
- All servers
- All network equipment

# PROMISSORY NOTE

| | |
|---|---|
| **Borrower:** | **Project Spokane, LLC**<br>5619 DTC Parkway #475<br>Greenwood Village, CO  80111 |
| **Lender:** | **Bonner Property Development, LLC**<br>224 North Higgins Ave<br>Missoula, MT 59802 |
| **Date of Note:** | Apr. 1 5th        , 2016 |
| **Face Amount:** | **$140,000.00** |
| **Interest Rate:** | **5.00% per annum, compounded monthly** |
| **Maturity Date:** | June  5th       , 2021 |

**FOR VALUE RECEIVED,** Project Spokane, LLC, a Colorado limited liability company ("Borrower") promises to pay to Bonner Property Development, LLC, a Montana limited liability company ("Lender"), or order, the principal sum of One Hundred Forty Thousand and no/100 Dollars ($140,000.00), with interest from the date of this Note on the unpaid principal balance owing from time to time at the rate of five percent (5.00%) per annum, compounded monthly, until fully paid upon the terms and conditions set forth below.

1.      Payments.  Commencing on _May 5th_____, 2016, Borrower shall make equal monthly payments on the __5th__ day of each month ("Due Date"), such payments to be calculated on a level amortization basis over five (5) years, but in any event with a balloon and final payment on _June 5th_____, 2021 (the "Maturity Date") of the entire balance then due hereunder.  A penalty of One Hundred and 00/100 Dollars ($100.00) shall be paid for any payment made ten (10) or more days past the due date.  On the Maturity Date, the entire balance of principal and interest and any other amounts due under this Note shall be due and payable in full.  Borrower shall make all payments in lawful money of the United States of America which shall be the legal tender for public and private debts at the time of payment and in immediately available funds.

2.      Prepayment.  This Note may be prepaid in whole or in part, without penalty, at the option of Borrower and without the consent of Lender.  All payments shall be applied first to any accrued and unpaid interest and then to the principal balance outstanding.  All payments under this Note shall be paid to Lender at the address indicated above, or at such other address as Lender shall direct Borrower in writing.

3.      Security Agreement.  This Note and the sums evidenced hereby are secured by a Security Agreement executed and delivered by, or caused to be executed and delivered by Borrower to Lender, and a lien on the property described in such Security Agreement.  Borrower agrees to perform and comply with, or to cause to be performed and complied with all of the agreements, terms and conditions of the Security Agreement.

4.      Events of Default; Default Interest; Attorneys Fees.  The occurrence of any of the following events shall constitute an event of default on the part of Borrower:

EXHIBIT 3.(i)
PAGE 2

(a)   Failure to make any payment required herein prior to ten (10) days after the Due Date.

(b)   Failure to fulfill any of Borrower's obligations under the Security Agreement.

(c)   Insolvency, appointment of a receiver, assignment for the benefit of creditors, commencement of any proceedings under the Bankruptcy Act or any insolvency law by or on behalf of Borrower.

(d)   Death, incapacity, or the commencement of liquidation or dissolution proceedings, of or by Borrower.

Upon the occurrence of any such event of default, all principal and accrued interest thereon together with all other charges to which Lender may be entitled, shall become immediately due and payable, without notice or demand, and shall continue to bear interest thereafter at a default interest rate of twelve percent (12%) per annum. It is agreed and understood that the waiver by Lender of any particular default in the terms of this Note shall not constitute waiver of any further default and that acceptance of any payment after it is due shall not be deemed a waiver of the right to require prompt payment when due on all other sums and that acceptance of any payment after default shall not cure the default or operate as a waiver of any rights of Lender hereunder unless otherwise agreed in writing.

Borrower shall pay reasonable costs and expenses, including attorney fees, incurred (i) in collecting payment on this Note, (ii) in enforcing Lender's rights under the Security Agreement, (iii) in connection with any dispute that arises as to its enforcement, validity, or interpretation, whether or not legal action is instituted or prosecuted to judgment, or (iv) in enforcing any judgment obtained in any related legal proceeding. In no event shall Borrower's liability for Lender's costs and expenses, referred to at the beginning of this paragraph, exceed $25,000.

5.   Applicable Law. This Note shall be governed by the laws of the State of Montana. The exclusive jurisdiction and venue of any legal action instituted by any party to this Note shall be the Fourth Judicial District Court, Missoula County, Montana.

6.   Liability. The undersigned, as Borrower, agrees that Borrower shall be liable hereon and waives demand, presentment for payment, protest, and notice of protest and non-payment. Borrower agrees that any modification or extension of the terms of payment made by Lender, with or without notice, at the request of any person liable hereon or owning an interest in any property described in the Security Agreement, or a release of any party liable for his obligation, or a release of the real or personal property, shall not diminish or impair Borrower's liability for the payment hereof.

7.   Waiver by Lender. Any of the terms and conditions of this Note may be waived by Lender, but no such waiver shall affect or impair the rights of Lender to require observance, performance, or satisfaction either of that term or condition as it applies on a subsequent occasion or of any other term or condition of this Note.

8.   Severability. If any provision or any word, term, clause, or part of any provision of this Note shall be invalid for any reason, the same shall be ineffective, but the remainder of this Note and of the provision shall not be affected and shall remain in full force and effect.

- SIGNATURE APPEARS ON FOLLOWING PAGE -

EXHIBIT 3.(i)
PAGE 3

**PRIOR TO SIGNING THIS NOTE, BORROWER HAS READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS NOTE.  BORROWER AGREES TO THE TERMS OF THE NOTE AND ACKNOWLEDGES RECEIPT OF A COMPLETED COPY OF THE NOTE.**

**IN WITNESS WHEREOF,** the undersigned has executed this Promissory Note dated as of the day and year first written above.

**BORROWER:**

**Project Spokane, LLC**

By: _____  4/5/16

Matthew Carson
Its: Manager/Authorized Member

3

## SECURITY AGREEMENT

FOR VALUE RECEIVED,

| Debtor: | Secured Party: |
|---|---|
| **Project Spokane, LLC,**<br>**a Colorado limited liability company**<br><br>**5619 DTC Parkway #475**<br>**Greenwood Village, CO  80111** | **Bonner Property Development, LLC,**<br>**a Montana limited liability company**<br><br>**224 North Higgins Ave**<br>**Missoula, MT 59802** |

Debtor hereby grants to Secured Party a continuing security interest on the terms and conditions set forth in this Agreement, in the following property, which shall include all of the following, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located (collectively the "Collateral"):

> **All outdoor medium voltage infrastructure to the Planer Building located in Bonner**
> **Mill Site, in Bonner, Montana, including power lines from the main site substation**
> **to the Planer Building, power poles, junction boxes, and ancillary equipment. For**
> **clarity, this does not include any Project Spokane LLC property located inside the**
> **Planar Building.**

Collateral also includes all proceeds from the sale, destruction, loss, or other disposition of any of the property described as "Collateral," all accessions, parts, and additions to, all replacements of, and all substitutions for any of the Collateral and any sums due from any third party who has damaged or destroyed any or all of the Collateral or from that party's insurer, whether due to judgment, settlement or other process.

**Section 1. <u>Obligations Secured by this Agreement</u>.** This Agreement secures the payment and performance by the Debtor of the following obligations:

> (i) All amounts owed under the Promissory Note (the "Note") in the principal amount of $140,000.00, executed by the Debtor, as Borrower, to the Secured Party, as Lender, contemporaneously with this Agreement;

> (ii) All renewals, extensions, refinancing, modifications, substitutions, or consolidations of the Note; and

(iii) The performance of all of the Debtor's obligations under this Agreement, the Note, and any other agreements which secure the repayment of the Note (collectively the "Secured Obligations").

**Section 2.     Maintenance of Security Interest**. The Debtor agrees to take all reasonable actions and execute all financing statements and other instruments which the Secured Party may reasonably request in order to create, perfect, evidence, determine the priority of, protect, enforce, continue, or terminate the security interest created by this Agreement. The Debtor agrees to perform such actions at no cost to Lender. The Secured Party may, but is not obligated to file any document or agreement to put third parties on notice of its security interest.

**Section 3.     Release of Security Interest**. This Agreement will remain in full force and effect until the Debtor pays the Note in full, performs all of the Debtor's obligations under this Agreement, and otherwise satisfies the Secured Obligations. Upon such performance, the Secured Party will deliver a U.C.C. termination (or it will be released from escrow, as the case may be) statement to the Debtor or other instruments the Debtor reasonable requests. The Debtor will be responsible for recording and filing all such releases at the Debtor's own expense.

**Section 4.     Possession of Collateral**. The Debtor will have the right to retain possession of the Collateral and to use it in any lawful manner not inconsistent with the provisions of this Agreement for so long as it complies with all requirements of this Agreement. The Debtor expressly waives all right to possession of the Collateral after the occurrence of an event of default, and agrees to deliver possession of the Collateral to the Secured Party promptly upon demand after the occurrence of an event of default.

**Section 5.     Protection of Collateral**. The Debtor (i) will keep the Collateral free of all liens, pledges, and security interests (if not in the normal course of business), (ii) will pay promptly when due all taxes, assessments, fees, and other charges levied on the ownership or use of the Collateral, and (iii) will not do anything or permit anything to be done that would materially impair the value of the Collateral or the security interest granted by this Agreement (this shall include, but not be limited to, the disposing of any of the Collateral if not in the normal course of business).

**Section 6.     Inspection of Collateral**. Upon 48 hours' notice, the Secured Party or its agent has the right to inspect and examine the Collateral at any reasonable time during normal business hours on reasonable advance written notice, wherever it is located. The Debtor agrees to assist the Secured Party in making such inspections, and to assemble the Collateral for the Secured Party when the Secured Party asks it to do so, to the extent that it is reasonably able to do so.

**Section 7.     Notification of Changes**. The Debtor agrees to notify the Secured Party immediately in writing of (i) any change in the jurisdiction of organization, or the name, address, ownership, or place of business of the Debtor, (ii) any change in the location of the Collateral, unless otherwise allowed by this Agreement, (iii) any loss of or damage to the Collateral, (iv) any sale, exchange, lease, encumbrance, or other transfer of any of the Collateral or any interest in the Collateral, except in the normal course of business, and (v) any other material change in

the business or financial condition of the Debtor, in the Collateral, or in the security provided by this Agreement.

**Section 8.**     **Events of Default**. The Debtor will be in default under this Agreement if any of the following events or conditions occur:

(i)     An event of default occurs under the Note or with regard to any documents or agreements related or connected to the Secured Obligations;

(ii)     The Commercial Lease for the property which is served by the Collateral, located in Bonner, Montana between Secured Party, as Landlord, and Debtor, as Tenant, is terminated for any reason;

(iii)     The Debtor files a petition in bankruptcy, takes any action under any other law relating to the relief of debtors, makes a general assignment for the benefit of creditors, or consents to the appointment of a receiver or trustee for any substantial part of the Debtor's property;

(iv)     An involuntary petition in bankruptcy is filed against the Debtor or a receiver or trustee is appointed to take possession of any substantial part of the property of the Debtor, and the petition or appointment is not withdrawn within 60 days;

(v)     Any substantial part of the property of the Debtor is seized, attached or garnished and not dismissed within 60 days;

(vi)     The Debtor fails to perform any obligation or comply with any requirement of this Agreement and does not cure such failure within 30 days of written notice from the Secured Party; or

(vii)     There is a default under any document or agreement related or connected to the Note.

**Section 9.**     **Remedies on Default**. (a) Upon the occurrence of any of the events of default listed in the previous section of this Agreement the Secured Party may, at its election, exercise any or all of the following rights and remedies:

(i)     The Secured Party may require the Debtor to assemble the Collateral and make it available to the Secured Party at a place designated by the Secured Party which is reasonably convenient to both parties to the extent it can reasonably be so assembled. The Debtor agrees to use reasonable efforts to comply promptly with any such demand.

(ii)     The Secured Party may, with legal process, enter the premises where the Collateral is located and take possession of and remove it.

(iii)     The Secured Party may sell all or any part of the Collateral in any commercially reasonable manner, at public or private sale, in one or more sales or lots,

and at any price and on any terms that the Secured Party considers reasonable. The Secured Party may be a purchaser at any such sale unless it is prohibited from being a purchaser by law. The sale may be made without any demand for performance, notice of intention to sell, or notice of the time or place of sale, except to the extent that such notice is required by the Montana enactment of Article 9 of the Uniform Commercial Code and cannot be waived. The Secured Party will apply the net proceeds of any sale, after deducting its expenses in taking, storing, insuring, repairing, and selling the Collateral, including reasonable attorneys' fees, to payment or reduction of the Secured Obligations in any order and amount chosen by the Secured Party.  The Debtor will remain liable to the Secured Party for any deficiency, and the Secured Party will pay any excess proceeds to the Debtor.

   (iv) The Secured Party may exercise any and all other remedies available to it at law or in equity.

 (b) The rights and remedies of the Secured Party under this Agreement are cumulative and not alternative, and may be exercised concurrently or successively.

 **Section 10.** **Successors Bound by Agreement**. This Agreement is binding upon and will inure to the benefit of the parties and their heirs, executors, representatives, successors and assigns.

 **Section 11.** **Assignment by Secured Party**. The Secured Party may assign, transfer or deliver any or all of the Secured Obligations, and any or all of its rights under this Agreement without the prior written consent of Debtor. Debtor may not assign it rights or obligations hereunder without the prior written consent of the Secured Party, which may be withheld in the Secured Party's sole discretion.

 **Section 12.** **Modification of Agreement**. No modification of this Agreement will be valid or binding unless the modification is in writing, signed by all parties to this Agreement.

 **Section 13.** **Waiver**. No waiver of any provision of this Agreement will be valid or binding unless the waiver is in writing, signed by the party waiving the provision. The failure of any party to this Agreement to exercise any right or remedy provided for in this Agreement or to insist upon the strict performance of any provision of this Agreement will not be a waiver of that party's right to exercise that right or remedy or insist upon the strict performance of that provision in the future.

 **Section 14.** **Notice**. Any notice that this Agreement requires or permits to be delivered to any person will be in writing and will be effective when delivered. Such notices shall be sent the addresses first listed above, as may be changes from time to time by written notice.

 **Section 15.** **Attorneys' Fees**. If either of the parties to this Agreement institute legal proceedings to enforce the terms of this Agreement, the parties agree that the prevailing party in the proceedings will be entitled to recover the reasonable attorney's fees and legal costs it incurs

prior to and at trial and on any appeal or discretionary review, as they may be approved by the court having jurisdiction over the proceedings, with a limit of $40,000.

**Section 16.** **Time of Essence**. Time will be of the essence in complying with the terms and conditions of this Agreement.

**Section 17.** **Headings**. The headings, titles and subtitles in this Agreement are inserted for convenience of reference only, do not in any way limit or amplify the terms and provisions of this Agreement, and are to be ignored in any construction of the provisions of this Agreement.

**Section 18.** **Applicable Law**. This Agreement will be governed by and construed in accordance with the laws of the State of Montana applicable to agreements entered into and performed in the State of Montana.

**Section 19.** **Counterpart Signatures.** This Agreement may be executed in any number of counterparts and when taken together shall constitute one original document.

This Agreement is effective as of _April       5th_, 2016.


**DEBTOR:**

**Project Spokane, LLC**


By: _____  4/5/16
Matthew Carson
Its: Manager/Authorized Member

## PROMISSORY NOTE

| | |
|---|---|
| **Borrower:** | **Project Spokane, LLC** |
| | 5619 DTC Parkway #475 |
| | Greenwood Village, CO  80111 |
| | |
| **Lender:** | **Bonner Property Development, LLC** |
| | 224 North Higgins Ave |
| | Missoula, MT 59802 |
| | |
| **Date of Note:** | **December ____, 2016** |
| | |
| **Face Amount:** | **$1,200,000.00** |
| | |
| **Interest Rate:** | **5.00% per annum, compounded monthly** |
| | |
| **Maturity Date:** | **December 31, 2021** |

---

**FOR VALUE RECEIVED,** Project Spokane, LLC, a Colorado limited liability company ("Borrower"), promises to pay to Bonner Property Development, LLC, a Montana limited liability company ("Lender"), or order, the principal sum of One Million Two Hundred Thousand and no/100 Dollars ($1,200,000.00), or the aggregate principal amount of all advances under this Note made by Lender to Borrower or for Borrower's benefit, whichever is less,  with interest from the date of this Note on the unpaid principal balance owing from time to time, based on advances actually made by Lender to Borrower in accordance with Paragraph 3, below, at the rate of five percent (5.00%) per annum, compounded monthly, until fully paid upon the terms and conditions set forth below.

1.       <u>Payments</u>.  Commencing on February 1, 2017, Borrower shall make equal monthly payments on the 1st day of each month ("Due Date") of $22,645.48, but in any event with a balloon and final payment on December 31, 2021 (the "Maturity Date") of the entire balance then due hereunder.  A penalty of Five Hundred and 00/100 Dollars ($500.00) shall be payable by Borrower for any payment made ten (10) or more days past the due date.  On the Maturity Date, the entire balance of principal and interest and any other amounts due under this Note shall be due and payable in full.  Borrower shall make all payments in lawful money of the United States of America which shall be the legal tender for public and private debts at the time of payment and in immediately available funds.

2.       <u>Prepayment</u>.  This Note may be prepaid in whole or in part, without penalty, at the option of Borrower and without the consent of Lender.  All payments shall be applied first to penalties due hereunder, next to any accrued and unpaid interest and then to the principal balance outstanding.   All payments under this Note shall be paid to Lender at the address indicated above, or at such other address as Lender shall direct Borrower in writing.

3.       <u>Advances by Lender; Use by Borrower</u>.   The funds loaned, or to be loaned under this Note, shall only be used for the purposes of improvements, equipment acquisitions and operations of the business of Borrower conducted at the Bonner Mill Site in Missoula, Montana. Lender shall advance funds to Borrower in conformity with the "Budget" attached hereto as **Exhibit A**, as it may be modified, amended and updated by mutual agreement of Lender and Borrower.  Notwithstanding the foregoing, except for advances of up to $300,000.00 (or more

EXHIBIT 3.(iii)
PAGE 2

by mutual agreement of Lender and Borrower) contemplated to be made in 2016, a condition to any further advances under this Note is that the power to the Planer Building occupied in part by Borrower must be actually switched from house power to substation power.  Once the switch actually occurs, Borrower shall provide substation power to Lender as provided for in the First Amendment to Commercial Lease Agreement dated _____ between Lender as Landlord and Borrower as Tenant.  As an important inducement to Lender to enter make the loan represented by this Note, Borrower represents that it is its intent to complete Phase II 10 megawatt power and service by April 1, 2017.

4.      Security Agreement.  This Note and the sums evidenced hereby are secured by a Security Agreement executed and delivered by, or caused to be executed and delivered by Borrower to Lender, and a lien on the property described in such Security Agreement.  Borrower agrees to perform and comply with, or to cause to be performed and complied with all of the agreements, terms and conditions of the Security Agreement.

5.      Events of Default; Default Interest; Attorneys Fees.  The occurrence of any of the following events shall constitute an event of default on the part of Borrower:

(a)     Failure to make any payment required herein prior to ten (10) days after receiving written notice from Lender.

(b)     Failure to fulfill any of Borrower's obligations under the Security Agreement prior to ten (10) days after receiving written notice from Lender.

(c)     Insolvency, appointment of a receiver, assignment for the benefit of creditors, commencement of any proceedings under the Bankruptcy Act or any insolvency law by or on behalf of Borrower.

(d)     Death, incapacity, or the commencement of liquidation or dissolution proceedings, of or by Borrower.

Upon the occurrence of any such event of default, all principal and accrued interest thereon together with all other charges to which Lender may be entitled, shall become immediately due and payable, without notice or demand, and shall continue to bear interest thereafter at the rate stated herein.  It is agreed and understood that the waiver by Lender of any particular default in the terms of this Note shall not constitute waiver of any further default and that acceptance of any payment after it is due shall not be deemed a waiver of the right to require prompt payment when due on all other sums and that acceptance of any payment after default shall not cure the default or operate as a waiver of any rights of Lender hereunder unless otherwise agreed in writing.

Borrower shall pay all costs and expenses, including attorney fees, incurred (i) in collecting payment on this Note, (ii) in enforcing Lender's rights under the Security Agreement, (iii) in connection with any dispute that arises as to its enforcement, validity, or interpretation, whether or not legal action is instituted or prosecuted to judgment, or (iv) in enforcing any judgment obtained in any related legal proceeding.

6.      Applicable Law.  This Note shall be governed by the laws of the State of Montana. The exclusive jurisdiction and venue of any legal action instituted by any party to this Note shall be the Fourth Judicial District Court, Missoula County, Montana.

EXHIBIT 3.(iii)
PAGE 3

7.   <u>Liability</u>.   The undersigned, as Borrower, agrees that Borrower shall be liable hereon and waives demand, presentment for payment, protest, and notice of protest and non-payment.  Borrower agrees that any modification or extension of the terms of payment made by Lender, with or without notice, at the request of any person liable hereon or owning an interest in any property described in the Security Agreement, or a release of any party liable for his obligation, or a release of the real or personal property, shall not diminish or impair Borrower's liability for the payment hereof.

8.   <u>Waiver by Lender</u>.  Any of the terms and conditions of this Note may be waived by Lender, but no such waiver shall affect or impair the rights of Lender to require observance, performance, or satisfaction either of that term or condition as it applies on a subsequent occasion or of any other term or condition of this Note.

9.   <u>Severability</u>.  If any provision or any word, term, clause, or part of any provision of this Note shall be invalid for any reason, the same shall be ineffective, but the remainder of this Note and of the provision shall not be affected and shall remain in full force and effect.

-   SIGNATURE APPEARS ON FOLLOWING PAGE -

EXHIBIT 3.(iii)
PAGE 4

**PRIOR TO SIGNING THIS NOTE, BORROWER HAS READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS NOTE.   BORROWER AGREES TO THE TERMS OF THE NOTE AND ACKNOWLEDGES RECEIPT OF A COMPLETED COPY OF THE NOTE.**

**IN WITNESS WHEREOF,** the undersigned has executed this Promissory Note dated as of the day and year first written above.

**BORROWER:**

**Project Spokane, LLC**

By: *Matthew Carson*         12/23/16
Matthew Carson
Its: Manager/Authorized Member

EXHIBIT 3.(iii)
PAGE 5

**Exhibit A**

**Mutually Agreed Budget for Advances**

| Budget for Loan Request | Dec-16 | Jan-17 | Feb-17 | Mar-17 | Apr-17 | May-17 | Jun-17 |
|---|---|---|---|---|---|---|---|
| Fans | $ 50,000 | | $ 50,000 | | | | |
| Shelving | $ 50,000 | | | | | | |
| Servers | $ 250,000 | | | | | | |
| Transformers | | | $ 37,500 | | | | |
| PDUs | | | | $ 40,000 | | | |
| Fire Suppression | | | $ 80,000 | | | | |
| J&M | $ 50,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 50,000 |
| | | | | | | | |
| Totals | $ 400,000 | $ 100,000 | $ 267,500 | $ 140,000 | $ 100,000 | $ 100,000 | $ 50,000 |

EXHIBIT 3.(iv)
PAGE 1

# SECURITY AGREEMENT

FOR VALUE RECEIVED,

| Debtor: | Secured Party: |
|---|---|
| **Project Spokane, LLC,**<br>**a Colorado limited liability company**<br><br>**5619 DTC Parkway #475**<br>**Greenwood Village, CO  80111** | **Bonner Property Development, LLC,**<br>**a Montana limited liability company**<br><br>**224 North Higgins Ave**<br>**Missoula, MT 59802** |

The Debtor hereby grants to Secured Party a continuing security interest on the terms and conditions set forth in this Agreement, in all of Debtor's right, title and interest in and to all of Debtor's assets, which shall include but is not limited to all of the following, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located (collectively the "Collateral"):

> **Furniture, accounts, chattel paper, accounts receivable, lease payments, instruments, goods, general intangibles, equipment, fixtures, and other articles of personal property now or hereafter owned by Debtor; together with all accessions, parts, and additions to, all replacements of, and all substitutions for, any of such property; and together with all proceeds (including without limitation all insurance proceeds and refunds of premiums) from any sale or other disposition of any such property.**

In addition, the word "Collateral" also includes all the following, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located:

(A)  All accessions, attachments, accessories, tools, parts, supplies, replacements of and additions to any of the collateral described herein, whether added now or later.

(B)  All products and produce of any of the property described in this Collateral section.

(C)  All accounts, general intangibles, instruments, rents, monies, payments, and all other rights, arising out of a sale, lease, consignment or other disposition of any of the property described in this Collateral section.

(D)  All proceeds (including insurance proceeds) from the sale, destruction, loss, or other disposition of any of the property described in this Collateral section, and

sums due from a third party who has damaged or destroyed the Collateral or from that party's insurer, whether due to judgment, settlement or other process.

(E)   All records and data relating to any of the property described in this Collateral section, whether in the form of a writing, photograph, microfilm, microfiche, or electronic media, together with all of Debtor's right, title, and interest in and to all computer software required to utilize, create, maintain, and process any such records or data on electronic media.

(F) All proceeds, including without limitation, any equipment purchased with proceeds, as well as all accessories, attachments, accessions, replacements and additions, whether added now or later, together with all insurance proceeds and refunds of insurance premiums, if any, and all sums that may be due from third parties who may cause damage to any of the foregoing, whether due to judgment, settlement or other process.

**Section 1. <u>Obligations Secured by this Agreement</u>.** This Agreement secures the payment and performance by the Debtor of the following obligations:

(i) All amounts owed under the Promissory Note (the "Note") in the principal amount of $1,200,000.00, executed by the Debtor, as Borrower, to the Secured Party, as Lender, contemporaneously with this Agreement;

(ii) All renewals, extensions, refinancing, modifications, substitutions, or consolidations of the Note; and

(iii) The performance of all of the Debtor's obligations under this Agreement or the Note (collectively the "Secured Obligations").

**Section 2.       <u>Maintenance of Security Interest</u>.** The Debtor agrees to take all reasonable actions and execute instruments which the Secured Party may reasonably request in order to create, perfect, evidence, determine the priority of, protect, enforce, continue, or terminate the security interest created by this Agreement. The Debtor agrees to perform such actions at no cost to Lender. The Secured Party may, but is not obligated to file any document or agreement to put third parties on notice of its security interest.

**Section 3.       <u>Release of Security Interest</u>.** This Agreement will remain in full force and effect until the Debtor pays the Note in full, performs all of the Debtor's obligations under this Agreement, and otherwise satisfies the Secured Obligations. Upon such performance, the Secured Party will deliver a U.C.C. termination statement to the Debtor or other instruments the Debtor reasonable requests. The Debtor will be responsible for recording and filing all such releases at the Debtor's own expense.

**Section 4.       <u>Possession of Collateral</u>.** The Debtor will have the right to retain possession of the Collateral and to use it in any lawful manner not inconsistent with the provisions of this Agreement for so long as it complies with all requirements of this Agreement. The Debtor expressly waives all right to possession of the Collateral after the occurrence of an

event of default, and agrees to deliver possession of the Collateral to the Secured Party promptly upon demand after the occurrence of an event of default.

**Section 5.**     **Protection of Collateral**. The Debtor (i) will pay promptly when due all taxes, assessments, fees, and other charges levied on the ownership or use of the Collateral, and (ii) will not do anything or permit anything to be done that would materially impair the value of the Collateral or the security interest granted by this Agreement (this shall include, but not be limited to, the disposing of any of the Collateral if not in the normal course of business).

**Section 6.**     **Inspection of Collateral**. Upon 48 hours' notice, the Secured Party or its agent has the right to inspect and examine the Collateral at any reasonable time during normal business hours on reasonable advance written notice, wherever it is located. The Debtor agrees to assist the Secured Party in making such inspections, and to assemble the Collateral for the Secured Party when the Secured Party asks it to do so, to the extent that it is reasonably able to do so.

**Section 7.**     **Notification of Changes**. The Debtor agrees to notify the Secured Party immediately in writing of (i) any change in the jurisdiction of organization, or the name, address, ownership, or place of business of the Debtor, (ii) any change in the location of the Collateral, unless otherwise allowed by this Agreement, (iii) any loss of or damage to the Collateral, (iv) any sale, exchange, lease, encumbrance, or other transfer of any of the Collateral or any interest in the Collateral, except in the normal course of business, and (v) any other material change in the business or financial condition of the Debtor, in the Collateral, or in the security provided by this Agreement.

**Section 8.**     **Events of Default**. The Debtor will be in default under this Agreement if any of the following events or conditions occur:

(i)     An event of default occurs under the Note or with regard to any documents or agreements related or connected to the Secured Obligations;

(ii)     The Commercial Lease for the property which is served by the Collateral, located in Bonner, Montana between Secured Party, as Landlord, and Debtor, as Tenant, is terminated for any reason;

(iii)     The Debtor files a petition in bankruptcy, takes any action under any other law relating to the relief of debtors, makes a general assignment for the benefit of creditors, or consents to the appointment of a receiver or trustee for any substantial part of the Debtor's property;

(iv)     An involuntary petition in bankruptcy is filed against the Debtor or a receiver or trustee is appointed to take possession of any substantial part of the property of the Debtor, and the petition or appointment is not withdrawn within 60 days;

(v)     Any substantial part of the property of the Debtor is seized, attached or garnished and not dismissed within 60 days;

(vi)     The Debtor fails to perform any obligation or comply with any requirement of this Agreement and does not cure such failure within 30 days of written notice from the Secured Party; or

(vii)     There is a default under any document or agreement related or connected to the Note.

**Section 9.     Remedies on Default**. (a) Upon the occurrence of any of the events of default listed in the previous section of this Agreement the Secured Party may, at its election, exercise any or all of the following rights and remedies:

(i)     The Secured Party may require the Debtor to assemble the Collateral and make it available to the Secured Party at a place designated by the Secured Party which is reasonably convenient to both parties to the extent it can reasonably be so assembled. The Debtor agrees to use reasonable efforts to comply promptly with any such demand.

(ii)     The Secured Party may, with legal process, enter the premises where the Collateral is located and take possession of and remove it.

(iii)     The Secured Party may sell all or any part of the Collateral in any commercially reasonable manner, at public or private sale, in one or more sales or lots, and at any price and on any terms that the Secured Party considers reasonable. The Secured Party may be a purchaser at any such sale unless it is prohibited from being a purchaser by law. The sale may be made without any demand for performance, notice of intention to sell, or notice of the time or place of sale, except to the extent that such notice is required by the Montana enactment of Article 9 of the Uniform Commercial Code and cannot be waived. The Secured Party will apply the net proceeds of any sale, after deducting its expenses in taking, storing, insuring, repairing, and selling the Collateral, including reasonable attorneys' fees, to payment or reduction of the Secured Obligations in any order and amount chosen by the Secured Party.  The Debtor will remain liable to the Secured Party for any deficiency, and the Secured Party will pay any excess proceeds to the Debtor.

(iv)     The Secured Party may exercise any and all other remedies available to it at law or in equity.

(b) The rights and remedies of the Secured Party under this Agreement are cumulative and not alternative, and may be exercised concurrently or successively.

**Section 10.     Successors Bound by Agreement**. This Agreement is binding upon and will inure to the benefit of the parties and their heirs, executors, representatives, successors and assigns.

**Section 11.     Assignment by Secured Party**. The Secured Party may assign, transfer or deliver any or all of the Secured Obligations, and any or all of its rights under this Agreement

without the prior written consent of Debtor. Debtor may not assign it rights or obligations hereunder without the prior written consent of the Secured Party, which may be withheld in the Secured Party's sole discretion.

      **Section 12.**    <u>**Modification of Agreement**</u>. No modification of this Agreement will be valid or binding unless the modification is in writing, signed by all parties to this Agreement.

      **Section 13.**    <u>**Waiver**</u>. No waiver of any provision of this Agreement will be valid or binding unless the waiver is in writing, signed by the party waiving the provision. The failure of any party to this Agreement to exercise any right or remedy provided for in this Agreement or to insist upon the strict performance of any provision of this Agreement will not be a waiver of that party's right to exercise that right or remedy or insist upon the strict performance of that provision in the future.

      **Section 14.**    <u>**Notice**</u>. Any notice that this Agreement requires or permits to be delivered to any person will be in writing and will be effective when delivered. Such notices shall be sent the addresses first listed above, as may be changes from time to time by written notice.

      **Section 15.**    <u>**Attorneys' Fees**</u>. If either of the parties to this Agreement institute legal proceedings to enforce the terms of this Agreement, the parties agree that the prevailing party in the proceedings will be entitled to recover the reasonable attorney's fees and legal costs it incurs prior to and at trial and on any appeal or discretionary review, as they may be approved by the court having jurisdiction over the proceedings, with a limit of $40,000.

      **Section 16.**    <u>**Time of Essence**</u>. Time will be of the essence in complying with the terms and conditions of this Agreement.

      **Section 17.**    <u>**Headings**</u>. The headings, titles and subtitles in this Agreement are inserted for convenience of reference only, do not in any way limit or amplify the terms and provisions of this Agreement, and are to be ignored in any construction of the provisions of this Agreement.

      **Section 18.**    <u>**Applicable Law**</u>. This Agreement will be governed by and construed in accordance with the laws of the State of Montana applicable to agreements entered into and performed in the State of Montana.

      **Section 19.**    <u>**Counterpart Signatures.**</u> This Agreement may be executed in any number of counterparts and when taken together shall constitute one original document.

SIGNATURE APPEARS ON FOLLOWING PAGE

EXHIBIT 3.(iv)
PAGE 6

This Agreement is effective as of December  23  , 2016.

**DEBTOR:**

**Project Spokane, LLC**

By: *Matthew Carson*

Matthew Carson
Its: Manager/Authorized Member

**Exhibit 4.** *[Dec. #7]* [Discussions RE HyperBlock-PS Transaction Emails among Rambod Peykar, Walsh, Stivers, Nelson, Bjornson RE HyperBlock-Project Spokane transaction from 07/02/2018-07/09/2018
EMAIL CHAIN #1:

    (i) Email from Stivers to group (including Walsh) on 07/02/2018 at 10:16 PM (regarding revisions to consent letter);

    (ii) Email from Rambod Peykar to group (including Walsh) on 07/02/2018 at 5:30 PM (regarding revisions to consent letter);

    (iii) Email from Rambod Peykar to group (including Walsh) 07/03/2018 at 3:21 PM (RE revised consent);

    (iv) Email from Nelson to group (including Walsh) 07/03/2018 at 3:19 PM (regarding BPD's signature to consent letter and requesting Assignment and Assumption Agreement);

    (v) Email from Rambod Peykar to group (including Walsh) 07/03/2018 at 4:21 PM (with Assignment and Assumption Agreement);

    (vi) Email from Jason Vaughan to group (including Walsh) on 07/03/2018 at 4:25 PM with BPD's signed Consent to Assignment of Contract and Payoff Letter;

    (vii) Email from Rambod Peykar to group (including Walsh) on 07/03/2018 at 5:31 PM (Rambod requesting Sean sign the Consent to Assignment);

    (viii) Email from Steve Nelson to Rambod Peykar on 07/04/2018 6:58 AM (regarding Bjornson's request for Assignment and Assumption of Lease separate from general assignment);

    (ix) Email from Zac Turke on 07/04/2018 at 8:29:37 AM MDT (asking if revising general assignment would be acceptable);

EMAIL CHAIN #2

    (x) Email from Bjornson to group (including Walsh) on 07/04/2018 at 12:43 PM (with draft Assignment and Assumption of Lease);

    (xi) Email from Rambod to group (including Walsh) on 07/08/2018 at 5:18 PM (with revised Assignment and Assumption of Lease);

    (xii) Email from Bjornson to group (including Walsh) on 07/08/2018 at 9:58 PM (revisions appear acceptable, will confirm with BPD);

    (xiii) Email from Rambod Peykar on 07/09/2018 at 8:48 AM requesting confirmation and Assignment signed by Nelson;

    (xiv) Email from Bjornson to group (including Walsh) on 07/09/2018 at 10:09 AM regarding working to get Assignment signed by Nelson;

    (xv) Email from Jason Vaughan to group (including Walsh) on 07/09/2018 at 10:35 AM with Assignment signed by Nelson;

    (xvi) Email from Rambod Peykar to group (including Walsh) on 07/09/2018 at 12:11 PM (with revised Assignment and Assumption of Lease);

    (xvii) Email from Bjornson to group (including Walsh) on 07/09/2018 at 11:38 AM approving revisions and authorizing change pages;

    (xviii) Email from Rambod Peykar on 07/09/2018 at 12:40 PM

EMAIL CHAIN #3

    (xix) Email from Rambod Peykar to Bjornson on 07/09/2018 at 11:44 AM regarding additional change to Assignment and want to have telephone call;

    (xx) Email from Bjornson to Rambod Peykar on 07/09/2018 regarding telephone call to discuss change;

    (xxi) Email from Rambod Peykar to Bjornson on 07/09/2018 at 12:27 PM regarding change to approve revised Assignment;

EXHIBIT 4
PAGE 2
EMAIL CHAIN #1

**From:** Zac Turke <ZTurke@sheppardmullin.com>
**Date:** July 4, 2018 at 8:29:37 AM MDT
**To:** 'Steve Nelson' <bsmcorpmt@gmail.com>, Rambod Peykar
<RPeykar@sheppardmullin.com>
**Cc:** Jason Vaughan <jason@projectspokane.co>, Dan Stivers
<dan@projectspokane.co>, Jon Freedman <JFreedman@sheppardmullin.com>,
"Kristen Martin" <ea@projectspokane.co>, Sean Walsh
<sean@redwoodcityventures.com>
**Subject: RE: Revised Consent to Assignment of Contract Letter**

Would it short circuit this if we just added an express reference to the Lease as an assigned contract?
It is included in that defined term already, so I don't think Hyperblock would have an issue expressly stating that.
Zac

Zac Turke
213.617.5540 | direct
213.443.2871 | direct fax
ZTurke@sheppardmullin.com | Bio

**Sheppard**Mullin

Sheppard Mullin Richter & Hampton LLP
333 South Hope Street, 43rd Floor
Los Angeles, CA 90071-1422
213.620.1780 | main
www.sheppardmullin.com

**From:** Steve Nelson [mailto:bsmcorpmt@gmail.com]
**Sent:** Wednesday, July 4, 2018 6:58 AM
**To:** Rambod Peykar <RPeykar@sheppardmullin.com>
**Cc:** Jason Vaughan <jason@projectspokane.co>; Dan Stivers
<dan@projectspokane.co>; Jon Freedman <JFreedman@sheppardmullin.com>; Zac
Turke <ZTurke@sheppardmullin.com>; Kristen Martin <ea@projectspokane.co>; Sean
Walsh <sean@redwoodcityventures.com>
**Subject:** Re: Revised Consent to Assignment of Contract Letter
My attorney did not like the Assignment & Assumption agreement. He will draft one for your approval. The one you sent was pretty generic & he will be more specific & tailored to our agreement. We will get this done quickly. Thx. Steve.

4(ix)

4(viii)

EXHIBIT 4
PAGE 3

Sent from my iPhone

On Jul 3, 2018, at 5:31 PM, Rambod Peykar <RPeykar@sheppardmullin.com> wrote:

Thanks. Sean, can you please countersign the consent? Thanks.

Rambod Peykar
213.617.4161 | direct
310.940.3792 | cell
213.443.2741 | direct fax
RPeykar@sheppardmullin.com | Bio

**Sheppard**Mullin

Sheppard Mullin Richter & Hampton LLP
333 South Hope Street, 43rd Floor
Los Angeles, CA 90071-1422
213.620.1780 | main
www.sheppardmullin.com

**4(vii)**

**From:** Jason Vaughan <jason@projectspokane.co>
**Sent:** Tuesday, July 3, 2018 4:25 PM
**To:** Rambod Peykar <RPeykar@sheppardmullin.com>
**Cc:** Steve Nelson <bsmcorpmt@gmail.com>; Dan Stivers
<dan@projectspokane.co>; Jon Freedman
<JFreedman@sheppardmullin.com>; Zac Turke
<ZTurke@sheppardmullin.com>; Kristen Martin
<ea@projectspokane.co>; Sean Walsh
<sean@redwoodcityventures.com>
**Subject:** Re: Revised Consent to Assignment of Contract Letter
Attached are Bonner Property Development's signed Consent to
Assignment of Contract and Payoff Letters.
Jason
On Tue, Jul 3, 2018 at 4:21 PM, Rambod Peykar
<RPeykar@sheppardmullin.com> wrote:

**4(vi)**

**4(v)**

Sure. Assignment and Assumption is attached. Can you please return a
signed copy of the consent as well as the signed payoff letter? Thank
you.

Rambod Peykar
213.617.4161 | direct
310.940.3792 | cell
213.443.2741 | direct fax
RPeykar@sheppardmullin.com | Bio

**Sheppard**Mullin

Sheppard Mullin Richter & Hampton LLP
333 South Hope Street, 43rd Floor
Los Angeles, CA 90071-1422
213.620.1780 | main
www.sheppardmullin.com

**From:** Steve Nelson <bsmcorpmt@gmail.com>
**Sent:** Tuesday, July 3, 2018 3:19 PM
**To:** Rambod Peykar <RPeykar@sheppardmullin.com>

**4(iv)**

EXHIBIT 4
PAGE 4

**Cc:** Dan Stivers <dan@projectspokane.co>; Jason Vaughan
<jason@projectspokane.co>; Jon Freedman
<JFreedman@sheppardmullin.com>; Zac Turke
<ZTurke@sheppardmullin.com>; Kristen Martin
<ea@projectspokane.co>; Sean Walsh
<sean@redwoodcityventures.com>

**Subject:** Re: Revised Consent to Assignment of Contract Letter

Yes. I thought I sent it to my attorney but didn't. He responded quickly. We are good. He made one comment. – we do not have the terms of the Assignment and Assumption Agreement. Could you provide that. Thx. Steve.

Sent from my iPhone

On Jul 3, 2018, at 3:21 PM, Rambod Peykar
<RPeykar@sheppardmullin.com> wrote:

**4(iii)**

Hi Steve, I wanted to see if you had a chance to review the revised consent I sent you and let us know if this works.
Thank you.
Best,

Rambod

**Rambod Peykar**
213.617.4161 | direct
310.940.3792 | cell
213.443.2741 | direct fax
RPeykar@sheppardmullin.com | Bio

**Sheppard**Mullin

Sheppard Mullin Richter & Hampton LLP
333 South Hope Street, 43rd Floor
Los Angeles, CA 90071-1422
213.620.1780 | main
www.sheppardmullin.com

**From:** Rambod Peykar
**Sent:** Monday, July 2, 2018 5:30 PM
**To:** 'Dan Stivers' <dan@projectspokane.co>; Steve Nelson
<bsmcorpmt@gmail.com>

**4(ii)**

**Cc:** Jason Vaughan <jason@projectspokane.co>; Jon
Freedman <JFreedman@sheppardmullin.com>; Zac Turke
<ZTurke@sheppardmullin.com>; Kristen Martin
<ea@projectspokane.co>; Sean Walsh
<sean@redwoodcityventures.com>

**Subject:** RE: Revised Consent to Assignment of Contract
Letter

Steve, apologies for the delay on getting back to you on the consent letter while we were waiting for Buyer's

counsel sign off on the letter. I've attached a revised draft of the letter and a redline showing the changes against the original draft that you received.

Buyer's counsel reviewed the transmittal you drafted had some concerns with it. Specifically, they didn't think the signature to the payoff letter should be held in escrow as that amount will be paid off at the closing. Also, our consent letter already said the consent will not be effective if the closing does not occur. We do, however, understand your legitimate concerns that you were trying to convey in the transmittal. We think the revisions in the attached consent letter address your legitimate concerns and we can forgo the transmittal having now incorporated your concerns directly in the letter. Please let us know if you have any questions or comments. Thank you.

Best,

Rambod

**Rambod Peykar**
213.617.4161 | direct
310.940.3792 | cell
213.443.2741 | direct fax
RPeykar@sheppardmullin.com | Bio

**Sheppard**Mullin

Sheppard Mullin Richter & Hampton LLP
333 South Hope Street, 43rd Floor
Los Angeles, CA 90071-1422
213.620.1780 | main
www.sheppardmullin.com

**From:** Dan Stivers <dan@projectspokane.co>
**Sent:** Monday, July 2, 2018 10:16 AM
**To:** Steve Nelson <bsmcorpmt@gmail.com>
**Cc:** Jason Vaughan <jason@projectspokane.co>; Rambod Peykar <RPeykar@sheppardmullin.com>; Jon Freedman <JFreedman@sheppardmullin.com>; Zac Turke <ZTurke@sheppardmullin.com>; Kristen Martin <ea@projectspokane.co>; Sean Walsh <sean@redwoodcityventures.com>
**Subject:** Revised Consent to Assignment of Contract Letter

Hi Steve,

Hyperblock's council had some changes to the consent letter. Attached is the revised version that will need to be signed.

Thank you

Dan

<u>Attention:</u> This message is sent by a law firm and may

4(i)

EXHIBIT 4
PAGE 6

contain information that is privileged or confidential. If
you received this transmission in error, please notify the
sender by reply e-mail and delete the message and any
attachments.


--
Jason Vaughan
Site Manager
Project Spokane, LLC
406-370-1859
jason@projectspokane.co

*CONFIDENTIALITY NOTICE:*
*This message (including any attachments) may contain confidential, proprietary, privileged*
*and/or private information. The information is intended to be for the use of the individual or entity*
*designated above. If you are not the intended recipient of this message, please notify the sender*
*immediately, and delete the message and any attachments. Any disclosure, reproduction,*
*distribution or other use of this message or any attachments by an individual or entity other than*
*the intended recipient is prohibited.*

EXHIBIT 4
PAGE 7
EMAIL CHAIN #2

| | |
|---|---|
| **From:** | Rambod Peykar |
| **To:** | David Bjornson; Jason Vaughan |
| **Cc:** | bsmcorpmt@gmail.com; dan@projectspokane.co; sean@redwoodcityventures.com; Jon Freedman; Zac Turke; ea@projectspokane.co |
| **Subject:** | RE: Project Spokane - Bonner Millsite Lease - Consent to Assignment Letter |
| **Date:** | Monday, July 9, 2018 12:40:17 PM |

**4(xviii)**

Thank you David!

Rambod Peykar

213.617.4161 | direct
310.940.3792 | cell
213.443.2741 | direct fax
RPeykar@sheppardmullin.com | Bio

## SheppardMullin

Sheppard Mullin Richter & Hampton LLP
333 South Hope Street, 43rd Floor
Los Angeles, CA 90071-1422
213.620.1780 | main
www.sheppardmullin.com

**4(xvii)**

**From:** David Bjornson <david@bjornsonlaw.com>
**Sent:** Monday, July 9, 2018 11:38 AM
**To:** Rambod Peykar <RPeykar@sheppardmullin.com>; Jason Vaughan <jason@projectspokane.co>
**Cc:** bsmcorpmt@gmail.com; dan@projectspokane.co; sean@redwoodcityventures.com; Jon Freedman <JFreedman@sheppardmullin.com>; Zac Turke <ZTurke@sheppardmullin.com>; ea@projectspokane.co
**Subject:** RE: Project Spokane - Bonner Millsite Lease - Consent to Assignment Letter

Those minor changes to verbiage in Section 2 are acceptable and you are authorized to change out pages. Thank you. David

_____

## David H. Bjornson

**Bjornson Jones Mungas, PLLC**
**2809 Great Northern Loop, Suite 100**
**Missoula, Montana 59808**
**(406) 721-8896**
**(406) 541-8037--fax**
http://www.bjornsonlaw.com/attorneys/david-h-bjornson/
Email: david@bjornsonlaw.com

*CONFIDENTIALITY NOTICE: The information contained in this email message may be privileged or confidential information and is intended only for the use of the individual or entity named above. If you have received this communication in error, please notify us immediately by telephone and delete the message from your system.*

**4(xvi)**

**From:** Rambod Peykar <RPeykar@sheppardmullin.com>
**Sent:** Monday, July 09, 2018 12:11 PM
**To:** Jason Vaughan <jason@projectspokane.co>; David Bjornson <david@bjornsonlaw.com>
**Cc:** bsmcorpmt@gmail.com; dan@projectspokane.co; sean@redwoodcityventures.com; Jon Freedman <JFreedman@sheppardmullin.com>; Zac Turke <ZTurke@sheppardmullin.com>; ea@projectspokane.co
**Subject:** RE: Project Spokane - Bonner Millsite Lease - Consent to Assignment Letter

David, thanks for speaking with me just now. Here is the slightly tweaked Assignment and

Assumption. Can you just reply and confirm? Thank you again!

Rambod Peykar
213.617.4161 | direct
310.940.3792 | cell
213.443.2741 | direct fax
RPeykar@sheppardmullin.com | Bio

**Sheppard**Mullin
Sheppard Mullin Richter & Hampton LLP
333 South Hope Street, 43rd Floor
Los Angeles, CA 90071-1422
213.620.1780 | main
www.sheppardmullin.com

**From:** Jason Vaughan <jason@projectspokane.co>
**Sent:** Monday, July 9, 2018 10:35 AM
**To:** David Bjornson <david@bjornsonlaw.com>
**Cc:** Rambod Peykar <RPeykar@sheppardmullin.com>; bsmcorpmt@gmail.com; dan@projectspokane.co; sean@redwoodcityventures.com; Jon Freedman <JFreedman@sheppardmullin.com>; Zac Turke <ZTurke@sheppardmullin.com>; ea@projectspokane.co
**Subject:** Re: Project Spokane - Bonner Millsite Lease - Consent to Assignment Letter

Rambod,

Assignment and Assumption signed by Steven Nelson is attached.

Jason

On Mon, Jul 9, 2018 at 10:09 AM, David Bjornson <david@bjornsonlaw.com> wrote:

> Yes I have confirmed. We will work with Steve to get his signature. David
>
> Sent from my iPhone
>
> On Jul 9, 2018, at 8:48 AM, Rambod Peykar <RPeykar@sheppardmullin.com> wrote:
>
>> David, have you confirmed with Steve re the Assignment and Assumption? If so, can you please send us his signature to the Assignment and Assumption? Thanks.
>> Best,
>>
>> Rambod
>> Rambod Peykar
>> 213.617.4161 | direct
>> 310.940.3792 | cell
>> 213.443.2741 | direct fax
>> RPeykar@sheppardmullin.com | Bio
>>
>> **Sheppard**Mullin
>> Sheppard Mullin Richter & Hampton LLP
>> 333 South Hope Street, 43rd Floor
>> Los Angeles, CA 90071-1422
>> 213.620.1780 | main
>> www.sheppardmullin.com
>>
>> **From:** David Bjornson <david@bjornsonlaw.com>
>> **Sent:** Sunday, July 8, 2018 9:58 PM
>> **To:** Rambod Peykar <RPeykar@sheppardmullin.com>

4(xv)

4(xiv)

4(xiii)

4(xii)

Cc: [bsmcorpmt@gmail.com](mailto:bsmcorpmt@gmail.com); [dan@projectspokane.co](mailto:dan@projectspokane.co);
[sean@redwoodcityventures.com](mailto:sean@redwoodcityventures.com); [jason@projectspokane.co](mailto:jason@projectspokane.co); Jon Freedman
<[JFreedman@sheppardmullin.com](mailto:JFreedman@sheppardmullin.com)>; Zac Turke <[ZTurke@sheppardmullin.com](mailto:ZTurke@sheppardmullin.com)>;
[ea@projectspokane.co](mailto:ea@projectspokane.co)

**Subject:** RE: Project Spokane - Bonner Millsite Lease - Consent to Assignment Letter

Thank you Rambod. These revisions appear to be acceptable. I will confirm with our client also, though I am fairly confident they will agree. I should hear from our client tonight or first thing in the morning on that point. David

_____

### David H. Bjornson

**Bjornson Jones Mungas, PLLC**

**2809 Great Northern Loop, Suite 100**

**Missoula, Montana 59808**

**(406)** 721-8896

(406) 541-8037--fax

**http://www.bjornsonlaw.com/attorneys/david-h-bjornson/**

**Email: david@bjornsonlaw.com**

*CONFIDENTIALITY NOTICE: The information contained in this email message may be privileged or confidential information and is intended only for the use of the individual or entity named above. If you have received this communication in error, please notify us immediately by telephone and delete the message from your system.*

**From:** Rambod Peykar <[RPeykar@sheppardmullin.com](mailto:RPeykar@sheppardmullin.com)>
**Sent:** Sunday, July 08, 2018 5:18 PM
**To:** David Bjornson <[david@bjornsonlaw.com](mailto:david@bjornsonlaw.com)>
**Cc:** [bsmcorpmt@gmail.com](mailto:bsmcorpmt@gmail.com); [dan@projectspokane.co](mailto:dan@projectspokane.co);
[sean@redwoodcityventures.com](mailto:sean@redwoodcityventures.com); [jason@projectspokane.co](mailto:jason@projectspokane.co); Jon Freedman
<[JFreedman@sheppardmullin.com](mailto:JFreedman@sheppardmullin.com)>; Zac Turke <[ZTurke@sheppardmullin.com](mailto:ZTurke@sheppardmullin.com)>;
[ea@projectspokane.co](mailto:ea@projectspokane.co)

**Subject:** RE: Project Spokane - Bonner Millsite Lease - Consent to Assignment Letter

David, thank you for getting us the Assignment and Assumption on the short time constraint. We have discussed it with Buyer's counsel and had some comments to it, which we hope are acceptable. Please see attached revised draft and a redline showing our comments. We would like to finalize and sign this tomorrow so again I apologize for the time constraint. Please don't hesitate to reach out should you have any questions. Thanks.

Best,

Rambod

Rambod Peykar
213.617.4161 | direct
310.940.3792 | cell
213.443.2741 | direct fax
RPeykar@sheppardmullin.com | Bio

**Sheppard**Mullin

Sheppard Mullin Richter & Hampton LLP

4(xi)

EXHIBIT 4
PAGE 10

333 South Hope Street, 43rd Floor
Los Angeles, CA 90071-1422
213.620.1780 | main
www.sheppardmullin.com

**4(x)**

**From:** David Bjornson <david@bjornsonlaw.com>
**Sent:** Wednesday, July 4, 2018 12:43 PM
**To:** Rambod Peykar <RPeykar@sheppardmullin.com>; bsmcorpmt@gmail.com;
dan@projectspokane.co; sean@redwoodcityventures.com;
jason@projectspokane.co; Jon Freedman <JFreedman@sheppardmullin.com>; Zac
Turke <ZTurke@sheppardmullin.com>; ea@projectspokane.co
**Subject:** Project Spokane - Bonner Millsite Lease - Consent to Assignment Letter

Attached is a draft of an Assignment, Assumption and Amendment
agreement for attachment to the Letter of Consent, as most recently
revised. Due to time constraints, I am leaving some blanks for
completion as to addresses and the current rent and additional rent.
Also, there may remain some repetitiousness or overlap in the
representations, warranties and estoppel certificate section, which I am
leaving without perfection due to the time pressure and also that it is
July 4.

I believe it can simply be substituted in as the attachment to the Consent
letter as currently drafted.

Please review and comment. I realize that time is precious here. I will
check emails and if a telephone call is needed today, I can be reached on
my cell – 406-370-8896. We want to work with you cooperatively to get
this accomplished for your transaction.

David

_____

**David H. Bjornson**

**Bjornson Jones Mungas, PLLC**

**2809 Great Northern Loop, Suite 100**
**Missoula, Montana 59808**

**(406)** 721-8896

(406) 541-8037--fax

**http://www.bjornsonlaw.com/attorneys/david-h-bjornson/**

**Email:** david@bjornsonlaw.com

*CONFIDENTIALITY NOTICE: The information contained in this email message may be
privileged or confidential information and is intended only for the use of the individual or entity
named above. If you have received this communication in error, please notify us immediately by
telephone and delete the message from your system.*

This email has been scanned for email related threats and delivered safely by Mimecast.
For more information please visit http://www.mimecast.com

<u>Attention:</u> This message is sent by a law firm and may contain information that is
privileged or confidential. If you received this transmission in error, please notify the
sender by reply e-mail and delete the message and any attachments.

EXHIBIT 4
PAGE 11

This email has been scanned for email related threats and delivered safely by Mimecast.
For more information please visit http://www.mimecast.com

This email has been scanned for email related threats and delivered safely by Mimecast.
For more information please visit http://www.mimecast.com

--
Jason Vaughan
Site Manager
Project Spokane, LLC
406-370-1859
jason@projectspokane.co

*CONFIDENTIALITY NOTICE:*
*This message (including any attachments) may contain confidential, proprietary, privileged and/or private information. The information is intended to be for the use of the individual or entity designated above. If you are not the intended recipient of this message, please notify the sender immediately, and delete the message and any attachments. Any disclosure, reproduction, distribution or other use of this message or any attachments by an individual or entity other than the intended recipient is prohibited.*

This email has been scanned for email related threats and delivered safely by Mimecast.
For more information please visit http://www.mimecast.com

EXHIBIT 4
PAGE 12

EMAIL CHAIN #3

| | |
|---|---|
| **From:** | Rambod Peykar |
| **To:** | David Bjornson |
| **Subject:** | RE: Project Spokane - Bonner Millsite Lease - Consent to Assignment Letter |
| **Date:** | Monday, July 9, 2018 12:27:39 PM |

**4(xxi)**  Just want to make sure you have a chance to respond to my email before you leave as I know you're leaving soon. Did you receive the revised copy that I sent to the larger group? If so, can you please just confirm? Again, I appreciate it.

Rambod Peykar
213.617.4161 | direct
310.940.3792 | cell
213.443.2741 | direct fax
RPeykar@sheppardmullin.com | Bio

**Sheppard**Mullin

Sheppard Mullin Richter & Hampton LLP
333 South Hope Street, 43rd Floor
Los Angeles, CA 90071-1422
213.620.1780 | main
www.sheppardmullin.com

**From:** David Bjornson <david@bjornsonlaw.com>
**Sent:** Monday, July 9, 2018 11:04 AM
**4(xx)**  **To:** Rambod Peykar <RPeykar@sheppardmullin.com>
**Subject:** RE: Project Spokane - Bonner Millsite Lease - Consent to Assignment Letter
**I am in the office — 406-721-8896 but leaving in 45 minutes. David**

_____

**David H. Bjornson**

**Bjornson Jones Mungas, PLLC**

**2809 Great Northern Loop, Suite 100**

**Missoula, Montana 59808**

**(406) 721-8896**

**(406) 541-8037--fax**

http://www.bjornsonlaw.com/attorneys/david-h-bjornson/

Email: david@bjornsonlaw.com

_CONFIDENTIALITY NOTICE: The information contained in this email message may be privileged or confidential information and is intended only for the use of the individual or entity named above. If you have received this communication in error, please notify us immediately by telephone and delete the message from your system._

**From:** Rambod Peykar <RPeykar@sheppardmullin.com>
**Sent:** Monday, July 09, 2018 11:44 AM
**4(xix)**  **To:** David Bjornson <david@bjornsonlaw.com>
**Subject:** Fwd: Project Spokane - Bonner Millsite Lease - Consent to Assignment Letter
David I had one thing to discuss with you. What's the best number to reach you? I'll call you in 15 min if that's ok with you.

Rambod Peykar
213.617.4161 | direct
310.940.3792 | cell
213.443.2741 | direct fax
RPeykar@sheppardmullin.com | Bio

EXHIBIT 4
PAGE 13

(v)    Attachment to email from Rambod Peykar to group (including Walsh) 07/03/2018 at 4:21 PM

## <u>ASSIGNMENT AND ASSUMPTION AGREEMENT</u>

This Assignment and Assumption Agreement (this "<u>Agreement</u>"), dated as of July [●], 2018, is made and entered into by and between Project Spokane, LLC, a Colorado limited liability company (the "<u>Company</u>"), and Hyperblock LLC, a Delaware limited liability company ("<u>Buyer</u>").

WHEREAS, the Company, Buyer and Sean Walsh have entered into a certain Asset Purchase Agreement, dated as of January 7, 2018, as amended by that certain Amendment to Asset Purchase Agreement, dated March 14, 2018, that certain Amendment No. 2 to Asset Purchase Agreement, dated April 2, 2018, and that certain Amendment No. 3 to Asset Purchase Agreement, dated July [●], 2018 (the "<u>Purchase Agreement</u>"), pursuant to which, among other things, the Company has agreed to assign all of its rights, title and interests in, and Buyer has agreed to assume all of the Company's duties and obligations under, the Assets and the Assumed Liabilities (each as defined in the Purchase Agreement);

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.    <u>Definitions</u>. All capitalized terms used in this Agreement but not otherwise defined herein are given the meanings set forth in the Purchase Agreement.

2.    <u>Assets</u>. On the terms and subject to the conditions set forth in the Purchase Agreement, the Company hereby sells, validly assigns and transfers to Buyer, and Buyer hereby purchases and takes from the Company, free and clear of all Encumbrances, all of the Company's right, title and interest in and to the Acquired Contracts.

3.    <u>Assumed Liabilities</u>. On the terms and subject to the conditions set forth in the Purchase Agreement, Buyer hereby assumes and agrees to pay, discharge or perform only the Assumed Liabilities.

4.    <u>Excluded Liabilities</u>. Buyer has not agreed to perform, assume, pay or discharge, and Buyer shall not have any liability or obligation, direct or indirect, absolute or contingent for, any (i) Liability (other than the Assumed Liabilities), or (ii) Excluded Liability. The Excluded Liabilities shall be retained by and remain liabilities of the Company, which shall discharge them on a timely basis.

5.    <u>Further Assurances</u>. Following the Closing, each of the parties hereto shall, and shall cause their respective Affiliates to, execute and deliver such additional documents, instruments, conveyances and assurances and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement.

6.    <u>No Additional Representations and Warranties</u>. The Company does not make any additional representations or warranties, whether express or implied, hereunder or otherwise except as set forth in the Purchase Agreement, subject to the survival and other limitations stated therein.

7.    <u>No Third-Party Beneficiaries</u>. This Agreement is for the sole and exclusive benefit of the Company and Buyer and their respective Affiliates, successors and permitted assigns and nothing herein is intended or shall be construed to confer upon any other person any right, remedy or claim under or by reason of this Agreement or any term, covenant or condition hereof.

8.    <u>Amendment</u>. This Agreement may only be amended, modified or supplemented by an agreement in writing signed by each party hereto.

EXHIBIT 4
PAGE 14

9.      Governing Law. This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York without giving effect to any choice or conflict of Law provision or rule (whether of the State of New York or any other jurisdiction).

10.     Successors and Assigns. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns. Neither party may assign its rights or obligations hereunder without the prior written consent of the other party, which consent shall not be unreasonably withheld or delayed. No assignment shall relieve the assigning party of any of its obligations hereunder.

11.     Conflicts with Purchase Agreement. Each of Buyer and the Company, by its execution of this Agreement, hereby acknowledges that the rights and remedies of each party under the Purchase Agreement will not be deemed to be enlarged, modified or altered in any way by such execution and acceptance of this instrument. To the extent the terms and provisions of this Agreement conflict with or otherwise modify the terms of the Purchase Agreement, the terms and provisions of the Purchase Agreement shall govern.

12.     Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

[Signature Page to Follow.]

IN WITNESS WHEREOF, the parties hereto have caused this Assignment and Assumption Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

The Company:

**PROJECT SPOKANE, LLC**
By: PS Mgt LLC, its Manager


By: _____
      Sean Walsh
      Manager



Buyer:

**HYPERBLOCK LLC**



By: _____
      Eric So
      Chairman

EXHIBIT 4
PAGE 16

**(vi)     Attachment to email from Jason Vaughan to group (including Walsh) on 07/03/2018 at 4:25 PM**

<u>**ASSIGNMENT, ASSUMPTION AND AMENDMENT OF LEASE**</u>

**THIS ASSIGNMENT, ASSUMPTION AND AMENDMENT OF LEASE** (this "Assignment and Amendment") is made effective this [_____] day of July, 2018 (the "Effective Date"), by and between **PROJECT SPOKANE, LLC**, a Colorado limited liability company, whose mailing address is 5619 DTC Parkway, #475, Greenwood Village, CA 80111 ("Assignor"), and **HYPERBLOCK LLC**, a Delaware limited liability company, whose mailing address is 120 Adelaide Street West, Suite 2210, Toronto, ON M5H 1T1("Assignee").

<u>**RECITALS:**</u>

A.     Assignor currently owns certain real property located in the Bonner Millsite in Bonner, Montana (the "premises") which are currently leased pursuant to the terms and conditions of that certain Commercial Lease Agreement, dated March 1, 2016, as amended by that certain First Amendment, effective as of January 1, 2017, and that certain Second Amendment, dated July 13, 2017 (the "Lease"), by and between Assignor and **BONNER PROPERTY DEVELOPMENT, LLC**, a Montana limited liability company (herein referred to as "Lessor").

B.     Assignor has engaged in a transaction pursuant to which substantially all of the assets of Assignor have been acquired by Hyperblock LLC, a Delaware limited liability company (the "Transaction").

B.     Pursuant to the Transaction, Assignor desires to transfer all of its right, title and interest in the Lease to Assignee upon the terms and conditions hereinafter set forth.

C.     Also pursuant to the Transaction, Assignee desires to assume the Lease and all obligations thereunder upon the terms and conditions set forth below.

D.     Lessor consents to the assignment under the conditions set forth herein and agrees to amend the Lease to reflect Assignee as the tenant moving forward.

**NOW, THEREFORE,** in consideration of the mutual promises and covenants contained herein and for valuable consideration, the receipt and sufficiency of which are hereby mutually acknowledged, the parties hereby agree as follows:

1.     <u>**Assignment of Lease; Disclosure of Assignee's Information.**</u>

A.     Assignor hereby grants, assigns and transfers to Assignee all of its right, title and interest in and to the Lease as amended by this Assignment and Amendment.

B.     Assignee hereby provides the following specific information to Lessor in connection with this Assignment and Amendment:

(i)     The name and contact information for Assignee is:

HYPERBLOCK, LLC
c/o HYPERBLOCK TECHNOLOGIES CORP.
388 Carlaw Avenue, Suite 300
Toronto, Ontario

Assignment, Assumption and Amendment of Lease

EXHIBIT 4
PAGE 17

M4M 2T4
Telephone Number: 416-551-7646
E-mail Address:  tim@hyperblock.co
Current Contact Name:  Tim Smart

**2.    Duties and Obligations.**  Assignor hereby assigns and delegates to Assignee only Assignor's duties and obligations under the Lease which both (i) arise after the closing of the Transaction, and (ii) do not relate to or arise from pre-closing breaches or occurrences prior to the closing that may give rise to such a breach (the "Assumed Obligations"); and in consideration of the Lease herein being assigned to Assignee, Assignee hereby accepts this assignment and agrees to assume and perform, and hereby assumes, all of the Assumed Obligations contained in the Lease to be observed, kept, performed or complied with by Assignor under the Lease from and after the Effective Date (and the Assignor shall remain liable for all other duties, obligations, covenants, agreements, promises, terms, conditions and provisions contained in the Lease).

**3.    Amendments to Lease.**    The Lease shall be amended, effective as of the Effective Date, to reflect Assignee as the tenant thereunder, and Lessor hereby consents to the Assignment and Amendment subject to the representations, warranties and conditions reflected herein.

**4.    Representations, Warranties and Estoppel Certificate from Assignment Parties.**  Assignor acknowledges, represents and warrants as follows:

•    The Lease, as amended by this Assignment and Amendment (collectively, the "Amended Lease"), is in full force and effect against Assignor, and has been so since the execution of the Lease, and has not been modified, changed, altered, assigned, supplemented or amended in any respect except for the First Amendment and Second Amendment.  From the Tenant's perspective, the Lease is not in default and is valid and in full force and effect against Assignor on the date hereof.  The Lease represents the entire agreement between Assignor, as landlord, and Assignor, as tenant, with respect to the premises.

•    Assignor's interest therein is free and clear from all encumbrances, and Assignor has fully performed all covenants and obligations under the Lease and has not done or permitted any act in violation of the covenants contained in the Lease;

•    there are no attachments, executions, assignments for the benefit of creditors, receiverships, conservatorships, or voluntary or involuntary proceedings in bankruptcy or pursuant to any other laws for relief or debtors contemplated or filed by Assignor or pending against Assignor, or involving the premises;

•    Assignor has not subleased all or any portion of the leased premises or (prior to the date hereof) assigned any of its rights under the Lease, nor pledged any interest therein;

•    Assignor is in full and complete possession of the premises and prior to the date hereof commenced full occupancy and use thereof except as to expansion space not yet occupied. Assignor is operating at the premises under the name of Project Spokane.

•    The rent and other charges payable in connection with the Lease are paid currently through the date hereof, and:

Assignment, Assumption and Amendment of Lease

EXHIBIT 4
PAGE 18

• no advance rent or other payment has been made in connection with the Lease, except rent for the current month;

• there is no "free rent" or other rent concession or adjustments to which Assignor is entitled under the remaining term of the Lease; and

• the Base Rent is set forth in Section 4(a) of the Lease.

• All obligations, commitments, space, payments, repairs, tenant improvements, build out, inducements, other sums and conditions under the Lease to be performed to date by Lessor have been satisfied, free of defenses and set-offs including any construction work on the premises.

• There is no existing default or unfulfilled obligations on the part of Assignor in any of the terms and conditions of the Lease, and no event has occurred or condition exists which, with the passing of time or giving of notice or both, would constitute an event of default on the part of Assignor under the Lease.

• Assignor claims no offsets, set-offs, rebates, adjustments, concessions, abatements or defenses against or with respect to rent, additional rent, security deposits or other sums payable under the terms of the Lease.

• Assignor has no option or right of first refusal to purchase the premises or any part thereof.

• Assignor has not committed any violation of any environmental law or regulation with respect to the premises.

• There are no unpaid or outstanding claims, bills or invoices for any labor performed upon or materials furnished to either Assignor or the premises on its behalf for which any lien or encumbrance including, without limitation, materialmen, suppliers and mechanic's liens, have been asserted or may be asserted against either Assignor or the premises.

• There are no existing, pending or threatened lawsuits affecting the premises or the Lease to which Assignor is a party.

• Assignor has all applicable permits, licenses, certificates of occupancy and other documentation required by the applicable governmental authorities in order to operate its business in full accordance with the law.

• Assignor and Assignee have notified their insurance carriers of the change in lessee under the Lease and owner of the operations conducted in the premises and owner of the personal property and/or fixtures in the premises for purposes of the insurance carrier naming Lessor under the Lease as additional insured, for liability and fire and casualty insurance coverages. Further, fully effective as of the Effective Date, Lessor is named as an additional insured in Assignee's policies and promptly following the closing of the Transaction Assignee will provide Lessor with such declaration pages and other certificates of insurance as are required to document such coverage to Lessor's satisfaction in its reasonable discretion.

• The Transaction has closed and, pursuant thereto, substantially all assets of Assignor have been assigned, conveyed and fully transferred to Assignee, including substantially all property and operations located in the premises.

Assignment, Assumption and Amendment of Lease

EXHIBIT 4
PAGE 19

5. **Attorneys' Fees.** Should any party incur any costs or expenses, including reasonable attorneys' fees, to enforce any of the provisions of this Agreement, the non-prevailing party shall reimburse the prevailing party upon demand.

6. **Counterparts.** This Assignment and Amendment may be executed in one or more counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument. As used herein, "counterparts" shall include full copies of this Agreement signed and delivered by facsimile transmission or electronic mail ("e-mail") correspondence, as well as photocopies of such facsimile transmission or e-mail correspondence.

7. **Binding Effect.** The provisions of this Assignment and Amendment shall be binding upon and inure to the benefit of the heirs, representatives, successors and assigns of the parties hereto.

*Signatures on the Following Page*

**IN WITNESS WHEREOF**, the parties have executed this Assignment and Amendment as of the Effective Date.

ASSIGNOR:

**PROJECT SPOKANE, LLC**
By: PS Mgt LLC, its Manager

By: _____
      Sean Walsh
      Manager

ASSIGNEE:

**HYPERBLOCK LLC**

By: _____
      Eric So
      Chairman

LESSOR:

**BONNER PROPERTY
DEVELOPMENT, LLC**

By: _____
Its:  Co-Manager
        Stephen K. Nelson

EXHIBIT 4
PAGE 21

(x)     Attachment to email from Bjornson to group (including Walsh) on 07/04/2018 at 12:43 PM

## ASSIGNMENT, ASSUMPTION AND AMENDMENT OF LEASE

**THIS ASSIGNMENT, ASSUMPTION AND AMENDMENT OF LEASE** (this "Assignment and Amendment") is made effective this _____ day of _____, 2018 (the "Effective Date"), by and between **PROJECT SPOKANE, LLC**, a Colorado limited liability company, whose mailing address is _____ ("Assignor"), and **HYPERBLOCK LLC,** a Delaware limited liability company, whose mailing address is _____ ("Assignee").

## RECITALS:

A.      Assignor currently owns certain real property located in the Bonner Millsite in Bonner, Montana (the "premises") which are currently leased pursuant to the terms and conditions of that certain Commercial Lease Agreement, dated March 1, 2016, as amended by that certain First Amendment, effective as of January 1, 2017, and that certain Second Amendment, dated July 13, 2017 (the "Lease"), by and between Assignor and **BONNER PROPERTY DEVELOPMENT, LLC**, a Montana limited liability company (herein referred to as "Lessor").

B.      Assignor has engaged in a transaction pursuant to which substantially all of the assets of Assignor have been acquired by Hyperblock LLC, a Delaware limited liability company (the "Transaction").

B.      Pursuant to the Transaction, Assignor desires to transfer all of its right, title and interest in the Lease to Assignee upon the terms and conditions hereinafter set forth.

C.      Also pursuant to the Transaction, Assignee desires to assume the Lease and all obligations thereunder upon the terms and conditions set forth below.

D.      Lessor consents to the assignment under the conditions set forth herein and agrees to amend the Lease to reflect Assignee as the tenant moving forward.

**NOW, THEREFORE,** in consideration of the mutual promises and covenants contained herein and for valuable consideration, the receipt and sufficiency of which are hereby mutually acknowledged, the parties hereby agree as follows:

1.      **Assignment of Lease; Disclosure of Assignee's Information.**

A.      Assignor hereby grants, assigns and transfers to Assignee all of its right, title and interest in and to the Lease as amended by this Assignment and Amendment.

B.      Assignee hereby provides the following specific information to Lessor in connection with this Assignment and Amendment:

(i)     The name and contact information for Assignee is:

HYPERBLOCK, LLC

_____

_____

EXHIBIT 4
PAGE 22

Telephone Number: _____

E-mail Address:           _____

Current Contact Name:_____

**2.     Duties and Obligations.**  Assignor hereby assigns and delegates to Assignee all of Assignor's duties and obligations under the Lease; and in consideration of the Lease herein being assigned to Assignee, Assignee hereby accepts this assignment and agrees to assume and perform, and hereby assumes, all of the duties, obligations, covenants, agreements, promises, terms, conditions and provisions contained in the Lease to be observed, kept, performed or complied with by Assignor under the Lease from and after the Effective Date.

**3.     Inspection.**  Assignee has personally inspected the premises, has had full opportunity for inspection, testing, and advice from professionals as it has deemed necessary and appropriate, and hereby agrees to take the premises in its existing condition, as is where is, on the Effective Date.

**4.     Amendments to Lease**.   The Lease shall be amended, effective as of the Effective Date, to reflect Assignee as the tenant thereunder, and Lessor hereby consents to the Assignment and Amendment subject to the representations, warranties and conditions reflected herein.

**5.     Representations, Warranties and Estoppel Certificate from Assignment Parties.**  Each of Assignee and Assignor acknowledges, represents and warrants as follows:

•      The Lease, as amended by this Assignment and Amendment (collectively, the "Amended Lease"), is in full force and effect, and has been so since the execution of the Lease, and has not been modified, changed, altered, assigned, supplemented or amended in any respect except for the First Amendment and Second Amendment.  From the Tenant's perspective, the Lease is not in default and is valid and in full force and effect on the date hereof.  The Lease represents the entire agreement between Assignor, as landlord, and Assignor, as tenant, with respect to the premises.

•      Assignor's interest therein is free and clear from all encumbrances, and Assignor has fully performed all covenants and obligations under the Lease and has not done or permitted any act in violation of the covenants contained in the Lease;

•      there are no attachments, executions, assignments for the benefit of creditors, receiverships, conservatorships, or voluntary or involuntary proceedings in bankruptcy or pursuant to any other laws for relief or debtors contemplated or filed by Assignor or pending against Assignor, or involving the premises;

•      Assignor has not subleased all or any portion of the leased premises or (prior to the date hereof) assigned any of its rights under the Lease, nor pledged any interest therein;

•      Assignor is in full and complete possession of the premises and prior to the date hereof commenced full occupancy and use thereof except as to expansion space not yet occupied.  Assignor is operating at the premises under the name of Project Spokane.

•      The rent and other charges payable in connection with the Lease are paid currently through the date hereof, and:

•       no advance rent or other payment has been made in connection with the Lease, except rent for the current month;

•       there is no "free rent" or other rent concession or adjustments to which Assignor is entitled under the remaining term of the Lease; and

•       rent is currently set at $_____ per month, and the monthly pro rata amount of Additional Rent paid and payable under the Lease as of the date hereof is $_____ , for a total payment due monthly of $_____ as of the date hereof, as such amounts may be adjusted in the future pursuant to the terms of the Lease.

•       All obligations, commitments, space, payments, repairs, tenant improvements, build out, inducements, other sums and conditions under the Lease to be performed to date by Lessor have been satisfied, free of defenses and set-offs including any construction work on the premises.

•       There is no existing default or unfulfilled obligations on the part of Assignor in any of the terms and conditions of the Lease, and no event has occurred or condition exists which, with the passing of time or giving of notice or both, would constitute an event of default under the Lease.

•       Assignor claims no offsets, set-offs, rebates, adjustments, concessions, abatements or defenses against or with respect to rent, additional rent, security deposits or other sums payable under the terms of the Lease.

•       Assignor has no option or right of first refusal to purchase the premises or any part thereof.

•       No violation of any environmental law or regulation has occurred or currently exists with respect to the premises.

•       There are no unpaid or outstanding claims, bills or invoices for any labor performed upon or materials furnished to either Assignor or the premises for which any lien or encumbrance including, without limitation, materialmen, suppliers and mechanic's liens, have been asserted or may be asserted against either Assignor or the premises.

•       There are no existing, pending or threatened lawsuits affecting the premises or the Lease.

•       Assignor has all applicable permits, licenses, certificates of occupancy and other documentation required by the applicable governmental authorities in order to operate its business in full accordance with the law.

•       Assignor and Assignee have notified their insurance carriers of the change in lessee under the Lease and owner of the operations conducted in the premises and owner of the personal property and/or fixtures in the premises for purposes of the insurance carrier naming Lessor under the Lease as additional insured, for liability and fire and casualty insurance coverages.  Further, fully effective as of the Effective Date, Lessor is named as an additional insured in Assignee's policies and Assignee will provide Lessor with such declaration pages and other certificates of insurance as are required to document such coverage to Lessor's satisfaction in its sole discretion.

EXHIBIT 4
PAGE 24

•      The Transaction has closed and, pursuant thereto, all assets of Assignor have been assigned, conveyed and fully transferred to Assignee, including all property and operations located in the premises.

**6.**     **Attorneys' Fees.**  Should any party incur any costs or expenses, including reasonable attorneys' fees, to enforce any of the provisions of this Agreement, the non-prevailing party shall reimburse the prevailing party upon demand.

**7.**     **Counterparts.**  This Assignment and Amendment may be executed in one or more counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.  As used herein, "counterparts" shall include full copies of this Agreement signed and delivered by facsimile transmission or electronic mail ("e-mail") correspondence, as well as photocopies of such facsimile transmission or e-mail correspondence.

**8.**     **Binding Effect.**  The provisions of this Assignment and Amendment shall be binding upon and inure to the benefit of the heirs, representatives, successors and assigns of the parties hereto.

***Signatures on the Following Page***

**IN WITNESS WHEREOF**, the parties have executed this Assignment and Amendment as of the Effective Date.

ASSIGNOR:

**PROJECT SPOKANE, LLC**
By: PS Mgt LLC, its Manager

By: _____
      Sean Walsh
      Manager

ASSIGNEE:

**HYPERBLOCK LLC**

By: _____
      Eric So
      Chairman

LESSOR:

**BONNER PROPERTY
DEVELOPMENT, LLC**

By:_____
Its:  Co-Manager

(xi)     Attachment to email from Rambod to group (including Walsh) on 07/08/2018 at 5:18 PM

## ASSIGNMENT, ASSUMPTION AND AMENDMENT OF LEASE

**THIS ASSIGNMENT, ASSUMPTION AND AMENDMENT OF LEASE** (this "Assignment and Amendment") is made effective this [_____] day of July, 2018 (the "Effective Date"), by and between **PROJECT SPOKANE, LLC**, a Colorado limited liability company, whose mailing address is 5619 DTC Parkway, #475, Greenwood Village, CA 80111 ("Assignor"), and **HYPERBLOCK LLC,** a Delaware limited liability company, whose mailing address is 120 Adelaide Street West, Suite 2210, Toronto, ON M5H 1T1("Assignee").

## RECITALS:

A.     Assignor currently owns certain real property located in the Bonner Millsite in Bonner, Montana (the "premises") which are currently leased pursuant to the terms and conditions of that certain Commercial Lease Agreement, dated March 1, 2016, as amended by that certain First Amendment, effective as of January 1, 2017, and that certain Second Amendment, dated July 13, 2017 (the "Lease"), by and between Assignor and **BONNER PROPERTY DEVELOPMENT, LLC**, a Montana limited liability company (herein referred to as "Lessor").

B.     Assignor has engaged in a transaction pursuant to which substantially all of the assets of Assignor have been acquired by Hyperblock LLC, a Delaware limited liability company (the "Transaction").

B.     Pursuant to the Transaction, Assignor desires to transfer all of its right, title and interest in the Lease to Assignee upon the terms and conditions hereinafter set forth.

C.     Also pursuant to the Transaction, Assignee desires to assume the Lease and all obligations thereunder upon the terms and conditions set forth below.

D.     Lessor consents to the assignment under the conditions set forth herein and agrees to amend the Lease to reflect Assignee as the tenant moving forward.

**NOW, THEREFORE,** in consideration of the mutual promises and covenants contained herein and for valuable consideration, the receipt and sufficiency of which are hereby mutually acknowledged, the parties hereby agree as follows:

1.     **Assignment of Lease; Disclosure of Assignee's Information.**

A.     Assignor hereby grants, assigns and transfers to Assignee all of its right, title and interest in and to the Lease as amended by this Assignment and Amendment.

B.     Assignee hereby provides the following specific information to Lessor in connection with this Assignment and Amendment:

(i)     The name and contact information for Assignee is:

HYPERBLOCK, LLC
_____
_____

~~Telephone Number: _____~~
~~E-mail Address:      _____~~
c/o HYPERBLOCK TECHNOLOGIES CORP.
388 Carlaw Avenue, Suite 300
Toronto, Ontario
M4M 2T4
Telephone Number: 416-551-7646
E-mail Address:  tim@hyperblock.co
Current Contact Name:_____  Tim Smart

**2.**     **Duties and Obligations.**  Assignor hereby assigns and delegates to Assignee ~~all of~~only Assignor's duties and obligations under the Lease which both (i) arise after the closing of the Transaction, and (ii) do not relate to or arise from pre-closing breaches or occurrences prior to the closing that may give rise to such a breach (the "Assumed Obligations"); and in consideration of the Lease herein being assigned to Assignee, Assignee hereby accepts this assignment and agrees to assume and perform, and hereby assumes, all of the ~~duties, obligations, covenants, agreements, promises, terms, conditions and provisions~~ Assumed Obligations contained in the Lease to be observed, kept, performed or complied with by Assignor under the Lease from and after the Effective Date (and the Assignor shall remain liable for all other duties, obligations, covenants, agreements, promises, terms, conditions and provisions contained in the Lease).

~~3.     Inspection.  Assignee has personally inspected the premises, has had full opportunity for inspection, testing, and advice from professionals as it has deemed necessary and appropriate, and hereby agrees to take the premises in its existing condition, as is where is, on the Effective Date.~~

**4~~3~~.**     **Amendments to Lease**.     The Lease shall be amended, effective as of the Effective Date, to reflect Assignee as the tenant thereunder, and Lessor hereby consents to the Assignment and Amendment subject to the representations, warranties and conditions reflected herein.

**5~~4~~.**     **Representations, Warranties and Estoppel Certificate from Assignment Parties.**  ~~Each of Assignee and~~ Assignor acknowledges, represents and warrants as follows:

•     The Lease, as amended by this Assignment and Amendment (collectively, the "Amended Lease"), is in full force and effect against Assignor, and has been so since the execution of the Lease, and has not been modified, changed, altered, assigned, supplemented or amended in any respect except for the First Amendment and Second Amendment.  From the Tenant's perspective, the Lease is not in default and is valid and in full force and effect against Assignor on the date hereof.  The Lease represents the entire agreement between Assignor, as landlord, and Assignor, as tenant, with respect to the premises.

•     Assignor's interest therein is free and clear from all encumbrances, and Assignor has fully performed all covenants and obligations under the Lease and has not done or permitted any act in violation of the covenants contained in the Lease;

•     there are no attachments, executions, assignments for the benefit of creditors, receiverships, conservatorships, or voluntary or involuntary proceedings in bankruptcy or pursuant to any other laws for relief or debtors contemplated or filed by Assignor or pending against Assignor, or involving the premises;

•     Assignor has not subleased all or any portion of the leased premises or (prior to the date hereof) assigned any of its rights under the Lease, nor pledged any interest therein;

•     Assignor is in full and complete possession of the premises and prior to the date hereof commenced full occupancy and use thereof except as to expansion space not yet occupied. Assignor is operating at the premises under the name of Project Spokane.

•     The rent and other charges payable in connection with the Lease are paid currently through the date hereof, and:

•     no advance rent or other payment has been made in connection with the Lease, except rent for the current month;

•     there is no "free rent" or other rent concession or adjustments to which Assignor is entitled under the remaining term of the Lease; and

~~• rent is currently set at $_____ per month, and the monthly pro rata amount of Additional Rent paid and payable under the Lease as of the date hereof is $_____, for a total payment due monthly of $_____ as of the date hereof, as such amounts may be adjusted in the future pursuant to the terms of the Lease.~~

•     the Base Rent is set forth in Section 4(a) of the Lease.

•     All obligations, commitments, space, payments, repairs, tenant improvements, build out, inducements, other sums and conditions under the Lease to be performed to date by Lessor have been satisfied, free of defenses and set-offs including any construction work on the premises.

•     There is no existing default or unfulfilled obligations on the part of Assignor in any of the terms and conditions of the Lease, and no event has occurred or condition exists which, with the passing of time or giving of notice or both, would constitute an event of default on the part of Assignor under the Lease.

•     Assignor claims no offsets, set-offs, rebates, adjustments, concessions, abatements or defenses against or with respect to rent, additional rent, security deposits or other sums payable under the terms of the Lease.

•     Assignor has no option or right of first refusal to purchase the premises or any part thereof.

•     ~~No~~ Assignor has not committed any violation of any environmental law or regulation ~~has occurred or currently exists~~ with respect to the premises.

•     There are no unpaid or outstanding claims, bills or invoices for any labor performed upon or materials furnished to either Assignor or the premises on its behalf for which any lien or encumbrance including, without limitation, materialmen, suppliers and mechanic's liens, have been asserted or may be asserted against either Assignor or the premises.

•     There are no existing, pending or threatened lawsuits affecting the premises or the Lease to which Assignor is a party.

•   Assignor has all applicable permits, licenses, certificates of occupancy and other documentation required by the applicable governmental authorities in order to operate its business in full accordance with the law.

•   Assignor and Assignee have notified their insurance carriers of the change in lessee under the Lease and owner of the operations conducted in the premises and owner of the personal property and/or fixtures in the premises for purposes of the insurance carrier naming Lessor under the Lease as additional insured, for liability and fire and casualty insurance coverages. Further, fully effective as of the Effective Date, Lessor is named as an additional insured in Assignee's policies and promptly following the closing of the Transaction Assignee will provide Lessor with such declaration pages and other certificates of insurance as are required to document such coverage to Lessor's satisfaction in its ~~sole~~reasonable discretion.

•   The Transaction has closed and, pursuant thereto, substantially all assets of Assignor have been assigned, conveyed and fully transferred to Assignee, including substantially all property and operations located in the premises.

~~6~~5.   **Attorneys' Fees.**   Should any party incur any costs or expenses, including reasonable attorneys' fees, to enforce any of the provisions of this Agreement, the non-prevailing party shall reimburse the prevailing party upon demand.

~~7~~6.   **Counterparts.**   This Assignment and Amendment may be executed in one or more counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.   As used herein, "counterparts" shall include full copies of this Agreement signed and delivered by facsimile transmission or electronic mail ("e-mail") correspondence, as well as photocopies of such facsimile transmission or e-mail correspondence.

~~8~~7.   **Binding Effect.**   The provisions of this Assignment and Amendment shall be binding upon and inure to the benefit of the heirs, representatives, successors and assigns of the parties hereto.

***Signatures on the Following Page***

EXHIBIT 4
PAGE 30

(xvi)   Attachment to email from Rambod Peykar to group (including Walsh) on 07/09/2018 at 12:11 PM

### ASSIGNMENT, ASSUMPTION AND AMENDMENT OF LEASE

**THIS ASSIGNMENT, ASSUMPTION AND AMENDMENT OF LEASE** (this "Assignment and Amendment") is made effective this _____ day of July, 2018 (the "Effective Date"), by and between **PROJECT SPOKANE, LLC**, a Colorado limited liability company, whose mailing address is 5619 DTC Parkway, #475, Greenwood Village, CA 80111 ("Assignor"), and **HYPERBLOCK LLC,** a Delaware limited liability company, whose mailing address is 120 Adelaide Street West, Suite 2210, Toronto, ON M5H 1T1 ("Assignee").

### RECITALS:

A.      Assignor currently owns certain real property located in the Bonner Millsite in Bonner, Montana (the "premises") which are currently leased pursuant to the terms and conditions of that certain Commercial Lease Agreement, dated March 1, 2016, as amended by that certain First Amendment, effective as of January 1, 2017, and that certain Second Amendment, dated July 13, 2017 (the "Lease"), by and between Assignor and **BONNER PROPERTY DEVELOPMENT, LLC**, a Montana limited liability company (herein referred to as "Lessor").

B.      Assignor has engaged in a transaction pursuant to which substantially all of the assets of Assignor have been acquired by Hyperblock LLC, a Delaware limited liability company (the "Transaction").

B.      Pursuant to the Transaction, Assignor desires to transfer all of its right, title and interest in the Lease to Assignee upon the terms and conditions hereinafter set forth.

C.      Also pursuant to the Transaction, Assignee desires to assume the Lease and all obligations thereunder upon the terms and conditions set forth below.

D.      Lessor consents to the assignment under the conditions set forth herein and agrees to amend the Lease to reflect Assignee as the tenant moving forward.

**NOW, THEREFORE,** in consideration of the mutual promises and covenants contained herein and for valuable consideration, the receipt and sufficiency of which are hereby mutually acknowledged, the parties hereby agree as follows:

1.      **Assignment of Lease; Disclosure of Assignee's Information.**

A.      Assignor hereby grants, assigns and transfers to Assignee all of its right, title and interest in and to the Lease as amended by this Assignment and Amendment.

B.      Assignee hereby provides the following specific information to Lessor in connection with this Assignment and Amendment:

(i)      The name and contact information for Assignee is:

HYPERBLOCK, LLC
c/o HYPERBLOCK TECHNOLOGIES CORP.
388 Carlaw Avenue, Suite 300
Toronto, Ontario

M4M 2T4
Telephone Number: 416-551-7646
E-mail Address:  tim@hyperblock.co
Current Contact Name:  Tim Smart

**2.**     **Duties and Obligations.**  Assignor hereby assigns and delegates to Assignee only Assignor's duties and obligations under the Lease which both (i) first arising after the closing of the Transaction, and (ii) do not relate to or arise from pre-closing breaches or occurrences prior to the closing that may give rise to such a breach (the "Assumed Obligations"); and in consideration of the Lease herein being assigned to Assignee, Assignee hereby accepts this assignment and agrees to assume and perform, and hereby assumes, all of the Assumed Obligations contained in the Lease to be observed, kept, performed or complied with by Assignor under the Lease from and after the Effective Date (and the Assignor shall remain liable for all other duties, obligations, covenants, agreements, promises, terms, conditions and provisions contained in the Lease).

**3.**     **Amendments to Lease**.   The Lease shall be amended, effective as of the Effective Date, to reflect Assignee as the tenant thereunder, and Lessor hereby consents to the Assignment and Amendment subject to the representations, warranties and conditions reflected herein.

**4.**     **Representations, Warranties and Estoppel Certificate from Assignment Parties**.  Assignor acknowledges, represents and warrants as follows:

•      The Lease, as amended by this Assignment and Amendment (collectively, the "Amended Lease"), is in full force and effect against Assignor, and has been so since the execution of the Lease, and has not been modified, changed, altered, assigned, supplemented or amended in any respect except for the First Amendment and Second Amendment.  From the Tenant's perspective, the Lease is not in default and is valid and in full force and effect against Assignor on the date hereof.  The Lease represents the entire agreement between Assignor, as landlord, and Assignor, as tenant, with respect to the premises.

•      Assignor's interest therein is free and clear from all encumbrances, and Assignor has fully performed all covenants and obligations under the Lease and has not done or permitted any act in violation of the covenants contained in the Lease;

•      there are no attachments, executions, assignments for the benefit of creditors, receiverships, conservatorships, or voluntary or involuntary proceedings in bankruptcy or pursuant to any other laws for relief or debtors contemplated or filed by Assignor or pending against Assignor, or involving the premises;

•      Assignor has not subleased all or any portion of the leased premises or (prior to the date hereof) assigned any of its rights under the Lease, nor pledged any interest therein;

•      Assignor is in full and complete possession of the premises and prior to the date hereof commenced full occupancy and use thereof except as to expansion space not yet occupied. Assignor is operating at the premises under the name of Project Spokane.

•      The rent and other charges payable in connection with the Lease are paid currently through the date hereof, and:

EXHIBIT 4
PAGE 32

- no advance rent or other payment has been made in connection with the Lease, except rent for the current month;

- there is no "free rent" or other rent concession or adjustments to which Assignor is entitled under the remaining term of the Lease; and

- the Base Rent is set forth in Section 4(a) of the Lease.

- All obligations, commitments, space, payments, repairs, tenant improvements, build out, inducements, other sums and conditions under the Lease to be performed to date by Lessor have been satisfied, free of defenses and set-offs including any construction work on the premises.

- There is no existing default or unfulfilled obligations on the part of Assignor in any of the terms and conditions of the Lease, and no event has occurred or condition exists which, with the passing of time or giving of notice or both, would constitute an event of default on the part of Assignor under the Lease.

- Assignor claims no offsets, set-offs, rebates, adjustments, concessions, abatements or defenses against or with respect to rent, additional rent, security deposits or other sums payable under the terms of the Lease.

- Assignor has no option or right of first refusal to purchase the premises or any part thereof.

- Assignor has not committed any violation of any environmental law or regulation with respect to the premises.

- There are no unpaid or outstanding claims, bills or invoices for any labor performed upon or materials furnished to either Assignor or the premises on its behalf for which any lien or encumbrance including, without limitation, materialmen, suppliers and mechanic's liens, have been asserted or may be asserted against either Assignor or the premises.

- There are no existing, pending or threatened lawsuits affecting the premises or the Lease to which Assignor is a party.

- Assignor has all applicable permits, licenses, certificates of occupancy and other documentation required by the applicable governmental authorities in order to operate its business in full accordance with the law.

- Assignor and Assignee have notified their insurance carriers of the change in lessee under the Lease and owner of the operations conducted in the premises and owner of the personal property and/or fixtures in the premises for purposes of the insurance carrier naming Lessor under the Lease as additional insured, for liability and fire and casualty insurance coverages. Further, fully effective as of the Effective Date, Lessor is named as an additional insured in Assignee's policies and promptly following the closing of the Transaction Assignee will provide Lessor with such declaration pages and other certificates of insurance as are required to document such coverage to Lessor's satisfaction in its reasonable discretion.

- The Transaction has closed and, pursuant thereto, substantially all assets of Assignor have been assigned, conveyed and fully transferred to Assignee, including substantially all property and operations located in the premises.

**5.** **Attorneys' Fees.**  Should any party incur any costs or expenses, including reasonable attorneys' fees, to enforce any of the provisions of this Agreement, the non-prevailing party shall reimburse the prevailing party upon demand.

**6.** **Counterparts.**  This Assignment and Amendment may be executed in one or more counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.  As used herein, "counterparts" shall include full copies of this Agreement signed and delivered by facsimile transmission or electronic mail ("e-mail") correspondence, as well as photocopies of such facsimile transmission or e-mail correspondence.

**7.** **Binding Effect.**  The provisions of this Assignment and Amendment shall be binding upon and inure to the benefit of the heirs, representatives, successors and assigns of the parties hereto.

***Signatures on the Following Page***

EXHIBIT 4
PAGE 34

**IN WITNESS WHEREOF**, the parties have executed this Assignment and Amendment as of the Effective Date.

ASSIGNOR:

**PROJECT SPOKANE, LLC**
By: PS Mgt LLC, its Manager

By: _____
        Sean Walsh
        Manager

ASSIGNEE:

**HYPERBLOCK LLC**

By: _____
        Eric So
        Chairman

LESSOR:

**BONNER PROPERTY
DEVELOPMENT, LLC**

By: _____
Its:  Co-Manager

          Stephen K. Nelson

# CERTIFICATE OF FORMATION
## OF
## HYPERBLOCK LLC

This Certificate of Formation of Hyperblock LLC is executed and filed by the undersigned, as authorized person, to form a limited liability company under the Delaware Limited Liability Company Act.

**FIRST:**  The name of the limited liability company is Hyperblock LLC.

**SECOND:**  The address of the registered office and the name and the address of the registered agent of the limited liability company required to be maintained under Section 18-104 of the Delaware Limited Liability Company Act are:

> The Corporation Trust Company
> 1209 Orange Street
> Wilmington, Delaware  19801
> New Castle County

**IN WITNESS WHEREOF,** the undersigned has executed this Certificate of Formation this 29th day of December, 2017.

Virginia K. Wigchers
Authorized Person

State of Delaware
Secretary of State
Division of Corporations
Delivered  01:46 PM 12/29/2017
FILED  01:46 PM 12/29/2017
SR 20177851810  -  File Number  6685694

EXHIBIT 5.(i)
PAGE 2

# Delaware

The First State

Page 1

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF

DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT

COPY OF THE CERTIFICATE OF FORMATION OF "HYPERBLOCK LLC", FILED

IN THIS OFFICE ON THE TWENTY-NINTH DAY OF DECEMBER, A.D. 2017,

AT 1:46 O`CLOCK P.M.



Jeffrey W. Bullock, Secretary of State

6685694  8100
SR# 20177851810

Authentication: 203857459
Date: 12-29-17

You may verify this certificate online at corp.delaware.gov/authver.shtml

## LIMITED LIABILITY COMPANY AGREEMENT
## OF
## HYPERBLOCK LLC

This **LIMITED LIABILITY COMPANY AGREEMENT** (this "Agreement") of HYPERBLOCK LLC (the "Company") is entered into by Hyperblock Technologies Corp., an entity organized under the laws of Canada, as the sole member of the Company (the "Member").

**WHEREAS**, the Delaware Limited Liability Company Act, as amended (the "Act"), permits the formation of a limited liability company with a single member;

**WHEREAS**, on December 29, 2017, the Member caused the formation of the Company by the filing of a Certificate of Formation with the Secretary of State of the State of Delaware pursuant to and in accordance with the Act; and

**WHEREAS**, the Member agrees that the membership in and management of the Company shall be governed by the terms set forth herein.

**NOW, THEREFORE**, the Member agrees as follows:

1.      Name. The name of the Company is "Hyperblock LLC".

2.      Limited Liability Company Agreement. This Agreement constitutes the "limited liability company agreement" of the Company within the meaning of Section 18-101(7) of the Act. Notwithstanding the date of execution, this Agreement shall be effective as of the date of the filing of the Certificate of Formation in the office of the Secretary of State of the State of Delaware (the "Effective Date") and shall govern the rights, duties and obligations of the Member, except as otherwise expressly required by the Act.

3.      Purpose. The purpose of the Company is to engage in any lawful act or activity for which limited liability companies may be formed under the Act and to engage in any and all activities necessary or incidental thereto.

4.      Principal Office; Registered Agent.

        (a)      Principal Office. The location of the principal office of the Company shall at such location as the Member may from time to time designate.

        (b)      Registered Agent. The registered agent of the Company for service of process in the State of Delaware and the registered office of the Company in the State of Delaware shall be that person and location reflected in the Certificate of Formation. In the event the registered agent ceases to act as such for any reason or the registered office shall change, the Member shall promptly designate a replacement registered agent or file a notice of change of address, as the case may be, in the manner provided by law.

5.      Members.

        (a)      Initial Member. The Member owns 100% of the membership interests in the Company.

        (b)      Additional Members. One or more additional members may be admitted to the Company with the consent of the Member. Prior to the admission of any such additional members to the Company, the Member shall amend this Agreement to make such changes as the Member shall determine to reflect the fact that the Company shall have such additional members. Each additional member shall execute and deliver a supplement or counterpart to this Agreement, as necessary.

(c)     Membership Interests; Certificates. The Company will not issue any certificates to evidence ownership of the membership interests.

6.     Management.

(a)     Authority; Powers and Duties of the Member. The Member shall have exclusive and complete authority and discretion to manage the operations and affairs of the Company and to make all decisions regarding the business of the Company. Any action taken by the Member shall constitute the act of and serve to bind the Company. Persons dealing with the Company are entitled to rely conclusively on the power and authority of the Member as set forth in this Agreement. The Member shall have all rights and powers of a manager under the Act, and shall have such authority, rights and powers in the management of the Company to do any and all other acts and things necessary, proper, convenient or advisable to effectuate the purposes of this Agreement.

(b)     Election of Officers; Delegation of Authority. The Member may, from time to time, designate one or more officers with such titles as may be designated by the Member to act in the name of the Company with such authority as may be delegated to such officers by the Member (each such designated person, an "Officer"). Any such Officer shall act pursuant to such delegated authority until such Officer is removed by the Member. Any action taken by an Officer designated by the Member pursuant to authority delegated to such Officer shall constitute the act of and serve to bind the Company. Persons dealing with the Company are entitled to rely conclusively on the power and authority of any officer set forth in this Agreement and any instrument designating such officer and the authority delegated to him or her. Ted Colivas is hereby appointed as the initial President of the Company.

7.     Liability of Member; Indemnification.

(a)     Liability of Member. Except as otherwise required in the Act, the debts, obligations, and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and the Member shall not be obligated personally for any such debt, obligation or liability of the Company solely by reason of being the Member or participating in the management of the Company.

(b)     Indemnification. To the fullest extent permitted under the Act, the Member (irrespective of the capacity in which it acts) and the Officers shall be entitled to indemnification and advancement of expenses from the Company for and against any loss, damage, claim or expense (including attorneys' fees) whatsoever incurred by the Member or the Officers relating to or arising out of any act or omission or alleged acts or omissions (whether or not constituting negligence or gross negligence) performed or omitted by the Member or the Officers on behalf of the Company; provided, however, that any indemnity under this Section 7(b) shall be provided out of and to the extent of Company assets only, and neither the Member or the Officers nor any other person shall have any personal liability on account thereof.

8.     Term. The term of the Company shall be perpetual unless the Company is dissolved and terminated in accordance with Section 12.

9.     Initial Capital Contribution. The Member hereby agrees to contribute to the Company such cash, property or services as determined by the Member.

10.     Tax Status; Income and Deductions.

(a)     Tax Status. As long as the Company has only one member, it is the intention of the Company and the Member that the Company be treated as a disregarded entity for federal and all relevant state tax purposes and neither the Company nor the Member shall take any action or make any election

which is inconsistent with such tax treatment. All provisions of this Agreement are to be construed so as to preserve the Company's tax status as a disregarded entity.

(b)     Income and Deductions. All items of income, gain, loss, deduction and credit of the Company (including, without limitation, items not subject to federal or state income tax) shall be treated for federal and all relevant state income tax purposes as items of income, gain, loss, deduction and credit of the Member.

11.     Distributions. Distributions shall be made to the Member at the times and in the amounts determined by the Member.

12.     Dissolution; Liquidation.

(a)     The Company shall dissolve, and its affairs shall be wound up upon the first to occur of the following: (i) the written consent of the Member or (ii) any other event or circumstance giving rise to the dissolution of the Company under Section 18-801 of the Act, unless the Company's existence is continued pursuant to the Act.

(b)     Upon dissolution of the Company, the Company shall immediately commence to wind up its affairs and the Member shall promptly liquidate the business of the Company. During the period of the winding up of the affairs of the Company, the rights and obligations of the Member under this Agreement shall continue.

(c)     In the event of dissolution, the Company shall conduct only such activities as are necessary to wind up its affairs (including the sale of the assets of the Company in an orderly manner), and the assets of the Company shall be applied as follows: (i) first, to creditors, to the extent otherwise permitted by law, in satisfaction of liabilities of the Company (whether by payment or the making of reasonable provision for payment thereof); and (ii) thereafter, to the Member.

(d)     Upon the completion of the winding up of the Company, the Member shall file a Certificate of Cancellation in accordance with the Act.

13.     Miscellaneous. Amendments to this Agreement may be made only with the consent of the Member. This Agreement shall be governed by the laws of the State of Delaware. In the event that any provision of this Agreement shall be declared to be invalid, illegal or unenforceable, such provision shall survive to the extent it is not so declared, and the validity, legality and enforceability of the other provisions hereof shall not in any way be affected or impaired thereby, unless such action would substantially impair the benefits to any party of the remaining provisions of this Agreement.

[Signature page follows.]

**IN WITNESS WHEREOF**, the undersigned has executed this Agreement effective as of the Effective Date.

**HYPERBLOCK TECHNOLOGIES CORP.**

By: _____
Eric So
Chairman

[Signature Page to Limited Liability Company Agreement of Hyperblock LLC]

1994712

EXHIBIT 5.(iii)
PAGE 1

| | |
|---|---|
| Ministry of Government and Consumer Services | Ministère des Services gouvernementaux et des Services aux consommateurs |
| ServiceOntario | ServiceOntario |
| Central Production and Verification Services Branch | Direction des services centraux de production et de vérification |
| (mailing address) 393 University Avenue, Suite 200 Toronto ON M5G 2M2 (physical address) 375 University Avenue, 2nd floor | (adresse postale) 393, avenue University, bureau 200 Toronto ON M5G 2M2 (adresse municipale) 375, avenue University, 2e étage |



# MEMORANDUM

TO:        FILE

DATE:     July 9, 2018

FROM:          WENDY GRANT
               SR. EXAMINER, SERVICE SUPPORT AND FULFILLMENT

**RE:       HYPERBLOCK INC.
            ONTARIO CORPORATION NUMBER 1994712**

Articles of Arrangement were filed, and endorsed by the Branch with a Certificate bearing an effective date of July 10, 2018. The Arrangement provided for, amongst other things, the amalgamation of the following corporations:

HYPERBLOCK TECHNOLOGIES CORP.
Ontario Corporation Number 2600603

And

CRYPTOGLOBAL CORP.
Ontario Corporation Number 2578157

The corporation resulting from the amalgamation was:

**HYPERBLOCK INC.
Ontario Corporation Number 1994712**

A copy of the Plan of Arrangement (Exhibit "A"), and the Order of the Superior Court of Justice, (Exhibit "B"), approving the Arrangement is attached to the file for each of the amalgamated corporations.

Exhibit 5.(iii)
PAGE 2

For Ministry Use Only
À l'usage exclusif du ministère

Ontario Corporation Number
Numéro de la société en Ontario

2578157

Ministry of Government
and Consumer Services

Ontario

CERTIFICATE
This is to certify that these articles
are effective on

Ministère des Services
gouvernementaux et des
Services aux consommateurs

CERTIFICAT
Ceci certifie que les présents statuts
entrent en vigueur le

Amalgamation Number

**1994712**

**JULY    10 JUILLET, 2018**

Director / Directrice
Business Corporations Act / Loi sur les sociétés par actions

---

**ARTICLES OF ARRANGEMENT**
**STATUTS D'ARRANGEMENT**

Form 8
Business
Corporations
Act

Formule 8
Loi sur les
sociétés par
actions

1.  The name of the corporation is: (Set out in BLOCK CAPITAL LETTERS)
    Dénomination sociale de la société : (Écrire en LETTRES MAJUSCULES SEULEMENT) :

    C R Y P T O G L O B A L   C O R P .

2.  The new name of the corporation if changed by the arrangement: (Set out in BLOCK CAPITAL LETTERS)
    Nouvelle dénomination sociale de la société si elle est modifiée par suite de l'arrangement :
    (Écrire en LETTRES MAJUSCULES SEULEMENT) :

    H Y P E R B L O C K   I N C .

3.  Date of incorporation/amalgamation: / Date de la constitution ou de la fusion :
    2017/05/18
    Year, Month, Day / année, mois, jour

4.  The arrangement has been approved by the shareholders of the corporation in accordance with section 182 of the
    Business Corporation Act. / Les actionnaires de la société ont approuvé l'arrangement conformément à l'article 182 de la Loi
    sur les sociétés par actions.

5.  A copy of the arrangement is attached to these articles as Exhibit "A" / Une copie de l'arrangement constitue l'annexe «A».

6.  The arrangement was approved by the court on / La cour a approuvé l'arrangement le
    2018/06/26
    Year, Month, Day / année, mois, jour

    and a certified copy of the Order of the court is attached to these articles as Exhibit "B". / Une copie certifiée conforme de
    l'ordonnance de la cour constitue l'annexe «B».

7.  The terms and conditions to which the scheme is made subject by the Order have been complied with.
    Les conditions que l'ordonnance impose au projet d'arrangement ont été respectées.

    These articles are signed in duplicate. / Les présents statuts sont signés en double exemplaire.



CRYPTOGLOBAL CORP.
Name of Corporation / Dénomination sociale de la société

By/
Par :
_____                    CEO
        Signature / Signature                            Description of Office / Fonctions

07163  (2011/07)    © Queen's Printer for Ontario, 2011 / © Imprimeur de la Reine pour l'Ontario, 2011

EXHIBIT 5.(iii)
PAGE 3

EXHIBIT "A"

ARRANGEMENT

EXHIBIT 5.(iii)
PAGE 4

PLAN OF ARRANGEMENT

ARTICLE 1
INTERPRETATION

**1.1** **Definitions.**

As used in this Plan of Arrangement, the following terms have the meanings given to such terms below:

"**Amalco**" has the meaning specified in Section 2.3(i) of this Plan of Arrangement.

"**Amalco Common Shares**" has the meaning specified in Section 2.3(i)(ii) of this Plan of Arrangement.

"**Amalco Option Plan**" means the Amalco Stock Option Plan, in the form agreed by the Parties, each acting reasonably.

"**Amalgamation**" has the meaning specified in Section 2.3(i) of this Plan of Arrangement.

"**Arrangement Agreement**" means the Arrangement Agreement between HyperBlock and CryptoGlobal dated as of April 3, 2018.

"**CryptoGlobal Arrangement Resolution**" means a special resolution to be approved by the CryptoGlobal Shareholders at the CryptoGlobal Meeting, substantially in the form of <u>Exhibit B1</u> to the Arrangement Agreement.

"**Articles of Arrangement**" means the articles of arrangement in respect of the Arrangement required by the OBCA to be sent to the Director after the Final Order is made, which shall include this Plan of Arrangement and otherwise be in a form and content satisfactory to CryptoGlobal and HyperBlock, each acting reasonably.

"**Certificate of Arrangement**" means the certificate of arrangement to be issued by the Director pursuant to Section 183(2) of the OBCA in respect of the Articles of Arrangement.

"**Code**" means the *United States Internal Revenue Code of 1986, as amended*.

"**Court**" means the Ontario Superior Court of Justice (Commercial List) or other court, as applicable.

"**CryptoGlobal**" means CryptoGlobal Corp.

"**CryptoGlobal Common Shares**" means the common shares in the capital of CryptoGlobal.

"**CryptoGlobal Common Share Escrow Agreements**" means: (i) the Form 2F CPC Escrow Agreement made as of July 28, 2017 among Apolo Acquisition Corp., as issuer, Computershare Investor Services Inc., as escrow agent and each of Brockville International Holdings Ltd., Apolo Capital Advisory Corp., 2462570 Ontario Inc., Sailstreet Capital Inc., Carrera Capital Inc., 2524036 Ontario Limited, Vincent Gasparro, Ryan Roebuck, Valerie Siggs, Blavinder Dadwan, John Coady, Jeff Hergott, Jeffery Zicherman, Ravi Sood, Patrick Molyneux and Glen Gibbons, as securityholders; and (ii) the Form 5D Surplus Security Escrow Agreement made as of January 25, 2018 among CryptoGlobal Corp, as issuer, Computershare Investor Services Inc., as escrow agent, and each of 1109382 Ontario Inc., Whole Earth Holdings Inc., Roozbeh Ebbadi, Jacob Shultis and Perry Miele, as securityholders.

"**CryptoGlobal Dissenting Holder**" means a registered holder of CryptoGlobal Common Shares that has duly exercised its CryptoGlobal Dissent Rights, and has not withdrawn or been deemed to have withdrawn such exercise of CryptoGlobal Dissent Rights, but only in respect of the CryptoGlobal Common Shares in respect of which CryptoGlobal Dissent Rights are validly exercised by such holder.

"**CryptoGlobal Dissent Rights**" has the meaning specified in Section 3.1 of this Plan of Arrangement.

EXHIBIT 5.(iii)
PAGE 5

"**CryptoGlobal Exchange Ratio**" means 0.4229 of a HyperBlock Common Share for each CryptoGlobal Common Share.

"**CryptoGlobal Meeting**" means the special meeting of CryptoGlobal Shareholders to be held to consider the Arrangement Resolution and related matters, and any adjournments thereof.

"**CryptoGlobal Shareholders**" means, collectively, the holders from time to time of CryptoGlobal Common Shares.

"**CryptoGlobal Warrants**" means broker warrants to acquire CryptoGlobal Common Shares pursuant to the terms thereof.

"**CSE**" means the Canadian Securities Exchange.

"**Depositary**" means TSX Trust Company, in its capacity as the depositary in connection with the Arrangement.

"**Director**" means the Director appointed pursuant to Section 278 of the OBCA.

"**Effective Date**" means the date shown on the Certificate of Arrangement giving effect to the Arrangement.

"**Effective Time**" means 12:01 a.m. on the Effective Date, or such other time as the Parties agree to in writing before the Effective Date.

"**Encumbrance**" means any mortgage, charge, pledge, hypothec, security interest, prior claim, encroachment, option, right of first refusal or first offer, occupancy right, covenant, assignment, lien (statutory or otherwise), defect of title, or restriction or adverse right or claim, or other third party interest or encumbrance of any kind, in each case, whether contingent or absolute.

"**Final Order**" means the final order of the Court in a form acceptable to CryptoGlobal and HyperBlock, each acting reasonably, approving the Arrangement, as such order may be amended by the Court (with the consent of both CryptoGlobal and HyperBlock, each acting reasonably) at any time prior to the Effective Date or, if appealed, then, unless such appeal is withdrawn or denied, as affirmed or as amended (provided, that any such amendment is acceptable to both CryptoGlobal and HyperBlock, each acting reasonably) on appeal.

"**Governmental Authority**" means any: (a) international, multinational, national, federal, provincial, state, regional, municipal, local or other government, governmental or public department, central bank, court, tribunal, arbitral body, commission, board, bureau, ministry, agency or instrumentality, domestic or foreign; (b) subdivision or authority of any of the foregoing; (c) quasi-governmental or private body exercising any regulatory, expropriation or taxing authority under or for the account of any of the foregoing; or (d) stock exchange.

"**HyperBlock**" means HyperBlock Technologies Corp.

"**HyperBlock Arrangement Resolution**" means a special resolution to be approved by the HyperBlock Shareholders at the HyperBlock Meeting, substantially in the form of Exhibit B2 to the Arrangement Agreement.

"**HyperBlock Common Shares**" means the common shares in the capital of HyperBlock.

"**HyperBlock Dissenting Holder**" means a registered holder of HyperBlock Common Shares that has duly exercised its HyperBlock Dissent Rights, and has not withdrawn or been deemed to have withdrawn such exercise of HyperBlock Dissent Rights, but only in respect of the HyperBlock Common Shares in respect of which HyperBlock Dissent Rights are validly exercised by such holder.

"**HyperBlock Dissent Rights**" has the meaning specified in Section 3.1 of this Plan of Arrangement.

EXHIBIT 5.(iii)
PAGE 6

"**HyperBlock Meeting**" means the special meeting of HyperBlock Shareholders to be held to consider the Arrangement Resolution and related matters, and any adjournments thereof.

"**HyperBlock Option Plan**" means the HyperBlock Stock Option Plan adopted on January 16, 2018.

"**HyperBlock Options**" means options to acquire HyperBlock Common Shares pursuant to the HyperBlock Option Plan.

"**HyperBlock Shareholders**" means, collectively, the holders from time to time of HyperBlock Common Shares.

"**HyperBlock Sub**" means Hyperblock LLC.

"**HyperBlock Sub-Receipt Agreement**" means the Subscription Receipt Agreement dated as of March 14, 2018 among HyperBlock, Canaccord Genuity Corp., Eight Capital, Haywood Securities Inc., Macquarie Capital Markets Canada, Clarus Securities Inc., PI Financial Corp., Cormark Securities Inc. and TSX Trust Company.

"**HyperBlock Sub-Receipt Financing**" means the transactions contemplated by the HyperBlock Sub-Receipt Agreement.

"**HyperBlock Sub-Receipts**" means the subscription receipts of HyperBlock issued to the holders thereof pursuant to the HyperBlock Sub-Receipt Agreement.

"**Interim Order**" means the interim order of the Court in a form acceptable to CryptoGlobal and HyperBlock, each acting reasonably, providing for, among other things, the calling and holding of the CryptoGlobal Meeting, as such order may be amended by the Court with the consent of CryptoGlobal and HyperBlock, each acting reasonably.

"**Laws**" means, with respect to any Person, any and all applicable law (statutory, common or otherwise), constitution, treaty, convention, ordinance, code, rule, regulation, order, injunction, judgment, decree, ruling or other similar requirement, whether domestic or foreign, enacted, adopted, promulgated or applied by a Governmental Authority that is binding upon or applicable to such Person or its business, undertaking, property or securities, and to the extent that they have the force of law, policies, guidelines, notices and protocols of any Governmental Authority, as amended.

"**Letter of Transmittal**" means the letter of transmittal sent to holders of CryptoGlobal Common Shares for use in connection with the Arrangement.

"**Person**" includes any individual, firm, partnership, joint venture, venture capital fund, association, trust, trustee, executor, administrator, legal personal representative, estate group, body corporate, corporation, unincorporated association or organization, governmental entity, syndicate or other entity, whether or not having legal status.

"**Reorganization**" has the meaning specified in Section 2.4 of this Plan of Arrangement.

"**Spokane**" means Project Spokane, LLC.

"**Spokane Acquisition**" means the pending acquisition by HyperBlock Sub of all or substantially all of the assets, and the assumption by HyperBlock Sub of certain of liabilities, of Spokane pursuant to the Spokane Purchase Agreement.

"**Spokane Purchase Agreement**" means the asset purchase agreement dated as of January 7, 2018 among Spokane, HyperBlock Sub and the other parties thereto.

"**Tax Act**" means the *Income Tax Act* (Canada).

"**TSX-V**" means the TSX Venture Exchange.

EXHIBIT 5.(iii)
PAGE 7

**1.2     References and Usage.**

Unless expressly stated otherwise or the context otherwise requires, in this Plan of Arrangement:

(a)     reference to a gender includes all genders;

(b)     the singular includes the plural and vice versa;

(c)     "**or**" is used in the inclusive sense of "**and/or**";

(d)     "**any**" means "**any and all**";

(e)     the words "**including**", "**includes**" and "**include**" mean "**including (or includes or include) without limitation**";

(f)     the phrase "**the aggregate of**", "**the total of**", "**the sum of**" or a phrase of similar meaning means "**the aggregate (or total or sum), without duplication, of**";

(g)     $ or dollars refers to Canadian currency;

(h)     accounting terms not specifically defined in this Plan of Arrangement are to be interpreted in accordance with IFRS;

(i)     a statute includes all rules and regulations made under it, if and as amended, re-enacted or replaced from time to time;

(j)     a Person includes its heirs, administrators, executors, legal representatives, predecessors, successors and permitted assigns, as applicable;

(k)     the term "**notice**" refers to written notices except as otherwise specified;

(l)     the terms "**Arrangement Agreement**" and "**Plan of Arrangement**", and any reference in this Plan of Arrangement to the Arrangement Agreement or this Plan or Arrangement, or to any other agreement or document, includes, and is a reference to, the Arrangement Agreement or this Plan of Arrangement, or to such other agreement or document, as it may have been, or may from time to time be, amended, restated, replaced, supplemented or novated, and all schedules, exhibits and appendices thereto, as applicable, except as otherwise provided in this Plan of Arrangement;

(m)     whenever payments are to be made, or an action is to be taken, on a day which is not a Business Day, such payment will be required to be made, or such action will be required to be taken, on or not later than the next succeeding Business Day; and

(n)     in the computation of periods of time, unless otherwise stated, the word "**from**" means "**from and excluding**" and the word "**to**" and "**until**" each mean "**to and including**".

**1.3     Headings, etc.**

The use of headings (*e.g.*, Article, Section, etc.) in this Plan of Arrangement is reference only and is not to affect the interpretation of this Plan of Arrangement.

**1.4     Time References.**

References to time are to local time in the City of Toronto, Ontario.

EXHIBIT 5.(iii)
PAGE 8

## ARTICLE 2
## THE ARRANGEMENT

**2.1     Arrangement Agreement.**

This Plan of Arrangement is made pursuant to and subject to the provisions of the Arrangement Agreement, except in respect of the sequence of the steps comprising the Arrangement, which shall occur in the order set forth herein.

**2.2     Binding Effect.**

This Plan of Arrangement will become effective on, and be binding on and after, the Effective Time on HyperBlock, Spokane, CryptoGlobal, all holders and beneficial owners of CryptoGlobal Common Shares (including, for the avoidance of doubt, CryptoGlobal Dissenting Holders), CryptoGlobal Options, CryptoGlobal Warrants, HyperBlock Common Shares (including, for the avoidance of doubt, HyperBlock Dissenting Holders), HyperBlock Options, HyperBlock Sub-Receipts, and Computershare Investor Services Inc., in its capacity as CryptoGlobal' transfer agent and the Depositary, in each case, without any further act or formality required on the part of any Person.

**2.3     Arrangement.**

At the Effective Time, the following shall occur, and shall be deemed to occur as set out below, without any further authorization, act or formality, in each case, effective as at five minute intervals starting at the Effective Time:

**Acquisition of CryptoGlobal by HyperBlock**

(a)     *CryptoGlobal Common Shares of CryptoGlobal Dissenting Holders* – The CryptoGlobal Common Shares held by CryptoGlobal Dissenting Holders that have exercised CryptoGlobal Dissent Rights which remain valid immediately prior to the Effective Time shall, as of the Effective Time, be deemed to have been transferred free and clear of any Encumbrances to, and acquired and cancelled by, CryptoGlobal, and the CryptoGlobal Dissenting Holders shall cease to have any rights as CryptoGlobal Shareholders, other than the right to be paid the fair value of their CryptoGlobal Common Shares in accordance with Article 4.

(b)     *HyperBlock Common Shares of HyperBlock Dissenting Holders* – The HyperBlock Common Shares held by HyperBlock Dissenting Holders that have exercised HyperBlock Dissent Rights which remain valid immediately prior to the Effective Time shall, as of the Effective Time, be deemed to have been transferred free and clear of any Encumbrances to, and acquired and cancelled by, HyperBlock, and the HyperBlock Dissenting Holders shall cease to have any rights as HyperBlock Shareholders, other than the right to be paid the fair value of their HyperBlock Common Shares in accordance with Article 4.

(c)     *CryptoGlobal Common Shares* – Each CryptoGlobal Common Share outstanding at the Effective Time (other than the CryptoGlobal Common Shares held by CryptoGlobal Dissenting Holders that have exercised CryptoGlobal Dissent Rights which remain valid immediately prior to the Effective Time) shall be deemed to be assigned and transferred by the holder thereof to HyperBlock in exchange for such number of HyperBlock Common Shares equal to the product of (i) the number of CryptoGlobal Common Shares held by such CryptoGlobal Shareholder and (ii) the CryptoGlobal Exchange Ratio.

(d)     *CryptoGlobal Options* – Each CryptoGlobal Option outstanding immediately prior to the Effective Time, whether or not vested, shall be deemed to be vested, remain outstanding and exercisable for such number of HyperBlock Common Shares equal to the product of (A) the number of CryptoGlobal Common Shares subject to such CryptoGlobal Option and (B) the CryptoGlobal Exchange Ratio (provided, that if the foregoing would result in the issuance of a fraction of a HyperBlock Common Share, then the number of HyperBlock Common Shares otherwise issued upon the exercise of any such CryptoGlobal Option shall be rounded down to the nearest whole number of HyperBlock Common Shares, for an exercise price per

EXHIBIT 5.(iii)
PAGE 9

HyperBlock Common Share equal to the quotient of (A) the exercise price per CryptoGlobal Common Share under such CryptoGlobal Option immediately prior to the Effective Time divided by (B) the CryptoGlobal Exchange Ratio (provided, that the aggregate exercise price payable on any particular exercise of any such CryptoGlobal Option shall be rounded up to the nearest whole cent), and otherwise pursuant to and in accordance with the terms of the CryptoGlobal Option Plan and the original grant of such CryptoGlobal Option.

(e)    *CryptoGlobal Warrants* – Each CryptoGlobal Warrant outstanding immediately prior to the Effective Time shall remain outstanding pursuant to its terms and will be deemed to be exercisable for such number of HyperBlock Common Shares equal to the product of (i) the number of CryptoGlobal Common Shares subject to such CryptoGlobal Warrant and (ii) the CryptoGlobal Exchange Ratio (provided, that if the foregoing would result in the issuance of a fraction of a HyperBlock Common Share, then the number of HyperBlock Common Shares otherwise issued upon the exercise of any such CryptoGlobal Warrant shall be rounded down to the nearest whole number of HyperBlock Common Shares), for a price per HyperBlock Common Share equal to the quotient of (i) the price per CryptoGlobal Common Share under the CryptoGlobal Warrant immediately prior to the Effective Time divided by (ii) the CryptoGlobal Exchange Ratio (provided, that the aggregate price payable on any particular exercise of any such CryptoGlobal Warrant shall be rounded up to the nearest whole cent), and otherwise pursuant to and in accordance with the terms of the original CryptoGlobal Warrant.

## CryptoGlobal TSX-V De-Listing

(f)    *CryptoGlobal TSX-V De-Listing* – The CryptoGlobal Common Shares shall be de-listed from the TSX-V pursuant to the de-listing application (in the form agreed by HyperBlock and CryptoGlobal, each acting reasonably) filed by CryptoGlobal with the TSX-V prior to the date hereof and the approval of the TSX-V thereof.

## Termination of CryptoGlobal Common Share Escrow Agreements

(g)    HyperBlock, as sole shareholder of CryptoGlobal, shall approve the termination of the CryptoGlobal Common Share Escrow Agreements in accordance with their terms.

## Reduction of CryptoGlobal Stated Capital

(h)    The aggregate stated capital of the CryptoGlobal Common Shares shall be reduced to $1.00 without any repayment of capital.

## Amalgamation of HyperBlock and CryptoGlobal

(i)    *Amalgamation* – HyperBlock and CryptoGlobal shall be amalgamated under the OBCA and continue as one corporation ("**Amalco**") on the terms prescribed in this Plan of Arrangement (the "**Amalgamation**") as follows:

(i)    the name of Amalco shall be "HyperBlock Inc.";

(ii)    Amalco shall be authorized to issue an unlimited number of common shares without par value ("**Amalco Common Shares**");

(iii)    the registered office of Amalco will be 388 Carlaw Avenue, Suite 300, Toronto, Ontario M4M 2T4;

(iv)    there shall be no restrictions on the business Amalco may carry on or on the powers Amalco may exercise;

EXHIBIT 5.(iii)
PAGE 10

(v)    the directors of Amalco shall, until otherwise changed in accordance with the OBCA, consist of a minimum number of one and a maximum number of ten;

(vi)    the directors of Amalco following the Amalgamation shall be the following individuals and the Canadian residency status of each individual is indicated next to his name: Eric So (resident), Sean Walsh (non-resident), Hon. Ronald R. Spoehel (non-resident), Anthony Gaffney (resident), Dayna Gibbs (resident) and Rob Segal (resident) and the registered office of Amalco shall be each director's address for service;

(vii)    the officers of Amalco following the Amalgamation shall be the following individuals: Sean Walsh (Chief Executive Officer), Rob Segal (President), and Chris McGarrigle (Chief Information Officer);

(viii)    the auditor of Amalco following the Amalgamation shall be MNP LLP;

(ix)    the provisions of subsections 179(a), (a.1), (b), (c), (d) and (e) of the OBCA will apply to the Amalgamation with the result that:

    1.    HyperBlock and CryptoGlobal are amalgamated and continue as one corporation under the terms and conditions prescribed in this Plan of Arrangement;

    2.    HyperBlock and CryptoGlobal cease to exist as entities separate from Amalco;

    3.    Amalco possesses all the property, rights, privileges and franchises, and is subject to all liabilities, including civil, criminal and quasi-criminal, and all contracts, disabilities and debts, of each of HyperBlock and CryptoGlobal;

    4.    a conviction against, or ruling, order or judgment in favour or against, HyperBlock or CryptoGlobal may be enforced by or against Amalco;

    5.    the Articles of Arrangement are deemed to be the articles of incorporation of Amalco and, except for the purposes of subsection 117(1) of the OBCA, the Certificate of Arrangement is deemed to be the certificate of incorporation of Amalco; and

    6.    Amalco shall be deemed to be the party plaintiff or the party defendant, as the case may be, in any civil action commenced by or against HyperBlock or CryptoGlobal before the Amalgamation has become effective; and

(x)    the by-laws of Amalco shall be the same as those of HyperBlock, *mutatis mutandis*.

(j)    *Exchange and Cancellation of Securities* – Pursuant to the Amalgamation:

(i)    each HyperBlock Common Share shall be converted into one Amalco Common Share;

(ii)    each CryptoGlobal Common Share held by HyperBlock shall be cancelled without any payment of capital in respect thereof;

(iii)    The stated capital of the Amalco Common Shares shall be equal to the total of the aggregate paid-up capital (as such term is defined in the Tax Act) of the HyperBlock Common Shares immediately prior to the Amalgamation (including, for greater certainty, any HyperBlock Common Shares issued in exchange for CryptoGlobal Common Shares pursuant to this Plan of Arrangement);

(iv)    each HyperBlock Option, CryptoGlobal Option and CryptoGlobal Warrant shall become exercisable for Amalco Common Shares on and subject to the terms and conditions thereof (for

EXHIBIT 5.(iii)
PAGE 11

the avoidance of doubt, with respect to each CryptoGlobal Option and CryptoGlobal Warrant, after giving effect to Section 2.3(d) and Section 2.3(e) of this Plan of Arrangement, respectively); and

(v)    the Amalco Option Plan shall be adopted.

**Amalco CSE Listing**

(k)    *Amalco CSE Listing* – The Amalco Common Shares shall be listed and posted for trading on the CSE pursuant to the listing application (in the form agreed by HyperBlock and CryptoGlobal, each acting reasonably) filed by HyperBlock with the CSE prior to the date hereof and the approval of the CSE thereof.

**HyperBlock Sub-Receipt Financing Closing**

(l)    *HyperBlock Sub-Receipt Financing Closing* – The HyperBlock Sub-Receipt Financing shall be consummated, and the holders of HyperBlock Sub-Receipts shall be issued Amalco Common Shares, pursuant to and in accordance with the terms and conditions of the HyperBlock Sub-Receipt Agreement.

**Spokane Acquisition Closing**

(m)    *Spokane Acquisition Closing* – The Spokane Acquisition shall be consummated, and Spokane shall be issued Amalco Common Shares, pursuant to and in accordance with the terms and conditions of the Spokane Purchase Agreement.

**2.4    Tax Treatment.**

The Parties intend for the acquisition of CryptoGlobal by HyperBlock, together with the Amalgamation (collectively, the **"Reorganization"**), to qualify as a reorganization within the meaning of Section 368(a) of the Code, and will report it as such for United States federal, state and local income tax purposes. None of the Parties will knowingly take any action or fail to take any action, which action or failure to act would cause the Reorganization to fail to qualify as a reorganization within the meaning of Section 368(a) of the Code. This Plan of Arrangement is intended to constitute a plan of reorganization with respect to the Reorganization for U.S. federal income tax purposes.

**ARTICLE 3
RIGHTS OF DISSENT**

**3.1    Rights of Dissent.**

Each registered holder of CryptoGlobal Common Shares and HyperBlock Common Shares may exercise dissent rights with respect to any CryptoGlobal Common Shares or HyperBlock Common Share held by such holder (respectively, **"CryptoGlobal Dissent Rights"** and **HyperBlock Dissent Rights"**) in connection with the Arrangement pursuant to and in the manner set forth in Section 185 of the OBCA, as modified by the Interim Order and this Section 3.1 of this Plan of Arrangement; provided, that, notwithstanding subsection 185(6) of the OBCA, the written objection to the Arrangement Resolution referred to in subsection 185(6) of the OBCA must be received by CryptoGlobal or HyperBlock not later than 5:00 p.m. (Toronto time) two Business Days immediately preceding the date of the CryptoGlobal Meeting or HyperBlock Meeting, as applicable (as it may be adjourned or postponed from time to time). Each CryptoGlobal Dissenting Holder and HyperBlock Dissenting Holder that duly exercises such CryptoGlobal Dissenting Holder's CryptoGlobal Dissent Rights or such HyperBlock Dissenting Holder's HyperBlock Dissent Rights, as applicable, shall be deemed to have transferred the CryptoGlobal Common Shares or HyperBlock Common Shares held by such CryptoGlobal Dissenting Holder or HyperBlock Dissenting Holder and in respect of which CryptoGlobal Dissent Rights or HyperBlock Dissent Rights have been validly exercised, as applicable, to HyperBlock free and clear of all Encumbrances (other than the right to be paid fair value for such CryptoGlobal Common Shares or HyperBlock Common Shares, as applicable, as set out in this Section 3.1 of this Plan of Arrangement), as provided in Section 2.3(a) or Section 2.3(b), as applicable, and if they:

Page A-8

EXHIBIT 5.(iii)
PAGE 12

(a)     ultimately are entitled to be paid fair value for such CryptoGlobal Common Shares or HyperBlock Common Shares, as applicable: (i) shall be deemed not to have participated in the transactions in Article 2 of this Plan of Arrangement (other than Section 2.3(a) or Section 2.3(b) of this Plan of Arrangement, as applicable); (ii) will be entitled to be paid the fair value of such CryptoGlobal Common Shares or HyperBlock Common Shares, as applicable, by Amalco, which fair value, notwithstanding anything to the contrary contained in Part XIV of the OBCA, shall be determined as of the close of business on the Business Day before the Arrangement Resolution was adopted; and (iii) will not be entitled to any other payment or consideration, including any payment that would be payable under the Arrangement had such CryptoGlobal Dissenting Holder or HyperBlock Dissenting Holder not exercised its CryptoGlobal Dissent Rights or HyperBlock Dissent Rights in respect of such CryptoGlobal Common Shares or HyperBlock Common Shares, as applicable; or

(b)     ultimately are not entitled, for any reason, to be paid fair value for such CryptoGlobal Common Shares or HyperBlock Common Shares, as applicable, shall be deemed to have participated in the Arrangement on the same basis as a CryptoGlobal Shareholder or HyperBlock Shareholder that is not a CryptoGlobal Dissenting Holder or a HyperBlock Dissenting Holder, as applicable, and shall be entitled to receive only the securities contemplated by Section 2.3(c) and/or Section 2.3(j) of this Plan of Arrangement that such CryptoGlobal Dissenting Holder or HyperBlock Dissenting Holder would have received pursuant to the Arrangement if such CryptoGlobal Dissenting Holder or HyperBlock Dissenting Holder had not exercised its CryptoGlobal Dissent Rights or HyperBlock Dissent Rights, as applicable.

**3.2     Recognition of CryptoGlobal Dissenting Holders and HyperBlock Dissenting Holders.**

(a)     In no circumstances shall HyperBlock, CryptoGlobal or any other Person be required to recognize a Person exercising CryptoGlobal Dissent Rights or HyperBlock Dissent Rights unless such Person is the registered holder of those CryptoGlobal Common Shares or HyperBlock Common Shares, as applicable, in respect of which such rights are sought to be exercised.

(b)     For greater certainty, in no case shall HyperBlock, CryptoGlobal or any other Person be required to recognize CryptoGlobal Dissenting Holders as holders of CryptoGlobal Common Shares in respect of which CryptoGlobal Dissent Rights have been validly exercised, or HyperBlock Dissenting Holders as holders of HyperBlock Common Shares in respect of which HyperBlock Dissent Rights have been validly exercised, after the completion of the transactions contemplated by Section 2.3(a) and Section 2.3(b), respectively, and the names of such CryptoGlobal Dissenting Holders and HyperBlock Dissenting Holders shall be removed from the registers of holders of CryptoGlobal Common Shares and HyperBlock Common Shares, as applicable, in respect of which CryptoGlobal Dissent Rights and HyperBlock Dissent Rights have been validly exercised at the same time as the event described in Section 2.3(a) or Section 2.3(b), as applicable, occurs. In addition to any other restrictions under Section 185 of the OBCA, none of the following shall be entitled to exercise CryptoGlobal Dissent Rights or HyperBlock Dissent Rights: (i) holders of CryptoGlobal Options or HyperBlock Options; (ii) holders of CryptoGlobal Warrants; and (iii) CryptoGlobal Common Shareholders and HyperBlock Common Shareholders that vote or have instructed a proxyholder to vote such CryptoGlobal Shares or HyperBlock Shares, as applicable, in favour of the Arrangement Resolution (but only in respect of such CryptoGlobal Common Shares or HyperBlock Common Shares, as applicable).

**ARTICLE 4
CERTIFICATES AND PAYMENTS**

**4.1     Payment of Consideration.**

(a)     Prior to the filing of the Articles of Arrangement:

(i)     CryptoGlobal shall deposit, for the benefit of CryptoGlobal Dissenting Holders, cash with the Depositary in the aggregate amount equal to the payments in respect thereof required by Section 2.3(a) of this Plan of Arrangement (with the amount per CryptoGlobal Common Share being deemed to be $0.74 for this purpose), net of

EXHIBIT 5.(iii)
PAGE 13

applicable withholdings.  The cash deposited with the Depositary shall be held in an interest-bearing account, and any interest earned on such funds shall be for the account of HyperBlock.

(ii)     HyperBlock shall deposit, for the benefit of HyperBlock Dissenting Holders, cash with the Depositary in the aggregate amount equal to the payments in respect thereof required by Section 2.3(b) of this Plan of Arrangement (with the amount per HyperBlock Common Share being deemed to be $1.75 for this purpose), net of applicable withholdings.  The cash deposited with the Depositary shall be held in an interest-bearing account, and any interest earned on such funds shall be for the account of HyperBlock.

(iii)    HyperBlock shall deliver, or cause to be delivered, the HyperBlock Common Shares to the Depositary to satisfy the consideration issuable to the CryptoGlobal Shareholders pursuant to Section 2.3(c) of this Plan of Arrangement (for the avoidance of doubt, excluding CryptoGlobal Dissenting Holders).

(b)     Upon surrender to the Depositary for cancellation of a certificate which immediately prior to the Effective Time represented outstanding CryptoGlobal Common Shares that were transferred pursuant to Section 2.3(b), together with a duly completed and executed Letter of Transmittal (and such additional documents and instruments as the Depositary may reasonably require), the CryptoGlobal Shareholder represented by such surrendered certificate shall be entitled to receive in exchange therefor, and the Depositary shall deliver to such CryptoGlobal Shareholder, a certificate representing the number of HyperBlock Common Shares which such CryptoGlobal Shareholder is entitled to receive under the Arrangement, which HyperBlock Common Shares will be registered in such CryptoGlobal Shareholder's name and either (i) delivered to the address as such CryptoGlobal Shareholder directed in its Letter of Transmittal or (ii) made available for pick-up at the offices of the Depositary, in either case, in accordance with the instructions of the CryptoGlobal Shareholder set out in the Letter of Transmittal, and any certificate representing CryptoGlobal Common Shares so surrendered shall forthwith thereafter be cancelled.

(c)     Until surrendered as contemplated by this Section 4.1 of this Plan of Arrangement, each certificate that immediately prior to the Effective Time represented CryptoGlobal Common Shares or HyperBlock Common Shares (other than CryptoGlobal Common Shares and HyperBlock Common Shares in respect of which CryptoGlobal Dissent Rights or HyperBlock Dissent Rights, as applicable, have been validly exercised and not withdrawn), shall be deemed after the Effective Time to represent only the right to receive upon such surrender the consideration in lieu of such certificate as contemplated in this Section 4.1, less any amounts withheld pursuant to Section 4.3, if applicable.  Any such certificate formerly representing CryptoGlobal Common Shares not duly surrendered on or before the second anniversary of the Effective Date shall cease to represent a claim by or interest of any former holder of CryptoGlobal Common Shares of any kind or nature against CryptoGlobal, HyperBlock or Amalco.  On such date, all consideration to which such former holder was entitled pursuant to this Plan of Arrangement shall be deemed to have been surrendered to HyperBlock and shall be paid over by the Depositary to Amalco or as directed by Amalco.

(d)     Any payment made by way of cheque by the Depositary pursuant to this Plan of Arrangement that has not been deposited, or has been returned to the Depositary or that otherwise remains unclaimed, in each case, on or before the second anniversary of the Effective Date, and any right or claim to payment hereunder that remains outstanding on the second anniversary of the Effective Date, shall cease to represent a right or claim of any kind or nature, and the right of the holder to receive the applicable consideration pursuant to this Plan of Arrangement shall terminate and be deemed to be surrendered and forfeited to HyperBlock for no consideration.

EXHIBIT 5.(iii)
PAGE 14

**4.2      Lost Certificates.**

In the event any certificate which immediately prior to the Effective Time represented one or more outstanding CryptoGlobal Common Shares that were transferred pursuant to Section 2.3 of this Plan of Arrangement shall have been lost, stolen or destroyed, upon the making of an affidavit of that fact by the Person claiming such certificate to be lost, stolen or destroyed, the Depositary will issue in exchange for such lost, stolen or destroyed certificate, the consideration that such CryptoGlobal Shareholder has the right to receive in accordance with Section 2.3 of this Plan of Arrangement and such CryptoGlobal Shareholder's Letter of Transmittal.  When authorizing such exchange for any lost, stolen or destroyed certificate, the Person to whom such consideration is to be delivered shall, as a condition precedent to the delivery of such consideration, give a bond satisfactory to HyperBlock and the Depositary (each acting reasonably) in such sum as HyperBlock (acting reasonably) may direct, or otherwise indemnify HyperBlock and CryptoGlobal in a manner satisfactory to HyperBlock (acting reasonably) against any claim that may be made against HyperBlock and/or CryptoGlobal with respect to the certificate alleged to have been lost, stolen or destroyed.

**4.3      Withholding Rights.**

HyperBlock, CryptoGlobal or the Depositary shall be entitled to deduct and withhold from any amount payable to any Person under this Plan of Arrangement (including any amounts payable pursuant to Section 3.1), such amounts as HyperBlock, CryptoGlobal or the Depositary determines, acting reasonably, are required or permitted to be deducted and withheld with respect to such payment under the Tax Act, the Code or any provision of any other Laws.  To the extent that amounts are so withheld, such withheld amounts shall be treated for all purposes hereof as having been paid to the Person in respect of which such withholding was made; provided, that such amounts are actually remitted to the appropriate Governmental Authority.

**4.4      No Encumbrances.**

Any exchange or transfer of securities pursuant to this Plan of Arrangement shall be free and clear of any Encumbrances or other claims of third Persons of any kind.

**ARTICLE 5
AMENDMENTS**

**5.1      Amendments to Plan of Arrangement.**

(a)      HyperBlock and CryptoGlobal, each acting reasonably, may amend, modify and/or supplement this Plan of Arrangement at any time and from time to time prior to the Effective Time; provided, that each such amendment, modification and/or supplement must: (i) be set out in writing; (ii) be approved by HyperBlock and CryptoGlobal (subject to the Arrangement Agreement), each acting reasonably; (iii) filed with the Court and, if made following the CryptoGlobal Meeting, approved by the Court; and (iv) communicated to holders of CryptoGlobal Common Shares if and as required by the Court.

(b)      Any amendment, modification or supplement to this Plan of Arrangement may be proposed by HyperBlock or CryptoGlobal at any time prior to the CryptoGlobal Meeting; provided, that HyperBlock or CryptoGlobal (subject to the Arrangement Agreement), as applicable, shall have consented thereto, with or without any other prior notice or communication, and if so proposed and accepted by the Persons voting at the CryptoGlobal Meeting (other than as may be required under the Interim Order), shall become part of this Plan of Arrangement for all purposes.

(c)      Any amendment, modification or supplement to this Plan of Arrangement that is approved or directed by the Court following the CryptoGlobal Meeting shall be effective only if: (i) it is consented to in writing by each of HyperBlock and CryptoGlobal, each acting reasonably; and (ii) if required by the Court, it is consented to by some or all of the CryptoGlobal Shareholders voting in the manner directed by the Court.

EXHIBIT 5.(iii)
PAGE 15

(d)     Any amendment, modification or supplement to this Plan of Arrangement may be made following the Effective Date unilaterally by HyperBlock; provided, that it concerns a matter which, in the reasonable opinion of HyperBlock, is of an administrative nature required to better give effect to the implementation of this Plan of Arrangement and is not adverse to the economic interest of any former CryptoGlobal Shareholder, or holders of CryptoGlobal Options or CryptoGlobal Warrants.

## ARTICLE 6
## FURTHER ASSURANCES

**6.1     Further Assurances.**

Notwithstanding that the transactions and events set out in this Plan of Arrangement shall occur and shall be deemed to occur in the order set out in this Plan of Arrangement without any further act or formality, each Party shall make, do and execute, or cause to be made, done and executed, all such further acts, deeds, agreements, transfers, assurances, instruments or documents as may reasonably be required by either Party in order further to document or evidence any of the transactions or events set out in this Plan of Arrangement.

EXHIBIT 5 (iii)
PAGE 16

**EXHIBIT "B"**

**COURT ORDER**

THIS IS TO CERTIFY THAT THIS
DOCUMENT, EACH PAGE OF
WHICH IS STAMPED WITH THE
SEAL OF THE SUPERIOR COURT
OF JUSTICE AT TORONTO, IS A
TRUE COPY OF THE DOCUMENT
ON FILE IN THIS OFFICE

LA PRESENT ATTEST QUE CE
DOCUMENT, DONT CHACUNE
DES PAGES EST REVETUE DU
SCEAU DE LA COUR SUPÉRIEURE
DE JUSTICE A TORONTO, EST UNE
COPIE CONFORME DU DOCUMENT
CONSERVÉ DANS CE BUREAU

DATED AT TORONTO THIS 26 DAY OF June 20 18
FAIT A TORONTO LE           JOUR DE

Maggie Sawka
REGISTRAR                    GREFFIER

EXHIBIT 5.(iii)
PAGE 17

Court File No.  CV-18-597803-00CL

**ONTARIO**

**SUPERIOR COURT OF JUSTICE**

**(COMMERCIAL LIST)**

THE HONOURABLE        )        TUESDAY, THE

JUSTICE S.F. DUNPHY    )

                    )        26TH DAY OF JUNE, 2018

**IN THE MATTER OF** an application under section 182 of the *Business Corporations Act*, R.S.O. 1990, c. B.16, as amended;

    **AND IN THE MATTER OF** Rules 14.05(2) and 14.05(3) of the *Rules of Civil Procedure*

    **AND IN THE MATTER OF** a proposed arrangement involving CryptoGlobal Corp. and HyperBlock Technologies Corp.

**CRYPTOGLOBAL CORP.**

Applicant

**FINAL ORDER**

**THIS APPLICATION** made by the Applicant, CryptoGlobal Corp. ("**CryptoGlobal**"), pursuant to section 182 of the *Business Corporations Act*, R.S.O. 1990, c. B.16, as amended, (the "**OBCA**") was heard this day at 330 University Avenue, Toronto, Ontario.

**ON READING** the the Notice of Application issued on May 14, 2018, the affidavit of Eric Klein sworn May 15, 2018 and the supplementary affidavit of Eric Klein sworn June 22, 2018, including the Joint Management Information Circular (the "**Circular**") of CryptoGlobal and HyperBlock Technologies Corp. ("**HyperBlock**") included at Exhibit "A"

Page 2

EXHIBIT 5.(iii)
PAGE 18

**ON HEARING** the submissions of the lawyers for CryptoGlobal and the lawyers for HyperBlock., no-one appearing for any other person, including any shareholders of CryptoGlobal, on being advised that the parties intend to rely upon the exemption available under Section 3(a)(10) of the *U.S. Securities Act of 1933*, and having determined that the Arrangement, as described in the Plan of Arrangement attached as Schedule "A" to this order is an arrangement for the purposes of section 182 of the OBCA and is fair and reasonable as that term is understood for the purposes of that section,

1.      **THIS COURT ORDERS** that the Arrangement, as described in the Plan of Arrangement attached as Schedule "A" to this order, shall be and is hereby approved.

2.      **THIS COURT ORDERS** that CryptoGlobal shall be entitled to seek leave to vary this order upon such terms and upon giving such notice as this court may direct, to seek the advice and directions of this court as to the implementation of this order, and to apply for such further order or orders as may be appropriate.

ENTERED AT / INSCRIT A TORONTO
ON / BOOK NO:
LE / DANS LE REGISTRE NO:

JUN 2 6 2018

PER / PAR:

SCHEDULE "A"                                    <span style="color:red">EXHIBIT 5.(iii)</span>
                                                <span style="color:red">PAGE 19</span>

# PLAN OF ARRANGEMENT

## ARTICLE 1
## INTERPRETATION

**1.1     Definitions.**

As used in this Plan of Arrangement, the following terms have the meanings given to such terms below:

**"Amalco"** has the meaning specified in Section 2.3(i) of this Plan of Arrangement.

**"Amalco Common Shares"** has the meaning specified in Section 2.3(i)(ii) of this Plan of Arrangement.

**"Amalco Option Plan"** means the Amalco Stock Option Plan, in the form agreed by the Parties, each acting reasonably.

**"Amalgamation"** has the meaning specified in Section 2.3(i) of this Plan of Arrangement.

**"Arrangement Agreement"** means the Arrangement Agreement between HyperBlock and CryptoGlobal dated as of April 3, 2018.

**"CryptoGlobal Arrangement Resolution"** means a special resolution to be approved by the CryptoGlobal Shareholders at the CryptoGlobal Meeting, substantially in the form of <u>Exhibit B1</u> to the Arrangement Agreement.

**"Articles of Arrangement"** means the articles of arrangement in respect of the Arrangement required by the OBCA to be sent to the Director after the Final Order is made, which shall include this Plan of Arrangement and otherwise be in a form and content satisfactory to CryptoGlobal and HyperBlock, each acting reasonably.

**"Certificate of Arrangement"** means the certificate of arrangement to be issued by the Director pursuant to Section 183(2) of the OBCA in respect of the Articles of Arrangement.

**"Code"** means the *United States Internal Revenue Code of 1986, as amended.*

**"Court"** means the Ontario Superior Court of Justice (Commercial List) or other court, as applicable.

**"CryptoGlobal"** means CryptoGlobal Corp.

**"CryptoGlobal Common Shares"** means the common shares in the capital of CryptoGlobal.

**"CryptoGlobal Common Share Escrow Agreements"** means: (i) the Form 2F CPC Escrow Agreement made as of July 28, 2017 among Apolo Acquisition Corp., as issuer, Computershare Investor Services Inc., as escrow agent and each of Brockville International Holdings Ltd., Apolo Capital Advisory Corp., 2462570 Ontario Inc., Sailstreet Capital Inc., Carrera Capital Inc., 2524036 Ontario Limited, Vincent Gasparro, Ryan Roebuck, Valerie Siggs, Blavinder Dadwan, John Coady, Jeff Hergott, Jeffery Zicherman, Ravi Sood, Patrick Molyneux and Glen Gibbons, as securityholders; and (ii) the Form 5D Surplus Security Escrow Agreement made as of January 25, 2018 among CryptoGlobal Corp, as issuer, Computershare Investor Services Inc., as escrow agent, and each of 1109382 Ontario Inc., Whole Earth Holdings Inc., Roozbeh Ebbadi, Jacob Shultis and Perry Miele, as securityholders.

**"CryptoGlobal Dissenting Holder"** means a registered holder of CryptoGlobal Common Shares that has duly exercised its CryptoGlobal Dissent Rights, and has not withdrawn or been deemed to have withdrawn such exercise of CryptoGlobal Dissent Rights, but only in respect of the CryptoGlobal Common Shares in respect of which CryptoGlobal Dissent Rights are validly exercised by such holder.

**"CryptoGlobal Dissent Rights"** has the meaning specified in Section 3.1 of this Plan of Arrangement.

EXHIBIT 5.(iii)
PAGE 20

"**CryptoGlobal Exchange Ratio**" means 0.4229 of a HyperBlock Common Share for each CryptoGlobal Common Share.

"**CryptoGlobal Meeting**" means the special meeting of CryptoGlobal Shareholders to be held to consider the Arrangement Resolution and related matters, and any adjournments thereof.

"**CryptoGlobal Shareholders**" means, collectively, the holders from time to time of CryptoGlobal Common Shares.

"**CryptoGlobal Warrants**" means broker warrants to acquire CryptoGlobal Common Shares pursuant to the terms thereof.

"**CSE**" means the Canadian Securities Exchange.

"**Depositary**" means TSX Trust Company, in its capacity as the depositary in connection with the Arrangement.

"**Director**" means the Director appointed pursuant to Section 278 of the OBCA.

"**Effective Date**" means the date shown on the Certificate of Arrangement giving effect to the Arrangement.

"**Effective Time**" means 12:01 a.m. on the Effective Date, or such other time as the Parties agree to in writing before the Effective Date.

"**Encumbrance**" means any mortgage, charge, pledge, hypothec, security interest, prior claim, encroachment, option, right of first refusal or first offer, occupancy right, covenant, assignment, lien (statutory or otherwise), defect of title, or restriction or adverse right or claim, or other third party interest or encumbrance of any kind, in each case, whether contingent or absolute.

"**Final Order**" means the final order of the Court in a form acceptable to CryptoGlobal and HyperBlock, each acting reasonably, approving the Arrangement, as such order may be amended by the Court (with the consent of both CryptoGlobal and HyperBlock, each acting reasonably) at any time prior to the Effective Date or, if appealed, then, unless such appeal is withdrawn or denied, as affirmed or as amended (provided, that any such amendment is acceptable to both CryptoGlobal and HyperBlock, each acting reasonably) on appeal.

"**Governmental Authority**" means any: (a) international, multinational, national, federal, provincial, state, regional, municipal, local or other government, governmental or public department, central bank, court, tribunal, arbitral body, commission, board, bureau, ministry, agency or instrumentality, domestic or foreign; (b) subdivision or authority of any of the foregoing; (c) quasi-governmental or private body exercising any regulatory, expropriation or taxing authority under or for the account of any of the foregoing; or (d) stock exchange.

"**HyperBlock**" means HyperBlock Technologies Corp.

"**HyperBlock Arrangement Resolution**" means a special resolution to be approved by the HyperBlock Shareholders at the HyperBlock Meeting, substantially in the form of Exhibit B2 to the Arrangement Agreement.

"**HyperBlock Common Shares**" means the common shares in the capital of HyperBlock.

"**HyperBlock Dissenting Holder**" means a registered holder of HyperBlock Common Shares that has duly exercised its HyperBlock Dissent Rights, and has not withdrawn or been deemed to have withdrawn such exercise of HyperBlock Dissent Rights, but only in respect of the HyperBlock Common Shares in respect of which HyperBlock Dissent Rights are validly exercised by such holder.

"**HyperBlock Dissent Rights**" has the meaning specified in Section 3.1 of this Plan of Arrangement.

EXHIBIT 5.(iii)
PAGE 21

"**HyperBlock Meeting**" means the special meeting of HyperBlock Shareholders to be held to consider the Arrangement Resolution and related matters, and any adjournments thereof.

"**HyperBlock Option Plan**" means the HyperBlock Stock Option Plan adopted on January 16, 2018.

"**HyperBlock Options**" means options to acquire HyperBlock Common Shares pursuant to the HyperBlock Option Plan.

"**HyperBlock Shareholders**" means, collectively, the holders from time to time of HyperBlock Common Shares.

"**HyperBlock Sub**" means Hyperblock LLC.

"**HyperBlock Sub-Receipt Agreement**" means the Subscription Receipt Agreement dated as of March 14, 2018 among HyperBlock, Canaccord Genuity Corp., Eight Capital, Haywood Securities Inc., Macquarie Capital Markets Canada, Clarus Securities Inc., PI Financial Corp., Cormark Securities Inc. and TSX Trust Company.

"**HyperBlock Sub-Receipt Financing**" means the transactions contemplated by the HyperBlock Sub-Receipt Agreement.

"**HyperBlock Sub-Receipts**" means the subscription receipts of HyperBlock issued to the holders thereof pursuant to the HyperBlock Sub-Receipt Agreement.

"**Interim Order**" means the interim order of the Court in a form acceptable to CryptoGlobal and HyperBlock, each acting reasonably, providing for, among other things, the calling and holding of the CryptoGlobal Meeting, as such order may be amended by the Court with the consent of CryptoGlobal and HyperBlock, each acting reasonably.

"**Laws**" means, with respect to any Person, any and all applicable law (statutory, common or otherwise), constitution, treaty, convention, ordinance, code, rule, regulation, order, injunction, judgment, decree, ruling or other similar requirement, whether domestic or foreign, enacted, adopted, promulgated or applied by a Governmental Authority that is binding upon or applicable to such Person or its business, undertaking, property or securities, and to the extent that they have the force of law, policies, guidelines, notices and protocols of any Governmental Authority, as amended.

"**Letter of Transmittal**" means the letter of transmittal sent to holders of CryptoGlobal Common Shares for use in connection with the Arrangement.

"**Person**" includes any individual, firm, partnership, joint venture, venture capital fund, association, trust, trustee, executor, administrator, legal personal representative, estate group, body corporate, corporation, unincorporated association or organization, governmental entity, syndicate or other entity, whether or not having legal status.

"**Reorganization**" has the meaning specified in Section 2.4 of this Plan of Arrangement.

"**Spokane**" means Project Spokane, LLC.

"**Spokane Acquisition**" means the pending acquisition by HyperBlock Sub of all or substantially all of the assets, and the assumption by HyperBlock Sub of certain of liabilities, of Spokane pursuant to the Spokane Purchase Agreement.

"**Spokane Purchase Agreement**" means the asset purchase agreement dated as of January 7, 2018 among Spokane, HyperBlock Sub and the other parties thereto.

"**Tax Act**" means the *Income Tax Act* (Canada).

"**TSX-V**" means the TSX Venture Exchange.

EXHIBIT 5.(iii)
PAGE 22

**1.2      References and Usage.**

Unless expressly stated otherwise or the context otherwise requires, in this Plan of Arrangement:

(a)      reference to a gender includes all genders;

(b)      the singular includes the plural and vice versa;

(c)      "**or**" is used in the inclusive sense of "**and/or**";

(d)      "**any**" means "**any and all**";

(e)      the words "**including**", "**includes**" and "**include**" mean "**including (or includes or include) without limitation**";

(f)      the phrase "**the aggregate of**", "**the total of**", "**the sum of**" or a phrase of similar meaning means "**the aggregate (or total or sum), without duplication, of**";

(g)      $ or dollars refers to Canadian currency;

(h)      accounting terms not specifically defined in this Plan of Arrangement are to be interpreted in accordance with IFRS;

(i)      a statute includes all rules and regulations made under it, if and as amended, re-enacted or replaced from time to time;

(j)      a Person includes its heirs, administrators, executors, legal representatives, predecessors, successors and permitted assigns, as applicable;

(k)      the term "**notice**" refers to written notices except as otherwise specified;

(l)      the terms "**Arrangement Agreement**" and "**Plan of Arrangement**", and any reference in this Plan of Arrangement to the Arrangement Agreement or this Plan or Arrangement, or to any other agreement or document, includes, and is a reference to, the Arrangement Agreement or this Plan of Arrangement, or to such other agreement or document, as it may have been, or may from time to time be, amended, restated, replaced, supplemented or novated, and all schedules, exhibits and appendices thereto, as applicable, except as otherwise provided in this Plan of Arrangement;

(m)      whenever payments are to be made, or an action is to be taken, on a day which is not a Business Day, such payment will be required to be made, or such action will be required to be taken, on or not later than the next succeeding Business Day; and

(n)      in the computation of periods of time, unless otherwise stated, the word "**from**" means "**from and excluding**" and the word "**to**" and "**until**" each mean "**to and including**".

**1.3      Headings, etc.**

The use of headings (*e.g.*, Article, Section, etc.) in this Plan of Arrangement is reference only and is not to affect the interpretation of this Plan of Arrangement.

**1.4      Time References.**

References to time are to local time in the City of Toronto, Ontario.

EXHIBIT 5.(iii)
PAGE 23

**ARTICLE 2**
**THE ARRANGEMENT**

**2.1    Arrangement Agreement.**

This Plan of Arrangement is made pursuant to and subject to the provisions of the Arrangement Agreement, except in respect of the sequence of the steps comprising the Arrangement, which shall occur in the order set forth herein.

**2.2    Binding Effect.**

This Plan of Arrangement will become effective on, and be binding on and after, the Effective Time on HyperBlock, Spokane, CryptoGlobal, all holders and beneficial owners of CryptoGlobal Common Shares (including, for the avoidance of doubt, CryptoGlobal Dissenting Holders), CryptoGlobal Options, CryptoGlobal Warrants, HyperBlock Common Shares (including, for the avoidance of doubt, HyperBlock Dissenting Holders), HyperBlock Options, HyperBlock Sub-Receipts, and Computershare Investor Services Inc., in its capacity as CryptoGlobal' transfer agent and the Depositary, in each case, without any further act or formality required on the part of any Person.

**2.3    Arrangement.**

At the Effective Time, the following shall occur, and shall be deemed to occur as set out below, without any further authorization, act or formality, in each case, effective as at five minute intervals starting at the Effective Time:

**Acquisition of CryptoGlobal by HyperBlock**

(a)    *CryptoGlobal Common Shares of CryptoGlobal Dissenting Holders* – The CryptoGlobal Common Shares held by CryptoGlobal Dissenting Holders that have exercised CryptoGlobal Dissent Rights which remain valid immediately prior to the Effective Time shall, as of the Effective Time, be deemed to have been transferred free and clear of any Encumbrances to, and acquired and cancelled by, CryptoGlobal, and the CryptoGlobal Dissenting Holders shall cease to have any rights as CryptoGlobal Shareholders, other than the right to be paid the fair value of their CryptoGlobal Common Shares in accordance with Article 4.

(b)    *HyperBlock Common Shares of HyperBlock Dissenting Holders* – The HyperBlock Common Shares held by HyperBlock Dissenting Holders that have exercised HyperBlock Dissent Rights which remain valid immediately prior to the Effective Time shall, as of the Effective Time, be deemed to have been transferred free and clear of any Encumbrances to, and acquired and cancelled by, HyperBlock, and the HyperBlock Dissenting Holders shall cease to have any rights as HyperBlock Shareholders, other than the right to be paid the fair value of their HyperBlock Common Shares in accordance with Article 4.

(c)    *CryptoGlobal Common Shares* – Each CryptoGlobal Common Share outstanding at the Effective Time (other than the CryptoGlobal Common Shares held by CryptoGlobal Dissenting Holders that have exercised CryptoGlobal Dissent Rights which remain valid immediately prior to the Effective Time) shall be deemed to be assigned and transferred by the holder thereof to HyperBlock in exchange for such number of HyperBlock Common Shares equal to the product of (i) the number of CryptoGlobal Common Shares held by such CryptoGlobal Shareholder and (ii) the CryptoGlobal Exchange Ratio.

(d)    *CryptoGlobal Options* – Each CryptoGlobal Option outstanding immediately prior to the Effective Time, whether or not vested, shall be deemed to be vested, remain outstanding and exercisable for such number of HyperBlock Common Shares equal to the product of (A) the number of CryptoGlobal Common Shares subject to such CryptoGlobal Option and (B) the CryptoGlobal Exchange Ratio (provided, that if the foregoing would result in the issuance of a fraction of a HyperBlock Common Share, then the number of HyperBlock Common Shares otherwise issued upon the exercise of any such CryptoGlobal Option shall be rounded down to the nearest whole number of HyperBlock Common Shares, for an exercise price per

EXHIBIT 5.(iii)
PAGE 24

HyperBlock Common Share equal to the quotient of (A) the exercise price per CryptoGlobal Common Share under such CryptoGlobal Option immediately prior to the Effective Time divided by (B) the CryptoGlobal Exchange Ratio (provided, that the aggregate exercise price payable on any particular exercise of any such CryptoGlobal Option shall be rounded up to the nearest whole cent), and otherwise pursuant to and in accordance with the terms of the CryptoGlobal Option Plan and the original grant of such CryptoGlobal Option.

(e)     *CryptoGlobal Warrants* – Each CryptoGlobal Warrant outstanding immediately prior to the Effective Time shall remain outstanding pursuant to its terms and will be deemed to be exercisable for such number of HyperBlock Common Shares equal to the product of (i) the number of CryptoGlobal Common Shares subject to such CryptoGlobal Warrant and (ii) the CryptoGlobal Exchange Ratio (provided, that if the foregoing would result in the issuance of a fraction of a HyperBlock Common Share, then the number of HyperBlock Common Shares otherwise issued upon the exercise of any such CryptoGlobal Warrant shall be rounded down to the nearest whole number of HyperBlock Common Shares) for a price per HyperBlock Common Share equal to the quotient of (i) the price per CryptoGlobal Common Share under the CryptoGlobal Warrant immediately prior to the Effective Time divided by (ii) the CryptoGlobal Exchange Ratio (provided, that the aggregate price payable on any particular exercise of any such CryptoGlobal Warrant shall be rounded up to the nearest whole cent), and otherwise pursuant to and in accordance with the terms of the original CryptoGlobal Warrant.

**CryptoGlobal TSX-V De-Listing**

(f)     *CryptoGlobal TSX-V De-Listing* – The CryptoGlobal Common Shares shall be de-listed from the TSX-V pursuant to the de-listing application (in the form agreed by HyperBlock and CryptoGlobal, each acting reasonably) filed by CryptoGlobal with the TSX-V prior to the date hereof and the approval of the TSX-V thereof.

**Termination of CryptoGlobal Common Share Escrow Agreements**

(g)     HyperBlock, as sole shareholder of CryptoGlobal, shall approve the termination of the CryptoGlobal Common Share Escrow Agreements in accordance with their terms.

**Reduction of CryptoGlobal Stated Capital**

(h)     The aggregate stated capital of the CryptoGlobal Common Shares shall be reduced to $1.00 without any repayment of capital.

**Amalgamation of HyperBlock and CryptoGlobal**

(i)     *Amalgamation* – HyperBlock and CryptoGlobal shall be amalgamated under the OBCA and continue as one corporation ("**Amalco**") on the terms prescribed in this Plan of Arrangement (the "**Amalgamation**") as follows:

   (i)     the name of Amalco shall be "HyperBlock Inc.";

   (ii)     Amalco shall be authorized to issue an unlimited number of common shares without par value ("**Amalco Common Shares**");

   (iii)     the registered office of Amalco will be 388 Carlaw Avenue, Suite 300, Toronto, Ontario M4M 2T4;

   (iv)     there shall be no restrictions on the business Amalco may carry on or on the powers Amalco may exercise;

EXHIBIT 5.(iii)
PAGE 25

(v)    the directors of Amalco shall, until otherwise changed in accordance with the OBCA, consist of a minimum number of one and a maximum number of ten;

(vi)    the directors of Amalco following the Amalgamation shall be the following individuals and the Canadian residency status of each individual is indicated next to his name: Eric So (resident), Sean Walsh (non-resident), Hon. Ronald R. Spoehel (non-resident), Anthony Gaffney (resident), Dayna Gibbs (resident) and Rob Segal (resident) and the registered office of Amalco shall be each director's address for service;

(vii)    the officers of Amalco following the Amalgamation shall be the following individuals: Sean Walsh (Chief Executive Officer), Rob Segal (President), and Chris McGarrigle (Chief Information Officer);

(viii)    the auditor of Amalco following the Amalgamation shall be MNP LLP;

(ix)    the provisions of subsections 179(a), (a.1), (b), (c), (d) and (e) of the OBCA will apply to the Amalgamation with the result that:

    1.    HyperBlock and CryptoGlobal are amalgamated and continue as one corporation under the terms and conditions prescribed in this Plan of Arrangement;

    2.    HyperBlock and CryptoGlobal cease to exist as entities separate from Amalco;

    3.    Amalco possesses all the property, rights, privileges and franchises, and is subject to all liabilities, including civil, criminal and quasi-criminal, and all contracts, disabilities and debts, of each of HyperBlock and CryptoGlobal;

    4.    a conviction against, or ruling, order or judgment in favour or against, HyperBlock or CryptoGlobal may be enforced by or against Amalco;

    5.    the Articles of Arrangement are deemed to be the articles of incorporation of Amalco and, except for the purposes of subsection 117(1) of the OBCA, the Certificate of Arrangement is deemed to be the certificate of incorporation of Amalco; and

    6.    Amalco shall be deemed to be the party plaintiff or the party defendant, as the case may be, in any civil action commenced by or against HyperBlock or CryptoGlobal before the Amalgamation has become effective; and

(x)    the by-laws of Amalco shall be the same as those of HyperBlock, *mutatis mutandis*.

(j)    *Exchange and Cancellation of Securities* – Pursuant to the Amalgamation:

(i)    each HyperBlock Common Share shall be converted into one Amalco Common Share;

(ii)    each CryptoGlobal Common Share held by HyperBlock shall be cancelled without any payment of capital in respect thereof;

(iii)    The stated capital of the Amalco Common Shares shall be equal to the total of the aggregate paid-up capital (as such term is defined in the Tax Act) of the HyperBlock Common Shares immediately prior to the Amalgamation (including, for greater certainty, any HyperBlock Common Shares issued in exchange for CryptoGlobal Common Shares pursuant to this Plan of Arrangement);

(iv)    each HyperBlock Option, CryptoGlobal Option and CryptoGlobal Warrant shall become exercisable for Amalco Common Shares on and subject to the terms and conditions thereof (for

EXHIBIT 5.(iii)
PAGE 26

the avoidance of doubt, with respect to each CryptoGlobal Option and CryptoGlobal Warrant, after giving effect to Section 2.3(d) and Section 2.3(e) of this Plan of Arrangement, respectively); and

(v)    the Amalco Option Plan shall be adopted.

**Amalco CSE Listing**

(k)    *Amalco CSE Listing* – The Amalco Common Shares shall be listed and posted for trading on the CSE pursuant to the listing application (in the form agreed by HyperBlock and CryptoGlobal, each acting reasonably) filed by HyperBlock with the CSE prior to the date hereof and the approval of the CSE thereof.

**HyperBlock Sub-Receipt Financing Closing**

(l)    *HyperBlock Sub-Receipt Financing Closing* – The HyperBlock Sub-Receipt Financing shall be consummated, and the holders of HyperBlock Sub-Receipts shall be issued Amalco Common Shares, pursuant to and in accordance with the terms and conditions of the HyperBlock Sub-Receipt Agreement.

**Spokane Acquisition Closing**

(m)    *Spokane Acquisition Closing* – The Spokane Acquisition shall be consummated, and Spokane shall be issued Amalco Common Shares, pursuant to and in accordance with the terms and conditions of the Spokane Purchase Agreement.

**2.4    Tax Treatment.**

The Parties intend for the acquisition of CryptoGlobal by HyperBlock, together with the Amalgamation (collectively, the "**Reorganization**"), to qualify as a reorganization within the meaning of Section 368(a) of the Code, and will report it as such for United States federal, state and local income tax purposes. None of the Parties will knowingly take any action or fail to take any action, which action or failure to act would cause the Reorganization to fail to qualify as a reorganization within the meaning of Section 368(a) of the Code. This Plan of Arrangement is intended to constitute a plan of reorganization with respect to the Reorganization for U.S. federal income tax purposes.

**ARTICLE 3
RIGHTS OF DISSENT**

**3.1    Rights of Dissent.**

Each registered holder of CryptoGlobal Common Shares and HyperBlock Common Shares may exercise dissent rights with respect to any CryptoGlobal Common Shares or HyperBlock Common Share held by such holder (respectively, "**CryptoGlobal Dissent Rights**" and "**HyperBlock Dissent Rights**") in connection with the Arrangement pursuant to and in the manner set forth in Section 185 of the OBCA, as modified by the Interim Order and this Section 3.1 of this Plan of Arrangement; provided, that, notwithstanding subsection 185(6) of the OBCA, the written objection to the Arrangement Resolution referred to in subsection 185(6) of the OBCA must be received by CryptoGlobal or HyperBlock not later than 5:00 p.m. (Toronto time) two Business Days immediately preceding the date of the CryptoGlobal Meeting or HyperBlock Meeting, as applicable (as it may be adjourned or postponed from time to time). Each CryptoGlobal Dissenting Holder and HyperBlock Dissenting Holder that duly exercises such CryptoGlobal Dissenting Holder's CryptoGlobal Dissent Rights or such HyperBlock Dissenting Holder's HyperBlock Dissent Rights, as applicable, shall be deemed to have transferred the CryptoGlobal Common Shares or HyperBlock Common Shares held by such CryptoGlobal Dissenting Holder or HyperBlock Dissenting Holder and in respect of which CryptoGlobal Dissent Rights or HyperBlock Dissent Rights have been validly exercised, as applicable, to HyperBlock free and clear of all Encumbrances (other than the right to be paid fair value for such CryptoGlobal Common Shares or HyperBlock Common Shares, as applicable, as set out in this Section 3.1 of this Plan of Arrangement), as provided in Section 2.3(a) or Section 2.3(b), as applicable, and if they:

EXHIBIT 5.(iii)
PAGE 27

(a)      ultimately are entitled to be paid fair value for such CryptoGlobal Common Shares or HyperBlock Common Shares, as applicable: (i) shall be deemed not to have participated in the transactions in Article 2 of this Plan of Arrangement (other than Section 2.3(a) or Section 2.3(b) of this Plan of Arrangement, as applicable); (ii) will be entitled to be paid the fair value of such CryptoGlobal Common Shares or HyperBlock Common Shares, as applicable, by Amalco, which fair value, notwithstanding anything to the contrary contained in Part XIV of the OBCA, shall be determined as of the close of business on the Business Day before the Arrangement Resolution was adopted; and (iii) will not be entitled to any other payment or consideration, including any payment that would be payable under the Arrangement had such CryptoGlobal Dissenting Holder or HyperBlock Dissenting Holder not exercised its CryptoGlobal Dissent Rights or HyperBlock Dissent Rights in respect of such CryptoGlobal Common Shares or HyperBlock Common Shares, as applicable; or

(b)      ultimately are not entitled, for any reason, to be paid fair value for such CryptoGlobal Common Shares or HyperBlock Common Shares, as applicable, shall be deemed to have participated in the Arrangement on the same basis as a CryptoGlobal Shareholder or HyperBlock Shareholder that is not a CryptoGlobal Dissenting Holder or a HyperBlock Dissenting Holder, as applicable, and shall be entitled to receive only the securities contemplated by Section 2.3(c) and/or Section 2.3(j) of this Plan of Arrangement that such CryptoGlobal Dissenting Holder or HyperBlock Dissenting Holder would have received pursuant to the Arrangement if such CryptoGlobal Dissenting Holder or HyperBlock Dissenting Holder had not exercised its CryptoGlobal Dissent Rights or HyperBlock Dissent Rights, as applicable.

**3.2      Recognition of CryptoGlobal Dissenting Holders and HyperBlock Dissenting Holders.**

(a)      In no circumstances shall HyperBlock, CryptoGlobal or any other Person be required to recognize a Person exercising CryptoGlobal Dissent Rights or HyperBlock Dissent Rights unless such Person is the registered holder of those CryptoGlobal Common Shares or HyperBlock Common Shares, as applicable, in respect of which such rights are sought to be exercised.

(b)      For greater certainty, in no case shall HyperBlock, CryptoGlobal or any other Person be required to recognize CryptoGlobal Dissenting Holders as holders of CryptoGlobal Common Shares in respect of which CryptoGlobal Dissent Rights have been validly exercised, or HyperBlock Dissenting Holders as holders of HyperBlock Common Shares in respect of which HyperBlock Dissent Rights have been validly exercised, after the completion of the transactions contemplated by Section 2.3(a) and Section 2.3(b), respectively, and the names of such CryptoGlobal Dissenting Holders and HyperBlock Dissenting Holders shall be removed from the registers of holders of CryptoGlobal Common Shares and HyperBlock Common Shares, as applicable. in respect of which CryptoGlobal Dissent Rights and HyperBlock Dissent Rights have been validly exercised at the same time as the event described in Section 2.3(a) or Section 2.3(b), as applicable, occurs.  In addition to any other restrictions under Section 185 of the OBCA, none of the following shall be entitled to exercise CryptoGlobal Dissent Rights or HyperBlock Dissent Rights: (i) holders of CryptoGlobal Options or HyperBlock Options; (ii) holders of CryptoGlobal Warrants; and (iii) CryptoGlobal Common Shareholders and HyperBlock Common Shareholders that vote or have instructed a proxyholder to vote such CryptoGlobal Shares or HyperBlock Shares, as applicable, in favour of the Arrangement Resolution (but only in respect of such CryptoGlobal Common Shares or HyperBlock Common Shares, as applicable).

**ARTICLE 4
CERTIFICATES AND PAYMENTS**

**4.1      Payment of Consideration.**

(a)      Prior to the filing of the Articles of Arrangement:

(i)      CryptoGlobal shall deposit, for the benefit of CryptoGlobal Dissenting Holders, cash with the Depositary in the aggregate amount equal to the payments in respect thereof required by Section 2.3(a) of this Plan of Arrangement (with the amount per CryptoGlobal Common Share being deemed to be $0.74 for this purpose), net of

EXHIBIT 5.(iii)
PAGE 28

applicable withholdings.  The cash deposited with the Depositary shall be held in an interest-bearing account, and any interest earned on such funds shall be for the account of HyperBlock.

(ii) HyperBlock shall deposit, for the benefit of HyperBlock Dissenting Holders, cash with the Depositary in the aggregate amount equal to the payments in respect thereof required by Section 2.3(b) of this Plan of Arrangement (with the amount per HyperBlock Common Share being deemed to be $1.75 for this purpose), net of applicable withholdings.  The cash deposited with the Depositary shall be held in an interest-bearing account, and any interest earned on such funds shall be for the account of HyperBlock.

(iii) HyperBlock shall deliver, or cause to be delivered, the HyperBlock Common Shares to the Depositary to satisfy the consideration issuable to the CryptoGlobal Shareholders pursuant to Section 2.3(c) of this Plan of Arrangement (for the avoidance of doubt, excluding CryptoGlobal Dissenting Holders).

(b) Upon surrender to the Depositary for cancellation of a certificate which immediately prior to the Effective Time represented outstanding CryptoGlobal Common Shares that were transferred pursuant to Section 2.3(b), together with a duly completed and executed Letter of Transmittal (and such additional documents and instruments as the Depositary may reasonably require), the CryptoGlobal Shareholder represented by such surrendered certificate shall be entitled to receive in exchange therefor, and the Depositary shall deliver to such CryptoGlobal Shareholder, a certificate representing the number of HyperBlock Common Shares which such CryptoGlobal Shareholder is entitled to receive under the Arrangement, which HyperBlock Common Shares will be registered in such CryptoGlobal Shareholder's name and either (i) delivered to the address as such CryptoGlobal Shareholder directed in its Letter of Transmittal or (ii) made available for pick-up at the offices of the Depositary, in either case, in accordance with the instructions of the CryptoGlobal Shareholder set out in the Letter of Transmittal, and any certificate representing CryptoGlobal Common Shares so surrendered shall forthwith thereafter be cancelled.

(c) Until surrendered as contemplated by this Section 4.1 of this Plan of Arrangement, each certificate that immediately prior to the Effective Time represented CryptoGlobal Common Shares or HyperBlock Common Shares (other than CryptoGlobal Common Shares and HyperBlock Common Shares in respect of which CryptoGlobal Dissent Rights or HyperBlock Dissent Rights, as applicable, have been validly exercised and not withdrawn), shall be deemed after the Effective Time to represent only the right to receive upon such surrender the consideration in lieu of such certificate as contemplated in this Section 4.1, less any amounts withheld pursuant to Section 4.3, if applicable.  Any such certificate formerly representing CryptoGlobal Common Shares not duly surrendered on or before the second anniversary of the Effective Date shall cease to represent a claim by or interest of any former holder of CryptoGlobal Common Shares of any kind or nature against CryptoGlobal, HyperBlock or Amalco.  On such date, all consideration to which such former holder was entitled pursuant to this Plan of Arrangement shall be deemed to have been surrendered to HyperBlock and shall be paid over by the Depositary to Amalco or as directed by Amalco.

(d) Any payment made by way of cheque by the Depositary pursuant to this Plan of Arrangement that has not been deposited, or has been returned to the Depositary or that otherwise remains unclaimed, in each case, on or before the second anniversary of the Effective Date, and any right or claim to payment hereunder that remains outstanding on the second anniversary of the Effective Date, shall cease to represent a right or claim of any kind or nature, and the right of the holder to receive the applicable consideration pursuant to this Plan of Arrangement shall terminate and be deemed to be surrendered and forfeited to HyperBlock for no consideration.

EXHIBIT 5.(iii)
PAGE 29

**4.2     Lost Certificates.**

In the event any certificate which immediately prior to the Effective Time represented one or more outstanding CryptoGlobal Common Shares that were transferred pursuant to Section 2.3 of this Plan of Arrangement shall have been lost, stolen or destroyed, upon the making of an affidavit of that fact by the Person claiming such certificate to be lost, stolen or destroyed, the Depositary will issue in exchange for such lost, stolen or destroyed certificate, the consideration that such CryptoGlobal Shareholder has the right to receive in accordance with Section 2.3 of this Plan of Arrangement and such CryptoGlobal Shareholder's Letter of Transmittal. When authorizing such exchange for any lost, stolen or destroyed certificate, the Person to whom such consideration is to be delivered shall, as a condition precedent to the delivery of such consideration, give a bond satisfactory to HyperBlock and the Depositary (each acting reasonably) in such sum as HyperBlock (acting reasonably) may direct, or otherwise indemnify HyperBlock and CryptoGlobal in a manner satisfactory to HyperBlock (acting reasonably) against any claim that may be made against HyperBlock and/or CryptoGlobal with respect to the certificate alleged to have been lost, stolen or destroyed.

**4.3     Withholding Rights.**

HyperBlock, CryptoGlobal or the Depositary shall be entitled to deduct and withhold from any amount payable to any Person under this Plan of Arrangement (including any amounts payable pursuant to Section 3.1), such amounts as HyperBlock, CryptoGlobal or the Depositary determines, acting reasonably, are required or permitted to be deducted and withheld with respect to such payment under the Tax Act, the Code or any provision of any other Laws. To the extent that amounts are so withheld, such withheld amounts shall be treated for all purposes hereof as having been paid to the Person in respect of which such withholding was made; provided, that such amounts are actually remitted to the appropriate Governmental Authority.

**4.4     No Encumbrances.**

Any exchange or transfer of securities pursuant to this Plan of Arrangement shall be free and clear of any Encumbrances or other claims of third Persons of any kind.

**ARTICLE 5
AMENDMENTS**

**5.1     Amendments to Plan of Arrangement.**

(a)     HyperBlock and CryptoGlobal, each acting reasonably, may amend, modify and/or supplement this Plan of Arrangement at any time and from time to time prior to the Effective Time; provided, that each such amendment, modification and/or supplement must: (i) be set out in writing; (ii) be approved by HyperBlock and CryptoGlobal (subject to the Arrangement Agreement), each acting reasonably; (iii) filed with the Court and, if made following the CryptoGlobal Meeting, approved by the Court; and (iv) communicated to holders of CryptoGlobal Common Shares if and as required by the Court.

(b)     Any amendment, modification or supplement to this Plan of Arrangement may be proposed by HyperBlock or CryptoGlobal at any time prior to the CryptoGlobal Meeting; provided, that HyperBlock or CryptoGlobal (subject to the Arrangement Agreement), as applicable, shall have consented thereto, with or without any other prior notice or communication, and if so proposed and accepted by the Persons voting at the CryptoGlobal Meeting (other than as may be required under the Interim Order), shall become part of this Plan of Arrangement for all purposes.

(c)     Any amendment, modification or supplement to this Plan of Arrangement that is approved or directed by the Court following the CryptoGlobal Meeting shall be effective only if: (i) it is consented to in writing by each of HyperBlock and CryptoGlobal, each acting reasonably; and (ii) if required by the Court, it is consented to by some or all of the CryptoGlobal Shareholders voting in the manner directed by the Court.

EXHIBIT 5.(iii)
PAGE 30

(d)     Any amendment, modification or supplement to this Plan of Arrangement may be made following the Effective Date unilaterally by HyperBlock; provided, that it concerns a matter which, in the reasonable opinion of HyperBlock, is of an administrative nature required to better give effect to the implementation of this Plan of Arrangement and is not adverse to the economic interest of any former CryptoGlobal Shareholder, or holders of CryptoGlobal Options or CryptoGlobal Warrants.

## ARTICLE 6
## FURTHER ASSURANCES

**6.1     Further Assurances.**

Notwithstanding that the transactions and events set out in this Plan of Arrangement shall occur and shall be deemed to occur in the order set out in this Plan of Arrangement without any further act or formality, each Party shall make, do and execute, or cause to be made, done and executed, all such further acts, deeds, agreements, transfers, assurances, instruments or documents as may reasonably be required by either Party in order further to document or evidence any of the transactions or events set out in this Plan of Arrangement.

EXHIBIT 5.(iii)
PAGE 31

IN THE MATTER OF AN APPLICATION UNDER SECTION 182 OF THE *BUSINESS CORPORATIONS ACT*
AND IN THE MATTER OF RULES 14.05(2) AND 14.05(3) OF THE *RULES OF CIVIL PROCEDURE*
AND IN THE MATTER OF A PROPOSED ARRANGEMENT INVOLVING CRYPTOGLOBAL CORP. AND HYPERBLOCK
TECHNOLOGIES CORP.

CRYPTOGLOBAL CORP.
Applicant

Court File No.  CV-18-597803-00CL

**RECEIVED**
COUNTER SERVICES #7
JUL 0 6 2018
Retail Offices Branch

**ONTARIO
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)**

PROCEEDING COMMENCED AT
TORONTO

**ORDER**

BENNETT JONES LLP
3400 One First Canadian Place
P.O. Box 130
Toronto ON M5X 1A4

Robert W. Staley (#27115J)
Telephone:  (416) 777-4857
Email:        staleyr@bennettjones.com

William A. Bortolin (#65426V)
Telephone:  (416) 777-6126
Email:        bortolinw@bennettjones.com

Fax: (416) 863-1716

Lawyers for the Applicant,
CryptoGlobal Corp.

EXHIBIT 5.(iii)
PAGE 32

# HYPERBLOCK INC.

## ARTICLES AND PLAN OF ARRANGEMENT

Summary of Changes made by the Arrangement

| Action Taken | Page No. in Plan of Arrangement | Corporate Information |
|---|---|---|
| Amalgamation | Pages 6 and 7 (Section 2.3(i)) | *Amalgamating Corporations:*<br><br>• HyperBlock Technologies Corp. (Ontario Corporation No. 2600603)<br><br>• CryptoGlobal Corp. (Ontario Corporation No. 2578157)<br><br>to form HYPERBLOCK INC. (referred to in the Plan of Arrangement as "Amalco")<br><br>*Registered Office Address:*<br>388 Carlaw Avenue, Suite 300, Toronto, Ontario, M4M 2T4<br><br>*Authorized Share Capital:*<br><br>• An unlimited number of common shares.<br><br>*Minimum/Maximum No. of Directors:*<br>Minimum: 1; Maximum: 10<br><br>*First Directors:*<br><br>Sean Walsh *(non-resident)*<br>388 Carlaw Avenue, Suite 300, Toronto, Ontario, M4M 2T4<br><br>Hon. Ronald R. Spoehel *(non-resident)*<br>388 Carlaw Avenue, Suite 300, Toronto, Ontario, M4M 2T4<br><br>Eric So *(resident)*<br>383 Carlaw Avenue, Suite 300, Toronto, Ontario, M4M 2T4 |

EXHIBIT 5.(iii)
PAGE 33

| Action Taken | Page No. in Plan of Arrangement | Corporate Information |
|---|---|---|
| | | Anthony Gaffney *(resident)*<br>388 Carlaw Avenue, Suite 300, Toronto, Ontario, M4M 2T4<br><br>Dayna Gibbs *(resident)*<br>388 Carlaw Avenue, Suite 300, Toronto, Ontario, M4M 2T4<br><br>Robert Segal *(resident)*<br>388 Carlaw Avenue, Suite 300, Toronto, Ontario, M4M 2T4<br><br>*Officers:*<br><br>Sean Walsh – *Chief Executive Officer*<br>388 Carlaw Avenue, Suite 300, Toronto, Ontario, M4M 2T4<br><br>Robert Segal – *President*<br>388 Carlaw Avenue, Suite 300, Toronto, Ontario, M4M 2T4<br><br>Chris McGarrigle – *Chief Information Officer*<br>388 Carlaw Avenue, Suite 300, Toronto, Ontario, M4M 2T4 |

EXHIBIT 5.(iii)
PAGE 34

**Schedule A**
**Share Provisions**

The rights, privileges, restrictions and conditions attaching to the common shares are as follows:

The Common Shares shall have attached thereto the following rights:

1.      to vote at any meeting of shareholders of the Corporation;

2.      to receive any dividend declared by the Corporation; and

3.      to receive the remaining property of the Corporation on dissolution.

1994712



Bennett Jones LLP
3400 One First Canadian Place, P.O. Box 130
Toronto, Ontario, M5X 1A4 Canada
T: 416.863.1200
F: 416.863.1716

EXHIBIT 5
PAGE 35

$500

**Nikki Christou**
Law Clerk, Corporate
Direct Line: 416.777.4682
e-mail: christoun@bennettjones.com
Our File No.: 79512.1

July 6, 2018

**HAND DELIVERED**

Ms. Wendy Crant
Ministry of Government Services
Companies and Personal Property Security Branch
393 University Avenue, Suite 200
Toronto, ON M5G 2M2



RECEIVED
COUNTER SERVICES #7
JUL 0 6 2018
Retail Offices Branch

Dear Wendy:

Re:     **HyperBlock Inc.**
        **- Arrangement**

21854714

Please find enclosed the following documents in connection with the above noted matter:

1.      Articles of Arrangement, in duplicate, for HyperBlock Inc. with respect to the **amalgamation of HyperBlock Technologies Corp. (OCN 2600603) and CryptoGlobal Corp. (OCN 2578157) to form HyperBlock Inc.;**

2.      a summary of the corporate changes authorized under the Plan of Arrangement; and

3.      NUANS Report.

We kindly request the filing be processed on **expedited service** with an effective date of **July 10, 2018**.

Thank you in advance for your kind assistance and timely attention to this matter. Should you have any questions or comments, feel free to contact us.

Yours truly,

**BENNETT JONES LLP**

Nikki Christou

/nc

PICK-UP CYBERBAHN
Attn: JOSIE ALEA

Encls.

WSLEGAL\079512\00001\20450528v1

EXHIBIT 6.
PAGE 1

| **From:** | Big Sky Mobile Catering |
| **Subject:** | FW: Assignment |
| **Attachments:** | (26) Consent Letter (with Payoff Letter and Assignment and Assumption) - Bonner Property Development.pdf |

**From:** Kristen Martin [mailto:ea@projectspokane.co]
**Sent:** Friday, December 07, 2018 1:46 PM
**To:** Dan Stivers <dan@projectspokane.co>; Jaymie Bowditch <jbowditch@boonekarlberg.com>; Big Sky Mobile Catering <bsmcorpmt@gmail.com>
**Subject:** Assignment

--
Kristen M. Martin
Executive Assistant to Sean M. Walsh
Mobile: 720.390.8023

EXHIBIT 6.
PAGE 2

**Project Spokane, LLC**
**5619 DTC Parkway, #475**
**Greenwood Village, CO 80111**


July **3** , 2018


Bonner Property Development, LLC
224 North Higgins Ave
Missoula, MT 59802

Re:     Consent to Assignment of Contract

To Whom It May Concern:

Reference is made to that certain Commercial Lease Agreement, dated March 1, 2016, as amended by that certain First Amendment, effective as of January 1, 2017, and that certain Second Amendment, dated July 13, 2017 (the "Contract"), by and between Project Spokane, LLC, a Colorado limited liability company ("Spokane"), and Bonner Property Development, LLC, a Montana limited liability company (herein referred to as "you").

Spokane hereby notifies you that it intends to engage in a transaction pursuant to which substantially all of the assets of Spokane will be acquired by Hyperblock LLC, a Delaware limited liability company (the "Transaction"). The closing of the Transaction (the "Closing") is currently anticipated to occur on or about July 6, 2018. The date on which the Closing actually occurs is herein referred to as the "Closing Date".

In connection with the Transaction, Spokane respectfully requests your consent to the assignment of the Contract. Such consent shall be conditioned on: (a) payment in full of the amounts set forth on the payoff letters attached hereto as Exhibit A and (b) delivery of an executed Assignment and Assumption agreement in the form attached hereto as Exhibit B.

Pending satisfaction of the above conditions, the assignment will be effective on the Closing Date, and, if the Closing does not occur, the assignment, shall not occur. By your execution hereof and subject to satisfaction of the above conditions, you hereby consent to the assignment of the Contract and the Transaction and agree that the assignment of the Contract and Transaction shall not constitute a default under the Contract and that you shall not terminate the Contract as a result of or in response to the assignment of the Contract and Transaction. You further agree that pending satisfaction of such conditions the Contract shall continue in full force and effect and that Hyperblock LLC shall enjoy the same rights and benefits following the Transaction as Spokane enjoyed prior to the consummation of the Transaction. Spokane shall remain liable for all obligations under the Contract first arising on or prior to the Closing and obligations arising after the Closing Date to the extent they relate to any breaches of the Contract by Spokane on or prior to the Closing and Hyperblock shall be responsible for and assume only responsibility for those obligations that first arise post-Closing.

As you might imagine, the potential Transaction is extremely confidential, and a premature release of information about the Transaction could have an adverse effect on Spokane. We would

therefore greatly appreciate you not discussing the Transaction or this request with anyone other than the undersigned.

Please acknowledge your consent and agreement to the terms of this letter agreement by signing the duplicate copy of this letter in the signature blank below and return it to me in an envelope at your earliest convenience. We would appreciate it if you would return the signed consent no later than July 3, 2018.

If you have any questions regarding this request, please contact Kristen Martin at (720) 390-8023 or ea@projectspokane.co. We appreciate your assistance and cooperation in this matter.

Sincerely,

Project Spokane, LLC

By: PS Mgt LLC, its manager

Sean Walsh
Manager

**The undersigned hereby agrees to the foregoing this 3rd day of July, 2018.**

Bonner Property Development, LLC

By: _____
Name: Stephen K Nelson
Title: Member Manager

By: _____
Name: Michael D Boehme
Title: Member Manager

EXHIBIT 6.
PAGE 4

**Exhibit A**

**Payoff Letters**

Please see attached.

## CERTIFICATE OF SERVICE

I, Quentin M. Rhoades, hereby certify that I have served true and accurate copies of the foregoing Affidavit - Affidavit in Support to the following on 06-01-2020:

Project Spokane, LLC (Defendant)
365-B Clinton Street
Costa Meas 92626
Service Method: Email

Sean Walsh (Defendant)
365-B Clinton Street
Costa Mesa 92626
Service Method: Email

Electronically Signed By: Quentin M. Rhoades
Dated: 06-01-2020