FILED
06/01/2020
*Shirley Faust*
: CLERK
Missoula County District Court
STATE OF MONTANA
By: Latishia Atkins
DV-32-2020-0000604-OC
Deschamps, Robert L III
7.2

EXHIBIT 2
PAGE 5

Assignment and the terms of the Note, the terms of this Assignment shall prevail insofar as the Lease is concerned, but the terms of the Note shall prevail in all other respects.

**15.** **Counterparts**. This Assignment may be executed in any number of counterparts with the same effect as if all parties hereto had signed the same document. All such counterparts shall be construed together and shall constitute one instrument.

**16.** **No Third Party Beneficiaries**. It is expressly agreed by the parties hereto that this Assignment shall not be construed or deemed made for the benefit of any third party or parties.

**17.** **Entire Agreement**. This Assignment and the Note contain the entire agreement concerning the assignment of the Lease between the parties hereto. No variations, modifications or changes herein or hereof shall be binding upon any party hereto, unless set forth in a document duly executed by both parties.

IN WITNESS WHEREOF, the parties hereto have executed this Assignment as of the date first written above.

**ASSIGNOR:**

Hyperblock, LLC

By: _Inder Sarmi_
Title: _Interim CFO_

**ASSIGNEE:**

PROJECT SPOKANE, LLC
    By: PS Mgt LLC, its Manager

By: _____
        Sean Walsh, Manager

Exhibit G (3 of 3)

EXHIBIT 21.
PAGE 6

## LESSOR'S CONSENT

The undersigned, being the Lessor under the Lease described above, does hereby consent to the terms and conditions of the foregoing Assignment. Further, Lessor covenants to Assignee that Lessor shall give notice to Assignee as specified in Section 8, above, and Assignee, at its option, shall have the right to correct any condition or to cure any default. Nothing in this instrument shall relieve Assignor of its obligations under the Lease. This Consent is given as of the date first written above.

**LESSOR:**

Bonner Property Development, LLC

By: _____
Stephen Nelson, Co-Manager

By: _____
Michael Boehme, Co-Manager

EXHIBIT 22
PAGE 1

**Exhibit 22**    *[Dec. #26]* Emails between Bowditch, Walsh, Nelson, Bjornson, regarding Collateral Assignment

   (i)     Email from Bowditch to Bjornson on 01/31/2019 at 5:57 PM, regarding BPD's rights on default;

   (ii)    Emails between Bjornson and Bowditch on 01/31/2019 at 9:11-9:25 PM RE priority of BPD's interests

   (iii)   Email from Bowditch to Bjornson on 02/01/2019 at 11:10 AM regarding changes to Collateral Assignment with attached revised Collateral Assignment;

   (iv)    Email from Bowditch to Bjornson 02/07/2019 at 6:38 PM with Collateral Assignment executed by HyperBlock and Project Spokane and requesting Nelson execute on behalf of BPD

   (v)     Email from Bowditch to Bjornson 02/20/2019 at 12:36 PM regarding advising Walsh on status of Collateral Assignment

EXHIBIT 22
PAGE 2

Collateral Assignment of Lease
(00663112-4).docx

22(i)

**From:** Jaymie Bowditch <jbowditch@boonekarlberg.com>
**Sent:** Thursday, January 31, 2019 5:57 PM
**To:** David Bjornson <david@bjornsonlaw.com>
**Cc:** Sean Walsh <sean@redwoodcityventures.com>; Kristen Martin <ea@projectspokane.co>; Jill Broughton <jill@bjornsonlaw.com>
**Subject:** RE: Collateral Assignment of Lease

David,

1. I agree with you.  Section 8 really is a notice for default that may result in a termination but is poorly worded.  I have changed the language.  Let me know if the changes I make to Section 8 work for you and BPD.

2. I agree that in the event of a default and termination of the Lease PS's right to any rents from subtenants would be subject to BPD's rights because the lease would be terminated and PS would have no such rights.  However, if the only default of Hyperblock is under the Note, PS would have the right to step in as tenant and, if it did, would have the right to those rents that would be superior to BPD (because the lease remains in effect).  I have made some changes to Section 1.  Please let me know if this addresses any concerns you have.

Please take a look at let me know if this works.

Thanks David.

-- Jaymie

**James A. Bowditch**
**President**
Boone Karlberg P.C.
201 West Main St., Suite 300
PO Box 9199
Missoula, MT 59807-9199
Phone: 406.543.6646

EXHIBIT 22
PAGE 3

## COLLATERAL ASSIGNMENT OF LEASE

THIS COLLATERAL ASSIGNMENT OF LEASE (this "Assignment") dated as of **January ____, 2019**, is entered into by and between Hyperblock LLC, a Delaware limited liability company (the "Assignor"), and Project Spokane, LLC, a Colorado limited liability company (the "Assignee").

### Recitals

A.      Effective March 1, 2016, Bonner Property Development, LLC ("Lessor") and Assignee entered into that certain Commercial Lease Agreement, as amended (the "Lease"), for certain real property located in the Bonner Mill Site in Bonner, Montana as further described in the Lease (the "Subject Property").

B.      The Lease was assigned to and assumed by Assignor pursuant to that certain Assignment, Assumption and Amendment of Lease executed effective July 10, 2018 executed in conjunction with Assignor's acquisition of substantially all of the assets of Assignee pursuant to an Asset Purchase Agreement between Assignor as buyer and Assignee as seller (the "Purchase Agreement").

C.      Pursuant to the terms of the Purchase Agreement as subsequently modified by a Secured Promissory Note (the "Note"), dated as of _____, 2018, executed by Assignor and Hyperblock Inc, an Ontario company that is the parent of Assignor (the "Parent") in conjunction herewith, Assignor and Parent are indebted to Assignee in the amount of $5,000,000 CAD.

D.      The Note is secured by those certain Security Agreements dated as of _____, 2019, by and between Assignor and Assignee (the "Assignor Security Agreement") and by and between the Parent and the Assignee (the "Parent Security Agreement"). The Assignor Security Agreement, the Parent Security Agreement and the Note are collectively referred to herein as the "Note Documents".

E.      To further secure the Note, Assignor has agreed to assign to Assignee, and Assignee has agreed to take from Assignor, an assignment of the Lease for collateral purposes, on the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the premises and in order to induce Assignee to extend accommodations to Assignor and Parent as evidenced by the Note, Assignor hereby agrees with the Assignee for the benefit of Assignee as follows:

1.      **Assignment**. Assignor, in consideration of the Note and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, does hereby absolutely and unconditionally grant, convey, assign, transfer and set over unto Assignee all rights, interests and estates of Assignor in, to and under the Lease, together with all renewals and extensions of the Lease and other agreements and all other leases or agreements that may hereafter be entered into which cover all or any portion of the Subject Property and together with all of Assignor's rights to collect and receive any rents and charges that it may receive from approved users, operators, sublessees and permitees (the "Rents"). This <u>assignment is for the purpose of securing payment and performance of Assignor under the Note Documents. Assignee, by acceptance hereof, agrees not to take any action to assert its rights to possession of the Subject Property or</u> Assignor's rights to collect and receive the Rents unless and until there shall exist or occur an Event of Default (as defined in the Note).

2. **Representations and Warranties of Assignor**. Assignor hereby represents and warrants to Assignee that:

      **a.**      Assignor has the right to assign the Lease and the Rents hereby assigned and no other person or entity has any right, title or interest therein;

      **b.**      Assignor has performed and will duly and punctually perform all of the material terms, covenants, conditions and warranties of the Lease;

      **c.**      Assignor has not at any time prior to the date hereof exercised any right to subordinate any Lease to any deed of trust or mortgage or any other encumbrance of any kind;

      **d.**      Assignor has not executed any prior assignments of the Lease or the Rents;

      **e.**      Assignor has performed no act or executed any other instrument which might prevent Assignee from enjoying and exercising any of its rights and privileges evidenced hereby;

      **f.**      The Lease is valid and subsisting and in full force and effect and unmodified; and

      **g.**      There are no defaults now existing under the Lease and no event has occurred which with the passage of time or the giving of notice, or both, would constitute such a default.

3. **Limitation of Assignee's Liability**.  Assignee shall not be obligated to perform or discharge any obligation, duty or liability under the Lease by reason of this Assignment or the exercise of rights or remedies hereunder.  Assignor shall and does hereby agree to indemnify, defend and hold Assignee harmless from and against any and all liability, loss or damage incurred under the Lease by reason of this Assignment or the exercise of rights or remedies hereunder, and from any and all claims and demands whatsoever that may be asserted against Assignee by reason of any alleged obligations or undertakings on its part to perform or discharge any of the terms, covenants or agreements contained in the Lease, other than claims and demands that arise in connection with the gross negligence or willful misconduct of the Assignee.  Should Assignee incur any such liability under the Lease by reason of this Assignment or the exercise of rights or remedies hereunder, or in defense of any such claims or demands, the amount thereof, including reasonable and documented out-of-pocket costs, expenses and attorney fees, shall be secured hereby and Assignor shall reimburse Assignee therefor promptly upon written demand, failing which Assignee may, at its option, declare all indebtedness secured hereby and by the Note Documents to be immediately due and payable.  This Assignment shall not operate to place responsibility upon Assignee for the control, care, management or repair of the Subject Property, nor for the carrying out of any of the terms and conditions of the Lease; nor shall it operate to make Assignee responsible or liable for any waste committed on the Subject Property or for any dangerous or defective condition of the Subject Property, or for any negligence in the management, upkeep, repair, or control of the Subject Property resulting in loss or injury or death to any tenant, licensee, employee, or stranger.

4. **Assignee's Remedies**. This Assignment is primary in nature to the obligation evidenced and secured by the Note.  Assignor agrees that Assignee may enforce this Assignment without first resorting to or exhausting any other security or collateral; provided, however, that nothing herein contained shall prevent Assignee from suing on the Note or exercising any other right under any document securing the payment of the Note.

5. **No Waiver**.  Nothing contained herein and no act done or omitted by Assignee pursuant to the powers and rights granted hereunder shall be deemed to be a waiver by Assignee of its rights and remedies under the Note or a waiver or curing of any default hereunder or under the Note, and this Assignment is made and accepted without prejudice to any of the rights and remedies possessed by Assignee under the terms of the Note. The right of Assignee to collect the interest and indebtedness

evidenced by the Note and to enforce any other security therefor held by it may be exercised by Assignee either prior to, simultaneously with, or subsequent to any action taken by it hereunder.

6. **Term of Assignment**.  If the Note and all other indebtedness secured hereby are paid as the same become due and payable and if all of the covenants, warranties, undertakings and agreements made in the Note and in this Assignment are kept and performed, this Assignment shall become null and void and of no further force and effect but the affidavit, certificate, letter or statement of any officer, agent or attorney of Assignee showing any portion of the Note or such other indebtedness to remain unpaid or any of such covenants, warranties, undertakings and agreements not to be kept or performed shall be and constitute conclusive evidence of the validity, effectiveness and continuing force of this Assignment and any person may, and is hereby authorized to, rely thereon.

7. **Survival; Attornment**.  Upon fourteen (14) days' notice from Assignee to Lessor of the occurrence and continuation of any Events of Default (as that term is defined in the Note) under the Note, then Lessor, Assignor and Assignee do hereby agree that the Lease and all terms, provisions, covenants and agreements thereof shall survive the occurrence and continuation of any such Events of Default, and the Lease shall remain in full force and effect, in accordance with and subject to all of its terms, provisions, agreements and covenants as a direct lease between Lessor (as lessor) and Assignee or any assignee of Assignee (as tenant).  Lessor shall, in such event, exercise and undertake all of the rights and obligations of the lessor in and under the Lease and Assignee or such assignee, as lessee, shall keep, observe and perform as to Lessor all of the terms, covenants and conditions to be kept by the lessee pursuant to the Lease, and Lessor shall have the same remedies for nonperformance or default of any agreement or term of the Lease as it would had or would have had as lessor under the Lease if no such Event of Default had occurred and was continuing. Such notices to Landlord shall be given to Landlord in the manner provided in the Lease at the following address:

> Bonner Property Development, LLC
> 224 N. Higgins Avenue
> Missoula, Montana  59802

or at such other address as Lessor shall provide Assignee in writing in the same manner.

8. **Notice of Default**.  For and so long as any obligations remain outstanding under any Note Document, Lessor agrees that, prior to terminating the Lease or taking any proceedings to enforce any such termination thereof for any reason other than the expiration of the term of the Lease, Lessor shall give Assignee, at the same time it gives Assignor notice thereof, prior notice in writing of any default under the Lease, specifying the reason for such default.  Such notice shall be given to Assignee in the same manner provided in the Lease at the following address:

> for Holder:   Project Spokane, LLC
>        5619 DTC Parkway #475
>        Greenwood Village, Colorado 80111
>        Attn:  Sean Walsh
>        Email:  sean@redwoodcityventures.com
>
> with a copy to:  Boone Karlberg P.C.
>        201 West Main St., Suite 300
>        PO Box 9199
>        Missoula, MT 59807-9199
>        Attn:  James A. Bowditch
>        Email: jbowditch@boonekarlberg.com

or at such other address as Assignee shall provide Lessor in writing in the same manner.

9. **Additional Rights of Assignee**.

   **a.**   Assignee may take or release other security for the payment of the Note and other indebtedness secured by the Note, may release any party primarily or secondarily liable therefor and may apply any other security held by it to the satisfaction of the Note and such other indebtedness without prejudice to any of its rights under this Assignment.

   **b.**   Assignee may at any time and from time to time in writing: (i) waive compliance by Assignor with any covenant herein made by Assignor to the extent and in the manner specified in such writing; (ii) consent to Assignor doing any act that hereunder Assignor is prohibited from doing, or consent to Assignor failing to do any act which hereunder Assignor is required to do, to the extent and in the manner specified in such writing; or (iii) release any portion of the Subject Property and/or the Lease, or any interest therein, from this Assignment. No such act shall in any way impair the rights of Assignee hereunder except to the extent specifically agreed to by Assignee in such writing.

   **c.**   The rights and remedies of Assignee hereunder shall not be impaired by any indulgence, including, but not limited to, (i) any renewal, extension, or modification that Assignee may grant with respect to any indebtedness secured hereby; (ii) any surrender, compromise, release, renewal, extension, exchange, or substitution that Assignee may grant in respect of any item of the Subject Property and/or the Lease or any part thereof or any interest therein; or (iii) any release or indulgence granted to any endorser, guarantor or surety of any indebtedness secured hereby.

   10. **Severability**.  A determination that any provision of this Assignment is unenforceable or invalid shall not affect the enforceability or validity of any other provision and any determination that the application of any provision of this Assignment to any person or circumstance is illegal or unenforceable shall not affect the enforceability or validity of such provision as it may apply to any other persons or circumstances.

   11. **No Merger**.  Notwithstanding (a) the fact that any Lease or the leasehold estate created thereby may be held, directly or indirectly, by or for the account of any person or entity that shall have an interest in the fee estate of the Subject Property; (b) the operation of law; or (c) any other event, the lessee's leasehold estate under such Lease shall not merge into the fee estate and the lessee shall remain obligated under such Lease as assigned by this Assignment.

   12. **Binding**.  The terms, provisions, representations, and warranties herein contained shall inure to the benefit of, and bind, the parties hereto and their respective heirs, representatives, successors and assigns, all Lessor approved subtenants and assigns of this Lease, and subsequent holders of the Note. All references in this Assignment to Assignor or Assignee shall be deemed to include all such heirs, representatives, successors and assigns of such respective party.

   13. **Additional Documentation**.  Assignor agrees to and shall promptly execute or cause to be executed and deliver to Assignee a specific assignment of each and every lease hereafter executed and covering all or a portion of the Subject Property, such specific assignment to be in the form of this Assignment.

   14. **Construction**.  Within this Assignment, words of any gender shall be held and construed to include any other gender, and words in the singular number shall be held and construed to include the plural, unless the context otherwise requires. The provisions of this Assignment are intended to supplement the provisions contained in the Note. In the event of any conflict between the terms of this

Assignment and the terms of the Note, the terms of this Assignment shall prevail insofar as the Lease is concerned, but the terms of the Note shall prevail in all other respects.

**15.** **Counterparts**.  This Assignment may be executed in any number of counterparts with the same effect as if all parties hereto had signed the same document. All such counterparts shall be construed together and shall constitute one instrument.

**16.** **No Third Party Beneficiaries**.  It is expressly agreed by the parties hereto that this Assignment shall not be construed or deemed made for the benefit of any third party or parties.

**17.** **Entire Agreement**.  This Assignment and the Note contain the entire agreement concerning the assignment of the Lease between the parties hereto. No variations, modifications or changes herein or hereof shall be binding upon any party hereto, unless set forth in a document duly executed by both parties.

IN WITNESS WHEREOF, the parties hereto have executed this Assignment as of the date first written above.

**ASSIGNOR:**

Hyperblock, LLC

By: _____
Title: _____



**ASSIGNEE:**

Project Spokane, LLC

By: _____
Title: _____

EXHIBIT 22
PAGE 8

## <u>LESSOR'S CONSENT</u>

The undersigned, being the Lessor under the Lease described above, does hereby consent to the terms and conditions of the foregoing Assignment. Further, Lessor covenants to Assignee that Lessor shall give notice to Assignee as specified in Section 8, above, and Assignee, at its option, shall have the right to correct any condition or to cure any default.  Nothing in this instrument shall relieve Assignor of its obligations under the Lease.  This Consent is given as of the date first written above.

**LESSOR:**

Bonner Property Development, LLC


By: _____
Stephen Nelson, Co-Manager


By: _____
Michael Boehme, Co-Manager

EXHIBIT 22
PAGE 9

22(ii)

-----Original Message-----
From: Jaymie Bowditch
Sent: Thursday, January 31, 2019 9:25 PM
To: David Bjornson
Cc: Sean Walsh ; Kristen Martin ; Jill Broughton
Subject: Re: Collateral Assignment of Lease

David,

Maybe we should chat. But why would a lessor have a right to sub-rents prior to a lease termination? Until termination the tenant is still in lawful possession of the property with the right to cure the default.

James A. Bowditch

EXHIBIT 22
PAGE 10

Boone Karlberg P.C.

Sent from my Pixel 2

On Thu, Jan 31, 2019 at 9:11 PM -0700, "David Bjornson" > wrote:

Jaymie –

22(ii)   I will review this, but in the meantime, let me clarify the issue about priority. I was concerned about a situation where there is a default under the Lease, but the Lease is not terminated. Whether or not PS steps into the lease as tenant, BPD should have priority to the rents and other revenues during those times and until PS steps in and cures, e.g. I hope I am not missing something on this train of thought. It happens.

Please consider this and reply before I review the attached. Thank you. David
_____
David H. Bjornson

Bjornson Jones Mungas, PLLC
2809 Great Northern Loop, Suite 100
Missoula, Montana 59808
(406) 721-8896
(406) 541-8037--fax
http://www.bjornsonlaw.com/attorneys/david-h-bjornson/
Email: david@bjornsonlaw.com
CONFIDENTIALITY NOTICE: The information contained in this email message may be privileged or confidential information and is intended only for the use of the individual or entity named above. If you have received this communication in error, please notify us immediately by telephone and delete the message from your system.

Exhibit
22(iii)

EXHIBIT 22
PAGE 11

Collateral Assignment of Lease (00663112-4).docx

**From:** Jaymie Bowditch <jbowditch@boonekarlberg.com>
**Sent:** Friday, February 01, 2019 11:10 AM
**To:** David Bjornson <david@bjornsonlaw.com>
**Subject:** RE: Collateral Assignment of Lease

David,

Thanks for the chat today.  Take a look at my changes to Section 1 – specifically the last sentence I just added – to see if that will work.

As reminder I also made some changes to Section 8 yesterday to clarify things.

-- Jaymie

EXHIBIT 22
PAGE 12

Attachment to 22(iii)

# COLLATERAL ASSIGNMENT OF LEASE

THIS COLLATERAL ASSIGNMENT OF LEASE (this "Assignment") dated as of **January ____, 2019**, is entered into by and between Hyperblock LLC, a Delaware limited liability company (the "Assignor"), and Project Spokane, LLC, a Colorado limited liability company (the "Assignee").

## Recitals

A.      Effective March 1, 2016, Bonner Property Development, LLC ("Lessor") and Assignee entered into that certain Commercial Lease Agreement, as amended (the "Lease"), for certain real property located in the Bonner Mill Site in Bonner, Montana as further described in the Lease (the "Subject Property").

B.      The Lease was assigned to and assumed by Assignor pursuant to that certain Assignment, Assumption and Amendment of Lease executed effective July 10, 2018 executed in conjunction with Assignor's acquisition of substantially all of the assets of Assignee pursuant to an Asset Purchase Agreement between Assignor as buyer and Assignee as seller (the "Purchase Agreement").

C.      Pursuant to the terms of the Purchase Agreement as subsequently modified by a Secured Promissory Note (the "Note"), dated as of _____, 2018, executed by Assignor and Hyperblock Inc, an Ontario company that is the parent of Assignor (the "Parent") in conjunction herewith, Assignor and Parent are indebted to Assignee in the amount of $5,000,000 CAD.

D.      The Note is secured by those certain Security Agreements dated as of _____, 2019, by and between Assignor and Assignee (the "Assignor Security Agreement") and by and between the Parent and the Assignee (the "Parent Security Agreement").  The Assignor Security Agreement, the Parent Security Agreement and the Note are collectively referred to herein as the "Note Documents".

E.      To further secure the Note, Assignor has agreed to assign to Assignee, and Assignee has agreed to take from Assignor, an assignment of the Lease for collateral purposes, on the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the premises and in order to induce Assignee to extend accommodations to Assignor and Parent as evidenced by the Note, Assignor hereby agrees with the Assignee for the benefit of Assignee as follows:

1.      **Assignment**.  Assignor, in consideration of the Note and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, does hereby absolutely and unconditionally grant, convey, assign, transfer and set over unto Assignee all rights, interests and estates of Assignor in, to and under the Lease, together with all renewals and extensions of the Lease and other agreements and all other leases or agreements that may hereafter be entered into which cover all or any portion of the Subject Property and together with all of Assignor's rights to collect and receive any rents and charges that it may receive from approved users, operators, sublessees and permitees (the "Rents"). This underline assignment is for the purpose of securing payment and performance of Assignor under the Note Documents.  Assignee, by acceptance hereof, agrees not to take any action to assert its rights to possession of the Subject Property or underline Assignor's rights to collect and receive the Rents unless and until there shall exist or occur an Event of Default (as defined in the Note).  Assignee acknowledges and agrees that Assignee's rights to the Rents upon an Event of Default under the Note underline and a default under the Lease shall be subject and subordinate to the rights of Lessor to said Rents, if any .

EXHIBIT 22
PAGE 13

2.   **Representations and Warranties of Assignor**. Assignor hereby represents and warrants to Assignee that:

a.   Assignor has the right to assign the Lease and the Rents hereby assigned and no other person or entity has any right, title or interest therein;

b.   Assignor has performed and will duly and punctually perform all of the material terms, covenants, conditions and warranties of the Lease;

c.   Assignor has not at any time prior to the date hereof exercised any right to subordinate any Lease to any deed of trust or mortgage or any other encumbrance of any kind;

d.   Assignor has not executed any prior assignments of the Lease or the Rents;

e.   Assignor has performed no act or executed any other instrument which might prevent Assignee from enjoying and exercising any of its rights and privileges evidenced hereby;

f.   The Lease is valid and subsisting and in full force and effect and unmodified; and

g.   There are no defaults now existing under the Lease and no event has occurred which with the passage of time or the giving of notice, or both, would constitute such a default.

3.   **Limitation of Assignee's Liability**.  Assignee shall not be obligated to perform or discharge any obligation, duty or liability under the Lease by reason of this Assignment or the exercise of rights or remedies hereunder.  Assignor shall and does hereby agree to indemnify, defend and hold Assignee harmless from and against any and all liability, loss or damage incurred under the Lease by reason of this Assignment or the exercise of rights or remedies hereunder, and from any and all claims and demands whatsoever that may be asserted against Assignee by reason of any alleged obligations or undertakings on its part to perform or discharge any of the terms, covenants or agreements contained in the Lease, other than claims and demands that arise in connection with the gross negligence or willful misconduct of the Assignee.  Should Assignee incur any such liability under the Lease by reason of this Assignment or the exercise of rights or remedies hereunder, or in defense of any such claims or demands, the amount thereof, including reasonable and documented out-of-pocket costs, expenses and attorney fees, shall be secured hereby and Assignor shall reimburse Assignee therefor promptly upon written demand, failing which Assignee may, at its option, declare all indebtedness secured hereby and by the Note Documents to be immediately due and payable.  This Assignment shall not operate to place responsibility upon Assignee for the control, care, management or repair of the Subject Property, nor for the carrying out of any of the terms and conditions of the Lease; nor shall it operate to make Assignee responsible or liable for any waste committed on the Subject Property or for any dangerous or defective condition of the Subject Property, or for any negligence in the management, upkeep, repair, or control of the Subject Property resulting in loss or injury or death to any tenant, licensee, employee, or stranger.

4.   **Assignee's Remedies**. This Assignment is primary in nature to the obligation evidenced and secured by the Note.  Assignor agrees that Assignee may enforce this Assignment without first resorting to or exhausting any other security or collateral; provided, however, that nothing herein contained shall prevent Assignee from suing on the Note or exercising any other right under any document securing the payment of the Note.

5.   **No Waiver**.  Nothing contained herein and no act done or omitted by Assignee pursuant to the powers and rights granted hereunder shall be deemed to be a waiver by Assignee of its rights and remedies under the Note or a waiver or curing of any default hereunder or under the Note, and this Assignment is made and accepted without prejudice to any of the rights and remedies possessed by Assignee under the terms of the Note. The right of Assignee to collect the interest and indebtedness

EXHIBIT 22
PAGE 14

evidenced by the Note and to enforce any other security therefor held by it may be exercised by Assignee either prior to, simultaneously with, or subsequent to any action taken by it hereunder.

6.   **Term of Assignment**.  If the Note and all other indebtedness secured hereby are paid as the same become due and payable and if all of the covenants, warranties, undertakings and agreements made in the Note and in this Assignment are kept and performed, this Assignment shall become null and void and of no further force and effect but the affidavit, certificate, letter or statement of any officer, agent or attorney of Assignee showing any portion of the Note or such other indebtedness to remain unpaid or any of such covenants, warranties, undertakings and agreements not to be kept or performed shall be and constitute conclusive evidence of the validity, effectiveness and continuing force of this Assignment and any person may, and is hereby authorized to, rely thereon.

7.   **Survival; Attornment**.  Upon fourteen (14) days' notice from Assignee to Lessor of the occurrence and continuation of any Events of Default (as that term is defined in the Note) under the Note, then Lessor, Assignor and Assignee do hereby agree that the Lease and all terms, provisions, covenants and agreements thereof shall survive the occurrence and continuation of any such Events of Default, and the Lease shall remain in full force and effect, in accordance with and subject to all of its terms, provisions, agreements and covenants as a direct lease between Lessor (as lessor) and Assignee or any assignee of Assignee (as tenant).  Lessor shall, in such event, exercise and undertake all of the rights and obligations of the lessor in and under the Lease and Assignee or such assignee, as lessee, shall keep, observe and perform as to Lessor all of the terms, covenants and conditions to be kept by the lessee pursuant to the Lease, and Lessor shall have the same remedies for nonperformance or default of any agreement or term of the Lease as it would had or would have had as lessor under the Lease if no such Event of Default had occurred and was continuing. Such notices to Landlord shall be given to Landlord in the manner provided in the Lease at the following address:

> Bonner Property Development, LLC
> 224 N. Higgins Avenue
> Missoula, Montana  59802

or at such other address as Lessor shall provide Assignee in writing in the same manner.

8.   **Notice of Default**.  For and so long as any obligations remain outstanding under any Note Document, Lessor agrees that, prior to terminating the Lease or taking any proceedings to enforce any such termination thereof for any reason other than the expiration of the term of the Lease, Lessor shall give Assignee, at the same time it gives Assignor notice thereof, prior notice in writing of any default under the Lease, specifying the reason for such default.  Such notice shall be given to Assignee in the same manner provided in the Lease at the following address:

> for Holder:            Project Spokane, LLC
>                        5619 DTC Parkway #475
>                        Greenwood Village, Colorado 80111
>                        Attn:  Sean Walsh
>                        Email:  sean@redwoodcityventures.com
>
> with a copy to:        Boone Karlberg P.C.
>                        201 West Main St., Suite 300
>                        PO Box 9199
>                        Missoula, MT 59807-9199
>                        Attn:  James A. Bowditch
>                        Email: jbowditch@boonekarlberg.com

or at such other address as Assignee shall provide Lessor in writing in the same manner.

9. **Additional Rights of Assignee**.

    **a.**    Assignee may take or release other security for the payment of the Note and other indebtedness secured by the Note, may release any party primarily or secondarily liable therefor and may apply any other security held by it to the satisfaction of the Note and such other indebtedness without prejudice to any of its rights under this Assignment.

    **b.**    Assignee may at any time and from time to time in writing: (i) waive compliance by Assignor with any covenant herein made by Assignor to the extent and in the manner specified in such writing; (ii) consent to Assignor doing any act that hereunder Assignor is prohibited from doing, or consent to Assignor failing to do any act which hereunder Assignor is required to do, to the extent and in the manner specified in such writing; or (iii) release any portion of the Subject Property and/or the Lease, or any interest therein, from this Assignment. No such act shall in any way impair the rights of Assignee hereunder except to the extent specifically agreed to by Assignee in such writing.

    **c.**    The rights and remedies of Assignee hereunder shall not be impaired by any indulgence, including, but not limited to, (i) any renewal, extension, or modification that Assignee may grant with respect to any indebtedness secured hereby; (ii) any surrender, compromise, release, renewal, extension, exchange, or substitution that Assignee may grant in respect of any item of the Subject Property and/or the Lease or any part thereof or any interest therein; or (iii) any release or indulgence granted to any endorser, guarantor or surety of any indebtedness secured hereby.

10. **Severability**.  A determination that any provision of this Assignment is unenforceable or invalid shall not affect the enforceability or validity of any other provision and any determination that the application of any provision of this Assignment to any person or circumstance is illegal or unenforceable shall not affect the enforceability or validity of such provision as it may apply to any other persons or circumstances.

11. **No Merger**.  Notwithstanding (a) the fact that any Lease or the leasehold estate created thereby may be held, directly or indirectly, by or for the account of any person or entity that shall have an interest in the fee estate of the Subject Property; (b) the operation of law; or (c) any other event, the lessee's leasehold estate under such Lease shall not merge into the fee estate and the lessee shall remain obligated under such Lease as assigned by this Assignment.

12. **Binding**.  The terms, provisions, representations, and warranties herein contained shall inure to the benefit of, and bind, the parties hereto and their respective heirs, representatives, successors and assigns, all Lessor approved subtenants and assigns of this Lease, and subsequent holders of the Note. All references in this Assignment to Assignor or Assignee shall be deemed to include all such heirs, representatives, successors and assigns of such respective party.

13. **Additional Documentation**.  Assignor agrees to and shall promptly execute or cause to be executed and deliver to Assignee a specific assignment of each and every lease hereafter executed and covering all or a portion of the Subject Property, such specific assignment to be in the form of this Assignment.

14. **Construction**.  Within this Assignment, words of any gender shall be held and construed to include any other gender, and words in the singular number shall be held and construed to include the plural, unless the context otherwise requires. The provisions of this Assignment are intended to supplement the provisions contained in the Note. In the event of any conflict between the terms of this

Assignment and the terms of the Note, the terms of this Assignment shall prevail insofar as the Lease is concerned, but the terms of the Note shall prevail in all other respects.

      **15.**    **Counterparts**.  This Assignment may be executed in any number of counterparts with the same effect as if all parties hereto had signed the same document. All such counterparts shall be construed together and shall constitute one instrument.

      **16.**    **No Third Party Beneficiaries**.  It is expressly agreed by the parties hereto that this Assignment shall not be construed or deemed made for the benefit of any third party or parties.

      **17.**    **Entire Agreement**.  This Assignment and the Note contain the entire agreement concerning the assignment of the Lease between the parties hereto. No variations, modifications or changes herein or hereof shall be binding upon any party hereto, unless set forth in a document duly executed by both parties.

      IN WITNESS WHEREOF, the parties hereto have executed this Assignment as of the date first written above.

**ASSIGNOR:**

Hyperblock, LLC

By: _____
Title: _____



**ASSIGNEE:**

Project Spokane, LLC

By: _____
Title: _____

EXHIBIT 22
PAGE 17

## <u>LESSOR'S CONSENT</u>

The undersigned, being the Lessor under the Lease described above, does hereby consent to the terms and conditions of the foregoing Assignment. Further, Lessor covenants to Assignee that Lessor shall give notice to Assignee as specified in Section 8, above, and Assignee, at its option, shall have the right to correct any condition or to cure any default.  Nothing in this instrument shall relieve Assignor of its obligations under the Lease.  This Consent is given as of the date first written above.

**LESSOR:**

Bonner Property Development, LLC


By: _____
Stephen Nelson, Co-Manager


By: _____
Michael Boehme, Co-Manager

EXHIBIT 22
PAGE 18

Collateral Lease Assignment (Lessor Signature Page).pdf

Collateral Assignment - Company Signed.pdf

22(iv)

**From:** Jaymie Bowditch <jbowditch@boonekarlberg.com>
**Sent:** Thursday, February 07, 2019 6:38 PM
**To:** David Bjornson <david@bjornsonlaw.com>
**Cc:** Kristen Martin <ea@projectspokane.co>; Sean Walsh <sean@redwoodcityventures.com>
**Subject:** RE: Collateral Assignment of Lease

David,

Were you able to get BPD to sign the attached?

_____

It has been fully signed by Project Spokane and Hyperblock per the second attachment.

**James A. Bowditch**

**President**

Boone Karlberg P.C.

201 West Main St., Suite 300

PO Box 9199
Missoula, MT 59807-9199
Phone: 406.543.6646

Fax: 406.532.5752

www.boonekarlberg.com

Case 9:20-cv-00082-DWM  Document 1-10  Filed 06/09/20  Page 21 of 262
Attachment to 22(iv)
EXHIBIT 22
PAGE 19

## COLLATERAL ASSIGNMENT OF LEASE

THIS COLLATERAL ASSIGNMENT OF LEASE (this "Assignment") dated as of **February 1 , 2019**, is entered into by and between Hyperblock LLC, a Delaware limited liability company (the "Assignor"), and Project Spokane, LLC, a Colorado limited liability company (the "Assignee").

### Recitals

A.      Effective March 1, 2016, Bonner Property Development, LLC ("Lessor") and Assignee entered into that certain Commercial Lease Agreement, as amended (the "Lease"), for certain real property located in the Bonner Mill Site in Bonner, Montana as further described in the Lease (the "Subject Property").

B.      The Lease was assigned to and assumed by Assignor pursuant to that certain Assignment, Assumption and Amendment of Lease executed effective July 10, 2018 executed in conjunction with Assignor's acquisition of substantially all of the assets of Assignee pursuant to an Asset Purchase Agreement between Assignor as buyer and Assignee as seller (the "Purchase Agreement").

C.      Pursuant to the terms of the Purchase Agreement as subsequently modified by a Secured Promissory Note (the "Note"), dated as of February 1, 2019 , executed by Assignor and Hyperblock Inc, an Ontario company that is the parent of Assignor (the "Parent") in conjunction herewith, Assignor and Parent are indebted to Assignee in the amount of $5,000,000 CAD.

D.      The Note is secured by those certain Security Agreements dated as of February 1 , 2019, by and between Assignor and Assignee (the "Assignor Security Agreement") and by and between the Parent and the Assignee (the "Parent Security Agreement"). The Assignor Security Agreement, the Parent Security Agreement and the Note are collectively referred to herein as the "Note Documents".

E.      To further secure the Note, Assignor has agreed to assign to Assignee, and Assignee has agreed to take from Assignor, an assignment of the Lease for collateral purposes, on the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the premises and in order to induce Assignee to extend accommodations to Assignor and Parent as evidenced by the Note, Assignor hereby agrees with the Assignee for the benefit of Assignee as follows:

**1.      Assignment**. Assignor, in consideration of the Note and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, does hereby absolutely and unconditionally grant, convey, assign, transfer and set over unto Assignee all rights, interests and estates of Assignor in, to and under the Lease, together with all renewals and extensions of the Lease and other agreements and all other leases or agreements that may hereafter be entered into which cover all or any portion of the Subject Property and together with all of Assignor's rights to collect and receive any rents and charges that it may receive from approved users, operators, sublessees and permitees (the "Rents"). This assignment is for the purpose of securing payment and performance of Assignor under the Note Documents. Assignee, by acceptance hereof, agrees not to take any action to assert its rights to possession of the Subject Property or Assignor's rights to collect and receive the Rents unless and until there shall exist or occur an Event of Default (as defined in the Note). Assignee acknowledges and agrees that Assignee's rights to the Rents upon an Event of Default under the Note and a default under the Lease shall be subject and subordinate to the rights of Lessor to said Rents, if any.

**2.** **Representations and Warranties of Assignor**. Assignor hereby represents and warrants to Assignee that:

**a.** Assignor has the right to assign the Lease and the Rents hereby assigned and no other person or entity has any right, title or interest therein;

**b.** Assignor has performed and will duly and punctually perform all of the material terms, covenants, conditions and warranties of the Lease;

**c.** Assignor has not at any time prior to the date hereof exercised any right to subordinate any Lease to any deed of trust or mortgage or any other encumbrance of any kind;

**d.** Assignor has not executed any prior assignments of the Lease or the Rents;

**e.** Assignor has performed no act or executed any other instrument which might prevent Assignee from enjoying and exercising any of its rights and privileges evidenced hereby;

**f.** The Lease is valid and subsisting and in full force and effect and unmodified; and

**g.** There are no defaults now existing under the Lease and no event has occurred which with the passage of time or the giving of notice, or both, would constitute such a default.

**3.** **Limitation of Assignee's Liability**. Assignee shall not be obligated to perform or discharge any obligation, duty or liability under the Lease by reason of this Assignment or the exercise of rights or remedies hereunder. Assignor shall and does hereby agree to indemnify, defend and hold Assignee harmless from and against any and all liability, loss or damage incurred under the Lease by reason of this Assignment or the exercise of rights or remedies hereunder, and from any and all claims and demands whatsoever that may be asserted against Assignee by reason of any alleged obligations or undertakings on its part to perform or discharge any of the terms, covenants or agreements contained in the Lease, other than claims and demands that arise in connection with the gross negligence or willful misconduct of the Assignee. Should Assignee incur any such liability under the Lease by reason of this Assignment or the exercise of rights or remedies hereunder, or in defense of any such claims or demands, the amount thereof, including reasonable and documented out-of-pocket costs, expenses and attorney fees, shall be secured hereby and Assignor shall reimburse Assignee therefor promptly upon written demand, failing which Assignee may, at its option, declare all indebtedness secured hereby and by the Note Documents to be immediately due and payable. This Assignment shall not operate to place responsibility upon Assignee for the control, care, management or repair of the Subject Property, nor for the carrying out of any of the terms and conditions of the Lease; nor shall it operate to make Assignee responsible or liable for any waste committed on the Subject Property or for any dangerous or defective condition of the Subject Property, or for any negligence in the management, upkeep, repair, or control of the Subject Property resulting in loss or injury or death to any tenant, licensee, employee, or stranger.

**4.** **Assignee's Remedies**. This Assignment is primary in nature to the obligation evidenced and secured by the Note. Assignor agrees that Assignee may enforce this Assignment without first resorting to or exhausting any other security or collateral; provided, however, that nothing herein contained shall prevent Assignee from suing on the Note or exercising any other right under any document securing the payment of the Note.

**5.** **No Waiver**. Nothing contained herein and no act done or omitted by Assignee pursuant to the powers and rights granted hereunder shall be deemed to be a waiver by Assignee of its rights and remedies under the Note or a waiver or curing of any default hereunder or under the Note, and this Assignment is made and accepted without prejudice to any of the rights and remedies possessed by Assignee under the terms of the Note. The right of Assignee to collect the interest and indebtedness

evidenced by the Note and to enforce any other security therefor held by it may be exercised by Assignee either prior to, simultaneously with, or subsequent to any action taken by it hereunder.

**6.** **Term of Assignment**. If the Note and all other indebtedness secured hereby are paid as the same become due and payable and if all of the covenants, warranties, undertakings and agreements made in the Note and in this Assignment are kept and performed, this Assignment shall become null and void and of no further force and effect but the affidavit, certificate, letter or statement of any officer, agent or attorney of Assignee showing any portion of the Note or such other indebtedness to remain unpaid or any of such covenants, warranties, undertakings and agreements not to be kept or performed shall be and constitute conclusive evidence of the validity, effectiveness and continuing force of this Assignment and any person may, and is hereby authorized to, rely thereon.

**7.** **Survival; Attornment**. Upon fourteen (14) days' notice from Assignee to Lessor of the occurrence and continuation of any Events of Default (as that term is defined in the Note) under the Note, then Lessor, Assignor and Assignee do hereby agree that the Lease and all terms, provisions, covenants and agreements thereof shall survive the occurrence and continuation of any such Events of Default, and the Lease shall remain in full force and effect, in accordance with and subject to all of its terms, provisions, agreements and covenants as a direct lease between Lessor (as lessor) and Assignee or any assignee of Assignee (as tenant). Lessor shall, in such event, exercise and undertake all of the rights and obligations of the lessor in and under the Lease and Assignee or such assignee, as lessee, shall keep, observe and perform as to Lessor all of the terms, covenants and conditions to be kept by the lessee pursuant to the Lease, and Lessor shall have the same remedies for nonperformance or default of any agreement or term of the Lease as it would had or would have had as lessor under the Lease if no such Event of Default had occurred and was continuing. Such notices to Landlord shall be given to Landlord in the manner provided in the Lease at the following address:

> Bonner Property Development, LLC
> 224 N. Higgins Avenue
> Missoula, Montana 59802

or at such other address as Lessor shall provide Assignee in writing in the same manner.

**8.** **Notice of Default**. For and so long as any obligations remain outstanding under any Note Document, Lessor agrees that, prior to terminating the Lease or taking any proceedings to enforce any such termination thereof for any reason other than the expiration of the term of the Lease, Lessor shall give Assignee, at the same time it gives Assignor notice thereof, prior notice in writing of any default under the Lease, specifying the reason for such default. Such notice shall be given to Assignee in the same manner provided in the Lease at the following address:

| for Holder: | Project Spokane, LLC |
| | 5619 DTC Parkway #475 |
| | Greenwood Village, Colorado 80111 |
| | Attn: Sean Walsh |
| | Email: sean@redwoodcityventures.com |
| | |
| with a copy to: | Boone Karlberg P.C. |
| | 201 West Main St., Suite 300 |
| | PO Box 9199 |
| | Missoula, MT 59807-9199 |
| | Attn: James A. Bowditch |
| | Email: jbowditch@boonekarlberg.com |

or at such other address as Assignee shall provide Lessor in writing in the same manner.

> **9.**      **Additional Rights of Assignee**.

   **a.**      Assignee may take or release other security for the payment of the Note and other indebtedness secured by the Note, may release any party primarily or secondarily liable therefor and may apply any other security held by it to the satisfaction of the Note and such other indebtedness without prejudice to any of its rights under this Assignment.

   **b.**      Assignee may at any time and from time to time in writing: (i) waive compliance by Assignor with any covenant herein made by Assignor to the extent and in the manner specified in such writing; (ii) consent to Assignor doing any act that hereunder Assignor is prohibited from doing, or consent to Assignor failing to do any act which hereunder Assignor is required to do, to the extent and in the manner specified in such writing; or (iii) release any portion of the Subject Property and/or the Lease, or any interest therein, from this Assignment. No such act shall in any way impair the rights of Assignee hereunder except to the extent specifically agreed to by Assignee in such writing.

   **c.**      The rights and remedies of Assignee hereunder shall not be impaired by any indulgence, including, but not limited to, (i) any renewal, extension, or modification that Assignee may grant with respect to any indebtedness secured hereby; (ii) any surrender, compromise, release, renewal, extension, exchange, or substitution that Assignee may grant in respect of any item of the Subject Property and/or the Lease or any part thereof or any interest therein; or (iii) any release or indulgence granted to any endorser, guarantor or surety of any indebtedness secured hereby.

  **10.**      **Severability**.  A determination that any provision of this Assignment is unenforceable or invalid shall not affect the enforceability or validity of any other provision and any determination that the application of any provision of this Assignment to any person or circumstance is illegal or unenforceable shall not affect the enforceability or validity of such provision as it may apply to any other persons or circumstances.

  **11.**      **No Merger**.  Notwithstanding (a) the fact that any Lease or the leasehold estate created thereby may be held, directly or indirectly, by or for the account of any person or entity that shall have an interest in the fee estate of the Subject Property; (b) the operation of law; or (c) any other event, the lessee's leasehold estate under such Lease shall not merge into the fee estate and the lessee shall remain obligated under such Lease as assigned by this Assignment.

  **12.**      **Binding**.  The terms, provisions, representations, and warranties herein contained shall inure to the benefit of, and bind, the parties hereto and their respective heirs, representatives, successors and assigns, all Lessor approved subtenants and assigns of this Lease, and subsequent holders of the Note. All references in this Assignment to Assignor or Assignee shall be deemed to include all such heirs, representatives, successors and assigns of such respective party.

  **13.**      **Additional Documentation**.  Assignor agrees to and shall promptly execute or cause to be executed and deliver to Assignee a specific assignment of each and every lease hereafter executed and covering all or a portion of the Subject Property, such specific assignment to be in the form of this Assignment.

  **14.**      **Construction**.  Within this Assignment, words of any gender shall be held and construed to include any other gender, and words in the singular number shall be held and construed to include the plural, unless the context otherwise requires. The provisions of this Assignment are intended to supplement the provisions contained in the Note. In the event of any conflict between the terms of this

Assignment and the terms of the Note, the terms of this Assignment shall prevail insofar as the Lease is concerned, but the terms of the Note shall prevail in all other respects.

**15.** **Counterparts**. This Assignment may be executed in any number of counterparts with the same effect as if all parties hereto had signed the same document. All such counterparts shall be construed together and shall constitute one instrument.

**16.** **No Third Party Beneficiaries**. It is expressly agreed by the parties hereto that this Assignment shall not be construed or deemed made for the benefit of any third party or parties.

**17.** **Entire Agreement**. This Assignment and the Note contain the entire agreement concerning the assignment of the Lease between the parties hereto. No variations, modifications or changes herein or hereof shall be binding upon any party hereto, unless set forth in a document duly executed by both parties.

IN WITNESS WHEREOF, the parties hereto have executed this Assignment as of the date first written above.

**ASSIGNOR:**

Hyperblock, LLC

By: _____ Inder Sarmi_____
Title: _Interim CFO_____

**ASSIGNEE:**

PROJECT SPOKANE, LLC
By: PS Mgt LLC, its Manager

By: _____
Sean Walsh, Manager

## <u>LESSOR'S CONSENT</u>

The undersigned, being the Lessor under the Lease described above, does hereby consent to the terms and conditions of the foregoing Assignment. Further, Lessor covenants to Assignee that Lessor shall give notice to Assignee as specified in Section 8, above, and Assignee, at its option, shall have the right to correct any condition or to cure any default. Nothing in this instrument shall relieve Assignor of its obligations under the Lease. This Consent is given as of the date first written above.

**LESSOR:**

Bonner Property Development, LLC

By: _____
Stephen Nelson, Co-Manager

By: _____
Michael Boehme, Co-Manager

EXHIBIT 22
PAGE 25

## **LESSOR'S CONSENT**

The undersigned, being the Lessor under the Lease described above, does hereby consent to the terms and conditions of the foregoing Assignment. Further, Lessor covenants to Assignee that Lessor shall give notice to Assignee as specified in Section 8, above, and Assignee, at its option, shall have the right to correct any condition or to cure any default.  Nothing in this instrument shall relieve Assignor of its obligations under the Lease.  This Consent is given as of the date first written above.

**LESSOR:**

Bonner Property Development, LLC


By: _____
Stephen Nelson, Co-Manager


By: _____
Michael Boehme, Co-Manager

EXHIBIT 22
PAGE 26

22.(v)

**From:** Jaymie Bowditch <jbowditch@boonekarlberg.com>
**Sent:** Wednesday, February 20, 2019 12:36 PM
**To:** David Bjornson <david@bjornsonlaw.com>
**Cc:** Jill Broughton <jill@bjornsonlaw.com>
**Subject:** RE: Collateral Assignment of Lease

Okay.  Just so I can advise Sean, is the delay related to Steve being out of the country or are there some substantive issues with the agreement?

**James A. Bowditch**

**President**

Boone Karlberg P.C.

201 West Main St., Suite 300

PO Box 9199
Missoula, MT 59807-9199
Phone: 406.543.6646

**Exhibit 23.** *[Dec. #27]* [Emails with Nelson, Stivers, et. al. from December 2019 regarding HyperBlock's desire to use the funds for the acquisition of new servers, modification of lease, and request that BPD and its principals consent to HyperBlock's use of the BOM Loan to acquire the Financed Equipment, including changes to Modification Section 5.b. regarding negotiated language regarding equipment in place on 12/31/2019 not included in BPD's first-priority security interest]:

      (i)      Email from Stivers on 12/30/2019 at 10:25 PM with revised draft modification of lease and prior emails in chain regarding BPD's security interest;

      (ii)     Email from Nelson to Stivers on 12/24/19 at 8:48 AM with revised Modification, including changes to Section 5.b. regarding negotiated language regarding equipment in place on 12/31/2019 not included in BPD's first-priority security interest

Exhibit
23(i)

| | |
|---|---|
| **From:** | Dan Stivers |
| **To:** | David Bjornson |
| **Cc:** | Big Sky Mobile Catering; Mike Boehme; mikeh@bonnerproperty.com; Jill Broughton; Sean Walsh; Kristen Martin |
| **Subject:** | Re: FW: Revised version 4 |
| **Date:** | Monday, December 30, 2019 10:25:17 PM |
| **Attachments:** | Modification of Lease Agreement Credit Enhancement Agreement et al. 12.30.19. REDLINED.docx |

Hi David,

The correct number is 0.005714286 or 0.5714286% which will equal the $15,000 credit enhancement fee for an advance of $2.625M. I updated in the redline word doc version and attached a copy for your review. Everything else looks good and I forwarded to Hannah Stone for review first thing in the morning.

Thanks
Dan


On Mon, Dec 30, 2019 at 9:54 PM Dan Stivers <dan@hyperblock.co> wrote:
  Thanks David. Reviewing now

  On Mon, Dec 30, 2019 at 9:49 PM David Bjornson <david@bjornsonlaw.com> wrote:

    Attached is a revised draft of the Modification.   One comment – the credit enhancement fee is somewhat less than the $15,000 communicated by Steve and Dan, so please check the math on that.  Perhaps that needs to be adjusted slightly.  Also, the amount of the warrants is different than in Dan's email due to what I understand is a full total of $3,540,000 not $3,554,000.  Again, please check me on that.



    Please review and comment.  David


    _____

    **David H. Bjornson**


    **Bjornson Jones Mungas, PLLC**

    **2809 Great Northern Loop, Suite 100**

    **Missoula, Montana  59808**

    **(406) 721-8896**

(406) 541-8037--fax

http://www.bjornsonlaw.com/attorneys/david-h-bjornson/

Email:  david@bjornsonlaw.com

*CONFIDENTIALITY NOTICE:  The information contained in this email message may be privileged or confidential information and is intended only for the use of the individual or entity named above.  If you have received this communication in error, please notify us immediately by telephone and delete the message from your system.*

**From:** Dan Stivers <dan@hyperblock.co>
**Sent:** Monday, December 30, 2019 1:51 PM
**To:** Big Sky Mobile Catering <bsmcorpmt@gmail.com>
**Cc:** Mike Boehme <mikeb@bonnerproperty.com>; mikeh@bonnerproperty.com; David Bjornson <david@bjornsonlaw.com>
**Subject:** Re: FW: Revised version 4

stock warrants

On Mon, Dec 30, 2019 at 1:38 PM Dan Stivers <dan@hyperblock.co> wrote:

> Also please add language regarding the issuance of warrants to Bonner Property as part of the credit enhancement agreement.
>
> 15% of loan amount ($3,554,000 * .15 = $533,100) in warrants with a strike price to be determined by the volume weighted average price (VWAP) with an expiration date of five years.

On Mon, Dec 30, 2019 at 1:22 PM Dan Stivers <dan@hyperblock.co> wrote:

> Hi All,
>
> Attached is the agreement with our comments.
>
> Thanks

Dan

On Tue, Dec 24, 2019 at 8:48 AM Big Sky Mobile Catering
<bsmcorpmt@gmail.com> wrote:

> Dan,  This is the final version.  David made some improvements.  Thx Steve.  Let
> me know your thoughts.
>
> _____
>
> **From:** David Bjornson [mailto:david@bjornsonlaw.com]
> **Sent:** Monday, December 23, 2019 10:24 PM
> **To:** Big Sky Mobile Catering (bsmcorpmt@gmail.com)
> <bsmcorpmt@gmail.com>; Michael Boehme <mikeb@bonnerproperty.com>
> **Cc:** Jill Broughton <jill@bjornsonlaw.com>
> **Subject:** Revised version 4
>
> Steve and Mike -   I am finally able to access my computer.  I have modified
> the version you sent to me earlier today in some important regards.  Please
> see the redline between your revision and my v4 attached.   David
>
> _____
>
> **David H. Bjornson**
>
> Bjornson Jones Mungas, PLLC
>
> 2809 Great Northern Loop, Suite 100
>
> Missoula, Montana  59808
>
> (406) 721-8896
>
> (406) 541-8037--fax
>
> http://www.bjornsonlaw.com/attorneys/david-h-bjornson/
>
> Email:  david@bjornsonlaw.com
>
> *CONFIDENTIALITY NOTICE:  The information contained in this email message may be privileged or*

| From: | Big Sky Mobile Catering |
|---|---|
| To: | dan@hyperblock.co |
| Cc: | Mike Boehme; mikeh@bonnerproperty.com; David Bjornson |
| Subject: | FW: Revised version 4 |
| Date: | Tuesday, December 24, 2019 8:48:28 AM |
| Attachments: | Modification of Lease Agreement Credit Enhancement Agreement et al. 12.23.19.v4.docx |
|  | Modification of Lease Agreement Credit Enhancement Agreement et al. 12.23.19.v4 REDLINED FROM CLIENT |
|  | REVISED v3.docx |

Exhibit
23(ii)

Dan,  This is the final version.  David made some improvements.  Thx Steve.  Let me know your
thoughts.

**From:** David Bjornson [mailto:david@bjornsonlaw.com]
**Sent:** Monday, December 23, 2019 10:24 PM
**To:** Big Sky Mobile Catering (bsmcorpmt@gmail.com) <bsmcorpmt@gmail.com>; Michael Boehme
<mikeb@bonnerproperty.com>
**Cc:** Jill Broughton <jill@bjornsonlaw.com>
**Subject:** Revised version 4

**Steve and Mike -   I am finally able to access my computer.  I have modified the
version you sent to me earlier today in some important regards.  Please see the redline
between your revision and my v4 attached.   David**

_____

**David H. Bjornson**

**Bjornson Jones Mungas, PLLC**
**2809 Great Northern Loop, Suite 100**
**Missoula, Montana  59808**
**(406) 721-8896**
**(406) 541-8037--fax**
**http://www.bjornsonlaw.com/attorneys/david-h-bjornson/**
**Email:  david@bjornsonlaw.com**
*CONFIDENTIALITY NOTICE:  The information contained in this email message may be privileged or confidential*
*information and is intended only for the use of the individual or entity named above.  If you have received this*
*communication in error, please notify us immediately by telephone and delete the message from your system.*

This email has been scanned for email related threats and delivered safely by Mimecast.
For more information please visit http://www.mimecast.com

EXHIBIT 23.
PAGE 6

## MODIFICATION OF LEASE AGREEMENT, CREDIT ENHANCEMENT AGREEMENT, SECURITY AGREEMENT AND SIDE LETTER TO THIRD AMENDMENT TO LEASE AGREEMENT

**THIS MODIFICATION OF LEASE AGREEMENT, CREDIT ENHANCEMENT AGREEMENT, SECURITY AGREEMENT AND SIDE LETTER TO THIRD AMENDMENT TO LEASE AGREEMENT ("Modification")** is dated as of the 31st day of December, 2019, by and between Bonner Property Development, LLC, a Montana limited liability company ("Landlord"), and Hyperblock LLC, a Delaware limited liability company ("Tenant" and sometimes "Hyperblock").

### Recitals

A.      Effective March 1, 2016, Landlord and Project Spokane, LLC entered into that certain Commercial Lease Agreement (the "Lease") for certain real property premises located in the Bonner Mill Site in Bonner, Montana as further described in the Lease.  Capitalized terms not otherwise defined herein shall be as defined in the Lease.

B.      The original parties executed that certain First Amendment to Commercial Lease Agreement in December 2016, effective January 1, 2017 (the "First Amendment") and that certain Second Amendment to Commercial Lease Agreement dated July 13, 2017, but effective January 1, 2017 (the "Second Amendment").

C.      The Lease was assigned by Project Spokane to, and assumed by, Tenant pursuant to that certain Assignment, Assumption and Amendment of Lease executed effective July 10, 2018.

D.      Landlord and Tenant executed that certain Third Amendment to Commercial Lease Agreement dated and effective December 13, 2018 (the "Third Amendment").

E.      Landlord and Tenant executed that certain Fourth Amendment to Commercial Lease Agreement dated and effective January 23, 2019 (the "Fourth Amendment").

F.      The First Amendment, Second Amendment, Third Amendment and Fourth Amendment are collectively referred to herein as the "Lease Amendments".

G.      As part of a change in plans as to certain expansion and improvements at the Property, Tenant will not be occupying certain parts of the Property and Landlord has agreed to remove them from the Lease.

H.      A certain financing arrangement designed to fund infrastructure and improvements was created through a line of credit arrangement undertaken by Landlord with Bank of Montana for the benefit of Tenant, and the parties entered into certain agreements in that certain Side Agreement to Third Amendment to Lease Agreement between Landlord and Tenant dated January 23, 2019 (the "Side Agreement"), that certain Credit Enhancement Agreement between the parties, dated December 13, 2018 (the "Credit Enhancement Agreement")

and that certain Security Agreement dated December 13, 2018 (the "Security Agreement") (the Lease, Side Agreement, Credit Enhancement Agreement and Security Agreement, sometimes referred to as the "Agreements").  As part of the change in plans, this financing line will be increased from $2,625,000 to $3,540,000, and will instead be used for the acquisition of new servers (instead of real property improvements).

H.     The parties wish to amend the Lease, as previously modified by the prior Amendments, and also to amend the terms of the Side Agreement, the Credit Enhancement Agreement, and the Security Agreement, all as set forth in this Modification.

## Amendments

The parties agree as follows:

1.  <u>Property</u>.

a.     <u>Revised Description of "Property"</u>.  Subsections iii. and iv. of the first paragraph of **Section 1.a.,** added to the Lease pursuant to the Third Amendment, shall be deleted in their entirety.  They formerly read:

> iii.   Bare land located behind the Sorter building of approximately 106,650 square feet, as reflected on the site plan on **Exhibit F.**
>
> iv.   Land for the power substation consisting of 15,625 square feet (125 x 125), located as reflected on the site plan on **Exhibit G.**   In addition to such land, Landlord shall grant to Tenant an easement for power poles to be located along the river bank, as reflected on **Exhibit B.**

The accompanying **Exhibits F** and **G** are also deleted in their entirety.

2.  <u>Equity and Loan Financing of Improvements</u>.  **Subsection 1.b.II.ix**, added to the Lease pursuant to the Third Amendment, and relating to additional equity and loan financing of various improvements, shall be amended in its entirety to read as follows:

ix)     As part of an expansion of operations, Tenant is engaging in fundraising through additional borrowing of $3,540,000 from the Bank of Montana ("New Loan").  The New Loan shall consist of two separate portions:  $2,625,000.00 (the "Original Amount") and the remainder of $915,000 (the "New Amount").  Tenant has committed to the expenditure of all of the proceeds of the New Loan to the acquisition of new servers ("New Servers") which will be held and operated on the Property.  In connection with the New Loan, Landlord has agreed to provide certain credit enhancements through the pledge of Landlord's property to support such loan under the terms and conditions of the Lease, as amended, Side Agreement to Third Amendment to Lease Agreement between Landlord and Tenant dated January 23, 2019 (the "Side Agreement"), that certain Credit Enhancement Agreement between the parties, dated December 13, 2018 (the "Credit Enhancement Agreement") and that certain Security Agreement dated December 13, 2018.  Landlord shall not be obligated to approve disbursements by Lender under the New Loan except for purchases of New Servers as provided herein.  Landlord agrees to provide Bank of Montana and/or the applicable title company Landlord's approval and authorization for

disbursements on the New Loan provided Borrower submits to Landlord and the Bank of Montana fully detailed draw requests for disbursements supported by adequate invoices, purchase orders and other documentation that the disbursements are appropriate, and within the scope of and in accordance with specifications for New Servers approved in writing by Landlord. Notwithstanding anything provided herein, no advances shall be made in excess of the Original Amount without the establishment of the account for security for the New Amount provided in Section 5.c. of that certain Modification of Lease Agreement, Credit Enhancement Agreement, Security Agreement and Side Letter to Third Amendment to Lease Agreement dated December 31, 2019 (the "Modification") and unless the payments under Sections 5.d. and 5.e. of the Modification are current at such time.

3.  <u>Base Rent</u>.  **Sections 4.a.(i) and (ii)**, relating to rent for bare land and for land for a power substation are deleted in their entirety.  **Section 4.a.(i)** shall be amended and restated in its entirety, beginning effective December 1, 2019, to read as follows:

(i)     The Base Rent payable hereunder shall initially be as follows:

A.  $75,420.90 per month which is based on $3.71 per square foot per year multiplied by the square footage of the "Planer Building" and "Sorter Building" portions of the Property currently occupied by Tenant, 243,949 square feet, divided by 12 months.

The Base Rent as set forth above shall continue at this rate for through February 28, 2020.  On March 1, 2020, and then again on March 1st of each year thereafter, hereinafter referred to as a "Lease Anniversary Date," the Base Rent will increase two percent (2%) per annum.

4.  <u>Pledge by Landlord for Bank of Montana Loan for Infrastructure and Improvements</u>. Section 4 of the Third Amendment, regarding a pledge by Landlord for a loan at Bank of Montana is hereby modified to reflect that, instead of infrastructure and improvements, the New Loan will be used for the acquisition of New Servers.

5.  <u>Credit Enhancement Agreement, Side Letter and Security Agreement</u>.  The Credit Enhancement Agreement shall be amended to reflect the following new and modified provisions:

a.  The concepts of "New Equity" and "New Improvements" are eliminated from the Agreements and the proceeds of the "Bank Loan" (also referred to sometimes as "New Loan") from Bank of Montana will be used to acquire New Servers instead of real property improvements

b.  The Security Agreement is modified to include the Lease being amended by the Fourth Amendment to Commercial Lease Agreement dated January 23, 2019, and property described in this Modification, and is modified to include ALL personal property owned by Tenant which is located currently at the Property (and not just newly acquired New Servers), but specifically excluding all servers owned by Tenant and located on the Property as of the date of this Modification.

c.  At some time prior to any advances to be made in excess of the Original Amount. Hyperblock shall place into an account with Bank of Montana, an amount of cash in the full amount of the New Amount, which shall partially secure Hyperblock's obligations under the Agreements.  Hyperblock will execute and deliver documents which pledge such account in a manner which will be perfected under the Montana Uniform Commercial Code, including a Deposit Account Control Agreement. Alternatively, with Landlord's advance written consent, this obligation may be satisfied with alternative deposits or pledges, including cryptocurrency, in a manner satisfactory to Landlord and its legal counsel.

d.  Consistent with loan documents with Bank of Montana for the New Loan, payment by Hyperblock will commence as provided hereinafter.   Notwithstanding the minimum payment requirements of the New Loan, including interest only for 6 months ("BOM Minimum Payment") or the timing of such payments, Hyperblock shall also make an additional payment amount calculated and administered as follows:

-   the amount advanced under the New Loan shall be amortized in level payments of interest and principal over a 36-month term at the greater of (i) Wall Street Prime Rate plus 299 basis points, or (ii) 8.24% (the "BPD Payment Amount"), with the payment being adjusted from time to time for additional advances as approved and made;

-   the excess of the BPD Payment Amount over the BOM Minimum Payment (whether or not interest only) (the excess is estimated at approximately $24,474 per month) shall be paid into another special account maintained at Bank of Montana, which shall further secure the obligations of Hyperblock under the Agreements.  Hyperblock shall execute and deliver documents which pledge such account in a manner which will be perfected under the Montana Uniform Commercial Code including a Deposit Account Control Agreement.  Further application of the balance of this account shall be only with the express written agreement of both parties.

These payments shall commence on the date which is the 30th day after installation and operation of the first servers ordered to arrive at the Property, even if such first arrival does not consist of all servers ordered, or, if a weekend or holiday, the first business day thereafter.

e.  In addition to all payments due under the Lease and the New Loan, Hyperblock shall make monthly payments to Landlord of a credit enhancement fee for Landlord's securing of the New Loan for the entire term of the New Loan, on the final day of the month, commencing in January 2020.  The credit enhancement fee shall be  0.5714286% of the amount advanced on the New Loan.  For example, if the amount advanced is only the Original Amount, the fee would be $ $15,000.00, and if the full amount is advanced, the fee would be  $20,228.57.

f.  As additional consideration for the credit enhancement, Hyperblock shall issue

EXHIBIT 23.
PAGE 10

within 30 days of the date hereof stock warrants in form and content acceptable to Landlord and its counsel for shares of its publicly trading common shares, calculated as follows:  the number of shares of common stock subject to the warrant is the number which is calculated by dividing the number which is 15% of the total amount of the New Loan, whether fully advanced or not ($3,540,000 * .15 = $531,000) by a strike price to be determined on the first day that public trading is allowed by relevant regulatory authorities at the volume weighted average price (VWAP).  The warrants shall have a term of 5 years.

6.   Renewable Energy Credits.   On or before the execution hereof, Tenant shall supply Landlord with copies of all correspondence with Missoula County regarding the potential of applying renewable energy credits to satisfy some of the requirements imposed by the Missoula County Commissioners affecting Tenant.

7.   Not a Precedent; Future Expansion.  Landlord's agreement pursuant to this Modification to remove Property from the scope of the Lease does not bind Landlord to agree to any future amendments reducing the leased Property, or the amount of Rent.  Should Tenant revise its expansion plans to reincorporate the portions of the Property hereby removed from the Lease, the terms shall be the same as what was negotiated in the Third Amendment to the Lease.

8.   Remaining Provisions of Agreements.  To the extent not modified herein, all remaining provisions of the Agreements shall remain in full force and effect, and are hereby reaffirmed.

9.   Counterparts.  This Modification may be signed in counterparts and the counterparts assembled into one or more originals.  The counterparts shall be deemed delivered to the receiving party upon delivery of the signed counterparts to the receiving party's authorized representative.

-   SIGNATURES APPEAR ON FOLLOWING PAGE -

EXHIBIT 23.
PAGE 11

-

    IN WITNESS WHEREOF this Modification has been executed effective the date and year first above written.

LANDLORD:                                    TENANT:

Bonner Property Development, LLC            Hyperblock LLC


By: _____         By:_____
Stephen Nelson, Co-Manager                  Print name:_____
                                            Its: _____


By: _____
Michael Boehme, Co-Manager

EXHIBIT 23.
PAGE 12

Attachment to 23(ii)

## MODIFICATION OF LEASE AGREEMENT, CREDIT ENHANCEMENT AGREEMENT, SECURITY AGREEMENT AND SIDE LETTER TO THIRD AMENDMENT TO LEASE AGREEMENT

**THIS MODIFICATION OF LEASE AGREEMENT, CREDIT ENHANCEMENT AGREEMENT, SECURITY AGREEMENT AND SIDE LETTER TO THIRD AMENDMENT TO LEASE AGREEMENT ("Modification")** is dated as of the 23rd day of December, 2019, by and between Bonner Property Development, LLC, a Montana limited liability company ("Landlord"), and Hyperblock LLC, a Delaware limited liability company ("Tenant" and sometimes "Hyperblock").

### Recitals

A.      Effective March 1, 2016, Landlord and Project Spokane, LLC entered into that certain Commercial Lease Agreement (the "Lease") for certain real property premises located in the Bonner Mill Site in Bonner, Montana as further described in the Lease.  Capitalized terms not otherwise defined herein shall be as defined in the Lease.

B.      The original parties executed that certain First Amendment to Commercial Lease Agreement in December 2016, effective January 1, 2017 (the "First Amendment") and that certain Second Amendment to Commercial Lease Agreement dated July 13, 2017, but effective January 1, 2017 (the "Second Amendment").

C.      The Lease was assigned by Project Spokane to, and assumed by, Tenant pursuant to that certain Assignment, Assumption and Amendment of Lease executed effective July 10, 2018.

D.      Landlord and Tenant executed that certain Third Amendment to Commercial Lease Agreement dated and effective December 13, 2018 (the "Third Amendment").

E.      Landlord and Tenant executed that certain Fourth Amendment to Commercial Lease Agreement dated and effective January 23, 2019 (the "Fourth Amendment").

F.      The First Amendment, Second Amendment, Third Amendment and Fourth Amendment are collectively referred to herein as the "Lease Amendments".

G.      As part of a change in plans as to certain expansion and improvements at the Property, Tenant will not be occupying certain parts of the Property and Landlord has agreed to remove them from the Lease.

H.      A certain financing arrangement designed to fund infrastructure and improvements was created through a line of credit arrangement undertaken by Landlord with Bank of Montana for the benefit of Tenant, and the parties entered into certain agreements in that certain Side Agreement to Third Amendment to Lease Agreement between Landlord and Tenant dated January 23, 2019 (the "Side Agreement"), that certain Credit Enhancement Agreement between the parties, dated December 13, 2018 (the "Credit Enhancement Agreement")

EXHIBIT 23.
PAGE 13

and that certain Security Agreement dated December 13, 2018 (the "Security Agreement") (the Lease, Side Agreement, Credit Enhancement Agreement and Security Agreement, sometimes referred to as the "Agreements").  As part of the change in plans, this financing line will be increased from $2,625,000 to $3,536,000, and will instead be used for the acquisition of new servers (instead of real property improvements).

H.     The parties wish to amend the Lease, as previously modified by the prior Amendments, and also to amend the terms of the Side Agreement, the Credit Enhancement Agreement, and the Security Agreement, all as set forth in this Modification.

## Amendments

The parties agree as follows:

1. Property.

a.      Revised Description of "Property".  Subsections iii. and iv. of the first paragraph of **Section 1.a.,** added to the Lease pursuant to the Third Amendment, shall be deleted in their entirety.  They formerly read:

iii.    Bare land located behind the Sorter building of approximately 106,650 square feet, as reflected on the site plan on **Exhibit F.**

iv.    Land for the power substation consisting of 15,625 square feet (125 x 125), located as reflected on the site plan on **Exhibit G.**    In addition to such land, Landlord shall grant to Tenant an easement for power poles to be located along the river bank, as reflected on **Exhibit B.**

The accompanying **Exhibits F** and **G** are also deleted in their entirety.

2. Equity and Loan Financing of Improvements.  **Subsection 1.b.II.ix**, added to the Lease pursuant to the Third Amendment, and relating to additional equity and loan financing of various improvements, shall be amended in its entirety to read as follows:

ix)     As part of an expansion of operations, Tenant is engaging in fundraising through additional borrowing of $3,536,000 from the Bank of Montana ("New Loan").  The New Loan shall consist of two separate portions:  $2,625,000.00 (the "Original Amount") and the remainder of $911,000 (the "New Amount").  Tenant has committed to the expenditure of all of the proceeds of the New Loan to the acquisition of new servers ("New Servers") which will be held and operated on the Property.  In connection with the New Loan, Landlord has agreed to provide certain credit enhancements through the pledge of Landlord's property to support such loan under the terms and conditions of the Lease, as amended, Side Agreement to Third Amendment to Lease Agreement between Landlord and Tenant dated January 23, 2019 (the "Side Agreement"), that certain Credit Enhancement Agreement between the parties, dated December 13, 2018 (the "Credit Enhancement Agreement") and that certain Security Agreement dated December 13, 2018.  Landlord shall not be obligated to approve disbursements by Lender under the New Loan except for purchases of New Servers as provided herein.  Landlord agrees to provide Bank of Montana and/or the applicable title company Landlord's approval and authorization for

disbursements on the New Loan provided Borrower submits to Landlord and the Bank of Montana fully detailed draw requests for disbursements supported by adequate invoices, purchase orders and other documentation that the disbursements are appropriate, and within the scope of and in accordance with specifications for New Servers approved in writing by Landlord. Notwithstanding anything provided herein, no advances shall be made in excess of the Original Amount without the establishment of the account for security for the New Amount provided in Section 5.c. and unless the payments under Sections 5.d. and 5.e. are current at such time.

3.  Base Rent.  **Sections 4.a.(i) and (ii)**, relating to rent for bare land and for land for a power substation are deleted in their entirety.  **Section 4.a.(i)** shall be amended and restated in its entirety, beginning effective December 1, 2019, to read as follows:

> (i)     The Base Rent payable hereunder shall initially be as follows:
>
> > A.  $75,420.90 per month which is based on $3.71 per square foot per year multiplied by the square footage of the "Planer Building" and "Sorter Building" portions of the Property currently occupied by Tenant, 243,949 square feet, divided by 12 months.
> >
> > The Base Rent as set forth above shall continue at this rate for through February 28, 2020.  On March 1, 2020, and then again on March 1st of each year thereafter, hereinafter referred to as a "Lease Anniversary Date," the Base Rent will increase two percent (2%) per annum.

4.  Pledge by Landlord for Bank of Montana Loan for Infrastructure and Improvements. Section 4 of the Third Amendment, regarding a pledge by Landlord for a loan at Bank of Montana is hereby modified to reflect that, instead of infrastructure and improvements, the New Loan will be used for the acquisition of New Servers.

5.  Credit Enhancement Agreement, Side Letter and Security Agreement.   The Credit Enhancement Agreement shall be amended to reflect the following new and modified provisions:

> a.  The concepts of "New Equity" and "New Improvements" are eliminated from the Agreements and the proceeds of the "Bank Loan" (also referred to sometimes as "New Loan") from Bank of Montana will be used to acquire New Servers instead of real property improvements
>
> b.  The Security Agreement is modified to include the Lease being amended by the Fourth Amendment to Commercial Lease Agreement dated January 23, 2019, and property described in this Modification, and is modified to include ALL personal property owned by Tenant which is located currently at the Property (and not just newly acquired New Servers), but specifically excluding all servers owned by Tenant and located on the Property as of the date of this Modification.

EXHIBIT 23.
PAGE 15

c.  Hyperblock shall place into an account with Bank of Montana, an amount of cash in the full amount of the New Amount, which shall partially secure Hyperblock's obligations under the Agreements.  Hyperblock will execute and deliver documents which pledge such account in a manner which will be perfected under the Montana Uniform Commercial Code, including a Deposit Account Control Agreement. Alternatively, with Landlord's advance written consent, this obligation may be satisfied with alternative deposits or pledges, including cryptocurrency, in a manner satisfactory to Landlord and its legal counsel.

d.  Consistent with loan documents with Bank of Montana for the New Loan, payment by Hyperblock will commence at the end of January 2020.   Notwithstanding the minimum payment requirements of the New Loan, including interest only for 6 months ("BOM Minimum Payment") or the timing of such payments, Hyperblock shall also make an additional payment amount calculated and administered as follows:

-   the full amount ($3,536,000) of the New Loan shall be amortized in level payments of interest and principal over a 36-month term at 8.24%, which is approximately $111,197 (the "BPD Payment Amount");

-   the excess of the BPD Payment Amount over the BOM Minimum Payment (whether or not interest only) (the excess is estimated at approximately $24,474 per month) shall be paid into another special account maintained at Bank of Montana, which shall further secure the obligations of Hyperblock under the Agreements.  Hyperblock shall execute and deliver documents which pledge such account in a manner which will be perfected under the Montana Uniform Commercial Code including a Deposit Account Control Agreement.  Further application of the balance of this account shall be only with the express written agreement of both parties.

These payments shall commence on the date which is the 45th day after arrival of the first servers to the Property, even if such first arrival does not consist of all servers ordered, or, if a weekend or holiday, the first business day thereafter.

e.  In addition to all payments due under the Lease and the New Loan, Hyperblock shall make monthly payments to Landlord of $19,815.00 as a credit enhancement fee for Landlord's securing of the New Loan for the entire term of the New Loan, on the final day of the month, commencing in January 2020.

6.  <u>Renewable Energy Credits</u>.   On or before the execution hereof, Tenant shall supply Landlord with copies of all correspondence with Missoula County regarding the potential of applying renewable energy credits to satisfy some of the requirements imposed by the Missoula County Commissioners affecting Tenant.

7.  <u>Not a Precedent; Future Expansion</u>.  Landlord's agreement pursuant to this Modification to remove Property from the scope of the Lease does not bind Landlord to agree to any future amendments reducing the leased Property, or the amount of Rent.  Should Tenant revise its

EXHIBIT 23.
PAGE 16

expansion plans to reincorporate the portions of the Property hereby removed from the Lease, the terms shall be the same as what was negotiated in the Third Amendment to the Lease.

8. <u>Remaining Provisions of Agreements</u>.  To the extent not modified herein, all remaining provisions of the Agreements shall remain in full force and effect, and are hereby reaffirmed.

9. <u>Counterparts</u>.  This Modification may be signed in counterparts and the counterparts assembled into one or more originals.  The counterparts shall be deemed delivered to the receiving party upon delivery of the signed counterparts to the receiving party's authorized representative.

- SIGNATURES APPEAR ON FOLLOWING PAGE -

EXHIBIT 23.
PAGE 17

-

     IN WITNESS WHEREOF this Modification has been executed effective the date and year first above written.

LANDLORD:                                    TENANT:

Bonner Property Development, LLC             Hyperblock LLC


By: _____         By:_____
Stephen Nelson, Co-Manager                   Print name:_____
                                             Its: _____


By: _____
Michael Boehme, Co-Manager

**Exhibit 24.**     *[Dec. #28] : Emails among Walsh, Stivers, Bowditch, Bjornson, Nelson, etc. regarding negotiations and revisions to Modification*

     (i)      Email from Stivers to Walsh on 12/29/19 at 7:13 PM with draft modification (attachment);

     (ii)     Email from Stivers on 12/30/2019 at 1:22 PM with "our comments" to revised draft modification; (attachment);

     (iii)    Email from Bjornson on 12/30/2019 at 11:49 EST PM with revised draft modification; (attachment);

     (iv)    Email from Stivers on 12/30/2019 at 10:25 PM with revised draft modification of lease;

     (v)     Emails between Stivers and Bjornson regarding revisions to Modification;

     (vi)    Emails between Stivers and Nelson on 12/30/2019 regarding revisions to Modification;

Exhibit
24(i)

| | |
|---|---|
| **From:** | Big Sky Mobile Catering |
| **To:** | |
| **Subject:** | FW: Modification of Lease Agreement Credit Enhancement |
| **Date:** | |
| **Attachments:** | Modification of Lease Agreement Credit Enhancement Agreement et al. 12.23.19.v4.docx |

**From:** Dan Stivers [mailto:dan@hyperblock.co]
**Sent:** Sunday, December 29, 2019 7:13 PM
**To:** Sean Walsh <sean@hyperblock.co>
**Cc:** Steve Nelson <bsmcorpmt@gmail.com>
**Subject:** Modification of Lease Agreement Credit Enhancement

Hi Sean,

Attached in a copy of the Modification of Lease Agreement Credit Enhancement Agreement which I have provided comments for your review and comments.

@Steve: please review comments and let me know if your in agreement. We will have Jaymie modify accordingly and review.

Thanks
Dan

EXHIBIT 24.
PAGE 3

| | |
|---|---|
| **From:** | David Bjornson |
| **To:** | |
| **Subject:** | FW: FW: FW: Revised version 4 |
| **Date:** | |
| **Attachments:** | Modification of Lease Agreement Credit Enhancement Agreement et al. 12.23.19.v4 - Comments SW.docx |

Exhibit
24(ii)

**From:** Dan Stivers <dan@hyperblock.co>
**Sent:** Monday, December 30, 2019 1:22 PM
**To:** Big Sky Mobile Catering <bsmcorpmt@gmail.com>
**Cc:** Mike Boehme <mikeb@bonnerproperty.com>; mikeh@bonnerproperty.com; David
Bjornson <david@bjornsonlaw.com>
**Subject:** Re: FW: Revised version 4

Hi All,

Attached is the agreement with our comments.

Thanks

Dan

On Tue, Dec 24, 2019 at 8:48 AM Big Sky Mobile Catering <bsmcorpmt@gmail.com> wrote:

> Dan,  This is the final version.  David made some improvements.  Thx Steve.  Let me know
> your thoughts.

**From:** David Bjornson [mailto:david@bjornsonlaw.com]
**Sent:** Monday, December 23, 2019 10:24 PM
**To:** Big Sky Mobile Catering (bsmcorpmt@gmail.com) <bsmcorpmt@gmail.com>;
Michael Boehme <mikeb@bonnerproperty.com>
**Cc:** Jill Broughton <jill@bjornsonlaw.com>
**Subject:** Revised version 4


Steve and Mike -   I am finally able to access my computer.  I have modified the
version you sent to me earlier today in some important regards.  Please see the
redline between your revision and my v4 attached.   David


_____


**David H. Bjornson**


**Bjornson Jones Mungas, PLLC**

**2809 Great Northern Loop, Suite 100**

**Missoula, Montana  59808**

**(406) 721-8896**

**(406) 541-8037--fax**

**http://www.bjornsonlaw.com/attorneys/david-h-bjornson/**

**Email:  david@bjornsonlaw.com**

*CONFIDENTIALITY NOTICE:  The information contained in this email message may be privileged or
confidential information and is intended only for the use of the individual or entity named above.  If you have
received this communication in error, please notify us immediately by telephone and delete the message from
your system.*

This email has been scanned for email related threats and delivered safely by Mimecast.
For more information please visit http://www.mimecast.com

EXHIBIT 24.
PAGE 5

Exhibit
24(iii)

| | |
|---|---|
| **From:** | David Bjornson |
| **To:** | |
| **Subject:** | FW: RE: FW: Revised version 4 |
| **Date:** | |
| **Attachments:** | Modification of Lease Agreement Credit Enhancement Agreement et al. 12.30.19.docx |
| | Modification of Lease Agreement Credit Enhancement Agreement et al. 12.30.19. REDLINED.docx |

---

**From:** "David Bjornson" <david@bjornsonlaw.com>
**Date:** Mon Dec 30 23:48:58 EST 2019
**To:** "Dan Stivers" <dan@hyperblock.co>,"Big Sky Mobile Catering"
<bsmcorpmt@gmail.com>
**Cc:** "Mike Boehme" <mikeb@bonnerproperty.com>,"mikeh@bonnerproperty.com"
<mikeh@bonnerproperty.com>,"Jill Broughton" <jill@bjornsonlaw.com>
**Subject:** RE: FW: Revised version 4

Attached is a revised draft of the Modification.   One comment — the credit
enhancement fee is somewhat less than the $15,000 communicated by Steve and Dan,
so please check the math on that.  Perhaps that needs to be adjusted slightly.  Also, the
amount of the warrants is different than in Dan's email due to what I understand is a
full total of $3,540,000 not $3,554,000.  Again, please check me on that.

Please review and comment.  David

_____

**David H. Bjornson**

**Bjornson Jones Mungas, PLLC**

**2809 Great Northern Loop, Suite 100**

**Missoula, Montana  59808**

**(406) 721-8896**

**(406) 541-8037--fax**

**http://www.bjornsonlaw.com/attorneys/david-h-bjornson/**

**Email:  david@bjornsonlaw.com**

EXHIBIT 24.
PAGE 6

*CONFIDENTIALITY NOTICE:  The information contained in this email message may be privileged or confidential information and is intended only for the use of the individual or entity named above.  If you have received this communication in error, please notify us immediately by telephone and delete the message from your system.*

**From:** Dan Stivers <dan@hyperblock.co>
**Sent:** Monday, December 30, 2019 1:51 PM
**To:** Big Sky Mobile Catering <bsmcorpmt@gmail.com>
**Cc:** Mike Boehme <mikeb@bonnerproperty.com>; mikeh@bonnerproperty.com; David Bjornson <david@bjornsonlaw.com>
**Subject:** Re: FW: Revised version 4

stock warrants

On Mon, Dec 30, 2019 at 1:38 PM Dan Stivers <dan@hyperblock.co> wrote:

Also please add language regarding the issuance of warrants to Bonner Property as part of the credit enhancement agreement.

15% of loan amount ($3,554,000 * .15 = $533,100) in warrants with a strike price to be determined by the volume weighted average price (VWAP) with an expiration date of five years.

On Mon, Dec 30, 2019 at 1:22 PM Dan Stivers <dan@hyperblock.co> wrote:

Hi All,

Attached is the agreement with our comments.

Thanks

Dan

On Tue, Dec 24, 2019 at 8:48 AM Big Sky Mobile Catering <bsmcorpmt@gmail.com>

wrote:

Dan,  This is the final version.  David made some improvements.  Thx Steve.  Let me know your thoughts.

---

**From:** David Bjornson [mailto:david@bjornsonlaw.com]
**Sent:** Monday, December 23, 2019 10:24 PM
**To:** Big Sky Mobile Catering (bsmcorpmt@gmail.com) <bsmcorpmt@gmail.com>; Michael Boehme <mikeb@bonnerproperty.com>
**Cc:** Jill Broughton <jill@bjornsonlaw.com>
**Subject:** Revised version 4

Steve and Mike -   I am finally able to access my computer.  I have modified the version you sent to me earlier today in some important regards.  Please see the redline between your revision and my v4 attached.   David

_____

**David H. Bjornson**

**Bjornson Jones Mungas, PLLC**

**2809 Great Northern Loop, Suite 100**

**Missoula, Montana  59808**

**(406) 721-8896**

**(406) 541-8037--fax**

**http://www.bjornsonlaw.com/attorneys/david-h-bjornson/**

**Email:  david@bjornsonlaw.com**

*CONFIDENTIALITY NOTICE:  The information contained in this email message may be privileged or confidential information and is intended only for the use of the individual or entity named above.  If you have received this communication in error, please notify us immediately by telephone and delete the message from your system.*

EXHIBIT 24.
PAGE 8

This email has been scanned for email related threats and delivered safely by Mimecast.
For more information please visit http://www.mimecast.com

| | |
|---|---|
| **From:** | David Bjornson |
| **To:** | |
| **Subject:** | FW: FW: Revised version 4 |
| **Date:** | |
| **Attachments:** | Modification of Lease Agreement Credit Enhancement Agreement et al. 12.30.19. REDLINED.docx |

Exhibit
24(iv)

**From:** Dan Stivers <dan@hyperblock.co>
**Sent:** Monday, December 30, 2019 10:25 PM
**To:** David Bjornson <david@bjornsonlaw.com>
**Cc:** Big Sky Mobile Catering <bsmcorpmt@gmail.com>; Mike Boehme
<mikeb@bonnerproperty.com>; mikeh@bonnerproperty.com; Jill Broughton
<jill@bjornsonlaw.com>; Sean Walsh <sean@hyperblock.co>; Kristen Martin
<kristen@hyperblock.co>
**Subject:** Re: FW: Revised version 4

Hi David,

The correct number is 0.005714286 or 0.5714286% which will equal the $15,000 credit
enhancement fee for an advance of $2.625M. I updated in the redline word doc version and
attached a copy for your review. Everything else looks good and I forwarded to Hannah
Stone for review first thing in the morning.

Thanks
Dan

On Mon, Dec 30, 2019 at 9:54 PM Dan Stivers <dan@hyperblock.co> wrote:

Thanks David. Reviewing now

On Mon, Dec 30, 2019 at 9:49 PM David Bjornson <david@bjornsonlaw.com> wrote:

**Attached is a revised draft of the Modification.   One comment – the credit
enhancement fee is somewhat less than the $15,000 communicated by Steve and
Dan, so please check the math on that.  Perhaps that needs to be adjusted
slightly.  Also, the amount of the warrants is different than in Dan's email due to
what I understand is a full total of $3,540,000 not $3,554,000.  Again, please
check me on that.**

**Please review and comment.  David**

_____

**David H. Bjornson**

**Bjornson Jones Mungas, PLLC**

**2809 Great Northern Loop, Suite 100**
**Missoula, Montana  59808**
**(406) 721-8896**
**(406) 541-8037--fax**
**http://www.bjornsonlaw.com/attorneys/david-h-bjornson/**
Email:  david@bjornsonlaw.com
*CONFIDENTIALITY NOTICE:  The information contained in this email message may be privileged or*
*confidential information and is intended only for the use of the individual or entity named above.  If you have*
*received this communication in error, please notify us immediately by telephone and delete the message*
*from your system.*


**From:** Dan Stivers <dan@hyperblock.co>
**Sent:** Monday, December 30, 2019 1:51 PM
**To:** Big Sky Mobile Catering <bsmcorpmt@gmail.com>
**Cc:** Mike Boehme <mikeb@bonnerproperty.com>; mikeh@bonnerproperty.com; David
Bjornson <david@bjornsonlaw.com>
**Subject:** Re: FW: Revised version 4

stock warrants

On Mon, Dec 30, 2019 at 1:38 PM Dan Stivers <dan@hyperblock.co> wrote:

> Also please add language regarding the issuance of warrants to Bonner Property as part of
> the credit enhancement agreement.
>
> 15% of loan amount ($3,554,000 * .15 = $533,100) in warrants with a strike price to be
> determined by the volume weighted average price (VWAP) with an expiration date of five
> years.
>
> On Mon, Dec 30, 2019 at 1:22 PM Dan Stivers <dan@hyperblock.co> wrote:
>
>> Hi All,
>>
>> Attached is the agreement with our comments.
>>
>> Thanks
>> Dan
>>
>>
>> On Tue, Dec 24, 2019 at 8:48 AM Big Sky Mobile Catering <bsmcorpmt@gmail.com>
>> wrote:
>>
>>> Dan,  This is the final version.  David made some improvements.  Thx Steve.  Let me
>>> know your thoughts.
>>>
>>> **From:** David Bjornson [mailto:david@bjornsonlaw.com]
>>> **Sent:** Monday, December 23, 2019 10:24 PM

**To:** Big Sky Mobile Catering (bsmcorpmt@gmail.com) <bsmcorpmt@gmail.com>;
Michael Boehme <mikeb@bonnerproperty.com>
**Cc:** Jill Broughton <jill@bjornsonlaw.com>
**Subject:** Revised version 4

**Steve and Mike -   I am finally able to access my computer.  I have modified
the version you sent to me earlier today in some important regards.  Please
see the redline between your revision and my v4 attached.   David**

_____

**David H. Bjornson**

**Bjornson Jones Mungas, PLLC**
**2809 Great Northern Loop, Suite 100**
**Missoula, Montana  59808**
**(406) 721-8896**
**(406) 541-8037--fax**
**http://www.bjornsonlaw.com/attorneys/david-h-bjornson/**
Email:  david@bjornsonlaw.com
*CONFIDENTIALITY NOTICE:  The information contained in this email message may be privileged
or confidential information and is intended only for the use of the individual or entity named above.  If
you have received this communication in error, please notify us immediately by telephone and
delete the message from your system.*

This email has been scanned for email related threats and delivered safely by Mimecast.
For more information please visit http://www.mimecast.com

This email has been scanned for email related threats and delivered safely by Mimecast.
For more information please visit http://www.mimecast.com

| | |
|---|---|
| **From:** | Dan Stivers |
| **To:** | David Bjornson |
| **Cc:** | bsmcorpmt@gmail.com; mikeb@bonnerproperty.com; mikeh@bonnerproperty.com; Jill Broughton; sean@hyperblock.co; kristen@hyperblock.co |
| **Subject:** | Re: FW: Revised version 4 |
| **Date:** | Monday, December 30, 2019 10:32:23 PM |

Exhibit 24(*v)

Done.  Thanks David

On Mon, Dec 30, 2019 at 10:28 PM David Bjornson <david@bjornsonlaw.com> wrote:

> **Great – let's consider your redline the current version as we move forward.   David**
>
> _____
>
> **David H. Bjornson**
>
> **Bjornson Jones Mungas, PLLC**
>
> **2809 Great Northern Loop, Suite 100**
>
> **Missoula, Montana  59808**
>
> **(406) 721-8896**
>
> **(406) 541-8037--fax**
>
> **http://www.bjornsonlaw.com/attorneys/david-h-bjornson/**
>
> **Email:  david@bjornsonlaw.com**
>
> _CONFIDENTIALITY NOTICE:  The information contained in this email message may be privileged or confidential information and is intended only for the use of the individual or entity named above.  If you have received this communication in error, please notify us immediately by telephone and delete the message from your system._
>
> **From:** Dan Stivers <dan@hyperblock.co>
> **Sent:** Monday, December 30, 2019 10:25 PM
> **To:** David Bjornson <david@bjornsonlaw.com>
> **Cc:** Big Sky Mobile Catering <bsmcorpmt@gmail.com>; Mike Boehme <mikeb@bonnerproperty.com>; mikeh@bonnerproperty.com; Jill Broughton <jill@bjornsonlaw.com>; Sean Walsh <sean@hyperblock.co>; Kristen Martin <kristen@hyperblock.co>
> **Subject:** Re: FW: Revised version 4

EXHIBIT 24.
PAGE 13

Hi David,

The correct number is 0.005714286 or 0.5714286% which will equal the $15,000 credit enhancement fee for an advance of $2.625M. I updated in the redline word doc version and attached a copy for your review. Everything else looks good and I forwarded to Hannah Stone for review first thing in the morning.

Thanks

Dan

On Mon, Dec 30, 2019 at 9:54 PM Dan Stivers <dan@hyperblock.co> wrote:

Thanks David. Reviewing now

On Mon, Dec 30, 2019 at 9:49 PM David Bjornson <david@bjornsonlaw.com> wrote:

Attached is a revised draft of the Modification.   One comment – the credit enhancement fee is somewhat less than the $15,000 communicated by Steve and Dan, so please check the math on that.  Perhaps that needs to be adjusted slightly.  Also, the amount of the warrants is different than in Dan's email due to what I understand is a full total of $3,540,000 not $3,554,000.  Again, please check me on that.

Please review and comment.  David

_____

David H. Bjornson

Bjornson Jones Mungas, PLLC

2809 Great Northern Loop, Suite 100

Missoula, Montana  59808

(406) 721-8896

(406) 541-8037--fax

http://www.bjornsonlaw.com/attorneys/david-h-bjornson/

Email:  david@bjornsonlaw.com

*CONFIDENTIALITY NOTICE:  The information contained in this email message may be privileged or confidential information and is intended only for the use of the individual or entity named above.  If you have received this communication in error, please notify us immediately by telephone and delete the message from your system.*

**From:** Dan Stivers <dan@hyperblock.co>
**Sent:** Monday, December 30, 2019 1:51 PM
**To:** Big Sky Mobile Catering <bsmcorpmt@gmail.com>
**Cc:** Mike Boehme <mikeb@bonnerproperty.com>; mikeh@bonnerproperty.com;
David Bjornson <david@bjornsonlaw.com>
**Subject:** Re: FW: Revised version 4

stock warrants

On Mon, Dec 30, 2019 at 1:38 PM Dan Stivers <dan@hyperblock.co> wrote:

> Also please add language regarding the issuance of warrants to Bonner Property as part of the credit enhancement agreement.

> 15% of loan amount ($3,554,000 * .15 = $533,100) in warrants with a strike price to be determined by the volume weighted average price (VWAP) with an expiration date of five years.

On Mon, Dec 30, 2019 at 1:22 PM Dan Stivers <dan@hyperblock.co> wrote:

> Hi All,

EXHIBIT 24.
PAGE 15

Attached is the agreement with our comments.


Thanks

Dan



On Tue, Dec 24, 2019 at 8:48 AM Big Sky Mobile Catering
<bsmcorpmt@gmail.com> wrote:

> Dan,  This is the final version.  David made some improvements.  Thx Steve.
> Let me know your thoughts.
>
> _____
>
> **From:** David Bjornson [mailto:david@bjornsonlaw.com]
> **Sent:** Monday, December 23, 2019 10:24 PM
> **To:** Big Sky Mobile Catering (bsmcorpmt@gmail.com)
> <bsmcorpmt@gmail.com>; Michael Boehme <mikeb@bonnerproperty.com>
> **Cc:** Jill Broughton <jill@bjornsonlaw.com>
> **Subject:** Revised version 4
>
>
> Steve and Mike -  I am finally able to access my computer.  I have
> modified the version you sent to me earlier today in some important
> regards.  Please see the redline between your revision and my v4
> attached.  David
>
>
> _____
>
>
> **David H. Bjornson**
>
>
> **Bjornson Jones Mungas, PLLC**
>
> **2809 Great Northern Loop, Suite 100**
>
> **Missoula, Montana  59808**
>
> **(406) 721-8896**

EXHIBIT 24.
PAGE 16

(406) 541-8037--fax

http://www.bjornsonlaw.com/attorneys/david-h-bjornson/

Email: david@bjornsonlaw.com

*CONFIDENTIALITY NOTICE:*  *The information contained in this email message may be privileged or confidential information and is intended only for the use of the individual or entity named above.  If you have received this communication in error, please notify us immediately by telephone and delete the message from your system.*

This email has been scanned for email related threats and delivered safely by Mimecast.
For more information please visit http://www.mimecast.com

This email has been scanned for email related threats and delivered safely by Mimecast.
For more information please visit http://www.mimecast.com

This email has been scanned for email related threats and delivered safely by Mimecast.
For more information please visit http://www.mimecast.com

**From:** David Bjornson
**To:**
**Subject:** FW: FW: Revised version 4
**Date:**

Exhibit
24(vi)

**From:** Dan Stivers <dan@hyperblock.co>
**Sent:** Monday, December 30, 2019 1:39 PM
**To:** Big Sky Mobile Catering <bsmcorpmt@gmail.com>
**Cc:** Mike Boehme <mikeb@bonnerproperty.com>; mikeh@bonnerproperty.com; David Bjornson <david@bjornsonlaw.com>
**Subject:** Re: FW: Revised version 4

Also please add language regarding the issuance of warrants to Bonner Property as part of the credit enhancement agreement.

15% of loan amount ($3,554,000 * .15 = $533,100) in warrants with a strike price to be determined by the volume weighted average price (VWAP) with an expiration date of five years.

On Mon, Dec 30, 2019 at 1:22 PM Dan Stivers <dan@hyperblock.co> wrote:

> Hi All,
>
> Attached is the agreement with our comments.
>
> Thanks
> Dan
>
>
> On Tue, Dec 24, 2019 at 8:48 AM Big Sky Mobile Catering <bsmcorpmt@gmail.com> wrote:
>
>> Dan,  This is the final version.  David made some improvements.  Thx Steve.  Let me know your thoughts.
>>
>> **From:** David Bjornson [mailto:david@bjornsonlaw.com]
>> **Sent:** Monday, December 23, 2019 10:24 PM
>> **To:** Big Sky Mobile Catering (bsmcorpmt@gmail.com) <bsmcorpmt@gmail.com>; Michael Boehme <mikeb@bonnerproperty.com>
>> **Cc:** Jill Broughton <jill@bjornsonlaw.com>
>> **Subject:** Revised version 4
>>
>> **Steve and Mike -   I am finally able to access my computer.  I have modified the version you sent to me earlier today in some important regards.  Please see the redline between your revision and my v4 attached.   David**

EXHIBIT 24.
PAGE 18

_____

## David H. Bjornson

**Bjornson Jones Mungas, PLLC**
**2809 Great Northern Loop, Suite 100**
**Missoula, Montana  59808**
**(406) 721-8896**
**(406) 541-8037--fax**
**http://www.bjornsonlaw.com/attorneys/david-h-bjornson/**
**Email:  david@bjornsonlaw.com**

*CONFIDENTIALITY NOTICE:  The information contained in this email message may be privileged or confidential information and is intended only for the use of the individual or entity named above.  If you have received this communication in error, please notify us immediately by telephone and delete the message from your system.*

---

This email has been scanned for email related threats and delivered safely by Mimecast.
For more information please visit http://www.mimecast.com

EXHIBIT 24.
PAGE 19

## MODIFICATION OF LEASE AGREEMENT, CREDIT ENHANCEMENT AGREEMENT, SECURITY AGREEMENT AND SIDE LETTER TO THIRD AMENDMENT TO LEASE AGREEMENT

**THIS MODIFICATION OF LEASE AGREEMENT, CREDIT ENHANCEMENT AGREEMENT, SECURITY AGREEMENT AND SIDE LETTER TO THIRD AMENDMENT TO LEASE AGREEMENT ("Modification")** is dated as of the 23rd day of December, 2019, by and between Bonner Property Development, LLC, a Montana limited liability company ("Landlord"), and Hyperblock LLC, a Delaware limited liability company ("Tenant" and sometimes "Hyperblock").

### Recitals

A.      Effective March 1, 2016, Landlord and Project Spokane, LLC entered into that certain Commercial Lease Agreement (the "Lease") for certain real property premises located in the Bonner Mill Site in Bonner, Montana as further described in the Lease.  Capitalized terms not otherwise defined herein shall be as defined in the Lease.

B.      The original parties executed that certain First Amendment to Commercial Lease Agreement in December 2016, effective January 1, 2017 (the "First Amendment") and that certain Second Amendment to Commercial Lease Agreement dated July 13, 2017, but effective January 1, 2017 (the "Second Amendment").

C.      The Lease was assigned by Project Spokane to, and assumed by, Tenant pursuant to that certain Assignment, Assumption and Amendment of Lease executed effective July 10, 2018.

D.      Landlord and Tenant executed that certain Third Amendment to Commercial Lease Agreement dated and effective December 13, 2018 (the "Third Amendment").

E.      Landlord and Tenant executed that certain Fourth Amendment to Commercial Lease Agreement dated and effective January 23, 2019 (the "Fourth Amendment").

F.      The First Amendment, Second Amendment, Third Amendment and Fourth Amendment are collectively referred to herein as the "Lease Amendments".

G.      As part of a change in plans as to certain expansion and improvements at the Property, Tenant will not be occupying certain parts of the Property and Landlord has agreed to remove them from the Lease.

H.      A certain financing arrangement designed to fund infrastructure and improvements was created through a line of credit arrangement undertaken by Landlord with Bank of Montana for the benefit of Tenant, and the parties entered into certain agreements in that certain Side Agreement to Third Amendment to Lease Agreement between Landlord and Tenant dated January 23, 2019 (the "Side Agreement"), that certain Credit Enhancement Agreement between the parties, dated December 13, 2018 (the "Credit Enhancement Agreement")

EXHIBIT 24.
PAGE 20

and that certain Security Agreement dated December 13, 2018 (the "Security Agreement") (the Lease, Side Agreement, Credit Enhancement Agreement and Security Agreement, sometimes referred to as the "Agreements"). As part of the change in plans, this financing line will be increased from $2,625,000 to $3,536,000, and will instead be used for the acquisition of new servers (instead of real property improvements).

H.     The parties wish to amend the Lease, as previously modified by the prior Amendments, and also to amend the terms of the Side Agreement, the Credit Enhancement Agreement, and the Security Agreement, all as set forth in this Modification.

**Amendments**

The parties agree as follows:

1.   <u>Property</u>.

a.     <u>Revised Description of "Property"</u>.  Subsections iii. and iv. of the first paragraph of **Section 1.a.,** added to the Lease pursuant to the Third Amendment, shall be deleted in their entirety.  They formerly read:

iii.   Bare land located behind the Sorter building of approximately 106,65o square feet, as reflected on the site plan on **Exhibit F.**

iv.   Land for the power substation consisting of 15,625 square feet (125 x 125), located as reflected on the site plan on **Exhibit G.**   In addition to such land, Landlord shall grant to Tenant an easement for power poles to be located along the river bank, as reflected on **Exhibit B.**

The accompanying **Exhibits F** and **G** are also deleted in their entirety.

2.   <u>Equity and Loan Financing of Improvements</u>.  **Subsection 1.b.II.ix**, added to the Lease pursuant to the Third Amendment, and relating to additional equity and loan financing of various improvements, shall be amended in its entirety to read as follows:

ix)     As part of an expansion of operations, Tenant is engaging in fundraising through additional borrowing of $3,536,000 from the Bank of Montana ("New Loan").  The New Loan shall consist of two separate portions:  $2,625,000.00 (the "Original Amount") and the remainder of $911,000 (the "New Amount").  Tenant has committed to the expenditure of all of the proceeds of the New Loan to the acquisition of new servers ("New Servers") which will be held and operated on the Property.  In connection with the New Loan, Landlord has agreed to provide certain credit enhancements through the pledge of Landlord's property to support such loan under the terms and conditions of the Lease, as amended, Side Agreement to Third Amendment to Lease Agreement between Landlord and Tenant dated January 23, 2019 (the "Side Agreement"), that certain Credit Enhancement Agreement between the parties, dated December 13, 2018 (the "Credit Enhancement Agreement") and that certain Security Agreement dated December 13, 2018.  Landlord shall not be obligated to approve disbursements by Lender under the New Loan except for purchases of New Servers as provided herein.  Landlord agrees to provide Bank of Montana and/or the applicable title company Landlord's approval and authorization for

disbursements on the New Loan provided Borrower submits to Landlord and the Bank of Montana fully detailed draw requests for disbursements supported by adequate invoices, purchase orders and other documentation that the disbursements are appropriate, and within the scope of and in accordance with specifications for New Servers approved in writing by Landlord. Notwithstanding anything provided herein, no advances shall be made in excess of the Original Amount without the establishment of the account for security for the New Amount provided in Section 5.c. and unless the payments under Sections 5.d. and 5.e. are current at such time.

3.  <u>Base Rent</u>.  **Sections 4.a.(i) and (ii)**, relating to rent for bare land and for land for a power substation are deleted in their entirety.  **Section 4.a.(i)** shall be amended and restated in its entirety, beginning effective December 1, 2019, to read as follows:

>     (i)  The Base Rent payable hereunder shall initially be as follows:
>
>         A.  $75,420.90 per month which is based on $3.71 per square foot per year multiplied by the square footage of the "Planer Building" and "Sorter Building" portions of the Property currently occupied by Tenant, 243,949 square feet, divided by 12 months.
>
>         The Base Rent as set forth above shall continue at this rate for through February 28, 2020.  On March 1, 2020, and then again on March 1st of each year thereafter, hereinafter referred to as a "Lease Anniversary Date," the Base Rent will increase two percent (2%) per annum.

4.  <u>Pledge by Landlord for Bank of Montana Loan for Infrastructure and Improvements</u>. Section 4 of the Third Amendment, regarding a pledge by Landlord for a loan at Bank of Montana is hereby modified to reflect that, instead of infrastructure and improvements, the New Loan will be used for the acquisition of New Servers.

5.  <u>Credit Enhancement Agreement, Side Letter and Security Agreement</u>.   The Credit Enhancement Agreement shall be amended to reflect the following new and modified provisions:

>     a.  The concepts of "New Equity" and "New Improvements" are eliminated from the Agreements and the proceeds of the "Bank Loan" (also referred to sometimes as "New Loan") from Bank of Montana will be used to acquire New Servers instead of real property improvements
>
>     b.  The Security Agreement is modified to include the Lease being amended by the Fourth Amendment to Commercial Lease Agreement dated January 23, 2019, and property described in this Modification, and is modified to include ALL personal property owned by Tenant which is located currently at the Property (and not just newly acquired New Servers), but specifically excluding all servers owned by Tenant and located on the Property as of the date of this Modification.

EXHIBIT 24.
PAGE 22

c.  Hyperblock shall place into an account with Bank of Montana, an amount of cash in the full amount of the New Amount, which shall partially secure Hyperblock's obligations under the Agreements.  Hyperblock will execute and deliver documents which pledge such account in a manner which will be perfected under the Montana Uniform Commercial Code, including a Deposit Account Control Agreement.  Alternatively, with Landlord's advance written consent, this obligation may be satisfied with alternative deposits or pledges, including cryptocurrency, in a manner satisfactory to Landlord and its legal counsel.

d.  Consistent with loan documents with Bank of Montana for the New Loan, payment by Hyperblock will commence at the end of January 2020.   Notwithstanding the minimum payment requirements of the New Loan, including interest only for 6 months ("BOM Minimum Payment") or the timing of such payments, Hyperblock shall also make an additional payment amount calculated and administered as follows:

-  the full amount ($3,536,000) of the New Loan shall be amortized in level payments of interest and principal over a 36-month term at 8.24%, which is approximately $111,197 (the "BPD Payment Amount");

-  the excess of the BPD Payment Amount over the BOM Minimum Payment (whether or not interest only) (the excess is estimated at approximately $24,474 per month) shall be paid into another special account maintained at Bank of Montana, which shall further secure the obligations of Hyperblock under the Agreements.  Hyperblock shall execute and deliver documents which pledge such account in a manner which will be perfected under the Montana Uniform Commercial Code including a Deposit Account Control Agreement.  Further application of the balance of this account shall be only with the express written agreement of both parties.

These payments shall commence on the date which is the 45th day after arrival of the first servers to the Property, even if such first arrival does not consist of all servers ordered, or, if a weekend or holiday, the first business day thereafter.

e.  In addition to all payments due under the Lease and the New Loan, Hyperblock shall make monthly payments to Landlord of $19,815.00 as a credit enhancement fee for Landlord's securing of the New Loan for the entire term of the New Loan, on the final day of the month, commencing in January 2020.

6.  <u>Renewable Energy Credits</u>.   On or before the execution hereof, Tenant shall supply Landlord with copies of all correspondence with Missoula County regarding the potential of applying renewable energy credits to satisfy some of the requirements imposed by the Missoula County Commissioners affecting Tenant.

7.  <u>Not a Precedent; Future Expansion</u>.  Landlord's agreement pursuant to this Modification to remove Property from the scope of the Lease does not bind Landlord to agree to any future amendments reducing the leased Property, or the amount of Rent.  Should Tenant revise its

EXHIBIT 24.
PAGE 23

expansion plans to reincorporate the portions of the Property hereby removed from the Lease, the terms shall be the same as what was negotiated in the Third Amendment to the Lease.

8.   <u>Remaining Provisions of Agreements</u>.  To the extent not modified herein, all remaining provisions of the Agreements shall remain in full force and effect, and are hereby reaffirmed.

9.   <u>Counterparts</u>.  This Modification may be signed in counterparts and the counterparts assembled into one or more originals.  The counterparts shall be deemed delivered to the receiving party upon delivery of the signed counterparts to the receiving party's authorized representative.

-   SIGNATURES APPEAR ON FOLLOWING PAGE -

EXHIBIT 24.
PAGE 24

-

IN WITNESS WHEREOF this Modification has been executed effective the date and year first above written.

LANDLORD:                                    TENANT:

Bonner Property Development, LLC             Hyperblock LLC



By: _____        By:_____
Stephen Nelson, Co-Manager                    Print name:_____
                                              Its: _____



By: _____
Michael Boehme, Co-Manager

EXHIBIT 24.
PAGE 25

## MODIFICATION OF LEASE AGREEMENT, CREDIT ENHANCEMENT AGREEMENT, SECURITY AGREEMENT AND SIDE LETTER TO THIRD AMENDMENT TO LEASE AGREEMENT

**THIS MODIFICATION OF LEASE AGREEMENT, CREDIT ENHANCEMENT AGREEMENT, SECURITY AGREEMENT AND SIDE LETTER TO THIRD AMENDMENT TO LEASE AGREEMENT ("Modification")** is dated as of the 23rd day of December, 2019, by and between Bonner Property Development, LLC, a Montana limited liability company ("Landlord"), and Hyperblock LLC, a Delaware limited liability company ("Tenant" and sometimes "Hyperblock").

### Recitals

A.      Effective March 1, 2016, Landlord and Project Spokane, LLC entered into that certain Commercial Lease Agreement (the "Lease") for certain real property premises located in the Bonner Mill Site in Bonner, Montana as further described in the Lease. Capitalized terms not otherwise defined herein shall be as defined in the Lease.

B.      The original parties executed that certain First Amendment to Commercial Lease Agreement in December 2016, effective January 1, 2017 (the "First Amendment") and that certain Second Amendment to Commercial Lease Agreement dated July 13, 2017, but effective January 1, 2017 (the "Second Amendment").

C.      The Lease was assigned by Project Spokane to, and assumed by, Tenant pursuant to that certain Assignment, Assumption and Amendment of Lease executed effective July 10, 2018.

D.      Landlord and Tenant executed that certain Third Amendment to Commercial Lease Agreement dated and effective December 13, 2018 (the "Third Amendment").

E.      Landlord and Tenant executed that certain Fourth Amendment to Commercial Lease Agreement dated and effective January 23, 2019 (the "Fourth Amendment").

F.      The First Amendment, Second Amendment, Third Amendment and Fourth Amendment are collectively referred to herein as the "Lease Amendments".

G.      As part of a change in plans as to certain expansion and improvements at the Property, Tenant will not be occupying certain parts of the Property and Landlord has agreed to remove them from the Lease.

H.      A certain financing arrangement designed to fund infrastructure and improvements was created through a line of credit arrangement undertaken by Landlord with Bank of Montana for the benefit of Tenant, and the parties entered into certain agreements in that certain Side Agreement to Third Amendment to Lease Agreement between Landlord and Tenant dated January 23, 2019 (the "Side Agreement"), that certain Credit Enhancement Agreement between the parties, dated December 13, 2018 (the "Credit Enhancement Agreement")

EXHIBIT 24.
PAGE 26

and that certain Security Agreement dated December 13, 2018 (the "Security Agreement") (the Lease, Side Agreement, Credit Enhancement Agreement and Security Agreement, sometimes referred to as the "Agreements"). As part of the change in plans, this financing line will be increased from $2,625,000 to $3,536,000, and will instead be used for the acquisition of new servers (instead of real property improvements).

      H.      The parties wish to amend the Lease, as previously modified by the prior Amendments, and also to amend the terms of the Side Agreement, the Credit Enhancement Agreement, and the Security Agreement, all as set forth in this Modification.

## Amendments

      The parties agree as follows:

1. <u>Property</u>.

      a.      <u>Revised Description of "Property"</u>. Subsections iii. and iv. of the first paragraph of **Section 1.a.,** added to the Lease pursuant to the Third Amendment, shall be deleted in their entirety. They formerly read:

> iii.    Bare land located behind the Sorter building of approximately 106,65o square feet, as reflected on the site plan on **Exhibit F.**

> iv.    Land for the power substation consisting of 15,625 square feet (125 x 125), located as reflected on the site plan on **Exhibit G.** In addition to such land, Landlord shall grant to Tenant an easement for power poles to be located along the river bank, as reflected on **Exhibit B.**

The accompanying **Exhibits F** and **G** are also deleted in their entirety.

2. <u>Equity and Loan Financing of Improvements</u>. **Subsection 1.b.II.ix**, added to the Lease pursuant to the Third Amendment, and relating to additional equity and loan financing of various improvements, shall be amended in its entirety to read as follows:

ix)    As part of an expansion of operations, Tenant is engaging in fundraising through additional borrowing of $3,536,000 from the Bank of Montana ("New Loan"). The New Loan shall consist of two separate portions: $2,625,000.00 (the "Original Amount") and the remainder of $911,000 (the "New Amount"). Tenant has committed to the expenditure of all of the proceeds of the New Loan to the acquisition of new servers ("New Servers") which will be held and operated on the Property. In connection with the New Loan, Landlord has agreed to provide certain credit enhancements through the pledge of Landlord's property to support such loan under the terms and conditions of the Lease, as amended, Side Agreement to Third Amendment to Lease Agreement between Landlord and Tenant dated January 23, 2019 (the "Side Agreement"), that certain Credit Enhancement Agreement between the parties, dated December 13, 2018 (the "Credit Enhancement Agreement") and that certain Security Agreement dated December 13, 2018. Landlord shall not be obligated to approve disbursements by Lender under the New Loan except for purchases of New Servers as provided herein. Landlord agrees to provide Bank of Montana and/or the applicable title company Landlord's approval and authorization for

EXHIBIT 24.
PAGE 27

disbursements on the New Loan provided Borrower submits to Landlord and the Bank of Montana fully detailed draw requests for disbursements supported by adequate invoices, purchase orders and other documentation that the disbursements are appropriate, and within the scope of and in accordance with specifications for New Servers approved in writing by Landlord. Notwithstanding anything provided herein, no advances shall be made in excess of the Original Amount without the establishment of the account for security for the New Amount provided in Section 5.c. and unless the payments under Sections 5.d. and 5.e. are current at such time.

3.   <u>Base Rent</u>.  **Sections 4.a.(i) and (ii)**, relating to rent for bare land and for land for a power substation are deleted in their entirety.  **Section 4.a.(i)** shall be amended and restated in its entirety, beginning effective December 1, 2019, to read as follows:

(i)       The Base Rent payable hereunder shall initially be as follows:

A.   $75,420.90 per month which is based on $3.71 per square foot per year multiplied by the square footage of the "Planer Building" and "Sorter Building" portions of the Property currently occupied by Tenant, 243,949 square feet, divided by 12 months.

The Base Rent as set forth above shall continue at this rate for through February 28, 2020.  On March 1, 2020, and then again on March 1st of each year thereafter, hereinafter referred to as a "Lease Anniversary Date," the Base Rent will increase two percent (2%) per annum.

4.   <u>Pledge by Landlord for Bank of Montana Loan for Infrastructure and Improvements</u>. Section 4 of the Third Amendment, regarding a pledge by Landlord for a loan at Bank of Montana is hereby modified to reflect that, instead of infrastructure and improvements, the New Loan will be used for the acquisition of New Servers.

5.   <u>Credit Enhancement Agreement, Side Letter and Security Agreement</u>.   The Credit Enhancement Agreement shall be amended to reflect the following new and modified provisions:

a.   The concepts of "New Equity" and "New Improvements" are eliminated from the Agreements and the proceeds of the "Bank Loan" (also referred to sometimes as "New Loan") from Bank of Montana will be used to acquire New Servers instead of real property improvements

b.   The Security Agreement is modified to include the Lease being amended by the Fourth Amendment to Commercial Lease Agreement dated January 23, 2019, and property described in this Modification, and is modified to include ALL personal property owned by Tenant which is located currently at the Property (and not just newly acquired New Servers), but specifically excluding all servers owned by Tenant and located on the Property as of the date of this Modification.

c.  Hyperblock shall place into an account with Bank of Montana, an amount of cash in the full amount of the New Amount, which shall partially secure Hyperblock's obligations under the Agreements.  Hyperblock will execute and deliver documents which pledge such account in a manner which will be perfected under the Montana Uniform Commercial Code, including a Deposit Account Control Agreement. Alternatively, with Landlord's advance written consent, this obligation may be satisfied with alternative deposits or pledges, including cryptocurrency, in a manner satisfactory to Landlord and its legal counsel.

d.  Consistent with loan documents with Bank of Montana for the New Loan, payment by Hyperblock will commence at the end of January 2020.   Notwithstanding the minimum payment requirements of the New Loan, including interest only for 6 months ("BOM Minimum Payment") or the timing of such payments, Hyperblock shall also make an additional payment amount calculated and administered as follows:

-   the full amount ($3,536,000) of the New Loan shall be amortized in level payments of interest and principal over a 36-month term at 8.24%, which is approximately $111,197 (the "BPD Payment Amount");

-   the excess of the BPD Payment Amount over the BOM Minimum Payment (whether or not interest only) (the excess is estimated at approximately $24,474 per month) shall be paid into another special account maintained at Bank of Montana, which shall further secure the obligations of Hyperblock under the Agreements.  Hyperblock shall execute and deliver documents which pledge such account in a manner which will be perfected under the Montana Uniform Commercial Code including a Deposit Account Control Agreement.  Further application of the balance of this account shall be only with the express written agreement of both parties.

These payments shall commence on the date which is the 45th day after arrival of the first servers to the Property, even if such first arrival does not consist of all servers ordered, or, if a weekend or holiday, the first business day thereafter.

e.  In addition to all payments due under the Lease and the New Loan, Hyperblock shall make monthly payments to Landlord of $19,815.00 as a credit enhancement fee for Landlord's securing of the New Loan for the entire term of the New Loan, on the final day of the month, commencing in January 2020.

6.  Renewable Energy Credits.   On or before the execution hereof, Tenant shall supply Landlord with copies of all correspondence with Missoula County regarding the potential of applying renewable energy credits to satisfy some of the requirements imposed by the Missoula County Commissioners affecting Tenant.

7.  Not a Precedent; Future Expansion.  Landlord's agreement pursuant to this Modification to remove Property from the scope of the Lease does not bind Landlord to agree to any future amendments reducing the leased Property, or the amount of Rent.  Should Tenant revise its

EXHIBIT 24.
PAGE 29

expansion plans to reincorporate the portions of the Property hereby removed from the Lease, the terms shall be the same as what was negotiated in the Third Amendment to the Lease.

8.   <u>Remaining Provisions of Agreements</u>.  To the extent not modified herein, all remaining provisions of the Agreements shall remain in full force and effect, and are hereby reaffirmed.

9.   <u>Counterparts</u>.  This Modification may be signed in counterparts and the counterparts assembled into one or more originals.  The counterparts shall be deemed delivered to the receiving party upon delivery of the signed counterparts to the receiving party's authorized representative.

-   SIGNATURES APPEAR ON FOLLOWING PAGE -

EXHIBIT 24.
PAGE 30

-

    IN WITNESS WHEREOF this Modification has been executed effective the date and year first above written.

LANDLORD:                                      TENANT:

Bonner Property Development, LLC               Hyperblock LLC


By: _____          By:_____
Stephen Nelson, Co-Manager             Print name:_____
                                       Its: _____


By: _____
Michael Boehme, Co-Manager

EXHIBIT 24.
PAGE 31

# MODIFICATION OF LEASE AGREEMENT, CREDIT ENHANCEMENT AGREEMENT, SECURITY AGREEMENT AND SIDE LETTER TO THIRD AMENDMENT TO LEASE AGREEMENT

**THIS MODIFICATION OF LEASE AGREEMENT, CREDIT ENHANCEMENT AGREEMENT, SECURITY AGREEMENT AND SIDE LETTER TO THIRD AMENDMENT TO LEASE AGREEMENT ("Modification")** is dated as of the 31st day of December, 2019, by and between Bonner Property Development, LLC, a Montana limited liability company ("Landlord"), and Hyperblock LLC, a Delaware limited liability company ("Tenant" and sometimes "Hyperblock").

## Recitals

A.      Effective March 1, 2016, Landlord and Project Spokane, LLC entered into that certain Commercial Lease Agreement (the "Lease") for certain real property premises located in the Bonner Mill Site in Bonner, Montana as further described in the Lease.  Capitalized terms not otherwise defined herein shall be as defined in the Lease.

B.      The original parties executed that certain First Amendment to Commercial Lease Agreement in December 2016, effective January 1, 2017 (the "First Amendment") and that certain Second Amendment to Commercial Lease Agreement dated July 13, 2017, but effective January 1, 2017 (the "Second Amendment").

C.      The Lease was assigned by Project Spokane to, and assumed by, Tenant pursuant to that certain Assignment, Assumption and Amendment of Lease executed effective July 10, 2018.

D.      Landlord and Tenant executed that certain Third Amendment to Commercial Lease Agreement dated and effective December 13, 2018 (the "Third Amendment").

E.      Landlord and Tenant executed that certain Fourth Amendment to Commercial Lease Agreement dated and effective January 23, 2019 (the "Fourth Amendment").

F.      The First Amendment, Second Amendment, Third Amendment and Fourth Amendment are collectively referred to herein as the "Lease Amendments".

G.      As part of a change in plans as to certain expansion and improvements at the Property, Tenant will not be occupying certain parts of the Property and Landlord has agreed to remove them from the Lease.

H.      A certain financing arrangement designed to fund infrastructure and improvements was created through a line of credit arrangement undertaken by Landlord with Bank of Montana for the benefit of Tenant, and the parties entered into certain agreements in that certain Side Agreement to Third Amendment to Lease Agreement between Landlord and Tenant dated January 23, 2019 (the "Side Agreement"), that certain Credit Enhancement Agreement between the parties, dated December 13, 2018 (the "Credit Enhancement Agreement")

and that certain Security Agreement dated December 13, 2018 (the "Security Agreement") (the Lease, Side Agreement, Credit Enhancement Agreement and Security Agreement, sometimes referred to as the "Agreements").   As part of the change in plans, this financing line will be increased from $2,625,000 to $3,540,000, and will instead be used for the acquisition of new servers (instead of real property improvements).

    H.    The parties wish to amend the Lease, as previously modified by the prior Amendments, and also to amend the terms of the Side Agreement, the Credit Enhancement Agreement, and the Security Agreement, all as set forth in this Modification.

## Amendments

    The parties agree as follows:

1. <u>Property</u>.

        a.    <u>Revised Description of "Property"</u>.   Subsections iii. and iv. of the first paragraph of **Section 1.a.,** added to the Lease pursuant to the Third Amendment, shall be deleted in their entirety.   They formerly read:

                iii.    Bare land located behind the Sorter building of approximately 106,650 square feet, as reflected on the site plan on **Exhibit F.**

                iv.    Land for the power substation consisting of 15,625 square feet (125 x 125), located as reflected on the site plan on **Exhibit G.**   In addition to such land, Landlord shall grant to Tenant an easement for power poles to be located along the river bank, as reflected on **Exhibit B.**

The accompanying **Exhibits F** and **G** are also deleted in their entirety.

    2. <u>Equity and Loan Financing of Improvements</u>.  **Subsection 1.b.II.ix**, added to the Lease pursuant to the Third Amendment, and relating to additional equity and loan financing of various improvements, shall be amended in its entirety to read as follows:

ix)    As part of an expansion of operations, Tenant is engaging in fundraising through additional borrowing of $3,540,000 from the Bank of Montana ("New Loan").  The New Loan shall consist of two separate portions:  $2,625,000.00 (the "Original Amount") and the remainder of $915,000 (the "New Amount").  Tenant has committed to the expenditure of all of the proceeds of the New Loan to the acquisition of new servers ("New Servers") which will be held and operated on the Property.  In connection with the New Loan, Landlord has agreed to provide certain credit enhancements through the pledge of Landlord's property to support such loan under the terms and conditions of the Lease, as amended, Side Agreement to Third Amendment to Lease Agreement between Landlord and Tenant dated January 23, 2019 (the "Side Agreement"), that certain Credit Enhancement Agreement between the parties, dated December 13, 2018 (the "Credit Enhancement Agreement") and that certain Security Agreement dated December 13, 2018.  Landlord shall not be obligated to approve disbursements by Lender under the New Loan except for purchases of New Servers as provided herein.  Landlord agrees to provide Bank of Montana and/or the applicable title company Landlord's approval and authorization for

disbursements on the New Loan provided Borrower submits to Landlord and the Bank of Montana fully detailed draw requests for disbursements supported by adequate invoices, purchase orders and other documentation that the disbursements are appropriate, and within the scope of and in accordance with specifications for New Servers approved in writing by Landlord. Notwithstanding anything provided herein, no advances shall be made in excess of the Original Amount without the establishment of the account for security for the New Amount provided in Section 5.c. of that certain Modification of Lease Agreement, Credit Enhancement Agreement, Security Agreement and Side Letter to Third Amendment to Lease Agreement dated December 31, 2019 (the "Modification") and unless the payments under Sections 5.d. and 5.e. of the Modification are current at such time.

3.  Base Rent.  **Sections 4.a.(i) and (ii)**, relating to rent for bare land and for land for a power substation are deleted in their entirety.  **Section 4.a.(i)** shall be amended and restated in its entirety, beginning effective December 1, 2019, to read as follows:

(i)     The Base Rent payable hereunder shall initially be as follows:

A.  $75,420.90 per month which is based on $3.71 per square foot per year multiplied by the square footage of the "Planer Building" and "Sorter Building" portions of the Property currently occupied by Tenant, 243,949 square feet, divided by 12 months.

The Base Rent as set forth above shall continue at this rate for through February 28, 2020.  On March 1, 2020, and then again on March 1st of each year thereafter, hereinafter referred to as a "Lease Anniversary Date," the Base Rent will increase two percent (2%) per annum.

4.  Pledge by Landlord for Bank of Montana Loan for Infrastructure and Improvements. Section 4 of the Third Amendment, regarding a pledge by Landlord for a loan at Bank of Montana is hereby modified to reflect that, instead of infrastructure and improvements, the New Loan will be used for the acquisition of New Servers.

5.  Credit Enhancement Agreement, Side Letter and Security Agreement.  The Credit Enhancement Agreement shall be amended to reflect the following new and modified provisions:

a.  The concepts of "New Equity" and "New Improvements" are eliminated from the Agreements and the proceeds of the "Bank Loan" (also referred to sometimes as "New Loan") from Bank of Montana will be used to acquire New Servers instead of real property improvements

b.  The Security Agreement is modified to include the Lease being amended by the Fourth Amendment to Commercial Lease Agreement dated January 23, 2019, and property described in this Modification, and is modified to include ALL personal property owned by Tenant which is located currently at the Property (and not just newly acquired New Servers), but specifically excluding all servers owned by Tenant and located on the Property as of the date of this Modification.

EXHIBIT 24.
PAGE 34

c.  At some time prior to any advances to be made in excess of the Original Amount. Hyperblock shall place into an account with Bank of Montana, an amount of cash in the full amount of the New Amount, which shall partially secure Hyperblock's obligations under the Agreements.  Hyperblock will execute and deliver documents which pledge such account in a manner which will be perfected under the Montana Uniform Commercial Code, including a Deposit Account Control Agreement. Alternatively, with Landlord's advance written consent, this obligation may be satisfied with alternative deposits or pledges, including cryptocurrency, in a manner satisfactory to Landlord and its legal counsel.

d.  Consistent with loan documents with Bank of Montana for the New Loan, payment by Hyperblock will commence as provided hereinafter.   Notwithstanding the minimum payment requirements of the New Loan, including interest only for 6 months ("BOM Minimum Payment") or the timing of such payments, Hyperblock shall also make an additional payment amount calculated and administered as follows:

-   the amount advanced under the New Loan shall be amortized in level payments of interest and principal over a 36-month term at the greater of (i) Wall Street Prime Rate plus 299 basis points, or (ii) 8.24% (the "BPD Payment Amount"), with the payment being adjusted from time to time for additional advances as approved and made;

-   the excess of the BPD Payment Amount over the BOM Minimum Payment (whether or not interest only) (the excess is estimated at approximately $24,474 per month) shall be paid into another special account maintained at Bank of Montana, which shall further secure the obligations of Hyperblock under the Agreements.  Hyperblock shall execute and deliver documents which pledge such account in a manner which will be perfected under the Montana Uniform Commercial Code including a Deposit Account Control Agreement.  Further application of the balance of this account shall be only with the express written agreement of both parties.

These payments shall commence on the date which is the 30th day after installation and operation of the first servers ordered to arrive at the Property, even if such first arrival does not consist of all servers ordered, or, if a weekend or holiday, the first business day thereafter.

e.  In addition to all payments due under the Lease and the New Loan, Hyperblock shall make monthly payments to Landlord of a credit enhancement fee for Landlord's securing of the New Loan for the entire term of the New Loan, on the final day of the month, commencing in January 2020.  The credit enhancement fee shall be 0.566038% of the amount advanced on the New Loan.  For example, if the amount advanced is only the Original Amount, the fee would be $14,858.50, and if the full amount is advanced, the fee would be $20,037.75.

f.  As additional consideration for the credit enhancement, Hyperblock shall issue

within 30 days of the date hereof stock warrants in form and content acceptable to Landlord and its counsel for shares of its publicly trading common shares, calculated as follows:  the number of shares of common stock subject to the warrant is the number which is calculated by dividing the number which is 15% of the total amount of the New Loan, whether fully advanced or not ($3,540,000 * .15 = $531,000) by a strike price to be determined on the first day that public trading is allowed by relevant regulatory authorities at the volume weighted average price (VWAP).  The warrants shall have a term of 5 years.

6.  <u>Renewable Energy Credits</u>.    On or before the execution hereof, Tenant shall supply Landlord with copies of all correspondence with Missoula County regarding the potential of applying renewable energy credits to satisfy some of the requirements imposed by the Missoula County Commissioners affecting Tenant.

7.  <u>Not a Precedent; Future Expansion</u>.  Landlord's agreement pursuant to this Modification to remove Property from the scope of the Lease does not bind Landlord to agree to any future amendments reducing the leased Property, or the amount of Rent.  Should Tenant revise its expansion plans to reincorporate the portions of the Property hereby removed from the Lease, the terms shall be the same as what was negotiated in the Third Amendment to the Lease.

8.  <u>Remaining Provisions of Agreements</u>.  To the extent not modified herein, all remaining provisions of the Agreements shall remain in full force and effect, and are hereby reaffirmed.

9.  <u>Counterparts</u>.  This Modification may be signed in counterparts and the counterparts assembled into one or more originals.  The counterparts shall be deemed delivered to the receiving party upon delivery of the signed counterparts to the receiving party's authorized representative.

-   SIGNATURES APPEAR ON FOLLOWING PAGE -

EXHIBIT 24.
PAGE 36

-

IN WITNESS WHEREOF this Modification has been executed effective the date and year first above written.

LANDLORD:                                    TENANT:

Bonner Property Development, LLC              Hyperblock LLC


By: _____         By:_____
Stephen Nelson, Co-Manager                   Print name:_____
                                             Its: _____


By: _____
Michael Boehme, Co-Manager

## MODIFICATION OF LEASE AGREEMENT, CREDIT ENHANCEMENT AGREEMENT, SECURITY AGREEMENT AND SIDE LETTER TO THIRD AMENDMENT TO LEASE AGREEMENT

**THIS MODIFICATION OF LEASE AGREEMENT, CREDIT ENHANCEMENT AGREEMENT, SECURITY AGREEMENT AND SIDE LETTER TO THIRD AMENDMENT TO LEASE AGREEMENT ("Modification")** is dated as of the 31st day of December, 2019, by and between Bonner Property Development, LLC, a Montana limited liability company ("Landlord"), and Hyperblock LLC, a Delaware limited liability company ("Tenant" and sometimes "Hyperblock").

### Recitals

A.      Effective March 1, 2016, Landlord and Project Spokane, LLC entered into that certain Commercial Lease Agreement (the "Lease") for certain real property premises located in the Bonner Mill Site in Bonner, Montana as further described in the Lease.  Capitalized terms not otherwise defined herein shall be as defined in the Lease.

B.      The original parties executed that certain First Amendment to Commercial Lease Agreement in December 2016, effective January 1, 2017 (the "First Amendment") and that certain Second Amendment to Commercial Lease Agreement dated July 13, 2017, but effective January 1, 2017 (the "Second Amendment").

C.      The Lease was assigned by Project Spokane to, and assumed by, Tenant pursuant to that certain Assignment, Assumption and Amendment of Lease executed effective July 10, 2018.

D.      Landlord and Tenant executed that certain Third Amendment to Commercial Lease Agreement dated and effective December 13, 2018 (the "Third Amendment").

E.      Landlord and Tenant executed that certain Fourth Amendment to Commercial Lease Agreement dated and effective January 23, 2019 (the "Fourth Amendment").

F.      The First Amendment, Second Amendment, Third Amendment and Fourth Amendment are collectively referred to herein as the "Lease Amendments".

G.      As part of a change in plans as to certain expansion and improvements at the Property, Tenant will not be occupying certain parts of the Property and Landlord has agreed to remove them from the Lease.

H.      A certain financing arrangement designed to fund infrastructure and improvements was created through a line of credit arrangement undertaken by Landlord with Bank of Montana for the benefit of Tenant, and the parties entered into certain agreements in that certain Side Agreement to Third Amendment to Lease Agreement between Landlord and Tenant dated January 23, 2019 (the "Side Agreement"), that certain Credit Enhancement Agreement between the parties, dated December 13, 2018 (the "Credit Enhancement Agreement")

and that certain Security Agreement dated December 13, 2018 (the "Security Agreement") (the Lease, Side Agreement, Credit Enhancement Agreement and Security Agreement, sometimes referred to as the "Agreements").  As part of the change in plans, this financing line will be increased from $2,625,000 to $3,540,000, and will instead be used for the acquisition of new servers (instead of real property improvements).

H.     The parties wish to amend the Lease, as previously modified by the prior Amendments, and also to amend the terms of the Side Agreement, the Credit Enhancement Agreement, and the Security Agreement, all as set forth in this Modification.

## Amendments

The parties agree as follows:

1.   Property.

a.     Revised Description of "Property".  Subsections iii. and iv. of the first paragraph of **Section 1.a.,** added to the Lease pursuant to the Third Amendment, shall be deleted in their entirety.  They formerly read:

iii.   Bare land located behind the Sorter building of approximately 106,65o square feet, as reflected on the site plan on **Exhibit F.**

iv.   Land for the power substation consisting of 15,625 square feet (125 x 125), located as reflected on the site plan on **Exhibit G.**   In addition to such land, Landlord shall grant to Tenant an easement for power poles to be located along the river bank, as reflected on **Exhibit B.**

The accompanying **Exhibits F** and **G** are also deleted in their entirety.

2.   Equity and Loan Financing of Improvements.  **Subsection 1.b.II.ix**, added to the Lease pursuant to the Third Amendment, and relating to additional equity and loan financing of various improvements, shall be amended in its entirety to read as follows:

ix)    As part of an expansion of operations, Tenant is engaging in fundraising through additional borrowing of $3,540,000 from the Bank of Montana ("New Loan").  The New Loan shall consist of two separate portions:  $2,625,000.00 (the "Original Amount") and the remainder of $915,000 (the "New Amount").  Tenant has committed to the expenditure of all of the proceeds of the New Loan to the acquisition of new servers ("New Servers") which will be held and operated on the Property.  In connection with the New Loan, Landlord has agreed to provide certain credit enhancements through the pledge of Landlord's property to support such loan under the terms and conditions of the Lease, as amended, Side Agreement to Third Amendment to Lease Agreement between Landlord and Tenant dated January 23, 2019 (the "Side Agreement"), that certain Credit Enhancement Agreement between the parties, dated December 13, 2018 (the "Credit Enhancement Agreement") and that certain Security Agreement dated December 13, 2018.  Landlord shall not be obligated to approve disbursements by Lender under the New Loan except for purchases of New Servers as provided herein.  Landlord agrees to provide Bank of Montana and/or the applicable title company Landlord's approval and authorization for

disbursements on the New Loan provided Borrower submits to Landlord and the Bank of Montana fully detailed draw requests for disbursements supported by adequate invoices, purchase orders and other documentation that the disbursements are appropriate, and within the scope of and in accordance with specifications for New Servers approved in writing by Landlord. Notwithstanding anything provided herein, no advances shall be made in excess of the Original Amount without the establishment of the account for security for the New Amount provided in Section 5.c. of that certain Modification of Lease Agreement, Credit Enhancement Agreement, Security Agreement and Side Letter to Third Amendment to Lease Agreement dated December 31, 2019 (the "Modification") and unless the payments under Sections 5.d. and 5.e. of the Modification are current at such time.

3.   Base Rent.   **Sections 4.a.(i) and (ii)**, relating to rent for bare land and for land for a power substation are deleted in their entirety.   **Section 4.a.(i)** shall be amended and restated in its entirety, beginning effective December 1, 2019, to read as follows:

(i)      The Base Rent payable hereunder shall initially be as follows:

A.   $75,420.90 per month which is based on $3.71 per square foot per year multiplied by the square footage of the "Planer Building" and "Sorter Building" portions of the Property currently occupied by Tenant, 243,949 square feet, divided by 12 months.

The Base Rent as set forth above shall continue at this rate for through February 28, 2020.   On March 1, 2020, and then again on March 1st of each year thereafter, hereinafter referred to as a "Lease Anniversary Date," the Base Rent will increase two percent (2%) per annum.

4.   Pledge by Landlord for Bank of Montana Loan for Infrastructure and Improvements. Section 4 of the Third Amendment, regarding a pledge by Landlord for a loan at Bank of Montana is hereby modified to reflect that, instead of infrastructure and improvements, the New Loan will be used for the acquisition of New Servers.

5.   Credit Enhancement Agreement, Side Letter and Security Agreement.   The Credit Enhancement Agreement shall be amended to reflect the following new and modified provisions:

a.   The concepts of "New Equity" and "New Improvements" are eliminated from the Agreements and the proceeds of the "Bank Loan" (also referred to sometimes as "New Loan") from Bank of Montana will be used to acquire New Servers instead of real property improvements

b.   The Security Agreement is modified to include the Lease being amended by the Fourth Amendment to Commercial Lease Agreement dated January 23, 2019, and property described in this Modification, and is modified to include ALL personal property owned by Tenant which is located currently at the Property (and not just newly acquired New Servers), but specifically excluding all servers owned by Tenant and located on the Property as of the date of this Modification.

EXHIBIT 24.
PAGE 40

c.  At some time prior to any advances to be made in excess of the Original Amount. Hyperblock shall place into an account with Bank of Montana, an amount of cash in the full amount of the New Amount, which shall partially secure Hyperblock's obligations under the Agreements.  Hyperblock will execute and deliver documents which pledge such account in a manner which will be perfected under the Montana Uniform Commercial Code, including a Deposit Account Control Agreement. Alternatively, with Landlord's advance written consent, this obligation may be satisfied with alternative deposits or pledges, including cryptocurrency, in a manner satisfactory to Landlord and its legal counsel.

d.  Consistent with loan documents with Bank of Montana for the New Loan, payment by Hyperblock will commence as provided hereinafter.   Notwithstanding the minimum payment requirements of the New Loan, including interest only for 6 months ("BOM Minimum Payment") or the timing of such payments, Hyperblock shall also make an additional payment amount calculated and administered as follows:

-  the amount advanced under the New Loan shall be amortized in level payments of interest and principal over a 36-month term at the greater of (i) Wall Street Prime Rate plus 299 basis points, or (ii) 8.24% (the "BPD Payment Amount"), with the payment being adjusted from time to time for additional advances as approved and made;

-  the excess of the BPD Payment Amount over the BOM Minimum Payment (whether or not interest only) (the excess is estimated at approximately $24,474 per month) shall be paid into another special account maintained at Bank of Montana, which shall further secure the obligations of Hyperblock under the Agreements.  Hyperblock shall execute and deliver documents which pledge such account in a manner which will be perfected under the Montana Uniform Commercial Code including a Deposit Account Control Agreement.  Further application of the balance of this account shall be only with the express written agreement of both parties.

These payments shall commence on the date which is the 30th day after installation and operation of the first servers ordered to arrive at the Property, even if such first arrival does not consist of all servers ordered, or, if a weekend or holiday, the first business day thereafter.

e.  In addition to all payments due under the Lease and the New Loan, Hyperblock shall make monthly payments to Landlord of a credit enhancement fee for Landlord's securing of the New Loan for the entire term of the New Loan, on the final day of the month, commencing in January 2020.  The credit enhancement fee shall be  0.5714286% of the amount advanced on the New Loan.  For example, if the amount advanced is only the Original Amount, the fee would be $ $15,000.00, and if the full amount is advanced, the fee would be  $20,228.57.

f.  As additional consideration for the credit enhancement, Hyperblock shall issue

within 30 days of the date hereof stock warrants in form and content acceptable to Landlord and its counsel for shares of its publicly trading common shares, calculated as follows:  the number of shares of common stock subject to the warrant is the number which is calculated by dividing the number which is 15% of the total amount of the New Loan, whether fully advanced or not ($3,540,000 * .15 = $531,000) by a strike price to be determined on the first day that public trading is allowed by relevant regulatory authorities at the volume weighted average price (VWAP).  The warrants shall have a term of 5 years.

6.  <u>Renewable Energy Credits</u>.    On or before the execution hereof, Tenant shall supply Landlord with copies of all correspondence with Missoula County regarding the potential of applying renewable energy credits to satisfy some of the requirements imposed by the Missoula County Commissioners affecting Tenant.

7.  <u>Not a Precedent; Future Expansion</u>.  Landlord's agreement pursuant to this Modification to remove Property from the scope of the Lease does not bind Landlord to agree to any future amendments reducing the leased Property, or the amount of Rent.  Should Tenant revise its expansion plans to reincorporate the portions of the Property hereby removed from the Lease, the terms shall be the same as what was negotiated in the Third Amendment to the Lease.

8.  <u>Remaining Provisions of Agreements</u>.  To the extent not modified herein, all remaining provisions of the Agreements shall remain in full force and effect, and are hereby reaffirmed.

9.  <u>Counterparts</u>.  This Modification may be signed in counterparts and the counterparts assembled into one or more originals.  The counterparts shall be deemed delivered to the receiving party upon delivery of the signed counterparts to the receiving party's authorized representative.

-   SIGNATURES APPEAR ON FOLLOWING PAGE -

EXHIBIT 24.
PAGE 42

-

IN WITNESS WHEREOF this Modification has been executed effective the date and year first above written.

LANDLORD:                                      TENANT:

Bonner Property Development, LLC               Hyperblock LLC


By: _____         By:_____
Stephen Nelson, Co-Manager               Print name:_____
                                         Its: _____


By: _____
Michael Boehme, Co-Manager

EXHIBIT 25.
PAGE 1

## MODIFICATION OF LEASE AGREEMENT, CREDIT ENHANCEMENT AGREEMENT, SECURITY AGREEMENT AND SIDE LETTER TO THIRD AMENDMENT TO LEASE AGREEMENT

**THIS MODIFICATION OF LEASE AGREEMENT, CREDIT ENHANCEMENT AGREEMENT, SECURITY AGREEMENT AND SIDE LETTER TO THIRD AMENDMENT TO LEASE AGREEMENT ("Modification")** is dated as of the 31st day of December, 2019, by and between Bonner Property Development, LLC, a Montana limited liability company ("Landlord"), and Hyperblock LLC, a Delaware limited liability company ("Tenant" and sometimes "Hyperblock").

### Recitals

A.       Effective March 1, 2016, Landlord and Project Spokane, LLC entered into that certain Commercial Lease Agreement (the "Lease") for certain real property premises located in the Bonner Mill Site in Bonner, Montana as further described in the Lease.  Capitalized terms not otherwise defined herein shall be as defined in the Lease.

B.       The original parties executed that certain First Amendment to Commercial Lease Agreement in December 2016, effective January 1, 2017 (the "First Amendment") and that certain Second Amendment to Commercial Lease Agreement dated July 13, 2017, but effective January 1, 2017 (the "Second Amendment").

C.       The Lease was assigned by Project Spokane to, and assumed by, Tenant pursuant to that certain Assignment, Assumption and Amendment of Lease executed effective July 10, 2018.

D.       Landlord and Tenant executed that certain Third Amendment to Commercial Lease Agreement dated and effective December 13, 2018 (the "Third Amendment").

E.       Landlord and Tenant executed that certain Fourth Amendment to Commercial Lease Agreement dated and effective January 23, 2019 (the "Fourth Amendment").

F.       The First Amendment, Second Amendment, Third Amendment and Fourth Amendment are collectively referred to herein as the "Lease Amendments".

G.       As part of a change in plans as to certain expansion and improvements at the Property, Tenant will not be occupying certain parts of the Property and Landlord has agreed to remove them from the Lease.

H.       A certain financing arrangement designed to fund infrastructure and improvements was created through a line of credit arrangement undertaken by Landlord with Bank of Montana for the benefit of Tenant, and the parties entered into certain agreements in that certain Side Agreement to Third Amendment to Lease Agreement between Landlord and Tenant dated January 23, 2019 (the "Side Agreement"), that certain Credit Enhancement Agreement between the parties, dated December 13, 2018 (the "Credit Enhancement Agreement")

and that certain Security Agreement dated December 13, 2018 (the "Security Agreement") (the Lease, Side Agreement, Credit Enhancement Agreement and Security Agreement, sometimes referred to as the "Agreements").  As part of the change in plans, this financing line will be increased from $2,625,000 to $3,540,000, and will instead be used for the acquisition of new servers (instead of real property improvements).

H.      The parties wish to amend the Lease, as previously modified by the prior Amendments, and also to amend the terms of the Side Agreement, the Credit Enhancement Agreement, and the Security Agreement, all as set forth in this Modification.

## Amendments

The parties agree as follows:

1.  Property.

a.      Revised Description of "Property".  Subsections iii. and iv. of the first paragraph of **Section 1.a.,** added to the Lease pursuant to the Third Amendment, shall be deleted in their entirety.  They formerly read:

iii.   Bare land located behind the Sorter building of approximately 106,650 square feet, as reflected on the site plan on **Exhibit F.**

iv.   Land for the power substation consisting of 15,625 square feet (125 x 125), located as reflected on the site plan on **Exhibit G.**   In addition to such land, Landlord shall grant to Tenant an easement for power poles to be located along the river bank, as reflected on **Exhibit B.**

The accompanying **Exhibits F** and **G** are also deleted in their entirety.

2.  Equity and Loan Financing of Improvements.  **Subsection 1.b.II.ix**, added to the Lease pursuant to the Third Amendment, and relating to additional equity and loan financing of various improvements, shall be amended in its entirety to read as follows:

ix)      As part of an expansion of operations, Tenant is engaging in fundraising through additional borrowing of $3,540,000 from the Bank of Montana ("New Loan").  The New Loan shall consist of two separate portions:  $2,625,000.00 (the "Original Amount") and the remainder of $915,000 (the "New Amount").  Tenant has committed to the expenditure of all of the proceeds of the New Loan to the acquisition of new servers ("New Servers") which will be held and operated on the Property.  In connection with the New Loan, Landlord has agreed to provide certain credit enhancements through the pledge of Landlord's property to support such loan under the terms and conditions of the Lease, as amended, Side Agreement to Third Amendment to Lease Agreement between Landlord and Tenant dated January 23, 2019 (the "Side Agreement"), that certain Credit Enhancement Agreement between the parties, dated December 13, 2018 (the "Credit Enhancement Agreement") and that certain Security Agreement dated December 13, 2018.  Landlord shall not be obligated to approve disbursements by Lender under the New Loan except for purchases of New Servers as provided herein.  Landlord agrees to provide Bank of Montana and/or the applicable title company Landlord's approval and authorization for

EXHIBIT 25.
PAGE 3

disbursements on the New Loan provided Borrower submits to Landlord and the Bank of Montana fully detailed draw requests for disbursements supported by adequate invoices, purchase orders and other documentation that the disbursements are appropriate, and within the scope of and in accordance with specifications for New Servers approved in writing by Landlord. Notwithstanding anything provided herein, no advances shall be made in excess of the Original Amount without the establishment of the account for security for the New Amount provided in Section 5.c. of that certain Modification of Lease Agreement, Credit Enhancement Agreement, Security Agreement and Side Letter to Third Amendment to Lease Agreement dated December 31, 2019 (the "Modification") and unless the payments under Sections 5.d. and 5.e. of the Modification are current at such time.

3.   Base Rent.  **Sections 4.a.(i) and (ii)**, relating to rent for bare land and for land for a power substation are deleted in their entirety.  **Section 4.a.(i)** shall be amended and restated in its entirety, beginning effective December 1, 2019, to read as follows:

(i)   The Base Rent payable hereunder shall initially be as follows:

A.  $75,420.90 per month which is based on $3.71 per square foot per year multiplied by the square footage of the "Planer Building" and "Sorter Building" portions of the Property currently occupied by Tenant, 243,949 square feet, divided by 12 months.

The Base Rent as set forth above shall continue at this rate for through February 28, 2020.  On March 1, 2020, and then again on March 1st of each year thereafter, hereinafter referred to as a "Lease Anniversary Date," the Base Rent will increase two percent (2%) per annum.

4.   Pledge by Landlord for Bank of Montana Loan for Infrastructure and Improvements. Section 4 of the Third Amendment, regarding a pledge by Landlord for a loan at Bank of Montana is hereby modified to reflect that, instead of infrastructure and improvements, the New Loan will be used for the acquisition of New Servers.

5.   Credit Enhancement Agreement, Side Letter and Security Agreement.  The Credit Enhancement Agreement shall be amended to reflect the following new and modified provisions:

a.   The concepts of "New Equity" and "New Improvements" are eliminated from the Agreements and the proceeds of the "Bank Loan" (also referred to sometimes as "New Loan") from Bank of Montana will be used to acquire New Servers instead of real property improvements

b.   The Security Agreement is modified to include the Lease being amended by the Fourth Amendment to Commercial Lease Agreement dated January 23, 2019, and property described in this Modification, and is modified to include ALL personal property owned by Tenant which is located currently at the Property (and not just newly acquired New Servers), but specifically excluding all servers owned by Tenant and located on the Property as of the date of this Modification.

c. At some time prior to any advances to be made in excess of the Original Amount. Hyperblock shall place into an account with Bank of Montana, an amount of cash in the full amount of the New Amount, which shall partially secure Hyperblock's obligations under the Agreements. Hyperblock will execute and deliver documents which pledge such account in a manner which will be perfected under the Montana Uniform Commercial Code, including a Deposit Account Control Agreement. Alternatively, with Landlord's advance written consent, this obligation may be satisfied with alternative deposits or pledges, including cryptocurrency, in a manner satisfactory to Landlord and its legal counsel.

d. Consistent with loan documents with Bank of Montana for the New Loan, payment by Hyperblock will commence as provided hereinafter.   Notwithstanding the minimum payment requirements of the New Loan, including interest only for 6 months ("BOM Minimum Payment") or the timing of such payments, Hyperblock shall also make an additional payment amount calculated and administered as follows:

- the amount advanced under the New Loan shall be amortized in level payments of interest and principal over a 36-month term at the greater of (i) Wall Street Prime Rate plus 299 basis points, or (ii) 8.24% (the "BPD Payment Amount"), with the payment being adjusted from time to time for additional advances as approved and made;

- the excess of the BPD Payment Amount over the BOM Minimum Payment (whether or not interest only) (the excess is estimated at approximately $24,474 per month) shall be paid into another special account maintained at Bank of Montana, which shall further secure the obligations of Hyperblock under the Agreements. Hyperblock shall execute and deliver documents which pledge such account in a manner which will be perfected under the Montana Uniform Commercial Code including a Deposit Account Control Agreement.  Further application of the balance of this account shall be only with the express written agreement of both parties.

- For one example, if the interest rate is 8.24% and the loan balance is $2,625,000, then the BOM Minimum Payment would be approximately $64,380 per month, and the 36-month amortized payment would be approximately $82,549 per month, resulting in an excess payment of approximately $18,168 per month and a Credit Enhancement Fee of $15,000 per month.

- For another example, if the interest rate is 8.24% and the loan balance is $3,540,000, then the BOM Minimum Payment would be approximately $86,821 per month, and the 36-month amortized payment would be approximately $111,323 per month, resulting in an excess payment of approximately $24,502 and a Credit Enhancement Fee of approximately $20,229 per month.

These payments shall commence on the date which is the 30th day after installation and operation of the first servers ordered to arrive at the Property, even if such first arrival does not consist of all servers ordered, or, if a weekend or holiday, the first business day thereafter.

e.   In addition to all payments due under the Lease and the New Loan, Hyperblock shall make monthly payments to Landlord of a credit enhancement fee for Landlord's securing of the New Loan for the entire term of the New Loan, on the final day of the month, commencing in January 2020.  The credit enhancement fee shall be 0.5714286% of the amount advanced on the New Loan.  For example, if the amount advanced is only the Original Amount, the fee would be $ $15,000.00, and if the full amount is advanced, the fee would be $20,228.57.

f.   As additional consideration for the credit enhancement, Hyperblock shall issue within 60 days of the date that Hyperblock stock resumes active trading, stock warrants in form and content acceptable to Landlord and its counsel for shares of its publicly trading common shares, calculated as follows:  the number of shares of common stock subject to the warrant is the number which is calculated by dividing the number which is 15% of the total amount of the New Loan, whether fully advanced or not ($3,540,000 * .15 = $531,000) by a strike price to be determined on the first day that public trading is allowed by relevant regulatory authorities at the volume weighted average price (VWAP).  The warrants shall have a term of 5 years.

6.   Renewable Energy Credits.   On or before the execution hereof, Tenant shall supply Landlord with copies of all correspondence with Missoula County regarding the potential of applying renewable energy credits to satisfy some of the requirements imposed by the Missoula County Commissioners affecting Tenant.

7.   Not a Precedent; Future Expansion.  Landlord's agreement pursuant to this Modification to remove Property from the scope of the Lease does not bind Landlord to agree to any future amendments reducing the leased Property, or the amount of Rent.  Should Tenant revise its expansion plans to reincorporate the portions of the Property hereby removed from the Lease, the terms shall be the same as what was negotiated in the Third Amendment to the Lease.

8.   Remaining Provisions of Agreements.  To the extent not modified herein, all remaining provisions of the Agreements shall remain in full force and effect, and are hereby reaffirmed.

9.   Counterparts.  This Modification may be signed in counterparts and the counterparts assembled into one or more originals.  The counterparts shall be deemed delivered to the receiving party upon delivery of the signed counterparts to the receiving party's authorized representative.

-   SIGNATURES APPEAR ON FOLLOWING PAGE -

EXHIBIT 25.
PAGE 6

IN WITNESS WHEREOF this Modification has been executed effective the date and year first above written.

LANDLORD:                                             TENANT:

Bonner Property Development, LLC                      Hyperblock LLC

By: _____                        By: _____
Stephen Nelson, Co-Manager                           Print name: _____
                                                     Its: _____

By: _____
Michael Boehme, Co-Manager

IN WITNESS WHEREOF this Modification has been executed effective the date and year first above written.

LANDLORD:                                    TENANT:

Bonner Property Development, LLC             Hyperblock LLC

By: _____         By: _____
Stephen Nelson, Co-Manager                   Print name:  Sean M. Walsh
                                             Its:   Chief Executive Officer

By: _____
Michael Boehme, Co-Manager

EXHIBIT 26.
PAGE 1

Modification of Lease Agreement Credit Enhancement Agreement et al. 12.30.19 V4.docx

---

**From:** Dan Stivers <dan@hyperblock.co>
**Sent:** Thursday, January 02, 2020 12:45 PM
**To:** David Bjornson <david@bjornsonlaw.com>; Steve Nelson <bsmcorpmt@gmail.com>
**Subject:** For Review - Modification of Lease Agreement and Credit Enhancement Fee

Hi David and Steve,

Our review is complete. Please review the two examples added in section 5 d for the purpose of clarification. If you are ok with these, then this version of the agreement is final.

Thanks

Dan

| | |
|---|---|
| **From:** | David Bjornson |
| **To:** | Jill Broughton |
| **Subject:** | FW: For Review - Modification of Lease Agreement and Credit Enhancement Fee |
| **Date:** | Sunday, January 5, 2020 9:26:07 PM |
| **Attachments:** | Modification of Lease Agreement Credit Enhancement Agreement et al. 12.30.19 V5.docx |

**From:** Dan Stivers <dan@hyperblock.co>
**Sent:** Thursday, January 02, 2020 3:26 PM
**To:** David Bjornson <david@bjornsonlaw.com>; Steve Nelson <bsmcorpmt@gmail.com>
**Subject:** Re: For Review - Modification of Lease Agreement and Credit Enhancement Fee

One more small change. See section 5 f
Edited the timing of the stock warrant issuance to resemble the process by regulation

Use this version as final. See attached.

On Thu, Jan 2, 2020 at 12:45 PM Dan Stivers <dan@hyperblock.co> wrote:

> Hi David and Steve,
>
> Our review is complete. Please review the two examples added in section 5 d for the purpose of clarification. If you are ok with these, then this version of the agreement is final.
>
> Thanks
> Dan

EXHIBIT 26.
PAGE 3

ATTACHMENT TO 26(i)

# MODIFICATION OF LEASE AGREEMENT, CREDIT ENHANCEMENT AGREEMENT, SECURITY AGREEMENT AND SIDE LETTER TO THIRD AMENDMENT TO LEASE AGREEMENT

**THIS MODIFICATION OF LEASE AGREEMENT, CREDIT ENHANCEMENT AGREEMENT, SECURITY AGREEMENT AND SIDE LETTER TO THIRD AMENDMENT TO LEASE AGREEMENT ("Modification")** is dated as of the 31st day of December, 2019, by and between Bonner Property Development, LLC, a Montana limited liability company ("Landlord"), and Hyperblock LLC, a Delaware limited liability company ("Tenant" and sometimes "Hyperblock").

## Recitals

A.      Effective March 1, 2016, Landlord and Project Spokane, LLC entered into that certain Commercial Lease Agreement (the "Lease") for certain real property premises located in the Bonner Mill Site in Bonner, Montana as further described in the Lease.  Capitalized terms not otherwise defined herein shall be as defined in the Lease.

B.      The original parties executed that certain First Amendment to Commercial Lease Agreement in December 2016, effective January 1, 2017 (the "First Amendment") and that certain Second Amendment to Commercial Lease Agreement dated July 13, 2017, but effective January 1, 2017 (the "Second Amendment").

C.      The Lease was assigned by Project Spokane to, and assumed by, Tenant pursuant to that certain Assignment, Assumption and Amendment of Lease executed effective July 10, 2018.

D.      Landlord and Tenant executed that certain Third Amendment to Commercial Lease Agreement dated and effective December 13, 2018 (the "Third Amendment").

E.      Landlord and Tenant executed that certain Fourth Amendment to Commercial Lease Agreement dated and effective January 23, 2019 (the "Fourth Amendment").

F.      The First Amendment, Second Amendment, Third Amendment and Fourth Amendment are collectively referred to herein as the "Lease Amendments".

G.      As part of a change in plans as to certain expansion and improvements at the Property, Tenant will not be occupying certain parts of the Property and Landlord has agreed to remove them from the Lease.

H.      A certain financing arrangement designed to fund infrastructure and improvements was created through a line of credit arrangement undertaken by Landlord with Bank of Montana for the benefit of Tenant, and the parties entered into certain agreements in that certain Side Agreement to Third Amendment to Lease Agreement between Landlord and Tenant dated January 23, 2019 (the "Side Agreement"), that certain Credit Enhancement Agreement between the parties, dated December 13, 2018 (the "Credit Enhancement Agreement")

and that certain Security Agreement dated December 13, 2018 (the "Security Agreement") (the Lease, Side Agreement, Credit Enhancement Agreement and Security Agreement, sometimes referred to as the "Agreements"). As part of the change in plans, this financing line will be increased from $2,625,000 to $3,540,000, and will instead be used for the acquisition of new servers (instead of real property improvements).

H.     The parties wish to amend the Lease, as previously modified by the prior Amendments, and also to amend the terms of the Side Agreement, the Credit Enhancement Agreement, and the Security Agreement, all as set forth in this Modification.

## Amendments

The parties agree as follows:

1.   Property.

a.     Revised Description of "Property". Subsections iii. and iv. of the first paragraph of **Section 1.a.,** added to the Lease pursuant to the Third Amendment, shall be deleted in their entirety. They formerly read:

iii.   Bare land located behind the Sorter building of approximately 106,650 square feet, as reflected on the site plan on **Exhibit F.**

iv.   Land for the power substation consisting of 15,625 square feet (125 x 125), located as reflected on the site plan on **Exhibit G.**   In addition to such land, Landlord shall grant to Tenant an easement for power poles to be located along the river bank, as reflected on **Exhibit B.**

The accompanying **Exhibits F** and **G** are also deleted in their entirety.

2.   Equity and Loan Financing of Improvements. **Subsection 1.b.II.ix**, added to the Lease pursuant to the Third Amendment, and relating to additional equity and loan financing of various improvements, shall be amended in its entirety to read as follows:

ix)     As part of an expansion of operations, Tenant is engaging in fundraising through additional borrowing of $3,540,000 from the Bank of Montana ("New Loan"). The New Loan shall consist of two separate portions: $2,625,000.00 (the "Original Amount") and the remainder of $915,000 (the "New Amount"). Tenant has committed to the expenditure of all of the proceeds of the New Loan to the acquisition of new servers ("New Servers") which will be held and operated on the Property. In connection with the New Loan, Landlord has agreed to provide certain credit enhancements through the pledge of Landlord's property to support such loan under the terms and conditions of the Lease, as amended, Side Agreement to Third Amendment to Lease Agreement between Landlord and Tenant dated January 23, 2019 (the "Side Agreement"), that certain Credit Enhancement Agreement between the parties, dated December 13, 2018 (the "Credit Enhancement Agreement") and that certain Security Agreement dated December 13, 2018. Landlord shall not be obligated to approve disbursements by Lender under the New Loan except for purchases of New Servers as provided herein. Landlord agrees to provide Bank of Montana and/or the applicable title company Landlord's approval and authorization for

disbursements on the New Loan provided Borrower submits to Landlord and the Bank of Montana fully detailed draw requests for disbursements supported by adequate invoices, purchase orders and other documentation that the disbursements are appropriate, and within the scope of and in accordance with specifications for New Servers approved in writing by Landlord. Notwithstanding anything provided herein, no advances shall be made in excess of the Original Amount without the establishment of the account for security for the New Amount provided in Section 5.c. of that certain Modification of Lease Agreement, Credit Enhancement Agreement, Security Agreement and Side Letter to Third Amendment to Lease Agreement dated December 31, 2019 (the "Modification") and unless the payments under Sections 5.d. and 5.e. of the Modification are current at such time.

    3.  Base Rent.  **Sections 4.a.(i) and (ii)**, relating to rent for bare land and for land for a power substation are deleted in their entirety.  **Section 4.a.(i)** shall be amended and restated in its entirety, beginning effective December 1, 2019, to read as follows:

        (i)      The Base Rent payable hereunder shall initially be as follows:

            A.  $75,420.90 per month which is based on $3.71 per square foot per year multiplied by the square footage of the "Planer Building" and "Sorter Building" portions of the Property currently occupied by Tenant, 243,949 square feet, divided by 12 months.

            The Base Rent as set forth above shall continue at this rate for through February 28, 2020.  On March 1, 2020, and then again on March 1st of each year thereafter, hereinafter referred to as a "Lease Anniversary Date," the Base Rent will increase two percent (2%) per annum.

    4.  Pledge by Landlord for Bank of Montana Loan for Infrastructure and Improvements. Section 4 of the Third Amendment, regarding a pledge by Landlord for a loan at Bank of Montana is hereby modified to reflect that, instead of infrastructure and improvements, the New Loan will be used for the acquisition of New Servers.

    5.  Credit Enhancement Agreement, Side Letter and Security Agreement.  The Credit Enhancement Agreement shall be amended to reflect the following new and modified provisions:

      a.  The concepts of "New Equity" and "New Improvements" are eliminated from the Agreements and the proceeds of the "Bank Loan" (also referred to sometimes as "New Loan") from Bank of Montana will be used to acquire New Servers instead of real property improvements

      b.  The Security Agreement is modified to include the Lease being amended by the Fourth Amendment to Commercial Lease Agreement dated January 23, 2019, and property described in this Modification, and is modified to include ALL personal property owned by Tenant which is located currently at the Property (and not just newly acquired New Servers), but specifically excluding all servers owned by Tenant and located on the Property as of the date of this Modification.

EXHIBIT 26.
PAGE 6

c.  At some time prior to any advances to be made in excess of the Original Amount. Hyperblock shall place into an account with Bank of Montana, an amount of cash in the full amount of the New Amount, which shall partially secure Hyperblock's obligations under the Agreements.  Hyperblock will execute and deliver documents which pledge such account in a manner which will be perfected under the Montana Uniform Commercial Code, including a Deposit Account Control Agreement. Alternatively, with Landlord's advance written consent, this obligation may be satisfied with alternative deposits or pledges, including cryptocurrency, in a manner satisfactory to Landlord and its legal counsel.

d.  Consistent with loan documents with Bank of Montana for the New Loan, payment by Hyperblock will commence as provided hereinafter.   Notwithstanding the minimum payment requirements of the New Loan, including interest only for 6 months ("BOM Minimum Payment") or the timing of such payments, Hyperblock shall also make an additional payment amount calculated and administered as follows:

- the amount advanced under the New Loan shall be amortized in level payments of interest and principal over a 36-month term at the greater of (i) Wall Street Prime Rate plus 299 basis points, or (ii) 8.24% (the "BPD Payment Amount"), with the payment being adjusted from time to time for additional advances as approved and made;

- the excess of the BPD Payment Amount over the BOM Minimum Payment (whether or not interest only) (the excess is estimated at approximately $24,474 per month) shall be paid into another special account maintained at Bank of Montana, which shall further secure the obligations of Hyperblock under the Agreements.  Hyperblock shall execute and deliver documents which pledge such account in a manner which will be perfected under the Montana Uniform Commercial Code including a Deposit Account Control Agreement.  Further application of the balance of this account shall be only with the express written agreement of both parties.

- For one example, if the interest rate is 8.24% and the loan balance is $2,625,000, then the BOM Minimum Payment would be approximately $64,380 per month, and the 36-month amortized payment would be approximately $82,549 per month, resulting in an excess payment of approximately $18,168 per month and a Credit Enhancement Fee of $15,000 per month.

- For another example, if the interest rate is 8.24% and the loan balance is $3,540,000, then the BOM Minimum Payment would be approximately $86,821 per month, and the 36-month amortized payment would be approximately $111,323 per month, resulting in an excess payment of approximately $24,502 and a Credit Enhancement Fee of approximately $20,229 per month.

EXHIBIT 26.
PAGE 7

These payments shall commence on the date which is the 30th day after installation and operation of the first servers ordered to arrive at the Property, even if such first arrival does not consist of all servers ordered, or, if a weekend or holiday, the first business day thereafter.

e.   In addition to all payments due under the Lease and the New Loan, Hyperblock shall make monthly payments to Landlord of a credit enhancement fee for Landlord's securing of the New Loan for the entire term of the New Loan, on the final day of the month, commencing in January 2020.  The credit enhancement fee shall be 0.5714286% of the amount advanced on the New Loan.  For example, if the amount advanced is only the Original Amount, the fee would be $ 15,000.00, and if the full amount is advanced, the fee would be $20,228.57.

f.   As additional consideration for the credit enhancement, Hyperblock shall issue within 30 days of the date hereof stock warrants in form and content acceptable to Landlord and its counsel for shares of its publicly trading common shares, calculated as follows:  the number of shares of common stock subject to the warrant is the number which is calculated by dividing the number which is 15% of the total amount of the New Loan, whether fully advanced or not ($3,540,000 * .15 = $531,000) by a strike price to be determined on the first day that public trading is allowed by relevant regulatory authorities at the volume weighted average price (VWAP).  The warrants shall have a term of 5 years.

6.   <u>Renewable Energy Credits</u>.   On or before the execution hereof, Tenant shall supply Landlord with copies of all correspondence with Missoula County regarding the potential of applying renewable energy credits to satisfy some of the requirements imposed by the Missoula County Commissioners affecting Tenant.

7.   <u>Not a Precedent; Future Expansion</u>.  Landlord's agreement pursuant to this Modification to remove Property from the scope of the Lease does not bind Landlord to agree to any future amendments reducing the leased Property, or the amount of Rent.  Should Tenant revise its expansion plans to reincorporate the portions of the Property hereby removed from the Lease, the terms shall be the same as what was negotiated in the Third Amendment to the Lease.

8.   <u>Remaining Provisions of Agreements</u>.  To the extent not modified herein, all remaining provisions of the Agreements shall remain in full force and effect, and are hereby reaffirmed.

9.   <u>Counterparts</u>.  This Modification may be signed in counterparts and the counterparts assembled into one or more originals.  The counterparts shall be deemed delivered to the receiving party upon delivery of the signed counterparts to the receiving party's authorized representative.

-   SIGNATURES APPEAR ON FOLLOWING PAGE -

EXHIBIT 26.
PAGE 8

-

 IN WITNESS WHEREOF this Modification has been executed effective the date and year first above written.

LANDLORD:                              TENANT:

Bonner Property Development, LLC        Hyperblock LLC


By: _____           By:_____
Stephen Nelson, Co-Manager             Print name:_____
                                       Its: _____


By: _____
Michael Boehme, Co-Manager

EXHIBIT 26.
PAGE 9

**MODIFICATION OF LEASE AGREEMENT, CREDIT ENHANCEMENT AGREEMENT, SECURITY AGREEMENT AND SIDE LETTER TO THIRD AMENDMENT TO LEASE AGREEMENT**

**THIS MODIFICATION OF LEASE AGREEMENT, CREDIT ENHANCEMENT AGREEMENT, SECURITY AGREEMENT AND SIDE LETTER TO THIRD AMENDMENT TO LEASE AGREEMENT ("Modification")** is dated as of the 31st day of December, 2019, by and between Bonner Property Development, LLC, a Montana limited liability company ("Landlord"), and Hyperblock LLC, a Delaware limited liability company ("Tenant" and sometimes "Hyperblock").

**Recitals**

A.      Effective March 1, 2016, Landlord and Project Spokane, LLC entered into that certain Commercial Lease Agreement (the "Lease") for certain real property premises located in the Bonner Mill Site in Bonner, Montana as further described in the Lease.  Capitalized terms not otherwise defined herein shall be as defined in the Lease.

B.      The original parties executed that certain First Amendment to Commercial Lease Agreement in December 2016, effective January 1, 2017 (the "First Amendment") and that certain Second Amendment to Commercial Lease Agreement dated July 13, 2017, but effective January 1, 2017 (the "Second Amendment").

C.      The Lease was assigned by Project Spokane to, and assumed by, Tenant pursuant to that certain Assignment, Assumption and Amendment of Lease executed effective July 10, 2018.

D.      Landlord and Tenant executed that certain Third Amendment to Commercial Lease Agreement dated and effective December 13, 2018 (the "Third Amendment").

E.      Landlord and Tenant executed that certain Fourth Amendment to Commercial Lease Agreement dated and effective January 23, 2019 (the "Fourth Amendment").

F.      The First Amendment, Second Amendment, Third Amendment and Fourth Amendment are collectively referred to herein as the "Lease Amendments".

G.      As part of a change in plans as to certain expansion and improvements at the Property, Tenant will not be occupying certain parts of the Property and Landlord has agreed to remove them from the Lease.

H.      A certain financing arrangement designed to fund infrastructure and improvements was created through a line of credit arrangement undertaken by Landlord with Bank of Montana for the benefit of Tenant, and the parties entered into certain agreements in that certain Side Agreement to Third Amendment to Lease Agreement between Landlord and Tenant dated January 23, 2019 (the "Side Agreement"), that certain Credit Enhancement Agreement between the parties, dated December 13, 2018 (the "Credit Enhancement Agreement")

and that certain Security Agreement dated December 13, 2018 (the "Security Agreement") (the Lease, Side Agreement, Credit Enhancement Agreement and Security Agreement, sometimes referred to as the "Agreements").  As part of the change in plans, this financing line will be increased from $2,625,000 to $3,540,000, and will instead be used for the acquisition of new servers (instead of real property improvements).

H.     The parties wish to amend the Lease, as previously modified by the prior Amendments, and also to amend the terms of the Side Agreement, the Credit Enhancement Agreement, and the Security Agreement, all as set forth in this Modification.

## Amendments

The parties agree as follows:

1. Property.

a.     Revised Description of "Property".  Subsections iii. and iv. of the first paragraph of **Section 1.a.,** added to the Lease pursuant to the Third Amendment, shall be deleted in their entirety.  They formerly read:

iii.   Bare land located behind the Sorter building of approximately 106,650 square feet, as reflected on the site plan on **Exhibit F.**

iv.   Land for the power substation consisting of 15,625 square feet (125 x 125), located as reflected on the site plan on **Exhibit G.**   In addition to such land, Landlord shall grant to Tenant an easement for power poles to be located along the river bank, as reflected on **Exhibit B.**

The accompanying **Exhibits F** and **G** are also deleted in their entirety.

2. Equity and Loan Financing of Improvements.  **Subsection 1.b.II.ix**, added to the Lease pursuant to the Third Amendment, and relating to additional equity and loan financing of various improvements, shall be amended in its entirety to read as follows:

ix)     As part of an expansion of operations, Tenant is engaging in fundraising through additional borrowing of $3,540,000 from the Bank of Montana ("New Loan").  The New Loan shall consist of two separate portions:  $2,625,000.00 (the "Original Amount") and the remainder of $915,000 (the "New Amount").  Tenant has committed to the expenditure of all of the proceeds of the New Loan to the acquisition of new servers ("New Servers") which will be held and operated on the Property.  In connection with the New Loan, Landlord has agreed to provide certain credit enhancements through the pledge of Landlord's property to support such loan under the terms and conditions of the Lease, as amended, Side Agreement to Third Amendment to Lease Agreement between Landlord and Tenant dated January 23, 2019 (the "Side Agreement"), that certain Credit Enhancement Agreement between the parties, dated December 13, 2018 (the "Credit Enhancement Agreement") and that certain Security Agreement dated December 13, 2018.  Landlord shall not be obligated to approve disbursements by Lender under the New Loan except for purchases of New Servers as provided herein.  Landlord agrees to provide Bank of Montana and/or the applicable title company Landlord's approval and authorization for

EXHIBIT 26.
PAGE 11

disbursements on the New Loan provided Borrower submits to Landlord and the Bank of Montana fully detailed draw requests for disbursements supported by adequate invoices, purchase orders and other documentation that the disbursements are appropriate, and within the scope of and in accordance with specifications for New Servers approved in writing by Landlord. Notwithstanding anything provided herein, no advances shall be made in excess of the Original Amount without the establishment of the account for security for the New Amount provided in Section 5.c. of that certain Modification of Lease Agreement, Credit Enhancement Agreement, Security Agreement and Side Letter to Third Amendment to Lease Agreement dated December 31, 2019 (the "Modification") and unless the payments under Sections 5.d. and 5.e. of the Modification are current at such time.

3.  <u>Base Rent</u>.  **Sections 4.a.(i) and (ii)**, relating to rent for bare land and for land for a power substation are deleted in their entirety.  **Section 4.a.(i)** shall be amended and restated in its entirety, beginning effective December 1, 2019, to read as follows:

(i)      The Base Rent payable hereunder shall initially be as follows:

A.  $75,420.90 per month which is based on $3.71 per square foot per year multiplied by the square footage of the "Planer Building" and "Sorter Building" portions of the Property currently occupied by Tenant, 243,949 square feet, divided by 12 months.

The Base Rent as set forth above shall continue at this rate for through February 28, 2020.  On March 1, 2020, and then again on March 1st of each year thereafter, hereinafter referred to as a "Lease Anniversary Date," the Base Rent will increase two percent (2%) per annum.

4.  <u>Pledge by Landlord for Bank of Montana Loan for Infrastructure and Improvements</u>. Section 4 of the Third Amendment, regarding a pledge by Landlord for a loan at Bank of Montana is hereby modified to reflect that, instead of infrastructure and improvements, the New Loan will be used for the acquisition of New Servers.

5.  <u>Credit Enhancement Agreement, Side Letter and Security Agreement</u>.  The Credit Enhancement Agreement shall be amended to reflect the following new and modified provisions:

a.  The concepts of "New Equity" and "New Improvements" are eliminated from the Agreements and the proceeds of the "Bank Loan" (also referred to sometimes as "New Loan") from Bank of Montana will be used to acquire New Servers instead of real property improvements

b.  The Security Agreement is modified to include the Lease being amended by the Fourth Amendment to Commercial Lease Agreement dated January 23, 2019, and property described in this Modification, and is modified to include ALL personal property owned by Tenant which is located currently at the Property (and not just newly acquired New Servers), but specifically excluding all servers owned by Tenant and located on the Property as of the date of this Modification.

EXHIBIT 26.
PAGE 12

c.   At some time prior to any advances to be made in excess of the Original Amount. Hyperblock shall place into an account with Bank of Montana, an amount of cash in the full amount of the New Amount, which shall partially secure Hyperblock's obligations under the Agreements.  Hyperblock will execute and deliver documents which pledge such account in a manner which will be perfected under the Montana Uniform Commercial Code, including a Deposit Account Control Agreement. Alternatively, with Landlord's advance written consent, this obligation may be satisfied with alternative deposits or pledges, including cryptocurrency, in a manner satisfactory to Landlord and its legal counsel.

d.   Consistent with loan documents with Bank of Montana for the New Loan, payment by Hyperblock will commence as provided hereinafter.   Notwithstanding the minimum payment requirements of the New Loan, including interest only for 6 months ("BOM Minimum Payment") or the timing of such payments, Hyperblock shall also make an additional payment amount calculated and administered as follows:

- the amount advanced under the New Loan shall be amortized in level payments of interest and principal over a 36-month term at the greater of (i) Wall Street Prime Rate plus 299 basis points, or (ii) 8.24% (the "BPD Payment Amount"), with the payment being adjusted from time to time for additional advances as approved and made;

- the excess of the BPD Payment Amount over the BOM Minimum Payment (whether or not interest only) (the excess is estimated at approximately $24,474 per month) shall be paid into another special account maintained at Bank of Montana, which shall further secure the obligations of Hyperblock under the Agreements.  Hyperblock shall execute and deliver documents which pledge such account in a manner which will be perfected under the Montana Uniform Commercial Code including a Deposit Account Control Agreement.  Further application of the balance of this account shall be only with the express written agreement of both parties.

- For one example, if the interest rate is 8.24% and the loan balance is $2,625,000, then the BOM Minimum Payment would be approximately $64,380 per month, and the 36-month amortized payment would be approximately $82,549 per month, resulting in an excess payment of approximately $18,168 per month and a Credit Enhancement Fee of $15,000 per month.

- For another example, if the interest rate is 8.24% and the loan balance is $3,540,000, then the BOM Minimum Payment would be approximately $86,821 per month, and the 36-month amortized payment would be approximately $111,323 per month, resulting in an excess payment of approximately $24,502 and a Credit Enhancement Fee of approximately $20,229 per month.

These payments shall commence on the date which is the 30th day after installation and operation of the first servers ordered to arrive at the Property, even if such first arrival does not consist of all servers ordered, or, if a weekend or holiday, the first business day thereafter.

e.    In addition to all payments due under the Lease and the New Loan, Hyperblock shall make monthly payments to Landlord of a credit enhancement fee for Landlord's securing of the New Loan for the entire term of the New Loan, on the final day of the month, commencing in January 2020.  The credit enhancement fee shall be  0.5714286% of the amount advanced on the New Loan.  For example, if the amount advanced is only the Original Amount, the fee would be $ 15,000.00, and if the full amount is advanced, the fee would be  $20,228.57.

f.    As additional consideration for the credit enhancement, Hyperblock shall issue within 60 days of the date that Hyperblock stock resumes active trading, stock warrants in form and content acceptable to Landlord and its counsel for shares of its publicly trading common shares, calculated as follows:  the number of shares of common stock subject to the warrant is the number which is calculated by dividing the number which is 15% of the total amount of the New Loan, whether fully advanced or not ($3,540,000 * .15 = $531,000) by a strike price to be determined on the first day that public trading is allowed by relevant regulatory authorities at the volume weighted average price (VWAP).  The warrants shall have a term of 5 years.

6.    Renewable Energy Credits.    On or before the execution hereof, Tenant shall supply Landlord with copies of all correspondence with Missoula County regarding the potential of applying renewable energy credits to satisfy some of the requirements imposed by the Missoula County Commissioners affecting Tenant.

7.    Not a Precedent; Future Expansion.  Landlord's agreement pursuant to this Modification to remove Property from the scope of the Lease does not bind Landlord to agree to any future amendments reducing the leased Property, or the amount of Rent.  Should Tenant revise its expansion plans to reincorporate the portions of the Property hereby removed from the Lease, the terms shall be the same as what was negotiated in the Third Amendment to the Lease.

8.    Remaining Provisions of Agreements.  To the extent not modified herein, all remaining provisions of the Agreements shall remain in full force and effect, and are hereby reaffirmed.

9.    Counterparts.  This Modification may be signed in counterparts and the counterparts assembled into one or more originals.  The counterparts shall be deemed delivered to the receiving party upon delivery of the signed counterparts to the receiving party's authorized representative.

-    SIGNATURES APPEAR ON FOLLOWING PAGE -

EXHIBIT 26.
PAGE 14

-

IN WITNESS WHEREOF this Modification has been executed effective the date and year first above written.

LANDLORD:                                    TENANT:

Bonner Property Development, LLC             Hyperblock LLC


By: _____                By:_____
Stephen Nelson, Co-Manager                   Print name:_____
                                             Its: _____


By: _____
Michael Boehme, Co-Manager

EXHIBIT 27.(i)
PAGE 1

# CHANGE IN TERMS AGREEMENT

| Original Commitment Amount | Original Loan Date | Original Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $2,625,000.00 | 12-03-2018 | 12-01-2023 | 4200 | | | *** | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.

Any item above containing "****" has been omitted due to text length limitations.

**Borrower:** HyperBlock, LLC
5619 DTC Parkway #475
Greenwood Village, CO  80111

**Lender:** Bank of Montana
125 Bank Street
Suite 100
Missoula, MT  59802

**Current Principal Balance:  $0.00**          **Date of Agreement:  January 10, 2020**

**DESCRIPTION OF EXISTING INDEBTEDNESS.** As of January 10, 2020, the principal amount of Loan 2018004200 (the "Loan") outstanding is $0.00. The Loan is evidenced by, among other things, that certain Promissory Note, Business Loan Agreement, and Deed of Trust, each executed by Borrower and/or Grantor effective as of December 14, 2018, in the original principal amount of $2,625,000.00 (all promissory notes, loan agreements, security agreements, environmental agreements, deed of trust, and all other instruments, agreements, and documents relating to the Loan (as they each may be amended, modified, extended, refinanced, renewed, or supplemented from time to time), including the Related Documents, the Security Documents (as defined below), the documents executed in connection with this Change in Terms Agreement are individually and collectively referred to herein as the "Loan Documents"). Capitalized terms used herein but not otherwise defined shall have the meanings set forth in the Business Loan Agreement and Promissory Note.

The Loan is secured by, among other things, that certain Deed of Trust and that certain Assignment of Rents, each as recorded in the office of the Clerk and Recorder of Missoula County, Montana, on December 18, 2018 (all of the foregoing and all documents relating to the Loan that grant or otherwise create a security interest in any property or right to secure the payment or performance of any part of or all of the Loan are referred to herein, individually and collectively, as the "Security Documents," with the security interests relating to the Security Documents being referred to, individually and collectively, as the "Security Interests," and the property and rights described therein or to which the Security Interests apply being referred to as the "Collateral").

**AGREEMENT. Effective as of the date of this Change in Terms Agreement, subject to the terms and conditions set forth herein, the parties agree as follows:**

- The Loan's principal balance is increased to $3,540,000.00 (the "Principal Increase"). Each of the Loan Documents is hereby amended so as to reflect the Principal Increase, and each of the amendments as stated in this Change in Terms;

- The Loan's Draw Period is extended to July 1, 2020 or until the principal has been fully advanced as described in the Note;

- The Loan's Maturity date is extended to July 1, 2024;

- Obligors herein agree that Deposit account #2014082 (defined in Exhibit A as the "Collateral Account") maintained by Borrower with Lender will be controlled by Grantor. For clarity, any and all requests for funds to be withdrawn from the Collateral Account must be acknowledged and approved by Grantor and delivered to Lender in writing, which may be done by electronic means, including but not limited to e-mail correspondence. Protections provided to Lender as described in Exhibit A related to the Collateral Account are incorporated herein.

- Obligors agree to the following lockbox arrangement:
  **Please see Exhibit A.**
- All amounts received by Grantor related to the real property collateral shall be directly and timely deposited into the Locked Account (#2014637) during the term of the Loan. Loan payments and any other amounts due and payable to Lender shall be automatically transferred to Lender from the Locked Account. For the avoidance of doubt, all gross revenue and/or gross proceeds of any kind due and/or paid to the Grantor or received by others for the benefit of the Grantor will first and directly be deposited by tenants, other recipients, and/or payors of such gross funds into the Locked Account without setoff or netting of any kind by any party. Grantor agrees to take steps to ensure tenants will make payment directly to the Locked Account. As a concession to Grantor, Lender is not initially requiring Grantor to maintain its operating account(s) related to the real property collateral at Lender, however, Lender reserves the right to require such account(s) to be maintained and held at Lender in the future, at Lender's sole discretion.

- An origination fee equal to $36,000.00 is charged by Lender and will be funded with an Advance upon the execution of this Change In Terms Agreement;

- As provided in the Business Loan Agreement, Borrower shall reimburse Lender for all third-party costs and expenses incurred including, without limitation, title policy endorsement premiums, recording fees, and legal fees. The reimbursement may be funded by an Advance, at Lender's sole discretion.

- Borrower and each party signing this Change in Terms, excluding only Lender, (individually and collectively referred to herein as the "Obligors") represent and warrant that the factual matters stated in this Change in Terms are true and correct in all material respects.

- Obligors represent and warrant that a Default has not occurred and is continuing, and no event, act or omission has occurred which, solely with the passage of time or giving of notice, would constitute a Default.

- Obligors represent and warrant that, since the execution of the Loan Documents, there has been no material adverse change in any Obligor's financial condition and no litigation has been initiated or threatened as relating to any Obligor or any Collateral.

- Except as amended herein, Obligors agree that the Loan, and all of the Loan Documents, as well as the Security Interests, are each hereby reaffirmed and remain enforceable in accordance with their terms (as amended herein or as previously amended in writing), and all of the representations and warranties set forth in the Loan Documents are true and correct as of the date of this Change in Terms Agreement.

- This Change in Terms Agreement shall not affect the priority or perfection of any of the Security Interests in favor of Lender. Further, the Obligors agree that nothing in this Change in Terms Agreement is waiver or forbearance by Lender with respect to any right or remedy to which Lender is, or hereafter become, entitled. The Obligors each, jointly and severally, indemnify and agree to hold Lender harmless from any and all costs, fees, losses, claims and liabilities arising out of or related to Lender's execution or performance of this Change in Terms Agreement, the Principal Increase, or Obligor's breach or noncompliance with any terms of this Change in Terms Agreement. Each Guarantor affirms its Guaranty and that such guaranty shall include the payment and performance of the Loan as amended by this Change in Terms Agreement.

- Without limiting any other provision of this Change in Terms Agreement, if any or all of the Note, the Related Documents, or the Indebtedness is invalidated, discharged, or found to be unenforceable for any reason, including but not limited to if the Borrower or the parent entity of Borrower lacked authority to execute or perform, such invalidation, discharge, or unenforceability shall in no way limit or reduce any Guarantor's obligation to pay and perform, and each Guarantor hereby agrees to be bound by the terms of such Guarantor's respective guaranty (as amended herein) without regard to such invalidation, discharge, or unenforceability and to the same extent as if no invalidation, discharge, or unenforceability existed.

- Each Obligor waives and releases any claim or right to which it may be entitled and arising out of or related to any action or omission of Lender relating to the Loan or the Loan Documents prior to the effective date of this Change in Terms.

- Each Obligor agrees that the Indebtedness whether now existing or hereafter created, shall be superior to any claim that any Obligor may now have or hereafter acquire against any other Obligor. Each Obligor hereby expressly subordinates any claim and security interest Obligor may have against each other Obligor, upon any account whatsoever, to any claim that Lender may now or hereafter have against each Obligor.

- Each person executing this Change in Terms Agreement represents and warrants that such person is authorized to so act and bind the party to this Change in Terms Agreement.

- All of the parties comprising Obligor have common ownership with or in each of the other parties comprising Obligor or otherwise acknowledge receiving a material benefit from this Change in Terms Agreement or the Principal Increase. Any Collateral being pledged (or reaffirmed) or granted as security (or reaffirmed) by a party comprising Obligor is being done so at the request of the other parties comprising Obligor, and not at Lender's request, and such pledge or granting of security is a material inducement for Lender entering this Change in Terms Agreement and making the Principal Increase. Each grantor of Collateral under any of the Security Documents has established adequate means of obtaining from Obligor on a continuing basis information about Obligor's financial condition and the obligations secured by the Security Documents. Further, Lender has made no representation to a grantor of Collateral (under any of the Security Documents) about Obligor, including without limitation the creditworthiness of Obligor.

- Obligors shall promptly provide and comply with all other reasonable items or requests made by Lender and execute any documents reasonably necessary with respect to this Change in Terms Agreement, including but not limited to any renewals or reaffirmations of any of the Loan Documents;

**CHANGE IN TERMS CONDITIONS.** Lender's obligation to be fund the Principal Increase and to be bound by the terms of this Change In Terms Agreement are conditioned upon the following:

- All necessary parties executing, delivering and recording such documents as Lender may require;
- Lender receiving satisfactory updated title insurance and coverage, including confirmation that Lender is in first priority lien position on the Collateral;
- All of Obligor's representations and warranties being true and correct;
- Evidence satisfactory to Lender of the due authorization of this Change in Terms Agreement by each party;
- Lender 's compliance, prior to any disbursements on the Loan, with all applicable regulatory requirements, including legal lending limitation restrictions. To be clear, as of the date of this Change In Terms Agreement, Lender has approximately $3,100,000.00 of Loan proceeds contingently committed. There is material risk that Lender may fail in placing the remaining $440,000 and such third-party participants are obviously beyond the control of Lender.
- Borrower paying all costs and fees related to this Change In Terms Agreement, including Lender's origination fee, plus legal fees and costs and title and recording fees and costs, including those costs and fees incurred following the date of execution of this Change in Terms. All fees shall be paid with an Advance, and are fully earned by Lender and nonrefundable as of the date of this Change in Terms Agreement; and
- Lender's receipt of a fully executed copy of this Change In Terms Agreement on or before January 10, 2020. Borrower agrees that if this Change in Terms Agreement is not executed and returned to Lender by January 10, 2020, then this proposed Change in Terms Agreement automatically expires at that time with all current terms and conditions remaining unchanged. This condition is only for Lender's benefit and Lender reserves the unilateral right to waive this condition and accept the fully endorsed Change In Terms Agreement after January 10, 2020, but Lender has no obligation to do so.

Lender reserves the right to retract or amend this offer at any time up until this Change In Terms Agreement is fully executed by all parties, with all fees being paid and all conditions being met, at Lender's sole discretion.

**ENTIRE AGREEMENT.** This Change In Terms Agreement supersedes all prior written or oral communications between Lender and Obligors related to the Loan. No modification or waiver of any of the provisions hereof shall be binding unless set forth in writing that specifically references and contemplates the amendment of this Loan and which is signed by the party(ies) to be bound thereby.

**CONTINUING VALIDITY; NO OTHER CHANGES.** Except as specifically stated in this Change in Terms Agreement and the other documents executed concurrently herewith, no amendment or modification of the Loan Documents is intended or made hereby. Obligors agree that, except as expressly changed by this Change in Terms Agreement and the other documents executed concurrently herewith, the Loan, and all of the Loan Documents, as well as the Security Interests, remain unchanged and in full force and effect and are hereby reaffirmed, and all of the representations and warranties set forth in the Loan Documents are true and correct as of the date of this Change in Terms Agreement. This Change in Terms Agreement in no way obligates, or in any manner implies, in any shape, manner or form, that future concessions or amendments will be granted by Lender, and consent by Lender to this Change in Terms Agreement does not waive Lender's right to strict performance of the terms of the Loan Documents as changed hereby, nor obligate Lender to grant any future consents or make any future changes in terms. Nothing in this Change in Terms Agreement will constitute a satisfaction or reduction of any obligation related to the Loan, and the parties further acknowledge, agree and reaffirm their intent that the Loan still be secured by all security interests of the Loan Documents and law, including the Security Documents. It is the intention of Lender to retain as liable parties all makers and endorsers of the original obligation(s), including accommodation parties, unless a party is expressly released by Lender in writing. Any maker or endorser, including accommodation makers, will not be released by virtue of this Change in Terms Agreement.

**OTHER TERMS.** In the event of a conflict between the terms of the Loan Documents and the terms of this Change in Terms Agreement, the terms of this Change in Terms Agreement shall control and govern to the extent necessary to resolve the conflict. If any provision of this Change in Terms

Agreement is determined to be legally invalid or unenforceable, the validity of the remainder of the Change in Terms Agreement will not be affected and such provision will be deemed modified to the minimum extent necessary to make such provision consistent with applicable law and, in modified form, such provision will then be enforceable and enforced. Unless a condition specially states the contrary, all conditions in this Agreement are included solely for the benefit of Lender, and may be enforced or waived only, and unilaterally, by Lender. Obligor acknowledges and agrees that all loan fees and prepaid finance charges to which Lender is entitled under this Change in Terms Agreement, including but not limited to the increase fee associated with the Principal Increase and the minimum interest charge, are reasonable, are earned fully as of the date hereof, and will not be subject to refund upon early payment (whether voluntary or as a result of default), except as otherwise required by law. This Change in Terms Agreement and the Loan Documents constitute the entire agreement between the parties concerning the subject matter therein, and this Change in Terms Agreement and the Loan Documents may not be modified except by a writing signed by the parties. Caption headings in this Change in Terms Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Change in Terms Agreement. This Change in Terms Agreement shall inure to the benefit of Lender, its successors and assigns, and be binding upon each of the parties' successors and assigns.

---

## VERIFICATION OF BENEFICIAL OWNERSHIP OF LEGAL ENTITY CUSTOMER

*This form may be used when there is an applicable triggering event that requires certification of beneficial owners and there have been **no changes** to the beneficial ownership certification form on file. If any of the information listed on the beneficial ownership certification has changed, a new certification must be completed and CIP information gathered for any new individuals listed.*

**CERTIFICATION:**

I, **Sean M. Walsh**, hereby certify, to the best of my knowledge, that the information provided on the **Certifications of Beneficial Ownership of Legal Entity Customers** dated **December 14, 2018** is correct and complete for the Legal Entity(ies) listed below:

*HyperBlock, LLC*
**Name of Legal Entity(ies)**

**PRIOR TO SIGNING THIS AGREEMENT, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS AGREEMENT. BORROWER AGREES TO THE TERMS OF THE AGREEMENT. THIS CHANGE IN TERMS AGREEMENT MAY BE EXECUTED IN ANY NUMBER OF COUNTERPARTS, INCLUDING BY ELECTRONIC MEANS, WHICH TOGETHER SHALL CONSTITUTE AND BE DEEMED AN ORIGINAL DOCUMENT.**

**BORROWER:**

**HYPERBLOCK, LLC**

**HYPERBLOCK, INC., Sole Member of HyperBlock, LLC**
By: _____
Sean M. Walsh, Chief Executive Officer of
HyperBlock, Inc.

**GRANTOR:**

**BONNER PROPERTY DEVELOPMENT, LLC**
By: _____
Stephen K. Nelson, Co-Manager and Member of
Bonner Property Development, LLC

By: _____
Michael D. Boehme, Co-Manager and Member of
Bonner Property Development, LLC

**GUARANTOR:**

X _____
Stephen K. Nelson

X _____
Michael D. Boehme

**LENDER:**

**BANK OF MONTANA**
X _____
Jacob T. Pelczar, Vice President

Agreement is determined to be legally invalid or unenforceable, the validity of the remainder of the Change in Terms Agreement will not be affected and such provision will be deemed modified to the minimum extent necessary to make such provision consistent with applicable law and, in its modified form, such provision will then be enforceable and enforced. Unless a condition specially states the contrary, all conditions in this Agreement are included solely for the benefit of Lender, and may be enforced or waived only, and unilaterally, by Lender. Obligor acknowledges and agrees that all loan fees and prepaid finance charges to which Lender is entitled under this Change in Terms Agreement, including but not limited to the increase fee associated with the Principal Increase and the minimum interest charge, are reasonable, are earned fully as of the date hereof, and will not be subject to refund upon early payment (whether voluntary or as a result of default), except as otherwise required by law. This Change in Terms Agreement and the Loan Documents constitute the entire agreement between the parties concerning the subject matter therein, and this Change in Terms Agreement and the Loan Documents may not be modified except by a writing signed by the parties. Caption headings in this Change in Terms Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Change in Terms Agreement. This Change in Terms Agreement shall inure to the benefit of Lender, its successors and assigns, and be binding upon each of the parties' successors and assigns.

---

## VERIFICATION OF BENEFICIAL OWNERSHIP OF LEGAL ENTITY CUSTOMER

*This form may be used when there is an applicable* triggering event *that requires certification of beneficial owners and there have been* **no changes** *to the beneficial ownership certification form on file. If any of the information listed on the beneficial ownership certification has changed, a new certification must be completed and CIP information gathered for any new individuals listed.*

**CERTIFICATION:**

I, **Sean M. Walsh,** hereby certify, to the best of my knowledge, that the information provided on the **Certifications of Beneficial Ownership of Legal Entity Customers** dated **December 14, 2018** is correct and complete for the Legal Entity(ies) listed below:

*HyperBlock, LLC*
_____
**Name of Legal Entity(ies)**

---

**PRIOR TO SIGNING THIS AGREEMENT, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS AGREEMENT.  BORROWER AGREES TO THE TERMS OF THE AGREEMENT. THIS CHANGE IN TERMS AGREEMENT MAY BE EXECUTED IN ANY NUMBER OF COUNTERPARTS, INCLUDING BY ELECTRONIC MEANS, WHICH TOGETHER SHALL CONSTITUTE AND BE DEEMED AN ORIGINAL DOCUMENT.**

**BORROWER:**


**HYPERBLOCK, LLC**

**HYPERBLOCK, INC., Sole Member of HyperBlock, LLC**
**By:** _____
**Sean M. Walsh, Chief Executive Officer of HyperBlock, Inc.**


**GRANTOR:**

**BONNER PROPERTY DEVELOPMENT, LLC**
**By:** _____     **By:** _____
**Stephen K. Nelson, Co-Manager and Member of**     **Michael D. Boehme, Co-Manager and Member of**
**Bonner Property Development, LLC**     **Bonner Property Development, LLC**


**GUARANTOR:**

**X** _____
**Stephen K Nelson**

**X** _____
**Michael D. Boehme**


**LENDER:**


**BANK OF MONTANA**
**X** _____
**Jacob T. Pelczar, Vice President**

Agreement is determined to be legally invalid or unenforceable, the validity of the remainder of the Change in Terms Agreement will not be affected and such provision will be deemed modified to the minimum extent necessary to make such provision consistent with applicable law and, in its modified form, such provision will then be enforceable and enforced. Unless a condition specially states the contrary, all conditions in this Agreement are included solely for the benefit of Lender, and may be enforced or waived only, and unilaterally, by Lender. Obligor acknowledges and agrees that all loan fees and prepaid finance charges to which Lender is entitled under this Change in Terms Agreement, including but not limited to the increase fee associated with the Principal Increase and the minimum interest charge, are reasonable, are earned fully as of the date hereof, and will not be subject to refund upon early payment (whether voluntary or as a result of default), except as otherwise required by law. This Change in Terms Agreement and the Loan Documents constitute the entire agreement between the parties concerning the subject matter therein, and this Change in Terms Agreement and the Loan Documents may not be modified except by a writing signed by the parties. Caption headings in this Change in Terms Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Change in Terms Agreement. This Change in Terms Agreement shall inure to the benefit of Lender, its successors and assigns, and be binding upon each of the parties' successors and assigns.

### VERIFICATION OF BENEFICIAL OWNERSHIP OF LEGAL ENTITY CUSTOMER

*This form may be used when there is an applicable <u>triggering event</u> that requires certification of beneficial owners and there have been __no changes__ to the beneficial ownership certification form on file. If any of the information listed on the beneficial ownership certification has changed, a new certification must be completed and CIP information gathered for any new individuals listed.*

**CERTIFICATION:**

I, **_Sean M. Walsh_**, hereby certify, to the best of my knowledge, that the information provided on the **Certifications of Beneficial Ownership of Legal Entity Customers** dated **_December 14, 2018_** is correct and complete for the Legal Entity(ies) listed below:

*HyperBlock, LLC*
_____
**Name of Legal Entity(ies)**

PRIOR TO SIGNING THIS AGREEMENT, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS AGREEMENT.  BORROWER AGREES TO THE TERMS OF THE AGREEMENT. THIS CHANGE IN TERMS AGREEMENT MAY BE EXECUTED IN ANY NUMBER OF COUNTERPARTS, INCLUDING BY ELECTRONIC MEANS, WHICH TOGETHER SHALL CONSTITUTE AND BE DEEMED AN ORIGINAL DOCUMENT.

**BORROWER:**

**HYPERBLOCK, LLC**

**HYPERBLOCK, INC., Sole Member of HyperBlock, LLC**

**By:** _____
**Sean M. Walsh, Chief Executive Officer of HyperBlock, Inc.**

**GRANTOR:**

**BONNER PROPERTY DEVELOPMENT, LLC**
**By:** _____
**Stephen K. Nelson, Co-Manager and Member of Bonner Property Development, LLC**

**By:** _____
**Michael D. Boehme, Co-Manager and Member of Bonner Property Development, LLC**

**GUARANTOR:**

X _____
**Stephen K. Nelson**

X _____
**Michael D. Boehme**

**LENDER:**

**BANK OF MONTANA**
X _____
**Jacob T. Pelczar, Vice President**

EXHIBIT 27.(i)
PAGE 6

# Exhibit A

To secure the payment and performance of the Loan, the Borrower and Grantor has pledged or hereby pledges as collateral or has granted or hereby grants to the Lender a security interest in, inter alia, the Funds (as defined in this paragraph). The term "Funds" as used in this paragraph means any and all payments received by Grantor which are associated with all real property collateral pledged by Grantor to Lender as security for the Loan and any and all payments made by, or on behalf of Borrower or Grantor to Lender as relating to any or all of the following: (i) any amounts deposited into the Locked Account (as defined below) that are ultimately intended to be deposited into collateral account #2_ . 4082 at Lender, or such other account at Lender as approved by Lender (all such accounts referred to herein as the "Collateral Account"). The Collateral Account is owned by Borrower. Promptly with any deposit to the Collateral Account, Grantor is to notify Lender, in writing, of the amount intended to be deposited into the Collateral Account, though Lender may also infer such amount in its discretion if an amount is not promptly provided (each amount that is ultimately intended to be deposited into the Collateral Account being referred to herein as the "Collateral Account Amount") ; (ii) the lease agreement, for the property commonly known as 9144 Bonner Mill Road, Bonner, MT 59823, between Borrower and Grantor; (iii) consideration being provided or paid to any guarantor of any or all of the Loan. Borrower agrees that all payments comprising the "Funds" will only be paid in U.S. dollars via ACH or wire. Borrower shall ensure, until the Loan is finally and fully paid, that any and all amounts comprising the Funds shall be paid entirely to account :  l637 at Lender, or such other deposit account at Lender as designated by Lender from time to time (all such accounts referred to herein as the "Locked Account"). Lender shall be the sole owner of the Locked Account, subject to the terms of this paragraph, for the benefit of Grantor. Once funds, including the Funds, are deposited into the Locked Account, Lender shall have no obligation to refund all or part of any such funds, and Lender may, in its discretion, comply with the terms of this paragraph without further approval from Borrower or Grantor and despite any objection from Borrower or Grantor. With the exception of depositing funds, regarding the Locked Account, Borrower and Grantor will not have any rights with regards to the Locked Account, including to withdraw or otherwise remove or reduce any funds therefrom. If no event of default has occurred, then the Funds (less the relevant Collateral Account Amount, which shall from time to time, at Lender's discretion, be transferred to the Collateral Account) shall from time to time, at Lender's discretion, be transferred by Lender from the Locked Account to an account designated by Grantor, or such other account at Lender as may be designated by Grantor from time to time (all such accounts shall be referred to herein as the "Grantor Account"). As of the date of this Change in Terms Agreement, Grantor is the owner of the Grantor Account. If any event of default relating to the Loan has occurred, then any funds, including the Funds, deposited into the Locked Account shall, at Lender's discretion, be applied and paid towards any amount of the Loan that is due and payable, including amounts being due and payable relating to the acceleration of the Loan due to an event of default, and then towards any other indebtedness owed by Borrower to Lender to the extent such indebtedness is due and payable, including amounts being due and payable relating to the acceleration of such indebtedness due to an event of default, and any remaining funds shall, from time to time, at Lender's discretion, be transferred by Lender from the Locked Account to the Grantor Account. Once the Loan is fully and finally paid, Lender shall transfer all remaining amounts from the Locked Account to the Grantor Account. In all instances it shall be Borrower's and Grantor's obligation to account for the application and use of funds being deposited into the Collateral Account and Grantor Account from the Locked Account, and Lender shall not be liable for determining any such amounts and may rely on the instructions of either Borrower or Grantor, at Lender's discretion, and all without inquiry or investigation. Notwithstanding any other provision of this paragraph, Borrower is still responsible for timely make all payments on the Loan and any other obligations relating to the amounts or items comprising the Funds, as well as to comply with the terms of this Change in Terms Agreement and all of the Related Documents. In addition to all other rights of Lender, all charges, penalties, fees, costs, expenses, losses, and reasonable attorney's fees incurred in connection with Lender's performance under this paragraph, this Change in Terms Agreement, and the Related Documents may be charged to any account of Borrower with Lender or the Locked Account prior to transfer to the Collateral Account or the Grantor Account. Notwithstanding anything to the contrary contained herein, it is understood and agreed that Lender will perform the services hereunder using reasonable care. Mere clerical error or inadvertence without malice or a mistake of judgment shall not constitute gross negligence, bad faith, or a failure to exercise reasonable care, or otherwise subject to Lender to any liability or relieve or reduce any obligation of Borrower or Grantor. Additionally, Lender shall not be liable for any failure or delay caused by circumstances beyond Lender's reasonable control, including but not limited to negligence or default of Borrower or Grantor, relying on information from any third-party, or resulting from Lender's reasonable belief that an action would violate any guideline, rule or regulation of any governmental authority. Except for Lender's gross negligence or intentional bad faith misconduct, each Obligor shall indemnify, defend, protect and hold Lender harmless from any and all claims, damages, and losses relating or connecting to this paragraph, including in the performance of the terms of this paragraph. If, as a result of Lender's gross negligence or intentional bad faith misconduct, Lender shall be liable as relating or connecting to this paragraph, such liability shall be limited in all instances to the lesser of the amount of the relevant transfer/deposit or the amount of direct losses by the damaged party that are solely attributable to Lender's gross negligence or intentional bad faith misconduct.  Without limiting any of the foregoing, IN NO EVENT SHALL LENDER BE LIABLE FOR ANY INDIRECT, SPECIAL, PUNITIVE, OR CONSEQUENTIAL DAMAGES OR LOSS OF PROFIT, NOTWITHSTANDING NOTICE OF THE POSSIBILITY OF SUCH DAMAGES OR LOSSES. The rights and remedies of this section are in addition to all other rights and remedies of the Lender, including the right of offset or to setoff, may be exercised in Lender's discretion, and shall not limit or delay any other right or remedy of Lender. Each Obligor agrees to take reasonable steps to ensure compliance with the terms of this paragraph. For purposes of clarity, and without limiting the overall application of such provisions to the terms of this Change in Terms Agreement or the Related Documents, all indemnification, hold harmless, and other protections of Lender granted herein or in any of the Related Documents are intended to, and shall also apply to Lender and Lender's conduct as relating to the actions or inactions contemplated by this paragraph.

Guarantor:     Stephen K. Nelson          Lender:     Bank of Montana
               733 Anglers Bend Way                   125 Bank Street
               Missoula, MT 59802                     Suite 100
                                                      Missoula, MT  59802

Guarantor:     Michael Boehme
               55 Brookside
               Missoula, MT 59802

Guarantor:

## Part I

**Notwithstanding any other part of this document, Part I of this document is not a legally binding agreement and does not amend or modify, or promise or require the amendment or modification, of any instrument or agreement. Capitalized words or terms not defined herein shall have the meaning as given the Business Loan Agreement relating to the Loan.**

Previously, based on the then existing facts and underwriting, Lender would have considered amortizing this Loan over a longer period of time. However, Borrower and Guarantor voluntarily elected to amortize the Loan over a short period relative to the underlying collateral type (improved real property). Based in part on the foregoing, Lender is willing, subject to the terms stated herein, to consider the following concession:

Guarantor may make a one-time request for the Loan payments to temporarily be interest-only for a period of six (6) consecutive months or until Maturity, whichever is less. Lender has no obligation to approve any such a request. Without limiting the foregoing, while Lender's determination to approve or deny such a request shall be made in Lender's sole and absolute discretion, some of the factors Lender may consider include the following:

- If Grantor has lost Borrower as a tenant under the lease for the real property commonly known as 9144 Bonner Mill Road, Bonner, MT 59823 (the "Lease");

- Grantor in good faith believes Borrower cannot or will not make payments as due under the Loan or Lease;

- The likelihood and/or actual full and punctual payment of the Indebtedness by Guarantor;

- If any other Loan Default(s) have occurred;

- If any adverse change in the financial condition of any Guarantor has occurred;

- If a change in payments would jeopardize Lender's current (as of the date of this Addendum) expectation of payment in full or remove or materially change any remedy of Lender.

## Part II

Part II of this document is a legally binding agreement but does not amend or modify, or promise or require the amendment or modification, of any instrument or agreement. This document supersedes any prior oral discussions, emails or texts regarding the subject matter herein. There are no oral or written promises or agreements of Lender regarding the subject matter of this document that are not stated herein. Lender reserves the right to deny Guarantor's request, as contemplated above, for any or no reason. There are no modifications or amendments to the Related Documents or any document relating to the Loan that have not been documented via a formal, written agreement signed by all of the relevant parties.

**LENDER:**

Bank of Montana

X _____
Jacob Pelczar, Vice-President

**GUARANTOR:**

X _____
Stephen K. Nelson

X _____
Michael D. Boehme



EXHIBIT 27.(H)
PAGE 1

WHEN RECORDED MAIL TO:
    Bank of Montana
    125 Bank Street
    Suite 100
    Missoula, MT  59802

RECORDATION REQUESTED BY:
    Bank of Montana
    125 Bank Street
    Suite 100
    Missoula, MT  59802

SEND TAX NOTICES TO:
    Bonner Property Development,
    LLC
    224 N. Higgins Avenue
    Missoula, MT  59802

```
202000633  B:1024 P:663  Pages:4  Fee:$28.00
01/10/2020 02:56:55 PM  Modification Of Mortgage Or
Tyler R. Gernant, Missoula County Clerk & Recorder
```

**FOR RECORDER'S USE ONLY**

# MODIFICATION OF DEED OF TRUST

THIS MODIFICATION OF DEED OF TRUST dated January 10, 2020, is made and executed between Bonner Property Development, LLC (referred to below as "Grantor") and Bank of Montana, whose address is 125 Bank Street, Suite 100, Missoula, MT  59802 ("Lender"). Capitalized terms or phrases not defined herein shall have the meaning as set forth in the Deed of Trust (defined below).

**DEED OF TRUST.** Lender and Grantor have entered into a Deed of Trust dated December 14, 2018 (the "Deed of Trust") which has been recorded in Missoula County, State of Montana, as follows:

    **Recorded as document number 201822086 on December 18, 2018 at 3:05:34 PM with the Missoula County Clerk & Recorder in Book 1006, Page 1302.**

**REAL PROPERTY DESCRIPTION.**  The Deed of Trust covers the following described real property located in Missoula County, State of Montana:

    Tract 25A, Certificate of Survey No. 06487; a Tract of land located in the East One-Half (E1/2) of Section 21 and the West One-Half (W1/2) of Section 22, Township 13 North, Range 18 West, P.M.M., Missoula County, Montana.

The Real Property or its address is commonly known as 9214 Bonner Mill Road, Bonner, MT 59823.

**MODIFICATION.** Lender and Grantor hereby modify the Deed of Trust as follows:

    **The total principal indebtedness that may be outstanding at any given time which is secured by this Deed of Trust is increased to $3,540,000.00. Further, other terms relating to the Note or Loan may have changed, all as set forth in that certain Change in Terms Agreement executed concurrently herewith (the "Change in Terms Agreement"). The principal amount of the Note, which comprises part of Indebtedness secured by the Deed of Trust, has been increased to $3,540,000.00. Without being limited by the foregoing, the Deed of Trust shall still secure the Note, as amended, and all obligations, debts, and liabilities, plus interest thereon, of Grantor to Lender, or any one or more of them, as well as all claims by Lender against Grantor or any one or more of them, whether now existing or hereafter arising, whether related or unrelated to the purpose of the Note, whether voluntary or otherwise, whether due or not due, direct or indirect, determined or undetermined, absolute or contingent, liquidated or unliquidated, whether Grantor may be liable individually or jointly with others, whether obligated as guarantor, surety, accommodation party or otherwise, and whether recovery upon such amounts may be or hereafter may become barred by any statute of limitations, and whether the obligation to repay such amounts may be or hereafter may become otherwise unenforceable.**

    **This increase and modification are not being done to delay or defraud any creditor of Grantor.**

**ASSIGNMENT OF RENTS AND ALL OTHER RECORDED DOCUMENTS.** In addition to the Deed of Trust, Lender and Grantor also entered into that certain Assignment of Rents (the "AOR") (**recorded as document number 201822087 on December 18, 2018 at 03:05:34 PM with the Missoula County Clerk & Recorder in Book 1006, Page 1303**). Lender and Grantor hereby modify the AOR and any other document related or connected to the loan referenced herein that have been recorded with the Missoula County Clerk & Recorder, to reflect the increase in the principal amount of the Note to **$3,540,000.00.**

**CONTINUING VALIDITY.**  Except as expressly modified above and in that certain Change in Terms Agreement executed concurrently herewith, the terms of the Deed of Trust, the AOR, and the Related Documents shall remain unchanged and in full force and effect.  Consent by Lender to this Modification does

EXHIBIT 17 (M)
PAGE 2

not waive Lender's right to require strict performance of the Deed of Trust, the AOR, or any of the Related Documents, as amended, nor obligate Lender to make any future modifications. Nothing in this Modification shall constitute a satisfaction or reduction of any obligation related to the Note, the Indebtedness, or other credit agreement related thereto or secured by the Deed of Trust, AOR, or any of the Related Documents. The "Note" shall have the meaning as given in the Deed of Trust, as modified herein and in that certain Change in Terms Agreement executed concurrently herewith. It is the intention of Lender to retain as liable all parties to the Deed of Trust, AOR, and Related Documents, all parties, makers and endorsers to the Note, including accommodation parties, unless a party is expressly released by Lender in writing. Any maker or endorser, including accommodation makers, shall not be released by virtue of this Modification. If any person who signed the original Deed of Trust, AOR, or Related Documents does not sign this Modification, then all persons signing below acknowledge that this Modification is given conditionally, based on the representation to Lender that the non-signing person consents to the changes and provisions of this Modification or otherwise will not be released by it (this condition is only for the benefit of Lender, may only be asserted by Lender, and may be asserted unilaterally by Lender). This Modification shall inure to the benefit of Lender, its successors and assigns, and be binding upon each of the parties' successors and assigns.

**[signatures on following page]**

EXHIBIT 27.(H)
PAGE 3

GRANTOR ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS MODIFICATION OF DEED OF TRUST AND GRANTOR AGREES TO ITS TERMS.  THIS MODIFICATION OF DEED OF TRUST IS DATED JANUARY 10, 2020.

**GRANTOR:**

**BONNER PROPERTY DEVELOPMENT, LLC**

By: _____
Stephen K. Nelson, Co-Manager and Member of Bonner Property Development, LLC

By: _____
Michael D. Boehme, Co-Manager and Member of Bonner Property Development, LLC

**LENDER:**

**BANK OF MONTANA**

X _____
Jacob T. Pelczar, Vice President

---

**LIMITED LIABILITY COMPANY ACKNOWLEDGMENT**

STATE OF __MT__                                          )
                                                         ) SS
COUNTY OF __Missoula__                                   )

This record was acknowledged before me on __Jan 10_____, 20_20_____ by **Stephen K. Nelson, Co-Manager and Member of Bonner Property Development, LLC** and Michael D. Boehme, Co-Manager and Member of Bonner Property Development, LLC.

_____
**(Signature of notarial officer)**

Asst VP
_____
**Title of officer (if not shown in stamp)**

ALEXANDRA DRAYTON
Notary Public for the
State of Montana
**(Official stamp)** Residing at MISSOULA, MT
My Commission Expires
April 26, 2022

---

**LENDER ACKNOWLEDGMENT**

STATE OF __MT__                                          )
                                                         ) SS
COUNTY OF __Missoula__                                   )

This record was acknowledged before me on __Jan 10_____, 20_20_ by **Jacob T. Pelczar** as **Vice President** of **Bank of Montana**.

_____
**(Signature of notarial officer)**

Asst VP
_____
**Title of officer (if not shown in stamp)**

ALEXANDRA DRAYTON
Notary Public for the
State of Montana
Notarial **(Official stamp)** Residing at MISSOULA, MT
My Commission Expires
April 26, 2022

GRANTOR ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS MODIFICATION OF DEED OF TRUST AND GRANTOR AGREES TO ITS TERMS.  THIS MODIFICATION OF DEED OF TRUST IS DATED JANUARY ⌐, 2020.

GRANTOR:


BONNER PROPERTY DEVELOPMENT, LLC

By: _____

Stephen K. Nelson, Co-Manager and Member of Bonner Property Development, LLC

By: _____

Michael D. Boehme, Co-Manager and Member of Bonner Property Development, LLC



LENDER:


BANK OF MONTANA

X _____

Jacob T. Pelczar, Vice President


_____

## LIMITED LIABILITY COMPANY ACKNOWLEDGMENT

STATE OF ___ARIZONA_____          )

                                                 ) SS

COUNTY OF ___MARICOPA_____          )


This record was acknowledged before me on ___JANUARY 8_____, 20 20  by Stephen K. Nelson, Co-Manager and Member of Bonner Property Development, LLC and Michael D. Boehme, Co-Manager and Member of Bonner Property Development, LLC.

EDWARD J SIBIGA
Notary Public - Arizona
Maricopa County
Commission # 550316
My Comm. Expires Aug 1, 2022

_____
(Signature of notarial officer)

(Official stamp)

_____
Title of officer (if not shown in stamp)



_____
_____

## LENDER ACKNOWLEDGMENT

STATE OF _____          )

                                                   ) SS

COUNTY OF _____          )


This record was acknowledged before me on _____, 20_____ by **Jacob T. Pelczar** as **Vice President** of **Bank of Montana**.

_____
(Signature of notarial officer)

(Official stamp)

_____
Title of officer (if not shown in stamp)

**CERTIFIED EXTRACT OF**
**MINUTES OF A MEETING OF THE BOARD OF DIRECTORS OF**
**HYPERBLOCK INC. (THE "CORPORATION") HELD ON JANUARY 7, 2020**

"Mr. Spoehel invited Mr. Walsh to report to the Board on proposed amendments to the Business Loan Agreement entered into between Hyperblock LLC, as borrower, and Bank of Montana ("Lender"), as lender, effective as of December 14, 2018 pertaining to a loan to Hyperblock LLC in the maximum principal amount of $2,625,000 (the "Loan").

Mr. Walsh referred the Directors to the draft Change in Terms Agreement and related resolutions provided to the Directors in the advance of the Board meeting.

Mr. Walsh also summarized the material terms of the proposed amendments, namely that the parties to the Loan Agreement desire to modify the terms of the Loan and execute certain documents related to such modification including the Change in Terms Agreement and that some of the terms to be modified include, but are not limited to: (i) an increase in the principal amount of the Loan to approximately $3,540,000.00 (an increase of approximately $915,000.00); (ii) an extension to the Loan's Draw Period to July 1, 2020; and (iii) an extension of the Loan's maturity date to July 1, 2024.

The Directors had a discussion regarding the matter presented by Mr. Walsh.

**ON A MOTION DULY MADE, SECONDED AND APPROVED UNANIMOUSLY, IT WAS RESOLVED THAT:** Sean Walsh, in his capacity as Chief Executive Officer of the Corporation, may enter into any agreements of any nature with Lender, including on behalf of the Corporation as the sole member of HyperBlock, LLC, and those agreements will bind HyperBlock, LLC. Specifically, but without limitation, such authorized person is authorized, empowered, and directed to do the following for and on behalf of the Corporation:

1.  General Authority. To take such other actions, including the negotiating of terms and provisions of any document or agreement, and execute and deliver such other documents as the person listed above may deem necessary or appropriate in order to carry out and perform the purposes of the following resolutions, with the taking of such action being evidence of the necessity of appropriateness thereof.

2.  Execute Documents. As Member of HyperBlock, LLC, to execute and deliver to Lender the form of Limited Liability Company Resolution and other loan documents submitted by Lender, confirming the nature and existence of HyperBlock, LLC, including the Corporation's participation in HyperBlock, LLC as a Member, and evidencing the terms of the loan from Lender to HyperBlock, LLC.

3.  Authorize Officers. To authorize other officers of the Corporation, from time to time, to act in his or her stead or as his or her successors on behalf of the Corporation as Member in HyperBlock, LLC. This includes but is not limited to Sean M. Walsh, in his capacity as Chief Executive Officer of the Corporation.

4.  Further Acts. In the case of lines of credit, to designate additional or alternate officers of the Corporation as being authorized to request advances under such lines, and in all cases, to do and perform such other acts and things, to pay any and all fees and costs, and to execute and deliver such other documents and agreements, including agreements waiving the right to a trial by jury, as the officer may in his or her discretion

2

deem reasonably necessary or proper in order to carry into effect the provisions of this Resolution."

\*     \*     \*     \*     \*

The undersigned each hereby certify in their capacity as Directors of the Corporation and not in their personal capacity and without personal liability, that the above minutes are an extract of the minutes of a duly held meeting of the directors of the Corporation, at which a quorum was present, held on the date hereof and that the resolutions approved in such minutes are in effect unamended as of the date hereof and are part of the corporate record of the Corporation. Bank of Montana may rely on, and continue to rely on short of actual knowledge to the contrary, this document and the authority granted hereunder or herein without further investigation or inquiry.

DATED January 8, 2020.

_____
Roozbeh Ebbadi - Director

_____
Ronald R. Spoehel - Director

_____
Sean Walsh - Director

EXHIBIT 28.(ii)
PAGE 1

# LIMITED LIABILITY COMPANY RESOLUTION TO BORROW / GRANT COLLATERAL / SUBORDINATE DEBT

| New Principal Amount | Loan Date | Mod. Date | New Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|---|
| $3,540,000.00 | 12-14-2018 | 01- -2020 | 07-01-2024 | 4200 | | | *** | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.

Any item above containing "***" has been omitted due to text length limitations.

**Company:**   HyperBlock, LLC
5619 DTC Parkway #475
Greenwood Village, CO   80111

**Lender:**   Bank of Montana
125 Bank Street
Suite 100
Missoula, MT   59802

**I, THE UNDERSIGNED, DO HEREBY CERTIFY AND AGREE THAT:**

**THE COMPANY'S EXISTENCE.** The complete and correct name of the Company is HyperBlock, LLC ("Company"). The Company is a limited liability company which is, and at all times shall be, duly organized, validly existing, and in good standing under and by virtue of the laws of the State of Delaware. The Company is duly authorized to transact business in the State of Montana and all other states in which the Company is doing business, having obtained all necessary filings, governmental licenses and approvals for each state in which the Company is doing business. Specifically, the Company is, and at all times shall be, duly qualified as a foreign limited liability company in all states in which the failure to so qualify would have a material adverse effect on its business or financial condition. The Company has the full power and authority to own its properties and to transact the business in which it is presently engaged or presently proposes to engage. The Company is managed by its sole member, which is HyperBlock, Inc. The limited liability company agreement of the Company, which is dated effective December 29, 2017 ("Operating Agreement"), and the Certificate of Formation filed on December 29, 2017, have not been amended or changed, except that the Company's sole member is now HyperBlock, Inc. as set forth in those certain Articles of Arrangement and Plan of Arrangement attached thereto, filed July 10, 2018 with the Ontario Ministry of Government and Consumer Services. The Company maintains its principal office at 5619 DTC Parkway #475, Greenwood Village, CO   80111. Unless the Company has designated otherwise in writing, the principal office is the office at which the Company keeps its books and records including its records concerning the Collateral. The Company will notify Lender prior to any change in the location of the Company's state of organization or any change in the Company's name. The Company shall do all things necessary to preserve and to keep in full force and effect its existence, rights and privileges, and shall comply with all regulations, rules, ordinances, statutes, orders and decrees of any governmental or quasi-governmental authority or court applicable to the Company and the Company's business activities. The member waives any right or restriction, including but not limited to any right or restriction in the Operating Agreement or Certificate of Formation of the Company, or any other agreement to which the Company or any of the undersigned is a party that would preclude, interfere or restrict the transaction(s) or any action as contemplated by the following resolutions or the documents contemplated thereby or therein. Any matter relating to the governance of the Company that is inconsistent or in contradiction with the matters set forth herein are hereby amended or modified to make the matters set forth herein factually and legally correct. This Limited Liability Company Resolution to Borrow / Grant Collateral / Subordinate Debt is dated January 10, 2020.

**LOAN.** On or about December 14, 2018, the Company entered into that certain Loan from Lender in the principal amount of $2,625,000 (as it may from time to time be amended, modified, extended, renewed, and/or refinanced, the "Loan"). As of January 10, 2020, the outstanding balance of the Loan was $0.00. The parties now desire to modify the terms of the Loan and execute certain documents related to such modification including that certain Change in Terms Agreement related thereto (the "Change in Terms Agreement"). Some of the terms to be modified include, but are not limited to:

1. Increase the principal amount of the Loan to approximately $3,540,000.00 (an increase of approximately $915,000.00);

2. Pay an origination fee of $36,000.00 and other fees and costs to Lender;

3. Extend the Loan's Draw Period to July 1, 2020;

4. Extend the Loan's Maturity date to July 1, 2024; and

**RESOLUTIONS ADOPTED.** At a meeting of the member of the Company, duly called and held on January 10, 2020, at which a quorum was present and voting, or by other duly authorized action in lieu of a meeting (including this document), the resolutions set forth in this Resolution were and are adopted and approved by all required parties.

**MEMBER.** The following named entity is the sole member of HyperBlock, LLC:

| NAMES | TITLES | AUTHORIZED | ACTUAL SIGNATURES |
|---|---|---|---|
| HyperBlock, Inc. | Member | Y | HyperBlock, Inc., an Ontario, Canada corporation |

By: _Sean M. Walsh_

Sean M. Walsh,
Its Chief Executive Officer

**ACTIONS AUTHORIZED.** The authorized entity listed above may enter into any agreements of any nature with Lender, and those agreements will bind the Company. Specifically, but without limitation, the authorized entity is authorized, empowered, and directed to do the following for and on behalf of the Company:

**General Authority.** To take such other actions, including the negotiating of terms and provisions of any document or agreement, and execute and deliver such other documents as the authorized entity listed above may deem necessary or appropriate in order to carry out and perform the purposes of the following resolutions, with the taking of such action being evidence of the necessity or appropriateness thereof.

**Execute Change in Terms Agreement.** To execute and deliver to Lender the Change in Terms Agreement and such other agreements and financing statements which Lender may require and which shall evidence the terms and conditions to which the parties have agreed related to the Loan.

**Borrow Money.** To borrow an additional $915,000.00, as a cosigner or otherwise, from time to time from Lender as contemplated under the terms of that certain Change in Terms Agreement, promissory note, and other related documents, as well as such other amounts, on such terms as may be agreed upon between the Company and Lender.

**Execute Notes.** To execute and deliver to Lender the promissory note or notes, or other evidence of the Company's credit accommodations, on Lender's forms, at such rates of interest and on such terms as may be agreed upon, evidencing the sums of money so borrowed or any of the Company's indebtedness to Lender, and also to execute and deliver to Lender one or more renewals, extensions, modifications, refinancings, consolidations, or substitutions for one or more of the notes, any portion of the notes, or any other evidence of credit accommodations.

**Grant Security.** To mortgage, pledge, transfer, endorse, hypothecate, or otherwise encumber and deliver to Lender any property now or hereafter belonging to the Company or in which the Company now or hereafter may have an interest, including without limitation all of the Company's real property and all of the Company's personal property (tangible or intangible), as security for the payment of any loans or credit accommodations so obtained, any promissory notes so executed (including any amendments to or modifications, renewals, and extensions of such promissory notes), or any other or further indebtedness of the Company to Lender at any time owing, however the same may be evidenced. Such property may be mortgaged, pledged, transferred, endorsed, hypothecated or encumbered at the time such loans are obtained or such indebtedness is incurred, or at any other time or times, and may be either in addition to or in lieu of any property theretofore mortgaged, pledged, transferred, endorsed, hypothecated or encumbered.

**Execute Security Documents.** To execute and deliver to Lender the forms of mortgage, deed of trust, pledge agreement, hypothecation agreement, and other security agreements and financing statements which Lender may require and which shall evidence the terms and conditions under and pursuant to which such liens and encumbrances, or any of them, are given; and also to execute and deliver to Lender any other written instruments, any chattel paper, or any other collateral, of any kind or nature, which Lender may deem necessary or proper in connection with or pertaining to the giving of the liens and encumbrances.

**Subordination.** To subordinate, in all respects, any and all present and future indebtedness, obligations, liabilities, claims, rights, and demands of any kind which may be owed, now or hereafter, from any person or entity to the Company to all present and future indebtedness, obligations, liabilities, claims, rights, and demands of any kind which may be owed, now or hereafter, from such person or entity to Lender ("Subordinated Indebtedness"), together with subordination by the Company of any and all security interests of any kind, whether now existing or hereafter acquired, securing payment or performance of the Subordinated Indebtedness; all on such subordination terms as may be agreed upon between the Company's member and Lender and in such amounts as in its judgment should be subordinated.

**Negotiate Items.** To draw, endorse, and discount with Lender all drafts, trade acceptances, promissory notes, or other evidences of indebtedness payable to or belonging to the Company or in which the Company may have an interest, and either to receive cash for the same or to cause such proceeds to be credited to the Company's account with Lender, or to cause such other disposition of the proceeds derived therefrom as it may deem advisable.

**Further Acts.** In the case of lines of credit, to designate additional or alternate individuals as being authorized to request advances under such lines, and in all cases, to do and perform such other acts and things, to pay any and all fees and costs, and to execute and deliver such other documents and agreements, **including agreements waiving the right to a trial by jury,** as the member may in its discretion deem reasonably necessary or proper in order to carry into effect the provisions of this Resolution.

**ASSUMED BUSINESS NAMES.** The Company has filed or recorded all documents or filings required by law relating to all assumed business names used by the Company. Excluding the name of the Company, the following is a complete list of all assumed business names under which the Company does business: **None.**

**NOTICES TO LENDER.** The Company will promptly notify Lender in writing at Lender's address shown above (or such other addresses as Lender may designate from time to time) prior to any (A) change in the Company's name; (B) change in the Company's assumed business name(s); (C) change in the management or in the members of the Company; (D) change in the authorized signer(s); (E) change in the Company's principal office address; (F) change in the Company's state of organization; (G) conversion of the Company to a new or different type of business entity; or (H) change in any other aspect of the Company that directly or indirectly relates to any agreements between the Company and Lender. No change in the Company's name or state of organization will take effect until after Lender has received notice.

**CERTIFICATION CONCERNING MEMBERS AND RESOLUTIONS.** The member named above is duly elected, appointed, or employed by or for the Company, as the case may be, and occupies the position set opposite its respective name. This Resolution now stands of record on the books of the Company, is in full force and effect, and has not been modified or revoked in any manner whatsoever.

**CONTINUING VALIDITY.** Any and all acts authorized pursuant to this Resolution and performed prior to the passage of this Resolution are hereby ratified and approved. This Resolution shall be continuing, shall remain in full force and effect and Lender may rely on it until written notice of its revocation shall have been delivered to and received by Lender at Lender's address shown above (or such addresses as Lender may designate from time to time). Any such notice shall not affect any of the Company's agreements or commitments in effect at the time notice is given. The undersigned represents and warrants that their approval, as evidenced by this Resolution, is sufficient without any other approvals or actions (unless such approvals and actions have been properly and duly obtained) to authorize all actions contemplated by the foregoing Resolutions.

**[Signature Page Follows]**

EXHIBIT 28.(ii)
PAGE 3

SIGNATURE PAGE TO

LIMITED LIABILITY COMPANY RESOLUTION TO BORROW/GRANT COLLATERAL/SUBORDINATE DEBT

I have read all the provisions of this Resolution, and I personally and on behalf of the Company certify that all statements and representations made in this Resolution are true and correct.

THIS RESOLUTION IS DELIVERED UNDER SEAL AND IT IS INTENDED THAT THIS RESOLUTION IS AND SHALL CONSTITUTE AND HAVE THE EFFECT OF A SEALED INSTRUMENT ACCORDING TO LAW.

IN TESTIMONY WHEREOF, I have hereunto set my hand and attest that the signature set opposite the name listed above is its genuine signature.

CERTIFIED TO AND ATTESTED BY:

HyperBlock, LLC,
a Delaware limited liability company

By its Member: HyperBlock, Inc.,
an Ontario, Canada Corporation

By: _____

Sean M. Walsh,
Chief Executive Officer of HyperBlock, Inc.

EXHIBIT 28.(iii)
PAGE 1

# RESOLUTION OF CORPORATE LLC MEMBER

| New Principal Amount | Loan Date | Mod. Date | New Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|---|
| $3,540,000.00 | 12-14-2018 | 01- -2020 | 07-01-2024 | - - - - - ¦200 | | | *** | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.

Any item above containing "****" has been omitted due to text length limitations.

**Borrower:** HyperBlock, LLC
5619 DTC Parkway #475
Greenwood Village, CO  80111

**Lender:** Bank of Montana
125 Bank Street
Suite 100
Missoula, MT  59802

**Corporation:** HyperBlock, Inc.
388 Carlaw Avenue, Suite 300
Toronto, ON  M4M 2T4

**WE, THE UNDERSIGNED, DO HEREBY CERTIFY AND AGREE THAT:**

**THE CORPORATION'S EXISTENCE.** The complete and correct name of the Corporation is HyperBlock, Inc. ("Corporation"). The Corporation is a corporation for profit which is, and at all times shall be, duly organized, validly existing, and in good standing under and by virtue of the laws of the Province of Ontario. The Corporation is duly authorized to transact business in the United States, the State of Montana, and all other states in which the Corporation is doing business, having obtained all necessary filings, governmental licenses and approvals for each state in which the Corporation is doing business. Specifically, the Corporation is, and at all times shall be, duly qualified as a foreign corporation in all states and countries in which the failure to so qualify would have a material adverse effect on its business or financial condition. The Corporation has the full power and authority to own its properties and to transact the business in which it is presently engaged or presently proposes to engage. Roozbeh Ebbadi, Ronald R. Spoehel, and Sean M. Walsh are the sole directors of the Corporation, or together constitute a quorum of the board with the authority to grant the authority contemplated herein. The Articles of Arrangement and Plan of Arrangement attached thereto, filed July 10, 2018, amalgamated HyperBlock Technologies Corp. and Cryptoglobal Corp. into the Corporation and such documents have not been amended or changed. The bylaws of the Corporation have not been amended or changed. The Corporation maintains an office at 388 Carlaw Avenue, Suite 300, Toronto, ON  M4M 2T4. Unless the Corporation has designated otherwise in writing, this is the principal office at which the Corporation keeps its books and records. The Corporation will notify Lender prior to any change in the location of the Corporation's state of organization, or any change in the Corporation's name. The Corporation shall do all things necessary to preserve and to keep in full force and effect its existence, rights and privileges, and shall comply with all regulations, rules, ordinances, statutes, orders and decrees of any governmental or quasi-governmental authority or court applicable to the Corporation and the Corporation's business activities. No right or restriction, including but not limited to any right or restriction in the bylaws and articles of arrangement of the Corporation, or any other agreement to which the Corporation or any of the undersigned is a party that would preclude, interfere or restrict the transaction(s) or any action as contemplated by the following or foregoing resolutions or the documents contemplated thereby or therein. Any matter relating to the governance of the Corporation that is inconsistent or in contradiction with the matters set forth herein is hereby (or has otherwise been) amended or modified to make the matters set forth herein factually and legally correct. This Resolution of Corporate LLC Member is dated January 1C, 2020.

**RELATIONSHIP TO BORROWER AND GRANTOR.** The Corporation is the sole member of the **HyperBlock, LLC. HyperBlock, LLC** has applied or will be applying to **Bank of Montana ("Lender")** to modify the terms of that certain loan from Lender currently in the original principal amount of $2,625,000 (the "Loan") to borrow approximately $915,000.00 in additional funds for a total Loan amount of approximately $3,540,000.00, to execute certain documents related to such modification including that certain Change in Terms Agreement related thereto (the "Change in Terms Agreement"). The Corporation has considered the value of **HyperBlock, LLC** obtaining the financial accommodations described above and granting the collateral.

**LOAN.** On or about December 14, 2018, the HyperBlock, LLC entered into the Loan. As of January 10, 2020, the outstanding balance of the Loan was $0.00. The parties now desire to modify the terms of the Loan and execute certain documents related to such modification including the Change in Terms Agreement. Some of the terms to be modified include, but are not limited to:

1. An increase in the principal amount of the Loan to approximately $3,540,000.00 (an increase of approximately $915,000.00);

2. Extend the Loan's Draw Period to July 1, 2020;

3. Extend the Loan's Maturity date to July 1, 2024; and

**AUTHORIZATION TO BE A MEMBER.** The Corporation is authorized to be and become a Member in the Limited Liability Company named **HyperBlock, LLC,** whose office is at 5619 DTC Parkway #475, Greenwood Village, CO  80111.

**RESOLUTIONS ADOPTED.** At a meeting of the Directors of the Corporation, duly called and held on **January 10, 2020,** at which a quorum was present and voting, or by other duly authorized action in lieu of a meeting (including this document), the resolutions set forth in this Resolution were and are adopted.

**OFFICER.** The following named person is an officer of HyperBlock, Inc.:

| NAMES | TITLES | AUTHORIZED | ACTUAL SIGNATURES |
|---|---|---|---|
| Sean M. Walsh | Chief Executive Officer | Y | X _____ |

**ACTIONS AUTHORIZED.** The authorized person listed above may enter into any agreements of any nature with Lender, including on behalf of the

Corporation as the sole member of HyperBlock, LLC, and those agreements will bind the Corporation.  Specifically, but without limitation, the authorized person is authorized, empowered, and directed to do the following for and on behalf of the Corporation:

**General Authority.**  To take such other actions, including the negotiating of terms and provisions of any document or agreement, and execute and deliver such other documents as the persons listed above may deem necessary or appropriate in order to carry out and perform the purposes of the following resolutions, with the taking of such action being evidence of the necessity of appropriateness thereof.

**Execute Documents.**  As Member of HyperBlock, LLC, to execute and deliver to Lender the form of Limited Liability Company Resolution and other loan documents submitted by Lender, confirming the nature and existence of HyperBlock, LLC, including the Corporation's participation in HyperBlock, LLC as a Member, and evidencing the terms of the loan from Lender to HyperBlock, LLC.

**Authorize Officers.**  To authorize other officers or employees of the Corporation, from time to time, to act in his or her stead or as his or her successors on behalf of the Corporation as Member in HyperBlock, LLC. This includes but is not limited to Sean M. Walsh, in his capacity as Chief Executive Officer of the Corporation.

**Further Acts.**  In the case of lines of credit, to designate additional or alternate individuals as being authorized to request advances under such lines, and in all cases, to do and perform such other acts and things, to pay any and all fees and costs, and to execute and deliver such other documents and agreements, **including agreements waiving the right to a trial by jury,** as the officer may in his or her discretion deem reasonably necessary or proper in order to carry into effect the provisions of this Resolution.

**NOTICES TO LENDER.**  The Corporation will promptly notify Lender in writing at Lender's address shown above (or such other addresses as Lender may designate from time to time) prior to any  (A)  change in the Corporation's name;  (B)  change in the Corporation's assumed business name(s);  (C) change in the management of the Corporation;  (D)  change in the authorized signer(s);  (E)  change in the Corporation's principal office address;  (F) change in the Corporation's state of organization;  (G)  conversion of the Corporation to a new or different type of business entity; or  (H)  change in any other aspect of the Corporation that directly or indirectly relates to any agreements between the Corporation and Lender.  No change in the Corporation's name or state of organization will take effect until after Lender has received notice.

**PARTICIPATION AUTHORIZED.**  The Corporation's participation in HyperBlock, LLC as a Member and the execution, delivery, and performance of the documents described herein have been duly authorized by all necessary action by the Corporation and do not conflict with, result in a violation of, or constitute a default under  (A)  any provision of its articles of arrangement, bylaws, or any agreement or other instrument binding upon the Corporation or (B)  any law, governmental regulation, court decree, or order applicable to the Corporation.

**CERTIFICATION CONCERNING OFFICERS AND RESOLUTIONS.**  The officer named above is duly elected, appointed, or employed by or for the Corporation, as the case may be, and occupies the position set opposite his or her respective name.  This Resolution now stands of record on the books of the Corporation, is in full force and effect, and has not been modified or revoked in any manner whatsoever.

**NO CORPORATE SEAL.**  The Corporation has no corporate seal, and therefore, no seal is affixed to this Resolution.

**CONTINUING VALIDITY.**  Any and all acts authorized pursuant to this Resolution and performed prior to the passage of this Resolution are hereby ratified and approved.  This Resolution shall be continuing, shall remain in full force and effect and Lender may rely on it until written notice of its revocation shall have been delivered to and received by Lender at Lender's address shown above (or such addresses as Lender may designate from time to time).  Any such notice shall not affect any of the Corporation's agreements or commitments in effect at the time notice is given. The undersigned represents and warrants that their approval, as evidenced by this Resolution, is sufficient without any other approvals or actions (unless such approvals and actions have been properly and duly obtained) to authorize all actions contemplated by the foregoing Resolutions.

**[Signature Page Follows]**

EXHIBIT 28.(iii)
PAGE 3

COUNTERPART SIGNATURE PAGE TO
RESOLUTION OF CORPORATE LLC MEMBER

IN TESTIMONY WHEREOF, I have hereunto set my hand and attest that the signature set opposite the name listed above is his or her genuine signature.

I have read all the provisions of this Resolution, and I on behalf of the Corporation certify that all statements and representations made in this Resolution are true and correct.

CERTIFIED TO AND ATTESTED BY:

X _____

Sean Walsh, as Chief Executive Officer of the Corporation

EXHIBIT 29.
PAGE 1

**Jill Broughton**

| | |
|---|---|
| **From:** | Big Sky Mobile Catering <bsmcorpmt@gmail.com> |
| **Sent:** | Sunday, May 31, 2020 5:17 PM |
| **To:** | Kassy Buss; David Bjornson |
| **Subject:** | FW: Your confirmation for your OUTGOING FX WIRE |

**From:** Jake Pelczar [mailto:jpelczar@bankofmt.com]
**Sent:** Friday, January 10, 2020 2:06 PM
**To:** Dan Stivers <dan@hyperblock.co>; Inder Saini <inder@hyperblock.co>; Sean Walsh <sean@hyperblock.co>; Steve Nelson <bsmcorpmt@gmail.com>; Kristen Martin <kristen@hyperblock.co>; Hisham Alwafai <hisham@hyperblock.co>; Jason Vaughan <jason@hyperblock.co>
**Cc:** BOM-Loans <loans@bankofmt.com>; BOM-Operations <operations@bankofmt.com>
**Subject:** FW: Your confirmation for your OUTGOING FX WIRE

Hi Dan and HyperBlock Team,

The Bitmain wire confirmation is below. We've also moved the $250,487.87 into the Project Spokane operating account. Thanks for everyone's hard work!

Talk soon,

Jake

**Jacob T. Pelczar**
Vice President
Phone: 406.829.2662  /  Fax: 406.829.2355
Bank of Montana
125 Bank Street, Suite 100
Missoula, MT 59802
NMLS: 944575

*The information contained in this message is proprietary and/or confidential.*
*If you are not the intended recipient, please: (i) delete the message and all copies;*
*(ii) do not disclose, distribute or use the message in any manner; and (iii) notify*
*the sender immediately. In addition, please be aware that any message addressed*
*to our domain is subject to archiving and review by persons other than the intended*
*recipient. Thank you.*

**From:** operations@bankofmt.com <operations@bankofmt.com>
**Sent:** Friday, January 10, 2020 1:38 PM
**To:** Jake Pelczar <jpelczar@bankofmt.com>
**Subject:** Your confirmation for your OUTGOING FX WIRE

# BANK OF MONTANA

125 Bank Street • Missoula, MT 59802

## INTERNATIONAL WIRE TRANSFER NOTICE

1

EXHIBIT 29.
PAGE 2

*for* HYPERBLOCK, LLC

| | |
|---|---|
| **Date Posted** | 01/10/2020 |
| **Date Entered** | 01/10/2020 |
| **Processing Reference No.** | 1    67    8963 |
| **Swift UETR** | 81496f1b-d94b-424c-b4bd-0bfd9e9bdb83 |
| **Amount (USD)** | 751,478.60 |
| **Foreign Amount** | 751,478.60 USD |

| **Beneficiary** |
|---|
| Bitmaintech Pte. Ltd. |
| 8 Kallang Avenue |
| Aperia Tower 1, #09-03/04 |
| SINGAPORE |

| **Beneficiary Bank** |
|---|
| STANDARD CHARTERED BANK (CHINA) LIMITED |
| 11/F Tower 1, Kingkey 100 |
| Building, No. 5016 |
| Shennan East Road, Luohu District |
| SHENZHEN Guangdong |
| CHINA |

EXHIBIT 29.
PAGE 3

| From: | Big Sky Mobile Catering |
|---|---|
| To: | Kassy Buss; David Bjornson |
| Subject: | FW: FW: Your confirmation for your OUTGOING FX WIRE |
| Date: | Sunday, May 31, 2020 5:20:51 PM |
| Attachments: | image001.jpg |

**From:** Big Sky Mobile Catering [mailto:bsmcorpmt@gmail.com]
**Sent:** Thursday, January 16, 2020 1:10 PM
**To:** 'Jake Pelczar' <jpelczar@bankofmt.com>; 'Inder Saini' <inder@hyperblock.co>
**Cc:** 'Dan Stivers' <dan@hyperblock.co>; 'Sean Walsh' <sean@hyperblock.co>; 'Roozbeh Ebbadi' <roozbeh@hyperblock.co>; 'Kristen Martin' <kristen@hyperblock.co>; 'BOM-Operations' <operations@bankofmt.com>
**Subject:** RE: FW: Your confirmation for your OUTGOING FX WIRE

I approve.  Steve Nelson, Bonner Property Development LLC.

**From:** Jake Pelczar [mailto:jpelczar@bankofmt.com]
**Sent:** Thursday, January 16, 2020 12:38 PM
**To:** Inder Saini <inder@hyperblock.co>
**Cc:** Dan Stivers <dan@hyperblock.co>; Sean Walsh <sean@hyperblock.co>; Roozbeh Ebbadi <roozbeh@hyperblock.co>; Big Sky Mobile Catering <bsmcorpmt@gmail.com>; Kristen Martin <kristen@hyperblock.co>; BOM-Operations <operations@bankofmt.com>
**Subject:** RE: FW: Your confirmation for your OUTGOING FX WIRE

Thanks, Inder!

Steve, can you please "reply all" with your approval of this draw request? Thanks!

Talk soon,

Jake

**Jacob T. Pelczar**
Vice President
Phone: 406.829.2662  /  Fax: 406.829.2355
Bank of Montana
125 Bank Street, Suite 100
Missoula, MT 59802
NMLS: 944575

*The information contained in this message is proprietary and/or confidential.*
*If you are not the intended recipient, please: (i) delete the message and all copies;*
*(ii) do not disclose, distribute or use the message in any manner; and (iii) notify*
*the sender immediately. In addition, please be aware that any message addressed*
*to our domain is subject to archiving and review by persons other than the intended*
*recipient. Thank you.*

EXHIBIT 29.
PAGE 4

**From:** Inder Saini <inder@hyperblock.co>
**Sent:** Thursday, January 16, 2020 10:48 AM
**To:** Jake Pelczar <jpelczar@bankofmt.com>
**Cc:** Dan Stivers <dan@hyperblock.co>; Sean Walsh <sean@hyperblock.co>; Roozbeh Ebbadi
<roozbeh@hyperblock.co>; Big Sky Mobile Catering <bsmcorpmt@gmail.com>; Kristen Martin
<kristen@hyperblock.co>
**Subject:** Fwd: FW: Your confirmation for your OUTGOING FX WIRE

Jake

Please find next funding request for servers. We have two invoices we are paying:
1) The balance of the 1,000 S17s = 1,017,159.84
2) Invoice for additional 60 S17 Pros that were shipped by bitmain to us for $40,740.30

Can we please do a wire for $1,057,900.14 to bitmain?

Same instruction as last time to Bitmain.

Thanks
Inder

---------- Forwarded message ---------
From: 赫炘然 **Joyce** <xinran.he@bitmain.com>
Date: Thu, Jan 16, 2020 at 3:38 AM
Subject: Re: FW: Your confirmation for your OUTGOING FX WIRE
To: Sean Walsh <sean@hyperblock.co>, Roozbeh Ebbadi <roozbeh@hyperblock.co>, Dan Stivers
<dan@hyperblock.co>
Cc: Kristen Martin <kristen@hyperblock.co>, Inder Saini <inder@hyperblock.co>


Hi Sean Roozbeh and Dan,

Now 800*S17+ are ready to be shipped.
100*S17+ 73T
500*S17+ 70T
100*S17+ 67T

Please finish the balance of 1000*S17+ 70T end of Jan batch, then we will arrange the shipping of first
700-unit batch shipping immediately. It would be perfect if it could be done today, thank you! Balance PI
is attached here.

2 Agreements will be sent later.

**Best Regards**
**赫炘然 Joyce He**
Sales and Business Development Department
Phone: +86-10-5327 3990
Mobile: +86-156-3613-0223
LinkedIn-Joyce Xinran He

EXHIBIT 29.
PAGE 5

北京比特大陆科技有限公司Bitmain Technologies Inc
北京市海淀区黑泉路宝盛南路1号院奥北科技园25号楼，100192
Building 25, AoBei Technology Garden, Baosheng South Road, Haidian District, Beijing 100192



www.bitmain.com

赫炘然Joyce <xinran.he@bitmain.com> 于2020年1月13日周一 下午6:56写道：

Hi Dan,

Payment arrived.

| | |
|---|---|
| 13-Jan-20 | IT13012001130544 HYPERBLOCK LLC 5619 DTC<br>IT13012001130544   751473.6PARKWAY 475 GREENWOOD VILLAGE CO 80111 USA<br>INVOICE 0012020010901 |

**Best Regards**
**赫炘然 Joyce He**
Sales and Business Development Department
Phone: +86-10-5327 3990
Mobile: +86-156-3613-0223
LinkedIn-Joyce Xinran He
北京比特大陆科技有限公司Bitmain Technologies Inc
北京市海淀区黑泉路宝盛南路1号院奥北科技园25号楼，100192
Building 25, AoBei Technology Garden, Baosheng South Road, Haidian District, Beijing 100192



www.bitmain.com

赫炘然Joyce <xinran.he@bitmain.com> 于2020年1月12日周日 上午10:25写道：

Hi Dan,

Thanks! I'll ask my colleague to check our bank account then let you know when this payment arrived.

The balance due, I'll send you next week.

**Best Regards**
**赫炘然 Joyce He**
Sales and Business Development Department
Phone: +86-10-5327 3990
Mobile: +86-156-3613-0223
LinkedIn-Joyce Xinran He
北京比特大陆科技有限公司Bitmain Technologies Inc

EXHIBIT 29.
PAGE 6

北京市海淀区黑泉路宝盛南路1号院奥北科技园25号楼，100192
Building 25, AoBei Technology Garden, Baosheng South Road, Haidian District, Beijing 100192



www.bitmain.com

Dan Stivers <dan@hyperblock.co> 于2020年1月11日周六 上午6:12写道：

> Hi Joyce,
>
> See wire transfer information below. The remaining deposit of $751,478.60 was sent. Please let
> us know when the remaining payment is due.
>
> Thanks
> Dan
>
>
> ---------- Forwarded message ---------
> From: **Jake Pelczar** <jpelczar@bankofmt.com>
> Date: Fri, Jan 10, 2020 at 2:05 PM
> Subject: FW: Your confirmation for your OUTGOING FX WIRE
> To: Dan Stivers <dan@hyperblock.co>, Inder Saini <inder@hyperblock.co>, Sean Walsh
> <sean@hyperblock.co>, Steve Nelson <bsmcorpmt@gmail.com>, Kristen Martin
> <kristen@hyperblock.co>, Hisham Alwafai <hisham@hyperblock.co>, Jason Vaughan
> <jason@hyperblock.co>
> Cc: BOM-Loans <loans@bankofmt.com>, BOM-Operations <operations@bankofmt.com>
>
>
> Hi Dan and HyperBlock Team,
>
> The Bitmain wire confirmation is below.
>
> Talk soon,
>
> Jake
>
> **Jacob T. Pelczar**
> Vice President
> Phone: 406.829.2662  /  Fax: 406.829.2355
> Bank of Montana
> 125 Bank Street, Suite 100
> Missoula, MT 59802
> NMLS: 944575
>
> *The information contained in this message is proprietary and/or confidential.*

EXHIBIT 29.
PAGE 7

*If you are not the intended recipient, please: (i) delete the message and all copies;*
*(ii) do not disclose, distribute or use the message in any manner; and (iii) notify*
*the sender immediately. In addition, please be aware that any message addressed*
*to our domain is subject to archiving and review by persons other than the intended*
*recipient. Thank you.*

**From:** operations@bankofmt.com <operations@bankofmt.com>
**Sent:** Friday, January 10, 2020 1:38 PM
**To:** Jake Pelczar <jpelczar@bankofmt.com>
**Subject:** Your confirmation for your OUTGOING FX WIRE

# BANK OF MONTANA

### 125 Bank Street • Missoula, MT 59802

## INTERNATIONAL WIRE TRANSFER NOTICE

*for* HYPERBLOCK, LLC

| | |
|---|---|
| **Date Posted** | 01/10/2020 |
| **Date Entered** | 01/10/2020 |
| **Processing Reference No.** | 1    67    8963 |
| **Swift UETR** | 81496f1b-d94b-424c-b4bd-0bfd9e9bdb83 |
| **Amount (USD)** | 751,478.60 |
| **Foreign Amount** | 751,478.60 USD |

| Beneficiary | Beneficiary Bank |
|---|---|
| Bitmaintech Pte. Ltd.<br>8 Kallang Avenue<br>Aperia Tower 1, #09-03/04<br>SINGAPORE | STANDARD CHARTERED BANK (CHINA) LIMITED<br>11/F Tower 1, Kingkey 100<br>Building, No. 5016<br>Shennan East Road, Luohu District<br>SHENZHEN Guangdong<br>CHINA |

--
Inder Saini, CPA, CA
C: 416-356-9611
E: inder@hyperblock.co

| From: | Big Sky Mobile Catering |
|---|---|
| To: | Kassy Buss; David Bjornson |
| Subject: | FW: Your confirmation for your OUTGOING FX WIRE |
| Date: | Sunday, May 31, 2020 5:21:50 PM |

**From:** Jake Pelczar [mailto:jpelczar@bankofmt.com]
**Sent:** Thursday, January 16, 2020 3:10 PM
**To:** Inder Saini <inder@hyperblock.co>; Dan Stivers <dan@hyperblock.co>; Sean Walsh <sean@hyperblock.co>; Roozbeh Ebbadi <roozbeh@hyperblock.co>; Big Sky Mobile Catering <bsmcorpmt@gmail.com>; Kristen Martin <kristen@hyperblock.co>
**Subject:** FW: Your confirmation for your OUTGOING FX WIRE

Hi HyperBlock Team,

Wire confirmation is below! Let me know if you need anything else.

Talk soon,

Jake

**Jacob T. Pelczar**
**Vice President**
Phone: 406.829.2662  /  Fax: 406.829.2355
Bank of Montana
125 Bank Street, Suite 100
Missoula, MT 59802
NMLS: 944575

*The information contained in this message is proprietary and/or confidential.*
*If you are not the intended recipient, please: (i) delete the message and all copies;*
*(ii) do not disclose, distribute or use the message in any manner; and (iii) notify*
*the sender immediately. In addition, please be aware that any message addressed*
*to our domain is subject to archiving and review by persons other than the intended*
*recipient. Thank you.*

**From:** operations@bankofmt.com <operations@bankofmt.com>
**Sent:** Thursday, January 16, 2020 2:37 PM
**To:** Jake Pelczar <jpelczar@bankofmt.com>
**Subject:** Your confirmation for your OUTGOING FX WIRE

# BANK OF MONTANA
### 125 Bank Street • Missoula, MT 59802

## INTERNATIONAL WIRE TRANSFER NOTICE

*for*

EXHIBIT 29.
PAGE 9

HYPERBLOCK, LLC

| | |
|---|---|
| **Date Posted** | 01/16/2020 |
| **Date Entered** | 01/16/2020 |
| **Processing Reference No.** | 11    7    0555 |
| **Swift UETR** | e99df0d3-445d-4b4b-aa7f-7512759bf045 |
| **Amount (USD)** | 1,057,900.14 |
| **Foreign Amount** | 1,057,900.14 USD |

| Beneficiary |
|---|
| Bitmaintech Pte. Ltd.
8 Kallang Avenue
Aperia Tower 1, #09-03/04
SINGAPORE |

| Beneficiary Bank |
|---|
| STANDARD CHARTERED BANK (CHINA) LIMITED
11/F Tower 1, Kingkey 100
Building, No. 5016
Shennan East Road, Luohu District
SHENZHEN Guangdong
CHINA |

| From: | Big Sky Mobile Catering |
|---|---|
| To: | Kassy Buss; David Bjornson |
| Subject: | FW: FW: Your confirmation for your OUTGOING FX WIRE |
| Date: | Sunday, May 31, 2020 5:19:36 PM |
| Attachments: | ~WRD000.jpg |
| | PI-Hyperblock-1000 S17+ end of Jan balance.pdf |
| | PI-Hyperblock-20 extra & 40 incorrect models.pdf |

**From:** Inder Saini [mailto:inder@hyperblock.co]
**Sent:** Thursday, January 16, 2020 10:48 AM
**To:** Jake Pelczar <jpelczar@bankofmt.com>
**Cc:** Dan Stivers <dan@hyperblock.co>; Sean Walsh <sean@hyperblock.co>; Roozbeh Ebbadi <roozbeh@hyperblock.co>; Big Sky Mobile Catering <bsmcorpmt@gmail.com>; Kristen Martin <kristen@hyperblock.co>
**Subject:** Fwd: FW: Your confirmation for your OUTGOING FX WIRE

Jake

Please find next funding request for servers. We have two invoices we are paying:
1) The balance of the 1,000 S17s = 1,017,159.84
2) Invoice for additional 60 S17 Pros that were shipped by bitmain to us for $40,740.30

Can we please do a wire for $1,057,900.14 to bitmain?

Same instruction as last time to Bitmain.

Thanks
Inder

---------- Forwarded message ---------
From: 赫炘然**Joyce** <xinran.he@bitmain.com>
Date: Thu, Jan 16, 2020 at 3:38 AM
Subject: Re: FW: Your confirmation for your OUTGOING FX WIRE
To: Sean Walsh <sean@hyperblock.co>, Roozbeh Ebbadi <roozbeh@hyperblock.co>, Dan Stivers <dan@hyperblock.co>
Cc: Kristen Martin <kristen@hyperblock.co>, Inder Saini <inder@hyperblock.co>


Hi Sean Roozbeh and Dan,

Now 800*S17+ are ready to be shipped.
100*S17+ 73T
500*S17+ 70T
100*S17+ 67T

Please finish the balance of 1000*S17+ 70T end of Jan batch, then we will arrange the shipping of first 700-unit batch shipping immediately. It would be perfect if it could be done today, thank you! Balance PI is attached here.

2 Agreements will be sent later.

EXHIBIT 29.
PAGE 11

**Best Regards**
**赫炘然 Joyce He**
Sales and Business Development Department
Phone: +86-10-5327 3990
Mobile: +86-156-3613-0223
LinkedIn-Joyce Xinran He
北京比特大陆科技有限公司Bitmain Technologies Inc
北京市海淀区昆泉路宝盛南路1号院奥北科技园25号楼，100192
Building 25, AoBei Technology Garden, Baosheng South Road, Haidian District, Beijing 100192



www.bitmain.com

赫炘然Joyce <xinran.he@bitmain.com> 于2020年1月13日周一 下午6:56写道：

Hi Dan,

Payment arrived.

| | |
|---|---|
| 13-Jan-20 | IT13012001130544 HYPERBLOCK LLC 5619 DTC IT13012001130544  751473.6PARKWAY 475 GREENWOOD VILLAGE CO 80111 USA INVOICE 0012020010901 |

**Best Regards**
**赫炘然 Joyce He**
Sales and Business Development Department
Phone: +86-10-5327 3990
Mobile: +86-156-3613-0223
LinkedIn-Joyce Xinran He
北京比特大陆科技有限公司Bitmain Technologies Inc
北京市海淀区黑泉路宝盛南路1号院奥北科技园25号楼，100192
Building 25, AoBei Technology Garden, Baosheng South Road, Haidian District, Beijing 100192



www.bitmain.com

赫炘然Joyce <xinran.he@bitmain.com> 于2020年1月12日周日 上午10:25写道：

Hi Dan,

Thanks! I'll ask my colleague to check our bank account then let you know when this payment arrived.

The balance due, I'll send you next week.

**Best Regards**
**赫炘然 Joyce He**

EXHIBIT 29.
PAGE 12

Sales and Business Development Department
Phone: +86-10-5327 3990
Mobile: +86-156-3613-0223
LinkedIn-Joyce Xinran He
北京比特大陆科技有限公司Bitmain Technologies Inc
北京市海淀区黑泉路宝盛南路1号院奥北科技园25号楼，100192
Building 25, AoBei Technology Garden, Baosheng South Road, Haidian District, Beijing 100192



www.bitmain.com

Dan Stivers <dan@hyperblock.co> 于2020年1月11日周六 上午6:12写道：

> Hi Joyce,
>
> See wire transfer information below. The remaining deposit of $751,478.60 was sent.
> Please let us know when the remaining payment is due.
>
> Thanks
> Dan
>
>
> ---------- Forwarded message ---------
> From: **Jake Pelczar** <jpelczar@bankofmt.com>
> Date: Fri, Jan 10, 2020 at 2:05 PM
> Subject: FW: Your confirmation for your OUTGOING FX WIRE
> To: Dan Stivers <dan@hyperblock.co>, Inder Saini <inder@hyperblock.co>, Sean Walsh
> <sean@hyperblock.co>, Steve Nelson <bsmcorpmt@gmail.com>, Kristen Martin
> <kristen@hyperblock.co>, Hisham Alwafai <hisham@hyperblock.co>, Jason Vaughan
> <jason@hyperblock.co>
> Cc: BOM-Loans <loans@bankofmt.com>, BOM-Operations <operations@bankofmt.com>
>
>
> Hi Dan and HyperBlock Team,
>
> The Bitmain wire confirmation is below.
>
> Talk soon,
>
> Jake
>
> **Jacob T. Pelczar**
> Vice President
> Phone: 406.829.2662  / Fax: 406.829.2355
> Bank of Montana
> 125 Bank Street, Suite 100
> Missoula, MT 59802
> NMLS: 944575

*The information contained in this message is proprietary and/or confidential.*
*If you are not the intended recipient, please: (i) delete the message and all copies;*
*(ii) do not disclose, distribute or use the message in any manner; and (iii) notify*
*the sender immediately. In addition, please be aware that any message addressed*
*to our domain is subject to archiving and review by persons other than the intended*
*recipient. Thank you.*

**From:** operations@bankofmt.com <operations@bankofmt.com>
**Sent:** Friday, January 10, 2020 1:38 PM
**To:** Jake Pelczar <jpelczar@bankofmt.com>
**Subject:** Your confirmation for your OUTGOING FX WIRE

# BANK OF MONTANA

125 Bank Street • Missoula, MT 59802

## INTERNATIONAL WIRE TRANSFER NOTICE

*for* HYPERBLOCK, LLC

| | |
|---|---|
| Date Posted | 01/10/2020 |
| Date Entered | 01/10/2020 |
| Processing Reference No. | 1    67         963 |
| Swift UETR | 81496f1b-d94b-424c-b4bd-0bfd9e9bdb83 |
| Amount (USD) | 751,478.60 |
| Foreign Amount | 751,478.60 USD |

| Beneficiary | Beneficiary Bank |
|---|---|
| Bitmaintech Pte. Ltd.<br>8 Kallang Avenue<br>Aperia Tower 1, #09-03/04<br>SINGAPORE | STANDARD CHARTERED BANK (CHINA) LIMITED<br>11/F Tower 1, Kingkey 100<br>Building, No. 5016<br>Shennan East Road, Luohu District<br>SHENZHEN Guangdong<br>CHINA |

--
Inder Saini, CPA, CA
C: 416-356-9611
E: inder@hyperblock.co

EXHIBIT 29.
PAGE 14

| | |
|---|---|
| **From:** | Big Sky Mobile Catering |
| **To:** | Kassy Buss; David Bjornson |
| **Subject:** | FW: EI INVOICE: 31,237.91 E032933691 FILE: 2030648728 |
| **Date:** | Sunday, May 31, 2020 5:22:29 PM |
| **Attachments:** | ~WRD000.jpg |
| | 2030648728_Expeditors Billing Invoice.pdf |

**From:** Inder Saini [mailto:inder@hyperblock.co]
**Sent:** Friday, January 24, 2020 9:27 AM
**To:** Jake Pelczar <jpelczar@bankofmt.com>
**Cc:** Big Sky Mobile Catering <bsmcorpmt@gmail.com>; Dan Stivers <dan@hyperblock.co>; Sean Walsh <sean@hyperblock.co>; Jason Vaughan <jason@hyperblock.co>
**Subject:** Fwd: EI INVOICE: 31,237.91 E032933691 FILE: 2030648728

Hi Jake,

We did a wire this morning to Expeditors Shipping to clear our duty fees for the server order. See invoice attached for $31,237.91.

We paid out of our operating account ending *3860 this morning to ensure they ship the servers ASAP. Can we please draw down on the loan amount from account 4200 to reimburse for this expense related to the servers? Please fund back into account 3860.

Let me know if you have any questions.

Thanks
Inder

---------- Forwarded message ---------
From: **Sarah Barba** <Sarah.Barba@expeditors.com>
Date: Thu, Jan 23, 2020 at 7:03 PM
Subject: RE: EI INVOICE: 31,237.91 E032933691 FILE: 2030648728
To: Jason Vaughan <jason@hyperblock.co>
Cc: roozbeh@hyperblock.co <roozbeh@hyperblock.co>, inder@hyperblock.co <inder@hyperblock.co>, Clayton Brenden <Clayton.Brenden@expeditors.com>

Hi Jason,

Please see attached revised invoice with HyperBlock listed.

**Regards,**

**Sarah Barba**
Customer Service Representative, Customs Brokerage

**Direct**   206-407-2948

EXHIBIT 29.
PAGE 15

**Office**  206-826-4100
**Email**  Sarah.Barba@Expeditors.com



**Seattle Branch, CSV Office**

19119 16th Ave. South

Seatac, WA 98188

**From:** Jason Vaughan <jason@hyperblock.co>
**Sent:** Thursday, January 23, 2020 3:12 PM
**To:** Sarah Barba <Sarah.Barba@expeditors.com>
**Cc:** roozbeh@hyperblock.co; inder@hyperblock.co; Clayton Brenden
<Clayton.Brenden@expeditors.com>
**Subject:** Re: EI INVOICE: 31,237.91 E032933691 FILE: 2030648728

Hi Sarah,

Per our phone conversation, please send and updated Invoice with Hyperblock Inc as the
Client please.
Address also needs to be changed to:

140 yonge st suite 209

Toronto, ON

M5c 1 x6

Regards,

Jason

On Thu, Jan 23, 2020 at 1:30 PM Sarah Barba <Sarah.Barba@expeditors.com> wrote:

Hello,

Since you do not have credit with Expeditors, we will need to receive  payment for this
shipment before we can process the entry.  We will require certified funds, meaning
cashier's check (not company check) , money order or wire transfer.

***Please note that we have included an "Incidental Expense fee" of $500.  We are adding
this to avoid any delay waiting for payment if there is a Customs exam, VACIS exam or
storage.  We hopefully will not need to request additional funds.   If no exams or storage
monies are needed, this $500 will be fully refunded to you or can be applied to your next
shipment.***

If you choose to wire the payment, please send me the wire transfer confirmation number
once it is completed.  Please make sure you reference our invoice number on the check or
on the wire transfer request to the bank.

EXHIBIT 29.
PAGE 16

WIRE TRANSFER INFO:
Beneficiary: Expeditors International of Washington, Inc.
Bank Name: Wells Fargo Bank
Bank Address: 999 Third Avenue, Seattle, Washington USA
ABA #:          0248
Account number:          752

**Regards,**

**Sarah Barba**

<span style="color:red">Customer Service Representative, Customs Brokerage</span>

**Direct**   206-407-2948
**Office**   206-826-4100
**Email**    Sarah.Barba@Expeditors.com



**Seattle Branch, CSV Office**
19119 16th Ave. South
Seatac, WA 98188

--



**Jason Vaughan**

Bonner, MT Site Manager

jason@hyperblock.co // 406.370.1859

—

**hyperblock.co**

--
Inder Saini, CPA, CA
C: 416-356-9611
E: inder@hyperblock.co



REMIT TO
EXHIBIT 29.
PAGE 17

EXPEDITORS INT'L OF WA INC.
P.O. BOX 1127
KENT, WA 98035-1127
253-872-3860

CLIENT NO: G2814505

| INVOICE DATE | 01/23/20 |

HyperBlock Inc.
140 Yonge St
Suite 209
Toronto, ON          M5C 1X6
CANADA

| INVOICE NUMBER | E032934355 |

| YOUR REFERENCE |

AWB/BL: 160-16272395                    ARRIVAL: 01/23/20

---

CARRIER: CATHAY PACIFIC AIRWA CUSTOMS#: 231-1138509-8
PCS:  24CTNS    WEIGHT:  8582.0K    CHG WGT:  8582.0K

ADDITIONAL BILLING, ORIGINAL 01/23/20

DUTY                            30,532.91 USD
INCIDENTALS                        500.00
DISBURSEMENT FEE                    35.00
CUSTOMS ENTRY                      125.00
CASH ACCOUNT FEE                    45.00

            SUB TOTAL:        31,237.91

          INVOICE TOTAL:      31,237.91 USD

Expeditors International of Washington, Inc.
"YOU'D BE SURPRISED HOW FAR WE'LL GO FOR YOU!"

---

An original version of this image, which can always be generated upon request, sets forth terms and conditions of service on the reverse side of this page. These terms and conditions are also available at www.expeditors.com/forms-downloads.  All services provided are subject to these terms and conditions.

| TERMS: NET CASH | EFT OPTIONS: | |
|---|---|---|
| | **Bank Name:** Wells Fargo Bank, N.A., Seattle, WA 98104 | |
| Unless credit has been granted pursuant to the terms and conditions of service or other written agreement with Expeditors, you must pay cash on receipt of goods or completion of service. | ACH Credit Account No.:          .363<br>Routing No.:          248<br>Preferred Remittance Format:  CTX | Wire Account No.:          I752<br>Routing No.:          248<br>SWIFT:          WFBIUS6S |

1/93            SC 03                        ORIGINAL   Expeditors Reference:  2030648728 B

EXHIBIT 29.
PAGE 18

| | |
|---|---|
| **From:** | Big Sky Mobile Catering |
| **To:** | Kassy Buss; David Bjornson |
| **Subject:** | FW: EI INVOICE: 31,237.91 E032933691 FILE: 2030648728 |
| **Date:** | Sunday, May 31, 2020 5:22:52 PM |
| **Attachments:** | ~WRD000.jpg |

**From:** Big Sky Mobile Catering [mailto:bsmcorpmt@gmail.com]
**Sent:** Friday, January 24, 2020 12:07 PM
**To:** 'Inder Saini' <inder@hyperblock.co>; 'Jake Pelczar' <jpelczar@bankofmt.com>
**Cc:** 'Dan Stivers' <dan@hyperblock.co>; 'Sean Walsh' <sean@hyperblock.co>; 'Jason Vaughan' <jason@hyperblock.co>
**Subject:** RE: EI INVOICE: 31,237.91 E032933691 FILE: 2030648728

I approve.  Steve Nelson, Bonner Property Development LLC.

**From:** Inder Saini [mailto:inder@hyperblock.co]
**Sent:** Friday, January 24, 2020 9:27 AM
**To:** Jake Pelczar <jpelczar@bankofmt.com>
**Cc:** Big Sky Mobile Catering <bsmcorpmt@gmail.com>; Dan Stivers <dan@hyperblock.co>; Sean Walsh <sean@hyperblock.co>; Jason Vaughan <jason@hyperblock.co>
**Subject:** Fwd: EI INVOICE: 31,237.91 E032933691 FILE: 2030648728

Hi Jake,

We did a wire this morning to Expeditors Shipping to clear our duty fees for the server order. See invoice attached for $31,237.91.

We paid out of our operating account ending *3860 this morning to ensure they ship the servers ASAP. Can we please draw down on the loan amount from account 4200 to reimburse for this expense related to the servers? Please fund back into account 3860.

Let me know if you have any questions.

Thanks
Inder

---------- Forwarded message ---------
From: **Sarah Barba** <Sarah.Barba@expeditors.com>
Date: Thu, Jan 23, 2020 at 7:03 PM
Subject: RE: EI INVOICE: 31,237.91 E032933691 FILE: 2030648728
To: Jason Vaughan <jason@hyperblock.co>
Cc: roozbeh@hyperblock.co <roozbeh@hyperblock.co>, inder@hyperblock.co <inder@hyperblock.co>, Clayton Brenden <Clayton.Brenden@expeditors.com>

Hi Jason,

EXHIBIT 29.
PAGE 19

Please see attached revised invoice with HyperBlock listed.


**Regards,**


**Sarah Barba**

Customer Service Representative, Customs Brokerage

**Direct**  206-407-2948
**Office**  206-826-4100
**Email**  Sarah.Barba@Expeditors.com



**Seattle Branch, CSV Office**

19119 16th Ave. South
Seatac, WA 98188

**From:** Jason Vaughan <jason@hyperblock.co>
**Sent:** Thursday, January 23, 2020 3:12 PM
**To:** Sarah Barba <Sarah.Barba@expeditors.com>
**Cc:** roozbeh@hyperblock.co; inder@hyperblock.co; Clayton Brenden
<Clayton.Brenden@expeditors.com>
**Subject:** Re: EI INVOICE: 31,237.91 E032933691 FILE: 2030648728

Hi Sarah,

Per our phone conversation, please send and updated Invoice with Hyperblock Inc as the
Client please.
Address also needs to be changed to:

140 yonge st suite 209

Toronto, ON

M5c 1 x6


Regards,

Jason

On Thu, Jan 23, 2020 at 1:30 PM Sarah Barba <Sarah.Barba@expeditors.com> wrote:

> Hello,
>
> Since you do not have credit with Expeditors, we will need to receive  payment for this
> shipment before we can process the entry.  We will require certified funds, meaning
> cashier's check (not company check) , money order or wire transfer.

***Please note that we have included an "Incidental Expense fee" of $500.  We are adding this to avoid any delay waiting for payment if there is a Customs exam, VACIS exam or storage.  We hopefully will not need to request additional funds.   If no exams or storage monies are needed, this $500 will be fully refunded to you or can be applied to your next shipment.***

If you choose to wire the payment, please send me the wire transfer confirmation number once it is completed.  Please make sure you reference our invoice number on the check or on the wire transfer request to the bank.

WIRE TRANSFER INFO:
Beneficiary: Expeditors International of Washington, Inc.
Bank Name: Wells Fargo Bank
Bank Address: 999 Third Avenue, Seattle, Washington USA
ABA #: 121000248
Account number: 4761071752


**Regards,**

**Sarah Barba**
Customer Service Representative, Customs Brokerage

**Direct**   206-407-2948
**Office**   206-826-4100
**Email**    Sarah.Barba@Expeditors.com



**Seattle Branch, CSV Office**
19119 16th Ave. South
Seatac, WA 98188


--



**Jason Vaughan**

Bonner, MT Site Manager

jason@hyperblock.co // 406.370.1859

EXHIBIT 29.
PAGE 21

**hyperblock.co**

--
Inder Saini, CPA, CA
C: 416-356-9611
E: inder@hyperblock.co

EXHIBIT 29.
PAGE 22

| | |
|---|---|
| **From:** | Big Sky Mobile Catering |
| **To:** | Kassy Buss; David Bjornson |
| **Subject:** | FW: EI INVOICE: 31,237.91 E032933691 FILE: 2030648728 |
| **Date:** | Sunday, May 31, 2020 5:23:44 PM |
| **Attachments:** | image002.png |
| | image003.png |
| | image004.png |
| | image005.jpg |

**From:** Alex Drayton [mailto:adrayton@bankofmt.com]
**Sent:** Friday, January 24, 2020 12:21 PM
**To:** Jake Pelczar <jpelczar@bankofmt.com>; Big Sky Mobile Catering <bsmcorpmt@gmail.com>;
'Inder Saini' <inder@hyperblock.co>
**Cc:** 'Dan Stivers' <dan@hyperblock.co>; 'Sean Walsh' <sean@hyperblock.co>; 'Jason Vaughan'
<jason@hyperblock.co>; BOM-Operations <operations@bankofmt.com>; BOM-Loans
<loans@bankofmt.com>
**Subject:** RE: EI INVOICE: 31,237.91 E032933691 FILE: 2030648728

Transfer has been completed!
Alex

## Alex Drayton

Assistant Vice President
Phone: 406.829.2662  |  Fax: 406.829.2355
www.bankofmontana.com
125 Bank Street, Suite 100
Missoula, MT 59802



*The information contained in this message is proprietary and/or confidential. If you are not the intended recipient,
please: (i) delete the message and all copies; (ii) do not disclose, distribute or use the message in any manner; and
(iii) notify the sender immediately. In addition, please be aware that any message addressed to our domain is subject
to archiving and review by persons other than the intended recipient. Thank you.*

**From:** Jake Pelczar <jpelczar@bankofmt.com>
**Sent:** Friday, January 24, 2020 12:19 PM
**To:** Big Sky Mobile Catering <bsmcorpmt@gmail.com>; 'Inder Saini' <inder@hyperblock.co>
**Cc:** 'Dan Stivers' <dan@hyperblock.co>; 'Sean Walsh' <sean@hyperblock.co>; 'Jason Vaughan'
<jason@hyperblock.co>; BOM-Operations <operations@bankofmt.com>; BOM-Loans
<loans@bankofmt.com>
**Subject:** RE: EI INVOICE: 31,237.91 E032933691 FILE: 2030648728

Hi Inder,

Yes, we're on it. We'll let you know when the transfer has been made. Thanks!

EXHIBIT 29.
PAGE 23

Jake

**Jacob T. Pelczar**
Vice President
Phone: 406.829.2662  /  Fax: 406.829.2355
Bank of Montana
125 Bank Street, Suite 100
Missoula, MT 59802
NMLS: 944575

*The information contained in this message is proprietary and/or confidential.*
*If you are not the intended recipient, please: (i) delete the message and all copies;*
*(ii) do not disclose, distribute or use the message in any manner; and (iii) notify*
*the sender immediately. In addition, please be aware that any message addressed*
*to our domain is subject to archiving and review by persons other than the intended*
*recipient. Thank you.*

---

**From:** Big Sky Mobile Catering <bsmcorpmt@gmail.com>
**Sent:** Friday, January 24, 2020 12:07 PM
**To:** 'Inder Saini' <inder@hyperblock.co>; Jake Pelczar <jpelczar@bankofmt.com>
**Cc:** 'Dan Stivers' <dan@hyperblock.co>; 'Sean Walsh' <sean@hyperblock.co>; 'Jason Vaughan'
<jason@hyperblock.co>
**Subject:** RE: EI INVOICE: 31,237.91 E032933691 FILE: 2030648728

I approve.  Steve Nelson, Bonner Property Development LLC.

**From:** Inder Saini [mailto:inder@hyperblock.co]
**Sent:** Friday, January 24, 2020 9:27 AM
**To:** Jake Pelczar <jpelczar@bankofmt.com>
**Cc:** Big Sky Mobile Catering <bsmcorpmt@gmail.com>; Dan Stivers <dan@hyperblock.co>; Sean
Walsh <sean@hyperblock.co>; Jason Vaughan <jason@hyperblock.co>
**Subject:** Fwd: EI INVOICE: 31,237.91 E032933691 FILE: 2030648728

Hi Jake,

We did a wire this morning to Expeditors Shipping to clear our duty fees for the server order.
See invoice attached for $31,237.91.

We paid out of our operating account ending *3860 this morning to ensure they ship the
servers ASAP. Can we please draw down on the loan amount from account 4200 to reimburse
for this expense related to the servers? Please fund back into account 3860.

Let me know if you have any questions.

Thanks
Inder

EXHIBIT 29.
PAGE 24

---------- Forwarded message ---------
From: **Sarah Barba** <Sarah.Barba@expeditors.com>
Date: Thu, Jan 23, 2020 at 7:03 PM
Subject: RE: EI INVOICE: 31,237.91 E032933691 FILE: 2030648728
To: Jason Vaughan <jason@hyperblock.co>
Cc: roozbeh@hyperblock.co <roozbeh@hyperblock.co>, inder@hyperblock.co <inder@hyperblock.co>, Clayton Brenden <Clayton.Brenden@expeditors.com>


Hi Jason,

Please see attached revised invoice with HyperBlock listed.


**Regards,**

**Sarah Barba**
Customer Service Representative, Customs Brokerage

| | |
|---|---|
| **Direct** | 206-407-2948 |
| **Office** | 206-826-4100 |
| **Email** | Sarah.Barba@Expeditors.com |



**Seattle Branch, CSV Office**
19119 16th Ave. South
Seatac, WA 98188


**From:** Jason Vaughan <jason@hyperblock.co>
**Sent:** Thursday, January 23, 2020 3:12 PM
**To:** Sarah Barba <Sarah.Barba@expeditors.com>
**Cc:** roozbeh@hyperblock.co; inder@hyperblock.co; Clayton Brenden <Clayton.Brenden@expeditors.com>
**Subject:** Re: EI INVOICE: 31,237.91 E032933691 FILE: 2030648728

Hi Sarah,

Per our phone conversation, please send and updated Invoice with Hyperblock Inc as the Client please.
Address also needs to be changed to:

140 yonge st suite 209

Toronto, ON

M5c 1 x6

Regards,

Jason

On Thu, Jan 23, 2020 at 1:30 PM Sarah Barba <Sarah.Barba@expeditors.com> wrote:

Hello,

Since you do not have credit with Expeditors, we will need to receive  payment for this shipment before we can process the entry.  We will require certified funds, meaning cashier's check (not company check) , money order or wire transfer.

***Please note that we have included an "Incidental Expense fee" of $500.  We are adding this to avoid any delay waiting for payment if there is a Customs exam, VACIS exam or storage.  We hopefully will not need to request additional funds.   If no exams or storage monies are needed, this $500 will be fully refunded to you or can be applied to your next shipment.***

If you choose to wire the payment, please send me the wire transfer confirmation number once it is completed.  Please make sure you reference our invoice number on the check or on the wire transfer request to the bank.

WIRE TRANSFER INFO:
Beneficiary: Expeditors International of Washington, Inc.
Bank Name: Wells Fargo Bank
Bank Address: 999 Third Avenue, Seattle, Washington USA
ABA #:          0248
Account number:          1752


**Regards,**

**Sarah Barba**
Customer Service Representative, Customs Brokerage

**Direct**    206-407-2948
**Office**    206-826-4100
**Email**     Sarah.Barba@Expeditors.com



**Seattle Branch, CSV Office**
19119 16th Ave. South
Seatac, WA 98188


--

EXHIBIT 29.
PAGE 26



**Jason Vaughan**

Bonner, MT Site Manager

jason@hyperblock.co // 406.370.1859

—

**hyperblock.co**


--
Inder Saini, CPA, CA
C: 416-356-9611
E: inder@hyperblock.co

EXHIBIT 29.
PAGE 27

| | |
|---|---|
| **From:** | Big Sky Mobile Catering |
| **To:** | Kassy Buss; David Bjornson |
| **Subject:** | FW: EI INVOICE: 15,011.85 E032935473 FILE: 2030649147 |
| **Date:** | Sunday, May 31, 2020 5:24:38 PM |

**From:** Steve Nelson [mailto:bsmcorpmt@gmail.com]
**Sent:** Monday, January 27, 2020 3:36 PM
**To:** Jake Pelczar <jpelczar@bankofmt.com>
**Cc:** Inder Saini <inder@hyperblock.co>; Dan Stivers <dan@hyperblock.co>; Sean Walsh <sean@hyperblock.co>; Jason Vaughan <jason@hyperblock.co>; BOM-Operations <operations@bankofmt.com>; BOM-Loans <loans@bankofmt.com>
**Subject:** Re: EI INVOICE: 15,011.85 E032935473 FILE: 2030649147

I approve.

Steve Nelson
Bonner Property Development


On Jan 27, 2020, at 1:48 PM, Jake Pelczar <jpelczar@bankofmt.com> wrote:


Hi Steve,

Please see HyperBlock's request for loan funds below. If you would please let us know whether you approve of this draw request at your earliest convenience, that would be great. Thanks!

Talk soon,

Jake

**Jacob T. Pelczar**
Vice President
Phone: 406.829.2662  /  Fax: 406.829.2355
Bank of Montana
125 Bank Street, Suite 100
Missoula, MT 59802
NMLS: 944575

*The information contained in this message is proprietary and/or confidential.*
*If you are not the intended recipient, please: (i) delete the message and all copies;*
*(ii) do not disclose, distribute or use the message in any manner; and (iii) notify*
*the sender immediately. In addition, please be aware that any message addressed*
*to our domain is subject to archiving and review by persons other than the intended*

*recipient. Thank you.*

---

**From:** Inder Saini <inder@hyperblock.co>
**Sent:** Monday, January 27, 2020 2:28 PM
**To:** Jake Pelczar <jpelczar@bankofmt.com>
**Cc:** Dan Stivers <dan@hyperblock.co>; Sean Walsh <sean@hyperblock.co>; Jason Vaughan <jason@hyperblock.co>
**Subject:** Fwd: EI INVOICE: 15,011.85 E032935473 FILE: 2030649147

Hi Jake
This is the second part of the duty on 300 s17 servers. Can we please use loan funds for this wire?

Thanks
Inder


Begin forwarded message:

> **From:** Jason Vaughan <jason@hyperblock.co>
> **Date:** January 27, 2020 at 4:06:23 PM EST
> **To:** Inder Saini <inder@hyperblock.co>, Roozbeh Ebbadi <roozbeh@hyperblock.co>
> **Subject: Fwd:  EI INVOICE: 15,011.85 E032935473 FILE: 2030649147**
>
>
> Sarah just informed me that she hadn't sent this to you.
> This is the invoice for additional duties on the remaining 300 units.
> We need to get this paid.
> I can get the wire form ready to submit to B of M.
>
> Inder, can you please look at getting the funds moved from the loan account to Ops to cover this?
>
> Regards,
>
> Jason
>
> ---------- Forwarded message ---------
> From: **Sarah Barba** <Sarah.Barba@expeditors.com>
> Date: Fri, Jan 24, 2020 at 4:08 PM
> Subject: EI INVOICE: 15,011.85 E032935473 FILE: 2030649147
> To: Jason Vaughan <jason@hyperblock.co>
>
>
> Hello Jason,

EXHIBIT 29.
PAGE 29

Since you do not have credit with Expeditors, we will need to receive payment for this shipment before we can process the entry.  We will require certified funds, meaning cashier's check (not company check) , money order or wire transfer.

***Please note that we have included an "Incidental Expense fee" of $500.  We are adding this to avoid any delay waiting for payment if there is a Customs exam, VACIS exam or storage.  We hopefully will not need to request additional funds.   If no exams or storage monies are needed, this $500 will be fully refunded to you or can be applied to your next shipment.***

If you choose to wire the payment, please send me the wire transfer confirmation number once it is completed.  Please make sure you reference our invoice number on the check or on the wire transfer request to the bank.

WIRE TRANSFER INFO:

Beneficiary: Expeditors International of Washington, Inc.

Bank Name: Wells Fargo Bank

Bank Address: 999 Third Avenue, Seattle, Washington USA

ABA #:             248

Account number:          1752

**Regards,**

**Sarah Barba**

Customer Service Representative, Customs Brokerage

EXHIBIT 29.
PAGE 30

| | |
|---|---|
| **Direct** | 206-407-2948 |
| **Office** | 206-826-4100 |
| **Email** | Sarah.Barba@Expeditors.com |

<image001.gif>

**Seattle Branch, CSV Office**

19119 16th Ave. South

Seatac, WA 98188

--

<~WRD4075.jpg>
**Error! Filename not specified.**

## Jason Vaughan

Bonner, MT Site Manager

jason@hyperblock.co // 406.370.1859

—

**hyperblock.co**

<2030649147_Expeditors Billing Invoice.pdf>

EXHIBIT 29.
PAGE 31

| | |
|---|---|
| **From:** | Big Sky Mobile Catering |
| **To:** | Kassy Buss; David Bjornson |
| **Subject:** | FW: FW: Your confirmation for your OUTGOING FX WIRE |
| **Date:** | Sunday, May 31, 2020 5:26:00 PM |
| **Attachments:** | image001.jpg |

**From:** Inder Saini [mailto:inder@hyperblock.co]
**Sent:** Monday, February 03, 2020 1:24 PM
**To:** Jake Pelczar <jpelczar@bankofmt.com>
**Cc:** Big Sky Mobile Catering <bsmcorpmt@gmail.com>; Sean Walsh <sean@hyperblock.co>; Dan Stivers <dan@hyperblock.co>; Jason Vaughan <jason@hyperblock.co>; BOM-Operations <operations@bankofmt.com>; BOM-Loans <loans@bankofmt.com>
**Subject:** Re: FW: Your confirmation for your OUTGOING FX WIRE

Hi Jake,
Can you give me a wire confirmation? I would like to send to bitmain to let them know
Thanks!

On Mon, Feb 3, 2020 at 12:47 PM Inder Saini <inder@hyperblock.co> wrote:

> Our cap is $2,625,000
> Let's use $480,000 from the loan for this order
> Please use 6886.79 from our 3860 account to cover the balance
> We are all good
> Thanks
>
> On Mon, Feb 3, 2020 at 12:42 PM Jake Pelczar <jpelczar@bankofmt.com> wrote:
>
>> Hi Inder,
>>
>> The loan commitment amount is $3,540,000. Current balance is $2,143,795.37 and there is $1,396,204.63 undisbursed.
>>
>> Steve, is part of your agreement that they can only take it up to $2,625,000 right now? Please advise. Thanks!
>>
>> Talk soon,
>>
>> Jake
>>
>> **Jacob T. Pelczar**
>> Vice President
>> Phone: 406.829.2662  /  Fax: 406.829.2355
>> Bank of Montana
>> 125 Bank Street, Suite 100
>> Missoula, MT 59802
>> NMLS: 944575

EXHIBIT 29.
PAGE 32

*The information contained in this message is proprietary and/or confidential.*
*If you are not the intended recipient, please: (i) delete the message and all copies;*
*(ii) do not disclose, distribute or use the message in any manner; and (iii) notify*
*the sender immediately. In addition, please be aware that any message addressed*
*to our domain is subject to archiving and review by persons other than the intended*
*recipient. Thank you.*

**From:** Inder Saini <inder@hyperblock.co>
**Sent:** Monday, February 03, 2020 10:35 AM
**To:** Jake Pelczar <jpelczar@bankofmt.com>
**Cc:** Big Sky Mobile Catering <bsmcorpmt@gmail.com>; Sean Walsh
<sean@hyperblock.co>; Dan Stivers <dan@hyperblock.co>; Jason Vaughan
<jason@hyperblock.co>
**Subject:** Re: FW: Your confirmation for your OUTGOING FX WIRE

Please correct me if I am wrong
- I think the max loan amount available at this time was 2,625,000
- Based on that assumption I am assuming our availability is only 481,204.63 at this time

Let me know if that is not the case, and if that works, then send full amount from loan
account

On Mon, Feb 3, 2020 at 12:33 PM Jake Pelczar <jpelczar@bankofmt.com> wrote:

> Hi Inder,
>
> There is plenty of room on the loan. I'm assuming you'd like us to pay it all from the
> loan, correct?
>
> Thanks,
>
> Jake
>
> **Jacob T. Pelczar**
> Vice President
> Phone: 406.829.2662  /  Fax: 406.829.2355
> Bank of Montana
> 125 Bank Street, Suite 100
> Missoula, MT 59802
> NMLS: 944575
>
> *The information contained in this message is proprietary and/or confidential.*
> *If you are not the intended recipient, please: (i) delete the message and all copies;*
> *(ii) do not disclose, distribute or use the message in any manner; and (iii) notify*
> *the sender immediately. In addition, please be aware that any message addressed*
> *to our domain is subject to archiving and review by persons other than the intended*
> *recipient. Thank you.*
>
> **From:** Inder Saini <inder@hyperblock.co>
> **Sent:** Monday, February 03, 2020 10:12 AM
> **To:** Jake Pelczar <jpelczar@bankofmt.com>
> **Cc:** Big Sky Mobile Catering <bsmcorpmt@gmail.com>; Sean Walsh

<sean@hyperblock.co>; Dan Stivers <dan@hyperblock.co>; Jason Vaughan
<jason@hyperblock.co>
**Subject:** Fwd: FW: Your confirmation for your OUTGOING FX WIRE

Hi Jake,

Can we setup a wire for the final invoice for bitmain on this order of S17s?

I believe we have availability of $480,000 in the loan account.
Please use 6886.79 from our 3860 account to cover the balance.

Thanks
Inder

---------- Forwarded message ---------
From: 赫炘然Joyce <xinran.he@bitmain.com>
Date: Mon, Feb 3, 2020 at 11:34 AM
Subject: Re: FW: Your confirmation for your OUTGOING FX WIRE
To: Sean Walsh <sean@hyperblock.co>, Roozbeh Ebbadi <roozbeh@hyperblock.co>,
Dan Stivers <dan@hyperblock.co>
Cc: Kristen Martin <kristen@hyperblock.co>, Inder Saini <inder@hyperblock.co>


Hi Sean, Roozbeh and Dan,

The balance of 490*S17+ 70T mid of Feb batch is attached here. Please kindly check
and finish the payment within 2 days. Thank you!

Please let me know if you have any questions.

**Best Regards**
**赫炘然 Joyce He**
Sales and Business Development Department
Phone: +86-10-5327 3990
Mobile: +86-156-3613-0223
LinkedIn-Joyce Xinran He
北京比特大陆科技有限公司Bitmain Technologies Inc
北京市海淀区黑泉路宝盛南路1号院奥北科技园25号楼，100192
Building 25, AoBei Technology Garden, Baosheng South Road, Haidian District, Beijing 100192



www.bitmain.com


赫炘然Joyce <xinran.he@bitmain.com> 于2020年1月12日周日 上午10:25写道：

Hi Dan,

Thanks! I'll ask my colleague to check our bank account then let you know when this

EXHIBIT 29.
PAGE 34

payment arrived.

The balance due, I'll send you next week.

**Best Regards**
**赫炘然 Joyce He**
Sales and Business Development Department
Phone: +86-10-5327 3990
Mobile: +86-156-3613-0223
LinkedIn-Joyce Xinran He
北京比特大陆科技有限公司Bitmain Technologies Inc
北京市海淀区黑泉路宝盛南路1号院奥北科技园25号楼，100192
Building 25, AoBei Technology Garden, Baosheng South Road, Haidian District, Beijing 100192



www.bitmain.com

Dan Stivers <dan@hyperblock.co> 于2020年1月11日周六 上午6:12写道：

> Hi Joyce,
>
> See wire transfer information below. The remaining deposit of $751,478.60 was
> sent. Please let us know when the remaining payment is due.
>
> Thanks
> Dan
>
>
> ---------- Forwarded message ---------
> From: **Jake Pelczar** <jpelczar@bankofmt.com>
> Date: Fri, Jan 10, 2020 at 2:05 PM
> Subject: FW: Your confirmation for your OUTGOING FX WIRE
> To: Dan Stivers <dan@hyperblock.co>, Inder Saini <inder@hyperblock.co>, Sean
> Walsh <sean@hyperblock.co>, Steve Nelson <bsmcorpmt@gmail.com>, Kristen
> Martin <kristen@hyperblock.co>, Hisham Alwafai <hisham@hyperblock.co>,
> Jason Vaughan <jason@hyperblock.co>
> Cc: BOM-Loans <loans@bankofmt.com>, BOM-Operations
> <operations@bankofmt.com>
>
>
> Hi Dan and HyperBlock Team,
>
> The Bitmain wire confirmation is below.
>
> Talk soon,
>
> Jake

EXHIBIT 29.
PAGE 35

**Jacob T. Pelczar**
Vice President
Phone: 406.829.2662  /  Fax: 406.829.2355
Bank of Montana
125 Bank Street, Suite 100
Missoula, MT 59802
NMLS: 944575

*The information contained in this message is proprietary and/or confidential.*
*If you are not the intended recipient, please: (i) delete the message and all copies;*
*(ii) do not disclose, distribute or use the message in any manner; and (iii) notify*
*the sender immediately. In addition, please be aware that any message addressed*
*to our domain is subject to archiving and review by persons other than the intended*
*recipient. Thank you.*

**From:** operations@bankofmt.com <operations@bankofmt.com>
**Sent:** Friday, January 10, 2020 1:38 PM
**To:** Jake Pelczar <jpelczar@bankofmt.com>
**Subject:** Your confirmation for your OUTGOING FX WIRE

# BANK OF MONTANA

### 125 Bank Street • Missoula, MT 59802

## INTERNATIONAL WIRE TRANSFER NOTICE

*for* HYPERBLOCK, LLC

| | |
|---|---|
| Date Posted | 01/10/2020 |
| Date Entered | 01/10/2020 |
| Processing Reference No. | 11      7             963 |
| Swift UETR | 81496f1b-d94b-424c-b4bd-0bfd9e9bdb83 |
| Amount (USD) | 751,478.60 |
| Foreign Amount | 751,478.60 USD |

| Beneficiary | Beneficiary Bank |
|---|---|
| Bitmaintech Pte. Ltd.<br>8 Kallang Avenue<br>Aperia Tower 1, #09-03/04<br>SINGAPORE | STANDARD CHARTERED BANK (CHINA) LIMITED<br>11/F Tower 1, Kingkey 100<br>Building, No. 5016<br>Shennan East Road, Luohu District<br>SHENZHEN Guangdong<br>CHINA |

--
Inder Saini, CPA, CA
C: 416-356-9611

EXHIBIT 29.
PAGE 36

E: inder@hyperblock.co

--
Inder Saini, CPA, CA
C: 416-356-9611
E: inder@hyperblock.co

--
Inder Saini, CPA, CA
C: 416-356-9611
E: inder@hyperblock.co

--
Inder Saini, CPA, CA
C: 416-356-9611
E: inder@hyperblock.co

| **From:** | Big Sky Mobile Catering |
| **To:** | Kassy Buss; David Bjornson |
| **Subject:** | FW: Your confirmation for your OUTGOING FX WIRE |
| **Date:** | Sunday, May 31, 2020 5:25:17 PM |
| **Attachments:** | ~WRD000.jpg |

**From:** Steve Nelson [mailto:bsmcorpmt@gmail.com]
**Sent:** Monday, February 03, 2020 10:29 AM
**To:** Inder Saini <inder@hyperblock.co>
**Cc:** Jake Pelczar <jpelczar@bankofmt.com>; Sean Walsh <sean@hyperblock.co>; Dan Stivers
<dan@hyperblock.co>; Jason Vaughan <jason@hyperblock.co>
**Subject:** Re: Your confirmation for your OUTGOING FX WIRE

I approve.

Steve Nelson
Bonner Property Development


On Feb 3, 2020, at 11:11 AM, Inder Saini <inder@hyperblock.co> wrote:

Hi Jake,

Can we setup a wire for the final invoice for bitmain on this order of S17s?

I believe we have availability of $480,000 in the loan account.
Please use 6886.79 from our 3860 account to cover the balance.

Thanks
Inder

---------- Forwarded message ---------
From: 赫炘然Joyce <xinran.he@bitmain.com>
Date: Mon, Feb 3, 2020 at 11:34 AM
Subject: Re: FW: Your confirmation for your OUTGOING FX WIRE
To: Sean Walsh <sean@hyperblock.co>, Roozbeh Ebbadi
<roozbeh@hyperblock.co>, Dan Stivers <dan@hyperblock.co>
Cc: Kristen Martin <kristen@hyperblock.co>, Inder Saini
<inder@hyperblock.co>


Hi Sean, Roozbeh and Dan,

The balance of 490*S17+ 70T mid of Feb batch is attached here. Please kindly
check and finish the payment within 2 days. Thank you!

Please let me know if you have any questions.

EXHIBIT 29.
PAGE 38

**Best Regards**
**赫炘然 Joyce He**
Sales and Business Development Department
Phone: +86-10-5327 3990
Mobile: +86-156-3613-0223
LinkedIn-Joyce Xinran He
北京比特大陆科技有限公司Bitmain Technologies Inc
北京市海淀区黑泉路宝盛南路1号院奥北科技园25号楼，100192
Building 25, AoBei Technology Garden, Baosheng South Road, Haidian District, Beijing 100192



www.bitmain.com

赫炘然Joyce He <xinran.he@bitmain.com> 于2020年1月12日周日 上午10:25写道：

> Hi Dan,
>
> Thanks! I'll ask my colleague to check our bank account then let you know when this payment arrived.
>
> The balance due, I'll send you next week.
>
> **Best Regards**
> **赫炘然 Joyce He**
> Sales and Business Development Department
> Phone: +86-10-5327 3990
> Mobile: +86-156-3613-0223
> LinkedIn-Joyce Xinran He
> 北京比特大陆科技有限公司Bitmain Technologies Inc
> 北京市海淀区黑泉路宝盛南路1号院奥北科技园25号楼，100192
> Building 25, AoBei Technology Garden, Baosheng South Road, Haidian District, Beijing 100192
>
> 
>
> www.bitmain.com

Dan Stivers <dan@hyperblock.co> 于2020年1月11日周六 上午6:12写道：

> Hi Joyce,
>
> See wire transfer information below. The remaining deposit of $751,478.60 was sent. Please let us know when the remaining payment is due.

EXHIBIT 29.
PAGE 39

Thanks
Dan


---------- Forwarded message ---------
From: **Jake Pelczar** <jpelczar@bankofmt.com>
Date: Fri, Jan 10, 2020 at 2:05 PM
Subject: FW: Your confirmation for your OUTGOING FX WIRE
To: Dan Stivers <dan@hyperblock.co>, Inder Saini <inder@hyperblock.co>,
Sean Walsh <sean@hyperblock.co>, Steve Nelson
<bsmcorpmt@gmail.com>, Kristen Martin <kristen@hyperblock.co>,
Hisham Alwafai <hisham@hyperblock.co>, Jason Vaughan
<jason@hyperblock.co>
Cc: BOM-Loans <loans@bankofmt.com>, BOM-Operations
<operations@bankofmt.com>


Hi Dan and HyperBlock Team,

The Bitmain wire confirmation is below.

Talk soon,

Jake

**Jacob T. Pelczar**
Vice President
Phone: 406.829.2662  /  Fax: 406.829.2355
Bank of Montana
125 Bank Street, Suite 100
Missoula, MT 59802
NMLS: 944575

*The information contained in this message is proprietary and/or confidential.*
*If you are not the intended recipient, please: (i) delete the message and all copies;*
*(ii) do not disclose, distribute or use the message in any manner; and (iii) notify*
*the sender immediately. In addition, please be aware that any message addressed*
*to our domain is subject to archiving and review by persons other than the intended*
*recipient. Thank you.*

**From:** operations@bankofmt.com <operations@bankofmt.com>
**Sent:** Friday, January 10, 2020 1:38 PM
**To:** Jake Pelczar <jpelczar@bankofmt.com>
**Subject:** Your confirmation for your OUTGOING FX WIRE

# BANK OF MONTANA

### 125 Bank Street • Missoula, MT 59802

## INTERNATIONAL WIRE TRANSFER NOTICE

EXHIBIT 29.
PAGE 40

*for* HYPERBLOCK, LLC

| Date Posted | 01/10/2020 |
|---|---|
| Date Entered | 01/10/2020 |
| Processing Reference No. | 1      7      963 |
| Swift UETR | 81496f1b-d94b-424c-b4bd-0bfd9e9bdb83 |
| Amount (USD) | 751,478.60 |
| Foreign Amount | 751,478.60 USD |

| Beneficiary |
|---|
| Bitmaintech Pte. Ltd. |
| 8 Kallang Avenue |
| Aperia Tower 1, #09-03/04 |
| SINGAPORE |

| Beneficiary Bank |
|---|
| STANDARD CHARTERED BANK (CHINA) LIMITED |
| 11/F Tower 1, Kingkey 100 |
| Building, No. 5016 |
| Shennan East Road, Luohu District |
| SHENZHEN Guangdong |
| CHINA |

--
Inder Saini, CPA, CA
C: 416-356-9611
E: inder@hyperblock.co
<PI-Hyperblock-490 S17+ mid of Feb balance.pdf>

EXHIBIT 29.
PAGE 41

| | |
|---|---|
| **From:** | Big Sky Mobile Catering |
| **To:** | Kassy Buss; David Bjornson |
| **Subject:** | FW: Legal Fees |
| **Date:** | Sunday, May 31, 2020 5:27:11 PM |
| **Attachments:** | image001.png |
| | image002.png |
| | image003.png |

---

**From:** Big Sky Mobile Catering [mailto:bsmcorpmt@gmail.com]
**Sent:** Tuesday, February 18, 2020 4:57 PM
**To:** 'Alex Drayton' <adrayton@bankofmt.com>; 'Inder Saini' <inder@hyperblock.co>; 'Dan Stivers' <dan@hyperblock.co>
**Cc:** 'Jake Pelczar' <jpelczar@bankofmt.com>
**Subject:** RE: Legal Fees

Alex,  Thanks.  I approve. Steve

---

**From:** Alex Drayton [mailto:adrayton@bankofmt.com]
**Sent:** Tuesday, February 18, 2020 4:44 PM
**To:** Inder Saini <inder@hyperblock.co>; Dan Stivers <dan@hyperblock.co>; Big Sky Mobile Catering <bsmcorpmt@gmail.com>
**Cc:** Jake Pelczar <jpelczar@bankofmt.com>
**Subject:** Legal Fees

Hi HyperBlock Team,

I hope you're well!
Letting you know that we received the bill for legal charges related to the recent CIT, which totaled $2,750. Per the CIT, we've disbursed that amount from the loan for this expense. Please let us know if you have any questions.

Thanks,
Alex

## Alex Drayton

**Assistant VP and Assistant COO**
Phone: 406.829.2662  |  Fax: 406.829.2355
www.bankofmontana.com
125 Bank Street, Suite 100
Missoula, MT 59802



*The information contained in this message is proprietary and/or confidential. If you are not the intended recipient,*
*please: (i) delete the message and all copies; (ii) do not disclose, distribute or use the message in any manner; and*

EXHIBIT 29.
PAGE 42

*(iii) notify the sender immediately. In addition, please be aware that any message addressed to our domain is subject to archiving and review by persons other than the intended recipient. Thank you.*

**From:**      Big Sky Mobile Catering
**To:**         Kassy Buss; David Bjornson
**Subject:**   FW: Legal Fees
**Date:**      Sunday, May 31, 2020 5:26:38 PM
**Attachments:**  image001.png
                  image002.png
                  image003.png

**From:** Alex Drayton [mailto:adrayton@bankofmt.com]
**Sent:** Tuesday, February 18, 2020 4:44 PM
**To:** Inder Saini <inder@hyperblock.co>; Dan Stivers <dan@hyperblock.co>; Big Sky Mobile Catering <bsmcorpmt@gmail.com>
**Cc:** Jake Pelczar <jpelczar@bankofmt.com>
**Subject:** Legal Fees

Hi HyperBlock Team,

I hope you're well!
Letting you know that we received the bill for legal charges related to the recent CIT, which totaled $2,750. Per the CIT, we've disbursed that amount from the loan for this expense. Please let us know if you have any questions.

Thanks,
Alex

# Alex Drayton
**Assistant VP and Assistant COO**
Phone: 406.829.2662  |  Fax: 406.829.2355
www.bankofmontana.com
125 Bank Street, Suite 100
Missoula, MT 59802



*The information contained in this message is proprietary and/or confidential. If you are not the intended recipient, please: (i) delete the message and all copies; (ii) do not disclose, distribute or use the message in any manner; and (iii) notify the sender immediately. In addition, please be aware that any message addressed to our domain is subject to archiving and review by persons other than the intended recipient. Thank you.*

EXHIBIT 30.(iii)
PAGE 1

# UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
DAVID H. BJORNSON (406)721-8896

**B. E-MAIL CONTACT AT FILER (optional)**
JILL@BJORNSONLAW.COM

**C. SEND ACKNOWLEDGMENT TO:   (Name and Address)**

BJORNSON LAW OFFICES

2809 GREAT NORTHERN LOOP #100

MISSOULA, MT 59808

US

**Delaware Department of State**
**U.C.C. Filing Section**
**Filed: 02:12 PM 05/22/2020**
**U.C.C. Initial Filing No: 2020 3609866**

**Service Request No:   20204462519**

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1. DEBTOR'S NAME:** Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| HYPERBLOCK LLC | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 120 ADELAIDE STREET WEST, SUITE 2210 | TORANTO | | M5H 1T1 | CA |

**2. DEBTOR'S NAME:** Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

**3. SECURED PARTY'S NAME** (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| BONNER PROPERTY DEVELOPMENT, LLC | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 224 NORTH HIGGINS AVENUE | MISSOULA | MT | 59802 | US |

**4. COLLATERAL:** This financing statement covers the following collateral:

Furniture, equipment, fixtures, computer servers, power supplies and other articles of personal property now or hereafter owned by Debtor; together with all accessions, parts, and additions to, all replacements of, and all substitutions for, any of such property; and together with all proceeds (including without limitation all insurance proceeds and refunds of premiums) from any sale or other disposition of any such property.  EXCLUDING however, all computer servers owned by Debtor and located at 9144 Bonner Mill Road, Bonner, MT 59823, at the close of business December 31, 2019.

**5.** Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

**6a.** Check only if applicable and check only one box:
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

**6b.** Check only if applicable and check only one box:
☐ Agricultural Lien ☐ Non-UCC Filing

**7.** ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

**8. OPTIONAL FILER REFERENCE DATA:**
BPD

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

International Association of Commercial Administrators

EXHIBIT 31.
PAGE 1

## <u>NOTICE OF DISPOSITION OF COLLATERAL BY PUBLIC SALE</u>

BY ELECTRONIC MAIL AND OVERNIGHT MAIL

To:     Hyperblock, LLC
        140 Yonge Street, #209
        Toronto, ON M5C 1X6
        Attention: Inder Saini
        inder@hyperblock.co

        Hyperblock, Inc.
        2 St. Claire Avenue East, Suite 1100
        Toronto, ON M4T 2T5
        Attention: Hans Rizarri
        hans.rizarri@crowesoberman.com

        Bank of Montana
        125 Bank Street, Suite 100
        Missoula, MT 59802
        Attention: Daniel Day
        dday@bankofmt.com

        Bonner Property Development, LLC
        224 N. Higgins Avenue
        Missoula, MT 59802
        Attention: Stephen Nelson
        bsmcorpmt@gmail.com

**PLEASE TAKE NOTICE THAT** Project Spokane, LLC ("<u>Project Spokane</u>") and Sean Walsh ("<u>Walsh</u>," together with Project Spokane, the "<u>Lenders</u>") will conduct a disposition of the below described collateral by public sale in accordance with the provisions of the New York Uniform Commercial Code Section 9-601, et. seq., as follows:

a)     **<u>Debtor</u>**:  The debtor is Hyperblock, LLC ("<u>Borrower</u>" or "<u>Hyperblock</u>").

b)     **<u>Secured Party</u>**:  The secured parties are Project Spokane and Walsh.

c)     **<u>Agreements Pursuant to Which the Sale is Held</u>**:

     i.    That Secured Promissory Note dated June 19, 2019, by and between Walsh, on the one hand, and Borrower and Hyperblock, Inc., on the other (the "<u>Walsh Note</u>").

     ii.   Security Agreement dated as of June 19, 2019, by and between Walsh and Borrower (the "<u>Walsh Security Agreement</u>").

iii.   That Secured Promissory Note dated July 10, 2018, by and between Project Spokane, on the one hand, and Borrower and Hyperblock, Inc., on the other, (the "<u>Project Spokane Note</u>").

iv.   Security Agreement dated as of February 1, 2019, by and between Project Spokane and Borrower (the "<u>Project Spokane Security Agreement</u>," together with the Walsh Note, Walsh Security Agreement, Project Spokane Note and all other agreements, instruments, and other documents executed in connection with or relating to the Walsh Note and Project Spokane Note, the "<u>Loan Documents</u>").

d)   **<u>Date, Hour and Place of Sale</u>**:   Telephonic auction to be held on June 3, 2020 at 12:00 p.m. Eastern.   Dial-in number: (712) 770-5027.   Access code: 315468.

e)   **<u>Description of Property to be Sold</u>**:   All of the Borrower's right, title and interest in and to Borrower's personal property including, without limitation, all of Borrower's equipment and fixtures (collectively, the "<u>Property</u>").   Lenders have a first priority security interest in the Property.   The total amount due to Project Spokane is approximately CAD$5,468,750.00 and the total amount due to Walsh is approximately US$2,187,500.00.   Project Spokane may bid for the Property and credit bid against all or a portion of its secured claim.   Together with Project Spokane, Walsh may bid for the Property and credit bid against all or a portion of his secured claim. **The Property will be sold free and clear of Lenders' liens and any subordinate security interests in the Property, including any lien of Bank of Montana and Bonner Property Development, LLC.**

The Property includes the assets set forth on Schedule "A" attached hereto.

f)   **<u>Participation Requirements</u>**:   In order to participate in the bidding process, each person (a "<u>Potential Bidder</u>") must deliver to the undersigned counsel to Lenders:

i.   an executed confidentiality agreement in form and substance satisfactory to Lenders, which form can be obtained by contacting undersigned counsel for Lenders; and

ii.   current financial statements of the Potential Bidder that will show sufficient assets to be able to close on a purchase of the Property or other evidence of the ability to purchase the Property.

g)   **<u>Information and Due Diligence</u>**:   A Potential Bidder that complies with the foregoing requirements shall be deemed a qualified bidder ("<u>Qualified Bidder</u>").   A Qualified Bidder will be permitted to perform due diligence by contacting the undersigned counsel for Lenders.   Lenders shall be deemed to be a Qualified Bidder.

h)   **<u>Terms of Sale</u>**:   At the Sale, the Property shall be offered for acquisition by Qualified Bidders.   The Property will be sold at a public auction to the highest Qualified Bidder. The Property shall be sold for cash at such price or prices and on such other commercially reasonable terms as Lenders may determine in their sole discretion.   Higher

EXHIBIT 31.
PAGE 3

bids will continue to be entertained until Lenders have determined that they have received the highest or best bid for the Property in their sole discretion. Lenders shall be permitted to bid, both jointly or separately, at the sale and, notwithstanding any requirement herein that the sale of Property be for cash, may credit their bid against all or a portion of their secured claims and become the purchaser of the Property. Lenders reserve the right to reject all bids and terminate the sale or adjourn the sale to such other time or times as they may deem proper only by announcement on the date of sale or any subsequent adjournment thereof without further publication and impose any other commercially reasonable conditions upon the sale of the Property as they may deem proper. Payment will be accepted in cash, certified or cashier's check, corporate, partnership or personal check of a corporation, partnership or person and presented with a letter of reference from the bank on which the check is drawn, money order, or, in the case of purchase by Lenders, credits against amounts due under the Loan Documents. Payment must be made in full at the time and place of the sale, or on such other terms as agreed by Lenders in their sole discretion. The sale of the Property shall be effectuated by delivery of a Secured Party Bill of Sale.

i)  **No Warranties**: The Property will be sold "AS IS, WHERE IS," "WITH ALL FAULTS," and "WITHOUT ANY WARRANTIES WHATSOEVER, EXPRESSED OR IMPLIED, INCLUDING, WITHOUT LIMITATION, A WARRANTY OF MERCANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE OR OTHER PURPOSE," and subject to taxes, special assessments and liens that have been levied or assessed, and/or are unpaid or unsatisfied (none of which will be paid by Lenders). The Property is being sold without recourse to Lenders, their attorneys or representatives. Lenders do not claim title to the Property being sold hereunder and disclaim any warranty of title, possession, quiet enjoyment and the like in the sale.

j)  **No Fees Payable**: No person shall be entitled to any expense reimbursement, brokerage fee, break-up fee, topping, termination or similar fee or payout from the proceeds of the sale.

k)  **Right to Accounting**: Pursuant to the requirements of New York Uniform Commercial Code Section 9-613, Borrower and Hyperblock, Inc. shall be entitled to an accounting of the unpaid principal indebtedness secured by the Property. An accounting may be requested by calling the undersigned counsel for Lenders.

l)  **Right to Redeem**: Until the earlier of (1) the effectuation of the public sale of the Property or (2) the execution of a contract for sale of the Property, Borrower shall have the right to redeem the Property by payment or fulfillment of all obligations under the Loan Documents, together with payment of all additional expenses incurred by Lenders.

EXHIBIT 31.
PAGE 4

m)    **<u>Postponement of Public Sale</u>**: The public sale scheduled on the above date, time and
       location may be postponed.  In such event, an announcement of postponement of the
       scheduled sale will be made by Lenders at the currently proposed date and time of the
       sale.


Dated:  May 19, 2020                          ITO LAW GROUP, P.C.


                                              *Peter Ito*
                                              _____
                                              Peter W. Ito
                                              1550 Larimer Street, Suite 667
                                              Denver, CO 80202
                                              hyperblockassets@gmail.com
                                              (720) 281-5294

                                              Attorneys for Project Spokane, LLC, and
                                              Sean Walsh

EXHIBIT 31.
PAGE 5

# SCHEDULE "A"

EXHIBIT 31.
PAGE 6

| Item | Quantity | Notes |
|---|---|---|
| Bitmain Antminer S17 Servers, with PSU | 791 | including PSUs |
| Bitmain Antminer S17 Pro Servers, with PSU | 359 | including PSUs |
| Bitmain Antminer S17+ Servers, with PSU | 1493 | including PSUs |
| Bitmain Antminer S9 Servers, with PSU | 6641 | including PSUs |
| Bitmain Antminer T17 Servers, with PSU | 726 | including PSUs |
| Avalon921 Servers, with PSU | 162 | including PSUs |
| GPU Servers, with PSU | 161 | including PSUs |
| | | |
| Acme Engineering, 36" Fans | 423 | |
| Grainger/ACME Engineering 42" Fans | 30 | |
| ACME Engineering 60" Fans | 14 | |
| 2,500 kVA Indoor Switchgear Lineups | 8 | |
| 500 kVA Indoor Transformers | 55 | |
| 750 kVA Indoor Transformers | 3 | |
| Misc PDUs | 3124 | |
| 225A Breaker Panels | 339 | |
| 400A Breaker Panels | 6 | |
| Electrical Cabling | | enough to run 13,000 servers |
| Rack Shelving | | 560 racks, 8' wide, 9' tall |
| Computer Network Equipment | | enough to run 13,000 servers |
| New Delta 2400W PSU | 6374 | |
| Used Delta 2400W PSU | 374 | |
| Brand New Delta 2400W psu (with 10, 16" PCIe cables solder to it) | 1420 | run for a couple months |

# Tribal Power Co. Says Cryptocurrency Miner Owes $3.7M

*By Morgan Conley*

Law360 (May 28, 2020, 4:03 PM EDT) -- Two cryptocurrency mining companies and their founder racked up a $3.7 million tab powering their servers and haven't settled up, a tribal-owned power company has told a Montana federal court.

Tribal Power Co. Says Cryptocurrency Miner Owes $3.7M

Power company Energy Keepers Inc. accused Project Spokane LLC, Hyperblock LLC and their owner Sean Walsh on Wednesday of breaking the terms of their electric sales agreement.

Energy Keepers told the court that both mining operations worked out of the same facility just outside of Missoula, Montana, and owe more than $3.7 million for their power use. Not only have the companies not paid, but they are hiding assets to avoid being held accountable, Energy Keepers claims.

The power company, which is owned by the Confederated Salish and Kootenai Tribes, says Walsh believed an inexpensive energy source was essential to build a thriving cryptocurrency mining operation. He was able to make his operations profitable due to the affordable, reliable energy provided to the companies by Energy Keepers, the power company says.

But then Walsh and his companies stopped paying, the power company alleges.

Energy Keepers told the court on Wednesday that the two cryptocurrency mining companies "are so intertwined" that they are essentially one and the same. The power company seeks a declaration that Walsh and Project Spokane are alter egos of Hyperblock under the energy agreement and owe the power company $3.7 million plus interest.

Project Spokane occupied the facility first and contracted with Energy Keepers for power beginning in 2016, and Hyperblock was founded the following year. Energy Keepers contends the two companies effectively merged into a single unit soon after.

https://www.law360.com/commercialcontracts/articles/1277581/tribal-power-co-says-cryptocurrency-miner-owes-3-7m

EXHIBIT 32.
PAGE 2

Hyperblock purchased Project Spokane's assets for nearly $66 million in 2018, despite the company having roughly $11 million in assets and $6.6 million in liabilities at the time, according to the suit.

"Sean Walsh intentionally undercapitalized Hyperblock LLC to his own financial benefit," the suit says, going on to accuse him of "setting up Project Spokane LLC to siphon off all of the revenues generated by Hyperblock LLC to Walsh's own financial benefit, while using the companies as a shield to prevent EKI from collecting the amounts due to it under the [master electric sales agreement] and confirmation letters."

Energy Keepers cut off Hyberblock's electricity on May 14, and the mining company filed for bankruptcy the next day. An auction for Hyperblock's assets is scheduled for June. Walsh is set to bid on the assets up for grabs, according to the suit.

In a statement on May 14 announcing its shuttering, Hyperblock cited the terminated electricity agreement coupled with a recent Bitcoin halving, which sliced the reward given to miners for processing transactions in half, among the reasons the company could not continue.

Energy Keepers alleges that this isn't the first time Walsh has skipped out on a bill. The suit says that in 2008, Walsh founded a separate cryptocurrency mining operation called Aquifer International Commerce Inc. Aquifer filed for bankruptcy nine months into business and left rent and power bills unpaid, the power company alleges.

Representatives for the parties didn't immediately respond to requests for comment.

Energy Keepers is represented in-house by Daniel F. Decker and by Susan A. Shyne, Matthew A. Love, Anne E. Lynch and Sophia Amberson of Van Ness Feldman.

Counsel information for Walsh and his companies wasn't immediately available.

The suit is Energy Keepers Inc. v. Hyperblock LLC et al., case number 9:20-cv-00076, in the U.S. District Court for the District of Montana.

https://www.law360.com/commercialcontracts/articles/1277581/tribal-power-co-says-cryptocurrency-miner-owes-3-7m

EXHIBIT 33.
PAGE 1

| From: | David Bjornson |
|---|---|
| To: | peter@itolawgroup.com; hyperblockassets@gmail.com; hans.rizarri@crowesoberman.com; inder@hyperblock.co; Danny Day (dday@bankofmt.com) |
| Cc: | Jill Broughton; Kassy Buss; Amie Zendron; Big Sky Mobile Catering (bsmcorpmt@gmail.com); Michael Boehme |
| Subject: | Defects in Notice of Disposition of Collateral By Public Sale - Hyperblock, LLC / Project Spokane, LLC / Sean Walsh / Bonner Property Development, LLC |
| Date: | Monday, May 25, 2020 7:04:42 PM |
| Attachments: | Notice re Defects in Notice of Disposition of Collateral by Public Sale 5.25.20.pdf |
| Importance: | High |

Attached is an important notice regarding defects in the above described notice. Please contact me if you have questions or comments.   David

_____

### David H. Bjornson

**Bjornson Jones Mungas, PLLC**

**2809 Great Northern Loop, Suite 100**

**Missoula, Montana  59808**

**(406) 721-8896**

**(406) 541-8037--fax**

http://www.bjornsonlaw.com/attorneys/david-h-bjornson/

Email:  david@bjornsonlaw.com

*CONFIDENTIALITY NOTICE:  The information contained in this email message may be privileged or confidential information and is intended only for the use of the individual or entity named above.  If you have received this communication in error, please notify us immediately by telephone and delete the message from your system.*

EXHIBIT 33.
PAGE 2

# Bonner Property Development, LLC
## 224 N Higgins Avenue
## Missoula, Montana 59802

SENT CERTIFIED U.S. MAIL, RETURN RECEIPT REQUESTED,
and U.S. FIRST CLASS MAIL, and E-MAIL TO hyperblockassets@gmail.com and
peter@itolawgroup.com

May 25, 2020

ITO LAW GROUP, P.C.                          Sean Walsh
ATTN:  Peter W. Ito                          151 Calle San Francisco, #200
1550 Larimer Street, Suite 667               San Juan, PR US 00901
Denver, CO 80202                             c/o Peter W. Ito, Esq.


Project Spokane, LLC
5619 DTC Parkway 475
Greenwood Village, CO  80111


   RE: Notice of Disposition of Collateral By Public Sale

Ladies and Gentlemen:

We are in receipt of your Notice of Disposition of Collateral By Public Sale related to a
disposition of certain property (the "Property") owned by Hyperblock, LLC, a Delaware limited
liability company ("Hyperblock"), by public sale that is scheduled to occur on June 3, 2020 (the
"Sale") related to certain debts owed by Hyperblock to Project Spokane, LLC, and Sean Walsh.

We are writing because some of the assets noticed for sale are not the property of Hyperblock to
convey, and some of the assets are encumbered by a contractually committed first lien security
interest which is not reflected in your Notice. As background, Sean Walsh, as CEO of
Hyperblock, negotiated and executed documents which committed Hyperblock to certain things
which are not reflected in the substance of your Notice.  In brief summary, over the course of
the tenancy, Sean Walsh requested that Bonner Property Development, LLC, a Montana limited
liability company ("BPD") and its principals make concessions, construct improvements, provide
credit enhancements to enable Hyperblock to obtain financing, and to provide various other
consideration, and in exchange, Hyperblock committed that certain assets would remain with the
leased premises at the termination of the lease.  More specifically related to this Sale, Sean
Walsh requested that BPD and its principals, Steve Nelson and Michael Boehme, put their credit
at stake in guaranteeing financing for the acquisition of additional servers, and Sean Walsh
committed to deliver a first lien security interest in such newly acquired equipment in exchange
for such guaranty.  Without this commitment by Sean Walsh, BPD, Steve Nelson and Michael

EXHIBIT 33.
PAGE 3

May 25, 2020
Page 2

Boehme would not have entered into these personal guaranties on behalf of Hyperblock, thus facilitating financing for Sean Walsh's company to acquire new servers, and without the personal guaranties of BPD, Steve Nelson and Michael Boehme, Hyperblock would not have been able to obtain financing for the new servers.

You are hereby reminded and notified that under the terms of the Fourth Amendment to Commercial Lease Agreement dated January 23, 2019 between Hyperblock, as Tenant, and BPD, as Landlord (the "Fourth Lease Amendment"), Hyperblock agreed that certain improvements to the real property would remain with the real property at the termination of such lease agreement and become property of BPD. Paragraph 1.a,ii. reads in part:

> Any fixtures and personal property located on or about the Property as of the Lease Commencement Date (defined below) shall be considered part of the Property hereby leased and subject to all terms and conditions hereof. The term "Fixture" shall refer to those items so permanently attached or embedded to as to be considered part of the premises, as defined in Section 70-15-103, MCA. Except as provided otherwise hereinbelow, upon termination or expiration of this Lease for any reason, Tenant shall be entitled to remove from the Property any improvements that Tenant has made to the Property and that are not considered "Fixtures." As used herein the term "Fixture" shall not include unattached personal property, furniture, or trade fixtures of Tenant including those set forth in **Exhibit E-1**, attached hereto and incorporated herein by reference. Furthermore, however, whether or not best legally described as Fixtures, all property relating to electrical supply and distribution shall remain with the Property and become the property of Landlord at the termination of the Lease, including but not limited to the property described in **Exhibit E-2**, attached hereto and incorporated herein by reference.

Exhibit E-2 of the Fourth Lease Amendment is attached to this letter as Exhibit A. Because Hyperblock agreed that the assets listed on the attached Exhibit A will remain with the real property and become property of BPD at the termination of the lease, such assets cannot be included in the Sale. They are not Hyperblock's property to sell. Accordingly, the Notice is erroneous.

Furthermore, Hyperblock committed some of the Property to be encumbered by and subject to a first lien position security interest and the remainder of the Property by a non-priority security interest, each in favor of BPD, pursuant to that certain Credit Enhancement Agreement, dated December 13, 2018, by and between BPD and Hyperblock; and that certain Security Agreement, dated December 13, 2018, by Hyperblock, as debtor, in favor of BPD, as secured party, each as amended by that certain Modification of Lease Agreement, Credit Enhancement Agreement, Security Agreement and Side Letter to Third Amendment to Lease Agreement executed effective December 31, 2019 (collectively, the "BPD Agreements"). UCC filings were made in Montana with the Secretary of State and Missoula County Clerk and Recorder, and, on May 22, 2020, in Delaware.

May 25, 2020
Page 3

Sean Walsh negotiated, executed and delivered these documents on behalf of Hyperblock and Hyperblock was obligated to, but failed to, formalize the first lien priority aspect of the security interest with respect to the new servers acquired with the new financing obtained. The only parties authorized or needed to provide that first lien security interest are Sean Walsh, individually, and Project Spokane, LLC, by Sean Walsh as authorized officer. They have not yet delivered this formal subordination.

The BPD security interest in the Property under the BPD Agreements for the new servers funded by the proceeds of the Bank of Montana loan is contractually committed to be superior in priority to the security interests in favor of Project Spokane, LLC, and Sean Walsh, the subject of the Sale. Sean Walsh had a good faith obligation to follow through and accomplish what was within his power and authority to fulfill on Hyperblock's obligation, as negotiated by him, to ensure BPD had a first lien security interest in the new servers as contractually promised in legal documents executed by Sean Walsh. Sean Walsh and Project Spokane cannot legally or equitably be allowed to benefit from their own failure to subordinate and provide the contractually committed first lien security interests.

Accordingly, BPD's various security interests and BPD's rights under the lease agreement and under the BPD Agreements (and BPD's rights and remedies as a secured party at law and in equity), must be considered at the Sale, and any disposition or transfer of the Property financed by the proceeds of the Bank of Montana loan would need to provide for the satisfaction of the amount due under the Bank of Montana loan, or at a minimum would occur with the Property remaining subject to BPD's security interests and all rights and remedies related thereto. Further, at this time the remaining Property is subject to a nonpriority security interest of BPD which needs to be noticed and considered in the Sale and the Notice.

As the Notice of Disposition of Collateral By Public Sale was issued on behalf of Sean Walsh and Project Spokane, Sean Walsh and Project Spokane were or should reasonably have been acutely aware of the priority and nonpriority security interests that were negotiated and executed by Sean Walsh. We demand on behalf of Bonner Property Development, LLC, Steve Nelson and Michael Boehme that you revise, modify and reissue your Notice to reflect the proper facts, the proper secured parties and priorities and exclude the assets that are not Hyperblock's to sell. This revised Notice must be issued immediately due to the short timeframe involved.

Please contact me immediately with any questions.

Sincerely,

**Bonner Property Development, LLC,**
a Montana limited liability company

By: _____

Steve Nelson, Co-Manager

EXHIBIT 33.
PAGE 5

May 25, 2020
Page 4

With copies to:

Hyperblock, Inc.
2 St. Claire Avenue East, Suite 1100
Toronto, ON M4T 2T5
Attention: Hans Rizarri
 hans.rizarri@crowesoberman.com

Bank of Montana
125 Bank Street, Suite 100 Missoula, MT
59802
Attention: Daniel Day
dday@bankofmt.com

Hyperblock, LLC
140 Yonge Street, #209
Toronto, ON M5C 1X6
Attention: Inder Saini
inder@hyperblock.co

EXHIBIT 33.
PAGE 6

# EXHIBIT A

### EXHIBIT E-2

Items to Remain with Property and Landlord Whether or not Fixtures

- All electrical supply and distribution related property of any kind, including but not limited to substations, distribution lines, poles, switching gear, fans, panels, fans, wire, fuse systems
- 5,000 KVA substations with associated switch gear
- 225A distribution panels with main breaker
- 500 KVA transformers 480Vto 208V
- 36" Tubeaxial 3HP fans
- 60" Tubeaxial 20Hp fans
- 2500 feet of cable tray
- 2500 feet of pallet racking
- 150,000 feet of 10 gauge wire
- 5 section 15KV fuse disconnect (outdoor)

062S0008648293

$5.750
US POSTAGE
FIRST-CLASS
FROM 59808
MAY 26 2020
stamps
endicia



CERTIFIED MAIL®

7017 2400 0000 5794 3748

Project Spokane, LLC
5619 DTC Parkway Ste 475
Greenwood Village CO 80111-3140

Bjornson Jones Mungas, PLLC
2809 Great Northern Loop, Suite 100
Missoula, MT 59808

---

062S0008648293

$5.750
US POSTAGE
FIRST-CLASS
FROM 59808
MAY 26 2020
stamps
endicia

CERTIFIED MAIL®

7017 2400 0000 5794 3731

ITO Law Group, P.C.
Attn: Peter W. Ito
1550 Larimer Street, Suite 667
Denver CO 80202-1602

Bjornson Jones Mungas, PLLC
2809 Great Northern Loop, Suite 100
Missoula, MT 59808

EXHIBIT 35.
PAGE 8

**U.S. Postal Service™**
**CERTIFIED MAIL® RECEIPT**
*Domestic Mail Only*

For delivery information, visit our website at www.usps.com®.

Certified Mail Fee  $3.55

Extra Services & Fees (check box, add fee as appropriate)
☐ Return Receipt (hardcopy)  $0.00
☐ Return Receipt (electronic)  $0.00
☐ Certified Mail Restricted Delivery  $0.00
☐ Adult Signature Required  $0.00
☐ Adult Signature Restricted Delivery $

Postage  $0.55

Total Postage and Fees  $4.10
$

Sent To

Street and Apt. No., or PO Box No.

City, State, ZIP+4®

PS Form 3800, April 2015 PSN 7530-02-000-9047   See Reverse for Instructions

7019 2290 0001 7213 8092

```
------------------------------
Total:                  $4.10
------------------------------

------------------------------
Debit Card Remit'd      $4.10
   (Card Name:MasterCard)
   (Account #:XXXXXXXXXXX6995)
   (Approval #)
   (Transaction #:400)
   (Receipt #:056482)
   (Debit Card Purchase:$4.10)
   (Cash Back:$0.00)
   (AID:A0000000042203      Chip)
   (AL:Debit)
   (PIN:Verified)
------------------------------

The timeliness of service to or from
destinations outside the contiguous US
may be affected by the limited
availability of transportation.

In a hurry? Self-service kiosks offer
quick and easy check-out. Any Retail
Associate can show you how.

Text your tracking number to 28777
(2USPS) to get the latest status.
Standard Message and Data rates may
apply. You may also visit www.usps.com
USPS Tracking or call 1-800-222-1811.


        Preview your Mail
        Track your Packages
        Sign up for FREE @
      www.informeddelivery.com


All sales final on stamps and postage.
Refunds for guaranteed services only.
     Thank you for your business.

     NOW HIRING. Please visit
    www.usps.com/careers to apply.

    HELP US SERVE YOU BETTER

  TELL US ABOUT YOUR RECENT
       POSTAL EXPERIENCE

           Go to:
  https://postalexperience.com/Pos

  840-5590-0482-002-00075-53153-02
```

or scan this code with
your mobile device:



or call 1-800-410-7420.

YOUR OPINION COUNTS

```
Receipt #: 840-55900482-2-7553153-2
Clerk: 05
```

**BANK OF MONTANA**

MONTANA'S BUSINESS BANK

EXHIBIT 34.
PAGE 1

May 26, 2020

ELECTRONIC MAIL OR OVERNIGHT MAIL

Hyperblock, LLC
5619 DTC Parkway #475
Greenwood Village, CO 80111
Attention: Inder Saini
inder@hyperblock.co

> Other known address of Hyperblock, LLC:
> 140 Yonge Street, #209
> Toronto, ON M5C 1X6

James A. Bowditch
  Registered Agent for Hyperblock, LLC
P.O. Box 9199
Missoula, MT 59807-9199
jbowditch@boonekarlberg.com

**Re:    Default Notice—Business Loan Agreement dated as of December 14, 2018
        Bank of Montana Loan #   4200**

Ladies and Gentlemen:

    This letter notifies Hyperblock, LLC (the "Borrower") of the occurrence of Events of Default under the Business Loan Agreement dated as of December 14, 2018 (as the same may have been amended, the "Agreement") between Borrower and Bank of Montana (the "Lender"). Capitalized terms used in this letter and not otherwise defined herein are accorded the meaning given such terms in the Agreement.

    The following Defaults have occurred under the Agreement and Related Documents as further stated in the Agreement section captioned "Default":

1. Default in Favor of Third Parties. Borrower has defaulted under agreements with third parties as stated in the Notice of Disposition of Collateral by Public Sale (the "Notice of Disposition") a copy of which has been delivered to Lender by a third party and is attached to this letter.

2. Other Defaults. Borrower is in Default under the Other Defaults provisions as follows:

**1** | P a g e

EXHIBIT 34.
PAGE 2

a.  Borrower failed to timely notify Lender of material changes in the financial condition of Borrower, including the defaults stated in the Notice of Disposition, the pursuit of remedies by third parties under the Notice of Disposition and Borrower's cessation of business.  Timely notice of the foregoing is required under the Affirmative Covenants, Notice of Claims and Litigation.  The failure to timely notify Lender is not a curable default.

b.  Borrower has ceased operations in violation of the Negative Covenants, Continuity of Operations.  Borrower's sole member stated the cessation of operations in published releases of which Lender is aware.

c.  As stated in the Notice of Disposition, Borrower has defaulted on agreements with third parties and failed to timely notify Lender of the defaults as required under Affirmative Covenants, Other Agreements.  The failure to timely notify Lender is not a curable default.

d.  Lender has been notified by third parties that Borrower executive and management personnel has resigned.  Borrower has failed to timely notify Lender of the changes in personnel as required under Affirmative Covenants, Operations.  The failure to timely notify Lender is not a curable default.

3.  <u>Adverse Change</u>.  Borrower's cessation of operations and actions taken under the Notice of Disposition are a material adverse change in the financial condition of Borrower.

Each of the foregoing Defaults is also an Event of Default under the Related Documents in accordance with the terms of such documents, including by cross default. There may be other Defaults that Lender has not named at this time. However, by not naming other Defaults at this time, Lender does not waive or surrender any rights granted within the Agreement and Related Documents or applicable laws and/or regulations.

In accordance the Agreement and the Related Documents, including the Promissory Note, Lender hereby (1) demands that Borrower cure the Defaults that are subject to cure within the times required under the Agreement and Related Documents and (2) declares the entire principal balance and all accrued and unpaid interest immediately due and payable and demands immediate payments of such amounts.

Sincerely,

Bank of Montana

By: _____
Jacob T. Pelczar, SVP

EXHIBIT 34.
PAGE 3

With copies to:


Hyperblock, Inc.
    Sole Member of Hyperblock, LLC
2 St. Claire Avenue East, Suite 1100
Toronto, ON M4T 2T5
Attention Hans Rizarri
hans.rizarri@crowesoberman.com

Bonner Property Development, LLC
224 N. Higgins Avenue
Missoula, MT 59802
Attention: Stephen Nelson
bsmcorpmt@gmail.com

Bjornson Jones Mungas, PLLC
2809 Great Northern Loop, Suite 100
Missoula, MT 59808
Attention: David Bjornson
david@bjornsonlaw.com

| From: | David Bjornson |
|---|---|
| To: | peter@itolawgroup.com |
| Cc: | Jill Broughton; Kassy Buss |
| Subject: | Subordination Agreement |
| Date: | Tuesday, May 26, 2020 7:30:11 PM |
| Attachments: | Subordination Agreement 05.26.2020 v4.docx |

Peter:

As you know, it is our position that Bonner Property Development, LLC ("**BPD**") contracted for and is entitled to a first lien security interest in the new servers owned by Hyperblock and financed by the Bank of Montana loan, which was guaranteed by BPD and its principals. The first lien position was a key term and material inducement, without which BPD and its principals would not have provided the credit enhancements which facilitated the financing to purchase the new servers. For your convenience, I have extracted the following pertinent language from the various Agreements with BPD that were negotiated and executed by Mr. Walsh on behalf of Hyperblock:

    a.  Section 1.2 of the Credit Enhancement Agreement provides that:

        "The reimbursement obligation [of Hyperblock to reimburse BPD and its principals] shall be secured by a first lien security interest in the new assets and other improvements that Borrower intends to acquire with the proceeds from the Bank Loan and the New Equity ("Borrower's Pledged Assets"). Borrower shall execute and deliver a security agreement contemporaneously with this Agreement in form and substance acceptable to Pledgor and its counsel ("Security Agreement"). Borrower covenants to obtain lien waivers and releases from contractors and suppliers and to maintain Pledgor's first lien position in Borrower's Pledged Assets at all times. Any default under the Bank Loan shall also be a default under this Agreement, and Pledgor shall have the remedies provided under the Security Agreement.

    b.  Section 4.1(f) of the Credit Enhancement Agreement further provides that Hyperblock will "execute such financing documents as [BPD] may reasonably request to perfect and continue a first position security interest in Borrower's Pledged Assets in favor of Pledgor."

    c.  The Modification was negotiated and executed by the parties pursuant to a revised plan to purchase "New Servers" as defined therein. The Modification provides in relevant part that the Security Agreement was "modified to include ALL personal property owned by Tenant which is located currently at the Property (and not just newly acquired New Servers), but specifically excluding all servers owned by Tenant and located on the Property as of the date of this Modification." (12-31-2019) The Modification did not eradicate the first lien position to be held on any assets acquired through the Bank of Montana loan.

EXHIBIT 35.
PAGE 2

Even if the UCC-1 had been filed in December 2019 at the time of the plan to purchase the New Servers, it would have been behind Project Spokane and Sean Walsh in priority under the race statute.  A subordination would have been required to be executed by Sean.  We provide it now, 5 months after the execution of the documents.   The expiration of 5 months does not extinguish the obligation to provide the subordination.

It was and remains the obligation of Hyperblock to obtain and provide BPD with a first position security interest in the subject assets.  To facilitate and correct such breach, please review and ask Sean to execute and deliver the attached subordination agreement.  This document would be executed only by Sean Walsh, the same person that negotiated and executed the first lien position in the documents with BPD.  We are most definitely open to comments and revisions to the subordination agreement.

After the phone call today, I am fully aware of how you may likely respond to this.  I felt it important to provide the contractual provisions as both you and Sean seemed unclear about this key contractual commitment which is clearly set forth in the legal documents.  I also felt it important to provide you and Sean with the path to rectify the failure to provide the subordination.   It would have no different effect if executed now vs being executed in January.

There was a lot of anger today.  I am not sure how you and Sean expected BPD to respond to this situation, without notice or knowledge of any plan to protect them.  I would ask you to put the shoe on the other foot and ask what would you and Sean have done in the reverse situation.

We have meetings tomorrow to discuss things further, based in part on the phone call.

David

_____

**David H. Bjornson**

**Bjornson Jones Mungas, PLLC**
**2809 Great Northern Loop, Suite 100**
**Missoula, Montana  59808**
**(406) 721-8896**
**(406) 541-8037--fax**
http://www.bjornsonlaw.com/attorneys/david-h-bjornson/
Email:  david@bjornsonlaw.com
*CONFIDENTIALITY NOTICE:  The information contained in this email message may be privileged or confidential information and is intended only for the use of the individual or entity named above.  If you have received this communication in error, please notify us immediately by telephone and delete the message from your system.*

## SUBORDINATION AGREEMENT

This SUBORDINATION AGREEMENT (this "**Agreement**") dated _____ 2020, is by and between Sean Walsh, an individual, of 151 Calle San Francisco, #200, San Juan, PR US 00901 ("**Walsh**"), Project Spokane, LLC, a Colorado limited liability company, of 5619 DTC Parkway 475, Greenwood Village, CO 80111 ("**PS**"), and Bonner Property Development, LLC, a Montana limited liability company, of 224 North Higgins Avenue, Missoula, MT 59802 ("**BPD**").

## RECITALS:

A.      BPD and Hyperblock, LLC, a Delaware limited liability company ("**Hyperblock**") previously entered into certain agreements, including the following agreements: the Commercial Lease Agreement, dated March 1, 2016; the First Amendment to Commercial Lease Agreement executed in December 2016, and effective January 1, 2017; the Second Amendment to Commercial Lease Agreement dated July 13, 2017, but effective January 1, 2017; the Third Amendment to Commercial Lease Agreement, effective December 13, 2018; the Side Agreement, dated January 23, 2019; the Fourth Amendment to Commercial Lease Agreement effective January 23, 2019; the Credit Enhancement Agreement, dated December 13, 2018; the Security Agreement, dated December 13, 2018, and the Modification of Lease Agreement, Credit Enhancement Agreement, Security Agreement and Side Letter to Third Amendment to Lease Agreement executed effective December 31, 2019 (the "**Modification**"), and all other instruments, documents, and agreements executed in connection with or related thereto, including as they may have been amended or modified (collectively, the "**BPD Agreements**"). Among other things, the Modification amended the Security Agreement to cover all personal property located at the Missoula leased premises excepting servers located there on December 31, 2019, but does not modify the first lien position on the newly financed servers described in Recital C which was provided by the terms of the Credit Enhancement Agreement.

B.      Any and all liens, encumbrances, or security interests, including those arising pursuant to the BPD Agreements or by operation of law (with such term including those arising thereafter or hereafter) in favor of BPD that secure any present or future indebtedness, obligation, liability, claim, right, or demand of any kind (including those arising thereafter or hereafter) of Hyperblock to BPD are referred to herein collectively as the "**BPD Security Interests**."

C.      Among the BPD Security Interests are a first lien priority security interest in the personal property financed by that certain loan that was made available to Hyperblock based in part on the credit enhancements of BPD and its principals in favor of Bank of Montana, in the original principal amount of approximately $2.625 million. Specifically, such equipment includes but is not limited to 1,493 Bitmain S17+ Servers, with PSU (the "**Financed Servers**"). The intended and agreed upon first lien security interests in the Financed Servers shall hereinafter be referred to as the "**BPD New Server Security Interests**."

D.      Any and all liens, encumbrances, or security interests, including those arising by operation of law (with such term including those arising thereafter or hereafter) in favor of Walsh that secure any present or future indebtedness, obligation, liability, claim, right, or demand of any kind (including those arising thereafter or hereafter) of Hyperblock to Walsh are referred to herein collectively as the "**Walsh Security Interests**."

E.      Any collateral referenced or captured by the Walsh Security Interests (including arising thereafter or hereafter or by operation of law) are referred to herein collectively as the "**Walsh Collateral**."

F.      Any and all liens, encumbrances, or security interests, including those arising by operation of law (with such term including those arising thereafter or hereafter) in favor of PS that secure any present or future indebtedness, obligation, liability, claim, right, or demand of any kind (including those arising thereafter or hereafter) of Hyperblock to PS are referred to herein collectively as the "**PS Security Interests**."

G.      Any collateral referenced or captured by the PS Security Interests (including arising thereafter or hereafter or by operation of law) are referred to herein collectively as the "**PS Collateral**."

**AGREEMENT:**

NOW, THEREFORE, the parties agree as follows:

1.      Walsh hereby subordinates the Walsh Security Interests and the Walsh Collateral in all respects to the BPD New Server Security Interests in the Financed Servers, and Walsh hereby agrees that, to the maximum extent allowable by law, such subordination shall be effective as of December 31, 2019, and continue forward.

2.      PS hereby subordinates the PS Security Interests and the PS Collateral in all respects to the BPD New Server Security Interests in the Financed Servers, and PS hereby agrees that, to the maximum extent allowable by law, such subordination shall be effective as of December 31, 2019, and continue forward.

3.      Walsh hereby represents and warrants to BPD that it has not assigned, encumbered or transferred any rights or interests, vested or contingent, in or to the Walsh Security Interests or the Walsh Collateral.

4.      PS hereby represents and warrants to BPD that it has not assigned, encumbered, or transferred any rights or interests, vested or contingent, in or to the PS Security Interests or the PS Collateral.

5.      The parties signing this Agreement represent and warrant such party has full authority to so act.

6.      The parties agree to promptly execute, or promptly cause to be executed, any and all supplemental documents, and to promptly perform, or cause to be promptly performed, any and all supplemental acts, to give full force and effect to the terms and intent of this Agreement.

7.      This Agreement contains the entire agreement between the parties as to the order of priority of the security interests addressed herein.

8.      This Agreement shall be interpreted, construed and governed by the laws of the State of Montana.

9.      This Agreement shall inure to the benefit of, and shall be binding upon, the respective successors and assigns of each of the parties hereto.

10.     This Agreement may be executed in any number of counterparts, each of which shall be an original, but all of which together shall be deemed to constitute one instrument.

[Remainder of Page Intentionally Left Blank – Signature and Notary Pages Follow]

EXHIBIT 35.
PAGE 5

IN WITNESS WHEREOF, the undersigned has executed this Agreement as of the date and year first above written.

**PS:**

**Project Spokane, LLC,**
**a Colorado limited liability company**


By: _____
Name: _____
Its: _____


STATE OF _____        )
                                                                ) ss.
COUNTY OF _____        )

The foregoing instrument was acknowledged before me this ___ day of _____ 2020, by _____, as _____ of Project Spokane LLC, a Colorado limited liability company.

[SEAL and Expiration Date]

                                                    _____
                                                    Notary Public
                                                    My Commission Expires _____

IN WITNESS WHEREOF, the undersigned has executed this Agreement as of the date and year first above written.

**WALSH:**

_____
Sean Walsh, individually

STATE OF _____        )
                                     ) ss.
COUNTY OF _____         )

The foregoing instrument was acknowledged before me this ___ day of _____ 2020, by Sean Walsh, individually.

[SEAL and Expiration Date]

_____
Notary Public
My Commission Expires _____

IN WITNESS WHEREOF, the undersigned has executed this Agreement as of the date and year first above written.

**BPD:**

**Bonner Property Development, LLC,**
**a Montana limited liability company**


By: _____
Name: Stephen Nelson
Its: Co-Manager



STATE OF MONTANA              )
                              ) ss.
COUNTY OF MISSOULA            )

The foregoing instrument was acknowledged before me this ___ day of _____ 2020, by Stephen Nelson, as Co-Manager of Bonner Property Development, LLC, a Montana limited liability company.

[SEAL and Expiration Date]


_____
Notary Public
My Commission Expires _____

| From: | peter@itolawgroup.com |
|---|---|
| To: | David Bjornson |
| Cc: | Jill Broughton; Kassy Buss; Amie Zendron; Big Sky Mobile Catering (bsmcorpmt@gmail.com); Michael Boehme; hans.rizarri@crowesoberman.com; Inder Saini; dday@bankofmt.com |
| Subject: | RE: Defects in Notice of Disposition of Collateral By Public Sale - Hyperblock, LLC / Project Spokane, LLC / Sean Walsh / Bonner Property Development, LLC |
| Date: | Tuesday, May 26, 2020 4:18:15 PM |
| Attachments: | 2020.04.07 MT UCC Search - Hyperblock LLC(9801718.1).pdf |

Mr. Bjornson,

As you are aware, my firm represents Sean Walsh ("**Mr. Walsh**") and Project Spokane, LLC. ("**Project Spokane**," together with Mr. Walsh, the "**Lenders**").  I am in receipt of your Notice re Defects ("**Notice re Defects**") in Notice of Disposition of Collateral by Public Sale ("**Notice of Disposition**"), which you sent on behalf of Bonner Property Development ("**BPD**").  This emails shall serve as Lenders' response to your Notice re Defects.

Your Notice re Defects is full of innuendo, hyperbole, and patently false and defamatory statements.  Your bullying tactics will not be tolerated.  At no time did Mr. Walsh or Project Spokane make most of the statements that you attribute to them.  Further, if a creditor desires a first priority lien then it is up to that creditor to negotiate terms, draft the appropriate documents, obtain necessary signatures and, thereafter, make the necessary statutory filings to obtain such a lien.  None of these steps are the obligations of another creditor.  The fact that you made these false statements is troubling but even more egregious is the fact that you sent these false statements to representatives for Hyperblock, LLC, Hyperblock, Inc. and Bank of Montana.  If your objective was to highjack any possibility of a business resolution, you are dangerously close to succeeding.  My clients demand that you retract your letter and statements no later than 5:00 p.m. Eastern on Wednesday, May 27, 2020.  You have caused tangible harm to Mr. Walsh and Project Spokane, and they intend to seek appropriate relief if a retraction is not made.

Your Notice re Defects also falls woefully short on the law.  In fact, your Notice re Defects fails to include any reference or citation to any legal authority to support BPD's assertion that Lenders cannot proceed forward with their disposition of collateral by public sale.  For the reasons set forth below, BPD does not, vis-à-vis Lenders, have superior lien rights In the property that is the subject of the sale.

The priorities among conflicting security interests is governed by Article 9 of the Uniform Commercial Code ("**UCC**").  In order to perfect its alleged security interest in the property that is the subject of the sale, BPD was required to file a UCC-1 Financing Statement in the jurisdiction where Hyperblock, LLC is located.  *See* UCC § 9-301(1).  Under Article 9, a limited liability company is deemed located in the state where it is organized. UCC § 9-307(e).  In this case, as Hyperblock is a Delaware limited liability company, BDP was required to file its UCC-1 Financing Statement with the Delaware Secretary of State.  Despite this fact, your office filed a UCC-1 Financing Statement on behalf of BPD on January 7, 2019, with the Montana Secretary of State (see attached).  Thereafter, your office allegedly filed a UCC-1 Financing Statement on behalf of BPD in Delaware on May 22, 2020.  I use the word "allegedly" as  your office has not provided Lenders with a certification from the Delaware Secretary of State evidencing the filing.  In contrast, in my email dated May 22, 2020, I

provided you with a Delaware Secretary of State certification for Hyperblock, LLC dated as of March 30, 2020.  That certification shows that (i)  Project Spokane filed its UCC-1 Financing Statement with the Delaware Secretary of State on July 10, 2018 as Filing No. 20184736126 followed by two amendments on February 15, 2019 and (ii) Mr. Walsh filed his UCC-1Financing Statement with the Delaware Secretary of State on July 19, 2019 at File No. 20195007682.

UCC § 9-322(a) governs the priorities among conflicting security interests.  More specifically, § 9-322(a)(1) states, in relevant part, as follows:  "Except as otherwise provided in this section, priority among conflicting security interests and agricultural liens in the same collateral is determined according to the following rules: (1) Conflicting perfected security interests and agricultural liens rank according to priority in time of filing or perfection.  Priority dates from the earlier of the time a filing covering the collateral is first made or the security interest or agricultural liens is first perfected, if there is no period thereafter when there is neither filing nor perfection."  In short, § 9-322(a) is a "pure race" statute.  It is not, contrary to your assertion, a "notice-race" statute.  Therefore, your argument that "Sean Walsh and Project Spokane were or should reasonably have been acutely aware of the priority and nonpriority security interests" is of no significance.  As noted by the foremost authority on Article 9:  "That is, the one who wins the 'race' to the filing office is superior even if that one had 'notice' or 'knowledge' of an earlier claim.  The section nowhere requires that the victor be without knowledge of its competitor's claim."  *See* James J. White, Robert F. Summers & Robert A. Hillman, *Uniform Commercial Code* § 33-3 (6th ed. 2015).

Simply put, as Lenders' UCC-1 Financing Statements were recorded prior in time to BPD's UCC-1 Financing Statement, Lenders' liens in the property that is the subject of the sale, including the property included on Exhibit E2 to your Notice re Defects, are senior in priority to the alleged lien of BPD.  Upon completion of the sale by Lenders, BPD's alleged lien will be discharged.  *See* UCC § 9-617(a)(3).   As such, Lenders have no intention of revising, modifying or reissuing their Notice of Disposition.  Rest assured that If BPD attempts to enjoin or disrupt the sale, Lenders will seek to recover all consequential damages caused by BPD's conduct, including damages for lost profits and revenue.

The foregoing is without prejudice to any of Lenders' rights, powers, privileges, remedies and defenses, now existing or hereafter arising, all of which are hereby expressly reserved.

Sincerely,

Peter W. Ito
Ito Law Group, P.C.
1550 Larimer Street, Suite 667
Denver, Colorado 80202
Phone: 720.281.5294
Email: peter@itolawgroup.com
Linkedin:  http://www.linkedin.com/pub/peter-ito/11/66a/15b
Website:  www.itolawgroup.com

**From:** David Bjornson <david@bjornsonlaw.com>
**Sent:** Monday, May 25, 2020 9:05 PM
**To:** peter@itolawgroup.com; hyperblockassets@gmail.com; hans.rizarri@crowesoberman.com;

inder@hyperblock.co; Danny Day (dday@bankofmt.com) <dday@bankofmt.com>
**Cc:** Jill Broughton <jill@bjornsonlaw.com>; Kassy Buss <kassy@bjornsonlaw.com>; Amie Zendron
<amiezendron@bjornsonlaw.com>; Big Sky Mobile Catering (bsmcorpmt@gmail.com)
<bsmcorpmt@gmail.com>; Michael Boehme <mikeb@bonnerproperty.com>
**Subject:** Defects in Notice of Disposition of Collateral By Public Sale - Hyperblock, LLC / Project
Spokane, LLC / Sean Walsh / Bonner Property Development, LLC
**Importance:** High


Attached is an important notice regarding defects in the above described notice.
Please contact me if you have questions or comments.   David


_____

**David H. Bjornson**

**Bjornson Jones Mungas, PLLC**
**2809 Great Northern Loop, Suite 100**
**Missoula, Montana  59808**
**(406) 721-8896**
**(406) 541-8037--fax**
**http://www.bjornsonlaw.com/attorneys/david-h-bjornson/**
**Email:  david@bjornsonlaw.com**
*CONFIDENTIALITY NOTICE:  The information contained in this email message may be privileged or confidential
information and is intended only for the use of the individual or entity named above.  If you have received this
communication in error, please notify us immediately by telephone and delete the message from your system.*


This email has been scanned for email related threats and delivered safely by Mimecast.
For more information please visit http://www.mimecast.com

EXHIBIT 36.
PAGE 4



# MONTANA SECRETARY OF STATE

Request Date: 04/07/2020 10:21 AM
Info Request Doc #:    20200267132
DLN #:    B0029-1033

CROWLEY FLECK PLLP
TAMARA MELIA-WOODWARD
PO BOX 2529
BILLINGS, MT  59103-2529

## Search Results Listing

Pursuant to the request that you submitted, a search was conducted based on the search criteria listed below. The listing below, within a reasonable degree of certainty, is a record of all presently effective UCC financial statements and Statements of Assignments which name the below debtor and which are on file in my office from January 1, 1965 through April 6, 2020.

The search results herein reflect only the specific information requested.  The results of this debtor search will not reflect variances of this name.  If the debtor is known under other personal names, trade names, business entities or cities, separate searches of these name will have to be requested and conducted. The Secretary of State disclaims any and all liability for claims resulting from other filings on which the name of the debtor can be found in any other form than that which was requested herein.

## Search Criteria:

Organization: HYPERBLOCK | using 'Begins With' search
Request Type: Non-Standard Information Request
Active (unlapsed records only), List and ALL Copies

Corey Stapleton
Montana Secretary of State

Enclosures: Original Documents

### Lien Listing

**Lien Doc #: 1901072389302      DLN #: A0099-7385   Filed: 01/07/2019 11:29 AM Lapse: 01/07/2024 11:59 PM**

Debtor(s):          HYPERBLOCK LLC , 120 ADELAIDE STREET WEST SUITE 2210 CANADA

Secured Party(s):  BONNER PROPERTY DEVELOPMENT, LLC , 224 NORTH HIGGINS AVENUE, MISSOULA, MT 59802

*Lien 3 Amendment - Restate Collateral*
Lien Doc #:  20200059663          DLN #: B0022-1783   Filed: 01/20/2020 03:13 PM

EXHIBIT 36.
PAGE 5



# MONTANA SECRETARY OF STATE

|  |  |
|---|---|
| Request Date: | 04/07/2020 10:21 AM |
| Info Request Doc #: | 20200267132 |
| DLN #: | B0029-1033 |

CROWLEY FLECK PLLP
ATTN: TAMARA MELIA-WOODWARD
PO BOX 2529
BILLINGS, MT 59103-2529

## Document Report

The Montana Secretary of State has received and processed your request for copies 1901072389302.

If you have any questions or concerns regarding this search, please contact a UCC specialist at 406-444-3665 at your earliest convenience.

Corey Stapleton
Montana Secretary of State
Enclosures: Original Documents

1901072389302

EXHIBIT 36.
PAGE 6

## UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS

| A. NAME & PHONE OF CONTACT AT FILER [optional] |
|---|
| Bjornson Law Offices, PLLC        (406) 721-8896 |

| B. E-MAIL CONTACT AT FILER (optional) |
|---|
| jill@bjornsonlaw.com |

C. SEND ACKNOWLEDGMENT TO:  (Name and Address)

Bjornson Law Offices, PLLC
2809 Great Northern Loop, Ste 100
Missoula, MT  59808

**Montana Secretary of State**
**File Number: 1901072389302**
**Date Filed: 1/7/2019 11:29 AM**

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

Page 1 of 1

**1. DEBTOR'S NAME:** Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the individual Debtor's name will not fit in the line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor Information in item 10 of the Financing Statement Addendum (Form UCC1AD)

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Hyperblock LLC | | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIALS | | SUFFIX |
| | | | | |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 120 Adelaide Street West, Suite 2210 | Toranto | ON | M5H 1T1 | Canada |

**2. DEBTOR'S NAME:** Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the individual Debtor's name will not fit in the line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor Information in item 10 of the Financing Statement Addendum (Form UCC1AD)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| | | | | |
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIALS | | SUFFIX |
| | | | | |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| | | | | |

**3. SECURED PARTY'S NAME** (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Bonner Property Development, LLC | | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| | | | | |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 224 North Higgins Avenue | Missoula | MT | 59802 | USA |

**4. COLLATERAL:** This financing statement covers the following collateral:

```
To the extent acquired, improved or built in part and directly or indirectly with proceeds of the "Bank
Loan" from Bank of Montana, as that term is defined in that certain Credit Enhancement Agreement
executed by the Debtor and Secured Party concurrently herewith, the
following:
Furniture, equipment, fixtures, and other articles of personal property now or hereafter owned by
Debtor; together with all accessions, parts, and additions to, all replacements of, and all
substitutions for, any of such property; and together with all proceeds (including without limitation
all insurance proceeds and refunds of premiums) from any sale or other disposition of any such property.
```

5. Check only if applicable and only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and only one box:
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and only one box:
☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA

**Project Spokane**

UCC FINANCING STATEMENT (FORM UCC1) (REV. 7/1/2013)



20200059663

B0022-1783 01/20/2020 3:13 PM Received by MT Secretary of State Corey Stapleton



**STATE OF MONTANA**
*SECRETARY OF STATE*
UCC3 AMENDMENT

Filing Fee - $5. Terminations are $0.

*For Office Use Only*
STATE OF MONTANA
**-FILED-**
SECRETARY OF STATE
Entity Number: 20200059663
Date Filed: 1/20/2020 3:13:08 PM

| Contact at Filer: | |
|---|---|
| Contact Name | David H. Bjornson |
| Contact Phone | (406) 721-8896 |
| Contact Email | jill@bjornsonlaw.com |

| Send acknowledgment to: | |
|---|---|
| Name | David H. Bjornson |
| Address | DAVID H. BJORNSON |
| | 2809 GREAT NORTHERN LOOP #100 |
| | MISSOULA, MT 59808 |

| Amendment Actions: | |
|---|---|
| Initial Financing Statement File Number | 1901072389302 |
| Date Filed | 01/07/2019 |
| Amendment Action | Collateral Amendment - $5.00 (add, edit or delete collateral) |
| Collateral Change | Edit Collateral |

| Collateral: | |
|---|---|
| Indicate collateral: | Furniture, equipment, fixtures, computer servers, power supplies, and other articles of personal property now or hereafter owned by Debtor; together with all accessions, parts, and additions to, all replacements of, and all substitutions for, any of such property; and together with all proceeds (including without limitation all insurance proceeds and refunds of premiums) from any sale or other disposition of any such property; EXCLUDING however, all computer servers owned by Debtor and located at 9144 Bonner Mill Road, Bonner, MT 59823, at the close of business December 31, 2019. |

**UCC3 Addendum**

☐ Check here if you are required to complete the UCC3 Addendum for this lien.

Name of SECURED PARTY of record authorizing this amendment:

☐ If this is an amendment authorized by a DEBTOR, check here and provide the name of the authorizing debtor.

| Authorizing Party Name | BONNER PROPERTY DEVELOPMENT, LLC |
|---|---|

Optional Filer Reference Data:
Project Spokane

| From: | peter@itolawgroup.com |
|---|---|
| To: | David Bjornson |
| Cc: | Jill Broughton; Kassy Buss |
| Subject: | RE: Subordination Agreement |
| Date: | Wednesday, May 27, 2020 2:51:28 PM |

David,

I am in receipt of your email below and have reviewed it along with your proposed Subordination Agreement.  On behalf of Sean Walsh ("**Mr. Walsh**") and Project Spokane, LLC ("**Project Spokane**"), I write in response to your demand that Mr. Walsh and Project Spokane execute the Subordination Agreement in favor of Bonner Property Development ("**BPD**").

BPD's request that Mr. Walsh and Project Spokane execute the Subordination Agreement is and will be treated as an admission that the liens held by Mr. Walsh and Project Spokane are senior in priority to the alleged lien of BPD.  Rest assured that this admission will be front and center before a court if BPD attempts to enjoin or disrupt the sale set for June 3, 2020.  To be clear, neither Mr. Walsh nor Project Spokane will execute the Subordination Agreement.  The Credit Enhancement Agreement that you cite to in your email below is between BPD and Hyperblock, LLC.  Neither Mr. Walsh nor Project Spokane are parties to this agreement.  Further, neither Mr. Walsh nor Project Spokane ever agreed to subordinate their liens against the assets owned by Hyperblock, LLC.  In this regard, your statement that Mr. Walsh negotiated "the first lien position in the documents with BPD," is patently false.  Other members of the Hyperblock, LLC team represented Hyperblock, LLC in its negotiations with BPD. These undisputed facts will also be brought to the court's attention If BPD attempts to enjoin or disrupt the sale on the grounds that it is entitled to a first priority lien.

As I made clear in my email to you dated May 26, Mr. Walsh and Project Spokane will seek to recover all damages caused by BPD  if the sale is enjoined or disrupted, including damages for lost profits and revenue.

The foregoing is without prejudice to any of Mr. Walsh's and Project Spokane's rights, powers, privileges, remedies and defenses, now existing or hereafter arising, all of which are hereby expressly reserved.

Sincerely,

Peter W. Ito
Ito Law Group, P.C.
1550 Larimer Street, Suite 667
Denver, Colorado 80202
Phone: 720.281.5294
Email: peter@itolawgroup.com
Linkedin:  http://www.linkedin.com/pub/peter-ito/11/66a/15b
Website:  www.itolawgroup.com

**From:** David Bjornson <david@bjornsonlaw.com>
**Sent:** Tuesday, May 26, 2020 9:30 PM
**To:** peter@itolawgroup.com

**Cc:** Jill Broughton <jill@bjornsonlaw.com>; Kassy Buss <kassy@bjornsonlaw.com>
**Subject:** Subordination Agreement

Peter:

As you know, it is our position that Bonner Property Development, LLC ("**BPD**") contracted for and is entitled to a first lien security interest in the new servers owned by Hyperblock and financed by the Bank of Montana loan, which was guaranteed by BPD and its principals.   The first lien position was a key term and material inducement, without which BPD and its principals would not have provided the credit enhancements which facilitated the financing to purchase the new servers.  For your convenience, I have extracted the following pertinent language from the various Agreements with BPD that were negotiated and executed by Mr. Walsh on behalf of Hyperblock:

    a.  Section 1.2 of the Credit Enhancement Agreement provides that:

> "The reimbursement obligation [of Hyperblock to reimburse BPD and its principals] shall be secured by a first lien security interest in the new assets and other improvements that Borrower intends to acquire with the proceeds from the Bank Loan and the New Equity ("Borrower's Pledged Assets").  Borrower shall execute and deliver a security agreement contemporaneously with this Agreement in form and substance acceptable to Pledgor and its counsel ("Security Agreement").   Borrower covenants to obtain lien waivers and releases from contractors and suppliers and to maintain Pledgor's first lien position in Borrower's Pledged Assets at all times.  Any default under the Bank Loan shall also be a default under this Agreement, and Pledgor shall have the remedies provided under the Security Agreement.

    b.  Section 4.1(f) of the Credit Enhancement Agreement further provides that Hyperblock will "execute such financing documents as [BPD] may reasonably request to perfect and continue a first position security interest in Borrower's Pledged Assets in favor of Pledgor."

    c.  The Modification was negotiated and executed by the parties pursuant to a revised plan to purchase "New Servers" as defined therein.  The Modification provides in relevant part that the Security Agreement was "modified to include ALL personal property owned by Tenant which is located currently at the Property (and not just newly acquired New Servers), but specifically excluding all servers owned by Tenant and located on the Property as of the date of this Modification."  (12-31-2019)  The Modification did not eradicate the first lien position to be held on any assets acquired through the Bank of Montana loan.

EXHIBIT 36.(ii)
PAGE 3

Even if the UCC-1 had been filed in December 2019 at the time of the plan to purchase the New Servers, it would have been behind Project Spokane and Sean Walsh in priority under the race statute.  A subordination would have been required to be executed by Sean.  We provide it now, 5 months after the execution of the documents.   The expiration of 5 months does not extinguish the obligation to provide the subordination.

It was and remains the obligation of Hyperblock to obtain and provide BPD with a first position security interest in the subject assets.  To facilitate and correct such breach, please review and ask Sean to execute and deliver the attached subordination agreement.  This document would be executed only by Sean Walsh, the same person that negotiated and executed the first lien position in the documents with BPD.  We are most definitely open to comments and revisions to the subordination agreement.

After the phone call today, I am fully aware of how you may likely respond to this.  I felt it important to provide the contractual provisions as both you and Sean seemed unclear about this key contractual commitment which is clearly set forth in the legal documents.  I also felt it important to provide you and Sean with the path to rectify the failure to provide the subordination.   It would have no different effect if executed now vs being executed in January.

There was a lot of anger today.  I am not sure how you and Sean expected BPD to respond to this situation, without notice or knowledge of any plan to protect them.  I would ask you to put the shoe on the other foot and ask what would you and Sean have done in the reverse situation.

We have meetings tomorrow to discuss things further, based in part on the phone call.

David

_____

**David H. Bjornson**

**Bjornson Jones Mungas, PLLC**
**2809 Great Northern Loop, Suite 100**
**Missoula, Montana  59808**
**(406) 721-8896**
**(406) 541-8037--fax**
http://www.bjornsonlaw.com/attorneys/david-h-bjornson/
Email:  david@bjornsonlaw.com
*CONFIDENTIALITY NOTICE:  The information contained in this email message may be privileged or confidential information and is intended only for the use of the individual or entity named above.  If you have received this communication in error, please notify us immediately by telephone and delete the message from your system.*

EXHIBIT 36.(ii)
PAGE 4

This email has been scanned for email related threats and delivered safely by Mimecast.
For more information please visit http://www.mimecast.com

EXHIBIT 37.
PAGE 1

**From:** David Bjornson
**Sent:** Sunday, May 31, 2020 6:06 PM
**To:** inder@hyperblock.co; hans.rizarri@crowesoberman.com; Jaymie Bowditch <jbowditch@boonekarlberg.com>
**Cc:** Jill Broughton <jill@bjornsonlaw.com>; Kassy Buss <kassy@bjornsonlaw.com>; Nick Jones <nickjones@bjornsonlaw.com>
**Subject:** Notice of Default - Hyperblock

Attached is a Notice of Default respecting the lease for the premises in Bonner, Montana as well as certain other agreements between Hyperblock LLC and Bonner Property Development, LLC.   It will also be sent by US Mail.   Please contact me if you have any questions or wish to discuss it.   David

_____

## David H. Bjornson

**Bjornson Jones Mungas, PLLC**
**2809 Great Northern Loop, Suite 100**
**Missoula, Montana  59808**
**(406) 721-8896**
**(406) 541-8037--fax**
**http://www.bjornsonlaw.com/attorneys/david-h-bjornson/**
Email:  david@bjornsonlaw.com
*CONFIDENTIALITY NOTICE:  The information contained in this email message may be privileged or confidential information and is intended only for the use of the individual or entity named above.  If you have received this communication in error, please notify us immediately by telephone and delete the message from your system.*

**BJM** **BJORNSON JONES MUNGAS**
P L L C

2809 Great Northern Loop, Suite 100
Missoula, Montana 59808
Telephone (406) 721-8896 • Fax (406) 541-8037 • bjorlaw@bjornsonlaw.com

May 31, 2020

_**SENT VIA USPS PRIORITY MAIL, DELIVERY CONFIRMATION AND BY EMAIL**_

Hyperblock LLC
140 Yonge Street, #209
Toronto, ON M5C 1X6
Attention: Inder Saini
inder@hyperblock.co

Hyperblock, Inc.
2 St. Claire Avenue East, Suite 1100
Toronto, ON M4T 2T5
Attention: Hans Rizarri
hans.rizarri@crowesoberman.com

James A. Bowditch
Boone Karlberg P.C.
PO Box 9199
Missoula, MT 59807-9199
jbowditch@boonekarlberg.com

RE:   **NOTICE OF DEFAULT AND NOTICE OF INTENT TO INSPECT PREMISES**

Ladies and Gentlemen:

We represent Bonner Property Development, LLC ("BPD") and its principal, Stephen Nelson and Michael Boehme, regarding certain agreements between HyperBlock LLC, a Delaware limited liability company ("HyperBlock"), and BPD. These agreements include the following (each as modified by that certain Modification of Lease Agreement, Credit Enhancement Agreement, Security Agreement and Side Letter to Third Amendment to Lease Agreement dated December 31, 2019 (the "Modification")): the Security Agreement dated December 13, 2018 (the "Security Agreement"); the Credit Enhancement Agreement dated December 31, 2019 (the "Credit Enhancement Agreement"); and the Commercial Lease Agreement dated March 1, 2016, as amended by multiple amendments (the "Lease") for the leasing of certain real property owned by BPD and more particularly described in the Lease (the "Premises"). Collectively, all of the foregoing may be referred to herein as the "BPD Agreements").

You are hereby provided this **NOTICE OF DEFAULT AND DEMAND TO CURE WITH REGARDS TO CERTAIN BREACHES OF HYPERBLOCK UNDER THE BPD AGREEMENTS**. HyperBlock's breaches and defaults under the BPD Agreements include, but are not limited, to the following:

1.   BPD received a notice dated May 19, 2020 (the "Notice") that Project Spokane, LLC, a Colorado limited liability company ("Project Spokane"), and Sean Walsh ("Walsh") intend to hold a public sale (the "Sale") to dispose of certain assets belonging to or used by HyperBlock, some of which assets are included in a first lien security interest granted by Hyperblock, and some of which assets are actually property belonging to BPD under the BPD Agreements. This constitutes a default under the BPD Agreements, including the Lease and the Security Agreement.

2.   Hyperblock and BPD agreed in the BPD Agreements that certain assets such as fixtures and certain items of personal property would remain with the Premises at the termination of the Lease. The Notice indicates this property is alleged to be subject to a lien in favor of Walsh and Project Spokane and this property is intended to be sold as a part of HyperBlock's assets at the Sale. The filing of a lien on property of BPD and the sale or attempted sale of assets, which by agreement and by law, are currently the property of BPD or will become BPD's property at the termination of the Lease, or are fixtures and constitute real property and not personal property, constitutes a default under the Lease. Hyperblock's defaults under the Lease have resulted in defaults under the Credit Enhancement Agreement and the Security Agreement;

May 31, 2020
RE:  Notice of Default

EXHIBIT 37.
PAGE 3

3.   BPD received a default notice from Bank of Montana dated May 26, 2020, related to HyperBlock's default under the Bank of Montana loan. Such default, if uncured, constitutes a default under the Credit Enhancement Agreement and the Security Agreement.

4.   HyperBlock has failed to make payments for utilities related to HyperBlock's use of the Premises, including by defaulting under the contract between HyperBlock and Energy Keepers, Inc. ("EKI"), which contract was terminated by EKI. This constitutes a breach of the Lease.

5.   BPD has received information that HyperBlock may be insolvent.  It has failed to pay its power utility bills, resulting in litigation by its power supplier, its authorized officer disclosed to us impending bankruptcy proceedsings, and communications to HyperBlock by email were met with an automatic response which reads as follows: "Please note that Hyperblock has filed an assignment into Bankruptcy. All emails are officially off.   For any further contact, contact the trustee in bankruptcy:

Crowe Soberman LLP:

Hans Rizarri
Hans.Rizarri@crowesoberman.com"

This constitutes a default under the Lease.

6.   The Security Agreement in (Section 1) and the Credit Enhancement Agreement (in Section 4.1.f.) contain affirmative covenants related to HyperBlock's obligation to "[e]xecute such financing statements and other documents as [BPD] may reasonably request to perfect and continue a first position security interest in Borrower's Pledged Assets in favor of [BPD]." HyperBlock has failed to ensure BPD's first position security interest, as evidenced by the failure of Sean Walsh or Project Spokane to recognize the contractually committed first lien security interest in the Notice for the Sale.

7.   BPD has become aware that HyperBlock made material representations and warranties in connection with the BPD Agreements and the Bank of Montana loan that were materially false at the time made, which constitutes a default under the Credit Enhancement Agreement, as well as to each BPD Agreement as to false material representations made respecting the same;

In addition to the foregoing, there may be additional defaults not named herein. By not naming such other defaults, BPD does not waive any rights granted under the BPD Agreements or applicable laws and/or regulations.

In accordance with the terms of the BPD Agreements, BPD hereby demands that HyperBlock cure the defaults that are subject to cure within the times required under the BPD Agreements and gives HyperBlock notice of BPD's intent to exercise any and all remedies available to BPD under the BPD Agreements or at law or in equity, as a secured creditor or otherwise. These include but are not limited to termination of any or all of the BPD Agreements and exercise of BPD's rights as a secured creditor, including but not limited to the right to require assembly of the collateral, enter the Premises and take possession of the collateral, and sell the collateral.

Please contact us immediately to discuss options with us. HyperBlock's failure to promptly address these defaults will result in additional attorneys' fees and costs, and our clients are prepared to exercise their legal remedies. If you do not contact us by **June 30, 2020, at 5:00 p.m. Mountain Time**, we will pursue legal action for all amounts due under the BPD Agreements, including attorneys' fees and costs of collection, and proceed with the next steps to collect the amounts due, which may include foreclosing against the collateral and proceedings to terminate the Lease.

We sincerely hope you will give your immediate attention to this matter to resolve this matter in the least costly way possible. Please contact me directly if you require any additional information.

May 31, 2020
RE:  Notice of Default

EXHIBIT 37.
PAGE 4

**NOTICE OF INTENT TO ACCESS PREMISES**: Pursuant to Section 9 of the Lease, BPD hereby provides written notice of its intent to access the Premises for the purpose of inspecting the Premises on **Monday, June 1, 2020, at 6:30 p.m. (local time).**

Sincerely,
BJORNSON JONES MUNGAS, PLLC

David H. Bjornson
david@bjornsonlaw.com

DHB:az

C:  Bonner Property Development, LLC

5/31/2020    Hyperblock Bitcoin Mining Servers and Datacenter Infrastructure to Be Auctioned off in Public Sale | Sponsored Bitcoin News

Case 9:20-cv-00082-DWM   Document 1-10   Filed 06/09/20   Page 213 of 262

EXHIBIT 38.(i)
PAGE 1

![Bitcoin.com](https://www.bitcoin.com/) **Bitcoin.com** (https://www.bitcoin.com/)  ≡

# NEWS (/)

May 31, 2020

itcoin.com/crypto/ETH)　　XRP $0.21 +2.90% (https://markets.bitcoin.com/crypto/XRP)　　BCH $

Your ad here (http://www.bitcoin.com/advertise)

(https://news.bitcoin.com/linkout/388205)

SPONSORED (HTTPS://NEWS.BITCOIN.COM/CATEGORY/SPONSORED/)

by **Bitcoin.com PR** (https://news.bitcoin.com/author/bitcoin-com-pr/)　　*May 20, 2020*

# Hyperblock Bitcoin Mining Servers and Datacenter Infrastructure to Be Auctioned off in Public Sale



Case 9:20-cv-00082-DWM   Document 1-10   Filed 06/09/20   Page 214 of 262

EXHIBIT 38.(i)
PAGE 2

**Thousands of mining servers and all the datacenter infrastructure needed to operate them will be auctioned off in an upcoming public sale of Hyperblock's property. The company has announced on Thursday, May 14, 2020, that its 20MW Montana, USA datacenter went offline and that it has ceased all cryptocurrency mining operations.**

# Hyperblock Equipment Public Sale

The senior secured lenders to Hyperblock LLC, Project Spokane and Sean Walsh, will conduct a public sale of the company's property on June 3, 2020 via conference call (see notice here for details (https://itolawgroup.com/hyperblock)). On auction will be all of Hyperblock's servers with their PSUs, including: 791 Bitmain Antminer S17 servers, 359 Bitmain Antminer S17 Pro servers, 1493 Bitmain Antminer S17+ servers, 6641 Bitmain Antminer S9 servers, 726 Bitmain Antminer T17 servers, 162 Avalon921 servers and 161 GPU servers.

The auction will also include all of Hyperblock's datacenter infrastructure, including: 423 Acme Engineering 36" fans, 30 Grainger/ACME Engineering 42" fans, 14 ACME Engineering 60" fans, 8 2,500kVA indoor Switchgear lineups (aka indoor substations), 55 500kVA indoor transformers, 3 750kVA indoor transformers, 3,124 misc PDUs, 339 225A breaker panels, 6 400A breaker panels, 560 (8' wide, 9' tall) shelving racks, 6,374 new Delta 2400W PSUs, 374 used Delta 2400W PSUs and 1,420 brand new Delta 2400W PSUs with 10, 16" PCIe cables soldered on. Additionally included are enough electrical cabling and computer network equipment to run 13,000 servers in about 120k square feet of space.

YouTube Video of Datacenter:

(Note: some of the statistics shown in this video are outdated)

# Terms of the Auction

The lenders have the first priority security interest in the property. They may bid for it and credit bid against all or a portion of its secured claim. The property will be sold free and clear of the lenders' liens and any subordinate security interests in the property. In order to participate in the auction process, each potential bidder must deliver an executed confidentiality agreement and current financial statements or other evidence of the ability to purchase the property.

A qualified bidder will be permitted to perform due diligence by contacting the counsel for the lenders (contact information below). At the Sale, the property will be sold at a public auction to the highest qualified bidder. Higher bids will continue to be entertained until the lenders have determined that they have received the best bid for the property in their sole discretion. The lenders reserve the right to reject all bids and terminate as they may deem proper.

The property will be sold as is, with all faults and without any warranties whatsoever, expressed or implied. No person shall be entitled to any expense reimbursement, brokerage fee, break up fee, "topping," termination or similar fee or payout from the proceeds of the sale.

The public sale may be postponed. In such event, an announcement of the scheduled sale will be made at the currently proposed date and time of the sale. Check out the notice here for more details (https://itolawgroup.com/hyperblock).

Case 9:20-cv-00082-DWM   Document 1-10   Filed 06/09/20   Page 216 of 262

EXHIBIT 38.(i)
PAGE 4

**Attorney Contact Information:**

**Peter W. Ito**
**1550 Larimer Street, Suite 667**
**Denver, CO 80202**
**hyperblockassets@gmail.com**
**(720) 281-5294**
**Click here for more details (https://itolawgroup.com/hyperblock).**

Case 9:20-cv-00082-DWM   Document 1-10   Filed 06/09/20   Page 217 of 262

EXHIBIT 38.(i)
PAGE 5

BitAmp - The Next New Open Source Wallet (https://news.bitcoin.com/bitamp-the-next-new-open-source-wallet/)

John McAfee Announces Privacy Coin – Airdrop Today (https://news.bitcoin.com/john-mcafee-announces-privacy-coin-airdrop-today/)

## TAGS IN THIS STORY

Antminer (https://news.bitcoin.com/tag/antminer/), antminers (https://news.bitcoin.com/tag/antminers/), Auction (https://news.bitcoin.com/tag/auction/), Hyperblock (https://news.bitcoin.com/tag/hyperblock/), Mining Servers (https://news.bitcoin.com/tag/mining-servers/), public sale (https://news.bitcoin.com/tag/public-sale/)

*Image Credits*: Shutterstock, Pixabay, Wiki Commons

Purchase Bitcoin without visiting a cryptocurrency exchange. Buy BTC and BCH **here (https://news.bitcoin.com/linkout/379014)**.

**READ DISCLAIMER**  |  **CLICK HERE TO COMMENT**

*Most Popular*

5/31/2020     Hyperblock Bitcoin Mining Servers and Datacenter Infrastructure to Be Auctioned off in Public Sale | Sponsored Bitcoin News

Case 9:20-cv-00082-DWM   Document 1-10   Filed 06/09/20   Page 218 of 262

EXHIBIT 38.(i)
PAGE 6



(https://news.bitcoin.com/gofrom/most_popular/china-law-cryptocurrency-inheritance)
## China Passes Law Protecting Cryptocurrency Inheritance

(https://news.bitcoin.com/gofrom/most_popular/china-law-cryptocurrency-inheritance)
NEWS | 1 day ago

---

### Bitcoin Fees Fall 60% While Transaction Count Declines

(https://news.bitcoin.com/gofrom/most_popular/bitcoin-fees-fall-60-while-transaction-count-declines)
MARKETS AND PRICES | 2 days ago

---

### Bitcoin Hashrate Bounces Back- 2x the Mining Pools, Farm Diversification, 100 Exahash

(https://news.bitcoin.com/gofrom/most_popular/bitcoin-hashrate-bounces-back-2x-the-mining-pools-farm-diversification-100-exahash)
MINING | 2 days ago

---

### Grayscale Bitcoin Trust Buys Over 1.5 Times Total BTC Mined Since Halving

(https://news.bitcoin.com/gofrom/most_popular/grayscale-bitcoin-trust-buys-1-5-times-total-btc-mined)
NEWS | 3 days ago

---

### South Korea to Start Taxing Bitcoin Profits in 2021

(https://news.bitcoin.com/gofrom/most_popular/south-korea-to-start-taxing-bitcoin-profits-in-2021)
TAXES | 2 days ago

---

### American Panic Led to the Creation and Expansion of the Corrupt Federal Reserve System

(https://news.bitcoin.com/gofrom/most_popular/american-panic-led-to-the-creation-and-expansion-of-the-corrupt-federal-reserve-system)
OP-ED | 1 day ago

## *Latest News*

With Riots Erupting in US Cities, Using Tools of Peaceful Protest Can be More Meaningful
(https://news.bitcoin.com/with-riots-erupting-in-us-cities-using-tools-of-peaceful-protest-can-be-more-
meaningful/)

Amid Youtube Censorship, Individuals Flock to Decentralized Video Sharing Apps Like Lbry.tv
(https://news.bitcoin.com/amid-youtube-censorship-individuals-flock-to-decentralized-video-sharing-
apps-like-lbry-tv/)

American Panic Led to the Creation and Expansion of the Corrupt Federal Reserve System
(https://news.bitcoin.com/american-panic-led-to-the-creation-and-expansion-of-the-corrupt-federal-
reserve-system/)

China Passes Law Protecting Cryptocurrency Inheritance (https://news.bitcoin.com/china-law-
cryptocurrency-inheritance/)

Bitcoin Fees Fall 60% While Transaction Count Declines (https://news.bitcoin.com/bitcoin-fees-fall-60-
while-transaction-count-declines/)

Bitcoin Hashrate Bounces Back- 2x the Mining Pools, Farm Diversification, 100 Exahash
(https://news.bitcoin.com/bitcoin-hashrate-bounces-back-2x-the-mining-pools-farm-diversification-100-
exahash/)

Bitpay Has 'No Current Plans' to Support Liquid or the Lightning Network (https://news.bitcoin.com/bitpay-
has-no-current-plans-to-support-liquid-or-the-lightning-network/)

EXHIBIT 38.(i)
PAGE 8

EXHIBIT 37.(ii)
PAGE 1

 Twitter › SeanWalshBTC

 Sean Walsh



Attention Bitcoin Miners! On June 3, 2020, there will be an auction for an entire 20MW crypto mining operation in Montana (telephone auction). Here's a video of the datacenter: lnkd.in/eaB9j7V Full Details Here: lnkd.in/eHXrvJ3

2 days ago

EXHIBIT 38.(iii)
PAGE 1

# The Bitcoin Barons: How a marketer and a money launderer sold Montana on digital gold



Derek Brouwer
Follow

Oct 26, 2018 · 29 min read

This story was originally published in the Missoula Independent on Jan. 25, 2018.

# March 6, 2017: 1 Bitcoin = $1,270

Sweat glistens on Sean Walsh's brow as he begins his pitch. He's standing in the circular Al Falak ballroom at the Burj Al Arab, one of the world's most extravagant hotels. Built on its own man-made island, where guests are transported by a fleet of white Rolls-Royces, the Dubai resort is shaped like a lateen sail pressing into the Persian Gulf, a symbol for a city on the leading edge. Everything in the ballroom seems to glitter; the hotel features 22,000 square feet of 24-karat gold gilding.

The gold that Walsh is pitching can't be seen, but its emerging power is on full display. Bitcoin first took off as the currency of drug sales and get-rich-quick scams. But by March 2017, 570,000

https://medium.com/@derekbrouwer/the-bitcoin-barons-how-a-marketer-and-a-money-launderer-sold-montana-on-digital-gold-2a255c96c981

EXHIBIT 38.(iii)
PAGE 2

people had digital wallets containing at least one bitcoin, including some of the biggest names in tech. The value of the world's first cryptocurrency had tripled in the previous year, and would balloon many times over in the following months.

Walsh is a marketer who is remaking himself as a "crypto-industry luminary," as the speakers at this World Blockchain Forum are billed. He looks slick with a scruffy beard, blue tie and buttoned black suit. Part Silicon Valley casual, part Wall Street hedge fund manager, Walsh's appearance fits his biography as a California man who left an executive position in private equity to start an angel investment firm, Redwood City Ventures, dedicated to promoting bitcoin to the masses. "I brought something for the group," he begins, striding past the podium. He reaches his left hand to his back pocket, then passes a small bag to his right hand and holds it above his head. The bag is full of cowrie shells, which, he reminds his audience of businessmen and industry insiders, was humankind's first form of money. Walsh asks a man at the front table if he'll sell his watch for the shells. When he declines, Walsh pulls out a second bag and drops both on the table.

"I'm trying to make a point here," he says.

His delivery is more polished six months later, when he sells a similar pitch to an audience in London: "The point is that we've lost trust in cowrie shells as money, despite the fact that they've been used for 12,000 years. Money moves on. People move on to

https://medium.com/@derekbrouwer/the-bitcoin-barons-how-a-marketer-and-a-money-launderer-sold-montana-on-digital-gold-2a255c96c981

EXHIBIT 38.(iii)
PAGE 3

new forms of money. They moved on to gold, they moved on to fiat currency. We're now moving into electronic money."

Bitcoin is the best form of money ever devised, Walsh tells the crowd, but it can only be as good as the faith society places in it. "So we need a sales pitch," he continues. "We need to speak to our target customers in a language … that will resonate with them and will get them to feel the way we want them to feel, get them to act the way we want them to act."

Walsh's idea is to use affiliate sales reps to help convince more people to convert cash into digital currency. He predicts a return on investment of 28,000 percent as new users drive up bitcoin's price. "I can tell you, even as a Silicon Valley venture capital investor, this type of opportunity is not out there," he says. It has existed before, though: in Countrywide Financial, the so-called 23,000 percent stock, where Walsh managed customer acquisitions in 2007 just as the lender's subprime mortgage bubble burst. But the conversion campaign is only part of Walsh's plan. The far bigger part, the one he alludes to as the "foundation" of his effort to take bitcoin mainstream, is half a world away, humming in an old lumber yard next to the Blackfoot River, minting more invisible money than any place else in North America.

Few people know how Montana became a mother lode in bitcoin's digital gold rush. It took a blunder, days before Walsh's talk in

https://medium.com/@derekbrouwer/the-bitcoin-barons-how-a-marketer-and-a-money-launderer-sold-montana-on-digital-gold-2a255c96c981

EXHIBIT 38.(iii)
PAGE 4

Dubai, for the public to even learn that bitcoin is being mined here. The story is as familiar to Montana as bitcoin is new. It also has striking parallels to the story of cryptocurrency itself. But it's not quite the story Walsh likes to tell.

# June 8, 2011: 1 Bitcoin = $29.60

The way Yan Ebyam entered the greenhouse on the outskirts of Sacramento seemed like a tell. He opened its wide door just enough to slide in sideways, then pulled it shut behind him. Or so it looked to the three undercover agents watching from their car a hundred yards away, who wanted a glimpse inside.

It wasn't going to be that easy to pin down the man whose first name stands for "yes and no," and whose last name spells "maybe" backward. So the driver pulled into the florist office out front and went inside to buy some flowers. While the driver was inside, the other two agents walked up to the silver Mercedes-Benz they'd seen Ebyam driving and attached a GPS tracker to it.

The agents had been led here by a woman at a renowned tomato farm 40 miles north, who told a local sheriff's deputy that Ebyam had "taken advantage" of her. She and Ebyam had been growing more than 4,000 marijuana plants on the farm, but she said

Ebyam ran off with most of the plants shortly after their landlord expressed concern to the deputy that he was acting strangely.

The federal indictments that followed that June stakeout marked a disastrous turnabout for a man who, only months earlier, had been one of the country's boldest marijuana entrepreneurs. Starting in 2008, Ebyam set up some of the country's largest indoor cannabis farms in defunct Oakland warehouses, angling to obtain one of the industrial-scale licenses city officials were planning to issue. Workers at one of his farms even unionized. Today, that business seems almost visionary, but at the time it relied on an interpretation of California's medical marijuana law that strained credulity. When the City of Oakland abandoned its plan under federal pressure, Ebyam disappeared to the tomato farm, one of what "the feds saw [as] unscrupulous operators on the fringes stuffing their pockets with cash," Peter Hecht writes in his 2014 book, Weed Land.

He definitely had an opportunistic streak. After the dot-com crash in 2002, Ebyam, then in his early 20s, and a business partner helped liquidate the surplus computer equipment that bankrupt Silicon Valley companies were offloading. They did plenty of legitimate business initially, but in 2004 they were indicted on federal money laundering charges for what a U.S. attorney later described as a "jaw-dropping conspiracy" to sell more than $6 million in stolen Cisco servers. They'd brokered the deals through

https://medium.com/@derekbrouwer/the-bitcoin-barons-how-a-marketer-and-a-money-launderer-sold-montana-on-digital-gold-2a255c96c981

a gang member with connections to a trucking warehouse, then created phony invoices to cover their tracks.

To those who encountered him, however, Ebyam came across as more eccentric than diabolical. As a kid growing up in northern California, he stayed inside surfing the web while his brother surfed waves, he told the writer of a profile republished in the New York Times. "He blurts out his thoughts in rapid fire and is highly intelligent but pays little attention to matters like clothing or social cues," the reporter wrote, adding that Ebyam had ordered milk and cookies during a coffee shop interview. Prosecutors called him "brilliant," a trait that was also palpable to former business partners and acquaintances interviewed by the Indy.

As his marijuana case played out in federal court, Ebyam lived with his mother for a few months before going back to his old line of work in electronics resale. During that time, he did "millions of dollars of business" as a broker for a Silicon Valley company called Prism Electronics, its CEO, John Mauro, says.

Then Ebyam got a chance to try something new.

# January 14, 2014: 1 Bitcoin = $842

https://medium.com/@derekbrouwer/the-bitcoin-barons-how-a-marketer-and-a-money-launderer-sold-montana-on-digital-gold-2a255c96c981

EXHIBIT 38.(iii)
PAGE 7

Walsh says the story of how he met Ebyam is too long to tell, but that both men were interested in a radical technology that was starting to generate attention around the edges of Silicon Valley.

Helping bitcoin get noticed was a man named Roger Ver, who had been plugging it in a hokey but eye-catching way: on the billboard he rented beside an expressway in Santa Clara. One of his ads touted bitcoin as "the honey badger of money," in reference to a viral YouTube video celebrating the species' fearlessness and snake-eating badassery. The tagline pointed to why people like Ver, whose evangelism had earned him the moniker "Bitcoin Jesus," were ecstatic about cryptocurrency. Ver was a fervent libertarian (he once ran for the California state assembly under the party banner), and bitcoin represented a way that average people could take down the central banking system.

The key was the ingenious way the bitcoin software had been written and introduced, anonymously, in 2008. In basic terms, the software allows users to exchange data, i.e., bitcoin, without requiring a middleman to verify the transaction. Instead, verification records are logged in a public database, called the blockchain, that's managed by the independent computers on the bitcoin network. There's no need for a federal reserve because the network's open-source code calls all the shots.

Like Ebyam, Ver was in the computer resale business, which he also entered in his early 20s in the dotcom bubble's wake. His

https://medium.com/@derekbrouwer/the-bitcoin-barons-how-a-marketer-and-a-money-launderer-sold-montana-on-digital-gold-2a255c96c981

EXHIBIT 38.(iii)
PAGE 8

company, Memory Dealers, became the first anywhere to accept payment in bitcoin — a service he advertised prominently on his highway billboard. In 2012, he started the first public bitcoin meetups in Sunnyvale, where early enthusiasts could chat about the technology and the curious could get initiated.

Bitcoin was gaining notice around the world, for better and worse. Some people, like Ver, saw a financial revolution brewing, while others wanted to cash in on the next big thing. Bitcoin's price rocketed on new exchanges. The U.S. government busted ponzi schemes and unraveled the first large, online black market to use bitcoin, Silk Road, which had enabled users to buy and sell drugs anonymously. Some prominent voices in finance, including JPMorgan Chase CEO Jamie Dimonand Warren Buffett, started pushing back against the buzz.

Bitcoin was programmed so that only a certain number — 21 million — can ever exist. However, they don't just appear out of thin air. They're released into circulation steadily over time as rewards to members who help maintain the network. Bitcoin transactions are verified by computers guessing the answers to difficult puzzles. When a computer finds the right answer, the associated transactions are entered into the public ledger and the miner receives a reward in the form of a newly minted bitcoin. The process is known as mining.

https://medium.com/@derekbrouwer/the-bitcoin-barons-how-a-marketer-and-a-money-launderer-sold-montana-on-digital-gold-2a255c96c981

EXHIBIT 38.(iii)
PAGE 9

Mining is one of the technology's most elegant features, but the industry that was springing up around it resembles an arms race. As in any extraction industry, people saw bitcoin mining as a way to acquire the currency at a discount while providing a service to the network. Anyone with a computer could profitably mine in the early days, but as more people joined the race and manufacturers started developing specialized mining computers, only industrial-scale operations stood a chance to win the rewards. Authors Paul Vigna and Michael Casey wrote in their 2015 book, The Age of Cryptocurrency, that "there seems to be no shortage of people who think that bitcoin, as some in the community like to say, is headed 'to the moon' and that mining is their ticket to those riches."

Walsh and Ebyam decided to join up to punch their tickets. The business model was simple. Walsh calls it "self-mining." They'd fill a warehouse with servers, mint digital money and pocket the profits.

At the same time, bitcoin advocates were trying to slough off the associations with money laundering and drugs that had tainted the currency's public image. So it was risky for Walsh, a marketing professional at Bertram Capital, a $1.3 billion private equity firm, to go into business with someone who had a federal rap sheet containing both types of offense. But Walsh says he saw Ebyam as a "mad scientist" who was otherwise naive to the world. He decided to find a way to make it work.

https://medium.com/@derekbrouwer/the-bitcoin-barons-how-a-marketer-and-a-money-launderer-sold-montana-on-digital-gold-2a255c96c981

EXHIBIT 38.(iii)
PAGE 10

"Sometimes people are so open and so trusting that they don't know what they get themselves into," Walsh says. "And I think Yan falls into that category."

Plus, each seemed to bring complementary skills to the project: Ebyam knew computer equipment and had managed large warehouses. Walsh worked with startups that his firm had funded. Walsh rounded up $850,000 from four investors, including himself and a relative, and in January formed a company called Aquifer. The company's success would depend on three factors: how efficiently its servers could win bitcoin (a metric known as "hashrate"); equipment and overhead costs; and the value of the bitcoin their servers won. The price of cooling and power tended to dictate where bitcoin mines were located. Most were overseas, in places like Iceland or China, where electricity was cheap.

Walsh and Ebyam figured they could do it in Silicon Valley's backyard.

---

# March 12, 2014: 1 Bitcoin = $637

At first they didn't tell their landlord exactly what they were planning to do. Debbie Olson, executive director of the Riverbank Local Redevelopment Authority, knew only that the men wanted

EXHIBIT 38.(iii)
PAGE 11

to install a server farm when she offered Aquifer a lease in March 2014. "They were quite secretive," Olson says.

She remembers that they became interested in the site, part of a former army munitions plant that Olson manages as an industrial park for the small city 100 miles east of San Jose, while visiting to look at used equipment for sale by another tenant. The long, narrow warehouses oozed PCBs, but the property's access to cheap hydroelectric power from Hetch Hetchy Reservoir caught their attention.

Olson soon learned that Ebyam was under a couple of indictments, which were still winding through court, and refused to let him sign any lease documents or official correspondence. Walsh was Aquifer's CEO, but he still had his day job at Bertram, so a coworker from the firm, Anthony Brough, left to become Aquifer's chief financial officer and public face. Ebyam was hired as an independent contractor as the facilities engineer.

The mine they began constructing seemed to reflect the idiosyncrasies of its designer. Photos of the interior taken by technicians for Olson's group show servers set inside plywood enclosures and cooled by rows of box fans. The fans kicked up dust throughout the complex, while the whole setup sounded like a jet engine running nonstop in an airplane hangar. Aquifer quickly became the bane of other tenants. It didn't help that Ebyam, who

https://medium.com/@derekbrouwer/the-bitcoin-barons-how-a-marketer-and-a-money-launderer-sold-montana-on-digital-gold-2a255c96c981

EXHIBIT 38.(iii)
PAGE 12

worked odd hours, had a habit of wandering all over the complex at night in his rumpled t-shirts.

Aquifer also installed a misting system for additional cooling, Olson says, which she worried could cause problems near all that electricity. After several small fires broke out in the wooden racks, the redevelopment authority brought in consultants to inspect the arrangement for compliance with health and building safety codes.

"They most certainly scratched their heads and said, 'We've never seen a server farm like this. This is just so unusual,'" Olson says.



https://medium.com/@derekbrouwer/the-bitcoin-barons-how-a-marketer-and-a-money-launderer-sold-montana-on-digital-gold-2a255c96c981

EXHIBIT 38.(iii)
PAGE 13



Interior of Aquifer bitcoin mine in Riverbank, Ca. Photo courtesy Riverbank LRA

But it was cheap, and DIY server farms were the name of the bitcoin mining game. Whereas traditional data centers emphasized reliability and backup power sources, the dog-eat-dog competitiveness of bitcoin mining encouraged stripped-down facilities that squeezed in as many servers as possible and cooled them cheaply. "Sometimes you hesitate to call these buildings data centers," one cooling equipment supplier told online industry site Data Center Knowledge in July 2014.

Aquifer brought 5 MW online, Walsh says — enough to power about 5,000 homes at any given moment. Aquifer at one point claimed it was operating the largest bitcoin mining farm in the U.S., according to a promotional video posted to YouTube. In January 2015, Brough, the CFO, introduced Aquifer at the North

EXHIBIT 38.(iii)
PAGE 14

American Bitcoin Conference as operating a "conglomerate" of California data centers with 28 MW of power and "considerable additional headroom."

Brough may have been getting ahead of himself, but Aquifer's team was nothing if not audacious. And they were looking to expand. In Oakland, after a string of suspicious burglaries at one of his marijuana grow operations, Ebyam had reportedly dragged a mattress into the warehouse office, along with a foghorn to deter thieves who would try to sneak in from the roof at night. At the industrial park, Ebyam was the one walking the roofs of abandoned buildings, explaining to Olson that he was scoping out additional space.

---

# March 4, 2015: 1 Bitcoin = $278

Walsh was escorting his elderly mother-in-law through the federal court building in San Jose when a man named Christopher Kilday saw his chance to confront him. Kilday, an equipment salesman, was owed a commission for a sale he'd brokered for Aquifer. Kilday snapped pictures with his phone as he taunted Walsh. "Hey! Hong Kong Sean!" he said, according to court filings. "You brought your mother to court?! Hey, old lady! Walk carefully!" Security had to intervene.

https://medium.com/@derekbrouwer/the-bitcoin-barons-how-a-marketer-and-a-money-launderer-sold-montana-on-digital-gold-2a255c96c981

EXHIBIT 38.(iii)
PAGE 15

By March 2015, Kilday was the least of Walsh's concerns. Bitcoin had soared to $1,200 when Walsh and his partners hatched their mining operation in early 2014. But just before Walsh signed the lease at the old munitions plant, the world's largest bitcoin trading exchange, Mt. Gox, filed bankruptcy after revealing that $460 million in bitcoin had been stolen by hackers. Bitcoin's value was halved virtually overnight. As Aquifer mined, the price continued to decline.

By the time the North American Bitcoin Conference rolled around in January 2015, all the gains made during Bitcoin's first run toward broader buy-in had evaporated. The mood was glum among the panel of mine operators. Yet Brough called the price collapse a "glorious opportunity" for mining companies, like his, that had been "conservative" in their business plans.

"We wouldn't be in this business if we didn't believe in the long-term prospects for bitcoin," he told the crowd.

https://medium.com/@derekbrouwer/the-bitcoin-barons-how-a-marketer-and-a-money-launderer-sold-montana-on-digital-gold-2a255c96c981

EXHIBIT 38.(iii)
PAGE 16



Aquifer mining hardware. Photo courtesy Riverbank LRA

https://medium.com/@derekbrouwer/the-bitcoin-barons-how-a-marketer-and-a-money-launderer-sold-montana-on-digital-gold-2a255c96c981

EXHIBIT 38.(iii)
PAGE 17

But mining companies also had high capital expenses — in real dollars. With their revenue in bitcoin, they'd have to sell bitcoin to pay the bills. Some observers in the press feared that would drive the price down further.

Three weeks later, Aquifer filed for Chapter 11 bankruptcy. Bankruptcy documents show the company had generated and converted bitcoins into $1.4 million over roughly nine months of mining. With bitcoin prices tanking, it wasn't enough to keep the company afloat.

Exchange rates alone don't explain the company's fall, according to two of its largest creditors. The business model made sense to Andy Faris, a business acquaintance of Ebyam's who later loaned Aquifer $300,000. He knew computer hardware, and thought an ultra-low-cost facility for turning bitcoin to cash could make him some money. But Aquifer had piled on debt to build out the data center without any Plan B in case something went wrong — if servers broke down or expansion plans hit delays or the price of bitcoin dropped, Faris says. Faris says his notes show that it took only weeks for him to realize that the management of the company was as precarious as its server racks. He sought to take over management duties to try to right the ship, but Walsh — in what Faris calls "self-preservation mode" — filed bankruptcy instead.

"The company was playing with a lot of other people's money in a very cavalier fashion," Faris says.

https://medium.com/@derekbrouwer/the-bitcoin-barons-how-a-marketer-and-a-money-launderer-sold-montana-on-digital-gold-2a255c96c981

EXHIBIT 38.(iii)
PAGE 18

Aquifer's landlord, a public entity, had been concerned for even longer. Olson says her agency often negotiated with tenants who ran into cash-flow problems. Aquifer, however, asked for concessions "from the beginning." Eventually, Olson began to feel strung along. She had trusted Brough, but he quit Aquifer shortly after the bankruptcy filing (Brough did not return several emails). Walsh took over as the face of the company, and the things he said to Olson didn't seem to bear out. "He just seemed slick, the kind of person that your antenna is up," she says.

Aquifer told the bankruptcy judge that the company's fate was caused by delays in getting permits to supply power to the servers it was setting up in three other buildings at the site. Certain creditors took "aggressive collection actions" when they didn't receive payment, forcing the company's managers to seek legal protection so they could reorganize.

Bankruptcy filings show that Aquifer LLC's majority partner was Chris Cunningham, a project manager at the Walt Disney Company (Cunningham didn't respond to an email for comment). Walsh, the CEO, held about a quarter interest, and one of his relatives held another 11-percent stake and was owed $300,000 for a loan at the time of bankruptcy.

Ebyam had no equity in the company, but he wasn't just an independent contractor, either. Bankruptcy documents list an outstanding debt of $130,000, as well as a mining profit-share

EXHIBIT 38.(iii)
PAGE 19

obligation, to an LLC named Vagada Holdings. Vagada was registered in California in 2002 by Ebyam and his business partner in the computer resale business that earned them money laundering convictions. (The name appears to reference a fictitious company in the 1997 film The Devil's Advocate that engages in shady activities.) Walsh says Ebyam loaned the company money through his LLC when Aquifer "was up against the ropes," but can't recall specific details.

For his part, Walsh made what seemed to be a particularly bold move once the bankruptcy was filed: He resigned his day job as vice president of online marketing at Bertram Capital.

"I wanted to try to save the business," he says. "I am a family man with wife and kids and those things. And I invested a huge portion of my life savings into that business, and so when it started failing, it was devastating. Even thinking about it now, it was very painful. It was such a stressful time in my life, you can't imagine. It was terrible."

Walsh bought a domain name, redwoodcityventures.com, and began introducing himself as the founding partner of a Silicon Valley investment firm dedicated to "angel investments" in cryptocurrency companies, with an additional focus on fostering partnerships between U.S. and Chinese bitcoin companies. Redwood City Ventures is not a legal entity with an investment fund. "I made some investments with different people and

https://medium.com/@derekbrouwer/the-bitcoin-barons-how-a-marketer-and-a-money-launderer-sold-montana-on-digital-gold-2a255c96c981

EXHIBIT 38.(iii)
PAGE 20

collaborated on various things. It's not like you'd be imagining, like a normal Silicon Valley firm," Walsh says.

Aquifer's bankruptcy case stretched out nearly 18 months, until the judge finally dismissed it. Walsh had presented a plan to rescue the company by distributing Chinese mining hardware to U.S. companies, but creditors including Faris didn't consider it a serious plan — Aquifer didn't have a sales team. The company later moved toward liquidation but didn't file a plan in time, and the case was dismissed over the objection of Aquifer and its creditors.

Walsh moved to Colorado, Olson says, and continued taking a salary from Aquifer, but many of the company's debts never got paid. The Riverbank LRA was out more than $500,000 in unpaid rent and legal fees, Olson says. The agency prepaid the power bill at the industrial complex, then billed tenants for their usage, meaning the LRA ultimately paid for much of the electricity used to generate new bitcoins at Aquifer's data center.

A local government in a town of 25,000 people had unwittingly gambled on bitcoin, and paid a hefty price for it.

"We think, quite frankly, if we can save another community from the losses that we had to bear with this company, then we feel like that's the right thing to do," Olson says. "We would caution any

https://medium.com/@derekbrouwer/the-bitcoin-barons-how-a-marketer-and-a-money-launderer-sold-montana-on-digital-gold-2a255c96c981

EXHIBIT 38.(iii)
PAGE 21

company doing business with this particular group to be concerned, to review the records and be very concerned."

---

# May 19, 2016: 1 Bitcoin = $446

Scotty's Table isn't the sort of restaurant where diners typically tap at their phones between bites of beef duo, but the four Missoula businessmen's new friend from Redwood City Ventures wanted to show them what the puzzling business he was bringing to town was all about. They downloaded bitcoin wallets — it takes just an email address and a few seconds to set up — and, one by one, Sean Walsh deposited a bitcoin into their accounts. It was his gift to his new landlords, Steve Nelson and Mike Boehme; their Realtor; and the local economic development officer, Missoula Economic Partnership CEO James Grunke, who had helped make introductions around town, and would later help Walsh's company apply for a $416,000 state grant. Grunke says he "knew nothing" about cryptocurrency at the time, but today he's able to scroll through his Coinbase app and find precisely the minute — 8:36 p.m., May 19, 2016 — when he started to learn.

"He gave us one just to let us know," Nelson says. "It'd be like handing [you] a $50 bill. At that time, they were worth $440. It was still significant. And his words were to us, 'Pass part of it along to some people so they can get a feel for it.'"

https://medium.com/@derekbrouwer/the-bitcoin-barons-how-a-marketer-and-a-money-launderer-sold-montana-on-digital-gold-2a255c96c981

EXHIBIT 38.(iii)
PAGE 22

Cryptocurrency promoters love to perform these initiations, and have used them to soften the skepticism of some of the tech industry's biggest figures. The journalist Nathaniel Popper describes one such instance in his 2015 book, Digital Gold, when attendees of an exclusive gathering laughed in amazement as they passed $250,000 worth of bitcoin among their new wallets.

Not that Grunke and Nelson needed any convincing by that point. There was already plenty to be excited about. Three months earlier, Walsh had inked a deal with Nelson that would bring the first bitcoin mine to Montana. In doing so, Walsh would help reinvigorate a former lumber mill community in Bonner and usher in what Grunke saw as an untapped opportunity for western Montana to become a haven for large data centers. Grunke had imagined attracting companies like Facebook or Google, but bitcoin was at least as intriguing.

Nelson's company was redeveloping the Stimson Lumber Company's plywood plant, which closed in 2007 and left Bonner-Milltown without a major industry. His Bonner Property Development LLC was having some success attracting new businesses, but the plywood storage building, one of the largest timber-framed structures in the country, was proving tricky to put to use. "It was always impressive to walk in and look at, because it's got these huge, high ceilings. But then because of the high ceilings it was very difficult to insulate and utilize for the

https://medium.com/@derekbrouwer/the-bitcoin-barons-how-a-marketer-and-a-money-launderer-sold-montana-on-digital-gold-2a255c96c981

EXHIBIT 38.(iii)
PAGE 23

manufacturing process, because it's so expensive, there's so much space to try to heat," Nelson says.



https://medium.com/@derekbrouwer/the-bitcoin-barons-how-a-marketer-and-a-money-launderer-sold-montana-on-digital-gold-2a255c96c981

EXHIBIT 38.(iii)
PAGE 24



Steve Nelson and Michael Boehme, the men working to redevelop the shuttered Stimson lumber mill, were excited to find a tenant in March 2016 for the enormous storage warehouse. They didn't know much about bitcoin, but Nelson has since become a believer in the future of digital currency. Photo submitted to U.S. District Court for the Eastern District of California

What would be additional overhead for most industrial tenants was an efficiency for a bitcoin mine. It helped, too, that western Montana isn't prone to natural disasters that could disrupt operations, Grunke says, and that the landlords were open to accommodating an unfamiliar industry. The crucial factor, of course, was power, and Montana allows large users to buy electricity on the open market. Documents posted online indicate that Walsh's company would ultimately negotiate a deal with

https://medium.com/@derekbrouwer/the-bitcoin-barons-how-a-marketer-and-a-money-launderer-sold-montana-on-digital-gold-2a255c96c981

EXHIBIT 38.(iii)
PAGE 25

Energy Keepers Inc., the tribally owned corporation of the
Confederated Salish and Kootenai Tribes that manages the Seʼliš
Ksanka Q̓lispeʼ dam. How cheap was the power? A press release
issued Jan. 11, 2018, by Project Spokane investor Rockshield
Capital put the figure at just $.033 per kWh. Aquifer had budgeted
at $.05 per kWh in California, according to bankruptcy records.

Grunke says his organization, a nonprofit that receives city and
county funds, helped facilitate the local connections to close the
deal. He recalls talking with Walsh in the old guard house onsite
about what the project could look like. "Clearly, as an organization,
we had a role in their decision to locate here," Grunke says. Walsh
had approached Nelson and Boehme after finding their
commercial lease listing online. Rather than try to disguise the
nature of his bitcoin business, Walsh sold them on it. Nelson
began researching bitcoin and, after Walsh gave him his first taste
of the cryptocurrency, Nelson started thinking he had stumbled
across the technology of the future. He remembered the day when,
as a 10-year-old in 1957, his father came home with a new Conoco
credit card and placed it on the table. Nelson couldn't believe the
plastic was as good as cash. "So why wouldn't we think of using
virtual currency in this world we're living in?" he reasoned, and
soon began investing a significant portion of his own money in the
cryptocurrencies Walsh was starting to mine on his property.

But otherwise, Walsh took steps to hide the new mine from public
view. He incorporated the company in Montana and Colorado as

EXHIBIT 38.(iii)
PAGE 26

Project Spokane LLC, which he has since said was meant to misdirect potential competitors. Nelson and Boehme first introduced the tenant to the Missoulian in August 2016 as Montana Data LLC, saying only that the company had built a data center to help balance energy loads for states that rely on inconsistent wind energy. It's since been referred to in the press as Global Big Data LLC and, most recently, Project Northwest. In his talks around the world, Walsh touted his investment in the "largest blockchain security data center in North America" without saying where in North America it was.

"When we started the business, we didn't want anyone to know anything," Walsh says. Montana's undiscovered supply of cheap energy was his ace in the hole in an ultracompetitive industry. And publicizing the mine's location could make it a target for thieves or hackers. "We were just afraid," Walsh says. "We thought people were going to try to break in and steal our bitcoin."

# January 25, 2017: 1 Bitcoin = $894

Back in San Jose, Walsh's bankruptcy attorney, Reno Fernandez, was still trying to get paid. His firm had been dismissed by Walsh shortly after the bankruptcy was thrown out in June 2016. Between June 15 and Aug. 1, Aquifer paid Walsh $24,500, while its attorney was still owed $182,000. Fernandez says he still hasn't

https://medium.com/@derekbrouwer/the-bitcoin-barons-how-a-marketer-and-a-money-launderer-sold-montana-on-digital-gold-2a255c96c981

EXHIBIT 38.(iii)
PAGE 27

been paid. Aquifer's new attorney told the judge in early 2017 that was because the company had no cash on hand. Efforts to find new capital were unsuccessful.

Fernandez and other creditors say they had no idea that Walsh had launched a new mining operation in a different state while Aquifer's bankruptcy was still pending. According to Nelson, the lease at the Bonner mill site began on March 1, 2016. Two days later, the bankruptcy court in San Jose held a hearing in which Aquifer withdrew its plan for reorganization and advised the court that it would be filing a liquidation plan instead.

"It signals to me that they're hedging their bets right there by forming another company in another state," Faris says. He says the timeline "raises questions" about whether any of the equipment, designs or other assets from Aquifer also made their way to Montana.

Walsh says he kept the businesses "totally segregated" in accordance with the law, and denies that any Aquifer assets were used in Project Spokane, noting that those assets were turned over to the company's secured creditors, which included Faris. Walsh explains that as Aquifer failed, a friend encouraged him to "double down" and invest in a new operation. Walsh agreed, believing the problems that led to Aquifer's demise were unlikely to recur. He says he found some "minority shareholders" for Project Spokane, but declines to identify them.

https://medium.com/@derekbrouwer/the-bitcoin-barons-how-a-marketer-and-a-money-launderer-sold-montana-on-digital-gold-2a255c96c981

EXHIBIT 38.(iii)
PAGE 28

"It's kind of a crazy thing to imagine based on what I just told you, on how devastating the loss was," Walsh says.

Not everyone in California was in the dark about the new venture. Ebyam, still awaiting sentencing for his marijuana grow operation, had obtained permission in August 2016 from the judge overseeing his case to relocate to Montana to work at a newly built data center. Ebyam left out the bitcoin part, writing in a letter to the judge that he had "found the way to make wind energy more viable by buying the power the wind farms can't sell." He said that his company's "innovative design" enabled it to cut the costs of building a data center by nearly 95 percent. The new data center was using recycled substations from a shuttered Intel facility in Colorado and transformers from an old Dell data center. Ebyam included four interior photos of the Bonner warehouse in various stages of build-out — which looks more professional than the one in Riverbank — and a letter of reference from Walsh, who wrote, "Yan is positively indispensable to our joint business venture that he leads many aspects of, and I hope to keep him at the helm for years to come." (Walsh tells the Indy that Ebyam was an independent contractor at Project Spokane.)

By then, Ebyam was introducing himself by a different last name, Allweiss, at least to Nelson.

Nelson says the lease in Bonner was signed by Project Spokane's other principal, a younger man named Matt Carson, who loves

https://medium.com/@derekbrouwer/the-bitcoin-barons-how-a-marketer-and-a-money-launderer-sold-montana-on-digital-gold-2a255c96c981

EXHIBIT 38.(iii)
PAGE 29

computer games and speaks with a Texas accent. Carson started mining bitcoin in his parents' garage in 2010 with equipment he configured from graphics cards and motherboards purchased on Craigslist, he told the hosts of a podcast called Bitcoin Sandwich in 2014. That grew into commercial mining operations in Missouri and Colorado. He opened his Colorado facility and mining equipment distributor at the same time Aquifer got going in California. It similarly went belly-up, and the company, Miner Hosting LLC, racked up $271,000 in default judgments in Colorado from customers who said their mining equipment wasn't delivered. (Parts delivery problems were "par for the course" in the nascent bitcoin mining industry in 2014, leading to bankruptcies and numerous lawsuits filed by customers who felt swindled, authors Paul Vigna and Michael Casey write in The Age of Cryptocurrency.) A writ of garnishment issued in 2017 was unable to collect because the company's bank account had closed.

Nelson today says he was unaware that Walsh's California mine had gone bankrupt. And none of the warning signs cited by the Riverbank landlords have turned up with Project Spokane. Indeed, far from sputtering on the fringe, Project Spokane was moving toward the center of the bitcoin universe. On Valentine's Day last year, Carson and Ebyam had dinner at what appears to be Missoula's Kobe Seafood & Steak with a development team from one of the cryptocurrency industry's most important companies: Bitcoin.com, owned by Roger Ver, aka Bitcoin Jesus, the man who had evangelized on that Silicon Valley billboard.

https://medium.com/@derekbrouwer/the-bitcoin-barons-how-a-marketer-and-a-money-launderer-sold-montana-on-digital-gold-2a255c96c981

EXHIBIT 38.(iii)
PAGE 30

Ver [posted a photo of their dinner to Twitter](#) with the caption "Eight guys, and all Bitcoin." A few weeks later, [Bitcoin.com](#) announced its latest project, a large-scale cryptocurrency mining pool.

[Bitcoin.com's announcement](#) didn't say where its mine is located (the company will not confirm or deny any partnership with Project Spokane), but the attached photo shows the site's developers with their arms around Ebyam, who is wearing the same [Bitcoin.com](#) logo polo shirt he was wearing at Kobe. Its landing page for customers shows images of the Bonner data center, with its long rows of servers racked beneath the dramatic wooden trestles. [Bitcoin.com](#)'s mining business is different from how Walsh and Ebyam had mined in California. In mining pools, individual customers purchase contracts for a small portion of the mine's overall hashrate. Pool mining provides an affordable entry point for individual miners and a more stable revenue stream for mine operators. The same risk that came back to bite Aquifer is now shared with [Bitcoin.com](#)'s customers. There's no guarantee their contracts won't lose money.

---

# June 6, 2017: 1 Bitcoin = $2,822

Somebody screwed up.

[https://medium.com/@derekbrouwer/the-bitcoin-barons-how-a-marketer-and-a-money-launderer-sold-montana-on-digital-gold-2a255c96c981](https://medium.com/@derekbrouwer/the-bitcoin-barons-how-a-marketer-and-a-money-launderer-sold-montana-on-digital-gold-2a255c96c981)

EXHIBIT 38.(iii)
PAGE 31

Montana Gov. Steve Bullock issued a press release in June 2017 announcing that the state Department of Commerce had awarded its latest round of job-creation grants. The largest award, funded through coal severance taxes, was made to a company called Project Spokane, in the amount of $416,000 to support expansion of its "blockchain security services for the bitcoin network." Bitcoin forums and industry websites immediately seized on the news that Montana's government was ready to pump tax dollars into an industry that the federal government, and some other states, had been all too suspicious of. Bitcoin.com's news service called it one of the first grants given to a bitcoin mining operation based in the U.S. In applying for the grant, Project Spokane had pledged to create 65 new jobs in Bonner over the next two years, writing that the funds would help purchase machinery, equipment, furniture and software and pay wages to new employees as it expanded operations, including additional data centers in Montana. The grant application stated that the total project would cost $26 million.

What Walsh hadn't expected was that anyone outside state government would find out. Walsh says he was told (he didn't say by whom) when Project Spokane applied that "there would be no publicity whatsoever from accepting it." In fact, Grunke had first spilled the beans locally, telling investors at a luncheon covered by the Missoulian that Project Spokane had applied for the grant, with Mayor John Engen signing a letter of support and county commissioners agreeing to sponsor the application. Grunke

https://medium.com/@derekbrouwer/the-bitcoin-barons-how-a-marketer-and-a-money-launderer-sold-montana-on-digital-gold-2a255c96c981

EXHIBIT 38.(iii)
PAGE 32

previously said he apologized to the company for that unwanted plug, but that his team otherwise communicated to Project Spokane's local managers the disclosure requirements associated with the public grant. (An accounting manager listed as the business contact on Project Spokane's application told the Indy last August that she was no longer with the company.)

Walsh decided to decline the grant. He says he hadn't been aware that the money wasn't as straightforward as it first seemed. The grant was technically a contract, and Project Spokane would have to submit follow-up financial documentation proving, among other things, that it had made the hires it was promising before funds were distributed. "I was like, 'Forget it, it's not worth the risk,'" Walsh says now.

Project Spokane continued to expand its mining capacity anyway, reaching 20 MW of contracted power, enough to power 20,000 homes. Grunke told investors at the March 2016 luncheon that the data center contained 12,000 servers, and planned to expand to 55,000. Nelson estimates the current number of employees on site is about 25, not including the temporary contractors Project Spokane hired during build-out.

Not among that crew is Ebyam, who was ordered to turn himself in at the Missoula federal courthouse by March 16, 2017, for a six-year jail sentence. He's currently held at a federal prison in Colorado, with a scheduled release date of June 2, 2022. Nelson

https://medium.com/@derekbrouwer/the-bitcoin-barons-how-a-marketer-and-a-money-launderer-sold-montana-on-digital-gold-2a255c96c981

EXHIBIT 38.(iii)
PAGE 33

says he knew that Ebyam had gone to Colorado early last year, but not that he was in jail. He says he joined a conference call with Walsh and Ebyam recently to discuss technical issues about the building's cooling system. "He understands the engineering side of things," Nelson says.

Walsh says Ebyam is no longer involved with Project Spokane: "Oh gosh, no. You know he's in jail, right?"

# January 17, 2018: 1 Bitcoin = $11,149

Though he didn't want it, Walsh says the attention generated by Project Spokane's grant award turned out to be good publicity for the currency he advocates. "It helped legitimize what everyone in bitcoin is doing," he says, before correcting himself. "Not everybody, just the good guys."

Walsh is speaking by phone the day before he heads to Miami to deliver a presentation at the North American Bitcoin Conference, Jan. 18 and 19. His session, one of dozens, took on the question that's become the subject of intense global speculation: Is bitcoin a bubble?

https://medium.com/@derekbrouwer/the-bitcoin-barons-how-a-marketer-and-a-money-launderer-sold-montana-on-digital-gold-2a255c96c981

EXHIBIT 38.(iii)
PAGE 34

When Ebyam went to prison in early 2017, bitcoin was trading at around $1,000. By year's end, it was trading at $13,000, down from a breathtaking rise to $20,000 in December. As the price rose and word got out that Montana was ripe for bitcoin, Grunke says his office began fielding daily calls from blockchain companies interested in setting up data centers in the area, if only they could find a big enough space.

Plans for the state's second bitcoin mine emerged in December. The Anaconda School District agreed to sell its recently vacated elementary school for $205,000 to a company called BitPower LLC, and the county agreed to lease BitPower a 40-acre site in a tax-increment financing district for $100 per year. School Superintendent Gerry Nolan jokes that he didn't know the difference between a bitcoin and a candy bar when the company turned up with an offer a couple of months ago. He says he still doesn't have any idea what its representatives meant when they told the school board they wanted to turn the elementary school into a "training facility." The Montana Standard reported that one of the company's local spokespersons is Rick Tabish, who was famously convicted, then acquitted, of murdering gambling mogul Ted Binion and then stealing silver stashed in Binion's desert vault. Nolan says knowing that another mine was already running in Bonner was one factor that put the school board at ease. That, and the 300 jobs the company reportedly promised to bring to town.

https://medium.com/@derekbrouwer/the-bitcoin-barons-how-a-marketer-and-a-money-launderer-sold-montana-on-digital-gold-2a255c96c981

EXHIBIT 38.(iii)
PAGE 35

Project Spokane has contributed new tax base to Missoula County, but it's also becoming a problem for the mine's neighbors. The everpresent noise generated by the facility's thousands of servers and 450 cooling fans is keeping them up at night — even some who live several miles away, depending on how the wind carries the sound through the canyon. Members of the Bonner-Milltown Community Council have been discussing the problem for more than six months, requesting monthly progress reports from Nelson. They're starting to grow restless.

"We need for the company to come do face-to-face," says Burt Caldwell, the council's secretary. "We think the right thing to do is for the company to come face the community and acknowledge there's an issue."

The council has invited state lawmakers representing the area to attend a special meeting on Feb. 5 to "see if the community has any recourse at all, other than declining property values and loss of sleep." Nelson says he and his tenants have been working for months to engineer a solution, and he's already spent more than $10,000 to commission sound analyses. They've settled on a plan that involves swapping out the fan blades for a quieter configuration. If the plan works with the first few dozen fans, Nelson says, he plans to apply for tax-increment money to offset the upgrade costs, which will amount to several hundred thousand dollars. Nelson considers the potential upgrades an investment

EXHIBIT 38.(iii)
PAGE 36

less in Project Spokane than in the burgeoning bitcoin and blockchain industry as a whole.

So far, Walsh's play is paying off. Walsh has been quoted increasingly by national publications for his crypto-industry insights, and was announced as founder and CEO this month of Hyperblock Technologies Corp., a Canadian cryptocurrency mining company that disclosed $15 million in securities distribution in December. A company website unveiled Jan. 22 says it is "building the future of cryptocurrency mining" and features extensive promotional material showing the Bonner mine, which it calls Project Northwest. Hyperblock touts a diverse revenue model, including wholesale hashrate sales to Bitcoin.com, server hardware sales, server hosting generating "monthly USD-denominated payments" and "self-mining" like that done by Aquifer. Its mission is the same one Walsh promoted in Dubai: "to accelerate the development of the blockchain and cryptocurrency industry through hyper disruptive innovation."

"I'm glad that I did take a second risk and invest a bunch more money, because we have a thriving business now," Walsh says.

A Bitcoin.com manager hinted obliquely in a recent interview with Business Insider Nordic that the site was making "an awful lot of money" as the price of bitcoin and other cryptocurrencies spiked. The Indy plugged in Bitcoin.com's advertised hashrates, the power costs advertised for "Project Northwest" and other inputs into a

https://medium.com/@derekbrouwer/the-bitcoin-barons-how-a-marketer-and-a-money-launderer-sold-montana-on-digital-gold-2a255c96c981

EXHIBIT 38.(iii)
PAGE 37

bitcoin mining profit calculator, which suggests that Project Spokane has mined hundreds of millions of dollars worth of cryptocurrency, at current prices.

When the price of bitcoin reached $17,000 in December, Grunke decided to cash out one-tenth of Walsh's gift — the first time he'd sold any cryptocurrency. He says he felt a small thrill.

"It's like pretend money to me, or being in Vegas," says Grunke, who on Jan. 19 announced his departure from MEP to pursue other opportunities out of state.

But should Montanan communities bank on it? Is bitcoin just another gold rush? And who will be left holding the bag if the rush goes bust?

"Those are good questions," Grunke says. "They aren't ones we've thought about."

5

- Bitcoin
- Project Spokane
- Hyperblock
- Montana
- Sean Walsh

https://medium.com/@derekbrouwer/the-bitcoin-barons-how-a-marketer-and-a-money-launderer-sold-montana-on-digital-gold-2a255c96c981

EXHIBIT 38.(iii)
PAGE 38

5 claps



WRITTEN BY

# Derek Brouwer

Follow

Freelance journalist in Montana. Formerly reporter for the Missoula Independent, Billings Gazette and Helena Independent Record. This is my portfolio.

https://medium.com/@derekbrouwer/the-bitcoin-barons-how-a-marketer-and-a-money-launderer-sold-montana-on-digital-gold-2a255c96c981

**Press Release**

# HyperBlock Provides April 2020 Status Update on Promissory Note Acceleration of Maturity Dates

Published: April 24, 2020 at 10:15 a.m. ET

**Sean Walsh Resigns as Chairman and CEO of Hyperblock Inc.**

*The MarketWatch News Department was not involved in the creation of this content.*

Toronto, Ontario, Apr 24, 2020 (Newsfile Corp via COMTEX) -- Toronto, Ontario--(Newsfile Corp. - April 24, 2020) - HyperBlock Inc. (CSE: HYPR) ("**HyperBlock** " or the " **Company** ") provided the status today of two promissory notes (the " **Notes** ") issued by Hyperblock LLC ("LLC") and the Company. The Company confirms that Project Spokane LLC, a company controlled by Sean Walsh, former Chairman and CEO of the Company, accelerated the maturity date of the LLC Note, and demand has been made for payment by LLC of the outstanding obligations in the amount of approximately CAD$5,220,000, which includes the outstanding principal balance plus accrued interest and expenses. The Company is also reporting an accelerated maturity date of a Note issued by LLC to Sean Walsh having outstanding obligations of approximately USD$2,100,000, which includes the outstanding principal balance plus accrued interest and expenses. The amounts due under the Notes were accelerated due to an event of default resulting from the Company failing to pay interest, when due, on the Notes. The Company is working with the lenders of the Notes and the Company's financial advisors to determine an appropriate course of action. The Company also announced that Sean Walsh has resigned as Chairman and CEO of the Company - and has resigned from his roles in all capacities related to LLC. The Company will provide further updates as possible.

## About HyperBlock Inc.

HyperBlock is a crypto-asset enterprise operating a North American cryptocurrency datacenter and providing complementary product offerings, which include cryptocurrency mining, Mining-as-a-Service (MAAS), server hosting, and server hardware sales, depending on market conditions. HyperBlock is committed to operating as sustainably as possible,

purchasing electricity for its flagship US datacenter from a hydro-electricity generator - and employing advanced recycling technology to minimize environmental impact. Learn more at www.hyperblock.co.

*Cautionary Note Regarding Forward Looking Information and Future-Orientated Financial Information*

Certain information in this news release constitutes forward-looking statements under applicable securities law. Any statements that are contained in this news release that are not statements of historical fact may be deemed to be forward-looking statements. Forward-looking statements are often identified by terms such as "plan", "believe", "may", "should", "anticipate", "expect", "intend", "forecast" and similar expressions. The forward-looking information contained in this press release includes, but is not limited to, statements related to: the profitability and growth of the Company as a result of the recent deployment of Bitmain servers; the future status of the Company's current power contracts; the impacts of the Company's liquidity, debt maturities, and trade payables; and the potential revocation of the cease trade orders on the Company's securities. These forward-looking statements contained herein are made as of the date of this press release and are based on assumptions and estimates of management, which management considers reasonable, based on information available on the date hereof. Such assumptions may be incorrect. Actual future results may differ materially as forward-looking statements involve known and unknown risks, uncertainties and other factors which may cause the actual results, performance or achievements of the Company to materially differ from any future results, performance or achievements expressed or implied by such forward looking statements. Such factors, among other things, include: general economic, market and business conditions will be consistent with expectations, fluctuations in general macroeconomic conditions; fluctuations in securities markets; risks relating to the Company's ability to execute its business strategy and the benefits realizable therefrom, the ability to retain personnel to execute the Company's business plans and strategies; the ability to retain auditors to perform an audit of the Company's financial statements; the presence of laws and regulations that may impose restrictions on the ability of the Company to operate its business, including securities laws applicable to the Company; the speculative nature of cryptocurrency mining and blockchain operations including but not limited to cryptocurrency prices, block rewards, and mining difficulties; and those factors described under the heading "Risks Factors" in the Company's listing statement dated July 10, 2018 and the risks described in the Company's Management's Discussion & Analysis for the year ended December 31, 2018 dated December 12, 2019, each

EXHIBIT 39.
PAGE 3

of which is available on the Company's issuer profile on SEDAR. There may be other factors that cause results not to be as anticipated, estimated or intended. Accordingly, readers should not place undue reliance on forward-looking statements and information. There can be no assurance that forward-looking information, or the material factors or assumptions used to develop such forward-looking information, will prove to be accurate. The Company does not undertake any obligations to release publicly any revisions for updating any voluntary forward-looking statements, except as required by applicable securities law. All forward-

looking information contained in this news release is expressly qualified in its entirety by this cautionary statement.

**For more information:**

Roozbeh Ebbadi
investors@hyperblock.co
1-800-613-4721

To view the source version of this press release, please visit
https://www.newsfilecorp.com/release/54843

copyright (c) newsfile corp. 2020. all rights reserved

*The MarketWatch News Department was not involved in the creation of this content.*