EXHIBIT 33.
PAGE 1

| | |
|---|---|
| **From:** | David Bjornson |
| **To:** | peter@itolawgroup.com; hyperblockassets@gmail.com; hans.rizarri@crowesoberman.com; inder@hyperblock.co; Danny Day (dday@bankofmt.com) |
| **Cc:** | Jill Broughton; Kassy Buss; Amie Zendron; Big Sky Mobile Catering (bsmcorpmt@gmail.com); Michael Boehme |
| **Subject:** | Defects in Notice of Disposition of Collateral By Public Sale - Hyperblock, LLC / Project Spokane, LLC / Sean Walsh / Bonner Property Development, LLC |
| **Date:** | Monday, May 25, 2020 7:04:42 PM |
| **Attachments:** | Notice re Defects in Notice of Disposition of Collateral by Public Sale 5.25.20.pdf |
| **Importance:** | High |

Attached is an important notice regarding defects in the above described notice.
Please contact me if you have questions or comments.   David

_____

**David H. Bjornson**

**Bjornson Jones Mungas, PLLC**

**2809 Great Northern Loop, Suite 100**

**Missoula, Montana  59808**

**(406) 721-8896**

**(406) 541-8037--fax**

http://www.bjornsonlaw.com/attorneys/david-h-bjornson/

Email:  david@bjornsonlaw.com

*CONFIDENTIALITY NOTICE:  The information contained in this email message may be privileged or confidential information and is intended only for the use of the individual or entity named above.  If you have received this communication in error, please notify us immediately by telephone and delete the message from your system.*

EXHIBIT 33.
PAGE 2

# Bonner Property Development, LLC
## 224 N Higgins Avenue
## Missoula, Montana 59802

SENT CERTIFIED U.S. MAIL, RETURN RECEIPT REQUESTED,
and U.S. FIRST CLASS MAIL, and E-MAIL TO hyperblockassets@gmail.com and
peter@itolawgroup.com

May 25, 2020

ITO LAW GROUP, P.C.                      Sean Walsh
ATTN:  Peter W. Ito                      151 Calle San Francisco, #200
1550 Larimer Street, Suite 667           San Juan, PR US 00901
Denver, CO 80202                         c/o Peter W. Ito, Esq.


Project Spokane, LLC
5619 DTC Parkway 475
Greenwood Village, CO  80111


   RE: Notice of Disposition of Collateral By Public Sale

Ladies and Gentlemen:

We are in receipt of your Notice of Disposition of Collateral By Public Sale related to a
disposition of certain property (the "Property") owned by Hyperblock, LLC, a Delaware limited
liability company ("Hyperblock"), by public sale that is scheduled to occur on June 3, 2020 (the
"Sale") related to certain debts owed by Hyperblock to Project Spokane, LLC, and Sean Walsh.

We are writing because some of the assets noticed for sale are not the property of Hyperblock to
convey, and some of the assets are encumbered by a contractually committed first lien security
interest which is not reflected in your Notice.  As background, Sean Walsh, as CEO of
Hyperblock, negotiated and executed documents which committed Hyperblock to certain things
which are not reflected in the substance of your Notice.   In brief summary, over the course of
the tenancy, Sean Walsh requested that Bonner Property Development, LLC, a Montana limited
liability company ("BPD") make concessions, construct improvements, provide
credit enhancements to enable Hyperblock to obtain financing, and to provide various other
consideration, and in exchange, Hyperblock committed that certain assets would remain with the
leased premises at the termination of the lease.  More specifically related to this Sale, Sean
Walsh requested that BPD and its principals, Steve Nelson and Michael Boehme, put their credit
at stake in guaranteeing financing for the acquisition of additional servers, and Sean Walsh
committed to deliver a first lien security interest in such newly acquired equipment in exchange
for such guaranty.  Without this commitment by Sean Walsh, BPD, Steve Nelson and Michael

EXHIBIT 33.
PAGE 3

May 25, 2020
Page 2

Boehme would not have entered into these personal guaranties on behalf of Hyperblock, thus facilitating financing for Sean Walsh's company to acquire new servers, and without the personal guaranties of BPD, Steve Nelson and Michael Boehme, Hyperblock would not have been able to obtain financing for the new servers.

You are hereby reminded and notified that under the terms of the Fourth Amendment to Commercial Lease Agreement dated January 23, 2019 between Hyperblock, as Tenant, and BPD, as Landlord (the "Fourth Lease Amendment"), Hyperblock agreed that certain improvements to the real property would remain with the real property at the termination of such lease agreement and become property of BPD. Paragraph 1.a,ii. reads in part:

> Any fixtures and personal property located on or about the Property as of the Lease Commencement Date (defined below) shall be considered part of the Property hereby leased and subject to all terms and conditions hereof. The term "Fixture" shall refer to those items so permanently attached or embedded to as to be considered part of the premises, as defined in Section 70-15-103, MCA. Except as provided otherwise hereinbelow, upon termination or expiration of this Lease for any reason, Tenant shall be entitled to remove from the Property any improvements that Tenant has made to the Property and that are not considered "Fixtures." As used herein the term "Fixture" shall not include unattached personal property, furniture, or trade fixtures of Tenant including those set forth in **Exhibit E-1**, attached hereto and incorporated herein by reference. Furthermore, however, whether or not best legally described as Fixtures, all property relating to electrical supply and distribution shall remain with the Property and become the property of Landlord at the termination of the Lease, including but not limited to the property described in **Exhibit E-2**, attached hereto and incorporated herein by reference.

Exhibit E-2 of the Fourth Lease Amendment is attached to this letter as Exhibit A. Because Hyperblock agreed that the assets listed on the attached Exhibit A will remain with the real property and become property of BPD at the termination of the lease, such assets cannot be included in the Sale. They are not Hyperblock's property to sell. Accordingly, the Notice is erroneous.

Furthermore, Hyperblock committed some of the Property to be encumbered by and subject to a first lien position security interest and the remainder of the Property by a non-priority security interest, each in favor of BPD, pursuant to that certain Credit Enhancement Agreement, dated December 13, 2018, by and between BPD and Hyperblock; and that certain Security Agreement, dated December 13, 2018, by Hyperblock, as debtor, in favor of BPD, as secured party, each as amended by that certain Modification of Lease Agreement, Credit Enhancement Agreement, Security Agreement and Side Letter to Third Amendment to Lease Agreement executed effective December 31, 2019 (collectively, the "BPD Agreements"). UCC filings were made in Montana with the Secretary of State and Missoula County Clerk and Recorder, and, on May 22, 2020, in Delaware.

May 25, 2020
Page 3

Sean Walsh negotiated, executed and delivered these documents on behalf of Hyperblock and Hyperblock was obligated to, but failed to, formalize the first lien priority aspect of the security interest with respect to the new servers acquired with the new financing obtained. The only parties authorized or needed to provide that first lien security interest are Sean Walsh, individually, and Project Spokane, LLC, by Sean Walsh as authorized officer.  They have not yet delivered this formal subordination.

The BPD security interest in the Property under the BPD Agreements for the new servers funded by the proceeds of the Bank of Montana loan is contractually committed to be superior in priority to the security interests in favor of Project Spokane, LLC, and Sean Walsh, the subject of the Sale.  Sean Walsh had a good faith obligation to follow through and accomplish what was within his power and authority to fulfill on Hyperblock's obligation, as negotiated by him, to ensure BPD had a first lien security interest in the new servers as contractually promised in legal documents executed by Sean Walsh.  Sean Walsh and Project Spokane cannot legally or equitably be allowed to benefit from their own failure to subordinate and provide the contractually committed first lien security interests.

Accordingly, BPD's various security interests and BPD's rights under the lease agreement and under the BPD Agreements (and BPD's rights and remedies as a secured party at law and in equity), must be considered at the Sale, and any disposition or transfer of the Property financed by the proceeds of the Bank of Montana loan would need to provide for the satisfaction of the amount due under the Bank of Montana loan, or at a minimum would occur with the Property remaining subject to BPD's security interests and all rights and remedies related thereto. Further, at this time the remaining Property is subject to a nonpriority security interest of BPD which needs to be noticed and considered in the Sale and the Notice.

As the Notice of Disposition of Collateral By Public Sale was issued on behalf of Sean Walsh and Project Spokane, Sean Walsh and Project Spokane were or should reasonably have been acutely aware of the priority and nonpriority security interests that were negotiated and executed by Sean Walsh. We demand on behalf of Bonner Property Development, LLC, Steve Nelson and Michael Boehme that you revise, modify and reissue your Notice to reflect the proper facts, the proper secured parties and priorities and exclude the assets that are not Hyperblock's to sell. This revised Notice must be issued immediately due to the short timeframe involved.

Please contact me immediately with any questions.

Sincerely,

**Bonner Property Development, LLC,**
a Montana limited liability company

By: _____
      Steve Nelson, Co-Manager

May 25, 2020
Page 4

With copies to:

Hyperblock, Inc.
2 St. Claire Avenue East, Suite 1100
Toronto, ON M4T 2T5
Attention: Hans Rizarri
 hans.rizarri@crowesoberman.com

Bank of Montana
125 Bank Street, Suite 100 Missoula, MT 59802
Attention: Daniel Day
dday@bankofmt.com

Hyperblock, LLC
140 Yonge Street, #209
Toronto, ON M5C 1X6
Attention: Inder Saini
inder@hyperblock.co

EXHIBIT 33.
PAGE 6

# EXHIBIT A

### EXHIBIT E-2

Items to Remain with Property and Landlord Whether or not Fixtures

- All electrical supply and distribution related property of any kind, including but not limited to substations, distribution lines, poles, switching gear, fans, panels, fans, wire, fuse systems
- 5,000 KVA substations with associated switch gear
- 225A distribution panels with main breaker
- 500 KVA transformers 480Vto 208V
- 36" Tubeaxial 3HP fans
- 60" Tubeaxial 20Hp fans
- 2500 feet of cable tray
- 2500 feet of pallet racking
- 150,000 feet of 10 gauge wire
- 5 section 15KV fuse disconnect (outdoor)



062S0008648293

$5.759
US POSTAGE
EXPRESS CLASS
FIRST-CLASS
FROM 59808
MAY 26 2020
stamps
endicia

CERTIFIED MAIL®

7017 2400 0000 5794 3748

Project Spokane, LLC
5619 DTC Parkway Ste 475
Greenwood Village CO 80111-3140

Bjornson Jones Mungas, PLLC
2809 Great Northern Loop, Suite 100
Missoula, MT 59808

---

062S0008648293

$5.759
US POSTAGE
FIRST-CLASS
FROM 59808
MAY 26 2020
stamps
endicia



CERTIFIED MAIL®

7017 2400 0000 5794 3731

ITO Law Group, P.C.
Attn: Peter W. Ito
1550 Larimer Street, Suite 667
Denver CO 80202-1602

Bjornson Jones Mungas, PLLC
2809 Great Northern Loop, Suite 100
Missoula, MT 59808

U.S. Postal Service™
CERTIFIED MAIL® RECEIPT
Domestic Mail Only

For delivery information, visit our website at www.usps.com®.

Certified Mail Fee   $3.55

Extra Services & Fees (check box, add fee as appropriate)
☐ Return Receipt (hardcopy)        $0.00
☐ Return Receipt (electronic)      $0.00
☐ Certified Mail Restricted Delivery $0.00
☐ Adult Signature Required         $0.00
☐ Adult Signature Restricted Delivery $

Postage   $0.55

Total Postage and Fees   $4.10

Sent To

Street and Apt. No., or PO Box No.

City, State, ZIP+4®

PS Form 3800, April 2015 PSN 7530-02-000-9047   See Reverse for Instructions

7019 2280 0000 2163 9092

--------------------------------------
Total:                          $4.10
--------------------------------------

--------------------------------------
Debit Card Remit'd              $4.10
     (Card Name:MasterCard)
     (Account #:XXXXXXXXXXXX6995)
     (Approval #)
     (Transaction #:400)
     (Receipt #:056482)
     (Debit Card Purchase:$4.10)
     (Cash Back:$0.00)
     (AID:A000000042203          Chip)
     (AL:Debit)
     (PIN:Verified)
--------------------------------------

The timeliness of service to or from
destinations outside the contiguous US
may be affected by the limited
availability of transportation.

In a hurry? Self-service kiosks offer
quick and easy check-out. Any Retail
Associate can show you how.

Text your tracking number to 28777
(2USPS) to get the latest status.
Standard Message and Data rates may
apply. You may also visit www.usps.com
USPS Tracking or call 1-800-222-1811.

           Preview your Mail
           Track your Packages
           Sign up for FREE @
           www.informeddelivery.com

All sales final on stamps and postage.
Refunds for guaranteed services only.
       Thank you for your business.

       NOW HIRING. Please visit
    www.usps.com/careers to apply.

     HELP US SERVE YOU BETTER

   TELL US ABOUT YOUR RECENT
          POSTAL EXPERIENCE

             Go to:
   https://postalexperience.com/Pos

   840-5590-0482-002-00075-53153-02

     or scan this code with
       your mobile device:



     or call 1-800-410-7420.

     YOUR OPINION COUNTS

Receipt #: 840-55900482-2-7553153-2
Clerk: 05

# BANK OF MONTANA
## MONTANA'S BUSINESS BANK

EXHIBIT 34.
PAGE 1

May 26, 2020

ELECTRONIC MAIL OR OVERNIGHT MAIL

Hyperblock, LLC
5619 DTC Parkway #475
Greenwood Village, CO 80111
Attention: Inder Saini
inder@hyperblock.co

> Other known address of Hyperblock, LLC:
> 140 Yonge Street, #209
> Toronto, ON M5C 1X6

James A. Bowditch
  Registered Agent for Hyperblock, LLC
P.O. Box 9199
Missoula, MT 59807-9199
jbowditch@boonekarlberg.com

**Re:** **Default Notice—Business Loan Agreement dated as of December 14, 2018**
**Bank of Montana Loan #2018004200**

Ladies and Gentlemen:

This letter notifies Hyperblock, LLC (the "Borrower") of the occurrence of Events of Default under the Business Loan Agreement dated as of December 14, 2018 (as the same may have been amended, the "Agreement") between Borrower and Bank of Montana (the "Lender"). Capitalized terms used in this letter and not otherwise defined herein are accorded the meaning given such terms in the Agreement.

The following Defaults have occurred under the Agreement and Related Documents as further stated in the Agreement section captioned "Default":

1. Default in Favor of Third Parties. Borrower has defaulted under agreements with third parties as stated in the Notice of Disposition of Collateral by Public Sale (the "Notice of Disposition") a copy of which has been delivered to Lender by a third party and is attached to this letter.

2. Other Defaults. Borrower is in Default under the Other Defaults provisions as follows:

EXHIBIT 34.
PAGE 2

a.  Borrower failed to timely notify Lender of material changes in the financial condition of Borrower, including the defaults stated in the Notice of Disposition, the pursuit of remedies by third parties under the Notice of Disposition and Borrower's cessation of business.  Timely notice of the foregoing is required under the Affirmative Covenants, Notice of Claims and Litigation.  The failure to timely notify Lender is not a curable default.

b.  Borrower has ceased operations in violation of the Negative Covenants, Continuity of Operations.  Borrower's sole member stated the cessation of operations in published releases of which Lender is aware.

c.  As stated in the Notice of Disposition, Borrower has defaulted on agreements with third parties and failed to timely notify Lender of the defaults as required under Affirmative Covenants, Other Agreements.  The failure to timely notify Lender is not a curable default.

d.  Lender has been notified by third parties that Borrower executive and management personnel has resigned.  Borrower has failed to timely notify Lender of the changes in personnel as required under Affirmative Covenants, Operations.  The failure to timely notify Lender is not a curable default.

3.  <u>Adverse Change</u>.  Borrower's cessation of operations and actions taken under the Notice of Disposition are a material adverse change in the financial condition of Borrower.

Each of the foregoing Defaults is also an Event of Default under the Related Documents in accordance with the terms of such documents, including by cross default. There may be other Defaults that Lender has not named at this time. However, by not naming other Defaults at this time, Lender does not waive or surrender any rights granted within the Agreement and Related Documents or applicable laws and/or regulations.

In accordance the Agreement and the Related Documents, including the Promissory Note, Lender hereby (1) demands that Borrower cure the Defaults that are subject to cure within the times required under the Agreement and Related Documents and (2) declares the entire principal balance and all accrued and unpaid interest immediately due and payable and demands immediate payments of such amounts.

Sincerely,

Bank of Montana

By: _____
Jacob T. Pelczar, SVP

EXHIBIT 34.
PAGE 3

With copies to:


Hyperblock, Inc.
   Sole Member of Hyperblock, LLC
2 St. Claire Avenue East, Suite 1100
Toronto, ON M4T 2T5
Attention Hans Rizarri
hans.rizarri@crowesoberman.com

Bonner Property Development, LLC
224 N. Higgins Avenue
Missoula, MT 59802
Attention: Stephen Nelson
bsmcorpmt@gmail.com

Bjornson Jones Mungas, PLLC
2809 Great Northern Loop, Suite 100
Missoula, MT 59808
Attention: David Bjornson
david@bjornsonlaw.com

| From: | David Bjornson |
|---|---|
| To: | peter@itolawgroup.com |
| Cc: | Jill Broughton; Kassy Buss |
| Subject: | Subordination Agreement |
| Date: | Tuesday, May 26, 2020 7:30:11 PM |
| Attachments: | Subordination Agreement 05.26.2020 v4.docx |

Peter:

As you know, it is our position that Bonner Property Development, LLC ("**BPD**") contracted for and is entitled to a first lien security interest in the new servers owned by Hyperblock and financed by the Bank of Montana loan, which was guaranteed by BPD and its principals. The first lien position was a key term and material inducement, without which BPD and its principals would not have provided the credit enhancements which facilitated the financing to purchase the new servers. For your convenience, I have extracted the following pertinent language from the various Agreements with BPD that were negotiated and executed by Mr. Walsh on behalf of Hyperblock:

    a. Section 1.2 of the Credit Enhancement Agreement provides that:

        "The reimbursement obligation [of Hyperblock to reimburse BPD and its principals] shall be secured by a first lien security interest in the new assets and other improvements that Borrower intends to acquire with the proceeds from the Bank Loan and the New Equity ("Borrower's Pledged Assets"). Borrower shall execute and deliver a security agreement contemporaneously with this Agreement in form and substance acceptable to Pledgor and its counsel ("Security Agreement"). Borrower covenants to obtain lien waivers and releases from contractors and suppliers and to maintain Pledgor's first lien position in Borrower's Pledged Assets at all times. Any default under the Bank Loan shall also be a default under this Agreement, and Pledgor shall have the remedies provided under the Security Agreement.

    b. Section 4.1(f) of the Credit Enhancement Agreement further provides that Hyperblock will "execute such financing documents as [BPD] may reasonably request to perfect and continue a first position security interest in Borrower's Pledged Assets in favor of Pledgor."

    c. The Modification was negotiated and executed by the parties pursuant to a revised plan to purchase "New Servers" as defined therein. The Modification provides in relevant part that the Security Agreement was "modified to include ALL personal property owned by Tenant which is located currently at the Property (and not just newly acquired New Servers), but specifically excluding all servers owned by Tenant and located on the Property as of the date of this Modification." (12-31-2019) The Modification did not eradicate the first lien position to be held on any assets acquired through the Bank of Montana loan.

EXHIBIT 35.
PAGE 2

Even if the UCC-1 had been filed in December 2019 at the time of the plan to purchase the New Servers, it would have been behind Project Spokane and Sean Walsh in priority under the race statute.  A subordination would have been required to be executed by Sean.  We provide it now, 5 months after the execution of the documents.   The expiration of 5 months does not extinguish the obligation to provide the subordination.

It was and remains the obligation of Hyperblock to obtain and provide BPD with a first position security interest in the subject assets.  To facilitate and correct such breach, please review and ask Sean to execute and deliver the attached subordination agreement.  This document would be executed only by Sean Walsh, the same person that negotiated and executed the first lien position in the documents with BPD.  We are most definitely open to comments and revisions to the subordination agreement.

After the phone call today, I am fully aware of how you may likely respond to this.  I felt it important to provide the contractual provisions as both you and Sean seemed unclear about this key contractual commitment which is clearly set forth in the legal documents.  I also felt it important to provide you and Sean with the path to rectify the failure to provide the subordination.   It would have no different effect if executed now vs being executed in January.

There was a lot of anger today.  I am not sure how you and Sean expected BPD to respond to this situation, without notice or knowledge of any plan to protect them.  I would ask you to put the shoe on the other foot and ask what would you and Sean have done in the reverse situation.

We have meetings tomorrow to discuss things further, based in part on the phone call.

David

_____

**David H. Bjornson**

**Bjornson Jones Mungas, PLLC**
**2809 Great Northern Loop, Suite 100**
**Missoula, Montana  59808**
**(406) 721-8896**
**(406) 541-8037--fax**
http://www.bjornsonlaw.com/attorneys/david-h-bjornson/
Email:  david@bjornsonlaw.com
*CONFIDENTIALITY NOTICE:*  *The information contained in this email message may be privileged or confidential information and is intended only for the use of the individual or entity named above.  If you have received this communication in error, please notify us immediately by telephone and delete the message from your system.*

EXHIBIT 35.
PAGE 3

## SUBORDINATION AGREEMENT

This SUBORDINATION AGREEMENT (this "**Agreement**") dated _____ 2020, is by and between Sean Walsh, an individual, of 151 Calle San Francisco, #200, San Juan, PR US 00901 ("**Walsh**"), Project Spokane, LLC, a Colorado limited liability company, of 5619 DTC Parkway 475, Greenwood Village, CO 80111 ("**PS**"), and Bonner Property Development, LLC, a Montana limited liability company, of 224 North Higgins Avenue, Missoula, MT 59802 ("**BPD**").

### RECITALS:

A.    BPD and Hyperblock, LLC, a Delaware limited liability company ("**Hyperblock**") previously entered into certain agreements, including the following agreements: the Commercial Lease Agreement, dated March 1, 2016; the First Amendment to Commercial Lease Agreement executed in December 2016, and effective January 1, 2017; the Second Amendment to Commercial Lease Agreement dated July 13, 2017, but effective January 1, 2017; the Third Amendment to Commercial Lease Agreement, effective December 13, 2018; the Side Agreement, dated January 23, 2019; the Fourth Amendment to Commercial Lease Agreement effective January 23, 2019; the Credit Enhancement Agreement, dated December 13, 2018; the Security Agreement, dated December 13, 2018, and the Modification of Lease Agreement, Credit Enhancement Agreement, Security Agreement and Side Letter to Third Amendment to Lease Agreement executed effective December 31, 2019 (the "**Modification**"), and all other instruments, documents, and agreements executed in connection with or related thereto, including as they may have been amended or modified (collectively, the "**BPD Agreements**"). Among other things, the Modification amended the Security Agreement to cover all personal property located at the Missoula leased premises excepting servers located there on December 31, 2019, but does not modify the first lien position on the newly financed servers described in Recital C which was provided by the terms of the Credit Enhancement Agreement.

B.    Any and all liens, encumbrances, or security interests, including those arising pursuant to the BPD Agreements or by operation of law (with such term including those arising thereafter or hereafter) in favor of BPD that secure any present or future indebtedness, obligation, liability, claim, right, or demand of any kind (including those arising thereafter or hereafter) of Hyperblock to BPD are referred to herein collectively as the "**BPD Security Interests**."

C.    Among the BPD Security Interests are a first lien priority security interest in the personal property financed by that certain loan that was made available to Hyperblock based in part on the credit enhancements of BPD and its principals in favor of Bank of Montana, in the original principal amount of approximately $2.625 million. Specifically, such equipment includes but is not limited to 1,493 Bitmain S17+ Servers, with PSU (the "**Financed Servers**"). The intended and agreed upon first lien security interests in the Financed Servers shall hereinafter be referred to as the "**BPD New Server Security Interests**."

D.    Any and all liens, encumbrances, or security interests, including those arising by operation of law (with such term including those arising thereafter or hereafter) in favor of Walsh that secure any present or future indebtedness, obligation, liability, claim, right, or demand of any kind (including those arising thereafter or hereafter) of Hyperblock to Walsh are referred to herein collectively as the "**Walsh Security Interests**."

E.    Any collateral referenced or captured by the Walsh Security Interests (including arising thereafter or hereafter or by operation of law) are referred to herein collectively as the "**Walsh Collateral**."

F.       Any and all liens, encumbrances, or security interests, including those arising by operation of law (with such term including those arising thereafter or hereafter) in favor of PS that secure any present or future indebtedness, obligation, liability, claim, right, or demand of any kind (including those arising thereafter or hereafter) of Hyperblock to PS are referred to herein collectively as the "**PS Security Interests**."

G.       Any collateral referenced or captured by the PS Security Interests (including arising thereafter or hereafter or by operation of law) are referred to herein collectively as the "**PS Collateral**."

**AGREEMENT:**

NOW, THEREFORE, the parties agree as follows:

1.       Walsh hereby subordinates the Walsh Security Interests and the Walsh Collateral in all respects to the BPD New Server Security Interests in the Financed Servers, and Walsh hereby agrees that, to the maximum extent allowable by law, such subordination shall be effective as of December 31, 2019, and continue forward.

2.       PS hereby subordinates the PS Security Interests and the PS Collateral in all respects to the BPD New Server Security Interests in the Financed Servers, and PS hereby agrees that, to the maximum extent allowable by law, such subordination shall be effective as of December 31, 2019, and continue forward.

3.       Walsh hereby represents and warrants to BPD that it has not assigned, encumbered or transferred any rights or interests, vested or contingent, in or to the Walsh Security Interests or the Walsh Collateral.

4.       PS hereby represents and warrants to BPD that it has not assigned, encumbered, or transferred any rights or interests, vested or contingent, in or to the PS Security Interests or the PS Collateral.

5.       The parties signing this Agreement represent and warrant such party has full authority to so act.

6.       The parties agree to promptly execute, or promptly cause to be executed, any and all supplemental documents, and to promptly perform, or cause to be promptly performed, any and all supplemental acts, to give full force and effect to the terms and intent of this Agreement.

7.       This Agreement contains the entire agreement between the parties as to the order of priority of the security interests addressed herein.

8.       This Agreement shall be interpreted, construed and governed by the laws of the State of Montana.

9.       This Agreement shall inure to the benefit of, and shall be binding upon, the respective successors and assigns of each of the parties hereto.

10.       This Agreement may be executed in any number of counterparts, each of which shall be an original, but all of which together shall be deemed to constitute one instrument.

[Remainder of Page Intentionally Left Blank – Signature and Notary Pages Follow]

EXHIBIT 35.
PAGE 5

     IN WITNESS WHEREOF, the undersigned has executed this Agreement as of the date and year first above written.

**PS:**

**Project Spokane, LLC,**
**a Colorado limited liability company**


By: _____
Name: _____
Its: _____



STATE OF _____          )
                                   ) ss.
COUNTY OF _____          )

     The foregoing instrument was acknowledged before me this ____ day of _____ 2020, by _____, as _____ of Project Spokane LLC, a Colorado limited liability company.

[SEAL and Expiration Date]


                                   _____
                                   Notary Public
                                   My Commission Expires _____

EXHIBIT 35.
PAGE 6

IN WITNESS WHEREOF, the undersigned has executed this Agreement as of the date and year first above written.

**WALSH:**

_____
Sean Walsh, individually


STATE OF _____        )
                                                                ) ss.
COUNTY OF _____       )

The foregoing instrument was acknowledged before me this ___ day of _____ 2020, by Sean Walsh, individually.

[SEAL and Expiration Date]

_____
Notary Public
My Commission Expires _____

IN WITNESS WHEREOF, the undersigned has executed this Agreement as of the date and year first above written.

**BPD:**

**Bonner Property Development, LLC,**
**a Montana limited liability company**


By: _____
Name: Stephen Nelson
Its: Co-Manager



STATE OF MONTANA                          )
                                          ) ss.
COUNTY OF MISSOULA                        )

The foregoing instrument was acknowledged before me this ___ day of _____ 2020, by Stephen Nelson, as Co-Manager of Bonner Property Development, LLC, a Montana limited liability company.

[SEAL and Expiration Date]


_____
Notary Public
My Commission Expires _____

| From: | peter@itolawgroup.com |
|---|---|
| To: | David Bjornson |
| Cc: | Jill Broughton; Kassy Buss; Amie Zendron; Big Sky Mobile Catering (bsmcorpmt@gmail.com); Michael Boehme; hans.rizzari@croweseoberman.com; Inder Saini; dday@bankofmt.com |
| Subject: | RE: Defects in Notice of Disposition of Collateral By Public Sale - Hyperblock, LLC / Project Spokane, LLC / Sean Walsh / Bonner Property Development, LLC |
| Date: | Tuesday, May 26, 2020 4:18:15 PM |
| Attachments: | 2020.04.07 MT UCC Search - Hyperblock LLC(9801718.1).pdf |

Mr. Bjornson,

As you are aware, my firm represents Sean Walsh ("**Mr. Walsh**") and Project Spokane, LLC. ("**Project Spokane**," together with Mr. Walsh, the "**Lenders**").  I am in receipt of your Notice re Defects ("**Notice re Defects**") in Notice of Disposition of Collateral by Public Sale ("**Notice of Disposition**"), which you sent on behalf of Bonner Property Development ("**BPD**").  This emails shall serve as Lenders' response to your Notice re Defects.

Your Notice re Defects is full of innuendo, hyperbole, and patently false and defamatory statements.  Your bullying tactics will not be tolerated.  At no time did Mr. Walsh or Project Spokane make most of the statements that you attribute to them.  Further, if a creditor desires a first priority lien then it is up to that creditor to negotiate terms, draft the appropriate documents, obtain necessary signatures and, thereafter, make the necessary statutory filings to obtain such a lien.  None of these steps are the obligations of another creditor.  The fact that you made these false statements is troubling but even more egregious is the fact that you sent these false statements to representatives for Hyperblock, LLC, Hyperblock, Inc. and Bank of Montana.  If your objective was to highjack any possibility of a business resolution, you are dangerously close to succeeding.  My clients demand that you retract your letter and statements no later than 5:00 p.m. Eastern on Wednesday, May 27, 2020.  You have caused tangible harm to Mr. Walsh and Project Spokane, and they intend to seek appropriate relief if a retraction is not made.

Your Notice re Defects also falls woefully short on the law.  In fact, your Notice re Defects fails to include any reference or citation to any legal authority to support BPD's assertion that Lenders cannot proceed forward with their disposition of collateral by public sale.  For the reasons set forth below, BPD does not, vis-à-vis Lenders, have superior lien rights In the property that is the subject of the sale.

The priorities among conflicting security interests is governed by Article 9 of the Uniform Commercial Code ("**UCC**").  In order to perfect its alleged security interest in the property that is the subject of the sale, BPD was required to file a UCC-1 Financing Statement in the jurisdiction where Hyperblock, LLC is located.  *See* UCC § 9-301(1).  Under Article 9, a limited liability company is deemed located in the state where it is organized. UCC § 9-307(e).  In this case, as Hyperblock is a Delaware limited liability company, BDP was required to file its UCC-1 Financing Statement with the Delaware Secretary of State.  Despite this fact, your office filed a UCC-1 Financing Statement on behalf of BPD on January 7, 2019, with the Montana Secretary of State (see attached).  Thereafter, your office allegedly filed a UCC-1 Financing Statement on behalf of BPD in Delaware on May 22, 2020.  I use the word "allegedly" as  your office has not provided Lenders with a certification from the Delaware Secretary of State evidencing the filing.  In contrast, in my email dated May 22, 2020, I

provided you with a Delaware Secretary of State certification for Hyperblock, LLC dated as of March 30, 2020.  That certification shows that (i)  Project Spokane filed its UCC-1 Financing Statement with the Delaware Secretary of State on July 10, 2018 as Filing No. 20184736126 followed by two amendments on February 15, 2019 and (ii) Mr. Walsh filed his UCC-1Financing Statement with the Delaware Secretary of State on July 19, 2019 at File No. 20195007682.

UCC § 9-322(a) governs the priorities among conflicting security interests.  More specifically, § 9-322(a)(1) states, in relevant part, as follows:  "Except as otherwise provided in this section, priority among conflicting security interests and agricultural liens in the same collateral is determined according to the following rules: (1) Conflicting perfected security interests and agricultural liens rank according to priority in time of filing or perfection.  Priority dates from the earlier of the time a filing covering the collateral is first made or the security interest or agricultural liens is first perfected, if there is no period thereafter when there is neither filing nor perfection."  In short, § 9-322(a) is a "pure race" statute.  It is not, contrary to your assertion, a "notice-race" statute.  Therefore, your argument that "Sean Walsh and Project Spokane were or should reasonably have been acutely aware of the priority and nonpriority security interests" is of no significance.  As noted by the foremost authority on Article 9:  "That is, the one who wins the 'race' to the filing office is superior even if that one had 'notice' or 'knowledge' of an earlier claim.  The section nowhere requires that the victor be without knowledge of its competitor's claim."  *See* James J. White, Robert F. Summers & Robert A. Hillman, *Uniform Commercial Code* § 33-3 (6th ed. 2015).

Simply put, as Lenders' UCC-1 Financing Statements were recorded prior in time to BPD's UCC-1 Financing Statement, Lenders' liens in the property that is the subject of the sale, including the property included on Exhibit E2 to your Notice re Defects, are senior in priority to the alleged lien of BPD.  Upon completion of the sale by Lenders, BPD's alleged lien will be discharged.  *See* UCC § 9-617(a)(3).  As such, Lenders have no intention of revising, modifying or reissuing their Notice of Disposition.  Rest assured that If BPD attempts to enjoin or disrupt the sale, Lenders will seek to recover all consequential damages caused by BPD's conduct, including damages for lost profits and revenue.

The foregoing is without prejudice to any of Lenders' rights, powers, privileges, remedies and defenses, now existing or hereafter arising, all of which are hereby expressly reserved.

Sincerely,

Peter W. Ito
Ito Law Group, P.C.
1550 Larimer Street, Suite 667
Denver, Colorado 80202
Phone: 720.281.5294
Email: peter@itolawgroup.com
Linkedin:  http://www.linkedin.com/pub/peter-ito/11/66a/15b
Website:  www.itolawgroup.com

---

**From:** David Bjornson <david@bjornsonlaw.com>
**Sent:** Monday, May 25, 2020 9:05 PM
**To:** peter@itolawgroup.com; hyperblockassets@gmail.com; hans.rizarri@crowesoberman.com;

inder@hyperblock.co; Danny Day (dday@bankofmt.com) <dday@bankofmt.com>
**Cc:** Jill Broughton <jill@bjornsonlaw.com>; Kassy Buss <kassy@bjornsonlaw.com>; Amie Zendron
<amiezendron@bjornsonlaw.com>; Big Sky Mobile Catering (bsmcorpmt@gmail.com)
<bsmcorpmt@gmail.com>; Michael Boehme <mikeb@bonnerproperty.com>
**Subject:** Defects in Notice of Disposition of Collateral By Public Sale - Hyperblock, LLC / Project
Spokane, LLC / Sean Walsh / Bonner Property Development, LLC
**Importance:** High


Attached is an important notice regarding defects in the above described notice.
Please contact me if you have questions or comments.   David

_____

**David H. Bjornson**

**Bjornson Jones Mungas, PLLC**
**2809 Great Northern Loop, Suite 100**
**Missoula, Montana  59808**
**(406) 721-8896**
**(406) 541-8037--fax**
http://www.bjornsonlaw.com/attorneys/david-h-bjornson/
**Email:  david@bjornsonlaw.com**
*CONFIDENTIALITY NOTICE:  The information contained in this email message may be privileged or confidential*
*information and is intended only for the use of the individual or entity named above.  If you have received this*
*communication in error, please notify us immediately by telephone and delete the message from your system.*

---

This email has been scanned for email related threats and delivered safely by Mimecast.
For more information please visit http://www.mimecast.com

---



# MONTANA SECRETARY OF STATE

Request Date: 04/07/2020 10:21 AM
Info Request Doc #:          20200267132
DLN #:          B0029-1033

CROWLEY FLECK PLLP
TAMARA MELIA-WOODWARD
PO BOX 2529
BILLINGS, MT 59103-2529

## Search Results Listing

Pursuant to the request that you submitted, a search was conducted based on the search criteria listed below. The listing below, within a reasonable degree of certainty, is a record of all presently effective UCC financial statements and Statements of Assignments which name the below debtor and which are on file in my office from January 1, 1965 through April 6, 2020.

The search results herein reflect only the specific information requested. The results of this debtor search will not reflect variances of this name. If the debtor is known under other personal names, trade names, business entities or cities, separate searches of these name will have to be requested and conducted. The Secretary of State disclaims any and all liability for claims resulting from other filings on which the name of the debtor can be found in any other form than that which was requested herein.

## Search Criteria:

Organization: HYPERBLOCK | using 'Begins With' search
Request Type: Non-Standard Information Request
Active (unlapsed records only), List and ALL Copies



Corey Stapleton
Montana Secretary of State
Enclosures: Original Documents

**Lien Listing**

**Lien Doc #: 1901072389302     DLN #: A0099-7385     Filed: 01/07/2019 11:29 AM Lapse: 01/07/2024 11:59 PM**

Debtor(s):          HYPERBLOCK LLC , 120 ADELAIDE STREET WEST SUITE 2210 CANADA

Secured Party(s):   BONNER PROPERTY DEVELOPMENT, LLC , 224 NORTH HIGGINS AVENUE, MISSOULA, MT
                    59802

*Lien 3 Amendment - Restate Collateral*

Lien Doc #: 20200059663          DLN #: B0022-1783   Filed: 01/20/2020 03:13 PM

EXHIBIT 36.
PAGE 5



# MONTANA SECRETARY OF STATE

| | |
|---|---|
| Request Date: | 04/07/2020 10:21 AM |
| Info Request Doc #: | 20200267132 |
| DLN #: | B0029-1033 |

CROWLEY FLECK PLLP
ATTN: TAMARA MELIA-WOODWARD
PO BOX 2529
BILLINGS, MT  59103-2529

## Document Report

The Montana Secretary of State has received and processed your request for copies 1901072389302.

If you have any questions or concerns regarding this search, please contact a UCC specialist at 406-444-3665 at your earliest convenience.

Corey Stapleton
Montana Secretary of State
Enclosures: Original Documents

Montana State Capitol . PO Box 202801 . Helena, Montana 59620-2801
tel: 406-444-3665 . fax: 406-444-3976 . TTY: 406-444-9068 . sosmt.gov

Page 1 of 1

## UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS

| A. NAME & PHONE OF CONTACT AT FILER [optional] |
|---|
| Bjornson Law Offices, PLLC          (406) 721-8896 |

**B. E-MAIL CONTACT AT FILER (optional)**

jill@bjornsonlaw.com

**C. SEND ACKNOWLEDGMENT TO:  (Name and Address)**

Bjornson Law Offices, PLLC
2809 Great Northern Loop, Ste 100
Missoula, MT  59808

> Montana Secretary of State
> File Number: 1901072389302
> Date Filed: 1/7/2019 11:29 AM

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

Page 1 of 1

**1. DEBTOR'S NAME:** Provide only <u>one</u> Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the individual Debtor's name will not fit in the line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor Information in item 10 of the Financing Statement Addendum (Form UCC1AD)

| | 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| OR | Hyperblock LLC | | | |
| | 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIALS | SUFFIX |
| | | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 120 Adelaide Street West, Suite 2210 | Toranto | ON | M5H 1T1 | Canada |

**2. DEBTOR'S NAME:** Provide only <u>one</u> Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the individual Debtor's name will not fit in the line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor Information in item 10 of the Financing Statement Addendum (Form UCC1AD)

| | 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| OR | | | | |
| | 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIALS | SUFFIX |
| | | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

**3. SECURED PARTY'S NAME** (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only <u>one</u> Secured Party name (3a or 3b)

| | 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| OR | Bonner Property Development, LLC | | | |
| | 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 224 North Higgins Avenue | Missoula | MT | 59802 | USA |

**4. COLLATERAL:**  This financing statement covers the following collateral:

```
To the extent acquired, improved or built in part and directly or indirectly with proceeds of the "Bank
Loan" from Bank of Montana, as that term is defined in that certain Credit Enhancement Agreement
executed by the Debtor and Secured Party concurrently herewith, the
following:
Furniture, equipment, fixtures, and other articles of personal property now or hereafter owned by
Debtor; together with all accessions, parts, and additions to, all replacements of, and all
substitutions for, any of such property; and together with all proceeds (including without limitation
all insurance proceeds and refunds of premiums) from any sale or other disposition of any such property.
```

**5.** Check only if applicable and only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

| 6a. Check only if applicable and only one box: | 6b. Check only if hereafter and only one box: |
|---|---|
| ☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility | ☐ Agricultural Lien ☐ Non-UCC Filing |

**7. ALTERNATIVE DESIGNATION (if applicable):** ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

**8. OPTIONAL FILER REFERENCE DATA**

Project Spokane

**UCC FINANCING STATEMENT (FORM UCC1) (REV. 7/1/2013)**



2020005963



**STATE OF MONTANA**
*SECRETARY OF STATE*
UCC3 AMENDMENT

| | |
|---|---|
| | *For Office Use Only*<br>STATE OF MONTANA<br>**-FILED-**<br>SECRETARY OF STATE<br>Entity Number: 20200059663<br>Date Filed: 1/20/2020 3:13:08 PM |

Filing Fee - $5.  Terminations are $0.

| Contact at Filer: | |
|---|---|
| Contact Name | David H. Bjornson |
| Contact Phone | (406) 721-8896 |
| Contact Email | jill@bjornsonlaw.com |

| Send acknowledgment to: | |
|---|---|
| Name | David H. Bjornson |
| Address | DAVID H. BJORNSON<br>2809 GREAT NORTHERN LOOP #100<br>MISSOULA, MT 59808 |

| Amendment Actions: | |
|---|---|
| Initial Financing Statement File Number | 1901072389302 |
| Date Filed | 01/07/2019 |
| Amendment Action | Collateral Amendment - $5.00 (add, edit or delete collateral) |
| Collateral Change | Edit Collateral |

| Collateral: | |
|---|---|
| Indicate collateral: | Furniture, equipment, fixtures, computer servers, power supplies, and other articles of personal property now or hereafter owned by Debtor; together with all accessions, parts, and additions to, all replacements of, and all substitutions for, any of such property; and together with all proceeds (including without limitation all insurance proceeds and refunds of premiums) from any sale or other disposition of any such property; EXCLUDING however, all computer servers owned by Debtor and located at 9144 Bonner Mill Road, Bonner, MT 59823, at the close of business December 31, 2019. |

| UCC3 Addendum | |
|---|---|
| ☐ | Check here if you are required to complete the UCC3 Addendum for this lien. |

| Name of SECURED PARTY of record authorizing this amendment: | |
|---|---|
| ☐ | If this is an amendment authorized by a DEBTOR, check here and provide the name of the authorizing debtor. |
| Authorizing Party Name | BONNER PROPERTY DEVELOPMENT, LLC |

| Optional Filer Reference Data: | |
|---|---|
| Project Spokane | |

B0022-1783 01/20/2020 3:13 PM Received by MT Secretary of State Corey Stapleton

| From: | peter@itolawgroup.com |
|---|---|
| To: | David Bjornson |
| Cc: | Jill Broughton; Kassy Buss |
| Subject: | RE: Subordination Agreement |
| Date: | Wednesday, May 27, 2020 2:51:28 PM |

David,

I am in receipt of your email below and have reviewed it along with your proposed Subordination Agreement.  On behalf of Sean Walsh ("**Mr. Walsh**") and Project Spokane, LLC ("**Project Spokane**"), I write in response to your demand that Mr. Walsh and Project Spokane execute the Subordination Agreement in favor of Bonner Property Development ("**BPD**").

BPD's request that Mr. Walsh and Project Spokane execute the Subordination Agreement is and will be treated as an admission that the liens held by Mr. Walsh and Project Spokane are senior in priority to the alleged lien of BPD.  Rest assured that this admission will be front and center before a court if BPD attempts to enjoin or disrupt the sale set for June 3, 2020.  To be clear, neither Mr. Walsh nor Project Spokane will execute the Subordination Agreement.  The Credit Enhancement Agreement that you cite to in your email below is between BPD and Hyperblock, LLC.  Neither Mr. Walsh nor Project Spokane are parties to this agreement.  Further, neither Mr. Walsh nor Project Spokane ever agreed to subordinate their liens against the assets owned by Hyperblock, LLC.  In this regard, your statement that Mr. Walsh negotiated "the first lien position in the documents with BPD," is patently false.  Other members of the Hyperblock, LLC team represented Hyperblock, LLC in its negotiations with BPD. These undisputed facts will also be brought to the court's attention If BPD attempts to enjoin or disrupt the sale on the grounds that it is entitled to a first priority lien.

As I made clear in my email to you dated May 26, Mr. Walsh and Project Spokane will seek to recover all damages caused by BPD  if the sale is enjoined or disrupted, including damages for lost profits and revenue.

The foregoing is without prejudice to any of Mr. Walsh's and Project Spokane's rights, powers, privileges, remedies and defenses, now existing or hereafter arising, all of which are hereby expressly reserved.

Sincerely,

Peter W. Ito
Ito Law Group, P.C.
1550 Larimer Street, Suite 667
Denver, Colorado 80202
Phone: 720.281.5294
Email: peter@itolawgroup.com
Linkedin:  http://www.linkedin.com/pub/peter-ito/11/66a/15b
Website:  www.itolawgroup.com

**From:** David Bjornson <david@bjornsonlaw.com>
**Sent:** Tuesday, May 26, 2020 9:30 PM
**To:** peter@itolawgroup.com

**Cc:** Jill Broughton <jill@bjornsonlaw.com>; Kassy Buss <kassy@bjornsonlaw.com>
**Subject:** Subordination Agreement

Peter:

As you know, it is our position that Bonner Property Development, LLC ("**BPD**") contracted for and is entitled to a first lien security interest in the new servers owned by Hyperblock and financed by the Bank of Montana loan, which was guaranteed by BPD and its principals.   The first lien position was a key term and material inducement, without which BPD and its principals would not have provided the credit enhancements which facilitated the financing to purchase the new servers.  For your convenience, I have extracted the following pertinent language from the various Agreements with BPD that were negotiated and executed by Mr. Walsh on behalf of Hyperblock:

   a.  Section 1.2 of the Credit Enhancement Agreement provides that:

      "The reimbursement obligation [of Hyperblock to reimburse BPD and its principals] shall be secured by a first lien security interest in the new assets and other improvements that Borrower intends to acquire with the proceeds from the Bank Loan and the New Equity ("Borrower's Pledged Assets").  Borrower shall execute and deliver a security agreement contemporaneously with this Agreement in form and substance acceptable to Pledgor and its counsel ("Security Agreement").   Borrower covenants to obtain lien waivers and releases from contractors and suppliers and to maintain Pledgor's first lien position in Borrower's Pledged Assets at all times.   Any default under the Bank Loan shall also be a default under this Agreement, and Pledgor shall have the remedies provided under the Security Agreement.

   b.  Section 4.1(f) of the Credit Enhancement Agreement further provides that Hyperblock will "execute such financing documents as [BPD] may reasonably request to perfect and continue a first position security interest in Borrower's Pledged Assets in favor of Pledgor."

   c.  The Modification was negotiated and executed by the parties pursuant to a revised plan to purchase "New Servers" as defined therein.   The Modification provides in relevant part that the Security Agreement was "modified to include ALL personal property owned by Tenant which is located currently at the Property (and not just newly acquired New Servers), but specifically excluding all servers owned by Tenant and located on the Property as of the date of this Modification."  (12-31-2019)   The Modification did not eradicate the first lien position to be held on any assets acquired through the Bank of Montana loan.

Even if the UCC-1 had been filed in December 2019 at the time of the plan to purchase the New Servers, it would have been behind Project Spokane and Sean Walsh in priority under the race statute.  A subordination would have been required to be executed by Sean.  We provide it now, 5 months after the execution of the documents.   The expiration of 5 months does not extinguish the obligation to provide the subordination.

It was and remains the obligation of Hyperblock to obtain and provide BPD with a first position security interest in the subject assets.  To facilitate and correct such breach, please review and ask Sean to execute and deliver the attached subordination agreement.  This document would be executed only by Sean Walsh, the same person that negotiated and executed the first lien position in the documents with BPD.  We are most definitely open to comments and revisions to the subordination agreement.

After the phone call today, I am fully aware of how you may likely respond to this.  I felt it important to provide the contractual provisions as both you and Sean seemed unclear about this key contractual commitment which is clearly set forth in the legal documents.  I also felt it important to provide you and Sean with the path to rectify the failure to provide the subordination.   It would have no different effect if executed now vs being executed in January.

There was a lot of anger today.  I am not sure how you and Sean expected BPD to respond to this situation, without notice or knowledge of any plan to protect them.  I would ask you to put the shoe on the other foot and ask what would you and Sean have done in the reverse situation.

We have meetings tomorrow to discuss things further, based in part on the phone call.

David

_____

**David H. Bjornson**

**Bjornson Jones Mungas, PLLC**
**2809 Great Northern Loop, Suite 100**
**Missoula, Montana  59808**
**(406) 721-8896**
**(406) 541-8037--fax**
http://www.bjornsonlaw.com/attorneys/david-h-bjornson/
**Email:  david@bjornsonlaw.com**
*CONFIDENTIALITY NOTICE:  The information contained in this email message may be privileged or confidential information and is intended only for the use of the individual or entity named above.  If you have received this communication in error, please notify us immediately by telephone and delete the message from your system.*

EXHIBIT 36.(ii)
PAGE 4

This email has been scanned for email related threats and delivered safely by Mimecast.
For more information please visit http://www.mimecast.com

EXHIBIT 37.
PAGE 1

**From:** David Bjornson
**Sent:** Sunday, May 31, 2020 6:06 PM
**To:** inder@hyperblock.co; hans.rizarri@crowesoberman.com; Jaymie Bowditch
<jbowditch@boonekarlberg.com>
**Cc:** Jill Broughton <jill@bjornsonlaw.com>; Kassy Buss <kassy@bjornsonlaw.com>; Nick Jones
<nickjones@bjornsonlaw.com>
**Subject:** Notice of Default - Hyperblock

Attached is a Notice of Default respecting the lease for the premises in Bonner,
Montana as well as certain other agreements between Hyperblock LLC and Bonner
Property Development, LLC.   It will also be sent by US Mail.   Please contact me if
you have any questions or wish to discuss it.   David

---

## David H. Bjornson

**Bjornson Jones Mungas, PLLC**
**2809 Great Northern Loop, Suite 100**
**Missoula, Montana  59808**
**(406) 721-8896**
**(406) 541-8037--fax**
http://www.bjornsonlaw.com/attorneys/david-h-bjornson/
Email:  david@bjornsonlaw.com
*CONFIDENTIALITY NOTICE:  The information contained in this email message may be privileged or confidential
information and is intended only for the use of the individual or entity named above.  If you have received this
communication in error, please notify us immediately by telephone and delete the message from your system.*

EXHIBIT 37.
PAGE 2

**BJM** | **BJORNSON JONES MUNGAS**
PLLC

2809 Great Northern Loop, Suite 100
Missoula, Montana 59808
Telephone (406) 721-8896 • Fax (406) 541-8037 • bjorlaw@bjornsonlaw.com

May 31, 2020

***SENT VIA USPS PRIORITY MAIL, DELIVERY CONFIRMATION AND BY EMAIL***

Hyperblock LLC
140 Yonge Street, #209
Toronto, ON M5C 1X6
Attention: Inder Saini
inder@hyperblock.co

Hyperblock, Inc.
2 St. Claire Avenue East, Suite 1100
Toronto, ON M4T 2T5
Attention: Hans Rizarri
hans.rizarri@crowesoberman.com

James A. Bowditch
Boone Karlberg P.C.
PO Box 9199
Missoula, MT 59807-9199
jbowditch@boonekarlberg.com

RE:     **NOTICE OF DEFAULT AND NOTICE OF INTENT TO INSPECT PREMISES**

Ladies and Gentlemen:

We represent Bonner Property Development, LLC ("BPD") and its principal, Stephen Nelson and Michael Boehme, regarding certain agreements between HyperBlock LLC, a Delaware limited liability company ("HyperBlock"), and BPD. These agreements include the following (each as modified by that certain Modification of Lease Agreement, Credit Enhancement Agreement, Security Agreement and Side Letter to Third Amendment to Lease Agreement dated December 31, 2019 (the "Modification")): the Security Agreement dated December 13, 2018 (the "Security Agreement"); the Credit Enhancement Agreement dated December 31, 2019 (the "Credit Enhancement Agreement"); and the Commercial Lease Agreement dated March 1, 2016, as amended by multiple amendments (the "Lease") for the leasing of certain real property owned by BPD and more particularly described in the Lease (the "Premises"). Collectively, all of the foregoing may be referred to herein as the "BPD Agreements").

You are hereby provided this **NOTICE OF DEFAULT AND DEMAND TO CURE WITH REGARDS TO CERTAIN BREACHES OF HYPERBLOCK UNDER THE BPD AGREEMENTS**. HyperBlock's breaches and defaults under the BPD Agreements include, but are not limited, to the following:

1.    BPD received a notice dated May 19, 2020 (the "Notice") that Project Spokane, LLC, a Colorado limited liability company ("Project Spokane"), and Sean Walsh ("Walsh") intend to hold a public sale (the "Sale") to dispose of certain assets belonging to or used by HyperBlock, some of which assets are included in a first lien security interest granted by Hyperblock, and some of which assets are actually property belonging to BPD under the BPD Agreements. This constitutes a default under the BPD Agreements, including the Lease and the Security Agreement.

2.    Hyperblock and BPD agreed in the BPD Agreements that certain assets such as fixtures and certain items of personal property would remain with the Premises at the termination of the Lease. The Notice indicates this property is alleged to be subject to a lien in favor of Walsh and Project Spokane and this property is intended to be sold as a part of HyperBlock's assets at the Sale. The filing of a lien on property of BPD and the sale or attempted sale of assets, which by agreement and by law, are currently the property of BPD or will become BPD's property at the termination of the Lease, or are fixtures and constitute real property and not personal property, constitutes a default under the Lease. Hyperblock's defaults under the Lease have resulted in defaults under the Credit Enhancement Agreement and the Security Agreement;

May 31, 2020
RE:  Notice of Default

EXHIBIT 37.
PAGE 3

3.   BPD received a default notice from Bank of Montana dated May 26, 2020, related to HyperBlock's default under the Bank of Montana loan. Such default, if uncured, constitutes a default under the Credit Enhancement Agreement and the Security Agreement.

4.   HyperBlock has failed to make payments for utilities related to HyperBlock's use of the Premises, including by defaulting under the contract between HyperBlock and Energy Keepers, Inc. ("EKI"), which contract was terminated by EKI. This constitutes a breach of the Lease.

5.   BPD has received information that HyperBlock may be insolvent.  It has failed to pay its power utility bills, resulting in litigation by its power supplier, its authorized officer disclosed to us impending bankruptcy proceedsings, and communications to HyperBlock by email were met with an automatic response which reads as follows: "Please note that Hyperblock has filed an assignment into Bankruptcy. All emails are officially off.   For any further contact, contact the trustee in bankruptcy:

Crowe Soberman LLP:

Hans Rizarri
Hans.Rizarri@crowesoberman.com"


This constitutes a default under the Lease.


6.   The Security Agreement in (Section 1) and the Credit Enhancement Agreement (in Section 4.1.f.) contain affirmative covenants related to HyperBlock's obligation to "[e]xecute such financing statements and other documents as [BPD] may reasonably request to perfect and continue a first position security interest in Borrower's Pledged Assets in favor of [BPD]." HyperBlock has failed to ensure BPD's first position security interest, as evidenced by the failure of Sean Walsh or Project Spokane to recognize the contractually committed first lien security interest in the Notice for the Sale.

7.   BPD has become aware that HyperBlock made material representations and warranties in connection with the BPD Agreements and the Bank of Montana loan that were materially false at the time made, which constitutes a default under the Credit Enhancement Agreement, as well as to each BPD Agreement as to false material representations made respecting the same;


In addition to the foregoing, there may be additional defaults not named herein. By not naming such other defaults, BPD does not waive any rights granted under the BPD Agreements or applicable laws and/or regulations.

In accordance with the terms of the BPD Agreements, BPD hereby demands that HyperBlock cure the defaults that are subject to cure within the times required under the BPD Agreements and gives HyperBlock notice of BPD's intent to exercise any and all remedies available to BPD under the BPD Agreements or at law or in equity, as a secured creditor or otherwise. These include but are not limited to termination of any or all of the BPD Agreements and exercise of BPD's rights as a secured creditor, including but not limited to the right to require assembly of the collateral, enter the Premises and take possession of the collateral, and sell the collateral.

Please contact us immediately to discuss options with us. HyperBlock's failure to promptly address these defaults will result in additional attorneys' fees and costs, and our clients are prepared to exercise their legal remedies. If you do not contact us by **June 30, 2020, at 5:00 p.m. Mountain Time**, we will pursue legal action for all amounts due under the BPD Agreements, including attorneys' fees and costs of collection, and proceed with the next steps to collect the amounts due, which may include foreclosing against the collateral and proceedings to terminate the Lease.

We sincerely hope you will give your immediate attention to this matter to resolve this matter in the least costly way possible. Please contact me directly if you require any additional information.

May 31, 2020
RE:  Notice of Default

EXHIBIT 37.
PAGE 4

**NOTICE OF INTENT TO ACCESS PREMISES**: Pursuant to Section 9 of the Lease, BPD hereby provides written notice of its intent to access the Premises for the purpose of inspecting the Premises on **Monday, June 1, 2020, at 6:30 p.m. (local time).**

Sincerely,
BJORNSON JONES MUNGAS, PLLC

David H. Bjornson
david@bjornsonlaw.com

DHB:az

C:   Bonner Property Development, LLC

5/31/2020    Hyperblock Bitcoin Mining Servers and Datacenter Infrastructure to Be Auctioned off in Public Sale | Sponsored Bitcoin News

Case 9:20-cv-00082-DWM   Document 11-5   Filed 06/15/20   Page 34 of 83

EXHIBIT 38.(i)
PAGE 1

 Bitcoin.com(https://www.bitcoin.com/)

# NEWS (/)

May 31, 2020

---

itcoin.com/crypto/ETH)        XRP $0.21 +2.90% (https://markets.bitcoin.com/crypto/XRP)        BCH $

Your ad here (http://www.bitcoin.com/advertise)

(https://news.bitcoin.com/linkout/388205)

SPONSORED (HTTPS://NEWS.BITCOIN.COM/CATEGORY/SPONSORED/)

by **Bitcoin.com PR** (https://news.bitcoin.com/author/bitcoin-com-pr/)                    *May 20, 2020*

# Hyperblock Bitcoin Mining Servers and Datacenter Infrastructure to Be Auctioned off in Public Sale



EXHIBIT 38.(f)
PAGE 2

**Thousands of mining servers and all the datacenter infrastructure needed to operate them will be auctioned off in an upcoming public sale of Hyperblock's property. The company has announced on Thursday, May 14, 2020, that its 20MW Montana, USA datacenter went offline and that it has ceased all cryptocurrency mining operations.**

# Hyperblock Equipment Public Sale

The senior secured lenders to Hyperblock LLC, Project Spokane and Sean Walsh, will conduct a public sale of the company's property on June 3, 2020 via conference call (see notice here for details (https://itolawgroup.com/hyperblock)). On auction will be all of Hyperblock's servers with their PSUs, including: 791 Bitmain Antminer S17 servers, 359 Bitmain Antminer S17 Pro servers, 1493 Bitmain Antminer S17+ servers, 6641 Bitmain Antminer S9 servers, 726 Bitmain Antminer T17 servers, 162 Avalon921 servers and 161 GPU servers.

The auction will also include all of Hyperblock's datacenter infrastructure, including: 423 Acme Engineering 36″ fans, 30 Grainger/ACME Engineering 42″ fans, 14 ACME Engineering 60″ fans, 8 2,500kVA indoor Switchgear lineups (aka indoor substations), 55 500kVA indoor transformers, 3 750kVA indoor transformers, 3,124 misc PDUs, 339 225A breaker panels, 6 400A breaker panels, 560 (8′ wide, 9′ tall) shelving racks, 6,374 new Delta 2400W PSUs, 374 used Delta 2400W PSUs and 1,420 brand new Delta 2400W PSUs with 10, 16″ PCIe cables soldered on. Additionally included are enough electrical cabling and computer network equipment to run 13,000 servers in about 120k square feet of space.

YouTube Video of Datacenter:

(Note: some of the statistics shown in this video are outdated)

# Terms of the Auction

The lenders have the first priority security interest in the property. They may bid for it and credit bid against all or a portion of its secured claim. The property will be sold free and clear of the lenders' liens and any subordinate security interests in the property. In order to participate in the auction process, each potential bidder must deliver an executed confidentiality agreement and current financial statements or other evidence of the ability to purchase the property.

Case 9:20-cv-00082-DWM   Document 11-5   Filed 06/15/20   Page 36 of 83

EXHIBIT 1
PAGE 3

A qualified bidder will be permitted to perform due diligence by contacting the counsel for the lenders (contact information below). At the Sale, the property will be sold at a public auction to the highest qualified bidder. Higher bids will continue to be entertained until the lenders have determined that they have received the best bid for the property in their sole discretion. The lenders reserve the right to reject all bids and terminate as they may deem proper.

The property will be sold as is, with all faults and without any warranties whatsoever, expressed or implied. No person shall be entitled to any expense reimbursement, brokerage fee, break up fee, "topping," termination or similar fee or payout from the proceeds of the sale.

The public sale may be postponed. In such event, an announcement of the scheduled sale will be made at the currently proposed date and time of the sale. Check out the notice here for more details (https://itolawgroup.com/hyperblock).

Case 9:20-cv-00082-DWM   Document 11-5   Filed 06/15/20   Page 37 of 83

EXHIBIT 38.(i)
PAGE 4

**Attorney Contact Information:**

**Peter W. Ito**
**1550 Larimer Street, Suite 667**
**Denver, CO 80202**
**hyperblockassets@gmail.com**
**(720) 281-5294**
**Click here for more details (https://itolawgroup.com/hyperblock).**

5/31/2020                    Hyperblock Bitcoin Mining Servers and Datacenter Infrastructure to Be Auctioned off in Public Sale | Sponsored Bitcoin News

Case 9:20-cv-00082-DWM   Document 11-5   Filed 06/15/20   Page 38 of 83
EXHIBIT 38.(i)
PAGE 5

BitAmp - The Next New Open Source Wallet

(https://news.bitcoin.com/bitamp-the-next-new-open-source-wallet/)

John McAfee Announces Privacy Coin – Airdrop Today

(https://news.bitcoin.com/john-mcafee-announces-privacy-coin-airdrop-today/)

## TAGS IN THIS STORY

Antminer (https://news.bitcoin.com/tag/antminer/), antminers (https://news.bitcoin.com/tag/antminers/), Auction (https://news.bitcoin.com/tag/auction/), Hyperblock (https://news.bitcoin.com/tag/hyperblock/), Mining Servers (https://news.bitcoin.com/tag/mining-servers/), public sale (https://news.bitcoin.com/tag/public-sale/)

*Image Credits:* Shutterstock, Pixabay, Wiki Commons

Purchase Bitcoin without visiting a cryptocurrency exchange. Buy BTC and BCH **here (https://news.bitcoin.com/linkout/379014)**.

READ DISCLAIMER  |  CLICK HERE TO COMMENT

*Most Popular*

5/31/2020     Hyperblock Bitcoin Mining Servers and Datacenter Infrastructure to Be Auctioned off in Public Sale | Sponsored Bitcoin News

Case 9:20-cv-00082-DWM   Document 11-5   Filed 06/15/20   Page 39 of 83
EXHIBIT 38.(i)
PAGE 6



(https://news.bitcoin.com/gofrom/most_popular/china-law-cryptocurrency-inheritance)

China Passes Law Protecting Cryptocurrency Inheritance

(https://news.bitcoin.com/gofrom/most_popular/china-law-cryptocurrency-inheritance)

NEWS | 1 day ago

Bitcoin Fees Fall 60% While Transaction Count Declines

(https://news.bitcoin.com/gofrom/most_popular/bitcoin-fees-fall-60-while-transaction-count-declines)

MARKETS AND PRICES | 2 days ago

Bitcoin Hashrate Bounces Back- 2x the Mining Pools, Farm Diversification, 100 Exahash

(https://news.bitcoin.com/gofrom/most_popular/bitcoin-hashrate-bounces-back-2x-the-mining-pools-farm-diversification-100-exahash)

MINING | 2 days ago

Grayscale Bitcoin Trust Buys Over 1.5 Times Total BTC Mined Since Halving

(https://news.bitcoin.com/gofrom/most_popular/grayscale-bitcoin-trust-buys-1-5-times-total-btc-mined)

NEWS | 3 days ago

South Korea to Start Taxing Bitcoin Profits in 2021

(https://news.bitcoin.com/gofrom/most_popular/south-korea-to-start-taxing-bitcoin-profits-in-2021)

TAXES | 2 days ago

American Panic Led to the Creation and Expansion of the Corrupt Federal Reserve System

(https://news.bitcoin.com/gofrom/most_popular/american-panic-led-to-the-creation-and-expansion-of-the-corrupt-federal-reserve-system)

OP-ED | 1 day ago

5/31/2020     Hyperblock Bitcoin Mining Servers and Datacenter Infrastructure to Be Auctioned off in Public Sale | Sponsored Bitcoin News

Case 9:20-cv-00082-DWM    Document 11-5    Filed 06/15/20    Page 40 of 83

EXHIBIT 38.(i)
PAGE 7

## Latest News

With Riots Erupting in US Cities, Using Tools of Peaceful Protest Can be More Meaningful (https://news.bitcoin.com/with-riots-erupting-in-us-cities-using-tools-of-peaceful-protest-can-be-more-meaningful/)

Amid Youtube Censorship, Individuals Flock to Decentralized Video Sharing Apps Like Lbry.tv (https://news.bitcoin.com/amid-youtube-censorship-individuals-flock-to-decentralized-video-sharing-apps-like-lbry-tv/)

American Panic Led to the Creation and Expansion of the Corrupt Federal Reserve System (https://news.bitcoin.com/american-panic-led-to-the-creation-and-expansion-of-the-corrupt-federal-reserve-system/)

China Passes Law Protecting Cryptocurrency Inheritance (https://news.bitcoin.com/china-law-cryptocurrency-inheritance/)

Bitcoin Fees Fall 60% While Transaction Count Declines (https://news.bitcoin.com/bitcoin-fees-fall-60-while-transaction-count-declines/)

Bitcoin Hashrate Bounces Back- 2x the Mining Pools, Farm Diversification, 100 Exahash (https://news.bitcoin.com/bitcoin-hashrate-bounces-back-2x-the-mining-pools-farm-diversification-100-exahash/)

Bitpay Has 'No Current Plans' to Support Liquid or the Lightning Network (https://news.bitcoin.com/bitpay-has-no-current-plans-to-support-liquid-or-the-lightning-network/)

5/31/2020 Hyperblock Bitcoin Mining Servers and Datacenter Infrastructure to Be Auctioned off in Public Sale | Sponsored Bitcoin News

Case 9:20-cv-00082-DWM   Document 11-5   Filed 06/15/20   Page 41 of 83
EXHIBIT 38.(i)
PAGE 8

EXHIBIT 37.(ii)
PAGE 1

 Twitter › SeanWalshBTC

 Sean Walsh



Attention Bitcoin Miners! On June 3, 2020, there will be an auction for an entire 20MW crypto mining operation in Montana (telephone auction). Here's a video of the datacenter: lnkd.in/eaB9j7V Full Details Here: lnkd.in/eHXrvJ3

2 days ago

EXHIBIT 38.(iii)
PAGE 1

# The Bitcoin Barons: How a marketer and a money launderer sold Montana on digital gold



Derek Brouwer

Follow

Oct 26, 2018 · 29 min read

This story was originally published in the Missoula Independent on Jan. 25, 2018.

# March 6, 2017: 1 Bitcoin = $1,270

Sweat glistens on Sean Walsh's brow as he begins his pitch. He's standing in the circular Al Falak ballroom at the Burj Al Arab, one of the world's most extravagant hotels. Built on its own man-made island, where guests are transported by a fleet of white Rolls-Royces, the Dubai resort is shaped like a lateen sail pressing into the Persian Gulf, a symbol for a city on the leading edge. Everything in the ballroom seems to glitter; the hotel features 22,000 square feet of 24-karat gold gilding.

The gold that Walsh is pitching can't be seen, but its emerging power is on full display. Bitcoin first took off as the currency of drug sales and get-rich-quick scams. But by March 2017, 570,000

https://medium.com/@derekbrouwer/the-bitcoin-barons-how-a-marketer-and-a-money-launderer-sold-montana-on-digital-gold-2a255c96c981

EXHIBIT 38.(iii)
PAGE 2

people had digital wallets containing at least one bitcoin, including some of the biggest names in tech. The value of the world's first cryptocurrency had tripled in the previous year, and would balloon many times over in the following months.

Walsh is a marketer who is remaking himself as a "crypto-industry luminary," as the speakers at this World Blockchain Forum are billed. He looks slick with a scruffy beard, blue tie and buttoned black suit. Part Silicon Valley casual, part Wall Street hedge fund manager, Walsh's appearance fits his biography as a California man who left an executive position in private equity to start an angel investment firm, Redwood City Ventures, dedicated to promoting bitcoin to the masses. "I brought something for the group," he begins, striding past the podium. He reaches his left hand to his back pocket, then passes a small bag to his right hand and holds it above his head. The bag is full of cowrie shells, which, he reminds his audience of businessmen and industry insiders, was humankind's first form of money. Walsh asks a man at the front table if he'll sell his watch for the shells. When he declines, Walsh pulls out a second bag and drops both on the table.

"I'm trying to make a point here," he says.

His delivery is more polished six months later, when he sells a similar pitch to an audience in London: "The point is that we've lost trust in cowrie shells as money, despite the fact that they've been used for 12,000 years. Money moves on. People move on to

https://medium.com/@derekbrouwer/the-bitcoin-barons-how-a-marketer-and-a-money-launderer-sold-montana-on-digital-gold-2a255c96c981

EXHIBIT 38.(iii)
PAGE 3

new forms of money. They moved on to gold, they moved on to fiat currency. We're now moving into electronic money."

Bitcoin is the best form of money ever devised, Walsh tells the crowd, but it can only be as good as the faith society places in it. "So we need a sales pitch," he continues. "We need to speak to our target customers in a language … that will resonate with them and will get them to feel the way we want them to feel, get them to act the way we want them to act."

Walsh's idea is to use affiliate sales reps to help convince more people to convert cash into digital currency. He predicts a return on investment of 28,000 percent as new users drive up bitcoin's price. "I can tell you, even as a Silicon Valley venture capital investor, this type of opportunity is not out there," he says. It has existed before, though: in Countrywide Financial, the so-called 23,000 percent stock, where Walsh managed customer acquisitions in 2007 just as the lender's subprime mortgage bubble burst. But the conversion campaign is only part of Walsh's plan. The far bigger part, the one he alludes to as the "foundation" of his effort to take bitcoin mainstream, is half a world away, humming in an old lumber yard next to the Blackfoot River, minting more invisible money than any place else in North America.

Few people know how Montana became a mother lode in bitcoin's digital gold rush. It took a blunder, days before Walsh's talk in

https://medium.com/@derekbrouwer/the-bitcoin-barons-how-a-marketer-and-a-money-launderer-sold-montana-on-digital-gold-2a255c96c981

EXHIBIT 38.(iii)
PAGE 4

Dubai, for the public to even learn that bitcoin is being mined here. The story is as familiar to Montana as bitcoin is new. It also has striking parallels to the story of cryptocurrency itself. But it's not quite the story Walsh likes to tell.

---

# June 8, 2011: 1 Bitcoin = $29.60

The way Yan Ebyam entered the greenhouse on the outskirts of Sacramento seemed like a tell. He opened its wide door just enough to slide in sideways, then pulled it shut behind him. Or so it looked to the three undercover agents watching from their car a hundred yards away, who wanted a glimpse inside.

It wasn't going to be that easy to pin down the man whose first name stands for "yes and no," and whose last name spells "maybe" backward. So the driver pulled into the florist office out front and went inside to buy some flowers. While the driver was inside, the other two agents walked up to the silver Mercedes-Benz they'd seen Ebyam driving and attached a GPS tracker to it.

The agents had been led here by a woman at a renowned tomato farm 40 miles north, who told a local sheriff's deputy that Ebyam had "taken advantage" of her. She and Ebyam had been growing more than 4,000 marijuana plants on the farm, but she said

Ebyam ran off with most of the plants shortly after their landlord expressed concern to the deputy that he was acting strangely.

The federal indictments that followed that June stakeout marked a disastrous turnabout for a man who, only months earlier, had been one of the country's boldest marijuana entrepreneurs. Starting in 2008, Ebyam set up some of the country's largest indoor cannabis farms in defunct Oakland warehouses, angling to obtain one of the industrial-scale licenses city officials were planning to issue. Workers at one of his farms even unionized. Today, that business seems almost visionary, but at the time it relied on an interpretation of California's medical marijuana law that strained credulity. When the City of Oakland abandoned its plan under federal pressure, Ebyam disappeared to the tomato farm, one of what "the feds saw [as] unscrupulous operators on the fringes stuffing their pockets with cash," Peter Hecht writes in his 2014 book, Weed Land.

He definitely had an opportunistic streak. After the dot-com crash in 2002, Ebyam, then in his early 20s, and a business partner helped liquidate the surplus computer equipment that bankrupt Silicon Valley companies were offloading. They did plenty of legitimate business initially, but in 2004 they were indicted on federal money laundering charges for what a U.S. attorney later described as a "jaw-dropping conspiracy" to sell more than $6 million in stolen Cisco servers. They'd brokered the deals through

EXHIBIT 38.(iii)
PAGE 6

a gang member with connections to a trucking warehouse, then created phony invoices to cover their tracks.

To those who encountered him, however, Ebyam came across as more eccentric than diabolical. As a kid growing up in northern California, he stayed inside surfing the web while his brother surfed waves, he told the writer of a profile republished in the New York Times. "He blurts out his thoughts in rapid fire and is highly intelligent but pays little attention to matters like clothing or social cues," the reporter wrote, adding that Ebyam had ordered milk and cookies during a coffee shop interview. Prosecutors called him "brilliant," a trait that was also palpable to former business partners and acquaintances interviewed by the Indy.

As his marijuana case played out in federal court, Ebyam lived with his mother for a few months before going back to his old line of work in electronics resale. During that time, he did "millions of dollars of business" as a broker for a Silicon Valley company called Prism Electronics, its CEO, John Mauro, says.

Then Ebyam got a chance to try something new.

# January 14, 2014: 1 Bitcoin = $842

https://medium.com/@derekbrouwer/the-bitcoin-barons-how-a-marketer-and-a-money-launderer-sold-montana-on-digital-gold-2a255c96c981

EXHIBIT 38.(iii)
PAGE 7

Walsh says the story of how he met Ebyam is too long to tell, but that both men were interested in a radical technology that was starting to generate attention around the edges of Silicon Valley.

Helping bitcoin get noticed was a man named Roger Ver, who had been plugging it in a hokey but eye-catching way: on the billboard he rented beside an expressway in Santa Clara. One of his ads touted bitcoin as "the honey badger of money," in reference to a viral YouTube video celebrating the species' fearlessness and snake-eating badassery. The tagline pointed to why people like Ver, whose evangelism had earned him the moniker "Bitcoin Jesus," were ecstatic about cryptocurrency. Ver was a fervent libertarian (he once ran for the California state assembly under the party banner), and bitcoin represented a way that average people could take down the central banking system.

The key was the ingenious way the bitcoin software had been written and introduced, anonymously, in 2008. In basic terms, the software allows users to exchange data, i.e., bitcoin, without requiring a middleman to verify the transaction. Instead, verification records are logged in a public database, called the blockchain, that's managed by the independent computers on the bitcoin network. There's no need for a federal reserve because the network's open-source code calls all the shots.

Like Ebyam, Ver was in the computer resale business, which he also entered in his early 20s in the dotcom bubble's wake. His

https://medium.com/@derekbrouwer/the-bitcoin-barons-how-a-marketer-and-a-money-launderer-sold-montana-on-digital-gold-2a255c96c981

EXHIBIT 38.(iii)
PAGE 8

company, Memory Dealers, became the first anywhere to accept payment in bitcoin — a service he advertised prominently on his highway billboard. In 2012, he started the first public bitcoin meetups in Sunnyvale, where early enthusiasts could chat about the technology and the curious could get initiated.

Bitcoin was gaining notice around the world, for better and worse. Some people, like Ver, saw a financial revolution brewing, while others wanted to cash in on the next big thing. Bitcoin's price rocketed on new exchanges. The U.S. government busted ponzi schemes and unraveled the first large, online black market to use bitcoin, Silk Road, which had enabled users to buy and sell drugs anonymously. Some prominent voices in finance, including JPMorgan Chase CEO Jamie Dimonand Warren Buffett, started pushing back against the buzz.

Bitcoin was programmed so that only a certain number — 21 million — can ever exist. However, they don't just appear out of thin air. They're released into circulation steadily over time as rewards to members who help maintain the network. Bitcoin transactions are verified by computers guessing the answers to difficult puzzles. When a computer finds the right answer, the associated transactions are entered into the public ledger and the miner receives a reward in the form of a newly minted bitcoin. The process is known as mining.

EXHIBIT 38.(iii)
PAGE 9

Mining is one of the technology's most elegant features, but the industry that was springing up around it resembles an arms race. As in any extraction industry, people saw bitcoin mining as a way to acquire the currency at a discount while providing a service to the network. Anyone with a computer could profitably mine in the early days, but as more people joined the race and manufacturers started developing specialized mining computers, only industrial-scale operations stood a chance to win the rewards. Authors Paul Vigna and Michael Casey wrote in their 2015 book, The Age of Cryptocurrency, that "there seems to be no shortage of people who think that bitcoin, as some in the community like to say, is headed 'to the moon' and that mining is their ticket to those riches."

Walsh and Ebyam decided to join up to punch their tickets. The business model was simple. Walsh calls it "self-mining." They'd fill a warehouse with servers, mint digital money and pocket the profits.

At the same time, bitcoin advocates were trying to slough off the associations with money laundering and drugs that had tainted the currency's public image. So it was risky for Walsh, a marketing professional at Bertram Capital, a $1.3 billion private equity firm, to go into business with someone who had a federal rap sheet containing both types of offense. But Walsh says he saw Ebyam as a "mad scientist" who was otherwise naive to the world. He decided to find a way to make it work.

https://medium.com/@derekbrouwer/the-bitcoin-barons-how-a-marketer-and-a-money-launderer-sold-montana-on-digital-gold-2a255c96c981

EXHIBIT 38.(iii)
PAGE 10

"Sometimes people are so open and so trusting that they don't know what they get themselves into," Walsh says. "And I think Yan falls into that category."

Plus, each seemed to bring complementary skills to the project: Ebyam knew computer equipment and had managed large warehouses. Walsh worked with startups that his firm had funded. Walsh rounded up $850,000 from four investors, including himself and a relative, and in January formed a company called Aquifer. The company's success would depend on three factors: how efficiently its servers could win bitcoin (a metric known as "hashrate"); equipment and overhead costs; and the value of the bitcoin their servers won. The price of cooling and power tended to dictate where bitcoin mines were located. Most were overseas, in places like Iceland or China, where electricity was cheap.

Walsh and Ebyam figured they could do it in Silicon Valley's backyard.

# March 12, 2014: 1 Bitcoin = $637

At first they didn't tell their landlord exactly what they were planning to do. Debbie Olson, executive director of the Riverbank Local Redevelopment Authority, knew only that the men wanted

EXHIBIT 38.(iii)
PAGE 11

to install a server farm when she offered Aquifer a lease in March 2014. "They were quite secretive," Olson says.

She remembers that they became interested in the site, part of a former army munitions plant that Olson manages as an industrial park for the small city 100 miles east of San Jose, while visiting to look at used equipment for sale by another tenant. The long, narrow warehouses oozed PCBs, but the property's access to cheap hydroelectric power from Hetch Hetchy Reservoir caught their attention.

Olson soon learned that Ebyam was under a couple of indictments, which were still winding through court, and refused to let him sign any lease documents or official correspondence. Walsh was Aquifer's CEO, but he still had his day job at Bertram, so a coworker from the firm, Anthony Brough, left to become Aquifer's chief financial officer and public face. Ebyam was hired as an independent contractor as the facilities engineer.

The mine they began constructing seemed to reflect the idiosyncrasies of its designer. Photos of the interior taken by technicians for Olson's group show servers set inside plywood enclosures and cooled by rows of box fans. The fans kicked up dust throughout the complex, while the whole setup sounded like a jet engine running nonstop in an airplane hangar. Aquifer quickly became the bane of other tenants. It didn't help that Ebyam, who

https://medium.com/@derekbrouwer/the-bitcoin-barons-how-a-marketer-and-a-money-launderer-sold-montana-on-digital-gold-2a255c96c981

EXHIBIT 38.(iii)
PAGE 12

worked odd hours, had a habit of wandering all over the complex at night in his rumpled t-shirts.

Aquifer also installed a misting system for additional cooling, Olson says, which she worried could cause problems near all that electricity. After several small fires broke out in the wooden racks, the redevelopment authority brought in consultants to inspect the arrangement for compliance with health and building safety codes.

"They most certainly scratched their heads and said, 'We've never seen a server farm like this. This is just so unusual,'" Olson says.



EXHIBIT 38.(iii)
PAGE 13



Interior of Aquifer bitcoin mine in Riverbank, Ca. Photo courtesy Riverbank LRA

But it was cheap, and DIY server farms were the name of the bitcoin mining game. Whereas traditional data centers emphasized reliability and backup power sources, the dog-eat-dog competitiveness of bitcoin mining encouraged stripped-down facilities that squeezed in as many servers as possible and cooled them cheaply. "Sometimes you hesitate to call these buildings data centers," one cooling equipment supplier told online industry site Data Center Knowledge in July 2014.

Aquifer brought 5 MW online, Walsh says — enough to power about 5,000 homes at any given moment. Aquifer at one point claimed it was operating the largest bitcoin mining farm in the U.S., according to a promotional video posted to YouTube. In January 2015, Brough, the CFO, introduced Aquifer at the North

EXHIBIT 38.(iii)
PAGE 14

American Bitcoin Conference as operating a "conglomerate" of California data centers with 28 MW of power and "considerable additional headroom."

Brough may have been getting ahead of himself, but Aquifer's team was nothing if not audacious. And they were looking to expand. In Oakland, after a string of suspicious burglaries at one of his marijuana grow operations, Ebyam had reportedly dragged a mattress into the warehouse office, along with a foghorn to deter thieves who would try to sneak in from the roof at night. At the industrial park, Ebyam was the one walking the roofs of abandoned buildings, explaining to Olson that he was scoping out additional space.

---

# March 4, 2015: 1 Bitcoin = $278

Walsh was escorting his elderly mother-in-law through the federal court building in San Jose when a man named Christopher Kilday saw his chance to confront him. Kilday, an equipment salesman, was owed a commission for a sale he'd brokered for Aquifer. Kilday snapped pictures with his phone as he taunted Walsh. "Hey! Hong Kong Sean!" he said, according to court filings. "You brought your mother to court?! Hey, old lady! Walk carefully!" Security had to intervene.

EXHIBIT 38.(iii)
PAGE 15

By March 2015, Kilday was the least of Walsh's concerns. Bitcoin had soared to $1,200 when Walsh and his partners hatched their mining operation in early 2014. But just before Walsh signed the lease at the old munitions plant, the world's largest bitcoin trading exchange, Mt. Gox, filed bankruptcy after revealing that $460 million in bitcoin had been stolen by hackers. Bitcoin's value was halved virtually overnight. As Aquifer mined, the price continued to decline.

By the time the North American Bitcoin Conference rolled around in January 2015, all the gains made during Bitcoin's first run toward broader buy-in had evaporated. The mood was glum among the panel of mine operators. Yet Brough called the price collapse a "glorious opportunity" for mining companies, like his, that had been "conservative" in their business plans.

"We wouldn't be in this business if we didn't believe in the long-term prospects for bitcoin," he told the crowd.

https://medium.com/@derekbrouwer/the-bitcoin-barons-how-a-marketer-and-a-money-launderer-sold-montana-on-digital-gold-2a255c96c981

EXHIBIT 38.(iii)
PAGE 16



Aquifer mining hardware. Photo courtesy Riverbank LRA

https://medium.com/@derekbrouwer/the-bitcoin-barons-how-a-marketer-and-a-money-launderer-sold-montana-on-digital-gold-2a255c96c981

EXHIBIT 38.(iii)
PAGE 17

But mining companies also had high capital expenses — in real dollars. With their revenue in bitcoin, they'd have to sell bitcoin to pay the bills. Some observers in the press feared that would drive the price down further.

Three weeks later, Aquifer filed for Chapter 11 bankruptcy. Bankruptcy documents show the company had generated and converted bitcoins into $1.4 million over roughly nine months of mining. With bitcoin prices tanking, it wasn't enough to keep the company afloat.

Exchange rates alone don't explain the company's fall, according to two of its largest creditors. The business model made sense to Andy Faris, a business acquaintance of Ebyam's who later loaned Aquifer $300,000. He knew computer hardware, and thought an ultra-low-cost facility for turning bitcoin to cash could make him some money. But Aquifer had piled on debt to build out the data center without any Plan B in case something went wrong — if servers broke down or expansion plans hit delays or the price of bitcoin dropped, Faris says. Faris says his notes show that it took only weeks for him to realize that the management of the company was as precarious as its server racks. He sought to take over management duties to try to right the ship, but Walsh — in what Faris calls "self-preservation mode" — filed bankruptcy instead.

"The company was playing with a lot of other people's money in a very cavalier fashion," Faris says.

https://medium.com/@derekbrouwer/the-bitcoin-barons-how-a-marketer-and-a-money-launderer-sold-montana-on-digital-gold-2a255c96c981

EXHIBIT 38.(iii)
PAGE 18

Aquifer's landlord, a public entity, had been concerned for even longer. Olson says her agency often negotiated with tenants who ran into cash-flow problems. Aquifer, however, asked for concessions "from the beginning." Eventually, Olson began to feel strung along. She had trusted Brough, but he quit Aquifer shortly after the bankruptcy filing (Brough did not return several emails). Walsh took over as the face of the company, and the things he said to Olson didn't seem to bear out. "He just seemed slick, the kind of person that your antenna is up," she says.

Aquifer told the bankruptcy judge that the company's fate was caused by delays in getting permits to supply power to the servers it was setting up in three other buildings at the site. Certain creditors took "aggressive collection actions" when they didn't receive payment, forcing the company's managers to seek legal protection so they could reorganize.

Bankruptcy filings show that Aquifer LLC's majority partner was Chris Cunningham, a project manager at the Walt Disney Company (Cunningham didn't respond to an email for comment). Walsh, the CEO, held about a quarter interest, and one of his relatives held another 11-percent stake and was owed $300,000 for a loan at the time of bankruptcy.

Ebyam had no equity in the company, but he wasn't just an independent contractor, either. Bankruptcy documents list an outstanding debt of $130,000, as well as a mining profit-share

https://medium.com/@derekbrouwer/the-bitcoin-barons-how-a-marketer-and-a-money-launderer-sold-montana-on-digital-gold-2a255c96c981

EXHIBIT 38.(iii)
PAGE 19

obligation, to an LLC named Vagada Holdings. Vagada was registered in California in 2002 by Ebyam and his business partner in the computer resale business that earned them money laundering convictions. (The name appears to reference a fictitious company in the 1997 film The Devil's Advocate that engages in shady activities.) Walsh says Ebyam loaned the company money through his LLC when Aquifer "was up against the ropes," but can't recall specific details.

For his part, Walsh made what seemed to be a particularly bold move once the bankruptcy was filed: He resigned his day job as vice president of online marketing at Bertram Capital.

"I wanted to try to save the business," he says. "I am a family man with wife and kids and those things. And I invested a huge portion of my life savings into that business, and so when it started failing, it was devastating. Even thinking about it now, it was very painful. It was such a stressful time in my life, you can't imagine. It was terrible."

Walsh bought a domain name, redwoodcityventures.com, and began introducing himself as the founding partner of a Silicon Valley investment firm dedicated to "angel investments" in cryptocurrency companies, with an additional focus on fostering partnerships between U.S. and Chinese bitcoin companies. Redwood City Ventures is not a legal entity with an investment fund. "I made some investments with different people and

https://medium.com/@derekbrouwer/the-bitcoin-barons-how-a-marketer-and-a-money-launderer-sold-montana-on-digital-gold-2a255c96c981

EXHIBIT 38.(iii)
PAGE 20

collaborated on various things. It's not like you'd be imagining, like a normal Silicon Valley firm," Walsh says.

Aquifer's bankruptcy case stretched out nearly 18 months, until the judge finally dismissed it. Walsh had presented a plan to rescue the company by distributing Chinese mining hardware to U.S. companies, but creditors including Faris didn't consider it a serious plan — Aquifer didn't have a sales team. The company later moved toward liquidation but didn't file a plan in time, and the case was dismissed over the objection of Aquifer and its creditors.

Walsh moved to Colorado, Olson says, and continued taking a salary from Aquifer, but many of the company's debts never got paid. The Riverbank LRA was out more than $500,000 in unpaid rent and legal fees, Olson says. The agency prepaid the power bill at the industrial complex, then billed tenants for their usage, meaning the LRA ultimately paid for much of the electricity used to generate new bitcoins at Aquifer's data center.

A local government in a town of 25,000 people had unwittingly gambled on bitcoin, and paid a hefty price for it.

"We think, quite frankly, if we can save another community from the losses that we had to bear with this company, then we feel like that's the right thing to do," Olson says. "We would caution any

https://medium.com/@derekbrouwer/the-bitcoin-barons-how-a-marketer-and-a-money-launderer-sold-montana-on-digital-gold-2a255c96c981

EXHIBIT 38.(iii)
PAGE 21

company doing business with this particular group to be concerned, to review the records and be very concerned."

---

# May 19, 2016: 1 Bitcoin = $446

Scotty's Table isn't the sort of restaurant where diners typically tap at their phones between bites of beef duo, but the four Missoula businessmen's new friend from Redwood City Ventures wanted to show them what the puzzling business he was bringing to town was all about. They downloaded bitcoin wallets — it takes just an email address and a few seconds to set up — and, one by one, Sean Walsh deposited a bitcoin into their accounts. It was his gift to his new landlords, Steve Nelson and Mike Boehme; their Realtor; and the local economic development officer, Missoula Economic Partnership CEO James Grunke, who had helped make introductions around town, and would later help Walsh's company apply for a $416,000 state grant. Grunke says he "knew nothing" about cryptocurrency at the time, but today he's able to scroll through his Coinbase app and find precisely the minute — 8:36 p.m., May 19, 2016 — when he started to learn.

"He gave us one just to let us know," Nelson says. "It'd be like handing [you] a $50 bill. At that time, they were worth $440. It was still significant. And his words were to us, 'Pass part of it along to some people so they can get a feel for it.'"

https://medium.com/@derekbrouwer/the-bitcoin-barons-how-a-marketer-and-a-money-launderer-sold-montana-on-digital-gold-2a255c96c981

EXHIBIT 38.(iii)
PAGE 22

Cryptocurrency promoters love to perform these initiations, and have used them to soften the skepticism of some of the tech industry's biggest figures. The journalist Nathaniel Popper describes one such instance in his 2015 book, Digital Gold, when attendees of an exclusive gathering laughed in amazement as they passed $250,000 worth of bitcoin among their new wallets.

Not that Grunke and Nelson needed any convincing by that point. There was already plenty to be excited about. Three months earlier, Walsh had inked a deal with Nelson that would bring the first bitcoin mine to Montana. In doing so, Walsh would help reinvigorate a former lumber mill community in Bonner and usher in what Grunke saw as an untapped opportunity for western Montana to become a haven for large data centers. Grunke had imagined attracting companies like Facebook or Google, but bitcoin was at least as intriguing.

Nelson's company was redeveloping the Stimson Lumber Company's plywood plant, which closed in 2007 and left Bonner-Milltown without a major industry. His Bonner Property Development LLC was having some success attracting new businesses, but the plywood storage building, one of the largest timber-framed structures in the country, was proving tricky to put to use. "It was always impressive to walk in and look at, because it's got these huge, high ceilings. But then because of the high ceilings it was very difficult to insulate and utilize for the

https://medium.com/@derekbrouwer/the-bitcoin-barons-how-a-marketer-and-a-money-launderer-sold-montana-on-digital-gold-2a255c96c981

EXHIBIT 38.(iii)
PAGE 23

manufacturing process, because it's so expensive, there's so much space to try to heat," Nelson says.





Steve Nelson and Michael Boehme, the men working to redevelop the shuttered Stimson lumber mill, were excited to find a tenant in March 2016 for the enormous storage warehouse. They didn't know much about bitcoin, but Nelson has since become a believer in the future of digital currency. Photo submitted to U.S. District Court for the Eastern District of California

What would be additional overhead for most industrial tenants was an efficiency for a bitcoin mine. It helped, too, that western Montana isn't prone to natural disasters that could disrupt operations, Grunke says, and that the landlords were open to accommodating an unfamiliar industry. The crucial factor, of course, was power, and Montana allows large users to buy electricity on the open market. Documents posted online indicate that Walsh's company would ultimately negotiate a deal with

https://medium.com/@derekbrouwer/the-bitcoin-barons-how-a-marketer-and-a-money-launderer-sold-montana-on-digital-gold-2a255c96c981

EXHIBIT 38.(iii)
PAGE 25

Energy Keepers Inc., the tribally owned corporation of the Confederated Salish and Kootenai Tribes that manages the Seʼliš Ksanka Qlispeʼ dam. How cheap was the power? A press release issued Jan. 11, 2018, by Project Spokane investor Rockshield Capital put the figure at just $.033 per kWh. Aquifer had budgeted at $.05 per kWh in California, according to bankruptcy records.

Grunke says his organization, a nonprofit that receives city and county funds, helped facilitate the local connections to close the deal. He recalls talking with Walsh in the old guard house onsite about what the project could look like. "Clearly, as an organization, we had a role in their decision to locate here," Grunke says. Walsh had approached Nelson and Boehme after finding their commercial lease listing online. Rather than try to disguise the nature of his bitcoin business, Walsh sold them on it. Nelson began researching bitcoin and, after Walsh gave him his first taste of the cryptocurrency, Nelson started thinking he had stumbled across the technology of the future. He remembered the day when, as a 10-year-old in 1957, his father came home with a new Conoco credit card and placed it on the table. Nelson couldn't believe the plastic was as good as cash. "So why wouldn't we think of using virtual currency in this world we're living in?" he reasoned, and soon began investing a significant portion of his own money in the cryptocurrencies Walsh was starting to mine on his property.

But otherwise, Walsh took steps to hide the new mine from public view. He incorporated the company in Montana and Colorado as

EXHIBIT 38.(iii)
PAGE 26

Project Spokane LLC, which he has since said was meant to misdirect potential competitors. Nelson and Boehme first introduced the tenant to the Missoulian in August 2016 as Montana Data LLC, saying only that the company had built a data center to help balance energy loads for states that rely on inconsistent wind energy. It's since been referred to in the press as Global Big Data LLC and, most recently, Project Northwest. In his talks around the world, Walsh touted his investment in the "largest blockchain security data center in North America" without saying where in North America it was.

"When we started the business, we didn't want anyone to know anything," Walsh says. Montana's undiscovered supply of cheap energy was his ace in the hole in an ultracompetitive industry. And publicizing the mine's location could make it a target for thieves or hackers. "We were just afraid," Walsh says. "We thought people were going to try to break in and steal our bitcoin."

---

# January 25, 2017: 1 Bitcoin = $894

Back in San Jose, Walsh's bankruptcy attorney, Reno Fernandez, was still trying to get paid. His firm had been dismissed by Walsh shortly after the bankruptcy was thrown out in June 2016. Between June 15 and Aug. 1, Aquifer paid Walsh $24,500, while its attorney was still owed $182,000. Fernandez says he still hasn't

https://medium.com/@derekbrouwer/the-bitcoin-barons-how-a-marketer-and-a-money-launderer-sold-montana-on-digital-gold-2a255c96c981

EXHIBIT 38.(iii)
PAGE 27

been paid. Aquifer's new attorney told the judge in early 2017 that was because the company had no cash on hand. Efforts to find new capital were unsuccessful.

Fernandez and other creditors say they had no idea that Walsh had launched a new mining operation in a different state while Aquifer's bankruptcy was still pending. According to Nelson, the lease at the Bonner mill site began on March 1, 2016. Two days later, the bankruptcy court in San Jose held a hearing in which Aquifer withdrew its plan for reorganization and advised the court that it would be filing a liquidation plan instead.

"It signals to me that they're hedging their bets right there by forming another company in another state," Faris says. He says the timeline "raises questions" about whether any of the equipment, designs or other assets from Aquifer also made their way to Montana.

Walsh says he kept the businesses "totally segregated" in accordance with the law, and denies that any Aquifer assets were used in Project Spokane, noting that those assets were turned over to the company's secured creditors, which included Faris. Walsh explains that as Aquifer failed, a friend encouraged him to "double down" and invest in a new operation. Walsh agreed, believing the problems that led to Aquifer's demise were unlikely to recur. He says he found some "minority shareholders" for Project Spokane, but declines to identify them.

https://medium.com/@derekbrouwer/the-bitcoin-barons-how-a-marketer-and-a-money-launderer-sold-montana-on-digital-gold-2a255c96c981

EXHIBIT 38.(iii)
PAGE 28

"It's kind of a crazy thing to imagine based on what I just told you, on how devastating the loss was," Walsh says.

Not everyone in California was in the dark about the new venture. Ebyam, still awaiting sentencing for his marijuana grow operation, had obtained permission in August 2016 from the judge overseeing his case to relocate to Montana to work at a newly built data center. Ebyam left out the bitcoin part, writing in a letter to the judge that he had "found the way to make wind energy more viable by buying the power the wind farms can't sell." He said that his company's "innovative design" enabled it to cut the costs of building a data center by nearly 95 percent. The new data center was using recycled substations from a shuttered Intel facility in Colorado and transformers from an old Dell data center. Ebyam included four interior photos of the Bonner warehouse in various stages of build-out — which looks more professional than the one in Riverbank — and a letter of reference from Walsh, who wrote, "Yan is positively indispensable to our joint business venture that he leads many aspects of, and I hope to keep him at the helm for years to come." (Walsh tells the Indy that Ebyam was an independent contractor at Project Spokane.)

By then, Ebyam was introducing himself by a different last name, Allweiss, at least to Nelson.

Nelson says the lease in Bonner was signed by Project Spokane's other principal, a younger man named Matt Carson, who loves

https://medium.com/@derekbrouwer/the-bitcoin-barons-how-a-marketer-and-a-money-launderer-sold-montana-on-digital-gold-2a255c96c981

EXHIBIT 38.(iii)
PAGE 29

computer games and speaks with a Texas accent. Carson started mining bitcoin in his parents' garage in 2010 with equipment he configured from graphics cards and motherboards purchased on Craigslist, he told the hosts of a podcast called Bitcoin Sandwich in 2014. That grew into commercial mining operations in Missouri and Colorado. He opened his Colorado facility and mining equipment distributor at the same time Aquifer got going in California. It similarly went belly-up, and the company, Miner Hosting LLC, racked up $271,000 in default judgments in Colorado from customers who said their mining equipment wasn't delivered. (Parts delivery problems were "par for the course" in the nascent bitcoin mining industry in 2014, leading to bankruptcies and numerous lawsuits filed by customers who felt swindled, authors Paul Vigna and Michael Casey write in The Age of Cryptocurrency.) A writ of garnishment issued in 2017 was unable to collect because the company's bank account had closed.

Nelson today says he was unaware that Walsh's California mine had gone bankrupt. And none of the warning signs cited by the Riverbank landlords have turned up with Project Spokane. Indeed, far from sputtering on the fringe, Project Spokane was moving toward the center of the bitcoin universe. On Valentine's Day last year, Carson and Ebyam had dinner at what appears to be Missoula's Kobe Seafood & Steak with a development team from one of the cryptocurrency industry's most important companies: Bitcoin.com, owned by Roger Ver, aka Bitcoin Jesus, the man who had evangelized on that Silicon Valley billboard.

https://medium.com/@derekbrouwer/the-bitcoin-barons-how-a-marketer-and-a-money-launderer-sold-montana-on-digital-gold-2a255c96c981

EXHIBIT 38.(iii)
PAGE 30

Ver posted a photo of their dinner to Twitter with the caption "Eight guys, and all Bitcoin." A few weeks later, Bitcoin.com announced its latest project, a large-scale cryptocurrency mining pool.

Bitcoin.com's announcement didn't say where its mine is located (the company will not confirm or deny any partnership with Project Spokane), but the attached photo shows the site's developers with their arms around Ebyam, who is wearing the same Bitcoin.com logo polo shirt he was wearing at Kobe. Its landing page for customers shows images of the Bonner data center, with its long rows of servers racked beneath the dramatic wooden trestles. Bitcoin.com's mining business is different from how Walsh and Ebyam had mined in California. In mining pools, individual customers purchase contracts for a small portion of the mine's overall hashrate. Pool mining provides an affordable entry point for individual miners and a more stable revenue stream for mine operators. The same risk that came back to bite Aquifer is now shared with Bitcoin.com's customers. There's no guarantee their contracts won't lose money.

---

# June 6, 2017: 1 Bitcoin = $2,822

Somebody screwed up.

https://medium.com/@derekbrouwer/the-bitcoin-barons-how-a-marketer-and-a-money-launderer-sold-montana-on-digital-gold-2a255c96c981

EXHIBIT 38.(iii)
PAGE 31

Montana Gov. Steve Bullock issued a press release in June 2017 announcing that the state Department of Commerce had awarded its latest round of job-creation grants. The largest award, funded through coal severance taxes, was made to a company called Project Spokane, in the amount of $416,000 to support expansion of its "blockchain security services for the bitcoin network." Bitcoin forums and industry websites immediately seized on the news that Montana's government was ready to pump tax dollars into an industry that the federal government, and some other states, had been all too suspicious of. Bitcoin.com's news service called it one of the first grants given to a bitcoin mining operation based in the U.S. In applying for the grant, Project Spokane had pledged to create 65 new jobs in Bonner over the next two years, writing that the funds would help purchase machinery, equipment, furniture and software and pay wages to new employees as it expanded operations, including additional data centers in Montana. The grant application stated that the total project would cost $26 million.

What Walsh hadn't expected was that anyone outside state government would find out. Walsh says he was told (he didn't say by whom) when Project Spokane applied that "there would be no publicity whatsoever from accepting it." In fact, Grunke had first spilled the beans locally, telling investors at a luncheon covered by the Missoulian that Project Spokane had applied for the grant, with Mayor John Engen signing a letter of support and county commissioners agreeing to sponsor the application. Grunke

https://medium.com/@derekbrouwer/the-bitcoin-barons-how-a-marketer-and-a-money-launderer-sold-montana-on-digital-gold-2a255c96c981

EXHIBIT 38.(iii)
PAGE 32

previously said he apologized to the company for that unwanted plug, but that his team otherwise communicated to Project Spokane's local managers the disclosure requirements associated with the public grant. (An accounting manager listed as the business contact on Project Spokane's application told the Indy last August that she was no longer with the company.)

Walsh decided to decline the grant. He says he hadn't been aware that the money wasn't as straightforward as it first seemed. The grant was technically a contract, and Project Spokane would have to submit follow-up financial documentation proving, among other things, that it had made the hires it was promising before funds were distributed. "I was like, 'Forget it, it's not worth the risk,'" Walsh says now.

Project Spokane continued to expand its mining capacity anyway, reaching 20 MW of contracted power, enough to power 20,000 homes. Grunke told investors at the March 2016 luncheon that the data center contained 12,000 servers, and planned to expand to 55,000. Nelson estimates the current number of employees on site is about 25, not including the temporary contractors Project Spokane hired during build-out.

Not among that crew is Ebyam, who was ordered to turn himself in at the Missoula federal courthouse by March 16, 2017, for a six-year jail sentence. He's currently held at a federal prison in Colorado, with a scheduled release date of June 2, 2022. Nelson

https://medium.com/@derekbrouwer/the-bitcoin-barons-how-a-marketer-and-a-money-launderer-sold-montana-on-digital-gold-2a255c96c981

EXHIBIT 38.(iii)
PAGE 33

says he knew that Ebyam had gone to Colorado early last year, but not that he was in jail. He says he joined a conference call with Walsh and Ebyam recently to discuss technical issues about the building's cooling system. "He understands the engineering side of things," Nelson says.

Walsh says Ebyam is no longer involved with Project Spokane: "Oh gosh, no. You know he's in jail, right?"

# January 17, 2018: 1 Bitcoin = $11,149

Though he didn't want it, Walsh says the attention generated by Project Spokane's grant award turned out to be good publicity for the currency he advocates. "It helped legitimize what everyone in bitcoin is doing," he says, before correcting himself. "Not everybody, just the good guys."

Walsh is speaking by phone the day before he heads to Miami to deliver a presentation at the North American Bitcoin Conference, Jan. 18 and 19. His session, one of dozens, took on the question that's become the subject of intense global speculation: Is bitcoin a bubble?

https://medium.com/@derekbrouwer/the-bitcoin-barons-how-a-marketer-and-a-money-launderer-sold-montana-on-digital-gold-2a255c96c981

EXHIBIT 38.(iii)
PAGE 34

When Ebyam went to prison in early 2017, bitcoin was trading at around $1,000. By year's end, it was trading at $13,000, down from a breathtaking rise to $20,000 in December. As the price rose and word got out that Montana was ripe for bitcoin, Grunke says his office began fielding daily calls from blockchain companies interested in setting up data centers in the area, if only they could find a big enough space.

Plans for the state's second bitcoin mine emerged in December. The Anaconda School District agreed to sell its recently vacated elementary school for $205,000 to a company called BitPower LLC, and the county agreed to lease BitPower a 40-acre site in a tax-increment financing district for $100 per year. School Superintendent Gerry Nolan jokes that he didn't know the difference between a bitcoin and a candy bar when the company turned up with an offer a couple of months ago. He says he still doesn't have any idea what its representatives meant when they told the school board they wanted to turn the elementary school into a "training facility." The Montana Standard reported that one of the company's local spokespersons is Rick Tabish, who was famously convicted, then acquitted, of murdering gambling mogul Ted Binion and then stealing silver stashed in Binion's desert vault. Nolan says knowing that another mine was already running in Bonner was one factor that put the school board at ease. That, and the 300 jobs the company reportedly promised to bring to town.

https://medium.com/@derekbrouwer/the-bitcoin-barons-how-a-marketer-and-a-money-launderer-sold-montana-on-digital-gold-2a255c96c981

EXHIBIT 38.(iii)
PAGE 35

Project Spokane has contributed new tax base to Missoula County, but it's also becoming a problem for the mine's neighbors. The everpresent noise generated by the facility's thousands of servers and 450 cooling fans is keeping them up at night — even some who live several miles away, depending on how the wind carries the sound through the canyon. Members of the Bonner-Milltown Community Council have been discussing the problem for more than six months, requesting monthly progress reports from Nelson. They're starting to grow restless.

"We need for the company to come do face-to-face," says Burt Caldwell, the council's secretary. "We think the right thing to do is for the company to come face the community and acknowledge there's an issue."

The council has invited state lawmakers representing the area to attend a special meeting on Feb. 5 to "see if the community has any recourse at all, other than declining property values and loss of sleep." Nelson says he and his tenants have been working for months to engineer a solution, and he's already spent more than $10,000 to commission sound analyses. They've settled on a plan that involves swapping out the fan blades for a quieter configuration. If the plan works with the first few dozen fans, Nelson says, he plans to apply for tax-increment money to offset the upgrade costs, which will amount to several hundred thousand dollars. Nelson considers the potential upgrades an investment

EXHIBIT 38.(iii)
PAGE 36

less in Project Spokane than in the burgeoning bitcoin and blockchain industry as a whole.

So far, Walsh's play is paying off. Walsh has been quoted increasingly by national publications for his crypto-industry insights, and was announced as founder and CEO this month of Hyperblock Technologies Corp., a Canadian cryptocurrency mining company that disclosed $15 million in securities distribution in December. A company website unveiled Jan. 22 says it is "building the future of cryptocurrency mining" and features extensive promotional material showing the Bonner mine, which it calls Project Northwest. Hyperblock touts a diverse revenue model, including wholesale hashrate sales to Bitcoin.com, server hardware sales, server hosting generating "monthly USD-denominated payments" and "self-mining" like that done by Aquifer. Its mission is the same one Walsh promoted in Dubai: "to accelerate the development of the blockchain and cryptocurrency industry through hyper disruptive innovation."

"I'm glad that I did take a second risk and invest a bunch more money, because we have a thriving business now," Walsh says.

A Bitcoin.com manager hinted obliquely in a recent interview with Business Insider Nordic that the site was making "an awful lot of money" as the price of bitcoin and other cryptocurrencies spiked. The Indy plugged in Bitcoin.com's advertised hashrates, the power costs advertised for "Project Northwest" and other inputs into a

https://medium.com/@derekbrouwer/the-bitcoin-barons-how-a-marketer-and-a-money-launderer-sold-montana-on-digital-gold-2a255c96c981

EXHIBIT 38.(iii)
PAGE 37

bitcoin mining profit calculator, which suggests that Project Spokane has mined hundreds of millions of dollars worth of cryptocurrency, at current prices.

When the price of bitcoin reached $17,000 in December, Grunke decided to cash out one-tenth of Walsh's gift — the first time he'd sold any cryptocurrency. He says he felt a small thrill.

"It's like pretend money to me, or being in Vegas," says Grunke, who on Jan. 19 announced his departure from MEP to pursue other opportunities out of state.

But should Montanan communities bank on it? Is bitcoin just another gold rush? And who will be left holding the bag if the rush goes bust?

"Those are good questions," Grunke says. "They aren't ones we've thought about."

5

- [Bitcoin](#)
- [Project Spokane](#)
- [Hyperblock](#)
- [Montana](#)
- [Sean Walsh](#)

https://medium.com/@derekbrouwer/the-bitcoin-barons-how-a-marketer-and-a-money-launderer-sold-montana-on-digital-gold-2a255c96c981

EXHIBIT 38.(iii)
PAGE 38

5 claps



WRITTEN BY

# Derek Brouwer

Follow

Freelance journalist in Montana. Formerly reporter for the Missoula Independent, Billings Gazette and Helena Independent Record. This is my portfolio.

EXHIBIT 39.
PAGE 1

**Press Release**

# HyperBlock Provides April 2020 Status Update on Promissory Note Acceleration of Maturity Dates

Published: April 24, 2020 at 10:15 a.m. ET

**Sean Walsh Resigns as Chairman and CEO of Hyperblock Inc.**

---

*The MarketWatch News Department was not involved in the creation of this content.*

Toronto, Ontario, Apr 24, 2020 (Newsfile Corp via COMTEX) -- Toronto, Ontario--(Newsfile Corp. - April 24, 2020) - HyperBlock Inc. (CSE: HYPR) ("**HyperBlock** " or the " **Company** ") provided the status today of two promissory notes (the " **Notes**") issued by Hyperblock LLC ("LLC") and the Company. The Company confirms that Project Spokane LLC, a company controlled by Sean Walsh, former Chairman and CEO of the Company, accelerated the maturity date of the LLC Note, and demand has been made for payment by LLC of the outstanding obligations in the amount of approximately CAD$5,220,000, which includes the outstanding principal balance plus accrued interest and expenses. The Company is also reporting an accelerated maturity date of a Note issued by LLC to Sean Walsh having outstanding obligations of approximately USD$2,100,000, which includes the outstanding principal balance plus accrued interest and expenses. The amounts due under the Notes were accelerated due to an event of default resulting from the Company failing to pay interest, when due, on the Notes. The Company is working with the lenders of the Notes and the Company's financial advisors to determine an appropriate course of action. The Company also announced that Sean Walsh has resigned as Chairman and CEO of the Company - and has resigned from his roles in all capacities related to LLC. The Company will provide further updates as possible.

## About HyperBlock Inc.

HyperBlock is a crypto-asset enterprise operating a North American cryptocurrency datacenter and providing complementary product offerings, which include cryptocurrency mining, Mining-as-a-Service (MAAS), server hosting, and server hardware sales, depending on market conditions. HyperBlock is committed to operating as sustainably as possible,

purchasing electricity for its flagship US datacenter from a hydro-electricity generator - and employing advanced recycling technology to minimize environmental impact. Learn more at www.hyperblock.co.

*Cautionary Note Regarding Forward Looking Information and Future-Orientated Financial Information*

Certain information in this news release constitutes forward-looking statements under applicable securities law. Any statements that are contained in this news release that are not statements of historical fact may be deemed to be forward-looking statements. Forward-looking statements are often identified by terms such as "plan", "believe", "may", "should", "anticipate", "expect", "intend", "forecast" and similar expressions. The forward-looking information contained in this press release includes, but is not limited to, statements related to: the profitability and growth of the Company as a result of the recent deployment of Bitmain servers; the future status of the Company's current power contracts; the impacts of the Company's liquidity, debt maturities, and trade payables; and the potential revocation of the cease trade orders on the Company's securities. These forward-looking statements contained herein are made as of the date of this press release and are based on assumptions and estimates of management, which management considers reasonable, based on information available on the date hereof. Such assumptions may be incorrect. Actual future results may differ materially as forward-looking statements involve known and unknown risks, uncertainties and other factors which may cause the actual results, performance or achievements of the Company to materially differ from any future results, performance or achievements expressed or implied by such forward looking statements. Such factors, among other things, include: general economic, market and business conditions will be consistent with expectations, fluctuations in general macroeconomic conditions; fluctuations in securities markets; risks relating to the Company's ability to execute its business strategy and the benefits realizable therefrom, the ability to retain personnel to execute the Company's business plans and strategies; the ability to retain auditors to perform an audit of the Company's financial statements; the presence of laws and regulations that may impose restrictions on the ability of the Company to operate its business, including securities laws applicable to the Company; the speculative nature of cryptocurrency mining and blockchain operations including but not limited to cryptocurrency prices, block rewards, and mining difficulties; and those factors described under the heading "Risks Factors" in the Company's listing statement dated July 10, 2018 and the risks described in the Company's Management's Discussion & Analysis for the year ended December 31, 2018 dated December 12, 2019, each

Case 9:20-cv-00082-DWM   Document 11-5   Filed 06/15/20   Page 83 of 83

EXHIBIT 39.
PAGE 3

of which is available on the Company's issuer profile on SEDAR. There may be other factors that cause results not to be as anticipated, estimated or intended. Accordingly, readers should not place undue reliance on forward-looking statements and information. There can be no assurance that forward-looking information, or the material factors or assumptions used to develop such forward-looking information, will prove to be accurate. The Company does not undertake any obligations to release publicly any revisions for updating any voluntary forward-looking statements, except as required by applicable securities law. All forward-

looking information contained in this news release is expressly qualified in its entirety by this cautionary statement.

**For more information:**

Roozbeh Ebbadi
investors@hyperblock.co
1-800-613-4721

To view the source version of this press release, please visit https://www.newsfilecorp.com/release/54843

copyright (c) newsfile corp. 2020. all rights reserved

*The MarketWatch News Department was not involved in the creation of this content.*