Quentin M. Rhoades
State Bar No. 3959
Robert Erickson
State Bar No. 9966
Rhoades, Siefert & Erickson PLLC
430 Ryman Street
Missoula, Montana 59802
Telephone: (406) 721-9700
qmr@montanalaywer.com
erickson@montanalawyer.com

*Pro Querente*

## UNITED STATES DISTRICT COURT
## DISTRICT OF MONTANA, MISSOULA DIVISION

| | |
|---|---|
| **STEVE NELSON, MICHAEL BOEHME, and BONNER PROPERTY DEVELOPMENT, LLC,** | Cause No. **CV 20-82-M-DWM** |
| Plaintiffs, | |
| **vs.** | ***PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION*** |
| **PROJECT SPOKANE, LLC, and SEAN WALSH,** | |
| Defendants. | |

# TABLE OF CONTENTS

INTRODUCTION..................................................................................................1

ISSUE.................................................................................................................1

FACTUAL BACKGROUND ..............................................................................2

    The Parties and Related Entities ...................................................................2

    The Bitcoin Mine...........................................................................................3

    The Expansion Plan .......................................................................................3

    The Bank of Montana Loan...........................................................................4

    The Walsh Promises ......................................................................................5

    The Financed Equipment...............................................................................8

    HyperBlock's Defaults and the Noticed Public Sale.....................................9

    The Scheme..................................................................................................11

LEGAL STANDARD.........................................................................................12

ARGUMENT .....................................................................................................13

1.   Plaintiffs are likely to succeed on their unjust enrichment, promissory estoppel and equitable estoppel claims, as well as their fraud claim. ..............................13

2.   Plaintiffs are likely to suffer irreparable harm in the absence of a preliminary injunction. ...................................................................................................17

3.   The balance of equities tips sharply in favor of Plaintiffs..................................20

4.   A preliminary injunction is in the public interest.............................................21

5.   The issuance of a preliminary injunction is ripe. .............................................21

6.    The Court should issue a preliminary injunction without bond. ........................23

CONCLUSION .................................................................................................24

CERTIFICATE OF COMPLIANCE ...........................................................25

# TABLE OF AUTHORITIES

## Cases

*Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) .........13

*Barahona-Gomez v. Reno*, 167 F.3d 1228, 1237 (9th Cir. 1999) ...............................23

*Barnes v. Healy*, 980 F.2d 572, 580 (9th Cir. 1992) ....................................................22

*CitiMortgage, Inc. v. Country Gardens Owners' Assn.*, 2013 U.S. Dist. LEXIS
  172320 (D. Nev. 2013) ...........................................................................................18

*Enron Oil Trading & Transp. Co. v. Walbrook Ins. Co.*, 133 F.3d 526, 528
  (9th Cir. 1997) .........................................................................................................13

*H&R Block Tax Servs. LLC v. Kitzman*, 681 F.Supp.2d 1248, 1253
  (D. Mont. 2010) ......................................................................................................21

*Jet Midwest Intl.  Co. v. Jet Midwest Group, LLC*, 953 F.3d 1041, 1046
  (8th Cir. 2020) .........................................................................................................19

*Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Circ. 2003) .......................................23

*Kapor v. RJC Inv., Inc.*, 2019 MT 41, ¶ 33, 394 Mont. 311, 434 P.3d 869 ..........15, 17

*MC, Inc. v. Cascade City-Cty. Bd. of Health*, 2015 MT 52, ¶ 31, 378 Mont. 267,
  343 P.3d 1208 .........................................................................................................14

*S & P Brake Supply, Inc. v. STEMCO LP*, 2016 MT 324, ¶ 28, 385 Mont. 488,
  385 P.3d 567 .....................................................................................................13, 17

*Sierra On-Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415 (9th Cir. 1984) .........24

*United States v. 475 Martin Lane,* 2011 U.S. Dist. LEXIS 79635 (Cent. D. Cal.,
  July 18, 2011) ..........................................................................................................19

*Volk v. Goeser*, 2016 MT 61, ¶ 45, 382 Mont. 382, 367 P.3d 378 .............................15

*Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20, 129 S. Ct. 365,
  172 L. Ed. 2d 249 (2008) ........................................................................................12

iv

**Statutes**

Section 28-2-405(4), MCA ....................................................................15

Section 30-1-103, MCA ........................................................................16

Section 30-9A-610, MCA ......................................................................22

**Rules**

Fed. R. Civ. P. 65 ............................................................................1, 23

Fed. R. Civ. P. 65(c)..............................................................................23

# INTRODUCTION

Pursuant to the  Court's June 15, 2020 Order (doc. 10), Plaintiffs Steve Nelson, Michael Boehme, and Bonner Property Development, LLC (BPD), under Fed. R. Civ. P. 65, have moved the Court to issue a preliminary injunction enjoining any sale or other disposition of equipment and fixtures located on BPD's leased premises pending entry of final judgment in this case.  The motion is supported by this brief, as well as the Declaration of Stephen Nelson (docs. 1.8 through 1.10, also filed as docs. 8.3, 8.6, 11 and 11.1 through 11.5) and the First Amended Complaint (doc. 7), all hereby incorporated by reference.

# ISSUE

The Court should preliminarily enjoin Defendants' intended disposition of assets because:  (1) the most valuable of the assets are subject to a first position security interest in favor of BPD, which Defendants promised to deliver but later refused to provide; (2) some of the assets are fixtures that belong to BPD (not HyperBlock) and in which Defendants have no security or any other interest; (3) the remaining assets (except computer servers purchased prior to December 31, 2019) are subject to BPD's nonpriority security interest which Defendants' failed to acknowledge in their prior effort to sell them.

Due to Defendants' broken promises and misrepresentations, upon which Plaintiffs justifiably relied, Plaintiffs are likely to succeed on the merits of their

1

claims for promissory estoppel, equitable estoppel, unjust enrichment and fraud. A balancing of hardships tips sharply towards Plaintiffs. And in the absence of injunctive relief, Plaintiffs will be irreparably harmed because they will have been deprived of valuable property rights.

**FACTUAL BACKGROUND**

**The Parties and Related Entities**

Among other properties, BPD owns Lot 25A at the Bonner Mill Site, which includes the largest industrial building at the former Stimson Lumber Mill in Bonner, Montana. Plaintiffs Steve Nelson and Michael Boehme are the only members of BPD. (Decl. of Steve Nelson, ¶ 2.)

Defendant Project Spokane is a Colorado limited liability company that started a large Bitcoin mining operation on BDP's Bonner Mill Site property. Defendant Walsh is a resident of Puerto Rico and serves as the controlling member and manager of Project Spokane. Walsh also served as the Chairman and CEO of a publicly traded Canadian Bitcoin mining firm called HyperBlock, Inc. (HBI) until his resignation in April 2020. (*Id.*, ¶ 47.) HyperBlock, LLC (HyperBlock), the company of which Walsh also was CEO until April 2020, is a solely-owned subsidiary of HBI. (*Id.*, ¶ 14.) HBI filed for bankruptcy in Canada on May 15, 2020.

2

**The Bitcoin Mine**

On March 1, 2016, BPD and Project Spokane entered into a Commercial Lease Agreement with BPD (the Lease) for Project Spokane's occupancy of the largest building at the Bonner Mill Site to house the Bitcoin mine. (*Id.*, ¶ 4.) The mining equipment consists of millions of dollars of specialized computer hardware and related infrastructure located on the leased premises. (*Id.*, ¶ 7.)

In July 2018, HyperBlock, through Walsh, bought the assets of Project Spokane, including the mining operation. As part of the transaction, Project Spokane assigned the Lease to HyperBlock. (*Id.*, ¶ 10.) The agreement was formalized in an Assignment, Assumption and Amendment of Lease executed effective July 10, 2018. (*Id.*) Walsh signed the Assignment, Assumption and Amendment of Lease for both assignor Project Spokane and assignee HyperBlock. Thus, Walsh served as chief executive officer or the controlling management officer for both BPD's old tenant and the new one.

**The Expansion Plan**

In December 2018, Walsh decided to expand HyperBlock's Bitcoin mining operation. HyperBlock applied for a loan from Bank of Montana (BOM) to finance the expansion through the construction of additional improvements and the acquisition of additional equipment. (*Id.*, ¶ 13.) In need of capital, Walsh requested that BPD and its principals, Nelson and Boehme, put their credit and BPD's real

3

estate at stake by guaranteeing and collateralizing bank financing in the amount of just under $3 million for the acquisition of additional Bitcoin mining computer hardware and improvements included in the expansion.  (*Id.*, ¶¶ 13, 16.)

The lynchpin of Walsh's plan was HyperBlock's promise to Plaintiffs, which he articulated expressly to provide a first position security interest to BPD in anything financed with the BOM Loan.  (*Id.*, ¶ 20.)  Absent that particular promise given expressly by Walsh, neither BPD nor Nelson nor Boehme would have executed the personal guarantees or the other agreements necessary to close the loan nor would BPD have pledged BPD's real estate.  (*Id.*, ¶¶ 18 and 22.)  In light of this promise, the negotiations resulted in four separate but related agreements, including the Credit Enhancement Agreement and the Security Agreement discussed below.  All four agreements were negotiated and executed, on behalf of HyperBlock, by Walsh.  (*Id.*, ¶¶ 17 and 24.)

### The Bank of Montana Loan

On December 14, 2018, HyperBlock, as borrower, executed a line of credit Promissory Note in the principal amount of $2,625,000 payable to BOM, as lender (the BOM Loan).  (*Id.*, ¶ 15.)  Again it was Walsh who signed the Promissory Note on behalf of the borrower.   As contemplated, BOM required BPD, the landlord, to pledge real property and improvements as collateral for the loan to its tenant, HyperBlock.  (*Id.*, ¶ 16.)  By means of a Deed of Trust, BPD conveyed an interest in

4

real estate and improvements to BOM as security for the BOM Loan – the proceeds of which Walsh eventually used, in January and February of 2020, to purchase millions of dollars of computer servers.  (*Id.*, ¶¶ 27-29.)  As an additional condition for the original Walsh-proposed BOM Loan in 2018, BOM required BPD's principals, Nelson and Boehme, to each individually guarantee HyperBlock's obligations under the BOM Loan, which they did  in reliance of Walsh's promises. (*Id.*, ¶ 16.)  Thus, under the BOM Loan, HyperBlock's multi-million-dollar obligations to BOM are secured BPD's real estate and improvements personally guaranteed by Nelson and Boehme.

**The Walsh Promises**

BPD pledged its multi-million-dollar property as collateral for the BOM loan to HyperBlock.  Both Nelson and Boehm executed personal guarantees for the BOM loan to HyperBlock.  (*Id.*, ¶ 16.)  Although BPD received a nominal credit enhancement fee, neither Nelson nor Boehme personally received any consideration for putting their personal credit at stake.  BPD, Nelson and Boehme would not have made these pledges and guarantees absent Walsh's promises that BPD would have a first priority security interest in the equipment purchased with the BOM loan and that certain property and fixtures would remain with the premises at the end of the lease term.  (*Id.*, ¶¶ 19, 22.)

5

Walsh's promise to provide first priority to the lien rights in relation to the

BOM Loan constituted the key material inducement for entry into these agreements,

without which neither BPD nor Nelson nor Boehme would have provided the credit

enhancements which made possible Walsh's ambitious purchases.  (*Id.*, ¶¶ 18-22.)

Nelson and Boehme relied on the promises of Walsh, on his own behalf and on

behalf of the company he managed (HyperBlock) and in which he owns and manages

(Project Spokane), that BPD would receive a lien position senior to those of Walsh

and Project Spokane vis-à-vis the Bitcoin mining equipment and anything else

funded by the BOM Loan.  (*Id.*)  In the event Hyperblock defaulted under the BOM

Loan,[1] BPD would be free to exercise its right as the first priority secured party to

liquidate the new Bitcoin mining equipment and any other assets financed – the

purchase of which was only made possible by BPD's pledge of real estate and Nelson

and Boehm's personal guarantees – to pay the BOM Loan on HyperBlock's behalf.

The Credit Enhancement Agreement, which Walsh executed for Hyperblock,

confirms Walsh's promise that BPD would have a first priority interest in assets

purchased with the BOM loan proceeds.  It states, at ¶ 1.2:

> The reimbursement obligation [of HyperBlock to reimburse BPD and
> its principals] shall be secured by a first lien security interest in the
> new assets and other improvements that Borrower intends to acquire
> with the proceeds from the Bank Loan and the New Equity

---

[1] HyperBlock has now defaulted under the BOM Loan, as well as defaulted under the
Lease.  (*Id.*, ¶ 43.)

> ("Borrower's Pledged Assets"). Borrower shall execute and deliver a
> security agreement contemporaneously with this Agreement in form
> and substance acceptable to Pledgor and its counsel ("Security
> Agreement").  Borrower covenants to obtain lien waivers and releases
> from contractors and suppliers and to maintain Pledgor's first lien
> position in Borrower's Pledged Assets at all times.

Moreover, there is an affirmative covenant in § 1 of the Security Agreement and in §

4.1.f of the Credit Enhancement Agreement that Hyperblock would

> execute such financing statements and other documents as [BPD] may
> reasonably request to perfect and continue a first position security
> interest in Borrower's Pledged Assets in favor of [BPD]

The December 13, 2018 Security Agreement, which Walsh executed for HyperBlock,

secures all obligations arising out of the Lease and the Credit Enhancement

Agreement until such time as HyperBlock fully satisfies the BOM Loan.  (*Id.*, ¶ 17.)

   In addition, in exchange for Plaintiffs' agreement to pledge property and

provide personal guarantees, Walsh also promised that HyperBlock would leave

certain fixtures and other Bitcoin mining assets on the leased premises at the

termination of the lease.  (*Id.*, ¶¶ 18 and 20.)  On January 23, 2019, BPD and

HyperBlock entered into a Fourth Amendment to Commercial Lease Agreement.

(*Id.*, ¶ 24.)  That amendment provides all fixtures "and personal property located on

or about the Property as of the Lease Commencement Date (defined below) shall be

considered part of the Property hereby leased and subject to all terms and conditions

hereof."  (*Id.*)  It continues:

7

> Furthermore, however, whether or not best legally described as
> Fixtures, all property relating to electrical supply and distribution
> shall remain with the Property and become the property of Landlord
> at the termination of the Lease, including but not limited to the
> property described in Exhibit E-2, attached hereto and incorporated
> herein by reference.

This list includes fans, electrical transformers and other specific items consisting of personal property and fixtures – all of which is property that Walsh would later attempt to sell. (*Id.*, ¶ 36.)

Walsh later confirmed the promises. In January 2019, Project Spokane and HyperBlock restructured a deferred obligation that HyperBlock owed to Project Spokane for the purchase and sale of the Project Spokane business and assets. (*Id.*, ¶ 25.) In exchange for Project Spokane's agreement to do so, HyperBlock agreed to a collateral assignment of the Lease with HyperBlock. (*Id.*) This assignment required the consent of the landlord. During these negotiations, Project Spokane agreed that in the event of default under the BOM Loan, if Project Spokane did not under the assignment step in as tenant and continue to run the Bitcoin mine, its rights would be subject to those of BPD, Nelson and Boehme. (*Id.*, ¶ 26.)

### The Financed Equipment

On December 31, 2019, BPD and HyperBlock entered into a Modification of Lease Agreement, Credit Enhancement Agreement, Security Agreement and Side Letter to Third Amendment to Lease Agreement (Modification). (*Id.*, ¶¶ 28-29.)

Walsh negotiated, executed, and delivered all documents on behalf of HyperBlock. (*Id.*, ¶ 29.)  The Modification allowed for an increase in the BOM line of credit to $3.5 million and for the use of those funds for the acquisition of new servers instead of real property improvements.  The Modification also expanded BPD's first position security interests to include <u>all</u> of HyperBlock's personal property located at the premises (excluding only the older servers owned by HyperBlock as of December 31, 2019) and specifically including the new servers that would be purchased.  (*Id.*)

Walsh then immediately purchased millions of dollars of state-of-the-art computer servers for HyperBlock, all financed with the BOM Loan.  (*Id.*, ¶ 27, 33.)

### HyperBlock's Defaults and the Noticed Public Sale

Walsh bought millions of dollars of computer hardware with borrowed BOM Loan money only a few short months ago, in January and February 2020.  On May 26, 2020, the BOM Loan was declared by the BOM to be in default.  (*Id.*, ¶ 43.)   By allowing the BOM Loan to go into default, HyperBlock is also in default of the Lease, and, moreover, has placed Plaintiffs at risk under their guarantees and pledged real estate.  (*Id.*, ¶ 44.)

Meanwhile, on or about May 19, 2020, Walsh (personally) and Project Spokane served a "Notice of Disposition of Collateral by Public Sale," in which Walsh and Project Spokane stated that they intended to conduct a public sale of the

very computer equipment Walsh just bought for HyperBlock with the borrowed money.  (*Id.*, ¶¶ 35-36.)

In addition to the new computer equipment, the notice stated that Defendants intended to sell fixtures that are part of the structure of the building and belong to BPD—not HyperBlock—and in which neither Project Spokane nor Walsh have a security interest. (*Id.*, ¶¶  35-36 and 38.)  These include 467 industrial fans, 58 power transformers, 445 electrical breaker panels, and other items.  (*Id.*, ¶ 40.)  These are items that have become so related to the building and property that any interest in them would arise under real property law, not the UCC.  (*Id.*, ¶ 36.)  For example, if the fans are removed there will be 467 gaping holes in the roof of the building, essentially destroying its utility.  (*Id.*)  HyperBlock, through Walsh, expressly promised that these items, and other items, would remain on the premises as fixtures and become part of the real property of the landlord.  Regardless, BPD holds a fixture lien on them – and no other party has made a fixture filing.  (*Id.,* ¶¶ 40 and 36.)  Defendants' notice also failed to acknowledge BPD's interest in the remaining scheduled assets.

Despite the deficiencies in the notice, of which Walsh and Project Spokane were aware, they widely advertised the public sale and appeared intent on carrying it out as noticed.  (*Id.*, ¶ 47.)  In the hope of achieving a mutually agreeable accommodation and hoping to get cooperation in making the most for everyone

facing a very difficult situation, Plaintiffs met with Walsh and his counsel via
telephone on May 26, 2020. (*Id.*, ¶ 42.)  They asked Walsh to fulfill his promise and
honor the first lien security interest in the Notice and the Sale—as one means of
addressing it, to sign a subordination agreement or to at least postpone the public sale
to allow the parties to attempt to negotiate a resolution.  (*Id.*, ¶ 45.)  Walsh refused
both requests.

### The Scheme

In January and February 2020, Walsh used some $2.6 million in BOM Loan
proceeds to buy computer hardware for HyperBlock on which he personally and his
company, Project Spokane, claimed to have a senior security interest.  Two months
later, Walsh resigned from HBI and HyperBlock, and he personally and on behalf of
his company, Project Spokane, accelerated the debt HBI and HyperBlock purportedly
owed them, demanding immediate payment.  Since HyperBlock could not pay, and
HBI was on the verge of bankruptcy (and now is bankrupt), Walsh set a public sale to
liquidate the same newly acquired computer hardware he just bought for HyperBlock
with the BOM Loan.  Worse, rather than use the proceeds to repay the BOM Loan,
Walsh and company instead intended to pocket the proceeds for themselves or take
ownership of the assets.

Because Plaintiffs stood to suffer irreparable harm in the event Defendants'
sale went forward, Plaintiffs filed this action in the Montana Fourth Judicial District

11

Court and sought a temporary restraining order enjoining the sale and prohibiting the disposal of the assets noticed in the sale. (Docs. 1.2 – 1.14.) The Fourth Judicial Court entered the temporary restraining order, *id.*, and Walsh apparently postponed the sale. It is reasonable to infer that absent the Court's entry of a preliminary injunction enjoining the disposition of the assets subject to Walsh's previously noticed sale, Walsh and Project Spokane intend to sell the scheduled assets without delay.

If they are allowed to do so, they would cause irreparable harm to the property and lien interests of Nelson, Boehme, and BPD. BPD's property, in which Defendants have no interest, would be sold and removed. BPD's lien rights, promised by Walsh, would be irreparably impaired, without adequate remedy. Under the facts, the Court should enjoin the disposition of those assets pending a final judgment in this case.

## LEGAL STANDARD

A party seeking a preliminary injunction must establish (1) a likelihood of success on the merits, (2) a likelihood of suffering irreparable harm if the preliminary injunction is denied, (3) that the balance of equities tips in its favor, and (4) that an injunction is in the public interest." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20, 129 S. Ct. 365, 172 L. Ed. 2d 249 (2008). If a plaintiff can raise "serious questions going to the merits" and "demonstrate a balance of hardships that

tips sharply towards the plaintiff," the plaintiff is entitled to a preliminary injunction "so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011). Plaintiffs have made such a showing here.

## ARGUMENT

1. **Plaintiffs are likely to succeed on their unjust enrichment, promissory estoppel and equitable estoppel claims, as well as their fraud claim.**

Because this case was removed to this Court under diversity jurisdiction, the substantive law of Montana, the forum state, applies. *Enron Oil Trading & Transp. Co. v. Walbrook Ins. Co.*, 133 F.3d 526, 528 (9th Cir. 1997). Among other claims, Plaintiffs seek relief against Defendants under the theories of unjust enrichment, promissory estoppel, equitable estoppel and fraud under Montana law. Plaintiffs are likely to succeed on each of these claims.

A party asserting promissory estoppel needs to prove four elements: "a clear and unambiguous promise, reliance by the promisee, reasonableness and foreseeability of the reliance, and resulting injury to the promisee." *S & P Brake Supply, Inc.*, 2016 MT 324, ¶ 44, 385 Mont. 488, 385 P.2d 567. Here, Walsh unambiguously promised – both orally and in writing – that BPD would have a first priority lien interest in the assets purchased with the BOM Loan. In addition, Walsh promised that certain property would remain with the premises at the termination of

13

the lease.  Walsh intended that Plaintiffs would rely upon those promises and, undoubtedly, they did by BPD's pledge of millions of dollars' worth of real estate as security for the BOM loan and Nelson and Boehm's personal guarantees.  Now, the BOM loan and the Lease are both in default.  Consequently, Plaintiffs have suffered – and will continue to suffer – injury.

Equitable estoppel is a common law doctrine based on the principle that "a party cannot, through his intentional conduct, actions, language, or silence, induce another to unknowingly or detrimentally alter his position and then subsequently deny the just and legal consequences of his intentional acts."  *MC, Inc. v. Cascade City-Cty. Bd. of Health*, 2015 MT 52, ¶ 31, 378 Mont. 267, 343 P.3d 1208 (internal citation omitted).  A party must demonstrate six elements through clear and convincing evidence to establish equitable estoppel:  (1) there must be conduct, acts, language, or silence amounting to a representation or a concealment of a material fact; (2) the facts must be known to the party to be estopped at the time of that party's conduct, or at least the circumstances must be such that knowledge of facts is necessarily imputed to that party; (3) the truth must be unknown to the other party at the time the representation was acted upon; (4) the representation must be made with the intent or expectation that it will be acted on by the other party; (5) the representation must be relied upon by the other party, leading that party to act upon it; and (6) the other party must in fact rely on the representation so as to change its

14

position for the worse.  *Kapor v. RJC Inv., Inc.*, 2019 MT 41, ¶ 33, 394 Mont. 311,

434 P.3d 869.  The facts demonstrate that Plaintiffs likewise have met each element

of equitable estoppel.  In sum, Walsh's abuse of his control of HyperBlock for the

purpose of lining his own pockets and the pockets of his wholly owned company, at

the expense of legitimate creditors, makes it inequitable for him and his company,

Project Spokane, to accept and retain these benefits without payment of their value.

To succeed on a claim for unjust enrichment, a plaintiff must prove three

elements: "(1) a benefit conferred upon a defendant by another; (2) an appreciation or

knowledge of the benefit by the defendant; and (3) the acceptance or retention of the

benefit by the defendant under such circumstances that would make it inequitable for

the defendant to retain the benefit without payment of its value."  *Volk v. Goeser*,

2016 MT 61, ¶ 45, 382 Mont. 382, 367 P.3d 378.  Again, the facts demonstrate each

of these elements.  Under unjust enrichment, Plaintiffs are not only entitled to

monetary damages, but also a constructive trust on the assets.  *See id.*

Finally, Plaintiffs will likely succeed under their fraud claim.  All indications

are that Walsh, with the intent to deceive Plaintiffs into agreeing to pledging their

security for the BOM loan, had no intention of performing his own promises at the

time he made them.  *See* § 28-2-405(4), MCA.  Walsh caused HyperBlock to take

disbursements from the BOM Loan to buy millions of dollars of computer servers not

for the legitimate purpose of Bitcoin mining, but instead for the fraudulent purpose of

15

obtaining new and valuable assets that Walsh and Project Spokane intended to liquidate at public sale. This damaged Plaintiffs, who guaranteed the BOM Loan, by placing them at risk of having to satisfy the BOM Loan, with HyperBlock closed down and in default on the BOM Loan as well its lease with BPD.  (Nelson Decl., ¶ 43.)  Plaintiffs face actual liability with respect to the BOM Loan.  Moreover, BPD's security for HyperBlock's performance under the now defaulted Lease – a first position security interest all personal property owned by HyperBlock except certain older servers – has been fundamentally impaired.

Walsh  may contend that because he and Project Spokane have filed nominally senior UCC-1 lien notices of record (the former in July 2019, the latter in June 2018), he and Project Spokane are legally privileged to dispose of the assets without considering Plaintiffs' interests.  The Uniform Commercial Code, however, was not adopted to allow a business manager like Walsh to use his insider control of a corporate debtor to loot creditors or guarantors.  Rather, fraud and other common law malfeasance enjoy no protection under the UCC.

As the UCC expressly provides: "Unless displaced by the particular provisions of this code, the principles of law and equity, . . . *estoppel*, *fraud*, *misrepresentation*, . . ., *or other validating or invalidating cause* shall supplement its provisions." Section 30-1-103, MCA (emphasis added).  Thus, the UCC does not preempt remedies for wrongs committed in violation of common law defenses and causes of

16

action.  Instead, the opposite is true.  The Montana Supreme Court recently ruled that equitable estoppel supplements the UCC.  *Kapor v. RJC Inv., Inc.*, 2019 MT 41, ¶ 33, 394 Mont. 311, 434 P.3d 869.  Similarly, in 2016, the Court adopted the same stance as to application of promissory estoppel in the context of the UCC.  *S & P Brake Supply, Inc. v. STEMCO LP*, 2016 MT 324, ¶ 28, 385 Mont. 488, 385 P.3d 567.

**2.    Plaintiffs are likely to suffer irreparable harm in the absence of a preliminary injunction.**

The harm of Walsh's attempt to avoid the obligations of his inducement to Nelson, Boehme and BPD, by attempting to sell assets securing his promises to them, is plain.  There is a clear and present danger that the Walsh gambit will deprive Nelson, Boehme and BPD of what Walsh promised them: security.  This is especially true in view of the tenant's default not just under the lease, but also under the BOM loan.  Walsh will gain a tremendous benefit, for which neither he nor Project Spokane bargained or gave good consideration, by selling the assets out from under the landlord and the guarantors of the tenant's debt.  In other words, absent injunctive relief, Walsh stands to gain an undeserved windfall while Nelson, Boehme and BPD suffer irreparable harm.

Money damages will not provide Plaintiffs with sufficient relief under the circumstances of this case.  Although Plaintiffs certainly stand to suffer financially, Plaintiffs do not claim a mere financial injury.  Instead, BPD claims a first priority

lien in property – the servers purchased with the BOM Loan – which priority lien Walsh promised to provide Plaintiffs.  In addition to monetary damages claims, Plaintiffs have lien and equitable interests at stake.   Monetary damages are insufficient to remedy impairment of Plaintiffs' lien and equitable interests in property, particularly property that is currently located and installed on BPD's premises, and was promised to be BPD's collateral, not Defendants'.

Moreover, Walsh has endeavored to sell – and continues to threaten to sell – fixtures and other personal property in which Walsh has no interest.  Selling and removing the 467 industrial fans, 58 power transformers, 445 electrical breaker panels, for example, will permanently impair BPD's commercial building.  Removing the fans, in particular will leave over 400 gaping holes in the roof of the building.  This would have a direct effect on BPD's real property and its ability to re-let the premises.  And, again, neither Defendants nor HyperBlock has a legitimate security or other legal interest in those fans – only BPD does.

More significantly, if Walsh is permitted to sell the assets, as is his stated intention, then what rightly should be BPD's first priority interest in at least the new, valuable computer servers arguably will be extinguished, according to Walsh himself.  (*See* Ex. 31 to Nelson Decl., Notice of Disposition of Public Sale at p. 2, ¶ (e).)  Having a lien extinguished is an irreparable injury.  *See, e.g., CitiMortgage, Inc. v. Country Gardens Owners' Assn.*, 2013 U.S. Dist. LEXIS 172320 (D. Nev. 2013);

18

*United States v. 475 Martin Lane,* 2011 U.S. Dist. LEXIS 79635 (Cent. D. Cal., July 18, 2011).

In addition, if the Court permits Defendants to sell the assets, or credit bid for the assets, then it will be difficult, or even impossible, to determine which parts were sold, who has a priority or other security interest in which parts, and how much each sold for (or was credit bid for) at the sale. This would make damages difficult to calculate – even if they could be recovered. *See Jet Midwest Intl. Co. v. Jet Midwest Group, LLC*, 953 F.3d 1041, 1046 (8th Cir. 2020). Because it would be extremely difficult, if not impossible, to trace the various portions of collateral and the security interests, BPD would suffer irreparable harm if Defendants are allowed to dispose of the assets they scheduled for sale. *See id.* Again, the possibility of mere money damages is not adequate.

Absent an opportunity for BPD to assert its first priority interest in the BOM Loan purchased assets prior to the assets' disposition, BPD will be permanently deprived of BPD's property rights in those assets, which Walsh promised BPD could utilize in the event HyperBlock defaulted the BOM Loan or HyperBlock defaulted under the Lease. Both of these defaults have now occurred. Allowing a sale would result in an irreversible disposition of the assets and leave Plaintiffs exposed for the BOM Loan, the proceeds of which were used to buy the very servers in which Walsh promised BPD a first position security interest. BPD would be precluded from

19

utilizing the servers as collateral to generate proceeds to pay the now-defaulted BOM

Loan, as promised.  And the result would be BOM's foreclosure on BPD's real

property pledged to secure HyperBlock's loan.  In effect, Defendants would end up

owning the assts that BPD paid for, and Plaintiffs would have no recourse against

HyperBlock because HyperBlock consequently would be left without assets.  This

scenario is precisely what lien rights and equitable claims are designed to prevent.  A

deprivation of BPD's lien and property rights in the servers, and other property,

especially since HyperBlock is now defunct, would be impossible to remedy with

monetary damages alone.

**3.      The balance of equities tips sharply in favor of Plaintiffs.**

Walsh promised to provide BPD first position lien security in the assets Walsh

caused Hyperblock to purchase with the BOM Loan proceeds, which loan is secured

by BPD's real estate and Nelson's and Boehm's personal guarantees.  Walsh also

promised that certain personal property would remain on the leased premises after

termination of the lease.  He has now reneged on those promises.  Walsh may never

have intended to perform, and certainly later to refused perform.  Plaintiffs justifiably

relied on the promises and fully performed their end of the bargain, exposing

themselves to significant potential liability, and Walsh enjoyed the fruits of his

promises.

Walsh now endeavors to take advantage of his own wrongdoing by selling assets in which he promised that BPD would have a first position security interest, and, indeed, assets in which Walsh has no interest at all because they are fixtures belonging to BPD. Walsh is attempting to gain an undue windfall at Plaintiffs' detriment by refusing to subordinate his and Project Spokane's lien interests as Walsh promised. The equities sharply favor Plaintiffs, as Plaintiffs are merely seeking to require Walsh to keep his word. *See, e.g., H&R Block Tax Servs. LLC v. Kitzman*, 681 F.Supp.2d 1248, 1253 (D. Mont. 2010).

**4.     A preliminary injunction is in the public interest.**

The public has an interest in valid contracts being upheld. *Id.* The public interest is served when courts prevent parties from receiving an undue windfall at the expense of others, especially when fraudulent conduct is involved. Public policy promotes protection of an individual's property against the wrongful acts of others and the enforcement of valid contracts. On the other hand, there is not public interest in allowing a party to engage in fraudulent efforts that, if successful, result in inequity. The Court would promote the common good by issuing a preliminary injunction and ultimately requiring Walsh to abide by his promises to Plaintiffs.

**5.     The issuance of a preliminary injunction is ripe.**

Plaintiffs recognize that, due to the entry of the state court's temporary restraining order, which now has expired, the sale Walsh and Project Spokane noticed

21

has been postponed.  It has not yet been rescheduled – at least not to Plaintiffs'
knowledge.  But a disposition of the collateral does not require a publicly noticed
sale.  *See* § 30-9A-610, MCA.  Moreover, Defendants have made clear that they
intend to sell the assets – or otherwise dispose of the assets – at the earliest
opportunity.

Defendants have not consented to postponing the sale until a final disposition
of the case.  Given Defendants' position, it is reasonable to infer Defendants intend to
quickly sell the assets – for example, before a second motion for a temporary
restraining order could be entered.  And forcing serial motions for temporary
restraining orders obviously would squander scarce judicial resources.  There
remains, therefore, a ripe controversy over the disposition of the assets.

Moreover, the "voluntary cessation" exception to the mootness doctrine applies
here because Defendants are free to notice a sale or otherwise dispose of the assets in
their discretion.  Under the voluntary cessation exception, a defendant's voluntary
cessation of a wrongful activity will moot a claim for an injunction against that
activity only if "(1) there is no reasonable expectation that the wrong will be
repeated, and (2) interim relief or events have completely and irrevocably eradicated
the effects of the alleged violation."  *Barnes v. Healy*, 980 F.2d 572, 580 (9th Cir.
1992) (citations omitted).  Here, given counsel's unwillingness to concede the sale
pending final disposition, the exceptions apply.  It is entirely reasonable to expect

22

Defendants will dispose of the assets without delay because Defendants have represented that this is precisely their intention.  The dispute regarding the disposition of the assets is a live controversy that should be addressed.

**6.      The Court should issue a preliminary injunction without bond.**

Rule 65 states that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount the court considers property to pay the costs and damages sustained by any party found to have been wrongfully restrained.  Fed. R. Civ. P. 65(c).  However, the Ninth Circuit Court appeals has "recognized that Rule 65(c) invests the district court 'with discretion as to the amount of security required, **if any**.'"  *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Circ. 2003) (citing *Barahona-Gomez v. Reno*, 167 F.3d 1228, 1237 (9th Cir. 1999).  "The district court may dispense with the bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or her conduct."  *Id.* Here, there is little to no possible harm in ordering the assets to remain in place.  The assets themselves are adequate security.  Even in the extremely unlikely event Plaintiffs do not prevail as to their several theories for relief, Defendants would then be free to dispose of the assets after only a relatively short period of delay.  Thus, the Court should not require Plaintiffs to post a bond.

Alternatively, if the Court is inclined to require some amount of security, it should be nominal, and the Court should allow Plaintiffs latitude to post alternate

23

forms of security, such as real estate or a letter of credit in lieu of an expensive surety bond.

## CONCLUSION

The purpose of a preliminary injunction is to preserve the status quo and prevent the irreparable loss of rights before a final judgment on the merits. *Sierra On-Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415 (9th Cir. 1984). In order to preserve BPD's rights in personal and real property, the Court should preliminarily enjoin Defendants from any sale or disposition of the assets located on the leased premises until after trial on the merits. Specifically, Plaintiffs request that the court enjoin any sale or other disposition any property located at located at the Bonner Mill Site in Missoula County, Montana, commonly known as 9144 Bonner Mill Road, Bonner, Montana, 59823; and further enjoin Defendants and their agents from removing, disposing of or damaging any property previously or currently located at the Bonner Mill Site in Missoula County, Montana, commonly known as 9144 Bonner Mill Road, Bonner, Montana, 59823, until after a trial on the merits.

DATED this 18th day of June 2020.

Respectfully Submitted,
RHOADES SIEFERT & ERICKSON PLLC

By: _/s/Quentin M. Rhoades_____
    Quentin M. Rhoades
    Robert Erickson
    *Pro Querente*

24

## CERTIFICATE OF COMPLIANCE

The undersigned certifies that the foregoing brief is 5752 words including footnotes, but excluding the caption, table of contents, table of authorities, index of exhibits, signature blocks, and certificates of compliance & service. Pursuant to Local Rule 7.1, a table of contents, table of authorities, and index of exhibits are included in this brief.

DATED this 18th day of June 2020.

Respectfully Submitted,
RHOADES SIEFERT & ERICKSON PLLC


By: _/s/Quentin M. Rhoades_____
Quentin M. Rhoades
Robert Erickson
*Pro Querente*

25