Quentin M. Rhoades
State Bar No. 3969
Robert Erickson
State Bar No. 9966
Rhoades, Siefert & Erickson PLLC
430 Ryman Street
Missoula, Montana 59802
Telephone: (406) 721-9700
qmr@montanalaywer.com
erickson@montanalawyer.com

*Pro Querente*

## UNITED STATES DISTRICT COURT
## DISTRICT OF MONTANA, MISSOULA DIVISION

| | |
|---|---|
| **STEVE NELSON, MICHAEL BOEHME, and BONNER PROPERTY DEVELOPMENT, LLC,**<br><br>Plaintiffs,<br><br>**vs.**<br><br>**PROJECT SPOKANE, LLC, and SEAN WALSH,**<br><br>Defendants. | Cause No. **CV 20-82-M-DWM**<br><br><br>***NOTICE OF ERRATA*** |

Exhibit 16 to the Declaration of Stephen Nelson was inadvertently omitted from the Court filings. A true and accurate copy of Exhibit 16, the contents of which are described in the exhibit list attached to the Nelson Declaration, is attached hereto, and is hereby incorporated into the Nelson Declaration.

DATED this 24th day of June 2020.

Respectfully Submitted,
RHOADES SIEFERT & ERICKSON PLLC


By: _/s/Robert Erickson_____
        Quentin M. Rhoades
        Robert Erickson
        *Pro Querente*

**Exhibit 16.** *[Dec. #19]* Emails with Bowditch, Walsh, Nelson, Bjornson, Stivers, regarding Credit Enhancement Agreement and Third Amendment

    (i)      Email from Bjornson to group (including Walsh) on 12/03/2018 at 4:44 PM (with draft Credit Enhancement Agt.), and earlier email chain including Walsh and Stivers regarding amendment to lease, draft Credit Enhancement Agt, and BOM Loan documents;

    (ii)     Email from Bjornson to group (including Walsh) on 12/04/2018 at 4:28 PM (with draft Security Agt.);

    (iii)    Email from Bowditch dated 12/07/2018 at 4:06 PM with attached redline of Credit Enhancement Agt. and Third Amendment in which Bowditch revised language in the Credit Enhancement Agt., including specifically the provisions related to HyperBlock's obligation to maintain BPD's first lien position in Borrower's Pledged Assets at all times.

    (iv)    Emails between Walsh and Bowditch (including Stivers) on 12/11/2018 (regarding approval to changed language in revised Third Amendment);

    (v)     Email from Bjornson to group (including Walsh) on 12/11/2018 at 10:09 PM with comments to draft Third Lease Amendment (with attached draft.);

Exhibit
16(i)

| | |
|---|---|
| **From:** | David Bjornson |
| **To:** | Big Sky Mobile Catering; "Jake Pelczar"; "Eric So" |
| **Cc:** | "Sean Walsh"; "Dan Stivers"; "Kristen Martin"; "Brent Arsenault"; mdbbpd@gmail.com; "Danny Day"; "Tom Swenson"; david@chisholmpllc.com; "Rauch, Eric" |
| **Subject:** | RE: HyperBlock - Draft Loan Documents |
| **Date:** | Monday, December 3, 2018 4:44:27 PM |
| **Attachments:** | Credit Enhancement Agreement.DRAFT. 12.03.18.REDLINED.docx |
| | Credit Enhancement Agreement.DRAFT. 12.03.18.docx |

Attached is a revised draft of the Credit Enhancement Agreement, together with a redline to the prior draft.   Please review and comment.   David

---

## David H. Bjornson

**Bjornson Jones Mungas, PLLC**

**2809 Great Northern Loop, Suite 100**

**Missoula, Montana  59808**

**(406) 721-8896**

**(406) 541-8037--fax**

http://www.bjornsonlaw.com/attorneys/david-h-bjornson/

Email:  david@bjornsonlaw.com

*CONFIDENTIALITY NOTICE:  The information contained in this email message may be privileged or confidential information and is intended only for the use of the individual or entity named above.  If you have received this communication in error, please notify us immediately by telephone and delete the message from your system.*

**From:** David Bjornson
**Sent:** Thursday, November 29, 2018 4:29 PM
**To:** 'Big Sky Mobile Catering' <bsmcorpmt@gmail.com>; 'Jake Pelczar' <jpelczar@bankofmt.com>; 'Eric So' <eric@hyperblock.co>
**Cc:** 'Sean Walsh' <sean@hyperblock.co>; 'Dan Stivers' <dan@hyperblock.co>; 'Kristen Martin' <kristen@hyperblock.co>; 'Brent Arsenault' <brent@hyperblock.co>; mdbbpd@gmail.com; 'Danny Day' <dday@bankofmt.com>; 'Tom Swenson' <tswenson@bankofmt.com>; david@chisholmpllc.com; 'Rauch, Eric' <eric.rauch@bclplaw.com>
**Subject:** RE: HyperBlock - Draft Loan Documents

Attached for review and comment are drafts of an amendment to the lease and a credit enhancement agreement, as well as exhibits.  We have tried to capture the agreed upon terms to the best of our understanding.

We would appreciate any definition or clarity that might be brought to the 'net cash flow' concept whereupon Hyperblock has agreed to make accelerated debt service on the Bank of Montana debt.

Please review and comment.   David

**David H. Bjornson**

Bjornson Jones Mungas, PLLC
2809 Great Northern Loop, Suite 100
Missoula, Montana  59808
(406) 721-8896
(406) 541-8037--fax
http://www.bjornsonlaw.com/attorneys/david-h-bjornson/
Email:  david@bjornsonlaw.com

*CONFIDENTIALITY NOTICE:  The information contained in this email message may be privileged or confidential*
*information and is intended only for the use of the individual or entity named above.  If you have received this*
*communication in error, please notify us immediately by telephone and delete the message from your system.*

---

**From:** Big Sky Mobile Catering <bsmcorpmt@gmail.com>
**Sent:** Thursday, November 29, 2018 2:05 PM
**To:** 'Jake Pelczar' <jpelczar@bankofmt.com>; 'Eric So' <eric@hyperblock.co>; David Bjornson <david@bjornsonlaw.com>
**Cc:** 'Sean Walsh' <sean@hyperblock.co>; 'Dan Stivers' <dan@hyperblock.co>; 'Kristen Martin' <kristen@hyperblock.co>; 'Brent Arsenault' <brent@hyperblock.co>; mdbbpd@gmail.com; David Bjornson <david@bjornsonlaw.com>; 'Danny Day' <dday@bankofmt.com>; 'Tom Swenson' <tswenson@bankofmt.com>; david@chisholmpllc.com; 'Rauch, Eric' <eric.rauch@bclplaw.com>
**Subject:** RE: HyperBlock - Draft Loan Documents

Jake & all,  David is putting the final touches on the lease.  We hope to have it out to everyone later today or tomorrow.  I hope everything else is coming together.  Do I need to do anything else?  Thx Steve.

---

**From:** Jake Pelczar [mailto:jpelczar@bankofmt.com]
**Sent:** Wednesday, November 28, 2018 6:26 PM
**To:** Eric So <eric@hyperblock.co>
**Cc:** Sean Walsh <sean@hyperblock.co>; Dan Stivers <dan@hyperblock.co>; Kristen Martin <kristen@hyperblock.co>; Brent Arsenault <brent@hyperblock.co>; bsmcorpmt@gmail.com; mdbbpd@gmail.com; david@bjornsonlaw.com; Danny Day <dday@bankofmt.com>; Tom Swenson <tswenson@bankofmt.com>; david@chisholmpllc.com; Rauch, Eric <eric.rauch@bclplaw.com>
**Subject:** RE: HyperBlock - Draft Loan Documents

Thanks Eric!

Jake

**Jacob T. Pelczar**
Vice President

Phone: 406.829.2662  /  Fax: 406.829.2355
Bank of Montana
125 Bank Street, Suite 100
Missoula, MT 59802
NMLS: 944575

*The information contained in this message is proprietary and/or confidential.*
*If you are not the intended recipient, please: (i) delete the message and all copies;*
*(ii) do not disclose, distribute or use the message in any manner; and (iii) notify*
*the sender immediately. In addition, please be aware that any message addressed*
*to our domain is subject to archiving and review by persons other than the intended*
*recipient. Thank you.*


**From:** Eric So <eric@hyperblock.co>
**Sent:** Wednesday, November 28, 2018 6:12 PM
**To:** Jake Pelczar <jpelczar@bankofmt.com>
**Cc:** Sean Walsh <sean@hyperblock.co>; Dan Stivers <dan@hyperblock.co>; Kristen Martin
<kristen@hyperblock.co>; Brent Arsenault <brent@hyperblock.co>; bsmcorpmt@gmail.com;
mdbbpd@gmail.com; david@bjornsonlaw.com; Danny Day <dday@bankofmt.com>; Tom Swenson
<tswenson@bankofmt.com>; david@chisholmpllc.com; Rauch, Eric <eric.rauch@bclplaw.com>
**Subject:** Re: HyperBlock - Draft Loan Documents

Here are the articles of arrangement.  It was a court approved process, so the attached is the
equivalent of the plan, what was approved and the "certificate" and associated governance "bylaws"
in Ontario.  The resolution will be signed an delivered contemporaneously with the approval by the
board of the loan.  I believe Sean and Dan have the lease.


Thanks
Eric


On Wed, Nov 28, 2018 at 8:07 PM Jake Pelczar <jpelczar@bankofmt.com> wrote:

> Hi Eric,
>
> I believe we have everything we need for the LLC. The items I mentioned are in regard to the Inc.
> I.e. HyperBlock, Inc. (Canada).
>
> Thanks,
>
> Jake
>
> **Jacob T. Pelczar**
> Vice President
> Phone: 406.829.2662  /  Fax: 406.829.2355
> Bank of Montana
> 125 Bank Street, Suite 100
> Missoula, MT 59802

NMLS: 944575

*The information contained in this message is proprietary and/or confidential.*
*If you are not the intended recipient, please: (i) delete the message and all copies;*
*(ii) do not disclose, distribute or use the message in any manner; and (iii) notify*
*the sender immediately. In addition, please be aware that any message addressed*
*to our domain is subject to archiving and review by persons other than the intended*
*recipient. Thank you.*

**From:** Eric So <eric@hyperblock.co>
**Sent:** Wednesday, November 28, 2018 6:04 PM
**To:** Jake Pelczar <jpelczar@bankofmt.com>
**Cc:** Sean Walsh <sean@hyperblock.co>; Dan Stivers <dan@hyperblock.co>; Kristen Martin <kristen@hyperblock.co>; Brent Arsenault <brent@hyperblock.co>; bsmcorpmt@gmail.com; mdbbpd@gmail.com; david@bjornsonlaw.com; Danny Day <dday@bankofmt.com>; Tom Swenson <tswenson@bankofmt.com>; david@chisholmpllc.com; Rauch, Eric <eric.rauch@bclplaw.com>
**Subject:** Re: HyperBlock - Draft Loan Documents

Hi Jake,

Thanks for these documents.  For the documents you require (articles, by-laws, etc.) do you need them for Hyperblock Inc. (Canada) or Hyperblock LLC (US)?

Thanks,
Eric


On Wed, Nov 28, 2018 at 2:58 PM Jake Pelczar <jpelczar@bankofmt.com> wrote:

> Hi All,
>
> Hope you're all having a great day!
>
> Attached is a zip folder containing the primary loan documents for the HyperBlock loan. These are marked "draft," which we will remove once everyone has had a chance to review them.
>
> So that we are all on the same page, here is short list of items we still need for closing:
>
> - HyperBlock resolution confirming Sean signs on behalf of HyperBlock, Inc.
>
> - HyperBlock Articles of Arrangement;
>
> - HyperBlock Certificate of Arrangement;
>
> - HyperBlock By-laws;

- New lease amendment between Bonner Property Development, LLC and HyperBlock, LLC;

Thanks everyone! Please don't hesitate to call me if you have any questions.

Talk soon,

Jake

**Jacob T. Pelczar**
Vice President
Phone: 406.829.2662  /  Fax: 406.829.2355
Bank of Montana
125 Bank Street, Suite 100
Missoula, MT 59802
NMLS: 944575

*The information contained in this message is proprietary and/or confidential.*
*If you are not the intended recipient, please: (i) delete the message and all copies;*
*(ii) do not disclose, distribute or use the message in any manner; and (iii) notify*
*the sender immediately. In addition, please be aware that any message addressed*
*to our domain is subject to archiving and review by persons other than the intended*
*recipient. Thank you.*

**Exhibit 16(ii)**

| | |
|---|---|
| **From:** | David Bjornson |
| **To:** | Big Sky Mobile Catering; "Jake Pelczar"; "Eric So" |
| **Cc:** | "Sean Walsh"; "Dan Stivers"; "Kristen Martin"; "Brent Arsenault"; mdbbpd@gmail.com; "Danny Day"; "Tom Swenson"; david@chisholmpllc.com; "Rauch, Eric" |
| **Subject:** | RE: HyperBlock - Draft Security Agreement to Support BPD"s Guaranty and Pledge |
| **Date:** | Tuesday, December 4, 2018 4:28:48 PM |
| **Attachments:** | Security Agreement - Hyperblock LLC 12.4.18.docx |

Attached is the security agreement referenced in the Credit Enhancement Agreement, which is intended to provide a priority lien on property funded by the Bank Loan, and for which BPD is guarantor and pledgor.

Please review and comment.   If it is appropriate, please include it in the executable documents.   David

_____

**David H. Bjornson**

**Bjornson Jones Mungas, PLLC**

**2809 Great Northern Loop, Suite 100**

**Missoula, Montana  59808**

**(406) 721-8896**

**(406) 541-8037--fax**

http://www.bjornsonlaw.com/attorneys/david-h-bjornson/

Email:  david@bjornsonlaw.com

*CONFIDENTIALITY NOTICE:  The information contained in this email message may be privileged or confidential information and is intended only for the use of the individual or entity named above.  If you have received this communication in error, please notify us immediately by telephone and delete the message from your system.*

Exhibit
16(iii)

| | |
|---|---|
| **From:** | Jaymie Bowditch |
| **To:** | David Bjornson |
| **Subject:** | BPD/Hyperblock |
| **Date:** | Friday, December 7, 2018 4:06:00 PM |
| **Attachments:** | Credit Enhancement Agreement (JAB Revisions 12-6-2018) (00649142-2).docx |
| | Third Lease Amendment (JAB Revisions 12-6-2018) (00649148-2).docx |

David,

At the request of Hyperblock, LLC, I have reviewed the Credit Enhancement Agreement and the Third Amendment to Lease.  Those documents with my suggested revisions are attached. If you want to discuss any of my suggested revisions please give me a call.

-- Jaymie

**James A. Bowditch**
**President**
Boone Karlberg P.C.
201 West Main St., Suite 300
PO Box 9199
Missoula, MT 59807-9199
Phone: 406.543.6646
Fax: 406.532.5752
www.boonekarlberg.com

_____

*Tax Advice Disclosure: To ensure compliance with requirements imposed by the IRS under Circular 230, please be informed that any U.S. federal tax advice contained in this communication (including any attachments), unless otherwise specifically stated, was not intended or written to be used, and cannot be used, for the purpose of (1) avoiding penalties under the Internal Revenue Code or (2) promoting, marketing or recommending to another party any matters addressed herein.*

*The information contained in this transmission may contain privileged and confidential information.  It is intended only for the use of the person(s) named above. If you are not the intended recipient, you are hereby notified that any review, dissemination, distribution or duplication of this communication is strictly prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.*

Exhibit
16(iv)

| | |
|---|---|
| **From:** | Sean Walsh |
| **To:** | jbowditch@boonekarlberg.com |
| **Cc:** | Eric So; David Bjornson; Dan Stivers; Kristen Martin |
| **Subject:** | Re: Small Amendment to Third Lease Amendment |
| **Date:** | Tuesday, December 11, 2018 6:08:06 PM |

Hi Jaymie,

Yep. That's fine.

Thank you,
Sean

On Tue, Dec 11, 2018 at 8:46 PM Jaymie Bowditch <jbowditch@boonekarlberg.com> wrote:

> Sean/Eric,
>
>
> I spoke to David Bjornson (copied here) after our call this afternoon.  Concerning the lease
> amendment Dave wanted a minor clarification to the language concerning draw requests set
> forth in Section 1.c. of the attached (bottom of page 3).  In the interest of expediency I am
> sending this to David for him to review at the same time.  In the attached I have accepted all
> of my changes I had proposed last Friday afternoon so the only thing in redline is the
> additional change Dave has requested.
>
>
> The change clarifies that once HB has satisfied the $3MM equity and $1MM expenditure
> requirements, BPD will approve and authorize any draw requests provided said requests as
> submitted to Bank of Montana are detailed and supported by documentation to show that the
> draw requests are to be used to pay for improvements related to the 40 MW substation.
>
>
> ASAP Please let me know if this this acceptable to Hyperblock.  Once I have obtained
> everyone's consent to the documents I will send clean copies out for execution.
>
>
> I will also be sending you one small change to the Security Agreement in a separate email.
> However, the changes I proposed to the Credit Enhancement Agreement are all acceptable
> to BPD.
>
>
> -- Jaymie

| | |
|---|---|
| **From:** | David Bjornson |
| **To:** | Jaymie Bowditch; Sean Walsh; Eric So |
| **Cc:** | Dan Stivers; Kristen Martin; Jill Broughton |
| **Subject:** | RE: Small Amendment to Third Lease Amendment |
| **Date:** | Tuesday, December 11, 2018 10:09:06 PM |
| **Attachments:** | Third Lease Amendment (JAB Revisions 12-6-2018) (00649148-3).COMMENTS.docx |

Exhibit 16(v)

Jaymie – I think the attached redlined changes reflect the concept I was trying to describe on the phone today.  The concept is that an approval is not automatic just because a draw request is submitted, but that the draw request and documentation must be adequate and must show that they are appropriate and within the scope and in accordance with the plans and specs.   I am not married to the attached attempt to capture this.   They are in essence functioning as the lender here, and so I would expect they would be provided the level of documentation that would be provided to a construction lender.    Please feel free to suggest other wording that accomplishes this concept.  Thank you.

David

_____

**David H. Bjornson**

**Bjornson Jones Mungas, PLLC**
**2809 Great Northern Loop, Suite 100**
**Missoula, Montana  59808**
**(406) 721-8896**
**(406) 541-8037--fax**
http://www.bjornsonlaw.com/attorneys/david-h-bjornson/
Email:  david@bjornsonlaw.com
*CONFIDENTIALITY NOTICE:  The information contained in this email message may be privileged or confidential information and is intended only for the use of the individual or entity named above.  If you have received this communication in error, please notify us immediately by telephone and delete the message from your system.*

---

**From:** Jaymie Bowditch <jbowditch@boonekarlberg.com>
**Sent:** Tuesday, December 11, 2018 5:46 PM
**To:** Sean Walsh <sean@hyperblock.co>; Eric So <eric@hyperblock.co>; David Bjornson <david@bjornsonlaw.com>
**Cc:** Dan Stivers <dan@hyperblock.co>; Kristen Martin <ea@projectspokane.co>
**Subject:** Small Amendment to Third Lease Amendment
**Importance:** High

Sean/Eric,

I spoke to David Bjornson (copied here) after our call this afternoon.  Concerning the lease amendment Dave wanted a minor clarification to the language concerning draw requests set

forth in Section 1.c. of the attached (bottom of page 3).  In the interest of expediency I am sending this to David for him to review at the same time.  In the attached I have accepted all of my changes I had proposed last Friday afternoon so the only thing in redline is the additional change Dave has requested.

The change clarifies that once HB has satisfied the $3MM equity and $1MM expenditure requirements, BPD will approve and authorize any draw requests provided said requests as submitted to Bank of Montana are detailed and supported by documentation to show that the draw requests are to be used to pay for improvements related to the 40 MW substation.

ASAP Please let me know if this this acceptable to Hyperblock.  Once I have obtained everyone's consent to the documents I will send clean copies out for execution.

I will also be sending you one small change to the Security Agreement in a separate email. However, the changes I proposed to the Credit Enhancement Agreement are all acceptable to BPD.


-- Jaymie


**James A. Bowditch**
**President**
Boone Karlberg P.C.
201 West Main St., Suite 300
PO Box 9199
Missoula, MT 59807-9199
Phone: 406.543.6646
Fax: 406.532.5752
www.boonekarlberg.com

---

*Tax Advice Disclosure: To ensure compliance with requirements imposed by the IRS under Circular 230, please be informed that any U.S. federal tax advice contained in this communication (including any attachments), unless otherwise specifically stated, was not intended or written to be used, and cannot be used, for the purpose of (1) avoiding penalties under the Internal Revenue Code or (2) promoting, marketing or recommending to another party any matters addressed herein.*

*The information contained in this transmission may contain privileged and confidential information.  It is intended only for the use of the person(s) named above. If you are not the intended recipient, you are hereby notified that any review, dissemination, distribution or duplication of this communication is strictly prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.*

**James A. Bowditch**

**President**

Boone Karlberg P.C.

201 West Main St., Suite 300

PO Box 9199
Missoula, MT 59807-9199
Phone: 406.543.6646

Fax: 406.532.5752
www.boonekarlberg.com

_____

*Tax Advice Disclosure: To ensure compliance with requirements imposed by the IRS under Circular 230, please be informed that any U.S. federal tax advice contained in this communication (including any attachments), unless otherwise specifically stated, was not intended or written to be used, and cannot be used, for the purpose of (1) avoiding penalties under the Internal Revenue Code or (2) promoting, marketing or recommending to another party any matters addressed herein.*

*The information contained in this transmission may contain privileged and confidential information.  It is intended only for the use of the person(s) named above. If you are not the intended recipient, you are hereby notified that any review, dissemination, distribution or duplication of this communication is strictly prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.*

--
Phone - 650.409.7326

Executive Assistant - Kristen Martin - kristen@hyperblock.co - 720.390.8023

LinkedIn

Confidentiality Note: This e-mail and any attachments are confidential and protected by legal privilege. Please be aware that any disclosure, copying, distribution or use of this e-mail or any attachment is prohibited. If you have received this e-mail in error, please notify us immediately by returning it to the sender and delete all copies from your system. Thank you for your cooperation.

Attachment to Exhibit 16(i)

# CREDIT ENHANCEMENT AGREEMENT

THIS AGREEMENT is made _____, 2018, between BONNER PROPERTY DEVELOPMENT ("Pledgor"), whose mailing address is 224 N. Higgins Avenue, Missoula, Montana 59802, and HYPERBLOCK LLC, a Delaware limited liability company ("Borrower"), whose address is 120 Adelaide Street West, Suite 2210, Toronto, ON M5H 1T1.

## RECITALS

**A.**     Borrower is the commercial tenant in premises owned by Pledgor, located in Bonner, Montana at the Bonner Mill Site (the "Premises"), under that certain Commercial Lease Agreement dated March 1, 2016, as amended (the "Lease").

**B.**     Borrower plans to raise capital in the amount of from $3,000,000 to $5,000,000, and to borrow funds as further described herein, the proceeds of which equity and debt will be used in part to construct improvements and fixtures upon the Premises.

**C.**     Pledgor is willing to provide credit enhancements in the form of its guarantee and the pledge of certain real property described hereinbelow (collectively, the "Credit Enhancement") to facilitate a loan facility for Borrower with Bank of Montana, with a maximum principal balance of $2,625,000 (the "Bank Loan"), with the proceeds of the Bank Loan to be applied to certain infrastructure and improvements located at the Premises.

**D.**     The parties acknowledge and agree that the Bank Loan would not be possible without the Credit Enhancement provided by Pledgor.

**E.**     The parties wish to set forth their agreements under which Pledgor will be able to assure it is indemnified and protected with respect to the Bank Loan, that the proceeds of the Bank Loan are applied to infrastructure and improvements at the Premises, and that Pledgor is otherwise compensated for providing the credit enhancements.

NOW, THEREFORE, the parties agree as follows:

## Section 1
## Credit Enhancement

**1.1**     Upon satisfaction of the conditions set forth in further detail herein, Pledgor hereby agrees to provide its Credit Enhancement, through the provision of its guaranty and to place certain of its real property at risk and available to the Bank of Montana through the execution and delivery of a guaranty, deed of trust, assignment of rents, an assignment of the Lease, and other requisite documents to secure the Bank Loan up to a maximum of $2,625,000 in principal balance, on terms acceptable to Pledgor (the "Credit Enhancement").   The real property to be pledged is the land and improvements located upon the real property legally described on **Exhibit A**  (the "Pledged Collateral").

**1.2**     Borrower hereby indemnifies and holds harmless Pledgor from and against any and

all costs, losses and expenses associated with the Bank Loan, the construction and installation of the improvements constructed through the equity and debt financing of Borrower and anything related to the conduct of Borrower's business, and anything related to its principals.  Should (i) the Pledged Collateral become further encumbered as a result of a default by Borrower under the Bank Loan, (ii) Pledgor advance any funds or incur any costs associated with the Bank Loan or this Credit Enhancement for any reason, and/or (iii) Pledgor incur any expense or losses associated with defending against or negotiating with the Bank of Montana or relating to any claims under this Credit Enhancement, Borrower shall reimburse Pledgor within ten (10) days of invoicing by Pledgor, with copies and appropriate evidence of such advances or expenditures.  The reimbursement obligation shall be secured by a first lien position security interest in all of the assets of Borrower located in Bonner, Montana, including but not limited to equipment, fixtures, leasehold improvements, and servers.  Borrower shall execute and deliver a security agreement contemporaneously with this Agreement in form and substance acceptable to Pledgor and its counsel ("Security Agreement").  Borrower covenants to obtain lien waivers and releases from contractors and suppliers and to maintain Pledgor's first lien position at all times.  Any default under the Bank Loan shall also be a default under this Agreement, and Pledgor shall have the remedies provided under the Security Agreement.

 **1.3** Borrower promises to make accelerated repayment of the Bank Loan, including a minimum of 25% of net operating cash flow.  Borrower hereby covenants in good faith to work to make its operations bankable without the need for the ~~Pledged Collateral~~Credit Enhancement, and to have ~~it~~ the guaranty and the Pledge Property released from this pledge at the earliest opportunity.

**Section 2**
**Consideration to Pledgor; Conditions to Pledgor's Obligations**

 **2.1** Borrower acknowledges the value of the Credit Enhancement.  As a condition to Pledgor's obligations hereunder:

  **a.** Borrower shall enter into that certain Third Amendment to Commercial Lease with Pledgor for its operations at the Bonner Mill Site, for a term extending through February 28, 2029, shall construct the improvements described in the Third Amendment to Commercial Lease and shall comply in all respects with the remaining terms thereof.

  **b.** All of the proceeds of the Bank Loan must be used for real property related infrastructure, including buildings and building improvements located at the Bonner Mill Site operations of Borrower, on plans and specifications approved in advance by Pledgor, and in compliance with the terms of the Lease.  In order to ensure this, the proceeds of the Bank Loan shall be made through a title company in the manner of a construction loan, with fully detailed and supported draw requests, approved by Pledgor in writing prior to disbursement, and accompanied by lien waivers and releases in preservation of Pledgor's first lien security interest.

  **c.** From the initial closing of the Bank Loan, certain fees and costs will be paid as provided in the Third Amendment to Commercial Lease, but all further disbursements on the Bank Loan shall be subject to satisfaction of the conditions provided in the Third Amendment to Commercial Lease.

Credit Enhancement Agreement           Page 2

## Section 3
## Representations and Warranties

**3.1**     Borrower has full power and authority to execute and perform the terms and provisions of this Agreement and to borrow hereunder, and the execution hereof, of the Bank Loan and the Third Amendment to Commercial Lease have all been approved by all parties required through all corporate and company action required by law and their organizational documents.


## Section 4
## Affirmative Covenants

**4.1**     Borrower agrees that until all indebtedness incurred which is supported by the Credit Enhancement has been paid in full, and Pledgor is no longer obligated or exposed under the Credit Enhancement, it will:

**a.**     Furnish Pledgor, no later than thirty (30) days after the end of each fiscal quarter, a profit and loss statement for each quarter and a balance sheet as of the last day of such fiscal quarter;

**b.**     Furnish to Pledgor all financial information furnished from time to time by Borrower to the Bank of Montana;

**c.**     With reasonable promptness, furnish to Pledgor, such additional financial statements and such data and information concerning the financial condition of Borrower as may be reasonably requested by Pledgor;

**d.**     Meet with Pledgor from time to time to update Pledgor as to financial condition, operations, projections, marketing plans, business developments and status of the Bank Loan;

**e.**     At all times keep its property and operations insured against loss or damage, and from business interruption, to the extent and against risks that similar property is usually insured by other companies engaged in the same business with Pledgor identified in such insurance policies as an additional named insured;

**f.**     Execute such financing statements and other documents as Pledgor may reasonably request to perfect and continue a first position security interest in the assets of Borrower in favor of Pledgor.


Credit Enhancement Agreement                                     Page 3

**6.4**   No delay on the part of Pledgor in exercising any right, power or privilege granted hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right, power or privilege preclude any other or further exercise thereof.  The rights and remedies herein expressly specified are cumulative and are not exclusive of any other rights and remedies which Pledgor would otherwise have.

**6.5**   All notices provided for hereunder shall be sent by certified mail, return receipt requested, addressed to the parties at the addresses set forth herein, or to such other address with respect to any party as such party shall notify the other in writing.  Any such notice shall be deemed to have been given three (3) days after the date it is duly deposited and certified in any U.S. Post Office.  ~~As used in this Credit Enhancement Agreement, "cure" means to make full payment of all payments due, or to perform all covenants or conditions to be performed by the date specified in the default notice.  If a default is so cured, this Credit Enhancement Agreement will continue in full force and effect.~~

**6.6**   In conjunction with the transactions evidenced by this Credit Enhancement Agreement, Borrower will execute a Security Agreement.

**6.7**   If for any reason any provision of this Credit Enhancement Agreement is determined by a tribunal of competent jurisdiction to be legally invalid or unenforceable, the validity of the remainder of the Credit Enhancement Agreement will not be affected and such provision will be deemed modified to the minimum extent necessary to make such provision consistent with applicable law and, in its modified form, such provision will then be enforceable and enforced.

-   SIGNATURES APPEAR ON FOLLOWING PAGE -

# CREDIT ENHANCEMENT AGREEMENT

THIS AGREEMENT is made _____, 2018, between BONNER PROPERTY DEVELOPMENT ("Pledgor"), whose mailing address is 224 N. Higgins Avenue, Missoula, Montana 59802, and HYPERBLOCK LLC, a Delaware limited liability company ("Borrower"), whose address is 120 Adelaide Street West, Suite 2210, Toronto, ON M5H 1T1.

## RECITALS

A.      Borrower is the commercial tenant in premises owned by Pledgor, located in Bonner, Montana at the Bonner Mill Site (the "Premises"), under that certain Commercial Lease Agreement dated March 1, 2016, as amended (the "Lease").

B.      Borrower plans to raise capital in the amount of from $3,000,000 to $5,000,000, and to borrow funds as further described herein, the proceeds of which equity and debt will be used in part to construct improvements and fixtures upon the Premises.

C.      Pledgor is willing to provide credit enhancements in the form of its guarantee and the pledge of certain real property described hereinbelow (collectively, the "Credit Enhancement") to facilitate a loan facility for Borrower with Bank of Montana, with a maximum principal balance of $2,625,000 (the "Bank Loan"), with the proceeds of the Bank Loan to be applied to certain infrastructure and improvements located at the Premises.

D.      The parties acknowledge and agree that the Bank Loan would not be possible without the Credit Enhancement provided by Pledgor.

E.      The parties wish to set forth their agreements under which Pledgor will be able to assure it is indemnified and protected with respect to the Bank Loan, that the proceeds of the Bank Loan are applied to infrastructure and improvements at the Premises, and that Pledgor is otherwise compensated for providing the credit enhancements.

NOW, THEREFORE, the parties agree as follows:

## Section 1
## Credit Enhancement

1.1      Upon satisfaction of the conditions set forth in further detail herein, Pledgor hereby agrees to provide its Credit Enhancement, through the provision of its guaranty and to place certain of its real property at risk and available to the Bank of Montana through the execution and delivery of a guaranty, deed of trust, assignment of rents, an assignment of the Lease, and other requisite documents to secure the Bank Loan up to a maximum of $2,625,000 in principal balance, on terms acceptable to Pledgor.   The real property to be pledged is the land and improvements located upon the real property legally described on **Exhibit A**  (the "Pledged Collateral").

1.2      Borrower hereby indemnifies and holds harmless Pledgor from and against any and all costs, losses and expenses associated with the Bank Loan, the construction and installation of

the improvements constructed through the equity and debt financing of Borrower and anything related to the conduct of Borrower's business, and anything related to its principals.  Should (i) the Pledged Collateral become further encumbered as a result of a default by Borrower under the Bank Loan, (ii) Pledgor advance any funds or incur any costs associated with the Bank Loan or this Credit Enhancement for any reason, and/or (iii) Pledgor incur any expense or losses associated with defending against or negotiating with the Bank of Montana or relating to any claims under this Credit Enhancement, Borrower shall reimburse Pledgor within ten (10) days of invoicing by Pledgor, with copies and appropriate evidence of such advances or expenditures.  The reimbursement obligation shall be secured by a first lien position security interest in all of the assets of Borrower located in Bonner, Montana, including but not limited to equipment, fixtures, leasehold improvements, and servers.  Borrower shall execute and deliver a security agreement contemporaneously with this Agreement in form and substance acceptable to Pledgor and its counsel ("Security Agreement").  Borrower covenants to obtain lien waivers and releases from contractors and suppliers and to maintain Pledgor's first lien position at all times.  Any default under the Bank Loan shall also be a default under this Agreement, and Pledgor shall have the remedies provided under the Security Agreement.

      **1.3**      Borrower promises to make accelerated repayment of the Bank Loan, including a minimum of 25% of net operating cash flow.  Borrower hereby covenants in good faith to work to make its operations bankable without the need for the Credit Enhancement, and to have the guaranty and the Pledge Property released from this pledge at the earliest opportunity.

## Section 2
## <u>Consideration to Pledgor; Conditions to Pledgor's Obligations</u>

      **2.1**      Borrower acknowledges the value of the Credit Enhancement.  As a condition to Pledgor's obligations hereunder:

      **a.**      Borrower shall enter into that certain Third Amendment to Commercial Lease with Pledgor for its operations at the Bonner Mill Site, for a term extending through February 28, 2029, shall construct the improvements described in the Third Amendment to Commercial Lease and shall comply in all respects with the remaining terms thereof.

      **b.**      All of the proceeds of the Bank Loan must be used for real property related infrastructure, including buildings and building improvements located at the Bonner Mill Site operations of Borrower, on plans and specifications approved in advance by Pledgor, and in compliance with the terms of the Lease.  In order to ensure this, the proceeds of the Bank Loan shall be made through a title company in the manner of a construction loan, with fully detailed and supported draw requests, approved by Pledgor in writing prior to disbursement, and accompanied by lien waivers and releases in preservation of Pledgor's first lien security interest.

      **c.**      From the initial closing of the Bank Loan, certain fees and costs will be paid as provided in the Third Amendment to Commercial Lease, but all further disbursements on the Bank Loan shall be subject to satisfaction of the conditions provided in the Third Amendment to Commercial Lease.

### Section 3
### Representations and Warranties

**3.1**      Borrower has full power and authority to execute and perform the terms and provisions of this Agreement and to borrow hereunder, and the execution hereof, of the Bank Loan and the Third Amendment to Commercial Lease have all been approved by all parties required through all corporate and company action required by law and their organizational documents.

### Section 4
### Affirmative Covenants

**4.1**      Borrower agrees that until all indebtedness incurred which is supported by the Credit Enhancement has been paid in full, and Pledgor is no longer obligated or exposed under the Credit Enhancement, it will:

   **a.**      Furnish Pledgor, no later than thirty (30) days after the end of each fiscal quarter, a profit and loss statement for each quarter and a balance sheet as of the last day of such fiscal quarter;

   **b.**      Furnish to Pledgor all financial information furnished from time to time by Borrower to the Bank of Montana;

   **c.**      With reasonable promptness, furnish to Pledgor, such additional financial statements and such data and information concerning the financial condition of Borrower as may be reasonably requested by Pledgor;

   **d.**      Meet with Pledgor from time to time to update Pledgor as to financial condition, operations, projections, marketing plans, business developments and status of the Bank Loan;

   **e.**      At all times keep its property and operations insured against loss or damage, and from business interruption, to the extent and against risks that similar property is usually insured by other companies engaged in the same business with Pledgor identified in such insurance policies as an additional named insured;

   **f.**      Execute such financing statements and other documents as Pledgor may reasonably request to perfect and continue a first position security interest in the assets of Borrower in favor of Pledgor.

## Section 5
## Events of Default

**5.1**     If any of the following events shall occur and be continuing, Pledgor may declare a default hereunder, shall be deemed to have damages and shall be able to pursue remedies under this Agreement and under the Security Agreement:

     **a.**     If Borrower fails to make payment of any principal or interest due on the Bank Loan when the same shall become due by the terms thereof;

     **b.**     If Borrower defaults in any payment of principal or interest on any other obligation beyond any period of grace or period of right to cure provided with respect thereto or in the performance of any other agreement, term or condition contained in any agreement under which any such obligation is created if the effect of such default is to cause or permit the holder thereof to cause such obligation to become due prior to its stated maturity;

     **c.**     If Borrower defaults under the terms and conditions of the Lease, including the terms reflected in the Third Amendment to Commercial Lease.

     **d.**     If any material representation or warranty made by Borrower in any writing furnished to Pledgor in connection with or pursuant to this Agreement or the Bank Loan shall be false in any material respect on the dates which they were made;

     **e.**     If Borrower petitions or applies to any court for the appointment of a trustee or receiver for Borrower, of any substantial part of the assets of Borrower, or commences any proceedings relating to Borrower under any bankruptcy, reorganization, arrangement, insolvency, readjustment of debt, dissolution or liquidation law of any jurisdiction, or if any such petition or application is filed, or any such proceeding is commenced, against Borrower, and such proceeding is not dismissed within sixty (60) days.

## Section 6
## Miscellaneous

**6.1**     This Agreement shall be binding on the parties and inure to the benefit of their respective successors and assigns.  This Agreement may not be modified without the express written consent of the parties.

**6.2**     Paragraph headings are for purposes of identification only.  In the event of a conflict between the body of the document and the paragraph headings, the body of the document shall control.

**6.3**     It is agreed that in the event of a dispute arising hereunder, any attorney's fees incurred shall be considered a part of the costs of action payable to the substantially prevailing party whether such fees are incurred in collection, suit or other proceeding, on appeal or in a bankruptcy action.

**6.4**     No delay on the part of Pledgor in exercising any right, power or privilege granted

hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right, power or privilege preclude any other or further exercise thereof.  The rights and remedies herein expressly specified are cumulative and are not exclusive of any other rights and remedies which Pledgor would otherwise have.

**6.5**    All notices provided for hereunder shall be sent by certified mail, return receipt requested, addressed to the parties at the addresses set forth herein, or to such other address with respect to any party as such party shall notify the other in writing.  Any such notice shall be deemed to have been given three (3) days after the date it is duly deposited and certified in any U.S. Post Office.

**6.6**    In conjunction with the transactions evidenced by this Credit Enhancement Agreement, Borrower will execute a Security Agreement.

**6.7**    If for any reason any provision of this Credit Enhancement Agreement is determined by a tribunal of competent jurisdiction to be legally invalid or unenforceable, the validity of the remainder of the Credit Enhancement Agreement will not be affected and such provision will be deemed modified to the minimum extent necessary to make such provision consistent with applicable law and, in its modified form, such provision will then be enforceable and enforced.

-    SIGNATURES APPEAR ON FOLLOWING PAGE -

The parties have caused this Agreement to be executed as of the day and year first above written.

**BORROWER:**                                    **PLEDGOR:**

Hyperblock LLC                                    Bonner Property Development, LLC


By:_____                          By:_____
Its:_____                          Its:  Co-Manager

Credit Enhancement Agreement                               Signature Page

**Exhibit A**

**Legal Description of Collateral**

# SECURITY AGREEMENT

FOR VALUE RECEIVED,

| Debtor: | Secured Party: |
|---|---|
| **Hyperblock LLC,**<br>**a Delaware limited liability company**<br><br>**120 Adelaide Street West, Suite 2210**<br>**Toronto, ON M5H 1T1.** | **Bonner Property Development, LLC,**<br>**a Montana limited liability company**<br><br>**224 North Higgins Ave**<br>**Missoula, MT 59802** |

The Debtor hereby grants to Secured Party a continuing security interest on the terms and conditions set forth in this Agreement, in all of Debtor's right, title and interest in and to all of Debtor's assets, which shall include but is not limited to all of the following, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located (collectively the "Collateral"):

> **To the extent acquired, improved or built in part and directly or indirectly with proceeds of the "Bank Loan" from Bank of Montana, as that term is defined in that certain Credit Enhancement Agreement executed by the Debtor and Secured Party concurrently herewith, the following:**

> **Furniture, equipment, fixtures, and other articles of personal property now or hereafter owned by Debtor; together with all accessions, parts, and additions to, all replacements of, and all substitutions for, any of such property; and together with all proceeds (including without limitation all insurance proceeds and refunds of premiums) from any sale or other disposition of any such property.**

In addition, the word "Collateral" also includes all the following, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located:

(A)  All accessions, attachments, accessories, tools, parts, supplies, replacements of and additions to any of the collateral described herein, whether added now or later.

(B)  All products and produce of any of the property described in this Collateral section.

(C)  All accounts, general intangibles, instruments, rents, monies, payments, and

all other rights, arising out of a sale, lease, consignment or other disposition of any of the property described in this Collateral section.

(D)  All proceeds (including insurance proceeds) from the sale, destruction, loss, or other disposition of any of the property described in this Collateral section, and sums due from a third party who has damaged or destroyed the Collateral or from that party's insurer, whether due to judgment, settlement or other process.

(E)  All records and data relating to any of the property described in this Collateral section, whether in the form of a writing, photograph, microfilm, microfiche, or electronic media, together with all of Debtor's right, title, and interest in and to all computer software required to utilize, create, maintain, and process any such records or data on electronic media.

(F)  All proceeds, including without limitation, any equipment purchased with proceeds, as well as all accessories, attachments, accessions, replacements and additions, whether added now or later, together with all insurance proceeds and refunds of insurance premiums, if any, and all sums that may be due from third parties who may cause damage to any of the foregoing, whether due to judgment, settlement or other process.

**Section 1. <u>Obligations Secured by this Agreement.</u>** This Agreement secures the payment and performance by the Debtor of the following obligations:

(i) All obligations owed by the Debtor to Secured Party arising out of the provision of guarantee and collateral generally described in that certain Credit Enhancement Agreement executed concurrently herewith, and that certain Lease Agreement dated March 1, 2016, as amended, including that certain Third Amendment to Commercial Lease, which amendment is executed concurrently herewith (the "Agreements"), of which Agreements the Debtor and the Secured Party are parties;

(ii) All renewals, extensions, refinancing, modifications, substitutions, or consolidations of the Agreements; and

(iii) The performance of all of the Debtor's obligations under this Agreement or the Agreements (collectively the "Secured Obligations").

**Section 2.    <u>Maintenance of Security Interest</u>**. The Debtor agrees to take all reasonable actions and execute instruments which the Secured Party may reasonably request in order to create, perfect, evidence, determine the priority of, protect, enforce, continue, or terminate the security interest created by this Agreement. The Debtor agrees to perform such actions at no cost to the Secured Party. The Secured Party may, but is not obligated to file any document or agreement to put third parties on notice of its security interest.

**Section 3.     Release of Security Interest**. This Agreement will remain in full force and effect until the Debtor satisfies all of its obligations under the Agreements in full, performs all of the Debtor's obligations under this Agreement, and otherwise satisfies the Secured Obligations. Upon such performance, the Secured Party will deliver a U.C.C. termination statement to the Debtor or other instruments the Debtor reasonable requests. The Debtor will be responsible for recording and filing all such releases at the Debtor's own expense.

**Section 4.     Possession of Collateral**. The Debtor will have the right to retain possession of the Collateral and to use it in any lawful manner not inconsistent with the provisions of this Agreement for so long as it complies with all requirements of this Agreement. The Debtor expressly waives all right to possession of the Collateral after the occurrence of an event of default, and agrees to deliver possession of the Collateral to the Secured Party promptly upon demand after the occurrence of an event of default.

**Section 5.     Protection of Collateral**. The Debtor (i) will pay promptly when due all taxes, assessments, fees, and other charges levied on the ownership or use of the Collateral, and (ii) will not do anything or permit anything to be done that would materially impair the value of the Collateral or the security interest granted by this Agreement (this shall include, but not be limited to, the disposing of any of the Collateral if not in the normal course of business).

**Section 6.     Inspection of Collateral**. Upon 48 hours' notice, the Secured Party or its agent has the right to inspect and examine the Collateral at any reasonable time during normal business hours on reasonable advance written notice, wherever it is located. The Debtor agrees to assist the Secured Party in making such inspections, and to assemble the Collateral for the Secured Party when the Secured Party asks it to do so, to the extent that it is reasonably able to do so.

**Section 7.     Notification of Changes**. The Debtor agrees to notify the Secured Party immediately in writing of (i) any change in the jurisdiction of organization, or the name, address, ownership, or place of business of the Debtor, (ii) any change in the location of the Collateral, unless otherwise allowed by this Agreement, (iii) any loss of or damage to the Collateral, (iv) any sale, exchange, lease, encumbrance, or other transfer of any of the Collateral or any interest in the Collateral, except in the normal course of business, and (v) any other material change in the business or financial condition of the Debtor, in the Collateral, or in the security provided by this Agreement.

**Section 8.     Events of Default**. The Debtor will be in default under this Agreement if any of the following events or conditions occur:

(i)      An event of default occurs under the Agreements or with regard to any documents or agreements related or connected to the Secured Obligations;

(ii)     The Commercial Lease for the property which is served by the Collateral, located in Bonner, Montana between Secured Party, as Landlord, and Debtor, as Tenant, is terminated for any reason;

(iii)    The Debtor files a petition in bankruptcy, takes any action under any other law relating to the relief of debtors, makes a general assignment for the benefit of creditors, or consents to the appointment of a receiver or trustee for any substantial part of the Debtor's property;

(iv)    An involuntary petition in bankruptcy is filed against the Debtor or a receiver or trustee is appointed to take possession of any substantial part of the property of the Debtor, and the petition or appointment is not withdrawn within 60 days;

(v)     Any substantial part of the property of the Debtor is seized, attached or garnished and not dismissed within 60 days;

(vi)    The Debtor fails to perform any obligation or comply with any requirement of this Agreement and does not cure such failure within 30 days of written notice from the Secured Party; or

(vii)   There is a default under any document or agreement related or connected to the Agreements.

**Section 9.      <u>Remedies on Default</u>**. (a) Upon the occurrence of any of the events of default listed in the previous section of this Agreement the Secured Party may, at its election, exercise any or all of the following rights and remedies:

(i)      The Secured Party may require the Debtor to assemble the Collateral and make it available to the Secured Party at a place designated by the Secured Party which is reasonably convenient to both parties to the extent it can reasonably be so assembled. The Debtor agrees to use reasonable efforts to comply promptly with any such demand.

(ii)     The Secured Party may, with legal process, enter the premises where the Collateral is located and take possession of and remove it.

(iii)    The Secured Party may sell all or any part of the Collateral in any commercially reasonable manner, at public or private sale, in one or more sales or lots, and at any price and on any terms that the Secured Party considers reasonable. The Secured Party may be a purchaser at any such sale unless it is prohibited from being a purchaser by law. The sale may be made without any demand for performance, notice of intention to sell, or notice of the time or place of sale, except to the extent that such notice is required by the Montana enactment of Article 9 of the Uniform Commercial Code and

cannot be waived. The Secured Party will apply the net proceeds of any sale, after deducting its expenses in taking, storing, insuring, repairing, and selling the Collateral, including reasonable attorneys' fees, to payment or reduction of the Secured Obligations in any order and amount chosen by the Secured Party.  The Debtor will remain liable to the Secured Party for any deficiency, and the Secured Party will pay any excess proceeds to the Debtor.

(iv)     The Secured Party may exercise any and all other remedies available to it at law or in equity.

(b) The rights and remedies of the Secured Party under this Agreement are cumulative and not alternative, and may be exercised concurrently or successively.

**Section 10.     <u>Successors Bound by Agreement</u>**. This Agreement is binding upon and will inure to the benefit of the parties and their heirs, executors, representatives, successors and assigns.

**Section 11.     <u>Assignment by Secured Party</u>**. The Secured Party may assign, transfer or deliver any or all of the Secured Obligations, and any or all of its rights under this Agreement without the prior written consent of Debtor. Debtor may not assign it rights or obligations hereunder without the prior written consent of the Secured Party, which may be withheld in the Secured Party's sole discretion.

**Section 12.     <u>Modification of Agreement</u>**. No modification of this Agreement will be valid or binding unless the modification is in writing, signed by all parties to this Agreement.

**Section 13.     <u>Waiver</u>**. No waiver of any provision of this Agreement will be valid or binding unless the waiver is in writing, signed by the party waiving the provision. The failure of any party to this Agreement to exercise any right or remedy provided for in this Agreement or to insist upon the strict performance of any provision of this Agreement will not be a waiver of that party's right to exercise that right or remedy or insist upon the strict performance of that provision in the future.

**Section 14.     <u>Notice</u>**. Any notice that this Agreement requires or permits to be delivered to any person will be in writing and will be effective when delivered. Such notices shall be sent the addresses first listed above, as may be changes from time to time by written notice.

**Section 15.     <u>Attorneys' Fees</u>**. If either of the parties to this Agreement institute legal proceedings to enforce the terms of this Agreement, the parties agree that the prevailing party in the proceedings will be entitled to recover the reasonable attorney's fees and legal costs it incurs

prior to and at trial and on any appeal or discretionary review, as they may be approved by the court having jurisdiction over the proceedings, with a limit of $40,000.

**Section 16.**   **Time of Essence**. Time will be of the essence in complying with the terms and conditions of this Agreement.

**Section 17.**   **Headings**. The headings, titles and subtitles in this Agreement are inserted for convenience of reference only, do not in any way limit or amplify the terms and provisions of this Agreement, and are to be ignored in any construction of the provisions of this Agreement.

**Section 18.**   **Applicable Law**. This Agreement will be governed by and construed in accordance with the laws of the State of Montana applicable to agreements entered into and performed in the State of Montana.

**Section 19.**   **Counterpart Signatures.** This Agreement may be executed in any number of counterparts and when taken together shall constitute one original document.

SIGNATURE APPEARS ON FOLLOWING PAGE

This Agreement is effective as of December _____, 2018.

**DEBTOR:**

**Hyperblock LLC**


By:_____


_____
Its: _____

# CREDIT ENHANCEMENT AGREEMENT

THIS AGREEMENT is made _____, 2018, between BONNER PROPERTY DEVELOPMENT ("Pledgor"), whose mailing address is 224 N. Higgins Avenue, Missoula, Montana 59802, and HYPERBLOCK LLC, a Delaware limited liability company ("Borrower"), whose address is 120 Adelaide Street West, Suite 2210, Toronto, ON M5H 1T1.

## RECITALS

**A.**      Borrower is the commercial tenant in premises owned by Pledgor, located in Bonner, Montana at the Bonner Mill Site (the "Premises"), pursuant to an assignment to Borrower and Borrower's assumption of that certain Commercial Lease Agreement dated March 1, 2016 between Project Spokane, LLC and Pledgor, as amended (the "Lease").

**B.**      Borrower plans to raise capital in the amount of from $3,000,000 to $5,000,000 ("New Equity"), and to borrow funds as further described herein, the proceeds of which equity and debt will be used in part to construct improvements and fixtures upon the Premises.

**C.**      Pledgor is willing to provide credit enhancements in the form of its guarantee and the pledge of certain real property described hereinbelow (collectively, the "Credit Enhancement") to facilitate a loan facility for Borrower with Bank of Montana, with a maximum principal balance of $2,625,000 (the "Bank Loan"), with the proceeds of the Bank Loan to be applied to certain infrastructure and improvements located at the Premises.

**D.**      The parties acknowledge and agree that the Bank Loan would not be possible without the Credit Enhancement provided by Pledgor.

**E.**      The parties wish to set forth their agreements under which Pledgor will be able to assure it is indemnified and protected with respect to the Bank Loan, that the proceeds of the Bank Loan are applied to infrastructure and improvements at the Premises.

NOW, THEREFORE, the parties agree as follows:

## Section 1
## Credit Enhancement

**1.1**      As consideration for the conditions imposed upon Borrower as set forth in further detail herein, Pledgor hereby agrees to provide its Credit Enhancement, through the provision of its guaranty and to place certain of its real property at risk and available to the Bank of Montana through the execution and delivery of a guaranty, deed of trust, assignment of rents, an assignment of the Lease, and other requisite documents to secure the Bank Loan up to a maximum of $2,625,000 in principal balance.   The real property to be pledged is the land and improvements located upon the real property legally described on **Exhibit A**  (the "Pledged Collateral").

**1.2**      Borrower hereby indemnifies and holds harmless Pledgor from and against any and all costs, losses and expenses associated with the Bank Loan and the construction and installation of the improvements constructed through the equity and debt financing of Borrower.  Should (i) the Pledged Collateral become further encumbered as a result of a default by Borrower under the

Bank Loan, (ii) Pledgor advance any funds or incur any costs associated with the Bank Loan or this Credit Enhancement as a result of any default by Borrower under the Bank Loan or related documents, and/or (iii) Pledgor incur any expense or losses associated with defending against or negotiating with the Bank of Montana or relating to any claims under this Credit Enhancement, Borrower shall reimburse Pledgor within thirty (30) days of invoicing by Pledgor, with copies and appropriate evidence of such advances or expenditures.  The reimbursement obligation shall be secured by a first lien position security interest in the new assets and other improvements that Borrower intends to acquire with the proceeds from Bank Loan and the New Equity ("Borrower's Pledged Assets").  Borrower shall execute and deliver a security agreement contemporaneously with this Agreement in form and substance acceptable to Pledgor and its counsel ("Security Agreement").  Borrower covenants to obtain lien waivers and releases from contractors and suppliers and to maintain Pledgor's first lien position in Borrower's Pledged Assets at all times. Any default under the Bank Loan shall also be a default under this Agreement, and Pledgor shall have the remedies provided under the Security Agreement.

**1.3**      Borrower promises to use any excess available cash from net operating cash flow, as determined by Borrower in Borrower's reasonable discretion, to make accelerated repayment of the Bank Loan.  Borrower hereby covenants in good faith to work to make its operations bankable without the need for the Credit Enhancement, and to have the guaranty and the Pledged Collateral released from this pledge at the earliest opportunity.

## Section 2
## Consideration to Pledgor; Conditions to Pledgor's Obligations

**2.1**      Borrower acknowledges the value of the Credit Enhancement.  In consideration for Pledgor's obligations hereunder:

**a.**      Borrower shall enter into that certain Third Amendment to Commercial Lease with Pledgor for its operations at the Bonner Mill Site, for a term extending through February 28, 2029, shall construct the improvements described in the Third Amendment to Commercial Lease and shall comply in all respects with the remaining terms thereof.

**b.**      All of the proceeds of the Bank Loan must be used for improvements and fixtures related to the operations of Borrower's business located at the Bonner Mill Site operations of Borrower, according to plans and specifications approved in advance by Pledgor, and in compliance with the terms of the Lease.  In order to ensure this, the proceeds of the Bank Loan shall be made through a title company in the manner of a construction loan, with fully detailed and supported draw requests, approved by Pledgor in writing prior to disbursement, and accompanied by lien waivers and releases in preservation of Pledgor's first lien security interest in Borrower's Pledged Assets.

**c.**      From the initial closing of the Bank Loan, certain fees and costs will be paid as provided in the Third Amendment to Commercial Lease, but all further disbursements on the Bank Loan shall be subject to satisfaction of the conditions provided in the Third Amendment to Commercial Lease.

## Section 3
## Representations and Warranties

{F:/Files/1017/1001/00649142.DOCX 2}

**3.1**     Borrower has full power and authority to execute and perform the terms and provisions of this Agreement and to borrow hereunder, and the execution hereof, of the Bank Loan and the Third Amendment to Commercial Lease have all been approved by all parties required through all corporate and company action required by law and their organizational documents.

## Section 4
## Affirmative Covenants

**4.1**     Borrower agrees that until all indebtedness incurred which is supported by the Credit Enhancement has been paid in full, and Pledgor is no longer obligated or exposed under the Credit Enhancement, it will:

    **a.**     Furnish Pledgor a profit and loss statement for each quarter and a balance sheet contemporaneously with Borrower furnishing said statements with applicable financial regulatory authorities;

    **b.**     Furnish to Pledgor all financial information furnished from time to time by Borrower to the Bank of Montana, subject to applicable law;

    **c.**     With reasonable promptness and subject to applicable law, furnish to Pledgor, such additional financial statements and such data and information concerning the financial condition of Borrower as may be reasonably requested by Pledgor;

    **d.**     Meet with Pledgor from time to time to update Pledgor as to financial condition (subject to applicable law), operations, projections, marketing plans, business developments and status of the Bank Loan;

    **e.**     At all times keep its property and operations insured against loss or damage, and from business interruption, to the extent and against risks that similar property is usually insured by other companies engaged in the same business with Pledgor identified in such insurance policies as may be applicable to Borrower's Pledged Assets as an additional named insured;

    **f.**     Execute such financing statements and other documents as Pledgor may reasonably request to perfect and continue a first position security interest in Borrower's Pledged Assets in favor of Pledgor.

## Section 5
## Events of Default

**5.1**     If any of the following events shall occur and be continuing, Pledgor may declare a default hereunder and shall be able to pursue remedies under this Agreement and under the Security Agreement:

   **a.**  If Borrower fails to make payment of any principal or interest due on the Bank Loan when the same shall become due by the terms thereof;

   **b.**  If Borrower defaults under the terms and conditions of the Lease, including the terms reflected in the Third Amendment to Commercial Lease.

   **c.**  If any material representation or warranty made by Borrower in any writing furnished to Pledgor in connection with or pursuant to this Agreement or the Bank Loan shall be false in any material respect on the dates which they were made;

   **d.**  If Borrower petitions or applies to any court for the appointment of a trustee or receiver for Borrower, of any substantial part of the assets of Borrower, or commences any proceedings relating to Borrower under any bankruptcy, reorganization, arrangement, insolvency, readjustment of debt, dissolution or liquidation law of any jurisdiction, or if any such petition or application is filed, or any such proceeding is commenced, against Borrower, and such proceeding is not dismissed within sixty (60) days.

### Section 6
### <u>Miscellaneous</u>

  **6.1**  This Agreement shall be binding on the parties and inure to the benefit of their respective successors and assigns.  This Agreement may not be modified without the express written consent of the parties.

  **6.2**  Paragraph headings are for purposes of identification only.  In the event of a conflict between the body of the document and the paragraph headings, the body of the document shall control.

  **6.3**  It is agreed that in the event of a dispute arising hereunder, any attorney's fees incurred shall be considered a part of the costs of action payable to the substantially prevailing party whether such fees are incurred in collection, suit or other proceeding, on appeal or in a bankruptcy action.

  **6.4**  No delay on the part of Pledgor in exercising any right, power or privilege granted hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right, power or privilege preclude any other or further exercise thereof.  The rights and remedies herein expressly specified are cumulative and are not exclusive of any other rights and remedies which Pledgor would otherwise have.

  **6.5**  All notices provided for hereunder shall be sent by certified mail, return receipt requested, addressed to the parties at the addresses set forth herein, or to such other address with respect to any party as such party shall notify the other in writing.  Any such notice shall be deemed to have been given three (3) days after the date it is duly deposited and certified in any U.S. Post Office.

  **6.6**  In conjunction with the transactions evidenced by this Credit Enhancement Agreement, Borrower will execute a Security Agreement.

**6.7**    If for any reason any provision of this Credit Enhancement Agreement is determined by a tribunal of competent jurisdiction to be legally invalid or unenforceable, the validity of the remainder of the Credit Enhancement Agreement will not be affected and such provision will be deemed modified to the minimum extent necessary to make such provision consistent with applicable law and, in its modified form, such provision will then be enforceable and enforced.

-    SIGNATURES APPEAR ON FOLLOWING PAGE -

The parties have caused this Agreement to be executed as of the day and year first above written.

**BORROWER:**                                **PLEDGOR:**

Hyperblock LLC                               Bonner Property Development, LLC


By:_____       By: _____
Its:_____       Its:  Co-Manager

**Exhibit A**

**Legal Description of Collateral**

Attachment 2 to Exhibit 16(iii)

# THIRD AMENDMENT
## TO
## COMMERCIAL LEASE AGREEMENT

THIS THIRD AMENDMENT TO LEASE AGREEMENT ("Third Amendment") is entered into effective as of November ____, 2018, by and between **Bonner Property Development, LLC**, a Montana limited liability company ("Landlord"), and **Hyperblock LLC**, a Delaware limited liability company ("Tenant").

## Recitals

A.      Effective March 1, 2016, Landlord and Project Spokane, LLC entered into that certain Commercial Lease Agreement (the "Lease") for certain real property premises located in the Bonner Mill Site in Bonner, Montana as further described in the Lease.  Capitalized terms not otherwise defined herein shall be as defined in the Lease.

B.      The original parties executed that certain First Amendment to Commercial Lease Agreement in December 2016, effective January 1, 2017, and that certain Second Amendment to Commercial Lease Agreement dated July 13, 2017, but effective January 1, 2017 (the "Lease Amendments").

C.      The Lease was assigned to and assumed by Hyperblock LLC pursuant to that certain Assignment, Assumption and Amendment of Lease executed effective July 10, 2018.

D.      Tenant wishes to expand and improve its space within the Bonner Mill Site in Bonner, Montana, to undertake some improvements and to extend the term of the Lease.

E.      As part of the expansion and further improvements, Tenant is engaging in fundraising through equity contributions of a minimum of $3,000,000.00 (USD) and from additional borrowing of $2,625,000.00 (USD) from the Bank of Montana (the "New Loan" as defined below).  Tenant has committed to the expenditure of certain of the new equity proceeds and all of the proceeds of the New Loan to improvements to be located on the Property (as that term is defined in the Lease as amended by the Lease Amendments and this Third Amendment).

F.      The parties wish to amend the Lease to reflect the additional premises, the commitment of Tenant to the improvements and for various other agreements between them.  All dollar figures in this Agreement are U.S. Dollars.

## Amendments

Landlord and Tenant agree as follows:

1.   <u>Property</u>.

a.      <u>Revised Description of "Property"</u>.  New third and fourth paragraphs of **Section 1.a.** shall be added to the Lease, as follows:

iii.   Bare land located behind the Sorter building of approximately 106,650 square feet, as reflected on the site plan on **Exhibit E.**

---

    iv.   Land for the power substation consisting of 15,625 square feet (125 x 125), located as reflected on the site plan on **Exhibit F.**    In addition to such land, Landlord shall grant to Tenant an easement for power poles to be located along the river bank, as reflected on **Exhibit B.**

    b.  **Section 1.b.I.** shall be amended to add new subsections iii) and iv), to read as follows:

    iii)    Respecting the land described in Section 1.a.iii, Landlord will cause the gas lines to be moved, fire hydrant to be relocated and for gravel to be relocated and compacted in the manner already agreed by Landlord and Tenant, at a total cost of $227,000, to be shared 30% by Landlord and 70% by Tenant (with estimated totals of $68,500 and $158,500, respectively), Tenant's portion to be funded by Tenant from the initial disbursement of the NewLoan.

    iv)    Sprinkler replacement:   Landlord will provide sprinkler heads in the area originally leased by Tenant under the original Lease Agreement in the Planer Building (approximately 1,700 heads) and will provide the use of a lift for use by Tenant in replacing such sprinkler heads; provided, however, the total cost to Landlord shall not exceed $45,000.00.  All labor is to be provided by Tenant or at Tenant's cost.  The sprinkler heads in the other half of the space in the Planer Building (the "Expansion Space" as referenced in the Lease and Lease Amendments) which Landlord is solely obligated to maintain and replace pursuant to the Lease and Lease Amendments, will be replaced by Landlord no later than April 30, 2019.

    c.  The following new **subsections ix)** shall be added to **Section 1.b.II.**

    ix)    As part of the expansion and further improvements, Tenant is engaging in fundraising through equity contributions of a minimum of $3,000,000.00 ("New Equity") and from additional borrowing of $2,625,000.00 from the Bank of Montana ("New Loan").  Tenant has committed to the expenditure of no less than $1,000,000 of the New Equity proceeds and all of the proceeds of the New Loan to improvements on the Property including a 40 megawatt substation and related improvements.  In connection with the New Loan, Landlord has agreed to provide certain credit enhancements through the pledge of Landlord's property to support such loan under the terms and conditions of this Third Amendment and that certain Credit Enhancement Agreement between Tenant and Landlord executed concurrently herewith.  Concerning the administration of the New Loan, Tenant agrees and Landlord approves and authorizes as follows:

A. The New Loan will be closed within 30 days of the date hereof.

B. From the closing of the New Loan shall be paid the Tenant's share of the cost of those certain improvements described in Section 1.B.I.iii) in the amount of $158,500 plus any bank loan fees and other charges as set forth in the Bank of Montana Disbursement Request and Authorization form.

C. Landlord shall not be obligated to approve further disbursements by Lender under the New Loan except and until as follows:

    i. Tenant has provided Landlord reasonable evidence that Tenant raised at least $3,000,000.00 in New Equity proceeds; and

    ii. Tenant has provided Landlord reasonable evidence that Tenant spent, or irrevocably committed to spend in a manner expressly approved by Landlord in writing, at least $1,000,000.00 of the New Equity to:

        1. Build the 161,000 kva power line across the river; and/or

        2. Construct a 40 megawatt power substation on the Property to provide additional power supply to the operation of Tenant's business on the Property (the "new Substation"); and/or

        3. Acquire the equipment for said New Substation; and/or

        4. Complete additional infrastructure for the remainder of buildout of said New Substation.

    iii. After full satisfaction of i. and ii. above, Landlord agrees to provide Bank of Montana and/or the applicable title company Landlord's approval and authorization for disbursements on the New Loan pursuant to fully detailed draw requests for disbursements supported by documentation and in accordance with plans and specifications approved in writing by Landlord.

2. Term; Occupancy.

    a. Section 2.a. **Section 2.a.** of the Lease shall be amended to provide that the term of the Lease, as amended and extended, shall extend through February 28, 2029. Additionally, the Renewal Periods shall be amended so that Tenant shall have the option to renew the Lease for two (2) additional periods of ten (10) years each.

3. Rent.

    a. Base Rent. **Sections 4.a.(i), (ii) and (iii)** shall be amended and restated in their entirety, beginning effective March 1, 2019, to read as follows:

(i)     The Base Rent payable hereunder shall initially be as follows:

     A.   $75,506.85 per month which is based on $3.71 per square foot per year multiplied by the square footage of the "Planer Building" and "Sorter Building" portions of the Property currently occupied by Tenant, 243,949 square feet, divided by 12 months; plus

     B.   $96,885.00 per year, or $8,073.75 per month, for the approximately 106,650 square feet of bare land as set forth in Section 1.a.iii and reflected on the site plan on **Exhibit E**; plus

     C.   $60,000.00 per year, or $5,000.00, for the approximately 15,625 square feet (125' x 125') of land for the power substation as set forth in Section 1.a.iv and reflected on the site plan on **Exhibit F**,

The Base Rent for the buildings as set forth in Section 4.a.(i).A, above, shall be referred to herein as the "Building Base Rent". The Base Rent for the bare land as set forth in Section 4.a.(i).B and 4.a.(i).C, above, shall be referred to herein as the "Land Base Rent". The Building base Rent and the Land Base Rent shall be collectively referred to herein as the "Base Rent". The Base Rent as set forth above shall continue at this rate for through February 28, 2020.   On March 1, 2020, and then again on March 1st of each year thereafter, hereinafter referred to as a "Lease Anniversary Date," the Base Rent will increase two percent (2%) per annum.

(ii)     If Tenant exercises the Expansion Space Option, the Building Base Rent payable shall be increased proportionally based on the increased square footage for the "Planer Building" and Sorter Building" portions of the Property and the Expansion Space that will be leased by Tenant. Specifically, if Tenant exercises the Expansion Space Option the new square footage of "Planer Building" and Sorter Building" space being leased by Tenant upon which Building Base Rent will be based will be 243,949 square feet currently comprising the Building Base Rent plus 59,000 square feet (the Expansion Space) for total of 302,949 square feet.

(iii)     Beginning January 1, 2017, Tenant shall transfer two Bitcoins per month to the wallet(s) or other destination directed by Landlord from time to time for sixty (60) consecutive months; provided that should the value of a Bitcoin exceed $5,000.00 each at the time of any transfer, the number of Bitcoin required to be transferred shall be limited to a total value of $10,000.00 per month, with any partial Bitcoins not capable of being so transferred carrying over to be transferred in the next succeeding month in addition to any Bitcoin required to be transferred in such succeeding month.   Any fractional Bitcoin remaining untransferred after 60 months pursuant to this limitation shall be paid in cash in the month succeeding the 60th month.

---

4.  Pledge by Landlord for Bank of Montana Loan for Infrastructure and Improvements. Landlord has agreed, subject to certain terms and conditions, to pledge certain of its property to the Bank of Montana to secure the New Loan to Tenant, under which Tenant will construct certain infrastructure and improvements on the Property.  The terms and conditions of this arrangement is set forth in that certain Credit Enhancement Agreement negotiated and executed by the parties contemporaneously with this Third Amendment.  Execution of this Third Amendment is conditioned upon execution of the Credit Enhancement Agreement and vice versa.

5.  Commercial Power.   In Landlord's discretion at any time during the term of the Lease, it shall have the right to cause Tenant's power needs relating to Tenant's use of the Sorter Building portion of the Property currently occupied by Tenant to be serviced through a commercial power service, with Tenant's power to be separately metered and billed.   All costs of the equipment, lines and any increase in the cost of power relating to servicing the Sorter Building occupied by Tenant through a commercial power service shall be borne by Landlord.

6.  Noise – Expansion.  The parties mutually acknowledge that noise caused by Tenant's operations has been an issue in the Bonner, Montana locale.  Relative to the installation and operation of any new equipment, including servers and fans, Tenant shall make a good faith effort to address noise levels, mitigation steps and limits that may be related to said new equipment.

7.  Remaining Provisions of Lease.   To the extent not modified herein, all remaining provisions of the Lease and Lease Amendments shall remain in full force and effect, and are hereby reaffirmed.

8.  Counterparts.   This Third Amendment may be signed in counterparts and the counterparts assembled into one or more originals.  The counterparts shall be deemed delivered to the receiving party upon delivery of the signed counterparts to the receiving party's authorized representative.

-   SIGNATURES APPEAR ON FOLLOWING PAGE -

IN WITNESS WHEREOF this Third Amendment to Lease has been executed effective the date and year first above written.

LANDLORD:                                    TENANT:

Bonner Property Development, LLC              Hyperblock LLC


By: _____        By:_____
Stephen Nelson, Co-Manager                    Print name:_____
                                               Its: _____


By: _____
Michael Boehme, Co-Manager

EXHIBIT E

Bare Land located behind the Sorter building

EXHIBIT F

Land for the power substation consisting of 15,625 square feet (125 x 125)

# THIRD AMENDMENT
## TO
# COMMERCIAL LEASE AGREEMENT

THIS THIRD AMENDMENT TO LEASE AGREEMENT ("Third Amendment") is entered into effective as of November _____, 2018, by and between **Bonner Property Development, LLC**, a Montana limited liability company ("Landlord"), and **Hyperblock LLC**, a Delaware limited liability company ("Tenant").

## Recitals

A.      Effective March 1, 2016, Landlord and Project Spokane, LLC entered into that certain Commercial Lease Agreement (the "Lease") for certain real property premises located in the Bonner Mill Site in Bonner, Montana as further described in the Lease.  Capitalized terms not otherwise defined herein shall be as defined in the Lease.

B.      The original parties executed that certain First Amendment to Commercial Lease Agreement in December 2016, effective January 1, 2017, and that certain Second Amendment to Commercial Lease Agreement dated July 13, 2017, but effective January 1, 2017 (the "Lease Amendments").

C.      The Lease was assigned to and assumed by Hyperblock LLC pursuant to that certain Assignment, Assumption and Amendment of Lease executed effective July 10, 2018.

D.      Tenant wishes to expand and improve its space within the Bonner Mill Site in Bonner, Montana, to undertake some improvements and to extend the term of the Lease.

E.      As part of the expansion and further improvements, Tenant is engaging in fundraising through equity contributions of a minimum of $3,000,000.00 (USD) and from additional borrowing of $2,625,000.00 (USD) from the Bank of Montana (the "New Loan" as defined below).  Tenant has committed to the expenditure of certain of the new equity proceeds and all of the proceeds of the New Loan to improvements to be located on the Property (as that term is defined in the Lease as amended by the Lease Amendments and this Third Amendment).

F.      The parties wish to amend the Lease to reflect the additional premises, the commitment of Tenant to the improvements and for various other agreements between them.  All dollar figures in this Agreement are U.S. Dollars.

## Amendments

Landlord and Tenant agree as follows:

1.   Property.

    a.      Revised Description of "Property".  New third and fourth paragraphs of **Section 1.a.** shall be added to the Lease, as follows:

        iii.   Bare land located behind the Sorter building of approximately 106,650 square feet, as reflected on the site plan on **Exhibit E.**

iv. Land for the power substation consisting of 15,625 square feet (125 x 125), located as reflected on the site plan on **Exhibit F.**   In addition to such land, Landlord shall grant to Tenant an easement for power poles to be located along the river bank, as reflected on **Exhibit B.**

b.   **Section 1.b.I.** shall be amended to add new subsections iii) and iv), to read as follows:

iii)   Respecting the land described in Section 1.a.iii, Landlord will cause the gas lines to be moved, fire hydrant to be relocated and for gravel to be relocated and compacted in the manner already agreed by Landlord and Tenant, at a total cost of $227,000, to be shared 30% by Landlord and 70% by Tenant (with estimated totals of $68,500 and $158,500, respectively), Tenant's portion to be funded by Tenant from the initial disbursement of the NewLoan.

iv)   Sprinkler replacement:   Landlord will provide sprinkler heads in the area originally leased by Tenant under the original Lease Agreement in the Planer Building (approximately 1,700 heads) and will provide the use of a lift for use by Tenant in replacing such sprinkler heads; provided, however, the total cost to Landlord shall not exceed $45,000.00.  All labor is to be provided by Tenant or at Tenant's cost.  The sprinkler heads in the other half of the space in the Planer Building (the "Expansion Space" as referenced in the Lease and Lease Amendments) which Landlord is solely obligated to maintain and replace pursuant to the Lease and Lease Amendments, will be replaced by Landlord no later than April 30, 2019.

c.   The following new **subsections ix)** shall be added to **Section 1.b.II.**

ix)   As part of the expansion and further improvements, Tenant is engaging in fundraising through equity contributions of a minimum of $3,000,000.00 ("New Equity") and from additional borrowing of $2,625,000.00 from the Bank of Montana ("New Loan").  Tenant has committed to the expenditure of no less than $1,000,000 of the New Equity proceeds and all of the proceeds of the New Loan to improvements on the Property including a 40 megawatt substation and related improvements.  In connection with the New Loan, Landlord has agreed to provide certain credit enhancements through the pledge of Landlord's property to support such loan under the terms and conditions of this Third Amendment and that certain Credit Enhancement Agreement between Tenant and Landlord executed concurrently herewith.  Concerning the administration of the New Loan, Tenant agrees and Landlord approves and authorizes as follows:

A. The New Loan will be closed within 30 days of the date hereof.

B. From the closing of the New Loan shall be paid the Tenant's share of the cost of those certain improvements described in Section 1.B.I.iii) in the amount of $158,500 plus any bank loan fees and other charges as set forth in the Bank of Montana Disbursement Request and Authorization form.

C. Landlord shall not be obligated to approve further disbursements by Lender under the New Loan except and until as follows:

  i.  Tenant has provided Landlord reasonable evidence that Tenant raised at least $3,000,000.00 in New Equity proceeds; and

  ii. Tenant has provided Landlord reasonable evidence that Tenant spent, or irrevocably committed to spend in a manner expressly approved by Landlord in writing, at least $1,000,000.00 of the New Equity to:

    1. Build the 161,000 kva power line across the river; and/or

    2. Construct a 40 megawatt power substation on the Property to provide additional power supply to the operation of Tenant's business on the Property (the "new Substation"); and/or

    3. Acquire the equipment for said New Substation; and/or

    4. Complete additional infrastructure for the remainder of buildout of said New Substation.

  iii. After full satisfaction of i. and ii. above, Landlord agrees to provide Bank of Montana and/or the applicable title company Landlord's approval and authorization for disbursements on the New Loan provided Borrower submits to Landlord and the Bank of Montana fully detailed draw requests for disbursements supported by adequate documentation that the disbursements are appropriate, and within the scope of and in accordance with plans and specifications approved in writing by Landlord.

2. <u>Term; Occupancy</u>.

   a. <u>Section 2.a</u>. **Section 2.a.** of the Lease shall be amended to provide that the term of the Lease, as amended and extended, shall extend through February 28, 2029. Additionally, the Renewal Periods shall be amended so that Tenant shall have the option to renew the Lease for two (2) additional periods of ten (10) years each.

---

3. <u>Rent</u>.

   a.   <u>Base Rent</u>. **Sections 4.a.(i), (ii) and (iii)** shall be amended and restated in their entirety, beginning effective March 1, 2019, to read as follows:

      (i)     The Base Rent payable hereunder shall initially be as follows:

         A.   $75,506.85 per month which is based on $3.71 per square foot per year multiplied by the square footage of the "Planer Building" and "Sorter Building" portions of the Property currently occupied by Tenant, 243,949 square feet, divided by 12 months; plus

         B.   $96,885.00 per year, or $8,073.75 per month, for the approximately 106,650 square feet of bare land as set forth in Section 1.a.iii and reflected on the site plan on **Exhibit E**; plus

         C.   $60,000.00 per year, or $5,000.00, for the approximately 15,625 square feet (125' x 125') of land for the power substation as set forth in Section 1.a.iv and reflected on the site plan on **Exhibit F**,

      The Base Rent for the buildings as set forth in Section 4.a.(i).A, above, shall be referred to herein as the "Building Base Rent".  The Base Rent for the bare land as set forth in Section 4.a.(i).B and 4.a.(i).C, above, shall be referred to herein as the "Land Base Rent".  The Building base Rent and the Land Base Rent shall be collectively referred to herein as the "Base Rent".  The Base Rent as set forth above shall continue at this rate for through February 28, 2020.  On March 1, 2020, and then again on March 1st of each year thereafter, hereinafter referred to as a "Lease Anniversary Date," the Base Rent will increase two percent (2%) per annum.

      (ii)     If Tenant exercises the Expansion Space Option, the Building Base Rent payable shall be increased proportionally based on the increased square footage for the "Planer Building" and Sorter Building" portions of the Property and the Expansion Space that will be leased by Tenant.  Specifically, if Tenant exercises the Expansion Space Option the new square footage of "Planer Building" and Sorter Building" space being leased by Tenant upon which Building Base Rent will be based will be 243,949 square feet currently comprising the Building Base Rent plus 59,000 square feet (the Expansion Space) for total of 302,949 square feet.

      (iii)     Beginning January 1, 2017, Tenant shall transfer two Bitcoins per month to the wallet(s) or other destination directed by Landlord from time to time for sixty (60) consecutive months; <u>provided that</u> should the value of a Bitcoin exceed $5,000.00 each at the time of any transfer, the number of Bitcoin required to be transferred shall be limited to a total value of $10,000.00 per month, with any partial Bitcoins not capable of being so transferred carrying over to be transferred in the next succeeding month in addition to any Bitcoin required to be

transferred in such succeeding month.   Any fractional Bitcoin remaining untransferred after 60 months pursuant to this limitation shall be paid in cash in the month succeeding the 60th month.

4.   <u>Pledge by Landlord for Bank of Montana Loan for Infrastructure and Improvements</u>. Landlord has agreed, subject to certain terms and conditions, to pledge certain of its property to the Bank of Montana to secure the New Loan to Tenant, under which Tenant will construct certain infrastructure and improvements on the Property.  The terms and conditions of this arrangement is set forth in that certain Credit Enhancement Agreement negotiated and executed by the parties contemporaneously with this Third Amendment.  Execution of this Third Amendment is conditioned upon execution of the Credit Enhancement Agreement and vice versa.

5.   <u>Commercial Power</u>.   In Landlord's discretion at any time during the term of the Lease, it shall have the right to cause Tenant's power needs relating to Tenant's use of the Sorter Building portion of the Property currently occupied by Tenant to be serviced through a commercial power service, with Tenant's power to be separately metered and billed.   All costs of the equipment, lines and any increase in the cost of power relating to servicing the Sorter Building occupied by Tenant through a commercial power service shall be borne by Landlord.

6.   <u>Noise – Expansion</u>.  The parties mutually acknowledge that noise caused by Tenant's operations has been an issue in the Bonner, Montana locale.  Relative to the installation and operation of any new equipment, including servers and fans, Tenant shall make a good faith effort to address noise levels, mitigation steps and limits that may be related to said new equipment.

7.   <u>Remaining Provisions of Lease</u>.   To the extent not modified herein, all remaining provisions of the Lease and Lease Amendments shall remain in full force and effect, and are hereby reaffirmed.

8.   <u>Counterparts</u>.   This Third Amendment may be signed in counterparts and the counterparts assembled into one or more originals.  The counterparts shall be deemed delivered to the receiving party upon delivery of the signed counterparts to the receiving party's authorized representative.

-   SIGNATURES APPEAR ON FOLLOWING PAGE -

   IN WITNESS WHEREOF this Third Amendment to Lease has been executed effective the date and year first above written.

LANDLORD:                                      TENANT:

Bonner Property Development, LLC               Hyperblock LLC


By: _____          By:_____
Stephen Nelson, Co-Manager                      Print name:_____
                                                 Its: _____


By: _____
Michael Boehme, Co-Manager

EXHIBIT E

Bare Land located behind the Sorter building

EXHIBIT F

Land for the power substation consisting of 15,625 square feet (125 x 125)