Quentin M. Rhoades
State Bar No. 3959
Robert Erickson
State Bar No. 9966
Rhoades, Siefert & Erickson PLLC
430 Ryman Street
Missoula, Montana 59802
Telephone: (406) 721-9700
qmr@montanalaywer.com
erickson@montanalawyer.com

*Pro Querente*

## UNITED STATES DISTRICT COURT
## DISTRICT OF MONTANA, MISSOULA DIVISION

| | |
|---|---|
| **STEVE NELSON, MICHAEL BOEHME, and BONNER PROPERTY DEVELOPMENT, LLC,**<br><br>Plaintiffs,<br><br>vs.<br><br>**PROJECT SPOKANE, LLC, and SEAN WALSH,**<br><br>Defendants. | Cause No. **CV 20-82-M-DWM**<br><br><br>***PLAINTIFFS' REPLY BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION*** |

## INTRODUCTION

Plaintiffs Steve Nelson, Michael Boehme, and Bonner Property Development, LLC (BPD) moved the Court to issue a preliminary injunction enjoining any sale or other disposition of equipment and fixtures located on BPD's leased premises pending entry of final judgment in this case. In Defendants' Objection (Doc. 21),

Defendants appear to concede Defendants have no rights in the fixtures located at the leased premises. In addition, Defendants appear to concede Defendants should be precluded from selling or otherwise disposing of any personal property located at the leased premises – except for computer servers. Thus, the Court should enter a preliminary injunction enjoining Defendants from selling any fixtures or any other personal property that is not a server. That much is clear.

Plaintiffs acknowledge they do not have a lien position with respect to the old servers, which constitutes the bulk of the thousands of servers on the premises. On the other hand, with respect to the new servers purchased with the Bank of Montana loan proceeds – the 1,493 Bitmain Antminer S17+ servers – BPD is entitled to a first position lien. Thus, the Court should preliminarily enjoin any sale or other disposition of the new servers.

Concerning the new servers only, Defendants argue (1) Walsh was not aware of the representations he made with respect to BPD's priority lien interest because he never read the contracts he signed; and (2) Walsh's misrepresentations were made on behalf of HyperBlock, LLC (HyperBlock) and not on behalf of himself or Project Spokane. Neither of these arguments are supported by the facts. And neither argument defeats Plaintiffs' entitlement to a preliminary injunction with respect to the new servers.

2

Finally, no bond should be required with respect to the fixtures or the other non-sever personal property because Defendants have no right to sell that property. With respect to the new servers, no bond should be required under Rule 65(c) because the servers will remain in place. To the extent the Court is inclined to require a bond related to the new servers, it should be in an amount far less than Defendants suggest.

## ARGUMENT

**1.   Defendants are not entitled to sell BPD's fixtures.**

Defendants argue that BPD has sought to restrain the sale or disposition of "some" of the fixtures at the leased premises. Not true. BPD seeks to restrain, and is entitled to a preliminary injunction concerning, all fixtures located at the leased premises. In their objection, Defendants argue they should be entitled to sell the fixtures. It may be the case that Defendants no longer seek to sell BPD's fixtures because they recognize they have no claim to that property.

The facts demonstrate that Plaintiffs have no claim upon BPD's fixtures. By definition, the fixtures are part of the real property and belong to BPD. *See Regan v. Weston*, 191 Mont. 546, 552-53, 625 P.2d 557, 560 (1981). There has been no allegation that BPD provided Defendants any lien or other right with respect to BPD's property – because BPD has not. The fixtures, including by agreement the 467 industrial fans, 58 power transformers, 445 electrical breaker panels, and

3

electrical components such as switchgear lineups, indoor and outdoor transformers, breaker panels, and electrical cabling and rack shelving, must remain with the property. (Nelson Decl., ¶ 24 and 36, and at Ex. 19 to Nelson Decl., Fourth Amendment to Commercial Lease Agreement, at p. 2.) *See id.* Defendants do not argue otherwise.

While Defendants' UCC filings specify "fixtures" in some instances, those filings are not effective against BPD – only against HyperBlock. HyperBlock does not own the fixtures. In addition, neither Defendants nor anyone else (except BPD) has made a fixture filing in Missoula County. Thus, BPD's rights to the fixtures, as the property owner, trump any claims to fixtures by any third-party in any event. *See* §§ 30-9A-301, MCA (local law governs fixture filings); 30-9A-334(3), MCA (realty owner's rights in fixtures trump third-party claimant's); 30-9A-334, MCA (setting forth exceptions, none of which apply).

Accordingly, the Court should grant BPD's request for a preliminary injunction with respect to the fixtures owned by BPD and the other property that was agreed to be treated as fixtures. Defendants do not dispute that Plaintiffs would suffer an irreparable injury if Defendants were permitted to sell that property.

2. **Defendants are not entitled to sell any non-server personal property.**

All other non-server personal property also should be enjoined from sale or other disposition. As Walsh points out, the Fourth Amendment to Commercial Lease

Agreement, when read with the other security enhancement documents, provides that BPD would have a first position security interest in "ALL personal property owned by [HyperBlock] which is located currently at the Property (and not just newly acquired New Servers)," excluding only those servers on the premises as of December 31, 2019. (Nelson Decl., ¶ 29.) Defendants do not dispute that this representation was made or that Plaintiffs relied upon it to their detriment. And, as with the fixtures, Defendants do not dispute that Plaintiffs would suffer an irreparable injury if Defendants were permitted to sell the non-server personal property.

Rather, the most Defendants argue with respect to the remaining personal property, as they do with respect to the new servers, is that Walsh did not make the representations because he never read any of the documents he signed and, even if he had, he never made any representations on behalf of himself or Project Spokane. But Defendants are incorrect as to both arguments.

**3.    Defendants should be preliminarily enjoined from selling the new servers.**

**A.    Walsh knew about his representations.**

Walsh argues that his representations made in the documents to which his signature was attached do not constitute representations because he never read the documents. Walsh also claims that he was never involved in the negotiations for the documents. It strains credibility that a sophisticated chief executive officer would not read contracts concerning multi-million-dollar transactions. And – contrary to

5

Walsh's assertion – he was directly involved in the negotiations regarding the contracts. He was emailed the drafts and final contracts, which he signed, repeatedly.

Exhibits 16, 17, 18, 23 and 24 to the Steve Nelson declaration reflect that Walsh was involved with or copied on emails related to the negotiations and received multiple copies of the draft documents and the final documents with his signature. Many of the emails are directed specifically to Walsh. This includes communications key to the transactions at issue, including the negotiation that BPD's first position security interest in the new servers would last only so long as the BOM Loan remained unpaid.

On November 29, 2018, and again December 3, 2018, BPD's lawyer emailed Walsh and others a draft of the Credit Enhancement Agreement. (Ex. 16 to the Nelson Decl., filed as Doc. 23, at p. 3.) The Credit Enhancement, even at that early stage, and then throughout the negotiations until execution, provided in ¶ 1.2 that BPD would have a first position security interest, that HyperBlock would execute a security agreement confirming the same, and that HyperBlock would obtain such documents "to maintain [BPD's] first lien position … at all times." (Ex. 16 to the Nelson Decl., filed as Doc. 23, at pp. 15–16, 19–20, 33–34.)

On December 4, 2018, BPD's lawyer emailed Walsh and others:

Attached is the security agreement referenced in the Credit Enhancement Agreement, *which is intended to provide a priority lien*

> ***on property funded by the Bank loan,*** and for which BPD is guarantor and pledgor.

(Ex. 16 to the Nelson Decl., filed as Doc. 23 at p. 9.) (Emphasis supplied.) A copy of the Security Agreement was attached to the foregoing email. Walsh's argument must be that he did not read that email either.

On December 11, 2018, Walsh's counsel emailed Walsh concerning the security agreement:

> Sean/Eric,
>
> Concerning the Security Agreement, David wants to be certain that the obligations imposed on HB in the Third Amendment to Lease concerning the Credit Enhancement BPD is providing are secured by the 40 MW substation improvements. However, I do not want the security agreement to secure all obligations under the lease since the lease will be in effect well after the Bank of Montana loan is paid. I have therefore agreed to retain the language in Section 1 of the attached Security Agreement stating that said agreement secures [the] obligation HB owes under the lease … only … until the BoM loan is paid. Once the loan is paid, BPD can no longer look to the collateral as security for any other obligations owed by HB under the lease (e.g. the payment of rent).
>
> \* \* \*
>
> ASAP Please let me know if this this acceptable to Hyperblock. Once I have obtained everyone's consent to the documents I will send clean copies out for execution.

(Exhibit 17 to Nelson Decl. at p. 11; Exhibit 18 to Nelson Decl. at p. 10.) A draft of the Security Agreement, for Walsh's review and approval, is attached to Walsh's

7

lawyer's email to Walsh.  (Ex. 17, pp. 11–19.)  Walsh responded to his lawyer: "That sounds reasonable to me."  (Exhibit 18 to Nelson Decl. at p. 10.)

BPD's counsel also emailed Walsh and others concerning changes to the Third Lease Amendment, attaching a copy to the email.  (Ex. 16 to the Nelson Decl., filed as Doc. 23, at pp. 12–13.)   Thereafter, Walsh's counsel emailed Walsh, with emphasis supplied:

> Sean/Eric,
>
> I spoke to David Bjornson (copied here) *after our call this afternoon*.  Concerning the lease amendment Dave wanted a minor clarification to the language concerning draw requests set forth in Section 1.c. of the attached (bottom of page 3).  In the interest of expediency I am sending this to David for him to review at the same time.  In the attached I have accepted all of my changes I had proposed last Friday afternoon so the only thing in redline is the additional change Dave has requested.
>
> * * *
>
> ASAP Please let me know if this this acceptable to Hyperblock.  Once I have obtained everyone's consent to the documents I will send clean copies out for execution.
>
> I will also be sending you one small change to the Security Agreement in a separate email.  However, the changes I proposed to the Credit Enhancement Agreement are all acceptable to BPD.

(Exhibit 17 to Nelson Decl. at p. 1.)  A draft of the Third Amendment to Commercial Lease is attached to the email from Walsh's lawyer to Walsh.  The email reflects that Walsh and his counsel had discussed the very documents at issue via telephone that

8

afternoon. Confirming receipt of the email and his review, Walsh responds to his lawyer: "Yep. That's fine." (Ex. 16 to the Nelson Decl., filed as Doc. 23, at p. 11.)

The next day, on December 12, 2018, Walsh's counsel emailed Walsh (only) clean execution copies of the Credit Enhancement Agreement, Third Amendment to Lease, and Security Agreement. (Exhibit 18 to Nelson Decl., p. 6 and 8.) These are the documents that ultimately were executed by Walsh. On December 13, 2018, a representative of **Project Spokane** (ea@projectspokane.co) emailed Walsh's counsel with Walsh's signed copies of the Credit Enhancement Agreement, Security Agreement, and Third Amendment to Lease – and copied Walsh on the email. (*Id.*)

Several other emails were directed to Walsh concerning the draft and, ultimately, signed agreements. (*See* Exhibits 16, 17, 18, 23 and 24 to Nelson Decl.) In total, Walsh was emailed these several drafts and then the final, signed credit enhancement and related lease documents at least a dozen times. Walsh actively participated, responding to requests for review and approval by his lawyer, and having telephone calls with his lawyer to discuss the proposed changes to the documents.

Later, with respect to the modifications of the lease, the credit enhancement and security agreement documents, a representative of HyperBlock emailed Walsh with the modification of the several documents for Walsh's "review and comments." (Nelson Decl., ¶ 28 and Exs. 24 and 25 thereto.)

Walsh clearly was involved with the negotiations of these agreements.  For Walsh to claim that he – not once – read the drafts of the agreements, which were emailed to him repeatedly, or the final documents, which were emailed to him from Project Spokane, and upon which he authorized his signature, simply is not credible.

Even if it were believable that a sophisticated CEO involved in a multi-million-dollar transaction did not read the contracts that he had been emailed multiple times and to which his signature was ultimately affixed, he still is presumed to know the contents thereof.  "One who executes a written contract is presumed to know its contents and assent to them; ignorance of the contents is not grounds for relief from liability."  *Johnson v. Estate of Shelton*, 232 Mont. 85, 90-91, 754 P.2d 828, 830 (1988).  "A party will not be relieved, either by a court of law or court of equity, when he executes an instrument without reading it, …."  *Wright v. Blevins*, 2017 Mont 439, 444, 705 P.2d 113, 117 (1985).  Finally, it makes no difference that a person Walsh admits was his authorized agent electronically affixed Walsh's signature.  *See* § 30-18-106, 112, and 113, MCA.  The fact remains that Walsh made representations in the documents, which were received and relied upon by Plaintiffs.

**4.     Walsh's representations are binding on him and Project Spokane under Plaintiffs' equitable claims.**

Walsh argues that he only signed the documents as an agent of HyperBlock, and not as himself or an agent of Project Spokane.  But Walsh cannot avoid the effect

of his representations, particularly in a court of equity, by arguing that he is not an agent of himself. Even if he could sustain such an argument, an agent is responsible to third persons as a principal when the agent's actions are wrongful in their nature. § 28-10-702, MCA. There is substantial evidence of wrongdoing on the part of Walsh.

Walsh is also Project Spokane's agent. Project Spokane was the original tenant of the leased premises, using the same equipment and conducting the same operations. Walsh is its sole owner and manager. Walsh *is* Project Spokane, as all involved parties knew or were led to believe. Even if Walsh were not Project Spokane's actual agent, Walsh was Project Spokane's ostensible agent. Ostensible agency arises when the principal intentionally or negligently causes a third person to believe that there is an agency relationship. *See* § 28-10-103, MCA. Project Spokane was the original tenant; Walsh signed everything on behalf of Project Spokane as well as HyperBlock. All involved parties believed that Walsh and Project Spokane were essentially the same. Walsh intentionally, or at minimum negligently, caused Plaintiffs to believe he was Project Spokane's agent. Thus, in the context of this case, where Plaintiffs have made equitable claims, Walsh's representations are attributed to himself and Project Spokane.

Moreover, Project Spokane (and Walsh, for that matter) later ratified the representations made by Walsh in the lease and credit enhancement agreements. *See*

11

§ 28-10-201, MCA.  In January 2019, prior to the purchase of the new servers with BOM loan funds, HyperBlock and Project Spokane approached Plaintiffs seeking their consent to HyperBlock's consent to a collateral assignment of the HyperBlock's lease to Project Spokane.  (Nelson Decl. ¶ 25-26.)  The lease, as amended by the third amendment, specifically references the Credit Enhancement Agreement, which in turn specifically references the Security Agreement.  (Nelson Decl. at Exs. 13, 14 and 15.)  Both HyperBlock and Project Spokane, through Walsh, agreed to the collateral assignment of the lease.  (Nelson Decl. ¶ 25-26 and Ex. 21 thereto.).  The collateral assignment of the lease, in conjunction with the referenced documents, contain the representations regarding the BPD's first priority security interest and the personal property designated to remain with the realty.  (*See* Nelson Decl. Exs. 13, 14, 15, 19 and 25.)  Walsh and Project Spokane now seek to disavow those representations; however, ratification of a part of an indivisible transaction is a ratification of the whole.  *See* § 28-10-212, MCA.

      Walsh made the unambiguous, written representation that BPD would have a first priority lien in the servers purchased with the BOM loan, and thereafter Walsh and Project Spokane ratified those representations.  Steve Nelson and Mike Boehme believed Walsh's representations.  They did not know that Walsh or his companies never intended to fulfill the promises.  Defendants do not convincingly argue that Walsh's promises are not imputed to Walsh and Project Spokane, and Defendants do

not suggest that Defendants did not justifiably rely on Walsh's representations or that they have been injured as a result. Plaintiffs therefore are likely to succeed on their claims of promissory estoppel, equitable estoppel, and fraud.

As to unjust enrichment, Defendants certainly received an unjust benefit as a result of the BOM Loan secured by Plaintiffs. HyperBlock is solely owned by HyperBlock, Inc. (HBI), and Walsh is the controlling shareholder of HBI. Walsh and Project Spokane are creditors of HBI and HyperBlock. Thus, the company in which Walsh had a significant ownership interest, albeit indirectly, and which owed him and Project Spokane large sums of money, received a $2.6M injection of equipment through a loan secured by Plaintiffs' assets and credit. That constitutes a concrete benefit that would be unjust for Defendants to retain.

Finally, Defendants do not dispute that Plaintiffs would suffer an irreparable injury with respect to the new servers if Defendants sold them. Instead, Defendants merely argue that should the Court impose preliminary injunctive relief, the Court should require a bond related to the new servers.

**6. The court should forego a bond or impose only minimal bond.**

No bond should be required with respect to an injunction precluding the sale of the fixtures or other non-server personal property located at the premises. Defendants have no claim in that property and therefore could suffer no conceivable injury if precluded from selling it. Defendants do not suggest otherwise.

13

Plaintiffs abandon their claim for a preliminary injunction with respect to all servers other than the 1,493 Bitmain Antminer S17+ servers.  Thus, the other, older servers are not at issue as far as a bond is concerned.

With respect the new servers, the Court should not require a bond, or only a minimal bond.  The servers will remain in place and therefore serve as adequate security.

Walsh claims, without support, that if "all the mining servers" are put back to work for mining Bitcoin, they will generate $15,200 per day "per current market conditions."  According to the list of property Defendants noticed for sale, however, there are over 10,000 servers currently located on the premises.  (Doc. 1-10 at p. 177, Exhibit 31 to Nelson Decl. at p. 6.)  The 1,493 new servers represent only about 15% of those servers, and Plaintiffs have abandoned their claims with respect to the rest.  Moreover, Walsh ignores that there is no current location for "all the mining servers" to operate, and more significantly, Walsh ignores the tremendous energy cost associated with running those servers.  As demonstrated by Energy Keepers, Inc.'s lawsuit, HyperBlock could not profitably run their operation – or even pay its bills.

Due to energy costs and the Bitcoin halving event, HyperBlock ceased Bitcoin mining operations and shuttered its operation.  Its parent company, HBI, filed for bankruptcy.  Given these facts, profitably putting the servers to work is extremely doubtful.  Walsh's argument concerning revenues gives no indication of net profits

14

because he never addresses the expenses that put his company out of business. Thus, any argument as to net profits, let alone net profits only from the 1,493 new servers, is pure speculation. The Court ought not impose a bond based on speculation. *See Giorgio, Inc. v. Parfums De Couer, Ltd*, *Brotherhood of Locomotive Engrs. v. Burlington N. R. Co.*, 1984 U.S. LEXIS 22978, *17-18 (D. Mont. 1984); *Bass v. Richardson*, 338 F.Supp. 478 (S.D.N.Y. 1971).

Walsh also argues that the new servers will decrease in value over time. While this is true to a certain degree, Walsh assumes that the used (not new) servers still have a brand-new price value of $2.6M – even if sold on 15 days' notice at a distress sale. This is not accurate. The new servers now are worth far less – even if sold today – under the conditions Defendants intend to sell them. (Ex. 1, Decl. of Ryan Alter.) And in six months, which is a reasonable amount of time for the parties to litigate this case through trial in the Montana District, the servers would not decrease in value nearly as much as Walsh suggests. Rather, they would decrease in value by only roughly $350,000. (*Id.*)

Thus, if the Court is inclined to impose some amount of bond – even though the new servers would remain in place – the bond should be no more than $350,000.

## CONCLUSION

Accordingly, the Court should preliminarily enjoin the sale or other disposition of all fixtures and non-server personal property located on the leased premises, as

well as the 1,493 Bitmain Antminer S17+ servers, until the trial on the merits.

DATED this 24th day of June 2020.

                                Respectfully Submitted,
                                RHOADES SIEFERT & ERICKSON PLLC

                                By: _/s/Quentin M. Rhoades_____
                                    Quentin M. Rhoades
                                    Robert Erickson
                                    *Pro Querente*

## CERTIFICATE OF COMPLIANCE

The undersigned certifies that the foregoing brief is 3487 words including footnotes, but excluding the caption, table of contents, table of authorities, index of exhibits, signature blocks, and certificates of compliance & service.  Pursuant to Local Rule 7.1, a table of contents, table of authorities, and index of exhibits are included in this brief.

DATED this 24th day of June 2020.

> Respectfully Submitted,
> RHOADES SIEFERT & ERICKSON PLLC
>
>
> By:  /s/Quentin M. Rhoades
>       Quentin M. Rhoades
>       Robert Erickson
>       *Pro Querente*