# EXHIBIT A

*Nelson et al. v. Walsh et al.*

Case No. 9:20-cv-00082-DWM

# FORM 2A

# LISTING STATEMENT

# in connection with the listing of HyperBlock Inc.

**Dated as at July 10, 2018**

**CAUTIONARY STATEMENTS**

Except for the statements of historical fact contained herein, the information presented in this Listing Statement and the information incorporated by reference herein, constitutes "forward-looking statements" and "forward-looking information" within the meaning of applicable Canadian securities laws (together, "**forward-looking statements**") concerning the business, operations, plans and financial performance and condition of each of HyperBlock, CryptoGlobal and the Issuer (as defined below). Often, but not always, forward-looking statements can be identified by words such as "pro forma", "plans", "expects", "may", "should", "could", "will", "budget", "scheduled", "estimates", "forecasts", "intends", "anticipates", "believes", or variations including negative variations thereof of such words and phrases that refer to certain actions, events or results that may, could, would, might or will occur or be taken or achieved.

Forward-looking statements involve known and unknown risks, uncertainties and other factors which may cause the actual plans, results, performance or achievements of HyperBlock, CryptoGlobal or the Issuer to differ materially from any future plans, results, performance or achievements expressed or implied by the forward-looking statements. Such factors include, among others, the timing, closing or non-completion of the Arrangement, including due to the parties failing to receive, in a timely manner and on satisfactory terms, the necessary Court, securityholder, stock exchange and regulatory approvals or the inability of the parties to satisfy or waive in a timely manner the other conditions to the closing or the conditions precedent, as applicable, of the Arrangement; inability to achieve the benefits or synergies anticipated from the Arrangement; actual operating cash flows, operating costs, free cash flows, total cash, transaction costs, and administrative costs of HyperBlock, CryptoGlobal or the Issuer differing materially from those anticipated; the timing or non-completion of Release Conditions, the timing or non-completion of the Spokane Acquisition; risks related to partnership or other joint operations; regulatory changes, defects in title; availability or integration of personnel, materials and equipment; inability to recruit or retain management and key personnel; the composition of the Issuer Board differing from the anticipated composition; performance of facilities, equipment and processes relative to specifications and expectations; capital requirements, operating risks and technological risks associated with the operations or an expansion of the operations of HyperBlock and CryptoGlobal; dilution due to future equity financings, fluctuations in the currency markets; changes in interest rates; disruption to the credit markets and delays in obtaining financing; inflationary pressures; adverse changes to market, political and general economic conditions or laws, rules and regulations applicable to HyperBlock, CryptoGlobal or the Issuer; there is no assurance the Issuer will be able to obtain insurance for its operations; The Issuer's directors and officers serve on the boards and as officers of other companies whose interests may conflict with the Issuer; there may not be an active or liquid market for the Issuer Shares after completion of the Arrangement; the Issuer may never pay any dividends; the Issuer's cryptocurrency inventory may lose or may be severely reduced in value as a result of flaws in the cryptocurrency code or malicious actors; regulatory changes or actions may alter or prohibit investment in cryptocurrencies and may result in a restriction in the use of cryptocurrencies; the current value of cryptocurrencies and the value of the Issuer's future holdings of cryptocurrencies may be overvalued and volatile as a result of momentum pricing; there may be fraud or security failures of the cryptocurrency exchanges on which the Issuer's cryptocurrencies are exchanged resulting in closures of the cryptocurrency exchanges or complete losses of the Issuer's cryptocurrency balance; banks may refuse to provide cryptocurrency-related services resulting in a decrease in the usefulness of cryptocurrency and reduction in the value of the Issuer's cryptocurrency inventory; the algorithm for cryptocurrencies may change resulting in the Issuer losing its competitive advantage; the Issuer's operations, investment strategies and profitability may be adversely affected by competition from other cryptocurrencies or financial vehicles; the Issuer may be subject to incorrect or fraudulent transactions resulting in its coins being lost or irretrievable; the number of coins awarded for

solving a block in the blockchain may be decreased resulting in the value of the inventory of the Issuer to decrease and may be decreased to a level where there is not an adequate incentive for the Issuer to continue operations; and the sale of coins by other vehicles investing in coins or tracking cryptocurrency markets may negatively affect cryptocurrency prices and reduce the value of the Issuer inventory; the irreversibility of incorrect or fraudulent cryptocurrency transactions; malicious actors or botnets altering or manipulating the blockchain; the potential for cryptocurrency exchanges or digital wallets to be hacked, leading to a loss of any investment made in the Issuer; closures of cryptocurrency exchanges or complete losses of the Issuer's cryptocurrency balance may occur due to flaws in the cryptocurrency code or security failures of cryptocurrency exchanges; the emergence of regulations in one or more countries that place restrictions or extraordinary expenses over the ownership and use of cryptocurrencies; fluctuation in the price and liquidity of cryptocurrencies; the lack of deposit insurance for transactions using cryptocurrency; and factors discussed under Section 17 – "Risk Factors".

In addition, forward-looking and pro forma information herein is based on certain assumptions and involves risks related to the consummation or non-consummation of the Arrangement and the business and operations of HyperBlock, CryptoGlobal and the Issuer. Forward-looking and pro forma information contained herein is based on certain assumptions including that HyperBlock Shareholders will vote in favour of the HyperBlock Arrangement Resolution, and that CryptoGlobal Shareholders will vote in favour of the CryptoGlobal Arrangement Resolution, that the Court will approve the Arrangement, that all other conditions to the Arrangement are satisfied or waived and that the Arrangement will be completed, and that the Release Conditions will be satisfied. Other assumptions include, but are not limited to, interest and exchange rates; competitive conditions in the cryptocurrency industry; synergies between HyperBlock and CryptoGlobal; financing and funding requirements; general economic, political and market conditions; and changes in laws, rules and regulations applicable to HyperBlock and CryptoGlobal.

Although HyperBlock and CryptoGlobal have attempted to identify important factors that could cause plans, actions, events or results to differ materially from those described in forward-looking statements in this Listing Statement, and the documents incorporated by reference herein, there may be other factors that cause plans, actions, events or results not to be as anticipated, estimated or intended. There is no assurance that such statements will prove to be accurate as actual plans, results and future events could differ materially from those anticipated in such statements or information. In addition, even if the outcome and financial effects of the plans and events described herein are consistent with the forward looking information contained in this Listing Statement, those results or developments may not be indicative of results or developments in subsequent periods. Accordingly, readers should not place undue reliance on forward-looking statements in this Listing Statement, nor in the documents incorporated by reference herein. All of the forward-looking statements made in this Listing Statement, including all documents incorporated by reference herein, are qualified by these cautionary statements.

Certain of the forward-looking statements and other information contained herein concerning the cryptocurrency industry and HyperBlock's and CryptoGlobal's general expectations concerning the industry, HyperBlock, CryptoGlobal and the Issuer, are based on estimates prepared by HyperBlock and CryptoGlobal using data from publicly available industry sources as well as from market research and industry analysis and on assumptions based on data and knowledge of this industry which HyperBlock and CryptoGlobal believe to be reasonable. However, although generally indicative of relative market positions, market shares and performance characteristics, this data is inherently imprecise. While HyperBlock and CryptoGlobal are not aware of any misstatement regarding any industry data presented herein, the cryptocurrency industry involves risks and uncertainties that are subject to change based on various factors.

- 3 -

The Issuer Shareholders are cautioned not to place undue reliance on forward-looking statements. The Issuer undertakes no obligation to update any of the forward-looking statements in this Listing Statement or incorporated by reference herein, except as required by law.

Unless otherwise indicated, all references to "$" or "C$" in this Listing Statement refer to Canadian dollars.

## NOTE TO THE LISTING STATEMENT

This Listing Statement is being submitted to the CSE in advance of the HyperBlock Meeting and CryptoGlobal Meeting, whereby HyperBlock Shareholders and CryptoGlobal Shareholders, respectively, will be asked to approve the Arrangement. Upon completion of the Arrangement, the businesses of HyperBlock and CryptoGlobal will become the business of the Issuer. Below is a brief description of the Arrangement Agreement.

### The Arrangement Agreement

On April 3, 2018, HyperBlock entered into the Arrangement Agreement with CryptoGlobal, pursuant to which, subject to the terms and conditions of the Arrangement Agreement, among other things, HyperBlock will acquire all of the CryptoGlobal Shares, and HyperBlock and CryptoGlobal will amalgamate to form the Issuer, pursuant to the Arrangement under the provisions of Section 182 of the OBCA.

Under the terms of the Arrangement, CryptoGlobal Shares (other than any Dissenting CryptoGlobal Shareholders) will receive 0.4229 of a HyperBlock Share in exchange for each CryptoGlobal Share held. Pursuant to the Arrangement, each HyperBlock Share (including the HyperBlock Shares issued to the CryptoGlobal Shareholders) will be converted into one Issuer Share.

In addition, pursuant to the Arrangement: (i) all of the CryptoGlobal Warrants, to the extent that such CryptoGlobal Warrants have not been exercised prior to the effective time of the Arrangement, will remain outstanding pursuant to their respective terms, and each CryptoGlobal Warrant will be deemed to be exercisable at such exercise price as may be adjusted in accordance with the Exchange Ratio for such number of HyperBlock Shares equal to the product of (A) the number of CryptoGlobal Shares subject to such CryptoGlobal Warrant and (B) the Exchange Ratio; and (ii) all of the outstanding CryptoGlobal Options, to the extent that such CryptoGlobal Options have not been exercised prior to the effective time of the Arrangement, will be deemed to be vested and will remain outstanding pursuant to their respective terms, and each CryptoGlobal Option will be deemed to be exercisable at such exercise price as may be adjusted in accordance with the Exchange Ratio for such number of HyperBlock Shares equal to the product of (A) the number of CryptoGlobal Shares subject to such CryptoGlobal Option and (B) the Exchange Ratio. Following the Amalgamation, each outstanding HyperBlock Option, CryptoGlobal Option and CryptoGlobal Warrant will be exercisable for the number of Issuer Shares equal to the number of HyperBlock Shares for which such HyperBlock Option, CryptoGlobal Option or CryptoGlobal Warrant is exercisable, as applicable.

In addition to the amalgamation of HyperBlock and CryptoGlobal, pursuant to the Arrangement, the Spokane Acquisition and the HyperBlock Offering (as described below) will be consummated.

If approved, the Arrangement will become effective at the Effective Time and will be binding at and after the Effective Time on each of CryptoGlobal, HyperBlock, the Issuer, CryptoGlobal Shareholders, CryptoGlobal Optionholders, CryptoGlobal Warrantholders, HyperBlock Shareholders and HyperBlock Optionholders. The Issuer will then be listed on the CSE.

**This summary does not purport to be complete and is qualified in its entirety by reference to the Arrangement Agreement and the Plan of Arrangement.** See the Plan of Arrangement attached as Schedule "A" – *"Plan of Arrangement"* to this Listing Statement for additional information and the Arrangement Agreement, the full text of which may be viewed on SEDAR under CryptoGlobal's issuer profile at www.sedar.com.

## TABLE OF CONTENTS

1. GLOSSARY OF TERMS ..................................................................................... 2

2. CORPORATE STRUCTURE ........................................................................... 10

3. GENERAL DEVELOPMENT OF THE BUSINESS ........................................ 11

4. NARRATIVE DESCRIPTION OF THE BUSINESS ...................................... 16

5. SELECTED CONSOLIDATED FINANCIAL INFORMATION ...................... 37

6. MANAGEMENT'S DISCUSSION AND ANALYSIS ...................................... 40

7. MARKET FOR SECURITIES .......................................................................... 40

8. CONSOLIDATED CAPITALIZATION ............................................................ 40

9. OPTIONS TO PURCHASE SECURITIES ...................................................... 40

10. DESCRIPTION OF SECURITIES .................................................................... 41

11. ESCROWED SECURITIES .............................................................................. 44

12. PRINCIPAL SHAREHOLDERS ...................................................................... 44

13. DIRECTORS AND OFFICERS ........................................................................ 44

14. CAPITALIZATION............................................................................................. 51

15. EXECUTIVE COMPENSATION ...................................................................... 52

16. INDEBTEDNESS OF DIRECTORS AND EXECUTIVE OFFICERS .............. 59

17. RISK FACTORS ............................................................................................... 59

18. PROMOTERS ................................................................................................... 76

19. LEGAL PROCEEDINGS ................................................................................. 76

20. INTEREST OF MANAGEMENT AND OTHERS IN MATERIAL TRANSACTIONS ....... 76

21. AUDITORS, TRANSFER AGENT AND REGISTRAR ................................... 76

22. MATERIAL CONTRACTS ............................................................................... 76

23. INTEREST OF EXPERTS ............................................................................... 77

24. OTHER MATERIAL FACTS ............................................................................ 77

25. FINANCIAL STATEMENTS ............................................................................ 77

SCHEDULE A PLAN OF ARRANGEMENT ......................................................... A-1

SCHEDULE B AUDITED FINANCIAL STATEMENTS OF HYPERBLOCK AND SPOKANE AND UNAUDITED FINANCIAL STATEMENTS OF SPOKANE ............................................. B-1

SCHEDULE C MANAGEMENT'S DISCUSSION AND ANALYSIS OF HYPERBLOCK AND SPOKANE ........................................................................................................... C-1

SCHEDULE D FINANCIAL STATEMENTS AND MANAGEMENT'S DISCUSSION AND ANALYSIS OF CRYPTOGLOBAL .......................................................................... D-1

SCHEDULE E UNAUDITED PRO FORMA CONDENSED CONSOLIDATED FINANCIAL STATEMENTS OF THE ISSUER........................................................................... E-1

SCHEDULE F POST-CLOSING CAPITALIZATION OF THE ISSUER................... F-1

## 1.   GLOSSARY OF TERMS

Unless otherwise indicated, the following terms used in this Listing Statement and the Schedules hereto shall have the meanings ascribed to them as set forth below:

"**Acceleration Event**" has the meaning specified in Section 15 – "*Executive Compensation – Incentive Plan Awards – Summary of Stock Option Plan*".

"**affiliate**" has the meaning specified in National Instrument 45-106 – *Prospectus Exemptions*.

"**Agency Agreement**" means the agency agreement entered into by HyperBlock, where the Agents sold, on a "best efforts" private placement basis,16,010,250 subscription receipts of HyperBlock at a subscription price of $1.75 per subscription receipt.

"**Agents**" means, collectively, Canaccord Genuity Corp., Eight Capital, Haywood Securities Inc., Macquarie Capital Markets Canada, Clarus Securities Inc., PI Financial Corp., and Cormark Securities Inc.

"**Amalgamation**" means the amalgamation of HyperBlock and CryptoGlobal pursuant to the Arrangement.

"**Amalco**" has the meaning specified under Section 3 – "*General Development of the Business – General Development of the Business of CryptoGlobal prior to the Arrangement*".

"**Amendment Agreement**" has the meaning specified under Section 3 – "*General Development of the Business –General Development of the Business of HyperBlock prior to the Arrangement – History and Significant Acquisitions – Acquisition of Sector 14 and Sector 22 Assets*".

"**Apolo**" has the meaning specified under Section 3 – "*General Development of the Business – General Development of the Business of CryptoGlobal prior to the Arrangement*".

"**AQH**" has the meaning specified in Section 13 – "*Directors and Officers – Cease Trade Orders, Bankruptcies, Penalties or Sanctions*"

"**arm's length**" has the meaning specified in the *Income Tax Act (Canada)*.

"**Arrangement**" means an arrangement under Section 182 of the OBCA on the terms, and subject to the conditions, set out in the Plan of Arrangement, subject to any amendments or variations to the Plan of Arrangement made in accordance with the terms of the Arrangement Agreement or made at the direction of the Court in the Final Order with the prior written consent of CryptoGlobal and HyperBlock, each acting reasonably.

"**Arrangement Agreement**" means the definitive arrangement agreement dated April 3, 2018, entered into between CryptoGlobal and HyperBlock, whereby HyperBlock will acquire all of the issued and outstanding CryptoGlobal Shares and HyperBlock and CryptoGlobal shall amalgamate to form the Issuer, pursuant to the Arrangement under the provisions of Section 182 of the OBCA.

"**Arrangement Consideration**" means the receipt, by each CryptoGlobal Shareholder (other than any CryptoGlobal Shareholders that validly exercise their statutory Dissent Rights), of 0.4229 of a HyperBlock Share in exchange for each CryptoGlobal Share held.

"**Articles of Arrangement**" means the articles of arrangement of CryptoGlobal in respect of the Arrangement required by the OBCA to be sent to the Director after the Final Order is made, which shall include the Plan of Arrangement and otherwise be in a form and content satisfactory to CryptoGlobal and HyperBlock, each acting reasonably.

"**associate**" has the meaning specified in the *Securities Act* (Ontario).

"**Bitcoin.com Agreement**" has the meaning specified under Section 4 – "*Narrative Description of the Business – Overview of the Issuer's Business – The Issuer – Economic Dependence*".

"**Blockchain**" has the meaning specified under Section 4 – "*Narrative Description of the Business – Overview of the Issuer's Business – The Issuer – Market – Bitcoin Core*".

"**Blockchain Dynamics Acquisition**" has the meaning specified under Section 3 – "*General Development of the Business – General Development of the Business of CryptoGlobal prior to the Arrangement – Significant Acquisitions"*.

"**Business Combination Agreement**" has the meaning specified under Section 3 – "*General Development of the Business – General Development of the Business of CryptoGlobal prior to the Arrangement*".

"**Colocation Facilities Agreement**" has the meaning specified under Section 3 – "*General Development of the Business –General Development of the Business of HyperBlock prior to the Arrangement – History and Significant Acquisitions – Acquisition of Sector 14 and Sector 22 Assets*".

"**Consulting Benefits**" has the meaning specified in Section 15 – "*Executive Compensation – Consulting Agreements*".

"**CryptoGlobal**" means CryptoGlobal Corp.

"**CryptoGlobal Arrangement Resolution**" means the special resolution of the CryptoGlobal Shareholders approving the Arrangement, the Plan of Arrangement and the Arrangement Agreement, to be considered at the CryptoGlobal Meeting.

"**CryptoGlobal Board**" means the board of directors of CryptoGlobal, as it may be comprised from time to time.

"**CryptoGlobal Dissent Right**" means the right of a registered holder of CryptoGlobal Shares to dissent in respect of the Arrangement as described in the Plan of Arrangement.

"**CryptoGlobal Dissenting Shareholder**" means a CryptoGlobal Shareholder exercising its CryptoGlobal Dissent Right in respect of the Arrangement.

"**CryptoGlobal Management Employment Agreements**" has the meaning specified in Section 15 – "*Executive Compensation – Consulting Agreements*".

"**CryptoGlobal Meeting**" means the special meeting of CryptoGlobal Shareholders to be held to consider the CryptoGlobal Arrangement Resolution and related matters, and any adjournments thereof.

"**CryptoGlobal Option Plan**" means the Apolo Acquisition Corp. Stock Option Plan.

"**CryptoGlobal Optionholders**" means, collectively, the holders from time to time of CryptoGlobal Options, and "**CryptoGlobal Optionholder**" means any one of them, as the context requires.

"**CryptoGlobal Options**" means options to acquire CryptoGlobal Shares pursuant to the CryptoGlobal Option Plan.

"**CryptoGlobal Shareholders**" means, collectively, the holders from time to time of CryptoGlobal Shares, and "**CryptoGlobal Shareholder**" means any one of them, as the context requires.

"**CryptoGlobal Shares**" means the common shares in the capital of CryptoGlobal.

"**CryptoGlobal Warrantholders**" means, collectively, the holders from time to time of CryptoGlobal Warrants, and "**CryptoGlobal Warrantholder**" means any one of them, as the context requires.

"**CryptoGlobal Warrants**" means broker warrants to acquire CryptoGlobal Shares pursuant to the terms thereof.

"**CSE**" means the Canadian Securities Exchange.

"**Director**" means the Director appointed pursuant to Section 278 of the OBCA.

"**Dissent Rights**" means the dissent rights that may be exercised by each Registered HyperBlock Shareholder and Registered CryptoGlobal Shareholder in connection with the Arrangement pursuant to and in the manner set forth in Section 185 of the OBCA, as modified by the Interim Order and Section 3.1 of the Plan of Arrangement.

"**Effective Date**" has the meaning specified in the Plan of Arrangement.

"**Effective Time**" has the meaning specified in the Plan of Arrangement.

"**Eligible Person**" has the meaning specified in Section 15 – "*Executive Compensation – Incentive Plan Awards – Summary of the Stock Option Plan*".

"**Employment Benefits**" has the meaning specified in Section 15 – "*Executive Compensation – Consulting Agreements*".

"**Escrow Release Notice**" means the executed escrow release notice required to be delivered by HyperBlock and the Canaccord Genuity Corp., for and on behalf of the Agents, to TSX Trust Company confirming that the Release Conditions have been satisfied or waived.

"**Escrowed Proceeds**" means the cash proceeds from the sale of the HyperBlock Subscription Receipts (being $16,176,532) that were delivered to and are being held by TSX Trust Company.

"**Exchange**" means the TSX Venture Exchange.

"**Exchange Ratio**" means the amount of HyperBlock Shares that each CryptoGlobal Shareholder (other than any CryptoGlobal Dissenting Shareholder) will receive in exchange for each CryptoGlobal Share held, which is set at 0.4229 under the terms of the Arrangement.

"**FAAN**" has the meaning specified in Section 15 – "*Executive Compensation – Employment Agreements, Termination and Change of Control Benefits*".

"**FAAN Personnel**" has the meaning specified in Section 15 – "*Executive Compensation – Employment Agreements, Termination and Change of Control Benefits*".

"**forward-looking statements**" has the meaning specified in the "Cautionary Statements" of this Listing Statement.

"**Holder**" means a beneficial owner of CryptoGlobal Shares and/or HyperBlock Shares who, at all relevant times, for the purposes of the Tax Act: (i) deals at arm's length with CryptoGlobal and HyperBlock and will deal at arm's length with the Issuer; (ii) is not affiliated with CryptoGlobal or HyperBlock and will not be affiliated with the Issuer; and (iii) holds CryptoGlobal Shares or HyperBlock Shares (as the case may be), and will hold any HyperBlock Shares and/or Issuer Shares (as the case may be) received upon the Arrangement, as capital property.

"**HyperBlock**" means HyperBlock Technologies Corp.

"**HyperBlock Arrangement Resolution**" means a special resolution to be approved by the HyperBlock Shareholders at the HyperBlock Meeting, substantially in the form of Schedule "A" of the Joint Management Information Circular.

"**HyperBlock Board**" means the board of directors of HyperBlock, as it may be comprised from time to time.

"**HyperBlock Dissent Right**" means the right of a registered holder of HyperBlock Shares to dissent in respect of the Arrangement as described in the Plan of Arrangement.

"**HyperBlock Dissenting Shareholder**" means a HyperBlock Shareholder exercising its HyperBlock Dissent Right in respect of the Arrangement.

"**HyperBlock Meeting**" means the special meeting of HyperBlock Shareholders to be held to consider the HyperBlock Arrangement Resolution and related matters, and any adjournments thereof.

"**HyperBlock Offering**" has the meaning specified under Section 3 – "*General Development of the Business –General Development of the Business of HyperBlock prior to the Arrangement – History and Significant Acquisitions – HyperBlock Offering*"

"**HyperBlock Optionholders**" means, collectively, the holders from time to time of HyperBlock Options, and "**HyperBlock Optionholder**" means any one of them, as the context requires.

"**HyperBlock Option Plan**" means the HyperBlock Stock Option Plan.

"**HyperBlock Options**" means options to acquire HyperBlock Shares pursuant to the HyperBlock Option Plan.

"**HyperBlock Shareholders**" means, collectively, the holders from time to time of HyperBlock Shares, and "**HyperBlock Shareholder**" means any one of them, as the context requires.

"**HyperBlock Shares**" means the common shares in the capital of HyperBlock.

"**HyperBlock Subscription Receipts**" has the meaning specified under Section 3 – "*General Development of the Business –General Development of the Business of HyperBlock prior to the Arrangement – History and Significant Acquisitions – HyperBlock Offering*".

"**Initial Shareholders**" has the meaning specified under Section 3 – "*General Development of the Business –General Development of the Business of HyperBlock prior to the Arrangement – History and Significant Acquisitions*".

"**Interim Order**" means the interim order of the Ontario Superior Court of Justice (Commercial List) rendered May 17, 2018 to CryptoGlobal, as may be further varied and amended.

"**Issuer**" means HyperBlock Inc., the amalgamated entity formed from the completion of the Arrangement.

"**Issuer Board**" means the board of directors of the Issuer, as it may be comprised from time to time.

"**Issuer Options**" means options to acquire Issuer Shares.

"**Issuer Shareholders**" means the holders of Issuer Shares.

"**Issuer Shares**" means the common shares in the capital of Issuer immediately following the Effective Time.

"**Joint Management Information Circular**" means the joint management information circular for the special meeting of shareholders of HyperBlock and CryptoGlobal dated May 22, 2018.

"**OBCA**" means the *Business Corporations Act* (Ontario).

"**Ordinary Course**" means, with respect to an action taken by a Person, that such action is consistent with the past practices of such Person and is taken in the ordinary course of the normal day-to-day operations of the business of such Person.

"**Parties**" means, collectively, HyperBlock and CryptoGlobal, and "**Party**" means any one of them, as the context requires.

"**Person**" includes any individual, firm, partnership, joint venture, venture capital fund, association, trust, trustee, executor, administrator, legal personal representative, estate group, body corporate, corporation, unincorporated association or organization, governmental entity, syndicate or other entity, whether or not having legal status.

"**Plan of Arrangement**" means the plan of arrangement substantially in the form of Schedule "A" of this Listing Statement, subject to any amendments or variations to such plan made in accordance with Article 5 thereof, made at the direction of the Court in the Final Order with the prior written consent of CryptoGlobal and HyperBlock, each acting reasonably.

"**Promissory Note**" means the promissory note payable to Spokane in connection with the Spokane Purchase Agreement.

"**PSUs**" has the meaning specified under Section 3 – "*General Development of the Business – General Development of the Business of HyperBlock prior to the Arrangement – History and Significant Acquisitions – Acquisition of Sector 14 and Sector 22 Assets*".

"**Purchased Assets**" has the meaning specified under Section 3 – "*General Development of the Business –General Development of the Business of HyperBlock prior to the Arrangement – History and Significant Acquisitions – Spokane Acquisition*"

"**Qualifying Transaction**" has the meaning specified under Section 3 – "*General Development of the Business – General Development of the Business of CryptoGlobal prior to the Arrangement*".

"**Registered CryptoGlobal Shareholder**" means a registered holder of CryptoGlobal Shares as recorded in the shareholder register of CryptoGlobal maintained by Computershare Investor Services Inc.

"**Registered HyperBlock Shareholder**" means a registered holder of HyperBlock Shares as recorded in the shareholder register of HyperBlock maintained by TSX Trust Company.

"**Release Conditions**" means the occurrence of each of the following events: (1) the    Spokane Purchase Agreement, in form and substance satisfactory to the Canaccord Genuity Corp., on behalf of the Agents, acting reasonably, shall have been entered into and be in full force and effect, without waiver of any representation, warranty, covenant, condition or other provision and the Canaccord Genuity Corp., on behalf of the Agents, shall be satisfied, in all material respects, acting reasonably, as to the completion or satisfaction by HyperBlock (and/or a subsidiary of HyperBlock) and Spokane of all conditions precedent to the Spokane Acquisition in accordance with the terms of the Spokane Purchase Agreement shall have occurred, except for those conditions that have been waived by HyperBlock (or its subsidiary, with the Canaccord Genuity Corp.'s consent, on behalf of the Agents, not to be unreasonably withheld); (2) the Canaccord Genuity Corp., on behalf of the Agents, being satisfied, acting reasonably, that HyperBlock shall be able to obtain, prepare and deliver or cause to be obtained, prepared and delivered, all such financial statements and other information with respect to HyperBlock, Spokane and the resulting issuer, as applicable, as may be required under applicable Canadian securities laws, subject to any discretionary relief having been obtained by HyperBlock or the resulting issuer, as applicable, including, without limitation, any audited, unaudited or pro forma financial statements and related MD&A, auditor consents and comfort letters to permit the HyperBlock Shares to be qualified for distribution to the public upon release of the Escrowed Proceeds; (3) the agreement or agreements giving effect to HyperBlock's going public transaction, in form and substance satisfactory to the Canaccord Genuity Corp., on behalf of the Agents, acting reasonably, shall have been entered into and be in full force and effect, without waiver of any representation, warranty, covenant, condition or other provision and the Canaccord Genuity Corp., on behalf of the Agents, shall be satisfied, in all material respects, acting reasonably, as to the completion or satisfaction by HyperBlock and the other party, or each of the other parties, thereto of all conditions precedent to the going public transaction in accordance with the terms of such agreement, shall have occurred, except for those conditions that have been waived by HyperBlock (with the Canaccord Genuity Corp.'s consent, on behalf of the Agents, not to be unreasonably withheld); (4) the HyperBlock Shares, or any such replacement shares of a resulting issuer, if applicable, shall have been approved for listing and posted for trading on a

recognized stock exchange, and such HyperBlock Shares, or all replacement shares of a resulting issuer replacing the HyperBlock Shares, shall be, upon issuance, freely tradable through the facilities of a recognized stock exchange; (5) HyperBlock or the resulting issuer shall be a reporting issuer; (6) HyperBlock shall not be in breach or default of any of its covenants or obligations under the Subscription Receipt Agreement or the Agency Agreement, except (in the case of the Agency Agreement only) for those breaches or defaults that have been waived by the Canaccord Genuity Corp., on behalf of the Agents, and all conditions set out under the Subscription Receipt Agreement and Agency Agreement shall have been fulfilled, which shall be confirmed to be true and accurate in a certificate of a senior officer of HyperBlock; and (7) the delivery of the Escrow Release Notice by the Canaccord Genuity Corp. and HyperBlock to the TSX Trust Company.

"**Release Deadline**" means July 13, 2018, which date may be extended by the Canaccord Genuity Corp. on behalf of the Agents, in its sole discretion, by delivery of notice in writing to HyperBlock and TSX Trust Company, or as otherwise determined in accordance with the Subscription Receipt Agreement.

"**Representative**" of a person means any director, officers, employee, advisor, agent or other Representative of such Person.

"**Resulting Issuer**" has the meaning specified under Section 3 – "*General Development of the Business – General Development of the Business of CryptoGlobal prior to the Arrangement*".

"**Sale Agreement**" has the meaning specified under Section 3 – "*General Development of the Business – General Development of the Business of HyperBlock prior to the Arrangement – History and Significant Acquisitions – Acquisition of Sector 14 and Sector 22 Assets*".

"**Saint Bitts**" has the meaning specified under Section 4 – "*Narrative Description of the Business – Overview of the Issuer's Business – The Issuer – Economic Dependence*".

"**Sale Closing**" has the meaning specified under Section 3 – "*General Development of the Business – General Development of the Business of HyperBlock prior to the Arrangement – History and Significant Acquisitions – Acquisition of Sector 14 and Sector 22 Assets*".

"**Sector 14 Assets**" has the meaning specified under Section 3 – "*General Development of the Business – General Development of the Business of HyperBlock prior to the Arrangement – History and Significant Acquisitions – Acquisition of Sector 14 and Sector 22 Assets*".

"**Sector 22 Assets**" has the meaning specified under Section 3 – "*General Development of the Business –General Development of the Business of HyperBlock prior to the Arrangement – History and Significant Acquisitions – Acquisition of Sector 14 and Sector 22 Assets*".

"**Service Orders**" has the meaning specified under Section 3 – "*General Development of the Business – General Development of the Business of HyperBlock prior to the Arrangement – History and Significant Acquisitions – Acquisition of Sector 14 and Sector 22 Assets*".

"**Smart Agreement**" has the meaning specified in Section 15 – "*Executive Compensation – Employment Agreements, Termination and Change of Control Benefits*".

"**Spokane**" means Project Spokane, LLC.

"**Spokane Acquisition**" means the pending acquisition by HyperBlock LLC of all or substantially all of the assets, and the assumption by HyperBlock LLC of certain of liabilities, of Spokane pursuant to the Spokane Purchase Agreement.

"**Spokane Assets**" means the business of Spokane, including (a) (i) hash rate sales for cryptocurrencies or similar cloudmining activities, (ii) blockchain security server distribution and resale; (iii) server hosting and co-location; and (iv) self-mining for cryptocurrencies and (b) any other business Project Spokane is engaged in or actively planning to engage in.

"**Spokane Purchase Agreement**" means the asset purchase agreement dated as of January 7, 2018 among Spokane, HyperBlock LLC and the other parties thereto, as amended on March 14, 2018 and April 2, 2018.

"**Stock Option Plan**" has the meaning specified in Section 15 – "*Executive Compensation – Compensation Components – Long Term Equity Incentives*".

"**Subscription Receipt Agreement**" means the subscription receipt agreement dated as of March 14, 2018 by and among HyperBlock, TSX Trust Company and the Agents, as amended.

"**subsidiary**" has the meaning specified in the *Securities Act* (Ontario).

"**Subco**" has the meaning specified under Section 3 – "*General Development of the Business – General Development of the Business of CryptoGlobal prior to the Arrangement*".

"**Tax Act**" means the *Income Tax Act (Canada).*

"**TSX-V**" means the TSX Venture Exchange.

"**Walsh Employment Agreement**" has the meaning specified in Section 15 – "*Executive Compensation – Employment Agreements, Termination and Change of Control Benefits*".

Words importing the singular number only include the plural and vice versa, and words importing any gender include all genders.

## 2.      CORPORATE STRUCTURE

### Corporate Name

On completion of the Arrangement, the businesses of HyperBlock and CryptoGlobal will be combined. Pursuant to the Arrangement Agreement, HyperBlock and CryptoGlobal will amalgamate to create the Issuer, and HyperBlock and CryptoGlobal will cease to exist as entities separate from the Issuer.

It is currently the intention of HyperBlock and CryptoGlobal that the name of the Issuer will be "HyperBlock Inc.", subject to regulatory approval, on the Effective Date.

### Incorporation

The Issuer will operate as one corporation under the OBCA, and the articles and by-laws of the Issuer will be the same as the articles of HyperBlock. The head and registered office of the Issuer will be 388 Carlaw Avenue, Suite 300, Toronto, Ontario, Canada, M4M 2T4.

### Inter-corporate Relationships

#### *Pre-Arrangement*

Prior to the completion of the Arrangement, HyperBlock had one wholly owned subsidiary, HyperBlock LLC. The following diagram sets forth the relationship between HyperBlock and HyperBlock LLC, including the jurisdiction of incorporation of each such entity:



The following diagram sets forth the inter-corporate relationships of CryptoGlobal and its subsidiaries, including the jurisdictions of incorporation, prior to the Arrangement:



***Post-Arrangement***

On completion of the Arrangement, the Issuer will have the following corporate structure:



## 3.     GENERAL DEVELOPMENT OF THE BUSINESS

### General Development of the Business of the Issuer

The Issuer, operating the businesses of both HyperBlock and CryptoGlobal, will be a North America-based, publicly-traded company focused on the creation, safeguarding, management and growth of the cryptocurrency and blockchain ecosystems. Its cryptocurrency mining assets

include a diversified portfolio in Ontario, Quebec, Nova Scotia and Montana. The Issuer will own 100% of HyperBlock's current asset portfolio, which includes the Sector 14 Assets, the Sector 22 Assets, and the Spokane Assets. The Issuer will also own 100% of CryptoGlobal's current asset portfolio, which includes Mine 0, Mine 1 and Blockchain Dynamics Inc.

HyperBlock's Chief Executive Officer, Sean Walsh, will lead the Issuer, while drawing upon the combined strategic resources of both HyperBlock and CryptoGlobal, which includes operational, financial and technical experience in the cryptocurrency and blockchain industries. Robert Segal, the Chief Executive Officer of CryptoGlobal, will be appointed President of the Issuer upon closing of the Arrangement and Tim Smart, the Interim Chief Financial Officer of HyperBlock will be appointed Interim Chief Financial Officer of the Issuer. Additionally, Blockchain Dynamics founder Chris McGarrigle will join Sean Walsh and Robert Segal as the management team of the Issuer. The proposed Issuer Board includes five current members of the HyperBlock Board, being Eric So, Sean Walsh, Hon. Ronald R. Spoehel, Anthony Gaffney and Dayna Gibbs, and Robert Segal, a current member of the CryptoGlobal Board.

**General Development of the Business of HyperBlock prior to the Arrangement**

HyperBlock was incorporated under the OBCA on October 10, 2017. HyperBlock's principal business is as an aggregator of crypto assets. Funds raised by HyperBlock in 2017 have been deployed to complete the Sale Agreement and the Amendment Agreement (as defined below), whereby HyperBlock acquired Bitmain S9 servers capable of producing 20 petahashes/second. These servers are hosted in a 20 MegaWatt (MW) data center, one of the largest blockchain security data centres in North America. The data centre was established in February 2016, and as of the date hereof, focuses on five principal Blockchains: Bitcoin Cash, Bitcoin Core, Ethereum, Zcash, and Litecoin.

*History and Significant Acquisitions*

Between the date of incorporation and February 28, 2018, HyperBlock issued an aggregate of 129,120,919 HyperBlock Shares to certain holders (the "**Initial Shareholders**") at subscription prices ranging between $0.001 and $0.35 per HyperBlock Share. The proceeds raised from the issuance of shares to the Initial Shareholders were used to fund the preliminary expenses related to the Sale Agreement (as defined below) and Amendment Agreement (as defined below).

*Acquisition of Sector 14 and Sector 22 Assets*

On November 29, 2017, HyperBlock entered into a sale agreement with Spokane (the "**Sale Agreement**") pursuant to which HyperBlock agreed to purchase Bitmain S9 servers capable of producing 10 Petahashes/second, with power supply units ("**PSUs**") from Spokane (the "**Sector 14 Assets**") for a total of USD$5,500,000. The Sale Agreement provides that upon the transfer of the Sector 14 Assets, Spokane must provide hosting services to HyperBlock under the Colocation Facilities Agreement (as defined below) with respect to the Sector 14 Assets. On December 18, 2017, HyperBlock entered into an amendment to the Sale Agreement with Spokane (the "**Amendment Agreement**") to purchase certain additional assets, including but not limited to a number of Bitmain S9 servers capable of producing 10 Petahases/second, with PSUs (the "**Sector 22 Assets**"). Pursuant to the Amendment Agreement, the purchase price for the Sector 22 Assets is equal to the sum of (i) USD$1,000,000 payable upon signing and (ii) USD$3,000,000 due to Spokane upon the execution of the Spokane Acquisition.

The closing date for the transactions contemplated by the Sale Agreement and the Amendment Agreement occurred on December 19, 2017 (the "**Sale Closing**"). On the Sale Closing, Spokane transferred the Sector 14 Assets to HyperBlock in exchange for USD$6,500,000 (which is the sum of the purchase price of the Sector 14 Assets and part of the purchase price of the Sector 22 Assets). The transfer of the Sector 22 Assets occurred upon Spokane's receipt, installment and deployment of such assets. The Sector 22 assets were fully deployed on February 2, 2018.

In connection with these agreements, Spokane and HyperBlock entered into a colocation facilities agreement dated December 18, 2017 (the "**Colocation Facilities Agreement**"), including service orders and hosting services for the Sector 14 Assets and Sector 22 Assets for a term of 12 months (the "**Service Orders**"). Pursuant to the Colocation Facilities Agreement and the Service Orders, Spokane granted HyperBlock a limited, revocable license to operate the computer equipment, software, hardware and other materials owned by HyperBlock at the Spokane data centre facility. In consideration for the services provided by Spokane, HyperBlock pays a monthly hosting rate of $7.05 per terahash, along with certain other non-recurring charges and refundable security deposits. The Colocation Facilities Agreement will terminate upon the completion of the Spokane Acquisition.

The acquisition of the Sector 14 Assets and the Sector 22 Assets is in keeping with HyperBlock's strategy to acquire cryptocurrency assets, and establish itself as a crypto-mining aggregator. HyperBlock does not presently plan or propose to make any material changes in its strategy, either generally or with respect to the Sector 14 Assets or Sector 22 Assets, however, the acquisition is reasonably expected to have a significant effect on the financial performance and financial position of HyperBlock. From the date of incorporation to February 28, 2018, HyperBlock had generated approximately $1.4 million in revenues and $0.4 million in income before taking into account transaction costs related to the acquisition of Spokane of $0.4 million and a fair value remeasurment loss of $0.4 million on digital assets. Prior to this acquisition, HyperBlock had no cash flow or operating results, and as such, the acquisition had a significant impact on revenue generation and income over the two month period. Further information on the business affairs, financial performance and financial position of HyperBlock can be found in Schedule "B" – *"Audited Financial Statements of HyperBlock and Spokane and Unaudited Financial Statements of Spokane*" of this Listing Statement.

Mr. Sean Walsh, the Chief Executive Officer and a director of HyperBlock, holds an interest in the acquisition of the Sector 14 Assets and Sector 22 Assets as he is a controlling member of Spokane.

*Spokane Acquisition*

On January 7, 2018, HyperBlock LLC entered into the Spokane Purchase Agreement with Spokane and Sean Walsh, to acquire all or substantially all of the assets used in the operation of, or related to, the business of Spokane (the "**Purchased Assets**"), and assume certain liabilities of Spokane for consideration in the form of cash, the Promissory Note and Issuer Shares. Upon consummation of the Spokane Acquisition, Spokane shall be paid $15,000,000 (less the Deposits, one-half of the Closing Encumbrances and the Promissory Note (as defined in the Spokane Purchase Agreement)) in cash consideration and issued approximately 33,863,237 Issuer Shares (in addition to the 3,245,714 Issuer Shares issued to Spokane upon completion of the HyperBlock Offering) for an aggregate purchase price for the assets acquired of US$65,947,720.65, calculated in accordance with the terms of the Spokane Purchase

Agreement. Upon completion of the Spokane Acquisition, HyperBlock will acquire certain non-material obligations of Spokane.

As of February 28, 2018, HyperBlock incurred costs of $0.4 million related to the Spokane Acquisition. The acquisition of the Purchased Assets is in keeping with HyperBlock's strategy to acquire cryptocurrency assets, and establish itself as a crypto-mining aggregator. HyperBlock does not presently plan or propose to make any material changes in its strategy, either generally or with respect to the Purchased Assets, however the acquisition is expected to have a significant effect on the financial performance or financial position of HyperBlock. Further information on the business affairs, financial performance and financial position of Spokane can be found in Schedule "B" – *"Audited Financial Statements of HyperBlock and Spokane and Unaudited Financial Statements of Spokane*". Details on how the acquisition will materially affect the financial position of HyperBlock can be found in Schedule "E" – "*Unaudited Pro Forma Condensed Consolidated Financial Statements of the Issuer*".

Upon satisfaction of the Release Conditions, the HyperBlock Subscription Receipts will convert into HyperBlock Shares and the Escrowed Proceeds will be released by TSX Trust Company. Upon receipt of the Escrowed Proceeds, pursuant to the Subscription Receipt Agreement, HyperBlock will pay the outstanding balance of the purchase price for the Spokane Assets to Spokane, thereby completing the acquisition of the Spokane Assets.

Mr. Sean Walsh, the Chief Executive Officer and a director of HyperBlock, holds an interest in the Spokane Acquisition as he is a controlling member of Spokane.

*HyperBlock Offering*

On March 14, 2018, HyperBlock entered into the Agency Agreement with the Agents to sell, on a "best efforts" private placement basis, 16,010,250 subscription receipts of HyperBlock ("**HyperBlock Subscription Receipts**") at a subscription price of $1.75 per HyperBlock Subscription Receipt (the "**HyperBlock Offering**"). Each HyperBlock Subscription Receipt entitles the holder thereof to receive one HyperBlock Share, for no additional consideration and without any further action on the part of the holder thereof, following the satisfaction of the Release Conditions. The first, second and third tranches of the HyperBlock Offering closed on March 14, 2018, March 22, 2018 and March 29, 2018, respectively.

Pursuant to the HyperBlock Offering, goNumerical Ltd. subscribed for 2,857,142 HyperBlock Subscription Receipts, which was offset by HyperBlock's $5,000,000 investment in goNumerical Ltd. for 322,165 common shares in the capital of goNumerical Ltd. The common shares in the capital of goNumerical Ltd. are held in escrow pending satisfaction of the Release Conditions. If the Release Conditions are not satisfied by the Release Deadline, the HyperBlock Subscription Receipts issued to goNumerical Ltd. will be cancelled, the common shares in the capital of goNumerical Ltd. issued to HyperBlock will be returned to goNumerical Ltd. pursuant to the terms of an escrow agreement and goNumerical Ltd. will not be entitled to any of the cash proceeds deposited in escrow with TSX Trust Company.

**General Development of the Business of CryptoGlobal prior to the Arrangement**

CryptoGlobal Inc. was incorporated under the OBCA on August 8, 2017 operating as a company focused on the creation, safeguarding, management and growth of the cryptocurrency and blockchain ecosystems. Its has been focused on continuing to scale its cryptocurrency mining operations across Canada and expanding its offerings to include custodial, trading and insights.

On January 25, 2018, Apolo Acquisition Corp. ("**Apolo**") completed its qualifying transaction (the "**Qualifying Transaction**") under TSX-V Policy 2.4 – *Capital Pool Companies*. The Qualifying Transaction was effected pursuant to the terms of a business combination agreement among CryptoGlobal Inc., Apolo, and a wholly-owned subsidiary of Apolo ("**Subco**") dated December 1, 2017 (the "**Business Combination Agreement**"). Pursuant to the terms of the Business Combination Agreement, CryptoGlobal Inc., Apolo, and Subco completed a three-cornered amalgamation whereby CryptoGlobal Inc. and Subco were amalgamated pursuant to section 174 of the OBCA to form CryptoGlobal Inc. ("**Amalco**") and the shareholders of CryptoGlobal Inc. received securities of the Resulting Issuer (as defined below) on the basis of one (1) Resulting Issuer share for every one (1) CryptoGlobal Inc. share held. Amalco is a wholly-owned subsidiary of CryptoGlobal.

Immediately prior to the completion of the Qualifying Transaction, Apolo consolidated its issued and outstanding common shares on a 3.938-for-one basis and changed its name to CryptoGlobal Corp. (the "**Resulting Issuer**"). The common shares of the Resulting Issuer commenced trading on the TSX-V under the symbol "CPTO" on January 29, 2018, following the issuance of the final bulletin of the TSX-V in respect of the Qualifying Transaction.

The Qualifying Transaction constituted a reverse-take-over of the Resulting Issuer inasmuch as the former shareholders of CryptoGlobal Inc. owned approximately 97.5% (on a non-diluted basis) of the outstanding shares of the Resulting Issuer immediately after the closing of the Qualifying Transaction. On completion of the Qualifying Transaction, the business of CryptoGlobal Inc., became the business of the Resulting Issuer (or CryptoGlobal), as further discussed below.

CryptoGlobal's primary business operations to-date has been the mining of a diverse portfolio of cryptocurrencies, namely Bitcoin, Ether, Dash, and Litecoin. CryptoGlobal's founding team operationalized a Proof-of-Concept mine in mid-2017, and then quickly ramped up its first large-scale Ontario-based test location with Application Specific Integrated Circuits (ASICs) and Graphics Processing Units (GPUs). CryptoGlobal's headquarters in Toronto contains both office space and a lab for research and development focused on optimizing efficiency and maximizing output of the machines. The lab is also being used to incubate innovative blockchain opportunities and grow promising ventures that have real market potential.

Mining machines that are brought online confirm and secure blockchain transactions, rewarding the owner with coins for the work required to effectively "write" these transactions into their respective distributed ledgers. CryptoGlobal's accumulated coins are held offline in cold storage as a precautionary measure against hacking and theft. Cold storage in the context of cryptocurrencies refers to keeping a reserve of coins offline (i.e. off a web server or any other computer), which is often a security precaution, especially dealing with large amounts of cryptocurrencies. For example, a holder of Bitcoins could store their Bitcoins on a USB drive or other data storage medium in a safe place, like a safety deposit box.

As at the date hereof, CryptoGlobal has 6,096 cryptocurrency mining machines operating at its Canadian data centres in Ontario, Quebec and Nova Scotia.

### *Significant Acquisitions*

On March 29, 2018, CryptoGlobal Corp. acquired Blockchain Dynamics Inc., a full service platform offering security, custodial services, trading and staking across a diversified base of

cryptocurrencies (the "**Blockchain Dynamics Acquisition**"). Pursuant to the terms of the Blockchain Dynamics Acquisition, CryptoGlobal issued 21,661,636 CryptoGlobal Shares at a deemed value of $1.40 per CryptoGlobal Share for a total transaction value of approximately $30 million. CryptoGlobal has filed a business acquisition report on Form 51-102F4 – *Business Acquisition Report*, a copy of which is available under CryptoGlobal's issuer profile on SEDAR at www.sedar.com.

## 4.     NARRATIVE DESCRIPTION OF THE BUSINESS

**General Business of the Issuer**

The Issuer, operating the businesses of both HyperBlock and CryptoGlobal, will be a North America-based, publicly-traded company focused on the creation, safeguarding, management and growth of the cryptocurrency and blockchain ecosystems. Its cryptocurrency mining assets include a diversified portfolio of assets in Ontario, Quebec, Nova Scotia and Montana. The Issuer will own 100% of HyperBlock's current asset portfolio, which includes the Sector 14 Assets, the Sector 22 Assets, and the Spokane Assets. The Issuer will also own 100% of CryptoGlobal's current asset portfolio, which includes GG Mine 0, CG Acquisitions Corp., CG Holdings and Blockchain Dynamics Inc.

**Overview of the Issuer's Business**

*Cryptocurrency Market*

The market for cryptocurrencies has experienced exponential growth in 2017 growing from $17 billion in January 2017 to over $421 billion by May 1, 2018 (source: coinmarketcap.com). The surge in aggregate market capitalization was largely driven by Bitcoin which has gained early mainstream acceptance as a form of digital gold, with the potential for exchange traded funds (ETFs), derivatives and other institutional instruments gaining acceptance. Moreover, Ethereum made significant gains in 2017 as it has been used as a funding mechanism for initial coin offerings, a unique crowd-funding method where Ethereum is exchanged for other newly minted coins or tokens used to finance distributed ledger technology projects.

A number of new coins were introduced over the course of 2016/2017, focusing on a multitude of applications, including shared computing resources (e.g. Golem), shared storage solutions (e.g. Storj, Filecoin), private lending (e.g. Salt), social networks (e.g. Steem) and others. Collectively, the market for cryptocurrencies is maturing and providing many use cases that threaten to disrupt the existing economic paradigm. The Issuer believes that as these technologies mature and gain widespread adoption, users will be monetarily incentivized to both adopt and provide services to these networks in a virtuous cycle providing benefits to all participants.

*The Issuer*

The Issuer will be a North America-based, publicly-traded company.  In December 2017, the Issuer purchased 20 petahashes of mining capacity in Spokane's data centre facility (see Section 3 – "*General Development of the Business –General Development of the Business of HyperBlock prior to the Arrangement – History and Significant Acquisitions*" above).  Following the Sale Closing, the Issuer entered into the Spokane Purchase Agreement to purchase the Spokane Assets. With the acquisition of the Spokane Assets, the Issuer will have one of the largest cryptocurrency data centres in North America with 20 Megawatts of current, power capacity of US$0.033 per kW/hr and up to 20 Megawatts of additional capacity.

The Issuer will have approximately 13,000 servers in its 240,000 square foot facility in Montana, providing blockchain security (also known as transaction verification services). The management team of the Issuer, including Sean Walsh, has been in the cryptocurrency market, as described below, since 2013 and has built a diversified business platform which will be instrumental to the growth and success of the Issuer.

The following mining machines, with the types and quantities described below, will be operationalized across the Issuer's Canadian data centres:

| Machine | Quantity |
|---|---|
| Antminer S9 (ASIC Bitcoin miner) | 2,936 |
| Antminer L3 (ASIC Litecoin miner) | 1,870 |
| Antminer D3 (ASIC Dash miner) | 1,100 |
| GPU (Ethereum miner) | 1,620 |
| **TOTAL** | 7,520 |

The principal business of the Issuer (following the completion of the Spokane Acquisition) will be divided into the following verticals:

1. *Mining as a Service (MaaS)*

   The Issuer will sell batches of hashrate on a wholesale basis to Bitcoin.com. The service is provided by way of the Bitcoin.com Agreement (as defined below) and the payment for the services are described in Section 4 – "*Narrative Description of the Business – Overview of the Issuer's Business – The Issuer – Economic Dependence*" below. The Issuer offers contracts for a one-year term whereby the Issuer retains server ownership and can resell available hashrate again upon contract expiration. This Mining as a Service product offering allows retail clients of Bitcoin.com to have access to hashrate. The Issuer charges an initial activation fee which is payable in full upfront and then a daily management fee via bitcoin cash. Daily management fees are received through cryptocurrency.

2. *Blockchain Security (Self-Mining)*

   In addition to selling hashrate through the Mining as a Service business, the Issuer is in the business of mining cryptocurrency. As consideration for these services, the Issuer will receive cryptocurrency from each specific network in which it participates.

   The creation of digital assets stems from the Issuer's diversified mining operation, which includes self-mining, hash rate sales and hosting. Cryptocurrency mining involves the process of confirming transactions to be added on a blockchain by solving complex,

computational puzzles using high performance computers. Mining is critical to the continuing functioning and security of the cryptocurrency network and, to incentivize this activity, a miner that verifies and solves a new block is awarded newly generated quantity of coins. A portion of coins earned through operations may be exchanged for fiat currencies, such as Canadian or United States dollars in order to fund forecasted expenses and machine acquisitions from time to time, while holding the remainder as inventory to benefit from price appreciation/volatility. The Issuer's goal is to build an integrated crypto ecosystem. To accomplish this goal, the Issuer intends to, among other things:

> **Build a Portfolio of Mines across Canada and Scale Continuously**. Use proceeds from the sale of securities from previous financings and the capital markets to purchase and operate mining equipment in facilities across Canada and re-invest up to 50% of earnings from operations to purchase new equipment on an ongoing monthly or quarterly basis to continuously scale each mine.

> **Build Coin Inventory - Diversify into Proof-of-Stake Coins**. Allocate up to 25% of mined coins to an investment strategy consisting of cold storage coins, fiat currencies and additional alternative coins with the goal of benefiting from price appreciation from the entire crypto-asset space.

> **Strategic Investments to Grow Enterprise Value**. Seek accretive investments to build upon its mining, custodial, trading and insights businesses.

Revenue is recognized by the Issuer when payment, in the form of digital currency, is received for mining services rendered. Revenue earned from digital currency mining activities is recognized at the fair value of the digital currency received as consideration on the date of actual receipt. Fair value is measured using the closing price on Coin Market Cap on the date of receipt.

*3.   Mining Server Distribution and Resale*

The Issuer has developed and maintained strong relationships with major mining server manufacturers globally. A mining server is a server used specifically for mining cryptocurrencies. The Issuer leverages this network to import ASIC (application-specific integrated circuit) and GPU (graphic processing unit) servers and components and sells both new and used servers to retail buyers at a mark-up. Upon receipt of either fiat currency or cryptocurrency the Issuer transfers ownership of the hardware.

For example, the Issuer has formed a close relationship with a Chinese supplier for the purchase of ASIC mining machines for Bitcoin, Litecoin, and Dash. This relationship has been established after purchasing machinery in the trailing six month period with a plan of future purchases on reinvestment of proceeds from operations. Moreover, members of the Issuer's management have met with other suppliers and venture capital firms to solidify business relationships. The Issuer has also purchased GPUs from a number of other reputable suppliers producing ASIC and GPU mining rigs in bulk. The Issuer's management team has traveled to Asia to meet directly with its suppliers to assist in building and securing its relationships.

*4.   Server Colocation and Hosting*

The Issuer also operates a server hosting business for cryptocurrencies mining servers whereby its customers contract with the Issuer to manage and oversee the set-up and operation of customer owned servers in the Issuer's data centre facility. Given the size of the Issuer's facility and the access to low-cost electricity, the Issuer offers these services

through monthly and annual contracts. With respect to the server collocation services, the Issuer charges monthly fees in advance of providing the services and receives payment in fiat currency or cryptocurrency.

5. *Safeguarding of Crypto Assts*

Safeguarding of digital assets relates to the secure storage of digital assets. The Issuer has acquired this capability through CryptoGlobal's purchase of Blockchain Dynamics. Blockchain Dynamics offers enterprise-grade security and storage of digital assets, employing leading security practices and adhering to key international security standards, such as ISO 27001. Custodial services will be leveraged internally and offered to prospective external institutional clients. The team is in the process of building an insured cold storage solution for institutional token holders, with the ability to stake portions of third party insured tokens held in cold storage to earn a yield from assets under advisory.

6. *Management of Crypto Assets*

Management of digital assets comprises a proprietary trading operation and insights platform. The trading desk will pursue arbitrage trades across exchanges when opportunities present themselves. Separately, the team has developed a proprietary crypto-specific natural language processing tool that scans over 23,000 sources per hour from Tweets, blog posts, news bulletins, etc., to gauge sentiment by specific cryptocurrency in real time. This data source will be used internally by traders to achieve alpha, and has the potential to be monetized through subscription services.

7. *Growing of Crypto Assets*

Growth of digital assets through the Issuer's labs includes the acceleration of blockchain and crypto networks as well as championing the adoption of crypto currencies around the world.

A key component of the Issuer's business model is the regular reinvestment of earnings from operations from the mining of cryptocurrencies into upgrading or purchasing new machines and infrastructure. The Issuer intends to make ongoing machine purchases in order to allow it to remain competitive and to ensure its machines do not become obsolete. This also allows the Issuer's asset portfolio to be rebalanced as market conditions and profitability shifts over time. As operations expand, it will be in a better position to maximize return on investment for its machines, shift mining power to the most profitable coins, use proceeds from the sale of coins to upgrade mining machines to remain competitive, and source electricity and cooling costs at more favorable rates than companies with smaller operations. Furthermore, mined coins will be held in inventory and will be kept to benefit from price appreciation and allow participation in Proof-of-Stake mining.

*Market*

Introduction to Blockchain and Cryptocurrency

A Blockchain (as defined below) database is a type of distributed ledger that protects the integrity of digital information through the use of a distributed and decentralized ledger for verifying and recording transactions between users across a peer-to-peer network, forming an immutable record of the ownership of the data it tracks, and the source code that comprises the basis for the cryptography and digital protocols governing the specific network. Each block contains a record of some or all recent transactions and a reference to the block that immediately preceded it. These blocks are organized into a chronological sequence that is

known as the blockchain. Each new block records outstanding transactions, and outstanding transactions are settled and validated through such recording. The blockchain represents a complete, transparent and unbroken history of all transactions on the network. Every block created makes it more difficult to rewrite (or hack) the historical record because anyone can verify if the history is accurate when looking back to previous blocks.

Blockchain was originally invented for the cryptocurrency called Bitcoin, and to track arrangements between counterparties involved in Bitcoin transactions, but today may be used for a multitude of other applications, including other forms of alternative cryptocurrencies (such as Ethereum, Dash and Litecoin), a platform for smart-contracts, which are transactions converted into digital code that facilitate, execute and enforce commercial agreements between parties, clearing and settlement of financial assets, voting systems, registration of land title, among other applications. In the case of Bitcoin and Ethereum, no single entity owns or operates the infrastructure which is collectively maintained by a decentralized user base. Bitcoin, Ether (the unit of cryptocurrency used on the Ethereum blockchain) and other select cryptocurrencies can also be used to pay for certain goods and services.

<u>Bitcoin Core</u>

Many consider Bitcoin to be the superset of two technically independent cryptocurrencies, Bitcoin Core and Bitcoin Cash. With increasing frequency, references to "Bitcoin" actually refer to both Bitcoin Cash and Bitcoin Core. Bitcoin Core is the original form of Bitcoin, a digital asset that is issued by, and transmitted through, an open source, digital protocol platform using cryptographic security that is known as the Bitcoin Core Network. The Bitcoin Core Network is an online, peer-to-peer user network that hosts the public transaction ledger (the "**Blockchain**"), and the source code that comprises the basis for the cryptography and digital protocols governing the Bitcoin Network. No single entity owns or operates the Bitcoin Core Network, the infrastructure of which is collectively maintained by a decentralized user base.

The supply of new Bitcoins is mathematically controlled in a manner so that the number of Bitcoins grows at a limited rate pursuant to a predetermined schedule. This deliberately controlled rate of Bitcoins creation means that the number of Bitcoins in existence will increase at a controlled rate until the number of Bitcoins in existence reaches the pre-determined number, which is 21 million Bitcoins. Approximately 17 million Bitcoins have been mined. It is expected that the 21 million Bitcoin limitation will be reached in the year 2140.

As at the date hereof, Bitcoin is valued at approximately US$6,795 per Bitcoin, with a market capitalization of all currently existing Bitcoins of over US$116 billion[1].

<u>Bitcoin Cash</u>

In 2017, many Bitcoin developers and stakeholders reached a conclusion that Bitcoin had several design flaws, including the maximum size of the "block" that Bitcoin allowed on its Blockchain. The insufficient block size was slowing down transactions, and other technical deficiencies such as segregated witness and replace-by-fee had caused extreme damage to the security and scalability of the Bitcoin system. Because Bitcoin is open-sourced and decentralized, developers can create what is known as a "fork", which is a divergence from the

---

[1] www.coinmarketcap.com/currencies/bitcoin

previous blockchain. Bitcoin Cash was created by a fork which launched on August 1, 2017. The Bitcoin Cash blockchain has a larger maximum block size than Bitcoin Core (as well as several other advantages) and can thus process transactions more quickly and securely.

As at the date hereof, Bitcoin Cash is valued at approximately US$744 per Bitcoin Cash, with a market capitalization for all current Bitcoin Cash of over US$12 billion[2].

Ethereum

Ether is a digital asset that is issued by, and transmitted through, the decentralized, open source protocol of the peer-to-peer Ethereum Network. The Ethereum Network is a network of computers all maintaining copies of the Ethereum Network's blockchain. The blockchain allows people to exchange tokens of value, called "ether", as noted above. The Ethereum Network also allows people to write and put on the network smart contracts- general-purpose code that executes on every computer in the network, by means of a certain scripting language. Operations are executed automatically on the blockchain and cost ether.

According to the terms of the 2014 presale, the issuance of Ether is capped at 18 million ether per year. There are over 99 million Ether in circulation as of the date hereof, with no finite limit on the amount that can be released into circulation. However, it is expected that in 2018 the Ethereum Network will switch from Proof-of-Work to a new Proof-of-Stake consensus protocol, called Casper that is expected to be more efficient and require less mining subsidy.

As at the date hereof, Ethereum is valued at approximately US$480 per Ether, with a market capitalization of all currently existing Ether of over US$48 billion[3].

Smart Contracts

As noted above, smart contracts are general purpose code that can facilitate the automatic, self-execution of certain transactions if certain conditions are satisfied. Smart contracts are autonomous and execute without the assistance of a third-party intermediary. Smart contracts can assist individuals and businesses exchange money, property, securities or anything of value in a transparent, conflict-free manner, without the use of an intermediary or middleman. Using the Ethereum platform, smart contracts can be programmed using basic logic, and at their simplest iteration can perform calculations, store information and send transactions to other accounts. Built upon the blockchain, a smart contract will often include the following parameters:

- Pre-written logic in the form of computer code

- Stored and replicated on the blockchain

- Executed and run by the network of computers running the blockchain

- Can result in update to accounts on the ledger

---

[2] www.coinmarketcap.com/currencies/bitcoin-cash

[3] www.coinmarketcap.com/currencies/ethereum

To date, the most prominent public blockchain platform for smart contracts is Ethereum. Although they run on the Ethereum network, smart contracts are autonomous and not controlled by any single party; instead, they self-execute based on a set of instructions that two or more parties have agreed to that is programmed into the code.

Litecoin

As with Bitcoin, Litecoin is a cryptocurrency that is generated by mining. Litecoin was created in October 2011 by former Google engineer Charles Lee. The motivation behind its creation was to improve upon Bitcoin. One significant difference between Litecoin and Bitcoin is that Litecoin incorporates a different Proof-of-work algorithm, which the developers of Litecoin believe offers significant advantages over Bitcoin. One of the differences between Litecoin and Bitcoin is that blocks are mined every 2.5 minutes versus every 10 minutes for Bitcoin. There are currently over 54 million Litecoins in circulation with a maximum supply of 84 million (compared to 21 million each for Bitcoin Cash and Bitcoin Core).

As at the date hereof, Litecoin is valued at approximately US$81 per Litecoin, with a market capitalization for all current Litecoins of over US$4 billion[4].

Zcash

Zcash is a cryptocurrency aimed at addressing privacy concerns of other cryptocurrencies, such as Bitcoin. Zcash payments are published on a public blockchain, but those who transact using Zcash have the option to conceal the sender, recipient and amount being transacted. Like Bitcoin, Zcash has a fixed total supply of 21,000,000 coins.

As at the date hereof, Zcash is valued at approximately US$170 per Zcash, with a market capitalization for all current Bitcoin Cash of over US$737 million[5].

Market Participants

- **Miners**. Miners range from enthusiasts to professional mining operations that design and build dedicated machines and data centers, including mining pools.

- **Investment and Speculative Sector**. This sector includes the investment and trading activities of both private and professional investors and speculators. Historically, larger financial services institutions are publicly reported to have limited involvement in investment and trading in cryptocurrencies and digital assets.

- **Retail Sector**. The retail sector includes users transacting in direct peer-to-peer Bitcoin transactions through the direct sending of Bitcoins over the Bitcoin Network. The retail sector also includes transactions between consumers paying for goods or services from commercial or service businesses through direct transactions or third-party service providers such as BitPay, Coinbase and GoCoin. BitPay, Coinbase and GoCoin provide a merchant platform for instantaneous transactions whereby the consumer sends bitcoins to BitPay, Coinbase or GoCoin, which then provides either the bitcoins or the

---

[4] www.coinmarketcap.com/currencies/litecoin

[5] www.coinmarketcap.com/currenices/zcash

cash value thereof to the commercial or service business utilizing the platform. PayPal, Square and Shopify are examples of traditional merchant payment processors or merchant platforms that have also added Bitcoin payment options for their merchant customers. Payment processing through Bitcoin typically reduces the transaction cost for merchants, relative to the costs paid for credit card transaction processing. While the use of Bitcoin to purchase goods and services from commercial or service business is developing, other cryptocurrencies, such as ether, have not yet been accepted in the same manner, presumably because, in the case of ether, of its infancy and because ether has a different purpose than Bitcoin. In addition, websites are rapidly adopting Dash and Litecoin as methods of payments. Set out below are some of the merchants that accept Dash and Litecoin:

| Dash | Litecoin |
|---|---|
| • **Debit cards**: Shakepay, SpectroCoin, Uquid, Bitwala, Wirex | • **Gift Cards**: eGifter, Gift Off |
| • **Email providers**: Claws Mail | • **E-Cigerettes**: Ara Clouds, Black Forest Vapes |
| • **VPN providers**: BolehVPN, VikingVPN, MultiVPN, AirVPN, SeedStuff | • **Games**: CoinPlay, GamerzHeat, Retro Towers |
| • **Hosting and VPS**: Lacie Cloud, Occulus Omega, CenterServ, … and many others… | • **Art**: CryptoArt |
| • **Web & Graphics Design**: Ether Design, West County Media, Creatable, …. | • **Health & Beauty**: Nuciya, Cheveux Naturels, Verbena Products |
| • **Gift Cards**: Crypto de Change, Gift Off, Cryfter | • **Clothing & Apparel**: 5 Minute Recess, Jesters Leather |
| • **Games**: NestorGames, Retro Towers, Key4coin, Coin Wars, FX-Lucky | • **Jewelry & Accessories**: All Things Luxury, Diadem **Multimedia**: Aircraft-photos.com, Juan Miguel Salas Blog |
| • **Online Casinos**: Dash Video Casino, Direct Bet, Fortune Jack, CryptoGames, Palast Casino, DashBets, DashPoker | (Source: https://litecoin.com/services#merchants) |
| • **Web Stores**: Aceon, Brave New Books, Bitstickers, Parallel Miner, Algo Strategic, Miconduct Wine Company, Healthiverse, Organic Coffee, …. | |
| • **Precious Metals**: COAEX, BitGild, Goldmoney | |
| • **Bill Payments**: Living Room of Satoshi | |
| (Source: https://www.dash.org/merchants/) | |

- **Service Sector.** This sector includes companies that provide a variety of services including the buying, selling, payment processing and storing of Bitcoins. Bitfinex, Bitstamp and OKCoin are three of the largest Bitcoin Exchanges in the world. BTCC, Huobi and OKCoin are large Bitcoin Exchanges based in China that primarily feature

trading of Bitcoins for Chinese Yuan. Coinbase is a multi-service financial institution that provides digital wallets that store Bitcoins and Ether for users and also serves as a retail gateway whereby users can purchase Bitcoins and Ether for fiat currency. In the case of Ethereum, Poloniex, Kraken, and Bitfinex are three of the largest Ether exchanges by volume traded. As the Ethereum Network (as well as Litecoin and Dash networks) continues to grow in acceptance, it is anticipated that service providers will expand the currently available range of services and that additional parties will enter the service sector for the Ethereum Network.

<u>Mining Process</u>

The process by which most cryptocurrencies are created and transactions are recorded is called "mining". To begin mining, a user, or "miner," can download and run a mining client which turns the user's computer into a "node" on the network that validates blocks. In the case of Bitcoin and Ethereum, for example, transactions are recorded in new blocks that are added to the Blockchain and new coins being issued to the miners. Miners, through the use of the speciality software programs, engage in a set of prescribed complex mathematical calculations in order to add a block to the Blockchain and thereby confirm transactions included in that block's data.

Most cryptocurrency transactions are recorded in blocks added to the Blockchain. Each block contains the details of some or all of the most recent transactions that are not memorialized in prior blocks, as well as a record of the award of a specific cryptocurrency to the miner who added the new block. In order to add blocks to the Blockchain, a miner must map an input data set (i.e. the Blockchain, plus a block of the most recent cryptocurrency network transactions and an arbitrary number called a "nonce") to a desired output data set of a predetermined length (the "hash value") using the SHA-256 hash algorithm. Each successive block can only be added to the Blockchain by one miner; therefore miners are engaged in a competitive process of constantly increasing their computing power to improve their likelihood of solving new blocks. As more miners join a specific network and its processing power increases, the network automatically adjusts the complexity of the block-solving equation to maintain a predetermined pace of adding new blocks to the Blockchain.

A miner's proposed block is added to the Blockchain once a majority of the nodes on the network confirms the miner's work. Miners that are successful in adding a block to the Blockchain are automatically awarded coins for their effort plus any transaction fees paid by transferors whose transactions are recorded in the block. This reward system is the method by which new coins enter into circulation to the public.

<u>Cryptocurrency Wallets</u>

A cryptocurrency "wallet" is a software program that stores private and public keys and interacts with various blockchains to allow users to send and receive digital currency and monitor their balance. Unlike a traditional wallet an individual would carry in their pockets, digital wallets do not store currency. In fact, currencies do not get stored in any single location or exist anywhere in any physical form. All that exists are records of transactions stored on the Blockchain. When a new cryptocurrency wallet is opened, two sets of keys are created: a public key and a private key. The public key or address is used to receive funds into a wallet and does not have to be kept secret as it is receive only access. The private key allows the user to update and send cryptocurrencies on the blockchain. Receiving or transferring funds is effectively recording a transaction on the blockchain and linking a public key and private key to the respective funds which is unique to a wallet. Some wallets are kept disconnected from the Internet most of the

time to increase their storage security. They are often called "cold wallets". HyperBlock does not typically use cold wallets, but often relies on multi-signature wallets for a desired blend of security and usability.

Cryptocurrency Exchanges

A cryptocurrency exchange is an online website where you can buy and sell, and in some cases store, cryptocurrencies. They are also some of the most popular options for hot wallets (as described above) where cryptocurrency can be purchased and private keys stored directly by the exchange. Private keys stored on an exchange are vulnerable in the event the exchange is hacked. Many online exchanges are starting to store the majority of their funds in cold wallets.

As at the date hereof, there are numerous cryptocurrency exchanges (including GDAX, Binance, Bitfinex and Bittrex), which provide liquidity and trading options for crypto-assets with gross volume totaling over $10 billion on a daily basis. This presents a means for the Issuer to exchange crypto-assets for other crypto-assets or for fiat currencies. Other options for larger transactions include worldwide OTC providers (including Coinsquare, QuadrigaCX and Einstein).

All digital asset exchanges the Issuer intends to utilize for the sale of its cryptocurrency holdings have know-your-client, anti-money laundering, consumer protection and cybersecurity procedures in place and present liquid enough markets to provide a means for the Issuer to exchange digital assets, although they are not overseen by specific regulatory bodies. The Issuer anticipates the nature of exchanges in the ecosystem to change as decentralized options for trading become available.

Incentives for Mining

As noted above, miners that are successful in adding a block to the Blockchain are awarded coins for their effort. These rewards incentivize miners to contribute to the network and aid in the processing and securing of blocks.  Given the increasing difficulty of the target established by a specific cryptocurrency network, current miners are required to invest in expensive mining servers with adequate computational processing power to hash at a competitive rate. The first wave of mining devices used central processing units (CPUs) used in standard home computers. Miners soon discovered that graphic processing units (GPUs) along with Application Specific Integrated Units (ASICs) provided them with more processing power per hardware unit cost, and per unit electricity used.

Value of Cryptocurrencies

Neither Bitcoin, nor any cryptocurrency mined by HyperBlock or Spokane, are fiat currencies, meaning a currency that is backed by a central bank or a national, supra-national or quasi-national organization, and are not backed by physical assets, such as gold, or other credit. As a result, the value of cryptocurrencies is currently determined by the value that various market participants place on such cryptocurrencies through their transactions. As a result, the most common means of determining the value of a type of cryptocurrency is by surveying one or more exchanges (such as Kraken, Poloniex or Gemini) where certain cryptocurrencies are traded. On each such exchange, cryptocurrencies are traded with publicly disclosed valuations for each transaction, measured by one or more fiat currencies such as the U.S. Dollar or Euro. While a significant volume of Bitcoin/Ethereum-to-fiat-currency exchange is denominated in

currency other than U.S. Dollars, movements in pricing on these exchanges are generally in-line with U.S. Dollar-denominated exchanges.

<u>Mining Pools</u>

Miners may organize themselves into mining pools. A mining pool is created when cryptocurrency miners pool their processing power over a network and mine blocks together. Rewards are then distributed proportionately to each miner based on the work or the hash power contributed. Operational fees are paid to the mining pool host (typically 1% to 2% of payouts). Use of mining pools gained popularity when mining difficulty increased since the ability to pool resources can generate blocks (and receive coins) on a more consistent basis.

<u>Proof-of-Stake vs. Proof-of-Work</u>

Bitcoin is a Proof-of-Work cryptocurrency in that to verify transactions on the network, miners must perform the work of running the algorithm and producing the blocks. There is an economic cost of electricity and capital to purchase the machines.

Alternatively, several new coins have been using Proof-of-Stake algorithms wherein a user (node) on the network must store the original coins in a wallet and in return, if they have enough tokens, can be a node on the network that verifies transactions. In other words, Proof-of-Stake is a means of verifying a distributed ledger where likelihood of receiving payouts is proportional to how many of the ledgers' tokens you already hold (these tokens act like virtual processing power). It is anticipated that Ethereum will switch from current resource-intensive Proof-of-Work algorithm to a Proof-of-Stake algorithm in 2018.

The Issuer intends to diversify from Proof-of-Work coins to Proof-of-Stake to take advantage of growth across the space.

<u>Forking</u>

In blockchain, a hard fork is a term that refers to a situation when a single cryptocurrency splits into two separate chains and occurs when a cryptocurrency's existing code is changed, resulting in both an old and new version. Similarly, a soft fork occurs when only one blockchain (and thus one coin) will remain valid as users adopt the update. Both fork types create a split, but a hard fork is meant to create two blockchain/coins and a soft fork is meant to result in one. For example, in 2016, Ethereum hard-forked to compensate investors in the Decentralized Autonomous Organization (known as the DAO) which was meant to operate like a venture capital fund in the blockchain space, after the DAO was hacked through a vulnerability in its code.

In the event of a fork of any cryptocurrencies mined or held by the Issuer (or its successors), management intends to address forks on a case-by-case basis depending on the ecosystem's support for the new fork. If the ecosystem including major providers like Coinbase and Bitpay show support for the new fork with integration into wallets and broader development of applications, and the coin has developer support as is the case with Bitcoin Cash, the Issuer (or its successors) may hold these coins for future appreciation. If, however, the new fork has very little community support, liquidating such new coins for Bitcoin or other more mainstream crypto-assets may be considered.

Mining Equipment

Factors that management of the Issuer may take into consideration when deciding to transition equipment include: global network hash rate, the price of a coin, blockchain mining difficulty level, blockchain difficulty adjustment periods, coin value paired with other coins, as well as the hash rate of each available machine. These factors will carry varying weight depending on the coin/algorithm being reviewed.

In terms of mining equipment, the Issuer expects to utilize more Bitcoin mining machines but also mining a wide portfolio of minable alt coins. As the Issuer submits machine orders, it is expected to adjust ratios based on updated machine pricing, mining profitability, and availability and delivery dates of machines. The reinvestment of earnings from operations is expected to allow the Issuer to continue to optimize its portfolio allocation and stay up to date on the latest technology.

*Operations*

The Issuer mines a selection of cryptocurrencies with its machine portfolio dynamically adjusted to ensure that maximum profitability can be achieved at any given time. The Issuer's mining machines operate continuously solving cryptographic problems on each cryptocurrency's blockchain network to confirm and secure transactions into a block, alongside other nodes (miners) around the world. The purpose of mining is to allow multiple nodes to reach a tamper-resistant consensus on the validity of each transaction. Proof-of-Work mining is a resource intensive method of mining requiring large amounts of hash power and electricity, and therefore, scale and access to cheap power is critical to profitability.

The Issuer conducts all of its mining activities itself, and does not have any current plans to subcontract production. All equipment (mining machines, power supplies, racks, portable cooling units, computing infrastructure and other hardware) is owned by the Issuer.

Determining where to build a cryptocurrency mining facility is generally based on three key factors: (i) access to low-priced electricity in order to profitably run operations; (ii) the need to have a fast internet connection to rapidly receive and broadcast data with other nodes on the network; and (iii) mining equipment must be kept from overheating to function optimally, therefore choosing a jurisdiction that has low temperature and low humidity zones offers substantial advantages as cooling costs can be kept relatively low. In particular, the location of Mine 1, and all other future mines, is expected to be based on the following additional criteria:

The Issuer has completed the research and development of its proprietary modular mining units (MMUs). The engineering effort is complete and MMUs are ready for manufacture. They have been designed with the goal of maximizing efficiency and operating as self-contained units. These MMUs will allow the Issuer to capitalize on stranded power assets where facilities are either not available or not suitable for a mining operation. MMUs can be easily transported to these locations, dropped down, connected to network and power sources, and begin mining.

The locations of all future mines is expected to be based on the following additional criteria:

- **Adequate facility space or developable land.** Each potential location is expected to have either an existing building in which the Issuer expects to install up to 10,000 machines or developable land for best of breed purpose built modular mining units.

- **Access to up to 50-100MW of Power.** Each location is expected to have immediate access to approximately 5MW of power with the ability to scale to up to 100MW.

- **Electricity cost of CAD$0.060/kWh or less.** Each location is expected to have scalable power at rates between CAD$0.040 and $0.060/kWh. The target rate is less than $0.060/kWh, based on publicly available Hydro rates in Alberta, Saskatchewan, Manitoba, Ontario, Newfoundland, and including discounts based on industrial consumption and elimination of Global Adjustment in Ontario.

The Issuer's existing mines are located in Montana, Ontario, Quebec and Nova Scotia.

*Principal Products and Services*

The average life span of ASIC and GPU machines is four years, however, equipment can be transitioned to mine different coins depending on the algorithm it was built to solve (i.e., SHA256 vs. Scrypt vs. X11). Bitcoin uses the SHA256 hashing algorithm which is also used by Bitcoin Cash. CryptoGlobal's Antminer S9 (ASIC) machines can be transitioned to mine any SHA256 cryptocurrency aside from Bitcoin, including Bitcoin Cash, Peercoin, and several others. Since CryptoGlobal's L3 Litecoin (ASIC) miners employ the Scrypt hashing algorithm, they can be transitioned to mine any cryptocurrency that uses the same algorithm such as Dogecoin, AuroraCoin, or ScoreCoin. Our D3 Dash (ASIC) miners use the X11 hashing algorithm, these machines can mine other coins that employ the X11 hashing algorithm, including StartCoin, Digitalcoin and more.

The Issuer's GPUs are currently running the 'Dagger Hashimoto - Ethash' algorithm to mine Ethereum. These GPUs can be easily transitioned to mine Ethereum Classic or Expanse. In addition to this, GPUs can also be repurposed to host artificial intelligence, machine learning, or video editing services.

Factors that management of the Issuer may take into consideration when deciding to transition equipment include: global network hash rate, the price of a coin, blockchain mining difficulty level, blockchain difficulty adjustment periods, coin value paired with other coins, as well as the hash rate of each available machine. These factors will carry varying weight depending on the coin/algorithm being reviewed.

In terms of mining equipment, the Issuer expects to utilize more Bitcoin mining machines but also mining a wide portfolio of minable alt coins. As the Issuer submits machine orders, it is expected to adjust ratios based on updated machine pricing, mining profitability, and availability and delivery dates of machines. The reinvestment of 50% of earnings from operations is expected to allow the Issuer to continue to optimize its portfolio allocation and stay up to date on the latest technology.

*Specialized Skills and Knowledge*

All aspects of the Issuer's business require specialized skills and knowledge. Such skills and knowledge currently include the areas of blockchain technology, software development, finance and accounting. In order to effectively operate the business of the Issuer, management and operational team require the following skills: (i) computer hardware knowledge, specifically analysis of component efficiency and compatibility; (ii) knowledge of computer network architecture and implementation; (iii) knowledge of computer software development and facilitating proprietary software systems; (iv) electrical engineering knowledge related to

electrical engineering architecture and implementation; (v) civil engineering knowledge specifically for designing mining specific buildings and retrofitting existing buildings to suit design needs; and (vi) knowledge of blockchain technology, as it relates to asset management (proper storage and transacting cryptocurrency assets). Availability of these specialized skills currently rests with the Issuer's engineering and operations staff, and a national, engineering partner firm offering a substantial resource base and deep project management expertise in mechanical and electrical engineering, building services, and building controls divisions.

The Issuer has retained qualified employees and consultants to conduct business equal to, or exceeding, industry standards. The Issuer has assembled a diverse, core team of engineers, software developers, digital asset traders and operational specialists with combined experience and expertise in the following areas: (i) civil engineering and computer hardware knowledge; (ii) software development and network architecture combined with blockchain technology and blockchain technology development knowledge; (iii) digital strategy, product development, digital payments, and technology commercialization, particularly within the startup sphere; and (iv) a specialist in operations, facilities management and international logistics. Upon completion of the Spokane Acquisition, the Issuer will acquire specialized skills in the construction and operation of data centres used for cryptocurrency mining activities.

*Marketing Plans and Strategies*

The Issuer has an internal marketing team which will lead all marketing initiatives and activities together with third party agency partners, which, to date, include: web design and development, brand design and public relations agencies and firms.

The Issuer has implemented an integrated marketing program which has included to date: sponsorships, trade shows, print/digital/broadcast/out-of-home advertising, events, social media content (including videos and white papers), newsletters, blogs, audio content, speaking events, and investor and public relations activities.

*Competitive Conditions*

The Issuer competes with other users and/or companies that are mining cryptocurrencies as a service, other users and companies who have commenced, or indicated an expression of interest to commence, cryptocurrency mining operations other potential financial vehicles, possibly including securities backed by or linked to cryptocurrencies through entities similar to the Issuer. The barriers to entry into cryptocurrency mining are designed to be low to increase network distribution and decentralization.

Many online companies exist that offer cryptocurrency mining services, as well as companies, individuals and groups that run their own mining farms or have pooled their resources. Miners can range from individual enthusiasts to professional mining operations with dedicated data centres, however, the vast majority of mining is now undertaken by mining pools.

Other market participants in the cryptocurrency industry include investors and speculators, retail users transacting in cryptocurrencies, and service companies that provide a variety of services including buying, selling, payment processing and storing of cryptocurrencies.

All cryptocurrency Proof-of-Work miners compete along two basic vectors: hash power and electricity cost. Accordingly, management of the Issuer believes that the key success factors of a mining operation are: (i) acquiring quality mining machines with the highest hash power and

power efficiency, for a given cryptocurrency algorithm, at the least expensive per unit cost; and (ii) access to large quantities of power at significant discounts for an industrial-level consumer at globally competitive rates

The following table identifies examples of mining, hosting and equipment sales companies that exist today:

| Competitor | Currency Mined | Business Lines | Location |
|---|---|---|---|
| Riot Blockchain Inc. (NASDAQ: RIOT) | Bitcoin, Bitcoin Cash, Litecoin | Cryptocurrency mining | Oklahoma City, USA |
| Hive Blockchain Technologies Ltd. (TSXV: HIVE) | Ethereum, Ethereum Classic, ZCash | Cryptocurrency mining | Iceland; Sweden |
| Hut8 Mining Corp. (TSXV:HUT) | Bitcoin | Cryptocurrency mining | Not disclosed |
| Blockchain Mining Ltd. (TASE:BLCM) | Bitcoin, Bitcoin Cash, Litecoin, Ethereum, Dash | Cryptocurrency mining | Quebec, Canada |
| The Future of Mining | Bitcoin | Cryptocurrency mining, hosting services | Boden, Sweden |
| MGT Capital Investments Inc. (MGTI-OTC) | Bitcoin | Cryptocurrency mining | Washington, DC, USA; Sweden |
| Fidelity Investments | Bitcoin, Ethereum | Cryptocurrency mining | Not disclosed |
| DMG Blockchain Solutions (TSXV:DMGI) | Bitcoin | Cryptocurrency mining, hosting services | Alberta and British Columbia, Canada |
| Bitfury Group | Bitcoin | Cryptocurrency mining, sale of mining machines | Iceland; Republic of Georgia |
| Bitmain Technologies Ltd. | Bitcoin | Cryptocurrency mining, sale of mining machines, hosting services | Not disclosed |
| Hashchain Technologies Inc. (TSXV:KASH) | Dash, Bitcoin | Cryptocurrency mining | British Columbia, Canada; Montana, USA |

| Hashcoins | Bitcoin, Litecoin | Sale of mining machines, hosting services | Estonia |
| Hashing24 | Bitcoin | Cryptocurrency mining, hosting services | Not disclosed |
| Hashnest | Bitcoin | Cryptocurrency mining, hosting services | China; Iceland |

*Components*

Mining server pricing is correlated to the price of the underlying cryptocurrency. As the value of cryptocurrencies increase so does the price of the related server. Availability of mining servers is inversely correlated to the price of the underlying cryptocurrency mined.

*Business Cycles and Seasonality*

The Issuer''s business is not cyclical or seasonal; however, coin generation may vary depending on the level of difficulty involved in confirming transactions to be added to the blockchain. Difficulty levels and coin generation have an inverse relationship and fluctuate daily.

*Economic Dependence*

Following the completion of the Spokane Acquisition, the Issuer will also acquire the following significant contracts:

(i)     a computer processing services agreement for hashrate sales with Saint Bitts, LLC ("**Saint Bitts**") dated February 2018 (the "**Bitcoin.com Agreement**"), under which the customer shall pay Spokane an activation fee along with a daily management fee, which is to be charged and deducted from such customer's revenue. Saint Bitts is responsible for calculating all fees due to Spokane and shall pay the daily management fee to Spokane on a daily basis. The fees payable to Spokane are paid in cryptocurrency. Each party may terminate the agreement (i) upon 180 days' prior written notice to the other party, (ii) for a material breach by the other party if such breach, if curable, remains uncured 60 days after delivery of the written notice of such breach, (iii) upon 60 days' prior written notice to the other party if, in such party's reasonable judgment, the performance of the agreement is made impracticable or impossible by any applicable Law, or (iv) immediately upon written notice to the other party if any regulatory authority imposes or threatens any fine, sanction or other penalty as a result of such party's performance under the Bitcoin.com Agreement;

(ii)    a mining-as-a-service joint venture agreement (the "**JV Agreement**") among HyperBlock, Spokane and Global Technology Inc. ("**Globalive**") dated June 2018, pursuant to which HyperBlock is responsible for the following services (the "**HyperBlock Services**"):

a.   brokering the sale of 800 cryptocurrency mining servers from CrytoGlobal to Globalive;

b.   providing adequate space for the mining servers at its facility, install and operate the mining servers together with required electrical infrastructure, which will be dedicated to the mining servers; and

c.   acting as a sales channel for Globalive in respect of hashrate produced by the mining servers through the Bitcoin.com Agreement.

In exchange for the services, Globalive will, (i) purchase the mining servers for an agreed upon price, (ii) pay to HyperBlock an agreed upon amount for the installation of required electrical infrastructure to support the mining servers, (iii) prepay in respect a portion of the services for the next three years, and (iv) pay a monthly fee for services.

For the HyperBlock Services to be performed by HyperBlock, Globalive will pay to HyperBlock, in addition to the monthly fee, an amount equal to 30% of the revenue generated by hashrate sales (including re-sales. After Globalive has recovered the its upfront cost, HyperBlock will be entitled to 60% of (i) the EBITDA generated from the hashrate sales, (ii) daily operating costs and (iii) any cryptocurrency coins mined.

The JV Agreement will continue until the later of (i) the last day of the last expiring hashrate sales contract for Globalive by HyperBlock; (ii) by written notice from one party to the other party no sooner than three (3) years from the date of the first hashrate sale for Globalive by HyperBlock; and (iii) by written notice from one party to the other party in the event that: (A) revenue from hashrate sales does not exceed mining server operating costs for a period of at least fifteen (15) days, or (B) EBITDA is less than or equal to USD$0.00 for a period of at least thirty (30) days.

(iii)   a lease agreement dated March 1, 2016 for Spokane's data centre facility.  The lease agreement is for a period of 10 years with the ability to extend for two additional periods of five years each subject to certain terms set out in the lease agreement; and

(iv)   a service agreement for power with a local power supplier at a fixed rate.

*Changes to Contracts*

No part of the Issuer's business is reasonably expected to be affected in the current financial year by either the renegotiation or termination of any contract. Except for the Colocation Facilities Agreement which terminates upon completion of the Spokane Acquisition, the Issuer does not anticipate that any significant contracts will be renegotiated or terminated over the next 12 months.

The Issuer expects more suppliers of mining machines will enter the market, lowering machine costs and helping to further diversify the Issuer's supply chain. The lower supplier power will help to ensure increased supplier competition, and in turn, rapid innovation by way of better performance and higher quality mining machines. The Issuer's existing contracts are formed on an order-by-order basis, do not provide for the continuation of provision of equipment and are unlikely to affect the business in any material way, particularly with a diversified supply chain.

*Employees*

As of the date of the Listing Statement, the Issuer has 16 employees and six consultants. Following the Spokane Acquisition, the Issuer will have approximately 36 employees and eight consultants. Management of the Issuer believes its relationship with its employees is excellent. None of the employees are represented by a union or are subject to a collective bargaining agreement.

*Foreign Operations*

Following to the Spokane Acquisition, the Issuer's assets and business operations will be located in Montana; Toronto, Ontario; and, Denver, Colorado.  The Issuer intends to become a reporting issuer in the Provinces of British Columbia, Alberta and Ontario, Canada.

*Lending*

The Issuer does not engage in any lending activities.

There are no bankruptcies, receivership or similar proceedings against the Issuer, nor is the Issuer aware of any such pending or threatened proceedings. There has not been any voluntary bankruptcy, receivership or similar proceedings by the Issuer since its incorporation.

See Section 13 – "Directors and Officers – *Cease Trade Orders, Bankruptcies, Penalties or Sanctions*" of this Listing Statement.

*Reorganizations*

Other than the proposed Spokane Acquisition and the Blockchain Dynamics Acquisition, the Issuer has not completed any material reorganization and no reorganization is proposed for the current financial year other than the transaction that is contemplated by this Listing Statement.

*Social and Environmental Policies*

The Issuer does not currently have any social or environmental policies in place. The Issuer anticipates developing such policies in the future.

The Issuer's mining operations do not result in any direct carbon emissions and most energy input for production comes from a vast network of renewable energy sources (primarily hydroelectric). No waste or discharge is generated from operations; only heat is generated which can be safely dissipated with proper facility ventilation. The Issuer has complied with any applicable environmental laws or regulations in accordance with the environmental protection laws in the jurisdictions in which the Issuer conducts business.

*Electricity Prices*

The Issuer expects to benefit from highly competitive electricity rates for its North American facilities between C$0.040 and $0.060/kWh.

These power rates are cost competitive with major cryptocurrency mining jurisdictions worldwide. Given the Issuer's efficient data centre operations and access to an abundance of

clean hydroelectric power, the Issuer has a distinct advantage of mining cryptocurrencies with a cheaper cost structure.

*Liquidation of Holdings*

The Issuer expects that it may use one or more of the following exchanges or OTC firms for the purposes of selling or buying cryptocurrency: Global Digital Assets Exchange (GDAX), Bitfinex, Binance, Bittrex, Gemini, Coinsquare, QuadrigaCX, Cumberland Trading, Genesis Global Trading and Kraken, subject to each exchange having adequate know-your-client, anti-money laundering, consumer protection and cybersecurity procedures in place, and market liquidity for coins. These options may expand and/or change in response to market conditions and decisions made by the Issuer's management.

*Cyber-Security Measures*

Cold storage wallet private keys are stored in a locked safe inside a locked room safeguarded by an alarm system. Access to this room is restricted to authorized personnel only. Transfer of coins to cold storage wallets does not require access to cold storage wallet private keys.

The Issuer's machines are kept behind a segregated network behind a firewall. Physical access to machines is restricted to authorized personnel. Intrusion prevention software monitors access to machines, and regular audits keep security software up to date.

The Issuer will continuously evaluate and update processes and procedures to ensure an appropriate level of cybersecurity.

*Coin Investment Strategy*

Going forward, the plans of the Issuer are to diversify its holdings across a number of assets and currencies in an effort to give shareholders broad exposure to the cryptocurrency space, as described below.

- *Bitcoin, Ethereum, Litecoin, Dash*. Since the Issuer's operations mine these assets, CryptoGlobal's aim is to have significant quantities on hand at any given time.

- *Alt-Coins*. This broadly includes all other cryptocurrencies aside from Bitcoin. The Issuer anticipates significant growth from this sector in the coming years.

- *Initial Coin Offerings (ICO)*. If the Issuer receives favourable terms with discounts to market valuations, management will explore gaining exposure to such an asset class.

- *Fiat Currencies*. Given market sentiment, management may opt to hedge into fiat currencies to re-purchase crypto-assets at more favourable valuations.

- *Futures & Derivatives*. Similar to the Issuer's goal with respect to the purchase of fiat currencies, futures may be purchased to hedge against market risk.

The exact ratio of these holdings will be at the discretion of management based on consumer adoption trends, long-term industry dynamics for each coin's vertical, current valuation or market capitalization, regulatory headwinds and any other forces deemed material to a coins short and long term performance profile.

***Business Objectives and Milestones***

The Issuer plans to accomplish several business objectives over the next 12 months including (1) creating digital assets; (2) building out our service offerings to: (i) secure and safeguard digital assets; and (ii) maximize returns held on digital assets through a proprietary trading desk; and (3) incubating blockchain ideas to drive adoption through innovative cryptocurrency networks, product development and marketing strategies.

The chart below sets out the key milestones and timing for each milestone that must occur for the business objectives to be achieve.

| ITEM | TIMING | AMOUNT (USD) |
|---|---|---|
| **CREATE DIGITAL ASSETS** | | |
| Add 20MW to US Data Centre | Q4'18 | 6,000,000 |
| Add 4MW to Eastern Canadian Facility | Q3'18 | 1,200,000 |
| Implement Modular Mining Units (MMU's) | Q3'18 + | 300,000  per MMU |
| Continue to improve Mining Dashboard | Q3'18 | |
| Create own pool | Q4'18/Q1'19 | |
| Sell Hashrate through partner | Q2/Q3+ | |
| Secure and build Western Canadian facility | Q4'18/Q1'19+ | 4,500,000 |
| Continue to optimize Diversified Mining Operation | Ongoing | |
| Opportunitistically sell hardware | Ongoing | |
| | | |
| **SAFEGUARD AND SECURE DIGITAL ASSETS** | | |
| Complete enterprise grade custodial solution | Q3 | 300,000 |
| Grow Assets Under Management (AUM) | Ongoing | |
| Finalize Insurance Backed product | Q2 | |
| Build Client base | Q3+ | |
| | | |
| **MAXIMIZE RETURNS ON DIGITAL ASSETS HELD** | | |
| Expansion of Proprietary Trading Desk | Q2+ | 150,000 |
| Complete Trading Arbitrage Software | Q3'18 | 100,000 |
| Build Mobile App for Insights Platform | Q3'18 | 150,000 |
| Cotinue to add capabilities to Insights Platform | Q2'18+ | 250,000 |
| | | |
| **GROW** | | |
| Build and scale engineering talent | Q2+ | 300,000 |
| Build and implement tools for Adoption | Q3+ | 500,000 |
| Creation of an advocacy consortium | Q3+ | |

*Available Funds*

The pro forma working capital position at February 28, 2018 is $4,916,296. The cash available at time of listing is expected to be $9.2 million. The following table sets forth the estimated sources of funds of the Issuer over the next twelve months.

| Source of Funds (USD's) | |
|---|---|
| Cash & Cash Equivalents | $ 7,159,533.07 |
| Investor Funding | $ 3,891,050.58 |
| Pre-paid Expenses | $ 1,509,727.63 |
| HST receivable | $ 1,291,828.79 |
| Sub-total | $ 13,852,140.08 |
| | |
| Gross margin from Operations[1] | $ 22,453,722.01 |
| | |
| Total | $ 36,305,862.09 |

1. Revenue less cost of revenue expected to be generated over
   next 12 months

Management anticipates using the available funds in the following manner over the next 12 months.

| Use of Funds (USD's) | |
|---|---|
| General & Administrative | $ 6,889,519.67 |
| Loan Payable | $ 809,338.52 |
| Promissory Note Payable | $ 3,891,050.58 |
| Accounts Payable | $ 389,105.06 |
| Sub-total | $ 11,979,013.84 |
| | |
| Capital Infrastructure | $ 10,428,015.56 |
| Unallocated Working Capital | $ 13,898,832.68 |
| Total | $ 36,305,862.09 |

General and administrative expenses over the next twelve months are expected to be:

| General & Administrative (USD's) | |
|---|---|
| Payroll | $ 2,568,268.57 |
| Consultants and Investor Relations | $ 638,325.11 |
| Marketing | $ 515,139.60 |
| Professional Fees | $ 1,438,974.51 |
| Facilities | $ 1,274,453.18 |
| Insurance | $ 212,071.15 |
| G&A | $ 242,287.56 |
| Total | $ 6,889,519.67 |

The Issuer intends to spend the funds available to it to further the Issuer's stated business objectives. However, there may be circumstances where, for good sound business reasons, a reallocation of funds may be necessary in order for the Issuer to achieve its stated business objectives.

**Outstanding Asset-based Securities**

This information is not applicable to the Issuer.

**Mineral Projects**

This information is not applicable to the Issuer.

**Oil and Gas Operations**

This information is not applicable to the Issuer.

**5.      SELECTED CONSOLIDATED FINANCIAL INFORMATION**

As the Issuer will be formed as a result of the Arrangement, it does not have historical financial statements presented on a consolidated basis. See Schedule "E" – "*Unaudited Pro Forma Condensed Consolidated Financial Statements of the Issuer*".

**Annual Information of the Issuer**

The following table sets out certain selected financial information of the Issuer, on a pro forma basis, as at and for the year ended February 28, 2018. This selected financial information has been derived from and should be read in conjunction with the unaudited pro forma consolidated financial statements as at and for the period ended February 28, 2018, and accompanying notes thereto.

| | As at and for the year ended February 28, 2018 (US$000s) |
|---|---|
| Current assets | 15,678 |
| Total assets | 178,450 |

| | |
|---|---:|
| Current liabilities | 11,375 |
| Total liabilities | 15,197 |
| Shareholders' equity | 163,253 |
| Revenue | 12,636 |
| Net Income | 6,206 |

## Annual Information of HyperBlock

The following table sets out certain selected financial information of HyperBlock in summary form for the period from incorporation on October 10, 2017 to February 28, 2018. This selected financial information has been derived from and should be read in conjunction with the HyperBlock financial statements for the year ended February 28, 2018 and the period from incorporation on October 10, 2017 to February 28, 2018, and accompanying notes thereto.

| | As at and for the period from incorporation on October 10, 2017 to February 28, 2018 ($000s) |
|---|---:|
| Current assets | 4,512 |
| Total assets | 13,704 |
| Current liabilities | 1,397 |
| Total liabilities | 1,397 |
| Shareholders' equity | 12,307 |
| Revenue | 1,400 |
| Net Loss | 384 |

## Annual Information of Spokane

The following table sets out certain selected financial information of Spokane in summary form for the three months ended March 31, 2018 and the year ended December 31, 2017. This selected financial information has been derived from and should be read in conjunction with the Spokane carve-out financial statements for the three months ended March 31, 2018 and the year ended December 31, 2017, and accompanying notes thereto.

| | As at March 31, 2018 | As at and December 31, 2017 |
|---|---:|---:|
| Current assets | 3,379 | 4,775 |
| Total assets | 11,335 | 13,667 |
| Current liabilities | 2,879 | 4,275 |
| Total liabilities | 6,678 | 8,483 |
| Shareholders' equity | 4,657 | 5,184 |

| | | |
|---|---|---|
| Revenue | 9,975 | 22,865 |
| Net Income | 5,843 | 8,345 |

## Annual Information of CryptoGlobal

The following table sets out certain selected financial information of CryptoGlobal in summary form for the period from incorporation on May 28, 2017 to December 31, 2017. This selected financial information has been derived from and should be read in conjunction with the CryptoGlobal financial statements for the period from incorporation on May 28, 2017 to December 31, 2017, and accompanying notes thereto.

| | As at and for the period from incorporation on May 28, 2017 to December 31, 2017 |
|---|---|
| Current assets | 837 |
| Total assets | 837 |
| Current liabilities | 67 |
| Total liabilities | 67 |
| Shareholders' equity | 770 |
| Revenue | 0 |
| Net Loss | 153 |

## Quarterly Information of the Issuer

The Issuer was not a reporting issuer for the eight most recently completed fiscal quarters and did not prepare quarterly financial statements during that time.

## Quarterly Information of HyperBlock

HyperBlock was not a reporting issuer for the eight most recently completed fiscal quarters and did not prepare quarterly financial statements during that time.

## Quarterly Information of Spokane

Spokane was not a reporting issuer for the eight most recently completed fiscal quarters and did not prepare quarterly financial statements during that time.

## Quarterly Information of CryptoGlobal

The following table sets out certain selected financial information in summary form of the quarterly results of CryptoGlobal from the period from incorporation on May 28, 2017 to December 31, 2017. This selected financial information has been derived from and should be read in conjunction with the CryptoGlobal financial statements for the period from incorporation on May 28, 2017 to December 31, 2017, and accompanying notes thereto.

| | December 31, 2017 | September 30, 2017 | June 30, 2017 | For the period ended December 31, 2017 |
|---|---|---|---|---|
| **Total Assets** | $837,006 | $529,762 | $156,475 | $837,006 |
| **Total Revenues** | nil | nil | nil | nil |
| **Total Expenses** | $52,301 | $101,108 | nil | $153,409 |
| **Net Loss** | $52,301 | $101,108 | nil | $153,409 |
| **Basic and diluted net loss per share** | $0.01 | $0.02 | nil | $0.04 |

**Dividends**

The payment of dividends following completion of the Arrangement will be at the discretion of the Issuer Board. HyperBlock has not, since the date of its incorporation, declared or paid any dividends on the HyperBlock Shares in the capital of HyperBlock, and does not currently have a policy with respect to the payment of dividend. It is currently expected that the Issuer will retain future earnings and other cash resources for the operation and development of its business. As such, there are no plans to pay dividends in the foreseeable future.

**6.     MANAGEMENT'S DISCUSSION AND ANALYSIS**

See Schedule "C" – "*Management's Discussion and Analysis of HyperBlock and Spokane*" and Schedule "D" – "*Financial Statements and Management's Discussion and Analysis of CryptoGlobal*".

**7.     MARKET FOR SECURITIES**

The Issuer Shares were not listed on any market prior to the application to the CSE. CryptoGlobal Shares are currently listed and posted for trading on the TSX-V under the symbol "CPTO". In accordance with the Plan of Arrangement, CryptoGlobal will be delisted from the TSX-V pursuant to a voluntary delisting application under TSX-V Policy 2.9 – *Trading Halts, Suspensions and Delisting*, and upon the assignment and transfer of all of the CryptoGlobal Shares to HyperBlock, HyperBlock, as sole shareholder of CryptoGlobal, will approve the termination of the CryptoGlobal Common Share Escrow Agreements in accordance with their terms.

**8.     CONSOLIDATED CAPITALIZATION**

Schedule "E" – "*Unaudited Pro Forma Condensed Consolidated Financial Statements of the Issuer*".

**9.     OPTIONS TO PURCHASE SECURITIES**

It is intended that upon completion of the Arrangement, the Issuer will adopt an option plan, in a form agreed by HyperBlock and CryptoGlobal.

The following table sets forth the options to purchase securities of the Issuer upon completion of the Arrangement:

| Category | Number of Shares reserved under Option | Exercise Price per Issuer Share | Expiry Date[(1)] |
|---|---|---|---|
| All executive officers and directors of the Issuer | 56,423 Issuer Options | $2.067 | March 29, 2023 |
| All executive officers and directors of any subsidiaries of the Issuer, who are not named above | 63,435 Issuer Options | $1.49 | November 8, 2022 |
| | 126,870 Issuer Options | $2.01 | January 12, 2023 |
| | 4,229 Issuer Options | $2.01 | January 25, 2023 |
| All employees of the Issuer | 296,030 Issuer Options | $1.49 | November 8, 2022 |
| | 196,648 Issuer Options | $2.01 | January 12, 2023 |
| All other employees and previous employees of any subsidiaries of the Issuer | 395,413 Issuer Options | $0.4375 | June 26, 2023 |
| All consultants of the Issuer | N/A | N/A | N/A |
| All previous employees of the Issuer | N/A | N/A | N/A |
| Any other person | 2,684 Issuer Options | $0.931 | August 15, 2027 |
| | 260,083 Issuer Warrants | US$0.946 | October 30, 2019 |
| | 116,297 Issuer Options | $1.49 | November 8, 2022 |
| | 182,095 Issuer Options | $2.01 | January 12, 2023 |
| | 465,190 Issuer Options | $2.01 | January 25, 2023 |

Notes:

(1)      Expiry dates may vary.

## 10.    DESCRIPTION OF SECURITIES

The authorized share capital of the Issuer following the completion of the Arrangement shall consist of an unlimited number of common shares. The rights attaching to the Issuer Shares will be the same as that of the HyperBlock Shares. Holders of HyperBlock Shares are entitled to receive notice of, attend and vote at all meetings of the shareholders of HyperBlock (except with respect to matters requiring the vote of a specified class or series voting separately as a class or series) and are entitled to one vote for each HyperBlock Share on all matters to be voted on by shareholders at meetings of the shareholders of HyperBlock. Holders of HyperBlock Shares are entitled to receive such dividends if, as and when declared by HyperBlock Board, in their sole discretion. All dividends which the HyperBlock Board may declare shall be declared and paid in equal amounts per HyperBlock Shares on all HyperBlock Shares at the time outstanding. On liquidation, dissolution or winding up of HyperBlock, the holders of HyperBlock Shares will be entitled to receive the property of HyperBlock remaining after payment of all outstanding debts on a pro rata basis, but subject to the rights, privileges, restrictions and conditions of any

other class of shares issued by HyperBlock. There are no pre-emptive, redemption or conversion rights attached to the HyperBlock Shares. All HyperBlock Shares, when issued, are and will be issued as fully paid and non-assessable HyperBlock Shares without liability for further calls or to assessment.

As of the date of this Listing Statement, there are 131,620,919 HyperBlock Shares issued and outstanding, as well as 16,010,250 HyperBlock Shares issuable upon the conversion of HyperBlock Subscription Receipts upon the satisfaction of the Release Conditions and approximately 34,366,283 Issuer Shares issuable under the Spokane Purchase Agreement. On completion of the Arrangement, and assuming that the number of HyperBlock Shares and CryptoGlobal Shares outstanding does not change, it is expected that approximately 181,997,452 Issuer Shares will be issued to HyperBlock Shareholders (other than any HyperBlock Shareholders that validly exercise their statutory Dissent Rights).

As of the date of this Listing Statement, there are 142,071,933 CryptoGlobal Shares issued and outstanding as well as 4,505,355 CryptoGlobal Shares and 615,000 CryptoGlobal Shares issuable upon the exercise of the CryptoGlobal Options and CryptoGlobal Warrants, respectively. On completion of the Arrangement, and assuming that the number CryptoGlobal Shares and CryptoGlobal Options and CryptoGlobal Warrants outstanding does not change, it is expected that an aggregate of approximately 61,237,482 Issuer Shares will be issued to CryptoGlobal Shareholders (other than CryptoGlobal Shareholders that validly exercise their statutory Dissent Rights) including the 1,155,262 Issuer Shares issued through the Arrangement to settle outstanding payables. Approximately 2,165,397 Issuer Shares are issuable upon the exercise of the CryptoGlobal Options and CryptoGlobal Warrants.

The issued share capital of HyperBlock will change as a result of the consummation of the Arrangement to reflect the issuance of the HyperBlock Shares contemplated in the Arrangement. See Schedule "E" – "*Unaudited Pro Forma Condensed Consolidated Financial Statements of the Issuer*".

**Prior Sales**

*HyperBlock*

The following table summarizes issuances of securities within the twelve months prior to the date of the Listing Statement.

| Date | Type of Security | Number of Securities | Issue/Exercise Price per Security |
|---|---|---|---|
| October 10, 2017 | HyperBlock Shares | 1 | $0.001 |
| November 1, 2017 | HyperBlock Shares | 49,500,000[1] | $0.001 |
| November 8, 2017 | HyperBlock Shares | 11,825,000[2] | $0.01 |
| November 15, 2017 | HyperBlock Shares | 300,000 | $0.02 |
| November 22, 2017 | HyperBlock Shares | 15,920,000[3][4][5] | $0.04 |
| November 29, 2017 | HyperBlock Shares | 4,420,000 | $0.05 |
| December 19, 2017 | HyperBlock Shares | 38,496,445[6][7] | $0.35 |
| December 20, 2017 | HyperBlock Shares | 3,671,716 | $0.35 |

| December 22, 2017 | HyperBlock Shares | 1,559,191[8] | $0.35 |
| December 27, 2017 | HyperBlock Shares | 428,567 | $0.35 |
| January 15, 2018 | HyperBlock Shares | 571,428[9] | $0.35 |
| January 15, 2018 | HyperBlock Shares | 2,228,571[10] | $0.35 |
| February 28, 2018 | HyperBlock Shares | 200,000[11] | $0.35 |
| March 14, 2018 | HyperBlock Subscription Receipts | 13,214,852[12] | $1.75 |
| March 22, 2018 | HyperBlock Subscription Receipts | 1,140,508 | $1.75 |
| March 29, 2018 | HyperBlock Subscription Receipts | 1,654,890 | $1.75 |
| June 17, 2018 | HyperBlock Shares | 2,500,000[13][14] | $0.60 |

**Notes:**
(1) 3,762,337 HyperBlock Shares were beneficially issued to Sean Walsh, the Chief Executive Officer and a director of HyperBlock.
(2) 4,812,410 HyperBlock Shares were issued to Eric So, the Chairman of HyperBlock.
(3) 1,237,663 HyperBlock Shares were beneficially issued to Sean Walsh, the Chief Executive Officer and a director of HyperBlock.
(4) 2,624,951 HyperBlock Shares were issued to Windrock Investments, LLC, a company directly controlled by Hon. Ronald R. Spoehel, the Vice-Chairman of HyperBlock.
(5) 8,662,337 HyperBlock Shares were issued to Sean Walsh, the Chief Executive Officer and a director of HyperBlock.
(6) 428,570 HyperBlock Shares were issued to Eric So, the Chairman of HyperBlock.
(7) 300,000 HyperBlock Shares were issued to Windrock Investments, LLC, a company directly controlled by Hon. Ronald R. Spoehel, the Vice-Chairman of HyperBlock.
(8) 702,189 HyperBlock Shares were issued to Sean Walsh, the Chief Executive Officer and a director of HyperBlock.
(9) 571,428 HyperBlock Shares were issued to Deirdre Patterson, the spouse of Anthony Gaffney, a director of HyperBlock.
(10) 742,857 HyperBlock Shares were issued to EHL Holdings Inc., a company indirectly controlled by Eric So, the Chairman of HyperBlock.
(11) 200,000 HyperBlock Shares were issued to Dayna Gibbs, a director of HyperBlock.
(12) 3,245,714 HyperBlock Subscription Receipts were issued to Spokane, a company controlled by Sean Walsh, the Chief Executive Officer and a director of HyperBlock.
(13) 450,000 HyperBlock Shares were issued to EHL Holdings Inc., a company indirectly controlled by Eric So, the Chairman of HyperBlock.
(14) 250,000 HyperBlock Shares were issued to Windrock Capital LLC, a company directly controlled by Hon. Ronald R. Spoehel, the Vice-Chairman of HyperBlock.

### *CryptoGlobal*

The following table summarizes the securities of CryptoGlobal issued or sold through financings within the 60 months prior to the date of this Listing Statement.

| Date | Type of Security | Number of Securities | Issue/Exercise Price per Security |
| --- | --- | --- | --- |
| August 8, 2017 | CryptoGlobal Shares | 9,700,000[1] | US$0.0001 |
| September 17, 2017 | CryptoGlobal Shares | 15,675,000[1] | US$0.0001 |
| September 20, 2017 | CryptoGlobal Shares | 48,100,000[1] | US$0.023 |
| September 24, 2017 | CryptoGlobal Shares | 1,500,000[1] | US$0.06667 |
| October 17, 2017 | CryptoGlobal Shares | 25,000[1] | US$0.20 |
| October 26, 2017 | CryptoGlobal Shares | 19,800,000[1] | US$0.40 |
| October 30, 2017 | CryptoGlobal Shares | 10,200,000[1] | US$0.40 |

| October 30, 2017 | CryptoGlobal Warrants | 750,000[1] | - |
| December 1, 2017 | CryptoGlobal Shares | 12,000,000[1] | $0.85 |
| January 12, 2018 | CryptoGlobal Shares | 14,771[1] | $0.85 |
| March 29, 2018 | CryptoGlobal Shares | 21,661,636 | - |

**Note:**
(1)        Issued by CryptoGlobal Inc., a predecessor entity to CryptoGlobal.

## Stock Exchange Price

CryptoGlobal Shares are currently listed and posted for trading on the TSX-V under the symbol "CPTO". The following table shows the price ranges and volume of CryptoGlobal Shares traded during the last twelve months.

| Month | High ($) | Low ($) | Volume |
|---|---|---|---|
| January 29 – January 31 | 2.05 | 1.05 | 10.43 million |
| February | 1.95 | 0.79 | 18.27 million |
| March | 1.02 | 0.415 | 9.40 million |

On April 2, 2018, the last trading day prior to the date of the public announcement of the Arrangement, the closing price of CryptoGlobal Shares on the TSX-V was $0.50.

## 11.    ESCROWED SECURITIES

Not applicable.

## 12.    PRINCIPAL SHAREHOLDERS

Other than as described below, to the knowledge of HyperBlock and CryptoGlobal, no person or company will beneficially own, or control or direct, directly or indirectly, Issuer Shares carrying more than 10% of the voting rights attached to all outstanding Issuer Shares after completion of the Arrangement.

Upon the completion of the Arrangement, including the HyperBlock Offering and the Spokane Acquisition, Spokane will be issued approximately 37,611,997 Issuer Shares representing approximately 15.46% of the issued and outstanding Issuer Shares. As a result of the Spokane Acquisition, Sean Walsh will hold, directly and indirectly, approximately 51,976,523 Issuer Shares representing approximately 21.37% of the issued and outstanding Issuer Shares.

## 13.    DIRECTORS AND OFFICERS

### Directors, Officers and Management of the Issuer

The following table lists the names and municipalities of residence of the proposed, officers, and promoters of the Issuer upon completion of the Arrangement and Amalgamation, their current and anticipated positions and offices with the Issuer, respectively, their principal occupations during the last five years and the number and percentage of Issuer Shares anticipated to be owned, directly or indirectly, or over which control or discretion is exercised by each.

| Name and Municipality of Residence | Proposed Office with Resulting Issuer | Period of Service / Expiry of Service | Principal Occupation and Positions Held During the Last 5 Years | Number and Percentage of Issuer Shares Owned, Beneficially Held or Controlled upon Completion of the Arrangement and Amalgamation 243,234,934 |
|---|---|---|---|---|
| Sean Walsh<br><br>San Juan, Puerto Rico | Director<br>Chief Executive Officer | N/A | Manager of Project Spokane LLC (2016 – Present); Founder of Redwood City Ventures (2015 – Present); Vice President, Bertram Capital (2011 – 2015) | 51,976,523 (21.37%) |
| Robert Segal[1]<br><br>Toronto, Ontario, Canada | Director<br>President | N/A | Chief Executive Officer and Chairman at CryptoGlobal (2017-Present); Chief Executive Officer at Ruby Life Inc. (2016-2017); Chief Executive Officer at World Gaming Inc. (2010-2016) | 11,485,816 (4.72%) |
| Tim Smart<br><br>Pickering, Ontario, Canada | Interim Chief Financial Officer | N/A | Director and Chair of Risk Committee of Concentra Bank (2016 to Present); Chief Financial Officer Meridian Credit Union (2014 - 2018; Chief Financial Officer of OANDA Corporation (2012 – 2013) | Nil |
| Chris McGarrigle<br><br>Toronto, Ontario, Canada | Chief Information Officer | N/A | Chief Executive Officer, Blockchain Dynamics (2016 – Present); Chief Executive Officer, Nuatrix IT Consultancy (2014 – 2018); Senior Principal Consultant, NTT Data Canada (2012 – 2014. | 1,692,293 (0.69%) |
| Eric So[2][3]<br><br>Maple, Ontario, Canada | Director | N/A | Co-Founder, Managing Director and Chief Strategy Officer at Globalive Technologies Partners Inc. (2017 – Present); Special Advisor, Chief Legal and Corporate Development Officer at Mundo Inc. (2012 – 2017) | 6,433,837 (2.65%) |
| Hon. Ronald R. Spoehel[1][3]<br><br>Hobe Sound, Florida, United States | Director | N/A | Managing Partner, Windrock Investments, LLC (2010 – present); Managing Partner, Windrock Capital LLC (2013 – Present); Chief Financial Officer, National Aeronautics and Space Administration (NASA) (2007 – 2009) | 3,174,951 (1.31%) |
| Anthony Gaffney[2][3]<br><br>Toronto, Ontario, | Director | N/A | Director and Chair of Human Resources and Compensation Committee of the Altus Group (2012 | 571,428 (0.23%) |

| | | | | |
|---|---|---|---|---|
| Canada | | | to present); Director and Chair of Governance Committee at Presidents Choice Bank (2013 to 2018); Managing Partner at Odgers Berndtson (October 2017 to present); CEO of Aon Hewitt, Canada (2012 to 2016) | |
| Dayna Gibbs[(1)(2)]<br><br>Toronto, Ontario, Canada | Director | N/A | Founder of MPI Consulting (2016 – Present); Board Trustee of Agellan Commercial Real Estate Investment Trust (2017 – 2018); Director of Investment Banking, Real Estate Group at BMO Capital Markets | 200,000 (0.08%) |

**Notes:**
(1)    Member of the audit committee.
(2)    Member of the compensation committee.
(3)    Member of the governance committee.

Each of the proposed directors of the Issuer will hold office until the next annual meeting of the shareholders or until his successor is duly elected or appointed, unless his office is earlier vacated in accordance with The Issuer's articles or by-laws.

**Board Committees**

The Issuer currently has an audit committee, a compensation committee and a governance committee. A brief description of each committee is set out below..

**Audit Committee**

The audit committee assists the Issuer's Board of Directors in fulfilling its responsibilities for oversight of financial and accounting matters. The audit committee reviews the financial reports and other financial information provided by the Issuer to regulatory authorities and its shareholder and reviews the Issuer's system of internal controls regarding finance and accounting including auditing, accounting and financial reporting processes.

The members of the audit committee after completion of the Transaction include the following following three directors. Also indicated is whether they are "independent" and "financially literate" within the meaning of National Instrument 52-110 – *Audit Committees* ("**NI 52-110**").

| Name of Member | Independent[(1)] | Financially Literate[(2)] |
|---|---|---|
| Hon. Ronald R. Spoehel | No | Yes |
| Dayna Gibbs | Yes | Yes |
| Robert Segal | Yes | Yes |

Notes:

(1)    A member of the audit committee is independent if he or she has no direct or indirect 'material relationship' with the Issuer. A material relationship is a relationship which could, in the view of the Issuer's Board of Directors, reasonably interfere with the exercise of a member's independent judgment. An executive officer of the Issuer, such as the President or Secretary, is deemed to have a material relationship with the Issuer.

(2)   A member of the audit committee is financially literate if he or she has the ability to read and understand a set of financial statements that present a breadth and level of complexity of accounting issues that are generally comparable to the breadth and complexity of the issues that can reasonably be expected to be raised by the Issuer's financial statements.

**Compensation Committee**

The compensation committee assists the Issuer's Board of Directors in fulfilling its responsibilities for compensation philosophy and guidelines, and fixing compensation levels for the Issuer's executive officers. In addition, the compensation committee is charged with reviewing the employee stock option plan and proposing changes thereto, approving any awards of options under the employee stock option plan and recommending any other employee benefit plans, incentive awards and perquisites with respect to the Issuer's executive officers. The Compensation Committee is also responsible for reviewing, approving and reporting to the Issuer's Board annually (or more frequently as required) on the Issuer's succession plans for its executive officers.

The proposed members of the compensation committee after completion of the Transaction include the following three directors: Dayna Gibbs, Anthony Gaffney and Eric So.

**Governance Committee**

The governance committee, among other things, approves all transactions involving the Issuer and related parties, implements a process for assessing the effectiveness of the Issuer's Board, considers and recommends to the Board the number of directors of the Board.

The proposed members of the governance committee after completion of the Transaction include the following three directors: Eric So, Anthony Gaffney and Hon. Ronald R. Spoehel.

**Cease Trade Orders, Bankruptcies, Penalties or Sanctions**

To HyperBlock and CryptoGlobal's knowledge, except as disclosed hereinafter, as at the date hereof, or was, within 10 years before the date hereof, no director, chief executive officer or chief financial officer of any company (including HyperBlock and CryptoGlobal) that:

(a)    was subject to a cease trade order, an order similar to a cease trade order or an order that denied the relevant company access to any exemption under securities legislation, that was in effect for a period of more than 30 consecutive days and that was issued while such individual was acting in the capacity as director, chief executive officer or chief financial officer; or

(b)    was subject to a cease trade order, an order similar to a cease trade order or an order that denied the relevant company access to any exemption under securities legislation, that was in effect for a period of more than 30 consecutive days, that was issued after such individual ceased to be a director, chief executive officer or chief financial officer, and which resulted from an event that occurred while such individual was acting in the capacity as director, chief executive officer or chief financial officer.

To HyperBlock and CryptoGlobal's knowledge, except as disclosed hereinafter, no individual set forth in the above table or shareholder holding a sufficient number of securities of HyperBlock

and CryptoGlobal to affect materially the control of HyperBlock and CryptoGlobal, nor any personal holding company of any such individual:

(a)     is, as of the date hereof, or has been within 10 years before the date hereof, a director or executive officer of any company (including HyperBlock and CryptoGlobal) that, while such individual was acting in that capacity, or within a year of such individual ceasing to act in that capacity, became bankrupt, made a proposal under any legislation relating to bankruptcy or insolvency, was subject to or instituted any proceedings, arrangement or compromise with creditors, or had a receiver, receiver manager or trustee appointed to hold its assets; or

(b)     has, within the 10 years before the date hereof, become bankrupt, made a proposal under any legislation relating to bankruptcy or insolvency, become subject to or instituted any proceedings, arrangement or compromise with creditors, or had a receiver, receiver manager or trustee appointed to hold the assets of such individual; or

(c)     has been subject to (i) any penalties or sanctions imposed by a court relating to securities legislation or by a securities regulatory authority, or has entered into a settlement agreement with a securities regulatory authority; or (ii) any other penalties or sanctions imposed by a court or regulatory body that would likely be considered important to a reasonable investor in making an investment decision.

Mr. Eric So served as Vice-President, Corporate Strategy and General Counsel to Synergex Corporation between 2006 and 2012, during which time, on June 12, 2010, the British Columbia Securities Commission, Alberta Securities Commission and the Ontario Securities Commission issued a permanent cease trade order for failing to file audited annual financial statements and related management's discussion and analysis for the year ended December 31, 2009, the annual information form for the year ended December 31, 2009, the interim financial statements and related management's discussion and analysis for the three-month period ended March 31, 2010, and the certification of the foregoing filings as required by National Instrument 52-109 – *Certification of Disclosure in Issuers' Annual and Interim Filings*.

Mr. Ronald Spoehel was a director of STG Group, Inc., until resigning on November 20, 2017. Following the sale of the underlying operating company, STG, Inc., on April 11, 2018, the parent company, STG Group, Inc., ceased operations and on April 19, 2018, filed a voluntary petition under Chapter 7 of the U.S. Bankruptcy Code at the U.S. Bankruptcy Court Eastern District of Virginia.

Mr. Sean Walsh was a Managing Member of AQH, LLC ("**AQH**") during 2015. On February 18, 2015, the Members of AQH filed a voluntary petition under Chapter 11 of the U.S. Bankruptcy Code with the U.S. Bankruptcy Court for the Northern District of California. On June 20, 2016, the U.S. Bankruptcy Court granted the motion of the U.S. Trustee to dismiss the case for cause under § 1112(b)(4)(A) for continuing loss and no reasonable likelihood of rehabilitation.

On June 11, 2011 Mr. Sean Walsh filed a voluntary petition in his personal capacity under Chapter 7 of the U.S. Bankruptcy Code at the U.S. Bankruptcy Court for the Central District of California, which was discharged by the court on October 17, 2011.

**Conflicts of Interest**

To the knowledge of HyperBlock and CryptoGlobal, other than in relation to the Spokane Acquisition and as otherwise disclosed in this Listing Statement, there are no known existing or potential conflicts of interest between HyperBlock or CryptoGlobal and its directors (including the individuals who are not currently directors but will serve as HyperBlock's directors effective immediately following completion of the HyperBlock Offering) or officers as a result of their outside business interests except that certain of HyperBlock and CryptoGlobal's directors and officers serve as directors and officers of other companies, and therefore it is possible that a conflict may arise between their duties to HyperBlock, CryptoGlobal, and on completion of the Arrangement and Amalgamation, the Issuer, and their duties as a director or officer of such other companies.

**Biographies**

The biographies noted below provide certain selected information in respect of the persons who will be serving as officers and/or management of the Issuer. With the exception of Sean Walsh, who will be a full-time employee with the Issuer, all other officers and members of management will be considered independent contractors and expect to devote approximately 7% of their time to the Issuer. Sean Walsh entered into a non-competition and non-disclosure agreement with the Issuer, and Tim Smart has entered into a non-disclosure agreement with the Issuer. Other than Robert Segal who has entered into a consulting agreement, all other officers and members of management have not entered into formal agreements with the Issuer, but all including Robert Segal are subject to fiduciary responsibilities not to compete or disclose confidential information.

### Sean Walsh, Chief Executive Officer and Director, Age 46

Sean Walsh was the founder of Project Spokane, LLC, one of the largest cryptocurrency mining datacenters in North America. Mr. Walsh also founded Redwood City Ventures ("**RWCV**"), a Silicon Valley based advisory and investment firm targeting the Bitcoin and Crytocurrency ecosystem. Prior to RWCV, Mr. Walsh worked at the private equity firm, Bertram Capital, where he was responsible for Customer Acquisition, Product Management/Marketing, Ecommerce, Online Marketing, and Mobile Applications across more than a dozen operating companies in Bertram's $1+ Billion portfolio. In 2011, he co-founded a division called Bertram Labs which was later recognized for disrupting the trillion-dollar private equity middle market. Mr. Walsh has devoted more than 15 years of his career to launching and growing online and mobile businesses, has helped design a number of commercial telecom satellite networks and has been involved with various NASA research missions. Mr. Walsh holds an Aerospace Engineering degree from the University of Colorado, Boulder.

### Robert Segal, President and Director, Age 51

Robert Segal is a North American marketing and communications executive and entrepreneur. Mr. Segal founded Segal Communications (acquired by Interpublic in 2000) and went on to lead WorldGaming (acquired by Cineplex in 2015), and Ruby, and has worked with a number of global brands. Mr. Segal was a co-founder of CryptoGlobal and served as CryptoGlobal's Chief Executive Officer. He currently is a board member of OMX (theOMX.com) and Autism Speaks Canada. He holds a B.A. from the University of Western Ontario.

### Tim Smart, Interim Chief Financial Officer, Age 55

Tim Smart brings more than 25 years of cross industry experience to his role as Interim Chief Financial Officer. Mr. Smart holds an MBA from McMaster University and currently serves as a Director and Chair of the Risk Committee for Concentra Bank. Previously, Mr. Smart served as the Chief Financial Officer of Meridian, where he was responsible for overseeing the financial strength of the credit union, including risk mitigation, financial performance, strategy and building strong relationships with Meridians key financial partners. Prior to joining Meridian, Mr. Smart served as the Chief Financial Officer for a number of financial services and technology related companies including OANDA Corporation, Audatex Canada, Q9 Networks Inc. and First Asset Management Inc.

### Chris McGarrigle, Chief Information Officer, Age 39

As a senior information technology professional with over 20 years of experience in the industry, Mr. McGarrigle has become a reputable and trusted leader in Canadian IT Security. Mr. McGarrigle is recognized as an encryption and cyber security specialist, and prior to shifting his entrepreneurial focus completely onto the cryptocurrency space, he led NTT Data's North American Centre of Excellence for Virtualization and Windows Architecture and Design. His public sector experience spans energy, defence, municipal governments, and other utilities. He has served as a Senior Consultant across a range of multinational private sector financial organizations, including some of Europe's biggest banks such as HBOS, Barclays Wealth, RBS, and SAIC. Mr. McGarrigle founded one of Canada's first BitCoin mining operations, and has been deeply involved in the blockchain for over five years. In 2017, his expertise in financial technology, and proven abilities in planning, design, and implementation of tactical strategic solutions positioned him to establish Blockchain Dynamics.

### Eric So, Director, Age 42

Eric So is the Co-founder, Managing Director and Chief Strategy Officer of Globalive Technology Partners Inc., a Toronto-based technology company. Globalive Technology Partners Inc. was founded in 2017 and deploys strategic capital and develops AI, blockchain and IoT technology which it leverages through joint ventures with strategic partners. Mr. So is also a Director of Therapix Biosciences Inc. Mr. So has previously served as the Chief Legal Officer and Chief Corporate Development Officer of Mundo Inc. A Torys LLP alumnus, Mr. So has more than 15 years of experience advising public and private companies on corporate and commercial matters, mergers and acquisitions, securities, corporate finance, employment, technology and privacy law. Mr. So expects to devote 7% of his time to the Issuer and will be considered an independent contractor. Mr. So holds a law degree from the University of Windsor and Bachelor of Science from McGill University.

### Hon. Ronald R. Spoehel, Director, Age 60

Hon. Ronald R. Spoehel served as the Presidentially-appointed Senate-confirmed Chief Financial Officer of NASA and is a private investor with over 35 years of private investment, board, executive management, and investment banking experience, from Fortune 500 to technology start-ups. Mr. Spoehel presently serves as Managing Partner of Windrock Investments, LLC, and on the Board of Directors of publicly-traded Profire Energy, Inc., and Millennial Esports Corp. (Chairman). He also serves on other U.S. and international private company and advisory boards, including various EJF Capital investment funds and Republic Capital Access, a unit of Stephens Investments Holdings. He is a CIMA registered director and

a member of the Economic Club of Washington, D.C.  Prior to NASA, he was a partner is various investment companies and earlier served ten years in investment banking at Lehman Brothers and Bank of America.  In addition, he held various board, and financial and general management positions with globally operating public and private companies in the U.S., Canada, Latin America, and Europe.  Mr. Spoehel is an honors graduate of the University of Pennsylvania, where he received his BS in Economics and MBA in Finance from the Wharton School and MSE from the Moore School of Electrical Engineering.

### Anthony Gaffney, Director, Age 60

Anthony Gaffney is Managing Partner, Board and CEO Services at Odgers Berndtson, Canada. Mr. Gaffney has over 25 years of extensive Board and C-suite leadership experience across a wide variety of sectors and organizations. Mr. Gaffney was previously the CEO of Aon Hewitt, Canada and a key member of their Global Executive Committee. Before joining Aon Hewitt, Mr. Gaffney served as a Managing Partner at Accenture, and has served as the President and CEO of Bell Nexxia and as the CEO of BCE Emergis. He has also held international leadership positions with MCI Telecommunications, SHL Systemhouse Inc., and Andersen Consulting. Mr. Gaffney holds a Bachelor of Engineering (B.A.I.) degree and M.A. from Trinity College Dublin, and is a graduate of the Rotman Corporate Directors program (ICD.D). Mr. Gaffney serves on the board of the Altus Group. He has previously served on the boards of President's Choice Bank, the Toronto Region Board of Trade, Bishop Strachan School, Crescent School, Canada's Walk of Fame and the United Way Cabinet.

### Dayna Gibbs, Director, Age 41

Dayna Gibbs brings over fifteen years of finance and capital markets experience to HyperBlock. Ms. Gibbs currently serves as Chair of the Corporate Governance and Nominating Committee and a Trustee of the Board of Agellan Commercial Real Estate Investment Trust, a TSX-listed REIT with approximately 6.3 million square feet of gross leasable area across industrial, office and retail properties in select major urban markets in the U.S. and Canada.  Prior to founding MPI Consulting, a boutique professional life coaching and consulting firm, she held progressively senior positions in the real estate investment banking divisions of BMO Capital Markets, Brascan Financial Real Estate Group and RBC Capital Markets and was a registered representative with the Investment Dealers' Association.  Ms. Gibbs' areas of expertise included financial and strategic advisory services to both public and private real estate companies and investors across a broad range of asset classes and geographies. Transactional experience included initial public offerings, follow-on and secondary offerings of debt and equity, as well as mergers and acquisitions. Additionally, her prior capital markets experience encompassed global markets sales and trading, compliance and risk management. Ms. Gibbs holds an Honours Bachelor of Arts degree in Economics from the University of Western Ontario. She is a member of the Institute of Corporate Directors, a member of Women in Capital Markets and is a Fellow of The Institute of Coaching, McLean/Harvard Medical School.

## 14.    CAPITALIZATION

Please see Schedule "F" – "Post-Closing Capitalization of the Issuer" for the capitalization information required in Section 14 of CSE Form 2A.

## 15.    EXECUTIVE COMPENSATION

The Issuer will adopt the executive compensation program of HyperBlock for its Named Executive Officers, and Robert Segal and James Millership will enter into the Consulting Agreements (as described below).

### Compensation Components

The Issuer's compensation is expected to consist primarily of three elements: base salary, annual bonus and long term equity incentives. Each element of compensation is described below in more detail.

*Base Salary*

Base salaries for the Issuer's executive officers are to be established based on the scope of their responsibilities and their prior relevant experience, taking into account competitive market compensation paid by other companies in the Issuer's industry for similar positions and the overall market demand for such executives at the time of hire. An executive officer's base salary will also be determined by reviewing the executive officer's other compensation to ensure that the executive officer's total compensation is in line with the Issuer's overall compensation philosophy.

Base salaries are to be reviewed annually and increased for merit reasons, based on the executive officers' success in meeting or exceeding individual objectives, and taking into account prevailing market conditions. Additionally, the Issuer will adjust base salaries as warranted throughout the year for promotions or significant changes in the scope or breadth of an executive officer's role or responsibilities.

*Annual Bonus*

The Issuer's compensation program will include eligibility for an annual incentive cash bonus. Annual incentive cash bonuses are discretionary and are not awarded pursuant to a formal plan. The Issuer Board will assess the level of the executive officer's achievement of meeting individual goals, as well as that executive officer's contribution towards corporation-wide goals. The amount of the cash bonus is expected to depend on the level of achievement of the individual performance goals, with a target bonus generally to be set as a percentage of base salary and based on profitability measures.

*Long Term Equity Incentives*

The Issuer believes that equity-based awards will allow it to reward executive officers for their sustained contributions to the Issuer. The Issuer also believes that equity awards reward continued employment by an executive officer, with an associated benefit to HyperBlock of employee continuity and retention. The Issuer Board believes that incentive stock options and other equity incentive awards provide management with a strong link to long-term corporate performance and the creation of shareholder value. The Issuer's stock option plan (the "**Stock Option Plan**") will allow the Issuer the opportunity to grant stock options to purchase HyperBlock Shares as well as various other awards. The Issuer Board will not issue stock options or awards according to a prescribed formula or target but will take into account the individual's position, scope of responsibility, ability to affect profits and the individual's historic and recent performance and the value of the awards in relation to other elements of the executive's total compensation. The Issuer Board will take previous grants of stock options and

awards into consideration when considering new grants of stock options and awards under the Stock Option Plan.

The Issuer intends to consider the implications of the risks associated with the Issuer's compensation policies and practices.

### Compensation Governance

The Issuer's compensation practices will be designed to retain, motivate and reward its executive officers for their performance and contribution to the Issuer's long-term success. The Issuer has not yet established a compensation committee, but intends to develop a compensation committee.

### Summary Compensation Table

The following table sets out information concerning the expected fiscal 2018 compensation to be paid to each of the Issuer's NEOs, excluding any stock options, awards or other compensation security.

| Compensation Table | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Name and principal position | Year | Salary/Fee ($) | Share-based awards ($) | Option-based awards ($) | Non-equity incentive plan compensation ($) | | Pension value ($) | All other compensation ($) | Total compensation ($) |
| | | | | | Annual Incentive Plans ($) | Long-term Incentive Plans ($) | | | |
| Sean Walsh, Director and Chief Executive Officer | 2018 | 309,120 | Nil | Nil | 154,560 | Nil | Nil | Nil | 463,680 |
| Robert Segal, President | 2018 | 175,000 | Nil | Nil | 175,000 | Nil | Nil | Nil | 300,000 |
| Tim Smart, Interim Chief Financial Officer | 2018 | 480,000[1] | Nil | Nil | Nil | Nil | Nil | Nil | 480,000 |
| Chris McGarrigle, Chief Information Officer | 2018 | 150,000 | Nil | 49,313.7 | 112,500 | Nil | Nil | Nil | 311,813.7 |

(1) Mr. Smart is providing servies through FAAN Advisors Group Inc.

**Share Based and Option Based Awards**

The following table sets out the outstanding share based and option based awards for each NEO at the end of the Issuer's most recently completed financial year.

| Name | Option-based Awards | | | | Share-based Awards | | |
|---|---|---|---|---|---|---|---|
| | Number of Securities underlying unexercised options (#) | Option Exercise Price ($) | Option Expiration Date | Value of unexercised in-the-money options ($) | Number of shares that have not vested (#) | Market or payout value of share-based awards that have not vested ($) | Market or payout of vested share-based awards not paid out or distributed ($) |
| Sean Walsh, Director and Chief Executive Officer | Nil | Nil | Nil | Nil | Nil | Nil | Nil |
| Robert Segal, President | Nil | Nil | Nil | Nil | Nil | Nil | Nil |
| Tim Smart, Interim Chief Financial Officer | Nil | Nil | Nil | Nil | Nil | Nil | Nil |
| Chris McGarrigle, Chief Information Officer | 56,423 | $0.874 | March 29, 2023 | Nil | Nil | Nil | Nil |
| | 126,870 | $0.4375 | June 26, 2023 | | | | |

**Incentive Plan Awards**

As of the date of the Listing Statement, the Issuer has not granted stock options to purchase Issuer Shares under its Stock Option Plan. The Stock Option Plan was approved by the Issuer Board.

*Summary of the Stock Option Plan*

Any senior officer, director, employee, management company employee, consultant, or investor relations person of the Issuer or its subsidiaries (each as described in the Stock Option Plan and each, an "**Eligible Person**") is eligible to receive options under the Stock Option Plan.

1. Issuer Shares Subject to Stock Option Plan

   The Stock Option Plan provides that the maximum number of Issuer Shares which may be available for issuance under the Stock Option Plan will not exceed 10% of the total number of Issuer Shares issued and outstanding from time to time.

*Limits with Respect to Insiders*

(a) The maximum number of Issuer Shares which may be reserved for issuance under options granted to insiders (as a group) under the Stock Option Plan, together with any other of the Issuer's previously established and outstanding stock option plans or grants, shall be 10% of the Issuer Shares issued and outstanding at the time of the grant (on a non-diluted basis); and

(b) The maximum number of options which may be granted to insiders (as a group) under the Stock Option Plan, together with any other of the Issuer's previously established and outstanding stock option plans or grants, within any 12 month period shall be 10% of the issued Issuer Shares, calculated on the date an option is granted to any insider (on a non-diluted basis).

*Limits with Respect to Consultants and Investor Relations Person*

(a) The maximum number of options which may be granted to any one consultant under the Stock Option Plan, together with any other of The Issuer's previously established and outstanding stock option plans or grants, within any 12 month period, must not exceed 2% of the issued and outstanding Issuer Shares, calculated at the date an option is granted to such consultant (on a non-diluted basis)

(b) The maximum number of options which may be granted to all investor relations persons under the Stock Option Plan, together with any other of The Issuer's previously established and outstanding stock option plans or grants, within any 12 month period, must not exceed, in the aggregate, 2% of the issued and outstanding Issuer Shares, calculated on the date an option granted to any such investor relations person (on a non-diluted basis).

2. Exercise of Options

The exercise price of options issued may not be less than the closing price of the Issuer Shares on the exchange on which the Issuer Shares are listed (and if the Issuer Shares are not listed on an exchange, the fair market value determined by the Issuer Board) at the time the option is granted, subject to the minimum exercise price allowable by the stock exchange on which the Issuer's securities are listed. Subject to the provisions of the Stock Option Plan and the particular option, an option may be exercised, in whole or in part, by delivering a written notice of exercise to the Issuer along with payment in cash or certified cheque for the full amount of the purchase price of the Issuer Shares then being purchased.

3. Term and Expiry Date

The period within which options may be exercised and the number of options which may be exercised in any such period are determined by the Issuer Board at the time of granting the options provided, however, that the maximum term of any options awarded under the Stock Option Plan is five years.

4.  Vesting

All options granted pursuant to the Stock Option Plan will be subject to such vesting requirements as may be prescribed by the stock exchange on which the Issuer's securities are listed, if applicable, or as may be imposed by the Issuer Board.  All options granted to investor relations persons must vest in stages over not less than 12 months with no more than one-quarter of the options vesting in any three-month period.

5.  Termination of Options

An optionee who ceases to be an Eligible Person for any reason, other than as a result of having been dismissed for cause or as a result of the optionee's death, may exercise any vested and unexpired options held by such optionee for a period of 90 days from the date of cessation (or until the normal expiry date of the option rights of such optionee, if earlier), subject to extension by the Issuer Board to a maximum of 12 months.   An optionee who was engaged in providing investor relation activities may exercise any vested and unexpired options held by such optionee for a period of 30 days from the date that the optionee ceased to provide such investor relations activities.

In the event of a death of the optionee, the optionee's representative may exercise any vested and unexpired options held by the optionee for a period of 12 months from the optionee's death (unless such period is extended by the Issuer Board). Any extention of the exercise period by the Issuer Board is subject to the approval of the stock exchange on which the Issuer's securities are listed, if applicable.

If an optionee ceases to be an Eligible Person as a result of having been dismissed for cause, all unexercised options of that optionee under the Stock Option Plan shall immediately become terminated and shall lapse.

6.  Transferability

Options granted under the Stock Option Plan will be non-assignable and non-transferable by an optionee other than pursuant to a will or by the laws of descent and distribution, and such option shall be exercisable, during an optionee's lifetime, only by the optionee.

7.  Capital Changes, Corporate Transactions and Change of Control

The Stock Option Plan contains provisions for the treatment of options in relation to capital changes and with regard to a reorganization, stock split, stock dividend, combination of shares merger, consolidation, rights offering or any other change in the corporate structure or shares of the Issuer.  The aggregate number and kind of shares available under the Stock Option Plan shall be appropriately adjusted in the event of a reorganization, recapitalization, stock split, stock dividend, combination of shares, merger, consolidation, rights offering or any other change in the corporate structure or shares of the Issuer.

In the event of (i) an acquisition of beneficial ownership or more than 50% of the outstanding voting securities of the Issuer, (ii) any consolidation, reorganization, merger,

amalgamation or arrangement, (iii) any sale, lease, exchange or transfer of all or substantially all of the assets of the Issuer, (iv) approval by the the Issuer Shareholders of any plan of liquidation or dissolution of the Issuer, or (v) the replacement by way of election or appointment at any time of one-half or more of the total number of the Issuer Board (each event as more particularly described in the Stock Option Plan and each defined as an "**Acceleration Event**"), provided that the Issuer Board has determined that no adjustment shall be made pursuant to the Stock Option Plan, the Issuer Board may (i) permit the optionee to exercise the option granted, as to all or any of the optioned shares in respect of which such option has not previously been exercised (regardless of any vesting restrictions), during the period specified in the notice (but in no event later than the expiry date of the option), so that the optionee may participate in such transaction, offer or proposal, and (ii) require the acceleration of the time for the exercise of the said option and of the time for the fulfilment of any conditions or restrictions on such exercise   Further, the Issuer Board, it its sole discretion, may authorize and implement any one or more of the following additional courses of action in the event of an Acceleration Event:

    (a) terminating without any payment or other consideration, any options not exercised or surrendered by the effective time of the Acceleration Event;

    (b) causing the Issuer to offer to acquire from each optionee his or her options for a cash payment equal to the in-the-money amount, and any options not so surrendered or exercised by the effective time of the Acceleration Event will be deemed to have expired; and

    (c) an option granted under the Stock Option Plan be exchanged for an option to acquire, for the same aggregate consideration, that number and type of securities as would be distributed to the optionee in respect of the shares issued to the optionee had he or she exercised the option prior to the effective time of the Acceleration Event, provided that any such replacement option must provide that it survives for a period of not less than one year from the effective time of the Acceleration Event, regardless of the continuing directorship, officership or employment of the optionee.

8. Amendment and Termination of the Stock Option Plan

The Issuer Board may at any time amend or terminate the Stock Option Plan, but where amended, such amendment is subject to regulatory approval.

**Outstanding Stock Options and Awards**

As of the date of the Listing Statement, there are 4,505,355 CryptoGlobal Options outstanding. Upon completion of the Arrangement, the 4,505,355 CryptoGlobal Options will be exchanged for 1,905,314 Issuer Options.

**Pension Benefits**

The Issuer does not have a pension plan that provides for payments or benefits to the Named Executive Officers at, following, or in connection with retirement.

**Employment Agreements, Termination and Change of Control Benefits**

On November 29, 2017, HyperBlock entered into an employment agreement with Sean Walsh to govern Mr. Walsh's role as Chief Executive Officer of HyperBlock ("**Walsh Employment Agreement**"). The Walsh Employment Agreement became effective as of the Sale Closing on December 19, 2017. The Issuer will adopt the Walsh Employment Agreement. The Walsh Employment Agreement will continue indefinitely, until terminated in accordance its terms. Pursuant to the Walsh Employment Agreement, the Issuer will pay Mr. Walsh a base salary of US$240,000 annually, payable in installments according to the customary practices of HyperBlock. Further, Mr. Walsh will participate in the Issuer's annual incentive bonus plan, which will be determined annually by the HyperBlock Board. In 2017, Mr. Walsh was not eligible for a bonus, but in 2018 Mr. Walsh may earn an annual incentive of up to 50% of his base salary. The Company may terminate Mr. Walsh's employment without cause and without advance notice provided that the Company pays a severance amount equal to six months of Mr. Walsh's annual salary. Mr. Walsh may terminate employment prior to the expiration of the term or following a Change of Control (as such term is defined in the Walsh Employment Agreement) in the event that there is a Good Reason (as such term is defined in the Walsh Employment Agreement). If Mr. Walsh resigns from his employment for a Good Reason or within 90 days of events constituting a Good Reason, and HyperBlock has not cured such breach, default, reduction or requirement within 30 days of receiving written notice of such breach, default, reduction or requirement, Mr. Walsh shall be paid (i) his salary through the date of termination, (ii) any unused vacation time, (iii) reimbursed for any business expenses that are subject to reimbursement under HyperBlock's then current policy on business expenses, and (iv) receive a severance amount equal to six months of Mr. Walsh's annual salary as of the termination date.

On April 12, 2018, HyperBlock entered into contractual agreement with FAAN Advisors Group Inc. ("**FAAN**"), pursuant to which FAAN will provide the services of its contractor, Tim Smart, to serve as the Interim Chief Financial Officer of HyperBlock ("**Smart Agreement**"). Mr. Smart commenced providing services to HyperBlock as the Interim Chief Financial Officer on April 20, 2018. The Issuer will adopt the Smart Agreement. The Smart Agreement will continue for a minimum of three months, after which it may be terminated in accordance with its terms. Pursuant to the Smart Agreement, the Issuer will pay FAAN a fee of C$40,000 per month, plus applicable taxes and out-of-pocket expenses reasonably incurred in connection with the Smart Agreement, and remitted a retainer of C$40,000 plus applicable taxes to FAAN. In the event that the Issuer employs or otherwise contracts with FAAN or its personnel (the "**FAAN Personnel**"), or any individual whom FAAN has identified as a candidate within 12 months of FAAN having presented such individual to the Issuer, the Issuer shall pay FAAN a fee equal to 25% of such individual's first-year compensation. In addition, the Issuer agrees not to use the services of any FAAN Personnel, or any individual whom FAAN has identified as a candidate, as its direct consulant, as an independent contractor, or through any person or firm other than FAAN during or within the twelve-month period from the Smart Agreement, unless the Issuer provides 14 days prior written notice to FAAN and pays a buy-out fee equal to 25% of such individual's first-year compensation.

**Consulting Agreements**

Mr. James Millership and Mr. Robert Segal, former members of CryptoGlobal's management team and the CryptoGlobal Board have entered  will enter in to the Consulting Agreements and will carry on in management roles at the Issuer for a period of no less than twelve months. The Consulting Agreements replace Mr. Millership and Mr. Segal's current employment agreements with CryptoGlobal (the "**CryptoGlobal Management Employment Agreements**") in their

entirely, including all benefits, bonuses and change of control payments that they would otherwise have been entitled to. Pursuant to the CryptoGlobal Management Employment Agreements, each of Messrs. Millership and Segal's compensation was currently set at a base salary of $175,000, with annual cash bonus eligibility of up to 100% of the base salary, based on corporate and personal performance targets and participation in CryptoGlobal's group insurance benefits (upon availability) and monthly parking, as well as a change of control payment comprised of: (i) a lump sum representing 24 months of average base salary earnings in the two years immediately preceding the change of control (less applicable deductions); (ii) a lump sum payment representing two times the average annual bonus paid in the two years immediately preceding the change of control (less applicable deductions); and (iii) and continuation of benefits under CryptoGlobal's group insurance benefits (upon availability) for a period of 24 months following the change of control (collectively, the "**Employment Benefits**"). Where two full years of employment have not been completed prior to a change of control, the lump sum amount in (ii) shall be two times the targeted bonus for the employee as of the date the change of control occurs. The Arrangement constitutes a change of control for the purposes of the CryptoGlobal Management Employment Agreements.

Pursuant to the Consulting Agreements, following the completion of the Arrangement, in their respective roles with the Issuer, each of Messrs. Millership and Segal will be paid: (i) a consulting fee of $20,833 per month; (ii) a $150,000 cash payment upon commencement of hashrate sales from the servers owned by CryptoGlobal prior to completion of the Arrangement; and (iii) a signing bonus equal to 700,000 Issuer Shares provided that in certain circumstances, such signing bonuses will not be required to be paid or the value of the signing bonuses will be reduced (collectively, the "**Consulting Benefits**"). Additionally, the Consulting Agreements include payments upon certain change of control or termination events.

### Director Compensation

No compensation is currently paid to the directors of the Issuer. The Issuer intends to compensate its directors commiserately with current industry standards. Directors will also be reimbursed for their out-of-pocket expenses incurred in connection with rendering services to the Issuer.

## 16.   INDEBTEDNESS OF DIRECTORS AND EXECUTIVE OFFICERS

As of the date hereof, there was no indebtedness owing to the Issuer from any of its directors or executive officers or any associate of such person, including in respect of indebtedness to others where the indebtedness is the subject of a guarantee, support agreement, letter of credit or other similar arrangement provided by the Issuer or any of its subsidiaries.

## 17.   RISK FACTORS

The business and operations of the Issuer will continue to be subject to the risks currently faced by HyperBlock and CryptoGlobal, as well as certain risks unique to the Issuer upon completion of the Arrangement and Amalgamation. Below are the risk factors related to the Issuer in connection with the Arrangement, risk factors related to cryptocurrency generally and the Issuer's participation in the cryptocurrency industry, and risk factors related to the Issuer with respect to each of the businesses of HyperBlock and CryptoGlobal.

**Risk Factors Related to Cryptocurrency**

***Cryptocurrency may be exposed to cybersecurity threats and hacks.***

As with any computer code, flaws in cryptocurrency codes have been exposed by certain malicious actors. Several errors and defects have been found and corrected, including those that disabled some functionality for users and exposed users' information. Discovery of flaws in or exploitations of the source code that allow malicious actors to take or create money have been relatively rare.

The Issuer 's cryptocurrency inventory may be lost or severely reduced as a result of flaws in the cryptocurrency code. Further, there may be fraud or security failures of the cryptocurrency exchanges on which the Issuer 's cryptocurrencies are exchanged, resulting in closures of the cryptocurrency exchanges or complete losses of the Issuer 's cryptocurrency balance. To the extent that cryptocurrency exchanges or other trading venues are involved in fraud or experience security failures or other operational issues, this could result in a reduction in cryptocurrency prices.

***Regulatory developments could change the nature of an investment in the Issuer or restrict the use of cryptocurrencies in a way that adversely affects the Issuer's business.***

As cryptocurrencies have grown in both popularity and market size, governments around the world have responded to cryptocurrencies differently: some governments have deemed them illegal, while others have allowed their use and trade. On-going and future regulatory actions may alter, perhaps to a materially adverse extent, the ability of the Issuer to continue to operate.

The effects of future regulatory developments on the Issuer or any cryptocurrency that the Issuer may hold are impossible to predict, but such developments could be substantial and adverse to the Issuer's business.

Governments could restrict or ban the acquisition, use or redemption of cryptocurrencies. Ownership of, holding or trading in cryptocurrencies could then be considered unlawful and subject to penalty. Governments could also take regulatory action that may increase the cost and/or subject cryptocurrency companies to additional regulation. For example, on July 25, 2017 the United States Securities and Exchange Commission reported that it would, in some circumstances, consider the offer and sale of blockchain tokens pursuant to an initial coin offering subject to U.S. securities laws.

Governments may in the future take regulatory actions that restrict or ban the right to acquire, own, hold, sell, use or trade cryptocurrencies or to exchange cryptocurrencies for fiat currency. By extension, similar actions by other governments could restrict the acquisition, ownership, holding, selling, use or trading in the Issuer. Such a restriction could result in the Issuer liquidating its cryptocurrency inventory at unfavourable prices and may adversely affect the Issuer's shareholders, or the Issuer may be unable to liquidate its inventory of cryptocurrencies.

Regulatory agencies have begun intervening to rectify fraud and other misconduct in the market. For example, PlexCorps, a Montreal-based cryptocurrency startup, was recently charged with fraud by the U.S. SEC and the Quebec AMF in connection with its ICO. Similarly, Munchee's ICO was also shut down by the SEC, forcing Munchee to return approximately $15MM for allegedly contravening U.S. securities laws. Additionally, coin issuers and exchanges have been subject to class action litigation in the U.S. Most significantly, BitConnect,

a significant Bitcoin exchange, shuttered its business after receiving cease and desist letters from the SEC, prompting investors to launch a class action.

***Incorrect or fraudulent coin transactions may be irreversible.***

In most cases, cryptocurrency transactions are irrevocable and stolen or incorrectly transferred coins may be irretrievable. As a result, most incorrectly executed or fraudulent coin transactions could adversely affect the Issuer's investments. Coin transactions are not, from an administrative perspective, reversible without the consent and active participation of the recipient of the transaction. In theory, cryptocurrency transactions may be reversible with the control or consent of a majority of processing power on the network. However, once a transaction has been verified and recorded in a block that is added to the blockchain, an incorrect transfer of a coin or a theft of coin generally will not be reversible and the Issuer may not be capable of seeking compensation for any such transfer or theft. It is possible that the Issuer 's coins could be transferred in incorrect amounts or to unauthorized third parties, or to uncontrolled accounts.

***Malicious actors could alter the blockchain.***

If a malicious actor or botnet (a volunteer or hacked collection of computers controlled by networked software coordinating the actions of the computers) obtains a majority of the processing power dedicated to "mining" of the Issuer it may be able to alter the blockchain on which cryptocurrency transactions rely. In such circumstances, the malicious actor or botnet could control, exclude or modify the ordering of transactions, though it could not generate new cryptocurrency or transactions using such control. The malicious actor or botnet could double spend its own cryptocurrency and prevent the confirmation of other users' transactions for so long as it maintains control. Such changes could adversely affect an investment in the Issuer.

***Cryptocurrency exchanges and digital wallets may be hacked.***

In the event that trading platforms and digital wallets are hacked, this could lead to a loss of any investment made in the Issuer.

***The Issuer's coins may be subject to loss, theft or restrictions on access.***

Cryptocurrencies are controllable only by the possessor of both the unique public and private keys relating to the local or online digital wallet in which they are held, which wallet's public key or address is reflected in the network's public blockchain. The Issuer will publish the public key relating to digital wallets in use when it verifies the receipt of transfers and disseminates such information into the network, but it will need to safeguard the private keys relating to such digital wallets. The loss or destruction of the private key required to access the Issuer's digital wallets may be irreversible, and the Issuer's loss of access to its private keys or its experience of a data loss relating to the Issuer's digital wallets could adversely affect its investments and profitability. Further, there is a risk that some or all of the Issuer 's coins or tokens could be lost or stolen. Access to the Issuer's inventory of coins or tokens could also be restricted by cybercrime (such as a denial of service (DDoS) attack) against a service at which the Issuer maintains a hosted online wallet. To the extent such private keys are lost, destroyed or otherwise compromised, the Issuer will be unable to access its coins and such private keys will not be capable of being restored by the network. Any loss of private keys relating to digital wallets used to store the Issuer 's inventory of cryptocurrencies could adversely affect its investments and profitability.

If the Issuer's inventory of cryptocurrencies are lost, stolen or destroyed under circumstances rendering a party liable to the Issuer, the responsible party may not have the financial resources sufficient to satisfy the Issuer's claim.

### Potential restrictions on ownership and use.

Although currently cryptocurrency is not regulated or is lightly regulated in most countries, including Canada, one or more countries may take regulatory actions in the future that severely restricts the right to acquire, own, hold, sell or use cryptocurrency or to exchange cryptocurrency for fiat currency. For example, government officials in South Korea and China have taken steps to regulate cryptocurrency and cryptocurrency exchanges. In 2017, the South Korea Financial Services Commission placed restrictions on initial coin offerings, and in January 2018 announced a ban on trading through South Korean based cryptocurrency accounts by foreigners. Like South Korea, the People's Bank of China banned initial coin offerings in September 2017 and subsequently issued a publication in February 2018 citing its commitment to monitoring and blocking domestic access to cryptocurrency exchanges. Such restrictions, including the possibility or contemplation of such restrictions, may adversely affect the Issuer 's operations or the market price of the Issuer 's securities.

### Regulatory changes may result in extraordinary, non-recurring expenses.

The Issuer may be required to comply with regulations that may cause the Issuer to incur extraordinary expenses, possibly affecting an investment in the Issuer in a material and adverse manner. Compliance with such regulations may result in extraordinary and non-recurring expenses that may be disadvantageous to the Issuer and its operations.

### Cryptocurrency prices may be subject to momentum pricing risk.

Momentum pricing typically occurs when a price, as determined by the investing public, accounts for anticipated future appreciation in value – for example, a growth stock. Cryptocurrency market prices are determined primarily using data from various exchanges, over-the-counter markets, and derivative platforms. Momentum pricing may have resulted, and may continue to result, in speculation regarding future appreciation in the value of cryptocurrencies, inflating and making their market prices more volatile. As a result, cryptocurrency prices may be more likely to fluctuate in value due to changing investor confidence in future appreciation (or depreciation) in their market prices, which could adversely affect the value of the Issuer's cryptocurrency inventory and thereby affect the Issuer's shareholders.

### Cryptocurrency prices may fluctuate.

The price of cryptocurrency has fluctuated widely over the past three years. There is no assurance that cryptocurrency will maintain long-term value in terms of purchasing power in the future or that the acceptance of cryptocurrency payments by mainstream retail merchants and commercial businesses will continue to grow. In the event that the price of cryptocurrency declines, the value of an investment in the Issuer will likely decline. Further, the price of the Issuer's securities and the overall success of the Issuer is tied to the price of cryptocurrency, which is outside of the Issuer's control.

Further, the collapse of any cryptocurrency exchange may limit the liquidity of cryptocurrency and result in volatile prices. The price of cryptocurrency on cryptocurrency exchanges may also

be impacted by policies on or interruptions in the deposit or withdrawal of fiat currency into or out of cryptocurrency exchanges. An investment in the Issuer may be adversely affected by pricing on any cryptocurrency exchange.

***The nascent cryptocurrency exchanges and other trading venues are young and largely unregulated, and may therefore be vulnerable to fraud and failure***

If a cryptocurrency exchange or other trading venue is involved in fraud or experiences a security failure or other operational issue, this could result in a reduction in cryptocurrency prices.

Cryptocurrency prices depend, directly and indirectly, on the prices set on exchanges and other trading venues. Cryptocurrency exchanges and other trading venues are new and, in most cases, largely unregulated when compared to established, regulated exchanges for securities, derivatives and other currencies. In many instances, customers of the closed Bitcoin Exchanges were not compensated for the partial or complete losses of their account balances. While smaller exchanges are less likely to have the infrastructure and capitalization that provide larger exchanges with additional stability, larger exchanges may be more likely to be appealing targets for hackers and "malware" (i.e., software used or programmed by attackers to disrupt computer operation, gather sensitive information or gain access to private computer systems) and may be more likely to be targets of regulatory enforcement action.

***Businesses that provide cryptocurrency-related services or that accept cryptocurrencies as payment may have difficulty obtaining traditional banking services.***

Some companies that provide cryptocurrency-related services have been unable to find banks willing to provide them with bank accounts and banking services. Similarly, a number of cryptocurrency-related companies have had their existing bank accounts closed by their banks. Banks may refuse to provide bank accounts and other banking services to cryptocurrency-related companies or companies that accept cryptocurrencies for a number of reasons, including perceived compliance risks or costs. The difficulty that many businesses that provide cryptocurrency-related services have and may continue to have in finding banks willing to provide them with bank accounts and other banking services may be currently decreasing the usefulness of cryptocurrencies as a payment system and harming public perception of cryptocurrencies or could decrease its usefulness and harm its public perception in the future. Similarly, the usefulness of cryptocurrencies as a payment system and the public perception of cryptocurrencies could be damaged if banks were to close the accounts of key businesses providing cryptocurrency-related services. This could decrease the market prices of cryptocurrencies and adversely affect the value of the Issuer's cryptocurrency inventory.

***The relationship between geopolitical events and the supply and demand for cryptocurrencies is uncertain.***

Crises may motivate large-scale purchases of cryptocurrencies, which could rapidly inflate the price of cryptocurrencies. This may increase the likelihood of a subsequent price deflation as crisis-driven purchasing wanes, adversely affecting the value of the Issuer's cryptocurrency inventory.

The large-scale purchase of cryptocurrencies in times of crisis may temporarily increase cryptocurrency prices. For example, in March 2013, reported uncertainty in the economy of the Republic of Cyprus and the imposition of capital controls by Cypriot banks motivated individuals

in Cyprus and other countries with similar economic situations to purchase Bitcoins. This resulted in a significant short-term positive impact on the price of Bitcoins. However, once the purchasing activity of individuals in this situation began to wane, speculative investors began to sell their Bitcoins, which significantly decreased the price of Bitcoins. Crises of this nature in the future may erode investors' confidence in the stability of cryptocurrencies and may impair their price performance which would, in turn, adversely affect the Issuer's investments.

As an alternative to fiat currencies backed by central governments, cryptocurrencies are subject to supply and demand forces based upon the desirability of an alternative, decentralized means of buying and selling goods and services, and it is unclear how geopolitical events will impact cryptocurrency supply and demand. Nevertheless, political or economic crises may motivate large-scale acquisitions or sales of cryptocurrency either globally or locally. Large-scale sales of cryptocurrencies would result in a reduction in their market prices and adversely affect the Issuer's operations and profitability.

***Development and acceptance of the cryptographic and algorithmic protocols that govern the issuance of and transactions in cryptocurrencies are subject to a variety of unpredictable factors.***

The use of cryptocurrencies in place of fiat currencies is part of a new and rapidly evolving industry that employs digital assets based on computer-generated mathematical and/or cryptographic protocol. This industry in general, and cryptocurrencies in particular, is subject to a high degree of uncertainty. If the development or acceptance of protocols slows, the Issuer's business may be adversely affected. The factors potentially affecting the industry's future development include, but are not limited to:

- Continued worldwide growth in the adoption and use of cryptocurrencies;
- Regulation of cryptocurrencies, or regulation of access to and operation of the network or similar cryptocurrency systems;
- Changes in consumer demographics and public tastes and preferences;
- Maintenance and development of the open-source software protocol of the network;
- The availability and popularity of other forms or methods of buying and selling goods and services, including new means of using fiat currencies;
- General economic conditions and the regulatory environment relating to digital assets; and
- Negative consumer sentiment and perception cryptocurrencies.

A decline in the popularity or acceptance of cryptocurrency would harm the business and affairs of the Issuer.

***Widespread acceptance and use of cryptocurrency is uncertain.***

Currently, there is relatively small use of Bitcoins and/or other cryptocurrencies in the retail and commercial marketplace in comparison to relatively large use by speculators, which contributes to price volatility that could adversely affect the Issuer's business.

As relatively new products and technologies, cryptocurrencies have not been widely adopted as a means of payment for goods and services by major retail and commercial outlets. Speculators and investors seeking to profit from short or long-term holding of cryptocurrencies currently generate a significant portion of cryptocurrency demand. The relative lack of acceptance of cryptocurrencies in the retail and commercial marketplace limits the ability of end-users to use

them to pay for goods and services. If cryptocurrencies do not expand into retail and commercial markets, or experience a contraction in use in those markets, cryptocurrency prices may become volatile or decrease, either of which could adversely impact the Issuer's business.

The ability to use cryptocurrency is limited by the willingness of others to accept it as no law requires companies or individuals to accept them as a form of payment for goods and services. In the event that no company or individual is willing to accept cryptocurrency they will not have any value and the Issuer's operations will be negatively impacted.

***Cryptocurrency is not covered by deposit insurance.***

Transactions using cryptocurrency are not covered by deposit insurance, unlike banks and credit unions that provide guarantees or safeguards.

***Significant cryptocurrency developers could propose amendments to network protocols and software that, if accepted and authorized, could adversely affect the Issuer's business.***

As open-source software, individuals can propose refinements or improvements to the cryptocurrency source code through one or more software upgrades that alter the protocols that govern the cryptocurrency networks and the properties of the cryptocurrencies exchanged on it, including, for example, the irreversibility of transactions and limitations on the mining of new bitcoin. To the extent that a significant majority of the users and miners on a cryptocurrency network install such software upgrade(s), the cryptocurrency network would be subject to new protocols and software that could adversely affect the Issuer's business.

In the event a developer or group of developers proposes a modification to a cryptocurrency network that is not accepted by a majority of miners and users, but that is nonetheless accepted by a substantial plurality of miners and users, two or more competing and incompatible blockchain implementations could result. This is known as a "hard fork." In such a case, the "hard fork" in the blockchain could materially and adversely affect the perceived value of bitcoin as reflected on one or both incompatible blockchains, that could adversely affect the Issuer's business.

***The open-source structure of cryptocurrency network protocols means that the contributors to the protocol are generally not directly compensated for their contributions in maintaining and developing the protocol. A failure to properly monitor and upgrade the protocol could damage the network and an investment in the Issuer.***

The Bitcoin network operates based on an open-source protocol maintained by contributors. As an open source project, Bitcoin is not represented by an official organization or authority. As cryptocurrency network protocols are generally not sold and their use does not generate revenues for contributors, contributors are generally not compensated for maintaining and updating cryptocurrency network protocols. The lack of guaranteed financial incentive for contributors to maintain or develop cryptocurrency networks and the lack of guaranteed resources to adequately address emerging issues with the Bitcoin Network may reduce incentives to address the issues adequately or in a timely manner. This could adversely affect the Issuer's business.

***If miners are not sufficiently compensated for solving blocks and validating transactions, they may cease their mining operations. A reduction in the processing power made***

*available by miners could result in delays and increase the likelihood of a malicious actor or botnet being able to manipulate cryptocurrencies.*

As the number of coins awarded for solving a block in the blockchain decreases, the incentive for miners to continue to contribute processing power to the network may transition from a set reward to transaction fees. In order to incentivize miners to continue to contribute processing power to the network, the network may either formally or informally transition from a set reward to transaction fees earned upon solving for a block. If the award of coins for solving blocks and transaction fees for recording transactions are not sufficiently high to incentivize miners, miners may cease expending processing power to solve blocks and confirming transactions on the Blockchain could be slowed temporarily. A reduction in the processing power expended by miners could increase the likelihood of a malicious actor or botnet obtaining control in excess of 50 percent of the processing power active on the Blockchain, potentially permitting such actor or botnet to manipulate the Blockchain in a manner that adversely affects the Issuer's mining activities.

Alternatively, if the award of new cryptocurrencies for solving transaction blocks declines and no such changes are made, cryptocurrency miners may not have an adequate incentive to continue mining and may cease their mining operations. Cryptocurrency miners ceasing operations would reduce the collective processing power on the cryptocurrency network, which would adversely affect the confirmation process for transactions by decreasing the speed at which transaction blocks are added to the blockchain until the next scheduled adjustment in difficulty for transaction block solutions. Any reduction in confidence in the confirmation process or processing power of the cryptocurrency network may adversely impact the business and affairs of the Issuer.

*If cryptocurrencies choose to incentivize miners using transaction fees, rather than coin awards, the use and demand for cryptocurrencies may decrease.*

In order to incentivize miners to continue to contribute processing power to the network, the network may either formally or informally transition from a set reward to transaction fees earned upon solving for a block. This transition could be accomplished either by miners independently electing to record on the blocks they solve only those transactions that include payment of a transaction fee or by the network adopting software upgrades that require the payment of a minimum transaction fee for all transactions. If transaction fees paid for the recording of transactions in the Blockchain become too high, the marketplace may be reluctant to accept network as a means of payment and existing users may be motivated to switch between cryptocurrencies or back to fiat currency. Decreased use and demand for coins may adversely affect their value and result in a reduction in the market price of coins.

*If miners cease to record transactions in solved blocks, transactions that do not include the payment of a transaction fee will not be recorded on the Blockchain until a miner who does not require the payment of transaction fees solves the block. Widespread delays in recording transactions could result in a loss of confidence in cryptocurrency, which could adversely impact an investment in the Issuer.*

If miners cease to record transaction in solved blocks, such transactions will not be recorded on the Blockchain. Currently, there are no known incentives for miners to elect to exclude the recording of transactions in solved blocks; however, to the extent that any such incentives arise (e.g., a collective movement among miners or one or more mining pools forcing cryptocurrency users to pay transaction fees as a substitute for or in addition to the award of new coins upon

the solving of a block), miners solving a significant number of blocks could delay the recording and confirmation of transactions on the Blockchain by withdrawing their mining efforts. Systemic delays in recording and confirming transactions on the Blockchain could result in greater risk of double-spending transactions, and a concurrent loss of confidence in cryptocurrency, which could adversely impact the Issuer's business.

***Core developers or other programmers could propose amendments to the protocols and software of the networks of cryptocurrencies (such as Bitcoin and Ether) that are held by the Issuer and if accepted and authorized by such network communities, could adversely affect an investment in the Issuer Shares***

Cryptocurrency networks uses a cryptographic protocol to govern the peer-to-peer interactions between computers connected to such networks. The code that sets forth the protocol is informally managed by core development team. The members of the core developers evolve over time, largely based on self-determined participation in the resource section dedicated to the particular cryptocurrency. Core developers can propose amendments to a cryptocurrency's network's source code through software upgrades that alter the protocols and software of the network and the properties of underlying cryptocurrency, including the irreversibility of transactions and limitations on the mining of new coins or tokens. Proposals for upgrades and related discussions take place on online forums such as GitHub.com, Bitcointalk.org. and ethereum.org, for example, in the case of Bitcoin and Ethereum. To the extent that a significant majority of the users and miners on the Bitcoin, Ethereum and other networks of cryptocurrencies owned and mined by the Issuer, install such software upgrade(s), the various cryptocurrency networks would be subject to new protocols and software that may adversely affect an investment in the Issuer Shares.

***Regulatory agencies could shut down or restrict exchanges***

Regulatory agencies could shut down or restrict the use of platforms or exchanges that use virtual currencies. This could lead to a loss of any investment made in the Issuer and may trigger regulatory action by regulators.

***Due to the unregulated nature and lack of transparency surrounding the operations of cryptocurrency, the marketplace may lose confidence in one or more exchanges upon which the Issuer is dependent***

The exchanges on which the inventory of cryptocurrencies mined and stored by HyperBlock and CryptoGlobal trade are relatively new and, in most cases, largely unregulated. Furthermore, while many prominent cryptocurrency exchanges provide the public with significant information regarding their ownership structure, management teams, corporate practices and regulatory compliance, many exchanges do not provide this information. As a result, the marketplace may lose confidence in certain exchanges, including prominent exchanges that handle a significant volume of trading of cryptocurrencies, including, but not limited to, Bitcoin, Ether, Litecoin, Dash, among others. A lack of stability in the exchange markets and the closure or temporary shutdown of cryptocurrency exchanges due to fraud, business failure, hackers or malware, or government-mandated regulation may reduce confidence in the networks and result in greater volatility in the price of certain cryptocurrencies. Furthermore, the closure or temporary shutdown of an exchange used in calculating the price of a cryptocurrency that is mined and stored by the Issuer may result in a loss of confidence in the Issuer's ability to determine its cryptocurrency holdings on a daily basis. These potential consequences of an exchange's failure could adversely affect an investment in the Issuer Shares.

***Other businesses investing in coins or tracking cryptocurrency markets may affect cryptocurrency prices.***

To the extent that other vehicles investing in cryptocurrency or tracking cryptocurrency markets form and come to represent a significant proportion of the demand for coins, large redemptions of the securities of those vehicles and the subsequent sale of coins by such vehicles could negatively affect cryptocurrency prices and therefore affect the value of the inventory held by the Issuer.

***Intellectual property rights claims may adversely affect the operation of the Bitcoin Network.***

Third parties may assert intellectual property claims against holding and transferring cryptocurrencies and their source codes. Regardless of the merit of such intellectual property claims or other legal action, threatened action could reduce confidence in cryptocurrency's long-term viability and the ability of end-users to hold and transfer cryptocurrency, either of which could adversely affect the Issuer's business.

A meritorious intellectual property claim could prevent the Issuer and other end-users from accessing, holding or transferring their cryptocurrency. As a result, an intellectual property claim against the Issuer or other large cryptocurrency participants could adversely affect the Issuer's business.

### Risks Related to the Issuer's Participation in the Cryptocurrency Industry

***The Issuer expects to invest in cryptocurrencies, the market prices of which are volatile.***

The Issuer's investments in cryptocurrencies are subject to volatility in the prices of those cryptocurrencies. The crypto-asset industry is rapidly evolving with an uncertain future trajectory. Cryptocurrency values are volatile and may lose momentum, which could result in a decline in corresponding mining activity and associated payout transactions. There can be no assurance that an active trading market for any cryptocurrencies the Issuer invests in is sustainable. The trading prices of cryptocurrencies could be subject to wide fluctuations in response to various factors beyond the control of the Issuer. In recent years cryptocurrency markets have experienced extreme price and volume fluctuations. These fluctuations have had a substantial effect on market prices. Such market fluctuations could materially adversely impact the market price of the Issuer's assets.

***The Issuer's business may be adversely affected by competition from other methods of investing in cryptocurrencies.***

The Issuer competes with other companies that invest directly in blockchain and cryptocurrency vehicles, possibly including securities backed by or linked to cryptocurrencies through entities similar to the Issuer. Market and financial conditions, and other conditions beyond the Issuer's control, may make it more attractive to invest in other financial vehicles offered by competitors, or to invest in cryptocurrencies directly which could limit the market for the Issuer's shares and reduce their liquidity.

***The Issuer's coins may be subject to loss, theft or restriction on access.***

Some or all of the Issuer's coins could be lost or stolen. Access to the Issuer's coins could also be restricted by cybercrime (such as a denial of service attack) against a service at which the

Issuer maintains a hosted online wallet. Any of these events may adversely affect the Issuer's business.

The loss or destruction of a private key required to access the Issuer's cryptocurrency inventory may be irreversible. Losing access to private keys or a data loss relating to the Issuer's digital wallets could adversely affect the Issuer's business.

Cryptocurrencies are controllable only by the possessor of both the unique public and private keys associated with the local or online digital wallet in which they are held. A wallet's public key or address is reflected in the network's public Blockchain. The Issuer will publish the public key relating to its digital wallets in use when it verifies the receipt of cryptocurrency transfers and disseminates such information into the network, but it will need to safeguard the private keys associated with its digital wallets. To the extent such private keys are lost, destroyed or otherwise compromised, the Issuer may be unable to access its cryptocurrency, and such private keys will not be capable of being restored by network. Any loss of private keys relating to digital wallets used to store the Issuer's cryptocurrency could adversely affect its business.

***Incorrect or fraudulent coin transactions may be irreversible***

Cryptocurrency transactions are irrevocable, and stolen or mistakenly transferred coins may be irretrievable. As a result, any incorrectly executed or fraudulent coin transactions could adversely affect the Issuer's investments.

Coin transactions are not reversible without the consent and active participation of the recipient of the transaction. Alternatively, cryptocurrency transactions are in theory reversible with the control or consent of a majority of processing power on the network. Once a transaction has been verified and recorded in a block that is added to the Blockchain, an incorrect transfer of a coin or a theft of coin will not be reversible by the Issuer acting alone, and the Issuer may not be capable of obtaining compensation for any such transfer or theft. Although the Issuer's transfers of coins will be made by experienced members of the management team, it is possible that, through computer or human error, or through theft or criminal action, the Issuer's coins could be transferred in incorrect amounts, to unauthorized third parties or to uncontrolled accounts.

***There is no assurance that the Issuer will be able to achieve its investment objectives.***

There is no assurance that the Issuer will be able to achieve its investment objectives. If the Issuer fails to invest any new capital effectively, its return on equity may be negatively impacted, which could reduce the price of the the Issuer Shares.

***Third Party Cyber Security Risk***

Cyber security risk is the risk of harm, loss and liability resulting from a failure or breach of information technology systems. Failures or breaches of the information technology systems can result from deliberate attacks or unintentional events and may arise from external or internal sources. Deliberate cyber-attacks include, but are not limited to, gaining unauthorized access to digital systems (e.g. through "hacking" or malicious software coding) for purposes of misappropriating assets or sensitive information, corrupting data, equipment or systems, or causing operational disruption. Deliberate cyber-attacks may also be carried out in a manner that does not require gaining unauthorized access, such as causing denial-of-service attacks on websites (i.e. efforts to make network services unavailable to intended users).

Cyber security incidents of the Issuer's third party service providers (e.g. administrators, transfer agents, the custodian) or entities that the Issuer invests in can also subject the Issuer to many of the same risks associated with direct cybersecurity incidents.

Certain Bitcoin exchanges have in the past been compromised by hackers and malware. In the event that a Bitcoin exchange is hacked such an event may result in the in the closure or temporary closure of an exchange or reduce investor confidence in Bitcoin generally which could affect the price of Bitcoin and in turn adversely affect the Issuer.

The Issuer cannot control the cybersecurity plans and systems put in place by the companies it invests in or any other third party whose operations may affect the Issuer, including the custodian, Blockchain Dynamics Inc.

### *Risks related to insurance*

The Issuer intends to insure its operations in accordance with technology industry practice. However, given the novelty cryptocurrencies and associated businesses, such insurance may not be available, uneconomical, or the nature or level may be insufficient to provide adequate insurance coverage. The occurrence of an event that is not covered or fully covered by insurance could have a material adverse effect on the Issuer's business.

### Risk Factors Related to the HyperBlock and CryptoGlobal's Combined Businesses

The Issuer has identified the following risks relevant to its business and operations, which could materially affect its operating results, financial performance and the value of the Issuer Shares. The information below and the information contained in the Listing Statement does not purport to be an exhaustive summary of the risks affecting the Issuer and additional risks and uncertainties not currently known to the proposed officers or directors of the Issuer or not currently perceived as being material may have an adverse effect on the business of the Issuer. The Issuer's future business is subject to significant risks and past performance of HyperBlock and/or CryptoGlobal is no guarantee of future performance.

### *Limited Operating History*

HyperBlock and CryptoGlobal have a limited history of operations and are in the early stage of development. As such, the Issuer will be subject to many risks common to such enterprises, including under-capitalization, cash shortages, limitations with respect to personnel, financial and other resources, lack of revenues and the possibility of cost overruns or unanticipated expenses. There is no assurance that the Issuer will be successful in achieving a return on shareholders' investment and the likelihood of success must be considered in light of its early stage of operations. There can be no assurance that the Issuer will be able to develop any of its projects profitably or that any of its activities will generate positive cash flow.

### *Risk of System Failure or Inadequacy*

Security procedures implemented by the Issuer are technical and complex, and the Issuer depends on the security procedures to protect the storage, acceptance and distribution of data relating to its inventory of cryptocurrencies and the digital wallets into which the Issuer deposits its cryptocurrencies. The Issuer's security procedures may not protect against all errors, software flaws (i.e., bugs) or vulnerabilities. Defects in the security procedures may only be discovered after a failure in the Issuer's safekeeping and storage of its inventory of cryptocurrencies. Further, the Issuer's operations will be dependent on its ability to maintain its

equipment in effective working order and to protect its systems against cybersecurity breaches, damage from fire, natural disaster, power loss, telecommunications failure or similar events. Although the Issuer will continually review and seek to upgrade its technical infrastructure and provide for certain system redundancies and backup power to limit the likelihood of systems overload or failure, there can be no assurance that there will not be any damage, failure or delay that causes interruptions in the Issuer's operations.

### Need for Continuing Development, Maintenance and Operation of Technology Systems

The success of the Issuer is dependent on the accuracy, proper use and continuing development of its technological systems, including its business systems and operational platforms. The Issuer's ability to effectively use the information generated by its information technology systems, as well as its success in implementing new systems and upgrades, may affect its ability to: conduct business with its clients, including delivering services and solutions; manage its inventory and accounts receivable; purchase, sell, ship and invoice its products and services efficiently and on a timely basis; and maintain its cost-efficient operating model while expanding its business in revenue and in scale.

Should competitors introduce new technological systems/software embodying new technologies, the Issuer's hardware and equipment and its underlying technology may become obsolete and require substantial capital to replace such equipment.

### Permits and Licenses

The operations of the Issuer may require licenses and permits from various governmental authorities. There can be no assurance that the Issuer will be able to obtain all necessary licenses and permits that may be required.

### Ability to Adequately Protect Intellectual Property

At the time of this Listing Statement, HyperBlock does not hold any patents related to its cryptocurrency mining operations, but rather relies upon a combination of trade secrets and contractual restrictions to establish and protect proprietary information. The ability of the Issuer to adequately protect proprietary information, trade secrets, and technology from competitors will impact the profitability of HyperBlock.

### The Ability to Acquire Mining Equipment at Favorable Prices

There can be no guarantee that the Issuer will be able to source mining machines required to scale the Issuer's business plan at prices that are favorable to the Issuer or at all.

### Competition with Other Cryptocurrency Companies

The Issuer will compete with other cryptocurrency and distributed ledger technology businesses, as well as other potential financial vehicles, possibly including securities backed by or linked to cryptocurrencies through entities similar to the Issuer, or exchange-traded funds. The Issuer's operations, investment strategies and profitability may be adversely affected by competition from other cryptocurrencies or financial vehicles. Market, financial, and other conditions beyond the Issuer's control could also adversely impact the business and affairs of the Issuer.

### Increase in Electricity Rates

If electricity rates in Canada, the United States or other jurisdictions where the Issuer may conduct operations in the future increase by a substantial amount, or if the Issuer is unable to negotiate favourable electricity rates in connection with the operation of its business, the operating costs of the Issuer would likely increase which could adversely affect its profitability and deployment of capital.

### Possibility of the Ether algorithm transitioning to Proof of Stake validation

Proof of Stake is an alternative method in validating cryptocurrency transactions. Should the Ether algorithm shift from a Proof-of-Work validation method to a Proof-of-Stake method, mining Ethereum would likely require less energy and may render the Issuer less competitive as other miners are able to mine Ethereum with lower energy requirements.

### Unavailability of Software

Certain of the Issuer's services rely on software developed and maintained by third-party software vendors. The Issuer also expects that it may incorporate software from third-party vendors and open source software in its future services. If this software, or functional equivalents of this software, were to become unavailable or no longer available on commercially reasonable terms, it could adversely affect sales of the Issuer's services, which could disrupt the business and harm the financial results of the Issuer.

### Business Strategy

As part of the HyperBlock's business strategy, HyperBlock has sought and will continue to seek new opportunities in the cryptocurrency mining as a service industry. In continuing the pursuit of such opportunities, the Issuer may fail to select appropriate acquisition candidates, negotiate acceptable arrangements or other partnerships as well as arrangements to finance acquisitions or integrate the acquired businesses and their personnel into the Issuer. The Issuer cannot assure that it can complete any acquisition or business arrangement that it pursues or is pursuing, on favourable terms, or that any acquisitions or business arrangements completed will ultimately benefit the Issuer.

HyperBlock is contemplating certain transactions, which if not completed could result in HyperBlock failing to achieve its projected results. Further, the failure to consummate such transactions could result in the loss of certain employees.

In the event that the Issuer chooses to raise debt capital to finance any acquisition or other arrangement, the Issuer's leverage will be increased. In addition, if the Issuer chooses to complete an equity financing, shareholders may suffer dilution.

### Potential Conflicts of Interest may arise

The Issuer may be subject to various potential conflicts of interest because of the fact that some of its officers and directors may be engaged in a range of business activities. In addition, the Issuer' executive officers and directors may devote time to their outside business interests, so long as such activities do not materially or adversely interfere with their duties to HyperBlock. In some cases, the Issuer's executive officers and directors may have fiduciary obligations associated with these business interests that interfere with their ability to devote time to the Issuer's business and affairs and that could adversely affect the Issuer's operations. These

business interests could require significant time and attention of the Issuer's executive officers and directors.

In addition, the Issuer may also become involved in other transactions which conflict with the interests of its directors and the officers who may from time to time deal with persons, firms, institutions or corporations with which the Issuer may be dealing, or which may be seeking investments similar to those desired by it. The interests of these persons could conflict with those of the Issuer. In addition, from time to time, these persons may be competing with the Issuer for available investment opportunities. Conflicts of interest, if any, will be subject to the procedures and remedies provided under applicable laws. In particular, in the event that such a conflict of interest arises at a meeting of the Issuer's directors, a director who has such a conflict will abstain from voting for or against the approval of such participation or such terms. In accordance with applicable laws, the directors of the Issuer are required to act honestly, in good faith and in the best interests of the Issuer.

### Reliance on Key Personnel

The success of the Issuer is dependent upon the ability, expertise, judgment, discretion and good faith of its senior management. Any loss of the services of such individuals or the Issuer's inability to attract and retain additional highly skilled employees could have a material adverse effect on HyperBlock's business, operating results or financial condition.

The development of the Issuer is dependent upon its ability to attract and retain key personnel, particularly the services of Sean Walsh, Robert Segal, Tim Smart and Chris McGarrigle (see Section 13 – "*Directors and Officers*" in this Listing Statement).The loss of the services of Messrs. Walsh, Segal, Smart or McGarrigle could have a materially adverse impact on the business of the Issuer. There can be no assurance that the Issuer can retain its key personnel or that it can attract and train qualified personnel in the future.

To operate successfully and manage its potential future growth, the Issuer must attract and retain highly qualified managerial, financial and technological personnel. The Issuer is expected to face intense competition for qualified personnel in these areas. If the Issuer is unable to hire and retain additional qualified personnel in the future to develop its business, then its financial condition and operating results could be adversely affected.

### Compliance with Laws

The Issuer's operations are subject to various laws, regulations and guidelines. The Issuer will endeavour to comply with all relevant laws, regulations and guidelines. To the best of HyperBlock and CryptoGlobal's knowledge, HyperBlock and CryptoGlobal are in compliance with all such laws, regulations and guidelines. However, there is a risk that HyperBlock or CryptoGlobal's interpretation of laws, regulations and guidelines, may differ from those of others, and HyperBlock or CryptoGlobal's operations may not be in compliance with such laws, regulations and guidelines. This potential non-compliance could cause the business, financial condition and results of the operations of the Issuer to be adversely affected.

Failure to comply with applicable laws and regulations may result in enforcement actions thereunder, including orders issued by regulatory or judicial authorities causing operations to cease or be curtailed, and may include corrective measures requiring capital expenditures or remedial actions. Parties may be liable for civil or criminal fines or penalties imposed for violations of applicable laws or regulations. Amendments to current laws, regulations and

permitting requirements, or more stringent application of existing laws, may have a material adverse impact on the Issuer.

Due to the complexity and nature of HyperBlock and CryptoGlobal's operations, various legal and tax matters are outstanding from time to time. If the Issuer is unable to resolve any of these matters favourably, there may be a material adverse effect on the Issuer. There are also risks to the business of the Issuer represented by court rulings or legislative changes.

### Dividend Policy

The declaration, timing, amount and payment of dividends, if any, are at the discretion of the Issuer's board of directors and will depend upon the Issuer's future earnings, cash flows, acquisition capital requirements and financial condition, and other relevant factors. There can be no assurance that the Issuer will declare a dividend on a quarterly, annual or other basis.

### Litigation

The Issuer may from time to time be involved in various claims, legal proceedings and disputes arising in the ordinary course of business. If the Issuer is unable to resolve these disputes favorably, it may have a material adverse effect on the Issuer. Even if the Issuer is involved in litigation and wins, litigation can redirect significant Issuer resources. Litigation may also create a negative perception of the Issuer's brand.

Securities litigation as well as potential future proceedings, could result in substantial costs and damages and divert the Issuer's management's attention and resources. Any decision resulting from any such litigation that is adverse to the Issuer could have a negative impact on the Issuer's financial position.

### Regulatory Risks

Achievement of the Issuer's business objectives is contingent, in part, upon compliance with regulatory requirements enacted by governmental authorities and obtaining regulatory approvals, where necessary. The Issuer may incur ongoing costs and obligations related to regulatory compliance. Failure to comply with regulations may result in additional costs for corrective measures, penalties or in restrictions on the Issuer's operations. In addition, changes in regulations, more vigorous enforcement thereof or other unanticipated events could require extensive changes to the Issuer's operations, increased compliance costs or give rise to material liabilities, which could have a material adverse effect on the business, results of operations and financial condition of the Issuer.

### Management of Growth

The Issuer may be subject to growth-related risks. The ability of the Issuer to manage growth effectively will require it to continue to implement and improve its operational and financial systems and to expand, train and manage its employee base. The inability of the Issuer to deal with this growth may have a material adverse effect on the Issuer's business, financial condition, results of operations and prospects.

### Ability to Generate Profits

There can be no assurance that the Issuer will generate net profits in future periods. Further, there can be no assurance that the Issuer will be cash flow positive in future periods. In the event that the Issuer fails to achieve profitability in future periods, the value of the Issuer Shares may decline. In addition, if the Issuer is unable to achieve or maintain positive cash flows, the Issuer would be required to seek additional funding, which may not be available on favourable terms, if at all.

### Future Capital Needs and Uncertainty of Additional Financing

The Issuer currently anticipates that the expected cash on hand will be sufficient to meet its presently anticipated working capital and capital expenditure requirements over the next 12 months. However, the Issuer may need to raise additional funds in order to support more rapid expansion, future acquisition of additional hardware to be used for the purposes of running diverse cryptographic functions in connection with the mining of cryptocurrencies, the costs associated with maintaining such hardware and the rights (if any) to host such hardware, the ongoing operation of the Issuer's cryptocurrency data centres located in Ontario, Quebec, Nova Scotia and Montana, acquisitions of new data-centres, and the funds to operate as a public company. There is no assurance that the Issuer will be successful in obtaining the required financing for these or other purposes, including for general working capital. There can be no assurance that such additional funding, if needed, will be available on terms attractive to the Issuer or at all. Furthermore, any additional equity financing may be dilutive to shareholders and debt financing, if available, may involve restrictive covenants, and the Issuer may be forced to liquidate mined output (coins or tokens) for such funds. If additional funds are raised through the issuance of equity securities, the percentage ownership of the Issuer Shareholders will be reduced, shareholders may experience additional dilution in net book value per share, or such equity securities may have rights, preferences or privileges senior to those of the holders of the common shares. If adequate funds are not available on acceptable terms, the Issuer may be unable to develop or enhance its business, take advantage of future opportunities or respond to competitive pressures, any of which could have a material adverse effect on the Issuer's business, financial condition and operating results.

### Limited management experience

The proposed management team of the Issuer has limited history of past performance in managing a cryptocurrency company, and the past performances of management in other positions are no indication of their ability to successfully manage the Issuer. If the experience of management is inadequate or unsuitable to manage the Issuer the operations of the Issuer may be adversely affected.

### Market Price and Volatile Securities Markets

Worldwide securities markets have been experiencing a high level of price and volume volatility and market prices of securities of many companies have experienced unprecedented declines in prices which have not necessarily been related to the operating performance, underlying asset values or prospects of such companies. Market forces may render it difficult or impossible for the Issuer to secure purchasers to purchase its securities at a price which will not lead to severe dilution to existing shareholders, or at all. In addition, shareholders may realize less than the original amount invested on dispositions of their the Issuer Shares during periods of such market price decline.

## 18.    PROMOTERS

Not applicable.

## 19.    LEGAL PROCEEDINGS

There are no legal proceedings material to HyperBlock or CryptoGlobal to which HyperBlock or CryptoGlobal is or was a party, or of which any of their properties is or was the subject matter, since the date of HyperBlock's incorporation and CryptoGlobal's most recently completed financial year, respectively, and HyperBlock and CryptoGlobal know of no such proceedings to be currently contemplated.

There have been no penalties or sanctions imposed against HyperBlock or CryptoGlobal by a court or regulatory body, and neither HyperBlock nor CryptoGlobal has entered into any settlement agreements before any court relating to provincial or territorial securities legislation or with any securities regulatory authority, as of the date of this Listing Statement or since HyperBlock's incorporation and CryptoGlobal's most recently completed financial year.

## 20.    INTEREST OF MANAGEMENT AND OTHERS IN MATERIAL TRANSACTIONS

Other than as disclosed elsewhere in this Listing Statement, no director, executive officer or principal shareholder or any of their respective associates or affiliates, has any material interest, direct or indirect, in any transaction within the three year period before the date of this Listing Statement, or in any proposed transaction, which has materially affected or is reasonably expected to materially affect the Issuer or any of its subsidiaries.

## 21.    AUDITORS, TRANSFER AGENT AND REGISTRAR

**Auditors**

MNP LLP, the current auditors of both HyperBlock and CryptoGlobal, are expected to be the auditors of the Issuer following completion of the Arrangement.

**Transfer Agent and Registrar**

The transfer agent and registrar for the Issuer Shares will be TSX Trust Company, at its principal office at 301 – 100 Adelaide Street West, Toronto, Ontario, Canada M5H 4H1.

## 22.    MATERIAL CONTRACTS

Except for contracts entered into by HyperBlock and CryptoGlobal in the ordinary course of business, the only material contracts entered into by the Issuer since the beginning of the most recently completed financial year or that are still in effect, are:

- the Sale Agreement and Amendment Agreement;
- the Spokane Purchase Agreement;
- the Agency Agreement;
- the Subscription Receipt Agreement; and
- the Bitcoin.com Agreement.

**23.    INTEREST OF EXPERTS**

Not applicable.

**24.    OTHER MATERIAL FACTS**

There are no other material facts other than as disclosed herein that are necessary to be disclosed in order for this Listing Statement to contain full, true and plain disclosure of all material facts relating to the Issuer.

**25.    FINANCIAL STATEMENTS**

See Schedule "B" – "*Audited Financial Statements of HyperBlock and Spokane and Unaudited Financial Statements of Spokane*" and Schedule "D" – "*Financial Statements and Management's Discussion and Analysis of CryptoGlobal*".

**CERTIFICATE OF THE ISSUER**

Pursuant to a resolution duly passed by its Board of Directors, HyperBlock Inc. hereby applies for the listing of the above mentioned securities on the Exchange.  The foregoing contains full, true and plain disclosure of all material information relating to HyperBlock Inc. It contains no untrue statement of a material fact and does not omit to state a material fact that is required to be stated or that is necessary to prevent a statement that is made from being false or misleading in light of the circumstances in which it was made.

Dated at _____this 10<u>th</u> day of <u>July</u>, 2018.


"*Sean Walsh*"                                                 "*Tim Smart*"
_____                    _____

Sean Walsh                                                    Tim Smart

Chief Executive Officer                                  Interim Chief Financial Officer


"*Eric So*"                                                     "*Hon. Ronald R. Spoehel*"
_____                    _____

Eric So                                                          Hon. Ronald R. Spoehel

Director                                                         Director

**SCHEDULE A**
**PLAN OF ARRANGEMENT**

PLAN OF ARRANGEMENT

ARTICLE 1
INTERPRETATION

1.1     **Definitions.**

As used in this Plan of Arrangement, the following terms have the meanings given to such terms below:

"**Amalco**" has the meaning specified in Section 2.3(i) of this Plan of Arrangement.

"**Amalco Common Shares**" has the meaning specified in Section 2.3(i)(ii) of this Plan of Arrangement.

"**Amalco Option Plan**" means the Amalco Stock Option Plan, in the form agreed by the Parties, each acting reasonably.

"**Amalgamation**" has the meaning specified in Section 2.3(i) of this Plan of Arrangement.

"**Arrangement Agreement**" means the Arrangement Agreement between HyperBlock and CryptoGlobal dated as of April 3, 2018.

"**CryptoGlobal Arrangement Resolution**" means a special resolution to be approved by the CryptoGlobal Shareholders at the CryptoGlobal Meeting, substantially in the form of <u>Exhibit B1</u> to the Arrangement Agreement.

"**Articles of Arrangement**" means the articles of arrangement in respect of the Arrangement required by the OBCA to be sent to the Director after the Final Order is made, which shall include this Plan of Arrangement and otherwise be in a form and content satisfactory to CryptoGlobal and HyperBlock, each acting reasonably.

"**Certificate of Arrangement**" means the certificate of arrangement to be issued by the Director pursuant to Section 183(2) of the OBCA in respect of the Articles of Arrangement.

"**Code**" means the *United States Internal Revenue Code of 1986, as amended*.

"**Court**" means the Ontario Superior Court of Justice (Commercial List) or other court, as applicable.

"**CryptoGlobal**" means CryptoGlobal Corp.

"**CryptoGlobal Common Shares**" means the common shares in the capital of CryptoGlobal.

"**CryptoGlobal Common Share Escrow Agreements**" means: (i) the Form 2F CPC Escrow Agreement made as of July 28, 2017 among Apolo Acquisition Corp., as issuer, Computershare Investor Services Inc., as escrow agent and each of Brockville International Holdings Ltd., Apolo Capital Advisory Corp., 2462570 Ontario Inc., Sailstreet Capital Inc., Carrera Capital Inc., 2524036 Ontario Limited, Vincent Gasparro, Ryan Roebuck, Valerie Siggs, Blavinder Dadwan, John Coady, Jeff Hergott, Jeffery Zicherman, Ravi Sood, Patrick Molyneux and Glen Gibbons, as securityholders; and (ii) the Form 5D Surplus Security Escrow Agreement made as of January 25, 2018 among CryptoGlobal Corp, as issuer, Computershare Investor Services Inc., as escrow agent, and each of 1109382 Ontario Inc., Whole Earth Holdings Inc., Roozbeh Ebbadi, Jacob Shultis and Perry Miele, as securityholders.

"**CryptoGlobal Dissenting Holder**" means a registered holder of CryptoGlobal Common Shares that has duly exercised its CryptoGlobal Dissent Rights, and has not withdrawn or been deemed to have withdrawn such exercise of CryptoGlobal Dissent Rights, but only in respect of the CryptoGlobal Common Shares in respect of which CryptoGlobal Dissent Rights are validly exercised by such holder.

"**CryptoGlobal Dissent Rights**" has the meaning specified in Section 3.1 of this Plan of Arrangement.

"**CryptoGlobal Exchange Ratio**" means 0.4229 of a HyperBlock Common Share for each CryptoGlobal Common Share.

"**CryptoGlobal Meeting**" means the special meeting of CryptoGlobal Shareholders to be held to consider the Arrangement Resolution and related matters, and any adjournments thereof.

"**CryptoGlobal Shareholders**" means, collectively, the holders from time to time of CryptoGlobal Common Shares.

"**CryptoGlobal Warrants**" means broker warrants to acquire CryptoGlobal Common Shares pursuant to the terms thereof.

"**CSE**" means the Canadian Securities Exchange.

"**Depositary**" means TSX Trust Company, in its capacity as the depositary in connection with the Arrangement.

"**Director**" means the Director appointed pursuant to Section 278 of the OBCA.

"**Effective Date**" means the date shown on the Certificate of Arrangement giving effect to the Arrangement.

"**Effective Time**" means 12:01 a.m. on the Effective Date, or such other time as the Parties agree to in writing before the Effective Date.

"**Encumbrance**" means any mortgage, charge, pledge, hypothec, security interest, prior claim, encroachment, option, right of first refusal or first offer, occupancy right, covenant, assignment, lien (statutory or otherwise), defect of title, or restriction or adverse right or claim, or other third party interest or encumbrance of any kind, in each case, whether contingent or absolute.

"**Final Order**" means the final order of the Court in a form acceptable to CryptoGlobal and HyperBlock, each acting reasonably, approving the Arrangement, as such order may be amended by the Court (with the consent of both CryptoGlobal and HyperBlock, each acting reasonably) at any time prior to the Effective Date or, if appealed, then, unless such appeal is withdrawn or denied, as affirmed or as amended (provided, that any such amendment is acceptable to both CryptoGlobal and HyperBlock, each acting reasonably) on appeal.

"**Governmental Authority**" means any: (a) international, multinational, national, federal, provincial, state, regional, municipal, local or other government, governmental or public department, central bank, court, tribunal, arbitral body, commission, board, bureau, ministry, agency or instrumentality, domestic or foreign; (b) subdivision or authority of any of the foregoing; (c) quasi-governmental or private body exercising any regulatory, expropriation or taxing authority under or for the account of any of the foregoing; or (d) stock exchange.

"**HyperBlock**" means HyperBlock Technologies Corp.

"**HyperBlock Arrangement Resolution**" means a special resolution to be approved by the HyperBlock Shareholders at the HyperBlock Meeting, substantially in the form of <u>Exhibit B2</u> to the Arrangement Agreement.

"**HyperBlock Common Shares**" means the common shares in the capital of HyperBlock.

"**HyperBlock Dissenting Holder**" means a registered holder of HyperBlock Common Shares that has duly exercised its HyperBlock Dissent Rights, and has not withdrawn or been deemed to have withdrawn such exercise of HyperBlock Dissent Rights, but only in respect of the HyperBlock Common Shares in respect of which HyperBlock Dissent Rights are validly exercised by such holder.

"**HyperBlock Dissent Rights**" has the meaning specified in Section 3.1 of this Plan of Arrangement.

"**HyperBlock Meeting**" means the special meeting of HyperBlock Shareholders to be held to consider the Arrangement Resolution and related matters, and any adjournments thereof.

"**HyperBlock Option Plan**" means the HyperBlock Stock Option Plan adopted on January 16, 2018.

"**HyperBlock Options**" means options to acquire HyperBlock Common Shares pursuant to the HyperBlock Option Plan.

"**HyperBlock Shareholders**" means, collectively, the holders from time to time of HyperBlock Common Shares.

"**HyperBlock Sub**" means Hyperblock LLC.

"**HyperBlock Sub-Receipt Agreement**" means the Subscription Receipt Agreement dated as of March 14, 2018 among HyperBlock, Canaccord Genuity Corp., Eight Capital, Haywood Securities Inc., Macquarie Capital Markets Canada, Clarus Securities Inc., PI Financial Corp., Cormark Securities Inc. and TSX Trust Company.

"**HyperBlock Sub-Receipt Financing**" means the transactions contemplated by the HyperBlock Sub-Receipt Agreement.

"**HyperBlock Sub-Receipts**" means the subscription receipts of HyperBlock issued to the holders thereof pursuant to the HyperBlock Sub-Receipt Agreement.

"**Interim Order**" means the interim order of the Court in a form acceptable to CryptoGlobal and HyperBlock, each acting reasonably, providing for, among other things, the calling and holding of the CryptoGlobal Meeting, as such order may be amended by the Court with the consent of CryptoGlobal and HyperBlock, each acting reasonably.

"**Laws**" means, with respect to any Person, any and all applicable law (statutory, common or otherwise), constitution, treaty, convention, ordinance, code, rule, regulation, order, injunction, judgment, decree, ruling or other similar requirement, whether domestic or foreign, enacted, adopted, promulgated or applied by a Governmental Authority that is binding upon or applicable to such Person or its business, undertaking, property or securities, and to the extent that they have the force of law, policies, guidelines, notices and protocols of any Governmental Authority, as amended.

"**Letter of Transmittal**" means the letter of transmittal sent to holders of CryptoGlobal Common Shares for use in connection with the Arrangement.

"**Person**" includes any individual, firm, partnership, joint venture, venture capital fund, association, trust, trustee, executor, administrator, legal personal representative, estate group, body corporate, corporation, unincorporated association or organization, governmental entity, syndicate or other entity, whether or not having legal status.

"**Reorganization**" has the meaning specified in Section 2.4 of this Plan of Arrangement.

"**Spokane**" means Project Spokane, LLC.

"**Spokane Acquisition**" means the pending acquisition by HyperBlock Sub of all or substantially all of the assets, and the assumption by HyperBlock Sub of certain of liabilities, of Spokane pursuant to the Spokane Purchase Agreement.

"**Spokane Purchase Agreement**" means the asset purchase agreement dated as of January 7, 2018 among Spokane, HyperBlock Sub and the other parties thereto.

"**Tax Act**" means the *Income Tax Act* (Canada).

"**TSX-V**" means the TSX Venture Exchange.

**1.2     References and Usage.**

Unless expressly stated otherwise or the context otherwise requires, in this Plan of Arrangement:

(a)     reference to a gender includes all genders;

(b)     the singular includes the plural and vice versa;

(c)     "**or**" is used in the inclusive sense of "**and/or**";

(d)     "**any**" means "**any and all**";

(e)     the words "**including**", "**includes**" and "**include**" mean "**including (or includes or include) without limitation**";

(f)     the phrase "**the aggregate of**", "**the total of**", "**the sum of**" or a phrase of similar meaning means "**the aggregate (or total or sum), without duplication, of**";

(g)     $ or dollars refers to Canadian currency;

(h)     accounting terms not specifically defined in this Plan of Arrangement are to be interpreted in accordance with IFRS;

(i)     a statute includes all rules and regulations made under it, if and as amended, re-enacted or replaced from time to time;

(j)     a Person includes its heirs, administrators, executors, legal representatives, predecessors, successors and permitted assigns, as applicable;

(k)     the term "**notice**" refers to written notices except as otherwise specified;

(l)     the terms "**Arrangement Agreement**" and "**Plan of Arrangement**", and any reference in this Plan of Arrangement to the Arrangement Agreement or this Plan or Arrangement, or to any other agreement or document, includes, and is a reference to, the Arrangement Agreement or this Plan of Arrangement, or to such other agreement or document, as it may have been, or may from time to time be, amended, restated, replaced, supplemented or novated, and all schedules, exhibits and appendices thereto, as applicable, except as otherwise provided in this Plan of Arrangement;

(m)     whenever payments are to be made, or an action is to be taken, on a day which is not a Business Day, such payment will be required to be made, or such action will be required to be taken, on or not later than the next succeeding Business Day; and

(n)     in the computation of periods of time, unless otherwise stated, the word "**from**" means "**from and excluding**" and the word "**to**" and "**until**" each mean "**to and including**".

**1.3     Headings, etc.**

The use of headings (*e.g.*, Article, Section, etc.) in this Plan of Arrangement is reference only and is not to affect the interpretation of this Plan of Arrangement.

**1.4     Time References.**

References to time are to local time in the City of Toronto, Ontario.

## ARTICLE 2
## THE ARRANGEMENT

**2.1     Arrangement Agreement.**

This Plan of Arrangement is made pursuant to and subject to the provisions of the Arrangement Agreement, except in respect of the sequence of the steps comprising the Arrangement, which shall occur in the order set forth herein.

**2.2     Binding Effect.**

This Plan of Arrangement will become effective on, and be binding on and after, the Effective Time on HyperBlock, Spokane, CryptoGlobal, all holders and beneficial owners of CryptoGlobal Common Shares (including, for the avoidance of doubt, CryptoGlobal Dissenting Holders), CryptoGlobal Options, CryptoGlobal Warrants, HyperBlock Common Shares (including, for the avoidance of doubt, HyperBlock Dissenting Holders), HyperBlock Options, HyperBlock Sub-Receipts, and Computershare Investor Services Inc., in its capacity as CryptoGlobal' transfer agent and the Depositary, in each case, without any further act or formality required on the part of any Person.

**2.3     Arrangement.**

At the Effective Time, the following shall occur, and shall be deemed to occur as set out below, without any further authorization, act or formality, in each case, effective as at five minute intervals starting at the Effective Time:

**Acquisition of CryptoGlobal by HyperBlock**

(a)     *CryptoGlobal Common Shares of CryptoGlobal Dissenting Holders* – The CryptoGlobal Common Shares held by CryptoGlobal Dissenting Holders that have exercised CryptoGlobal Dissent Rights which remain valid immediately prior to the Effective Time shall, as of the Effective Time, be deemed to have been transferred free and clear of any Encumbrances to, and acquired and cancelled by, CryptoGlobal, and the CryptoGlobal Dissenting Holders shall cease to have any rights as CryptoGlobal Shareholders, other than the right to be paid the fair value of their CryptoGlobal Common Shares in accordance with Article 4.

(b)     *HyperBlock Common Shares of HyperBlock Dissenting Holders* – The HyperBlock Common Shares held by HyperBlock Dissenting Holders that have exercised HyperBlock Dissent Rights which remain valid immediately prior to the Effective Time shall, as of the Effective Time, be deemed to have been transferred free and clear of any Encumbrances to, and acquired and cancelled by, HyperBlock, and the HyperBlock Dissenting Holders shall cease to have any rights as HyperBlock Shareholders, other than the right to be paid the fair value of their HyperBlock Common Shares in accordance with Article 4.

(c)     *CryptoGlobal Common Shares* – Each CryptoGlobal Common Share outstanding at the Effective Time (other than the CryptoGlobal Common Shares held by CryptoGlobal Dissenting Holders that have exercised CryptoGlobal Dissent Rights which remain valid immediately prior to the Effective Time) shall be deemed to be assigned and transferred by the holder thereof to HyperBlock in exchange for such number of HyperBlock Common Shares equal to the product of (i) the number of CryptoGlobal Common Shares held by such CryptoGlobal Shareholder and (ii) the CryptoGlobal Exchange Ratio.

(d)     *CryptoGlobal Options* – Each CryptoGlobal Option outstanding immediately prior to the Effective Time, whether or not vested, shall be deemed to be vested, remain outstanding and exercisable for such number of HyperBlock Common Shares equal to the product of (A) the number of CryptoGlobal Common Shares subject to such CryptoGlobal Option and (B) the CryptoGlobal Exchange Ratio (provided, that if the foregoing would result in the issuance of a fraction of a HyperBlock Common Share, then the number of HyperBlock Common Shares otherwise issued upon the exercise of any such CryptoGlobal Option shall be rounded down to the nearest whole number of HyperBlock Common Shares, for an exercise price per

HyperBlock Common Share equal to the quotient of (A) the exercise price per CryptoGlobal Common Share under such CryptoGlobal Option immediately prior to the Effective Time divided by (B) the CryptoGlobal Exchange Ratio (provided, that the aggregate exercise price payable on any particular exercise of any such CryptoGlobal Option shall be rounded up to the nearest whole cent), and otherwise pursuant to and in accordance with the terms of the CryptoGlobal Option Plan and the original grant of such CryptoGlobal Option.

(e)     *CryptoGlobal Warrants* – Each CryptoGlobal Warrant outstanding immediately prior to the Effective Time shall remain outstanding pursuant to its terms and will be deemed to be exercisable for such number of HyperBlock Common Shares equal to the product of (i) the number of CryptoGlobal Common Shares subject to such CryptoGlobal Warrant and (ii) the CryptoGlobal Exchange Ratio (provided, that if the foregoing would result in the issuance of a fraction of a HyperBlock Common Share, then the number of HyperBlock Common Shares otherwise issued upon the exercise of any such CryptoGlobal Warrant shall be rounded down to the nearest whole number of HyperBlock Common Shares), for a price per HyperBlock Common Share equal to the quotient of (i) the price per CryptoGlobal Common Share under the CryptoGlobal Warrant immediately prior to the Effective Time divided by (ii) the CryptoGlobal Exchange Ratio (provided, that the aggregate price payable on any particular exercise of any such CryptoGlobal Warrant shall be rounded up to the nearest whole cent), and otherwise pursuant to and in accordance with the terms of the original CryptoGlobal Warrant.

## CryptoGlobal TSX-V De-Listing

(f)     *CryptoGlobal TSX-V De-Listing* – The CryptoGlobal Common Shares shall be de-listed from the TSX-V pursuant to the de-listing application (in the form agreed by HyperBlock and CryptoGlobal, each acting reasonably) filed by CryptoGlobal with the TSX-V prior to the date hereof and the approval of the TSX-V thereof.

## Termination of CryptoGlobal Common Share Escrow Agreements

(g)     HyperBlock, as sole shareholder of CryptoGlobal, shall approve the termination of the CryptoGlobal Common Share Escrow Agreements in accordance with their terms.

## Reduction of CryptoGlobal Stated Capital

(h)     The aggregate stated capital of the CryptoGlobal Common Shares shall be reduced to $1.00 without any repayment of capital.

## Amalgamation of HyperBlock and CryptoGlobal

(i)     *Amalgamation* – HyperBlock and CryptoGlobal shall be amalgamated under the OBCA and continue as one corporation ("**Amalco**") on the terms prescribed in this Plan of Arrangement (the "**Amalgamation**") as follows:

(i)     the name of Amalco shall be "HyperBlock Inc.";

(ii)    Amalco shall be authorized to issue an unlimited number of common shares without par value ("**Amalco Common Shares**");

(iii)   the registered office of Amalco will be 388 Carlaw Avenue, Suite 300, Toronto, Ontario M4M 2T4;

(iv)    there shall be no restrictions on the business Amalco may carry on or on the powers Amalco may exercise;

(v)     the directors of Amalco shall, until otherwise changed in accordance with the OBCA, consist of a minimum number of one and a maximum number of ten;

(vi)     the directors of Amalco following the Amalgamation shall be the following individuals and the Canadian residency status of each individual is indicated next to his name: Eric So (resident), Sean Walsh (non-resident), Hon. Ronald R. Spoehel (non-resident), Anthony Gaffney (resident), Dayna Gibbs (resident) and Rob Segal (resident) and the registered office of Amalco shall be each director's address for service;

(vii)     the officers of Amalco following the Amalgamation shall be the following individuals: Sean Walsh (Chief Executive Officer), Rob Segal (President), and Chris McGarrigle (Chief Information Officer);

(viii)     the auditor of Amalco following the Amalgamation shall be MNP LLP;

(ix)     the provisions of subsections 179(a), (a.1), (b), (c), (d) and (e) of the OBCA will apply to the Amalgamation with the result that:

     1.     HyperBlock and CryptoGlobal are amalgamated and continue as one corporation under the terms and conditions prescribed in this Plan of Arrangement;

     2.     HyperBlock and CryptoGlobal cease to exist as entities separate from Amalco;

     3.     Amalco possesses all the property, rights, privileges and franchises, and is subject to all liabilities, including civil, criminal and quasi-criminal, and all contracts, disabilities and debts, of each of HyperBlock and CryptoGlobal;

     4.     a conviction against, or ruling, order or judgment in favour or against, HyperBlock or CryptoGlobal may be enforced by or against Amalco;

     5.     the Articles of Arrangement are deemed to be the articles of incorporation of Amalco and, except for the purposes of subsection 117(1) of the OBCA, the Certificate of Arrangement is deemed to be the certificate of incorporation of Amalco; and

     6.     Amalco shall be deemed to be the party plaintiff or the party defendant, as the case may be, in any civil action commenced by or against HyperBlock or CryptoGlobal before the Amalgamation has become effective; and

(x)     the by-laws of Amalco shall be the same as those of HyperBlock, *mutatis mutandis*.

(j)     *Exchange and Cancellation of Securities* – Pursuant to the Amalgamation:

(i)     each HyperBlock Common Share shall be converted into one Amalco Common Share;

(ii)     each CryptoGlobal Common Share held by HyperBlock shall be cancelled without any payment of capital in respect thereof;

(iii)     The stated capital of the Amalco Common Shares shall be equal to the total of the aggregate paid-up capital (as such term is defined in the Tax Act) of the HyperBlock Common Shares immediately prior to the Amalgamation (including, for greater certainty, any HyperBlock Common Shares issued in exchange for CryptoGlobal Common Shares pursuant to this Plan of Arrangement);

(iv)     each HyperBlock Option, CryptoGlobal Option and CryptoGlobal Warrant shall become exercisable for Amalco Common Shares on and subject to the terms and conditions thereof (for

the avoidance of doubt, with respect to each CryptoGlobal Option and CryptoGlobal Warrant, after giving effect to Section 2.3(d) and Section 2.3(e) of this Plan of Arrangement, respectively); and

(v)      the Amalco Option Plan shall be adopted.

## Amalco CSE Listing

(k)      *Amalco CSE Listing* – The Amalco Common Shares shall be listed and posted for trading on the CSE pursuant to the listing application (in the form agreed by HyperBlock and CryptoGlobal, each acting reasonably) filed by HyperBlock with the CSE prior to the date hereof and the approval of the CSE thereof.

## HyperBlock Sub-Receipt Financing Closing

(l)      *HyperBlock Sub-Receipt Financing Closing* – The HyperBlock Sub-Receipt Financing shall be consummated, and the holders of HyperBlock Sub-Receipts shall be issued Amalco Common Shares, pursuant to and in accordance with the terms and conditions of the HyperBlock Sub-Receipt Agreement.

## Spokane Acquisition Closing

(m)      *Spokane Acquisition Closing* – The Spokane Acquisition shall be consummated, and Spokane shall be issued Amalco Common Shares, pursuant to and in accordance with the terms and conditions of the Spokane Purchase Agreement.

**2.4**      **Tax Treatment.**

The Parties intend for the acquisition of CryptoGlobal by HyperBlock, together with the Amalgamation (collectively, the "**Reorganization**"), to qualify as a reorganization within the meaning of Section 368(a) of the Code, and will report it as such for United States federal, state and local income tax purposes. None of the Parties will knowingly take any action or fail to take any action, which action or failure to act would cause the Reorganization to fail to qualify as a reorganization within the meaning of Section 368(a) of the Code. This Plan of Arrangement is intended to constitute a plan of reorganization with respect to the Reorganization for U.S. federal income tax purposes.

**ARTICLE 3**
**RIGHTS OF DISSENT**

**3.1**      **Rights of Dissent.**

Each registered holder of CryptoGlobal Common Shares and HyperBlock Common Shares may exercise dissent rights with respect to any CryptoGlobal Common Shares or HyperBlock Common Share held by such holder (respectively, "**CryptoGlobal Dissent Rights**" and "**HyperBlock Dissent Rights**") in connection with the Arrangement pursuant to and in the manner set forth in Section 185 of the OBCA, as modified by the Interim Order and this Section 3.1 of this Plan of Arrangement; provided, that, notwithstanding subsection 185(6) of the OBCA, the written objection to the Arrangement Resolution referred to in subsection 185(6) of the OBCA must be received by CryptoGlobal or HyperBlock not later than 5:00 p.m. (Toronto time) two Business Days immediately preceding the date of the CryptoGlobal Meeting or HyperBlock Meeting, as applicable (as it may be adjourned or postponed from time to time). Each CryptoGlobal Dissenting Holder and HyperBlock Dissenting Holder that duly exercises such CryptoGlobal Dissenting Holder's CryptoGlobal Dissent Rights or such HyperBlock Dissenting Holder's HyperBlock Dissent Rights, as applicable, shall be deemed to have transferred the CryptoGlobal Common Shares or HyperBlock Common Shares held by such CryptoGlobal Dissenting Holder or HyperBlock Dissenting Holder and in respect of which CryptoGlobal Dissent Rights or HyperBlock Dissent Rights have been validly exercised, as applicable, to HyperBlock free and clear of all Encumbrances (other than the right to be paid fair value for such CryptoGlobal Common Shares or HyperBlock Common Shares, as applicable, as set out in this Section 3.1 of this Plan of Arrangement), as provided in Section 2.3(a) or Section 2.3(b), as applicable, and if they:

(a)   ultimately are entitled to be paid fair value for such CryptoGlobal Common Shares or HyperBlock Common Shares, as applicable: (i) shall be deemed not to have participated in the transactions in Article 2 of this Plan of Arrangement (other than Section 2.3(a) or Section 2.3(b) of this Plan of Arrangement, as applicable); (ii) will be entitled to be paid the fair value of such CryptoGlobal Common Shares or HyperBlock Common Shares, as applicable, by Amalco, which fair value, notwithstanding anything to the contrary contained in Part XIV of the OBCA, shall be determined as of the close of business on the Business Day before the Arrangement Resolution was adopted; and (iii) will not be entitled to any other payment or consideration, including any payment that would be payable under the Arrangement had such CryptoGlobal Dissenting Holder or HyperBlock Dissenting Holder not exercised its CryptoGlobal Dissent Rights or HyperBlock Dissent Rights in respect of such CryptoGlobal Common Shares or HyperBlock Common Shares, as applicable; or

(b)   ultimately are not entitled, for any reason, to be paid fair value for such CryptoGlobal Common Shares or HyperBlock Common Shares, as applicable, shall be deemed to have participated in the Arrangement on the same basis as a CryptoGlobal Shareholder or HyperBlock Shareholder that is not a CryptoGlobal Dissenting Holder or a HyperBlock Dissenting Holder, as applicable, and shall be entitled to receive only the securities contemplated by Section 2.3(c) and/or Section 2.3(j) of this Plan of Arrangement that such CryptoGlobal Dissenting Holder or HyperBlock Dissenting Holder would have received pursuant to the Arrangement if such CryptoGlobal Dissenting Holder or HyperBlock Dissenting Holder had not exercised its CryptoGlobal Dissent Rights or HyperBlock Dissent Rights, as applicable.

**3.2   Recognition of CryptoGlobal Dissenting Holders and HyperBlock Dissenting Holders.**

(a)   In no circumstances shall HyperBlock, CryptoGlobal or any other Person be required to recognize a Person exercising CryptoGlobal Dissent Rights or HyperBlock Dissent Rights unless such Person is the registered holder of those CryptoGlobal Common Shares or HyperBlock Common Shares, as applicable, in respect of which such rights are sought to be exercised.

(b)   For greater certainty, in no case shall HyperBlock, CryptoGlobal or any other Person be required to recognize CryptoGlobal Dissenting Holders as holders of CryptoGlobal Common Shares in respect of which CryptoGlobal Dissent Rights have been validly exercised, or HyperBlock Dissenting Holders as holders of HyperBlock Common Shares in respect of which HyperBlock Dissent Rights have been validly exercised, after the completion of the transactions contemplated by Section 2.3(a) and Section 2.3(b), respectively, and the names of such CryptoGlobal Dissenting Holders and HyperBlock Dissenting Holders shall be removed from the registers of holders of CryptoGlobal Common Shares and HyperBlock Common Shares, as applicable, in respect of which CryptoGlobal Dissent Rights and HyperBlock Dissent Rights have been validly exercised at the same time as the event described in Section 2.3(a) or Section 2.3(b), as applicable, occurs.  In addition to any other restrictions under Section 185 of the OBCA, none of the following shall be entitled to exercise CryptoGlobal Dissent Rights or HyperBlock Dissent Rights: (i) holders of CryptoGlobal Options or HyperBlock Options; (ii) holders of CryptoGlobal Warrants; and (iii) CryptoGlobal Common Shareholders and HyperBlock Common Shareholders that vote or have instructed a proxyholder to vote such CryptoGlobal Shares or HyperBlock Shares, as applicable, in favour of the Arrangement Resolution (but only in respect of such CryptoGlobal Common Shares or HyperBlock Common Shares, as applicable).

**ARTICLE 4**
**CERTIFICATES AND PAYMENTS**

**4.1   Payment of Consideration.**

(a)   Prior to the filing of the Articles of Arrangement:

(i)   CryptoGlobal shall deposit, for the benefit of CryptoGlobal Dissenting Holders, cash with the Depositary in the aggregate amount equal to the payments in respect thereof required by Section 2.3(a) of this Plan of Arrangement (with the amount per CryptoGlobal Common Share being deemed to be $0.74 for this purpose), net of

applicable withholdings.  The cash deposited with the Depositary shall be held in an interest-bearing account, and any interest earned on such funds shall be for the account of HyperBlock.

(ii)     HyperBlock shall deposit, for the benefit of HyperBlock Dissenting Holders, cash with the Depositary in the aggregate amount equal to the payments in respect thereof required by Section 2.3(b) of this Plan of Arrangement (with the amount per HyperBlock Common Share being deemed to be $1.75 for this purpose), net of applicable withholdings.  The cash deposited with the Depositary shall be held in an interest-bearing account, and any interest earned on such funds shall be for the account of HyperBlock.

(iii)     HyperBlock shall deliver, or cause to be delivered, the HyperBlock Common Shares to the Depositary to satisfy the consideration issuable to the CryptoGlobal Shareholders pursuant to Section 2.3(c) of this Plan of Arrangement (for the avoidance of doubt, excluding CryptoGlobal Dissenting Holders).

(b)     Upon surrender to the Depositary for cancellation of a certificate which immediately prior to the Effective Time represented outstanding CryptoGlobal Common Shares that were transferred pursuant to Section 2.3(b), together with a duly completed and executed Letter of Transmittal (and such additional documents and instruments as the Depositary may reasonably require), the CryptoGlobal Shareholder represented by such surrendered certificate shall be entitled to receive in exchange therefor, and the Depositary shall deliver to such CryptoGlobal Shareholder, a certificate representing the number of HyperBlock Common Shares which such CryptoGlobal Shareholder is entitled to receive under the Arrangement, which HyperBlock Common Shares will be registered in such CryptoGlobal Shareholder's name and either (i) delivered to the address as such CryptoGlobal Shareholder directed in its Letter of Transmittal or (ii) made available for pick-up at the offices of the Depositary, in either case, in accordance with the instructions of the CryptoGlobal Shareholder set out in the Letter of Transmittal, and any certificate representing CryptoGlobal Common Shares so surrendered shall forthwith thereafter be cancelled.

(c)     Until surrendered as contemplated by this Section 4.1 of this Plan of Arrangement, each certificate that immediately prior to the Effective Time represented CryptoGlobal Common Shares or HyperBlock Common Shares (other than CryptoGlobal Common Shares and HyperBlock Common Shares in respect of which CryptoGlobal Dissent Rights or HyperBlock Dissent Rights, as applicable, have been validly exercised and not withdrawn), shall be deemed after the Effective Time to represent only the right to receive upon such surrender the consideration in lieu of such certificate as contemplated in this Section 4.1, less any amounts withheld pursuant to Section 4.3, if applicable.  Any such certificate formerly representing CryptoGlobal Common Shares not duly surrendered on or before the second anniversary of the Effective Date shall cease to represent a claim by or interest of any former holder of CryptoGlobal Common Shares of any kind or nature against CryptoGlobal, HyperBlock or Amalco.  On such date, all consideration to which such former holder was entitled pursuant to this Plan of Arrangement shall be deemed to have been surrendered to HyperBlock and shall be paid over by the Depositary to Amalco or as directed by Amalco.

(d)     Any payment made by way of cheque by the Depositary pursuant to this Plan of Arrangement that has not been deposited, or has been returned to the Depositary or that otherwise remains unclaimed, in each case, on or before the second anniversary of the Effective Date, and any right or claim to payment hereunder that remains outstanding on the second anniversary of the Effective Date, shall cease to represent a right or claim of any kind or nature, and the right of the holder to receive the applicable consideration pursuant to this Plan of Arrangement shall terminate and be deemed to be surrendered and forfeited to HyperBlock for no consideration.

**4.2    Lost Certificates.**

In the event any certificate which immediately prior to the Effective Time represented one or more outstanding CryptoGlobal Common Shares that were transferred pursuant to Section 2.3 of this Plan of Arrangement shall have been lost, stolen or destroyed, upon the making of an affidavit of that fact by the Person claiming such certificate to be lost, stolen or destroyed, the Depositary will issue in exchange for such lost, stolen or destroyed certificate, the consideration that such CryptoGlobal Shareholder has the right to receive in accordance with Section 2.3 of this Plan of Arrangement and such CryptoGlobal Shareholder's Letter of Transmittal.  When authorizing such exchange for any lost, stolen or destroyed certificate, the Person to whom such consideration is to be delivered shall, as a condition precedent to the delivery of such consideration, give a bond satisfactory to HyperBlock and the Depositary (each acting reasonably) in such sum as HyperBlock (acting reasonably) may direct, or otherwise indemnify HyperBlock and CryptoGlobal in a manner satisfactory to HyperBlock (acting reasonably) against any claim that may be made against HyperBlock and/or CryptoGlobal with respect to the certificate alleged to have been lost, stolen or destroyed.

**4.3    Withholding Rights.**

HyperBlock, CryptoGlobal or the Depositary shall be entitled to deduct and withhold from any amount payable to any Person under this Plan of Arrangement (including any amounts payable pursuant to Section 3.1), such amounts as HyperBlock, CryptoGlobal or the Depositary determines, acting reasonably, are required or permitted to be deducted and withheld with respect to such payment under the Tax Act, the Code or any provision of any other Laws.  To the extent that amounts are so withheld, such withheld amounts shall be treated for all purposes hereof as having been paid to the Person in respect of which such withholding was made; provided, that such amounts are actually remitted to the appropriate Governmental Authority.

**4.4    No Encumbrances.**

Any exchange or transfer of securities pursuant to this Plan of Arrangement shall be free and clear of any Encumbrances or other claims of third Persons of any kind.

**ARTICLE 5**
**AMENDMENTS**

**5.1    Amendments to Plan of Arrangement.**

(a)     HyperBlock and CryptoGlobal, each acting reasonably, may amend, modify and/or supplement this Plan of Arrangement at any time and from time to time prior to the Effective Time; provided, that each such amendment, modification and/or supplement must: (i) be set out in writing; (ii) be approved by HyperBlock and CryptoGlobal (subject to the Arrangement Agreement), each acting reasonably; (iii) filed with the Court and, if made following the CryptoGlobal Meeting, approved by the Court; and (iv) communicated to holders of CryptoGlobal Common Shares if and as required by the Court.

(b)     Any amendment, modification or supplement to this Plan of Arrangement may be proposed by HyperBlock or CryptoGlobal at any time prior to the CryptoGlobal Meeting; provided, that HyperBlock or CryptoGlobal (subject to the Arrangement Agreement), as applicable, shall have consented thereto, with or without any other prior notice or communication, and if so proposed and accepted by the Persons voting at the CryptoGlobal Meeting (other than as may be required under the Interim Order), shall become part of this Plan of Arrangement for all purposes.

(c)     Any amendment, modification or supplement to this Plan of Arrangement that is approved or directed by the Court following the CryptoGlobal Meeting shall be effective only if: (i) it is consented to in writing by each of HyperBlock and CryptoGlobal, each acting reasonably; and (ii) if required by the Court, it is consented to by some or all of the CryptoGlobal Shareholders voting in the manner directed by the Court.

(d)      Any amendment, modification or supplement to this Plan of Arrangement may be made following the Effective Date unilaterally by HyperBlock; provided, that it concerns a matter which, in the reasonable opinion of HyperBlock, is of an administrative nature required to better give effect to the implementation of this Plan of Arrangement and is not adverse to the economic interest of any former CryptoGlobal Shareholder, or holders of CryptoGlobal Options or CryptoGlobal Warrants.

## ARTICLE 6
## FURTHER ASSURANCES

**6.1**      **Further Assurances.**

Notwithstanding that the transactions and events set out in this Plan of Arrangement shall occur and shall be deemed to occur in the order set out in this Plan of Arrangement without any further act or formality, each Party shall make, do and execute, or cause to be made, done and executed, all such further acts, deeds, agreements, transfers, assurances, instruments or documents as may reasonably be required by either Party in order further to document or evidence any of the transactions or events set out in this Plan of Arrangement.

**SCHEDULE B**
**AUDITED FINANCIAL STATEMENTS OF HYPERBLOCK AND SPOKANE AND UNAUDITED**
**FINANCIAL STATEMENTS OF SPOKANE**

**HyperBlock Technologies Corp.**
**Financial Statements**

**For the period from incorporation October 10, 2017 to February 28, 2018**

## Independent Auditors' Report

To the Shareholders of HyperBlock Technologies Corp.,

We have audited the accompanying financial statements of HyperBlock Technologies Corp., which comprise the statement of financial position as at February 28, 2018, and the statement of loss and comprehensive loss, changes in shareholders' equity and cash flows for the period from the date of incorporation (October 10, 2017) to February 28, 2018 and a summary of significant accounting policies and other explanatory information.

*Management's Responsibility for the Financial Statements*

Management is responsible for the preparation and fair presentation of these financial statements in accordance with International Financial Reporting Standards, and for such internal control as management determines is necessary to enable the preparation of financial statements that are free from material misstatement, whether due to fraud or error.

*Auditors' Responsibility*

Our responsibility is to express an opinion on these financial statements based on our audit. We conducted our audit in accordance with Canadian generally accepted auditing standards. Those standards require that we comply with ethical requirements and plan and perform the audit to obtain reasonable assurance about whether the financial statements are free from material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the financial statements. The procedures selected depend on the auditors' judgment, including the assessment of the risks of material misstatement of the financial statements, whether due to fraud or error. In making those risk assessments, the auditor considers internal control relevant to the entity's preparation and fair presentation of the financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the entity's internal control. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of accounting estimates made by management, as well as evaluating the overall presentation of the financial statements.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

*Opinion*

In our opinion, the financial statements present fairly, in all material respects, the financial position of HyperBlock Technologies Corp. as at February 28, 2018 and its financial performance and its cash flows for the period from the date of incorporation (October 10, 2017) to February 28, 2018 are in accordance with International Financial Reporting Standards.

*MNP LLP*

May 22, 2018                                                    Chartered Professional Accountants
Toronto, Ontario                                                    Licensed Public Accountants



**HYPERBLOCK TECHNOLOGIES CORP.**
**STATEMENT OF FINANCIAL POSITION**
**AS AT FEBRUARY 28, 2018**
**(Expressed in US dollars)**

|  | Note | February 28, 2018 |
|---|---|---|
|  |  | $ |
| **ASSETS** |  |  |
|  |  |  |
| **Current Assets** |  |  |
| Cash |  | 3,361,479 |
| Prepaid expenses |  | 161,999 |
| Digital assets | 4 | 988,898 |
| **Total Current Assets** |  | 4,512,376 |
|  |  |  |
| **Non-Current Assets** |  |  |
| Mining equipment, net | 5 | 9,191,319 |
| **Total Non-Current Assets** |  | 9,191,319 |
|  |  |  |
| **Total Assets** |  | 13,703,695 |
|  |  |  |
| **LIABILITIES** |  |  |
|  |  |  |
| **Current Liabilities** |  |  |
| Accounts payable and accrued liabilities |  | 1,396,551 |
| **Total Current Liabilities** |  | 1,396,551 |
|  |  |  |
| **SHAREHOLDER'S EQUITY** |  |  |
| Share capital | 11 | 12,691,493 |
| Deficit |  | (384,349) |
| **Total Shareholder's equity** |  | 12,307,144 |
|  |  |  |
| **Total Liabilities and Shareholders' Equity** |  | 13,703,695 |

| **Commitments** | [Note 9] |
| **Subsequent Events** | [Note 13] |

"Eric So"                                        "Sean Walsh"
Director                                          Director

The accompanying notes are an integral part of these financial statements

**HYPERBLOCK TECHNOLOGIES CORP.**
**STATEMENT OF LOSS AND COMPREHENSIVE LOSS**
**FROM DATE OF INCORPORATION TO FEBRUARY 28, 2018**
**(Expressed in US dollars)**

| | Note | February 28, 2018 |
|---|---|---|
| | | $ |
| **REVENUE** | | |
| Digital assets mined | 3 and 4 | 1,399,972 |
| **Total Revenue** | | 1,399,972 |
| | | |
| **COST OF REVENUE** | | |
| Amortization | 5 | 456,736 |
| Hosting fees | 6 and 9 | 238,547 |
| **Total Cost of Revenue** | | 695,283 |
| | | |
| **Gross Profit** | | 704,689 |
| | | |
| | | |
| **OPERATING EXPENSES** | | |
| Professional and legal | | 248,270 |
| General and administrative | | 77,372 |
| Salaries and wages | 6 | 75,363 |
| **Total operating expenses** | | 401,005 |
| | | |
| **INCOME BEFORE OTHER ITEMS** | | 303,684 |
| | | |
| Transaction costs - acquisition | 12 | 351,614 |
| Fair value remeasurement loss on digital assets | 4 | 411,074 |
| Foreign exchange gain | | (74,655) |
| | | |
| **NET LOSS AND COMPREHENSIVE LOSS** | | (384,349) |
| | | |
| | | |
| **LOSS PER SHARE, basic and diluted** | 11 | (0.01) |
| | | |
| **Weighted average number of common shares, basic and diluted** | | 55,507,024 |

The accompanying notes are an integral part of these financial statements

**HYPERBLOCK TECHNOLOGIES CORP.**
**STATEMENT OF CASH FLOWS**
**FROM DATE OF INCORPORATION TO FEBRUARY 28, 2018**
**(Expressed in US dollars)**

| | Note | February 28, 2018 |
|---|---|---|
| | | $ |
| OPERATING ACTIVITIES | | |
| Net loss and comprehensive loss for the period | | (384,349) |
| Changes in non-cash working capital | | |
|   Prepaid expenses | | (161,999) |
|   Accounts payable and accrued liabilities | | 1,396,551 |
| Items not affecting cash: | | |
|   Amortization | 5 | 456,736 |
|   Digital assets | 4 | (1,399,972) |
|   Fair value remeasurment loss on digital assets | 4 | 411,074 |
| Cash flows from (used in) operating activities | | 318,041 |
| FINANCING ACTIVITIES | | |
| Issuance of share capital | 11 | 13,061,058 |
| Issuance of share capital - costs | | (369,565) |
| Cash flows from (used in) financing activities | | 12,691,493 |
| INVESTING ACTIVITIES | | |
| Acquistion of mining equipment | 5 | (9,648,055) |
| Cash flows (used in) from investing activities | | (9,648,055) |
| Change in cash during the period | | 3,361,479 |
| Cash, beginning of period | | - |
| Cash, end of period | | 3,361,479 |

The accompanying notes are an integral part of these financial statements

**HYPERBLOCK TECHNOLOGIES CORP.**
**STATEMENT OF CHANGES IN EQUITY**
**FROM DATE OF INCORPORATION TO FEBRUARY 28, 2018**
**(Expressed in US dollars)**

| | Note | Number of Shares | Share Capital | Retained earnings (deficit) | Total |
|---|---|---|---|---|---|
| | | | $ | $ | $ |
| Balance at October 10, 2017 | | - | - | - | - |
| Issuance of share capital | 11 | 129,120,919 | 13,061,058 | - | 13,061,058 |
| Issuance of share capital - costs | | - | (369,565) | - | (369,565) |
| Net loss and comprehensive loss for the period | | - | - | (384,349) | (384,349) |
| Balance at February 28, 2018 | | 129,120,919 | 12,691,493 | (384,349) | 12,307,144 |

The accompanying notes are an integral part of these financial statements

**HYPERBLOCK TECHNOLOGIES CORP.**
**Notes to the Financial Statements**
**For the period from incorporation to February 28, 2018**
(Expressed in US Dollars)

**1.   Nature of Operations**

HyperBlock Technologies Corp. (the "Company" or "HyperBlock") was incorporated in Ontario on October 10, 2017. The Company is a crypto mining aggregator. On February 2, 2018, the Company completed the purchase of specialized servers capable of producing 20 Petahashes/second. These servers are used to solve complex computational problems (known in the industry as mining) to validate transactions on the blockchain. The Company receives digital currencies in return for this service.

These financial statements were authorized for issuance by the Board of Directors on May 18, 2018.

**2.   Basis of Presentation**

*(a)   Statement of Compliance*

These financial statements have been prepared in accordance with International Financial Reporting Standards ("IFRS") as issued by the International Accounting Standards Board ("IASB") and using accounting policies described here in.

*(b)   Presentation and Functional Currency*

These financial statements are presented in US Dollars, which is the Company's functional and reporting currency.

Foreign currency transactions that are in a different currency than the functional currency are recorded at the exchange rate as at the date of the transaction.  At the end of each statement of financial position date, monetary assets and liabilities are translated using the period end foreign exchange rate.  Non-monetary assets and liabilities in foreign currencies other than the functional currency are translated using the historical rate.  Gains and losses on transactions are included in the profit and loss.

*(c)   Basis of Measurement*

These financial statements have been prepared on the historical cost basis, except as detailed in the accounting policies notes.

*(d)   Significant Accounting Judgments and Estimates*

The preparation of the Company's financial statements requires management to make judgements, estimates and assumptions that affect the reported amounts of assets, liabilities, revenue and expenses, and the disclosure of contingent assets and contingent liabilities at the end of the reporting period. However, uncertainty about these assumptions and estimates could result in outcomes that require a material adjustment to the carrying amount of the asset or liability affected in future periods. The key assumptions concerning the future and other key sources of estimation uncertainty at the reporting date that have a significant risk of causing a material adjustment to the carrying amounts of assets and liabilities within the next fiscal year are described below. The Company based its assumptions and estimates on parameters available when the financial statements were prepared. Existing circumstances and assumptions about future developments, however, may change due to market changes or circumstances arising beyond the control of the Company. Such changes are reflected in the assumptions when they occur.

Significant areas of estimation uncertainty and judgment considered by management in preparing the financial statements include:

7

**HYPERBLOCK TECHNOLOGIES CORP.**
**Notes to the Financial Statements**
**For the period from incorporation to February 28, 2018**
(Expressed in US Dollars)

*Determination of Asset Fair Values and Allocation of Purchase Consideration*

Significant asset acquisitions require judgements and estimates to be made at the date of acquisition in relation to determining the relative fair value of the assets acquired and the allocation of the purchase consideration over the fair value of the assets. The information necessary to measure the fair values as at the acquisition date of assets acquired requires certain judgements and estimates about future events, including but not limited to availability of hardware and expertise, future production opportunities, future digital currency prices and future operating costs.

*Accounting for Digital Assets*

At present, there is no specific definitive guidance in IFRS or alternative accounting frameworks for the recognition and measurement of digital assets.  Note 3 below includes key policies related to accounting for these assets.

*Fair Value of Digital Assets*

Digital Assets consist of cryptocurrency denominated assets and are included in current assets. Digital assets are measured at fair value using the quoted price on www.coinmarketcap.com ("CMC").  Management considers this fair value to be a Level 2 input under IFRS 13 *Fair Value Measurement* fair value hierarchy as the price on this source represents an average of quoted prices on multiple digital currency exchanges. The digital assets are valued based on the closing price obtained from CMC on the date that the digital assets are earned.  The digital assets are revalued based on the closing price on CMC as at the end of each reporting period of the Company. The Company is relying on the data available at CMC to be an accurate representation of the closing price for the different digital assets.

*Functional Currency*

The determination of functional currency is a matter of judgement.  The majority of the Company's operating expenditures are in US dollars. Management has assessed the functional currency as United States dollars.

*Useful life of Mining Equipment*

In order to determine the useful life of mining equipment, assumptions are required about a range of computing and industry market and economic factors, including required hashrates, technological changes, availability of hardware and other inputs and production costs.

*Impairment of Non-Financial Assets*

Impairment exists when the carrying value of an asset exceeds its recoverable amount, which is the higher of its fair value less costs to sell and its value in use. These calculations are based on available data, other observable inputs and projections of cash flows, all of which are subject to estimates and assumptions. Recoverable amounts are also sensitive to assumptions about the future usefulness of in-process development and the related marketing rights.

The Company amortizes the servers used for mining on a straight-line basis.  The value of the mining equipment may vary based on a number of factors, including, but not limited to, the complexity of the mining processes, which is algorithmically driven by the blockchain, availability of servers on a global basis and technological enhancements making next generation servers more efficient and cost effective.  The Company factors these variables into its assessments for potential impairment on servers for mining.

At the year end, management concluded that none of the Company's nonfinancial assets were impaired.

8

**HYPERBLOCK TECHNOLOGIES CORP.**
**Notes to the Financial Statements**
**For the period from incorporation to February 28, 2018**
(Expressed in US Dollars)

*Income Taxes*

Uncertainties exist with respect to the interpretation of evolving tax regulations relating to digital assets, changes in tax laws, and the amount and timing of future taxable income. The Company has not recognized the value of any deferred tax assets in its statements of financial position.

The Company recognizes the tax benefit from an uncertain tax position only if it is more likely than not that the tax position will be sustained based on its technical merits. The Company measures and record the tax benefits from such a position based on the largest benefit that has a greater than 50% likelihood of being realized upon ultimate settlement. The Company's estimated liabilities related to these matters are adjusted in the period in which the uncertain tax position is effectively settled, the statute of limitations for examination expires or when additional information becomes available. The Company's liability for unrecognized tax benefits requires the use of assumptions and significant judgment to estimate the exposures associated with our various filing positions. Although the Company believes that the judgments and estimates made are reasonable, actual results could differ and resulting adjustments could materially affect our effective income tax rate and income tax provision.

**3.   Significant Accounting Policies**

***Cash***

Cash in the statements of financial position is comprised of cash on deposit at banking institutions. The Company's cash is invested in demand deposits or short-term investment certificates with major financial institutions that are available on demand by the Company for its operations.

***Digital Assets***

Digital assets consist of digital currencies generated from the Company's mining activities. The Company classifies and measures digital assets at fair value and realized and unrealized gains and losses are recorded through profit and loss.

The Company obtains the equivalency rate of tradeable digital assets to USD from www.coinmarketcap.com , a source that aggregates data from multiple exchanges and applies a methodology to determine the best quoted USD price on the date the digital assets were generated. The Company calculates the price in US Dollar based on the closing exchange rate on the date of asset generation. Subsequent to initial recognition, digital assets are remeasured at each reporting period to the US Dollar price. The resulting gain or loss from subsequent remeasurement is recognized in the statement of income and comprehensive loss as a fair value remeasurement of digital assets.  The equivalency rate obtained from www.coinmarketcap.com represents a generally well recognized quoted price for tradeable digital assets, and this information and all related databases are accessible to the Company.

***Revenue Recognition***

Revenue is recognized as earned when the following four criteria have been met: (a) when persuasive evidence of an arrangement exists, (b) the product has been delivered to a customer and title has been transferred or the services have been rendered (c) the sales price is fixed or determinable, and (d) collection is reasonably assured.

The Company has not early adopted IFRS 15.

**HYPERBLOCK TECHNOLOGIES CORP.**
**Notes to the Financial Statements**
**For the period from incorporation to February 28, 2018**
(Expressed in US Dollars)

*Revenue from Digital Assets Mined*

Revenue is comprised of the fair value of consideration received for the provision of services in the ordinary course of business.

The Company derives its revenue from digital currency received for providing mining services to various digital currency blockchains. Mining is the process by which transactions are verified and added to the blockchain. A miner is only able to validate transactions once their servers have solved a computationally difficult puzzle.

Revenue is recognized by the Company when payment, in the form of digital currency, is received for successful mining services rendered. Revenue earned from digital currency mining activities is recognized at the fair value of the digital currency received as consideration on the date of actual receipt. Fair value is measured using the closing price on www.coinmarketcap.com on the date of receipt. Revenue is recognized daily at the US Dollar value for the digital currencies mined. For the period ended February 28, 2018, the Company recognized revenue from Bitcoin Core and Bitcoin Cash mining of $466,831 and $933,141 respectively.

***Financial Instruments***

Financial assets and financial liabilities are recognized when the Company becomes a party to the contractual provisions of the financial instrument.  Purchases or sale of financial assets that require delivery of assets within a time frame established by regulation or convention in the market place (regular way trades) are recognized on the trade date, i.e. the date that the Company commits to purchase or sell the asset.   Financial assets are de-recognized when the contractual rights to the cash flows from the financial asset expire, or when the financial asset and all substantial risks and rewards are transferred.   A financial liability is de-recognized when it is extinguished, discharged, cancelled or when it expires.

Financial assets and financial liabilities are measured initially at fair value plus transaction costs, except for financial assets and financial liabilities carried at fair value through profit or loss, which are measured initially at fair value. The Company describes its financial instruments by category according to their nature and their characteristics.  Management determines the classification when the instruments are initially recognized, which is normally the date of the transaction.

The Company classifies its financial assets and financial liabilities as outlined below:

| Financial Instrument | Classification |
| --- | --- |
| Cash | Fair value through profit or loss (FVTPL) |
| Accounts payable and accrued liabilities | Other financial liabilities |

*Loans and Receivables*

Loans and receivables are non-derivative financial assets with fixed and determinable payments that are not quoted in an active market.  After initial recognition, these are measured at amortized cost using the effective interest method, less provision for impairment.  Discounting is omitted where the effect of discounting is immaterial.

**HYPERBLOCK TECHNOLOGIES CORP.**
**Notes to the Financial Statements**
**For the period from incorporation to February 28, 2018**
(Expressed in US Dollars)

*Available for Sale Financial Assets ("AFS")*

Available for sale financial assets are non-derivative financial assets that are either designated to this category or do not qualify for inclusion in any of the other categories of financial assets.
The equity interest in a private company is measured at cost less any impairment loss in the absence of a quoted market price and when the fair value cannot be reasonably determined.

AFS financial assets are measured at fair value except when the fair value cannot be reasonably determined. Fair value is based on the last closing price.  The net change in fair value is recognized in other comprehensive income (loss).  When the asset is derecognized, the cumulated net change in fair value recognized in other comprehensive income (loss) is reclassified to comprehensive income (loss) under "gain (loss) on disposal of available for sale investment" if applicable and presented as a reclassification adjustment within other comprehensive income (loss). Impairment charges are recognized in profit or loss as impairment on investments, if applicable.  Reversals of impairment losses are recognized in other comprehensive income (loss).

*Financial Assets at Fair Value Through Profit or loss ("FVTPL)*

Financial assets at fair value through profit or loss include financial assets that are either classified as held for trading or that meet certain conditions and are designated at fair value through profit or loss upon initial recognition.  Assets in this category are measured at fair value with gains and losses recognized in profit or loss.

When the Company holds debentures that are convertible into the issuer's equity shares at the Company's option, the equity conversion feature represents an embedded option written by the issuer on its equity shares. The embedded derivative is not closely related to the host contract (the debenture) from the Company's perspective. Such equity conversion feature is classified as FVTPL, with the debenture being classified as loans and receivables. The embedded derivative's fair value (the conversion feature) is calculated first, and the carrying value of the debenture is assigned to the residual amount after deducting from the consideration paid to acquire the hybrid instrument, the amount separately determined for the embedded derivative.

<u>Financial Liabilities</u>

Financial liabilities are classified as either financial liabilities at FVTPL or other financial liabilities.

*Other Financial Liabilities*

Other financial liabilities are initially measured at fair value, net of transaction costs, and are subsequently measured at amortized cost using the effective interest method, with interest expense recognized on an effective yield basis.
The effective interest method is a method of calculating the amortized cost of a financial liability and of allocating interest expenses over the corresponding period. The effective interest rate is the rate that exactly discounts estimated future cash payments over the expected life of the financial liability, or, where appropriate, a shorter period, to the net carrying amount on initial recognition. The Company has classified accounts payable and accrued liabilities as other financial liabilities.

*Derecognition of Financial Liabilities*

The Company derecognizes financial liabilities when, and only when, the Company's obligations are discharged, cancelled or they expire.

**HYPERBLOCK TECHNOLOGIES CORP.**
**Notes to the Financial Statements**
**For the period from incorporation to February 28, 2018**
(Expressed in US Dollars)

*Asset Acquisitions*

The Company determines whether assets acquired, and liabilities assumed constitute a business. A business consists of inputs and processes applied to those inputs that have the ability to create outputs. The Company completed the purchase of cryptocurrency mining equipment in December 2017 (see Note 5) at which time it concluded that the purchase of this equipment did not qualify as a business combination under IFRS 3, "Business Combinations", as management concluded that significant processes were not acquired. Accordingly, the transaction has been accounted for as an asset acquisition.

*Mining Equipment*

Cryptocurrency mining equipment is stated at historical cost, less any accumulated amortization and any accumulated impairment losses. Historical costs include all costs directly attributable to the acquisition.

Amortization of mining equipment is calculated on components that have homogeneous useful lives, using the straight-line basis to depreciate the initial costs over 3 years. Amortization is recognized in cost of revenue in the statement of net loss and comprehensive loss.

The useful life, residual values, amortization rates and amortization methods are reviewed annually and takes into consideration the nature of the assets, their intended use and technological changes. Gain or loss on disposal are determined by comparing the proceeds of disposition with the carrying amount and are recognized in profit or loss.

Mining equipment is derecognized upon disposal, or when no future economic benefits are expected from its use or disposal. Any gain or loss arising on derecognition is included in the statement of net loss and comprehensive loss when the asset is derecognized.

*Impairment of Non-Financial Assets*

Mining equipment is tested for impairment if events or changes in circumstances indicate that their carrying amount may not be recoverable.

Impairment losses are recognized and measured as the excess of the carrying value of the mining equipment over its recoverable amount. Mining equipment's recoverable amount is the higher of its value in use and its fair value less costs to sell. Value in use is defined as the present value of the future cash flows expected to be derived from an asset or a cash generating unit. Previously recognized impairment losses are reviewed for possible reversal at each reporting date and, if the equipment's recoverable amount has increased, all or a portion of the impairment is reversed.

*Share Issuance Costs*

Direct costs associated with the issuance of common shares are deducted from the related proceeds.

*Taxes*

HyperBlock is in the business of mining for digital assets in a commercial manner, the income from the business is included in determining taxable income for the year. Income tax expense consists of current and deferred tax expense. Current and deferred tax are recognized in profit or loss except to the extent that it relates to items recognized directly in equity or other comprehensive income.

**HYPERBLOCK TECHNOLOGIES CORP.**
**Notes to the Financial Statements**
**For the period from incorporation to February 28, 2018**
(Expressed in US Dollars)

*Current income tax*

Current income tax assets and liabilities are measured at the amount expected to be recovered from or paid to the taxation authorities. The tax rates and tax laws used to compute the amounts are those that are enacted or substantively enacted at the reporting date in the countries where the Company operates and generates taxable income.

Management periodically evaluates positions taken in the tax returns with respect to situations in which applicable tax regulations are subject to interpretation and establishes provisions where appropriate.

*Deferred income tax*

Deferred tax is provided using the liability method on temporary differences at the reporting date between the tax bases of assets and liabilities and their carrying amounts for financial reporting purposes.

The carrying amount of deferred tax assets is reviewed at each reporting date and reduced to the extent that it is no longer probable that sufficient taxable income will be available to allow all or part of the deferred tax assets to be utilized. Unrecognized deferred tax assets are reassessed at each reporting date and are recognized to the extent that it has become probable that future taxable income will allow the deferred tax asset to be recovered.

Deferred tax assets and liabilities are measured at the tax rates that are expected to apply in the period when the asset is realized, or the liability is settled, based on tax rates and tax laws that have been enacted or substantively enacted at the reporting date. The effect of a change in the enacted or substantively enacted tax rates is recognized in net earnings and comprehensive income or in equity depending on the item to which the adjustment relates.

Deferred tax assets and deferred tax liabilities are offset if a legally enforceable right exists to set off current tax assets against current income tax liabilities and the deferred taxes relate to the same taxable entity and the same taxation authority.

**Accounting Policies not yet Adopted**

The following new standards, amendments to standards and interpretations have been issued but are not yet effective for the period ended February 28, 2018 and accordingly, have not been applied in preparing these financial statements:

*IFRS 9 Financial Instruments*

IFRS 9, published in July 2014, replaces the existing guidance in IAS 39 Financial Instruments: Recognition and Measurement. IFRS 9 includes revised guidance on the classification and measurement of financial instruments, a new expected credit loss model for calculating impairment on financial assets, and new general hedge accounting requirements. It also carries forward the guidance on recognition and de-recognition of financial instruments from IAS 39. IFRS 9 is effective for annual reporting periods beginning on or after January 1, 2018, with early adoption permitted. The Company has determined there will be no material impact on adoption of this standard.

*IFRS 16 – Leases*

In January 2016, the IASB issued IFRS 16 Leases, which requires lessees to recognize assets and liabilities for most leases.  For lessors, there is little change to the existing accounting in IAS 17 Leases.  The new standard is effective

**HYPERBLOCK TECHNOLOGIES CORP.**
**Notes to the Financial Statements**
**For the period from incorporation to February 28, 2018**
(Expressed in US Dollars)

for annual periods beginning on or after January 1, 2019. Early adoption is permitted, provided the new revenue standard, IFRS 16 has been applied, or is applied at the same date as IFRS 16. The Company is currently assessing the impact of IFRS 16 on the Company's financial statements. The Company has determined there will be no material impact on adoption of this standard.

**4.   Digital Assets**

As at February 28, 2018, the fair value of Company's digital assets was $988,898. Digital assets include Bitcoin Core ($466,938) and Bitcoin Cash ($521,960). Digital assets are recorded at their fair value on the date they are received and are revalued to their current market value at each reporting date. At the initial date of recognition, the Company calculates the fair value of digital assets in US Dollars based on the closing exchange rate from https://coinmarketcap.com. Subsequent to initial recognition, digital assets are remeasured at each reporting period to the US Dollar price.

For the period ended February 28, 2018, the Company incurred a fair value revaluation loss on its digital currencies of $411,074.

|  | Bitcoin | | Bitcoin Cash | |
| --- | --- | --- | --- | --- |
|  | $ | Units | $ | Units |
| **Opening balance at October 10, 2017** | - | - | - | - |
| Mined additons | 466,831 | 44.91 | 933,141 | 433.46 |
| Unrealized gain (loss) in fair value through profit and loss | 107 |  | (411,181) |  |
| **Ending balance at February 28, 2018** | 466,938 | 45 | 521,960 | 433 |

**5.   Mining Equipment**
During the period, the Company acquired $9,500,000 of specialized servers used to mine digital assets. These servers are located in a data centre in the US and are subject to a colocation agreement. Costs incurred of $148,055 to acquire the equipment were capitalized to the related equipment.

|  | Mining equipment |
| --- | --- |
| **Cost** |  |
| Opening | - |
| Additions | 9,648,055 |
| **Balance at February 28, 2018** | 9,648,055 |
|  |  |
| **Accumulated Depreciation** |  |
| Opening | - |
| Amortization | 456,736 |
| **Balance at February 28, 2018** | 456,736 |
|  |  |
| **Net Book Value, February 28, 2018** | 9,191,319 |

During the year ended February 28, 2018, $456,736 was recorded as amortization expense.

**HYPERBLOCK TECHNOLOGIES CORP.**
Notes to the Financial Statements
For the period from incorporation to February 28, 2018
(Expressed in US Dollars)

6.   **Related Party Transactions**

During the period ended February 28, 2018, the Company purchased $9,648,055 (including $148,055 related to costs to acquire) of mining equipment from Project Spokane, an entity controlled by a senior executive of the Company. The Company paid server hosting fees of $238,547 to the Project Spokane during the period ended February 28, 2018.

Key management includes directors and officers of the Company. For the period ended February 28, 2018, compensation awarded to key management was comprised of salary in the amount of $48,386.

During the period ended February 28, 2018, the Company issued 1,900,000 common shares to certain Directors of the Company for advisory services provided.

7.   **Financial Instruments**

*Fair value hierarchy*

Financial instruments recorded at fair value are classified using a fair value hierarchy that reflects the significance of inputs used in making the measurements. The hierarchy is summarized as follows:

Level 1: Unadjusted quoted prices in active markets for identical assets and liabilities;
Level 2: Inputs other than quoted prices that are observable for the asset or liability either directly or indirectly from observable market data; and
Level 3: Inputs that are not based on observable market data

The Company's financial instruments have been classified as follows:

| February 28, 2018 | Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|
| Fair value through profit and loss | | | | |
| Cash | $   3,361,479 | $            - | $            - | $   3,361,479 |

*Financial risk management*

The Company is exposed to various financial instrument risks and continuously assesses the impact and likelihood of this exposure. These risks include credit risk, liquidity risk, interest rate risk and currency risk.  Where material these risks are reviewed and monitored by the Board of Directors.

*Credit risk*

Credit risk arises from the non-performance by counterparties of contractual financial obligations resulting in financial loss to the Company. The Company's credit risk is primarily attributable to its cash.  Cash is held with an investment grade Canadian financial institution as assessed by external rating agencies. The deposits held with these institutions may exceed the amount of insurance provided on such deposits. Management believes the risk of loss to be minimal.

*Liquidity risk*

Liquidity risk refers to the risk that the Company will not be able to meet its financial obligations when they become due or can only do so at excessive cost. As at February 28, 2018, the Company had working capital of

**HYPERBLOCK TECHNOLOGIES CORP.**
Notes to the Financial Statements
For the period from incorporation to February 28, 2018
(Expressed in US Dollars)

$3,115,825. All of the Company's financial liabilities have contractual maturities within twelve months. Management has determined that this risk is not significant at this point in time.

*Market Risk*

(i) *Interest rate risk*

Interest rate risk is the risk that the fair value or future cashflows of a financial instrument will fluctuate because of changes in market interest rates. The Company maintains its cash balances in demand deposit accounts with reputable financial institutions and does not believe it is not currently exposed to interest rate risk and therefore interest rate risk is considered by the Company to be low.

(ii) *Foreign currency risk*

The Company's functional currency is the U.S. dollar. The Company is exposed to some foreign currency fluctuations as some of its administrative costs are transacted in Canadian dollars.

(iii) *Crypto-currency risk*

The Company is exposed to risk with respect to cryptocurrency prices and valuations which are largely based on the supply and demand of these digital currencies and their acceptance in the financial market.

(iv) *Fair value*

Fair value estimates are made at the statement of financial position date, based on relevant market information and information about the financial instrument. These estimates are subjective in nature and involve uncertainties in significant matters of judgement and therefore cannot be determined with precision. Changes in assumptions could significantly affect these estimates. The carrying amounts for cash, and accounts payable and accrued liabilities approximate fair value because of the limited term of the instruments.

**8. Capital Management**

The Company's objective in managing capital is to ensure (i) financial capacity to meet current obligations is maintained and continue as a going concern, and (ii) the financial capacity to execute strategic plans is maintained. The Company defines capital as debt and shareholder's equity. At February 28, 2018, the Company had no outstanding debt.

To maintain or adjust its capital structure, the Company may issue new shares, issue new debt or acquire or dispose of assets. The Company is not subject to externally imposed capital requirements

**9. Commitments**

The Company had no commitments for operating leases or capital expenditures at February 28, 2018.

During the period, the Company entered into a colocation agreement with Project Spokane, an entity controlled by a senior executive of the Company. The contract is for the provision of hosting services and has a duration of 12 months. Fees are billed monthly in advance in the amount $141,000.

**HYPERBLOCK TECHNOLOGIES CORP.**
**Notes to the Financial Statements**
**For the period from incorporation to February 28, 2018**
(Expressed in US Dollars)

10.  **Income Taxes**

The reconciliation of the combined Canadian federal and provincial statutory income tax rate of 26.5% to the effective tax rate is as follows:

**HYPERBLOCK TECHNOLOGIES CORP.**
Notes to the Financial Statements
For the period from incorporation to February 28, 2018
(Expressed in US Dollars)

|  | | 2018 |
|---|---|---|
| Net Income (Loss) before recovery of income taxes | $ | (384,349) |
| | | |
| Expected income tax (recovery) expense | $ | (101,853) |
| Revaluation of Assets mined | | 108,935 |
| Other permanent differences | | 303 |
| Change in tax benefits not recognized | | (7,385) |
| | | |
| Income tax (recovery) expense | $ | - |
| | | |
| The Company's income tax (recovery) is allocated as follows: | | |
| Current tax (recovery) expense | $ | - |
| Deferred tax (recovery) expense | | - |
| | | |
| | $ | - |

**Deferred tax**

The following table summarizes the components of deferred tax:

**Deferred Tax Assets**

| | |
|---|---|
| Non capital losses | 87,260 |

**Deferred Tax Liabilities**

| | |
|---|---|
| Property, plant and equipment | (87,260) |
| | |
| Net deferred tax Asset | $ - |

Deferred tax assets and liabilities have been offset where they relate to income taxes levied by the same taxation authority and the Company has the legal right and intent to offset.

**Unrecognized deferred tax assets**

Deferred taxes are provided as a result of temporary differences that arise due to the differences between the income tax values and the carrying amount of assets and liabilities. Deferred tax assets have not been recognized in respect of the following deductible temporary differences:

| | |
|---|---|
| Share issuance costs - 20(1)(e ) | 338,987 |
| Non-capital losses carried forward | 2,711 |
| | 341,698 |

The Company's Canadian non-capital income tax losses expire as follows:

| | | |
|---|---|---|
| 2038 | | 331,995 |
| | $ | 331,995 |

18

**HYPERBLOCK TECHNOLOGIES CORP.**
**Notes to the Financial Statements**
**For the period from incorporation to February 28, 2018**
(Expressed in US Dollars)

**11.  Share capital**

**Authorized**

Unlimited common shares.

**Issued and outstanding**

From the date of incorporation to February 28, 2018 the Company issued 129,120,919 common shares with a value, net of cost to issue, of $12,691,493.

For the period from October 10, 2017, date of incorporation, to February 28, 2018, the weighted average number of shares outstanding was 55,507,024.

**12.  Spokane Transaction**

On January 7, 2018, the Company entered into an purchase agreement with Project Spokane ("Spokane") and the controlling member and Manager of Spokane to acquire the business, including (a) (i) hash rate sales for cryptocurrencies or similar cloudmining activities, (ii) blockchain security server distribution and resale; (iii) server hosting and co-location; and (iv) self-mining for cryptocurrencies and (b) any other business Spokane is engaged in or actively planning to engage in (see Note 13).

Costs of $351,614 related to the transaction have been incurred as at February 28, 2018.

**13.  Subsequent Events**

On March 14, 2018, the parties executed an amendment to the Spokane Purchase Agreement to adjust the outside date for the transaction from March 31, 2018 to May 31,2018. The aggregate purchase price payable to Spokane is $65,947,721 which is payable in cash, common shares and a promissory note secured by the assets of Spokane. On April 2, 2018, the parties executed a second amendment to the Purchase Agreement to adjust the outside date for the transaction from May 31, 2018 to the Escrow Release Deadline (as defined in the subscription receipt agreement dated March 14, 2018 between the Company, TSX Trust Company, and Canaccord Genuity Corp., among others, as amended on March 26, 2018, and to amend the purchase price payment schedule.

On March 14, 2018, March 22, 2018 and March 29, 2018, by way of a private placement, the Company issued 15,498,360 Subscription Receipts ("Receipts") at CAD$1.75 per Receipt. The Company also issued an additional 511,890 Receipts at a price of CAD$1.75 each for fees incurred to in connection with the private placement. The proceeds from the Receipts will be partially used to acquire Project Spokane. In addition, pursuant to the terms of commitment letters with two subscribers, 2,000,000 Subscription Receipts were subscribed for but not yet issued by the Company as the subscribers have committed to funding at a later date, subject to certain termination rights.

On April 3, 2018, HyperBlock entered into a definitive arrangement agreement (the "Arrangement Agreement) pursuant to which HyperBlock will acquire all of the issued and outstanding common shares of CryptoGlobal Corp. (a cryptocurrency mining company located in Canada) by way of an acquisition arrangement (the "Transaction"). Pursuant to the Transaction, the parties will apply to list the combined company, which will operate under the name HyperBlock Technologies Corp. on the Canadian Securities Exchange on closing.

Under the terms of the Transaction, HyperBlock will acquire all of the issued and outstanding shares of CryptoGlobal (on a fully-diluted basis) for consideration of CAD$0.74 per CryptoGlobal common share,

**HYPERBLOCK TECHNOLOGIES CORP.**
**Notes to the Financial Statements**
**For the period from incorporation to February 28, 2018**
(Expressed in US Dollars)

representing a total equity value for CryptoGlobal of approximately CAD$106 million. CryptoGlobal shareholders will receive 0.4229 of a HyperBlock common share for each CryptoGlobal common share held which, based on HyperBlock's recently completed subscription receipt financing of $1.75 per subscription receipt, equates to $0.74 of value per CryptoGlobal common share.

HyperBlock expects to issue up to approximately 60.4 million HyperBlock common shares to CryptoGlobal shareholders in connection with the Transaction. Upon closing of the Transaction, CryptoGlobal shareholders will own approximately 25.2% of the combined company.

The closing of the Transaction remains subject to the satisfaction of certain customary closing conditions, including approval of the shareholders of both CryptoGlobal and the Company, approval of the Transaction by the Ontario Superior Court of Justice, conditional listing approval of the combined company's common shares on the Canadian Securities Exchange and delisting of the CryptoGlobal's common shares from the TSXV.

HyperBlock has secured irrevocable hard lock-up agreements to vote in favour of the Transaction from CryptoGlobal shareholders representing approximately 58% of the currently issued and outstanding CryptoGlobal common shares. CryptoGlobal has secured irrevocable hard lock-up agreements to vote in favour of the Transaction from HyperBlock shareholders representing approximately 50% of the currently issued outstanding HyperBlock common shares.

**Project Spokane**
**Carve-out Financial Statements**

**For the year ended December 31, 2017 and the period from date of commencement on February 24, 2016 to December 31, 2016**

## Independent Auditors' Report

To the Members of Project Spokane,

We have audited the accompanying carve-out financial statements of Project Spokane, which comprise the carve-out statements of financial position as at December 31, 2017 and 2016, and the carve-out statements of income and comprehensive income and carve-out statements of cash flows for the year ended December 31, 2017 and the period from the date of commencement on February 24, 2016 to December 31, 2016, and a summary of significant accounting policies and other explanatory information.

*Management's Responsibility for the Carve-out Financial Statements*

Management is responsible for the preparation and fair presentation of these carve-out financial statements in accordance with International Financial Reporting Standards, and for such internal control as management determines is necessary to enable the preparation of carve-out financial statements that are free from material misstatement, whether due to fraud or error.

*Auditors' Responsibility*

Our responsibility is to express an opinion on these carve-out financial statements based on our audits. We conducted our audits in accordance with Canadian generally accepted auditing standards. Those standards require that we comply with ethical requirements and plan and perform the audits to obtain reasonable assurance about whether the carve-out financial statements are free from material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the carve-out financial statements. The procedures selected depend on the auditors' judgment, including the assessment of the risks of material misstatement of the carve-out financial statements, whether due to fraud or error. In making those risk assessments, the auditor considers internal control relevant to the entity's preparation and fair presentation of the carve-out financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the entity's internal control. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of accounting estimates made by management, as well as evaluating the overall presentation of the carve-out financial statements.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

*Opinion*

In our opinion, the carve-out financial statements present fairly, in all material respects, the financial positions of Project Spokane as at December 31, 2017 and 2016, and its financial performance and its cash flows for the year ended December 31, 2017and the period from the date of commencement on February 24, 2016 to December 31, 2016 are in accordance with International Financial Reporting Standards.

*MNP LLP*

May 22, 2018
Toronto, Ontario

Chartered Professional Accountants
Licensed Public Accountants



**Project Spokane**
**Carve-out statements of financial position**
**As at December 31, 2017 and 2016**
(Expressed in US Dollars)

| | Note | December 31 2017 | December 31 2016 |
|---|---|---|---|
| | | $ | $ |
| **ASSETS** | | | |
| | | | |
| **Current Assets:** | | | |
| Cash | | 2,688,080 | 320,276 |
| Accounts receivable | | 51,989 | 170,124 |
| Contract asset | 3 | 261,440 | - |
| Deposits | | 1,267,120 | 622,462 |
| Inventories | | 506,629 | - |
| **Total Current Assets** | | 4,775,258 | 1,112,862 |
| | | | |
| **Non-Current Assets:** | | | |
| Mining equipment, net | 4 | 4,110,265 | 432,681 |
| Other capital assets, net | 5 | 4,781,000 | 2,307,868 |
| **Total Non-Current Assets** | | 8,891,265 | 2,740,549 |
| | | | |
| **Total Assets** | | 13,666,523 | 3,853,411 |
| | | | |
| **LIABILITIES** | | | |
| | | | |
| **Current Liabilities** | | | |
| Accounts payable and accrued liabilities | | 571,826 | 672,386 |
| Contract liability | 3 | 10 | 176,014 |
| Finance lease obligations | 12 | 59,097 | - |
| Unearned revenue | 6 | 3,644,325 | 684,088 |
| **Total Current Liabilities** | | 4,275,258 | 1,532,488 |
| | | | |
| **Non-Current Liabilities** | | | |
| Finance lease obligations | 12 | 109,540 | - |
| Unearned revenue | 6 | 4,098,214 | - |
| **Total Non-Current Liabilities** | | 4,207,754 | - |
| | | | |
| **Total Liabilities** | | 8,483,012 | 1,532,488 |
| | | | |
| **DIVISIONAL EQUITY** | | 5,183,511 | 2,320,923 |
| | | | |
| **Total Liabilities and Shareholders' Equity** | | 13,666,523 | 3,853,411 |

Commitments – Note 11
Subsequent Events – Note 14


"Sean Walsh"_____
Sean Walsh

The accompanying notes are an integral part of these carve-out financial statements

**Project Spokane**

**Carve-out statement of income and comprehensive income**
**For the year ended December 31, 2017 and the period from commencement to December 31, 2016**
 (Expressed in US Dollars)

| | | December 31, 2017 | December 31, 2016 |
|---|---|---|---|
| **REVENUE** | | | |
| Digital assets mined | | 2,117,304 | 1,023,645 |
| Hashrate sales | | 4,594,954 | - |
| Hardware sales | | 6,049,106 | 1,081,337 |
| Hosting sales | | 4,694,875 | 1,922,051 |
| Gain (loss) on disposition of hardware | | 5,408,552 | 575,979 |
| **Total Revenue** | | 22,864,791 | 4,603,012 |
| | | | |
| **COST OF REVENUE** | | | |
| Hardware sales | 8 | 4,825,709 | 1,066,687 |
| Mining, hosting and hashrate | 8 | 4,035,523 | 1,919,958 |
| **Total Cost of Revenue** | | 8,861,232 | 2,986,645 |
| | | | |
| **Gross Profit** | | 14,003,559 | 1,616,367 |
| | | | |
| **GENERAL AND ADMINISTRATION** | | | |
| General and administrative | | 303,516 | 105,559 |
| Office and rent | | 1,284,171 | 509,171 |
| Professional and legal | | 439,328 | 223,870 |
| Salaries and wages | 8 | 1,396,836 | 391,180 |
| Travel and meals | | 145,341 | 50,944 |
| Depreciation | 4, 5 | 2,089,136 | 324,879 |
| | | | |
| **NET INCOME AND COMPREHENSIVE INCOME** | | 8,345,231 | 10,764 |

The accompanying notes are an integral part of these carve-out financial statements

**Project Spokane**
**Carve-out statement of cash flows**
**For the year ended December 31, 2017 and the period from date of commencement to December 31, 2016**
(Expressed in US Dollars)

| | Note | December 31, 2017 | December 31, 2016 |
|---|---|---|---|
| | | | $ |
| OPERATING ACTIVITIES | | | |
| Net income for the period | | 8,345,231 | 10,764 |
| Changes in working capital: | | | |
| Increase in accounts receivable | | (4,144,437) | (2,805,072) |
| Increase in inventory | | (806,159) | - |
| Increase in prepaid expenses | | (644,658) | (622,462) |
| Increase in contract assets | | (261,440) | - |
| Increase in accounts payable and accrued liabilities | | 4,290,253 | 1,326,339 |
| (Decrease) increase in contract liability | | (176,004) | 176,014 |
| Increase in deferred revenues | | 648,338 | 684,088 |
| Items not affecting cash: | | | |
| Digital assets mined | | (2,117,304) | (1,023,645) |
| Hashrate sales | | (4,594,954) | - |
| Depreciation | 4,5 | 2,089,136 | 324,879 |
| Gain on disposition of mining equipment | 4,5 | (5,408,552) | (575,979) |
| Loss from non-monetary transactions | | 192,655 | - |
| Cash flows from (used in) operating activities | | (2,587,895) | (2,505,074) |
| FINANCING ACTIVITIES | | | |
| Proceeds from finance lease | | 203,073 | - |
| Payment of principal portion of finance lease | | (34,436) | - |
| Contributions to divisional equity | | 6,523,459 | 5,476,049 |
| Cash flows from (used in) financing activities | | 6,692,096 | 5,476,049 |
| INVESTING ACTIVITIES | | | |
| Additions of mining equipment | 4 | (4,262,346) | (1,268,004) |
| Dispositions of mining equipment | 4 | 5,384,395 | 1,017,265 |
| Additions to other equipment, net | 5 | (2,858,446) | (2,399,960) |
| Cash flows (used in) from investing activities | | (1,736,397) | (2,650,699) |
| Change in cash during the period | | 2,367,804 | 320,276 |
| Cash, beginning of period | | 320,276 | - |
| Cash, end of period | | 2,688,080 | 320,276 |

The accompanying notes are an integral part of these carve-out financial statements

**Project Spokane**
**Notes to the Carve-out Financial Statements**
**For the year ended December 31, 2017 and the period from date of commencement to December 31, 2016**
(Expressed in US Dollars)

**1.    Nature of Operations**

Project Spokane (the "Company" or "Spokane"), as presented in these carve-out financial statements is not a legal entity.  The Company and its related assets and liabilities are currently under control of a limited liability company formed under the laws of the state of Colorado, called Project Spokane, LLC.

The Company has two main lines of business.  The first line of business relates to utilizing servers to provide hashrate for securing the blockchain. The second line of business relates to sales of new and used servers to customers. The first line of business consists of three key areas of operations, which are:

1. Hosting fees charged to others to host their servers ("Hosting");
2. Hosting of Company owned servers, under which the Company receives all of revenues ("Mining"); and
3. Hosting of Company owned servers, under which the hashrate has been sold to a single customer ("Hashrate Sales"), under which the customer pays a daily maintenance fee to the Company.

These carve-out financial statements were authorized for issuance by Spokane on May 22, 2018.

**2.    Basis of Presentation**

*(a)   Carve-out*

These carve-out financial statements have been prepared in accordance with International Financial Reporting Standards ("IFRS") as issued by the International Accounting Standards Board ("IASB") and using accounting policies described herein.

As the carve-out financial statements were prepared for the purposes of the acquisition of certain operational assets and liabilities of the Company, the following assets and liabilities have not been included in the carve-out financial statements.  The Company has also presented all transactions that would generally be included in the shareholders' equity section as other divisional equity.  The assets and liabilities, and associated accounts that have not been presented as part of the carve-out financial statements are:

1.    Digital Assets (as defined below) and associated gains or losses thereon;
2.    Any and all loans and notes payable, including any associated interest expense;
3.    Any taxes payable based on the net income of the Company; and
4.    Any cash that results in a working capital greater than $500,000.

The above assets and liabilities were eliminated from the carve-out financial statements through other divisional equity.

*(b)   Presentation and Functional Currency*

The carve-out financial statements are presented in US Dollars, which is also the functional currency of the Company.

Foreign currency transactions that are in a different currency than the functional currency are recorded at the exchange rate as at the date of the transaction.  At the end of each reporting period, monetary assets and liabilities are translated using the period end foreign exchange rate.  Non-monetary assets and liabilities in foreign currencies other than the functional currency are translated using the historical rate.  Gains and losses on transaction are included in the profit and loss.

6

**Project Spokane**
**Notes to the Carve-out Financial Statements**
**For the year ended December 31, 2017 and the period from date of commencement to December 31, 2016**
(Expressed in US Dollars)


*(c)  Basis of Measurement*

These financial statements have been prepared on a going concern and historical cost basis, except as detailed in the accounting policies notes.

**2.    Basis of Presentation (continued)**

*(a)  Significant Accounting Judgments and Estimates*

The preparation of these financial statements require management to make estimates and assumptions that affect the reported amount of assets and liabilities at the date of the consolidated financial statements and reported amounts of expenses during the reporting period. Actual outcomes could differ from these estimates.

In particular, information about significant areas of estimation uncertainty and judgment considered by management in preparing the consolidated financial statements includes:

*Accounting for Digital Assets*

At present, there is limited guidance in IFRS on the recognition and measurement of Digital Assets (as defined below).  Note 3 below includes key policies related to accounting for these assets.

Digital Assets are measured at fair value using the quoted price on www.coinmarketcap.com ("CMC"). Management considers this fair value to be a Level 2 input under IFRS 13 *Fair Value Measurement* fair value hierarchy as the price on this source represents an average of quoted prices on multiple digital currency exchanges. The Digital Assets are valued based on the closing price obtained from CMC on the date that the Digital Assets are earned.  The Digital Assets are revalued based on the closing price on CMC at each reporting period of the Company. The Company is relying on the data available at CMC to be an accurate representation of the closing price for the different Digital Assets.

*Lifetime Hashrate Sales*

The Company has sold lifetime contract of hashrate sales, under which the customer pays the entire fee up front, a daily maintenance fee is charged and deducted from the customers revenue, and there is no fixed end date for the plan. The contract will terminate when the contract is no longer profitable for 60 consecutive days (i.e. the maintenance fee exceeds revenue).  The Company has factored in several different assumptions including the future difficulty, price changes in Bitcoin Core, and pricing mechanisms of hashrate sales to estimate that period.

*Multiple Deliverable Arrangements*

The Company has sold both equipment and hosting services to customers, which results in a multiple deliverable arrangement. Estimates are required to determine the status of a contract at each period end. The Company's revenue recognition policy for multiple deliverable arrangements is discussed in Note 3.

*Functional Currency*

The determination of functional currency is a matter of judgement.  Some of the Company's transactions are denominated in digital currencies.  Often these are convertible into US dollars.  Most of the Company's expenditures and financing is in United States dollars. Management has assessed the functional currency as United States dollars.

**Project Spokane**
**Notes to the Carve-out Financial Statements**
**For the year ended December 31, 2017 and the period from date of commencement to December 31, 2016**
(Expressed in US Dollars)

## 2.   Basis of Presentation (continued)

*Impairment of Non-Financial Assets*

Impairment exists when the carrying value of an asset exceeds its recoverable amount, which is the higher of its fair value less costs to sell and its value in use. These calculations are based on available data, other observable inputs and projections of cash flows, all of which are subject to estimates and assumptions. Recoverable amounts are also sensitive to assumptions about the future usefulness of in-process development and the related marketing rights.

The Company amortizes the server used for Mining on a straight-line basis.  The value of the Mining equipment may vary based on a number of factors, including, but not limited to, the complexity of the Mining processes, which is algorithmically driven by the blockchain, availability of servers on a global basis and technological enhancements making next generation servers more efficient and cost effective.  The Company factors these variables into its assessments for potential impairment on servers for Mining.

At the year end, management concluded that none of the Company's nonfinancial assets were impaired.

*Income Taxes*

Uncertainties exist with respect to the interpretation of complex tax regulations, changes in tax laws, and the amount and timing of future taxable income. Because the Company is in a loss position, it has not recognized the value of any deferred tax assets in its consolidated statements of financial position.

## 3.   Significant Accounting Policies

### Cash

Cash in the statements of financial position is comprised of cash on deposit at banking institutions and with digital asset exchanges. The Company's cash is invested with major financial institutions and is held in business accounts that are available on demand by the Company for its operations.

### Digital Assets

Digital Assets consist of digital currencies generated from the Company's mining activities. The Company classifies and measures Digital Assets at fair value and realized and unrealized gains and losses are recorded through profit and loss.

The Company obtains the equivalency rate of tradeable Digital Assets to USD from CMC, a source that aggregates data from multiple exchanges and applies a methodology to determine the best quoted USD price on the date the digital assets were generated. The Company calculates the price in USD based on the closing exchange rate on the date of asset generation. Subsequent to initial recognition, Digital Assets are remeasured at each reporting period to the US Dollar price. The resulting gain or loss from subsequent remeasurement is recognized in the carve-out statement of comprehensive income as a fair value remeasurement of Digital Assets, however, as this account is not part of the carve-out, any effect has been recorded to divisional equity.  The equivalency rate obtained from CMC represents a generally well recognized quoted price for tradeable Digital Assets, and this information and all related databases are accessible to the Company.

8

**Project Spokane**
**Notes to the Carve-out Financial Statements**
**For the year ended December 31, 2017 and the period from date of commencement to December 31, 2016**
(Expressed in US Dollars)

**3.    Significant Accounting Policies (continued)**

**Digital Assets on Cash Flow**

From time to time, the Company will make payments on amounts owed, in Digital Assets. For cash flow purposes, the Company considers these to be non-monetary transactions and they are excluded from the statements of cash flows.

***Revenue Recognition***

Revenue is recognized as earned when the following four criteria have been met: (a) when persuasive evidence of an arrangement exists, (b) the product has been delivered to a customer and title has been transferred or the services have been rendered (c) the sales price is fixed or determinable, and (d) collection is reasonably assured.

*Digital Assets Mined*

Revenues are comprised of the fair value of consideration received or receivable for the provision of services in the ordinary course of business.

The Company derives a portion of its revenue from digital currency received for providing mining services to various digital currency blockchains. Mining is the process by which transactions are verified and added to the blockchain. A miner is only able to validate transactions once their servers have solved a computationally difficult puzzle.

Revenue is recognized by the Company when payment, in the form of digital currency, is received for mining services rendered. Revenue earned from digital currency mining activities is recognized at the fair value of the digital currency received as consideration on the date of actual receipt. Fair value is measured using the closing price on CMC on the date of receipt. Revenue is recognized daily at the US Dollar value for the digital currencies mined.

From time to time, the hashrate that has been sold mines on a different digital currency than the one the purchaser has selected ("Arbitrage Revenue"). This may occur when there the profitability of mining one digital asset is greater than another with the same hashrate. The Arbitrage revenue that is generated from time to time has been included in the revenue from digital assets mined as it is immaterial.

*Hashrate Sales*

Hashrate sales represent contracts under which the Company sells hashing power to mine Digital Assets to customers for periods ranging from one month through to a lifetime. The contracts are structured such that the customer pays an upfront fee for the initial purchase and pays an additional maintenance fee on a daily basis for the Company to maintain the hashing power. The maintenance fee is a fixed amount in USD per terahash and is automatically deducted on a daily basis from the customers proceeds from Digital Assets mined. The lifetime contracts are terminated when the Digital Assets mined by the customers are less than the daily maintenance fee for a period of 60 days.

Revenue from the initial sales of the hashing power is deferred and amortized on a straight-line basis over the length of the contract. For a life-time hash-rate contract, the Company amortizes revenue over a four-year period which is the estimated life of the contract.

**Project Spokane**
**Notes to the Carve-out Financial Statements**
**For the year ended December 31, 2017 and the period from date of commencement to December 31, 2016**
(Expressed in US Dollars)

Revenue from maintenance fees are recorded on a daily basis as earned.

**3.    Significant Accounting Policies (continued)**

*Hardware Sales*

The Company recognizes revenue from hardware sales when the four revenue recognition criteria above are met. Specifically, the Company recognizes the revenue upon shipment, provided that the Company is able to conclude that the price was fixed and determinable.

*Hosting Sales*

Hosting Sales represent agreements under which the Company will host servers owned by customers for a monthly fee at the Company's facility. The Company recognizes revenue from hosting sales when the four revenue recognition criteria above are met.  This results in the monthly fees being recognized on a monthly basis.  When customers pay for a period greater than one month, the amount is initially recorded as unearned revenue and recognized on a monthly basis.

Multiple Deliverable Arrangements

The Company sells products and services as part of multiple deliverable arrangements, which consists of hardware sales and hosting sales as described above.  These sales are recognized as follows:

- The products and services are divided into separate units of accounting, so long as the delivered elements have stand-alone value to customers and the fair value can be determined of any of the undelivered elements objectively and reliably; then
- The consideration is measured and allocated among the accounting units on a residual basis, under which, the fair value is first allocated to the hosting sales, and the residual balance is allocated to the hardware sales.
- When there is no formal contract detailing the period for which the Company will be hosting the customer, the Company uses a ten-month period which is based on historical averages.
- A contract asset or contract liability may be recognized as a result of the difference between revenue recognized on the sale of the hardware at the onset of a contract versus the timing of the receipt of payment.

***Financial Instruments***

Financial assets and financial liabilities are recognized when the Company becomes a party to the contractual provisions of the financial instrument.  Purchases or sale of financial assets that require delivery of assets within a time frame established regulation or convention in the market place (regular way trades) are recognized on the trade date, i.e. the date that the Company commits to purchase or sell the asset.  Financial assets are de-recognized when the contractual rights to the cash flows from the financial asset expire, or when the financial asset and all substantial risks and rewards are transferred.  A financial liability is de-recognized when it is extinguished, discharged, cancelled or when it expires.

Financial assets and financial liabilities are measured initially at fair value plus transaction costs, except for financial assets and financial liabilities carried at fair value through profit or loss, which are measured initially at fair value. The Company describes its financial instruments by category according to their nature and their characteristics.  Management determines the classification when the instruments are initially recognized, which is normally the date of the transaction.

**Project Spokane**
**Notes to the Carve-out Financial Statements**
**For the year ended December 31, 2017 and the period from date of commencement to December 31, 2016**
(Expressed in US Dollars)

3. **Significant Accounting Policies (continued)**

The Company classifies its financial assets and financial liabilities as outlined below:

| Financial Instrument | Classification |
|---|---|
| Cash | Fair value through profit or loss (FVTPL) |
| Accounts receivables | Loans and receivables |
| Accounts payable and accrued liabilities | Other financial liabilities |

*Loans and receivables*

Loans and receivables are non-derivative financial assets with fixed and determinable payments that are not quoted in an active market. After initial recognition, these are measured at amortized cost using the effective interest method, less provision for impairment. Discounting is omitted where the effect of discounting is immaterial.

*Available for sale financial assets ("AFS")*

Available for sale financial assets are non-derivative financial assets that ate either designated to this category or do not qualify for inclusion in any of the other categories of financial assets.

The equity interest in a private company is measured at cost less any impairment loss in the absence of a quoted market price and when the fair value cannot be reasonably determined.

AFS financial assets are measured at fair value except when the fair value cannot be reasonably determined. Fair value is based on the last closing price. The net change in fair value is recognized in other comprehensive income or loss. When the asset is derecognized, the cumulated net charge in fair value is recognized in other comprehensive income or loss, is reclassified to comprehensive income or loss under "Gain or loss on disposal of available for sale investment" if applicable and presented as a reclassification adjustment within other comprehensive income or loss.

Impairment charges are recognized in profit or loss as impairment on investments, if applicable. Reversals of impairment losses are recognized in other comprehensive income or loss.

*Financial assets at fair value through profit of loss ("FVTPL")*

Financial assets at fair value through profit of loss include financial assets that are either classified as held for trading or that meet certain conditions and are designated at fair value through profit or loss upon initial recognition. Assets in this category are measured at fair value with gains and losses recognized in profit or loss.

<u>*Financial liabilities*</u>

Financial liabilities are classified as either financial liabilities at FVTPL or other financial liabilities.

*Other financial liabilities*

Other financial liabilities are initially measured at fair value, net of transaction costs, and are subsequently measured at amortized cost using the effective interest method, with interest expense recognized on an effective yield basis.

11

**Project Spokane**
**Notes to the Carve-out Financial Statements**
**For the year ended December 31, 2017 and the period from date of commencement to December 31, 2016**
(Expressed in US Dollars)

The effective interest method is a method of calculating the amortized cost of a financial liability and of allocating interest expenses over the corresponding period. The effective interest rate is the rate that exactly discounts estimated future cash payments over the expected life of the financial liability, or, where appropriate, a shorter

**3.    Significant Accounting Policies (continued)**

period, to the net carrying amount on initial recognition. The Company has classified accounts payable and accrued liabilities as other financial liabilities.

*Derecognition of financial liabilities*

The Company derecognizes financial liabilities when, and only when, the Company's obligations are discharged, cancelled or they expire.

**Mining Equipment and Other Capital Assets**

Mining equipment and other capital assets are stated at historical cost, less any accumulated amortization and any accumulated impairment losses.  Historical costs include all costs directly attributable to the acquisition.

Amortization of mining equipment and other capital assets are calculated on components that have homogeneous useful lives, using the straight-line basis to depreciate the initial costs as follows:

| | |
|---|---|
| Mining equipment | 2 to 3 years |
| Data centre and electrical equipment | 5 to 20 years |
| Leasehold improvements | Over the remaining life of the lease term |

The useful life, residual values, amortization rates and amortization methods are reviewed annually and takes into consideration the nature of the assets, their intended use and technological changes.  Gain or loss on disposal are determined by comparing the proceeds of disposition with the carrying amount and are recognized in profit or loss.

An item of property and equipment and any significant part initially recorded is derecognized upon disposal, or when no future economic benefits are expected from its use or disposal.  Any gain or loss arising on derecognition is included in the statement of loss and comprehensive loss when the asset is derecognized.

**Impairment of Non-Financial Assets**

Mining equipment and other capital assets are tested for impairment if events or changes in circumstances, assessed at the end of each reporting period, indicate that their carrying amount may not be recoverable.  For purposes of impairment testing, assets other than goodwill are grouped at the lowest level for which there are separately identifiable cash inflows.

Impairment losses are recognized and measured as the excess of the carrying value of the assets over their recoverable amount.  An asset's recoverable amount is the higher of its value in use and its fair value less costs to sell.  Value in use is defined as the present value of the future cash flows expected to be derived from an asset or a cash generating unit (see note 13).  Previously recognized impairment losses, other than those attributable to goodwill, are reviewed for possible reversal at each reporting date and, if the asset's recoverable amount has increased, all or a portion of the impairment is reversed.

**Project Spokane**
**Notes to the Carve-out Financial Statements**
**For the year ended December 31, 2017 and the period from date of commencement to December 31, 2016**
(Expressed in US Dollars)

**Leases**

Leases are classified as either finance or operating leases. Leases that transfer substantially all the benefits and inherent risks of ownership of property to the Company are accounted for as finance leases. At the time a finance lease is entered into, an asset is recorded together with its related long-term obligation to reflect the acquisition and financing. Equipment recorded under a finance lease is amortized on the same basis as described above.

**3.    Significant Accounting Policies (continued)**

Operating lease payments are recognized as an operating expense in the combined statements of income on a straight-line basis over the lease term.

**Inventories**

Inventories are valued at the lower of cost and net realizable value.  The cost of inventories is determined on a weighted average basis and includes expenditures incurred in acquiring the inventories.  Net realizable value is the estimated selling price in the ordinary course of business, less the estimated costs of completion and selling expenses.

**Accounting policies not yet adopted**

The following new standards, amendments to standards and interpretations have been issued but are not yet effective for the year ended December 31, 2017 and accordingly, have not been applied in preparing these carve-out financial statements:

*IFRS 9 – Financial Instruments*

IFRS 9, published in July 2014, replaces the existing guidance in IAS 39 Financial Instruments: Recognition and Measurement. IFRS 9 includes revised guidance on the classification and measurement of financial instruments, a new expected credit loss model for calculating impairment on financial assets, and new general hedge accounting requirements. It also carries forward the guidance on recognition and de-recognition of financial instruments from IAS 39. IFRS 9 is effective for annual reporting periods beginning on or after January 1, 2018, with early adoption permitted. The Company has determined there will be no material impact on adoption of this standard.

*IFRS 15 – Revenue from Contracts with Customers*

In May 2014, the IASB issued IFRS 15 Revenue from Contracts with Customers, which covers principles that an entity shall apply to report useful information to users of financial statements about the nature, amount, timing and uncertainty of revenue and cash flows arising from a contract with a customer.  In September 2015, the IASB deferred the effective date of the standard to annual reporting periods beginning on or after January 1, 2018, with earlier application permitted.  The Company has determined there will be no material impact on adoption of this standard.

*IFRS 16 – Leases*

In January 2016, the IASB issued IFRS 16 Leases, which requires lessees to recognize assets and liabilities from most leases.  For lessors, there is little change to the existing accounting in IAS 17 Leases.  The new standard is effective for annual periods beginning on or after January 1, 2019.  Early adoption is permitted, provided the new revenue standard, IFRS 16 has been applied, or is applied at the same date as IFRS 16.  The Company is currently assessing the impact of IFRS 16 on the Company's financial statements along with the planned timing of our adoption of IFRS 16.

13

**Project Spokane**
**Notes to the Carve-out Financial Statements**
**For the year ended December 31, 2017 and the period from date of commencement to December 31, 2016**
(Expressed in US Dollars)

4. **Mining Equipment, net**

| | SHA-256 Equipment | GPU Equipment | Total |
|---|---|---|---|
| **Cost** | | | |
| Opening | - | - | - |
| Additions | 1,310,804 | - | 1,310,804 |
| Dispositions | (727,046) | - | (727,046) |
| **Balance at December 31, 2016** | 583,758 | - | 583,758 |
| Additions | 7,164,383 | 310,927 | 7,475,310 |
| Dispositions | (2,606,381) | - | (2,606,381) |
| **Balance at December 31, 2017** | 5,141,760 | 310,927 | 5,452,687 |
| | | | |
| **Accumulated Depreciation** | | | |
| Opening | - | - | - |
| Depreciation | 228,664 | - | 228,664 |
| Dispositions | (77,587) | - | (77,587) |
| **Balance at December 31, 2016** | 151,077 | - | 151,077 |
| Depreciation | 1,631,270 | 70,278 | 1,701,548 |
| Dispositions | (510,203) | - | (510,203) |
| **Balance at December 31, 2017** | 1,272,144 | 70,278 | 1,342,422 |
| | | | |
| **Net Book Value** | | | |
| **December 31, 2016** | 432,681 | - | 432,681 |
| **December 31, 2017** | 3,869,616 | 240,649 | 4,110,265 |

SHA-256 Equipment consists of specialized equipment from Bitmain, Ebit, and Avalon, which was used to mine Bitcoin Core and Bitcoin Cash. GPU Mining equipment was used to mine Zcash.  During the year ended December 31, 2016, the Company acquired mining equipment from a related party (Note 8).

Included in SHA-256 Equipment is $203,073 (2016 - $Nil) of equipment under a finance lease.

During the year ended December 31, 2017, $1,701,548 (2016 - $228,664) was recorded as depreciation expense.

14

**Project Spokane**
**Notes to the Carve-out Financial Statements**
**For the year ended December 31, 2017 and the period from date of commencement to December 31, 2016**
(Expressed in US Dollars)

5.   **Other Capital Assets, net**

| | Data Center and Electrical | Leaseholds | Total |
|---|---|---|---|
| **Cost** | | | |
| Opening | - | - | - |
| Additions | 2,324,797 | 79,286 | 2,404,083 |
| **Balance at December 31, 2016** | 2,324,797 | 79,286 | 2,404,083 |
| Additions | 2,675,818 | 188,645 | 2,864,463 |
| Dispositions | (3,742) | - | (3,742) |
| **Balance at December 31, 2017** | 4,996,873 | 267,931 | 5,264,804 |
| | | | |
| **Accumulated Depreciation** | | | |
| Opening | - | - | - |
| Depreciation | 90,905 | 5,310 | 96,215 |
| **Balance at December 31, 2016** | 90,905 | 5,310 | 96,215 |
| Depreciation | 364,201 | 23,388 | 387,589 |
| **Balance at December 31, 2017** | 455,106 | 28,698 | 483,804 |
| | | | |
| **Net Book Value** | | | |
| **December 31, 2016** | 2,233,892 | 73,976 | 2,307,868 |
| **December 31, 2017** | 4,541,767 | 239,233 | 4,781,000 |

During the year ended December 31, 2017, $387,589 (2016 - $96,215) was recorded as depreciation expense.

6.   **Unearned Revenue**

| | December 31, 2017 | December 31, 2016 |
|---|---|---|
| Hardware Sales | 1,003,500 | 523,590 |
| Hosting Fees | 328,926 | 160,498 |
| Hashrate Sales | 2,311,899 | - |
| **Total current Unearned Revenue** | 3,644,325 | 684,088 |
| Hashrate Sales | 4,098,214 | - |
| **Total Unearned Revenue** | 7,742,539 | 684,088 |

7.   **Digital Assets Mined**

During the year, the Company earned revenue through mining the following Digital Assets:

| | December 31, 2017 | December 31, 2016 |
|---|---|---|
| Bitcoin Core | 408,121 | 1,023,645 |
| Bitcoin Cash | 1,412,884 | - |
| Zcash | 122,479 | - |
| Litecoin | 173,820 | - |
| | 2,117,304 | 1,023,645 |

15

**Project Spokane**
**Notes to the Carve-out Financial Statements**
**For the year ended December 31, 2017 and the period from date of commencement to December 31, 2016**
(Expressed in US Dollars)

**8.   Related Party Transactions**

The following are all related party transactions recorded:

- During the year ended December 31, 2017, the Company purchased $Nil (2016 - $1,142,370) of mining equipment and other capital assets from senior management of the Company.
- During the year ended December 31, 2017, the Company sold $68,800 (2016 - $70,000) of mining equipment to senior management of the Company.
- During the year ended December 31, 2017, the Company earned $68,678 (2016 - $74,000) in hosting revenue from senior management of the Company.
- During the year ended December 31, 2017, the Company sold $5,500,000 (2016 - $Nil) of mining equipment and charged hosting fees of $29,564 (2016 - $Nil) to a company with common management.

Key management includes directors and officers of the Company. Compensation awarded to key management was comprised of the following:

|  | | 2017 | | 2016 |
|---|---|---|---|---|
| Short term wages | $ | 548,278 | $ | 94,782 |
| Commissions and other | | 29,500 | | 22,500 |
| **Total** | $ | 577,778 | $ | 117,282 |

**9.   Financial Instruments**

*Fair value hierarchy*

Financial instruments recorded at fair value are classified using a fair value hierarchy that reflects the significance of inputs used in making the measurements. The hierarchy is summarized as follows:

Level 1: Unadjusted quoted prices in active markets for identical assets and liabilities;
Level 2: Inputs other than quoted prices that are observable for the asset or liability either directly or indirectly from observable market data; and
Level 3: Inputs that are not based on observable market data

The Company's financial instruments have been classified as follows:

| December 31, 2017 | Level 1 | | Level 2 | | Level 3 | | Total | |
|---|---|---|---|---|---|---|---|---|
| Fair value through profit and loss | | | | | | | | |
| Cash | $ | 2,688,080 | $ | - | $ | - | $ | 2,688,080 |

| December 31, 2016 | Level 1 | | Level 2 | | Level 3 | | Total | |
|---|---|---|---|---|---|---|---|---|
| Fair value through profit and loss | | | | | | | | |
| Cash | $ | 320,276 | $ | - | $ | - | $ | 320,276 |

*Financial risk management*

The Company is exposed to various financial instrument risks and continuously assesses the impact and likelihood of this exposure. These risks include credit risk, liquidity risk, customer risk, interest rate risk and currency risk. Where material these risks are reviewed and monitored by the Board of Directors.

16

**Project Spokane**
**Notes to the Carve-out Financial Statements**
**For the year ended December 31, 2017 and the period from date of commencement to December 31, 2016**
(Expressed in US Dollars)

**9.   Financial Instruments (continued)**

*Credit risk*

Credit risk arises from the non-performance by counterparties of contractual financial obligations resulting in financial loss to the Company. The Company's credit risk is primarily attributable to its cash.  Cash is held with an investment grade financial institution as assessed by external rating agencies. The deposits held with this institution may exceed the amount of insurance provided on such deposits. Management believes the risk of loss to be minimal.

*Liquidity risk*

Liquidity risk refers to the risk that the Company will not be able to meet its financial obligations when they become due or can only do so at excessive cost. As at December 31, 2017, the Company had working capital of $500,000 (December 31, 2016 – working capital deficit of $419,626). All of the Company's financial liabilities have contractual maturities within twelve months. Management has determined that this risk is not significant at this point in time.

*Customer Risk*

The Company has earned revenue from certain customers that individually represented 10% or more of the Company's total revenue.  The Company has a single customer for its hashrate sales as it sells hashrate on a wholesale basis.  Hashrate sales accounted for approximately 20% of the total sales of the Company for the year ended December 31, 2017 (December 31, 2016 – 0%).  As at December 31, 2017, the Company had liabilities of $6,410,113 (December 31, 2016 - $Nil) for unearned hash rate sales revenue, consisting of $2,311,899 current (December 31, 2016 - $Nil) and $4,098,214 long-term (December 31, 2016 - $Nil).

**10.  Capital Management**

The Company's objective in managing capital is to ensure a sufficient liquidity position to safeguard the Company's ability to continue as a going concern in order to provide returns for the benefit of its stakeholders.

**11.  Commitments**

The Company has entered into an agreement for the lease of its premises.  Future minimum lease payments aggregate to and include the following future payments:

|  | Total |
| --- | --- |
| 2018 | $        909,203 |
| 2019 | 932,015 |
| 2020 | 946,777 |
| 2021 | 963,203 |
| 2022 | 979,675 |
| Thereafter | 3,213,224 |
|  | $     7,944,097 |

**Project Spokane**
**Notes to the Carve-out Financial Statements**
**For the year ended December 31, 2017 and the period from date of commencement to December 31, 2016**
(Expressed in US Dollars)

**12.  Finance Lease Obligations**

|  | 2017 | 2016 |
|---|---|---|
| Minimum payments under finance leases |  |  |
| Within 1 year | $      59,097 | $        - |
| 2 to 3 years | 118,194 | - |
| 4 to 5 years | 14,775 | - |
|  | 192,066 | - |
| Effect of discounting | (23,429) | - |
| Present value of minimum lease payments | 168,637 | - |
| Less: current portion | (59,097) | - |
| Non-current portion of finance lease obligations | $    109,540 | $        - |

**13.  Segmented Information**

The Company operates in the following segments, in one geographic location:
- General corporate;
- Hashrate for securing the blockchain ("Hashrate"); and
- Sales of new and used servers ("Servers").

| 2017 | Hashrate | Servers | General Corporate | Total |
|---|---|---|---|---|
| Revenue | 11,407,133 | 11,457,658 | - | 22,864,791 |
| Cost of Revenue | 4,035,523 | 4,825,709 | - | 8,861,232 |
| **Expenses** |  |  |  |  |
| General and administrative | - | - | 303,516 | 303,516 |
| Office and rent | - | - | 1,284,171 | 1,284,171 |
| Professional and legal | - | - | 439,328 | 439,328 |
| Salaries and wages | - | - | 1,396,836 | 1,396,836 |
| Travel and meals | - | - | 145,341 | 145,341 |
| Depreciation | 2,089,136 | - | - | 2,089,136 |
| Net Income and comprehensive income | 5,282,474 | 6,631,949 | (3,569,192) | 8,345,231 |
| Total assets | 10,978,443 | - | 2,688,080 | 13,666,523 |
| Total liabilities | 7,911,186 | - | 571,826 | 8,483,012 |

**Project Spokane**
**Notes to the Carve-out Financial Statements**
**For the year ended December 31, 2017 and the period from date of commencement to December 31, 2016**
(Expressed in US Dollars)

| 2016 | Hashrate | Servers | General Corporate | Total |
|---|---|---|---|---|
| **Revenue** | 2,945,696 | 1,657,316 | - | 4,603,012 |
| **Cost of Revenue** | 1,919,958 | 1,066,687 | - | 2,986,645 |
| **Expenses** | | | | |
| General and administrative | - | - | 105,559 | 105,559 |
| Office and rent | - | - | 509,171 | 509,171 |
| Professional and legal | - | - | 223,870 | 223,870 |
| Salaries and wages | - | - | 391,180 | 391,180 |
| Travel and meals | - | - | 50,944 | 50,944 |
| Depreciation | 324,879 | - | - | 324,879 |
| **Net Income and comprehensive income** | 700,859 | 590,629 | (1,280,724) | 10,764 |
| **Total assets** | 3,533,135 | - | 320,276 | 3,853,411 |
| **Total liabilities** | 860,102 | - | 672,386 | 1,532,488 |

**14.  Subsequent Events**

On January 7, 2018, the Company, along with the controlling member and Manager of Spokane,  entered into a purchase agreement (the "Purchase Agreement") with HyperBlock Technologies Corp. ("HyperBlock"), a corporation located in Canada, to acquire the business of Spokane, including (a) (i) hash rate sales for cryptocurrencies or similar cloud mining activities (ii) blockchain security server distribution and resale (iii) server hosting and co-location, and (iv) self-mining for cryptocurrencies and (b) any other business Spokane is engaged in or actively planning to engage in (the "Spokane Assets"). Under the terms of the purchase agreement, HyperBlock has agreed to pay $65,947,721, which shall be paid in cash, common shares of HyperBlock and a promissory note secured by the assets of Spokane.

On March 14, 2018, the parties executed an amendment to the Purchase Agreement to adjust the outside date for the closing of the transaction from March 31, 2018 to May 31, 2018. On April 2, 2018, the parties executed a second amendment to the Purchase Agreement to adjust the outside date for the closing of the transaction from May 31, 2018 to the Escrow Release Deadline (as defined in the subscription receipt agreement dated March 14, 2018 between HyperBlock, TSX Trust Company, and Canaccord Genuity Corp., among others, as amended on March 26, 2018), and to amend the purchase price payment schedule.

**Project Spokane**
**Condensed Interim Carve-out Financial Statements**

**For the three months ended March 31, 2018**

**(Expressed in US dollars)**

**Notice of No Auditor Review of Condensed Interim Financial Statements**

The accompanying unaudited condensed interim carve-out financial statements of Project Spokane have been prepared by and are the responsibility of the Company's Management.

The Company's independent auditor has not performed a review of these condensed interim financial statements in accordance with the standards established by the Chartered Professional Accountants of Canada for a review of interim financial statements by an entity's auditor.

These financial statements do not comply with IFRS as comparative figures have not been presented for the three-month period ended March 31, 2017.

**Project Spokane**

**Condensed Interim Carve-out Statements of Financial Position**
**As at March 31, 2018 and December 31, 2017**
(Expressed in US Dollars)

| | Note | March 31 2018 | December 31 2017 |
|---|---|---|---|
| | | $ | $ |
| **ASSETS** | | | |
| | | | |
| **Current Assets:** | | | |
| Cash | | 1,906,934 | 2,688,080 |
| Accounts receivable | | 61,186 | 51,989 |
| Contract asset | | 376,102 | 261,440 |
| Deposits | | 528,475 | 1,267,120 |
| Inventories | | 506,629 | 506,629 |
| **Total Current Assets** | | 3,379,326 | 4,775,258 |
| | | | |
| **Non-Current Assets:** | | | |
| Mining equipment, net | 4 | 3,200,806 | 4,110,265 |
| Other capital assets, net | 5 | 4,754,862 | 4,781,000 |
| **Total Non-Current Assets** | | 7,955,668 | 8,891,265 |
| | | | |
| **Total Assets** | | 11,334,994 | 13,666,523 |
| | | | |
| **LIABILITIES** | | | |
| | | | |
| **Current Liabilities** | | | |
| Accounts payable and accrued liabilities | | 213,650 | 571,826 |
| Contract liability | | - | 10 |
| Finance lease obligations | 12 | 59,097 | 59,097 |
| Unearned revenue | 6 | 2,606,579 | 3,644,325 |
| **Total Current Liabilities** | | 2,879,326 | 4,275,258 |
| | | | |
| **Non-Current Liabilities** | | | |
| Finance lease obligations | 12 | 98,062 | 109,540 |
| Unearned revenue | 6 | 3,701,105 | 4,098,214 |
| **Total Non-Current Liabilities** | | 3,799,167 | 4,207,754 |
| | | | |
| **Total Liabilities** | | 6,678,493 | 8,483,012 |
| | | | |
| **DIVISIONAL EQUITY** | | 4,656,501 | 5,183,511 |
| | | | |
| **Total Liabilities and Shareholders' Equity** | | 11,334,994 | 13,666,523 |

"Sean Walsh"
Sean Walsh

The accompanying notes are an integral part of these condensed interim carve-out financial statements

3

**Project Spokane**
**Condensed Interim Carve-out Statement of Income and Comprehensive Income**
**For the three months ended March 31, 2018**
(Expressed in US Dollars)

|  | March 31, 2018 |
|---|---:|
| **REVENUE** | |
| Digital assets mined | 2,014,965 |
| Hashrate sales | 1,578,594 |
| Hardware sales | 4,172,302 |
| Hosting sales | 2,160,596 |
| Gain on disposition of hardware | 48,100 |
| **Total Revenue** | 9,974,557 |
| | |
| **COST OF REVENUE** | |
| Hardware sales | 1,156,800 |
| Mining, hosting and hashrate | 1,232,032 |
| **Total Cost of Revenue** | 2,388,832 |
| | |
| **Gross Profit** | 7,585,725 |
| | |
| **GENERAL AND ADMINISTRATION** | |
| General and administrative | 82,868 |
| Office and rent | 366,674 |
| Professional and legal | 8,349 |
| Salaries and wages | 552,953 |
| Travel and meals | 31,021 |
| Depreciation | 701,257 |
| | |
| **INCOME BEFORE OTHER ITEMS** | 5,842,603 |
| | |
| **NET INCOME AND COMPREHENSIVE INCOME** | 5,842,603 |

The accompanying notes are an integral part of these condensed interim carve-out financial statements

**Project Spokane**
**Condensed Interim Carve-out Statement of Cash Flows**
**For the three months ended March 31, 2018**
(Expressed in US Dollars)

| | Note | March 31, 2018 |
|---|---|---|
| OPERATING ACTIVITIES | | |
| | | |
| Net income for the period | | 5,842,602 |
| Changes in working capital | | (498,092) |
| | | |
| Items not affecting cash: | | |
| Digital assets mined | | (2,014,965) |
| Hashrate sales | | (3,721,352) |
| Depreciation | 4,5 | 701,257 |
| Gain on disposition of mining equipment | 4,5 | (48,100) |
| | | |
| Cash flows from (used in) operating activities | | 261,350 |
| | | |
| FINANCING ACTIVITIES | | |
| | | |
| Payment of principal portion of finance lease | | (11,478) |
| Contributions to divisional equity | | (2,154,932) |
| | | |
| Cash flows from (used in) financing activities | | (2,166,410) |
| | | |
| INVESTING ACTIVITIES | | |
| Dispositions of mining equipment | 4 | 1,221,799 |
| Additions to other equipment, net | 5 | (97,885) |
| | | |
| Cash flows (used in) from investing activities | | 1,123,914 |
| | | |
| Change in cash during the period | | (781,146) |
| Cash, beginning of period | | 2,688,080 |
| Cash, end of period | | 1,906,934 |

The accompanying notes are an integral part of these condensed interim carve-out financial statements

**Project Spokane**
**Notes to the Condensed Interim Carve-out Financial Statements**
**March 31, 2018**
(Expressed in US Dollars)

**1.   Nature of Operations**

Project Spokane (the "Company" or "Spokane"), as presented in these condensed interim carve-out financial statements is not a legal entity.  The Company and its related assets and liabilities are currently under control of a limited liability company formed under the laws of the state of Colorado, called Project Spokane, LLC.

The Company has two main lines of business.  The first line of business relates to utilizing servers to provide hashrate for securing the blockchain. The second line of business relates to sales of new and used servers to customers. The first line of business consists of three key areas of operations, which are:

1. Hosting fees charged to others to host their servers ("Hosting");
2. Hosting of Company owned servers, under which the Company receives all revenues ("Mining"); and
3. Hosting of Company owned servers, under which the hashrate has been sold to a single customer ("Hashrate Sales"), under which the customer pays a daily maintenance fee to the Company.

These condensed interim carve-out financial statements were authorized for issuance by Spokane on July 3, 2018.

**2.   Basis of Presentation**

*(a)   Carve-out*

These condensed interim carve-out financial statements have been prepared in accordance with International Financial Reporting Standards ("IFRS") as issued by the International Accounting Standards Board ("IASB") applicable to the preparation of condensed interim consolidated financial statements, including International Accounting Standard (IAS) 34 – Interim Financial Reporting. The accounting policies following in these condensed interim consolidated financial statements are materially the same as those applied in the Company's audited annual carve-out financial statements for the year ended December 31, 2018.

As this is the first quarterly condensed interim carve-out financial report of the Company there are no comparative amounts for the preceding year's corresponding period.

As the condensed interim carve-out financial statements were prepared for the purposes of the acquisition of certain operational assets and liabilities of the Company, the following assets and liabilities have not been included in the condensed interim carve-out financial statements.  The Company has also presented all transactions that would generally be included in the shareholders' equity section as other divisional equity.  The assets and liabilities, and associated accounts that have not been presented as part of the condensed interim carve-out financial statements are:

1.   Digital Assets (as defined below) and associated gains or losses thereon;
2.   Any and all loans and notes payable, including any associated interest expense;
3.   Any taxes payable based on the net income of the Company; and
4.   Any cash that results in a working capital greater than $500,000.

The above assets and liabilities were eliminated from the carve-out financial statements through other divisional equity.

*(b)   Presentation and Functional Currency*

The condensed interim carve-out financial statements are presented in US Dollars, which is also the functional currency of the Company.

6

**Project Spokane**
**Notes to the Condensed Interim Carve-out Financial Statements**
**March 31, 2018**
(Expressed in US Dollars)

**2.    Basis of Presentation (continued)**

Foreign currency transactions that are in a different currency than the functional currency are recorded at the exchange rate as at the date of the transaction.  At the end of each reporting period, monetary assets and liabilities

are translated using the period end foreign exchange rate.  Non-monetary assets and liabilities in foreign currencies other than the functional currency are translated using the historical rate.  Gains and losses on transaction are included in the profit and loss.

*(c)   Basis of Measurement*

These condensed interim carve-out financial statements have been prepared on a going concern and historical cost basis, except as detailed in the accounting policies notes.

*(d)   Significant Accounting Judgments and Estimates*

The preparation of these financial statements require management to make estimates and assumptions that affect the reported amount of assets and liabilities at the date of the financial statements and reported amounts of expenses during the reporting period. Actual outcomes could differ from these estimates.

In particular, information about significant areas of estimation uncertainty and judgment considered by management in preparing the financial statements includes:

*Accounting for Digital Assets*

At present, there is limited guidance in IFRS on the recognition and measurement of Digital Assets (as defined below).

Digital Assets are measured at fair value using the quoted price on www.coinmarketcap.com ("CMC").  Management considers this fair value to be a Level 2 input under IFRS 13 *Fair Value Measurement* fair value hierarchy as the price on this source represents an average of quoted prices on multiple digital currency exchanges. The Digital Assets are valued based on the closing price obtained from CMC on the date that the Digital Assets are earned.  The Digital Assets are revalued based on the closing price on CMC at each reporting period of the Company. The Company is relying on the data available at CMC to be an accurate representation of the closing price for the different Digital Assets.

*Lifetime Hashrate Sales*

The Company has sold lifetime contract of hashrate sales, under which the customer pays the entire fee up front, a daily maintenance fee is charged and deducted from the customers revenue, and there is no fixed end date for the plan. The contract will terminate when the contract is no longer profitable for 60 consecutive days (i.e. the maintenance fee exceeds revenue).  The Company has factored in several different assumptions including the future difficulty, price changes in Bitcoin Core, and pricing mechanisms of hashrate sales to estimate that period.

*Multiple Deliverable Arrangements*

The Company has sold both equipment and hosting services to customers, which results in a multiple deliverable arrangement. Estimates are required to determine the status of a contract at each period end.

**Project Spokane**
**Notes to the Condensed Interim Carve-out Financial Statements**
**March 31, 2018**
(Expressed in US Dollars)

*Functional Currency*

The determination of functional currency is a matter of judgement.  Some of the Company's transactions are denominated in digital currencies.  Often these are convertible into US dollars.  Most of the Company's expenditures and financing is in United States dollars. Management has assessed the functional currency as United States dollars.

**2.   Basis of Presentation (continued)**

*Impairment of Non-Financial Assets*

Impairment exists when the carrying value of an asset exceeds its recoverable amount, which is the higher of its fair value less costs to sell and its value in use. These calculations are based on available data, other observable inputs and projections of cash flows, all of which are subject to estimates and assumptions. Recoverable amounts are also sensitive to assumptions about the future usefulness of in-process development and the related marketing rights.

The Company amortizes the servers used for Mining on a straight-line basis.  The value of the Mining equipment may vary based on a number of factors, including, but not limited to, the complexity of the Mining processes, which is algorithmically driven by the blockchain, availability of servers on a global basis and technological enhancements making next generation servers more efficient and cost effective.  The Company factors these variables into its assessments for potential impairment on servers for Mining.

At period end, management concluded that none of the Company's nonfinancial assets were impaired.

**3.   Significant Accounting Policies**

The accounting policies applied in the preparation of these condensed interim financial statements are consistent with those followed in the preparation of the Company's December 31, 2017 audited financial statement, except for the adoption of new standards and interpretations as of January 1, 2018.

At January 1, 2018, the Company adopted the following International Financial Accounting Standards:

*IFRS 9 – Financial Instruments*

Effective January 1, 2018, the Company adopted IFRS 9, Financial Instruments, including the classification and measurement of financial assets and the expected loss impairment model. The amendments to IFRS 9 were affective for annual periods on or after January 1, 2018 and are applied retrospectively. The adoption of this standard had no material impact on these condensed interim carve-out financial statements.

*IFRS 15 – Revenue from Contracts with Customers*

Effective January 1, 2018, the Company adopted IFRS 15, Revenue from Contracts with Customers. The adoption of this standard had no material impact on the amounts recorded in these financial statements.

The new guidance includes a five-step, principles-based recognition and measurement approach as well as requirements for accounting for contract costs and enhanced quantitative and qualitative disclosure requirements. IFRS 15 excludes from its scope revenue related to lease contracts, insurance contracts and financial instruments.

The Company enters into a variety of contracts and recognizes revenue when performance obligations have been fulfilled. The following describes the recognition of revenue for each of the Company's lines of business:

**Project Spokane**
**Notes to the Condensed Interim Carve-out Financial Statements**
**March 31, 2018**
(Expressed in US Dollars)

_Digital Assets Mined_

The Company derives a portion of its revenue from digital currency received for providing mining services to various digital currency blockchains. Mining is the process by which transactions are verified and added to the blockchain. A miner is only able to validate transactions once their servers have solved a computationally difficult puzzle.
Revenue is recognized by the Company when payment, in the form of digital currency, is received for mining services rendered. Revenue earned from digital currency mining activities is recognized at the fair value of the digital currency received as consideration on the date of actual receipt. Fair value is measured using the closing price on CMC on the date of receipt. Revenue is recognized daily at the US Dollar value for the digital currencies mined.

From time to time, the hashrate that has been sold mines on a different digital currency than the one the purchaser has selected ("Arbitrage Revenue").  This may occur when there the profitability of mining one digital asset is greater than another with the same hashrate.  The Arbitrage revenue that is generated from time to time has been included in the revenue from digital assets mined as it is immaterial.

_Hashrate Sales_

Hashrate sales represent contracts under which the Company sells hashing power to mine Digital Assets to customers for periods ranging from one month through to a lifetime.  The contracts are structured such that the customer pays an upfront fee for the initial purchase and pays an additional maintenance fee on a daily basis for the Company to maintain the hashing power.  The maintenance fee is a fixed amount in USD per terahash and is automatically deducted on a daily basis from the customers proceeds from Digital Assets mined.  The lifetime contracts are terminated when the Digital Assets mined by the customers are less than the daily maintenance fee for a period of 60 days.

Revenue from the initial sales of the hashing power is deferred and amortized on a straight-line basis over the length of the contract.  For a life-time hash-rate contract, the Company amortizes revenue over a four-year period which is the estimated life of the contract.

Revenue from maintenance fees are recorded on a daily basis as earned.

_Hardware Sales_

The Company recognizes revenue from hardware sales at the point in time of transfer of risk to the customer. Specifically, the Company recognizes the revenue when control of the asset is transferred to the customer which is generally on delivery of the hardware.

_Hosting Sales_

Hosting Sales represent agreements under which the Company will host servers owned by customers for a monthly fee at the Company's facility. The Company recognizes hosting revenue according to the delivery of the performance obligation in the contract.  Hosting contracts generally result in a linear monthly revenue recognition over the term of the contract.

The following new standards, amendments to standards and interpretations have been issued but are not yet effective for the period ended March 31, 2018 and accordingly, have not been applied in preparing these condensed interim financial statements:

9

**Project Spokane**
**Notes to the Condensed Interim Carve-out Financial Statements**
**March 31, 2018**
(Expressed in US Dollars)

*IFRS 16 – Leases*

In January 2016, the IASB issued IFRS 16 Leases, which requires lessees to recognize assets and liabilities from most leases.  For lessors, there is little change to the existing accounting in IAS 17 Leases.  The new standard is effective for annual periods beginning on or after January 1, 2019.  Early adoption is permitted, provided the new revenue standard, IFRS 15 has been applied, or is applied at the same date as IFRS 16.  The Company is currently assessing the impact of IFRS 16 on the Company's financial statements along with the planned timing of our adoption of IFRS 16.

**4.   Mining Equipment, net**

|  | SHA-256 Equipment | GPU Equipment | Total |
|---|---|---|---|
| **Balance at December 31, 2017** | 5,141,761 | 310,927 | 5,452,688 |
| Additions | 841,475 | - | 841,475 |
| Dispositions | (1,184,907) | - | (1,184,907) |
| **Balance at March 31, 2018** | 4,798,329 | 310,927 | 5,109,256 |
|  |  |  |  |
| **Accumulated Depreciation** |  |  |  |
| **Balance at December 31, 2017** | 1,272,143 | 70,278 | 1,342,421 |
| Depreciation | 538,900 | 38,333 | 577,234 |
| Dispositions | (11,207) | - | (11,207) |
| **Balance at March 31, 2018** | 1,799,836 | 108,612 | 1,908,447 |
|  |  |  |  |
| **Net Book Value** |  |  |  |
| **December 31, 2017** | 3,869,618 | 240,649 | 4,110,267 |
| **March 31, 2018** | 2,998,493 | 202,316 | 3,200,809 |

SHA-256 Equipment consists of specialized equipment from Bitmain, Ebit, and Avalon, which was used to mine Bitcoin Core and Bitcoin Cash. GPU Mining equipment was used to mine Zcash. Included in SHA-256 Equipment is $203,073 of equipment under a finance lease.

During the three months ended March 31, 2018, $577,234 was recorded as depreciation expense.

**5.   Other Capital Assets, net**

**Project Spokane**
**Notes to the Condensed Interim Carve-out Financial Statements**
**March 31, 2018**
(Expressed in US Dollars)

| | Data Center and Electrical | Leaseholds | Total |
|---|---|---|---|
| **Balance at December 31, 2017** | 4,996,873 | 267,931 | 5,264,804 |
| Additions | 50,012 | 47,873 | 97,885 |
| Dispositions | - | - | - |
| **Balance at March 31, 2018** | 5,046,885 | 315,804 | 5,362,689 |
| | | | |
| **Accumulated Depreciation** | | | |
| **Balance at December 31, 2017** | 455,106 | 28,698 | 483,804 |
| Depreciation | 115,916 | 8,107 | 124,023 |
| Dispositions | - | - | - |
| **Balance at March 31, 2018** | 571,022 | 36,805 | 124,023 |
| | | | |
| **Net Book Value** | | | |
| **December 31, 2017** | 4,541,767 | 239,233 | 4,781,000 |
| **March 31, 2018** | 4,475,863 | 278,999 | 4,754,862 |

During the three months ended March 31, 2018, $124,023 was recorded as depreciation expense.

**6.   Unearned Revenue**

| | March 31, 2018 | December 31, 2017 |
|---|---|---|
| Hardware Sales | - | 1,003,500 |
| Hosting Fees | 577,734 | 328,926 |
| Hashrate Sales | 2,028,845 | 2,311,899 |
| **Total current Unearned Revenue** | 2,606,579 | 3,644,325 |
| Hashrate Sales | 3,701,105 | 4,098,214 |
| **Total Unearned Revenue** | 6,307,684 | 7,742,539 |

**7.   Digital Assets Mined**

During the three months ended March 31, 2018 the Company earned revenue through mining the following Digital Assets:

| | March 31, 2018 |
|---|---|
| Bitcoin Cash | 1,190,373 |
| Bitcoin Core | 688,495 |
| Ethereum | 1,983 |
| Litecoin | 11,714 |
| Zcash | 122,400 |
| | 2,014,965 |

11

**Project Spokane**
**Notes to the Condensed Interim Carve-out Financial Statements**
**March 31, 2018**
(Expressed in US Dollars)

**8.   Related Party Transactions**

The following are all related party transactions recorded:
- During the three months ended March 31, 2018, the Company sold $2,300 of mining equipment to senior management of the Company.
- During the three months ended March 31, 2018, the Company sold $4,000,000 of mining equipment and charged hosting fees of $208,898 to a company with common management.

**9.   Financial Instruments**

*Fair value hierarchy*

Financial instruments recorded at fair value are classified using a fair value hierarchy that reflects the significance of inputs used in making the measurements. The hierarchy is summarized as follows:

Level 1: Unadjusted quoted prices in active markets for identical assets and liabilities;
Level 2: Inputs other than quoted prices that are observable for the asset or liability either directly or indirectly from observable market data; and
Level 3: Inputs that are not based on observable market data

The Company's financial instruments have been classified as follows:

| March 31, 2018 | Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|
| Fair value through profit and loss | | | | |
| Cash | $  1,906,934 | $         - | $         - | $  1,906,934 |

| December 31, 2017 | Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|
| Fair value through profit and loss | | | | |
| Cash | $  2,688,080 | $         - | $         - | $  2,688,080 |

*Financial risk management*

The Company is exposed to various financial instrument risks and continuously assesses the impact and likelihood of this exposure. These risks include credit risk, liquidity risk, customer risk, interest rate risk and currency risk. Where material these risks are reviewed and monitored by the Board of Directors.

**9.   Financial Instruments (continued)**

*Credit risk*

Credit risk arises from the non-performance by counterparties of contractual financial obligations resulting in financial loss to the Company. The Company's credit risk is primarily attributable to its cash.  Cash is held with an investment grade financial institution as assessed by external rating agencies. The deposits held with this institution may exceed the amount of insurance provided on such deposits. Management believes the risk of loss to be minimal.

**Project Spokane**
**Notes to the Condensed Interim Carve-out Financial Statements**
**March 31, 2018**
(Expressed in US Dollars)

*Liquidity risk*

Liquidity risk refers to the risk that the Company will not be able to meet its financial obligations when they become due or can only do so at excessive cost. As at March 31, 2018, the Company had working capital of $500,000. All of the Company's financial liabilities have contractual maturities within twelve months. Management has determined that this risk is not significant at this point in time.

*Customer Risk*

The Company has earned revenue from certain customers that individually represented 10% or more of the Company's total revenue.  The Company has a single customer for its hashrate sales as it sells hashrate on a wholesale basis.  Hashrate sales accounted for approximately 37% of the total sales of the Company for the three months ended March 31, 2018.  As at March 31, 2018, the Company had liabilities of $5,729,950 for unearned hash rate sales revenue, consisting of $2,028,845 current and $3,701,105 long-term.

**10.  Capital Management**

The Company's objective in managing capital is to ensure a sufficient liquidity position to safeguard the Company's ability to continue as a going concern in order to provide returns for the benefit of its stakeholders.

**11.  HyperBlock Transaction**

On January 7, 2018, the Company, along with the controlling member and Manager of Spokane,  entered into a purchase agreement (the "Purchase Agreement") with HyperBlock Technologies Corp. ("HyperBlock"), a corporation located in Canada, to acquire the business of Spokane, including (a) (i) hash rate sales for cryptocurrencies or similar cloud mining activities (ii) blockchain security server distribution and resale (iii) server hosting and co-location, and (iv) self-mining for cryptocurrencies and (b) any other business Spokane is engaged in or actively planning to engage in (the "Spokane Assets"). Under the terms of the purchase agreement, HyperBlock has agreed to pay $65,947,721, which shall be paid in cash, common shares of HyperBlock and a promissory note secured by the assets of Spokane.

On March 14, 2018, the parties executed an amendment to the Purchase Agreement to adjust the outside date for the closing of the transaction from March 31, 2018 to May 31, 2018. On April 2, 2018, the parties executed a second amendment to the Purchase Agreement to adjust the outside date for the closing of the transaction from May 31, 2018 to the Escrow Release Deadline (as defined in the subscription receipt agreement dated March 14, 2018 between HyperBlock, TSX Trust Company, and Canaccord Genuity Corp., among others, as amended on March 26, 2018), and to amend the purchase price payment schedule.

**12.  Finance Lease Obligations**

**Project Spokane**
**Notes to the Condensed Interim Carve-out Financial Statements**
**March 31, 2018**
(Expressed in US Dollars)

| | March 31, 2018 |
|---|---|
| Minimum payments under finance leases | |
| Within 1 year | 59,097 |
| 2 to 3 years | 118,194 |
| 4 to 5 years | - |
| | 177,291 |
| Effect of discounting | (20,132) |
| Present value of minimum lease payme | 157,159 |
| Less: current portion | (59,097) |
| Non-current portion of finance lease ob | 98,062 |

### 13. Segmented Information

The Company operates in the following segments, in one geographic location:
- General corporate;
- Hashrate for securing the blockchain ("Hashrate"); and
- Sales of new and used servers ("Servers").

| March 31, 2018 | Hashrate | Servers | General Corporate | Total |
|---|---|---|---|---|
| **Revenue** | 5,754,154 | 4,220,402 | - | 9,974,556 |
| **Cost of Revenue** | 1,232,032 | 1,156,800 | - | 2,388,832 |
| **Expenses** | | | | |
| General and administrative | - | - | 82,868 | 82,868 |
| Office and rent | - | - | 366,674 | 366,674 |
| Professional and legal | - | - | 8,349 | 8,349 |
| Salaries and wages | - | - | 552,953 | 552,953 |
| Travel and meals | - | - | 31,021 | 31,021 |
| Depreciation | 701,257 | - | - | 701,257 |
| **Net Income and comprehensive income** | 3,820,865 | 3,063,602 | (1,041,865) | 5,842,602 |
| **Total assets** | 9,428,060 | - | 1,906,934 | 11,334,994 |
| **Total liabilities** | 6,464,843 | - | 213,650 | 6,678,493 |

| December 31, 2017 | Hashrate | Servers | General Corporate | Total |
|---|---|---|---|---|
| **Total assets** | 10,978,443 | - | 2,688,080 | 13,666,523 |
| **Total liabilities** | 7,911,186 | - | 571,826 | 8,483,012 |

**SCHEDULE C**
**MANAGEMENT'S DISCUSSION AND ANALYSIS OF HYPERBLOCK AND SPOKANE**

**HYPERBLOCK TECHNOLOGIES CORP.**
**MANAGEMENT DISCUSSION AND ANALYSIS FOR THE YEAR ENDED FEBRUARY 28, 2018**
(All amounts expressed in U.S. dollars, unless otherwise stated)

**BACKGROUND**

The following management discussion and analysis ("**MD&A**") of the results of operations and financial condition, prepared as of May 18, 2018, should be read in conjunction with the audited financial statements of HyperBlock Technologies Corp. (the "**Company**" or "**HyperBlock**") for the year ended February 28, 2018 and the period from incorporation on October 10, 2017 to February 28, 2018, and accompanying notes thereto. The financial statements are prepared in accordance with International Financial Reporting Standards ("**IFRS**").

All amounts are expressed in U.S. dollars unless noted otherwise.

**CAUTIONARY NOTE REGARDING FORWARD LOOKING STATEMENTS**

Certain statements in this MD&A other than statements of historical fact may constitute "forward-looking statements" based on certain assumptions and reflect current expectations of HyperBlock's management. These statements include without limitation, statements regarding the operations, business, financial condition, expected financial results, performance, prospects, opportunities, goals, ongoing objectives, strategies, regulatory compliance and outlook of the Company, as well as the outlook for economic and capital markets conditions for the current and subsequent fiscal years.

Forward-looking statements include statements that are predictive in nature, depend upon or refer to future events or conditions, or include words such as "expects", "anticipates", "plans", "believes", "considers", "intends", "targets", or negative versions thereof and other similar expressions or future or conditional verbs such as "may", "will", "should", "would" and "could". The Company provides forward-looking statements for the purpose of conveying information about its current expectations and plans relating to the future. The Company cautions investors that any forward-looking statements made by the Company are not guarantees of future performance, and that actual results may differ materially from those in forward-looking statements as a result of various factors including, but not limited to, the Company's ability to continue its projected growth, to raise the necessary capital or to be fully able to implement its business strategies.

By its nature, forward-looking statements are subject to inherent risks and uncertainties that may be general or specific and which give rise to the possibility that expectations, forecasts,

predictions, projections or conclusions will not prove to be accurate, that assumptions may not be correct, and that objectives, strategic goals and priorities will not be achieved.

Other than as specifically required by law, HyperBlock undertakes no obligation to update any forward-looking statement to reflect events or circumstances after the date of which such statement is made, or to reflect the occurrence of unanticipated events, whether as a result of new information, future events or results otherwise.

**DISCRIPTON OF BUSINESS AND OVERALL PERFORMANCE**

HyperBlock was incorporated in Ontario, Canada on October 10, 2017. HyperBlock's principal business is a crypto mining aggregator. During 2017, HyperBlock raised funds through the issuance of common shares of the Company and acquired cryptocurrency mining servers which are hosted in a datacenter in the US. The Company mines Bitcoin Core and Bitcoin Cash.

**HIGHLIGHTS FOR THE PERIOD ENDED FEBRUARY 28, 2018, AND SUBSEQUENTLY**

Between the date of incorporation and February 28, 2018, the Company issued an aggregate of 129,120,919 common shares at subscription prices ranging between $0.001 and $0.35 per common share for net proceeds of $12,691,493 million. A portion of the proceeds raised from the issuance of the common shares were used to fund the acquisition of cryptocurrency mining servers as more fully described below.

During the period ended February 28, 2018, the Company acquired $9,648,055 (including $148,055 related to costs to acquire) of specialized servers used to mine digital assets. These servers are located in a data centre in the US and are subject to a colocation agreement.

Factors affecting the further development of the cryptocurrency industry include (i) worldwide adoption and usage of Bitcoin Core, Bitcoin Cash and other cryptocurrencies; (ii) regulations by governments and/or by organizations directing governmental regulations (such as the European Union) regarding the use and operation of and access to cryptocurrencies; (iii) changes in consumer demographics and public behaviour, tastes and preferences; (iv) redirection and liberalization of using fiat currencies as well as the development of other forms of publicly acceptable means of buying and selling goods and services; (v) general economic conditions and the regulatory environment relating to cryptocurrencies.

**RESULTS OF OPERATIONS FOR THE YEAR ENDED FEBRUARY 28, 2018**

The Company's operations are in its infancy and therefore comparative analysis is not applicable.

Revenue related to mining Bitcoin Core and Bitcoin Cash for the period ended February 28, 2018 totaled $1,399,972. As the Company was incorporated on October 10, 2017, revenues were only generated over the three-month period ending February 28, 2018, subsequent to the acquisition of mining assets.

Cost of revenues for the period ended February 28, 2018 were $695,283 and were comprised of (i) depreciation expense of $456,736 related to mining equipment, and (ii) colocation fees for hosting the Company's mining equipment at a data centre in the US in the amount of $238,547.

Operating expenses were $401,005 of which $248,270 related to legal and audit fees, $75,363 was incurred for salaries and $77,372 was incurred for general and administrative expenditures. Legal fees were related to the incorporation of the Company.

The Company also incurred transaction costs in the amount of $351,614 related to the expected acquisition of Project Spokane as more fully discussed below.

For the period ended February 28, 2018, the Company incurred a fair value revaluation loss on its digital currencies of $411,074.

HyperBlock intends to focus its business on the development and servicing of cryptocurrency platforms. Cryptocurrency is a young and rapidly growing business area. Although it is widely predicted that cryptocurrency will become a leading means of digital payment, it cannot be assured that this will occur. The Company's future success is dependent on the widespread acceptance of cryptocurrency as a means of payment within the digital economy.

**LIQUIDITY AND CAPITAL RESOURCES**

As at February 28, 2018, the Company had cash and non-cash working capital of $3,115,825.

The Company has financed its operations through the sale of equity securities. During the year ended February 28, 2018, the Company raised net proceeds of $12,691,493 through the issuance of common shares.

The Company expects to generate revenues during the next 12 months and to generate cash from operations to a limited extent.

In order to finance the Company's future development and expansion, the Company intends to raise additional funds primarily by way of the issuance of common shares from treasury or short-term debt facilities. The timing and ability to fulfill these objectives will depend on the liquidity of the financial markets, as well as the willingness of investors to finance new start up ventures, particularly, new start up ventures with limited or no operations history.

The Company believes it has sufficient cash on hand to meet its current obligations for the following 12 months. The Company also believes it has the ability to fund capital commitments more fully discussed under the Proposed Transaction and Subsequent Events sections of this Management Discussion and Analysis. Although the Company will continue its fund-raising efforts, there is no certainty that it will be successful in raising additional funds, if needed.

The Company is a cryptocurrency aggregator and as such has raised funds through the issuance of common shares to acquire cryptocurrency mining servers which are hosted in a datacenter in the US.

The Company has entered into certain commitments as noted in the Proposed Transaction and Subsequent Events sections of this Management Discussion and Analysis, whereby the Company is committed to acquire certain business in the cryptocurrency mining space.

The Company intends to pay for these commitments through the issuance of common shares and proceeds raised through a private placement of securities as more fully described under Subsequent Events in this Management Discussion and Analysis.

**OUTSTANDING SHARE DATA**

As at May 18, there are:
- 129,120,919 common shares outstanding (February 28, 2018 – 129,120,919)
- 16,010,250 Subscription Receipts outstanding (February 28, 2018 – nil)

**OFF-BALANCE SHEET ARRANGEMENTS**

The Company has not entered into any off-balance sheet arrangements from the date of its incorporation to the date of this MD&A.

**RELATED PARTY TRANSACTIONS**

During the period ended February 28, 2018, the Company paid $9,500,000 for certain mining servers from Project Spokane, LLC ("**Project Spokane**") an entity substantially controlled by the Company's Chief Executive Officer, Sean Walsh.  In addition, the Company paid $238,547 for colocation fees to Project Spokane. As at February 28, 2018, $238,547 is included in accounts payable and accrued liabilities for these colocation services.

During the period ended February 28, 2018, the Company issued 1,900,000 common shares to certain Directors of the Company for advisory services provided.

**PROPOSED TRANSACTIONS**

On January 7, 2018, the Company entered into a purchase agreement (the "**Purchase Agreement**") with Project Spokane, an entity located in the US, and the controlling member and Manager of Project Spokane to acquire the business, including (a) (i) hash rate sales for cryptocurrencies or similar cloudmining activities, (ii) blockchain security server distribution and resale; (iii) server hosting and co-location; and (iv) self-mining for cryptocurrencies and (b) any other business Project Spokane is engaged in or actively planning to engage in (the "**Spokane Assets**"). The Purchase Agreement will be considered a related party transaction as Project Spokane is an entity substantially controlled by the Company's Chief Executive Officer, Sean Walsh.

On March 14, 2018, the parties executed an amendment to the Purchase Agreement to adjust the outside date for the transaction from March 31, 2018 to May 31, 2018. The aggregate purchase price payable to Project Spokane is $65,947,721 which is payable in cash, common shares and a promissory note secured by the assets of Project Spokane. On April 2, 2018, the parties executed a second amendment to the Purchase Agreement to adjust the outside date for the transaction from May 31, 2018, to the Escrow Release Deadline (as defined in the subscription receipt agreement dated March 14, 2018 between the Company, TSX Trust Company, and Canaccord Genuity Corp., among others, as amended on March 26, 2018 (the "**Subscription Receipt Agreement**")), and to amend the purchase price payment schedule.

As of February 28, 2018, the Company incurred costs of $0.4 million related to the acquisition of the Spokane Assets. Upon satisfaction of the Release Conditions (as defined in the Subscription Receipt Agreement), the Receipts (as defined below) will convert into common shares and the escrowed proceeds will be released by TSX Trust Company. Upon receipt of the escrowed proceeds, pursuant to the Subscription Receipt Agreement, the Company will pay the outstanding balance of the purchase price for the Spokane Assets to Project Spokane, thereby completing the acquisition of the Spokane Assets.

**KEY MANAGEMENT COMPENSATION**

Key management personnel include those persons having authority and responsibility for planning, directing and controlling the activities of the Company as a whole. The Company has determined that key management personnel consist of members of the Company's Board of Directors and its corporate officers.

For the period from incorporation to February 28, 2018, compensation includes salaries and wages paid to key management personnel in the amount of $48,386.

**CAPITAL MANAGEMENT**

The Company's objective in managing capital is to ensure (i) financial capacity to meet current obligations is maintained and continue as a going concern, and (ii) the financial capacity to execute strategic plans is maintained. The Company defines capital as debt and shareholder's equity. At February 28, 2018, the Company had no outstanding debt.

To maintain or adjust its capital structure, the Company may issue new common shares, issue new debt or acquire or dispose of assets. The Company is not subject to externally imposed capital requirements

**FINANCIAL INSTRUMENTS AND RISK MANAGEMENT**

All financial instruments are recorded at fair value. In subsequent periods, all financial instruments are measured based on the classification adopted for the financial instruments: held to maturity, loans and receivables, fair value through profit or loss, available-for-sale, fair value through profit or loss liabilities or other liabilities. Fair value through profit or loss assets and liabilities are subsequently measure at amortized cost using the effective interest rate method. Available-for-sale assets are subsequently measured at fair value with the change in fair value recorded in other comprehensive income or loss except for equity instruments without a quoted market price in active markets and whose fair value cannot be reliably measured, which are measured at cost.

The principal financial instruments used by the Company, from which financial instrument risk arises are cash and accounts payable and accrued liabilities.

**Credit risk**
Credit risk arises from the non-performance by counterparties of contractual financial obligations resulting in financial loss to the Company. The Company's credit risk is primarily attributable to its cash.  Cash is held with investment grade Canadian financial institutions as assessed by external rating agencies. The deposits held with these institutions may exceed the amount of insurance provided on such deposits. Management believes the risk of loss to be minimal.

**Liquidity risk**
Liquidity risk refers to the risk that the Company will not be able to meet its financial obligations when they become due or can only do so at excessive cost. As at February 28, 2018, the Company had working capital of $3,115,825. All of the Company's financial liabilities have contractual maturities within twelve months. Management has determined that this risk is not significant.

**Market Risk**

**(i)** **Interest rate risk**

Interest rate risk is the risk that the fair value or future cashflows of a financial instrument will fluctuate because of changes in market interest rates. The Company maintains its cash balances in demand deposit accounts with reputable financial institutions and does not believe it is exposed to interest rate risk and therefore interest rate risk is considered by the Company to be low.

**(ii)** **Foreign currency risk**

The Company's functional currency is the U.S. dollar. The Company is exposed to some foreign currency fluctuations as some of its administrative costs are transacted in Canadian dollars.

**(iii)** **Crypto-currency risk**

The Company is exposed to risk with respect to crypto-currency prices and valuations which are largely based on the supply and demand of the specific digital currency and its acceptance in the financial market.

**(iv)** **Fair value**

Fair value estimates are made at the statement of financial position date, based on relevant market information and information about the financial instrument. These estimates are subjective in nature and involve uncertainties in significant matters of judgement and therefore cannot be determined with precision. Changes in assumptions could significantly affect these estimates. The carrying amounts for cash, receivables, accounts payable and accrued liabilities approximate fair value because of the limited term of the instruments.

**CRITICAL ACCOUNTING ESTIMATES**

The Company's significant accounting policies are summarized in Note 3 to the audited financial statements.

**ACCOUNTING STANDARDS ISSUED BUT NOT YET EFFECTIVE**

The following new standards, amendments to standards and interpretations have been issued but are not yet effective for the year ended February 28, 2018, and accordingly, have not been applied in preparing the financial statements:

*IFRS 9 – Financial Instruments*

IFRS 9, published in July 2014, replaces the existing guidance in IAS 39 Financial Instruments: Recognition and Measurement. IFRS 9 includes revised guidance on the classification and measurement of financial instruments, a new expected credit loss model for calculating impairment on financial assets, and new general hedge accounting requirements. It also carries forward the guidance on recognition and de-recognition of financial instruments from IAS 39. IFRS 9 is effective for annual reporting periods beginning on or after January 1, 2018, with early adoption permitted. The Company has determined there will be no material impact on adoption of this standard.

*IFRS 16 – Leases*

In January 2016, the IASB issued IFRS 16 Leases, which requires lessees to recognize assets and liabilities for most leases.  For lessors, there is little change to the existing accounting in IAS 17 Leases.  The new standard is effective for annual periods beginning on or after January 1, 2019. Early adoption is permitted, provided the new revenue standard, IFRS 16 has been applied, or is applied at the same date as IFRS 16.  The Company has determined there will be no material impact on adoption of this standard.

**SUBSEQUENT EVENTS**

On March 14, 2018, March 22, 2018 and March 29, 2018, by way of a private placement, the Company issued 15,498,360 Subscription Receipts ("**Receipts**") at CAD$1.75 per Receipt. The Company also issued an additional 511,890 Receipts at a price of CAD$1.75 each for fees incurred to issue the Receipts. The proceeds from the Receipts will be partially used to acquire Project Spokane. In addition, pursuant to the terms of commitment letters with two subscribers, 2,000,000 Subscription Receipts were subscribed for but not yet issued by the Company as the subscribers have committed to funding at a later date, subject to certain termination rights.

On April 3, 2018, HyperBlock entered into a definitive arrangement agreement (the "**Arrangement Agreement**") pursuant to which HyperBlock will acquire all of the issued and outstanding common shares of CryptoGlobal Corp. (a cryptocurrency mining company located in Canada) by way of an acquisition arrangement (the "**Transaction**"). Pursuant to the Transaction, the parties will apply to list the combined company, which will operate under the name HyperBlock Technologies Corp. on the Canadian Securities Exchange on closing.

Under the Transaction, HyperBlock will acquire all of the issued and outstanding shares of CryptoGlobal (on a fully-diluted basis) for consideration of CAD$0.74 per CryptoGlobal common share, representing a total equity value for CryptoGlobal of approximately CAD$106 million.

CryptoGlobal shareholders will receive 0.4229 of a HyperBlock common share for each CryptoGlobal common share held which, based on HyperBlock's recently completed subscription receipt financing of $1.75 per subscription receipt, equates to $0.74 of value per CryptoGlobal common share.

HyperBlock expects to issue up to approximately 60.4 million HyperBlock common shares to CryptoGlobal shareholders in connection with the Transaction. Upon closing of the Transaction, CryptoGlobal shareholders will own approximately 25.2% of the combined company.

The closing of the Transaction remains subject to the satisfaction of certain customary closing conditions, including approval of the shareholders of both CryptoGlobal and the Company, approval of the Transaction by the Ontario Superior Court of Justice, conditional listing approval of the combined company's common shares on the Canadian Securities Exchange and delisting of the CryptoGlobal's common shares from the TSX Venture Exchange.

The Company has secured irrevocable hard lock-up agreements to vote in favour of the Transaction from CryptoGlobal shareholders representing approximately 58% of the currently issued and outstanding CryptoGlobal common shares. CryptoGlobal has secured irrevocable hard lock-up agreements to vote in favour of the Transaction from HyperBlock shareholders representing approximately 50% of the currently issued outstanding HyperBlock common shares.

**PROJECT SPOKANE**
**INTERIM MANAGEMENT DISCUSSION AND ANALYSIS FOR THE THREE-MONTH PERIOD ENDED MARCH 31, 2018**
(All amounts expressed in U.S. dollars, unless otherwise stated)

**BACKGROUND**

The following interim management discussion and analysis ("**MD&A**") of the results of operations and financial condition, prepared as of July 3, 2018, should be read in conjunction with the audited annual carve-out financial statements of Project Spokane (the "Company" or "Spokane") at December 31, 2017 and the notes thereto, and the condensed interim carve-out financial statements for the period ended March 31, 2018 and the notes thereto. The financial statements are prepared in accordance with International Financial Reporting Standards ("**IFRS**").  As this is the first quarterly condensed interim carve-out financial report of the Company there are no comparative amounts for the preceding year's corresponding period.

The Company's carve-out condensed interim financial statements were prepared in accordance with IFRS as issued by the International Accounting Standards Board ("**IASB**") and using accounting policies described here in.

As the December 31, 2017 annual carve-out financial statements and March 31, 2018 condensed interim carve-out financial statements were prepared for the purposes of the acquisition of certain operation assets and liabilities of the Company, the following assets and liabilities have not been included in the carve-out financial statements.  The Company has also presented all transactions that would generally be included in the shareholders' equity section as other divisional equity.  The asset and liabilities, and associated accounts that have not been presented as part of the carve-out financial statements, are:

1.  Digital Assets and associated gains or losses thereon;
2.  Any and all loans and notes payable, including any associated interest expense;
3.  Any taxes payable based on the net income of the Company; and
4.  Any cash that results in a working capital greater than $500,000.

**CAUTIONARY NOTE REGARDING FORWARD LOOKING STATEMENTS**

Certain statements in this interim MD&A other than statements of historical fact may constitute "forward-looking statements" based on certain assumptions and reflect current expectations of Spokane's management. These statements include without limitation, statements regarding the operations, business, financial condition, expected financial results, performance, prospects, opportunities, goals, ongoing objectives, strategies, regulatory compliance and outlook of the Company, as well as the outlook for economic and capital markets conditions for the current and subsequent fiscal years.

Forward-looking statements include statements that are predictive in nature, depend upon or refer to future events or conditions, or include words such as "expects", "anticipates", "plans", "believes", "considers", "intends", "targets", or negative versions thereof and other similar expressions or future or conditional verbs such as "may", "will", "should", "would" and "could". The Company provides forward-looking statements for the purpose of conveying information about its current expectations and plans relating to the future. The Company cautions investors that any forward-looking statements made by the Company are not guarantees of future performance, and that actual results may differ materially from those in forward-looking statements as a result of various factors including, but not limited to, the Company's ability to continue its projected growth, to raise the necessary capital or to be fully able to implement its business strategies.

By its nature, forward-looking statements are subject to inherent risks and uncertainties that may be general or specific and which give rise to the possibility that expectations, forecasts, predictions, projections or conclusions will not prove to be accurate, that assumptions may not be correct, and that objectives, strategic goals and priorities will not be achieved.

Other than as specifically required by law, Spokane undertakes no obligation to update any forward-looking statement to reflect events or circumstances after the date of which such statement is made, or to reflect the occurrence of unanticipated events, whether as a result of new information, future events or results otherwise.

**DESCRIPTION OF BUSINESS AND OVERALL PERFORMANCE**

The Company is a limited liability company formed under the laws of the state of Colorado.

The Company has two main lines of business. The first line of business relates to utilizing servers to provide hashrate for securing the blockchain. The second line of business related to sales of new and used servers to customers. The first line of business consists of three key areas of operations, which are:

1. Hosting fees charged to others to host third-party servers ("**Hosting**");

2. Hosting of Company owned servers, under which the Company receives all of revenues ("**Mining**"); and

3. Hosting of Company owned servers, under which the hashrate has been sold to a customer ("**Hashrate Sales**"), under which the customer receives all the revenues less a daily maintenance fee paid to the Company.

Cryptocurrency is a young and rapidly growing business area. Although it is widely predicted that cryptocurrency will become a leading means of digital payment, it cannot be assured that this

will in fact occur. The Company's future success is dependent on the widespread acceptance of cryptocurrency as a means of payment within the digital economy.

## RESULTS OF OPERATIONS FOR THE THREE MONTHS ENDED MARCH 31, 2018

Revenue for the three months ended March 31, 2018 totalled $10 million. Total revenue is comprised of four separate components, digital assets mined, hashrate sales, hardware sales, and hosting sales. Amounts for each component are set out in the table below.

|  | March 31, 2018 |
|---|---|
| **REVENUE** |  |
| Digital assets mined | 2,014,965 |
| Hashrate sales | 1,578,594 |
| Hardware sales | 4,172,302 |
| Hosting sales | 2,160,596 |
| Gain on disposition of hardware | 48,100 |
| **Total Revenue** | 9,974,557 |

Revenue from mining of digital currencies was $2.0 million for the three months ended March 31, 2018. Revenue from mining digital currencies is related to the amount of mining equipment owned by the Company, as well as the price of the Digital Assets being mined.

Revenue from hashrate sales was $1.6 million for the three months ended March 31, 2018. In May of 2017, the Company started selling its hashrate in bulk to a third-party website.  Under the terms of the hashrate sales, the customer pays a daily maintenance fee to the Company.  During the three months ended March 31, 2018, $0.9 million of the revenue related to maintenance fees, and the remaining $0.7 million related to the initial sales of hashrate, which is amortized over the life of the hashrate sales agreements.  Hashrate contracts that the Company has entered into have had terms ranging from one month to indefinitely.  Indefinite (or lifetime) contracts terminate when the maintenance fee is greater than earnings from the hashrate for a sixty-day period.  As at December 31, 2017, the Company had approximately 45.8 Petahashes that were sold under these hashrate sales.

For the three months ended March 31, 2018, the Company generated $4.2 million of revenue from the sale of new servers used for digital asset mining Hardware sales are dependent on general growth in adoption of the industry, an increase in price of Bitcoin Core and Ethereum, as well as newer more powerful equipment that is made available on the market.  The increased adoption in the industry, makes equipment more challenging to obtain at times allowing for sales of hardware by the Company. The Company also had significant revenue related to the sale of equipment to HyperBlock as Sector 22 Assets were recorded as a sale of equipment with the related cost booked to cost of revenue.

3

Revenue from hosting sales was $2.2 million for the March 31, 2018. Hosting sales are impacted by the power availability of the Company. As the Company continues to engage in self-mining and selling hashrate the amount of power available for Hosting sales will decline.

Revenue from gain on disposition of hardware was $48K for the three months ended March 31, 2018. Revenue from the disposition of hardware is contingent upon the amount of equipment that is sold during the period.

Cost of revenue was $2.4 million for the period ended March 31, 2018. Cost of revenue includes the cost of acquiring new servers for the purpose of reselling to customers as well as direct costs incurred for mining, hosting and hashrate sales. Changes in the cost of revenues for the hardware sales, is due to an overall increase or decrease in hardware sales.

Changes in the mining, hosting and hashrate cost of sales are due to the changes in the associated revenue. As the Company continues to increase the number of Megawatts available at its facility, the Company is able to reduce the number of servers that it had hosted at an alternate facility. These steps allowed the Company to increase its annual profit margin from approximately 35% in 2016 to 61% in 2017. The margin for the three months ended March 31, 2018 was approximately 78%.

General and administrative expenses for the three months ended March 31, 2018 were approximately $1,743,122 million. Amounts for each component of general and administrative expenses are set out in the table below.

|  | March 31, 2018 |
| --- | --- |
| **GENERAL AND ADMINISTRATION** |  |
| General and administrative | 82,868 |
| Office and rent | 366,674 |
| Professional and legal | 8,349 |
| Salaries and wages | 552,953 |
| Travel and meals | 31,021 |
| Depreciation | 701,257 |

During the three months ended March 31, 2018, the Company's rent was $0.4 million. During 2017, the Company took over additional space that was available at their current facility for expansion purposes. Rent is also contingent on Bitcoin Core price, as the Company under its agreement, is required to pay additional rent of 2 Bitcoin Core, up to $10,000 per month.

During the year three months ended March 31, 2018, the Company's salaries and wages were $0.6 million. The Company started paying market salaries to certain key employees during 2017, who had originally received reduced salaries in 2016. The number of employees has not significantly changed since the year ended December 31, 2017.

4

|                                | March 31<br>2018 | December 31<br>2017 |
|--------------------------------|-----------|-------------|
| Total Current Assets           | 3,379,326 | 4,775,258   |
| Total Non-Current Assets       | 7,955,668 | 8,891,265   |
| Total Current Liabilities      | 2,879,326 | 4,275,258   |
| Total Non-Current Liabilities  | 3,799,167 | 4,207,754   |

The Company's non-current assets consists of mining equipment and other capital assets, which includes data centre and electrical equipment, as well as leasehold improvements.  The decrease from $8,891,265 at December 31, 2017 to $7,955,668 at March 31, 2018 was a result of depreciation taken on those assets during the period.

As at March 31, 2018, the total of the non-current liabilities consists of finance lease obligations and unearned revenue related to the sale of lifetime hash rate, as the revenue is recorded over a four-year period.  The decrease from $4,207,754 at December 31, 2017 to $3,799,167 at March 31, 2018 relates to the amortization of the unearned revenue balances and payments made on the finance lease obligation.

**LIQUIDITY AND CAPITAL RESOURCES**

As at March 31, 2018, the Company, as per the structure of the carve-out financial statements, had working capital of $500,000.

**OFF-BALANCE SHEET ARRANGEMENTS**

The Company does not have any off-balance sheet arrangements.

**RELATED PARTY TRANSACTIONS**

The Company had the following related party transactions not otherwise disclosed in this Management Discussion and Analysis:

- During the year three months ended March 31, 2018, the Company sold $2,300 of mining equipment to senior management of the Company.
- During the three months ended March 31, 2018, the Company sold $4,000,000 of mining equipment and charged hosting fees of $208,898 to a company with common management of the Company.

**CAPITAL MANAGEMENT**

The Company's objective in managing capital is to ensure a sufficient liquidity position to safeguard the Company's ability to continue as a going concern in order to provide returns for the benefit of its stakeholders.

**FINANCIAL INSTRUMENTS AND RISK MANAGEMENT**

Financial assets and financial liabilities are recognized when the Company becomes a part to the contractual provisions of the financial instrument.  Purchases or sale of financial assets that require delivery of assets within a time frame established regulation or convention in the market place (regular way trades) are recognized on the trade date, i.e. the date that the Company commits to purchase or sell the asset.  Financial assets are de-recognized when the contractual rights to the cash flows from the financial asset expire, or when the financial asset and all substantial risks and rewards are transferred.  A financial liability is de-recognized when it is extinguished, discharged, cancelled or when it expires.

Financial assets and financial liabilities are measured initially at fair value plus transaction costs, except for financial assets and financial liabilities carried at fair value through profit or loss, which are measured initially at fair value. The Company describes its financial instruments by category according to their nature and their characteristics.  Management determines the classification when the instruments are initially recognized, which is normally the date of the transaction.

The Company classifies its financial assets and financial liabilities as outlined below:

| Financial Instrument | Classification |
|---|---|
| Cash | Fair value through profit or loss (FVTPL) |
| Accounts receivables | Loans and receivables |
| Accounts payable and accrued liabilities | Other financial liabilities |

**Credit risk**

Credit risk arises from the non-performance by counterparties of contractual financial obligations resulting in financial loss to the Company. The Company's credit risk is primarily attributable to its cash.  Cash is held with an investment grade financial institution as assessed by external rating agencies. The deposits held with this institution may exceed the amount of insurance provided on such deposits. Management believes the risk of loss to be minimal.

**Liquidity risk**

Liquidity risk refers to the risk that the Company will not be able to meet its financial obligations when they become due or can only do so at excessive cost. As at March 31, 2018, the Company had working capital of $500,000. All of the Company's financial liabilities have contractual

maturities within twelve months. Management has determined that this risk is not significant at this point in time.

**Market Risk**

**(i)**   **Interest rate risk**

Interest rate risk is the risk that the fair value or future cashflows of a financial instrument will fluctuate because of changes in market interest rates. The Company maintains its cash balances in demand deposit accounts with reputable financial institutions and does not believe it is not currently exposed to interest rate risk and therefore interest rate risk is considered by the Company to be low.

**(ii)**   **Foreign currency risk**

The majority of the Company's expenditures and financing is in U.S. dollars and as such the Company's functional currency is the U.S. dollar.

**(iii)**   **Digital asset risk**

The Company is exposed to risk with respect to crypto-currency prices and valuations which are largely based on the supply and demand of Bitcoin Core and Bitcoin Cash or other digital asset risk their demand in the marketplace.

**(iv)**   **Fair value**

Fair value estimates are made at the statement of financial position date, based on relevant market information and information about the financial instrument. These estimates are subjective in nature and involve uncertainties in significant matters of judgement and therefore cannot be determined with precision. Changes in assumptions could significantly affect these estimates. The carrying amounts for cash, receivables, accounts payable and accrued liabilities approximate fair value because of the limited term of the instruments.

**CUSTOMER RISK**

The Company had certain customers whose revenue individually represented 10% or more of the Company's total revenue.  The reason for this is, the Company has one customer for the hashrate sales as it sells hashrate on a wholesale basis.  Hashrate sales accounted for approximately 37% of the total sales of the Company for three months ended March 31, 2018.  As at March 31, 2018, the Company had a liability $5,729,950 of unearned hash rate sales revenue, consisting of $2,028,845 current and $3,701,105 long-term.

**CRITICAL ACCOUNTING ESTIMATES**

The Company's significant accounting policies are summarized in Note 3 to the December 31, 2017 audited carve-out financial statements.

**ACCOUNTING STANDARDS ADOPTED JANUARY 1, 2018**

At January 1, 2018, the Company adopted the following International Financial Accounting Standards:

*IFRS 9 – Financial Instruments*

Effective January 1, 2018, the Company adopted IFRS 9, Financial Instruments, including the classification and measurement of financial assets and the expected loss impairment model. The amendments to IFRS 9 are affective for annual periods on or after January 1, 2018 and are applied retrospectively. The adoption of this standard had no material impact on these interim condensed carve-out financial statements.

*IFRS 15 – Revenue from Contracts with Customers*

Effective January 1, 2018, the Company adopted IFRS 15, Revenue from Contracts with Customers. The adoption of this standard had no material impact on the amounts recorded in these financial statements.

The new guidance includes a five-step, principles-based recognition and measurement approach as well as requirements for accounting for contract costs and enhanced quantitative and qualitative disclosure requirements. IFRS 15 excludes from its scope revenue lease contracts, insurance contracts and financial instruments.

The Company enters into a variety of contracts and recognized revenue when performance obligations have been fulfilled. The following describes the recognition of revenue for each of the Company's lines of business:

*Digital Assets Mined*

The Company derives a portion of its revenue from digital currency received for providing mining services to various digital currency blockchains. Mining is the process by which transactions are verified and added to the blockchain. A miner is only able to validate transactions once their servers have solved a computationally difficult puzzle.

Revenue is recognized by the Company when payment, in the form of digital currency, is received for mining services rendered. Revenue earned from digital currency mining activities is recognized at the fair value of the digital currency received as consideration on the date of actual

receipt. Fair value is measured using the closing price on CMC on the date of receipt. Revenue is recognized daily at the US Dollar value for the digital currencies mined.

From time to time, the hashrate that has been sold mines on a different digital currency than the one the purchaser has selected ("Arbitrage Revenue"). This may occur when there the profitability of mining one digital asset is greater than another with the same hashrate. The Arbitrage Revenue that is generated from time to time has been included in the revenue from digital assets mined as it is immaterial.

_Hashrate Sales_

Hashrate sales represent contracts under which the Company sells hashing power to mine Digital Assets to customers for periods ranging from one month through to a lifetime. The contracts are structured such that the customer pays an upfront fee for the initial purchase and pays an additional maintenance fee on a daily basis for the Company to maintain the hashing power. The maintenance fee is a fixed amount in USD per terahash and is automatically deducted on a daily basis from the customers proceeds from Digital Assets mined. The lifetime contracts are terminated when the Digital Assets mined by the customers are less than the daily maintenance fee for a period of 60 days.

Revenue from the initial sales of the hashing power is deferred and amortized on a straight-line basis over the length of the contract. For a life-time hash-rate contract, the Company amortizes revenue over a four-year period which is the estimated life of the contract.

Revenue from maintenance fees are recorded on a daily basis as earned.

_Hardware Sales_

The Company recognizes revenue from hardware sales at the point in time of transfer of risk to the customer. Specifically, the Company recognizes the revenue when control of the asset is transferred to the customer which is generally on delivery of the hardware.

_Hosting Sales_

Hosting Sales represent agreements under which the Company will host servers owned by customers for a monthly fee at the Company's facility. The Company recognizes hosting revenue according to the delivery of the performance obligation in the contract. Hosting contracts generally result in a linear monthly revenue recognition over the term of the contract.

**ACCOUNTING STANDARDS ISSUED BUT NOT YET EFFECTIVE**

The following new standards, amendments to standards and interpretations have been issued but are not yet effective for the period ended March 31, 2018 and accordingly, have not been applied in preparing these condensed interim financial statements:

*IFRS 16 – Leases*

In January 2016, the IASB issued IFRS 16 Leases, which requires lessees to recognize assets and liabilities from most leases.  For lessors, there is little change to the existing accounting in IAS 17 Leases.  The new standard is effective for annual periods beginning on or after January 1, 2019.  Early adoption is permitted, provided the new revenue standard, IFRS 15 has been applied, or is applied at the same date as IFRS 16.  The Company is currently assessing the impact of IFRS 16 on the Company's financial statements along with the planned timing of our adoption of IFRS 16.

**HYPERBLOCK TRANSACTION**

On January 7, 2018, the Company, along with the controlling member and Manager of Spokane, entered into a purchase agreement (the "**Purchase Agreement**") with HyperBlock Technologies Corp. ("**HyperBlock**"), a corporation located in Canada, to acquire the business of Spokane, including (a) (i) hash rate sales for cryptocurrencies or similar cloudmining activities, (ii) blockchain security server distribution and resale; (iii) server hosting and co-location; and (iv) self-mining for cryptocurrencies and (b) any other business Spokane is engaged in or actively planning to engage in (the "**Spokane Assets**"). The Purchase Agreement will be considered a related party transaction as HyperBlock's Chief Executive Officer, Sean Walsh, substantially controls Spokane. Under the terms of the purchase agreement, HyperBlock has agreed to pay $65,947,721, which shall be paid in cash, common shares of HyperBlock and a promissory note secured by the assets of Spokane.

On March 14, 2018, the parties executed an amendment to the Purchase Agreement to adjust the outside date for the transaction from March 31, 2018 to May 31, 2018. On April 2, 2018, the parties executed a second amendment to the Purchase Agreement to adjust the outside for the transaction from May 31, 2018 to the Escrow Release Deadline (as defined in the subscription receipt agreement dated March 14, 2018 between HyperBlock, TSX Trust Company, and Canaccord Genuity Corp., among others, as amended on March 26, 2018 (the "**Subscription Receipt Agreement**")), and to amend the purchase price payment schedule.

Upon receipt of the escrowed proceeds, pursuant to the Subscription Receipt Agreement, HyperBlock will pay the outstanding balance of the purchase price for the Spokane Assets to Spokane, thereby completing the acquisition of the Spokane Assets.

**PROJECT SPOKANE, LLC**
**MANAGEMENT DISCUSSION AND ANALYSIS FOR THE YEAR ENDED DECEMBER 31, 2017 AND THE PERIOD FROM INCORPORATION TO DECEMBER 31, 2016**
(All amounts expressed in U.S. dollars, unless otherwise stated)

**BACKGROUND**

The following management discussion and analysis ("**MD&A**") of the results of operations and financial condition, prepared as of May 22, 2018, should be read in conjunction with the carve-out financial statements of Project Spokane, LLC (the "**Company**" or "**Spokane**") for the year ended December 31, 2017 and accompanying notes thereto. The financial statements are prepared in accordance with International Financial Reporting Standards ("**IFRS**").

The Company commenced operations on February 24, 2016. Comparative information is for the period of commencement from February 24, 2016, to December 31, 2016.  Any references in this MD&A to a period ended December 31, 2016, are referring to the period of commencement from February 24, 2016 to December 31, 2016.

These carve-out financial statements were prepared in accordance with IFRS as issued by the International Accounting Standards Board ("**IASB**") and using accounting policies described here in.

As the carve-out financial statements were prepared for the purposes of the acquisition of certain operation assets and liabilities of the Company, the following assets and liabilities have not been included in the carve-out financial statements.  The Company has also presented all transactions that would generally be included in the shareholders' equity section as other divisional equity.   The asset and liabilities, and associated accounts that have not been presented as part of the carve-out financial statements, are:

1.  Digital Assets and associated gains or losses thereon;
2.  Any and all loans and notes payable, including any associated interest expense;
3.  Any taxes payable based on the net income of the Company; and
4.  Any cash that results in a working capital greater than $500,000.

During the year ended December 31, 2017, the Company's critical accounting estimates, significant accounting policies and risk factors have remained substantially unchanged and are still applicable to the Company unless otherwise indicated. All amounts are expressed in U.S. dollars unless noted otherwise.

**CAUTIONARY NOTE REGARDING FORWARD LOOKING STATEMENTS**

Certain statements in this MD&A other than statements of historical fact may constitute "forward-looking statements" based on certain assumptions and reflect current expectations of Spokane's management. These statements include without limitation, statements regarding the operations, business, financial condition, expected financial results, performance, prospects, opportunities, goals, ongoing objectives, strategies, regulatory compliance and outlook of the Company, as well as the outlook for economic and capital markets conditions for the current and subsequent fiscal years.

Forward-looking statements include statements that are predictive in nature, depend upon or refer to future events or conditions, or include words such as "expects", "anticipates", "plans", "believes", "considers", "intends", "targets", or negative versions thereof and other similar expressions or future or conditional verbs such as "may", "will", "should", "would" and "could". The Company provides forward-looking statements for the purpose of conveying information about its current expectations and plans relating to the future. The Company cautions investors that any forward-looking statements made by the Company are not guarantees of future performance, and that actual results may differ materially from those in forward-looking statements as a result of various factors including, but not limited to, the Company's ability to continue its projected growth, to raise the necessary capital or to be fully able to implement its business strategies.

By its nature, forward-looking statements are subject to inherent risks and uncertainties that may be general or specific and which give rise to the possibility that expectations, forecasts, predictions, projections or conclusions will not prove to be accurate, that assumptions may not be correct, and that objectives, strategic goals and priorities will not be achieved.

Other than as specifically required by law, Spokane undertakes no obligation to update any forward-looking statement to reflect events or circumstances after the date of which such statement is made, or to reflect the occurrence of unanticipated events, whether as a result of new information, future events or results otherwise.

**DESCRIPTION OF BUSINESS AND OVERALL PERFORMANCE**

The Company is a limited liability company formed under the laws of the state of Colorado.

The Company has two main lines of business. The first line of business relates to utilizing servers to provide hashrate for securing the blockchain. The second line of business related to sales of new and used servers to customers. The first line of business consists of three key areas of operations, which are:

1. Hosting fees charged to others to host their servers ("**Hosting**");

2. Hosting of Company owned servers, under which the Company receives all of revenues ("**Mining**"); and

3. Hosting of Company owned servers, under which the hashrate has been sold to a customer ("**Hashrate Sales**"), under which the customer receives all of the revenues less a daily maintenance fee paid to the Company.

Cryptocurrency is a young and rapidly growing business area. Although it is widely predicted that cryptocurrency will become a leading means of digital payment, it cannot be assured that this will in fact occur. The Company's future success is dependent on the widespread acceptance of cryptocurrency as a means of payment within the digital economy.

**RESULTS OF OPERATIONS FOR THE YEAR ENDED DECEMBER 31, 2017 AND THE PERIOD FROM COMMENCEMENT ON FEBRUARY 24, 2016 TO DECEMBER 31, 2016**

Total revenue for the year ended December 31, 2017 totalled $22.9 million compared to $4.6 million from the period of commencement to December 31, 2016. Total revenue is comprised of four separate components, digital assets mined, hashrate sales, hardware sales, and hosting sales. Amounts for each component are set out in the table below.

| | December 31, 2017 | December 31, 2016 |
|---|---|---|
| **REVENUE** | | |
| Digital assets mined | 2,117,304 | 1,023,645 |
| Hashrate sales | 4,594,954 | - |
| Hardware sales | 6,049,106 | 1,081,337 |
| Hosting sales | 4,694,875 | 1,922,051 |
| Gain (loss) on disposition of hardware | 5,408,552 | 575,979 |
| **Total Revenue** | **22,864,791** | **4,603,012** |

Revenue from mining of digital currencies was $2.1 million for the year ended December 31, 2017 compared to $1.0 million for the prior period. The increase in revenue from mining digital currencies was related to an increase in mining equipment owned by the Company, as well as a significant increase in the price of the Digital Assets being mined.

Revenue from hashrate sales was $4.6 million in 2017 compared to $Nil for 2016. In May of 2017, the Company started selling its hashrate in bulk to a third-party website.  Under the terms of the hashrate sales, the customer pays a daily maintenance fee to the Company. During the year ended December 31, 2017, $2.4 million of the revenue related to maintenance fees, and the remaining $2.2 million related to the initial sales of hashrate, which is amortized over the life of the hashrate sales agreements.  Hashrate contracts that the Company has entered into have had terms ranging from one month to indefinitely.  Indefinite (or lifetime) contracts terminate when the maintenance fee is greater than earnings from the hashrate for a

sixty-day period.  As at December 31, 2017, the Company had approximately 50.2 Petahashes that were sold under these hashrate sales.

For the year ended December 31, 2017, the Company generated $6.0 million of revenue from the sale of new servers used for digital asset mining activities compared to $1.1 million in 2016. The increase in hardware sales was driven by a general growth in adoption of the industry, an increase in price of Bitcoin Core and Ethereum, as well as newer more powerful equipment that was made available on the market.  The increased adoption in the industry, made equipment more challenging to obtain at times allowing for an increase in sales of hardware by the Company.

Revenue from hosting sales was $4.7 million for the year ended December 31, 2017 compared to $1.9 million for the period ended December 31, 2016. The increase in hosting sales relates to an increase in the power availability of the Company as the Company increased the number of megawatts increased during the year having approximately doubled by the end of the year. These increases in megawatts allowed the Company to increase its hosting capacity leading to increased revenue.  The increase was further assisted by the continued adoption in the industry.

Revenue from gain on disposition of hardware increased to $5.4 million for the year ended December 31, 2017, from $0.6 million in 2016.  The main reasons for this increase, was because the Company sold a greater amount of its equipment during the year as it started to sell its Bitmain S7 servers.  The Company also had a significant gain related to the sale of equipment to HyperBlock as Sector 14 Assets was recorded as a gain on disposition of hardware.

Cost of revenue was $8.9 million for the period ended December 31, 2017 compared to $3.0 million for the period ended December 31, 2016. Cost of revenue includes the cost of acquiring new servers for the purpose of reselling to customers as well as direct costs incurred for mining, hosting and hashrate sales. The increase in the cost of sales for the hardware sales, was due to an overall increase in hardware sales.  The increase demonstrates the continued adoption in the industry, as Spokane was able to realize a greater margin on the hardware sales in 2017 compared to 2016.

The increase in the mining, hosting and hashrate cost of sales was due to the significant increase in the associated revenue.   During the year, as the Company increased the number of Megawatts available at its facility, the Company was able to reduce the number of servers that it had hosted at an alternate facility.  These steps allowed the Company to increase its profit margin from approximately 35% in 2016 to 61% in 2017.

General and administrative expenses for the year ended December 31, 2017 were approximately $5.7 million compared to $1.6 million for the period ended December 31, 2016. Amounts for each component of general and administrative expenses are set out in the table below.

4

|  | December 31, 2017 | December 31, 2016 |
|---|---|---|
| **GENERAL AND ADMINISTRATION** | | |
| General and administrative | 303,516 | 105,559 |
| Office and rent | 1,284,171 | 509,171 |
| Professional and legal | 439,328 | 223,870 |
| Salaries and wages | 1,396,836 | 391,180 |
| Travel and meals | 145,341 | 50,944 |
| Depreciation | 2,089,136 | 324,879 |
| **Total** | 5,658,328 | 1,605,603 |

During the year ended December 31, 2017, the Company saw the rent increase to $1.3 million from $0.5 million.  The increase was a result of the Company taking over additional space that was available at their current facility for expansion purposes. The increase was also a result of an increase in Bitcoin Core price, as the Company under its agreement, was required to pay additional rent of 2 Bitcoin Core, up to $10,000 per month. The rent also increased as it was in operations for the entire 2017, as the Company was formed in 2016.

During the year ended December 2017, the Company had an increase in salaries and wages to $1.4 million from $0.4 million, an increase of approximately 257%.  The increase was due to the Company hiring a number of additional personnel as it continued to grow.  The Company also started paying market salaries to certain key employees during 2017, who had originally received reduced salaries in 2016.

|  | December 31 2017 | December 31 2016 |
|---|---|---|
| **Total Current Assets** | 4,775,258 | 1,112,862 |
| **Total Non-Current Assets** | 8,891,265 | 2,740,549 |
| **Total Current Liabilities** | 4,275,258 | 1,532,488 |
| **Total Non-Current Liabilities** | 4,207,754 | - |

The Company's non-current assets consists of mining equipment and other capital assets, which includes data centre and electrical equipment, as well as leasehold improvements.   The increase from $2,740,549 in 2016 to $8,891,265 in 2017 was a result of the purchase of additional mining equipment, as well as costs that have been capitalized related to upgrading the facility, as well as increasing the power available at the facility.

As at December 31, 2017, the total of the non-current liabilities consists of finance lease obligations and unearned revenue related to the sale of lifetime hash rate, as the revenue is recorded over a four-year period.  The increase from $Nil to $4,207,754, was because the Company only started selling hash rate in 2017.

**LIQUIDITY AND CAPITAL RESOURCES**

As at December 31, 2017, the Company, as per the structure of the carve-out financial statements, had working capital of $500,000 (December 31, 2016 – working capital deficit of $419,626).

**COMMITMENTS**

The Company has entered into agreement for the lease of premises.  Future minimum lease payments aggregate to and include the following future payments for the next year:

|  | Total |
|---|---|
| 2018 | $        909,203 |
| 2019 | 932,015 |
| 2020 | 946,777 |
| 2021 | 963,203 |
| 2022 | 979,675 |
| Thereafter | 3,213,224 |
|  | $     7,944,097 |

**OFF-BALANCE SHEET ARRANGEMENTS**

The Company does not have any off-balance sheet arrangements.

**RELATED PARTY TRANSACTIONS**

The Company had the following related party transactions not otherwise disclosed in this Management Discussion and Analysis:

- During the year ended December 31, 2017, the Company purchased $Nil (2016 - $1,142,370) of mining equipment and other capital assets from senior management of the Company.
- During the year ended December 31, 2017, the Company sold $68,800 (2016 - $70,000) of mining equipment to senior management of the Company.
- During the year ended December 31, 2017, the Company earned $68,678 (2016 - $74,000) in hosting revenue from senior management of the Company.
- During the year ended December 31, 2017, the Company sold $5,500,000 (2016 - $Nil) of mining equipment and charged hosting fees of $29,564 (2016 - $Nil) to a company with common management of the Company.

**KEY MANAGEMENT COMPENSATION**

Key management includes directors and officers of the Company. Compensation awarded to key management was comprised of the following:

|  | 2017 | 2016 |
|---|---|---|
| Short term wages | $ 548,278 | $ 94,782 |
| Commissions and other | 29,500 | 22,500 |
| **Total** | $ 577,778 | $ 117,282 |

**CAPITAL MANAGEMENT**

The Company's objective in managing capital is to ensure a sufficient liquidity position to safeguard the Company's ability to continue as a going concern in order to provide returns for the benefit of its stakeholders.

**FINANCIAL INSTRUMENTS AND RISK MANAGEMENT**

Financial assets and financial liabilities are recognized when the Company becomes a part to the contractual provisions of the financial instrument.  Purchases or sale of financial assets that require delivery of assets within a time frame established regulation or convention in the market place (regular way trades) are recognized on the trade date, i.e. the date that the Company commits to purchase or sell the asset.  Financial assets are de-recognized when the contractual rights to the cash flows from the financial asset expire, or when the financial asset and all substantial risks and rewards are transferred.  A financial liability is de-recognized when it is extinguished, discharged, cancelled or when it expires.

Financial assets and financial liabilities are measured initially at fair value plus transaction costs, except for financial assets and financial liabilities carried at fair value through profit or loss, which are measured initially at fair value. The Company describes its financial instruments by category according to their nature and their characteristics.  Management determines the classification when the instruments are initially recognized, which is normally the date of the transaction.

The Company classifies its financial assets and financial liabilities as outlined below:

| Financial Instrument | Classification |
|---|---|
| Cash | Fair value through profit or loss (FVTPL) |
| Accounts receivables | Loans and receivables |
| Accounts payable and accrued liabilities | Other financial liabilities |

7

**Credit risk**

Credit risk arises from the non-performance by counterparties of contractual financial obligations resulting in financial loss to the Company. The Company's credit risk is primarily attributable to its cash.  Cash is held with an investment grade financial institution as assessed by external rating agencies. The deposits held with this institution may exceed the amount of insurance provided on such deposits. Management believes the risk of loss to be minimal.

**Liquidity risk**

Liquidity risk refers to the risk that the Company will not be able to meet its financial obligations when they become due or can only do so at excessive cost. As at December 31, 2017, the Company had working capital of $500,000 (December 31, 2016 – working capital deficit of $419,626). All of the Company's financial liabilities have contractual maturities within twelve months. Management has determined that this risk is not significant at this point in time.

**Market Risk**

**(i)     Interest rate risk**

Interest rate risk is the risk that the fair value or future cashflows of a financial instrument will fluctuate because of changes in market interest rates. The Company maintains its cash balances in demand deposit accounts with reputable financial institutions and does not believe it is not currently exposed to interest rate risk and therefore interest rate risk is considered by the Company to be low.

**(ii)    Foreign currency risk**

The majority of the Company's expenditures and financing is in U.S. dollars and as such the Company's functional currency is the U.S. dollar.

**(iii)   Digital asset risk**

The Company is exposed to risk with respect to crypto-currency prices and valuations which are largely based on the supply and demand of Bitcoin Core and Bitcoin Cash or other digital asset risk their demand in the marketplace.

**(iv)    Fair value**

Fair value estimates are made at the statement of financial position date, based on relevant market information and information about the financial instrument. These estimates are subjective in nature and involve uncertainties in significant matters of judgement and therefore cannot be determined with precision. Changes in assumptions could significantly affect these estimates. The carrying amounts for cash, receivables, accounts payable and accrued liabilities approximate fair value because of the limited term of the instruments.

**CUSTOMER RISK**

The Company had certain customers whose revenue individually represented 10% or more of the Company's total revenue.  The reason for this is, the Company has one customer for the hashrate sales as it sells hashrate on a wholesale basis.   Hashrate sales accounted for approximately 20% of the total sales of the Company for year ended December 31, 2017 (December 31, 2016 – 0%).  As at December 31, 2017, the Company had a liability $6,410,113 (December 31, 2016 - $Nil) of unearned hash rate sales revenue, consisting of $2,311,899 current (December 31, 2016 - $Nil) and $4,098,214 long-term (December 31, 2016 - $Nil).

**CRITICAL ACCOUNTING ESTIMATES**

The Company's significant accounting policies are summarized in Note 3 to the audited carve-out financial statements.

**ACCOUNTING STANDARDS ISSUED BUT NOT YET EFFECTIVE**

The following new standards, amendments to standards and interpretations have been issued but are not yet effective for the year ended December 31, 2017 and accordingly, have not been applied in preparing the financial statements:

*IFRS 9 – Financial Instruments*

IFRS 9, published in July 2014, replaces the existing guidance in IAS 39 Financial Instruments: Recognition and Measurement. IFRS 9 includes revised guidance on the classification and measurement of financial instruments, a new expected credit loss model for calculating impairment on financial assets, and new general hedge accounting requirements. It also carries forward the guidance on recognition and de-recognition of financial instruments from IAS 39. IFRS 9 is effective for annual reporting periods beginning on or after January 1, 2018, with early adoption permitted. The Company has determined there will be no material impact on adoption of this standard.

*IFRS 15 – Revenue from Contracts with Customers*

In May 2014, the IASB issued IFRS 15 Revenue from Contracts with Customers, which covers principles that an entity shall apply to report useful information to users of financial statements about the nature, amount, timing and uncertainty of revenue and cash flows arising from a contract with a customer.  In September 2015, the IASB deferred the effective date of the standard to annual reporting periods beginning on or after January 1, 2018, with earlier application permitted.  The Company has determined there will be no material impact on adoption of this standard.

*IFRS 16 – Leases*

In January 2016, the IASB issued IFRS 15 Leases, which requires lessees to recognize assets and liabilities from most leases.  For lessors, there is little change to the existing accounting in IAS 17 Leases.  The new standard is effective for annual periods beginning on or after January 1, 2019.  Early adoption is permitted, provided the new revenue standard, IFRS 16 has been applied, or is applied at the same date as IFRS 16.  The Company is currently assessing the impact of IFRS 16 on the Company's financial statements along with the planned timing of our adoption of IFRS 16.

**SUBSEQUENT EVENTS**

On January 7, 2018, the Company, along with the controlling member and Manager of Spokane, entered into a purchase agreement (the "**Purchase Agreement**") with HyperBlock Technologies Corp. ("**HyperBlock**"), a corporation located in Canada, to acquire the business of Spokane, including (a) (i) hash rate sales for cryptocurrencies or similar cloudmining activities, (ii) blockchain security server distribution and resale; (iii) server hosting and co-location; and (iv) self-mining for cryptocurrencies and (b) any other business Spokane is engaged in or actively planning to engage in (the "**Spokane Assets**"). The Purchase Agreement will be considered a related party transaction as HyperBlock's Chief Executive Officer, Sean Walsh, substantially controls Spokane. Under the terms of the purchase agreement, HyperBlock has agreed to pay $65,947,721, which shall be paid in cash, common shares of HyperBlock and a promissory note secured by the assets of Spokane.

On March 14, 2018, the parties executed an amendment to the Purchase Agreement to adjust the outside date for the transaction from March 31, 2018 to May 31, 2018. On April 2, 2018, the parties executed a second amendment to the Purchase Agreement to adjust the outside for the transaction from May 31, 2018 to the Escrow Release Deadline (as defined in the subscription receipt agreement dated March 14, 2018 between HyperBlock, TSX Trust Company, and Canaccord Genuity Corp., among others, as amended on March 26, 2018 (the "**Subscription Receipt Agreement**")), and to amend the purchase price payment schedule.

Upon receipt of the escrowed proceeds, pursuant to the Subscription Receipt Agreement, HyperBlock will pay the outstanding balance of the purchase price for the Spokane Assets to Spokane, thereby completing the acquisition of the Spokane Assets.

**SCHEDULE D**
**FINANCIAL STATEMENTS AND MANAGEMENT'S DISCUSSION AND ANALYSIS OF CRYPTOGLOBAL**

**CryptoGlobal Corp. (formerly Apolo Acquisition Corp.)**
Condensed Consolidated Interim Financial Statements
Three months ended March 31, 2018
(Unaudited)

**CryptoGlobal Corp. (formerly Apolo Acquisition Corp.)**

**Condensed Consolidated Interim Statement of Financial Position**
**As at March 31, 2018 and December 31, 2017**
[Expressed in Canadian dollars]

| | Note | March 31, 2018 | December 31, 2017 |
|---|---|---|---|
| | | (Unaudited) | (Audited) |
| **Assets** | | | |
| | | | |
| **Current assets:** | | | |
| Cash | 9 | $ 3,165,708 | $ 4,241,891 |
| Other receivables | 11 | 1,659,342 | 6,303 |
| Prepaid expenses | 9 | 2,474,294 | 368,134 |
| Digital assets | 5 | 1,341,489 | 96,164 |
| **Total current assets** | | 8,640,833 | 4,712,492 |
| | | | |
| **Non-current assets:** | | | |
| Deposit on mining equipment | | - | 5,770,457 |
| Mining equipment, net | 6 | 20,241,818 | 14,555,111 |
| Other capital assets, net | 6 | 603,902 | 411,734 |
| Unallocated purchase price | 9 | 6,527,418 | - |
| **Total non-current assets** | | 27,373,138 | 20,737,302 |
| | | | |
| **Total assets** | | $ 36,013,971 | $ 25,449,794 |
| | | | |
| **Liabilities and shareholders' equity** | | | |
| | | | |
| **Current liabilities:** | | | |
| Accounts payable and accrued liabilities | 9 | $ 3,053,258 | $ 847,866 |
| Due to related party | 12 | 1,040,000 | - |
| **Total current liabilities** | | 4,093,258 | 847,866 |
| | | | |
| **Non-current liabilities:** | | | |
| Deferred rent liability | | 29,215 | - |
| **Total non-current liabilities** | | 29,215 | - |
| | | | |
| **Shareholders' equity** | | | |
| Share capital | 7 | 39,460,638 | 25,652,086 |
| Warrants | 7 | 240,164 | 292,883 |
| Contributed surplus | 7, 8, 9 | 379,242 | 90,343 |
| Deficit | | (8,188,546) | (1,433,384) |
| **Total shareholders' equity** | | 31,891,498 | 24,601,928 |
| | | | |
| **Total liabilities and shareholders equity** | | $ 36,013,971 | $ 25,449,794 |

Comparative figures [note 1]
Commitments and contingencies [note 13]
Events after the reporting period [note 15]

*The accompanying notes are an integral part of these condensed consolidated interim financial statements*

Approved by the Directors:

"James Millership"                                "Rob Segal"
Director                                          Director

**CryptoGlobal Corp. (formerly Apolo Acquisition Corp.)**

**Condensed Consolidated Interim Statement of Loss and Comprehensive Loss**
[Expressed in Canadian dollars]

For the three months ended

| | Note | March 31, 2018 |
|---|---|---|
| | | (Unaudited) |
| **Revenue** | | |
| Digital assets mined | 5 | $ 1,616,161 |
| **Total Revenue** | | 1,616,161 |
| | | |
| Cost of revenue | | 2,952,158 |
| **Gross Profit** | | (1,335,997) |
| | | |
| **Expenses** | | |
| General and administrative | 10 | 679,223 |
| Marketing | | 415,788 |
| Research and development | | 220,894 |
| Operations | | 458,118 |
| Trading | | 25,241 |
| Share-based compensation | 7 | 283,466 |
| **Total operating expenses** | | 2,082,730 |
| | | |
| **Loss before undernoted items** | | (3,418,727) |
| | | |
| Fair value remeasurement loss on digital assets[1] | 5 | (601,833) |
| Foreign exchange loss | | (10,663) |
| RTO transaction cost[1] | 8 | (2,013,980) |
| Business combination transaction cost[1] | 9 | (709,959) |
| **Net loss and comprehensive loss for the period** | | $ (6,755,162) |
| | | |
| **Loss per share - basic and diluted [note 7]** | | (0.06) |
| | | |
| **Weighted average number of shares outstanding - basic and diluted** | | 120,144,081 |

[1] Refer to the Condensed Consolidated Interim Statement of Cash Flows

*The accompanying notes are an integral part of these condensed consolidated interim financial statements*

**CryptoGlobal Corp. (formerly Apolo Acquisition Corp.)**

**Condensed Consolidated Interim Statement of Changes in Shareholders' Equity**
**For the three months from December 31, 2017 to March 31, 2018**
[Expressed in Canadian dollars]
Unaudited

| | Note | Number | Capital Stock | Warrants | Stock Options | Deficit | Total |
|---|---|---|---|---|---|---|---|
| **Balance, December 31, 2017** | | 117,000,000 | $ 25,652,086 | $ 292,883 | $ 90,343 | $ (1,433,384) | $ 24,601,928 |
| Share issuance to service provider | | 14,771 | 12,555 | - | - | - | 12,555 |
| Elimination of Old CryptoGlobal shares | 8 | (117,014,771) | - | - | - | - | - |
| Conversion of Old CryptoGlobal shares | 8 | 117,014,771 | - | - | - | - | - |
| Consideration for reverse takeover | 8 | 2,958,354 | 2,514,600 | - | 212,373 | - | 2,726,973 |
| Exercise of stock options pursuant to reverse takeov | 8 | 302,184 | 327,243 | - | (208,243) | - | 119,000 |
| Exercise of broker warrants | 7 | 135,000 | 123,335 | (52,719) | - | - | 70,616 |
| Shares issued for acquisition of Blockchain Dynamic | 9 | 20,241,720 | 10,120,860 | - | 1,303 | - | 10,122,163 |
| Financing cost for acquisition of Blockchain Dynamics | | 1,419,918 | 709,959 | - | - | - | 709,959 |
| Share-based compensation | 7, 8 | - | - | - | 283,466 | - | 283,466 |
| Net loss and comprehensive loss for the period | | - | - | - | - | (6,755,162) | (6,755,162) |
| **Balance, March 31, 2018** | | 142,071,947 | $ 39,460,638 | $ 240,164 | $ 379,242 | $ (8,188,546) | $ 31,891,498 |

*The accompanying notes are an integral part of these condensed consolidated interim financial statements*

**CryptoGlobal Corp. (formerly Apolo Acquisition Corp.)**

**Condensed Consolidated Interim Statement of Cash Flows**
[Expressed in Canadian dollars]
For the three months ended

| Operating activities | Note | March 31, 2018 |
|---|---|---|
| | | (Unaudited) |
| Net loss for the period | | $          (6,755,162) |
| Add items not involving cash | | |
| Amortization of mining equipment | 6 | 241,893 |
| Amortization of other capital assets | 6 | 36,298 |
| Digital assets mined | 5 | (1,616,161) |
| Share-based compensation | 7 | 283,466 |
| RTO transaction cost | 8 | 2,013,980 |
| Business combination transaction cost | 9 | 709,959 |
| Settlement of expense through issuance of shares | 7 | 12,555 |
| Fair value remeasurement loss on digital assets | 5 | 601,833 |
| | | (4,471,339) |
| Changes in working capital balances related to operations | | |
| Other receivables | | (1,078,428) |
| Prepaid expenses | | (1,810,490) |
| Accounts payable and accrued liabilities | | 1,901,345 |
| Deferred rent liability | | 29,215 |
| **Cash used in operating activities** | | **(5,429,697)** |
| | | |
| **Investing Activities** | | |
| Proceeds from business combination | 9 | 3,130,668 |
| Proceeds from reverse takeover | 8 | 711,925 |
| Purchase of mining equipment | 6 | (514,224) |
| Purchase of other capital assets | 6 | (204,471) |
| **Cash used in investing activities** | | **3,123,898** |
| | | |
| **Financing Activities** | | |
| Due to related party | 12 | 1,040,000 |
| Proceeds from exercise of stock options | 8 | 119,000 |
| Proceeds from exercise of broker warrants | 7 | 70,616 |
| **Cash provided by financing activities** | | **1,229,616** |
| | | |
| **Net decrease in cash during the period** | | (1,076,183) |
| Cash, beginning of period | | 4,241,891 |
| **Cash, end of period** | | **$          3,165,708** |

*The accompanying notes are an integral part of these condensed consolidated interim financial statements*

**CryptoGlobal Corp.**

## Notes to the Condensed Consolidated Interim Financial Statements
**[Expressed in Canadian dollars]**
Unaudited

Three months ended March 31, 2018

**1. Reporting entity**

CryptoGlobal Inc. ("Old CryptoGlobal") was incorporated on August 8, 2017 under the Ontario Business Corporations Act.

Apolo Acquisition Corp. ("Apolo"), was incorporated under the Business Corporations Act (Ontario) on May 18, 2017 and was in the process for applying for status as a Capital Pool Company, as defined in Policy 2.4 of the TSX Venture Exchange (the "Exchange"). On August 16, 2017, Apolo announced that it had completed its initial public offering and that it was now defined as a Capital Pool Corporation.

On January 25, 2018, a triangular amalgamation ("Amalgamation") was completed whereby Apolo shares were exchanged for CryptoGlobal Corp. shares on the basis of 3.938 Apolo shares for every CryptoGlobal share (see Note 8) and Old CryptoGlobal shares were exchanged for CryptoGlobal shares on the basis of 1 CryptoGlobal Corp. share for every Old CryptoGlobal share. The Amalgamation was accounted for as a reverse takeover ("RTO") and Old CryptoGlobal was identified as the acquirer for accounting purposes and the resulting condensed consolidated interim financial statements are presented as a continuance of Old CryptoGlobal. The comparative figures presented in the condensed consolidated interim financial statements after the RTO are those of Old CryptoGlobal. There is no comparative information available for the condensed consolidated interim statement of comprehensive loss and condensed consolidated interim statement of cash flows as Old CryptoGlobal was incorporated on August 8, 2017 and did not exist for the quarter ending March 31, 2017.

The transaction was Apolo's Qualifying Transaction (as such term is defined in the CPC Policy) completed in accordance with the policies of the Exchange. Concurrently with the completion of the RTO, Apolo changed its name to "CryptoGlobal Corp." (the "Company" or "CryptoGlobal").

The Company's registered office is located at 388 Carlaw Avenue Unit 300 and 300A, Toronto Ontario, M4M 2T4.  The Company and its subsidiaries are in the business of utilizing specialized equipment to solve complex computational problems to validate transactions on the blockchain.  The Company receives digital currencies in return for this service.

**CryptoGlobal Corp.**

## Notes to the Condensed Consolidated Interim Financial Statements
### [Expressed in Canadian dollars]
Unaudited

Three months ended March 31, 2018

## 2. Basis of preparation

(i) Statement of compliance

The Company applies International Financial Reporting Standards ("IFRS") as issued by the International Accounting Standards Board ("IASB"). These unaudited condensed consolidated interim financial statements have been prepared in accordance with International Accounting Standard 34, Interim Financial Reporting. Accordingly, they do not include all of the information required for full annual financial statements required by IFRS as issued by the IASB.

The policies applied in these unaudited condensed consolidated interim financial statements are based on IFRS issued and outstanding as of May 31, 2018, the date the Board of Directors approved the statements. The same accounting policies and methods of computation are followed in these unaudited condensed consolidated interim financial statements as compared with the most recent annual financial statements as at and for the period from August 8, the date of incorporation to December 31, 2017, except as noted below. Any subsequent changes to IFRS that are given effect in the Company's annual financial statements for the year ending December 31, 2018 could result in restatement of these unaudited condensed consolidated interim financial statements.

(ii) Accounting policy adoptions and changes

*IFRS 9 Financial Instruments ("IFRS 9")*

On July 24, 2014, the IASB issued the completed IFRS 9, Financial Instruments, (IFRS 9 (2014)) to come into effect on January 1, 2018 with early adoption permitted.

IFRS 9 (2014) includes finalized guidance on the classification and measurement of financial assets. Under IFRS 9, financial assets are classified and measured either at amortized cost, fair value through other comprehensive income ("FVOCI") or fair value through profit or loss ("FVTPL") based on the business model in which they are held and the characteristics of their contractual cash flows. IFRS 9 largely retains the existing requirements in IAS 39 Financial Instruments: recognition and measurement, for the classification and measurement of financial liabilities.

The Company adopted IFRS 9 in its consolidated financial statements on January 1, 2018.  Due to the nature of its financial instruments, the adoption of IFRS 9 had no impact on the opening

**CryptoGlobal Corp.**

## Notes to the Condensed Consolidated Interim Financial Statements
**[Expressed in Canadian dollars]**
Unaudited

Three months ended March 31, 2018

accumulated deficit balance on January 1, 2018. The impact on the classification and measurement of its financial instruments is set out below.

**2. Basis of preparation (continued)**

All financial assets not classified at amortized cost or FVOCI are measured at FVTPL. On initial recognition, the Company can irrevocably designate a financial asset at FVTPL if doing so eliminates or significantly reduces an accounting mismatch.

A financial asset is measured at amortized cost if it meets both of the following conditions and is not designated at FVTPL: It is held within a business model whose objective is to hold the financial asset to collect the contractual cash flows associated with the financial asset instead of selling the financial asset for a profit or loss; its contractual terms give rise to cash flows that are solely payments of principal and interest. All financial instruments are initially recognized at fair value on the consolidated statement of financial position. Subsequent measurement of financial instruments is based on their classification. Financial assets and liabilities classified at FVTPL are measured at fair value with changes in those fair values recognized in the consolidated statement of loss and comprehensive loss for the year. Financial assets classified at amortized cost and financial liabilities are measured at amortized cost using the effective interest method.

The following table summarizes the classification and measurement changes under IFRS 9 for each financial instrument:

| Classification | IAS 39 | IFRS 9 |
|---|---|---|
| Cash | Loans and receivables (amortized cost) | Amortized cost |
| Due from related party | Loans and receivables (amortized cost) | Amortized cost |
| Other receivable | Loans and receivables (amortized cost) | Amortized cost |
| Accounts payable and accrued liabilities | Other financial liabilities (amortized cost) | Amortized cost |

The original carrying value of the Company's financial instruments under IAS 39 has not changed under IFRS 9.

**3. Use of estimates and judgments**

(i) Impairment of non-financial assets

Impairment exists when the carrying value of an asset exceeds its recoverable amount, which is the higher of its fair value less costs to sell and its value in use. These calculations are based on

**CryptoGlobal Corp.**

## Notes to the Condensed Consolidated Interim Financial Statements
### [Expressed in Canadian dollars]
Unaudited

Three months ended March 31, 2018

available data, other observable inputs and projections of cash flows, all of which are subject to estimates and assumptions. Recoverable amounts are also sensitive to assumptions about the

### 3. Use of estimates and judgments

future usefulness of in-process development and the related marketing rights. At the period end, management concluded that none of the Company's non-financial assets were impaired.

(ii) Income taxes

Uncertainties exist with respect to the interpretation of evolving tax regulations relating to digital assets, changes in tax laws, and the amount and timing of future taxable income. The Company has not recognized the value of any deferred tax assets in its statements of financial position.

The Company recognizes the tax benefit from an uncertain tax position only if it is more likely than not that the tax position will be sustained based on its technical merits. The Company measures and record the tax benefits from such a position based on the largest benefit that has a greater than 50% likelihood of being realized upon ultimate settlement. The Company's estimated liabilities related to these matters are adjusted in the period in which the uncertain tax position is effectively settled, the statute of limitations for examination expires or when additional information becomes available. The Company's liability for unrecognized tax benefits requires the use of assumptions and significant judgment to estimate the exposures associated with our various filing positions. Although the Company believes that the judgments and estimates made are reasonable, actual results could differ and resulting adjustments could materially affect our effective income tax rate and income tax provision.

Provisions for taxes are made using the best estimate of the amount expected to be paid based on a qualitative assessment of all relevant factors. The Company reviews the adequacy of these provisions at the end of the reporting period. However, it is possible that at some future date an additional liability could result from audits by taxing authorities. Where the final outcome of these tax-related matters is different from the amounts that were initially recorded, such differences will affect the tax provisions in the period in which such determination is made.

There is uncertainty regarding the taxation of cryptocurrency and the CRA may assess the Company differently from the position adopted. In addition, there is uncertainty with regards to GST/HST implications of cryptocurrency transactions.

(iii) Fair value measurement of broker warrants

**CryptoGlobal Corp.**

**Notes to the Condensed Consolidated Interim Financial Statements**
**[Expressed in Canadian dollars]**
Unaudited

Three months ended March 31, 2018

The Company measures the cost of equity-settled transactions by reference to the fair value of the equity instruments at the date on which they are granted. Estimating fair value for broker warrants requires determining the most appropriate valuation model, which is dependent on the

**3. Use of estimates and judgments**

terms and conditions of the grant. This estimate also requires the determination of the most appropriate inputs to the valuation model including the expected life of the broker warrants, volatility and dividend yield and making assumptions about them. The assumptions and models used for estimating fair value for broker warrants are disclosed in note 8.

(iv) Accounting for Digital Assets

At present, there is limited guidance in IFRS on the recognition and measurement of Digital Assets. Noted below are the key policies used to account for these assets.

(v) Fair value of Digital Assets

Digital Assets are measured at fair value using the quoted price on www.coinmarketcap.com. Management considers this fair value to be a Level 2 input under IFRS 13 *Fair Value Measurement* fair value hierarchy as the price on this source represents an average of quoted prices on multiple digital currency exchanges. The Digital Assets are valued based on the closing price obtained from www.coinmarketcap.com ("Coin Market Cap") at the reporting period corresponding to the different Digital Assets mined by the Company. The Company is relying on the data available at www.coinmarketcap.com to be an accurate representation of the closing price for the different Digital Assets.

(vi) Useful life of mining equipment

Effective January 1, 2018, management is amortizing mining equipment over three years on a straight-line basis. This accounting policy was changed from a useful life of four years effective on January 1, 2018. The mining equipment is used to generate digital assets. The rate at which the Company generates digital currencies and, therefore, consumes the economic benefits of its mining equipment are influenced by a number of factors including the following:

- the complexity of the mining process which is driven by the algorithms contained within the digital assets open source software;
- the general availability of appropriate computer processing capacity on a global basis technological obsolescence reflecting rapid development in the mining

**CryptoGlobal Corp.**

## Notes to the Condensed Consolidated Interim Financial Statements
**[Expressed in Canadian dollars]**
Unaudited

Three months ended March 31, 2018

machines such that more recently developed hardware is more economically efficient to run in terms of digital assets mined as a function of operating costs, primarily power costs (i.e., the speed of mining machines evolution in the industry) is such that later mining machines models generally have faster processing capacity combined with lower operating costs and a lower cost of purchase.

**3. Use of estimates and judgments (continued)**

(vi) Useful life of mining equipment (continued)

Based on the Company's, and the industry's, short life cycle to date, management is limited by the market data available. Furthermore, the data available also includes data derived from the use of economic modelling to forecast future digital assets and the assumptions included in such forecasts, including digital currencies' (such as Bitcoin and Ethereum) price and network difficulty, are derived from management's assumptions which are inherently judgmental. Based on current data available management has determined that the straight-line method of amortization over three years best reflects the current expected useful life of mining equipment. Management will review this estimate at each reporting date and will revise such estimates as and when data becomes available. The mining equipment has been assumed to have no residual value at the end of its useful life. Management will review the appropriateness of its assumption of nil residual value at each reporting date.

As set out in Note 3(i) management also assesses whether there are any indicators of impairment of mining equipment at the end of each reporting period and if any such indication exists, the Company will estimate the recoverable amount of its mining equipment.

**4. Standards issued but not yet effective**

*IFRS 16, Leases*

IFRS 16 was issued in January 2016 and requires lessees to recognize assets and liabilities for most leases. For lessors, there is little changed to the existing accounting in IAS 17 Leases.

The new standard is effective for annual periods beginning on or after January 1, 2019. Early adoption is permitted, provided the new revenue standard, IFRS 15, has been applied, or is applied at the same date as IFRS 16. The Company is in the process of assessing the impact of this standard on the Company's condensed consolidated interim financial statements.

**CryptoGlobal Corp.**

## Notes to the Condensed Consolidated Interim Financial Statements
### [Expressed in Canadian dollars]
Unaudited

Three months ended March 31, 2018

### 5. Digital assets

Digital assets consist of Bitcoin, Ethereum, Litecoin, and Dash coins. Below is a continuity of digital assets mined, acquired through purchase, settled and revalued during the year.

| | Bitcoin | | Ethereum | | Litecoin | | Dash | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | $ | Units | $ | Units | $ | Units | $ | Units |
| **Opening balance as at December 31, 2017** | 19,939 | 1.12 | 68,479 | 72.14 | 7,746 | 26.60 | - | - |
| Mined additions | 1,134,082 | 82.77 | 8,815 | 10.15 | 405,725 | 1,699.17 | 67,539 | 78.44 |
| Settled for purchase of prepaid expenses | (240,987) | (24.16) | - | - | - | - | - | - |
| Unrealized gains/(losses) in fair value through profit & loss | (376,002) | - | (35,227) | - | (153,989) | - | (36,615) | - |
| Acquired through business combination, note 9 | | | 471,984 | 968.0 | | | | |
| **Ending balance as at March 31, 2018** | 537,032 | 59.73 | 514,051 | 1,050.29 | 259,482 | 1,725.77 | 30,924 | 78.44 |

### 6. Property and equipment

Property and equipment consists of the following:

| | | | | Other Capital Assets | | |
| --- | --- | --- | --- | --- | --- | --- |
| | | Mining equipment[1] | Furniture and fixtures | Leasehold improvements | Mining fixtures | Subtotal |
| | | $ | $ | $ | $ | $ |
| **Cost** | | | | | | |
| Balance, December 31, 2017 | | 14,568,131 | 23,122 | 71,843 | 324,452 | 419,417 |
| Additions | | 5,736,536 | - | 161,556 | 16,548 | 178,104 |
| Acquired through business combination (note 9) | | 192,164 | 45,278 | 5,083 | - | 50,361 |
| **As at March 31, 2018** | | 20,496,731 | 68,400 | 238,482 | 341,000 | 647,882 |
| | | | | | | |
| **Accumulated amortization** | | | | | | |
| Balance, December 31, 2017 | | (13,020) | (1,542) | (3,878) | (2,263) | (7,683) |
| Amortization charge | | (241,893) | (1,156) | (18,154) | (16,987) | (36,297) |

**CryptoGlobal Corp.**

## Notes to the Condensed Consolidated Interim Financial Statements
### [Expressed in Canadian dollars]
Unaudited

Three months ended March 31, 2018

| As at March 31, 2018 | (254,913) | (2,698) | (22,032) | (19,250) | (43,980) |
|---|---|---|---|---|---|
| | | | | | |
| **Net book value** | | | | | |
| As at December 31, 2017 | 14,555,111 | 21,580 | 67,965 | 322,189 | 411,734 |
| **As at March 31, 2018** | 20,241,818 | 65,702 | 216,450 | 321,750 | 603,902 |

**6. Property and equipment (continued)**

As at March 31, 2018, $2,900,308 (December 31, 2017 - $585,463) of mining equipment was in production.

[1] Mining equipment additions are made up of specialized computer equipment to mine Bitcoin, Ethereum, Litecoin and Dash. Below is a breakdown of mining equipment corresponding to the type of digital asset it is capable of mining.

| March 31 ,2018 | Cost | Accumulated amortization | Net book value |
|---|---|---|---|
| | $ | $ | $ |
| Bitcoin | 8,010,516 | (135,694) | 7,874,822 |
| Ethereum | 5,109,675 | (10,297) | 5,099,378 |
| Litecoin | 5,101,095 | (92,355) | 5,008,740 |
| Dashcoin | 2,275,445 | (16,567) | 2,258,878 |
| **Total mining equipment** | **20,496,731** | **(254,913)** | **20,241,818** |

| December 31, 2017 | Cost | Accumulated amortization | Net book value |
|---|---|---|---|
| | $ | $ | $ |
| Bitcoin | 4,300,868 | (4,712) | 4,296,156 |
| Ethereum | 4,579,339 | (5,574) | 4,573,765 |
| Litecoin | 3,269,111 | (2,734) | 3,266,377 |
| Dashcoin | 2,418,813 | - | 2,418,813 |
| **Total mining equipment** | **14,568,131** | **(13,020)** | **14,555,111** |

**7. Share capital**

**Authorized**

Unlimited common shares.

**CryptoGlobal Corp.**

## Notes to the Condensed Consolidated Interim Financial Statements
### [Expressed in Canadian dollars]
Unaudited

Three months ended March 31, 2018

**Issued and outstanding**

As at March 31, 2018, the issued share capital amounted to $39,460,638. Changes in issued share capital are as follows:

**7. Share capital (continued)**

| Old CryptoGlobal | Number of shares # | Amount $ |
|---|---|---|
| **Balance, date of incorporation on August 8, 2017** | - | - |
| Shareholder funding[1] | 75,000,000 | 1,527,885 |
| Private placements[2] | 42,000,000 | 24,124,201 |
| **Balance, December 31, 2017** | 117,000,000 | 25,652,086 |
| Common shares issued for services received[3] | 14,771 | 12,555 |
| **Balance, January 25, 2018** | 117,014,771 | 25,664,641 |

| CryptoGlobal Corp. | Number of shares # | Amount $ |
|---|---|---|
| **Balance, January 25, 2018** | 117,014,771 | 25,664,641 |
| Elimination of Old CryptoGlobal shares[4] | (117,014,771) | - |
| Conversion of Old CryptoGlobal shares[4] | 117,014,771 | - |
| Conversion of CryptoGlobal shares and consideration for RTO[4] | 2,958,354 | 2,514,601 |
| Apolo options exercised for CryptoGlobal shares[5] | 302,184 | 327,243 |
| Warrants exercised[6] | 135,000 | 123,335 |
| Shares issued for acquisition of Blockchain Dynamics, note 9 | 20,241,720 | 10,120,860 |
| Financing cost for acquisition of Blockchain Dynamics, note 9 | 1,419,918 | 709,959 |
| **Balance, March 31, 2018** | 142,071,947 | 39,460,638 |

[1] Shareholder funding in the amount of $1,527,885 was provided in the form of cash, property and equipment and payment of operating expenditures in exchange for 75,000,000 shares. Included in the 75,000,000 shares are 25,375,000 shares issued at a nominal amount on the incorporation of Old CryptoGlobal.

[2] On October 25, 2017, Old CryptoGlobal closed a private placement of 30,000,000 shares at USD $0.40 per share with gross proceeds of $15,427,247 (USD $12,000,000) less legal and agent's fees of $437,903 and net of broker warrants of $292,883.

**CryptoGlobal Corp.**

## Notes to the Condensed Consolidated Interim Financial Statements
### [Expressed in Canadian dollars]
Unaudited

Three months ended March 31, 2018

On December 1, 2017, Old CryptoGlobal closed a private placement of 12,000,000 shares at $0.85 per share with gross proceeds of $10,200,000 less legal and agent's fees of $772,280.

### 7. Share capital (continued)

[3] On January 12, 2018, Old CryptoGlobal issued 14,771 common shares to a service provider at $0.85 per share in exchange for services received. The shares were valued at the fair value of services received.

[4] On January 25, 2018, Old CryptoGlobal and Apolo completed the Amalgamation whereby Apolo shares were exchanged for CryptoGlobal shares on the basis of 3.938 Apolo shares for each CryptoGlobal share. The Amalgamation effectively provided for the acquisition of all of the outstanding equity interests of Old CryptoGlobal by Apolo, indirectly through 2607715 Ontario Inc. ("Subco"), a wholly owned Ontario incorporated subsidiary of Apolo, in a transaction in which the security holders of Old CryptoGlobal received shares of CryptoGlobal Corp. and if applicable, convertible securities of CryptoGlobal Corp. As a result of the Amalgamation of Subco and Old CryptoGlobal ("AmalCo"), Apolo became the sole beneficial owner of all of the issued and outstanding shares of AmalCo. Pursuant to the Amalgamation, CryptoGlobal Corp. issued an aggregate of 2,958,354 shares to the shareholders of Apolo and 117,014,771 shares to the shareholders of Old CryptoGlobal.

The Amalgamation was accounted for as a RTO whereby Old CryptoGlobal was identified as the acquirer for accounting purpose (see note 8).

[5] Immediately following the Amalgamation, Apolo stock option holders exercised 302,184 of 308,532 Apolo stock options outstanding at an exercise price of $0.39. As a result, 302,184 CryptoGlobal common shares were issued. The Apolo stock options transferred to CryptoGlobal as part of the RTO were estimated to have a fair value of $212,373, using the Black-Scholes valuation model with the following assumptions: expected dividend yield of 0%; expected volatility of 208%, risk-free interest rate of 1.76% and an expected life ranging from 0.76 to 1.56 years.

[6] On March 20, 2018, warrant holders of Old CryptoGlobal exercised 135,000 share purchase broker warrants to acquire 135,000 common shares of CryptoGlobal at a purchase price of $0.40 USD per share. The warrants were previously estimated to have a fair value of $52,719, using the Black-Scholes valuation model with the following assumptions: expected dividend

**CryptoGlobal Corp.**

## Notes to the Condensed Consolidated Interim Financial Statements
**[Expressed in Canadian dollars]**
Unaudited

Three months ended March 31, 2018

yield of 0%; expected volatility of 165%, risk-free interest rate of 0.9% and an expected life of two years.

### 7. Share capital (continued)

*Share-based payments*

The directors of the Company have established a stock option plan under which options to purchase shares are granted to directors, employees, officers and consultants of the Company. The number of options and exercise price thereof is set by directors at the time of grant, provided that the exercise price shall not be less than the market price of the common shares on the day immediately preceding the date of grant of the options, on the stock exchange on which such shares are then traded.

The following table reflects the continuity of stock options for the three months ended March 31, 2018:

| | Number of options # | Weighted average exercise price $ | Weighted average remaining life # |
|---|---|---|---|
| **Balance, December 31, 2017** | 1,850,000 | 0.63 | 4.61 |
| Granted[1] | 2,305,587 | 0.85 | 4.81 |
| Issued as consideration for the RTO, see note 8[2] | 308,532 | 0.39 | 4.75 |
| Cancelled[3] | (725,000) | 0.63 | N/A |
| Exercised as part of RTO, see note 8[2] | (302,184) | 0.39 | N/A |
| Issued as part of business combination, see note 9[4] | 400,260 | 0.87 | 1.83 |
| **Balance, March 31, 2018** | **3,837,195** | **0.72** | |

[1] During the quarter ended March 31, 2018, 2,305,587 options were granted to directors, management, employees and service providers of the Company. The fair value of stock options was estimated on the date of grant using the Black-Scholes option pricing model with the following assumptions: share price of $0.85, expected dividend yield of 0%; expected volatility of 208%, risk-free interest rate of 1.71% and an expected life of 5 years. The calculated fair value of stock options granted and vested during the quarter was $0.83. This resulted in share-based compensation expense of $283,466. The options vest over various vesting periods.

**CryptoGlobal Corp.**

## Notes to the Condensed Consolidated Interim Financial Statements
### [Expressed in Canadian dollars]
Unaudited

Three months ended March 31, 2018

[2] As part of the reverse takeover, 308,532 stock options of the acquire became stock options of the Company pursuant to the Amalgamation. As a result, the fair value of these stock options was estimated on the acquisition date using the Black-Scholes option pricing model with the following assumptions: share price of $0.85, expected dividend yield of 0%; expected volatility of 208%, risk-free interest rate of 1.76% and expected lives ranging from 0.76-1.56 years. The calculated fair value of stock options granted as a result of the RTO ranged from $0.65-$0.74.

**7. Share capital (continued)**

Subsequently, 302,184 stock options were exercised for proceeds of $119,000.

[3] During the quarter ended March 31, 2018, 725,000 options previously issued to a director and potential management of the Company were forfeited. The options were not vested at the time of cancellation.

[4] Pursuant to the business combination with Blockchain Dynamics (note 9), option holders of Blockchain Dynamics became holders of 400,260 CryptoGlobal stock options. The fair value of these stock options was estimated on the acquisition date using the Black-Scholes option pricing model with the following assumptions: share price of $0.50, expected dividend yield of 0%, expected volatility ranging from 43%-194%, risk-free interest rates ranging from 1.12%-1.96% and expected lives ranging from 0.25-5 years. The calculated fair value of stock options granted as a result of the business combination ranged from $0.01-$0.50.

The stock options outstanding and exercisable as at March 31, 2018, are as follows:

| Grant date | Exercise price | Number of options | Number of vested options | Expiry date |
|---|---|---|---|---|
| November 8, 2017 | 0.63 | 1,125,000 | 0 | November 8, 2022 |
| January 12, 2018 | 0.85 | 905,587 | 0 | January 12, 2023 |
| January 25, 2018 | 0.85 | 1,400,000 | 0 | January 25, 2023 |
| January 25, 2018 | 0.39 | 6,348 | 6,348 | January 25, 2019 |
| March 29, 2018 | 0.87 | 266,840 | 266,840 | June 27, 2018 |
| March 29, 2018 | 0.87 | 133,420 | 0 | March 29, 2023 |
| | | **3,837,195** | **273,188** | |

*Broker warrants*

During the year ended December 31, 2017, old CryptoGlobal issued 750,000 share purchase broker warrants as part of the October 25, 2017 private placement. Each broker warrant

**CryptoGlobal Corp.**

## Notes to the Condensed Consolidated Interim Financial Statements
### [Expressed in Canadian dollars]
Unaudited

Three months ended March 31, 2018

entitles the holder to acquire an additional common share at $0.40 USD and expires on October 30, 2019.

The fair value of all broker warrants was estimated on the date of grant using the Black-Scholes option pricing model with the following assumptions: expected dividend yield of 0%; expected volatility of 165%, risk-free interest rate of 0.9% and an expected life of two years. The calculated fair value of warrants granted during the year was $0.39.

### 7. Share capital (continued)

Pursuant to the Amalgamation, old CryptoGlobal broker warrant holders became CryptoGlobal broker warrant holders. On March 20, 2018, 135,000 of 750,000 warrants were exercised at $0.40 USD.

*Contributed surplus*

|  | March 31, 2018 |
|---|---|
|  | $ |
| **Balance, December 31, 2017** | 90,343 |
| Stock options issued | 283,466 |
| Stock options issued as consideration for the RTO, see note 9 | 212,373 |
| Stock options exercised post the Amalgamation, see note 9 | (208,243) |
| Stock options issued for acquisition of Blockchain Dynamics, see note 10 | 1,303 |
| **Balance, March 31, 2018** | **379,242** |

*Loss per share amounts*

For the period from January 1, 2018 to March 31, 2018, the weighted average number of shares outstanding was 120,144,081. As at March 31, 2018, the Company had 615,000 warrants [exercisable for 615,000 shares] and 3,837,195 options [exercisable for 3,837,195 shares] that were outstanding and anti-dilutive and therefore were excluded from the computation of diluted loss per share.

### 8. Reverse Takeover

The share capital of each company prior to the RTO was as follows:

| *Old CryptoGlobal* | Number of shares | Amount |
|---|---|---|
|  | # | $ |
| Balance, December 31, 2017 | 117,000,000 | 25,652,086 |

**CryptoGlobal Corp.**

## Notes to the Condensed Consolidated Interim Financial Statements
### [Expressed in Canadian dollars]
Unaudited

Three months ended March 31, 2018

| | | |
|---|---|---|
| Balance at January 25, 2018 prior to the RTO | 117,014,771 | 25,664,641 |

**8. Reverse Takeover (continued)**

| *Apolo* | Number of shares # | Amount $ |
|---|---|---|
| Balance, December 31, 2017 | 11,650,000 | 844,121 |
| Balance at January 25, 2018 prior to the RTO | 11,650,000 | 844,121 |

On January 25, 2018, Old CryptoGlobal and Apolo completed the Amalgamation whereby Apolo shares were exchanged for CryptoGlobal shares on the basis of 3.938 Apolo shares for each one old CryptoGlobal share. Pursuant to the Amalgamation, CryptoGlobal Corp. issued an aggregate of 2,958,354 shares to the prior shareholders of Apolo and 117,014,771 shares to the shareholders of Old CryptoGlobal.

In accordance with IFRS 3, Business Combination, the substance of the transaction is a reverse takeover of a non-operating company. The transaction does not constitute a business combination as Apolo does not meet the definition of a business under the standard. As a result, the transaction is accounted for as a capital transaction with Old CryptoGlobal being identified as the acquirer and the equity consideration being measured at fair value. The resulting condensed consolidated interim statement of financial position is presented as a continuance of Old CryptoGlobal and comparative figures presented in the condensed consolidated interim financial statements after the reverse takeover are those of Old CryptoGlobal.

IFRS 2, Share-based Payment, applies to transactions where an entity grants equity instruments and cannot identify specifically some or all of the goods or services received in return. Because Old CryptoGlobal would have issued shares with a value in excess of the assets received, the difference is recognized in comprehensive loss as a transaction cost. The amount assigned to the transaction cost of $2,013,980 is the difference between the fair value of the consideration and the net identifiable assets of Apolo acquired by Old CryptoGlobal and included in the condensed consolidated interim statement of comprehensive loss.

**CryptoGlobal Corp.**

## Notes to the Condensed Consolidated Interim Financial Statements
**[Expressed in Canadian dollars]**
Unaudited

Three months ended March 31, 2018

The fair value of the consideration is determined based on the percentage of ownership the legal parent's shareholders have in the amalgamated entity after the transaction. This represents the fair value of the shares that Old CryptoGlobal would have had to issue for the ratio of ownership interest in the combined entity to be the same, if the transaction had taken the legal form of Old CryptoGlobal acquiring 100% of the shares in Apolo.

**8. Reverse Takeover (continued)**

The percentage of ownership Apolo shareholders had in the combined entity is 2% after the issue of 2,958,354 CryptoGlobal shares. The fair value of the consideration in the RTO is equivalent to the fair value of the 2,958,354 CryptoGlobal shares controlled by original Apolo shareholders and 308,532 stock options to Apolo stock options holders. The fair value of the shares controlled by original Apolo shareholders was estimated to be $2,514,601 based on the fair market value of $0.85 per share on the date of January 25, 2018. The fair value of the stock options was estimated to be $212,373 using the Black-Scholes valuation model on the following assumptions: dividend yield 0%; volatility 208%; risk-free interest rate of 1.76%; and expected lives of 0.75 to 1.56 years.

Based on the statement of financial position of Apolo at the time of the RTO, the net assets at estimated fair value that were acquired by CryptoGlobal were $712,993 and the resulting transaction cost charged to the condensed consolidated interim statement of comprehensive loss is as follows:

| | |
|---|---|
| **Consideration** | |
| Shares | $2,514,600 |
| Stock options | 212,373 |
| | $2,726,973 |
| **Assets acquired** | |
| Cash | $711,925 |
| Prepaid expenses | 1,068 |
| Transaction cost | 2,013,980 |
| Total net identifiable assets and transaction cost | $2,726,973 |

**CryptoGlobal Corp.**

## Notes to the Condensed Consolidated Interim Financial Statements
### [Expressed in Canadian dollars]
Unaudited

Three months ended March 31, 2018

During the quarter ended March 31, 2018, the Company incurred $78,725 in legal fees in relation to the reverse takeover. Such amounts have been included within general & administrative expenses on the statement of loss and comprehensive loss.

### 9. Business Combination

On March 29, 2018, CryptoGlobal acquired Blockchain Dynamics Inc. ("Blockchain Dynamics"), a full service platform offering security, custodial services, trading and staking across a diversified base of cryptocurrencies. Under the business combination, the Company and Blockchain Dynamics combined by way of a plan of arrangement, resulting in 10656178 Canada Inc. ("AcquisitionCo"), a wholly owned subsidiary of the Company, acquiring all of the issued and outstanding common shares of Blockchain Dynamics.

### 9. Business Combination (continued)

Each common share of Blockchain Dynamics issued and outstanding immediately prior to the closing of the business combination, was exchanged for either 0.2859 of a CryptoGlobal common share.

Upon closing of the business combination, the total equity instruments issued were as follows:

| | |
|---|---|
| CryptoGlobal shares issued to Blockchain Dynamics shareholders | 20,241,720 |
| CryptoGlobal shares issued to financial advisor in relation to the business combination | 1,419,916 |
| Replacement stock options issued to holders of Blockchain Dynamics options | 400,260 |

This transaction has been accounted for as a business combination in accordance with IFRS 3, Business Combinations. Based on consideration of all relevant factors, including that the Company's Board of Directors of the combined entity has a majority of directors who were incumbent Company directors, CryptoGlobal has been identified as the acquirer. Accordingly, Blockchain Dynamics' net assets have been re measured at their individual fair values estimated as of March 29, 2018, and Blockchain Dynamics' financial results have been consolidated commencing from March 29, 2018.

The total purchase consideration for accounting purposes was $10,122,163, based on the fair value of the issued common shares and stock options as of March 29, 2018, the closing date of the transaction. Upon closing, Blockchain Dynamics was obligated to deliver at least $3,500,000 in working capital, of which $1,700,000 was required to be in cash and cash equivalents. The fair value of the common shares was determined using the market based measurement method and was based on the Company's share price on March 29, 2018 of $0.50. As the

**CryptoGlobal Corp.**

## Notes to the Condensed Consolidated Interim Financial Statements
### [Expressed in Canadian dollars]
Unaudited

Three months ended March 31, 2018

Company was obligated to replace the Blockchain Dynamics stock options under the terms of the transaction, the consideration includes the fair value of the replacement stock options that relate to services prior to the merger. The fair values of the replacement stock options were determined using the Black Scholes option pricing model using the following assumptions: expected life ranging from 3 months to 5 years, exercise price of $0.87, share price of $0.50, expected dividend yield of 0%, risk-free rate ranging from 1.12% - 1.96% and volatility ranging from 43% to 194%.

The following summarizes the preliminary purchase price allocation of consideration transferred and the recognized amounts of net assets acquired at the acquisition date. The fair values have been estimated on a provisional basis. Management is in the process of further refining the fair value estimates. Changes to such estimates could be material.

### 9. Business Combination (continued)

| | |
|---|---:|
| **Consideration** | |
| Shares | $10,120,860 |
| Stock options | 1,303 |
| | $10,122,163 |
| **Identifiable assets acquired** | |
| Cash | $3,130,668 |
| Digital assets | 471,984 |
| Prepaid expenses | 53,615 |
| Mining equipment, net | 192,164 |
| Other capital assets, net | 50,361 |
| Accounts payable and accrued liabilities | (304,047) |
| **Total identifiable assets acquired** | 3,594,745 |
| Unallocated purchase price | 6,527,418 |
| Total net identifiable assets and transaction cost | $10,122,163 |

The Company intends on finalizing the purchase price allocation within 12 months of the acquisition date, in line with the guidance in IFRS 3. From the closing date of the business combination, revenues and expenses incurred by Blockchain Dynamics are nominal in value.

The Company has incurred $709,959 in transaction costs related to the acquisition of Blockchain Dynamics, and this amount has been expensed in the condensed consolidated interim statement of comprehensive loss for the quarter ending March 31, 2018.

**CryptoGlobal Corp.**

## Notes to the Condensed Consolidated Interim Financial Statements
### [Expressed in Canadian dollars]
Unaudited

Three months ended March 31, 2018

**10. Expenses**

Expenses are classified by function on the condensed consolidated interim statement of loss and comprehensive loss and are comprised of cost of revenue, general and administrative, marketing, research and development, trading and operational expenses. Below is a breakdown of what is included within expenses.

|  | Three months ended March 31, 2018 |
| --- | --- |
|  | $ |
| **Cost of revenue** | |
| Amortization of mining equipment and mining fixtures | 258,880 |
| Other cost of revenue | 2,693,278 |
| **General and administrative** | |
| Amortization of furniture and fixtures | 1,156 |
| Amortization of leasehold improvements | 18,154 |
| Travel, meals and entertainment | 33,184 |
| Professional fees | 523,893 |
| Office expenses | 95,252 |
| Other general and administrative expenses | 7,584 |
| **Marketing** | |
| Employee benefits | 34,375 |
| Other marketing expenses | 381,413 |
| **Research and development** | |
| Employee benefits | 12,500 |
| Other research and development expenses | 208,394 |
| **Operations** | |
| Employee benefits | 66,291 |
| Other operations expenses | 391,827 |
| **Trading** | |
| Employee benefits | 6,250 |
| Other trading expenses | 18,991 |

**CryptoGlobal Corp.**

## Notes to the Condensed Consolidated Interim Financial Statements
### [Expressed in Canadian dollars]
Unaudited

Three months ended March 31, 2018

**11. Financial instruments**

*Fair value hierarchy*

Financial instruments recorded at fair value are classified using a fair value hierarchy that reflects the significance of inputs used in making the measurements. The hierarchy is summarized as follows:

Level 1: Unadjusted quoted prices in active markets for identical assets and liabilities;
Level 2: Inputs other than quoted prices that are observable for the asset or liability either directly or indirectly from observable market data; and
Level 3: Inputs that are not based on observable market data.

The Company's financial instruments have been classified as follows:

| Financial assets as fair value through profit and loss | Level 1 $ | Level 2 $ | Level 3 $ |
|---|---|---|---|
| Cash | 3,165,708 | - | - |
| Total | 3,165,708 | - | - |

*Financial risk management*

The Company is exposed to various financial instrument risks and continuously assesses the impact and likelihood of this exposure. These risks include credit risk, liquidity risk, currency risk and price risk.  Where material these risks are reviewed and monitored by the Board of Directors.

*Credit risk*

Financial instruments that potentially subject the Company to a concentration of credit risk consist primarily of cash and amounts receivable. The Company limits its exposure to credit loss by placing its cash with high credit quality financial institutions. The majority of amounts receivable consists of HST refunds due from the Government of Canada. The carrying amount of financial assets represents the maximum credit exposure.

**CryptoGlobal Corp.**

## Notes to the Condensed Consolidated Interim Financial Statements
**[Expressed in Canadian dollars]**
Unaudited

Three months ended March 31, 2018

**11. Financial instruments (continued)**

*Liquidity risk*

Liquidity risk is the risk that the Company will not be able to meet its financial obligations as they fall due. The Company currently settles its financial obligations out of cash. The ability to do this relies on the Company scaling to become profitable or raising additional equity in excess of anticipated cash needs. All of the Company's liabilities are due in the next year.

*Currency risk*

As at March 31, 2018, a portion of the Company's financial assets are held in USD. The Company's objective in managing its foreign currency risk is to minimize its net exposure to foreign currency cash flows by transacting, to the greatest extent possible, with third parties in Canadian dollars. The Company does not currently use foreign exchange contracts to hedge its exposure of its foreign currency cash flows as management has determined that this risk is not significant at this point in time. The following USD amounts are presented in CAD to demonstrate the effect of changes in foreign exchange rates:

|  | March 31, 2018 | December 31, 2017 |
|---|---|---|
|  | $ | $ |
| Cash | 71,222 | 170,379 |
|  | 71,222 | 170,379 |
| Effect of +/- 10% change in exchange rate | 7,122 | 17,038 |

The significant exchange rates that have been applied include the following:

|  | Average rate | Quarter-end spot rate |
|---|---|---|
| 1 USD | 1.2750 | 1.2908 |

A reasonably possible strengthening (weakening) of the USD against the CAD at year end would have affected the measurement of financial instruments denominated in a foreign currency and affected equity and profit or loss by the amount shown above.

**CryptoGlobal Corp.**

## Notes to the Condensed Consolidated Interim Financial Statements
**[Expressed in Canadian dollars]**
Unaudited

Three months ended March 31, 2018

### 11. Financial instruments (continued)

*Capital management*

The Company's objectives when managing its capital are:
1. To maintain a flexible capital structure that optimizes the cost of capital at acceptable risk while providing an appropriate return to its shareholders;
2. To maintain a strong capital base so as to maintain investor, creditor and market confidence and to sustain future development of the business;
3. To safeguard the Company's ability to obtain financing should the need arise; and
4. To maintain financial flexibility in order to have access to capital in the event of future capital acquisitions.

The Company manages its capital structure and makes adjustments to it in accordance with the objectives stated above, as well as responds to changes in economic conditions and the risk characteristics of the underlying assets. The Company monitors the return on capital, which is defined as total shareholders' equity. The Company is not subject to externally imposed capital requirements.

### 12. Related party disclosures

*Subsidiaries*

The condensed consolidated interim financial statements include the results of the Company and the following subsidiaries: CG Mine 0 Inc. [100% equity interest], CryptoGlobal Acquisition Corporation [100% equity interest] and CG Crypto Holdings Inc. [100% equity interest].

*Transactions with key management and directors*

During the quarter ended March 31, 2018, 10,000 stock options were issued to a member of key management. These options vest half on the three month anniversary of the grant date and half on the six month anniversary of the grant date.

During the quarter ended March 31, 2018, 300,000 stock options were issued to directors of the Company. The options vest one third on each anniversary of the grant date.

As at March 31, 2018, the Company has a short-term loan payable to a director and member of key management in the amount of $1,040,000. The director and member of key management

**CryptoGlobal Corp.**

### Notes to the Condensed Consolidated Interim Financial Statements
**[Expressed in Canadian dollars]**
Unaudited

Three months ended March 31, 2018

made a payment on behalf of the Company and will be repaid within the next 12 months. The amount is non-interest bearing and has no fixed terms of repayment.

**13. Commitments and contingencies**

*Commitments*

The Company is committed to annual payments for rented premises as follows:

| | |
|---|---:|
| 2018 | 691,369 |
| 2019-2023 | 1,902,449 |
| Thereafter | - |
| **Total** | **2,593,818** |

During the quarter ended March 31, 2018, the Company entered into hosting agreements with service providers. Under these hosting agreements, the Company is committed to monthly payments of $643,595 ranging over a term of six months to one year.

*Contingent Liabilities*

The Company is in dispute with a supplier over net invoices in the amount of $595,883 for which the supplier has sought dispute resolution. The supplier has filed a claim in the amount of $715,784. The Company does not believe any amount to be payable on the claim or the original invoice.  However, the Company has accrued the original amount in accounts payable.

Subsequent to March 31, 2018, the Company was served with a statement of claim from previous employees of Blockchain Dynamics claiming damages of up to $600,000 plus potential accrued wages and benefits. The Company believes this claim is without merit and plans to vigorously defend its position.

**14. Segment information**

The Company operates in one industry and geographic segment; the digital currency mining industry with all current mining activities conducted in Canada.

**CryptoGlobal Corp.**

## Notes to the Condensed Consolidated Interim Financial Statements
### [Expressed in Canadian dollars]
Unaudited

Three months ended March 31, 2018

**15. Subsequent events**

On February 26, 2018, CryptoGlobal entered into a preliminary agreement to acquire BitCity Group ("BitCity") along with a transformational 100 MW, ten year Power Purchase Agreement and hosting agreement to build out a 40,000 square foot cryptocurrency mine in Ontario. The proposed acquisition would consist of $39,000,000 in common shares to be paid in three installments between September 1, 2018 and September 1, 2019 and a $1,000,000 cash payment to be paid between closing and June 1, 2018. The shares to be issued shall be based on the greater of current fair market value and the fair market value on the date of issuance.

On April 3, 2018, CryptoGlobal and HyperBlock Technologies Corp. ("HyperBlock") announced that they have entered into a proposed arrangement agreement (the "Arrangement Agreement") dated April 3, 2018 pursuant to which HyperBlock will acquire all of the issued and outstanding common shares of CryptoGlobal Corp. by way of an acquisition arrangement (the "Transaction"). Pursuant to the proposed Transaction, the parties will apply to list the combined company, which will operate under the name HyperBlock Technologies Corp., on the Canadian Securities Exchange on closing. The parties intend to promptly call the required meetings of shareholders of both HyperBlock and CryptoGlobal with the goal of completing the Transaction no later than the end of the second quarter in 2018, subject to the satisfaction of customary conditions to closing.

Under the proposed Transaction, HyperBlock will acquire all of the issued and outstanding shares of CryptoGlobal by issuing 0.4229 of a common share of HyperBlock for each CryptoGlobal common share.

On May 23, 2018, the Company terminated the preliminary agreement to acquire BitCity within the due diligence period.

Throughout the quarter and subsequently, the Company began to decommission its mining facility in Hamilton and as of April 23, 2018 it had fully surrendered its lease. The Company now operates in a Company run location in Quebec as well as various short-term colocation partner sites in Eastern Canada.

**CryptoGlobal Corp.**
**Interim Management's Discussion & Analysis**
**For the three months ended March 31, 2018**
**Dated – May 30, 2018**

The following interim Management's Discussion & Analysis ("Interim MD&A") of CryptoGlobal Corp. ("CryptoGlobal" or the "Company" or "the Corporation") for the three months ended March 31, 2018 constitutes management's review of the factors that affected the Company's financial and operating performance for the three months ended March 31, 2018. This MD&A was written to comply with the requirements of National Instrument 51-102 – Continuous Disclosure Obligations. This discussion should be read in conjunction with the audited annual consolidated financial statements of the Company for the period from incorporation on August 8, 2017 to December 31, 2017, together with the notes thereto, and unaudited condensed consolidated interim financial statements of the Company for the three months ended March 31, 2018, together with the notes thereto. Results are reported in Canadian dollars, unless otherwise noted. The Company's financial statements and the financial information contained in this Interim MD&A are prepared in accordance with International Financial Reporting Standards ("IFRS") as issued by the International Accounting Standards Board and interpretations of the IFRS Interpretations Committee. The unaudited condensed interim consolidated financial statements have been prepared in accordance with International Standard 34, Interim Financial Reporting. Accordingly, information contained herein is presented as of May 30, 2018, unless otherwise indicated.

For the purposes of preparing this Interim MD&A, management, in conjunction with the Board of Directors, considers the materiality of information. Information is considered material if: (i) such information results in, or would reasonably be expected to result in, a significant change in the market price or value of CryptoGlobal's common shares; (ii) there is a substantial likelihood that a reasonable investor would consider it important in making an investment decision; or (iii) it would significantly alter the total mix of information available to investors. Management, in conjunction with the Board of Directors, evaluates materiality with reference to all relevant circumstances, including potential market sensitivity.

Further information about the Company and its operations can be obtained from the offices of the Company or on SEDAR at **www.sedar.com**.

**Forward-looking statements**

Certain statements contained in this Interim MD&A may constitute forward-looking statements. These statements relate to future events or the Corporation's future performance. All statements, other than statements of historical fact, may be forward-looking statements.

Forward-looking statements are often, but not always, identified by the use of words such as "seek", "anticipate", "plan", "continue", "estimate", "expect", "may", "will", "project", "predict", "propose", "potential", "targeting", "intend", "could", "might", "should", "believe" and similar expressions. These statements involve known and unknown risks, uncertainties and

**CryptoGlobal Corp.**
**Interim Management's Discussion & Analysis**
**For the three months ended March 31, 2018**
**Dated – May 30, 2018**

other factors that may cause actual results or events to differ materially from those anticipated in such forward-looking statements. The Company believes that the expectations reflected in those forward-looking statements are reasonable but no assurance can be given that these expectations will prove to be correct and such forward-looking statements included in this Interim MD&A should not be unduly relied upon by investors as actual results may vary. These statements speak only as of the date of this Interim MD&A and are expressly qualified, in their entirety, by this cautionary statement. The Corporation's actual results could differ materially from those anticipated in these forward-looking statements as a result of various risk factors.

**Description of Business**

CryptoGlobal Inc. ("Old CryptoGlobal") was incorporated under the Ontario Business Corporations Act on August 8, 2017. The registered address and head office of the Old CryptoGlobal  and the Company, after the Apolo Transaction as discussed below is located at 388 Carlaw Avenue, Units 300 and 300A, Toronto, Ontario M4M 2T4.

The Company is a leading blockchain and financial technology company that includes custodial, proprietary trading, exchange, insights and content — underpinned by a diversified cryptocurrency mining operation. The Company continues to build out its crypto ecosystem that includes the creation, safeguarding, management and growth of crypto assets  as follows:

1) Self-mining of a diverse portfolio of digital currencies for the purpose of funding and growing operations, trading on the open market and providing shareholders with a regular return on their investment. The Company focuses on mining Bitcoin, DASH, Ethereum and Litecoin;
2) the provision of custodial services to hold and secure digital assets for others;
3) the supply and trading of asset management services of digital assets stored with the Company ;
4) access to an online cryptocurrency insights platform, a proprietary technology being developed by the Company.

The principal business of the Company is utilizing specialized equipment to solve complex computational problems to validate transactions on the blockchain. The Company receives digital currencies in exchange for this service and utilizes those funds to invest in growing the other core pillars of the business which include safeguarding, management and growth of crypto assets.

**Apolo Transaction**

Apolo Acquisition Corp. ("Apolo"), was incorporated under the Business Corporations Act (Ontario) on May 18, 2017 and was in the process for applying for status as a Capital Pool Company, as defined in Policy 2.4 of the TSX Venture Exchange (the "Exchange"). On August 16,

**CryptoGlobal Corp.**
**Interim Management's Discussion & Analysis**
**For the three months ended March 31, 2018**
**Dated – May 30, 2018**

2017, Apolo announced that it had completed its initial public offering and that it was now defined as a Capital Pool Corporation.

On January 25, 2018, a triangular amalgamation ("Amalgamation") was completed whereby Apolo shares were exchanged for CryptoGlobal Corp. shares on the basis of 3.938 Apolo shares for every CryptoGlobal share and Old CryptoGlobal shares were exchanged for CryptoGlobal shares on the basis of 1 CryptoGlobal Corp. share for every Old CryptoGlobal share. The Amalgamation effectively provided for the acquisition of all of the outstanding equity interests of Old CryptoGlobal by Apolo, indirectly through 2607715 Ontario Inc. ("Subco"), a wholly owned Ontario incorporated subsidiary of Apolo, in a transaction in which the security holders of Old CryptoGlobal received shares of CryptoGlobal Corp. and if applicable, convertible securities of CryptoGlobal Corp. The Amalgamation was accounted for as a reverse takeover ("RTO") and Old CryptoGlobal was identified as the acquirer for accounting purposes and the resulting condensed consolidated interim financial statements are presented as a continuance of Old CryptoGlobal. The comparative figures presented in the condensed consolidated interim financial statements after the RTO are those of Old CryptoGlobal. There is no comparative information available for the condensed consolidated interim statement of comprehensive loss and condensed consolidated interim statement of cash flows as Old CryptoGlobal was incorporated on August 8, 2017 and did not exist for the quarter ending March 31, 2017.

The percentage of ownership Apolo shareholders had in the combined entity is 2% after the issue of 2,958,354 CryptoGlobal shares. The fair value of the consideration in the RTO is equivalent to the fair value of the 2,958,354 CryptoGlobal shares controlled by original Apolo shareholders and 308,532 stock options to Apolo stock options holders. The fair value of the shares controlled by original Apolo shareholders was estimated to be $2,514,601 based on the fair market value of $0.85 per share on the date of January 25, 2018. The fair value of the stock options was estimated to be $212,373 using the Black-Scholes valuation model on the following assumptions: dividend yield 0%; volatility 208%; risk-free interest rate of 1.76%; and expected lives of 0.75 to 1.56 years.

On January 25, 2018, the TSX Venture Exchange approved the Proposed Transaction and Subco was renamed to CryptoGlobal Corp., which started trading on the TSXV on January 29, 2018.

**Acquisition of Blockchain Dynamics Inc.**

On March 29, 2018, CryptoGlobal acquired Blockchain Dynamics Inc. ("Blockchain Dynamics"), a full service platform offering security, custodial services, trading and staking across a diversified base of cryptocurrencies. Under the business combination, the Company and Blockchain Dynamics combined by way of a plan of arrangement, resulting in 10656178 Canada Inc. ("AcquisitionCo"), a wholly owned subsidiary of the Company, acquiring all of the issued and outstanding common shares of Blockchain Dynamics.

**CryptoGlobal Corp.**
**Interim Management's Discussion & Analysis**
**For the three months ended March 31, 2018**
**Dated – May 30, 2018**

Each common share of Blockchain Dynamics issued and outstanding immediately prior to the closing of the business combination, was exchanged for either 0.2859 of a CryptoGlobal common share.

This transaction has been accounted for as a business combination in accordance with IFRS 3, Business Combinations. Based on consideration of all relevant factors, including that the Company's Board of Directors of the combined entity has a majority of directors who were incumbent Company directors, CryptoGlobal has been identified as the acquirer. Accordingly, Blockchain Dynamics' net assets have been re measured at their individual fair values estimated as of March 29, 2018, and Blockchain Dynamics' financial results have been consolidated commencing from March 29, 2018.

The total purchase consideration for accounting purposes was $10,122,163, based on the fair value of the issued common shares and stock options as of March 29, 2018, the closing date of the transaction. Upon closing, Blockchain Dynamics was obligated to deliver at least $3,500,000 in working capital, of which $1,700,000 was required to be in cash and cash equivalents. The fair value of the common shares was determined using the market based measurement method and was based on the Company's share price on March 29, 2018 of $0.50. As the Company was obligated to replace the Blockchain Dynamics stock options under the terms of the transaction, the consideration includes the fair value of the replacement stock options that relate to services prior to the merger. The fair values of the replacement stock options were determined using the Black Scholes option pricing model using the following assumptions: expected life ranging from 3 months to 5 years, exercise price of $0.87, share price of $0.50, expected dividend yield of 0%, risk-free rate ranging from 1.12% - 1.96% and volatility ranging from 43% to 194%.

**Proposed Transactions**

Acquisition of BitCity Group

On February 26, 2018, CryptoGlobal announced an agreement to acquire the BitCity Group subjected to due diligence. This transaction has subsequently been terminated, effective May 23, 2018.

Proposed Financing

On March 1, 2018, CryptoGlobal agreed to enter into a secured credit facility with a strategic investor in the amount of up to CAD$15million. Subsequently management decided not to pursue this credit facility.

**CryptoGlobal Corp.**
**Interim Management's Discussion & Analysis**
**For the three months ended March 31, 2018**
**Dated – May 30, 2018**

The Transaction with HyperBlock

On April 3, 2018, CryptoGlobal Corp. and HyperBlock Technologies Corp. ("HyperBlock") announced that they have entered into a definitive arrangement agreement (the "Arrangement Agreement") dated April 3, 2018 pursuant to which HyperBlock will acquire all of the issued and outstanding common shares of CryptoGlobal by way of an acquisition arrangement (the "Transaction"). Pursuant to the Transaction, the parties will apply to list the combined company, which will operate under the name HyperBlock Technologies Corp., on the Canadian Securities Exchange on closing. The parties intend to call the required meetings of shareholders of both HyperBlock and CryptoGlobal on June 22, 2018, with the goal of completing the Transaction by the end of May 2018, subject to the satisfaction of customary conditions to closing.

The Transaction has been unanimously approved by the board of directors of each of CryptoGlobal and HyperBlock, and is supported by the management teams as well as the significant shareholders of both companies. All principal shareholders representing approximately 50% of current shares outstanding of the combined entity have entered into 30-180 day lock-ups. Certain Shareholders of both CryptoGlobal and HyperBlock have entered into irrevocable support agreements representing 58% and 50% of total shares outstanding of each entity respectively. Under the Transaction, HyperBlock will acquire all of the issued and outstanding shares of CryptoGlobal by issuing 0.4229 of a common share of HyperBlock for each CryptoGlobal common share, valuing each CryptoGlobal common share at $0.74, which represents a 48% premium to the closing price of $0.50 of CryptoGlobal's common shares on March 29, 2018, and a 31% premium to the 10-day VWAP of CryptoGlobal's common shares, on the TSX Venture Exchange (the "TSXV"). The implied value of CryptoGlobal's equity under the Transaction is approximately $106 million.

**Selected Annual Financial Information**

The following is selected financial data derived from the audited consolidated financial statements of the Company for the period from August 8, 2017 (date of incorporation) to December 31, 2017.

**CryptoGlobal Corp.**
**Interim Management's Discussion & Analysis**
**For the three months ended March 31, 2018**
**Dated – May 30, 2018**

| | Period from August 8, 2017 (date of incorporation) to December 31, 2017 |
|---|---|
| Net loss | $(1,433,384) |
| Net loss per share (basic and diluted) | $(0.02) |
| | **As at December 31, 2017** |
| Total assets | $25,449,794 |

- The net loss for the period  ended December 31, 2017, consisted primarily of (i) general and administrative of $545,631; (ii) operations of $135,611; (iii) share-based compensation of $90,343; (iv) research and development of $95,992; and (v) revenue of $56,238 offset by cost of revenue of $606,611;

**Financial Highlights**

The Company's revenue from operations was $1,616,161 during the 3 months ended March 31, 2018. The Company's cost of revenue was $2,952,158.  Cost of revenue consisted of power and amortization on mining equipment.

The Company's operational costs totaled $2,082,730.  General and administrative expenses were the largest expense category comprising of $679,223 of the total balance.  The majority of general and administrative expenses incurred related to professional fees incurred for its Amalgamation with Apolo Acquisition Corp and acquisition of Blockchain Dynamics.

The Company incurred non-cash adjustments including; (i) a fair value remeasurement loss on digital assets of $601,833 (ii) a  foreign exchange loss of $10,663 upon revaluing assets owned or  purchased and liabilities owed by the Company in US dollars (iii) $2,013,980 of RTO transaction costs and (iv) $709,959 business combination transaction costs.

The Company recorded a loss of $3,418,727 prior to the inclusion of non-cash items in the amount of $3,336,435 for a net loss for the period of $6,755,162.

**CryptoGlobal Corp.**
**Interim Management's Discussion & Analysis**
**For the three months ended March 31, 2018**
**Dated – May 30, 2018**

Since the Company has limited revenue from operations, the following is a breakdown of the material costs incurred in the period ended March 31, 2018:

| Material Cost | Three Months Ended March 31, 2018 |
|---|---|
| Cost of generating revenue (including amortization of mining equipment and power costs) (1) | $2,952,158 |
| General & administrative expenses | 679,223 |
| Marketing expenses | 415,788 |
| Research & development expenses | 220,894 |
| Other operating expenses | 458,118 |
| Trading | 25,241 |
| Share-based compensation expense | 283,466 |

(1)  Cost of revenue includes accrual of disputed invoice of $595,883. Please refer to Contingent Liabilities section below for details.

As the Company increases the number of machines mining, it expects to be profitable from its ongoing operations.  The Company's revenue from mining digital currencies is highly dependent upon the current market price of digital currencies and the Company's ability to transact with, and convert digital currencies. Management monitors the legal and regulatory environment surrounding digital currencies on an ongoing basis.

The Company's total assets at March 31, 2018 were $36,013,971.   This comprises of $20,845,720 invested in mining equipment and other capital assets either purchased or in production at March 31, 2018.

**Summary of Quarterly Results**

The Company was incorporated on August 8, 2017 and no quarterly financial statements were prepared. Please refer to Selected Annual Financial Information above for financial information for the period from August 8, 2017 to December 31, 2017.

**Outstanding Share Data**

As of the date of this Interim MD&A, the outstanding capital of the Company includes (i) 142,071,947 common shares of the Company issued and outstanding; (ii) Broker Warrants exercisable for the purchase of 615,000 common shares of the Company; and (iv) stock options exercisable for the purchase of 3,837,195 common shares of the Company.

**CryptoGlobal Corp.**
**Interim Management's Discussion & Analysis**
**For the three months ended March 31, 2018**
**Dated – May 30, 2018**

**Liquidity and Capital Resources**

As at March 31, 2018, the Company had current assets of $8,640,833 (as compared to $4,712,492 as at December 31, 2017) including; (i) a cash balance of $3,165,708 as compared to a cash balance of $4,241,891 as at December 31, 2017. The decrease is mainly due to cash used in operating activities of $5,429,679 offset by cash from investing activities of $3,123,898 including proceeds from the business combination of $3,130,668 and proceeds from reverse takeover of $711,925, offset by the purchase of mining equipment of $514,224 and the purchase of other capital assets of $204,471 along with cash from financing activities of $1,229,616, including advances from a related party of $1,040,000, proceeds from exercise of stock options of $119,000 and proceeds from exercise of broker warrants of $70,616 (ii) other receivables of $1,659,342 as compared to $6,303 as at December 31, 2017. These amounts are primarily related to HST receivable (iii) Pre-paid Expenses of $2,474,294 as compared to $368,134 as at December 31, 2017. The increase is primarily related to security deposits paid for power at the Company's colocation partner sites operated under short-term contracts and (iv) Digital Assets of $1,341,489 as compared with $96,164 of Digital Assets as at December 31, 2017.

The Company had current liabilities of $4,093,258 (as compared to $847,866 as at December 31, 2017) including; (i) Accounts Payable of $3,053,258 as compared to $847,866 as at December 31, 2017. The increase of Accounts Payable is mainly due to incurring of operating expenses during the three months ended March 31, 2018 and (ii) a related party loan of $1,040,000.

**Off-balance Sheet Arrangements**

The Company does not have any off-balance sheet arrangements from the date of its incorporation to the date of this Interim MD&A.

**Related Party Transactions**

Key management personnel include those persons having authority and responsibility for planning, directing, and controlling the activities of the Company.  The Company's key management currently consists of members of the Company's Board of Directors and corporate officers.

During the quarter ended March 31, 2018, 10,000 stock options were issued to a member of key management. These options vest half on the three month anniversary of the grant date and half on the six month anniversary of the grant date.

**CryptoGlobal Corp.**
**Interim Management's Discussion & Analysis**
**For the three months ended March 31, 2018**
**Dated – May 30, 2018**

During the quarter ended March 31, 2018, 300,000 stock options were issued to directors of the Company. The options vest one third on each anniversary of the grant date.

As at March 31, 2018, the Company has a short-term loan payable to a director and member of key management in the amount of $1,040,000. The director and member of key management made a payment on behalf of the Company and will be repaid within the next 12 months. The amount is non-interest bearing and has no fixed terms of repayment.

The amount is non-interest bearing and has no fixed terms of repayment.

**Commitments and Contingencies**

*Commitments*

The Company is committed to annual payments for rented premises as follows:

|  |  |
|---|---:|
| 2018 | 772,447 |
| 2019-2023 | 2,180,429 |
| Thereafter | - |
| **Total** | **2,952,876** |

During the quarter ended March 31, 2018, the Company entered into hosting agreements with certain colocation partners in Eastern Canada. Under these hosting agreements, the Company is committed to monthly payments of $603,898 ranging over a term of six months to one year. Upon completion of the HyperBlock transaction the Company intends to cycle off those locations tied to short term contracts into Company owned facilities at more attractive power rates as its internal Megawatt capacity scales. This process is currently underway.

*Contingent Liabilities*

The Company is in dispute with a supplier over net invoices in the amount of $595,883 for which the supplier has sought dispute resolution. The supplier has filed a claim in the amount of $715,784. The Company does not believe any amount to be payable on the claim or the original invoice. However, the Company has accrued the original amount in accounts payable.

Subsequent to March 31, 2018, the Company was served with a statement of claim from previous employees of Blockchain Dynamics claiming damages of up to $600,000 plus potential accrued wages and benefits. The Company believes this claim is without merit and plans to vigorously defend its position.

**CryptoGlobal Corp.**
**Interim Management's Discussion & Analysis**
**For the three months ended March 31, 2018**
**Dated – May 30, 2018**

**Financial Instruments and Other Instruments**

*Fair value hierarchy*

Financial instruments recorded at fair value are classified using a fair value hierarchy that reflects the significance of inputs used in making the measurements. The hierarchy is summarized as follows:

Level 1: Unadjusted quoted prices in active markets for identical assets and liabilities;
Level 2: Inputs other than quoted prices that are observable for the asset or liability either directly or indirectly from observable market data; and
Level 3: Inputs that are not based on observable market data.

The Company's financial instruments have been classified as follows:

| Financial assets as fair value through profit and loss | Level 1 $ | Level 2 $ | Level 3 $ |
|---|---|---|---|
| Cash | 3,165,708 | - | - |
| Digital Assets | $1,341,489 | | |
| Total | $4,507,197 | - | - |

*Financial risk management*

The Company is exposed to various financial instrument risks and continuously assesses the impact and likelihood of this exposure. These risks include credit risk, liquidity risk, currency risk and price risk.  Where material these risks are reviewed and monitored by the Board of Directors.

**Credit Risk**

Financial instruments that potentially subject the Company to a concentration of credit risk consist primarily of cash and amounts receivable. The Company limits its exposure to credit loss by placing its cash with high credit quality financial institutions. The majority of amounts receivable consists of HST refunds due from the Government of Canada. The carrying amount of financial assets represents the maximum credit exposure.

**Liquidity risk**

Liquidity risk is the risk that the Company will not be able to meet its financial obligations as they fall due. The Company currently settles its financial obligations out of cash. The ability to

**CryptoGlobal Corp.**
**Interim Management's Discussion & Analysis**
**For the three months ended March 31, 2018**
**Dated – May 30, 2018**

do this relies on the Company scaling to become profitable or raising additional equity in excess of anticipated cash needs. All of the Company's liabilities are due in the next year.

**Currency risk**

As at March 31, 2018, a portion of the Company's financial assets are held in USD. The Company's objective in managing its foreign currency risk is to minimize its net exposure to foreign currency cash flows by transacting, to the greatest extent possible, with third parties in Canadian dollars. The Company does not currently use foreign exchange contracts to hedge its exposure of its foreign currency cash flows as management has determined that this risk is not significant at this point in time. The following USD amounts are presented in CAD to demonstrate the effect of changes in foreign exchange rates:

|  | March 31, 2018 | December 31, 2017 |
|---|---|---|
|  | $ | $ |
| Cash | 71,222 | 170,379 |
|  | 71,222 | 170,379 |
| Effect of +/- 10% change in exchange rate | 7,122 | 17,038 |

The significant exchange rates that have been applied include the following:

|  | Average rate | Quarter-end spot rate |
|---|---|---|
| 1 USD | 1.2750 | 1.2908 |

A reasonable possible strengthening (weakening) of the USD against the CAD at year end would have affected the measurement of financial instruments denominated in a foreign currency and affected equity and profit or loss by the amount shown above.

**Capital Management**

The Company's objectives when managing its capital are:
1. to maintain a flexible capital structure that optimizes the cost of capital at acceptable risk while providing an appropriate return to its shareholders;
2. to maintain a strong capital base so as to maintain investor, creditor and market confidence and to sustain future development of the business;
3. to safeguard the Company's ability to obtain financing should the need arise; and
4. to maintain financial flexibility in order to have access to capital in the event of future capital acquisitions.

**CryptoGlobal Corp.**
**Interim Management's Discussion & Analysis**
**For the three months ended March 31, 2018**
**Dated – May 30, 2018**

The Company manages its capital structure and makes adjustments to it in accordance with the objectives stated above, as well as responds to changes in economic conditions and the risk characteristics of the underlying assets. The Company monitors the return on capital, which is defined as total shareholders' equity. The Company is not subject to externally imposed capital requirements.

**Accounting Policy Adoptions and Changes**

*IFRS 9 Financial Instruments ("IFRS 9")*

On July 24, 2014, the IASB issued the completed IFRS 9, Financial Instruments, (IFRS 9 (2014)) to come into effect on January 1, 2018 with early adoption permitted.

IFRS 9 (2014) includes finalized guidance on the classification and measurement of financial assets. Under IFRS 9, financial assets are classified and measured either at amortized cost, fair value through other comprehensive income ("FVOCI") or fair value through profit or loss ("FVTPL") based on the business model in which they are held and the characteristics of their contractual cash flows. IFRS 9 largely retains the existing requirements in IAS 39 Financial Instruments: recognition and measurement, for the classification and measurement of financial liabilities.

The Company adopted IFRS 9 in its consolidated financial statements on January 1, 2018.  Due to the nature of its financial instruments, the adoption of IFRS 9 had no impact on the opening accumulated deficit balance on January 1, 2018. The impact on the classification and measurement of its financial instruments is set out below.

All financial assets not classified at amortized cost or FVOCI are measured at FVTPL. On initial recognition, the Company can irrevocably designate a financial asset at FVTPL if doing so eliminates or significantly reduces an accounting mismatch.

A financial asset is measured at amortized cost if it meets both of the following conditions and is not designated at FVTPL: It is held within a business model whose objective is to hold the financial asset to collect the contractual cash flows associated with the financial asset instead of selling the financial asset for a profit or loss; its contractual terms give rise to cash flows that are solely payments of principal and interest. All financial instruments are initially recognized at fair value on the consolidated statement of financial position. Subsequent measurement of financial instruments is based on their classification. Financial assets and liabilities classified at FVTPL are measured at fair value with changes in those fair values recognized in the consolidated statement of loss and comprehensive loss for the year.  Financial assets classified at amortized cost and financial liabilities are measured at amortized cost using the effective interest method.

**CryptoGlobal Corp.**
**Interim Management's Discussion & Analysis**
**For the three months ended March 31, 2018**
**Dated – May 30, 2018**

The following table summarizes the classification and measurement changes under IFRS 9 for each financial instrument:

| Classification | IAS 39 | IFRS 9 |
|---|---|---|
| Cash | Loans and receivables (amortized cost) | Amortized cost |
| Due from related party | Loans and receivables (amortized cost) | Amortized cost |
| Other receivable | Loans and receivables (amortized cost) | Amortized cost |
| Accounts payable and accrued liabilities | Other financial liabilities (amortized cost) | Amortized cost |

The original carrying value of the Company's financial instruments under IAS 39 has not changed under IFRS 9.

**Critical Accounting Estimates and Judgments**

(i) Impairment of non-financial assets

Impairment exists when the carrying value of an asset exceeds its recoverable amount, which is the higher of its fair value less costs to sell and its value in use. These calculations are based on available data, other observable inputs and projections of cash flows, all of which are subject to estimates and assumptions. Recoverable amounts are also sensitive to assumptions about the future usefulness of in-process development and the related marketing rights. At the period end, management concluded that none of the Company's non-financial assets were impaired.

(ii) Income taxes

Uncertainties exist with respect to the interpretation of evolving tax regulations relating to digital assets, changes in tax laws, and the amount and timing of future taxable income. The Company has not recognized the value of any deferred tax assets in its statements of financial position.

The Company recognizes the tax benefit from an uncertain tax position only if it is more likely than not that the tax position will be sustained based on its technical merits. The Company measures and record the tax benefits from such a position based on the largest benefit that has a greater than 50% likelihood of being realized upon ultimate settlement. The Company's estimated liabilities related to these matters are adjusted in the period in which the uncertain tax position is effectively settled, the statute of limitations for examination expires or when

**CryptoGlobal Corp.**
**Interim Management's Discussion & Analysis**
**For the three months ended March 31, 2018**
**Dated – May 30, 2018**

additional information becomes available. The Company's liability for unrecognized tax benefits requires the use of assumptions and significant judgment to estimate the exposures associated with our various filing positions. Although the Company believes that the judgments and estimates made are reasonable, actual results could differ and resulting adjustments could materially affect our effective income tax rate and income tax provision.

Provisions for taxes are made using the best estimate of the amount expected to be paid based on a qualitative assessment of all relevant factors. The Company reviews the adequacy of these provisions at the end of the reporting period. However, it is possible that at some future date an additional liability could result from audits by taxing authorities. Where the final outcome of these tax-related matters is different from the amounts that were initially recorded, such differences will affect the tax provisions in the period in which such determination is made.

There is uncertainty regarding the taxation of cryptocurrency and the CRA may assess the Company differently from the position adopted. In addition, there is uncertainty with regards to GST/HST implications of cryptocurrency transactions.

(iii) Fair value measurement of broker warrants

The Company measures the cost of equity-settled transactions by reference to the fair value of the equity instruments at the date on which they are granted. Estimating fair value for broker warrants requires determining the most appropriate valuation model, which is dependent on the terms and conditions of the grant. This estimate also requires the determination of the most appropriate inputs to the valuation model including the expected life of the broker warrants, volatility and dividend yield and making assumptions about them. The assumptions and models used for estimating fair value for broker warrants are disclosed in note 8.

(iv) Accounting for Digital Assets

At present, there is limited guidance in IFRS on the recognition and measurement of Digital Assets. Noted below are the key policies used to account for these assets.

(v) Fair value of Digital Assets

Digital Assets are measured at fair value using the quoted price on www.coinmarketcap.com. Management considers this fair value to be a Level 2 input under IFRS 13 *Fair Value Measurement* fair value hierarchy as the price on this source represents an average of quoted prices on multiple digital currency exchanges. The Digital Assets are valued based on the closing price obtained from www.coinmarketcap.com ("Coin Market Cap") at the reporting period corresponding to the different Digital Assets mined by the Company. The Company is relying on

**CryptoGlobal Corp.**
**Interim Management's Discussion & Analysis**
**For the three months ended March 31, 2018**
**Dated – May 30, 2018**

the data available at www.coinmarketcap.com to be an accurate representation of the closing price for the different Digital Assets.

(vi) Useful life of mining equipment

Effective January 1, 2018, management is amortizing mining equipment over three years on a straight-line basis. This accounting policy was changed from a useful life of four years effective on January 1, 2018. The mining equipment is used to generate digital assets. The rate at which the Company generates digital currencies and, therefore, consumes the economic benefits of its mining equipment are influenced by a number of factors including the following:

- the complexity of the mining process which is driven by the algorithms contained within the digital assets open source software;

- the general availability of appropriate computer processing capacity on a global basis technological obsolescence reflecting rapid development in the mining machines such that more recently developed hardware is more economically efficient to run in terms of digital assets mined as a function of operating costs, primarily power costs (i.e., the speed of mining machines evolution in the industry) is such that later mining machines models generally have faster processing capacity combined with lower operating costs and a lower cost of purchase.

Based on the Company's, and the industry's, short life cycle to date, management is limited by the market data available. Furthermore, the data available also includes data derived from the use of economic modelling to forecast future digital assets and the assumptions included in such forecasts, including digital currencies' (such as Bitcoin and Ethereum) price and network difficulty, are derived from management's assumptions which are inherently judgmental. Based on current data available management has determined that the straight-line method of amortization over three years best reflects the current expected useful life of mining equipment. Management will review this estimate at each reporting date and will revise such estimates as and when data becomes available. The mining equipment has been assumed to have no residual value at the end of its useful life. Management will review the appropriateness of its assumption of nil residual value at each reporting date.

Management also assesses whether there are any indicators of impairment of mining equipment at the end of each reporting period and if any such indication exists, the Company will estimate the recoverable amount of its mining equipment

**CryptoGlobal Corp.**
**Interim Management's Discussion & Analysis**
**For the three months ended March 31, 2018**
**Dated – May 30, 2018**

(vii) Contingent liabilities

Management decision that no provision is needed for the contingency in note 13 represents management estimates and the eventual resolution of the liability may differ based on additional information and the occurrence of future events.

**Standards Issued But Not Yet Effective**

IFRS 16 was issued in January 2016 and requires lessees to recognize assets and liabilities for most leases. For lessors, there is little changed to the existing accounting in IAS 17 Leases.

The new standard is effective for annual periods beginning on or after January 1, 2019. Early adoption is permitted, provided the new revenue standard, IFRS 15, has been applied, or is applied at the same date as IFRS 16. The Company is in the process of assessing the impact of this standard on the Company's condensed consolidated interim financial statements.

**Risk Factors**

There have been no changes in the risk factors pertaining to the Company since the Company's filing statement dated January 17, 2018 (the "Filing Statement") and available on the Company's issuer profile on SEDAR at www.sedar.com. The disclosure in this MD&A is subject to, and should be read in conjunction with, the risk factors outlined in the Filing Statement.

**Subsequent Events**

On February 26, 2018, CryptoGlobal announced an agreement to acquire the BitCity Group subjected to due diligence. This transaction has subsequently been terminated, effective May 23, 2018.

On March 1, 2018, CryptoGlobal agreed to enter into a secured credit facility with a strategic investor in the amount of up to CAD$15million. Subsequently management decided not to pursue this credit facility.

On April 3, 2018, CryptoGlobal and HyperBlock Technologies Corp. ("HyperBlock") announced that they have entered into a proposed definitive arrangement agreement (the "Arrangement Agreement") dated April 3, 2018 pursuant to which HyperBlock will acquire all of the issued and outstanding common shares of CryptoGlobal Corp. by way of an acquisition arrangement (the "Transaction"). Pursuant to the proposed Transaction, the parties will apply to list the combined company, which will operate under the name HyperBlock Technologies Corp., on the Canadian Securities Exchange on closing. The parties intend to promptly call the required meetings of shareholders of both HyperBlock and CryptoGlobal with the goal of completing the

**CryptoGlobal Corp.**
**Interim Management's Discussion & Analysis**
**For the three months ended March 31, 2018**
**Dated – May 30, 2018**

Transaction no later than the end of the second quarter in 2018, subject to the satisfaction of customary conditions to closing.

Under the proposed Transaction, HyperBlock will acquire all of the issued and outstanding shares of CryptoGlobal by issuing 0.4229 of a common share of HyperBlock for each CryptoGlobal common share.

Throughout the quarter and subsequently, the Company began to decommission its mining facility in Hamilton and as of April 23, 2018 it had fully surrendered its lease. The Company now operates in a Company run location in Quebec as well as various short-term colocation partner sites in Eastern Canada.

**Additional Information**

Additional information relating to the Company, including a management information circular, is available on SEDAR at www.sedar.com.

# Apolo Acquisition Corp.
### (A Capital Pool Corporation)

## Audited Financial statements

### For the Period from the Date of Incorporation (May 18, 2017) to December 31, 2017
#### (In Canadian Dollars)

## Independent Auditors' Report

To the Shareholders of Apolo Acquisition Corp.
(A Capital Pool Corporation)

We have audited the accompanying financial statements of Apolo Acquisition Corp., which comprise the statement of financial position as at December 31, 2017 and the statements of loss and comprehensive loss, changes in shareholders' equity and cash flows for the period from the date of incorporation (May 18, 2017) to December 31, 2017, and a summary of significant accounting policies and other explanatory information.

*Management's Responsibility for the Financial Statements*

Management is responsible for the preparation and fair presentation of these financial statements, in accordance with International Financial Reporting Standards, and for such internal control as management determines is necessary to enable the preparation of financial statements that are free from material misstatement, whether due to fraud or error.

*Auditors' Responsibility*

Our responsibility is to express an opinion on these financial statements, based on our audit. We conducted our audit in accordance with Canadian generally accepted auditing standards. Those standards require that we comply with ethical requirements and plan and perform the audit to obtain reasonable assurance about whether the financial statements are free from material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the financial statements. The procedures selected depend on the auditors' judgment, including the assessment of the risks of material misstatement of the financial statements, whether due to fraud or error. In making those risk assessments, the auditor considers internal controls relevant to the entity's preparation and fair presentation of the financial statements, in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the entity's internal control. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of accounting estimates made by management, as well as evaluating the overall presentation of the financial statements.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

*Opinion*

In our opinion, the financial statements present fairly, in all material respects, the financial position of Apolo Acquisition Corp. as at December 31, 2017 and its financial performance and its cash flows for the period from the date of incorporation (May 18, 2017) to December 31, 2017, in accordance with International Financial Reporting Standards.

*MNP LLP*

Toronto, Ontario
April 30, 2018

Chartered Professional Accountants
Licensed Public Accountants



**Apolo Acquisition Corp.**
**Statement of Financial Position**
(in Canadian dollars)

| | December 31, 2017 |
|---|---|
| **Assets** | |
| Cash (including cash held in trust) | $ 837,006 |
| | **$ 837,006** |
| **Liabilities** | |
| Accrued liabilities | $  66,653 |
| | 66,653 |
| **Shareholders' Equity** | |
| Share capital, net of issuance costs (Note 3) | 844,121 |
| Contributed surplus | 79,641 |
| Deficit | (153,409) |
| | 770,353 |
| | **$ 837,006** |

*The accompanying notes are an integral part of these audited financial statements.*

Subsequent Events (Note 7)

**Approved by the Board** _____**Rob Segal**_____          _____**James Millership**_____
Director **(Signed)**                    Director **(Signed)**

1

**Apolo Acquisition Corp.**
**Statement of Loss and Comprehensive Loss**
**For the Period from the Date of Incorporation (May 18, 2017) to December 31, 2017**
(in Canadian dollars)

**Expenses**

| | | |
|---|---|---:|
| Professional fees | $ | 85,841 |
| Stock-based compensation | | 51,456 |
| Listing fees | | 13,136 |
| Donation expense | | 1,864 |
| Mailing fees | | 1,068 |
| Bank charges | | 44 |
| **Net loss and comprehensive loss for the period** | | **$ 153,409** |
| | | |
| **Loss per share** | | |
| Basic | $ | (0.04) |
| Diluted | $ | (0.04) |
| | | |
| **Weighted average number of common shares** | | |
| Basic | | 4,106,123 |
| Diluted | | 4,106,123 |

*The accompanying notes are an integral part of these audited financial statements.*

**Apolo Acquisition Corp.**
**Statement of Changes in Shareholders' Equity**
**For the Period from the Date of Incorporation (May 18, 2017) to December 31, 2017**
(in Canadian dollars)

| | Number of Shares | Share Capital | Contributed Surplus | Deficit | Shareholders' Equity |
|---|---|---|---|---|---|
| **Balance May 18, 2017** | - | $ - | $ - | $ - | $ - |
| Net loss for the period | - | - | - | (153,409) | (153,409) |
| Share subscriptions (Note 3) | 6,650,000 | 495,000 | - | - | 495,000 |
| Initial public offering (Note 3) | 5,000,000 | 500,000 | - | - | 500,000 |
| Offering costs | - | (150,879) | - | - | (150,879) |
| Stock based compensation (Note 3) | - | - | 79,641 | - | 79,641 |
| **Balance December 31, 2017** | **11,650,000** | **$ 844,121** | **$ 79,641** | **$ (153,409)** | **$ 770,353** |

*The accompanying notes are an integral part of these audited financial statements*

3

**Apolo Acquisition Corp.**
**Statement of Cash Flows**
**For the Period from the Date of Incorporation (May 18, 2017) to December 31, 2017**
(in Canadian dollars)

|  |  | **2017** |
|---|---|---|
| **Cash provided by (used in)** | | |
| **Operating** | | |
| Net loss | $ | (153,409) |
| Add back non-cash transactions: | | |
| Stock-based compensation | | 51,456 |
| Donation expense | | 1,864 |
| Changes in working capital: | | |
| Accrued liabilities | | 66,653 |
| **Cash used in operating activities** | | **(33,436)** |
| | | |
| **Financing** | | |
| Share subscription | | 995,000 |
| Offering costs | | (124,558) |
| **Cash used in financing activities** | | **870,442** |
| | | |
| **Net change in cash** | | **837,006** |
| | | |
| **Cash, end of period** | $ | **837,006** |

*The accompanying notes are an integral part of these audited financial statements.*

4

**Apolo Acquisition Corp.**
**Notes to the Audited Financial Statements**
December 31, 2017
(in Canadian dollars)

1.   **INCORPORATION AND NATURE OF OPERATIONS**

Apolo Acquisition Corp. (the "Company"), was incorporated under the *Business Corporations Act* (Ontario) on May 18, 2017 and was in the process for applying for status as a Capital Pool Company, as defined in Policy 2.4 of the TSX Venture Exchange (the "Exchange").  On August 16, 2017, the Company announced that it had completed its initial public offering and that it was now defined as a Capital Pool Corporation. See Note 3 for further details. On January 25, 2018, the Company completed its Qualifying Transaction. See Note 7 for further details.

The principal business of the Company was the identification and evaluation of assets or businesses with a view to completing a Qualifying Transaction ("QT").   At December 31, 2017, the Company had not commenced operations and had no assets other than cash (including cash held in trust).

The registered address and head office of the Company is located at 388 Carlaw Avenue, Unit 300, Toronto, Ontario, M4M 2T4.

On April 30, 2018, the Board of Directors approved the financial statements for the period from Date of Incorporation (May 18, 2017) to December 31, 2017.

2.   **SIGNIFICANT ACCOUNTING POLICIES**

**Statement of Compliance**

These audited financial statements, have been prepared in accordance with the International Financial Reporting Standards ("IFRS") issued by the International Accounting Standards Board ("IASB") and Interpretations of the International Financial Reporting Interpretations Committee ("IFRIC").

These financial statements have been prepared on an accrual basis and are based on historical costs, modified, where applicable, by the measurement at fair value of selected non-current assets, financial assets, and financial liabilities.

These financial statements are presented in Canadian dollars, which is the Company's functional and presentation currency.

**Use of Estimates and Judgments**

The preparation of these financial statements, in conformity with IFRS accounting principles, requires management to make certain estimates, judgments, and assumptions that affect the reported amounts of assets and liabilities, and the reported amounts of revenues and expenses during the period. Estimates and assumptions are continuously evaluated and are based on management's experience and other factors that are believed to be reasonable under the circumstances. Actual results could differ from those estimates used in the financial statements.

**Apolo Acquisition Corp.**
**Notes to the Audited Financial Statements**
December 31, 2017
(in Canadian dollars)

2.  **SIGNIFICANT ACCOUNTING POLICIES (continued)**

**Income Taxes**

Income tax comprises current and deferred tax. Income tax is recognized in profit or loss except to the extent that it relates to items recognized directly in equity or other comprehensive income, in which case the income tax is also recognized directly in equity or other comprehensive income.

Current income tax assets and liabilities for the current periods are measured at the amount expected to be recovered from or paid to the taxation authorities. The tax rates and tax laws used to compute the amount are those that are enacted or substantively enacted by the end of the reporting period. Current income tax relating to items recognized directly in equity is recognized in equity and not in the statement of comprehensive income.

Deferred tax is recognized in respect of all qualifying temporary differences arising between the tax bases of assets and liabilities and their carrying amounts in the financial statements. Deferred income tax is determined on a non-discounted basis using tax rates and laws that have been enacted or substantively enacted at the end of the reporting period and are expected to apply when the deferred tax asset or liability is settled. Deferred tax assets are recognized to the extent that it is probable that the assets can be recovered. Deferred tax assets and liabilities are offset when there is a legally enforceable right to offset current tax assets and liabilities and when the deferred tax balances relate to the same taxation authority.

**Share Capital**

Common shares are classified as equity. Incremental costs directly attributable to the issuance of shares are recognized as a deduction from equity.

**Basic and Diluted Loss per Share**

Basic loss per share is computed by dividing the net loss applicable to common shares by the weighted average number of common shares outstanding for the relevant period. Common shares escrowed pursuant to the requirements of the Exchange are excluded from the number of outstanding common shares.

Diluted loss per share is computed by dividing the net loss applicable to common shares by the sum of the weighted average number of common shares issued and outstanding and all additional common shares that would have been outstanding if potentially dilutive instruments were converted.

**Share-based Compensation**

Equity-settled share based payments for directors and officers are measured at fair value at the date of grant and recorded as compensation expense in the financial statements. Share options are measured at the fair value of each tranche on the grant date and are recognized in their respective vesting period using the Company's expected forfeiture rate. Any consideration paid by directors and officers on exercise of equity-settled share based payments is credited to share capital. Shares are issued from treasury upon the exercise of equity-settled share based instruments.

**Apolo Acquisition Corp.**
**Notes to the Audited Financial Statements**
December 31, 2017
(in Canadian dollars)

## 2.   SIGNIFICANT ACCOUNTING POLICIES (continued)

**Financial Instruments**

All financial instruments are recorded initially at fair value. In subsequent periods, all financial instruments are measured based on the classification adopted for the financial instrument: held to maturity, loans and receivables, fair value through profit or loss ("FVTPL"), available for sale, FVTPL liabilities or other liabilities.

FVTPL assets and liabilities are subsequently measured at fair value with the change in the fair value recognized in net income (loss) during the period.

Held to maturity assets, loans and receivables, and other liabilities are subsequently measured at amortized cost using the effective interest rate method.

Available for sale assets are subsequently measured at fair value with the changes in fair value recorded in other comprehensive income (loss), except for equity instruments without a quoted market price in an active market and whose fair value cannot be reliably measured, which are measured at cost.

The Company has classified its financial instruments as follows:

| **Financial Instrument** | **Classification** |
|---|---|
| Cash | Loans and Receivables |
| Accrued Liabilities | Other Liabilities |

## 3.   SHARE CAPITAL

<u>Authorized</u>

Unlimited common shares

Unlimited preferred shares

<u>Issued</u>

| | | |
|---|---|---|
| 11,650,000 common shares | $ | 844,121 |

**Escrowed Shares**

During the period from the Date of Incorporation (May 18, 2017) to December 31, 2017, the Company issued 3,400,000 common shares at $0.05 per share for total proceeds of $170,000. 3,400,000 of the issued and outstanding common shares were held in escrow pursuant to the requirements of the Exchange at December 31, 2017.

**Filing of Prospectus and Initial Public Offering**

On August 15, 2017, the Company completed its initial public offering (the "Offering") of 5,000,000 common shares at a purchase price of $0.10 per common share for aggregate gross proceeds of $500,000

**Apolo Acquisition Corp.**
**Notes to the Audited Financial Statements**
December 31, 2017
(in Canadian dollars)

3. **SHARE CAPITAL (continued)**

**Filing of Prospectus and Initial Public Offering (continued)**

Richardson GMP Limited (the "Agent") acted as agent for the initial public offering. In connection with the offering, the Agent received a cash commission equal to 10% of the aggregate gross proceeds from the sale of the common shares. In connection with the Offering, the Corporation also granted to the Agent non-transferable options to acquire up to an aggregate of 500,000 common shares (the "Agent's Options"). Each Agent's Option is exercisable to acquire one common share at a price of $0.10 for a period of 24 months following the date that the common shares are listed on the Exchange. The Agent's Options were valued on the date of issue using the Black-Scholes option pricing model with the following assumptions: dividend yield 0%, discount rate of 1.24%, expected volatility of 100%, and an expected life of two years. The value attributed to the 500,000 Agent's Options was $26,321.

**Private Placement**

On October 25, 2017, the Company completed a non-brokered private placement offering of 3,250,000 common shares at a price of $0.10 per common share for aggregate proceeds of $325,000.

**Options**

Upon the closing of the Offering, the Corporation issued 690,000 stock options to directors and officers (or companies controlled by them) and 25,000 charitable stock options to the Canadian Liver Foundation. Each stock option entitles the holder to acquire one common share of the Corporation at an exercise price of $0.10 any time on or before August 15, 2027 and in the case of the charitable stock options, any time after the earlier of August 15, 2027 and the 90th day following the date the holder ceases to be an Eligible Chartable Organization (as that term is defined in the policies of the Exchange). All of the options were valued on the date of issue using the Black-Scholes option pricing model with the following assumptions: dividend yield 0%, discount rate of 1.43%, expected volatility of 100%, and an expected life of five years. The value attributed the 690,000 stock options to directors and officers was $51,456. The value attributed to the 25,000 charitable stock options was $1,864.

As at December 31, 2017, 1,215,000 stock options were outstanding and exercisable with a weighted average exercise price of $0.10. The weighted average remaining contractual life of the agent options is 1.62 years and of the remaining options is 9.63.

4. **FINANCIAL RISK MANAGEMENT OBJECTIVES AND POLICIES**

**Capital Management**

The Company's objective when managing capital is to maintain its ability to continue as a going concern, in order to provide returns for the shareholders and benefits for other stakeholders. The Company includes equity, comprised of share capital, contributed surplus and deficit, in the definition of capital.

**Apolo Acquisition Corp.**
**Notes to the Audited Financial Statements**
December 31, 2017
(in Canadian dollars)

## 4.  FINANCIAL RISK MANAGEMENT OBJECTIVES AND (continued)

**Capital Management (continued)**

For the period ended December 31, 2017, the Company's primary objective, with respect to its capital management, was to ensure that it has sufficient cash resources to fund the identification and evaluation of potential acquisitions.

**Risk Disclosures and Fair Values**

The Company's financial instruments, consisting of cash and accrued liabilities, approximate fair value due to the relatively short-term maturities of the instruments. It is management's opinion that the Company is not exposed to significant interest, currency, or credit risks arising from these financial instruments.

## 5.  RELATED PARTY TRANSACTIONS

During the period ended December 31, 2017, the Company incurred legal fees of approximately $78,246 for services provided by a law firm whose partner is an officer of the Company.  $65,990 of these fees are included in professional fees and $12,256 are recorded in share issuance costs.  As at December 31, 2017, $61,653 is included in accounts payable and accrued liabilities for these services.

As a part of the initial public offering, $22,250 of share issuance costs capitalized were also paid to a law firm whose partner is an officer of the Company.

During the period ended December 31, 2017, stock based compensation paid to directors and officers of the Company (or companies controlled by them) totaled $51,456.

There were no other transactions with related parties during the period ended December 31, 2017.

## 6. INCOME TAXES

A reconciliation of combined federal and provincial corporate income taxes of statutory rates of 26.5% and the Company's effective income tax expense is as follows:

| Net loss for the period | $ | 153,409 |
|---|---|---|
| | | |
| Expected income tax recovery | | (40,650) |
| Share-based payments | | 13,640 |
| Deferred tax assets not recognized | | 27,010 |
| | | |
| **Income tax recovery** | **$** | **-** |

At December 31, 2017, the Company had a non-capital loss for income tax purposes of approximately $118,949 which can be carried forward to be applied against future taxable income. These losses expire to

**Apolo Acquisition Corp.**
**Notes to the Audited Financial Statements**
December 31, 2017
(in Canadian dollars)

**6. INCOME TAXES (continued)**

the extent that they are unutilized against future taxable income in 2037. The Company also had approximately $132,019 in undeducted share issuance costs which will be expensed for tax purposes over the next five years. The Company also had $1,864 of unutilized donation credits as of December 31, 2017.

The Company has not recorded deferred tax assets related to these unused carry forward losses and share issuance costs as it is not probable that future taxable profits will be available against which these can be deducted.

**7. SUBSEQUENT EVENTS**

On January 17, 2018, the Toronto Stock Venture Exchange ("TSX-V") conditionally accepted the Company's proposed Qualifying Transaction with CryptoGlobal Inc.

On January 25, 2018, the Company's Qualifying Transaction with CryptoGlobal Inc. was completed through a reverse take-over. Trading began on the TSX-V on January 29, 2018 under the ticker "CPTO".

**Apolo Acquisition Corp.**
**Management Discussion and Analysis**
**For the Period Ended December 31, 2017**

**April 30, 2018**

The following management discussion and analysis ("MD&A") of the results of the operations and financial position of Apolo Acquisition Corp. (the "Corporation" or "Apolo") prepared from the period of incorporation (May 18, 2017) to December 31, 2017 should be read in conjunction with the Corporation's audited financial statements for the period ended December 31, 2017. All figures contained in this MD&A are presented in Canadian dollars.

**Forward-Looking Statements**
Certain statements contained in this MD&A may constitute forward-looking statements. These statements relate to future events or the Corporation's future performance. All statements, other than statements of historical fact, may be forward-looking statements.

Forward-looking statements are often, but not always, identified by the use of words such as "seek", "anticipate", "plan", "continue", "estimate", "expect", "may", "will", "project", "predict", "propose", "potential", "targeting", "intend", "could", "might", "should", "believe" and similar expressions. These statements involve known and unknown risks, uncertainties and other factors that may cause actual results or events to differ materially from those anticipated in such forward-looking statements. The Corporation believes that the expectations reflected in those forward-looking statements are reasonable but no assurance can be given that these expectations will prove to be correct and such forward-looking statements included in this MD&A should not be unduly relied upon by investors as actual results may vary. These statements speak only as of the date of this MD&A and are expressly qualified, in their entirety, by this cautionary statement. The Corporation's actual results could differ materially from those anticipated in these forward-looking statements as a result of various risk factors.

**The Corporation**
The Corporation was incorporated under the Ontario Business Corporations Act on May 18, 2017 and was in the process for applying for status as a Capital Pool corporation, as defined in the Policy 2.4 of the TSX Venture Exchange (the "Exchange").  On August 16, 2017, the Company announced that it had completed its initial public offering and that it was now defined as a Capital Pool Corporation. On January 25, 2018, the Company completed its Qualifying Transaction.

The principal business of the Company was the identification and evaluation of assets or businesses with a view to completing a Qualifying Transaction ("QT").  At December 31, 2017,  the Company had not commenced operations and had no assets other than cash held in trust.

**The Corporation (continued)**

In a prospectus dated July 28, 2017, the Company offered to sell and issue 5,000,000 common shares at $0.10 per share ($500,000). The Company entered into an agreement with Richardson GMP Limited (the "Agent") to raise $500,000, in connection with the Company's IPO. The Company paid a cash commission of 10% of the aggregate gross proceeds to the Agent, and granted the Agent an option to acquire 10% of the common shares issued in the offering exercisable for a period ending twenty-four months from the date on which the Company's Common Shares are listed on the TSX Venture Exchange. The Agent Options were valued on the date of issue using the Black-Scholes option pricing model with the following assumptions: dividend yield 0%, discount rate of 1.24%, expected volatility of 100% and an expected life of two years. The value attributed to the 500,000 Agent Options was $26,321.

The registered address and head office of the Company is located at 388 Carlaw Avenue, Unit 300, Toronto, Ontario, M4M 2T4 Toronto, Ontario M5H 2V1.

On April 30, 2018 the Board of Directors approved the audited financial statements for the period ended December 31, 2017.

**Summary of Quarterly and Annual Results**

|  | December 31, 2017 | September 30, 2017 | June 30, 2017 | For the period ended December 31, 2017 |
|---|---|---|---|---|
| Total Assets | $837,006 | $529,762 | $156,475 | $837,006 |
| Total Revenues | nil | nil | nil | nil |
| Total Expenses | $52,301 | $101,108 | nil | $153,409 |
| Net Loss | $52,301 | $101,108 | nil | $153,409 |
| Basic and diluted net loss per share | $0.01 | $0.02 | nil | $0.04 |

**Results of Operations**
*Three months ended December 31, 2017*
The Corporation recorded a net loss of $52,301 during the three month period ended December 31, 2017. The net loss for the three month period ended December 31, 2017 is due mainly to costs in relation to its listing on the Exchange as well as share-based compensation.

**Additional Disclosure for Venture Issuers without Significant Revenue**

Since the Corporation has no revenue from operations, the following is a breakdown of the material costs incurred in the period from the date of incorporation (May 18, 2017) to December 31, 2017:

| Material Costs | Period from May 18, 2017 (date of incorporation) to December 31, 2017 |
|---|---|
| Professional fees | $85,841 |
| Share-based compensation | $51,456 |
| Listing fees | $13,136 |

**Liquidity and Capital Resources**

As at December 31, 2017, the Corporation had cash of $837,006. The Corporation had current liabilities of $66,653 and working capital of $770,353.

Cash flows of $870,442 were recorded from financing activities from the date of incorporation (May 18, 2017) to December 31, 2017. This is primarily due to cash inflow from the initial public offering completed and due to a private placement resulting in increased share subscriptions.

**Outstanding Share Data**

As of the date of this MD&A, there are no common shares issued and outstanding.

During the period from the Date of Incorporation (May 18, 2017) to December 31, 2017, the Company issued 11,650,000 common shares at $0.05 per share for total proceeds of $995,000.

At December 31, 2017, 3,400,000 of the issued and outstanding common shares were held in escrow pursuant to the requirements of the Exchange.

In a prospectus dated July 28, 2017, the Company offered to sell and issue 5,000,000 common shares at $0.10 per share ($500,000). The Company entered into an agreement with Richardson GMP Limited (the "Agent") to raise $500,000, in connection with the Company's IPO. The Company paid a cash commission of 10% of the aggregate gross proceeds to the Agent, and granted the Agent an option to acquire 10% of the common shares issued in the offering exercisable for a period ending twenty-four months from the date on which the Company's Common Shares are listed on the TSX Venture Exchange.

The Corporation's common shares commenced trading on the TSX Venture Exchange under the trading symbol "ACA.P" on August 15, 2017.

**Off-Balance Sheet Arrangements**

The Corporation has not had any off-balance sheet arrangements from the date of its incorporation to the date of this MD&A.

**Related Party Transactions**

During the period ended December 31, 2017, the Company incurred legal fees of approximately $78,246 for services provided by a law firm whose partner is an officer of the Company.  As at December 31, 2017, $61,653 is included in accounts payable and accrued liabilities for these services.

As a part of the initial public offering, $22,250 of share issuance costs capitalized were also paid to a law firm whose partner is an officer of the Company.

During the period ended December 31, 2017, stock based compensation paid to directors and officers of the Company totaled $51,456.

There were no other transactions with related parties during the period ended December 31, 2017.

**Capital Management**

For the period ended December 31, 2017, the Company's primary objective, with respect to its capital management, was to ensure that it has sufficient cash resources to fund the identification and evaluation of potential acquisitions.

**Risk Disclosures and Fair Values**

The Company's financial instruments, consisting of cash and accrued liabilities, approximate fair value due to the relatively short-term maturities of the instruments. It is management's opinion that the Company is not exposed to significant interest, currency or credit risks arising from these financial instruments.

**Critical Accounting Estimates**

The Corporation's significant accounting policies are summarized in Note 2 to the audited financial statements for the period ended December 31, 2017.

**Future Changes in Accounting Policies**

The following standards have been issued but are not yet effective:

  • IFRS 9 – Financial Instruments

The Corporation is currently evaluating the impact of the above standard on its financial performance and financial statement disclosures but expects that such impact will not be material.  There are additional new standards that have not been discussed as they are not expected to impact the Corporation.

**Subsequent Events**

On January 17, 2018, the Toronto Stock Venture Exchange ("TSX-V") conditionally accepted the Company's proposed Qualifying Transaction with CryptoGlobal Inc.

On January 25, 2018, the Company's Qualifying Transaction with CryptoGlobal Inc. was completed through a reverse take-over. Trading began on the TSX-V on January 29, 2018 under the ticker "CPTO".

**Additional Information**

For further detail, see the Corporation's audited financial statements for the period ended December 31, 2017.  Additional information about the Corporation can also be found on SEDAR.

**SCHEDULE E**
**UNAUDITED PRO FORMA CONDENSED CONSOLIDATED FINANCIAL STATEMENTS OF
THE ISSUER**

# HyperBlock Inc. (Formerly CryptoGlobal Corp.)

Unaudited pro forma consolidated statement of financial position as at February 28, 2018
(Expressed in US Dollars, unless otherwise noted)

| | CryptoGlobal Corp. (CDN $) | Consolidated CryptoGlobal Corp. | Project Spokane, LLC | HyperBlock Inc. | Note 5 | Adjustments | Total |
|---|---|---|---|---|---|---|---|
| | $ | $ | $ | $ | | $ | $ |
| **Assets** | | | | | | | |
| Current assets | | | | | | | |
| Cash and cash equivalents | 3,165,708 | 2,471,468 | 1,906,934 | 3,361,479 | | - | 8,780,144 |
| | | | | | (h) | 21,174,247 | |
| | | | | | (i) | (305,035) | |
| | | | | | (k) | (1,000,000) | |
| | | | | | (l) | (3,903,499) | |
| | | | | | (m) | (16,096,500) | |
| | | | | | (n) | 1,171,050 | |
| Digital assets | 1,341,489 | 1,047,300 | - | 988,898 | | - | 2,036,198 |
| Other receivables | 1,659,342 | 1,295,448 | - | - | | - | 1,295,448 |
| Deposits | - | - | 528,475 | - | | - | 528,475 |
| Inventories | - | - | 506,629 | - | | - | 506,629 |
| Accounts receivables | - | - | 61,186 | - | | - | 61,186 |
| Prepaid expenses | 2,474,294 | 1,931,681 | - | 161,999 | | - | 2,093,680 |
| Contract asset | - | - | 376,102 | - | | - | 376,102 |
| Total current assets | 8,640,833 | 6,745,897 | 3,379,326 | 4,512,376 | | 1,040,263 | 15,677,862 |
| | | | | | | | |
| Non-current assets | | | | | | | |
| Unallocated purchase price | 6,527,418 | 5,095,955 | - | - | (j) | 59,059,407 | 125,446,582 |
| | | | | | (m) | 61,291,220 | |
| Deposit on mining equipment | - | - | - | - | | - | - |
| Mining equipment, net | 20,241,818 | 15,802,787 | 3,200,806 | 9,191,319 | | - | 28,194,912 |
| Investment in goNumerical ltd. | - | - | - | - | (l) | 3,903,499 | 3,903,499 |
| Other capital assets, net | 603,902 | 471,466 | 4,754,862 | - | | - | 5,226,328 |
| Total assets | 36,013,971 | 28,116,105 | 11,334,994 | 13,703,695 | | 125,294,389 | 178,449,183 |
| | | | | | | | |
| **Liabilities** | | | | | | | |
| Current liabilities | | | | | | | |
| Accounts payable and accrued liabilities | 3,053,258 | 2,383,677 | 213,650 | 1,396,551 | | - | 3,993,878 |
| Contract liability | - | - | - | - | | - | - |
| Finance lease obligations | - | - | 59,097 | | | | 59,097 |
| Unearned revenue | - | - | 2,606,579 | - | | - | 2,606,579 |
| Promissory note | 1,040,000 | 811,928 | - | - | (m) | 3,903,500 | 4,715,428 |
| Total current liabilities | 4,093,258 | 3,195,605 | 2,879,326 | 1,396,551 | | 3,903,500 | 11,374,982 |
| | | | | | | | |
| Non-current liabilities | | | | | | | |
| Finance lease and other obligations | 29,215 | 22,808 | 98,062 | - | | - | 120,870 |
| Unearned revenue | - | - | 3,701,105 | - | | - | 3,701,105 |
| Total liabilities | 4,122,473 | 3,218,413 | 6,678,493 | 1,396,551 | | 3,903,500 | 15,196,957 |
| | | | | | | | |
| **Shareholders' Equity** | | | | | | | |
| Share capital | 39,460,638 | 30,806,920 | - | 12,691,493 | (c) | (30,806,920) | 162,553,990 |
| | | | | | (h) | 21,174,247 | |
| | | | | | (i) | (1,004,392) | |
| | | | | | (i) | 699,357 | |
| | | | | | (j) | 81,874,514 | |
| | | | | | (m) | 45,947,721 | |
| | | | | | (n) | 1,171,050 | |
| Warrants | 240,164 | 187,496 | - | - | (e) | (187,496) | 272,437 |
| | | | | | (j) | 272,437 | |
| Divisional equity | - | - | 4,656,501 | - | (d) | (4,656,501) | - |
| Contributed surplus | 379,242 | 296,074 | - | - | (f) | (296,074) | 1,810,148 |
| | | | | | (j) | 1,810,148 | |
| Deficit | (8,188,546) | (6,392,798) | - | (384,349) | (g) | 6,392,798 | (1,384,349) |
| | | | | | (k) | (1,000,000) | |
| Total shareholders' equity | 31,891,498 | 24,897,692 | 4,656,501 | 12,307,144 | | 121,390,889 | 163,252,226 |
| | | | | | | | |
| Total liabilities and shareholders' equity | 36,013,971 | 28,116,105 | 11,334,994 | 13,703,695 | | 125,294,389 | 178,449,183 |

*See accompanying notes to the unaudited pro forma financial statements*

# HyperBlock Inc. (Formerly CryptoGlobal Corp.)

Unaudited pro forma consolidated statement of income (loss) and comprehensive income (loss) for the period ended February 28, 2018
(Expressed in US Dollars, unless otherwise noted)

| | CryptoGlobal Corp. (CDN $) | Consolidated CryptoGlobal Corp. | Project Spokane, LLC | HyperBlock Inc. | Note 5 | Adjustments | Total |
|---|---|---|---|---|---|---|---|
| | | $ | $ | $ | | $ | $ |
| **Revenue** | | | | | | | |
| Mining revenue | 1,616,161 | 1,261,737 | 2,014,965 | 1,399,972 | | - | 4,676,674 |
| Realized gains on trading | - | - | - | - | | - | - |
| Hashrate sales | - | - | 1,578,594 | - | | - | 1,578,594 |
| Hardware sales | - | - | 4,172,302 | - | | - | 4,172,302 |
| Gain on disposition of hardware | - | - | 48,100 | - | | - | 48,100 |
| Hosting sales | - | - | 2,160,596 | - | | - | 2,160,596 |
| Total revenue | 1,616,161 | 1,261,737 | 9,974,557 | 1,399,972 | | - | 12,636,266 |
| | | | | | | | |
| **Cost of revenue** | | | | | | | |
| Depreciation of mining equipment | - | - | - | 456,736 | | - | 456,736 |
| Cost of revenue | 2,952,158 | 2,304,750 | 1,232,032 | 238,547 | (b) | 8,535 | 3,783,864 |
| Hardware sales | - | - | 1,156,800 | - | | - | 1,156,800 |
| Total cost of revenue | 2,952,158 | 2,304,750 | 2,388,832 | 695,283 | | 8,535 | 5,397,400 |
| | | | | | | | |
| **Gross profit** | (1,335,997) | (1,043,013) | 7,585,725 | 704,689 | | (8,535) | 7,238,866 |
| | | | | | | | |
| **Expenses** | | | | | | | |
| Professional fees | - | - | 8,349 | 248,270 | | - | 256,619 |
| Stock-based compensation | 283,466 | 221,302 | - | - | | - | 221,302 |
| Listing fees | 25,241 | 19,706 | - | - | | - | 19,706 |
| Donation expense | - | - | - | - | | - | - |
| Travel and meals | - | - | 31,021 | - | | - | 31,021 |
| Mailing fees | - | - | - | - | | - | - |
| Bank charges | - | - | - | - | | - | - |
| Operating expenses | 458,118 | 357,653 | - | - | | - | 357,653 |
| General and administrative | 679,223 | 530,269 | 82,868 | 77,372 | | - | 690,509 |
| Marketing | 415,788 | 324,606 | - | - | | - | 324,606 |
| Research and development | 220,894 | 172,452 | - | - | | - | 172,452 |
| Depreciation | - | - | 701,257 | - | | - | 701,257 |
| Hosting fees | - | - | - | - | | - | - |
| Salaries and wages | - | - | 552,953 | 75,363 | | - | 628,316 |
| Office and rent | - | - | 366,674 | - | | - | 366,674 |
| | | | | | | | |
| **Operating expenses** | 2,082,730 | 1,625,987 | 1,743,122 | 401,005 | | - | 3,770,114 |
| | | | | | | | |
| **Operating income (loss)** | (3,418,727) | (2,669,000) | 5,842,603 | 303,684 | | (8,535) | 3,468,752 |
| | | | | | | | |
| Other items | | | | | | | |
| Fair value remeasurement gain on digital assets | (601,833) | (469,851) | - | (411,074) | | - | (880,925) |
| Foreign exchange loss | (10,663) | (8,325) | - | 74,655 | | - | 66,330 |
| Transaction costs - acquisition | (2,723,939) | (2,126,579) | - | (351,614) | (k) | (1,000,000) | (3,478,193) |
| Interest income | - | - | - | - | | - | - |
| Net income (loss) and comprehensive income (loss) | (6,755,162) | (5,273,755) | 5,842,603 | (384,349) | | (1,008,535) | (824,036) |
| | | | | | | | |
| Weighted average number of common shares outstanding | | | | | | | 243,234,934 |
| Diluted weighted average number of common shares outstanding | | | | | | | 243,673,655 |
| | | | | | | | |
| Basic income per common share | | | | | | | (0.00) |
| Diluted income per common share | | | | | | | (0.00) |

*See accompanying notes to the unaudited pro forma financial statements*

# HyperBlock Inc. (Formerly CryptoGlobal Corp.)

Notes to Unaudited Pro Forma Consolidated Financial Statement
February 28, 2018
(Expressed in US Dollars, unless otherwise noted)

**1. Basis of presentation**

The unaudited pro forma consolidated financial statements have been prepared by management based on historical financial statements prepared in accordance with International Financial Reporting Standards ("IFRS"), for illustrative purposes only, after giving effect to the proposed transaction on the basis of the assumptions and adjustments described in notes 2, 3, 4 and 5.

The unaudited pro forma consolidated statement of financial position and statement of income (loss) and comprehensive income (loss) have been derived from:

(a)  the unaudited consolidated statement of financial position of CryptoGlobal Corp. ("Crypto Corp.") as at March 31, 2018;
(b)  the audited statement of financial position of HyperBlock Technologies Corp. ("HyperBlock") as at February 28, 2018;
(c)  the carve-out statement of financial position of Project Spokane, LLC ("Spokane") as at March 31, 2018; and
(d)  unless otherwise noted, the unaudited pro forma consolidated statement of financial position and its accompanying notes are presented in US dollars.

The unaudited pro forma consolidated statement of income (loss) and comprehensive income (loss) has been derived from:
(a)  the unaudited consolidated statement of loss and comprehensive loss of Crypto Corp. for the three month period to March 31, 2018;
(d)  the audited statement of loss and comprehensive loss of HyperBlock from the date of incorporation (October 10, 2017) to February 28, 2018;
(e)  the carve-out statement of income and comprehensive income of Spokane for the three month period ended March 31, 2018; and
(f)  unless otherwise noted, the unaudited pro forma consolidated statement of loss and comprehensive loss and its accompanying notes are presented in US dollars.

It is management's opinion that the unaudited pro forma financial statements, include all adjustments necessary for the fair presentation, in all material respects, of the transactions described in notes 3 and 4 in accordance with IFRS, applied on a basis consistent with HyperBlock's accounting policies, except as otherwise noted.  The unaudited pro forma financial statements are not necessarily indicative of the pro forma financial statements that would have resulted if the combination had actually occurred on February 28, 2018.

The unaudited pro forma financial statements should be read in conjunction with the historical financial statements and notes thereto of Crypto Corp, HyperBlock and Spokane, included elsewhere in this Listing Statement or on SEDAR.

**2. Significant accounting policies**

The unaudited pro forma financial statements have been compiled using the significant accounting policies, as set out in the audited consolidated financial statements of HyperBlock as at and for the year ended February 28, 2018.  Management has determined that no material pro forma adjustments are necessary to conform Crypto Corp. or Spokane accounting policies to the accounting policies used by HyperBlock in the preparation of its financial statements.

**3. The transaction**

a)  Crypto Corp. and HyperBlock have entered into a definitive arrangement agreement pursuant to which HyperBlock will acquire all of the issued and outstanding common shares of Crypto Corp.

b)  HyperBlock has entered into a purchase agreement with Spokane, pursuant to which HyperBlock will acquire certain assets and liabilities of Spokane in exchange for consideration comprised of cash, a promissory note, and shares in the capital of HyperBlock.

c)  Crypto Inc. has completed a reverse acquisition of Crypto Corp. (the "CryptoGlobal RTO") and Crypto Corp. has acquired Blockchain through the issuance of securities of Crypto Corp.

d)  Shareholders of Crypto Corp. will receive 0.4229 of a common share of HyperBlock in exchange for each common share held in Crypto Corp.

# HyperBlock Inc. (Formerly CryptoGlobal Corp.)

Notes to Unaudited Pro Forma Consolidated Financial Statement
February 28, 2018
(Expressed in US Dollars, unless otherwise noted)

e)   HyperBlock completed a private placement raising gross proceeds of $21,174,247 through the issuance of 15,498,360 subscription receipts at CAD$1.75 per subscription receipt. Each subscription receipt entitled the holder thereof to receive one common share in the capital of HyperBlock, for no additional consideration and without any further action on the part of the holder thereof, upon the satisfaction of the escrow release conditions. 511,890 subscription receipts were issued to the agents as commission for services provided in connection with the offering.

f)   HyperBlock and Crypto Corp. will amalgamate and continue as one corporation ("Amalco"). Each common share held in the capital of HyperBlock will be converted into one common share in the capital of Amalco.

g)   Upon completion of the arrangement (the "Arrangement Transaction"), the HyperBlock shareholders will hold approximately 75% of the issued and outstanding Amalco shares, deeming HyperBlock to be the acquirer for accounting purposes.

The Crypto Acquisition is subject, but not limited to, regulatory approval. Shareholder approval has already been received.

## 4.   Accounting for Arrangement Transaction

The transaction has been accounted for in accordance with IFRS 3 "Business Combinations", since the operations of Crypto Corp. constitute a business, which results in the following:

o   HyperBlock is deemed to be the acquirer and Crypto Corp. is deemed to be the acquiree for accounting purposes;

o   accordingly, HyperBlock's balances are accounted for at cost and Crypto Corp's balances are accounted for at fair value;

o   the capital structure recognized in the consolidated financial statements will be that of Crypto Corp., but the dollar amount of the issued share capital in the unaudited pro forma consolidated statement of financial position immediately prior to acquisition will be that of HyperBlock, plus the value of shares issued prior to or as part of the transaction.

## 5.   Pro forma assumptions and adjustments

The unaudited pro forma consolidated financial statements reflect the following assumptions and adjustments:

(a)   Crypto Corp. financial results were converted into US dollars at the February 28, 2018 exchange rate of 0.7807 on the statement of financial position and statement of loss and comprehensive loss.

**Reconciliation of Crypto Corp.'s current share capital:**

| | |
|---|---:|
| Crypto Corp. common shares outstanding - March 31, 2018 | 142,071,933 |
| Shares issued to vendors | 2,731,761 |
| Share capital post Crypto Corp., Crypto Inc. and Blockchain combination | 144,803,694 |
| Consolidation ratio for Crypto Corp. as part of Arrangement Transaction | 0.4229 |
| Total Crypto Corp. common shares post consolidation ratio | 61,237,482 |

(c)   An adjustment of $30,806,920 to eliminate Crypto Corp's historical share capital.

(d)   An adjustment of $4,656,501 to eliminate Spokane's divisional equity.

(e)   An adjustment of $187,496 to eliminate Crypto Corp's historical warrants.

(f)   An adjustment of $296,074 to eliminate Crypto Corp's historical contributed surplus after option exercise in 5(b).

(g)   An adjustment of $6,392,798 to eliminate Crypto Corp's historical deficit.

(h)   An adjustment of $21,174,247 to record HyperBlock's private placement of 15,498,360 common shares at CDN $1.75 per share.

(i)   An adjustment to recognize the $1,004,392 in broker commission paid in association with HyperBlock's private placement of which $699,357 was received through the issuance of 511,890 shares and $305,035 was paid in cash.

(j)   The allocation of the purchase price for the Arrangement Transaction has been prepared on a preliminary basis as the final purchase price allocation report had not been completed as of the date of these pro-forma financial statements. The identified assets and liabilities below are a result of management's best estimates and assumptions after taking into account all relevant information available. The final purchase price allocation may result in adjustments to the preliminary estimate of the purchase date fair values disclosed in the table below.

# HyperBlock Inc. (Formerly CryptoGlobal Corp.)

Notes to Unaudited Pro Forma Consolidated Financial Statement
February 28, 2018
(Expressed in US Dollars, unless otherwise noted)

| | | |
|---|---|---:|
| Share consideration transferred (61,237,482 shares on a post-consolidation (142,071,947 pre-consolidation) basis at a price of $1.34 per share) | $ | 81,874,514 |
| Warrant consideration transferred (260,083 warrants on a post-consolidation (615,000 pre-consolidation) basis at an average fair value of $1.05 per warrant) (1) | | 272,437 |
| Option consideration transferred (1,905,314 options on a post-consolidation (4,505,355 pre-consolidation) basis at an average fair value of $0.95 per option) (2) | | 1,810,148 |
| Total value | $ | 83,957,099 |
| | | |
| Cash and cash equivalents | $ | 2,471,468 |
| Other receivables | | 1,295,448 |
| Prepaid expenses | | 1,931,681 |
| Digital assets | | 1,047,300 |
| Deposit on mining equipment | | - |
| Mining equipment | | 15,802,787 |
| Capital assets | | 471,466 |
| Accounts payable and accrued liabilities | | (2,383,677) |
| Promissory note | | (811,928) |
| Finance lease obligations | | (22,808) |
| Unallocated purchase price - original | | 5,095,955 |
| Unallocated purchase price - additional | | 59,059,407 |
| | $ | 83,957,099 |

(1) Valued using the Black-Scholes Option Pricing Model with a share price of $1.37, volatility of 165%, risk free rate of 1.78%, expected life of 1.68 years and dividend yield of 0%.
(2) Valued using the Black-Scholes Option Pricing Model with a share price of $1.37, volatility of 165%, risk free rate of 2.04%, weighted average expected life of 3.8 years and dividend yield of 0%.

As the consolidated statement of financial position for Crypto Corp. is already included, the only adjustments required are for the payment of the purchase price and the elimination of all items in shareholders equity. Tax effects of these transactions have not been presented in the purchase price allocation, and any effects are currently considered part of the unallocated purchase price.

(k) An adjustment of $1,000,000 to record the transaction costs associated with the Arrangement Transaction and to normalize accounts payble

(l) An adjustment of $3,903,499 related to a minority investment in goNumerical ltd.

(m) As part of the transaction, the acquisition of the assets of Spokane was completed. This acquisition has been accounted for in accordance with IFRS 3 "Business Combinations", as their operations constitutes a business. The allocation of the purchase price has been prepared on a preliminary basis as the final purchase price allocation report had not been completed as of the date of these pro-forma financial statements. The identified assets and liabilities below are a result of management's best estimates and assumptions after taking into account all relevant information available. The final purchase price allocation may result in adjustments to the preliminary estimate of the purchase date fair values disclosed in the table below.

# HyperBlock Inc. (Formerly CryptoGlobal Corp.)

Notes to Unaudited Pro Forma Consolidated Financial Statement
February 28, 2018
(Expressed in US Dollars, unless otherwise noted)

| **Purchase Price:** | |
|---|---|
| Cash payment (Spokane has agreed to reinvest CAD$5,679,999.50 into the private placement in note 5(h)) | 16,096,500 |
| Promissory note (CAD$5,000,000, secured note) | 3,903,500 |
| Shares issued (34,366,283 shares issued) | 45,947,721 |
| **Total purchase price** | 65,947,721 |
| | |
| **Fair value of net assets acquired:** | |
| Cash and cash equivalents | 1,906,934 |
| Receivables | 61,186 |
| Contract asset | 376,102 |
| Deposits | 528,475 |
| Inventories | 506,629 |
| Mining equipment, net | 3,200,806 |
| Other capital assets, net | 4,754,862 |
| Accounts payable and accrued liabilities | (213,650) |
| Contract liability | - |
| Finance lease obligations | (157,159) |
| Unearned revenue | (6,307,684) |
| | 4,656,501 |
| | |
| Unallocated purchase price | 61,291,220 |

As the statement of financial position for Spokane is already included, the only adjustments required are for the payment of the purchase price and the elimination of all items in shareholders equity. Tax effects of these transactions have not been presented in the purchase price allocation, and any effects are currently considered part of the unallocated purchase price.

(n)   As part of the transaction, 2,500,000 shares were issued to service providers in the amount of $1,171,050

**6.   Pro forma share capital**

| (presented on a post-consolidation basis) | Number | | Amount |
|---|---|---|---|
| HyperBlock's common shares outstanding - February 28, 2018 | 129,120,919 | $ | 12,691,493 |
| Common shares issued to Crypto Corp's shareholders, post-consolidation as per note 5(j) | 61,237,482 | | 81,874,514 |
| Common shares issued under financing as per note 5(h) | 15,498,360 | | 21,174,247 |
| Common shares issued as broker commission per note 5(i) | 511,890 | | 699,357 |
| Common shares issued to Spokane per note 5(l) | 34,366,283 | | 45,947,721 |
| Common shares issued to consultants for services performed | 2,500,000 | | 1,171,050 |
| Share issue costs per note 5(i) | - | | (1,004,392) |
| Pro forma share capital - February 28, 2018 | **243,234,934** | | **162,553,990** |

# HyperBlock Inc. (Formerly CryptoGlobal Corp.)

Notes to Unaudited Pro Forma Consolidated Financial Statement
February 28, 2018
(Expressed in US Dollars, unless otherwise noted)

**7. Pro forma contributed surplus**

| (presented on a post-consolidation basis) | Amount |
|---|---|
| HyperBlock's contributed surplus - February 28, 2018 | $ - |
| Valuation of options in Crypto Corp. at the transaction date as per note 5(j) | 1,810,148 |
| Pro forma contributed surplus - February 28, 2018 | **$ 1,810,148** |

**8. Pro forma warrants**

| (presented on a post-consolidation basis) | Number | Amount |
|---|---|---|
| HyperBlock's warrants - February 28, 2018 | - | - |
| Valuation of warrants issued to Crypto Corp. warrant holders at the transaction date per note 5(j) | 260,083 | 272,437 |
| Pro forma warrants - February 28, 2018 | **260,083** | **$ 272,437** |

**9. Pro forma stock options**

| (presented on a post-consolidation basis) | Weighted average remaining life (yrs) | Number outstanding | Number vested | Exercise price |
|---|---|---|---|---|
| | 4.70 | 475,762 | 475,762 | $ 1.16 |
| | 4.87 | 382,973 | 382,973 | 1.57 |
| | 4.91 | 592,059 | 592,059 | 1.57 |
| | 0.91 | 2,685 | 2,685 | 0.72 |
| | 5.00 | 56,423 | 56,423 | 1.61 |
| | 5.00 | 395,412 | 395,412 | 0.34 |
| Pro forma stock options - February 28, 2018 | | **1,905,314** | **1,905,314** | **1.21** |

**10. Pro forma deficit**

| | Amount |
|---|---|
| HyperBlock's deficit | $ 384,349 |
| To record estimated transaction costs per note 5(j) | 1,000,000 |
| Pro forma deficit - February 28, 2018 | **$ 1,384,349** |

**11. Pro forma income taxes**

HyperBlock expects to have an effective pro forma income tax rate of 26.5%.

### SCHEDULE F
### POST-CLOSING CAPITALIZATION OF THE ISSUER

The following table sets forth the pro forma consolidated capitalization of the Issuer as of the date of this Listing Statement.

| | Number of Securities (non-diluted) | Number of Securities (fully-diluted) | % of Issued (non-diluted) | % of Issued (fully diluted) |
|---|---|---|---|---|
| Public Float | | | | |
| Total outstanding (A) | 243,234,934 | 245,400,331 | N/A | N/A |
| Held by Related Persons or employees of the Issuer or Related Person of the Issuer, or by persons or companies who beneficially own or control, directly or indirectly, more than a 5% voting position in the Issuer (or who would beneficially own or control, directly or indirectly, more than a 5% voting position in the Issuer upon exercise or conversion of other securities held) (B) | 75,534,848 | 75,718,141 | 31.05% | 30.85% |
| Total Public Float (A-B) | 167,700,086 | 169,682,190 | 68.95% | 69.15% |
| Freely-Tradeable Float | | | | |
| Number of outstanding securities subject to resale restrictions, including restrictions imposed by pooling or other arrangements or in a shareholder agreement and securities held by control block holders (C) | 112,750,415 | 112,933,708 | 46.35% | 46.02% |
| Total Tradeable Float (A-C) | 130,484,519 | 132,466,623 | 53.65% | 53.98% |

## Public Securityholders (Registered)
**Class of Security**

| Size of Holding | Number of holders | Total number of securities |
|---|---|---|
| 1 – 99 securities | 0 | 0 |
| 100 – 499 securities | 1 | 359 |
| 500 – 999 securities | 0 | 0 |
| 1,000 – 1,999 securities | 0 | 0 |
| 2,000 – 2,999 securities | 26 | 31,865 |
| 3,000 – 3,999 securities | 0 | 0 |
| 4,000 – 4,999 securities | 34 | 95,243 |
| 5,000 or more securities | 364 | 174,280,689 |

**Public Securityholders (Beneficial)**
Class of Security

| Size of Holding | Number of holders | Total number of securities |
|---|---|---|
| 1 – 99 securities | 264 | 6,663 |
| 100 – 499 securities | 1,017 | 205,362 |
| 500 – 999 securities | 469 | 231,402 |
| 1,000 – 1,999 securities | 407 | 443,311 |
| 2,000 – 2,999 securities | 93 | 177,477 |
| 3,000 – 3,999 securities | 0 | 0 |
| 4,000 – 4,999 securities | 263 | 747,418 |
| 5,000 or more  securities | 500 | 22,427,926 |

**Non-Public Securityholders (Registered)**
Class of Security

| Size of Holding | Number of holders | Total number of securities |
|---|---|---|
| 1 – 99 securities | 0 | 0 |
| 100 – 499 securities | 0 | 0 |
| 500 – 999 securities | 0 | 0 |
| 1,000 – 1,999 securities | 0 | 0 |
| 2,000 – 2,999 securities | 0 | 0 |
| 3,000 – 3,999 securities | 0 | 0 |
| 4,000 – 4,999 securities | 0 | 0 |
| 5,000 or more  securities | 10 | 83,938,292 |

The following table sets forth the securities convertible or exchangeable for Issuer Shares as at the date of this Listing Statement.

| Description of Security (include conversion / exercise terms, including conversion / exercise price) | Number of convertible / exchangeable securities outstanding | Number of listed securities issuable upon conversion / exercise |
|---|---|---|
| Issuer Options[1] | 1,905,314 | 1,905,314 |
| Issuer Warrants[2] | 260,083 | 260,083 |

Notes:

(1) See the "Options to Purchase Securities" section in the Listing Statement for a description of the exercise terms and exercise price of the Issuer Options.

(2) See the "Options to Purchase Securities" section in the Listing Statement for a description of the exercise terms and exercise price of the Issuer Warrants.