# EXHIBIT I

*Nelson et al. v. Walsh et al.*

Case No. 9:20-cv-00082-DWM

PRIORITY AGREEMENT

This Priority Agreement is dated as of June 14, 2019 and made between:

(1)   **SEAN WALSH**, an individual ("**Lender A**");

(2)   **PROJECT SPOKANE, LLC**, a Colorado limited liability company ("**Lender B**"); and

(3)   **HYPERBLOCK LLC**, a Delaware limited liability company and **HYPERBLOCK INC.**, an Ontario corporation (collectively, the "**Corporation**").

**RECITALS:**

(A)   Lender A has agreed to make a certain credit facility available to the Corporation upon the terms and conditions contained in a secured promissory note between the Corporation and Lender A dated as of June 14, 2019 (such secured promissory note, as it may at any time or from time to time, be amended, supplemented, restated or replaced, the "**Lender A Note**").

(B)   Lender B has also agreed to make a certain credit facility available to the Corporation upon the terms and conditions contained in a secured promissory note between the Corporation and Lender B dated as of July 10, 2018 (such secured promissory note, as it may at any time or from time to time, be amended, supplemented, restated or replaced, the "**Lender B Note**").

(C)   The Corporation has granted each of the Lenders security over all of its all property and assets as security for the payment and performance of the Corporation's obligations to the Lenders under the Lender A Note, the Lender B Note and the credit documents relating thereto.

(D)   The parties are entering into this Agreement to confirm the *pari passu* ranking of the Lender A Security and the Lender B Security.

**NOW THEREFORE** in consideration of the foregoing premises and other good and valuable consideration, the receipt and sufficiency of which are acknowledged, the parties agree as follows.

### Article 1 – Definitions

**1.1   Definitions**

In this Agreement, unless the context otherwise requires, words and expressions have the following meanings.

"**Agreement**" means this priority agreement, as it may be amended, supplemented, restated or replaced from time to time.

"**Business Day**" means any day of the year other than a Saturday, Sunday or other day on which banks are required or authorized to close in Toronto, Ontario.

"**Collateral**" means all of the property and assets of the Corporation at any time and from time to time.

"**Enforcement Action**" means any one or more of the following actions: (a) enforcement of Obligations owed to a Person by the exercise of any right or remedy under any document securing such Obligations, or the exercise of any other right or remedy available to such Person at

law or in equity or under any other agreement including any right of set-off or compensation, (b) foreclosure upon, levy against, quit claim or acceptance of a debt in lieu of foreclosure upon, or any other exercise of rights or remedies against, or in respect of, the Collateral pursuant to security, by way of judicial action or otherwise, or (c) the initiation of any proceeding under Insolvency Legislation involving the Corporation.

**"Event of Default"** means any of the events specified or defined as events of default under the Lender Documents.

**"Insolvency Legislation"** means the *Bankruptcy and Insolvency Act* (Canada), the *Companies' Creditors Arrangement Act* (Canada), the *Personal Property Security Act* (Ontario), the *United States Bankruptcy Code* and any similar statute or law in any applicable jurisdiction.

**"Lender Credit Agreements"** means the Lender A Note and the Lender B Note or either of them, as the context requires.

**"Lender Debt"** means the Lender A Debt and the Lender B Debt or either of them, as the context requires.

**"Lender Documents"** means the Lender A Note, the Lender A Security, the Lender B Note, the Lender B Security and all agreements, instruments and certificates delivered in connection therewith.

**"Lender A Debt"** means all Obligations owed to Lender A from time to time, including all Obligations arising pursuant to the Lender A Note.

**"Lender A Security"** means all security instruments (including all mortgages, pledges and security agreements) securing all or any part of the Lender A Debt, as such security instruments may be amended, modified, restated, supplemented, renewed or replaced from time to time.

**"Lender B Debt"** means all Obligations owed to Lender B from time to time, including all Obligations arising pursuant to the Lender B Note.

**"Lender B Security"** means all security instruments (including all mortgages, pledges and security agreements) securing all or any part of the Lender B Debt, as such security instruments may be amended, modified, restated, supplemented, renewed or replaced from time to time.

**"Lenders"** means Lender A and Lender B or either of them, as the context requires, and includes their successors and permitted assigns.

**"Obligations"** means all debts, liabilities and obligations of the Corporation now or hereafter existing, of any and every nature whatsoever, whether direct or indirect, absolute or contingent, matured or unmatured and whether as principal, guarantor or surety.

**"Person"** means a natural person, partnership, limited partnership, corporation, unlimited liability company, limited liability company, trust, fund, unincorporated organization, joint venture, syndicate and governmental authority and pronouns have a similar extended meaning.

**"Security"** means all security instruments (including all mortgages, pledges and security agreements) securing all or any part of the Obligations owed to any Person including the Lender A Security and the Lender B Security.

1.2 **Gender and Number**

Any reference in this Agreement to gender includes all genders, and words importing the singular include the plural and *vice versa*.

1.3 **Headings, etc.**

The division of this Agreement into articles and sections and the insertion of headings are for convenient reference only and are not to affect or be used in the construction or interpretation of this Agreement.

**Article 2 – Consents and Subordination**

2.1 **Consents to Security**

(a) Subject to compliance by Lender B with the provisions of this Agreement, Lender A hereby consents to the creation, execution, delivery and registration, filing and perfection of the Lender B Security and confirms that its existence is not prohibited by any agreement between the Corporation and Lender A including any documentation delivered in connection with the Lender A Debt.

(b) Subject to compliance by Lender A with the provisions of this Agreement, Lender B hereby consents to the creation, execution, delivery and registration, filing and perfection of the Lender A Security and confirms that its existence is not prohibited by any agreement between the Corporation and Lender B including any documentation delivered in connection with the Lender B Debt.

2.2 **Pari Passu Ranking**

The Lender A Security and the Lender B Security and all rights arising therefrom rank and are enforceable in all respects and for all purposes on a *pari passu* basis without preference or priority of the Security of one Lender over the Security of the other Lender.

2.3 **Effect of Ranking**

The rights of Lender A and Lender B and the *pari passu* ranking of the Lender A Security and the Lender B Security shall prevail in all circumstances irrespective of:

(a) the time or order of creation, execution, delivery, attachment or perfection of the Lender A Security or the Lender B Security;

(b) the method of perfection of the Lender A Security or the Lender B Security;

(c) the time or order of registration or filing of financing statements, or other recordings of the Lender A Security or the Lender B Security;

(d) the giving of, or failure to give, notice to the Corporation or to any other Person or the timing of the giving of any such notice;

(e) the date or dates of any existing or future advance or other credit accommodation granted by Lender A or Lender B to the Corporation;

- (f) the date or dates of any default by the Corporation in respect of the Lender A Debt, the Lender B Debt, the Lender A Security or the Lender B Security;

- (g) the date of crystallization of any floating charge contained in the Lender A Security or the Lender B Security; or

- (h) the priorities otherwise accorded to the Lender A Security or the Lender B Security by any applicable laws.

## 2.4 Mutual Subordination

- (a) Lender A hereby postpones, subordinates and cedes rank to and in favour of Lender B in respect of the Lender A Security to the extent necessary to give effect to the *pari passu* ranking and sharing referred to in this Agreement.

- (b) Lender B hereby postpones, subordinates and cedes rank to and in favour of Lender A in respect of the Lender B Security to the extent necessary to give effect to the *pari passu* ranking and sharing referred to in this Agreement.

## 2.5 Representations and Warranties of the Lenders

Each of the Lenders covenants, represents and warrants to the other in respect of itself only that:

- (a) there are no Obligations owed to it except for its Lender Debt arising pursuant to its Lender Note, the outstanding principal amount of which, at the date hereof, is set out in Schedule A; and

- (b) there are no mortgages, liens or security interests affecting any Collateral held by or on its benefit except for those mortgages, liens and security interests identified in Schedule A.

## 2.6 Covenants of the Lenders

- (a) A Lender may not assign or transfer its Security, in whole or in part, to any Person unless such Person enters into a written agreement with the remaining Lender pursuant to which the proposed assignee agrees to be bound by the terms of this Agreement on terms and conditions satisfactory to the remaining Lender, acting reasonably. Upon delivery to the remaining Lender of a copy of such written agreement, duly executed by the Corporation, the assigning Lender and the assignee, the assigning Lender shall be released from all obligations arising after the date of such delivery.

## 2.7 Reliance and Waiver

No representations or warranties are hereby given by either Lender to the other with respect to the due execution, legality, validity or enforceability of any Lender Document or the collectability of the Lender Debt. Each Lender may manage and supervise its loans and other financial accommodations to the Corporation in accordance with applicable law and its usual practices. Except as expressly provided in this Agreement, neither Lender has any liability to the other Lender for any actions which the Lender takes or omits to take (including with respect to the creation or perfection of security interests, Collateral, the occurrence of any Event of Default or

the collection of its Lender Debt from the Corporation, a guarantor or any other Person) with respect to its Lender Debt and any Lender Document.

### 2.8 Notice of Event of Default

Each Lender agrees to give the other Lender notice of the occurrence of an Event of Default under its Lender Documents, specifying in reasonable detail the nature of such Event of Default. Any such notice shall be given at the same time as notice thereof is given to the Corporation or as soon as reasonably practicable after receipt of notice thereof from or on behalf of the Corporation. Any failure on the part of a Lender to give such notice does not impair or affect the benefits provided to the Lenders in this Agreement or result in any liability of a Lender to the other Lender or any other Person.

## Article 3 – Enforcement and Realization

### 3.1 Enforcement

(a) Provided that the Lenders have complied with the other provisions of this Section 3.1, nothing in this Agreement prevents Lender A or Lender B from declaring an Event of Default, accelerating its Lender Debt or exercising its rights and remedies upon its Lender Security becoming enforceable.

(b) A Lender may not take any Enforcement Action unless it gives at least fifteen (15) days prior written notice to the other Lender (the "**Remaining Lender**") of its intention to do so, provided the Remaining Lender may agree at any time to waive such notice. During such period, if the Remaining Lender does not wish to participate in an Enforcement Action, it may acquire the Lender Debt of the Lender wishing to take Enforcement Action (the "**Enforcing Lender**"). The Lender Debt to be acquired includes the outstanding principal amount of such Lender Debt plus interest thereon, and the obligation to indemnify and hold the Enforcing Lender harmless from any liability under any outstanding bankers' acceptances, letters of credit, letters of guarantee, foreign exchange futures contracts and other instrument issued relating to such Lender Debt. In such case, the Enforcing Lender shall assign, its Lender Documents to the Remaining Lender in a manner and subject to documentation satisfactory to both Lenders and the Corporation shall execute and deliver all such documents as may be required, in the opinion of the Remaining Lender, to give effect to the assignment.

(c) If, at the end of the thirty-day period, the Remaining Lender has not acquired the Lender Debt of the Enforcing Lender, the Enforcing Lender may commence an Enforcement Action and the proceeds therefrom shall be applied firstly to all reasonable costs of realization (including legal fees) and secondly to the Lender Debt owing to the Enforcing Lender. The Remaining Lender shall have no right to share in such proceeds, unless and until it indicates in writing to the other Lender its intention to also take Enforcement Action and forthwith does so, in which event the proceeds of the Security realized thereafter shall be shared by both of the Lenders on the basis set out in this Agreement.

### 3.2 Proceeds of Realization

If the Lenders together agree to take Enforcement Action, they may appoint an agent or trustee to act on their behalf in effecting such action. To the extent permitted by law, all proceeds of realization shall be applied, firstly, to all reasonable costs of realization (including legal fees), and

secondly on a *pro rata* basis in accordance with the outstanding indebtedness owed to each of the Lenders in respect of their respective Lender Debt. Any payment (whether voluntary, involuntary or through the exercise of set-off or compensation or by counterclaim or cross-action) of or on account of the Lender Debt after the date upon which the Lenders agree to realize upon the Security, shall be applied in payment to the Lenders as aforesaid.

3.3    **Payments Received by the Lenders**

If a Lender or any Person on its behalf receives any payment or distribution on account of its Security, then the Lender shall, and shall cause such other Person to, receive and hold such payment or distribution in trust for the benefit of itself and the other Lender in accordance with this Agreement, segregate it from its other funds and property and, to the extent necessary to give effect to the distributions contemplated in this Agreement, promptly pay the same over or deliver it to the other Lender in the form received (together with any necessary endorsement or assignment).

3.4    **Voided Payments**

If any amount is received in respect of Lender Debt that is subsequently invalidated, declared to be fraudulent or preferential or set aside or is required to be repaid to a trustee, receiver or any other Person under any proceeding under Insolvency Legislation (a "**Voided Payment**"), then that portion of Lender Debt that had been previously satisfied by such Voided Payment shall be revived and continue in full force and effect as if such Voided Payment had never been made, and this Agreement shall continue in full force and effect with respect to that portion of Lender Debt. If a Lender has received any payments with respect to its Lender Debt subsequent to the date of initial receipt of such Voided Payment and such payments have not been invalidated, declared to be fraudulent or preferential or set aside or required to be repaid to a trustee, receiver, or any other Person, such Lender shall be obligated and hereby agrees that any such payment so made or received shall be deemed to have been received in trust for the benefit of the other Lender, to be distributed in accordance with the terms of this Agreement.

3.5    **No Objection**

No Lender may take, or cause or permit any other Person to take, any steps whatsoever whereby the priority or validity of the Lender Security or the rights of the Lenders are delayed, defeated, impaired or diminished, it being understood that, regardless of the validity, effectiveness or enforceability of this Agreement or any of the Lender Documents, as between the Lenders, they rank *pari passu* with respect to the Collateral and its realization. Without limiting the generality of the foregoing, the Lenders shall not challenge, object to, compete with or impede in any manner any Enforcement Action taken by a Lender in connection with its Lender Security and in accordance with this Agreement or contest any price obtained for any Collateral.

3.6    **Possession of Pledged Securities**

If a Lender has control or possession of any share certificates or other securities (collectively, "**Pledged Securities**") as Collateral, it shall hold and posses such Pledged Securities, as agent for and on behalf of itself and the other Lender, to be dealt with in accordance with the terms of this Agreement; provided that, while the Lender holding Pledged Securities shall treat such Pledged Securities with the same degree of care as it treats its own property, it shall not be liable for the loss or destruction of any such Pledged Securities. At any time while any Lender Debt remains unpaid and the Lenders have any commitments to extend credit to the Corporation, the

Corporation agrees to deliver any additional Pledged Securities required to be delivered under the Lender Security to Lender B or as it may direct, to be held by Lender B, as agent for and on behalf of the other Lender, to be dealt with in accordance with the terms of this Agreement.

### 3.7 Other Security

The Lenders acknowledge that the Security they hold from the Corporation is intended to give each Lender substantially the same benefit (without regard to the amount of Lender Debt owed to each Lender) and, to the extent the Security does not do so, the Lenders and the Corporation agree to cooperate to do all things and take all actions as are reasonably required to give effect to this principle.

### 3.8 No Liability

Each Lender agrees that the other Lender and its officers, directors and agents are not liable to the first Lender for any error of judgment or for any action taken or omitted to be taken with respect to any Lender Document and the realization of its Security including the liquidation, sale, release or other disposition of Collateral (except for the gross negligence or wilful misconduct of the Lender or its officers, directors or agents, but in such case, not including special or consequential damages).

## Article 4 – Miscellaneous

### 4.1 No Rights to the Corporation or any Other Person

Nothing in this Agreement:

(a)  confers any rights upon the Corporation or any Person not a signatory to this Agreement;

(b)  entitles any Person that is not a signatory to this Agreement to receive any proceeds of realization of any Collateral; or

(c)  requires or obligates any Lender to (i) advance any monies or otherwise extend credit to the Corporation, or (ii) enforce or realize upon any Collateral.

If any Person (other than the Lenders) has a valid claim to proceeds of realization of the Collateral in priority to or on parity with any of the Lenders, then this Agreement shall not apply so as to diminish the rights (as such rights would have been but for this Agreement) of the Lenders to such proceeds of realization.

### 4.2 Cumulative Rights

The rights, powers and remedies of the Lenders under this Agreement are in addition to all rights, powers and remedies given to the Lenders by virtue of any statute, rule of law or any Lender Document, all of which rights, powers and remedies are cumulative and may be exercised successively or concurrently.

### 4.3 Exchange of Information

The Lenders may at any time and from time to time exchange information concerning the Collateral and the business and affairs of the Corporation, and the Corporation expressly consents

to such exchange of information provided each of the Lenders maintains all such information in accordance with relevant confidentiality provisions of the Lender A Note and the Lender B Note, as applicable.

### 4.4 Further Assurances

The parties shall at all times do, execute, acknowledge and deliver all such acts, deeds and agreements as may be reasonably necessary or desirable to give effect to the provisions of this Agreement including any and all acts, deeds or agreements as may be necessary for the purpose of registering or filing notice of the terms and provisions of this Agreement.

### 4.5 Notice

Any notice, direction or other communication given under this Agreement must be in writing and given by delivering it or sending it by facsimile or other similar form of recorded communication to the parties at the addresses set out on the signature page hereof. Any such communication is deemed to have been validly and effectively given if (a) personally delivered, on the date of such delivery if such date is a Business Day and such delivery was made prior to 4 pm, otherwise on the next Business Day, or (b) transmitted by facsimile or similar means of recorded communication on the Business Day following the date of transmission. Any party may change its address for service from time to time by notice given in accordance with the foregoing and any subsequent notice shall be sent to the party at its changed address.

### 4.6 Severability

If a provision of this Agreement is determined by a court of competent jurisdiction to be illegal, invalid or unenforceable that provision may be severed from this Agreement and the remaining provisions will continue in full force and effect, without limitation.

### 4.7 Successors and Assigns; Assignment

This Agreement is binding upon the Corporation, the Lenders and their respective successors, heirs, transferee and assigns, as applicable, and enures to the benefit of the Lenders and their respective successors, heirs, transferee and assigns, as applicable. This Agreement may not be assigned by a Lender without the prior written consent of other Lender unless it is being done in conjunction with an assignment of Security pursuant to Section 2.6(a). This Agreement may not be assigned by the Corporation without the prior written consent of the Lenders.

### 4.8 Governing Law

(a) This Agreement is governed by and is to be interpreted, construed and enforced in accordance with the laws of the Province of Ontario and the laws of Canada applicable therein, without regard to conflict of law principles.

(b) Each of the parties irrevocably and unconditionally (i) submits to the non-exclusive jurisdiction of the courts of (A) Ontario, located in Toronto, or (B) the State of New York, (ii) agrees that all claims in respect of any suit, action or proceeding arising out of or relating to this Agreement may be heard and determined in any such court, and (iii) waives, to the fullest extent permitted by law, any objection which it may now or hereafter have based upon doctrines of venue or *forum incoveniens*.

### 4.9 No Consent of the Corporation

No consent of the Corporation is necessary for any amendment to this Agreement by the Lenders.

### 4.10 Paramountcy of Agreement

The terms of this Agreement govern the Lender Security as if recited in all respects therein, and in the event of any conflict between the terms of this Agreement and those of the Lender Documents, the terms of this Agreement will prevail.

### 4.11 Termination

This Agreement will terminate upon the earlier of:

(a) repayment in full of the Lender A Debt and the termination of the Lender A Note;

(b) repayment in full of the Lender B Debt and the termination of the Lender B Note; and

(c) the written agreement of the Lenders.

### 4.12 Counterparts and Electronic Delivery

This Agreement may be executed in any number of separate counterparts and all such signed counterparts constitute one and the same agreement. Delivery by facsimile or other electronic means of an originally executed signature page to this Agreement by a party is as effective as personal delivery of such signature page.

[The remainder of this page has been intentionally left blank. Signature page follows.]

**IN WITNESS WHEREOF** the parties have executed and delivered this Agreement.

In the presence of:

_____
Witness Signature

**SEAN WALSH**

By: _____
Authorized Signing Officer

Address:  151 Calle San Francisco, #200
San Juan, Puerto Rico  00901

**PROJECT SPOKANE, LLC**

By: _____
Authorized Signing Officer

Address:  5619 DTC Parkway, No. 475
Greenwood Village, Colorado

**HYPERBLOCK INC.**

By: _____
Authorized Signing Officer

Address:  140 Yonge Street, Suite 209
Toronto ON M5C 1X6

**HYPERBLOCK LLC**

By: _____
Authorized Signing Officer

Address:  140 Yonge Street, Suite 209
Toronto ON M5C 1X6

**IN WITNESS WHEREOF** the parties have executed and delivered this Agreement.

In the presence of:

_____
Witness Signature

**SEAN WALSH**

By: _____

Address:  151 Calle San Francisco, #200
San Juan, Puerto Rico  00901

**PROJECT SPOKANE, LLC**

By: _____
Authorized Signing Officer

Address:  5619 DTC Parkway, No. 475
Greenwood Village, Colorado

**HYPERBLOCK INC.**

By: *[signature]*
Authorized Signing Officer

Address:  140 Yonge Street, Suite 209
Toronto ON M5C 1X6

**HYPERBLOCK LLC**

By: _____
Authorized Signing Officer

Address:  140 Yonge Street, Suite 209
Toronto ON M5C 1X6

**IN WITNESS WHEREOF** the parties have executed and delivered this Agreement.

**SEAN WALSH**

In the presence of:

By: _____

_____
Witness Signature

Address:  151 Calle San Francisco, #200
San Juan, Puerto Rico 00901

**PROJECT SPOKANE, LLC**

By: _____
Authorized Signing Officer

Address:  5619 DTC Parkway, No. 475
Greenwood Village, Colorado

**HYPERBLOCK INC.**

By: _____
Authorized Signing Officer

Address:  140 Yonge Street, Suite 209
Toronto ON M5C 1X6

**HYPERBLOCK LLC**

By: _____[signature]_____
Authorized Signing Officer

Address:  140 Yonge Street, Suite 209
Toronto ON M5C 1X6

**SCHEDULE A**

**LENDER A MATTERS**

## SCHEDULE A

### LENDER A MATTERS

| | |
|---|---|
| Lender A Debt: | US$2,000,000 |
| Lender A Security: | Security Agreement dated as of June 14, 2019 by Hyperblock LLC in favour of Sean Walsh, governed by the laws of New York |
| | General Security Agreement dated as of June 14, 2019 by Hyperblock Inc. in favour of Project Spokane, LLC, governed by the laws of Ontario |

### LENDER B MATTERS

| | |
|---|---|
| Lender B Debt: | CAD$5,000,000 |
| Lender B Security: | Security Agreement dated as of February 1, 2019 by Hyperblock LLC in favour of Project Spokane, LLC, governed by the laws of New York |
| | Security Agreement dated as of February 1, 2019 by Hyperblock Inc. in favour of Project Spokane, LLC, governed by the laws of Ontario |
| | General Security Agreement dated as of June 14, 2019 by Hyperblock Inc. in favour of Project Spokane, LLC, governed by the laws of Ontario |
| | Collateral Assignment of Lease dated as of February 1, 2019 in favour of Project Spokane, LLC, relating to a Commercial Lease Agreement between Hyperblock LLC, as lessee and Bonner Property Development, LLC, as lessor, dated as of March 1, 2016 |