1   JULIE M. LAKE, RMR, RDR, CRR
    Martin-Lake & Associates, Inc.
2   P.O. Box 7765
    Missoula, Montana 59807-7765
3   406/543-6447 office
    jml@martin-lake.com
4   United States Contract Court Reporter

5              IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF MONTANA
6                    MISSOULA DIVISION

7
    ENERGY KEEPERS, INC.,          No. 9:20-cv-00076-DWM
8
            Plaintiff,
9
        vs.                        MOTION HEARING
10
    HYPERBLOCK, LLC, et al.,
11
            Defendants.
12  ─────────────────────────   ──────────────────────────

13  STEVE NELSON, MICHAEL          No. 9:20-cv-00082-DWM
    BOEHME and BONNER PROPERTY
14  DEVELOPMENT, LLC,

15          Plaintiffs,

16      vs.                        MOTION HEARING

17  PROJECT SPOKANE, LLC, and
    SEAN WALSH,
18
            Defendants.
19

20        BEFORE THE HONORABLE DONALD W. MOLLOY
           UNITED STATES DISTRICT COURT JUDGE
21            FOR THE DISTRICT OF MONTANA

22        Russell Smith Federal Courthouse
                201 East Broadway
23           Missoula, Montana 59802
      Thursday, June 25, 2020 - 9 a.m. to 10:43 a.m.

24
          Proceedings recorded by machine shorthand
25  Transcript produced by computer-assisted transcription.

<u>APPEARANCES</u>

For the Plaintiff ENERGY KEEPERS , INC.:

Daniel F. Decker
Energy Keepers, Incorporated 110
Main Street #304
Polson, Montana 59860
dan.decker@energykeepersinc.com

Sophia E. Amberson
VAN NESS FELDMAN, LLP
719 Second Avenue, Suite 1150
Seattle, Washington 98104
samberson@vnf.com

Anne E. Lynch
VAN NESS FELDMAN, LLP
1050 Thomas Jefferson Street
NW Seventh Floor
Washington, DC 20015
alynch@vnf.com

For the Plaintiffs:  STEVE NELSON, MICHAEL BOEHME, and
BONNER PROPERTY DEVELOPMENT, LLC:

Robert Erickson
State Bar No. 9966
RHOADES, SIEFERT & ERICKSON, PLLC
430 Ryman Street
Missoula, Montana 59802
erickson@montanalawyer.com

For the Defendants HYPERBLOCK, LLC, PROJECT SPOKANE, LLC
and SEAN WALSH:

James A. Patten
PATTEN PETERMAN BEKKEDAHL & GREEN, PLLC
2817 Second Avenue North, Suite 300
Billings, Montana 59101
apatten@ppbglaw.com

Peter Ito (via videoconference)
ITO LAW GROUP
1550 Larimer Street, Suite 667
Denver, Colorado 80202
peter@itolawgroup.com
Sean Walsh (via videoconference)

1

## CONTENTS

2      Proceedings........................................... 4

3      Legal Argument by Plaintiff Energy Keepers........... 5

4      Legal Argument by Defendant HyperBlock, Inc.......... 12

5      Legal Argument by Plaintiff Energy Keepers .......... 23

6      Legal Argument by Plaintiff Nelson, et al............ 26

7      Legal Argument by Defendant Project Spokane, et al... 41

8

9      Reporter's Certificate............................... 57

10

11

12

13

14

15

16

17

18

19

2Ø

21

22

23

24

25

                        THURSDAY, JUNE 25, 2020

                        Whereupon, the following proceedings were had and

entered on the record in open court:

                        THE COURT:  Good morning.  Please be seated.

09:09:29   Before we get going, I was able to see that the table

was a little crowded, so I think I can keep straight where

everybody is sitting and there's no reflection on anybody

because you are seated at different places.  It would be

helpful to me if you use the lectern when you are arguing.

09:09:57   I will not mandate that.  If you are more comfortable

seated, just make sure that you are speaking into the

microphones.  All right?

      And you guys in the back there, let's make sure we keep

some social separation so that we're not exposing anybody.

09:10:19   Would you call the first matter on the calendar, please.

                        THE CLERK:  This is the time set for a motion

hearing in Case No. CV-20-76-M-DWM, Energy Keepers,

Incorporated versus HyperBlock, LLC, et al., and

CV-20-82-M-DWM, Nelson, et al., versus Project Spokane, LLC,

09:10:43   et al.

                        THE COURT:  All right, the first matter is the

Energy Keepers.  Who is going to argue?  Is it Ms. Amberson

or Ms. Lynch?

                        MS. LYNCH:  Anne Lynch for EKI, Your Honor.

09:11:04   THE COURT:  Okay, you are up.

1          MS. LYNCH:  Thank you, Your Honor.

2      Anne Lynch for Energy Keepers, Inc.  With me today is

3  also Dan Decker from Energy Keepers, Inc., and Brian

4  Lipscomb is here with us as CEO for Energy Keepers, Inc.

09:11:40  5      We are here today because Sean Walsh and his companies

6  are trying to avoid paying undisputed amounts owed to EKI

7  for electricity that they used to mine cryptocurrency at

8  their Bonner facility.  There is no dispute about the breach

9  of contract or that Sean Walsh was the key or sole decision

09:12:03 10  maker at each step.

11      As set out in our papers, the alter ego test is met

12  here.  HyperBlock and Project Spokane, Walsh and Walsh is

13  these companies.  Just to quickly recap, Walsh formed the

14  two LLC defendants.  He was the CEO and manager of

09:12:28 15  HyperBlock until the end of April.  He was and remains the

16  sole member and manager of Project Spokane.  Signed the

17  contracting documents with EKI.  Caused his company to enter

18  into commercially unreasonable promissory notes with himself

19  and his company that ensured HyperBlock, LLC would remain

09:12:50 20  chronically undercapitalized, and caused the triggering

21  event to accelerate the maturity date of his notes in an

22  effort to personally acquire the equipment from the Bonner

23  Mill facility instead of paying his business obligations.

24          THE COURT:  So let me ask you, I don't want to

09:13:09 25  interrupt your argument, but the thing that troubles me is

1    the--you are making a claim for breach of contract, but

2    doesn't Justice Scalia's opinion in *Grupo Mexico* say I have

3    no power--when there is strictly a breach of contract claim,

4    I have no power to enjoin the defendant in the case.  Isn't

09:13:33    5    that what that *Grupo Mexico* case holds?

6            MS. LYNCH:  Well, Your Honor, we would rely on the

7    Ninth Circuit's post *Grupo Mexicana* decision in

8    *Johnson* which stated that the four-factor test is still

9    applied in cases for monetary damages.  And a preliminary

09:13:59    10    injunction is appropriate under Montana Supreme Court

11    precedent where the legal remedy, the monetary damages from

12    the defendants, would be inadequate due to allegations the

13    defendant will be insolvent at the time of judgment or

14    there's danger of dissipation of assets that would render a

09:14:19    15    judgment ineffective.  And importantly what we're asking for

16    here is freezing the assets of the two LLCs and supervising

17    any sale that might go forward as was noticed in the prior

18    notification of public sale.

19            So we're not trying to do anything that would devalue

09:14:44    20    the assets of HyperBlock.  In fact, it's in our interest to

21    maximize any value that remains in HyperBlock, LLC.

22            THE COURT:  Doesn't this whole cryptocurrency

23    thing--those computers don't have a very long life, do they?

24    And if--if you are right and you've asked for a jury trial

09:15:06    25    and so has the other plaintiff, Nelson, and you are not

1      going to get a jury trial for some time and it sounds like,

2      at least from some of the materials that were filed, those

3      assets, the computers, their value is going to begin

4      diminishing on almost a daily basis. So how do you--how do

09:15:32    5      you deal with that issue?

6              MS. LYNCH: That is one of the reasons why we

7      haven't asked to enjoin the sale of those assets. What

8      we're looking for is the Court to supervise the proceeds of

9      such a sale. So the request for relief in our case is a

09:15:53   10      little bit different than in the other case. We're not

11      looking to stop the sale or do anything that would devalue

12      those assets.

13              THE COURT: Well, don't you have to have the sale

14      and then seek the injunction? You are asking--what are you

09:16:13   15      asking me to do?

16              MS. LYNCH: Well, what we are asking is that if the

17      sale does proceed, that the proceeds from the sale, for

18      example, be put in the court registry or some other

19      supervised escrow; that they be held until such a time until

09:16:34   20      a judgment is entered in the case so that actions taken

21      between now and then don't render such a judgment

22      ineffective.

23              THE COURT: And which assets is it that you are

24      concerned about if--I mean, do you have any dog in the fight

09:16:55   25      about what assets are sold if there is a sale?

1            MS. LYNCH:  No, we do not for EKI.  So in the event

2       there is a sale, we would ask that whatever proceeds are

3       generated from that sale be included.

4            THE COURT:  Are you asking me to appoint a receiver?

09:17:14    5  If so, what are the bases I could do that?

6            MS. LYNCH:  Really, you know, we're asking for--I

7       think the most appropriate thing would either be to put it

8       into an escrow or put it into the court so that the

9       monetary--the cash assets that are generated from the sale

09:17:40   10  are not dissipated between now and the entry of a judgment.

11      What we would ask for is either the court's registry or an

12      escrow account.

13           THE COURT:  Is there some authority for that?

14           MS. LYNCH:  Well, there is authority to freeze the

09:18:00   15  assets of a defendant pending the entry of a judgment.  And

16      we see that in the--both the *Van Lone* case and the *Johnson*

17      case.  *Van Lone* is a Montana Supreme Court case and, of

18      course, *Johnson* is the Ninth Circuit case that I mentioned a

19      few minutes ago.  So there certainly is precedent for

09:18:23   20  freezing the assets.

21           Now we have the additional complication that you

22      highlighted here where the assets may lose value over time.

23      And in an effort to avoid losing the value of those assets

24      that exist today we're not seeking to freeze the sale but to

09:18:42   25  exercise the equitable powers of the court to insure that

those activities don't render an eventual judgment
ineffective.

    This, you know, fits squarely within the Montana Supreme
Court precedent of avoiding irreparable harm based on
pattern and practice and the activity of the defendant in
this matter.  There's been a string of affirmative actions
that have threatened the value of those assets to be used
for a judgment, including the Notice of the Public Sale
which was noticed the same day that EKI sent its notice of
the settlement amounts that were owed under the contract,
which remains undisputed.

    There's no dispute in this case as well about the
undercapitalization of HyperBlock, the insolvency of
HyperBlock or close to insolvency of HyperBlock.  There is
no dispute about the creation of the promissory note that
kept HyperBlock perpetually undercapitalized.  I would just
note that there is a very similar case, *Peschel Family Trust*
case out of the Montana Supreme Court, where the Defendant
there had used a sliding scale for rent that his company
would pay to himself.  And the court there found that that
type of use of a sliding scale of rent to personally profit
from the corporate entity enabled the defendant there to
make sure his corporation would never have sufficient assets
to satisfy the plaintiff's judgment.  And the court--the
Montana Supreme Court found that that met the second prong

1    of the corporate veil piercing, using a corporate entity as

2    a subterfuge to defeat public convenience, justify wrong or

3    perpetuate fraud.  So there are several cases from our

4    perspective that are directly on point with what has been

09:21:32    5    happening here with the three defendants that EKI has named.

6        We would just also add that in this situation the

7    equities tip in favor of an injunction.  The business model

8    used for this cryptomining operation is basically to take

9    electricity which they contracted for to purchase from EKI

09:22:13    10    and convert that into currency.  The defendants kept the

11    servers at the Bonner Mill facility running around the clock

12    performing that operation until the day that EKI shut off

13    power.  So there is a strong injustice that would result by

14    allowing those activities to have occurred and then

09:22:42    15    dissipate the remaining assets that would prevent EKI from

16    recovering for those damages.  I'll reserve the remainder of

17    my time for rebuttal.

18        THE COURT:  So tell me one way or the other, whether

19    there is a preliminary injunction or the denial, how quickly

09:23:14    20    could the case be tried?  As you know under Rule 65 when

21    there's injunctive relief requested, other than criminal

22    cases, it takes priority on the court's docket.  So how

23    quickly?  I mean, is it a whole bunch of discovery?  It

24    doesn't seem like it, if you are saying it's undisputed

09:23:38    25    about this and undisputed about that.  So how quickly?

1          MS. LYNCH:  That's right, Your Honor.  First of all,

2     we believe that a judgment against HyperBlock could

3     be--could occur in very short order.  There is no dispute

4     about the contract claim, the damages, the amount that was

09:23:58   5     calculated, so that we believe can happen immediately.

6          Now, with respect to the two other defendants I think a

7     minimal amount of discovery would be required.  You know,

8     something--you know, 90 to 120 days would be sufficient from

9     our perspective to complete the minimal discovery that would

09:24:19  10     be required.

11          THE COURT:  So if I set a case in September, you

12     would drop everything else you are doing and nobody would

13     ask for a continuance of any dates and your clients would be

14     happy with a September trial date?

09:24:38  15          MS. LYNCH:  I would like to confirm that with my

16     clients, but that would be our expectation that this would

17     move quickly.  And we are certainly in favor of this moving

18     as quickly as possible and our expectation would be that

19     sometime in the fall this would be--

09:24:55  20          THE COURT:  Just out of curiosity.  Do you

21     anticipate or think that you are in a position to ask for

22     summary judgment on the question of liability?

23          MS. LYNCH:  Yes, Your Honor.  And there may be the

24     availability of a default judgment against HyperBlock as

09:25:11  25     well since they were--

1         THE COURT:  They haven't appeared, have they?

2         MS. LYNCH:  No, but they were served more than

3    30 days ago.

4         THE COURT:  So why don't you take their default?

09:25:21   5         MS. LYNCH:  We plan to do that, Your Honor.

6         THE COURT:  Okay.  Anything else you want to argue?

7         MS. LYNCH:  Unless you have other questions for me,

8    I'll reserve.

9         THE COURT:  All right, Mr. Patten, how do you want

09:25:36  10    to do it?  Do you want to argue in response to both

11    simultaneously or do you want to respond to this claim now

12    and then respond later to the other case?

13         MR. PATTEN:  I would just as soon respond to this

14    claim now, Your Honor.

09:25:50  15         THE COURT:  All right, you are up.

16         MR. PATTEN:  Good morning, Your Honor.  Andy Patten

17    for the defendants Sean Walsh and Project Spokane.

18         Energy Keepers' motion, Your Honor, is long on

19    conclusion and really short on facts that support the

09:26:20  20    conclusions.  And what I would like to do is just set the

21    table with I think the facts that are not in dispute.  And I

22    don't think a claim that either Mr. Walsh or Project Spokane

23    are insolvent without anything underlying that is an

24    undisputed fact.

09:26:43  25         But Project Spokane entered into an energy purchase

contract with Energy Keepers, Inc.  The Project
Spokane/Energy Keepers, Inc. contract was assigned to
HyperBlock, LLC as part of a sale of substantially all of
the assets of Project Spokane to HyperBlock, LLC.  The terms
of the sale were a matter of public knowledge, and
essentially the sale included a $5,000, Canadian dollar,
promissory note from HyperBlock to Project Spokane, secured
by the assets of HyperBlock.

    Energy Keepers consented to the transfer, to the
assignment of its contract.  The assignment letter, which is
one of the exhibits that have been stipulated into evidence,
allows Energy Keepers 90 days to conduct its due diligence
on the creditworthiness of HyperBlock and if it determines
that HyperBlock was not creditworthy, it could withdraw its
consent.  The consent has not been withdrawn.

    In 2019 Mr. Walsh lent $2 million to HyperBlock, LLC so
that it could purchase new servers.  In 2020 the Bank of
Montana lent HyperBlock, LLC approximately $2.6 million so
it could buy additional servers.  Those additional servers,
Your Honor, are the ones that are in dispute with
Mr. Nelson.

    Bonneville Development Partners--excuse me.  Bonner
Partner Development or Bonner Property Development obtained
a security interest in the HyperBlock assets as part of the
Montana--Bank of Montana loan.  Walsh retained a security

1   interest in the HyperBlock assets as part of his loan.

2   Walsh's and Project Spokane's security interests were duly

3   noticed to the public through the filing of financing

4   statements with the Delaware Secretary of State.

09:29:32   5       From these fundamental facts that aren't in dispute

6   Energy Keepers takes a leap that Walsh undercapitalized

7   HyperBlock.  It takes that leap after it had 90 days and it

8   knew of the transaction between Project Spokane and

9   HyperBlock.  It had the time to investigate that, yet it now

09:30:01   10  claims that Project--or that HyperBlock was undercapitalized

11  by Mr. Walsh.

12       THE COURT:  So let me ask you about Mr. Walsh.  So

13  Energy Keepers, we've got them on the one side of this, but

14  then we have Mr. Walsh who is the sole member of Project

09:30:23   15  Spokane.  Am I right?

16       MR. PATTEN:  He is now, Your Honor.

17       THE COURT:  And he's also the CEO and a member of

18  HyperBlock, LLC, right?

19       MR. PATTEN:  He is a shareholder in HyperBlock,

09:30:41   20  Inc.--

21       THE COURT:  He's going to rattle his brain there.

22  His head is going back and forth.

23       MR. PATTEN:  I'm not looking at him.

24       But, Your Honor, Mr. Walsh is a shareholder of

09:30:52   25  HyperBlock, Inc., which is a Canadian publicly traded

1    corporation.

2        THE COURT:  Yeah, that's in bankruptcy or was in

3    bankruptcy.

4        MR. PATTEN:  It was put in bankruptcy a month ago in

09:31:04   5    Canada.

6        THE COURT:  That's also a member of HyperBlock, LLC?

7        MR. PATTEN:  That's the sole member of HyperBlock,

8    LLC.

9        THE COURT:  And Walsh is the chairman and CEO and

09:31:15   10   owns 21 percent of the stock of HyperBlock, Inc.?

11       MR. PATTEN:  He owned 21 percent, Your Honor, at the

12   time of the arrangement, which is what they call mergers in

13   Canada.

14       THE COURT:  Okay.  And then HyperBlock Technologies,

09:31:34   15   Inc. is a Canadian company no longer in existence?

16       MR. PATTEN:  Correct.  It was--it was merged into

17   HyperBlock, Inc.

18       THE COURT:  Yeah.  One of the things that--of

19   course, there's claims about alter ego penetration.  But it

09:31:53   20   seems like this is the guy on the block in Time Square that

21   has the three nuts that you are--he puts a pea under one of

22   them and you are trying to figure out where the pea is.

23   That looks like what's going on here.

24       MR. PATTEN:  I don't think so, Your Honor, because

09:32:10   25   everything is public.  And, more importantly, Energy Keepers

knew of all of this, so there was nothing hidden from Energy

Keepers.  Energy Keepers knew that Project Spokane was going

to have a $5 million note secured by the assets of

HyperBlock, LLC.  They knew about that and they knew about

09:32:33   it in time to withdraw their consent.  They didn't do it.

THE COURT:  Did Mr. Walsh have $2 million of his own

money loaned in there some place?

MR. PATTEN:  It was after the--chronologically, it

was the assignment of the contract was in July of 2018.

09:32:56   Mr. Walsh's loan, and it's Exhibit B, I think, in our

exhibits, but I think that's in the spring of 2019.

THE COURT:  Did he get his money back?

MR. PATTEN:  No.  He's still owed $2 million and

he's one of the parties that's doing the disposition sale.

09:33:19   So chronologically in terms of liens, Project Spokane has

the first perfected lien and Mr. Walsh has the second

perfected lien.  But Mr. Walsh's loan was for a legitimate

business purpose.  It was to buy servers, it was to buy

mining equipment.  There's nothing nefarious about that.

09:33:43   THE COURT:  Yeah, but the equipment was purchased in

January of 2020?

MR. PATTEN:  No, Your Honor.  Mr. Walsh's loan

bought equipment that was purchased in--

THE COURT:  2019.

09:33:56   MR. PATTEN:  --2019.  The Bank of Montana loan was

1    used in January of 2020 to buy the 1,493 new highest

2    generation servers.

3          THE COURT:  And then in February one month later

4    Mr. Walsh knew things were going toe up, right?

09:34:20    5          MR. PATTEN:  I don't know that he knew that.

6          THE COURT:  He's shaking his head no, so.

7          MR. PATTEN:  But I don't know that that makes

8    Mr. Walsh having any kind of improper conduct.

9          THE COURT:  Well, if he's self dealing, and the case

09:34:45    10   cited by counsel, does that make a difference in terms of

11   how the case here proceeds?

12         MR. PATTEN:  I don't think it is self dealing and I

13   don't think that it is improper.  These are not unusual

14   commercial transactions that both Mr. Walsh and the Bank of

09:35:07    15   Montana entered into, or the loans.  Certainly nothing that

16   Project Spokane has done has been improper.

17         Judge Cavan in a decision involving trying to pierce the

18   corporate veil said that there has to be some--I don't

19   remember the language off the top of my head.  It's in our

09:35:45    20   brief, Your Honor.  But it's some improper activity that was

21   conducted by the person who you are trying to pierce the

22   veil to get through and there is no evidence of that here.

23   We have loans that were--we have the Project Spokane loan

24   that was fully disclosed to Energy Keepers.  Energy Keepers

09:36:12    25   had its eyes wide open and entered into a contract and said,

1    okay, instead of Project Spokane being a party to our energy

2    contract, we're going to let HyperBlock, LLC be the party to

3    that contract.  They are trying to repudiate that now.  And

4    they are trying to repudiate it based on the argument and

09:36:31    5    not the fact that Mr. Walsh and Project Spokane are

6    insolvent or that they have a history of dissipating or

7    hiding assets, although they offered no actual fact that

8    backs up a claim that either Walsh or Project Spokane hide

9    or dissipate assets.

09:36:55    10    THE COURT:  Well, take me back to square one.  Did

11    he use the energy that was supplied by Energy Keepers?  Was

12    that used by Mr. Walsh and his companies?

13    MR. PATTEN:  It was--it was used by Project Spokane

14    until it was assigned and then it was used by HyperBlock,

09:37:19    15    LLC.

16    THE COURT:  Well, is there 3 point some million

17    dollars owed to Energy Keepers?

18    MR. PATTEN:  I don't think there is a dispute as to

19    the amount.

09:37:29    20    THE COURT:  Okay.  And is there any dispute that,

21    whoever the entity was, they were using the energy to run

22    the mining operation at Bonner?

23    MR. PATTEN:  I don't think there is a dispute about

24    that.

09:37:42    25    THE COURT:  So what's the defense?

1          MR. PATTEN:  The defense is that Mr. Walsh is a

2     separate individual and is not liable for the debt of

3     HyperBlock, LLC.  Energy Keepers is trying to pierce the

4     veil based on a claim that HyperBlock, LLC was

09:38:14   5     undercapitalized.  Now, they had 90 days after they

6     consented to the assignment to determine if HyperBlock, LLC

7     was undercapitalized.  They didn't withdraw their consent.

8     So at least through 90 days after that assignment was

9     approved they were satisfied with the creditworthiness of

09:38:33  10     HyperBlock, LLC.  After that Mr. Walsh made a loan with his

11     money to HyperBlock, LLC to buy Bitcoin mining servers and

12     he took a lien for that loan.  That happens all the time,

13     every day.  It's happening right now somewhere in Missoula,

14     I'm sure.  Then in January the Bank of Montana lent

09:39:09  15     HyperBlock money to buy servers and they were purchased.

16          So what Energy Keepers is, I guess, concluding is that

17     borrowing money to buy an asset for an operating business is

18     somehow improper, and it isn't.  It's entirely appropriate

19     that HyperBlock, LLC buys equipment with which to conduct

09:39:38  20     its operations.  Particularly, Your Honor, as you noted

21     earlier, these computers are sort of kind of perishable.

22     They are worth less tomorrow than they are today.  And so

23     one of the reasons to have the newest, fastest, slickest

24     Bitcoin server is because it can operate faster.  And as it

09:40:13  25     operates faster, it performs the functions that enable it to

1    get their Bitcoins faster and more frequently.

2          And so it's entirely appropriate for HyperBlock, LLC to

3    want to have the fastest, best servers for Bitcoin mining

4    purposes because it makes more money for them.  And there is

09:40:36    5    nothing improper about that.  There is nothing nefarious

6    about that.  There is no self dealing by Mr. Walsh in that.

7    There is no self dealing by Project Spokane in that.  And

8    there is certainly no evidence that's been presented that

9    Mr. Walsh or Project Spokane are dissipating their assets or

09:40:57   10    have a history of concealing the assets.

11          THE COURT:  And if there's a sale, who gets the

12    money?  Mr. Walsh?

13          MR. PATTEN:  Project Spokane would get it first and

14    then if Project Spokane's debt was satisfied, then Mr. Walsh

09:41:12   15    would get it.

16          THE COURT:  And then Energy Keepers is just out to

17    lunch?

18          MR. PATTEN:  Yes.

19          THE COURT:  So I guess that's the way business is

09:41:22   20    done in this country?

21          MR. PATTEN:  Absolutely it is, Your Honor.  If--

22          THE COURT:  Okay.  Well, I won't get into editorial

23    comments.

24          But what about Justice Scalia says because such a remedy

09:41:38   25    was historically unavailable from a court of equity, we hold

the district court had no authority to issue a preliminary

injunction preventing petitioners from disposing of their

assets pending adjudication of respondent's contract claim

for money damages?  How does that play out here?

09:41:56    MR. PATTEN:  Well, I think that's the law in the

United States, including the Ninth Circuit.  But what--they

are not trying to enjoin Mr. Walsh or Project Spokane from

disposing of their assets.  They are trying to enjoin

HyperBlock from disposing their assets through an Article 9

09:42:19  disposition sale.

    THE COURT:  Uh-huh.

    MR. PATTEN:  So--

    THE COURT:  Well, counsel says we don't want to stop

the sale.  We want an injunction to keep whatever the

09:42:36  proceeds of the sale in the court registry or

something--some other place.  I'm curious if there is any

authority to do that before there's a sale.  And if there's

a sale, what's the procedure?

    MR. PATTEN:  I don't know the answers to those

09:42:56  questions, Your Honor.  But what they haven't--what Energy

Keepers hasn't shown is why they can get an injunction

when--they haven't shown that a monetary judgment does not

provide--is going to be inadequate.  If--and a preliminary

injunction shouldn't be provided, shouldn't be ordered

09:43:30  unless monetary damages are going to be inadequate and there

1    is nothing to indicate that--there is no evidence that's

2    been put before the Court to come to that conclusion.

3           THE COURT:  Well, HyperBlock, LLC has enough money

4    to cover the three and a half million dollars that they owe

09:43:50   5    the Energy Keepers, plus the money they may owe, if they do

6    owe to Mr. Nelson his partner?

7           MR. PATTEN:  No, I don't believe that HyperBlock,

8    Inc.--or HyperBlock, LLC does.

9           THE COURT:  So isn't that the whole argument, that

09:44:09   10   there isn't enough there to cover any judgment, so freeze

11   what they do have until after we get a resolution, a final

12   resolution of the case.

13          MR. PATTEN:  But what they--in order to do that they

14   have to have some kind of claim against Mr. Walsh and

09:44:32   15   Project Spokane that would entitle them to repudiate the

16   contract that they made and consented to with HyperBlock,

17   LLC.  When they--Your Honor, when the contract was assigned

18   and Energy Keepers consented to it without asking anybody to

19   guarantee it, then Energy Keepers made the decision to rely

09:45:01   20   on HyperBlock, LLC only for payment of the energy.  Now they

21   are trying to change the terms of that contract and come

22   back and say, well, we think Walsh is going to secrete

23   assets and we need to prevent him from getting the assets to

24   secrete.  And they don't have any evidence that he has any

09:45:34   25   kind of a history or a proclivity to secrete assets or to

1    dissipate the assets.  So what they are trying to do, Your

2    Honor, is to use an injunction to preserve the status quo in

3    terms of the assets of HyperBlock when HyperBlock is the

4    only creditor, is the only party to Energy Keepers' claim

09:46:05   5    until they can rope in Mr. Walsh and Project Spokane.

6            THE COURT:  Okay, before you sit down, because you

7    are out of time, there is a jury demand here.  How quickly,

8    if there's a trial, do you believe you could be prepared to

9    try the case?  Just listening, it sounds like the issue is

09:46:30   10   going to be the piercing of the corporate veil, if that's a

11   viable claim.

12           MR. PATTEN:  Well, as Ms. Lynch noted, we would need

13   some time for discovery.  She said four months and I don't

14   dispute that.  So it seems to me that if we need four months

09:46:48   15   for discovery and we have a time period for summary judgment

16   motions and whatnot, then we're looking at six months.  And,

17   Your Honor, even then that seems highly expeditious to me in

18   my experience.

19           THE COURT:  It is, but I like to work fast.  All

09:47:10   20   right, thank you.

21       Ms. Lynch, you've got about six minutes and 53 seconds.

22           MS. LYNCH:  Approximately.  I think I can make this

23   fairly short.  I appreciate the time for rebuttal.

24       With respect to the assignment of the contract and the

09:47:37   25   argument that EKI had eyes wide open at the time of agreeing

1    to that, at the time of that assignment which was in July

2    of 2018 there was no reason to think that HyperBlock, LLC

3    was not creditworthy.  The action, as we've laid out in our

4    verified complaint and elsewhere, that really drove

09:48:15    5    HyperBlock, LLC into the ground and all the self dealing,

6    happened largely after that consent to assignment.  EKI

7    certainly believed that HyperBlock was going to pay its

8    bills.  HyperBlock was presented as basically a continuation

9    of Project Spokane, LLC, operating the same business at the

09:48:43    10    same address, same customers, and Project Spokane had been a

11    good customer during that time.

12       As we've laid out, it was really the actions taken by

13    Walsh to manipulate these transactions that occurred more

14    recently that solidify our alter ego in piercing the

09:49:11    15    corporate veil argument.  His actions as CEO of HyperBlock,

16    Inc. to trigger the acceleration of the promissory note and

17    then noticing the public sale and the other actions that

18    we've already talked about, it's his actions that are

19    causing the HyperBlock insolvency here and that's the basis

09:49:39    20    for our veil piercing argument.

21       And the question of the consent to assignment, you know,

22    from our perspective is a little bit by the point anyway.

23    There is no dispute about the facts of what happened in the

24    time since then.

09:50:03    25       And then just one more point about the monetary request.

We are not arguing that a monetary judgment would be

inadequate, if HyperBlock had the money or whoever has the

money that would be adequate.  We're just arguing it's

likely to be ineffective given the inability of HyperBlock

to pay the amounts that it owes and the question about

whether that monetary relief is available elsewhere.  So

that's what we're requesting.  We've tried to tailor our

request as narrowly as possible to the needs as presented by

this particular situation.

Then I have one housekeeping matter that I want to be

sure I don't sit down without taking care of, and that's

with respect to the exhibits that we have included in our

filings.  We have reached stipulation with the defendants,

Walsh and Spokane, to the admissibility of those, save for

the bankruptcy filing exhibits that were attached to the

second declaration where my understanding is there's simply

an objection based on relevancy.

THE COURT:  That's the Canadian bankruptcy?

MS. LYNCH:  It's the AQH, LLC bankruptcy, which was

Walsh's former cryptocurrency mining operation in

California, where there was a similar situation where the

company did not pay for the, you know, last month of its

electricity usage that it owed to its landlord and then the

company went into bankruptcy but did not receive a

discharge.  So we included those exhibits to show the

1    pattern and risk here, and my understanding is that there's

2    a relevancy objection but no other objection to those

3    exhibits.

4             THE COURT:  All right.  If the cases go forward, any

09:52:38    5    problem with consolidating them for trial?

6             MS. LYNCH:  I don't think that there's a problem

7    with consolidating them for purposes of a trial.

8             THE COURT:  All right, thank you.

9        Now we will go to the case of Stephen Nelson and Michael

09:53:01   10    Boehme and Bonner Property Development, LLC versus Project

11    Spokane, LLC and Sean Walsh, which is CV-20-M-DWM.

12        Is it Mr. Erickson?

13             MR. ERICKSON:  It is, Judge.

14             THE COURT:  You are up.

09:53:21   15             MR. ERICKSON:  Good morning, Judge.  Robert Erickson

16    on behalf of the plaintiffs; that's Steve Nelson, Mike

17    Boehme individually, and also on behalf of Bonner Property

18    Development, LLC.  They are seated here with me at counsel

19    table.

09:53:35   20        First thanks, Judge, for the expedited schedule.  Thanks

21    for making the time today.  We really appreciate it.  These

22    are critical issues.

23        I want to be first clear about the relief we are seeking

24    here today.  We want the Court to put the brakes on this

09:53:49   25    sale but only with respect to certain components of it.

1    First, the fixtures of Bonner Property Development were

2    noticed for sale.  Well, they shouldn't be sold because they

3    belong to Bonner Property Development.

4              THE COURT:  What exactly are the fixtures and the

5    computers that you claim should not be a part of the sale?

6              MR. ERICKSON:  Sure, Judge.  Let me focus first on

7    the computers because that's a little easier to separate.

8    There is only one subgroup of computer servers in which we

9    claim an interest.  It's the 1,493 Bitmain Antminer S17 Plus

10   servers.  The rest of the servers we don't have a claim

11   against those and we don't object to a sale of those.  They

12   don't belong to us.

13       On the other hand, the fixtures surely belong to us.  So

14   everything that is affixed to the property is a fixture.  By

15   definition, it belongs to the realty.  That's not only under

16   real property law, but it's also what the lease agreements

17   provide.

18       Beyond that there are certain items that, whether or not

19   strictly considered a fixture, are intended to remain with

20   the property by contract.  And so essentially everything on

21   that Notice of Sale that's not a server should remain with

22   the property.  In addition, those servers that I mentioned

23   should also not be sold.

24             THE COURT:  So if Spokane and Walsh go forward with

25   the sale and they sell the 1,493 Bitmain Antminer S17 Plus

servers, does that extinguish any security interest that

Bonner property has?

MR. ERICKSON:  It would functionally, Judge.  The

defendants acknowledge that we do have a security interest.

They just argue that it's not a priority security interest.

The figures at issue here, though, would far eclipse that.

And, Judge, there is another risk here.  It's not clear

to me at all that this will be a cash sale.  Under an

Article 9 disposition it certainly could be a credit bid.

We have every indication that's what it will be.  A credit

bid with money that doesn't really exist.  And in exchange

for that Mr. Walsh will receive all these servers and be

able to do with them what he pleases.  That's also sort of

the risk associated with allowing a sale to go forward but

depositing the money in a trust account or with the court

registry, it doesn't have to be a cash sale here and in fact

there is a serious risk that there won't be.

Judge, I've talked about the fixtures.  I don't think

there is much of a dispute there.  The law is on our side

and I'm not sure that defendants intend to sell that

property anymore.

There is that other personal property that was promised

to remain on the premises.  It's essentially that second

list on the Notice of Sale.  The lease documents provide for

that.  Even if it was paid for by the tenant, and some of it

1   was but not all of it, it was intended to remain with the

2   property whether or not strictly called a fixture.

3       So what we're really focusing on is the servers.  We

4   have no claim on the remainder of the servers.  That 1,493

09:57:14   5   S17 Plus we most certainly do.  And it's not just a security

6   interest, it's a priority security interest.

7           THE COURT:  Say that again.  If you answered

8   correctly, that if those computers are sold it extinguishes

9   your security interest, how do you have a priority if it can

09:57:32   10  be extinguished by the sale?

11          MR. ERICKSON:  And, Judge, I'm talking about if the

12  sale goes forward and we don't have a resolution of our

13  argument, our claim which we've supported by the facts, then

14  that's what will happen.  In other words, there is an

09:57:47   15  assumption right now that our security interest is junior.

16  We contend that it's senior in a court of equity and I would

17  be glad to explain why.

18          THE COURT:  Well, I understand.  But they perfected

19  the security interest in Delaware which is where it had to

09:58:03   20  be perfected; is that right?

21          MR. ERICKSON:  They did.  We have no dispute about

22  that.

23          THE COURT:  Why didn't--why didn't Mr. Nelson and

24  the Bonner Development, why didn't they perfect their

09:58:19   25  security interest by filing it with the Secretary of State?

1  I know they did later but they only did that in May, right,

2  of this year?

3          MR. ERICKSON:  That's correct, Judge, those are

4  facts.  But the reason why is because Sean Walsh promised

09:58:32  5  them a first position security interest.  He had promised

6  them that before in prior transactions and had kept his

7  word.  In this circumstance he made that representation.

8  They relied on it and it did not come to pass.

9          THE COURT:  Just one second.

09:58:46  10          Mr. Walsh, stop shaking your head.  It's distracting.

11  It's inappropriate.  And if you cannot constrain yourself,

12  then you are going to be sitting in Puerto Rico wondering

13  what's going on, because I'll cut you off.  You get it?

14          MR. WALSH:  My apologies, Your Honor.  I'll sit

09:59:11  15  still.

16          THE COURT:  You may proceed now.

17          MR. ERICKSON:  Thank you, Judge.

18          Mr. Walsh made these representations over and over and

19  in writing--

09:59:20  20          THE COURT:  But as Mr. Patten is wont to argue,

21  there's the law, and it might not seem right.  You take

22  somebody at their word if that's what was given.  But the

23  law, Article 9, says you have to perfect your security

24  interest before you get a priority and you didn't do that,

09:59:37  25  did you?

1          MR. ERICKSON:  Well, Judge, let me take those points

2    in tandem.  Number one, we did not do that.  We freely admit

3    it.

4          No. 2, the UCC also incorporates common-law principles,

09:59:50   5    including equitable principles, and that's exactly what

6    we're arguing today.  Promissory estoppel, equitable

7    estoppel, unjust enrichment and, indeed, fraud.

8          That's the basis of our arguments and the facts clearly

9    support them.  We have representations that were relied upon

10:00:08  10    justifiably.  In the face of that reliance our clients

11    pledged millions of dollars of real estate.  They put their

12    personal credit on the line via personal guaranties.  And

13    what did they do that for?  They did that for HyperBlock's

14    loan from Bank of Montana.

10:00:27  15          So let me be sure that we're clear on that.  HyperBlock

16    borrowed the money to buy these servers but they didn't post

17    any security.  Sean Walsh didn't post any security.  Project

18    Spokane certainly didn't.  Instead, it was our clients who

19    put their property and their good credit at risk.  And so,

10:00:44  20    Judge, it makes perfect sense that they have a first

21    priority security interest.  It's akin to a purchase money

22    security interest.  We're not claiming that here.  We can't.

23    The loan wasn't made directly, but it might as well have

24    been.  They put up all the collateral for this loan and then

10:01:02  25    what was purchased with that loan, they were promised a

|   | 1 | first lien position.  Very typical.  If it were a purchase |
|---|---|---|

1  first lien position.  Very typical.  If it were a purchase

2  money security interest, there would be no debate about

3  that.

4      So, Judge, you are right, because of the UCC filings,

10:01:16  5  which we don't dispute, we're arguing an equity under these

6  facts, representation, justifiable reliance to our clients'

7  severe detriment the Court should preserve the status quo

8  with respect to these subset of servers, and clearly with

9  respect to the collateral and collateral-like items in order

10:01:36  10  for us to litigate this case and be able to have the

11  collateral to use to satisfy at least in part this Bank of

12  Montana loan.  That was the program from the beginning, the

13  middle and the end and we're asking the Court just to

14  preserve that.

10:01:51  15      THE COURT:  Was Mr. Walsh required to personally

16  guarantee the loan with the Bank of Montana?

17      MR. ERICKSON:  No.

18      THE COURT:  Why not?

19      MR. ERICKSON:  The loan again, Judge, was to

10:02:01  20  HyperBlock.  Bank of Montana didn't require that.  But what

21  they did require--they wouldn't loan HyperBlock money unless

22  our clients pledged significant amounts of real property and

23  personally guaranteed it.  HyperBlock didn't have the

24  wherewithal to--it didn't have the collateral or the

10:02:18  25  encumbrance-free collateral to be provided a loan.

1      THE COURT:  But it's not entirely clear to me.

2  There is reference in the briefing, but the money, initially

3  the 2.6 or 2.5, whatever it was from the Bank of Montana,

4  was initially for improvements in the Bonner property, but

10:02:43  5  then Missoula County changed some regulatory or did

6  something that the money couldn't be used to install the

7  generators or whatever it was that the 40-megawatt

8  whatever--

9      MR. ERICKSON:  Right, that's primarily correct,

10:03:05  10  Judge.  Initially everybody thought we're going to get this

11  Bank of Montana loan in which our clients were promised a

12  first position security interest in whatever was purchased

13  with that.  That was originally going to be improvements to

14  the property.

10:03:17  15      HyperBlock later made a business decision based on, I

16  assume, what Missoula County did and other reasons, probably

17  economic factors as well, to not do those improvements.  But

18  they requested that that Bank of Montana loan stay open

19  without any disbursements because they might need it for

10:03:36  20  something later.  The regulatory regime might have changed,

21  for instance.  Well, it hasn't.

22      But then they asked to be able to use that Bank of

23  Montana loan funding under the same exact conditions, the

24  same agreements that remained in place with a promised first

10:03:51  25  security interest to use those for servers.  Our clients had

1    another opportunity to object, but in light of the promises

2    that they received, first priority lien interest, they

3    consented to that.

4        And then another time when the loan funds were actually

10:04:04    5    disbursed our clients had to approve those.  Again in

6    reliance of the promises they had they allowed those to

7    happen.  So those purchases occurred in January and

8    February.  And what happened next--the timing is important

9    here, Judge.

10:04:18    10        Within a month--and keep in mind that Mr. Walsh is CEO

11    of HyperBlock.  He's CEO of HyperBlock, Inc., the parent

12    company.  He solely owns Project Spokane and, of course,

13    he's in the middle of all of this.  He had to know, Judge, I

14    would submit, that HyperBlock, Inc. was on the verge of

10:04:39    15    bankruptcy.  HyperBlock, LLC was facing this imminent

16    Bitcoin halving event.  They couldn't pay their energy

17    bills.  I think we can develop the evidence through modest

18    discovery to absolutely establish that.  So buy the servers.

19    One month later, can't pay the energy bills.  One month

10:04:58    20    later, Mr. Walsh and his company called their notes due.

21    Days later, bankruptcy, the operation has shut down.  That

22    timing is so close, Judge, it just can't be a coincidence.

23            THE COURT:  Well, you may not know the answer to

24    this and it's not anything a part of the record, but

10:05:17    25    curiosity.

1     Once the purpose of the loan from the Bank of Montana

2     became obvious with whatever regulatory changes occurred, at

3     that point it wasn't going to be used to improve the real

4     property.  So why didn't they then--if Mr. Walsh wanted to

10:05:41   5     use that money for computers or some other purpose, why

6     didn't they insist that he guarantee, just like they had,

7     the performance on the loan?

8            MR. ERICKSON:  Well, Judge, the simple answer is

9     because they trusted him.  He signed the documents in which

10:05:57   10    the representations are contained.  He was CEO of

11    HyperBlock.  He was the sole member of Project Spokane.  And

12    they had engaged in similar transactions before which

13    actually worked out.  This time they didn't.

14           And if we look at the timing again, it sure seems quite

10:06:13   15    calculated that this was destined to fail from the

16    beginning.  It's unfortunate that our clients didn't realize

17    that and it's unfortunate they took Mr. Walsh's word, but

18    the fact is that they did.

19           So, Judge, we have representations clear and

10:06:32   20    unambiguous.  And keep in mind that we don't have to

21    necessarily prove a representation.  We're arguing equitable

22    estoppel, among other things.  If there is silence or acts

23    that constitute a representation or a material concealment,

24    that's enough to achieve that element.  And we certainly

10:06:48   25    have detrimental reliance.  So we submit that we can

1    establish all of our equitable claims in this case.

2        So in light of all of these facts what do defendants

3    argue?  Well, they make two arguments which are equally

4    insufficient to defeat injunctive relief.

5        First, Mr. Walsh makes the specious arguments that he

6    didn't read these contracts to which his signature was

7    affixed.  He didn't know about the representations because

8    he didn't read the contracts of this multi-million dollar

9    deal while he was CEO of the very companies involved in it.

10       Now, Judge, you are the arbiter of truth here, but it

11   strains credibility that a sophisticated chief executive

12   officer involved in a multi-million deal with multi-national

13   companies didn't bother to read the contracts.

14       Judge, we've referenced in our materials and we've

15   provided to the Court today volumes of e-mails in which Sean

16   Walsh either received or sent and certainly participated in

17   where these contracts are circulated.

18       In each of the agreements, and I don't want to say that

19   the particular portions of the agreements changed, I don't

20   want to say that negotiations should reflect what actually

21   the agreements came to be because they don't.  The critical

22   portions of these agreements, the representations, they are

23   in all of them.  They were there from the beginning.  They

24   were a key part of this deal from our clients' perspective

25   and a key inducement for them to agree to put their credit

at risk.  There is volumes of these e-mails, Judge.  For
Mr. Walsh to say that he'd never read these contracts is
just not credible.

Mr. Walsh also argues that he didn't make the
recommendations on behalf of himself or Project Spokane.
Well, we're not arguing a contract case here, Judge.  We're
arguing equitable remedies.  Mr. Walsh made the
representations, he signed the documents, period.

As to Project Spokane, inseparable.  Energy Keepers has
made that argument quite cogently.  I won't try to repeat
it.

If not, an agency relationship can also lead to
equitable remedies and even a fraud remedy.  Clearly Walsh
is Project Spokane's agent.  If not an actual agent, sole
member and then certainly an ostensible agent, he at least
negligently allowed our clients to believe that and they
did.

And then finally Project Spokane, for itself, it
ratified these agreements.  Later in time Project Spokane
wanted additional collateral.  It took Bonner Property
Development's lease as additional collateral.  That lease,
as amended, references the Credit Enhancement Agreement
which provides for the first position lien.  That references
the security agreement that shows that everything purchased
with Bank of Montana assets would be subject to that first

priority lien.  For him to claim that he didn't know about it, Judge, strains credibility.  And also Project Spokane adopted that.  They ratified it when they entered into that arrangement.

10:09:47      I want to spend just a minute talking about irreparable harm.  With respect to the fixtures there is no doubt there would be irreparable harm.  Removing these 400-plus fans, gigantic fans, from the roof of this gigantic building would leave that building unrentable for months.  That's

10:10:07 irreparable harm.  And I'm not sure that there is much dispute about that now.

The other personal property, the same thing.  If it's electrical property, if it's affixed to the property, that causes irreparable harm because the building is functionally

10:10:21 destroyed if it's removed.

Now, the real action here, I think--I won't speak for Mr. Patten, but I think the fixtures issue has been set aside, the other personal property.

The real action here is these servers, right?  And,

10:10:34 again, we concede that we abandoned our claim to the 10,000 other older servers.  It's the S17 Plus servers that were purchased with Bank of Montana loan proceeds that we're concerned about.  Well, we argue and believe we have established a first position security interest in those

10:10:52 servers based on the facts.

1        Alternatively, we believe, in equity, Project Spokane

2   and Sean Walsh, inseparable, are estopped from claiming a

3   first position--lien position.  UCC filings aside, equitable

4   principles are specifically incorporated into the UCC for

10:11:09   5   precisely these circumstances.

6        In terms of an irreparable injury, the defendants don't

7   actually really argue that there is not an irreparable

8   injury.  We would be losing a valuable lien right, a

9   property right.  Everybody agreed that these servers, as it

10:11:25   10   turned out, would be collateral that Bonner Property

11   Development could use if everything went south to satisfy

12   the Bank of Montana loan.  Well, everything went south and

13   now they have nothing if this sale with respect to the

14   servers is allowed to go forward.  That's an irreparable

10:11:42   15   injury.  A lien in property as collateral is irreparable.

16   Monetary damages can't satisfy that.

17        And they haven't really argued against that, but what

18   they have said is if the Court does grant injunctive relief

19   as they have requested, that there should be a bond imposed.

10:11:57   20        Well, number one, there should be no bond with respect

21   to the fixtures or the fixture-like property.  It's our

22   property, not theirs.  It shouldn't be sold, period.  There

23   is no chance that the defendants would have damages with

24   respect to that.  There should be no bond.

10:12:10   25        So let's talk about a bond with respect to the servers.

1    The Court is correct.  Those servers have a diminishing life

2    capacity.  We don't deny that.  But we do dispute how much

3    of a diminished life capacity that they have.  We have

4    submitted with our materials expert testimony about that

10:12:31    5    issue.

6        Number one--well, I should step back.  One, Mr. Walsh

7    argues that he could put these servers to work and they

8    would generate gross revenue.  He puts that in his

9    Declaration.  Well, gross revenue they might generate,

10:12:48   10    Judge, but not net revenue.  That is highly doubtful and

11   indeed quite speculative, because you have to keep in mind

12   that that's exactly what they were doing out in Bonner three

13   months ago.  HyperBlock was operating.  It wasn't making a

14   profit.  Couldn't pay its energy bills.  Ceased operations.

10:13:05   15   Its parent went bankrupt, and now everybody agrees that

16   HyperBlock has no assets to pay any of its bills.  Well, to

17   say that Mr. Walsh could go and re-create that situation is

18   speculative at best.  It also ignores that there would be no

19   place for those servers.  The lease is terminated.  It's

10:13:23   20   over.  HyperBlock hasn't paid its rent.  The incredible

21   energy cost, his argument in that regard doesn't account for

22   that either.

23        So we encourage the Court to disregard that part of

24   their argument altogether.  It's too speculative to base an

10:13:37   25   adequate ruling on.

```
 1              THE COURT:  Okay, now--

 2              MR. ERICKSON:  Now, Judge, there is the issue--

 3              THE COURT:  You are getting close to running out of

 4     time.  So tell me, can the cases be consolidated for trial?

 5              MR. ERICKSON:  Yes, Judge.

 6              THE COURT:  And how quickly would you be prepared to

 7     try the case?

 8              MR. ERICKSON:  I'm familiar with the Court's desire

 9     for expediency and I think six months is adequate.  I'm not

10     going to say it wouldn't be a struggle, but we're up to the

11     task.

12              THE COURT:  Okay.  Anything else you want to argue?

13              MR. ERICKSON:  No, Judge, thank you.

14              THE COURT:  All right.  Mr. Patten.

15              MR. PATTEN:  The fundamental purpose of what

16     Mr. Nelson and the other plaintiffs are trying to do is to

17     change the terms of a contract and make parties to a

18     contract who weren't made parties before.  There is only one

19     document that provides that Mr. Nelson is to have a first

20     lien and that is the Credit Enhancement Agreement.  And

21     while there were multiple iterations of the parties'

22     agreements, they were done in the form--and these would be

23     from Mr. Nelson's exhibits.  They were done in the form of

24     periodic amendments to agreements.  So they take an original

25     set of a lease and other agreements and then they start
```

10:13:52
10:14:08
10:14:25
10:15:04
10:15:35

1    modifying them through a single document.

2         The Credit Enhancement Agreement is dated sometime in

3    December of 2018.  It was modified again a year later in

4    2019--at the end of the year 2019.

10:16:01    5         But what I want to do is talk about what the agreements

6    require and what the crux is.

7         Article--or Paragraph 1.2 of the Credit Enhancement

8    Agreement requires that HyperBlock, LLC is to grant a first

9    position lien to Mr. Nelson or Bonner Property Development.

10:16:42   10    The Credit Enhancement Agreement does not require Mr. Walsh

11   or Project Spokane to do anything.  They are not parties to

12   that agreement.  And fundamentally what the plaintiffs are

13   presenting to this court is that they want to change the

14   agreement and make Mr. Walsh and Project Spokane explicit

10:17:09   15   parties to the agreement, and they do that only after the

16   business fails and they want to change the agreement.

17        Effectively what they are asking the Court to do is to

18   reform the Credit Enhancement Agreement to include Mr. Walsh

19   and Project Spokane as parties to it.  If you look at the

10:17:33   20   various agreements, Your Honor, and the modifications, there

21   were sophisticated parties that were preparing that.  Bonner

22   Property Development had a sophisticated attorney.

23   HyperBlock, LLC had a sophisticated attorney, and the

24   documents reflect that.

10:17:58   25        Mr. Walsh and Project Spokane were not parties to the

contract.  They did not have attorneys because they didn't

need one because they weren't parties to the contract.

All of the transaction documents that were signed by

Mr. Walsh were signed in his capacity as the CEO of

HyperBlock, Inc.  They were not signed individually but only

in a representative capacity.  Neither Walsh nor Project

Spokane were requested to execute any documents in

connection with the Credit Enhancement Agreement or anything

else at the time these transactions and various documents

were signed.

THE COURT:  What about HyperBlock, LLC?  You are

talking about HyperBlock, Inc., but they are in bankruptcy

in Canada.

MR. PATTEN:  Correct.  And if I said Inc., I

misspoke.

THE COURT:  Okay.

MR. PATTEN:  HyperBlock, LLC.  You asked

Mr. Erickson a question about why didn't they get a

guarantee from Mr. Walsh.  Well, they could have.  They

didn't ask him.  If they would have asked him, I don't know

what he would have said but the question never came up.  The

issue never came up.  Similarly, they never asked or

required Mr. Walsh or Project Spokane to take the steps

necessary in order for Bonner Property Development to have a

first lien on the servers.  That would require a

1    subordination agreement, would require that Walsh and

2    Project Spokane affirmatively subordinate their liens that

3    are otherwise going to be senior liens to the lien of

4    Bonneville--I keep saying Bonneville--Bonner Property

10:20:05    5    Development.  They didn't do that.  They had sophisticated

6    attorneys.  Nobody said anything about it.  Nobody asked him

7    to do it.

8        It's undisputed that the Project Spokane and the Walsh

9    liens are senior by reason of the filing financing

10:20:22    10    statements with the Delaware Secretary of State.  It's

11    undisputed that prior to the--at least the assignment--or,

12    excuse me, the Credit Enhancement Agreement Project

13    Spokane's lien was of record through its financing

14    statement.  And in 2000--in December of 2019 when the

10:20:56    15    agreements were all modified to provide for the purchase of

16    servers rather than the purchase of transformers and such

17    on-site improvements, at that point in time Mr. Walsh's lien

18    was of record.  Nobody--nobody said anything about it.

19    Nobody asked him to do anything about it.  And it's

10:21:21    20    undisputed that Bonner Property Development didn't even file

21    a financing statement until about a month ago.

22        So what's happened is, Bonner Property Development has a

23    contract that it didn't think all the way through and didn't

24    include all of the necessary steps in order to provide that

10:21:53    25    it would, in fact, have a first lien on these 1,493 servers

1   purchased with the Bank of Montana loan.  And they are now

2   trying to fix that mistake by saying, oh, now, Mr. Walsh and

3   Project Spokane have to do something that they didn't agree

4   to do and that nobody asked them to do and effectively make

10:22:18   5   them a party to this contract when they are not parties to

6   the contract.

7       Getting to the likelihood of success on the merits, Your

8   Honor--

9       THE COURT:  Before you go there, do you agree with

10:22:40   10   Mr. Erickson that the Uniform Commercial Code does have and

11   incorporate some equity principles?

12       MR. PATTEN:  It allows--it has language that it

13   doesn't affect equitable principles unless it's contrary to

14   the terms of the Uniform Commercial Code.

10:23:07   15       THE COURT:  Is that a yes or a no?

16       MR. PATTEN:  Well, it's both, Your Honor; because I

17   think the question is, do equity principles override the

18   lien priorities of the code, and I don't think they do.  The

19   lien priorities are the lien priorities.  Article 9 is a

10:23:32   20   race.  It's a race to the Secretary of State's office and

21   whoever gets there first wins.  And in this case Project

22   Spokane won and Mr. Walsh came in second and now Bonner

23   Property Development comes in third.  And I don't think that

24   they can use equitable concepts to upset the lien priority

10:23:58   25   that is specifically laid out in Article 9.

1        The problematic issue I think here for--for the

2    defendants is while Mr. Walsh's signature appears on the

3    various documents, it's his testimony that he didn't read

4    them.  He just had his assistant use his electronic digital

10:24:35    5    signature to sign them.  Mr. Erickson says that's not

6    credible.  But as CEO, Mr. Walsh has a lot of ground that he

7    has to cover, and he assigned the project, the transaction,

8    to a management team and they did it, and so he didn't have

9    knowledge of the provision in the Credit Enhancement

10:25:12   10    Agreement, which is the only place in all of the documents

11    that talks about a first lien position.  He was unaware that

12    that Credit Enhancement Agreement would require him to

13    subordinate and Project Spokane to subordinate their senior

14    liens.

10:25:33   15        THE COURT:  So what difference does it make if

16    that's what the agreement says?  That's sort of flipping

17    your argument about the plaintiffs on its head, isn't it?

18    You are arguing the same thing.  Well, that may be what the

19    contract says but that isn't really--we want to have some

10:25:51   20    other modification of that agreement.

21        MR. PATTEN:  Not at all, Your Honor, because it's

22    Mr. Walsh who--if HyperBlock, LLC wants to grant a senior

23    lien to Bonner Property Development and Bonner Property

24    Development wants to have a senior lien, then there's a way

10:26:17   25    to do that and it's not--and nobody did it.

And so while--while HyperBlock, LLC can say, yeah, you can have a senior lien, Walsh didn't know that and he wasn't a party individually to the contract.  And so the lack of knowledge means he didn't agree to it as an individual.  And while knowledge of what's in the contract may be imputed to him as the signator of the Credit Enhancement Agreement, that was imputed to him as HyperBlock, LLC and doesn't change the fact that he wasn't aware of that language in the Credit Enhancement Agreement.

And so if he was not aware of that language in the Credit Enhancement Agreement, then he can't have--he wasn't the promissor.  The promissor was HyperBlock, LLC.  So there is no promissory estoppel.  He didn't have actual knowledge of it and so there can't be equitable estoppel.  There can't be fraud because he didn't make the promise.  He didn't make the representation.

And in terms of the unjust enrichment and I think the notion--I sense the notion bothers the Court, but there are times when people don't get paid and there's not an equitable remedy for every time somebody doesn't get paid. There are times when the law requires a certain result that perhaps is unfair, but it's still the law.  And here the law is that the first guy to the Secretary of State's office wins.  And we ask the Court to impose that law on the arguments of Bonner Property Development.  And I think that

all shows that they don't have a likelihood of success on the merits.

In terms of the irreparable injury, and maybe this is confusing and perhaps I'm confused, but it seems to me that if they are trying to enjoin Mr. Walsh and Project Spokane from realizing on their collateral through a disposition sale, then the question is not whether it's going to leave HyperBlock insolvent but whether somehow Mr. Walsh and Project Spokane are going to be insolvent.  Because if they use their debt to them to credit bid as Mr. Erickson described, they will own the assets and they would have acquired the assets in accordance with the terms of the Uniform Commercial Code.  And so then the question is, are they going to be insolvent so that if they convince this court that, in fact, Mr. Walsh and Project Spokane should be liable for the claim of a first lien through these equitable arguments that they raise, then will they have an inadequate remedy by having a money judgment against Mr. Walsh and Project Spokane.  And, again, there is no evidence that Mr. Walsh or Project Spokane won't be in a position to stand behind and make up on a monetary judgment.

THE COURT:  So I'm not entirely clear on the argument about credit.  They can sell it for some sort of credit.  So you could get a straw person to issue a credit, say we'll give you $10 million for those computers and give

1   a note.  And then the note liberates the physical property

2   so that Mr. Walsh and Spokane--Project Spokane then have the

3   physical asset they could turn around and sell.  In the

4   meantime the credit note can be worthless.

10:31:36   5        MR. PATTEN:  I don't think that's correct, Your

6   Honor.  So the notion is a credit bid.  So if--if a secured

7   creditor is owed $2 million and there's a disposition sale

8   of the collateral, then that secured creditor who's owed

9   $2 million can say I will bid up to $2 million for the--to

10:32:02   10   acquire the collateral at a disposition sale and the amount

11   of the credit bid just reduces what is owed to me.

12        So if--

13        THE COURT:  Give it to me here in terms of Mr. Walsh

14   and the security interest that he claims and has perfected

10:32:22   15   in Delaware.  What happens?

16        MR. PATTEN:  So--so, Your Honor, if Project Spokane

17   credit bids its $5 million, Canadian dollar, whatever that

18   converts to in U.S. dollars, and says I'll bid $5 million

19   for all of these assets and nobody outbids him, then Project

10:32:46   20   Spokane can--will own the assets for five million bucks.

21   And at that point HyperBlock's debt to--HyperBlock, LLC's

22   debt to Project Spokane would be satisfied.

23        THE COURT:  But is there money that's exchanged?

24        MR. PATTEN:  No, because--

10:33:05   25        THE COURT:  I'm just going to cut--you owe me five

1  million and I'll cut it back to 500,000 and I take the

2  secured property.

3      MR. PATTEN:  Yes.

4      THE COURT:  So it could be a situation there is

10:33:22  5  never any money exchanged, but the asset could end up in

6  Mr. Walsh and Project Spokane's control and then they could

7  turn around and either use those assets someplace else or

8  sell them on the open market or whatever the Bitcoin market

9  might support.  Am I right?

10:33:44  10      MR. PATTEN:  I think you are right, Your Honor.

11  That's explicitly allowed in the Uniform Commercial Code.

12      THE COURT:  I'm not arguing the law.  I'm trying to

13  understand the law.

14      MR. PATTEN:  Okay, sorry.  But it's not an

10:34:01  15  infrequent result in a disposition sale.

16      THE COURT:  Well, you are the one who deals with

17  that all the time.

18    So I don't know if you have anything else you want to

19  argue.  You are about out of time.

10:34:13  20    But what about consolidating the cases for trial?  Any

21  problem with that?  It seems like it's all the same thing,

22  just different claims.

23      MR. PATTEN:  Well, the concern I would have about

24  that, Your Honor, is if it remains as a jury trial, it may

10:34:32  25  be unduly confusing to the jury as to who's who and which

1     claim is which.

2               THE COURT:  I don't think so.

3               MR. PATTEN:  You would know better than I, Your

4     Honor.

10:34:44   5     THE COURT:  Well, I mean, we have had a lot of

6     complicated cases and I, believe it or not, have a lot of

7     faith in juries.  I think if you guys do your jobs in terms

8     of preparing clear proposed instructions and I do my job by

9     making sure they understand what's going on, I think they

10:35:03  10    can keep these claims separate.  It may be a different

11    question about if there ever was a judgment, then what.  But

12    that's something we would have to deal with.

13        How much time would it take?  I mean, I've heard six

14    months.  I've suggested four months.  And I think you said

10:35:21  15    that would be a little tight.  Six months?

16              MR. PATTEN:  Well, Your Honor, we've got a small

17    shop.

18              THE COURT:  When I worked for Judge Battin, one of

19    the lawyers at Crowley was in the Montana Legislature.  This

10:35:41  20    is years ago.  And every other year when the Legislature

21    met, that lawyer would come over and say he needed to

22    continue all of his cases.  I think Crowley was 11 lawyers

23    at the time.  And Judge Battin finally had it up to here and

24    called Cale over and said, Cale, you've got to do one of two

10:36:09  25    things:  Either hire more lawyers or stop taking the work.

1    And they hired more lawyers, as you know.

2         MR. PATTEN:  I appreciate that, Your Honor.  I think

3    six months is the earliest that we could do it.

4         THE COURT:  Okay.  So--and you already argued about

10:36:35    5    a bond.  You haven't suggested any--

6         MR. PATTEN:  Well, I think if--and the other point

7    that I want to bring up is I think the plaintiffs misread

8    Mr. Alters' affidavit that they filed as an attachment to

9    the reply brief.  Because as I read Mr. Alter's affidavit,

10:36:54    10    it says what the current value of the computers are.  Not

11    what the diminution amount would be but what the current

12    value is.

13        And I think if the--and he has a six-month amount of

14    what they will be worth--what they are worth today and what

10:37:16    15    they will be worth in six months, and it's 3 or $400,000,

16    I'm saying off the top of my head but it's calculable from

17    his declaration.  I think the bond ought to be at least that

18    amount.  And, frankly, the bond ought to be what the servers

19    could earn in addition to that over that particular time

10:37:43    20    period.

21        THE COURT:  So I think I'm hearing, but I might be

22    inferring something that you are not comfortable with.  What

23    property is it Mr. Walsh and --

24        MR. PATTEN:  Project Spokane?

10:38:07    25        THE COURT:  -- Project Spokane want to sell?

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | MR. PATTEN:  They want to sell everything.                   |
|       | 2  | THE COURT:  Well, the real property?                         |
|       | 3  | MR. PATTEN:  No, no.  But they want to sell all of           |
|       | 4  | the servers.                                                 |
| 10:38:17 | 5  | THE COURT:  Yeah.                                         |
|       | 6  | MR. PATTEN:  They want to sell all of the things             |
|       | 7  | that are not fixtures, which brings up another little        |
|       | 8  | complication where people I don't think were paying          |
|       | 9  | attention to what the law is.  But there is an agreement     |
| 10:38:28 | 10 | where certain items will be deemed fixtures.  Certain items |
|       | 11 | that are personal property and subject to the Article 9 will |
|       | 12 | be deemed fixtures and--                                     |
|       | 13 | THE COURT:  Is that the fans?                                |
|       | 14 | MR. PATTEN:  Well, I think the fans probably are             |
| 10:38:42 | 15 | fixtures because you remove the fans, you've got big holes  |
|       | 16 | in the ceiling.  But there are some electrical components    |
|       | 17 | that are just sitting on or bolted to a concrete pad that    |
|       | 18 | can be unbolted and removed without causing any damage to    |
|       | 19 | the property itself.                                         |
| 10:38:55 | 20 | THE COURT:  How about the 150 feet--or 150,000 feet        |
|       | 21 | of wire that I saw?  It's 150,000 feet of 10-gauge wire.     |
|       | 22 | MR. PATTEN:  I would say this, Your Honor; that if           |
|       | 23 | it requires making a hole in the building to remove the      |
|       | 24 | wires, then it's a fixture.  If it's sitting on a            |
| 10:39:22 | 25 | conduit--in a conduit that is screwed to the floor and can  |

1   be unscrewed, then it's not a fixture.

2   　　　　　THE COURT:  How about the 5,000-kilovolt substations

3   and their switching gear?

4   　　　　　MR. PATTEN:  I think those--those, I understand, are

10:39:40   5   just sitting on and may be bolted to a cement pad, so they

6   can be removed and they are not fixtures.

7   　　　　　THE COURT:  And the 500-kilovolt transformers?

8   　　　　　MR. PATTEN:  Same.

9   　　　　　THE COURT:  Okay.  Anything else?

10:39:58   10   　　　　　MR. PATTEN:  No, Your Honor.  Thank you.

11   　　　　　THE COURT:  All right.  Well, thank you for the

12   argument and the relatively expeditious briefing.  I'll get

13   something out either today or tomorrow.

14   　　　　　Now, having said that, it seems to me like this is ripe

10:40:21   15   for early intervention to try and get the thing resolved.  I

16   am going to refer the matter to Judge DeSoto to conduct a

17   settlement conference, because the value of those computers,

18   regardless of what I do, they are going to take a hit and if

19   they take a hit, whomever is correct is going to take a hit.

10:40:55   20   So I don't know about Mr. Walsh being in Puerto Rico.  My

21   experience is that things work in person.  I don't know what

22   the travel limits are and all that sort of stuff.  So if you

23   have some issue with a settlement conference, tell me now so

24   we don't waste your time or everybody else's.

10:41:24   25   　　　　　MR. PATTEN:  I hate to make a commitment, Your

1   Honor, without talking to Mr. Walsh, but I'm a proponent of

2   some efforts.

3         THE COURT:  What I would do is refer it to Judge

4   DeSoto.  She would then contact you.  You would have time to

10:41:40   5   talk to Mr. Walsh and they would have time to talk to their

6   clients, and then she would make the preliminary inquiry,

7   are we wasting our time if I have a settlement conference?

8   And if the answer is yes, then there won't be a settlement

9   conference, but there will be an early trial date.  As I

10:42:03   10   indicated, I probably wouldn't be very amenable to a request

11   for continuances of anything.  In the event that there ever

12   was a request for a continuance, I would have to require--I

13   would require that the client be here when we talk about a

14   continuance so that it's not, well, the Court's too busy and

10:42:28   15   the Court's continuing this.  It will be somebody asking and

16   probably not getting a continuance.  So I think it's

17   important.  And the bond issue I'll have to consider.

18         MR. PATTEN:  Your Honor, there is one little issue.

19   So we have six exhibits attached to our briefs--or our brief

10:42:56   20   on the Nelson case.  I don't think there is any dispute with

21   Mr. Erickson or his clients about the admission of those

22   exhibits.

23         THE COURT:  Mr. Erickson, is there?

24         MR. ERICKSON:  That's correct, Judge, and we've

10:43:09   25   also--

1          THE COURT:  Okay, that's what I understood earlier.

2     All right, thank you, counsel.  And we will be in

3     recess.  You will hear from me either this afternoon or

4     tomorrow.

10:43:21    5          (Whereupon, court was in recess at 10:43 a.m.)

1                    C E R T I F I C A T E

2      STATE OF MONTANA      )
                             )  ss.
3      COUNTY OF MISSOULA    )

4              I, Julie M. Lake, RDR, CRR, CSR, Freelance Court
       Reporter for the State of Montana, residing in Missoula,
5      Montana, do hereby certify:

6              That I was duly authorized to and did report the
       proceedings in the above-entitled cause;

7
               I further certify that the foregoing pages of this
8      transcript represent a true and accurate transcription of my
       stenotype notes.
9
               IN WITNESS WHEREOF, I have hereunto set my hand on
10     this the 6th day of July, 2020.

11

12

               *Julie M Lake*_____
13             Julie M. Lake, RDR, CRR, CSR
               Freelance Court Reporter
14             State of Montana, residing in
               Missoula, Montana.

15

16

17

18

19

20

21

22

23

24

25